# Attachment C

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


UNITED STATES OF AMERICA,        *    CRIMINAL ACTION
                                 *
        PLAINTIFF,               *    CR-C-02-216(1)
                                 *
VS.                              *
                                 *    CORPUS CHRISTI, TEXAS
ALFRED BOURGEOIS,                *    SEPTEMBER 24, 2010
                                 *    8:26 A.M.
        DEFENDANT.               *
                                 *
* * * * * * * * * * * * * * * * *


     PARTIAL TRANSCRIPT OF EVIDENTIARY HEARING – DAY 5
   (TESTIMONY OF JERRILYN CONWAY PREVIOUSLY TRANSCRIBED)

         BEFORE THE HONORABLE JANIS GRAHAM JACK
              UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:        MS. PATTI HUBERT BOOTH
                           MS. ELSA SALINAS
                           OFFICE OF THE U.S. ATTORNEY
                           800 NORTH SHORELINE, SUITE 500
                           CORPUS CHRISTI, TEXAS 78401

                           MR. TONY R. ROBERTS
                           MR. MARK MICHAEL DOWD
                           OFFICE OF THE U.S. ATTORNEY
                           P. O. BOX 61129
                           HOUSTON, TEXAS 77208

(APPEARANCES CONTINUED ON PAGE 2)

COURT RECORDER:            MS. VELMA GANO


     PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
       TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
            MOLLY CARTER, P. O. BOX 270203
        CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

USCA5 4171

APPEARANCES:  (CONTINUED)


FOR THE DEFENDANT:          MR. VICTOR JULIO ABREU
                           MR. MICHAEL WISEMAN
                           MS. ELIZABETH A. LARIN
                           OFFICE OF THE FEDERAL PUBLIC DEFENDER
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 545
                           PHILADELPHIA, PENNSYLVANIA 19106

                           MR. JAMES McHUGH
                           FEDERAL COMMUNITY DEFENDER OFFICE
                           FOR THE EASTERN DISTRICT OF
                           PENNSYLVANIA
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 540
                           PHILADELPHIA, PENNSYLVANIA 19106

USCA5 4172

(The proceedings began at 8:26 a.m.)

(Call to Order of the Court.)

THE COURT:  Are you all ready to begin?

MR. WISEMAN:  Yes, Your Honor.

MR. ROBERTS:  Your Honor, we have one bit of administrative.

THE COURT:  Okay.

MR. ROBERTS:  Matter.  The United States has decided that we're not going to call Dr. Oliver.  We don't believe there's any evidence with regard to enhancements to rebut.  And so we would like to release Dr. Oliver.

THE COURT:  Mr. Wiseman?

MR. McHUGH:  Well, Your Honor, we had, through Dr. Bowers, we had attempted to put in expert testimony concerning the photo imaging enhancements, digitization and enhancements, and that was denied.  We were going to call Manfred Shenk in our case, but in an attempt to streamline, we were going to use Dr. Bowers.  So at this point, I guess we're left to supplement with Manfred Shenk, who was on our original witness list.  At that point, I believe the Government would be calling Dr. Bowers.  But I thought that we had talked about doing it by way of deposition.  So --

THE COURT:  Doing what?

MR. McHUGH:  Doing each witness by way of -- supplementing by November 15th.

USCA5 4173

THE COURT: No, I was talking about those, the people in Louisiana, the --

MS. BOOTH: The lay witnesses, Your Honor?

THE COURT: The lay witnesses.

MR. McHUGH: Well, then we would be asking then to cross-examine Dr. Oliver. I mean, that would be our --

THE COURT: Well, he's not going to be here. Did you have him under subpoena?

MR. McHUGH: We don't. He was on the Government's witness list, and that was what we relied upon. But again --

THE COURT: But you did your case in chief already. It's done.

MR. McHUGH: I understand that, Your Honor. But pursuant to the Court's order, I believe, back in the April conference, was to streamline. And so we went with Dr. Bowers, who in his report had given a critique as to the photo enhancements. Then when we called -- and we thought we would use him. And then during his examination, I was going to have him say he relied on Cherry Biometrics with this Manfred Shenk's report, and move that in by that way, which I thought we were in compliance with the Court's order.

But when the Court didn't have him found as an expert, qualified as an expert --

THE COURT: The Photo Shop guy?

MR. McHUGH: Dr. Bowers.

USCA5 4174

THE COURT:  Yeah, the Photo Shop person.

MR. McHUGH:  But he had published in the Journal of Forensic Science on digital imaging, just not enhancement.  He had written a book on enhancement.  And so half of what Dr. Oliver is going to testify is digital imaging.  The second half is enhancement.  And so that was our intent was to streamline, as I thought it was in compliance with Your Honor's order, which was have him cite to --

THE COURT:  No, you were going to have the Photo Shop guy be the expert on digital enhancing.

MR. McHUGH:  And in his report, he did do that.  And I was going to, rather than call Mr. Shenk, have him say he reviewed Mr. Shenk's report, which is Cherry Biometrics, and have that moved in.  But obviously when that didn't go through with him being qualified as an expert, I didn't do that.  And then I thought, well --

THE COURT:  Well, do you have another expert?

MR. McHUGH:  Manfred Shenk from Cherry Biometrics. But obviously, we didn't have him here because we thought we were going to proceed by way of having Dr. Bowers incorporate his report, which I thought was in compliance with the Court's order.

THE COURT:  So who did you want to leave?

MR. ROBERTS:  Your Honor, it was Dr. Oliver.  He's the -- he was the person who testified at trial about the

USCA5 4175

enhancements, and they've challenged him, but Dr. Bowers really didn't say anything that we thought we need to rebut, so we didn't -- we're not going to put him on.

MR. WISEMAN:  Your Honor --

MR. McHUGH:  He didn't say -- he did comment on the photos, first of all.  He said that he thought that the photos were not reliable, as a layperson, because of obviously the Court's ruling.  But again, what I would express to the Court was it was Dr. Bowers in his report, in compliance with Rule 26, did comment on the enhancements and the imaging and the fact of Cherry Biometrics.  So we were going to try and streamline by using just Dr. Bowers and move in Cherry Biometrics' report, which is Manfred Shenk.  We didn't get that far because of the fact that Dr. Bowers was objected to as far as his expertise.  So that would be an issue that we would be asking just to supplement instead of bringing Manfred Shenk concerning the enhancements.

THE COURT:  The digital enhancements?

MR. McHUGH:  Yes, that Dr. Bowers was not able --

THE COURT:  Now, which digital enhancements are you talking about?

MR. McHUGH:  There's autopsy photos and the bite mark photos.  It's all done by Dr. Oliver.  They were all done by Dr. Oliver.  And we were going to have Dr. Bowers not only talk about forensic --

USCA5 4176

THE COURT:  Okay.  Wait a minute.  Dr. Bowers was a psychologist?

MR. McHUGH:  Forensic odontologist.  But he also has published in the area of digital imaging and Journal of Forensic Science and has a book published in enhancements.  So Dr. Oliver's testimony covers two things, digital enhancements -- I'm sorry -- digital compression and then enhancements.  And Dr. Bowers was not permitted to testify as to either.

THE COURT:  Well, why don't you find somebody that is an expert in that and just do -- I'll allow you to supplement with a deposition.

MR. McHUGH:  And that's what I -- we have him.  It's Cherry Biometrics, Manfred Shenk.  And that's what we would ask the Court to be -- leave to do.  And we will do that.

MR. ROBERTS:  Your Honor, I guess the point is that they had an opportunity to put their case on.  They rested.  They had a chance.  They could have requested that even before they rested, but they didn't.

THE COURT:  Okay.  I'm not going to hold them to -- I understand that.  I'm not going to hold them to technicalities when it's this kind of a case.  So I'm going to let him supplement.  Again, the rules of the deposition are -- I'm not paying, I'm not going to authorize payment for anybody to fly anywhere.  Put them in a video conference room.  You all appear

USCA5 4177

by however it is you appear and depose them that way.  Okay?

MR. ROBERTS:  Your Honor, if I may, that puts us in a particular difficult situation, because we would bring Dr. Oliver in to respond to what their case is.

THE COURT:  Depose him.

MR. ROBERTS:  So, and we have Dr. Oliver here now, but then obviously we have to wait to see what they say and so --

THE COURT:  Okay.  I agree with you.  Do them both.  But just do all that by November 15th.

MR. ROBERTS:  Your Honor, as far as other evidence or the other depositions --

THE COURT:  And I agree with you 100 percent, Mr. Roberts.  If this were a normal civil case, I would just say, "It's over, forget about it."  But obviously there's more at stake than money damages or something like that.

MR. ROBERTS:  Ms. Booth would like to ask you about the clarification of the rest of the witnesses before this November 15th --

THE COURT:  Yes.

MS. BOOTH:  Yes, Your Honor.  The way we understand your ruling is that -- and I would like to have a name, because you see, it looks like they're getting a lot of do-overs here.  And so I want to know --

THE COURT:  They are.

USCA5 4178

MS. BOOTH:  Yeah.  I want to know.  This is like the fourth do-over from the beginning.

THE COURT:  And that's correct.

MS. BOOTH:  I'd like to know exactly who it is that they're going to call from Louisiana.

THE COURT:  Who are you going to call?  What witness?

MS. BOOTH:  Exactly the names.

MR. WISEMAN:  Yes, Your Honor, I'm not prepared at this moment to give you the precise names.  We'll give it to you by the end of the day, if that's acceptable.

THE COURT:  That's good.  By the end of the day is fine.

MS. BOOTH:  Well, what the problem is, Your Honor, is that we're the Respondents.  I mean, we're only addressing what they put before the Court.  And there have been many issues that they've -- and I'm not going to point them out.

THE COURT:  No, I got it.  We're moving --

MS. BOOTH:  So we don't want to be caught in a -- I'm not going to say any more.

THE COURT:  With your scarf down.

MS. BOOTH:  Pardon?  Number two, Lloyd Ferdinand that we have on our witness list, we will not be calling Mr. Ferdinand.  Number two --

THE COURT:  Can you get him an earlier flight out?

MS. BOOTH:  We're doing the best we can, Judge.

USCA5 4179

We're working with the Marshals.  We will not be calling Douglas Tenore.  We don't believe that that's necessary.  Or Angela Lockett-Sampson.  She was a custodian that we didn't need.

THE COURT:  Okay.  You know what, I want the name by 11:00 o'clock.

MR. WISEMAN:  Yes, Your Honor.

THE COURT:  Because then they have to decide whether they want Dr. Oliver here or not.

MR. WISEMAN:  Yes, ma'am.

MS. BOOTH:  And we have to decide what it is we -- we know what we need to respond to as far as what's been on put on by the Defense.

THE COURT:  Okay.  Look, if you all want to call Dr. Oliver, call Dr. Oliver, and then you can avoid the depositions.  Right?

MR. McHUGH:  Your Honor, we know the name.  It's Manfred Shenk, from Cherry Biometrics.  He was on our original list.  And that's who we'd be deposing.  And we have no objection --

THE COURT:  Well, why didn't you have him here?

MR. McHUGH:  As I had indicated --

THE COURT:  The streamlined doesn't make any sense. Why didn't you have him here?

MR. McHUGH:  Because Dr. Bowers, in his report,

USCA5 4180

had --

THE COURT:  The Photo Shop guy, okay.

MR. McHUGH:  -- had reviewed Cherry Biometrics, had also given digital enhancement expert testimony, you know, in his report and had commented on all the photographs.

THE COURT:  Had he ever been qualified as an expert in digital enhancement?

MR. McHUGH:  Well, he had been --

THE COURT:  Ever?  I'm just asking you, in any court.

MR. McHUGH:  I believe so.

THE COURT:  Where?

MR. McHUGH:  He said state court.  I didn't ask him what state court, but I asked him, has he ever been called as an expert to testify, and I listed all of them, including photo --

THE COURT:  Yeah, but not digital enhancement.  You asked him about the main thing he was testifying about.

MR. McHUGH:  I believe I did ask, and that's when I got the objection from the Government.  And so what my intention was with Dr. Bowers was to go into all of that and save the time of the Court and say that he relied on Cherry Biometrics' report, which he had done.  We didn't get that far. So Your Honor, at this time we would be wanting to call Manfred Shenk from Cherry Biometrics, and we would be happy to do it by way of deposition.  I don't think it's lengthy testimony.  And

USCA5 4181

obviously, I know the Government has an opportunity to rebut that with Dr. Oliver.

THE COURT:  Okay.  I want him in the next two weeks, you to depose him in the next two weeks, so they have a chance to respond.

MR. ROBERTS:  Your Honor, Dr. Oliver is not scheduled to leave until tomorrow morning.  If he is released, we could get him on a noon flight and actually --

THE COURT:  He's being released.

MR. ROBERTS:  He is released?  Okay.  Thank you, Your Honor.  And if we had, if they present something that we need to rebut, then we can do --

THE COURT:  Absolutely.

MR. ROBERTS:  Thank you, Your Honor.

MR. WISEMAN:  May I proceed, Your Honor?

THE COURT:  Yes.  Thank you.

MR. WISEMAN:  Your Honor, yesterday you asked us to provide the Court with an outline or some evidence as to when the mitigation specialists were advised of Mr. Bourgeois's childhood abuse.  We -- I won't represent that this is a complete accounting, but over the evening, we extracted several pages from Petitioner's Exhibit 61, which the Government has, and we've marked it as Petitioner's 61A.  And for the record, that would be Page 1 and 2, 24 through 28, 29, 30, 32.

MS. BOOTH:  And this is from which document?

USCA5 4182

MR. WISEMAN:  61.  36, 37, 38 and 39.  And all of these are memoranda or other documents that Mr. Bierbaum collected indicating childhood abuse from a variety of sources. And I would offer that up to the Court for the Court's consideration.  I'd offer it into evidence, I guess, is more properly it.

MR. DOWD:  And these are offered as the basis for Mr. Bierbaum's analysis, not for the truth of the matter?

MR. WISEMAN:  Well, I'm not sure, because the Judge asked us a question, and it's offered to respond to that question.

THE COURT:  What?

MR. WISEMAN:  You asked us to provide you with information relevant to when and where Mr. Bierbaum heard about the childhood abuse.  This document responds to that question, in part.  You know, so I don't know how the Court wants to consider it.  I'm simply trying to respond.

THE COURT:  Why don't you just tell me what you have.

MR. WISEMAN:  Yeah, it's there.  I mean, there's a number --

THE COURT:  Just tell me.

MR. WISEMAN:  Oh, I could read it.  I mean, it's --

MS. BOOTH:  It's -- he caught more whippings than the rest.

MR. WISEMAN:  Oh, I mean, that's one line from many

USCA5 4183

pages.

MS. BOOTH:  Yes.

MR. WISEMAN:  On January 9, 2004, prior Counsel, Jose Gonzalez-Falla --

THE COURT:  Falla.

MR. WISEMAN:  I'm sorry, Falla.  January 9th, 2004, he wrote to Mr. Bierbaum and he told him that he had a July 24th, 2002, phone call with Mr. Ferdinand, Lloyd Ferdinand, who said, quote, Alfred was abused as a child.  Mr. Ferdinand said his mother used a belt and an extension cord to discipline Alfred.  And so Mr. Bierbaum had that, and it's notable that Mr. Falla did that in 2002 in the summer, right away.

There's a memorandum of February 4th, 2004, from Mr. Bierbaum, an interview of Mr. Bourgeois, where he extensively outlines Mr. Bourgeois's reports of abuse.

MS. BOOTH:  Well, and I think it's important, that, Judge, you hear what abuse we're talking about.  It's not --

MR. WISEMAN:  Well, I could read the whole document if the Court wants me to.

THE COURT:  No, just tell me what abuse you're talking about.

MS. BOOTH:  Highlight it.

MR. WISEMAN:  Physical abuse.

THE COURT:  No, read what it says.

MR. WISEMAN:  Sure.  "Alfred" -- this is Mr. Bierbaum

USCA5 4184

reporting.  "Alfred got whipped with extension cords or belts, whatever other implement was handy."  He quotes Mr. Bourgeois, "Mom always beat me with my clothes off."

"Alfred thought his siblings didn't see very many of his beatings, but they could always hear the beatings if they were home.

"In addition to beatings, Eunice would slap Alfred when she was within reach.  She slapped him when picking his nose.  She cleaned his nose for cutting his hair.  Mom didn't slap the other siblings.

"Alfred recalled one instance where he was swinging in a swing, and mom was standing beside him.  Without any warning, quote, she back slapped me off the swing, closed quote.  I'm sorry, I couldn't figure out what I had done, closed quote.  Alfred had gone to the hospital to have doctors burn something inside my nose to stop his nose from bleeding over this incident.

"Alfred as a child was required to wear a bald head. Mom would shave his head whenever his hair got too long.  She made him wear a bald head constantly as a child.  Mom had long fingernails.  When Alfred was little, she would constantly pick his nose in a very aggressive manner.

"Alfred was singled out by -- singled out of the siblings for punishment, mistreatment.  Alfred alone of the siblings was never allowed to go anywhere.  Quote, I couldn't

USCA5 4185

go to the beach or anywhere.  If they got to go, I never did.

"Mom never bought Alfred any toys or new clothes or anything.  Quote, when I was with her, I didn't know what a toy was.  Mom just wouldn't buy me anything.

"Alfred thought his mom treated him like a girl regarding chores and household duties."

I'm going on to the next one.  There's more, but that will give the Court a flavor.  This is a interview of February 25th, 2004, Bierbaum, of Nicole Ferdinand.  This is Page 30 of the exhibits.

"Alfred's mom, the woman that raised Nicole, quote, treated him different than the rest of the children, closed quote.  Alfred told Nicole about the things that his mom did to him.  Nicole mentioned that Eunice used to beat him with an extension cord and tried to cut his fingers with a can knife.  Nicole believed Alfred when he told her about these things, because quote, I could just see the redness come in his eyes, you know."  And then she goes on to say, "Alfred, quote, been through a lot when he was coming up."

February 25th memorandum Gerald Bierbaum to Counsel, in a second interview with Claudia Williams, "Claudia told me that Alfred, quote, used to get the most whippings.  She, mom, really beat him a lot, closed quote.  He was one of the, quote, hard-headed ones, end quote, didn't listen a lot, so mom would whip him really good.

USCA5 4186

"Claudia was reluctant to talk about her mom, but she would admit that Alfred wasn't treated like the other siblings. Claudia said she never knew him to whip his kids.  He never whipped none of his kids like he got whipped."

Moving on to another February 26th, 2004, memo from Bierbaum to Counsel.  This is an interview of Alton Preston. "Alfred told Alton about his mom singling him out and not liking him because he looked like his dad, and his dad didn't stay around.  Alton did recall that Alfred was, quote, raised up by Ms. Mary.  Ms. Mary was the only woman that Alfred thought cared for him."

Let me see if there's anything else in here.  That's all from this exhibit, Your Honor.  Well, actually, there's one more.  March 3rd, 2004, again from Bierbaum to Counsel, and this is an interview of Harry, quote, Slick, closed quote, Bourgeois.  His statements regarding Eunice and Alfred.

"Alfred's mama didn't do shit for him.  All her kids raised they-self.  It was like he didn't have no mama.  She has half-ass retarded, close the quote.  Eunice, quote, didn't look out too close for none of them, closed quote.  She would party or run around, never seemed to mind the kids like a mom should. Whenever she was paying attention to Alfred or Lloyd, she was, quote, always trying to put a broomstick on his ass or something.

"Harry said he put his, quote, shoes on Alfred's feet

USCA5 4187

because his mama wouldn't give him shit.  Harry knew that Alfred went to live with Ms. Clayton about 700 to 1,000 yards from mom's home, because, quote, her mom -- her, (his mom) and Alfred could never make it, closed quote.  Mom constantly fussed and beat Alfred.  They couldn't get along at all. Quote, she never did him right.  Quote, Alfred was like a stray sheep going from place to place looking for someone to take care of him."

So, I mean, that's what we came up with overnight. There's more and --

THE COURT:  Thank you.

MR. WISEMAN:  Okay.  Is the Court going to accept the document or is --

THE COURT:  Well, I just accepted what you said.

MR. WISEMAN:  All right.

THE COURT:  That was, I thought that was easier.

MR. WISEMAN:  Okay.  That's fine.

THE COURT:  That's what you wanted me to hear anyway.

MR. WISEMAN:  Correct.

THE COURT:  Okay.

MR. WISEMAN:  Good morning, Dr. Price.

THE WITNESS:  Good morning.

MR. WISEMAN:  I have to catch my breath.  Oh, yes, Your Honor, we filed a motion over evening --

THE COURT:  Oh, I couldn't open it.  What did it say?

USCA5 4188

MR. WISEMAN:  I took so much time preparing it.

THE COURT:  I'm sorry.

MR. WISEMAN:  Your Honor, we have moved to strike a -- thank you, Mr. Roberts.  Your Honor, Mr. Roberts has been kind enough to give me a copy to hand up to the Court.

(PAUSE.)

THE COURT:  I thought you brought up with the cross-examination about the organic --

MR. WISEMAN:  Yes, and my application is limited to portions of his -- well first of all, it was the direct examination --

THE COURT:  You're the one who brought it up.

MR. WISEMAN:  No, no, it was the direct examination of Dr. Price --

THE COURT:  Okay.

MR. WISEMAN:  -- in which he commented on two tests and appeared to apply some norms that none of that was in his report.  He doesn't mention the word "brain damage."  There was nothing in his report about these norms.

THE COURT:  Okay.

MR. WISEMAN:  And I'm simply unprepared to confront him on those issues.  It's very complicated.  I don't even know what he's talking about.  And I would need to -- you know, our experts are long gone.  We tried to reach them last night, were unsuccessful.  And I think this is exactly a paradigmatic

USCA5 4189

example of what the rule is designed to prevent.  Our witnesses are gone, and he's giving an opinion I can't confront.  And again, it's limited to just those two areas, categories --

THE COURT:  Mr. Dowd?

MR. DOWD:  Your Honor, the -- obviously Counsel was aware that this was an issue.  His experts testified that Mr. Bourgeois suffered from organic brain damage, and they were relying on the psychological testing to do that.  So obviously this is not a surprise for the Defense.  That's the point of their case.  Dr. Price is merely critiquing their experts' claims about the basis and the reliability of their testimony.

Now, Dr. Price, a complaint is made that he didn't describe the norms that he used to critique that Dr. Gelbort's conclusions, but he's here for cross-examination, and he's already been cross-examined on that.  So I don't see any surprise to the Defense since it was part of their case in chief.

MR. WISEMAN:  Your Honor, I was dumbfounded, befuddled, completely surprised by that testimony.  The word "brain damage" does not appear in his report.  He doesn't discuss it.  He discusses his IQ.  He discusses his personality disorders.  He discusses adaptive deficits.  That's all he discusses.  Obviously, brain damage is an issue in this case, and had we been aware that he was going to critique those tests, we would have been prepared to confront him on it.  I am

USCA5 4190

not.  I can't ask him questions about it, because I don't know, I don't know what he's talking about.  I'm not an expert in that particular area.  Or I'm not expert, I should say, in that particular area.

So I am truly at a loss to confront this witness on those two discrete issues.  Now, if it gets --

THE COURT:  I don't know why, though, because you put on your own experts about it.

MR. WISEMAN:  But they didn't put on any testimony about norms.  They applied a different set of norms than the ones he's talking about, and it's a complicated --

THE COURT:  Well, just ask him about the norms.

MR. WISEMAN:  But I don't know what to ask him even.  I mean, I could say, "What norms did you apply?"  But then when he gives me an answer, I have no way to test that answer.  You know, I'd have to go to the books and the literature.  I'd have to see what he's talking about.

You know, I would think at a minimum, and I hate to go to the well too often here, but I think --

THE COURT:  One more deposition?

MR. WISEMAN:  Well, you know, on those two discrete issues at some point, I think, would be fair.  I can't imagine it would be very long, but I think that would be appropriate and by video.

THE COURT:  Okay.

USCA5 4191

MR. WISEMAN:  All right, thank you.

THE COURT:  Go ahead.

RANDALL PRICE, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

CROSS-EXAMINATION (Continued)

BY MR. WISEMAN:

Q.   Good morning again, Dr. Price.  I want to talk a little bit with you initially about borderline personality disorder. I'm going to try -- I'm not going to try.  I'm not going to intentionally repeat myself from yesterday.

You would agree that a borderline personality disorder is, manifests in instability in relationships and marked impulsivity?

A.   I would.

Q.   And the person with the borderline personality disorder is driven by a real or a perceived need to avoid abandonment?

A.   Yes.

Q.   And the origins of borderline is quite often because the person, him or herself was abandoned in childhood?

A.   Yes.

Q.   And that's what happened to Mr. Bourgeois?

A.   Yes.

Q.   It could also be caused by a trauma history like the one Mr. Bourgeois has.

A.   Yes.

Q.   And the impairments in the relationships typically cause a

USCA5 4192

fluctuation between idolization and demonization of the particular person with whom the subject's in relationship with.

A.    Yes.

Q.    And under stress, significant stress, those with a borderline personality disorder can compensate into dissociative states.  Do you agree with that?

A.    Yes, it's possible.

Q.    Okay.  And under that stress, they can also undergo psychotic episodes?

A.    Yes, it's possible.

Q.    And in fact, the concept of borderline, or the origins of the diagnosis were that it used to be considered borderline schizophrenic, hence the name borderline.

A.    I would have a different explanation for the word, the reason it's called a borderline.  But it does border on psychotic disorders, as well as other kinds of disorders.

Q.    Now, the Government brought in a number of lay witnesses, as I mentioned yesterday, that testified that they knew Mr. Bourgeois for years, and he never seemed to, you know, have that fluctuation.  He was always just a real gregarious, pleasant fellow.  You would agree that the rages and the dissociation and the psychosis that the DSM talks about with respect to borderline personality disorder are manifested in the relationships that the subject has with intimate people in his life?

USCA5 4193

A.    Yes.

Q.    Like wives?

A.    Yes.

Q.    Girlfriends?

A.    Yes.

Q.    Lovers?

A.    Yes.

Q.    Okay.  So it's not inconsistent with a borderline personality disorder that Mr. Bourgeois presented well to nonintimate people he knew.

A.    It is not inconsistent.

Q.    On your administration of the DSM structured interview, he responded to a number of questions in which he endorsed borderline questions.

A.    Yes.

Q.    All right.  So for example, you asked him, "Do you do -- do things seem strange to you when you're under stress?"  And he said, quote, Like a circus in my head, closed quote.  Would you consider that an endorsement of a borderline symptom?

A.    Yes.  I don't remember the word "circus."  Is that what you said?

Q.    Yeah, yes, "Like a circus in my head."  That's how I heard it.  I have to admit I had a hard time with the dialects and accents.  But that's how I made it out.  Does that have a dissociative flavor to it?

USCA5 4194

A.    I don't know.  It has a decompensation flavor to it, under stress.

Q.    Okay.  It's certainly on a continuum towards dissociation, wouldn't you agree?

A.    You know, I don't recall that comment.

Q.    Well, assume it's there.

A.    And it was that it's like a circus in his head?

Q.    "In my head," when he's under stress.

A.    I don't know that I would say that's an indication of a dissociation.  But it's an indication of disturbance in thinking under stress.

Q.    Okay.  And you would agree that it's on a continuum towards dissociation; may not be quite there, but it's heading in that direction?

A.    I don't know.  I wouldn't conceptualize it like that.

Q.    Okay.  You also endorsed that he has suffered black-outs under stress?

A.    Yes.

Q.    And is that consistent with dissociation?

A.    Yes.

Q.    Why don't you explain to the Court briefly what dissociation is.

A.    It's where the person is out of touch with reality.  They -- it's like they see themselves behaving, kind of looking down at themselves, they're not aware of their surroundings as

USCA5 4195

much as if they were in an intact mental state at the time.

Q.   And it's not psychosis.  Correct?

A.   No, it's not psychosis.

Q.   But it shares at least the feature of being out of touch with reality?

A.   Yes.

Q.   And he also endorsed the concept that he is paranoid while under stress.

A.   Yes.

Q.   But in that section, he denied suicidality or self-harm. Right?

A.   Yes.  As I recall, if you could direct me to the section --

Q.   Oh, okay.

A.   -- that you're talking about.

Q.   It should be in your data.  You know, I think I may have gotten it off the tape, but I -- Page 8 or 9 of your, let's see, of that instrument.

     Well, let's assume, for purposes of the question, that he said that to you in that section that's reflected on the tape. I mean, I don't have the reference right here.  If I'm wrong about that, Her Honor will certainly know that.

     I want to talk about the MMPI that was administered to him in 1985 when he applied for the Sheriff's Department job.  Do you recall that document?

USCA5 4196

A.    Yes, I do.

Q.    I'll put it up on the screen.  It's Petitioner's 58.  It's dated May 22nd, 1985.  And in fact, Mr. Bourgeois was administered an MMPI when he applied for that job.  Is that right?

A.    That's correct.

Q.    And an MMPI is probably the most long-standing and reliable of the paper and pencil personality tests?

A.    Yes, that's correct.

Q.    And it's over 500 questions?

A.    Yes.

Q.    And significantly, it contains, is it three or four validity scales?

A.    Well, there are now more than that.  At the time this was administered, there were at least three.  There were others that were used.  But there were three main ones, yes.

Q.    All right.  So the point being that the test is designed then and now to sort out people who are exaggerating symptoms?

A.    Yes.

Q.    And it's considered quite reliable in that respect?

A.    Yes, it is.

Q.    In fact, some people use it as a malingering tool, among other things.

A.    Well, it has validity scales that allow us to tell if the person is trying to look bad or look good.

USCA5 4197

Q.   Okay.

A.   And so it's used for that, as well as personality.

Q.   Okay.  And in regard to personality, it's got, I think -- I don't know what it had then, but somewhere in the neighborhood of nine or ten personality scales?

A.   Yes.

Q.   Hypochondriac, depressed, paranoid.  Right?

A.   There were nine primary clinical scales.

Q.   Okay.  And one of those clinical scales is, reflects sociopathic behavior.

A.   Um --

Q.   Scale 6.  Right?

A.   Actually it's Scale 4.

Q.   4?  Okay.  I'm sorry.

A.   But yes, there is one --

Q.   Okay.

A.   -- that does reflect that.

Q.   And you've seen the report of the administration of the MMPI that's contained in this document.  There's no indication that either Mr. Bourgeois malingered on this test?

A.   There is no indication that he malingered.  That's correct.

Q.   And there's no report that he presented at all elevated on the antisocial scale?

A.   Not in the interpretation that's given.  I didn't see

USCA5 4198

the --

Q.   The data?

A.   -- the actual test, but not in --

Q.   We don't have the data, so we're left with the report.  It does indicate moderate -- possible problems, I should say, in social facility, possible problems in overall adjustment, and possible problems in stress tolerance.  Correct?

A.   In his interpretation of the MMPI, it does reflect that, yes.

Q.   Were these computer-scored back then?

A.   Could be.

Q.   This is on Page 2.  It says, "He," Mr. Bourgeois, "appears to be an individual with high ideals and goals, but lacks the ability to achieve these goals.  He appears to be somewhat anxious and nervous at times and appears to worry excessively.  His self-esteem does not appear to be very good, as he indicated during the interview he presents himself as a very traditional and moralistic individual."

     Now, what I wanted to ask you about that is we've heard testimony, I think you heard it yesterday, that he was very ambitious at his jobs?

A.   Yes.

Q.   Okay.  So that's consistent with what the MMPI is reporting.  It also says, "He lacks the ability to achieve some goals."  Is that consistent, using your phrase, with a

USCA5 4199

diagnosis of mental retardation, inability to achieve goals?

A.    Well, sure, depending on what the goals are, yes.

Q.    Okay.  His anxiety and nervousness and excessive worry are all consistent with an adult survivor of childhood abuse.

A.    Among other things, yes.

Q.    Okay.  And low self-esteem is also consistent with an adult survivor of childhood abuse.

A.    Among other things, yes.

Q.    So if this document were presented to you pretrial in a capital case with this document and those reports of anxiety and inability to achieve goals and excessive worry, would that pique your interest in exploring the origins for those conditions?

A.    Yes.

Q.    Okay.  You'd want to look into it.

A.    I think it would be something, as a psychologist, that I would want to look into.

Q.    On the next page, in the Summary and Conclusions section, it says, "He seems to be a rather moralistic individual, who believes in right and wrong; however, he shows feelings of inadequacy and problems in evaluating self-worth.  He shows very strong ambition, but it is not clear what he wants or how to get it."

      And again, those observations are, the inadequacy is consistent with childhood abuse?

USCA5 4200

A.    Well, it's not inconsistent with childhood abuse.  That wouldn't alert me to childhood abuse from that summary and conclusion.

Q.    You'd want to look into why he feels inadequate.  Could be a lot of explanations, one of which is childhood abuse.

A.    That's correct.

Q.    And in combination with the things we just talked about on the previous page, it certainly presents a curious package of symptoms you'd want to explore.

A.    Yes.  He was found by this industrial psychologist to not be suitable to be a police officer.  I think I would want to find out why.

Q.    Okay.

        MR. WISEMAN:  Your Honor, I'm not sure we've offered this, but I would offer it at this time, P-58.

        THE COURT:  Any objection?

        MR. DOWD:  No, Your Honor.

        THE COURT:  P-58 is admitted.

BY MR. WISEMAN:

Q.    By the way, Dr. Price, were you ever permitted to review Dr. Moore's report --

A.    Yes.

Q.    -- in this case?

A.    Yes.

Q.    Okay.  Now, leaving aside the question that Her Honor has

USCA5 4201

indicated we can take a deposition on, there are a few things in your report that -- I'm sorry -- a few things in your testimony yesterday on direct that weren't exactly in your report.  Is that right?

A.    That's correct.

Q.    Okay.  And I take it that your testimony about those things that aren't in your report came up as a result of your meeting with Government Counsel, going through your report and discussing it.

A.    They, those things came up with my review of the work of the neuropsychologist in this, in continuing to analyze all the information in this case, not as a result of meeting with --

Q.    Okay.

A.    -- the Government.

Q.    I misunderstood.  I probably didn't phrase that well.

          MR. DOWD:  Your Honor, I'd ask that the witness be permitted to finish his answer.

          THE COURT:  Go ahead, sir.  Complete your answer.

          THE WITNESS:  I was just clarifying that those opinions did not come as a result of meeting with the Government's attorneys.

BY MR. WISEMAN:

Q.    And I didn't mean to suggest that they did.  My question, inartfully posed, was the way in which you were able to testify about it is you told the Government lawyers in meetings that

USCA5 4202

you had this additional information to offer.  Didn't just

spontaneously appear.  Right?  You said to them, "Hey, I could

talk about some other things that aren't in my report."

A.    Well, I was asked questions about --

Q.    Okay.

A.    -- those things, and I had developed it.  And at some

point, I told them what I thought of the neuropsychological

data.

Q.    Yeah.  I'm not even talking about that at this point.  I'm

just talking about generally.  So the point of my question here

is that you sat down and you had a long conversation with the

Government attorneys -- on more than one occasion?

A.    Well, yes.

Q.    How many times did you meet with them?

A.    I had a long -- excuse me?

Q.    How many times did you meet with them?

A.    Well, the discussion of that --

Q.    I'm not talking about neuropsychology.  I'm just talking

about generally, how long did you -- how many times did you

meet with the Government attorneys about your findings in this

case?

A.    I had one telephone conversation.

Q.    How long did that last?

A.    Between two and three hours.

Q.    Okay.  And how long did the personal meetings last?

USCA5 4203

A.   On Tuesday evening, maybe a half hour.  Wednesday evening, again, maybe that long or an hour.

Q.   Okay.  So you altogether communicated either in person or on the phone about five hours with the Government lawyers?

A.   I think that would be approximate, yes.

Q.   Your article that we talked about yesterday says, quote, Every capital defense should begin with a biopsychosocial history, closed quote.  And that's on Page 116.  What does that mean?

A.   A complete life history should be conducted by someone to begin an investigation into the records that could be obtained.

Q.   And sources of information in addition to records?  Individuals?

A.   Yes.

Q.   And is it important, in your view, to have that biopsychosocial history early in the development of the mitigation case?  The earlier the better?

A.   Well, I think that's true about any information, yes.

Q.   Yeah, okay.  I mean, as a consulting forensic psychologist, you wouldn't be pleased to receive this information two weeks before a trial started, would you?

A.   I would not.

Q.   How long do you think you'd need, or what do you typically require in terms of receiving this type of information?  Four-and-a-half months?  Five months?  Three months?

**USCA5 4204**

A.    I don't have a certain time frame, just --

Q.    Okay.

A.    I mean, every case is different.

Q.    Okay.  You've heard me rattling off all those reports of abuse in that document that I just read to Judge Jack.  If you were provided information like that by a mitigation specialist, would you recommend a neuropsychological battery?

A.    Well, if there was other information, possibly.  But just from what you read, I certainly would recommend a psychological evaluation by someone who was an expert in child abuse.  I didn't hear anything in that, in those documents that you read, about a head injury.  But certainly the abuse would be investigated.

Q.    Okay.  Do you agree that brain dysfunction can be caused by severe and prolonged childhood abuse, even in the absence of a blow to the head; just the stress caused by that kind of abuse?

A.    You know, I do not at this time.  That is an area of some research of late, but I don't think, in my opinion, we're at the place to say that stress in childhood -- or in adulthood -- there's also the idea that individuals with PTSD, that it may alter brain functioning.  But I think that's in the beginning of the research, and I wouldn't ascribe that that was what was going on at this time.

Q.    And if you were provided information about abuse that

USCA5 4205

contained information about blows to the head, would that cause you to recommend a neuropsychological battery?

A.   Yes.

Q.   You testified on direct examination that you, that Mr. Bourgeois gave concrete responses to a number of the proverbs you administered.

A.   Yes.

Q.   And to be clear, the purpose of administering proverbs in a, in this setting, is to measure abstract thinking versus concrete thinking.

A.   Yes.

Q.   And so a concrete person has trouble interpreting the proverbs.

A.   That's correct.

Q.   All right.  And abstract thinking is a frontal lobe function, isn't it?

A.   Yes, pretty much.

Q.   And to be more precise, when you said he had trouble with them, he really gave no responses at all to any of them, except "Don't count your chickens before they hatch," and "I'll cross that bridge when I get to it."  Do you remember that?  Any other ones he was dumbfounded by.  He didn't respond.

A.   That's correct.

Q.   So he was pretty impaired on proverbs, wasn't he?

A.   He was very quick to say he had no idea what they meant.

USCA5 4206

Q.   In your experience as a clinician and as a forensic psychologist, could you tell the Court why survivors of abuse or witnesses of childhood abuse within the family are sometimes reluctant to disclose it?

A.   Well, it's especially true with sexual abuse, and they feel often that they were compliant and that in some way they caused it, they allowed it to happen, they were a confederate in the instances, and they're ashamed of it.

Q.   And that's true to some degree as well with regard to physical abuse?

A.   Yes.

Q.   People are ashamed.

A.   Yes, often.

Q.   And they want to deny that they were abused.

A.   Yes.

Q.   And it's often painful for people, witnesses as well as victims, to discuss it.

A.   That's correct.

Q.   Psychologically painful.

A.   Yes.

Q.   It causes distress.

A.   Yes.

Q.   Now, as a practitioner, how do you break through that reluctance?  What do you do?  When you're sitting down with someone that you suspect is abused, how do you get them to open

USCA5 4207

up?

A.    Development of rapport, trust, showing signs of acceptance, indicating that if it did happen, that you wouldn't blame them for it.  The trust and rapport.

Q.    Okay.  And that's a time-consuming process, I take it?

A.    It can be.

Q.    Okay.  It doesn't often happen on the first visit or the second visit?

A.    Well, I wouldn't say that.  But it, you know, sometimes with some individuals it takes time.  Sometimes it's relatively quick, if you -- if it's the right situation, the right person.

Q.    Okay.  It can go either way.

A.    Yeah.

Q.    Okay.  Now, in your clinical practice, do you, have you ever treated someone who was the survivor of childhood abuse?

A.    Yes.

Q.    And do you have any experience where, you know, I gather 45-minute sessions are typical and 50-minute sessions that you have with folks?

A.    What's the question?  I'm sorry.

Q.    When you sit down with a clinical patient, in a therapy session, is it typically 45, 50 minutes?

A.    Yes.  I don't do treatment at this time, but I understand that's still kind of the standard.

Q.    You used to do treatment, though.

USCA5 4208

A.    Yes.

Q.    Okay.  And in your experience, have you had patients who took several of those sessions to finally open up and discuss it?

A.    I have had that experience, yes.

Q.    Now, I take it that a psychologist is far more skilled, in theory -- I'm sure you are, but I'm just saying hypothetically -- than a mitigation specialist to go through that process.  You have the expertise.

A.    Well, I mean, I think there's a lot of people able to do that.  A lot of people that I've worked with that were mitigation specialists were trained as psychiatric social workers.  They were quite, quite capable of that as well.

Q.    Okay.  But as a general proposition, you would agree that a licensed, trained psychologist, who teaches psychology to psychiatrists, like yourself, is probably better skilled to get the person to open up.

A.    Well, as a generalization, psychologists with that kind -- with experience in doing that are likely pretty good at doing that.

Q.    Now, you know Mark Cunningham, don't you?

A.    Yes.

Q.    And you've been on both sides of cases with him?

A.    Yes.

Q.    Okay.  Do you think he's skilled in the ability to, you

USCA5 4209

know, break through and open up people who might be reluctant

to talk about abuse?

MR. DOWD:  Your Honor, can we narrow down the, what

the doctor's basis for this opinion would be?

MR. WISEMAN:  Well, if you know.

MR. DOWD:  Knowing him and working with him, I don't

know the extent of his contact and knowledge of

Dr. Cunningham's abilities.

MR. WISEMAN:  Yeah, and that's a fair point, Your

Honor.

BY MR. WISEMAN:

Q.    If you know, Doctor.  And if you do, tell us how you know.

A.    Well, I do know.

Q.    Okay.

A.    And I have worked with him, as you said, on the same side

and opposite side.  I've reviewed his work on many occasions

and have conducted evaluations with him.  So I do know.  And he

is a person that is skilled in that area.

Q.    And I'm sure there are occasions when you don't agree with

his views in a particular case, but as a general proposition,

he's a practitioner with integrity?

A.    Yes.

Q.    And honesty?

A.    Yes.

Q.    Have you ever known him to get angry?  Over a case, that

USCA5 4210

is.

A.   Frustrated, a little impatient, like maybe all of us have been, but I've never seen him angry.

Q.   You've never refused to work with him because he's an angry guy?

A.   No.

THE COURT:  Who are we talking about?

MR. WISEMAN:  Dr. Cunningham.

THE COURT:  Were you in here when he testified?

THE WITNESS:  I was.

THE COURT:  Pardon?

THE WITNESS:  I was.

THE COURT:  What do you think?

THE WITNESS:  I think he got frustrated.  I think he was upset.  And I think he has been in this case, from what I have heard and read.

BY MR. WISEMAN:

Q.   In what respect?

A.   Well, that he thought he should have testified.

Q.   Because he had something to say.

A.   That's what he thought, yes.

Q.   When you were given Mr. Bourgeois his mental status exam, I think you started out by explaining to him that it was a means of taking his temperature.  You remember that?

A.   Yes.

USCA5 4211

Q.    And what did he respond?

A.    That he didn't understand what -- I was saying, I just want to see if you're all right to be here.  It's kind of like taking your temperature.  And he thought it was going to be some kind -- or he said that he didn't want any kind of medical procedure, like a shot.

Q.    Well, actually, that's pretty close.  I have -- I noted that he said -- and the Court, of course, will review the tape. He said, "There won't be any needles, will there?"  You remember that?

A.    Okay.  I said "shot."  He said "needles."

Q.    Yeah, okay.

A.    Yeah.

Q.    So the point being, he totally missed the boat on that. Right?  He didn't catch your meaning?

A.    Right.

Q.    Okay.  You used a metaphor, and he interpreted it about as concretely as a person could?

A.    That's correct.

Q.    And you said yesterday that he doesn't test well.  You remember that?

A.    Yes.

Q.    Okay.  So this is an example where we're not talking about testing.  Right?  You're just talking to the guy, and he gives a response that's as concrete as any of the proverbs that you

USCA5 4212

tested him on.  Right?

A.    Yes.

Q.    So you can derive from that concrete response that his performance on proverbs isn't because he doesn't test well, it's because he's concrete.

A.    I would say that he's concrete, yes.

Q.    He talked about the anniversary of the death of his daughter.  Do you remember that?  Getting upset at that time.

A.    Yes.

Q.    I think he said it's like a few days away.

A.    Yes.

Q.    Do you remember him saying that in a few days, it's going to be the four-year anniversary?

A.    Well, I don't remember the number of years.

Q.    Okay.  Again, the tape will decide.  But assuming he said four years, that would put the death at 2006.  And of course, the death was in 2002.  Is that some evidence of his mental functioning, that he would be off on such an -- a fact that's so important to him by double?

A.    And evident of my dysfunction, because I didn't pick up on that.

Q.    You didn't pick up on it.  All right.  Well, if the psychological shoe fits.

       Did you notice on the tape at the beginning that he seemed rather interested in communicating to you that he wasn't --

USCA5 4213

that the crime, to the extent it occurred, didn't happen on the

Naval Air Base?

A.    Yes.

Q.    Do you remember when he said he doesn't understand why

he's being charged with this by the State of Texas?

A.    No, I don't remember that.

Q.    Well, assume that's what he said, because it's on the

tape.  I mean, obviously, he's not being charged by the State

of Texas.  He's being charged by the United States of America.

Is that right?

A.    That's correct.

Q.    Okay.  So that kind of fundamental misstatement of who the

folks who are prosecuting him now eight years into this case

again shows a level of impairment and dysfunction.  He's wrong

about a very important fact in his life.

A.    Well, he's wrong.  Not every error that someone makes is a

sign of some kind of global impairment.  I mean --

Q.    No, of course not.

A.    -- we all make errors.  And if -- and that is a mistake in

his thinking if he thinks --

Q.    Okay.

A.    -- that the State of Texas is prosecuting him.

Q.    Now, getting back to this idea that he doesn't test well,

would you agree it's possible that he doesn't test well because

he's got all the deficits we've been discussing, the low

USCA5 4214

intelligence, the impulsivity, the borderline personality disorder?  I mean, can't those all contribute to his inability to test well?

A.   Yes.

Q.   So inability to test well is not an excuse for a practitioner to throw out all this psychological, neuropsychological testing.  Right?

A.   No.  I don't think you should throw out the testing.  I think that you'd put it in context and compare it to other information that you have about the person's life, and you do look at effort.

And I think a person with poor educational experiences, you start bringing out tests, and sometimes that, they just think, "Oh, this is like when I was back in school, and I never liked taking tests then," and so that contributes to it as well.

Q.   Okay.  You mentioned that he has an easier time -- and I'm paraphrasing here -- talking about himself than taking the tests.  Is that right?

A.   Yes.

Q.   Okay.  Now, you would agree that he told you a lot of information during your nine hours that you absolutely have no way to verify, one way or the other.

A.   I have no way to verify some of the things he said. That's correct.

USCA5 4215

Q.   So for instance, when he says he had a big gumbo pot, you don't know if that's true.

A.   Right.

Q.   You don't know if he can cook gumbo.

A.   That's correct.

Q.   You don't know if he can cook a Pop Tart.

A.   I don't know.

Q.   Okay.  And you have no way of determining whether he had a secret bank account in Memphis to hide money from his wife. You've never seen bank records for that, have you?

A.   No.

Q.   All right.  So when you've got a person who puffs and exaggerates and wants to look good, and you have no collateral information to verify his claims, you sort of have to rely more on testing than when you have a reliable accurate historian, don't you?

A.   Well, and collateral information that is available and information from other people and from records, et cetera, all of that.  Yes, you do.  I think the point is, to me, as a forensic evaluator, that you don't want to rely solely on self-report.

Q.   Right.  Especially with Mr. Alfred Bourgeois.

A.   And he's one of the ones I would not want to rely solely on self-report.  I could say that as a generalization, that I am uncomfortable with relying on self-report.  I just evaluated

USCA5 4216

someone that had a doctorate that didn't tell me some very significant information.

Q.   Okay.  Yeah.  And so when Dr. Estrada reported that Mr. Bourgeois reported that he had an idyllic childhood, I mean, in a case like this, you wouldn't just say, "Well, okay, that's the beginning and end of, you know, what his childhood was like."  I mean, you'd want to look past that.

A.   Yeah, I would want to have other information in any forensic evaluation, other than self-report.

Q.   Now, you said yesterday something like when he came back on the second day, he seemed interested in telling you that he really doesn't read as well as he may have indicated the day before.  And I think you described that as he was trying to fix a slip that he had made, words to that effect.

A.   Well, I think he had thought about that and wanted to clarify what he thought I thought.

Q.   Okay.  And you would agree, of course, as we discussed, that if you want to use the phrase "slipped," I mean, he slipped quite a bit in this, in terms of giving you information that made him look good.  I think you testified that he wanted to look good.

A.   Oh, what's the question?  I'm sorry.

Q.   Sure.  If you want to use the term "slipped," to describe Mr. Bourgeois's comments to you on that day, you would agree that he slipped quite a bit in this interview, because he

USCA5 4217

disclosed lots of information that made him look really good.

A.    And information that made him look bad, too.

Q.    Right.  He gave you a bunch of information, some good and some bad.

A.    That's correct.

Q.    Okay.

      (Counsel conferring off the record.)

BY MR. WISEMAN:

Q.    Dr. Estrada reported that Mr. Bourgeois has above average intelligence, and I think you indicated that -- well, he, do you recall that he reported that, above average intelligence?

A.    I do.

Q.    And there was no indication that any psychological, psychometric testing was done to provide him a basis for that opinion.

A.    That's correct.

Q.    Because he didn't wait to see what Dr. Weiner's results of the IQ testing were.  He just kind of made an assess, a clinical assessment in that setting and arrived at that conclusion.

A.    Yes.

Q.    Okay.  And I think you agree that he was clearly wrong in that regard.  Right?  I mean, Mr. Bourgeois is nowhere near above average intelligence.

A.    That's correct.

USCA5 4218

Q.   He's not average.  He's not low average.  He's either
borderline or mild mentally retarded.

A.   Yes, that's --

Q.   On IQ testing.

A.   Yes, that's correct.

Q.   Now, you don't teach your psychiatrists to opine about
intelligence in a death penalty case without psychometric
testing, especially when a subject, who we all agree is,
presents far better than he actually is.  That's not good
practice, is it?

A.   No, it's not good practice.

Q.   You were discussing his facility and familiarity with the
Bible.  Do you recall that?

A.   Yes.

Q.   Were you aware that Judge Jack, from the time of this
trial, has put in place a communication limitation order, and
as a result of that, Mr. Bourgeois is not permitted phone calls
or mail communication with anyone but his legal team?

A.   I am aware of that.

Q.   We get all those long letters now.  And that as a result,
he doesn't have access to funds and such, other than what his
legal team might be able to provide.

     If the Bible is the only thing, the only book he has to
read, does that -- and he's in isolation pretty much 24 hours a
day, seven days a week, would you agree that his familiarity

USCA5 4219

with the Bible, with a sixth grade reading level, which is what

I think he has, based on the testimony, that it doesn't add a

whole --

MR. DOWD:  Your Honor, I think Counsel's testifying.

MR. WISEMAN:  I'm sorry, you're right.

MR. DOWD:  That's not in the record.  I would ask

that that --

MR. WISEMAN:  I withdraw that.  I withdraw it.  I

went too far there.

BY MR. WISEMAN:

Q.    The point being, if all he's doing is reading the Bible,

you would agree that his facility, his familiarity with it

doesn't really, isn't really inconsistent with mental

retardation.  He's sitting with this book day after day,

reading it over and over again.

A.    Well, I think that it's inconsistent with mental

retardation, to be able to read and understand and

conceptualize some of the things that he was able to talk

about, yes.

Q.    You said that he wrote his paragraph for you in a, quote,

normal amount of time.  You would agree that there's no -- you

weren't using any standardization when you opined that it was

normal.  I mean, you don't have a chart that says this is how

long it should take a person to write a paragraph.

A.    No, I don't.  That was a subjective interpretation on my

USCA5 4220

part.

MR. WISEMAN: All right. I think that's all I have, Your Honor. Thank you, Dr. Price.

THE COURT: Thank you, sir. Anything further?

MR. WISEMAN: Oh, you know what, Your Honor? I missed one question. I'm sorry.

THE COURT: Go right ahead.

MR. WISEMAN: I reminded myself.

BY MR. WISEMAN:

Q. You talked about his lack of adaptive -- to the extent you agree there's any lack of adaptive skills, they may be better attributed or caused by his cultural deprivation, something like that.

A. I believe I testified that some of the problems that had been interpreted as being adaptive behavior deficits, in my opinion, are consistent with a personality disorder rather than mental retardation.

Q. Right. I get that. But I thought you also said that some of these deficits could be attributable to a cultural deprivation, his impoverishment, his poverty, his lack of education, things like that.

A. Well, as I recall, when you and I were discussing the impoverishment and the lack of cultural enrichment, that was in relationship to his low intelligence.

Q. I thought you had said it on direct. But in any event,

USCA5 4221

you would agree that according to the 11th edition of the AAIDD

manual, that risk factors for intellectual disability can

include impaired child giving (sic) interaction, lack of

adequate stimulation, family poverty, chronic illness in the

family, things of that nature.  So environmental factors can

contribute to a person's development of MR.

A.    Yes.  And it's, that's -- I think what I was saying, it

said there that intellectual deficits can be attributed to

that.

Q.    Okay.

A.    And I totally agree with that.

Q.    Okay.

A.    Absolutely.

        MR. WISEMAN:  All right.  That's all.  Thank you,

sir.

        MR. DOWD:  Your Honor, I don't have any redirect, but

I did want to clarify with Dr. Price, for purposes of

Mr. Wiseman's motion for deposition, what norms he did use to

evaluate Dr. Weiner and Gelbort's evaluation of the Trail

Making Test in 2004 and 2007, as well as the category, his

evaluation of Dr. Weiner's conclusions based on the category

test.  And I would just like to clarify that for the record.

        THE COURT:  Go ahead.

                    REDIRECT EXAMINATION

BY MR. DOWD:

USCA5 4222

Q.   What were the norms that you employed in evaluating those opinions by Dr. Gelbort and Dr. Weiner regarding the Trail Making and the Category Test?

A.   Yes.  They are the published age and education norms for neuropsychological tests, compiled by Dr. Robert Heaton, H-E-A-T-O-N.

Q.   All right.  For both analyses?

A.   Yes.

MR. DOWD:  That's all I had, Your Honor.  I just wanted to clarify that.

MR. WISEMAN:  I have nothing further, Your Honor.

THE COURT:  Thank you, sir.  You may stand down. Call your next witness.

MR. DOWD:  May Dr. Price be released, Your Honor?

THE COURT:  Any objection?

MR. WISEMAN:  I'm sorry, I didn't hear that.

MR. DOWD:  I asked if Dr. Price could be released.

MR. WISEMAN:  Oh, absolutely.

MR. DOWD:  Thank you, Your Honor.  We call Jerrilyn Conway, Your Honor.

MS. BOOTH:  And Judge, while we're waiting for the witness to come in, a little earlier from a Defense Exhibit -- I mean Petitioner's Exhibit Number 61, when you asked Mr. Wiseman to read from the reports to talk about the abuse that was stated, I feel like I need to add a line or two --

USCA5 4223

THE COURT:  Go ahead.

MS. BOOTH:  -- to where he was reading.  He read off of Petitioner's Number 61 that "Mom never bought Alfred any" --

MR. WISEMAN:  What page, please?

MS. BOOTH:  That is Page 2.  "Mom never bought Alfred" -- and this is Alfred speaking to the --

MR. WISEMAN:  Page 2 of where?

MS. BOOTH:  Of 61.

MR. WISEMAN:  I know, but there's a lot of Page 2s.  It's a compilation of --

MS. BOOTH:  Well, I'm reading, okay, 004582, your Bates stamp.

MR. WISEMAN:  Okay.

MS. BOOTH:  And he read that "Mom never bought Alfred any toy or new toys or anything.  'When I was with her, I didn't know what a new toy was.  Mom just wouldn't buy me anything.  I don't remember Mama never buying me anything.'  He never had any new clothes during the time he lived with his mother.  His brothers got the new clothes.  He got the hand-me-downs.  And he used to sneak clothes from his brothers outside and change after he had left for school.  His mom wouldn't let him wear anything nice, so he would have to leave the house, then change into his brother's clothes.  'I was the black sheep of the family.'  Alfred thought his mom treated him like a girl regarding chores or household duties.  Alfred was

USCA5 4224

the only boy that mom made wash the dishes after supper or help put all the clothes on wash day.  Alfred often had to do the girls' chores when his brothers were never made to do the girls' chores.  'I got treated like a girl.'"

MR. DOWD:  Your Honor, may I step out for about two minutes while Mrs. Booth is conducting --

THE COURT:  You all can keep going in and out, as long as somebody's here from each side.

MS. BOOTH:  Okay.  I just wanted to add that to the reading, Your Honor.

MR. WISEMAN:  And I have no objection to that.  In fact, I would renew my offer to just let the Court have the packet, and you can read it at your leisure and --

THE COURT:  Okay.  Any objection to --

MS. BOOTH:  Not at all, Your Honor.

THE COURT:  What's it called?

MR. WISEMAN:  61A.

THE COURT:  P-61A is admitted.

MS. BOOTH:  It's Alfred Bourgeois's statement.  So it's --

THE COURT:  Is it labeled on there that it's his statement?

MR. WISEMAN:  Well, there's a number of statements, as I read to the Court, including his.

THE COURT:  Oh, okay.  Okay.  That's a packet of

USCA5 4225

statements.

MR. WISEMAN:  A packet of statements.

THE COURT:  Got it.  Okay.

MR. ROBERTS:  Your Honor, just so -- excuse me -- so I can clarify, we had a whole list of exhibits that we were going to put into evidence with Dr. Oliver.  They are obviously now, we're not going to offer them, so our exhibits are going to, just so the record's clear, we're going to have some that are -- we do have some that are listed in the high numbers of the 100s and 200s -- and the low numbers of the 200s.  And there's going to be a big gap between some of our exhibits. But we would have the opportunity to put those on, if necessary, on the deposition --

THE COURT:  Yes.

MR. ROBERTS:  -- if necessary?  Thank you, Your Honor.  And the next witness is -- Mark Dowd.

     (Witness sworn.)

MR. DOWD:  Ms. Conway, do not touch the microphone.

THE WITNESS:  Thank you.

     (Stopping at 9:38:05 a.m.)

     (TESTIMONY OF JERRILYN CONWAY PREVIOUSLY TRANSCRIBED.)

     (Beginning at 12:13:00 p.m.)

MR. ABREU:  Your Honor, may I offer Petitioner's Exhibits?  There are one or two that I needed to make a copy of, and I'll provide to Ms. -- they were -- oh, I'm sorry.

USCA5 4226

Petitioner's 179, Your Honor.

THE COURT:  Any objection?

MR. DOWD:  179, no objection, Your Honor.

THE COURT:  P-179 is admitted.

MR. ABREU:  And I do have a motion, Your Honor, with regard to this particular claim, whenever the Court's ready.

THE COURT:  Which claim?

MR. ABREU:  The alleged semen claim.

THE COURT:  Okay.

MR. ABREU:  As Your Honor is aware -- or I don't know if Your Honor is aware -- but there's been some back and forth regarding what documents were produced at what time in regards to time of trial.  This document, Petitioner's 179, which I questioned Ms. Conway about, is a document, as I've noted before, I had never seen before.

Certainly, there was no testimony at the time of trial regarding very weak, very weak, or weak.  And certainly Mr. Tinker didn't ask any questions reflective of the fact that he had that particular document at the time.

THE COURT:  Well, you don't have any evidence that he didn't.

MR. ABREU:  No, no, I'm not saying that yet.

THE COURT:  Okay.

MR. ABREU:  We're trying to figure this out right now.  And Ms. Johnson did not have that particular document at

USCA5 4227

the time, as she testified.  She had no information regarding the strength of the tests.

My understanding is that the Government went back and did a review of -- let me just also say, to preface that, that I have searched all of our 12,000 pages that we received from trial counsel, which we then re-provided to the Government.  I have searched those 12,000 pages for this one document, and this one document does not exist in those 12,000 pages.  That still leaves a possibility that it somehow got removed between the time it got from trial counsel to us.

My understanding is that the Government has gone back and reviewed how these files came into existence.  Apparently, the FBI sent them to the Government back at the time of trial. The Government then produced three copies, one of which was sent to trial counsel, which is the one that we eventually ended up with, I presume, because it's not in that one either, and --

MR. DOWD:  Which one?

THE COURT:  Wait a minute.  So P-179 trial counsel had at the time of trial.

MR. ABREU:  No.  We don't know that yet.  And, but let me say this.

THE COURT:  I thought you said --

MR. ABREU:  No.

MR. DOWD:  I can clarify, Your Honor.

**USCA5 4228**

THE COURT: Okay, Mr. Dowd.

MR. DOWD: This is what I understand happened. I wasn't here at the trial time, but the FBI shared their entire lab file with the Government.

THE COURT: Okay.

MR. DOWD: We took that and made three copies. One copy we sent to Mr. Tinker.

THE COURT: Okay.

MR. DOWD: Two copies, we kept. One just as a standby copy. The other is part of the working file. We've gone back, once this came up yesterday, we went back and looked at our original FBI file, the one that was provided to the Government, and this document, P-179, is in there.

THE COURT: Okay.

MR. DOWD: We went to the next copy of our FBI file, which is the copy we're preserving, and it's in that copy as well. We went, then went to the third copy, which is the, or what was part of our working file, and it's not contained in that working file. Other documents are contained in there. There's several other documents from the FBI file which are also not contained in that third working file.

So what I believe -- what I believe is that we made the copies of the original FBI file. That document was in there, because it's in one of our copies.

THE COURT: Okay.

USCA5 4229

MR. DOWD:  One of our copy files.  So that's why I believe it went to Mr. Tinker, because if the copier made one copy, then it would have made the three copies.  If two pages stuck together, we wouldn't have any copies of this page in any of our copied files.  So it's our position that Mr. Tinker got it, on that basis.

MR. ABREU:  Are you finished?

MR. DOWD:  I'm finished.

MR. ABREU:  And our contention, Your Honor, is that there is a working copy that does not contain this particular document, and that the files that were sent to Mr. Tinker could just have easily have come from that particular copy that didn't contain this, and that the evidence presented at trial, and Mr. Tinker's questioning at the time of trial, which the Court can go back and take a look at, is reflective of him not having received this, in conjunction with the testimony of Ms. Johnson.

So our motion, Your Honor, is to amend the claim as currently written to include a component alleging the violation of Brady versus Maryland for the Government's failure to disclose this particular document, P-179, Your Honor.

THE COURT:  Okay.  And that's the evidence that you've got to support that?

MR. ABREU:  Well, there's more in the record, which we'll cite to you when we come back and address this in

USCA5 4230

argument or in, I mean, I can make other -- I just don't know the entire record cold of every question Mr. Tinker asked, and I would like to show that to the Court at some point.

MR. DOWD:  Judge, I have one more clarification.

THE COURT:  Yes, sir.

MR. DOWD:  Actually, the file that was digitized and sent to the present defense team, unfortunately, was made from --

THE COURT:  The working file.

MR. DOWD:   -- our working file.

THE COURT:  Okay.

MR. DOWD:  And I can verify that that's the file that was used unfortunately to --

THE COURT:  And you got your working file from the original one that had it in there?

MR. DOWD:  We got the working file from the original one that had it in there, but unfortunately people have gone in and placed documents in there that shouldn't be in there and have removed documents that should be in there.  So we have a secondary copy file, which is complete, and it mirrors the original FBI file.  And that document is in our --

THE COURT:  And that's the one you used to make the extra copies?

MR. DOWD:  No.  We used the working file to provide the Public Defender with the FBI file.  That's why it's not in

USCA5 4231

their file.

THE COURT:  No, no, I'm talking about the trial team.

MR. DOWD:  Oh, the trial team --

THE COURT:  What file did you use?

MR. DOWD:  We took the original FBI file and we made three copies.  We sent one copy to Mr. Tinker.  We kept one, and we kept that one in pristine condition.

THE COURT:  Okay.

MR. DOWD:  That one contains this document.

THE COURT:  Okay.

MR. DOWD:  That's why I believe Mr. Tinker got his.

MR. ABREU:  Your Honor, our contention is that in the context of the questions that Mr. Tinker was asking -- and Your Honor can go back and look at the transcript.

THE COURT:  I have looked at that.

MR. ABREU:  Oh, I'm sorry.  And if you look at all the questions he's asking all the witnesses, for somebody who's trying to disprove that this is a positive test for p30 and semen, it would seem obvious to me that if he had this document, he would then be arguing that it was very weak, very weak, or weak, and bringing that out with the witnesses.  And in fact, if he did not -- if he had, if he had that particular document and didn't use it, that would only strengthen our ineffectiveness claim.  So it's either a Brady claim or it's an ineffectiveness claim.  Either way, Your Honor.  But I would

USCA5 4232

say it's good evidence of a Brady claim.

THE COURT:  I'm not going to allow you to amend for the Brady claim, because I think that's futile.  There's no evidence that they didn't get it.  In fact, there's evidence that they did.  But if you want to use it for ineffective, you can use it for ineffective.

Okay.  Move along.

MR. ABREU:  I'm just going to take a second to collect my documents here, Your Honor.

THE COURT:  You all want to have lunch?  Okay.  Oh, we've got noon settings.  Sorry.

Okay.  So we're going to break for lunch, come back at 1:30.  How many more witnesses?

MR. ROBERTS:  Well, Your Honor, we were going to offer a bunch of documents.  And if those documents came in, we would only have one more witness.

THE COURT:  Dr. Moore?

MR. ROBERTS:  Yes.

THE COURT:  Okay.

MR. ROBERTS:  But if they don't just allow it in, we've got to offer them through the witness, Your Honor.

THE COURT:  Well, talk to them over the lunch time. Y'all share lunch and visit.

MR. ROBERTS:  Yes, Your Honor.

(Recess from 12:21 p.m. to 1:35 p.m.)

USCA5 4233

THE COURT:  Thank you.  You may be seated.  Would you call your next witness.

MR. ROBERTS:  Yes, Your Honor.  Before we do that, there's a couple of evidentiary issues.

THE COURT:  Okay.

MR. ABREU:  Your Honor, there actually are a couple.  And if I may, may I ask a point of clarification of the Court's earlier ruling --

THE COURT:  No.

MR. ABREU:  -- regarding -- a point of clarification?

THE COURT:  No.  Go ahead and -- what else do you have?

MR. ABREU:  There's another matter, Your Honor.

MR. ROBERTS:  I believe the Defense wanted to offer an exhibit.

MR. McHUGH:  Your Honor, yes.  I would ask that -- there's a Government Exhibit that was marked as Government Exhibit 169 prior to the -- I'm sorry -- prior to the hearing, and I'd be asking if -- the Government has indicated they're not offering as part of their case in chief, and I'd be asking if we could have it moved in as a Defense Exhibit.  Our next Number would be 182.  It's a document provided to us from the Government.  It's a letter from Ms. Patti Booth to the Texas Board of Pardons and Paroles.  It's relevant to our Brady claim concerning Mr. Longoria.

USCA5 4234

MS. BOOTH:  Your Honor, there is no evidence to proceed on that.  And I did provide it to them.  And we intended, if we had to defend that issue, we were going to defend it.  It wasn't addressed.

THE COURT:  So their objection -- your objection?

MS. BOOTH:  Is that their case is closed, Your Honor.

THE COURT:  Sustained.

MS. BOOTH:  Thank you.

MR. ROBERTS:  Your Honor, I have several Government exhibits that I'd like to offer at this time, and I've already showed it to the Petitioner.  That would be Government Exhibit 27, which is a letter by --

THE COURT:  Just call them out.

MR. ROBERTS:  Okay, Your Honor.  Government Exhibit 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41 and 43.

MR. WISEMAN:  And we have no objection.

THE COURT:  I'm sorry, after 39 there was what?

MR. ROBERTS:  I'm sorry, Your Honor.  39, 40, 41, we're skipping 42, but we have 43.

THE COURT:  43.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  Government's Exhibits 2 through 41 are admitted -- 27 through 41 are admitted, and 43.

Call your next witness.

USCA5 4235

MR. ROBERTS:  Your Honor, the United States calls Dr. Moore.

THE COURT:  Could you come forward, please, sir.

(Witness sworn.)

MR. ROBERTS:  And Dr. Moore, you've been present throughout these proceedings.  So, Your Honor, I can assure you that he's more afraid of touching your mike than anything else.

THE COURT:  Good.

MR. ROBERTS:  And we've talked about it several times.  So you've been warned, Dr. Moore.

ROGER BYRON MOORE, JR., GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. ROBERTS:

Q.   Dr. Moore, could you state your full name for the record, please?

A.   Roger Byron Moore, Jr., Ph.D.

Q.   Can you tell us the city and state where you reside?

A.   Cary, North Carolina.

Q.   What is your role, what is your role here in this case?

A.   I am a clinical and forensic psychologist who was asked to do an evaluation in relation to mental retardation with Mr. Bourgeois.

Q.   Did you prepare a curriculum vitae and provide that to the United States?

A.   Yes, sir.

USCA5 4236

Q.    I'm showing you what's been marked as Government Exhibit 17, and I'll ask --

THE COURT:  Any objection?

MR. WISEMAN:  No objection to it being moved in.

THE COURT:  Government's Exhibit 17 is admitted.  You can still refer to it if you want.

BY MR. ROBERTS:

Q.    Also, did you prepare a list of your history of testimony and depositions since January of 2006?

A.    Yes, sir.

Q.    I'm showing you what's marked as Government Exhibit 18. Do you recognize that?

A.    Yes, sir.

Q.    Is that what you prepared?

A.    Yes, sir.

MR. ROBERTS:  I offer that, Your Honor.

MR. WISEMAN:  No objection, Your Honor.

THE COURT:  I'm sorry, Number what?

MR. ROBERTS:  It's Government Exhibit 18.

THE COURT:  Government's 18 is admitted.

MR. ROBERTS:  Your Honor, I'm going to go ahead and hand the CV to the -- I'll hand it in so the Court has a copy of that.

BY MR. ROBERTS:

Q.    Dr. Moore, can you tell us, what is your area of

USCA5 4237

expertise?

A.   It's clinical and forensic psychology.

Q.   And how did you come to be experienced in that area?

A.   Through education and experience.  I have two master's, a Ph.D. and two post-docs.

Q.   Tell us what those degrees are in.

A.   My bachelor's degree is in psychology.  My first master's is in mental retardation and developmental disabilities.  My second master's is in clinical, and my doctorate is in clinical.  The two post-docs are in, one's in cognitive research and therapy and the other is, was a behavioral sciences fellowship.  Basically it's behavioral medicine.

Q.   And do you have a subspecialty?

A.   Well, I work with mental retardation, clinical issues and forensics.  Within my general practice, I see a wide range of patients.

Q.   You mentioned several areas that you, in your education. Do you have a specific education that you, that would qualify you as an expert in the mental retardation assessments?

A.   Yes, sir.

Q.   What would that be?

A.   I have a master's degree in mental retardation and developmental disabilities, and I have additional training and work experience in working with a population of -- with mental retardation, referred to as intellectual disabilities now.

USCA5 4238

Q.    Could you please tell Judge Jack what your experience is with IQ testing?

A.    My experience with IQ testing goes back to the earliest stages of my master's training.  So I guess we began being trained in intellectual assessment back in about '85, '86, somewhere along there.

THE COURT:  Where is East Carolina University?

THE WITNESS:  It's in Greenville, North Carolina, ma'am.

THE COURT:  Thank you.

BY MR. ROBERTS:

Q.    What about your experience in assessing adaptive functioning?

A.    That, too, began back in that program at East Carolina.  But the training in assessment has continued throughout the training programs noted here.  That was ongoing at the time of my training.

Q.    How many times have you testified in any kind of hearing?

A.    In any kind of hearing, it would be over a thousand.

Q.    And I know you have some experience in, I think you called it the Panel of Medical Experts that is ran through the Office of Hearings and Appeals?

A.    Yes, sir.  I'm on the Panel of Medical Experts that's maintained by the Office of Hearings and Appeals with the Social Security Administration.

USCA5 4239

Q.   Does that have any relevance to mental retardation or assessment?

A.   It does.  The Social Security Administration has a couple of programs, Title 2 and Title 16, which are disability programs.  And people can apply for funding basically under that, receive disability payments.  And one of the areas under which they can obtain disability is mental retardation.

Q.   In the criminal context, now I'm going to move to the criminal context and ask you, have you testified for both Defense and Government in the criminal context for forensic psychology with mental retardation as the focus?

A.   Yes, sir.

Q.   And how many times do you think, in the criminal context, that you testified in a case either for the Government or the Defense?

A.   In the criminal context, it's probably been about a dozen or so.  And then there have been some civil cases as well.

Q.   And is there a percentage that you can break down of how many times you've been asked by a Defense to assist their trial team versus how many times you've been asked by the Government to assist their trial team?

A.   I would say at this point the ratio is probably 80/20.  About 80 percent of the time or so, I've been with the Government, and about 20 percent of the time with the Defense.  But then again, as we get into civil cases, those numbers

USCA5 4240

switch a bit.

Q.    Tell us what the numbers are for civil cases.

A.    Probably closer to 70/30.

Q.    And what is the focus of those civil cases?  Is it obtaining benefits and services?

A.    No, sir.  That would be cases where, for example, somebody has been in an automobile accident and there's post-traumatic stress from that, or there were a number of cases where persons with intellectual disabilities, the contention had been that they had been abused within an institutional setting, and I was helping to establish evidence that they had experienced emotional trauma from that.

Q.    In the cases that you've testified in, have you been qualified as an expert in clinical and forensic psychology and also in mental retardation assessments?

A.    Yes, sir.

Q.    Have you ever been denied qualifications as an expert in those instances?

A.    No, sir.

        MR. ROBERTS:  Your Honor, we would proffer Dr. Moore as an expert in clinical and forensic psychology and in the field of mental retardation assessment.

        MR. WISEMAN:  May I inquire, Your Honor?

        THE COURT:  I'm sorry?

        MR. WISEMAN:  May I inquire?

USCA5 4241

THE COURT:  About?

MR. WISEMAN:  Qualifications.

THE COURT:  Oh, on voir dire.  You can take him on voir dire, sure.

VOIR DIRE EXAMINATION

BY MR. WISEMAN:

Q.    Good afternoon, Dr. Moore.

A.    Good afternoon.

Q.    I noticed on your curriculum vitae on Page 4 that you list as a publication "Modification of Individual Scores, IQ Scores" -- that says "in," I guess that should be "is" -- "Not Accepted Professional Practice."  And that's a publication that you did in psychology of mental retardation and developmental disabilities.  What's that article about, briefly?  I mean, what --

A.    I'm sorry, I don't have that publication in front of me. But that's not a peer-reviewed article.  Let me be clear about that.  When I list publications, I just simply have listed articles or things that have been written, some in peer-review journals, some not.  But in case, in this context someone needs to be able to pull out things that I've written.  That was a letter to the newsletter that is put out by the Division 33 from the American Psychological Association, which is the division on intellectual disabilities, and the letter had to do with my disagreement in applying the Flynn Effect modification

USCA5 4242

to the actual scores on IQ tests.

Q.   And is this the letter?  My scratch is on there, but is that the letter to the editor?

A.   Yes, sir, it is.

Q.   Did you have anything to do with the submission of these photographs in that particular publication of Division 33?

A.   No, sir.

Q.   How about those?

A.   Did I have anything to do with the submission of the photographs?

Q.   Yeah.  I mean, you submitted a letter to the editor.  I wondered if you sent any pictures.

A.   Oh, no, sir.

Q.   Oh, okay.  Just the letter.

A.   Yes, sir.

Q.   Okay.  Did I hear you say that you've testified about post-traumatic stress disorder from automobile accidents?

A.   Yes, sir.

Q.   And finally, when was the last time you were retained by Defense Counsel in an Atkins situation?

THE COURT:  So what does this have to do with the qualifications?

MR. WISEMAN:  You know what, you're right.  It doesn't.

THE COURT:  Thank you.  Would you proceed.

USCA5 4243

MR. ROBERTS:  May he be accepted as an expert in these fields, Your Honor?

THE COURT:  Any objection?

MR. WISEMAN:  No objection.

THE COURT:  Yes.

MR. ROBERTS:  Thank you.

                    DIRECT EXAMINATION (Continued)

BY MR. ROBERTS:

Q.   Dr. Moore, did you prepare a report about everything that you did in this case?

A.   Yes, sir.

Q.   Does your report accurately reflect your analysis and your conclusions from this case?

A.   Yes, sir.

Q.   Have you had a chance to review that report?

A.   Yes, sir.

Q.   In fact, you made several corrections, typographical errors and other things a couple of times in putting this particular report together.  Is that correct?

A.   Yes, sir.

Q.   Okay.  I'm showing you what's marked as Government Exhibit 15.  Does that look like the first page of your forensic psychological evaluation?

A.   Yes, sir.

MR. ROBERTS:  This is a 21-page document, Your Honor.

USCA5 4244

I would offer Government Exhibit 15.

MR. WISEMAN: Your Honor, I would have no objection if the witness could identify the places where he's made changes, because it's a long document. And although Mr. Roberts provided it to me, I haven't had a chance to figure out what's different.

MR. ROBERTS: It might be easier, Your Honor, just to have him testify about what changes you made.

BY MR. ROBERTS:

Q. Were they substantive changes or just typographical errors?

A. Typographical errors in general. There was one place where I had misworded where the phrase was "at least two standard deviations below the mean," which was a phrase we're very, it's been very commonly used throughout the statistics work that I've done and whatnot. And I needed to change that to "approximately two standard deviations below the mean." So literally it was a single word change. I did that in two places, where I --

MR. WISEMAN: With that, I have no objection, Your Honor.

THE COURT: Okay. Go ahead.

MR. ROBERTS: May the exhibit be admitted, Your Honor?

THE COURT: Exhibit Number?

USCA5 4245

MR. ROBERTS:  15, Government Exhibit 15.

THE COURT:  Government's 15 is admitted.

BY MR. ROBERTS:

Q.    Dr. Moore, did you also have to prepare an addendum to your exhibit?

A.    Yes, sir.

Q.    To your report?  Why did you have to prepare an addendum?

A.    The report was due on a Friday, and about a little after 9:00 o'clock the preceding night before it was due, but after the report had been written, I received about 95 pages worth of materials from Dr. Swanson, which I had not seen before.  And so I didn't have time to review those and integrate them into the report.  It was due the next day.

Q.    Show you again Government Exhibit 15, your report.  Is that noted on this report anywhere?

A.    Yes, sir, it is.

Q.    Where is it noted?

A.    It was a footnote.  Off of the date of the report, there's a footnote sign at the bottom.  It indicates the reasons that the addendum would be submitted.

Q.    You're referencing Footnote 1?

A.    Yes, sir.

Q.    Where it says, "The current author received 95 pages of materials," and then it continues?  And did you have a chance to review all those documents, and does the addendum that you

USCA5 4246

prepared accurately reflect your review and your analysis and your conclusions of the documents you received from Dr. Swanson?

A.    Yes, sir.

Q.    I'm showing you what's marked as Government Exhibit 16, Forensic Psychological Report Addendum.  Is that the document you prepared?

A.    Yes, sir.

Q.    It is a one, two, three-page document.  Is that your signature on the last page?

A.    Yes, sir.

MR. ROBERTS:  Your Honor, I'd offer the addendum, Government Exhibit 16 at this time.

THE COURT:  Any objection?

MR. WISEMAN:  Your Honor, I'm not sure.  The addendum I have is on letterhead, and the document Mr. Roberts put up is not.  I'm assuming it's the same document.  I'm not sure it is, though.

MR. ROBERTS:  I'll give it to Defense Counsel to review, Your Honor.

(PAUSE.)

MR. WISEMAN:  What Mr. Roberts just handed me is what I previously had, but I'm not sure that's what he put up on the screen.  So if he's offering what's marked as 16, I have no objection.

USCA5 4247

THE COURT:  Which are you doing?

MR. ROBERTS:  Your Honor, I'm going to substitute the -- it was my copy that I had put the evidentiary mark on, so I'm going to substitute that and ask Dr. Moore if he can --

THE COURT:  Okay.

MR. ROBERTS:  -- see this.  And I will change the exhibit number.

BY MR. ROBERTS:

Q.   Doctor, as Mr. Wiseman correctly pointed out, the one I put up did not have a letterhead on it.  This document has a letterhead on it.  Is that from your business?

A.   Yes, sir.

Q.   And is this addendum, the one with the letterhead on it, is it the exact, as the copy that you reviewed earlier?

A.   Yes, sir.

Q.   And again, it's a three-page document, with your signature on the last page?

A.   Yes, sir.

Q.   And that signature is the exact same as, and as far as the date and the signature block area?

A.   Yes, sir.

MR. ROBERTS:  Your Honor, at this time I would offer the corrected addendum with the letterhead.

MR. WISEMAN:  No objection.

THE COURT:  Government's 16 is admitted.

USCA5 4248

BY MR. ROBERTS:

Q.   Dr. Moore, did you also have an opportunity to interview Alfred Bourgeois at the end of June 2010?

A.   Yes, sir.

Q.   The Government has offered and the Court has accepted Government Exhibits 19, 20, 21 and 22.  They are purported to be videotapes of your interview with Alfred Bourgeois.  Have you had a chance to observe those?

A.   Yes, sir.

Q.   Are they accurate and depict the interview you had with Mr. Bourgeois?

A.   Yes, sir.

Q.   Do you recall when you were first contacted in this case?

A.   I believe it was in July of 2009.

Q.   Do you recall the context in which you were contacted and what you were asked to do?

A.   I believe it was you, Mr. Roberts, who contacted me by telephone to talk a little bit about the matter at hand, perhaps about my availability, but I think even more so just asking a little bit about these types of situations.

Q.   What was your understanding at that time as to why you were being asked to evaluate the evidence in this case?

A.   To see, or to obtain my take on whether there was evidence that Mr. Bourgeois was mentally retarded, at a sort of a first glance level, if you will.

USCA5 4249

Q.    Do you recall, I mean, obviously you accepted the opportunity to review the evidence in this case.  Do you recall what we sent to you?

A.    There was a CD that had a substantial amount of material, trial data, declarations, testing, et cetera.

Q.    Government's Exhibit 15 has a list of the materials that you reviewed on the first page.  I ask you just to glance down that real quick.  And I'll also ask you to look at the second page.  It says, "Materials Reviewed Continued."

A.    Yes, sir.

Q.    Did you actually review all that information?

A.    Yes, sir.

Q.    Did you read all the transcripts?

A.    Yes, sir.

Q.    After you read all the transcripts, do you recall having additional conversations with myself or other members of the trial team?

A.    Yes, sir.

Q.    And what exactly did we ask you to perform, as far as your role in this case?

A.    In general, you asked for me to perform an assessment of whether Mr. Bourgeois was mentally retarded or not.  And as we went further in the case, my role became somewhat more refined.

Q.    Did we ask -- you heard Dr. Price testify a little earlier about splitting up of duties.  Can you tell the Court kind of

USCA5 4250

how that came about?

A.    Yes, sir.  There were two of us who had been contacted on the case who had expertise in this area, and determined that it would be beneficial to divide the duties to be able to take care of them more efficiently.  And so Dr. Price did more of the intellectual component, and I focused more on the adaptive functioning component.

Q.    I want to talk to you about some general terms and concepts first.  Obviously I'm not going to waste the Court's time going into detail about every concept in this, but there are some things that are important, so let me draw your attention on your, in your report.  You did two addendums, did you not -- or appendixes, didn't you?

A.    Yes, sir.

Q.    Do you recall what Appendix A and Appendix B are?

A.    Yes, sir.

Q.    Can you briefly summarize for the Court what addendum -- what Appendix A, the importance of Appendix A?

A.    Yes, sir.  There are two definitions of mental retardation that are primarily described at this point in time, one of them from the DSM-IV-TR, the Diagnostic and Statistics Manual, the other which has been promulgated by the AAIDD.

And it was my understanding -- one of the first questions always asked or that I always ask in these types of matters, because the definition of mental retardation under Atkins was

USCA5 4251

left to the states, is what's the prevailing definition?  And my understanding was that with current case law in this matter, it would be the definition that's currently denoted in the DSM-IV-TR.  And so I wrote my report based on that, but included as Appendix A how the data would be interpreted under the definition that's currently put forth by AAIDD.

Q.   Yeah, we've heard some testimony earlier, I'm showing you now what is Page 20, what is Page 20 of Government Exhibit 15. And I'm going to ask you, draw your attention to -- we heard testimony from Dr. Swanson and I asked her some questions about the different categories of domains and the ten domains.  You say in your letter here that the DSM-IV focuses on deficits in two or more of ten specified domains, whereas the AAIDD focuses on three broad domains.  Is that what you mean when you say there's actually two different kind of competing definitions for what we define in the area of adaptive functioning for mental retardation?

A.   Yes, sir.  Yes, sir.

Q.   So if someone reads this Appendix A, they would be able to understand kind of how the definition of mental retardation is kind of working its way out in your professional capacity and in the legal setting?

A.   Yes, sir.

Q.   You had an opportunity to review Dr. Swanson's adaptive deficit analysis.

USCA5 4252

MR. ROBERTS:  And if I could retrieve Petitioner's Exhibit 33.

(PAUSE.)

BY MR. ROBERTS:

Q.   I'm showing you what's Petitioner's Exhibit 33, Ms. Swanson's consultation.  It's dated August 12, 2010.  Did you have an opportunity to review this document?

A.   Yes, sir.

Q.   And you were sitting in here for Dr. Swanson's testimony?

A.   Yes, sir.

Q.   And in general, I don't want to get into the details of her conclusions yet, but in general, with regard to the two areas, these two separate areas of the DSM-IV and the AAIDD's definitions, I'm showing you on Page 3 of her report, which of those two definitions did she apply in her analysis?

A.   It appears that she applied the one of three, the three broad domains, but she also included bold and underlined sub-domains, if you will, from the two of ten.  So the two of ten is somewhat noted in there, but it appears that she's broken down her report in general by the three broader domains.

Q.   Can you tell from her report which of the two definitions she's actually relying upon?

A.   I believe she's relying on, or it appeared to me, from her report, that she was relying on the one of three.

Q.   I want to talk for just a minute about intellectual

USCA5 4253

functioning.  And we know that Dr. Price pretty much covered that area.  But do you have any significant expertise or experience with the Flynn Effect?

A.    Yes, sir.

Q.    Tell the Court a little bit about your understanding of the Flynn Effect.

A.    The Flynn Effect is based on a collection of research studies that Dr. Flynn had pulled together where he had made the observation that when newer tests are normed and there's reliability checks with previous versions of the same test or groups are tested over time with the same test, that there are changes in the population means on those.

     And in general, through the 20th century, those population means tended to rise.  And so at a general level, the Flynn Effect refers to changes at a population level on -- in performance on IQ measures over time.  By and large, they have been in an upward direction, not exclusively.  They've fallen over a relatively wide range.

     He then took the next step and said if there is -- let's just for ease sake say that there is a three-point rise, and there were ten years between when one test was standardized and the other test was standardized, then divide the three points by ten, and it would be approximately three points per year that the population performance is changing.

     There is a controversy over whether that's exactly what it

USCA5 4254

means.  What we do know is that the farther a test gets from its norming date, the less reliable the standardization is, because populations change in various ways.

The contention that it's a steady rise or that it is at a specific rate would certainly be -- that it's a steady rise would be controversial.  That it is at exactly the same rate I think would be extremely controversial, because we see very different rates when different tests are compared to each other.

Q.   Let me ask you if you wrote about that in your report, and --

THE COURT:  Okay.  So it's like almost comparing apples and oranges then to compare one test with another test?

THE WITNESS:  Yes, ma'am.  The rise of, or the change in scores has been shown to differ by test, subtest, population, age, culture --

THE COURT:  Okay.

THE WITNESS:  -- intellectual level.

BY MR. ROBERTS:

Q.   In that regard, first of all, did you -- I'm showing you what's marked Government Exhibit 15.  It's Page 8 of your report.  And it appears to me that you wrote a good bit on that, of the Flynn Effect aspect in your report.

A.   Yes, sir.

Q.   Okay.  I want to show you what is marked only for

USCA5 4255

identification purposes as Government Exhibit 207.  At the top of this, it's convergent evidence for the WAIS-III.  You gave me this document.  It's out of what publication?

A.    The WAIS-III manual.

Q.    Okay.  Does this document help you in any way describe some of the concerns about the Flynn Effect?

A.    Yes, sir.

Q.    Okay.  Can you please describe that for us?

A.    Well, for example, on this document, this is the type of data that Flynn uses to describe -- as support for his effect. And what's happened here is this is a reliability study.  So whenever a new IQ test comes out, one of the things that's done is to compare it with existing IQ tests as a check of its validity.  And so the new test and the old test are administered to people in a counter-balanced manner, and then the scores compared to look for a convergence of data, if you will.  And this would be the exact data that Flynn used.

      And in this particular case, the part that he would use would be the full scale IQ, under the WAIS-R, of 105.8, and the --

Q.    Where exactly is that on the document?  You can actually touch the screen and it will make some marks.

A.    Well, right here is the --

Q.    You can also erase it by going down to the bottom right corner.

USCA5 4256

A.    I tell you what, how about if I just -- it's right here.
I'm sorry, ma'am.  That part that it says "clear"?  Oh, gotcha.
Bottom left corner.  I gotcha.

     So if we look right here at this line, which says "Full
Scale IQ Score," we've got the full scale IQ score for the
WAIS-R population right here, and we've got the full scale IQ
score for the WAIS-III right here.  That's right here.  And so
at 105.8 on the WAIS-R, 102.9 on the WAIS-III.  And so what
Flynn would do is subtract 102.9 from 105.8, and then he would
divide that by the number of years between when the WAIS-R was
standardized and the WAIS-III was standardized, and that's
where he would get his rate.  In this particular case, it winds
up being about .171 points per year.

Q.    And you heard Dr. Gelbort's testimony.  What rate did he
apply?

A.    He applied .3.

Q.    And how is that different from what you were saying?

A.    Well, the rate of change is somewhat in contention.
The .3 is often cited.  AAIDD actually notes .33.  The actual
rate is, again, it varies across any number of different
aspects.  In fact, Flynn has testified that it may be 2.5
or .3.  There's been, again, variability around the particular
number to be applied.

Q.    Let me ask you -- I want to remove Government Exhibit 207
for identification and ask you, have you ever seen scores

USCA5 4257

adjusted, in a clinical setting, to account for the Flynn Effect?

A.   No, sir.

Q.   You are aware of my questioning of Dr. Gelbort with regard to applying or using the Flynn Effect in a court only.  Have you read that testimony?

A.   Yes, sir, I have.

Q.   Because you weren't actually present for his testimony. It was on earlier this month.

A.   That's correct.

        MR. WISEMAN:  Your Honor, I think the record would reflect that Dr. Moore was present for a good part of Dr. Gelbort's testimony.

        MR. ROBERTS:  That's correct.

BY MR. ROBERTS:

Q.   Let me just clarify.  You had to leave early.  You were not able to hear the end of his --

        THE COURT:  He left at 4:00, and we finished about 6:40 that night.  And we started at --

        MR. WISEMAN:  3:00 o'clock.

        THE COURT:  -- I think about 3:00 o'clock.  So he was here for just a fragment of his testimony, less than a third.

BY MR. ROBERTS:

Q.   And were you able to hear my interaction with him about his application of or using the Flynn Effect?

USCA5 4258

A.    I read it.  It was after I had left.

Q.    My question to you is, he seemed to have some problem with my use of the term "applying" or "using" as it related to the Flynn Effect.  And my question to you is, was I misusing the terms with regard to the Flynn Effect?

A.    No, sir.  Those were the appropriate verbs to use.  "Did you apply it?"  "Did you utilize it?"  "Did you correct the scores for it?"  Those are the verbs that would be used.

Q.    Okay.  Let me ask you this.  Is the Flynn Effect a concept that is widely accepted across the psychological field?

A.    I think it depends what you mean by the Flynn Effect.  If what you mean by the Flynn Effect is that the norming, the reliability of the norming tends to decrease over time, I think that's widely accepted, and was I think widely accepted before Flynn came along, but he certainly has brought it onto the fore.

If you're referring to whether scores should be adjusted based on the Flynn Effect, that would be significantly controversial.

Q.    In fact, you made a comment about that on Page 8.  I'm showing you what's Government Exhibit 15, Page 8, and I'm pointing right in the middle of the page, where it says, "In sum, it is not professionally accepted practice to alter obtained IQ scores for the Flynn Effect or any other factors."

That's still your belief?

USCA5 4259

A.    That's correct.  When we obtain IQ scores, we report the scores that are obtained, and then in our narrative indicate if there are factors that would affect the validity or the reliability of those scores.

Q.    Now, the Petitioner did a very nice chart comparing Dr. Weiner's scores in the WAIS-IV -- I'm sorry -- the WAIS-R that he applied in 2004 or gave in 2004, and the WAIS-III that Dr. Gelbort gave in 2007.  So I'm showing you what's marked as Petitioner's Exhibit 155.  And we've heard testimony and noted the differences on the scoring.  What I wanted to ask you is in your assessment of all of the data that you've seen in this case, what is the significance of the decrease on the verbal IQ of Dr. Gelbort's versus the increase on performance in Dr. Gelbort's testing?

A.    What was notable to me about this -- and in just a moment I'm going to ask you, can you put the other chart back up on to the screen, but just for a moment, if we'll look at here in the verbal, we've got a 76 versus a 67.  So on the WAIS-R, he scored a 76, and on the WAIS-III, a 67.  And down here, he scored a 76 on the performance and a 78 on -- I'm sorry -- a 76 on the performance of the WAIS-R and a 78 on the performance of the WAIS-III.  And then a five point difference down here, the full scale.

So he went down by nine points on the verbal, up by two points on the performance.  And then overall, down five points

USCA5 4260

on the full scale.

If you could put that other chart up for me.

Q.   Would it be this chart?

A.   Yes, sir.

Q.   Okay.  You can clear those dots.  Government Exhibit 207 I'm showing you again, which is marked for identification only, and how does that chart help you in explaining his scoring?

A.   Well, what was striking to me is that his verbal IQ dropped by nine points.  But if we look in general, when one compares the WAIS-R to the WAIS-III, we'd only expect about a point drop.  And when we look at the performance, his score went up by two.  But what we would have expected, in general, in a population level, would have been for it to drop by about four points.

So the difference of five points versus an expected difference on the full scale of three points or so, that's not so striking to me, when it got collapsed.  But what was really strange to me was when we would have expected the verbal to have gone down a tad, it went down a lot.  And we would have expected the performance to have gone down a moderate amount, but it went up a bit.

So there are two things about that that stood out to me. First of all, this is one of the reasons that we don't apply something like the Flynn correction to individual scores, because we see right here his very performance on the verbal

USCA5 4261

and performance aspects are different from the trends that we would expect.

The second part that was striking to me about it is the one thing that I think everyone would agree on is that his verbal skills are his strength.  And to have them drop by nine points, that's a significant drop.  That's a notable drop.

Q.   Again, and that's, when you say nine points, you're talking about the 67 he scored when Dr. Gelbort gave him the WAIS-III versus the 76 he scored when Dr. Weiner gave him the WAIS-R?

A.   Yes, sir.

Q.   Now, what may be a little confusing, and it was to me, I know, when we first started discussing this, is that you're actually still using the WAIS-R to some extent, and yet it's your professional opinion that the WAIS-R should have never been given.  Is that right?

         MR. WISEMAN:  Objection to leading, Your Honor.

         MR. ROBERTS:  It's just a foundation question, Your Honor.

         THE COURT:  Overruled.

BY MR. ROBERTS:

Q.   So you really -- so I guess my question is, why would you continue to point to the scoring on the WAIS-R if, in your opinion, and you've said so in your report, the WAIS-R is really invalid as a scoring mechanism?

USCA5 4262

Moore - Direct                          93

A.   I was very struck by the use of the WAIS-R at that time.

The WAIS-III had been out for about six years at that point.

Q.   But in answering my question, though, why would you

continue to point to the scoring and the actual testing that

underlies the score if you think a test is invalid?  Does it

help us in any way assess his --

          MR. WISEMAN:  Objection to "invalid," Your Honor.  I

don't think there was testimony it's invalid.  And if there

isn't, he's leading the witness.

          THE COURT:  Sustained.

          THE WITNESS:  The scores --

          MR. WISEMAN:  It's sustained, sir.

          MR. ROBERTS:  Let me ask you the question.

          THE COURT:  That's the difference, isn't it?  Okay.

          MR. WISEMAN:  I thought your words meant something,

but that might just be me.

BY MR. ROBERTS:

Q.   My question is with regard to -- do you think it was

appropriate for Dr. Weiner to give the WAIS-R in 2004?

A.   I don't think that it was appropriate for him to give the

WAIS-R in 2004.

Q.   And you commented on that in your report, did you not?

A.   Yes, sir.

Q.   What did you say in your report?  I'm having a hard time

finding it.  Do you remember?

USCA5 4263

A.    Well, in sum, I thought that it was, that it was inappropriate to have given a test that was that far out of date.  What I actually say is, it's on Page 7, "At the time that Dr. Weiner conducted the assessment, the new edition of the Wechsler scale has been published and in use for over six years.  It's unclear why such an outdated test was utilized."

Q.    Let me just stop you for a second, because I did find Page 7, and I want to zero in, and which sentence were you reading?  Can you point us to the sentence?

A.    Yes, sir.  I started right here.

Q.    Where -- that's where it says, "95 percent confidence intervals" --

A.    No, sir, I mean right there where that "at" is, "at the time" --

Q.    Where the "at" -- okay.  Go ahead.  Tell us what you were saying about Dr. Weiner's use of this test.

A.    So I pick up at, "in use for over six years."

        MR. WISEMAN:  Your Honor, I'm going to object to this testimony.  Dr. Weiner is a neuropsychologist who provided a neuropsychological reason for his administration of the WAIS-R, and that explanation was that it is norm for the neuropsychological deficit scale, the Halstead-Reitan battery, and this witness has not been qualified as a neuropsychological expert, and I don't think he's qualified to offer an opinion on that explanation by Dr. Weiner.

USCA5 4264

MR. ROBERTS:  Your Honor, I'd be happy to let him question him on his neuropsychological expertise.

THE COURT:  Go ahead.  Would you like to take him on voir dire on that?

MR. WISEMAN:  Well, I didn't hear an offer.

THE COURT:  I didn't either.  Do you want to offer him for that and lay a, you know, ask him the questions?

MR. ROBERTS:  Your Honor, I just actually was asking him his opinion of Dr. Weiner's testimony.  I wasn't really asking him within his expertise.

THE COURT:  Okay.

MR. WISEMAN:  And I was really just objecting.

THE COURT:  Uh-huh, and -- okay.  So --

MR. ROBERTS:  What I'll do --

BY MR. ROBERTS:

Q.   Let me ask you, what -- the question that I began this with is why would someone in your position, with the mental retardation assessment experience that you have, still consider a test, the testing scores, when it was given at a time when it's outdated?  And I meant the testing scores, I meant the underlying testing data versus --

A.   The data is data from a test that had been administered. My concern with it is simply the lowered reliability and validity of the scores.

Q.   Okay.  Let me ask you this, were there any other

USCA5 4265

achievement testing that Mr. Bourgeois participated in that gives you any insight into his intellectual functioning?

A.    Yes, sir, there was additional achievement tests that would give me an insight into his cognitive functioning.

Q.    What was that?

A.    He was given Wide Range Achievement Test, WRATs, by Dr. Weiner and Dr. Gelbort, and he was given a Woodcock-Johnson by Dr. Swanson.

Q.    And in your report, do you reference where he would score at the grade -- well, let me just show you.  On Page 7 of your report, Government Exhibit 15 again, you note that, at the end of the first full paragraph, on the 2007 achievement testing, Mr. Bourgeois scored at the grade equivalent of high school in reading and spelling, and at the fifth grade level in arithmetic.  What significance is that statement in your report?

A.    That's based on the WRATs that had been administered to Mr. Bourgeois, and it showed a level, particularly in regards to his reading and spelling, that were certainly very strong in regards to the IQ testing, but particularly with the verbal IQ testing.

Q.    I want to move now to the area of malingering, because that's been mentioned quite a bit this week.  Tell us how, in your understanding, how a psychologist attempts to detect malingering when they're giving tests.

USCA5 4266

A.    Well, there are a number of different ways.  We certainly, you know, watch for physical or behavioral signs that an individual may display, but we also look for patterns in the testing, and we also administer different types of measures that would be suitable to hopefully detect malingering.

Q.    We've heard a little bit of testimony about TOMM.  Is that T-O-M-M?

A.    Yes, sir, the Test of Memory Malingering, the TOMM, created by Dr. Tom Tombaugh.

Q.    And can you tell us a little bit of how easy or hard the TOMM is?

A.    No, the TOMM is a very, very simple test.

Q.    Can you give us an example of some of the questions that might be asked?

A.    Well, it's not so much that there are different questions. The way the TOMM is set up is that it's based on visual memory. And so an individual would be shown one at a time about 50 line drawings, like a wheelbarrow or a bucket or whatnot.  And then they would be shown pairs of line drawings, one which they had seen before and one which they had not, and they're asked to identify which one they've seen before, with corrective feedback given.

Q.    And that's just one example --

A.    Yes, sir.

Q.    -- or is that how the whole test is administered?

USCA5 4267

A.    That's how the whole test is administered.  There are a couple of trials to it.

Q.    And there's been some testimony with regard to areas of which Alfred Bourgeois is unable to perform or perhaps has some deficiencies in these areas.  What was your opinion about his ability to comprehend -- he was given a TOMM in this case, wasn't he?

A.    Yes, sir.

Q.    What was your opinion about his ability to perform on that test?

A.    He did well on the TOMM.  He made 47 of 50 on the first trial and 50 of 50 correct on the second trial.

Q.    So that --

THE COURT:  So what does that mean?

THE WITNESS:  That means that he was correctly, on the second trial, he was correctly identifying each object that he had seen before.  And so it would indicate that -- well, there would be no indication of significant malingering on that test, or there's no indication of malingering.  I'll take the "significant" out.  There's no indication of malingering on that test, on that administration of it.

THE COURT:  So what is it -- so what did he -- what did that measure?

THE WITNESS:  Well, it is an effort test, and one of the things that, one of the characteristics of malingering is

USCA5 4268

that it's not necessarily a universal phenomenon.  First of all, it's not necessarily a longstanding characteristic.  But also malingering, the symptoms that an individual malingers depend in part on what they're attempting to malinger.  So, for example, if someone is attempting to malinger a psychosis, they might perform well on a test of memory malingering, for example.

And so what this indicates is that in regards to a test of whether he was malingering a memory dysfunction, there didn't appear to be evidence of that.

BY MR. ROBERTS:

Q.   But does that test also show you anything about his ability to understand or follow directions?

A.   Well, it shows his ability to follow directions on it as well.

Q.   You mentioned this idea of not trying hard enough.  So let me ask you, there was a -- when Dr. Price was testifying, Judge Jack had a question to him about what would happen if someone's just not trying hard enough.  I think that was the Judge's words.  When you look at his IQ testing and the questions, the raw data, is there any evidence that you see in there that would communicate to you that Alfred Bourgeois may be -- may not have been trying hard enough in this particular case on the IQ testing?

A.   I have looked and looked at the intellectual

USCA5 4269

neuropsychological data in this case, and they're puzzling to me.

MR. WISEMAN:  Your Honor, I'm going to object.  He's talking about neuropsychological data.  If he wants to talk about the IQ test, I have no objection.

BY MR. ROBERTS:

Q.   I guess I'm not smart enough, Dr. Moore, to know the difference between the two of them.

A.   There's sort of a blend.

Q.   I do want to -- I do want to get to the -- I believe there are some -- you've indicated that there are some answers that were on the WAIS-R that you found puzzling to you.  Can you give us some specific examples of where you, where there was a question he was asked on the WAIS-R, where you would have thought he should have gotten it correct and he didn't?

A.   Yes, sir.  In looking just at the WAIS-R, there were a couple of items that stood out to me.  Just thinking of a few examples, one would be on the information test.  One of the very early items is "In what direction does the sun rise?"  And I think Mr. Bourgeois answered, "Up in the sky."  And, but --

Q.   Is that a verbal test, or is that a multiple choice test?  How is that --

A.   It's a verbal, it's a verbal test, so --

Q.   In what way?  Is a question posed and someone answers it?  Is that how --

USCA5 4270

A.    Yes, sir.

Q.    Okay.

A.    And that answer was a bit striking to me, because Mr. --

Q.    Well, that answer is actually correct.  I mean, it's in the sky.  So did he get it right or wrong?

A.    He got it incorrect.

Q.    Why is that?

A.    The correct answer would be "The sun rises in the east."

Q.    And so why is that striking to you with regard to this case and Alfred Bourgeois?

A.    Because Mr. Bourgeois was a long-distance truck driver, driving a route that went from New England to California.  And so driving into the sun, the sun in your eyes, either in the morning or the evening, depending on whether you were driving east or west, that would seem to have been an answer that he would have known more readily than that.

Q.    Was there any other question that just stands out in your mind about, that you thought was a little strange in the answer?

A.    Another one was to name four men that had been President of the United States since, I believe since 1952.  And he provided four names, one of them incorrect, but he didn't name the current or even the most recent President.  It would have been an easy, an easier item than when the test had been normed, because we had had a few more administrations,

USCA5 4271

governmental administrations, presidential administrations by then. But he missed the question. It was a little striking to me that some of the easiest answers would have been the current or past President. And those weren't included.

Q. Do you remember which ones he included?

A. I think Nixon was in there. I think Roosevelt was in there. I don't recall whether Kennedy was, and then George Washington was.

Q. And the question again was to name them, the Presidents since a certain time?

A. Any four men who had been President of the United States since that time.

Q. Since what time? What year?

A. I think it was 1952. It's been a while since I've administered a WAIS-R.

Q. Let me move on to the adaptive functioning area. In your report, on Page 8, you begin discussing adaptive functioning. Does your report on that page -- can you show us on that page where you actually attempt to define "adaptive functioning"?

A. Yes, sir, right here.

Q. Okay. Let me ask you about a sentence before that, where you state that intellectual testing seeks to measure what a person has the potential to do, whereas assessment of adaptive functioning seeks to measure what a person typically does. Tell me what exactly you mean by that.

USCA5 4272

A.    The intellectual functioning is, I guess, seen as a testing of the limits, if you will, how far can a person stretch, how well can they, how well can they maximally do, what's their maximal performance, whereas adaptive functioning is based on what does a person generally do.  That's one of the reasons why in adaptive functioning measures we don't generally come in and give a person items to do, because the contention there would be that the issue is less what they're able to do in a particular setting than what do they generally do in their daily life.

Q.    And when you, the place where you put the dot -- I'm going to move that.  It starts, it's actually the line before that, that says, "According to the DSM-IV."  So is this definition, "Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in a particular age group, sociocultural background and community setting."  That's straight out of the DSM-IV?

A.    Yes, sir.

Q.    Is that the definition that you use when you're doing an adaptive functioning assessment?

A.    Yes, sir.

Q.    When you're doing, preparing to assess adaptive functioning, what type of data do you consider?  How do you go about deciding what it is you're going to consider?

USCA5 4273

A.   I try to get as many records as I can, because I'm trying to get a snapshot of -- actually not a snapshot, an overview of what this person's functioning is like and has been like.  So I'd seek to get employment records, hospital records, if there's been disability applications, school records, whatever records that I can.

Q.   And we heard about -- we've heard testimony about an ABAS and a Vineland.  Are those instruments commonly used in adaptive functioning assessments?

A.   Yes, sir.

Q.   How do you go about selecting the individuals that you might decide to interview?

A.   Well, at a most basic level, we want to have people who know the individual well and across a variety of settings. Certainly, we want to be aware of whether the person has a vested interest in the outcome.  So we want to make sure we get good and objective data.  And in a forensic setting, that becomes even more of a challenge.

Q.   When you're trying to -- is there a specific word that you use -- or let me just show you, on Page 15, Page 9 of Government Exhibit 15, this is right after, on Page 8, where you were defining "adaptive functioning," you mention a concept of a significant deficit and how it's generally taken to be approximately two standard deviations below the mean.  Is that something you're looking for when you're assessing the testing

USCA5 4274

of individuals in adaptive functioning?

A.   Yes, sir.

Q.   Can you expound on that a little bit more and help us understand about this two standard deviations below the mean, why that's important?

A.   Most naturally occurring phenomenon fall on a bell-shaped curve of frequency.  So the curve, the frequency curve looks like a bell, and the average is right in the middle, and that's the most common score.  More people have that score than any other.  But most people don't have that score.  Most people differ from the average.

And one standard deviation, or a standard deviation is the average amount that people differ from the average by.  And the bell-shaped curve has some very specific characteristics related to standard deviations in the frequency distribution.

So about 34 percent of the population falls between the mean and positive one standard deviation, and about 34 percent of the population falls between the mean and minus one standard deviation.  So about 68 percent of the population falls between plus and minus one standard deviation.

Another 14 percent fall between one standard deviation and two standard deviations, and about 14 percent between minus one and minus two.  So then about 96 percent of the population falls between minus two standard deviations and positive two standard deviations.

USCA5 4275

And we consider a person to be significantly subaverage when they are approximately two standard deviations or more below the mean.  In other words, when they're at about the second percentile or below.

Q.   Can you put that in some kind of layman's terms so I can understand?  I mean, is there a numerical value that you can apply to help us understand standard deviations?

A.   I think that's one of the biggest challenges in bringing data into the courtroom is because, as statisticians -- I used to teach statistics -- as statisticians, we get used to weaving all in and out.  To me, I try to keep it a little bit simple.

If we'll think in standard scores, standard scores have a mean of 100 and a standard deviation of 15.  So that's where the IQ of approximately 70 comes into play.  And when we look at other measures that have been standardized on that type of distribution, we can look at scores of about 70 as being our key number.

MR. ROBERTS:  I need to retrieve Petitioner's Exhibit 170.

(Counsel conferring off the record.)

MR. ROBERTS:  Could I have just a moment, Your Honor?  Seems like there's one exhibit that none of the parties have in order.

THE COURT:  Sure.

(Counsel conferring off the record.)

USCA5 4276

BY MR. ROBERTS:

Q.    Well, I can't find the exhibit right now, but let me ask you if you recall when I was talking to Dr. Swanson and there was a chart that listed the raw data for Beverly Franks.  And it had a bunch of numbers of her -- it had "SS" at the top of the document.  I believe it was Petitioner's Exhibit 171, for identification.  But they said they didn't offer it, so --

MR. WISEMAN:  Mr. Roberts, I think it's a different document.  I can provide it to you.

MR. ROBERTS:  Actually, it's Petitioner's Exhibit 35.  I couldn't find it.  Page 13.

MR. WISEMAN:  I hope the record is reflecting just how overly cooperative I'm being, Your Honor.

THE COURT:  I will make that reflection.

MR. WISEMAN:  Okay, thank you.

THE COURT:  Nothing unusual about it, Mr. Wiseman.

MR. WISEMAN:  I certainly appreciate that.

MR. ROBERTS:  And I will acknowledge it as well, Your Honor.

BY MR. ROBERTS:

Q.    Do you recall when I was speaking, asking Dr. Swanson about the scores that are over here under the SS?

A.    Yes.

Q.    And when we were talking about the scoring, and I had asked her a question, what is your opinion on Alfred

USCA5 4277

Bourgeois -- well again, let me take this away for a minute, and let's talk about this just a minute.  There's a little confusion about the ABAS and the Vineland, because these are individuals that are taking the test, but they're taking it about someone else.  Is that right?

A.   Yes, sir.

Q.   Okay.  So this raw data that we're looking at in relation to Beverly Franks' testing, these are actually the scores --

MR. WISEMAN:  Your Honor, I would --

MR. ROBERTS:  I'm sorry.

BY MR. ROBERTS:

Q.   I'll ask you.  You tell me, what does "raw data" mean?

A.   This is actually from the Woodcock-Johnson, not from the Vineland or the ABAS.  So this is his achievement testing, not his adaptive functioning testing.

Q.   Okay.  I had asked you earlier about achievement testing. Is there anything significant about the scores under the SS that help us understand anything about Alfred Bourgeois?

A.   Yes, sir.  I believe there is.  Again, what we're looking at is in comparison to the general population, a person with mental retardation is significantly impaired.  Generally about two standard deviations below the mean.  And the standard scores here have a mean of 100 and a standard deviation of 15. So two standard deviations below the mean or significantly impaired would be a score of about 70 or below.

USCA5 4278

And what we see on here is, as we follow down this --

Q.   And you're drawing a line there between --

A.   This line of standard scores --

Q.   Let me just comment for the record, you're drawing a line between the RPI line and -- list, and the SS list?

A.   Yes, sir.

THE COURT:  We're just looking at the SS list of things that may be under 70.  Right?

THE WITNESS:  Yes, ma'am.  I'll take the line off then.  Yes, ma'am.  And so we see the majority of those scores are of 80 or above.  A couple of exceptions, but by and large he's scoring 80 or above on the particular subtests.

BY MR. ROBERTS:

Q.   Does that tell us anything about Alfred Bourgeois's abilities?

A.   Well, it appears that at a global level he is functioning in this test of academic achievement.  By and large, he's functioning in the lower part of the low average range, with a couple of areas that he was significantly below in.

Q.   Okay.  We're going to -- we'll get more into those in a few minutes.  We'll go back now to your selection of individuals.  Is there anything about the relationship that plays a role in your determination of who you're going to interview?

A.   Yes, sir.  We want to try to find folks who know the

USCA5 4279

individual well, but we also need to find folks who don't have a vested interest in the case, or are as neutral as possible. And oftentimes that is a significant challenge. The better that a person knows someone, the more likely they are either in a positive or negative way to have a vested interest. And the less vested interest that they have, the likelihood is perhaps the less well that they know the person. And so we're looking at trying to create an optimal balance between those two factors.

Q.   Did you select a number of people to interview in this case?

A.   Yes, sir.

Q.   I'm showing you what's Page 2 of Government Exhibit 15, and it has a list there of interviews conducted. Are those the individuals that you interviewed in this case?

A.   Yes, sir.

Q.   Which of those did you interview with regard to trying to make you, help you with your adaptive functioning assessment?

A.   All of them were in an effort to help with the adaptive functioning assessment, although there were, a subset of those were actually administered adaptive functioning measures to, and those would be Danny Clark, Michelle Armont, Nathaniel Banks, and Rhonda Davis.

Q.   When did you schedule your interviews? Do you recall what month and year?

USCA5 4280

A.    I think it was in -- I think they were actually scheduled

in late June of this year and took place in mid July of this

year.

Q.    What states did you go to, did you travel to to interview?

A.    Louisiana and Alabama.

Q.    On Page 10 of your report -- I'll show you what's marked

as Page 10, or what is Page 10 of Government Exhibit 15, ask

you to look, ask you to look over this paragraph, top paragraph

and tell me if that is some of the discussion of the people you

interviewed in your efforts to do an adaptive functioning

assessment.

A.    Yes, sir.

Q.    Who was the first person that you interviewed?

A.    On that trip?

Q.    On that trip.

A.    Michelle Armont.

Q.    All right.  Describe for the Court what happened when

you -- how did you arrange this interview, and what happened

when you showed up?

A.    The interview had been arranged through the Attorney

General's Office, I believe.

Q.    The Attorney General's Office?  Or would it be United

States Attorney's Office?

A.    United States Attorney's Office.

Q.    That's all right.  It happens sometimes.

USCA5 4281

A.    Yeah, I'm sorry.

MR. WISEMAN:  I thought Mr. Holder was involved.

THE COURT:  Definitely.

MR. ROBERTS:  Yes.

THE WITNESS:  I beg your pardon.  Y'all's office.

BY MR. ROBERTS:

Q.    Okay.  That's a good southern expression.  So tell us what happened when you -- you said that our office helped arrange the interview, called ahead.  So what happened?  Did you get a scheduled date for that interview?

A.    Yes, sir, we did.  I think the interview was scheduled for 9:00 or 9:30 in the morning, and at Ms. Armont's house.  And when we arrived at her house, there were already a couple of other individuals present.

Q.    Do you know who those individuals were?

A.    Yes, sir.  I didn't know at the time who they were, but I've come to understand it was Ms. Larin and --

Q.    The co-counsel for the Petitioner?

A.    Yes, sir.

Q.    And who else?

A.    And their investigator.  I'm sorry, I'm not sure what her name is.

Q.    Okay.  And did they, did they explain to you their purpose for being there?

A.    They --

USCA5 4282

Q.   I'm just asking you, without them telling you, did they
explain to you why they were there?

A.   They were I think more explaining to Ms. Hohle from your
office --

Q.   You're talking about Debbie Hohle from our office?

A.   Debbie Hohle, yes, from y'all's office.

Q.   Spoke with her?

A.   About why they were there.

Q.   Okay.  I guess my question for you is, did their presence
concern you at all about your ability to get an accurate
assessment from Michelle Armont?

A.   Yes, sir.  I've never been in a situation before, in all
the forensic evaluations that I did, where opposing counsel or
an investigator were there unexpectedly.  There's only one
situation I ever had where opposing counsel was even there, and
it had to do with a very elderly witness, where it was agreed
upon in advance that both parties would be there, because we
didn't want to unduly burden.

Q.   Do you know what Debbie Hohle -- you said, you mentioned
Debbie Hohle's name.  Do you know what her role is at the U.S.
Attorney's Office?  Is she an attorney?

A.   No, sir, I don't believe that she is.

Q.   Okay.  Do you know what --

A.   No, sir, she's not.  She seems to make all the travel
arrangements and to take care of everything, it seems.

USCA5 4283

MR. ROBERTS:  Let the record reflect, Your Honor, that --

THE COURT:  That she's fantastic?

MR. ROBERTS:  Yes, Your Honor.  Thank you.  Can I say "thank you" in that instance, Your Honor?

THE COURT:  You can.

MR. ROBERTS:  Thank you.

BY MR. ROBERTS:

Q.   What was her role in being with you at the actual interviews?  Do you have any -- was she, did she have any role that you know of, other than to --

A.   She had no role in the interviews.  In fact, in all the other interviews that I conducted, she wasn't even present.  They would drop me off at the house.  She and Mr. Dan Smith was driving us.

Q.   And Dan Smith is -- what agency is he with?

A.   He's with the FBI.

THE COURT:  So somebody showed up at his interview?

BY MR. ROBERTS:

Q.   Can you tell her who showed up?

A.   They were there when I got there.

THE COURT:  And you made an appointment with her?

THE WITNESS:  Yes, ma'am.

THE COURT:  To see -- that's Mr. Bourgeois's sister?

THE WITNESS:  Yes, ma'am.

USCA5 4284

THE COURT:  Did they say what they were doing there?

THE WITNESS:  The indication that I had was that Ms. Armont had contacted the investigator and had asked did she need to have Counsel present, or I'm not sure exactly what it was that was said, and so Ms. Larin was called in, was present to be there.

THE COURT:  So did you get to do your interview?  Or did that compromise it?

THE WITNESS:  Could I have C, both of the above?

THE COURT:  Yes.

THE WITNESS:  I did it.  I was there.  And it certainly gave me significant concerns about the interview. And as we were leaving, we had a whole series of interviews scheduled.  I was doing about five or six.  And the indication to us was that we would be seeing them throughout the day.

And so we made a couple of schedule adjustments, and then wound up going to Alabama to do a different set of interviews.

BY MR. ROBERTS:

Q.   And again, your goal in going out there was what?  Your goal in going to Louisiana to do this interview with Michelle Armont, what was your -- what were you attempting to do?

A.   I was attempting to do an interview with her in regards to Mr. Bourgeois's adaptive functioning and perhaps to administer an ABAS, if I deemed that appropriate.

USCA5 4285

Q.    And did you actually get to administer the ABAS?

A.    I did.

Q.    Tell, please inform Judge Jack of who was present throughout that interview, and what if any actions they took while they were, while the interview was ongoing.

A.    Well, while the interview was ongoing, we were around a table in her, in her dining room area, me at one end, the investigator at the other, Ms. Larin on one side of the table and Ms. Armont on the other.

And throughout the interview at various points --
Ms. Armont clearly was unsure whether, you know, kind of what the situation here was, if she had somehow done something wrong.  And I think everyone was trying to assure her that she was okay.  But she was certainly, you know, glancing back and forth at the, Ms. Larin.  The investigator was taking notes throughout, and Ms. Larin had a computer and at various points would type in regards to different comments that Ms. Armont made.

And for me, that's a bit of a -- there's a bit of a challenge with that.  Your Honor may have noticed in the interview that I did with Mr. Bourgeois that I wrote virtually the whole time.  And the reason that I do that is whenever I'm taking notes with someone --

THE COURT:  So that he doesn't think that one thing is significant and something else is insignificant.

USCA5 4286

THE WITNESS:  Yes, ma'am.

THE COURT:  So you keep writing all the time.

THE WITNESS:  Yes, ma'am.

BY MR. ROBERTS:

Q.   In your report, I'm showing you your report on Page 11, Government Exhibit 15, there's a sentence at the top there. Does that relate to the results of the testing of Ms. Armont and your conclusion as to whether they're reliable or not?

A.   Well, certainly the presence of --

Q.   What I'm referring to right now --

MR. ROBERTS:  I'm sorry, Your Honor.  I'm going to interrupt for a minute.

BY MR. ROBERTS:

Q.   What I'm referring you to right now is just this question. Does this sentence at the top, the very top sentence, does that refer to your -- what does that refer to, this sentence at the top that starts with, "As such," and ends in "validity."

A.   In looking at the results of the ABAS that Ms. Armont had completed, there were significant questions about validity of that measure.  I had concerns while she was taking it, but in looking at the results, those concerns were certainly verified.

Q.   Okay.  Can you explain to the Judge what those concerns are?

A.   Well, during the actual administration of the ABAS -- actually, let me take one step before that.  During the

USCA5 4287

interview, Ms. Armont seemed to be very tuned in to the issue of mental retardation as a key issue.

Q.   What do you mean by that, she tuned in to the issue?

A.   Well, for example --

THE COURT:  Well, she had been previously coached, is what you're saying?

MR. WISEMAN:  Your Honor, I respectfully object to that characterization that I coached a witness.

THE COURT:  Is that the characterization?

THE WITNESS:  It appeared to me that she was well aware that mental retardation was the issue at hand.

THE COURT:  Okay.  So somebody had told her.

THE WITNESS:  She was aware.

THE COURT:  Okay.

BY MR. ROBERTS:

Q.   So, and we're going to -- you've got, on Page 12 of your report, you've got a list of some of the scores.  I'm going to get to that in a minute.  But I want to ask you before we go to that, did you speak to any other family members of Alfred Bourgeois in an attempt to get them to complete any of the ABAS testing?  And if so, what happened?

A.   Yes, sir.  I also went to the home of Ms. Claudia Williams.  She and her --

Q.   Let me stop you there.  Was that prearranged also?  Did you call ahead of time, or did you just show up?

USCA5 4288

A.   We -- I believe that we called ahead of time.  We were doing -- we did the interview out of order with what had been anticipated.

Q.   Why did y'all decide to do that?

A.   We were seeking -- I was seeking to be able to have an interview with the Respondents without opposing counsel present to be able to do a clinical interview in the way that I generally do a clinical interview.

Q.   And did you get an opportunity to speak with Ms. Claudia Williams?

A.   Yes, sir, I did.

Q.   Were you able to do a, complete an ABAS test with her?

A.   No, sir, I didn't.  We spoke for a while, and I had the ABAS out in front of, or had it there, and Ms. Williams looked through it and very much struggled in terms of, of whether to complete it or not.  She asked --

Q.   I'm sorry.  Did you say "struggled"?

A.   Struggled emotionally in terms of -- I say emotionally, because she sort of teared up.  It was clear in talking about Mr. Bourgeois, it certainly is an emotional situation for her. And she asked, did she have to complete the form.  And I told her, "Of course not."  That was certainly at her option, and she declined to complete the ABAS because she indicated she didn't want to do anything that could be potentially of harm to her brother.

USCA5 4289

Q.    You mentioned earlier you had also given an ABAS to Danny Clark, Rhonda Davis and Nate Banks.  I want to ask you about your Appendix B to your report.  Please inform the Judge what exactly Appendix B is and why you had to add that.

MR. WISEMAN:  Your Honor, I'm going to object, although it might be premature, to any reference to Mr. Banks' ABAS.  He, in a sense, has given statements to the Government psychologist.  He's not here for us to examine him as to the veracity of his responses.  I think it's a denial of our right to confront what is in effect a witness against us.

THE COURT:  Who are you talking about again?

MR. WISEMAN:  I'm sorry?

THE COURT:  Who are you talking about again?  Say it again.

MR. WISEMAN:  That would be Mr. Banks.  He's not being produced by the Government as a witness in this case, and I would like an opportunity to ask him about his responses, which the Court permitted us to do with the other ABAS Respondents.

MR. ROBERTS:  Well, Your Honor, my only response to that is that we're going to compare the scores.  We're not going to get into the actual questions of Nate Banks.  But I will get into what his focus was on his test and how those test results affected the assessment.

MR. WISEMAN:  Your Honor, the scores and responses

USCA5 4290

are based on questions, and I have a right to probe why he gave certain responses, as I did with the other witnesses, when Your Honor approved the bathtub questioning.  I don't see how this is any different.

MR. ROBERTS:  Your Honor, we turned over all the raw data to the Defendant, to the Petitioner, and they have all the information.  And these -- Nate Banks' responses are in the report that is already in evidence.  And the report discusses his scores, and we're not going to get into any actual hearsay.  There's nothing going to be offered for the truth of what's asserted, other than to show the same assessment that they've submitted through Beverly Franks, that we've submitted through Armont, Clark and Davis.  So it's really peculiar that they pick Nate Banks out of the whole mess to say they're objecting to his response.

MR. WISEMAN:  Well, he's the only one who's not here. I didn't object to the others.  It is hearsay.  It is being offered for the truth.  If Mr. Banks says Mr. Bourgeois, you know, always grabs hot dogs off of grills or not, I have a right to probe that, and --

THE COURT:  Sustained.

MR. WISEMAN:  I would assume, Your Honor, that portion of the report, referring to Mr. Banks, would also be stricken?

THE COURT:  No.  It's already been admitted.

USCA5 4291

MR. WISEMAN:  I'm sorry?

THE COURT:  It's already been admitted.

MR. WISEMAN:  Okay.

MR. ROBERTS:  Well, Your Honor, may I just have a point of clarification?

THE COURT:  No.

BY MR. ROBERTS:

Q.   Can you explain for us, Dr. Moore, Appendix B?

A.   Yes, sir.  We've been, or y'all have been referring to Banks.  This was actually in regards to Danny Clark, the Appendix B.  I administered the ABAS to Mr. Clark, and I interviewed him as well.  In fact, I had spoken with him on the phone as well as spoken with him that day.  And after I left with the ABAS, he was on a work break and had kindly agreed to meet us.  We had a relatively short period of time.

And so after we had left, I looked at his responses and his scores, and they were at odds with how he had described Mr. Bourgeois to me.  And --

Q.   I'm going to stop you for a minute, because it says at the top, "Results from Invalid ABAS."  What does that actually mean?  You may be getting there, but --

A.   Well, as directed by the ABAS manual, when there is a disparity between the scores obtained and the other information, for instance, interview information you get from someone, you need to determine why.  And in speaking to

USCA5 4292

Mr. Clark, it became apparent that he had not fully understood the instructions for the ABAS, and thus had completed the form in a manner that invalidated the scores.

Q. What did you do in regards to this invalid test result?

A. I asked him if he would be willing to complete a new ABAS.

Q. Was he willing to do so?

A. Yes, sir.

Q. And did he?

A. Yes, sir.

Q. What happened with that test result?

A. He completed the ABAS. The problem with the first ABAS, the reason it was invalid was that if he had to guess on an item, that he generally just simply checked a 2. He checked that he had guessed, but he assessed the level of proficiency at a 2.

Q. Well, help me understand, what is 2 in the range of the answer?

A. A 2 would mean that an individual wasn't able to do the item, needed help in doing the item or wasn't -- was able to do it some of the time independently.

Q. Okay. Give us one example of an item so we can use that as our point of contact as we discuss this.

A. Is able to pack clothes independently for an overnight trip.

Q. So if someone, if he was asked this question on that, if

USCA5 4293

Mr. Clark was asked this question on that test and his response was what?

A.   He put a 2 and indicated that he had guessed.

Q.   Okay.  And that was on the second test that he took?

A.   That was on the first one.

Q.   Okay.  And why was that, why did you ultimately determine it was invalid?

A.   Because based on the information that he had shared with me, Mr. Bourgeois would have been able to do that type of behavior independently.  The way the measure is set up, you either get a zero, or you can score a 1, 2 or 3.  And some people tend to gravitate, if they don't know an item, to the middle.  "Well, I'll just, I'll give them a 2 on that.  I'm not quite sure."  But the instructions are, based on what you know of the individual, if you have to guess on the item, based on what you know of them in other situations, how would you estimate that he would do, based on that knowledge.

Q.   What is the importance of that column for them checking off "guessing"?

A.   Guessing let's one know that they may not have had the opportunity to specifically observe the individual.  And so that item is an estimate or guess.

Q.   And then Mr. Clark completed the second form, and was that one completed correctly?

A.   No, sir.

USCA5 4294

Q.   What happened with that?

A.   He went through and he checked the items that -- he filled it out, except the items that he guessed at, he didn't put a numeric score on.  So I contacted him again and said, "Those items where you have checked that you guessed, we actually need for you to make an estimate on there of what your assessment would be."  And so he completed it there.

Q.   Okay.  And I'm showing you what is Page 11 of Government Exhibit 15.  And I believe the second paragraph that starts, "In the assessment of Mr. Banks' adulthood adaptive functioning, Mr. Clark completed two," does that paragraph explain what you were just describing to the Court?

A.   Yes, sir.

Q.   And ultimately, when he completed the second one, after the second contact with him, did you determine whether his scores could be used in the assessment in a way that was reliable?

A.   Yes, sir, it appeared so.

Q.   Because of the objection, I'm not going to go into the specifics of the next paragraph, but that paragraph does refer to Nathan Banks and what, some of the information he gave you.  Is that correct?

A.   Yes, sir.

Q.   What about Rhonda Davis', what was -- was there anything about her testing that was interesting?

USCA5 4295

A.   Yes, sir, there was to me.  I think she was in perhaps even -- she was certainly a very fastidious, perhaps over-cautious, in endorsing guessed items.  But she made seemingly, was vigilant to, if she didn't see it happen, that she checked a guess on there.  So there was certainly a lot of guessed responses on there, and she appeared to be, again, taking that, you know, very much tuned into that issue.

Q.   Did you ask her about that?

A.   I didn't ask her about that specifically.  She actually made comments as she went along that let me know kind of how she was doing that.  "Oh, that applies here," or, "Well, he could do such-and-such here."

Q.   Okay.  I'm going to show you again what's Page 11, Government Exhibit 15.  I want to draw your attention to a phrase that you use, and that is, in the last paragraph on that page, you say, "As such, one looks for a convergence of data." Do you see that where you included that in?

A.   Yes, sir.

Q.   Third line down, at the end of the third line.

A.   Yes, sir.

Q.   "Convergence of data."  What exactly are you trying to convey with that phrase, "convergence of data"?

A.   That the more that data from different sources comes together to reflect the same level of functioning, the more confidence that we can have that that data accurately reflects

USCA5 4296

a valid assessment.

Q.   Now, I've -- as you sat through the trial, did you hear some of the individuals that took these tests, particularly Danny Clark and Rhonda Davis, when they were on the stand, they were questioned about the guessing block.  You've mentioned guessing.  Is that -- tell us, I mean, is that part of the test, or is that something that's really peculiar for someone to check guessing?

A.   It certainly is a part of the test.  People are instructed to complete every item, and some items they may not have had the opportunity to observe.  So they're instructed to indicate if they guessed.

In the administration of the ABAS and the manner that it was standardized, a high number of guesses would be a bit of a flag, because we're looking at, for someone who knows a person across a variety of settings and has ongoing contact with them.

The challenge, again, in a forensic setting and particularly one where there's been some degree of time that's passed is that balance between how much ongoing contact the person has versus the vested interest in the case.

And so in a typical assessment where the ABAS would normally be used, a high number of guesses would be somewhat of a red flag.  In this particular case, it's not unexpected because of the circumstances of the evaluation.

Q.   I'm going to show you what's Exhibit -- Page 12 of

USCA5 4297

Government Exhibit 15.  And there's a chart here that has the, it's got "Sub-domain," and then it's got "Communication, Community Use, Functioning Academics, Home Living, Health and Safety, Leisure."  What are these categories over here under Sub-domain?

A.   The ABAS-II is broken up in ten sections, and those ten sections correspond to the domains of adaptive functioning identified, for example, by the DSM-IV-TR in regards to the key areas of assessment.  So these are subsections within the ABAS.

Q.   Okay.  Before you, before that table on Page 11 -- and again the table's on Page 12, but at the bottom of Page 11 of Government Exhibit 15, draw your attention to this statement, the very last sentence on this page, "Significantly subaverage functioning would be a score of 4 or below."  Describe for us what that means in relation to the chart that you have on Page 12.

A.   On the chart on Page 12 --

Q.   And I'm putting the chart on Page 12 back up.

A.    -- the scoring for those ten sub-domains has a mean or average of 10 and a standard deviation of 3.  And so a score of 4 would fall at two standard deviations below the mean.  So "significantly below the mean" would be scores of 4 or below.

Q.   And so what does -- you've got this sub-domain you said on this side, and then you've got four names of individuals with years beside them.  What are those names, and what do the years

USCA5 4298

beside them mean?

A.    The names are the individuals who completed the ABAS, and these are their scores from that ABAS.  And the years beside of them, that's how old Mr. Bourgeois was at the time of their last contact with him upon which the, they were completing the ABAS.

Q.    Okay.

A.    So what I had done was ask them to remember back to his age or remember back to the last time they had ongoing contact with him and to assess his functioning as of that time.

Q.    Now briefly, just so I can understand, I'm going to take that one away.  We're going to come back to that and talk about that, but on Appendix A, you've got an entirely different chart, and it's got different categories over here.  Tell us why you did a different chart on Appendix A.  And Appendix A again is -- well, you tell us why you did a chart, a different chart on this one?

A.    Well, Appendix A is utilizing the AAIDD definition of adaptive functioning deficits.  And so it uses the categories of conceptual, social and practical skills.  In this case, with the standard scores, they have an average of 100 and a standard deviation of 15.  So "significantly below the mean" would be scores of 70 or below.

Q.    Let's go back to the ten sub-domain categories, and tell us what, if anything, is significant about the scoring of these

USCA5 4299

four individuals as they rated Alfred Bourgeois's performance.

A.    Well, there's pretty close agreement between Davis and Clark, and relatively good agreement with Banks as well.

MR. WISEMAN:    Objection to the reference of Banks, Your Honor.

THE COURT:    Sustained.

BY MR. ROBERTS:

Q.    Okay.    Just go ahead and reference the two that are not there, I mean the other two, Davis and Clark.    We'll just stick with them for now.

A.    Okay.    So there is -- there is significant convergence overall between Davis and Clark.    The agreements were pretty close across domains.

Q.    And versus Armont, tell us about why your, why that one's so different.

A.    Well, the scores that she -- the responses that she gave resulted in extremely low scores, certainly far at odds with that of Ms. Davis and Mr. Clark.

Q.    And again, what is the significance -- on the page prior to this, you said something about the significance of the scoring of 4.    What does a scoring of 4 tell us again?

A.    A score of 4 would be approximately two standard deviations below the mean.

Q.    Same question with regard to this one.    Can you do the comparison between Armont, Davis and Clark?    And tell us what

USCA5 4300

that information tells us under the AAIDD's definition of adaptive functioning.

A.   Yes.  Again, the scores between Davis and Clark are relatively consistent.  Certainly when you look at the global adaptive composite right here, where one has an overall as a 108, and one -- and the other is a 105, and that's sort of all of it collapsed together, all the domains collapsed together, so it's a global assessment.  And Ms. Armont's scores, or the results from the administration to Ms. Armont was significantly below that, significantly different from that.  He was in the, basically in the average range, average to slightly above average on the conceptual, social, practical and global for Davis and Clark.  He was in the significantly impaired range for Ms. Armont.

Q.   And in the same way, you've reviewed the information from Dr. Swanson with regard to Beverly Franks?

A.   Yes, sir.

Q.   And do you recall -- well again, I'm going to show you Dr. Swanson's report again, on Page 3, where she begins with the deficits in the conceptual domain.  Does she tell us where the scoring is on this page for Beverly Franks?  Does she give us a numerical number?

A.   I don't see so.

Q.   Do you recall what her data reflected?

A.   On the ABAS for Ms. Frank, the scores were extremely low.

USCA5 4301

And the ABAS has what's called a high floor, which means that even if you scored -- if I may, a different analogy.  The Wechsler scales also have a very high floor, which means if you missed all the items, you would still wind up with an IQ score in the 40s.  So it doesn't measure all the way down, if you will.  And it's similar with the ABAS.

So her scores were almost as low as you can get.

THE COURT:  So what does that tell you?

THE WITNESS:  It certainly gave me pause on the -- well, that in and of itself raised a question of is he functioning that -- you know, is that really an accurate reflection of his functioning?

THE COURT:  Was it, in your opinion?

THE WITNESS:  No, ma'am, I don't believe so.

THE COURT:  Do you see any evidence, in the hours you've spent on this case reviewing the documents, everything, that Mr. Bourgeois is mentally restarted?

THE WITNESS:  No, ma'am.

THE COURT:  Okay.

BY MR. ROBERTS:

Q.   There was -- earlier there was testimony about you actually contacting people that he worked with and telephone conversations.  Did your conversations with those individuals play any role in your assessment on his adaptive functioning?

A.   Yes, sir.

USCA5 4302

Moore - Direct                                                    133

Q.   Okay.  And you're well aware, he's a truck driver.  Does

his truck driving abilities tell us anything about his adaptive

functioning?

A.   Well, they certainly feed into that, yes, sir.  Certainly

in regards to work-related functioning, but I think even more

broadly, the nature of the job itself.  This isn't a simple

repetitive job that he went to in a factory putting lids on

widgets, but a job that had him going out and around the

country, living, at least driving independently, picking up

loads, taking care of his self-care during that period,

interacting with people across a lot of different certainly

social styles, as we move across the country.

Q.   Your report on Page 2, Government Exhibit 15, indicates at

the bottom of materials reviewed "contents of briefcase

belonging to Mr. Bourgeois."  You had an opportunity to review

the contents of the briefcase?

A.   Yes, sir.

Q.   Did you actually see the briefcase, the briefcase itself?

A.   Yes, sir.

Q.   And Government Exhibit 28 is a pretty thick package.  It's

177 pages.  I'm showing you that exhibit, just the first page

of that exhibit, Government Exhibit 28.  And it says, "First

American Bank."  What was your understanding of -- or did you

find this document inside that briefcase?

A.   Yes, sir.

USCA5 4303

Moore - Direct

Q.   All 177 pages of it?

A.   I think what I actually found in the briefcase was the items that are photocopied onto that document.

Q.   Let me ask you -- before you testified, I asked you to look through this document and mark certain areas.

A.   Yes, sir.

Q.   So I'm going to refer to the pages that you marked and ask you why you marked those pages.  This would be Page 19 of Exhibit -- Page 19 of Exhibit 28.

A.   I checked that --

Q.   Why did you mark that page?

A.   I'm sorry, sir?

Q.   Why did you mark that page?

A.   I marked that for the notation on there, just as an example, on the outside of each of the envelopes, there was -- or on many, there was this type of notation.  "Checked out and okay by Alfred."

Q.   And do you recognize the handwriting?

A.   That looks like the left-handed slant of Mr. Bourgeois, although I'm not a handwriting expert.

Q.   How would you know that?

A.   I'm sorry?

Q.   How would you know that?

A.   I've seen many of his letters.

Q.   What letters are you referring to?

USCA5 4304

A.    There were letters to his wife, letters to Mr. Gilmore.
There have been many different letters that he's written that
I've seen.

Q.    What's the -- what, in your opinion, what is the
significance of this notation on this page, this exhibit?

A.    It appears that he's gone through and checked through the
canceled checks that have been sent to him from First American
Bank that covered the periods that are noted up top.  And one
of the other things that makes me think that this may have been
Mr. Bourgeois's handwriting is in his writing, one of the
things he tends to do is use the word T-O-O.  This is spelled
T-O-O instead of T-O.  So when he had "8/29/2000 too
9/27/2000," the spelling error that he makes, or the spelling
error he makes is consistent with what I've seen in other
places.

Q.    Bear with me for just a minute.  I have some of these
turned upside down.  I'm going to show you what's Page 13 of
Exhibit 28.

A.    Yes, sir.

Q.    What do you see on that page?

A.    Again, they were okayed and checked by him.  I'm not sure
whether that's his handwriting there or not.  I can't quite
tell.  There's a left-handed slant.  The typo, the "to" is
spelled correctly there, so I'm not sure whether that's his
handwriting or not.  But someone seems to be indicating that he

USCA5 4305

had checked and okayed them.

Q.   You marked this page, which is Page 25.  I'll have to zoom out on that.  Page 25, what's significant on this page?

A.   I marked this page because it was just an example of, that he actually appears to be writing a number of the checks. Again, the distinctive slants.  Not all of these are his.  You can see handwriting in the other direction on some, but some of these are.  I can't quite see on here.  Either on this or some of the other pages, it will actually indicate --

Q.   I can zoom in.

A.   -- accounts that he's writing to.  Right, like I believe this is --

Q.   Tell me which check number.  I'll just go down -- do you have anything --

A.   Well, right here, right here, it looks like an account number on the top at Hibernia Mortgage, for example.  So he's being, he's going through, he's writing a check, and then certainly noting on there a complete, a pretty complete record for himself, what the account is and which payment it is.

Q.   Let me ask you, was there any documents in the briefcase with regard to Hibernia Mortgage?

A.   Yes, sir.

Q.   For the record, I would -- I'm showing you what's been marked as Government Exhibit 34, Government Exhibit 34, and ask you if you recognize that document and the check that was

USCA5 4306

attached.

A.    I recognize the check.  I'm not sure whether the document was one of the ones that was in that pack.  I mean, I saw hundreds of pages in there.

Q.    Let me move to another, the next document you checked.  You've only got a couple more of these, so --

MR. WISEMAN:  Your Honor, I'm going to object to the cumulative nature of this.  I mean, it's apparent that these all show some action on the checking account, which presumably was Mr. Bourgeois, and I don't know what the point in continuing through them is.

MR. ROBERTS:  Your Honor, three more tabs.

THE COURT:  How many more?

MR. ROBERTS:  Just three.

THE COURT:  Okay.  Do them a little quickly.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  Or quicker.

BY MR. ROBERTS:

Q.    I'm showing you Page 35, Government Exhibit 28.  What's significant on this page?  Why don't you mark that?

A.    Again, just all check out and okay, so indicating that he appears to have gone through them and been doing some sort of double-checking, whether it's balancing, whether it's confirming against another record or whatnot, I'm not sure.  But all checked out and okay.

USCA5 4307

Q.   One more, Page 55 of Government Exhibit 28.

A.   The same there.  I think there's one more where you actually see check marks on the checks themselves.  That let me know it appears he's going by and actually checking off against a record.

Q.   Let me show you that one real quick, and I'll be done with this exhibit.  Show you what's marked as Government Exhibit -- Page 57 of Government Exhibit 28.  And it's a list of checks and the check marks.  How do you know that's his check mark?

A.   I don't know for certain that that's his check mark, but again, it's a left-handed check mark.

Q.   You mentioned that you had read his letters --

          THE COURT:  Are you going to offer any of those?

          MR. ROBERTS:  I'm sorry, Your Honor?

          THE COURT:  Are you going to offer any of those?

          MR. ROBERTS:  These are Government Exhibit 28.

          THE COURT:  They're already admitted?

          MR. ROBERTS:  They're already in, yes, Your Honor.

          THE COURT:  Okay.

BY MR. ROBERTS:

Q.   You mentioned that you have read his letters.  Do you know how many of his letters you've read?

A.   No, sir, I'm not sure.  But I would think, my estimate would be perhaps a dozen or two, at least.

Q.   And what were the majority that were -- explain to the

USCA5 4308

Judge the majority of the letters that you reviewed before coming into court.

A.    There were, I think one of them was a letter to Her Honor or to a Judge indicating the need to be able to be in contact with some folks around some of the legal issues that he had going on with the foreclosure of his house.  There were letters to his wife.  There are certainly letters to Mr. Gilmore that we've seen.

Q.    You observed the letters here in court to Mr. Gilmore --

A.    Yes, sir.

Q.    -- that were offered earlier, Government Exhibits 178 through 200?  What, if anything, could you discern with regard to his adaptive functioning from reviewing his letter writing?

A.    Well, I think that there are a couple of things.  He certainly appears to be able to use written communication effectively.  He seems to write in the manner that he speaks.  In other words, the style.  There are some grammatical errors in there, but if you'll read them, hear his voice on the inside, it's literally as if he's writing, speaking as he's reading.  But the language is -- certainly the vocabulary is good.  The ideas are complex.  The sentences are often compound.  He's able to follow a flow of thought, communicate his ideas effectively.  He certainly seems to be a vigilant record keeper, well aware of dates and perhaps locations.

Q.    One more question with regard to Dr. Swanson --

USCA5 4309

THE COURT:  He also, when I saw you interviewing him, he seemed to be a very good historian.

THE WITNESS:  Yes, ma'am.

BY MR. ROBERTS:

Q.   Were there anything else -- what were your general impressions about him when you interviewed him with the Government Exhibits 19 through 22 that reflect your interview? Were there anything in particular that stood out that you thought were, that was specifically relevant to your adaptive functioning assessment?

A.   Well, he was certainly highly verbal.  The fact that he was able to recall specific details both back from apparently his work history -- I don't know that all that he told me was true.  There are times that it appears that he exaggerates or dissimilates, but he certainly provided details around pay rates and things like that that appear to have been confirmed later on by others.

Certainly his ability to follow a flow of thought, his ability to be redirected, his interpersonal skills were notable in terms of how he began very quickly relating things to where I was from.  He asked early on where I was from, and then would relate back to that, in North Carolina.  He called me by name quite a bit throughout, and Dr. Price, remembering back to him.

The level of language that he used, the words that, you know, literally we're talking about the words and concepts,

USCA5 4310

whether we were talking about things like escrow or people being manipulative or something being deficient or -- you know, he has certainly a notable vocabulary that is generally accurately used.

Q.    And one more question with Dr. Swanson's testing.  You reviewed her raw data, and you heard her testimony.  What is your opinion about how she administered and interpreted the tests that she applied with regard to Beverly Franks?

A.    Well, I think the issue is less with how she administered it, per se, than there was no acknowledgment of the significant violation of the standardization norm, so that the scores would be of highly questionable validity and reliability.  And that part wasn't acknowledged at all.

Q.    And she -- that's the test where she had Beverly Franks refer back to when Alfred Bourgeois was seven.  Did you find anything interesting about her selection of the age of seven?

A.    I did.  If you're going back and interviewing somebody retrospectively, as she noted, one of the challenges is how do you keep them focused on a specific age.  And I think that's a noteworthy challenge.  And in fact, what I do whenever I'm giving an ABAS and have to go back in time or need to, is I have them choose or base it on the last time they saw the individual, instead of trying to pick out a particular age. I've got two children, and if someone were to ask me how were they, how is one of them functioning at age eight, I would have

USCA5 4311

a tremendously difficult time picking out their functioning at exactly that age, versus if they said, you know, let's say one had left home for college and I had not seen them after that. I could go back to that last point in time.

So to me, that's one of the challenges to it.  She chose seven, which apparently was when he first began to live with Ms. Mary.  So she would have been newly getting to know him, and it wouldn't have been the last time that she saw him or the more recent time that she saw him.  So we would have wanted to not stretch the memory back as far as possible.  We want to try to keep that as close in time, and also to be able to have a specific, a good specific marker for when that time would be.

Also in regards to this, that time point would have been one where he's coming right out of a highly, what seemed, what apparently was a highly dysfunctional family situation.  And we would expect there to be all sorts of factors that could be affecting his presentation.

Q.   Let me ask you quickly about Dr. Estrada's testimony, because you were present for the deposition.  Was there anything in particular that struck you about Dr. Estrada's testimony that you think is helpful for the Judge in assessing the mental retardation issue that's before her?

A.   Well, he certainly seemed to be tuned into kind of the mixture of data.  But the thing, I think, that struck me most with Dr. Estrada is that as a psychologist, I know that the

USCA5 4312

testing component, the IQ component can be, there is a significant part of the diagnosis of IQ, and that psychiatrists generally don't do IQ testing.

And so we get used to, when they talk about the IQ part of it, then they're sort of shooting off the cuff, if you will, I guess with no disrespect --

THE COURT:  Stepping in your field.

THE WITNESS:  Yes, ma'am.  Yes, ma'am.  Well, stepping in our field without perhaps a good knowledge base underneath that.  And my ears certainly pricked up very hard when I realized that Dr. Estrada has a master's in psychology and had administered the IQ test before, so had a --

THE COURT:  And I think he does them in his office also.  He has someone there who administers them, and he reviews them as well.

THE WITNESS:  So that was striking to me.

THE COURT:  At least I've seen him do that on other cases.

BY MR. ROBERTS:

Q.   And that was striking in what way?

A.   It led some, to me, it led some credibility to his observations, because as he noted, the issue with an IQ test is it's a snapshot in time versus the assessment or impression one can get over a longer period of interaction.

Q.   I want to touch just briefly also on his diagnosis of

USCA5 4313

borderline personality disorder.  In your report, you agree

with him --

A.    Yes.

Q.    -- that that's a valid assessment is -- and the reason I

want to touch on that, I want to go back to, I want to take

that information and ask you about Dr. Gelbort and

Dr. Swanson's assessments with regard to how -- did they pay

attention to borderline personality disorder and the

possibility of it affecting their assessments?  Did I not ask

the question artfully?

    Let me just ask you this way.  If a psychologist is trying

to assess someone for mental retardation and they're doing,

whether they're doing IQ testing or adaptive functioning, to

what extent should they be paying attention to reactions or --

in their assessment, if someone has borderline personality

disorder or other disorders?

A.    Well, I think you have to keep your radar up whenever

you're doing an assessment to look for factors that can be

affecting functioning or performance in whatever manner.  So is

it at a personality level?  Is it at a general health level

that day?  Is there a depression or some sort of other Axis I

disorder?  So we have to be able to look carefully at other

factors that provide a context for understanding the

performance that we're getting.

Q.    Now, let's go to the last prong of the mental retardation

USCA5 4314

test, and that's the onset before the age of 18.  In your opinion, does this record, the record in this case, contain sufficient evidence for you to conclude that Alfred Bourgeois was mentally retarded prior to the age of 18?

A.   No, sir.

Q.   You heard evidence about an alleged head injury that may have happened in '84 or may have happened in '93.  I just want you to quickly, if you could inform the Judge at least with regard to if Alfred Bourgeois even had those head injuries resulting from those accidents in those years, what significance would that be in assessing mental retardation in this case?

A.   One of the implications here, and one can certainly argue over the IQ scores themselves specifically and whether they should, would be adjusted or modified or whatever the circumstance would be.  But the implication seems to be that the IQ scores obtained in the 2004 and 2007 assessments can be extrapolated back to prior to the age of 18, because all things left the same, the IQ is relatively stable across the life span.  But in this particular case there is the contention that there were two significant injuries, two significant head injuries, one of which purportedly led to a behavioral change.  And to me, that would create a snag or a difficulty to being able to extrapolate those scores back.  We don't know whether those head injuries would have led to a decrease in his IQ

USCA5 4315

functioning. And in fact, if they were significant and led to behavioral change, it's likely that they could have led to a change. So I can't take the scores of the present and simply extrapolate them back and say there's been no change in intellectual functioning.

Q. And what, in your recollection of the evidence in this case, what age was he when the 1984 accident allegedly happened?

A. I think he was -- I think it was just after his 20th birthday. It was right around his 20th birthday.

Q. Judge Jack asked you this already, but I want to reference this on your report. Page 17 of the Government's Exhibit 15, you give your conclusion of the, it's a short one. Would you just read that for the record?

A. Yes, sir. "Based on an extensive records review, multiple interviews, and formal assessment of adaptive functioning, it is my opinion, to a reasonable degree of psychological certainty, that Alfred Bourgeois does not meet the diagnostic criteria for mental retardation as that term is defined by prevailing federal law or by current professional standards."

Q. Final question. You've been in this -- you've seen the entire trial.

        MR. WISEMAN: Hearing.

BY MR. ROBERTS:

Q. Good point. You've been present in the entire hearing.

USCA5 4316

Moore - Direct                                    147

A.    Yes, sir.

Q.    You've actually seen additional evidence since you've been here.  Has your opinion changed at all since you observed all of this in the last week?

A.    Not in regards to my conclusions.

Q.    Your conclusions with regard to --

A.    The paragraph that I just read.

THE COURT:  What's the significance -- you remember yesterday when the lady was testifying how much she cared about him?  The one from Birmingham, Alabama, and how friendly he was and you know, I mean, she kind of teared up thinking that he had gotten himself into this horrible situation, that Mr. Bourgeois never looked at her or met her eyes, contact or anything.  What does that mean?  I was interested in that. Didn't acknowledge her in any way, when she couldn't really say enough good things about him.

THE WITNESS:  My hypothesis on that would be that it may be a reflection of the -- I have two hypotheses.  One is that it may be part of the borderline functioning, where she's gone from being a really close friend who's now turned on him perhaps.  It may be that the emotional flood is so big, I mean, they clearly had a close relationship, and he just sort of shut the emotion out --

THE COURT:  Okay.

THE WITNESS:  -- and sort of dissociated that, or you

USCA5 4317

know, split off.  Not dissociated, but just sort of, you know, just shut off that emotional side.

THE COURT:  "Dissociative" has another psychiatric or psychological meaning.

THE WITNESS:  Ma'am?

THE COURT:  I said the word "dissociative" has another meaning than what you were saying.

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.

MR. ROBERTS:  I have no other questions, Your Honor.

THE COURT:  Thank you.  Go ahead, Mr. Wiseman.

MR. WISEMAN:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WISEMAN:

Q.   Good afternoon, Dr. Moore.

A.   Good afternoon.

Q.   We're at the home stretch.

A.   Yes, sir.

Q.   I'm going to try to be as quick as I can.  It's getting late, and I know we're all beat.

Judge Jack asked you a question, and you responded, I think you said, "There is no evidence of mental retardation." Is that what you said?  "No evidence of mental retardation"?  I mean, we could read it back.  I wrote it down.

THE COURT:  I thought that's what he said.

USCA5 4318

MR. WISEMAN:  Yeah, okay, so let's assume --

THE COURT:  I said, "Do you find any evidence of mental retardation in all your interviews," et cetera, et cetera?  And he said, "None" or "No."

BY MR. WISEMAN:

Q.  You would agree that's somewhat of an inaccurate statement.  There is in fact some evidence.

A.  Yes, sir.  My understanding wasn't -- she was asking it at a global level, that did I assess him, did I feel there was --

THE COURT:  And I guess, I guess what you're asking, I'm wondering if he was differentiating between in his mind credible evidence and evidence.

MR. WISEMAN:  Oh, that may be.  That may be.

THE COURT:  And the reason I asked that is he was tearing apart all of those --

MR. WISEMAN:  I just, as I'm sure the Court agrees, we need to be precise here.  So --

THE COURT:  Yes.

BY MR. WISEMAN:

Q.  So we're not dealing with no evidence, we're dealing with some evidence, and you don't think it makes it all the way across the goal line, to use a bad metaphor.

A.  I'll roll along with your metaphor, sir.

THE COURT:  I asked about credible evidence because it seemed to me you were not believing some of these test

USCA5 4319

results.

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.  You did not find that credible.

THE WITNESS:  That's correct, ma'am.

THE COURT:  Okay, the WAIS-R and the WAIS-III, or something along those lines.

THE WITNESS:  Well, the WAIS-R and WAIS-III, the issue with those is that they have to be considered, for there to be a diagnosis of mental retardation with IQ scores in that range, there has to be significant deficits in adaptive functioning.

THE COURT:  Okay.

MR. WISEMAN:  So Dr. Moore --

THE COURT:  So that's what you're getting to.

MR. WISEMAN:  Correct.  That's what I --

THE COURT:  Got it.

MR. WISEMAN:  That's what I was wondering about.

BY MR. WISEMAN:

Q.   As Mr. Roberts brought out, you've been here for the whole, the whole thing.  And you've heard all the witnesses, at least all the witnesses related to the mental health issue.  Is that right?

A.   Yes, sir.

Q.   Okay.  And you were here on Tuesday, September 21st, at about 9:35, at least by my estimate, when Ms. Booth stood up

USCA5 4320

and said the Government concedes that Mr. Bourgeois was abused as a child.  Did you hear that?

A.    Yes, sir.

Q.    And you agree with her.  Right?

A.    I agree that she said and the Government conceded there was abuse of a child.

Q.    Okay.  And you think that's an accurate concession on the Government's part, based on the entire record you've reviewed?

          MR. ROBERTS:  Objection, Your Honor, relevance.

          MR. WISEMAN:  Relevance?

          MR. ROBERTS:  I don't know what his, whether he agrees with our concession or not, I don't know that that has any relevance.

BY MR. WISEMAN:

Q.    Well, I'm asking you if you think the record of this case shows that Mr. Bourgeois was abused as a child.

          MR. ROBERTS:  That's a different question, Your Honor.

BY MR. WISEMAN:

Q.    I think you can answer.

A.    Yes, sir, I think the -- I'm sorry, I wanted to make sure --

          THE COURT:  I got it.

          THE WITNESS:  Okay.

          THE COURT:  Go ahead.  You can answer.

USCA5 4321

THE WITNESS:  Yes, sir, I think the record does show that.

BY MR. WISEMAN:

Q.   Okay.  And do you agree with the statement that was made at about 9:50 by Ms. Booth that Mr. Bourgeois's a sociopath?

THE COURT:  That what?

MR. WISEMAN:  That Mr. Bourgeois is a sociopath, antisocial.

THE COURT:  Who made that statement?

MR. WISEMAN:  Ms. Booth.

THE COURT:  Okay.

MR. ROBERTS:  Your Honor, I'd object that Ms. Booth wasn't a witness in this case, and --

MR. WISEMAN:  Exactly.

THE COURT:  I think actually Mr. Wiseman and Ms. Booth have been witnesses in the case, one way or the other.

MR. WISEMAN:  You've got to throw Mr. McHugh in there, too.

THE COURT:  Oh, definitely.  I don't want to leave him out.

BY MR. WISEMAN:

Q.   Okay.  My point being, sir, you don't think Mr. Bourgeois, based on everything you've seen, is a sociopath.

A.   I don't diagnose him as a sociopath.

USCA5 4322

Q.   Okay.

A.   I assume that when you say "sociopath," you're referring to antisocial personality disorder.

Q.   Antisocial personality disorder.

A.   I don't think that he meets the diagnostic criteria for antisocial personality disorder.

THE COURT:  What is that?  What is the diagnosis?  I just, see, I'm the one misunderstanding it, because I used that, remember, with the doctor on Friday?

MR. WISEMAN:  No, I remember quite well, yes.  Yes.

THE COURT:  I thought it was somebody -- when he was saying that he didn't have any moral brakes, I thought that's what that meant.

MR. WISEMAN:  I think he said behavioral brakes. There's a difference.

THE COURT:  Well, he couldn't put the brakes on his behavior.

MR. WISEMAN:  Correct.

THE COURT:  I assumed that that meant morally.

MR. WISEMAN:  I --

THE COURT:  As well as rage and all kinds of other things.

MR. WISEMAN:  Right.

THE COURT:  And it was me that first used that term.

MR. WISEMAN:  Correct.

USCA5 4323

THE COURT:  And I've misused it, apparently.

MR. WISEMAN:  That would be our view with --

THE COURT:  That's fine.

MR. WISEMAN:  -- with respect.

THE COURT:  So what does that mean when they -- were you here when he testified?  Actually, you were not here.  You had already gone.  But I said that behavior, when he says he can't put the brakes on his behavior, I said, "Well, that sounds like a sociopath."  He said, "Yes, it's the same presentation, but a different etiology."  So what does that mean?  If I'm misusing the word wrong, I've got to erase it from my mind quickly.

THE WITNESS:  Well, diagnostically we talk about an antisocial personality disorder.  So I get much more used to talking about, you know, from a clinical perspective, so there's a common term that one is agreeing on.

THE COURT:  Well, I think of a sociopath who has no sense of right and wrong, who is a con person as well, and who has no moral compass.

THE WITNESS:  Yes, ma'am, one who is focused on getting their needs met, with no concern about --

THE COURT:  Well, the doctor did say he tested out as a narcissist, the one from the Friday --

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.  So what does that mean?  I don't

USCA5 4324

mean the narcissist.  I know what that means.  But the sociopath.  He's not a sociopath, in your opinion?

THE WITNESS:  I don't think that he meets well --

THE COURT:  Or am I saying, using it differently than the right way?

THE WITNESS:  Well, I think you're using the term "sociopath," and I'm not sure how you define that.  I talk in terms of antisocial personality disorder.

THE COURT:  Okay.  I'll tell you where I -- when I was in nursing school, we went to the Patuxent Institute, which was the housing, before the Supreme Court said you can't let -- you've got to evaluate people regularly.  And they had the most brilliant sociopaths in this place that I've ever seen.  Beautiful artists.  They were very talented people.  And they had all been diagnosed as sociopaths.  And so that was my background.  That's why I use the word.

THE WITNESS:  I think in general, when we're talking about a sociopath -- and again, that gets into, I think the definition becomes looser, because it begins to be used by the lay public.  But basically we're talking about somebody who doesn't have a development of conscience.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.   And Mr. Bourgeois is driven in his conduct by other factors other than a lack of a conscience.

USCA5 4325

A.    I believe so.

Q.    And that would be his borderline personality disorder primarily?

A.    Yes, sir.

Q.    And you agree -- I don't want to go through all the stuff I went through yesterday with Dr. Price, but you heard me -- or was that today?  It felt like yesterday.  You heard me go through all the borderline criteria and what it means, and you don't have any quarrel with Dr. Price on any of his testimony with respect to Mr. Bourgeois's borderline personality and what it means.

A.    Not at a global level.  We certainly parse out some details around the psychotic piece of it --

Q.    Okay.

A.    -- and where the definition specifically came from, but no, sir, in general, I don't.

        THE COURT:  Did you have an expert testify, Mr. Wiseman, that he was not a borderline --

        MR. WISEMAN:  I do not believe so.

        THE COURT:  Okay.

        MR. WISEMAN:  We've been consistent.

        THE COURT:  Has anybody testified to that, that he was not?

        MR. WISEMAN:  Um --

        MR. ROBERTS:  Not to me knowledge, Your Honor.

USCA5 4326

THE COURT:  Okay.

MR. WISEMAN:  Maybe we've proven something.

THE COURT:  No, I think you've done an excellent job.

BY MR. WISEMAN:

Q.    I see that you've relied on the DSM-IV-TR as your authoritative source for this evaluation.  Is that right?

A.    Yes, sir.

Q.    Now, you heard Dr. Price talk about the 11th edition of the AAIDD manual, also known as the green book.  You would agree that that's likewise authoritative?

A.    I don't use it for diagnostic purposes, in a clinical sense, but I believe it is an authoritative manual.

Q.    Okay.  And the DSM-IV-TR came out in 2000.  Correct?

A.    Yes, sir.  I'm sorry.

Q.    And that's before the Atkins decision?

A.    That's correct.

Q.    And the green book came out in 2010.  Correct?

A.    Yes, sir.

Q.    All right.  After Atkins, obviously.

A.    Yes, sir.

Q.    And it addresses some of the issues raised by Atkins cases, and by that I mean the retrospective nature of some of these evaluations.

A.    Yes, sir.

Q.    And the DSM just doesn't deal with that.  There's nothing

USCA5 4327

in the DSM about retroactive or what test to use for it or how to approach them or anything like that.

A.   The DSM doesn't tell how to evaluate.  It tells what the diagnostic criteria would be.

Q.   But for purposes of how to evaluate that, you would agree that as we stand here today, the green book is the authoritative source for how to evaluate.

A.   I think it's a good source.

Q.   Okay.  Well, you've cited its predecessors.  You've cited the 10th edition, you've cited the 9th edition.  Is there something about the 11th edition that you don't like, or is it --

A.   Oh, no, sir.  I simply mean by that that I think the blue, the red, the green books, you know, are certainly important sources, but that there may be other sources of information in the field about how to go about the assessments that would be important as well.

Q.   I'm going to be jumping around here.  I'm trying to be organized, but there's a lot of information.  You say in your report that Mr. Bourgeois went to college.  Other than his self-report, you've seen no document that says he went to college.

A.   While I've not seen any document from a college, at least one of the people that I interviewed indicated that he had been to the community college.

USCA5 4328

Q.   And who was that?

A.   And --

Q.   Who was that?

A.   Ms. Armont.

Q.   Okay.

A.   And I believe that it may have been indicated on his application perhaps at the Sheriff's Department.  I'm not certain about that.  It seems that there was an application, and it indicated he had had some, he began at the college.

Q.   Now, your report at Page 6 says that the Bureau of Prisons records on Mr. Bourgeois say they gave him a preliminary diagnosis of intermittent explosive disorder, follow-up screening and monthly mental health reviews, noted that there is no evidence of mental illness or distress.  He seems to function adequately.

     A couple of questions about that.  Intermittent explosive disorder, you would agree, is -- cannot be diagnosed if the conduct is better accounted for by a borderline personality disorder?

A.   Um --

Q.   Page 667 of the DSM-IV.

A.   I don't have the DSM-IV memorized.

Q.   Well, lucky for you, I happen to have one.

A.   But I certainly wouldn't --

Q.   Let's just --

USCA5 4329

A.    I wouldn't argue or contend that it doesn't say it.  I'm just trying to in my own head figure out where the rule outs on there are.

Q.    Yes.  It's a big book.  Nobody can remember all of it.  I'm putting up for you the diagnostic criteria for intermittent explosive disorder, and you'll see the aggressive episodes are not better accounted for by another mental disorder, and it gives examples, including borderline personality disorder.

A.    Yes, sir.

Q.    Okay.  So the BOP got that wrong.  Right?  It would seem.

A.    I believe they got it wrong because I think he has borderline.  They may say that I was wrong, but I would believe that they would be incorrect with that.

Q.    And you heard me questioning Dr. Price about the people with whom a borderline is most likely to act out in a rageful or violent way would be intimate folks.  Right?

A.    In general.

Q.    Yeah.

A.    And --

Q.    Now, you know --

A.    Far more than in general.  Yes, they would -- I mean, I can certainly, I'm sure, think of exceptions to that, but by and large, it's about people they're in a relationship with.

Q.    Close relationship.

A.    Yes, sir.

USCA5 4330

Moore - Cross                                                161

Q.    Now, you heard me talk with Dr. Price about

Mr. Bourgeois's conditions of confinement at the Terra Haute

Penitentiary.  Doesn't seem likely he's got too many intimate

folks with whom to act out in those conditions, locked in a

cell all day, seven days a week?

A.    I would agree with that, sir.

Q.    Do you agree with the proposition that one should not

infer the absence of adaptive deficits by one's verbal ability?

In other words, if someone presents verbally well, you can't

put too much stock in that when assessing about the deficits.

A.    One wouldn't base their entire assessment on verbal

presentation.

Q.    I've got a white version of the green book.

A.    How did you do that?  Oh, I'm sorry.

Q.    That's all right.  Oh, it's the ABAS manual.

Now I've got the dark version.  I've highlighted a portion

of Page 102.  It says, "Do not use past criminal behavior or

verbal ability to infer level of adaptive behavior or about

having ID," which is their term for MR, mental retardation.

There's a cite, "Discuss two reasons for this guideline.

There is not enough available information, and there is a lack

of normative information."  Do you agree with that proposition

out of the green book?

MR. ROBERTS:  I just ask you what page that is.

MR. WISEMAN:  I'm sorry, Page 102.

USCA5 4331

THE WITNESS:  While I agree with that proposition, there are certainly caveats that I would put with that.

BY MR. WISEMAN:

Q.    I mean, and the reason I ask is that, you know, as I went through with Dr. Price, we've got a lot of folks, lay people coming in, and to some degree I think the Court, saying, "Well, he talks so well."  That's of limited use in making this assessment.  Do you agree?

A.    It certainly doesn't capture the entire picture.

Q.    And that's especially true in a case like this, where the person we're dealing with is narcissistic, and I think you used the word "dissimilates," which means he tends to want to make himself look better than he really is.

A.    Yes, sir.

Q.    You heard me discuss with Dr. Price the notion that MR is not a diagnosis of exclusion, that it can become morbidity, with many conditions including borderline personality disorder. You don't have any quarrel with that, do you?

A.    No, sir.

Q.    And you also agree with the proposition that weaknesses can coexist with strengths.

A.    Yes, sir.

Q.    And under your definition, the two of ten definition, he can be strong in eight areas, weak in two, and we win.  Yes?

A.    I'm not sure about the "we."

USCA5 4332

MR. ROBERTS:  Your Honor, I object to a legal conclusion.

BY MR. WISEMAN:

Q.   Well, we prove our case.

MR. ROBERTS:  Your Honor, I object to a legal conclusion.

BY MR. WISEMAN:

Q.   He's mentally retarded.

A.   If a person --

THE COURT:  If you do what?  Say it again.

MR. WISEMAN:  Prove two of ten.

THE COURT:  Two of ten what?

MR. WISEMAN:  Of adaptive deficits.

THE COURT:  Okay.

MR. WISEMAN:  We -- he's mentally retarded.

MR. ROBERTS:  Technically, Your Honor, they still have the third prong they'd have to prove.

MR. WISEMAN:  True.

BY MR. WISEMAN:

Q.   Assuming the other prong is met.

A.   The question is long.  May I repeat my understanding of your question?

Q.   Let me rephrase it.  A person can be mentally retarded and be quite strong in eight of the ten areas, have significant deficits in two of the ten areas, and therefore be diagnosed as

USCA5 4333

mentally retarded, assuming the first and third prongs are present.

A.   Yes, sir.

Q.   I'm going to put up an exhibit we produced, which I shared with the Government yesterday.  Hmm, this is going to be tough.  I wasn't prepared for this technology when we prepared this.

You've had a chance to go through this chart, when it was given to you yesterday?

A.   Yes, I have.

Q.   All right.  And for the record, this is marked as Petitioner's 177.  Does it accurately reflect the number of guesses each of the ABAS Respondents recorded in your testing?

A.   In my testing, yes.  Ms. Banks, I mean, Ms. Franks is not there, but yes.  Yes, sir.

Q.   And it -- we rounded the percentages, but the percentages are approximately correct.  Is that right?  Do you have any quarrel with the arithmetic on this?

A.   No, sir.  I haven't gone through the specific arithmetic, but I don't have a quarrel with that.  I believe that y'all --

Q.   Now, the column that says "Average Number" refers to the table in the ABAS manual that reflects what the mean number of guesses were in each of the scale areas on the ABAS?

A.   Yes, sir.

Q.   Okay.  And are any of them, aside from work, are any of them above one guess per skill area?

**USCA5 4334**

A.   No, sir.

Q.   All right.  So when they normed this test, the norm of guesses was .1 in communication, .16 in community use.  So people essentially weren't guessing a whole lot in a normative process for this test.

A.   That's correct.

Q.   Okay.  Now, comparing that to your respondents, we see guesses as high as 100.  So Mr. Davis -- I'm sorry, Ms. Davis guessed 100 percent of the time with respect to leisure, 54 percent with respect to community use.  Home living, 70 percent.  Health and safety, 70.  And I could go on.  The point here is that there's a lot of guesses in your ABAS administration.

A.   Yes, sir.

Q.   And what does the manual say is the number of guesses that should cause the practitioner to be concerned in each skill area?

A.   If the ABAS were being administered in concordance with how it had been standardized, being a contemporaneous administration, one would have a concern with more than, I believe it's four guesses per.

Q.   And after your concern, you're supposed to go back and determine why that person is guessing so much.

A.   Yes, sir.

Q.   Okay.

USCA5 4335

MR. WISEMAN:  Your Honor, I'd offer this document, 177.

MR. ROBERTS:  No objection, Your Honor.

THE COURT:  P-177 is admitted.  I can read your mind, Ms. Booth.

MR. WISEMAN:  What's she saying?

THE COURT:  I think -- I'm not going to say, because if I'm wrong, I don't want to give anybody a hint of something.  Okay?

BY MR. WISEMAN:

Q.   All right.  I shared this document with you as well yesterday, Petitioner's 176, and this is a --

THE COURT:  Could you zoom it in just a tad?  Thank you, sir.

BY MR. WISEMAN:

Q.   Declaration of Thomas Oakland, Ph.D.  Did you have a chance to review this?

A.   Yes, sir.

Q.   Okay.  And tell the Court who Mr. Oakland is.

MR. ROBERTS:  Your Honor, I object to this statement.  It's hearsay.

THE COURT:  Sustained.

BY MR. WISEMAN:

Q.   Is Mr. Oakland an authority --

THE COURT:  Would you mind taking it down?

USCA5 4336

MR. WISEMAN:  Oh, I'm sorry.

THE COURT:  Thank you.

BY MR. WISEMAN:

Q.   Dr. Oakland is an authoritative source?

A.   On?

Q.   On?

THE COURT:  I just sustained the objection.

MR. WISEMAN:  I put the document down.  I'm asking a separate question about Dr. Oakland.

THE COURT:  An authoritative source on what?

MR. WISEMAN:  On the administration of the ABAS.

THE WITNESS:  Yes.

BY MR. WISEMAN:

Q.   Okay.  He wrote the manual.

A.   Yes, sir.

Q.   He designed the test.

A.   I believe one of the folks who designed the test.

Q.   One of two people.  Right?

A.   Yes, sir.

Q.   Okay.  And he -- would you consider him authoritative in the manner in which the test should be applied?

A.   Yes, sir.

MR. WISEMAN:  Your Honor, I would submit to the Court that this is an authoritative source.

THE COURT:  I have already ruled on this.

USCA5 4337

MR. WISEMAN:  All right.  I was just trying to lay a foundation.

THE COURT:  So please move on.

MR. WISEMAN:  Okay.

THE COURT:  And a foundation for his declaration you have not done.  So move on.  It's not like it's a learned treatise.  Are you finished?

MR. WISEMAN:  Am I finished?

THE COURT:  Yes.

MR. WISEMAN:  With the exam?

THE COURT:  Yes.  Well, you walked away, so I --

MR. WISEMAN:  Oh, no, no.  I was just putting the exhibit down.

THE COURT:  Oh, okay.

MR. WISEMAN:  Goodness gracious, no.

THE COURT:  I was just hopeful.  Are you going to have rebuttal, by the way?

MR. WISEMAN:  I don't think so.

(Counsel conferring off the record.)

THE COURT:  Yes?

MR. WISEMAN:  Well --

THE COURT:  I just want to make time, make sure you have time to do that.

MR. WISEMAN:  Yeah, I mean, we don't have a witness here.  I would like to present Dr. Oakland in rebuttal, but

USCA5 4338

he's, you know, an elderly fellow who's out of the country, and you know --

THE COURT:  Did you try to take his deposition?

MR. WISEMAN:  Well --

THE COURT:  I'm not going to let you do it now.

MR. WISEMAN:  Well --

THE COURT:  I'm just curious as to why you didn't beforehand.

MR. WISEMAN:  No, we didn't.  I frankly thought his learned --

THE COURT:  Does he live outside the country?

MR. WISEMAN:  No -- no, ma'am.  He lives in Florida.

THE COURT:  Well, that's part of this country.

MR. WISEMAN:  I didn't say he was out of the country. I said he was --

THE COURT:  I thought you said he was out of the country.

UNIDENTIFIED SPEAKER:  He's in Thailand right now.

MR. WISEMAN:  He's out of the country at the moment. He lives in Florida.  He traveled.

THE COURT:  Okay.  But I thought you were saying -- so the reason I asked was that the assumption is that he's too elderly to travel here.

MR. WISEMAN:  No, no, Your Honor.

THE COURT:  And instead, he's out of the country.

USCA5 4339

MR. WISEMAN:  He's recently retired from his teaching duties at the University of Florida, Tallahassee.

THE COURT:  Well, how elderly is elderly?  I have to get this straight.

MR. WISEMAN:  Significantly older than any of us.

THE COURT:  Uh-huh.

MR. WISEMAN:  Your Honor, I honestly thought a treatise from the -- or a declaration from the person who wrote the manual would be accepted by the Court as an authoritative source.

THE COURT:  Not unless he's -- no.

MR. WISEMAN:  I was wrong.

THE COURT:  If you want to introduce the manual, that's fine.

MR. WISEMAN:  Okay.

BY MR. WISEMAN:

Q.   The manual says that you should mention in whomever you're reporting about your evaluation --

THE COURT:  Do you have the manual there?

MR. WISEMAN:  Oh, sure.

THE COURT:  Okay.

MR. ROBERTS:  I guess we should clarify what manual, Your Honor.

THE COURT:  What manual is it?

MR. WISEMAN:  I'm sorry.  Let me start over.  I've

USCA5 4340

been thrown for a loop here.

BY MR. WISEMAN:

Q.   The ABAS manual says that when you have a high number of guesses, four or more, you ought to provide that information with an explanation for its significance to the person to whom you're reporting, in this case the Court.  Do you agree with that?

A.   I'd like to -- I don't have the manual memorized.

THE COURT:  The expert, when I asked your expert on this, Mr. Wiseman --

MR. WISEMAN:  Yes, ma'am.

THE COURT:  Because I understood that none of these tests were designed for what they're being used for in this case.

MR. WISEMAN:  That's right.

THE COURT:  Is that right, Dr. Moore?

THE WITNESS:  Yes, ma'am.

THE COURT:  Pardon?

THE WITNESS:  Yes, ma'am, that's correct.

MR. WISEMAN:  Our view is you don't therefore depart from the manual.  You do the best you can.  And I think my question will make that clear.  At least I hope it will.

THE COURT:  It will.

BY MR. WISEMAN:

Q.   I'm on Page 23 of the manual.  The part that I've

USCA5 4341

highlighted says, it's regarding scoring of checking.

THE COURT:  Can you read that?

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.   It says, "Most respondents in the standardization sample guessed three or fewer times.  For each scale area if the respondent guesses four or more items, interview the respondent to determine the reason.  If you decide to continue scoring and interpretation with the current respondent, report the higher number of guesses in all reports, multidisciplinary team discussions, and other venues in which the score may be used to make decisions of the individual."

And my question is, did you in your report make any comment about the high number of guesses?

A.   While I didn't make any comment about the high number of guesses, I tried to highlight the reduced validity and reliability.  To the degree that that should have been in there, I would apologize to the Court and will make sure that those are always in reports in the future.  But I thought the focus on the reduced reliability and validity in noting that we were trying to do a retrospective analysis or assessment kind of made clear that --

Q.   Well, you're relying on your ABAS testing to some degree, aren't you?  I mean, I know you think it's got some flaws, but

USCA5 4342

you're considering it and relying on it and using it.

A.    Yes, sir.

Q.    And you would agree that it's not entirely forthcoming to not report to the Court, to us -- I mean, you didn't think I was getting your data, and you didn't think it was important to tell me that there was that number of guesses in these, in these administrations?

A.    I would take a bit of umbrage at the implication that I was attempting to mislead you or the Court.  I was entirely aware and certainly confident that the data I obtained would be turned over to your experts, who would be able to make a full assessment of the responses contained therein.

Q.    How did you go about picking your informants for the ABAS testing?

A.    I spoke with, I guess Mr. Bill Shotts initially, who provided me with names of various folks who knew Mr. Bourgeois for, over a long period of time or knew him.  And then I called them individually, and in my conversations attempted to get a bead on who would have known him, both -- as well as possible and across a broader number of situations, recognizing that none of them lived with him or saw him socially, and attempted to balance that out with the possibility of family members.  Although in this context, where I'm working for the Government, that can be a challenging situation for two reasons.  One is sometimes they are reluctant to speak with me, and the second

USCA5 4343

one is I feel a real difficult challenge asking a family member to complete a measure that could actually come back around and be --

THE COURT:  Harmful to the family member.

THE WITNESS:  Yes, ma'am.

BY MR. WISEMAN:

Q.    Okay.  I guess I really was looking for some different information.  That's my fault.  Once you sat down with a person you identified as a potential informant, how did you make the determination as to whether to administer the ABAS?  You didn't give the ABAS to everybody you talked to.  Right?

A.    No, sir.

Q.    Okay.  So how did you determine if you thought the person was sufficiently reliable to administer the ABAS?

A.    If they had known Mr. Bourgeois over a fairly extended period -- in this case, I was trying to look for, you know, a number of years -- and they had been able to spend social time with him, had seen him on a more casual basis, so that I could get a bit of an idea of how he functioned specifically -- not specifically in the workplace, but at least more casually if they were spending the night in a terminal, or with Ms. Davis, where it appeared that she and her family had known him for many, many, many years, but also she talked about some of the times that they had talked when her mom brought meals in and things like that.

USCA5 4344

So we tried to, I tried to get folks who knew him a little bit more broadly than someone like Mr. Shotts, for example, who knew him more in a boss/worker relationship, but didn't really, it seemed, sit down to eat with him or spent the night with him at a terminal or whatever.

Q.   Okay.  And so I would take it then that you're looking at two things.  One is the sort of opportunity to observe, as well as the person's apparent reliability as a historian.

A.   Yes.

Q.   You know, if they remember things, things like that.

A.   Yes, sir.

Q.   Now, when you called Ms. Armont up, did you make the call to schedule the appointment, or did someone from the Government's office do that?

A.   Someone from the Government's office did.  I don't believe I spoke with them.

Q.   So someone from the United States Attorney's Office who's trying to defend this capital conviction called --

MR. ROBERTS:  Objection, Your Honor, to the argument nature of his question with regard to --

MR. WISEMAN:  All right.  That's fair.

THE COURT:  Well, it's just us.  It's not a jury.  It doesn't -- he can say whatever he wants pretty much.

MR. WISEMAN:  Oh, really?  Just opened some doors.

MR. ROBERTS:  I just have to defend my office, Your

USCA5 4345

Honor.

THE COURT:  Thank you.

BY MR. WISEMAN:

Q.   Well, I mean, the point is you had someone from the prosecution call this woman up and say, "We want to come talk to you."  Right?  Something like that.  Okay.

A.   Yeah -- sure.

Q.   Did that person say that an FBI --

THE COURT:  You could just call them "the Respondent."

BY MR. WISEMAN:

Q.   Did someone from the FBI, did you inform or anyone inform Ms. Armont that an FBI Agent was going to be showing up as well?

A.   I'm not sure what Ms. Armont knew in terms of who would be there, but it was my understanding that she had spoken with Mr. Smith on occasion before, and his take on it was that she had been comfortable with him.

Q.   Okay.  So your view then is that Beth Larin, all five-foot-two of her showed up, and that somehow skewed the evaluation, but the agent, who I presume brought his gun, didn't have any effect on the evaluation or couldn't conceivably have had an effect on the evaluation?

A.   The pleasantness --

Q.   Is that your point?

USCA5 4346

A.   The pleasantness of Ms. Larin or her relatively small stature weren't factors in this.  The FBI Agent stayed outside the door.  He wasn't even in the house.  The issue had to do with the very clear and ongoing display that it was an adversarial process, and again the issue of inadvertent reinforcement of response to --

THE COURT:  I think we can all figure this out.

THE WITNESS:  Thank you, ma'am.

BY MR. WISEMAN:

Q.   Okay.  I just wanted that point to be clear.  It is an adversarial process, and you were there for the adversary.

THE COURT:  Mr. Wiseman, no one has criticized you for having a lawyer there.

MR. WISEMAN:  Okay.  Well, that was not the tenor of the questioning, I thought.

THE COURT:  No.  You have every right to have somebody there.

MR. WISEMAN:  Thank you.

THE COURT:  There's no -- but the question is, and I agree with him, if he says it affected the validity of his testing.

MR. WISEMAN:  Okay.

THE COURT:  And that's okay.

MR. WISEMAN:  Okay.

THE COURT:  It doesn't -- it's neither here nor there

USCA5 4347

really.

MR. WISEMAN:  Well, and I guess the last question --

THE COURT:  I think you had the right to do that, too.

BY MR. WISEMAN:

Q.   Okay.  The last question I would have is, wouldn't you think the presence of an armed FBI Agent could have an effect on the testing?

A.   It would --

THE COURT:  Well, he said that FBI Agent was outside.

MR. WISEMAN:  Well, Your Honor, inside, outside, the point is he's standing there, he's armed, he's an FBI Agent. You don't think that can have an effect?

THE COURT:  Well, how about affecting the testing of somebody that's on death row?

MR. WISEMAN:  That's the question for the expert.  I mean --

THE COURT:  I know, but I mean all of these things affect the validity of testing, I would assume.  Is that right?

THE WITNESS:  Yes, ma'am.

MR. WISEMAN:  Now --

THE COURT:  I mean, when you're fighting for your life and your defense is mental retardation.

MR. WISEMAN:  That's one of his defenses.

THE COURT:  One of the defenses, and you're being

USCA5 4348

Moore - Cross

tested for it after the fact, that would certainly affect -- it could affect the validity of the testing, could it not?

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.   I want to talk a little bit about -- just one more question about the respondents.  Did you try to talk to Beverly Frank?

A.   No, sir.  I --

Q.   She's the one who came in and testified and to whom Dr. Swanson administered the Vineland and the ABAS.

A.   Just to be clear in my answer to you, I think she was on the list of folks that we were going to interview over those days, but we adjusted the interview schedule.

Q.   Okay.  Did you have any information that -- well, let me back up a moment.  You understood that Ms. Armont had called my office and asked for us to be there?  Is that your understanding of why Ms. Larin and the investigator showed up?

THE COURT:  That was what I understood him to say.

MR. WISEMAN:  Yeah, okay.

BY MR. WISEMAN:

Q.   Did you ask similar information that Ms. Frank had done the same thing?  I mean, did you expect we were going to be there, too?  Did you think we were going to be everywhere?

A.   Yes, sir, based on a comment that --

USCA5 4349

THE COURT:  It's a conspiracy.

THE WITNESS:  -- Ms. Larin had made to Ms. Hohle before we left, along the line, they were speaking, "I guess we'll be seeing you over the, later on today," or whatnot.  We took that to mean that perhaps additional interviews that we would be at, they would also be there.

THE COURT:  I was joking about the conspiracy, by the way.

MR. WISEMAN:  I know.

THE COURT:  Okay.

MR. WISEMAN:  The record should reflect there's been a lot of friendly banter.

THE COURT:  Thank you.

MR. WISEMAN:  Does Your Honor agree?

THE COURT:  I do.  Thank you.

MR. WISEMAN:  I just wanted the record to be clear.

THE COURT:  Without sacrificing the purpose of the hearing.

MR. WISEMAN:  Of course.

BY MR. WISEMAN:

Q.  So as I understand your criticism of Dr. Swanson's interpretation of the Woodcock, which I put up Petitioner's 35 at Page 13, is that you think the Scaled Score column is the relevant one and not the one she relied on, Age and Grade Equivalent.  Is that right?

USCA5 4350

A.    I think in terms of looking at the definition of mental retardation in terms of two standard deviations below the mean, that is the most relevant number to look at, because that gives us a comparison to his same age to peers.

Q.    Okay.  And two standard deviations below the mean in this case would be 70 or below?

A.    Yes, sir.

Q.    In regard to the Woodcock?

A.    Yes, sir.

Q.    And I think your testimony, which I wrote down was, you said a couple, as in two, of his scores were two standard deviations.  I just want to be clear on this.  We see he's got a 68 in Broad Math.  He's got a 70 in Brief Math.  He's got a 66 in Story Recall.  He's got a 63 in Applied Problems, and a 57 in Story Recall Delay.  So in fact, there are five of his scores that are two standard deviations below the mean.  Is that right?

A.    Yes, sir.  That would be true.

Q.    And if one -- well, let me ask you this, what does the DSM say is the rough grade equivalent for a person with mild mental retardation?  Sixth grade?

A.    The -- I'm sorry.  I didn't mean to interrupt you.

Q.    I interrupted you, but I'll keep going.  It's sixth grade is roughly the upper grade level for a person with mild mental retardation.

USCA5 4351

A.   I think the way it says it is that folks with mild mental retardation may reach up to about the sixth grade level.  Yes, that's correct.

Q.   Okay.  So when we look at the grade equivalency levels, we see 3.1, 4.1.  We've got one above 6, the 6.2, 5.4, 5.8, 4.1, 7.2.  I mean, going down the line, he's got far more grade equivalents below the sixth grade, doesn't he?

A.   While it's true that he does, I think what's most striking is that with those standard scores, it would also mean that about 10 to 12 percent of the population would have scores, grade equivalents that low as well.

Q.   You're familiar with Muriel Lezak's Neuropsychological Assessment, Fourth Edition?

A.   Yes, sir.

Q.   It's an authoritative source?  It's the bible of neuropsychology?

A.   A bible in what?

        THE COURT:  He said it was a bible of neuropsychology.

BY MR. WISEMAN:

Q.   It's got all the tests, everything in there.

        THE COURT:  Is that right?  That's what you said?

        THE WITNESS:  I didn't think I was allowed to talk about neuropsychology.

        MR. ROBERTS:  Your Honor, is the witness going to be

USCA5 4352

allowed to talk about neuropsychology now?

MR. WISEMAN:  No, he's going to be able to talk about, if I'm permitted, the Woodcock-Johnson --

THE COURT:  You shouldn't have said that.  Go ahead.

MR. WISEMAN:  -- the Woodcock-Johnson, which is a test he's commented on.

THE COURT:  Thank you.

MR. WISEMAN:  Just have a moment to find the page.

BY MR. WISEMAN:

Q.   I'm going to put up for you -- this book is a little bulky.  I'm going to make Ms. Larin carry it back to Philadelphia.  You see here on Page 665 is the Woodcock-Johnson?

A.   Yes, sir.

Q.   Right?  That's what we're talking about.  And over in the right column, this is at Page 665, there's a discussion about age and education equivalence provided in the test record booklet?

THE COURT:  Could you push it down a little bit --

MR. WISEMAN:  Sure.

THE COURT:  -- so that it's more -- no, I meant flatten it.

MR. WISEMAN:  Oh, flatten it.  It doesn't fit on the ELMO.

THE COURT:  Okay.  It's hard to read the words when

USCA5 4353

it's not flat.

MR. WISEMAN:  Yeah, I got you.  Okay.

THE COURT:  Well, maybe if you zoom it in a bit, it would be easier.

MR. WISEMAN:  How is that?

THE COURT:  Better.  Much better.  Thank you.

BY MR. WISEMAN:

Q.    It says, "Age and education equivalence are provided in the test record booklet.  Age and education ranges vary from test to test," and it talks about all that.  And down at the bottom here, the part I want to draw your attention to, it says, "Of course, when using the test selectively, scores requiring combinations and comparisons of discrete test scores cannot be obtained.  For most purposes experienced neuropsychologists would be able to rely on the age and education equivalence."  Do you see that?

A.    Yes, sir.

Q.    So isn't Lezak there essentially saying that what's important for assessment purposes are age and grade equivalence, and not standard scores or scaled scores, for experienced folks?

A.    Well, I think it would depend on the context within which the information is being utilized.

Q.    Okay.  But I mean, let's just say, focus on what Muriel Lezak says.  She says that, for experienced practitioners, it's

USCA5 4354

age and it's grade equivalency that are the most relevant of these measures.

MR. ROBERTS:  Objection, asked and answered.

THE COURT:  It's okay.

THE WITNESS:  Again, I think it has to do with the context.  If the issue were about trying to determine where a person's reading level's set for education and habilitation purposes, I think the grade equivalent would be an appropriate place to be putting the focus.

BY MR. WISEMAN:

Q.  So you agree, disagree with Lezak on that point.  Let's move on to --

MR. ROBERTS:  Your Honor, can the witness be allowed to answer?  He was not --

THE COURT:  Go ahead.

THE WITNESS:  Again, I think it depends on the context.

BY MR. WISEMAN:

Q.  Okay.  Let's move on to the Flynn Effect.  And I don't want to get into a whole big fight about the Flynn Effect, because we could be here, and I do have to get home, as we all do.  I think --

THE COURT:  Are you planning on leaving tonight?

MR. WISEMAN:  Tomorrow.

THE COURT:  Okay.

USCA5 4355

MR. WISEMAN:  I hope.

BY MR. WISEMAN:

Q.   I'm going to try to characterize the dispute.  You tell me if I'm doing it right, just so we can sort of set the terms.  As I understand the dispute, there's this recognized phenomena that norms get outdated, IQ scores tend to drift up a little bit and over-reflect people's true abilities if the norms are kind of old.

A.   Globally, that's correct, with a recognition that in some of the studies that have been used in Flynn, some of the ones in Scandinavian countries, but ones that he's talked about particularly earlier on being some of the most robust data for the Flynn Effect have reversed.  But in general, I would accept that as a baseline --

Q.   Okay.

A.   -- field.

Q.   All right.  And then the dispute, if you will, seems to be between folks, who I gather you're one of, who say, "Well, you know, you don't adjust the score.  You simply make it known that the outdated -- that the score obtained on the outdated test, or the one with the older norms, may be an overestimate of true ability."  Is that the position that you sort of take?

A.   I would say that would be an unreliable, a less reliable estimate.

Q.   Less reliable.  Okay.  And the other side of that

USCA5 4356

controversy says you actually make an arithmetic adjustment and adjust down the score.

A.    Yes, sir, that's correct.

Q.    Okay.  I want to draw your attention to the green book. At Page 37, weighs in on this controversy.  It says, "Best practices require recognition of potential Flynn Effect when older editions of an intelligence test with corresponding older norms are used in the assessment and interpretation of IQ scores.  Then it refers to the user's guide from 2007.  The user's guide in that context is the user's guide to this manual.  Yes?

A.    Yes, sir.  I'm sorry.

Q.    And it then quotes the user's guide and says, "The main recommendation resulting from this work regarding the Flynn Effect is that all intellectual assessments must use a reliable and appropriately individually administered intelligence test. In cases of tests with multiple versions, the most recent version with the most current norm should be used at all times. In cases where a test with aging norms is used, a correction for the age of the norms is warranted," closed quote.

      So the green book, the most current authoritative post-Atkins statement on Flynn, from this organization, says, "Correct," Doesn't it?

A.    The AAIDD, without doubt, proposes to correct for Flynn, in fact, uses a correction number higher than I see in

USCA5 4357

virtually any other place.  And the AAIDD espouses how to score a correct IQ test I have a bit of an issue with.  I think they can tell us a lot, a tremendous amount about the diagnosis of mental retardation.  But in terms of how to administer or score an IQ test or what to do with those scores, I have more difficulty with that.

Q.    Okay.  So you disagree with the eleventh edition, the most current authoritative post-Atkins source on assessment of, or application of the Flynn Effect.

A.    Yes.

Q.    I mean, it's not, it's nothing to be ashamed of --

A.    Yes.

Q.    -- but that's your position.

A.    Yes, sir.

Q.    I didn't see anything in your report other than the criticism of Dr. Weiner's using the WAIS-R.  I didn't see any criticism about the way in which it was scored or administered.  I mean, you have no quarrel with that?  Did he make any mistakes?

A.    Right.  Other than that, which I think actually the mistake that I noted in there actually was acknowledging or pulling the score down --

Q.    Oh, really?

A.    -- by a point.  I think it went from a --

Q.    Do tell.

USCA5 4358

A.    -- a 76 to a 75.

Q.    Oh, okay.  That was the transcription error between the report --

A.    Yes.

Q.    -- and the data.

A.    But there had been the contention in some places, and they couldn't tell where that error was, whether it really should have been a 76 or a 75.  And I believe it should have been a 75.

Q.    Now, you've testified that one of the problems in using these standard measures for assessing adaptive deficits is that there were not norms out there for the application of these tests in a retroactive adaptive deficit situation.  Is that -- am I understanding that?

A.    Yes, sir.

Q.    Okay.

      (PAUSE.)

          MR. WISEMAN:  Your Honor, you know, I'm missing a document and --

          THE COURT:  What you need to do -- oh, you -- okay.

          MR. WISEMAN:  I could also use a five-minute break. I don't want to keep people waiting.

          THE COURT:  Okay.  Five minutes.

          MR. WISEMAN:  Thank you.

          THE COURT:  Ten minutes.

USCA5 4359

(Recess from 4:42 p.m. to 5:11 p.m.)

THE COURT:  Thank you.  You may be seated.  You may proceed.

MR. WISEMAN:  Thank you, Your Honor.

MS. BOOTH:  Your Honor, before we start, if it's okay, my case agent, Megan Beckett, would it be okay if she left at 5:30?  Could she be released?  Is there any problem with that?

THE COURT:  I've been surprised she was here the whole time.

MS. BOOTH:  She's under two weeks before her due date.  We want to get her back to Philadelphia.

MR. WISEMAN:  I thought I would be done before then.

THE COURT:  Where are you living now?

MS. BECKETT:  Las Vegas, ma'am.

MS. BOOTH:  Oh, okay.

THE COURT:  Oh.

MS. BECKETT:  I have a little bit of a flight tonight.

THE COURT:  You better get on the way before they don't let you fly.

MS. BECKETT:  Yes, ma'am.

THE COURT:  Well, it's good to see you again.

MS. BECKETT:  You too, Judge.  Thank you.

THE COURT:  Bye-bye.

USCA5 4360

MR. WISEMAN:  And Your Honor, just so the Court and the Court staff know, I don't expect to be more than 30 minutes.

THE COURT:  Thank you.

MR. WISEMAN:  I thought you'd appreciate that.

CROSS-EXAMINATION (Continued)

BY MR. WISEMAN:

Q.   When we broke, Dr. Moore, I was asking you about your concern that there aren't any formal instructions for how to proceed in a retrospective adaptive deficit evaluation.  I just put up on the screen here, just for identification, a document called the Vineland II, Expanded Interview Form Manual, a Revision of the Vineland Social Maturity Scale, and it's got the author's name.  Are you familiar with this document?

A.   Yes, sir.

Q.   Okay.  And this is like -- and you would agree this is an up-to-date addendum to the Vineland II Manual?

A.   Yes, sir.

Q.   And you agree that it's got a chapter on retrospective interviews?

A.   Yes, sir.

Q.   So in fact, there is guidance from the test designers as to how to proceed in a retrospective setting.

A.   I'm not sure that I testified there was no guidance on how to proceed in a retrospective setting.  I think my testimony

USCA5 4361

was that the tests weren't normed for that situation.

Q.    I'm sorry, I didn't hear the last part.

A.    I don't believe the tests were normed or standardized for that situation.

Q.    But the folks who designed the tests are putting out instructions about how to use them in a retrospective setting.

A.    Yes, sir.

Q.    You saw Claudia Williams testify in the court that first -- she was our first witness, I think, the first witness on the second day.  It's all running together.  But you saw her.  Right?

A.    Yes, sir.

Q.    Okay.  And you asked her to take the ABAS, and she declined.

A.    Yes, sir.

Q.    Okay.  And I presume you interviewed her prior to asking her to take the ABAS, as part of the protocol requires, you interview the person to see what their basis of knowledge is and whether they're a good, reliable informant.

A.    Yes, sir.

Q.    Okay.  And after watching her testimony, did you think she would have been a suitable ABAS informant, in terms of her ability to recall dates?  I thought she said several times to Judge Jack, "I'm not real good with dates.  I can't remember dates."

**USCA5 4362**

THE COURT:  I thought she was a poor historian.

MR. WISEMAN:  Yes, that's my point.

BY MR. WISEMAN:

Q.   Did you, do you agree with Judge Jack?

A.   Yes, sir.  Certainly.

Q.   Smart man.  And so Judge Jack had criticized, I think, Dr. Swanson for choosing Beverly Frank over Michelle, over Claudia Williams, and I think you'd agree that Ms. Frank was a much better historian, in fact a pretty good historian in her ability to recall specifics.

A.   She seemed to be a good historian.

Q.   And I thought you had some criticism of Dr. Swanson's going back to age seven, and I thought there were a couple of reasons, but the one I wanted to ask you about was in doing a retrospective analysis, it's important to be able to keep the informant focused on a specific time in order to ensure reliability.  You agree with that?

A.   Yes, sir.

Q.   And so I think with one of your informants, you chose graduation from high school as a point.

A.   With -- that's correct.  With my informants, what I had them utilize was the last date that they had ongoing contact --

Q.   Okay.

A.   -- with the individual, so that it was firmly established for them.

USCA5 4363

Q.   Okay.

A.   We knew they were giving me the maximal level of advancement that the person had reached.

Q.   All right.  And you'd agree that Dr. Swanson essentially did the same thing when she said to Ms. Frank, "Let's focus on when Alfred came to live with you.  What could he do then?"  And that's similar to what you did, in the sense of pinpointing a specific time frame.

A.   Well, there's a similarity in terms of pinpointing a time frame.  The difference for me is that we know there is the end point.  So whatever it was they did, that by the end point they knew how to do that.  In other words, it's their highest level of functioning, versus reaching back to this particular date where she would have had interactions with him perhaps after that as well, and maybe even before then.  I'm not sure whether, why they chose exactly seven.

Q.   And I thought, you know, the record will reflect it, but I thought that Dr. Swanson testified that that was the last date that Ms. Frank had a recollection of Mr. Bourgeois, from around the time that he came to live with her grandmother.

A.   That's not my understanding, sir.  I thought that she said that she knew him from about the age of seven till he was about nine.

Q.   I see.  So given that Ms. Frank hadn't seen Mr. Bourgeois from age nine till she came into this courtroom, you would

USCA5 4364

agree that that is consistent with -- well, withdraw that.

What's your basis for thinking she's biased?  Or do you think she has a bias for Mr. Bourgeois?

A.    The concern that I had -- well, there are two pieces.  My issue in terms of, or my struggle with Ms. Frank had to do more with the comparison of the Vineland to the ABAS in general, where some of the responses or numbered responses were different.  But secondly, that level of adaptive functioning that she described on the ABAS was --

Q.    Seemed low?

A.    -- seemed low.

Q.    Okay.  But didn't you hear Dr. Swanson testify that's why she followed up with the Vineland, which provides the evaluator an opportunity to clarify and understand responses?

A.    Yes.

Q.    That's a feature of the Vineland that's not present in the ABAS.

A.    Yes, sir.

Q.    All right.  And when she clarified and asked probative questions and clarified questions, in fact, Ms. Franks' ratings went up, still in the significantly deficient range, but they did go up.

A.    Oh, yes, sir.

Q.    And you didn't do that with your ABAS's, because they don't, it doesn't permit it.  It's not part of the test.  You

USCA5 4365

don't get to clarify and say, "What did you mean by this" and "What did you mean by that?"

A.    That's correct.

Q.    Now, in doing this retrospective analysis, you didn't interview anyone -- you didn't -- well, I'll take that back.  I guess with Ms. Davis, she knew him a little bit before age 18, although it was unclear, I think, how much before 18.  But no other -- I'm getting punchy.  Right, you didn't administer the ABAS to anybody who knew Mr. Bourgeois pre-18 is the point I was trying to ask you about.

A.    It seems like --

          MR. ROBERTS:  Your Honor, I would ask the witness be permitted to speak about Mr. Banks, because he's just asked him --

          THE COURT:  Yeah, go ahead.

          THE WITNESS:  I administered it to Mr. Nathaniel Banks, who was a childhood friend of Mr. Bourgeois and knew him throughout his childhood up to the point that they graduated from -- well, knew him throughout his life, but had ongoing contact with him until he was about 18.

BY MR. WISEMAN:

Q.    Right.  But I thought the date that you asked him to pinpoint was when Mr. Bourgeois was 18, not pre-18.  Did you ask him to recall "What was Mr. Bourgeois like the last day you saw him," which was after his 18th birthday?

USCA5 4366

A.    My understanding on the dates of that was that it was -- I think it actually wound up being May of that year.  I believe it was just prior to 18.

Q.    We're going to check on that, and I'll move on to something else for now.  But you would agree that it would be helpful in this setting to administer a test to somebody who knew Mr. Bourgeois before he was 18, in meeting the onset criteria.

A.    Well, sir, actually the way that I've addressed this in the past --

Q.    Okay.

A.    The way that I've addressed this in the past, again, the struggle with the adaptive functioning measures in an adult is the farther you go back, the less reliable the information is.  So what's happened in cases where I've worked with is if their adaptive functioning were in the significantly impaired range, in adulthood, and they had significant deficits in intellectual functioning, et cetera, and there was other ancillary data that reflected that the impairment had began before the age of 18, then my recommendation in those cases has been that while it can't be firmly established as an onset prior to the age of 18, it appears from the data that we have that it's likely, you know, the person is currently mentally retarded, and it appears that that's been a condition that had an onset prior to the age of 18.  So I wouldn't have necessarily had to have gone back

USCA5 4367

and, you know, I certainly don't require IQ testing that sometimes isn't even available in someone prior to the age of 18. And adaptive functioning measures, again, I don't necessarily have an adaptive functioning measure that's completed prior to the age of 18.

Q. Now, I'm putting back up 177, which is the chart outlining the guesses of the respondents. You would agree that with the exception of Mr. Banks, the people who knew Mr. Bourgeois in the work setting guessed zero times. That would be Clark and Davis -- Clark's valid one -- and those two folks guessed far more often in the other areas.

A. Yes, sir, that's correct.

Q. And it's important in doing this assessment to select informants who have good information, good source for information in more than one skill area.

A. Yes, sir.

Q. So you wouldn't want to give it to someone who only knows the subject in terms of home living.

A. Yes, sir, that's correct.

Q. Okay. And yet you'd agree that Davis and Clark really are guessing pretty extremely, except in the one domain where they knew Mr. Bourgeois, which was work.

A. They guessed more in those domains than in the work setting. I would certainly agree with that. I think that their knowledge of him in different settings was such that they

USCA5 4368

may not have seen him engage in a specific behavior, but from what they knew of him, felt confident in their rating.

For example, Ms. Davis' estimate that he would be able to find a restroom in a public area, that he would appropriately find the restroom, well she said he could, she thought he would be able to consistently do it independently, but she guessed.

Q.    Now, I thought your view was that Mr. Clark checked guesses because -- I'm sorry -- Ms. Davis checked guesses because she didn't actually see him do things, and you thought that was somewhat improper under the protocols.

A.    I'm sorry, I didn't mean to interrupt you.

Q.    Yeah.

A.    Would you say that again?

Q.    Sure.  I thought you were saying that Ms. Davis, her completion of the test, she guessed improperly sometimes because she was interpreting it to mean that if she didn't see him do something, she had to guess.  And you don't agree with that.

A.    Oh, no, sir, I would disagree with your contention there.

Q.    Oh.

A.    I think she absolutely did it correctly.  I think that she was just extremely vigilant to, "If I didn't lay my eyes on him to do it," then she would check a guess.

Q.    Right, okay.

A.    I think she did it appropriately.  I think that most

USCA5 4369

people completing that form might have been a little less, you know, hyper vigilant to that.

Q.    But you would agree that the instructions said that you should check guess if you've never seen the individual in a situation in which the behavior is needed.

A.    Oh, absolutely.

Q.    What?

A.    I don't think that she mischecked.  I don't think she was in error.  I think she was being very vigilant.

Q.    Okay.  So the point is, is if you don't see the person do something, you're not supposed to speculate.  You just say you guessed.

A.    You are supposed to speculate.

Q.    Right.

A.    You're supposed to speculate and say --

Q.    But you're supposed to check that you guessed.

        THE COURT:  Let him finish answering.

BY MR. WISEMAN:

Q.    I'm sorry.

A.    You are supposed to speculate, but you're supposed to indicate that that speculation, being based on your knowledge of the individual in other situations, was in fact a guess or an estimate.

Q.    Are you familiar with this volume, the ABAS-II, clinical use and interpretation by Thomas Oakland and Patty Harrison?

USCA5 4370

A.    Yes, sir.

Q.    Okay.  And this is a -- those are the authors of the ABAS test, correct?

A.    Yes, sir.

Q.    And this volume came out, published in 2008?

A.    Yes, sir.

Q.    There's a chapter here on the use of the ABAS in adult forensic settings.  Are you familiar with that, Chapter 20?

A.    I would certainly appreciate the prompts.  Oh, yes.

Q.    You see that?

A.    Yes.  Yes, sir.

Q.    Okay.  In that -- excuse me -- in that chapter, at Page 389, says, "If the focus of adaptive behavior is work, the informant may be a former employer or co-worker, he or she will provide useful information by completing only the work adaptive skill area."  Do you agree with that?

A.    I agree that if they only knew them in work, then in a general guideline, that would be a reasonable contention.  I think the nature of Mr. Bourgeois's work and the nature of the contacts that he had with the informants that were utilized was appropriate because they had somewhat broader contact.

Q.    All right.  Well, let's take Mr. Clark.  I mean, Mr. Clark, I thought his testimony was quite -- oops, I'm sorry -- Mr. Clark's testimony was quite clear that he, you know, other than an occasional meal every other week or so, he

USCA5 4371

had no other contact with Mr. Bourgeois.  He saw him occasionally in terminals, they'd go out for a bite.  So he really had no -- I mean, would you agree with that characterization?

A.   I would agree that that was the way the testimony was elicited here.  In my interview with him, he indicated they did runs together, they would stay in the terminal spending the night, you know, where everybody would be there in the terminals every night, so he had seen him in that type of circumstance.  They would do cookouts together sometimes there, they would go to the store to buy items, sometimes splitting up when they got there to buy various items, and when they would cook out, sometimes Mr. Bourgeois would do the grill, and sometimes others.  It appeared that there was much more of a social basis, and sometimes after hours they would help other truckers with things, they'd hang out, maybe go work on a CB radio, those types of things.  So --

Q.   So he -- I'm sorry.  Go ahead.  Finish.  I'm sorry.

A.   So what he described to me in the interviews that I had with him was a broader degree of social contact.

Q.   Okay.  So you were told one thing, and Judge Jack was told another thing with respect to the frequency of his contacts and the setting of his contacts.  Would you agree that there's some difference?

A.   I would agree that the interview that I had with him and

USCA5 4372

the information I got was more broad-based than what he shared here.

Q.    Okay.  And wouldn't you agree that the number of times he's guessing, like for example on every question in leisure, he guessed 100 percent of the time, suggests that he really wasn't a good informant for that skill area?  He just didn't know Mr. Bourgeois in leisure.

A.    That's Ms. Davis, sir.

Q.    Oh, you're right.  Well, let's pick a different one.  Home living, 61 percent guesses.  I mean, that means he didn't know Mr. Bourgeois in home living.

A.    While it indicates he doesn't know him in home living, it doesn't mean that the foundation upon which he was making the guesses were that extreme.  For example, one of them was packing for an overnight trip.  He said, "I saw him and his truck, how things had been packed.  I knew that he was able to pack his own stuff when we were on the road.  I presumed that he was able to pack himself at home, but I didn't actually lay my eyes on him to do so."  So it was a guess, but it certainly appeared to be an informed guess.

Q.    The same section of the ABAS-II book I was just reading to you also -- well, I'll put it up.  It says, "Some informants" -- oops, that's terrible.  "Some informants may have known a Defendant's functioning well in one setting and may be able to provide useful anecdotes, yet not enough is

USCA5 4373

known to complete all sections of the ABAS-II."  Do you agree with that?

A.   That some informants may not have known an individual enough to be able to, to be able to talk about all settings?

Q.   Right.

A.   Yes, sir.

Q.   Okay.  But they can provide useful anecdotes is what this says.

A.   Yes, sir.

Q.   Okay.  Now, in terms of bias, did you see any bias at all with regard to Donald Reese, who hasn't seen Mr. Bourgeois in 20 years, knew him for two weeks?

A.   He didn't seem --

Q.   He was the guy who was hanging over the cliff in Tennessee?

A.   Yes, sir.  He didn't seem to have the highest opinion of Mr. Bourgeois.

Q.   Okay.  So if anything, he was biased against him.

A.   Yes, sir.  He didn't seem overly impressed with him.

Q.   Okay.  And so that set of anecdotes he related about how Mr. Bourgeois, when he started to drive a new kind of truck, couldn't figure it out that well.  Right?

A.   There was a button that he pushed --

Q.   Right.

A.   -- that he didn't understand what it was the button did.

USCA5 4374

And then as I understand it, a couple of minutes later, he pushed a button that undid the thing.  So I don't know whether the characterization that he wasn't able to drive the truck well or didn't understand about it was --

Q.   What about the part where they stopped and all the liquid sloshed and Mr. Reese was thrown out of his sleeper compartment and got out of the truck and saw they were in a ditch?

A.   They had run into -- I'm not sure how much you've driven through the mountains of Tennessee or North --

Q.   Never.

A.   To run into the ditch on a mountain in that regards, the way those roads are cut in, is not a real surprising thing. They're fairly narrow, and there's a sharp dropoff on one side. And while I wasn't in that particular site, as he noted, he could look off to the one side and you could see the top of the pine trees.  It's a little disconcerting to drive in those.

Q.   Are you seeking to explain away behavior suggestive of an adaptive deficit?  I mean, the man ran an 18-wheeler off the road.  You don't think that's --

        MR. ROBERTS:  Your Honor, that's argumentative.

BY MR. WISEMAN:

Q.   Do you think that's --

        MR. ROBERTS:  Object.

BY MR. WISEMAN:

Q.    -- significant information?

USCA5 4375

A.    Do I think the fact that a person in, on mountain roads in that type of an area drove an 18-wheeler into a ditch or went off of the road into a ditch is a sign of an adaptive deficit? That would be an anecdote --

Q.    Some evidence?  Would it be some evidence?

A.    That the man drove the 18-wheeler, or rolled into a ditch on a mountain road like that would be an anecdote.  When we look at adaptive functioning, we're looking far more broad-based than that.  I think that the population of people who have driven off of the road into a ditch would be fairly broad.

Q.    Okay.  Well, you know, maybe it's my fault we're taking this in isolation, but I mean, this man drove tandem for two weeks with Mr. Bourgeois and basically testified he was terrified and got out of the truck and took a bus home.  I mean, that's more than one incident anecdote, isn't it?  They had gotten lost --

A.    He related three.  He said there was --

Q.    Got it.

A.    I'm sorry.  He related three.

Q.    Right.

A.    The one with the button where they had, apparently just learning the truck, the place where he had over shot the highway and was going down a different -- was not taking the road, the highway they were supposed to take, and the episode

USCA5 4376

in the ditch.

Q.    Right.  And the overall flavor to him was, "Oh, my God, I've got to get out of this truck."

A.    Yes.

Q.    Okay.  So that's more than just an incident.  It's more than just running off the road.  It's a pattern of behavior when Mr. Bourgeois first started driving these trucks that caused this man to be afraid of his ability.

A.    I think he was not only afraid of him.  It sounded like that Mr. Bourgeois with his excessive verbalizations was problematic for him as well.  He sounded, he sounded irritated with him --

Q.    All right, so --

A.    -- to me as well.

Q.    How many in-person meetings have you had with the Government lawyers in this case?

A.    How many in-person meetings?

Q.    Yeah.

A.    Prior to this week?

Q.    Yeah, prior to this week.

A.    Can I carry it back one more and say prior to last week when we were up here for that deposition as well?

Q.    Sure.

A.    Okay.  I think I was only here once --

Q.    Okay.

USCA5 4377

A.    -- prior to that.

Q.    And how long did you meet with them?

A.    I think I flew in on a Wednesday evening, and we met on Thursday and part of Friday.

Q.    A day-and-a-half.

A.    Yes, sir.

Q.    Okay.  And I think we, you and I bumped into each other when we were checking in for the Gelbort and Estrada portions of these proceedings.  Right?

A.    Yes, sir.

Q.    So you were here a good day ahead of the start of those proceedings.  Right?  I think that was a Wednesday, and you met with the Government on that Thursday.

A.    Yes, sir, that's correct.

Q.    Okay.  So you spent a day-and-a-half before then, spent, I assume, another day with them before the Gelbort, Estrada deposition -- proceedings.

A.    Yes, sir.

Q.    Okay.  And I don't want to -- it's getting late.  I don't want to go through every one of them, but I would assume you've had quite a number of phone calls with the Government, other than logistical phone calls, substantive discussions on the telephone?

A.    I think substantive phone calls, and I would need to check my records on that, but would be three.

USCA5 4378

Q.    Three.  How many hours or minutes?

A.    Oh, those phone calls would have been an hour.

Q.    An hour, okay.  So sounds like you spent about six, seven hours talking with the Government about the substantive -- did I say six?  My God -- a couple of days and then six or seven hours of phone calls?  Three hours of phone calls.

A.    No, sir.  I thought I said three --

Q.    Three, three.

A.    -- phone calls of an hour --

Q.    That's right.

A.    -- a piece.

Q.    Okay.  I guess the point I'm making, rather clumsily, is you've devoted a lot of time educating the Government lawyers about what you've got to say.  Right?

A.    I don't think that I've spent nearly as much time teaching them about what I have to say than trying to help them understand about the mental retardation issues in general.  And then a reasonable part that time, particularly while I was on site, was them looking at or dealing with other types of issues as well.  And then if I could be of consultative help with them, then I would.

Q.    And you heard Dr. Weiner's testimony about the amount of time trial counsel spent with him?

A.    I don't recall what that time -- I was in here for it, but I don't recall.  That was not a particular feature I tuned

USCA5 4379

into.

Q.    I think it was zero.

A.    Okay.

Q.    All right.  So --

A.    Shows why I missed it.

Q.    I just want to cover this chart for a moment.  And I have a feeling it may be too late in the day for me to make any sense of this, but my question -- that's my writing on there, or my scribbles, but my question is, what was the date on which this study was conducted?  The year, not the day, but I mean -- this is comparing WAIS-R with WAIS-III scores.  Right?

A.    Yes, sir.  That's from the WAIS-III handbook.  So the WAIS was published in 1997.  And so the correlational studies probably would have been being done in probably '95 to '97.  I think.  And that's my best guess.  That's when they were norming the test, I believe.

Q.    Okay.  I was just curious about that, because it wasn't apparent on the chart.

      You expressed shock or that you thought it was striking the drop in Mr. Bourgeois's performance on the verbal IQ between the WAIS-R and the WAIS-III.  Do you recall that?

A.    Yes, sir.  I thought that was a notable drop.

Q.    Okay.  Could part of that drop be attributable to the -- by the time he was taking the WAIS-III, he had been on death row for about three years, without appropriate stimulation,

USCA5 4380

things to challenge his mind?

A.   While that's an interesting hypothesis, I wouldn't particularly ascribe to it.  And I would think that it would be a little notable that his performance would have gone up over that same period and under those same conditions.

Q.   Well, but isn't -- you would agree that Mr. Bourgeois generally performs better on the performance tasks than he does on the verbal.  That's one of his strengths.  Right?  Well, not a strength, but he's relatively better in performance than he is in verbal?

MR. ROBERTS:  Your Honor, could I have the record reflect that the witness was very puzzled by that question.

MR. WISEMAN:  I think the witness can say if he's puzzled.  I mean, if he's puzzled, he can say.

THE WITNESS:  Well, I think that when we think about verbal versus performance, in general, his verbal skills, we look, for example, at the academic functioning.  His verbal skills are a very strong component.  In the testing, the 1994 testing, the --

BY MR. WISEMAN:

Q.   What 1994 testing?

A.   I'm sorry.  Wow, it has been a long day.  The 2004 testing, the verbal and performance were approximately even.  And then there had been the split on the 2007.  In general, it seems to be that his verbal skills, whether spoken or written,

USCA5 4381

are one of his notable strengths.

Q.    All right.  Leaving aside that disagreement, I mean, verbal skills are going to deteriorate if they aren't used, aren't they?  I mean, if you don't read, if you don't think, if you don't --

A.    While it may --

Q.    -- stimulate your mind, you're going to lose some of that, aren't you?

A.    While it may be that that -- there could be some degree of deterioration over time, I don't believe that he was not speaking at all during that period.  He certainly seemed to be reading the Bible.  A comment that he made in my interview with him that Her Honor would see in the videotape was that he was referring to a new car that had come out that he had seen in the paper.  So it looks like he's got some sort of stimulation, verbal type of stimulation, language stimulation on board.  I wouldn't have expected to see that type of drop.  In fact, vocabulary is one of the most robust measures of intelligence, or aspects of intelligence.

Q.    When Dr. Price -- or withdrawn.  You thought it was notable that when he said the sun rises in the sky that that seemed like a, something he should have gotten --

A.    It was a concrete answer.  And there was an aspect to it that certainly he's concrete.  There are probably better examples than I could have chosen on the fly with that.  Up

USCA5 4382

in --

Q.   You anticipated my question, which was that's very consistent with his performance on proverbs, his performance on the orientation questions asked by Dr. Price.  Right?

A.   I wouldn't disagree with that.

Q.   Okay.  You said that getting recent Presidents was easy. I mean, it's easy for you, it's easy for me, but it's not necessarily easy for a person who has, at best, a borderline IQ.  Right?

A.   I didn't testify to that.  You did right here, if that's your contention.

Q.   No, I thought I heard you say that you were, noted his failure to cite the Presidents, and you thought that was easy.

A.   My point being --

Q.   It was your word.

A.   I'm sorry.  My point being that you were saying that would be more difficult for a person with borderline.  My contention would be that the current Presidents would be more likely to be learned or seen, because they would be information around them, whether on TV, in conversation, et cetera.  It would have been --

Q.   So he should have named Jimmy Carter over George Washington?  Is that what you're --

A.   Or Bill Clinton.

Q.   What's that?

USCA5 4383

A.    Or Bill Clinton.  Or George Bush.

        MR. WISEMAN:  If I might have a moment, Your Honor.

        THE COURT:  Yes, sir.

    (Counsel conferring off the record.)

BY MR. WISEMAN:

Q.    Ms. Larin's making me ask you another question.

A.    It's probably because of that whole thing with the interview.

Q.    You would agree, sir, that the DSM clearly requires the administration of a recognized intelligence test to diagnose MR?

A.    Yes, sir.

Q.    Okay.  And achievement tests are not diagnostic in that setting --

A.    Yes.

Q.    -- in that sense.

A.    That's correct.

Q.    All right.  I think I'm done.  Thank you.

A.    You're welcome.

        THE COURT:  Thank you.  Anything further?

        MR. ROBERTS:  Your Honor, I have just a couple of quick questions, I think.

    (Counsel conferring off the record.)

                REDIRECT EXAMINATION

BY MR. ROBERTS:

USCA5 4384

Q.    I'm showing you what is Petitioner's Exhibit 177.

          MR. ROBERTS:  Your Honor, I would ask that since Banks is listed on this document and they put in this information, that we be allowed to go into the information about Banks on Dr. Moore's report.

          MR. WISEMAN:  Your Honor, that chart only talks about guesses.  It doesn't talk about any of the substance of his responses, other than the guessing.  And so I have no objection to them questioning about guessing, but I do object to anything beyond that.

          MR. ROBERTS:  I would add two points, Your Honor.  One, they mentioned, they asked -- on cross, they asked if he had informed anyone or spoken to anyone with regards to high school information, and they also asked about whether he had administered the test to anyone prior to the age of 18.  And I think the information contained in his report clearly shows that Banks and Alfred Bourgeois went to high school together, and he certainly fits in that category.  I believe they opened the door.

          THE COURT:  Yes, sir.

          MR. ROBERTS:  Thank you, Your Honor.  I need to retrieve Government Exhibit 15.

BY MR. ROBERTS:

Q.    Dr. Moore, I believe in your report -- showing you Page 10 of Government Exhibit 15.  But you refer to Nathaniel Banks --

USCA5 4385

I have my finger here on the first full paragraph, about seven lines up from the bottom of the paragraph, where it mentions Nathan Banks is the fourth rater.  Why did you choose Nathan Banks as one of the people, as a rater?

A.   Because the -- I had heard the trans -- I'm sorry, I heard a recording of the telephone call between Mr. Bourgeois and Mr. Banks where it seemed clear that they knew each other well, that they had a good friendship, but also that Mr. Banks seemed willing to ask his friend about inconsistencies, and seemed to be really trying to get a bead or understanding about what had happened.

Q.   Was there anything that Nathan Banks had a base knowledge of that the other raters that you spoke to did not?

A.   He had a base knowledge of his functioning prior to the age of 18.

Q.   In your statement here, you said that he indicated that he grew up with Mr. Bourgeois and knew him from first grade through high school.  Did he tell you anything about their relationship, how often they were together?

A.   He said they were friends.  They saw each other daily, or virtually daily.  They played together.

Q.   When you gave the ABAS to Mr. Banks, did you ask him to focus on the -- when did you, what did you ask him to focus on?

A.   I asked Mr. Banks when it was that he had had last ongoing consistent contact with Mr. Bourgeois.  He indicated that it

USCA5 4386

was basically just right at the end of high school.  Then after that, they had gone their separate ways.  So I had him to focus on the last dates that they really had close contact, which was at that point near the end of their high school career.

Q.    I'm showing you what's Page 11 of Government Exhibit 15, and I'm referring to the third full paragraph of this document, where it mentions that -- it mentions Nathan Banks again.  And the sentence right here says, "Functioning at approximately the age of 18 was assessed by childhood friend Nathan Banks."  What exactly does that sentence mean?

A.    I believe the date that he was focusing on was May of Mr. Bourgeois's -- May of the year that he turned 18 in June.  So it was just prior to when he turned 18.

Q.    And why was he focusing on that date?

A.    That was the last time that they had had significant ongoing contact.

Q.    And did he tell you -- it says here that he indicated that he knew Mr. Bourgeois well and had strong relations.  Did he talk to you about the -- did he talk to you about how much relations they had?

A.    Recollections?

Q.    His, yes, what their relationship was.

A.    He said that they were really good friends, close friends.  They played together a lot, and that later on after he had moved away, they would see each other.  He came back for

USCA5 4387

special occasions or graduations.  They'd see each other at times like that.  It sounded like they had a good, close friendship.

Q.    I'm going to show you again the chart that's on Page 12 of your report, Government Exhibit 15.  And now I'm going to ask you to consider Banks' scores and ask you how that affected your assessment of adaptive functioning in this case.

A.    Again, I was looking for data to see if there was convergence.  What's interesting here is Mr. Banks, on assessment, and most of the domains is a little bit lower than Ms. Davis or Mr. Clark.  It appears that Mr. Bourgeois may be on an upward course of improvement in adaptive functioning. But more importantly, all of the measures -- the question at hand is, are his, is his adaptive functioning significantly below the mean.  And what this says is that those three raters, all would note that his adaptive functioning was above that level, that it was in the below average or higher level.

In fact, Mr. Banks had two where he was below average. Other than that, it was average or higher in every domain.

Q.    Now, compared to the -- we also have Ms. Armont's information on there, on that chart.  You make a comment here on Page 10, in Government Exhibit 15, about Ms. Armont's testing.  You mention that many of her responses reflected a degree of impairment notably at odds with established functional abilities.  What did you mean by that, compared to

USCA5 4388

the other tests that you have?

A.    There were responses that she gave indicating that he had an inability to do certain behaviors that the record seemed to clearly indicate that he had the ability not only to do, but to do well.

For example -- and she's assessing him at the age of 31, I believe, and indicated that he would have rarely independently been able to engage in, even when needed, would have rarely independently been able to engage in naming 20 or more familiar objects, telling parents or friends about his favorite activities, relying on himself for travel in the community, such as using a car, writing his own address, including ZIP code, planning ahead for fun activities, having one or more friends, starting back to work willingly after taking a break. It appeared that the functioning that she described was significantly at odds with a multitude of information that I was getting from other sources.

Q.    If Ms. Armont's calculations were correct, what type of mental retardation would we be looking at here with regard to Alfred Bourgeois, just taking her in a vacuum?

A.    Just taking her in a vacuum would have put him, well, certainly into the mild to moderate range.  In fact -- well, in the upper moderate to low mild range of retardation, as it was -- as it used to be denoted.

Q.    And compared to the other information that you got from

USCA5 4389

the other raters that you got, including Mr. Banks, how did

Ms. Armont's testing compare to the others?

A.   Significantly lower.

Q.   Now, you were given a -- the exhibit I put on, that the

Petitioner gave you, 177, you were given that document earlier

today, were you not?

        MR. WISEMAN:  I believe it was yesterday,

Mr. Roberts.

        MR. ROBERTS:  I'm sorry?

        MR. WISEMAN:  It was yesterday.

        MR. ROBERTS:  It was yesterday.  Sorry.

BY MR. ROBERTS:

Q.   When you received that document, did you note that someone

was missing from that with regard to the ABAS?

A.   There was one more person who an ABAS had been

administered.

Q.   Who was that?

A.   That was Ms. Franks.

Q.   And then did you take this, the document that the, that

Mr. Wiseman gave to the United States and then add some numbers

to it?

A.   Yes, sir.

Q.   I'm showing what's been marked as Government Exhibit 208,

and I'll ask you if that is your handwriting.

A.   Yes, sir.

USCA5 4390

Q.    And were those the numbers that you added?

A.    Yes, sir.

        MR. ROBERTS:  Your Honor, I would offer this into the evidence right now, Government 208.

        MR. WISEMAN:  No objection.

        THE COURT:  Government's 208 is admitted.

BY MR. ROBERTS:

Q.    What is the significance of you adding Franks and all the indicators underneath her, Franks' name?

A.    Those are the number of guesses that Ms. Franks had on the ABAS.  And so if we look at her data, she didn't indicate that she had guessed on any items on the entire measure.

Q.    And did Ms. Franks know -- what did she do with regard to work?

A.    Because of the -- because of his age at when she was filling it out, that was nonapplicable.  It doesn't have a work section.

Q.    Okay.  And to your knowledge, was she around him during his functional academics?

        MR. WISEMAN:  Your Honor, objection.  That's a mischaracterization of the skill area.

        MR. ROBERTS:  The skill level, it's the third one on the left.

        MR. WISEMAN:  No, it's a mischaracterization by saying was she around for his skill, his functional academics.

USCA5 4391

It's not an event.  It's not like you're going to work.

MR. ROBERTS:  I'll withdraw the question.

BY MR. ROBERTS:

Q.   With regard to any of these areas where she felt, she says she didn't guess at all, what is most striking to you about the fact that she would be able to answer questions without guessing, with regard to Ms. Franks?  Anything?

A.   It was surprising to me that she was able to recall back to that age and not guess on anything.  But what was more striking to me was when Dr. Swanson administered the Vineland to her, there were a number of items -- we've gone through a few of them -- but a number of items where she changed what her assessment was.  And to me, it stood out that here is an individual who's indicating that they're quite sure, they're not needing to guess on any items, and yet when an interview is conducted, we see that their recollection actually changes significantly.

Q.   What about Ms. Armont, with regard to the number of guesses?  There's only one category here where she has guessed at all.  Is there any area in particular with regard to Ms. Armont that is striking in the fact that she says she didn't have to guess in order to answer the questions?

A.   I thought it was striking that she had no guesses in the work domain.

Q.   Why is that?

USCA5 4392

A.   I don't believe that he and Ms. Armont worked together.

Q.   What does the fact that there are no guesses or very few guesses on one of these ABAS's, when you -- how does that affect your consideration and reliability of the test and the outcome?

A.   Well, what was striking to me about this is the contention has been that if we had a respondent with a high number of guesses, that it renders the assessment invalid.  And my reply to that would be that in general, when we're looking for how an ABAS is generally given, how it's standardized, then that would be a red flag.

But then in this retrospective assessment, we would expect there to be some guesses.  And ironically the two people who have no guesses, which by the manual would have indicated that that was the most reliable data, are actually the two folks where the data appears to be notably unreliable; Ms. Franks because of -- at least the data on the ABAS, Ms. Franks because her assessment changes when she does the Vineland, and Ms. Armont where there were many items that her assessment was well at odds with, again, a plethora of data to the contrary.

So while they may have not guessed, the accuracy of their -- that doesn't appear to be an appropriate reflection of the reliability of their data.

Q.   Now, Mr. Wiseman asked you about the people that you used

USCA5 4393

as raters and the need to get people from more than one skill area.  The list of people that you intended to interview when you first went to New Orleans, did those include a cross-mix of skill area?

A.    They did.

Q.    And had you been able to interview those people without feeling that the interviews were compromised, would you have been able to get people from across skill area?

A.    I would have had the opportunity to assess whether it appeared that they had a reasonable degree of neutrality and would have made good respondents in terms of both neutrality and depth of knowledge.

Q.    There was some discussion on cross-examination about the decrease in the verbal scores and the concern that Mr. Wiseman had about Mr. Bourgeois being in jail for several years and maybe his vocabulary decreasing.  Did you make a note as you watched --

        MR. WISEMAN:  Your Honor, I didn't say anything about vocabulary.  I said his verbal skills.

        MR. ROBERTS:  Excuse me.  I stand corrected.

BY MR. ROBERTS:

Q.    About his verbal skills decreasing, did you make any notations as you watched him during the interview about certain vocabulary words that he used that you thought were interesting?

USCA5 4394

A.   He did.  He certainly was a highly verbal individual, and his vocabulary was notable:  Escrow, manipulative, deficient. There were many words -- and Her Honor will certainly, I'm sure, note that as she views the tapes, but there were many concepts and -- both concepts and vocabulary words that were used that were notable in their complexity.

Q.   I'm going to put this back up one more time and ask again, these are the ten -- this is Government Exhibit 208 again.  And on the far left side, the list of the -- is that the list of the ten sub-domains?

A.   Yes, sir.

Q.   And my last question to you, Dr. Moore, is, in this case, did you find Alfred Bourgeois significantly deficient in any two of these sub-domains for adaptive functioning assessment?

MR. WISEMAN:  Asked and answered.

THE COURT:  Sustained.  I'm sorry.  You know what, ask it one more time, because I don't remember whether he said it or not.  I'm sorry.

MR. WISEMAN:  Believe me --

MR. ROBERTS:  Your Honor, I didn't ask it that -- I didn't ask it that precisely.  I asked him before if he had a general opinion --

THE COURT:  Okay.  Well, ask him -- I've already said you can do it.  Just ask him.

MR. ROBERTS:  I don't even know if I can restate the

USCA5 4395

question, Your Honor.  I'll try.  It's getting late.

BY MR. ROBERTS:

Q.    In the ten sub-domains that the -- what's the book?

          THE COURT:  You said the ten sub-domains of whatever that thing was --

          MR. ROBERTS:  Yes, that's about as accurate --

          THE COURT:  -- that Mr. Wiseman was talking about.

          MR. ROBERTS:  It's the DSM --

          THE COURT:  The testing --

          MR. ROBERTS:  The DSM-IV.

          THE COURT:  The testing --

          MR. ROBERTS:  No, Your Honor.  I'm actually talking, focusing on the ten areas --

          THE COURT:  Did you find him mentally deficient in any of those ten categories that are used to do adaptive, or is it --

          MR. ROBERTS:  Functioning, yes, Your Honor.

          THE COURT:  -- functioning adaptation?

          THE WITNESS:  No, ma'am.

          THE COURT:  Okay.

          MR. ROBERTS:  That's all I have, Your Honor.

          THE COURT:  I think that was sort of the question.

          MR. ROBERTS:  That was the effort, yes.

          THE COURT:  Mr. Wiseman.

          MR. WISEMAN:  Yes, Your Honor.  I'll be brief.

USCA5 4396

RECROSS-EXAMINATION

BY MR. WISEMAN:

Q.   Did you find any basis for concluding in your review that Beverly Franks or Brenda Goodman were in any way biased towards Mr. Bourgeois?

A.   I'm sorry, sir, would you recollect -- refresh my recollection of who Brenda Goodman is?

Q.   Brenda Goodman was the woman who testified here.

THE COURT:  I know, but which --

MR. WISEMAN:  She was the woman from Florida.  I'm sorry?

THE COURT:  He doesn't remember who she was.  And you know what, I don't either.

MR. WISEMAN:  She was another granddaughter of Ms. Mary, from Florida.

THE COURT:  Right.

MR. WISEMAN:  Testified here, legal services background.

THE COURT:  Right.  None of them were the granddaughter -- let me make sure I've got this right.  The granddaughter who was living there didn't testify.

MS. LARIN:  She has passed away.

THE COURT:  Oh, I'm sorry.  But then she -- that answers my question.

MS. LARIN:  Oh, wait.  The grandmother.  The

USCA5 4397

grandmother.

THE COURT:  No, the granddaughter that was living with Ms. Mary when --

MS. LARIN:  Do you know, I'm not quite --

THE COURT:  -- Mr. Bourgeois's sister Claudia and Mr. Bourgeois were living there, she wasn't here.

MS. LARIN:  I don't know who that is, because I thought she said Brenda, and I think they might have been talking about the one who was on the stand who was like living in two different homes.

MS. BOOTH:  Wasn't that Vera?

MS. LARIN:  I'm not sure.  Yeah, Vera.

THE COURT:  I thought it was Vera.

MS. LARIN:  I don't know who that was.

MS. BOOTH:  It was Vera.  It was Vera.

THE COURT:  I thought there was a Vera.  I wrote down "Vera."

MS. LARIN:  I don't know who that is, honestly, Your Honor, so --

THE COURT:  Because I thought --

MS. LARIN:  I had never heard that before.

THE COURT:  Okay.  Well, I thought Mr. Bourgeois mentioned a Vera, or I could have misspoken for Mary --

MS. LARIN:  It could be Brenda.

THE COURT:  -- when Dr. Moore talked to him on the

USCA5 4398

video.  I wrote down a Vera.  But it could have been Mary.

MS. LARIN:  And you know, if I may, Your Honor --

THE COURT:  Please.

MS. LARIN:  One problem is that it seems like a lot of people have nicknames, too.  So that's my best guess is that that might be Brenda, who was in and out of the house.  But I --

THE COURT:  No, it was Claudia Williams said there was someone there, her age, a granddaughter within a year or two of her age --

MS. LARIN:  Yeah, I --

THE COURT:  -- that was living in the house with Ms. Mary when she was living there, when Claudia Williams was living there.

MR. ROBERTS:  Your Honor, I'm just going to say, if all of us are having this many problems figuring it out, I don't think Dr. Moore will be able to --

MS. LARIN:  That is one person who might have possibly been a good respondent that we have not --

THE COURT:  Okay.

MR. WISEMAN:  And the point of my question is --

THE COURT:  Moving along.

BY MR. WISEMAN:

Q.   Beverly Frank took the Vineland after she took the ABAS.  I mean, she hasn't seen Mr. Bourgeois since he was nine years

USCA5 4399

old.  There's no bias in her responding.  I mean, there's no basis for you to conclude that she's biased, or is there?

A.  I would certainly say there could be a hypothesis to that. It's a close knit community.  He was a grandson-like individual.

Q.  Close knit like the trucking community and Ms. Davis?

THE COURT:  And they were related somehow.  Miss --

MR. WISEMAN:  No, they weren't related.  They weren't related.

THE COURT:  Oh, I'm sorry.  I thought Ms. Mary was a cousin.

MR. WISEMAN:  No, no, no, Beverly -- Beverly Frank was the granddaughter of Ms. Mary.  All right?

THE COURT:  I know that, but I thought --

MR. WISEMAN:  Not related to Mr. Bourgeois.

THE COURT:   -- Ms. Mary was related, a cousin or something, to Mr. Bourgeois's mother.

MS. LARIN:  No.

MR. WISEMAN:  No.

MS. LARIN:  As far as we can tell, back in the family tree, there might, generations ago, be some relation, but that would be like five plus.

THE COURT:  Do you know who was living in the house? A woman named somebody Batiste.

MR. WISEMAN:  I really don't know who was living in

USCA5 4400

the house.

THE COURT:  It was a Ms. Batiste.

MR. WISEMAN:  All right.  I'll move on.

THE COURT:  Because I remember the name because I --
I just remember the name.

MS. LARIN:  Yeah, right, Judge.

MR. WISEMAN:  I'll move on.

THE COURT:  And we didn't hear from that woman.

MR. WISEMAN:  Correct.

BY MR. WISEMAN:

Q.   Dr. Swanson, in her initial report in 2009, did not rely on Ms. Franks' administration of the ABAS.  Correct?

A.   Yes, sir.

Q.   She relied on the Vineland?

A.   That's -- that's correct.

Q.   Okay.  So when you were responding to questions for Mr. Roberts just now about the ABAS and Ms. Franks and reliance on it, I mean, Dr. Swanson did not rely on that test.  In fact, she had problems with that test.  Right?  She thought it wasn't the way it should be.

A.   She certainly seemed to have more confidence in the Vineland, yes, sir.

Q.   Okay.  Now, back to this 2008 ABAS book, Chapter 20, Page 390 -- maybe I'll put it up so you can read along --

THE COURT:  Claudia Williams said that Ms. Mary was a

USCA5 4401

cousin to her.

MS. LARIN:  I think that might be -- I don't know what the --

THE COURT:  But that doesn't make her related -- I'm getting this -- I'm getting an e-mail from my law clerk.

MS. LARIN:  I think it's like a saying, as --

THE COURT:  Claudia Williams said that Ms. Mary was a cousin to her, and Claudia Williams is the sister of Mr. Bourgeois.

MS. LARIN:  That's true.

THE COURT:  So I'm just saying, I remembered somehow --

MS. LARIN:  Someone said that.

THE COURT:  -- there was a relationship --

MS. LARIN:  Someone did say that on the record.  I stand corrected.

BY MR. WISEMAN:

Q.  I see you're reading ahead of us.  Let me read it for the record.  "Although the scale may be administered over the telephone or by having the informant read and complete the items, it is preferable to administer the scale in person, in a setting in which the informant is comfortable, such as his or her own home.  First discuss the purposes of the interview, the scoring criteria, the need for accurate information.  Continue by asking the respondent to describe the Defendant's behavior

USCA5 4402

at home, school, work, a particular age.  The discussion may provide a general understanding of the Defendant's adaptive skills and behavior at that time.  The examiner should continue by reading the items aloud while the informant answers the questions, assisted by knowing the four response options stated above.  Providing these options on a separate card or providing another ABAS grading form may also clarify the items and scoring."

Now, with respect to Mr. Banks, you mailed it to him.  Right?

A.    That's correct.

Q.    You didn't read it to him?

A.    That's correct.

Q.    You weren't there when he took it?

A.    I wasn't there while he took it.  I was available by telephone.

Q.    And the same is -- and in fact, you didn't read the ABAS to any of the respondents you interviewed.

A.    That's correct.

Q.    And so that's in conflict with the preference of this article.

A.    With that article.  I was following the directions of the ABAS manual itself.

Q.    Okay.  Which you acknowledge isn't appropriate necessarily in full, in regard to retrospective.  Right?  I mean, this

USCA5 4403

chapter is about retrospective.

A.    We've now mixed apples and oranges together, but sure.

Q.    On the next page, it says, "This approach provides" -- "this approach" meaning the reading -- "provides some assurance that the informant understands each item and does not fall into a response bias, e.g. giving the same answer to nearly every item.  Items should be read as they appear, and they may be repeated to assure understanding.  If the informant does not understand the wording, it is permissible to re, paraphrase the item.  However, it is essential not to change the meaning.  A clarification is helpful, but coaching in any form is not permissible."

      Again, you didn't assure understanding, because you didn't read it to the person and gauge their response.  You just let them take it.

A.    I administered it as directed by the administration manual.

Q.    Okay.  Well, you keep up on this stuff.  Right?  You're involved in a lot of Atkins cases.  Right?

A.    Sure.

Q.    And you know about this book?

A.    Yes, sir.

Q.    And you know about the chapter that talks about retrospective?

A.    Yes, sir.

USCA5 4404

Q.    And it's by the authors who designed the test?

A.    Not -- well, that particular chapter has other authors.

Q.    Not that chapter, but the people who edited this book are, you know --

A.    Yes, sir.

Q.    -- Dr. Oakland and Dr. Harrison.

A.    Yes, sir.

Q.    Okay.  So, I mean, their word is more than just another article out there.  They endorsed this stuff.  They say in a retrospective, you've got to read it.  Right?

A.    Yes, sir.

Q.    Okay.  I just want to be clear on one thing.  When we talk about someone being verbal, talking a lot, saying a lot and sounding like they know something, that's different than having good verbal performance on an IQ test, isn't it?

A.    I'm sorry, did you say "that's different from"?

Q.    Yeah.

A.    Yes, sir.

Q.    Okay.  And so the fact that Mr. Bourgeois has, as I think someone put it, has the gift of gab -- I think maybe that was you.  Was it you or Dr. --

A.    Sounds like something --

Q.    I'm sorry?

A.    Sounds like something I'd say.

Q.    Okay.  The fact that he has the gift of gab doesn't mean

USCA5 4405

his verbal performance and IQ testing is the same.

A.    While that's true, I think we look at the quality of the

gab that he has the gift of.

Q.    Okay.  All right.

            MR. WISEMAN:  That's all.

            MR. ROBERTS:  Nothing further, Your Honor.

            THE COURT:  No.

            MR. ROBERTS:  Nothing further.

            THE COURT:  Okay.  Thank you.  You may stand down.

            Now, how do you all plan on concluding?

            MR. WISEMAN:  Well, we've got our couple of

depositions.

            THE COURT:  Okay.

            MR. WISEMAN:  And we'll have them submitted to the

Court by November 15th, as per your instructions.

            THE COURT:  You want to do -- you want to do

arguments, or do you want to do submission briefs, or how would

you prefer to do this?

            MR. WISEMAN:  I guess our preference would be

briefing followed by an argument.

            THE COURT:  We could do the argument by telephone, if

you want.

            MR. WISEMAN:  Oh, no.

            THE COURT:  Okay.

            MR. ROBERTS:  We can visit.

USCA5 4406

THE COURT:  You miss us all here too much?

MR. WISEMAN:  You know what, I don't do well on the phone.

THE COURT:  Okay.

MR. WISEMAN:  I really don't enjoy those times when we've talked on the phone.  I mean not personally for us, but I just feel like the --

MR. ROBERTS:  In that case, Your Honor, I prefer the phone.

THE COURT:  That's fine.

MR. WISEMAN:  Yeah, I don't --

THE COURT:  I was just trying to make it easy on you.

MR. WISEMAN:  No, and I appreciate it.  I know that's what Your Honor meant.  No, I think we'd rather be here for something like that.

THE COURT:  Okay.

MR. WISEMAN:  I think we can excuse Mr. Bourgeois.

THE COURT:  Well, let's wait until -- file the objections.  Also, if you're taking depositions and you have any problems with objections or something, just call me.

MR. WISEMAN:  Okay, as opposed to preserving them on the record.  Okay.

THE COURT:  Yeah, because it just -- if it's something really contentious, let me deal with it.

MR. WISEMAN:  Okay.

USCA5 4407

MR. ABREU:  And Your Honor, if I may, another housecleaning matter.  As Your Honor recalls, there was the claim related to jurisdiction in this case, whether the murder occurred on the military base or not.

THE COURT:  Right.  I didn't want to hear any --

MR. ABREU:  That's correct.

THE COURT:  -- evidence about that.

MR. ABREU:  That's correct.  At the --

THE COURT:  I had forgotten, however, that I didn't, until Mr. Wiseman told me.

MR. ABREU:  But at the April 20th hearing, Your Honor indicated that we could.  You actually said, "It's absurd, but I understand you have a job to do, so I will let you" --

MR. WISEMAN:  I would have left that out.

MR. ABREU:  I know.  I just wanted to get it in --

THE COURT:  As if I hadn't already made up my mind on that issue.

MR. ABREU:  I wanted to put it in context, though.  "I will let you proffer two affidavits from your doctor.  How is that?"

THE COURT:  From the --

MR. ABREU:  "From a doctor, on the issue of where the cause of death, what the fatal blow was and the timing."

THE COURT:  I said that?

MR. ABREU:  Yes, Your Honor, whether the timing --

USCA5 4408

I'll direct you to some pages.  The discussion started on Page 42 of that transcript, and then it ends for a little while.  Then it picks back up I think around 53 or 54.  Then on 55 --

THE COURT:  Well, do you have the affidavits?

MR. ABREU:  I want to explain why that is.  Towards the end of that transcript, at the very last page, Your Honor says the following:  "May I -- I'm going to make one requirement about the proffer from your expert that wants to talk about the cause of death and the time of death."

"Yes?"

"That he must review both Koufle's (phonetic) testimony, as well as the emergency room doctor."

Immediately upon that, I hired a new expert, who is actually the person who wrote the book called Forensic Neuropathology.  I sent him all the testimony.  He reviewed it.  He then got back to me and said, "You know what, I really want to look at the autopsy slides before I make a decision in this case."

THE COURT:  No, this is the time to do it.  It's --

MR. ABREU:  Well, Your Honor, last week -- let me just explain why it's not happened yet.  Mr. Roberts attempted to locate the autopsy slides for some time, and it's not his fault, but he couldn't get in touch with Dr. Rouse.  He finally got in touch with Dr. Rouse some time in August.  He then notified us where the autopsy slides were.  We then filed a

USCA5 4409

motion with the Court asking for a subpoena for the autopsy slides.

THE COURT:  I did that.

MR. ABREU:  Your Honor just recently signed the subpoena to send the autopsy slides --

THE COURT:  Well, I signed it as soon as you filed it.

MR. ABREU:  That's correct.  The autopsy slides are still being awaited to arrive at our expert's location.  So what I'm saying is that we will endeavor, by the same date, November 15th, to supply those affidavits regarding that issue.

THE COURT:  No, if we're going to do that, we're going to depose them.

MR. ABREU:  That's fine with me, Your Honor.  I want him to look at the slides.  He wants to look at the slides as well.

THE COURT:  I mean, you know, Mr. Bourgeois testified that she fell out of the truck on the Navy Base and died from that.  AB1994 testified that he picked her up and smashed her head against the window, and there was blood, I think, on the inside of the car where that occurred.

MR. ABREU:  And those are certainly issues and --

THE COURT:  So you know, you can re -- I'm just telling you.

MR. ABREU:  I understand.

USCA5 4410

THE COURT:  I had the advantage of hearing all this before.

MR. ABREU:  I understand.

THE COURT:  And so I'm not going to let them do that without a deposition.

MR. ABREU:  That's fine, Your Honor.

THE COURT:  One more.

Look, this is -- I know that it's difficult for the U.S. Attorney's Office, but this is somebody who's really, you know -- like in the trial, when y'all groaned when I sustained every objection of the Defense --

MS. SALINAS:  Every --

MS. BOOTH:  Every.

MR. ROBERTS:  Your Honor, we never groaned out loud.

THE COURT:  It was like Ms. Booth throwing her head on the table.

MR. ROBERTS:  Oh, Ms. Booth.  I'm sorry.  I'm sorry, we can't help Ms. Booth.

THE COURT:  I mean, I struck every juror that the Defendant wanted to strike, and I don't want to leave -- I don't want to leave anything unturned, any stone unturned in this last effort that he's going to have to present this information, possibly.

MR. WISEMAN:  And Your Honor, on --

THE COURT:  And then from here it goes up, obviously,

USCA5 4411

242

to the Fifth Circuit and then the Supreme Court.

MR. WISEMAN:  Do you think the Government will appeal?

THE COURT:  Pardon?

MR. WISEMAN:  You think the Government's going to appeal?

Your Honor, on that note, I do want to thank the Court on behalf of all the folks who have attended on our side, Mr. Bourgeois, and thank the Court staff, who have been incredibly --

THE COURT:  They're great.

MR. WISEMAN:  You've been incredibly courteous, and we appreciate it.

THE COURT:  You're very kind, Mr. Wiseman.  And really, I really enjoy your advocacy.

MR. WISEMAN:  Why, thank you.  Not always evident, but thank you.

(Proceedings concluded at 6:22 p.m.)

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ Molly Carter                    November 5, 2010
Molly Carter                        Date

USCA5 4413

INDEX

| GOVERNMENT'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| RANDALL PRICE | | 22 | 52 | |
| ROGER BYRON MOORE, JR. | 66 | 72 (Voir Dire) | | |
| | 74 | 148 | 214 | 227 |

EXHIBITS:                                                        RECEIVED

PX-61A:  BOURGEOIS STATEMENTS . . . . . . . . . . . . . .    55

PX-177:  COMPARISON . . . . . . . . . . . . . . . . . . .   166

PX-179:  P30 TEST RESULTS . . . . . . . . . . . . . . .    57

                 -----------------------

GX-15:  REPORT OF DR. MOORE . . . . . . . . . . . . . .    76

GX-16:  ADDENDUM REPORT DR. MOORE . . . . . . . . . . .    78

GX-17:  DR. MOORE CV  . . . . . . . . . . . . . . . . .    67

GX-18:  DR. MOORE LIST OF PRIOR TESTIMONY . . . . . . .    67

GX-27:  LETTER BY MR. BOURGEOIS TO ROBIN BOURGEOIS

        IN 1998 . . . . . . . . . . . . . . . . . . . .    65

GX-28:  AMERICAN CHECKING ACCT STATEMENTS FROM 12/27/00

        TO 1/24/02 SEIZED FROM MR.  BOURGEOIS' BRIEFCASE   65

GX-29:  BENEFITS ELECTION PACKAGE SEIZED FROM MR.

        BOURGEOIS' BRIEFCASE  . . . . . . . . . . . . .    65

**USCA5 4414**

EXHIBITS:  (CONTINUED)                                    RECEIVED

GX-30:  CDL CITATION RECORD SEIZED FROM MR.  BOURGEOIS'

       BRIEFCASE . . . . . . . . . . . . . . . . .    65

GX-31:  US EXPRESS EXPENSE REPORT SEIZED FROM MR.

       BOURGEOIS' BRIEFCASE  . . . . . . . . . . .    65

GX-32:  CORRESPONDENCE TO KERRY BROWN SEIZED FROM

       MR. BOURGEOIS' BRIEFCASE  . . . . . . . . .    65

GX-33:  CORRESPONDENCE TO MINISTRIES SEIZED FROM

       MR. BOURGEOIS' BRIEFCASE  . . . . . . . . .    65

GX-34:  HIBERNIA MORTGAGE PAYMENT COUPON AND CHECK

       SEIZED FROM MR. BOURGEOIS' BRIEFCASE  . . . . .    65

GX-35:  DOT MEDICAL EXAMINATION CERTIFICATE SEIZED

       FROM MR. BOURGEOIS' BRIEFCASE . . . . . . . . .    65

GX-36:  MEDICAL EXAMINATION FOR DRIVER FROM BRIEFCASE .    65

GX-37:  LETTER TO THE COURT FROM MS. BOURGEOIS  . . . .    65

GX-38:  SKIPPER TRANSPORTATION APPLICATION FOR DRIVER

       QUALIFICATION . . . . . . . . . . . . . . . . .    65

GX-39:  FORD MOTOR CREDIT APPLICATION . . . . . . . . .    65

GX-40:  LETTER REQUESTING REDUCTION IN CHILD SUPPORT

       PAYMENTS  . . . . . . . . . . . . . . . . . . .    65

GX-41:  BIRTHDAY PARTY VIDEO  . . . . . . . . . . . . .    65

GX-43:  DOG VIDEO . . . . . . . . . . . . . . . . . . .    65

GX-58:  LETTER FROM MR. BOURGEOIS . . . . . . . . . . .    31

GX-208:  NUMBER OF GUESSES BY DAVID CLARK . . . . . . .   221

USCA5 4415

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**


UNITED STATES OF AMERICA

v.                                                      Case No.: 2:02–cr–00216
                                                        Judge Janis Graham Jack

Alfred NMI Bourgeois

                          Defendant


NOTICE OF FILING OF OFFICIAL TRANSCRIPT


An official transcript has been filed in this case and it may contain information protected under the E–Government Act of 2002, and Fed. R. Civ. P. 5.2(a) or Fed. R. Crim. P. 49.1(a).

Transcripts will be electronically available on PACER to the public 90 days after their filing with the court. To comply with privacy requirements of Fed. R.Civ.P.5.2 and Fed. R. Crim. P. 49.1(a), the parties must ensure that certain protected information is redacted from transcripts prior to their availability on PACER.

If redaction is necessary, the parties must file a statement of redaction listing the items to be redacted, citing the transcript's docket number, the item's location by page and line, and including only the following portions of the protected information. This statement must be filed within 21 days of the transcript being filed. A suggested form for the statement of redaction is available at http://www.txs.uscourts.gov.


- the last four digits of the social security number or taxpayer identification number;
- the year of the individual's birth;
- the minor's initials;
- the last four digits of the financial account number; and
- the city and state of the home address (criminal cases only).


Any additional redaction requires a separate motion and Court approval.

A party may review the transcript at the Clerk's Office public terminals or purchase it by following the instruction on our website at http://www.txs.uscourts.gov or by calling (361)888–3142 . A party is only responsible for reviewing the:


- opening and closing statements made on the party's behalf;
- statements of the party;
- testimony of any witness called by the party; and
- any other portion of the transcript as ordered by the court.


Redaction is your responsibility. The Clerk, court reporter, or transcriber will not review this transcript for compliance.


David Bradley, Clerk


USCA5 4416

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____      :

UNITED STATES OF AMERICA,              :         No. Cr-C-02-216
                                       :         No. Cv-07-223
            Respondent,                :    Honorable Janis Graham Jack,
                                       :            U.S.D.J.
      -against-                        :
                                       :
ALFRED BOURGEOIS,                      :      Electronically Filed
                                       :
            Petitioner.                :
_____      :

**Notice of Compliance**

Petitioner, through counsel, files this Notice of Compliance and states that he conducted the following trial depositions:

1.    On October 28, 2010 William R. Oliver, M.D. and Manfred Schenk were deposed.

2.    On November 10, 2010 J. Randal Price, Ph.D. was deposed.

Petitioner will file the transcripts and videotape of these depositions immediately upon receipt.

**USCA5 4417**

Respectfully Submitted,

/s/ Michael Wiseman

_____
Michael Wiseman
Victor Abreu
Elizabeth Larin
James McHugh
Federal Community Defender
Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West, The Curtis Center
Philadelphia, PA 19106
Counsel for Petitioner
Alfred Bourgeois

Dated:       Philadelphia, PA
             November 15, 2010

### Certificate of Service

I, Michael Wiseman, hereby certify that on this 15th day of November, 2010 I served the foregoing on the following person by ECF Filing:

Tony Roberts
Mark Dowd
Patti Booth
Elsa Salinas-Patterson

/s/ Michael Wiseman

_____
Michael Wiseman

USCA5 4418

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____    :

UNITED STATES OF AMERICA,    :    No. Cr-C-02-216
                             :    No. Cv-07-223
            Respondent,      :    Honorable Janis Graham Jack,
                             :    U.S.D.J.
      -against-              :
                             :
ALFRED BOURGEOIS,            :    Electronically Filed
                             :
            Petitioner.      :
_____    :

**PETITIONER'S MOTION FOR LEAVE OF COURT TO TAKE THE DEPOSITIONS OF WILLIAM MAY AND ADAM LONGORIA IN SUPPORT OF CLAIM VII TO HIS *MOTION FOR RELIEF PURSUANT TO 28 U.S.C. SECTION 2255***

Petitioner, ALFRED BOURGEOIS, Through undersigned counsel respectfully moves for leave to take the depositions of William May and Adam Longoria in support of Claim VII to his Motion *for Relief Pursuant to 28 U.S.C. Section 2255* corpus.  In support of this motion, Petitioner states as follows:

1.      William May and Adam Longoria are critical witnesses from whom testimony is material to Claim VII of the Motion for Relief Pursuant to 28 U.S.C. Section 2255.   On September 3, 2010 – 17 days prior to the start of the evidentiary hearing – counsel filed ex parte motions pursuant to Federal Rule of Criminal Procedure 17 (b) and 28 U.S.C. §1825 for the issuance and service of subpoenas

USCA5 4419

compelling the attendance of both May and Longoria at the evidentiary hearing. Petitioner's motion identified Mr. May's address as 4353 Eldora Drive, Corpus Christi, Texas.  Petitioner's motion identified Mr. Longoria's address as Barton County Jail, 1408 Kansas Ave., Great Bend, Kansas, 67530.

2.     On September 3, 2010 the Court granted petitioner's motion as to Mr.Longoria, finding, inter alia, that the presence of Mr. Longoria was necessary to an adequate defense of this case and ordering, inter alia, that a subpoena shall be served on this witness by the United States Marshal compelling attendance at the evidentiary hearing.

3.     On September 20, 2010, petitioner was notified by the United States Marshal that Mr. Longoria  – although he was a homicide suspect in Great Bend, Kansas – was being housed in Sedgwick County Jail for security reasons.  On this same date petitioner's counsel was notified by the United States Marshal that a writ was needed to compel his presence at the hearing.  Petitioner brought this to the attention of the court on Tuesday, September 21, 2010 which was the second day of the hearing and prior to resting its case.

4.     Petitioner now requests leave of Court to depose Mr. Longoria because he is a critical and necessary witness and was not brought to the hearing pursuant to the properly filed motion for subpoena and the Court's order compelling service of a

USCA5 4420

subpoena on him.

5.     The Court also granted petitioner's motion compelling service of a subpoena upon William May by the United States Marshal.  However, the Court informed counsel that Mr. May was no longer residing in Corpus Christi.  On September 15, 2010 petitioner's counsel discovered Mr. May's correct address in Irving, Texas and also determined that he was physically unable to attend the hearing in Corpus Christi due to severe medical issues.

6.     During the course of the hearing – but prior to resting –  petitioner's counsel, James J. McHugh, Jr., noting the medical condition of Mr. May, asked Assistant United States Attorney Tony Roberts if the Government would agree to the deposition of Mr. May at a later date to be decided by the parties.  Mr. Roberts advised counsel that he would need to check with other members of the prosecution team and would thereafter advise petitioner' s counsel of the government's position.

7.     Thereafter, on Wednesday September 22, 2010 petitioner rested.  At the time it rested Petitioner had not yet been informed by the Government of its position concerning the deposition of William May.

8.     Procedural defect cannot bar subpoena enforcement and procedural rules should not bar federal habeas review.  Here, there was not a clear rule that stated Petitioner was responsible for drafting the writ of habeas corpus ad testificandum

USCA5 4421

following the issuance of the subpoena, rather than the court. Furthermore, while procedural rule may serve legitimate interests, it may be set aside when the defendant is not given a reasonable opportunity to assert his federal rights, which is without question the circumstance here. See Lee v. Kemna, 122 S.Ct. 877 (2002) (Subpoenaed alibi witnesses left the courthouse without explanation, District Court refused to grant continuance, Eighth Circuit affirmed, but Supreme Court vacated and remanded).

9.    Petitioner's counsel has been advised by counsel for the government that they oppose this motion.

WHEREFORE, Petitioner respectfully requests that this Court grant this motion for leave of court to take the depositions of William May and Adam Longoria  in support of Claim VII to his petition for a writ of habeas corpus.

Respectfully Submitted,

/s/ Michael Wiseman

_____
Michael Wiseman
Victor Abreu
Elizabeth Larin
James McHugh
Federal Community Defender
Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West, The Curtis Center
Philadelphia, PA 19106
Counsel for Petitioner
Alfred Bourgeois

Dated:    Philadelphia, PA
          November 15, 2010

USCA5 4422

## Certificate of Service

I, Michael Wiseman, hereby certify that on this 15th day of November, 2010 I served the foregoing on the following person by ECF Filing:

Tony Roberts
Mark Dowd
Patti Booth
Elsa Salinas-Patterson

/s/ Michael Wiseman

_____

Michael Wiseman

USCA5 4423

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____     :
                                      :
UNITED STATES OF AMERICA,             :         No. Cr-C-02-216
                                      :         No. Cv-07-223
                    Respondent,       :      Honorable Janis Graham Jack,
                                      :              U.S.D.J.
          -against-                   :
                                      :
ALFRED BOURGEOIS,                     :        Electronically Filed
                                      :
                    Petitioner.       :
_____       :

**PETITIONER'S UNOPPOSED MOTION TO
ADMIT HEARING EXHIBIT**

COMES NOW, Petitioner, ALFRED BOURGEOIS, by and through undersigned counsel, and respectfully moves, unopposed, for admission of a previously marked hearing exhibit.  In support of this motion, Petitioner states as follows:

1.      Pending before the Court is Petitioner's *Motion for Relief Pursuant to 28 U.S.C. Section 2255*.  This Court heard evidence on September 10 and 20-24, 2010.

2.      On August 19, 2010, the Government provided Petitioner with three manuals containing FBI Lab serology protocols.  During the evidentiary hearing, Petitioner marked for identification, referred to, quoted and/or cited two (2002 and 2009) of the FBI manuals.  Tr. 9/24/10, 48-50, 65-66, 68-72, 83-85.  The manuals are

**USCA5 4424**

collectively marked as Petitioner's hearing exhibit 180 (P-180).  Petitioner, however,

neglected to formally move the manuals into the record at the close of testimony.

Accordingly, Petitioner respectfully requests that the Court admit P-180.

   3.  Petitioner has contacted attorney for the Government, AUSA Mark Dowd,

Esq., who, indicated that the government is NOT opposed to this request.

   WHEREFORE, Petitioner respectfully requests that this Court grant this

unopposed motion for admission of Petitioner's previously marked hearing exhibit, P-

180.

Respectfully Submitted,

/s/ Michael Wiseman

_____
Michael Wiseman
Victor Abreu
Elizabeth Larin
James McHugh
Federal Community Defender
Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West, The Curtis Center
Philadelphia, PA 19106
Counsel for Petitioner
Alfred Bourgeois

Dated:  Philadelphia, PA
    November 15, 2010

USCA5 4425

**Certificate of Service**

I, Michael Wiseman, hereby certify that on this 15th day of November, 2010 I served the foregoing on the following person by ECF Filing:

Tony Roberts
Mark Dowd
Patti Booth
Elsa Salinas-Patterson

/s/ Michael Wiseman

_____
Michael Wiseman

USCA5 4426

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____     :
                                      :
UNITED STATES OF AMERICA,             :          No. Cr-C-02-216
                                      :          No. Cv-07-223
            Respondent,               :     Honorable Janis Graham Jack,
                                      :          U.S.D.J.
      -against-                       :
                                      :
ALFRED BOURGEOIS,                     :       Electronically Filed
                                      :
            Petitioner.               :
_____     :

**PETITIONER'S UNOPPOSED MOTION FOR AN ADDITIONAL
THIRTY DAYS TO SUBMIT EVIDENCE IN
SUPPORT OF CLAIM III TO HIS *MOTION FOR RELIEF PURSUANT
TO 28 U.S.C. SECTION 2255***

Petitioner, ALFRED BOURGEOIS, through undersigned counsel, respectfully moves this Court for an additional thirty (30) days to submit evidence, via video deposition, in support of Claim III to his Section 2255 Motion.  In support of this motion, Petitioner states as follows:

1.      In Claim III of his *Motion*, Petitioner alleged that the Government lacked jurisdiction to prosecute him as no reasonable view of the Government's evidence existed upon which a  fact finder could conclude that the fatal injuries to JG-1999 were inflicted on the Corpus Christi Naval Air Station, and that trial counsel was ineffective for failing to raise this issue.  <u>See</u> Petitioner's Motion for Relief Pursuant to  28 U.S.C.

USCA5 4427

Section 2255, at 58-62.  Specifically, Petitioner alleged that the subdural hematoma identified as the cause of death by the medical examiner, Dr. Elizabeth Rouse, resulted from an injury that occurred days before Petitioner arrived at the naval base.  Id. see also Neuropathology Report of Dr. Kathleen Kagan-Hallet, MD, contained in *PA*, document # 50.  Thus, despite the fact that JG-1999 was found unconscious on the base, the Government lacked jurisdiction to prosecute  Mr. Bourgeois.  Id.; 18 U.S.C. § 3236 (murder is "committed at the place **where the injury was inflicted** . . .  which caused the death, **without** regard to the place where the death occurs").[1]

2.	During argument on the scope of the evidentiary hearing, the Court denied a hearing on Claim III but stated that Petitioner could proffer, via affidavit, any expert evidence in support of his claim.  See NT 4/20/10, 55.  The Court also requested that any additional expert opinion and affidavit specifically include and reference a review of the testimony of Dr. Coufal, the Opthamologist, and the emergency room physician.  Id. at 67.  Additionally, the Court noted that  Petitioner's experts had not previously had an opportunity to review the actual autopsy slides prepared by Dr. Rouse during the autopsy of JG-1999, id. at 61-62, and required that any subsequent defense opinions take those slides into account.

---

[1]The Government was aware of this potential issue prior to trial.  See attached Notes of Government counsel (provided by AUSA Tony Roberts to undersigned counsel when counsel were present in Corpus Christi in advance of the April 20, 2010 argument regarding the scope of the evidentiary hearing).

USCA5 4428

3.      Immediately thereafter, Petitioner consulted forensic neuropathologist, Jan E. Leestma, M.D., M.M.,[2] to review the evidence regarding JG-1999's cause of death and the age and timing of the previously identified fatal subdural hematoma.  However, after conducting his initial review (including the testimony of Dr. Coufal and the ER physician as the Court requested), Dr. Leestma also requested review of the autopsy slides.  On June 11, 2010, petitioner requested those slides from the Government.

4.      On August 9, 2010, AUSA Tony Roberts notified Petitioner that Dr. Rouse had finally responded to his previous inquiries and informed him that the autopsy slides were currently located at the Wilford Hall Medical Center at Lackland Air Force Base in San Antonio, TX.

5.      After several attempts to reach their legal department, Petitioner confirmed the presence of the autopsy slides at the Wilford Hall Medical Center and that a subpoena duces tecum would be required to release the autopsy slides to

---

[2]Dr Leestma is a 1964 graduate of the University of Michigan School of Medicine.  He completed his training in Neuropathology at Albert Einstein College of Medicine, NY in 1968. Dr. Leestma served in the United States Air Force Medical Corps at the Armed Forces Institute of Pathology from 1968-71 and was honorably discharged with the rank of Major USAF, MC.  From 1971-85, Dr. Leestma was Associate Professor of Pathology and Neurology at Northwestern Medical School and Chief, Neuropathology at Northwestern Memorial Hospital and the Children's Memorial Hospital in Chicago, IL.  He has also served as Assistant Medical Examiner with the Cook County Medical Examiner's Office.  Dr. Leestma is the author of more than 100 professional publications including his text, FORENSIC NEUROPATHOLOGY, 2d. Ed. (2009).

USCA5 4429

Petitioner's expert, Dr. Leestma.

6.    Petitioner subsequently requested that this Court issue a subpoena requiring the Custodian of Records at the Wilford Hall Medical Center to produce any and all slides, photographs and impressions prepared during the course of the autopsy of JG-199 by Dr. Elizabeth A. Rouse. Petitioner also requested that in lieu of personal appearance, the slides, photographs and impressions could be delivered to Dr. Leestma, in Chicago IL. On September 13, 2010, the Court issued an Order granting Petitioner's request to issue a subpoena.

7.    During the evidentiary hearing, Petitioner learned that the autopsy slides had not been delivered to Dr. Leestma and requested additional time for Dr. Leestma to receive and review the slides and opine on the timing of the fatal injuries to JG-1999. NT 9/24/10, 238-41. The Court granted Petitioner's request and ordered that any additional evidence from Dr. Leestma be presented, not by affidavit as previously ordered, but through deposition which Petitioner stated that he would endeavor to complete by November 15, 2010. Id., 240-41.

8.    Thereafter, Petitioner, through repeated phone calls, vigorously urged Wilford Hall Medical Center and their custodian of records, Sylvia Rodriguez, to deliver the slides to Dr. Leestma and comply with Court's subpoena. However, Petitioner was informed that original slides are never released and when requested, new

USCA5 4430

duplicate slides are created which are produced from the original paraffin blocks.

Petitioner was also informed that in this case, production of the new slides and thus

delivery to Dr. Leestma was delayed because Dr. Rouse, who created the original slides

at the time of autopsy, was now retired and a new doctor would have to create the

duplicate slides.

9.      On October 13, 2010, Petitioner was informed that production of the new

slides had been completed and that they were en route to Dr. Leestma.  Dr. Leestma

received the autopsy slides on October 14, 2010.  Thus, Dr. Leestma had only thirty

days, until November 15, 2010, to review the slides, compare them to the evidence he

had already reviewed, draw conclusions, schedule, prepare for and be deposed at a date

and time convenient to all parties.  This already difficult undertaking was rendered

impossible by the fact that Dr. Leestma was  out of the country from October 17, 2010

until November 14, 2010.

10.      Furthermore, after review, Dr. Leestma has determined that the slides that

were provided by the government were incomplete.  Wilford Hall Medical Center did

not include the slides viewed by the neuropathologist  Dr. Kathleen Kagan-Hallet

which are relevant to his analysis.

11.      Nevertheless, Dr. Leestma has reviewed the slides that were provided to

him, along with the autopsy photographs, the relevant trial testimony concerning the

USCA5 4431

time of death and the autopsy report of Dr. Elizabeth Rouse as well as the neuropathology report of Dr. Kathleen Kagan-Hallet. Dr. Leestma has determined from this initial review that the time of the infliction of the fatal injury was prior to the time the petitioner and the decedent were on federal property. Nevertheless, per this Court's direction, Dr. Leestma still needs to review the relevant slides to conclude his analysis. See NT 4/20/10, 61-62.

12. Accordingly, Petitioner respectfully requests an additional thirty (30) days, until December 15, 2010 in which to depose Dr. Leestma. Petitioner believes that a deposition of Dr. Leestma will greatly assist the Court in its review and resolution of Claim III and an additional thirty days will allow all parties time to schedule and prepare for the deposition. Of course, that proposed deadline is dependent on the prompt provision of the autopsy slides to Dr. Leestma.

13. Petitioner has contacted attorney for the Government, AUSA Tony Roberts, Esq., who has indicated that the Government is not opposed to this Motion.

USCA5 4432

WHEREFORE, Petitioner respectfully requests that this Court grant this  motion

for an additional thirty days to submit evidence in support of Claim III to his Motion

for Relief Pursuant to 28 U.S.C. Section 2255.

Respectfully submitted,

/s/Michael Wiseman

Michael Wiseman
Victor J. Abreu
Elizabeth Larin
James McHugh
Federal Community Defender Office
Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West - The Curtis Center
Philadelphia, PA 19106
215-928-0520

Dated:      November 15, 2010
            Philadelphia, PA

USCA5 4433

## Certificate of Service

I, Michael Wiseman, hereby certify that on this 15th day of November, 2010 I served the foregoing on the following person by ECF Filing:

Tony Roberts
Mark Dowd
Patti Booth
Elsa Salinas-Patterson

/s/ Michael Wiseman

_____

Michael Wiseman

USCA5 4434



DR Elizabeth Rouse

June 2002 / Regional Med Examiner → Occured on Naval Air Station

Death at Aircraft → 28 June 02 1145 → Friday

ME in active Duty US Mil → Per

BS - Biol → VirTech →

Vet → (3yrs at Vet)

USSH → Mil . → license

Res → Anath + Clinic → 5 ryg.

Fellowship → Sub-Spec : Pathology (Study of Disease)

Forensic → 1yr → Civilian

Bear Cty →

- Wilford -

Staff Path → add duties → autopsy → 1yr.

Now - Maryland - Rockville → July 2002 to Present. —

Autopsy → 800 (30 Children)

Boarded in auto →

Teacher → lecturer !

Academic or →

☆ What autopsies & current duties → all Fed Jurisdiction !

✳ why was your office the one that did the autopsy? Federal

If incident occured off Mil base — NO Jurisdiction!   ✳

Have you can

Expert in field of Foren Path →

Perform autopsy → Took your own Photos!

TOO long → Too Many Injuries

① What killed the child? — Head Injury! →

② Other Injuries Subq lesion → Bruising (10 Exposed Sight)
   → Heads - → Brain Swollen

③ Sexual assault → Prior Head Trauma → P 10
   Bruise

Petrol Hem - NON-acci

multiple Impact

Clean

Photos → Impact Sight

all Recent past few days
P. 5

USCA5 4435
AB216_Page_00898

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

———————————————————  :

UNITED STATES OF AMERICA,  :  No. Cr-C-02-216

  :  No. Cv-07-223

Respondent,  :  Honorable Janis Graham Jack,

  :  U.S.D.J.

-against-  :

  :

ALFRED BOURGEOIS,  :  Electronically Filed

  :

Petitioner.  :

———————————————————  :

**PETITIONER'S RENEWED MOTION TO AMEND**

**AND**

**SUPPLEMENT TO CLAIM IV**

**OF HIS *MOTION FOR RELIEF PURSUANT TO 28 U.S.C. SECTION 2255***

**AND**

**CONSOLIDATED MEMORANDUM OF LAW[1]**

Petitioner, Alfred Bourgeois, through counsel, renews his motion to amend

Claim IV and pursuant to this Court's Order also supplements that claim, as follows.

**Background**

1.      Pending before the Court is Petitioner's *Motion for Relief Pursuant to 28*

*U.S.C. Section 2255*.  This Court heard evidence on September 10 and 20-24, 2010.

---

[1]All emphasis is added unless otherwise indicated.  Transcripts of the trial and section 2255 hearing are cited by "Tr." followed by the date and a page cite.

1

USCA5 4436

Three depositions have been completed pursuant to this Court's authorization in order to further complete the record.[2]

2.     Petitioner raised as a ground for relief an allegation that his trial counsel ineffectively failed to challenge the Government's evidence that semen was recovered from the rectum of JG-1999.  See Claim IV, *Petition*.   Specifically, Petitioner alleged that counsel ineffectively failed to challenge the FBI's assertion that a positive p30 test, alone, despite overwhelming evidence to the contrary (a negative acid phosphatase (AP) test, negative smear slide sperm search, negative microscopic pellet sperm search, negative autosomal DNA test, negative Y chromosomal DNA test (YSTR), and no sign of physical trauma to JG-1999), could support a claim that "semen" was detected.

3.     During the evidentiary hearing on this claim, the Government revealed **for the first time to undersigned counsel** the existence of a document, identified and admitted at the hearing as Petitioner's Hearing Exhibit, P-179 (a copy is attached to this pleading).  This document was not in the file provided to undersigned counsel by trial counsel; it was not among the documents sent to trial counsel's DNA expert, Dr. Elizabeth Johnson – even though counsel sent to her a variety of other documents relevant to these issues – nor did trial counsel make reference to this document in his

---

[2]Petitioner has taken the depositions of Dr. Price, Dr. Oliver and Manfred Schenk.

2

USCA5 4437

cross-examination of FBI serology and DNA witnesses at trial, when it would have been only logical for him to have utilized this document. Based on these factors, discussed in detail herein, it is apparent that P-179 had never before been disclosed to the defense.

4.      Shortly after this document came to undersigned counsel's attention on September 23, 2010 during the course of the evidentiary hearing, Attorney Abreu advised the Court that Petitioner would be filing a motion to amend the Section 2255 Motion to include a new claim that the Government's non-disclosure of this critical document violated Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.

5.      Without hearing argument and without any written submission, this Court denied Petitioner's oral motion to amend the petition and announced that it would not permit an amendment because such an amendment would be "futile" because, in the Court's view, Petitioner had not demonstrated non-disclosure of the document.[3] Tr.

_____

[3]The Court's decision to deny amendment on the ground of futility, without affording an opportunity for Petitioner to prove non-disclosure of P-179, was an abuse of discretion and error. Fed.R.Civ.P., Rule 15 provides the standard governing a motion for leave to amend. Rule 15(a) provides that "leave [to amend] shall be freely given when justice so requires." Jamieson By and Through Jamieson v. Shaw, 772 F.2d 1205, 1208 (5th Cir. 1985). Failure to abide by this Rule can constitute an abuse of discretion. Indeed, in Jamieson, the Court of Appeals explained that where resolution of factual issues is essential to the proper evaluation of the issues before the court, amendment should be freely allowed:

3

USCA5 4438

9/24/10, 60-63.

6.      Petitioner submits that the Court should reconsider that decision.  As set

forth in the body of this document, non-disclosure is evident based on the trial record,

the pre-trial discovery provided by the Government and by the events that transpired

at the hearing.  Petitioner herein makes the showing of non-disclosure that he would

have made had the Court not made its oral ruling prohibiting amendment.

Alternatively, should the Court remain unconvinced that Petitioner has demonstrated

non-disclosure of P-179, Petitioner would move to conduct deposition(s) of the person

or persons who were responsible for the ostensible trial level non-disclosure.  To date,

---

> We do not hold that Rule 15(a) requires the district court in every case to
> grant leave to amend when the amended complaint states a cause of
> action. ... However, where, as here, the only proffered justification for
> denial is futility, the determination that the complaint is legally sufficient
> and not cumulative deprives the district court of all "substantial reason"
> to deny leave and severely restricts its discretion to do so. In such a case,
> leave to amend should be granted. Justice requires no less.

Id., 1211.

Here, Petitioner's motion to amend based on the Government's suppression of
exculpatory evidence is "legally sufficient" and "not cumulative."  This Court should
allow amendment to consider this claim.  This is particularly so when the basis for
finding futility has not yet been the subject of adversarial testing.  As shown, infra, the
Court did not permit Petitioner the opportunity to prove non-disclosure, although
Petitioner submits that non-disclosure is plain on the current record.  Therefore, the
Court cannot deny amendment without permitting further factual development on this
question.

4

USCA5 4439

the record is devoid of any such evidence.  Jamieson, 772 F.2d at 1211.

## Structure of this Submission

7.     Petitioner seeks to accomplish several things in this submission and accordingly offers this statement regarding structure.

8.     First, he will explain the critical nature of P-179 as a factual matter. Whether viewed through the prism of Brady or Strickland ineffectiveness, this document was, or would have been, highly material to trial counsel's efforts to show that semen was not recovered from JG-1999 rectum.  Second, he will set forth the facts showing non-disclosure of this document.  Should the Court remain unconvinced regarding non-disclosure, Petitioner will alternatively propose brief and truncated discovery to resolve this question.  Third, he will supplement the ineffective assistance of counsel claim with respect to P-179 and the other documents and proofs that counsel failed to effectively utilize.  Fourth, he will explain that the failure to disclose this document was material under Brady and its progeny, or alternatively, that trial counsel's deficient failure to use the document if in fact is was disclosed, caused Petitioner prejudice.[4]

---

[4]The Fourth Section will address Brady materiality and Strickland prejudice because the Supreme Court has held that these two questions are co-extensive.  Kyles v. Whitley, 514 U.S. 419, 436 (1995).

USCA5 4440

**PART ONE**

**EXHIBIT P-179 FURTHER PROVES THAT SEMEN WAS NOT PRESENT IN THE RECTUM OF JG-1999.**

9.      P-179, entitled "P30 Test Results" indicates that on the three swabs, Q5-Q7, that were subjected to p30 testing by the FBI, the results were "very weak, very weak and weak," respectively.  Within the context of the issues before the Court these results are highly relevant and extraordinarily exculpatory as to guilt and punishment.

10.      FBI Procedures for the Serological Identification of Biological Substances on Evidentiary Materials (2002), Chapter 11 states:

> Attempts to identify human semen in some categories of evidence **MUST** be approached through the identification of spermatozoa rather than by the detection of human specific proteins, such as p30.  These categories would include ... stain extracts that possess **borderline levels of p30**.

FBI Procedures, admitted at hearing as Exhibit P-180.

11.      Thus, in this case, because the previously undisclosed P-179 reveals "borderline levels of p30," (weak to very weak), the FBI was required to confirm the presence of any alleged semen through the identification of spermatozoa – not solely a p30 test.  Notably, no sperm were ever detected in this case.  Indeed, the smear slide which was inspected by the FBI was NEGATIVE for the presence of any spermatozoa. The microscopic sperm searches conducted **on all three swabs** by Technical Associates at the request of Dr. Elizabeth Johnson were also NEGATIVE for the

6

presence of spermatozoa.

12.     P-179, in conjunction with the FBI's own serology protocols, P-180,

demonstrate that the Government's evidence that semen was definitively detected in

the rectum of JG-1999 was scientifically unsupportable.

**PART TWO**

**P-179 WAS NOT DISCLOSED TO TRIAL COUNSEL. SHOULD THE COURT REMAIN UNCONVINCED DESPITE THE OVERWHELMING EVIDENCE OF NON-DISCLOSURE, PETITIONER SEEKS FURTHER FACTUAL DEVELOPMENT.**

13.     It is manifest that P-179 was not disclosed to trial counsel.  That P-179

was not provided to the defense at the time of trial is clear from the trial record, the

post-conviction evidentiary hearing testimony and the pre-hearing discovery conducted

by Petitioner and the Government.  This fact is shown by the following:

A.     P-17 is not among the almost 12,000 pages that were disclosed to undersigned counsel by Mr. Tinker and Mr. Gilmore.  As the Court knows, that Bate-stamped file was provided to the Government.  Neither undersigned counsel nor the Government have located P-179 in the Gilmore/Tinker file.

B.     Mr. Tinker provided his trial DNA expert, Dr. Elizabeth Johnson, with the discovery that was provided to him by the Government. P-179 was not included in the materials that Mr. Tinker provided to her.  By itself, this strongly supports Petitioner's view that the document was not disclosed by the Government to trial counsel.

C.     Mr. Tinker did not use P-179 at points of his examinations of witnesses during which it would have been expected and logical

7

that competent counsel would have used it.

These points are addressed in detail below.

## The Trial Record

14.    At trial, FBI serologist Caroline Zervos and DNA analyst Anthony Onorato testified that the results of the p30 testing conducted by the FBI on Q5-Q7 were positive.  Tr., 3/5/04, 87 (Zervos); id., 118, 128-29 (Onorato).  At no time did either FBI witness state that the actual results, reflected in P-179, were "very weak," "very weak" and "weak."  See generally Tr., 3/5/04 see also testimony of Jerrilyn Conway, Tr., 9/24/10, 68 (Q: Do you recall in your review of the trial transcript whether Carolyn Zervos or Anthony Onorato ever mentioned that the results were very weak, very weak and weak? A: I don't think that they did").  Additionally, at no time did trial counsel, Mr. Tinker, ask an single question or make any argument which reflected his knowledge of the results of the FBI p30 testing set forth in P-179.  See generally Tr., 3/5/04, even though he was cross examining the Government's witnesses in an attempt to show that semen was not present.

## Evidentiary Hearing Testimony

15.    Dr. Elizabeth Johnson's evidentiary hearing testimony also makes clear that she was **not** provided P-179 at the time of her consultation with trial counsel or at any time thereafter.

8

USCA5 4443

16.    Petitioner asked Dr. Johnson to explain the significance between the "weak positive" result she obtained using the Seratec card and the "positive result" obtained by the FBI using the ABA card.  NT 9/22/10 at 18.  Had Dr. Johnson or Petitioner ever previously seen P-179, these questions would have been irrelevant because P-179 indicates that both tests obtained "weak" to "very weak" positive results.[5]

17.    Dr. Johnson first learned that the FBI had obtained a "weak" positive result when she was asked the significance of that result on cross-examination by the Government at the section 2255 hearing:

Q:    And what was Mr. Tinker supposed to draw from the Fact that your, the FBI had a weak positive on the p30 test? You look –

A:    Okay.

Q:    **You look surprised**.

A:    **The FBI did not report a strength of their test.  They just reported it positive.**

Q:    Oh.  Did you look – you didn't look at the FBI raw data?

A:    There is no raw data on the ABA test card.  They should have made photographs –

---

[5]Dr Johnson went on to explain why a positive p30 test, let alone a "weak" positive result, without any other evidence was <u>not</u> indicative of the presence of semen. Tr., 9/22/10, 18-19.

9

USCA5 4444

Q:    On p30?

A:    Right.

Q:    Oh, ABA card.  I'm sorry. Go ahead.

A:    They – any decent laboratory would photograph the results, and they did not.  And there is no way for me to review the actual test itself.  It's just a notation, a note in a worksheet.

Q:    So you weren't provided any information regarding the FBI test which resulted in a weak positive?

A:    They recorded it as positive.  **They didn't note that it was weak**.

Q:    Okay.

A:    **So I have no way of determining it was very positive or weak positive**.

Id., 78-79.  Dr. Johnson's "surprise" about the FBI's "weak" positive result prompted an objection by Petitioner and a renewed request for any all information contained in the FBI file.

> MR. ABREU:  Your Honor, may I object at this moment ... And make a request here?  I personally, Your Honor, have not seen the FBI's raw data.  The witness has indicated that she's never seen the raw data.  I want to know if there in fact is raw data that we should be looking at and whether in fact the FBI did have a weak positive.  I know I've made a request for that information but I have not seen that.
>
> * * *
>
> I know we don't have anything that says weak positive.  All we have is a check mark on a test that says it was positive.  That's the only thing we've ever seen, the only thing we've ever provided to Ms. Johnson.

10

USCA5 4445

And if that does exist, I would actually like to see that information, Your Honor. That's my request.

Id., 79, 80-81. After further discussion between the parties and the Court about what documents had been provided at the time of trial, Petitioner reiterated what information he was requesting from the FBI and why he believed that information regarding the "weak" positives in P-179 had not been disclosed at the time of trial:

> MR. ABREU: Even if, in fact, the FBI did not photograph these test cards, I don't know if Mr. Dowd is asking questions regarding documents that I still haven't seen, which are whether the FBI recorded a week positive or a regular positive. Again, we've presented evidence that a weak positive versus a positive is relevant. If, in fact, it was a weak positive, I suspect Mr. Tinker would have wanted to use that at trial to say, "This is not necessarily semen because of the weak positive." I suspect that's what he would have tried to use it for. If that's information, I would like to see it. It might implicate Brady. I think I'd like to see that information, Your Honor, from the FBI, if they have bench notes and specific documents related to the testing and the card.
>
> THE COURT: Where did you see it Mr. Dowd?
>
> MR. DOWD: I was told by Ms. Jerrilyn Conway, Your Honor, our expert witness --
>
> THE COURT: And she's going to be here?
>
> Mr. DOWD: She's flying in this afternoon ... Will be here at 3:45. And I understand it was material that had been shared. But that will, I'll be able to put testimony on on that.

Id., 86-87.

18.    Later that night, in response to Petitioner's request, the Government

11

USCA5 4446

provided Petitioner with a copy of P-179, and the following day, Petitioner informed

the Court why he believed it had not been produced at the time of trial.

> MR. ABREU:  Last night Mr. Dowd did provide me with this particular
> document which I will now show the Court.  It relates to Q5, in particular
> of note, Q5, Q6, and Q7, which are the three swabs which the FBI
> alleged had tested positive for semen.  As the Court can note, in their
> notes and remarks it indicates regarding Q5 that it was very weak, Q6
> very weak, Q7 weak.  There certainly was no testimony at trial regarding
> the strength of those tests.  I can assure Your Honor that I have never
> seen this particular document and that if I had seen it, I most certainly
> would have used it and I most certainly would have had our experts
> address the significance of this particular document.
>
> * * *
>
> I think there might be perhaps a contention by the Government at some
> point that it went directly also from the FBI to Ms. Johnson back at the
> time of trial; however, Ms. Johnson testified yesterday that she had never
> seen any notes regarding the strength of the FBI testing, that that
> information was not something she had ever seen.  And if you look at her
> report produced in 2004, she indicates a weak positive on our tests but
> she never makes any indication at that point about whether their test was
> weak positive or strong positive because she didn't have that information.

Tr., 9/23/10, 40, 43.

## The Discovery Process

19.    The Government's failure to provide P-179 at the time of trial is proven

not only by the trial record and Dr. Johnson's "surprised" hearing testimony, but also

by the post-conviction discovery process.  On September 9, 2009 the Court ordered

Petitioner to produce to the Government every document received from trial counsel's

12

USCA5 4447

files.  In compliance, on November 9, 2009 Petitioner provided the Government with

everything – 11,611 pages – from trial counsel's file.[6]   However, as the record

indicates, P-179 was not part of those thousands of pages.

> MR. ABREU  ... I searched our entire file which was gathered from trial counsel which consists of 12,000 pages, I searched, did an electronic search with the term P30 and I, and this document was not part of those records.  Mr. Dowd also did a search of the files that were disclosed to us in April of this year and that document was not part of those.  They are
>
> MR. DOWD:  Well, we are not sure about that.  We are still doing a search on that, Your Honor.
>
> MR. ABREU:  Right, Your Honor, so it's a document, the documents that we searched are the 12,000 pages that we provided to the Government as part of discovery, so if they want to search that they certainly can search it as well for that document.  And Mr. Dowd is actually correct, they are in the process of checking additionally.  However, when that's complete, Your Honor, I suspect that I will have a motion to amend our claim to include a Brady violation.  And let me just make this clear, I am not saying that Ms. Booth or any member of the U.S. Attorney's Office failed to disclose it to trial counsel, because the information that I have here indicates that Ms. Booth turned over everything that she got from the FBI and I will concede that at this point.  My questions is whether the FBI actually provided the U.S. Attorney's Office with this particular document which I am saying is particularly relevant.  And I also can't imagine Mr. Tinker, or perhaps I can but Mr. Tinker was certainly trying to dispute the evidence of the semen and here he has, here is a document that indicates very weak, very weak and weak,

---

[6]The only documents not provided were about twenty pages which were provided to the Court for in camera review.  The Court sustained Petitioner's privilege arguments and those documents have not been provided.  Counsel represents, and the Court can certainly confirm, that P-179 was not included in the in camera documents.

13

USCA5 4448

and I know that that was never used at the time of the trial. So, what I am requesting again, Your Honor, is for the FBI to provide me with a copy of every single document in their file related to the testing of these materials. I would then like to review those documents before Ms. Conway testifies, or any witness for the Government testifies in this particular matter. I should also note that Ms. Conway is not the person who testified at trial, she has never been a part of this case, so I am not sure that she would even know what was turned over at any point, but I would – so for that reason I would really like to see that entire file and I think I am entitled to that file, Your Honor.

Tr., 9/23/10, 41.

20.    Subsequently, the Government attempted to showing that P-179 was disclosed. However, that attempt was not done through adversarial testing. Rather, it was done through the unsworn statements of an AUSA Mark Dowd, who did not even have personal knowledge of the relevant facts. Because the Government proceeded through unsworn representations, Mr. Dowd was not subject to cross examination, or to legal objections regarding his basis of knowledge.

21.    The Government did not bring any witness who had actual knowledge of the alleged transmission of the document to the defense.

22.    After Mr. Dowd's explanation, counsel advised the Court that they would move to amend to include a claim that the Government's failure to provide this document to trial counsel violated Brady v. Maryland, 373 U.S. 83 (1963) and its progeny. The Court immediately said it would not permit amendment because doing

14

USCA5 4449

so would be "futile." Tr. 9/24/10, 63.

23. In addition to granting the motion to Amend the pleading, should this Court continue to harbor any doubt about non-disclosure, it should provide Petitioner with the required tools to further prove that the document was not provided to his trial counsel. First, he should be permitted to depose the person or persons identified by the Government as responsible for the copying and transmission of the FBI documents related to this issue. Mr. Dowd's unsworn statements are not a sufficient evidentiary basis upon which to conclude whether the document was provided. Second, he should be permitted to inspect the original FBI file– which to date he has not been permitted to inspect. The Government has provided him with what purports to be a copy of the file, but has not permitted him to view the original. If the copy is complete, the Government should have no reluctance to permit inspection of the original. Third, counsel should be permitted to depose those in the FBI who may have been responsible for or have knowledge of the non-disclosure.

## PART THREE

### SUPPLEMENT TO INEFFECTIVENESS CLAIM REGARDING P-179

24. At trial, Mr. Tinker attempted to argue that there was no evidence that semen had been detected in the rectum of JG-1999. See e.g. Tr. 3/16/04, 43 ('There's no evidence of semen, I suggest to you, being found on this child"). Mr. Tinker,

15

however, failed to present **any** evidence that "there's no semen," and this Court, appropriately sustained a Government objection to Mr. Tinker's argument. See Tr. 3/16/04, 43-45 ("Ms. Booth: Your Honor, I have to object. That is a mischaracterization of the evidence.  The Court: That is sustained ... The test was positive for semen.  They sent it off for an extra DNA test.  That came back no DNA from your client.  Don't refer again, there was").

25.    Although, as set forth above, Petitioner believes that P-179 was not disclosed at the time of trial, if P-179 was provided to counsel, they were ineffective for failing to utilize the document and the evidence contained therein, in conjunction with all the other evidence that could have presented, see Claim IV,  to support their argument that no semen was detected in JG-1999's rectum.[7]

26.    Indeed, the FBI's **sole** reliance on the "very weak, very weak and weak" positive p30 results reflected in P-179 would have supported an argument by trial counsel that, in the absence of detectable acid phosphatase, sperm or male DNA, the

---

[7]This Court previously ruled that Petitioner may supplement Claim IV to include an allegation of ineffectiveness regarding P-179.  Tr. 9/24/10, 63 ("I'm not going to allow you to amend for the Brady claim ... But if you want to use it for ineffective, you can use it for ineffective"). Herein, Petitioner only sets forth the facts necessary to supplement Claim IV to in include an allegation of counsel's ineffectiveness for failing to utilize P-179.  Petitioner will set forth all of the evidence of trial counsel's ineffectiveness regarding claim IV which was developed at the evidentiary hearing in the forthcoming post-hearing briefing and oral argument.

USCA5 4451

Government's allegation that "semen" was detected was scientifically unsupportable.

See P-180, FBI Procedures for the Serological Identification of Biological Substances

on Evidentiary Materials (2002), 11("Attempts to identify human semen in some

categories of evidence **MUST** be approached through the identification of spermatozoa

rather than by the detection of human specific proteins, such as p30.  These categories

would include ... stain extracts that possess **borderline levels of p30**");[8] see also Texas

Department of Public Safety, DNA-04-09, p.1 ("P30 Identification ... p30 is

considered to be a **presumptive** test for semen.  The presence of p30 indicates, **but**

**does not confirm** the presence of semen.  Semen can **only** be confirmed by the

presence of spermatozoa"), attached;[9] California Department of Justice Bureau of

Forensic Services, Biology Technical Procedures, p. 51 ("Section 4 – Semen ... for p30

immunassay cards, a positive result **alone** (without sperm or AP results) will allow you

---

[8]Thus, the FBI's very own protocols require the identification of sperm to confirm the presence of semen when, as in this case, you have borderline levels of p30. The two separate sperm searches conducted in the case were negative.

[9]Texas DPS policy conforms with the evidentiary hearing testimony of Alan Keel who stated that a p30 test can be used in conjunction with other evidence to indicated the presence of semen but the only stand alone confirmatory test for semen was the identification of spermatozoa.  See e.g. P-88, 2007 Report of Forensic Science Associates, 20 (" And since sperm are only found in semen, the observation of sperm is proof of the presence of semen.  In the criminal justice context, the observation of sperm is the only definitive proof of the presence of semen from a forensic specimen"). In this case, all searches for the presence of spermatozoa were negative.

17

USCA5 4452

to make the statement of 'p30 detected.'  **However, your report should include a statement that explains that the other body fluids may react with these test cards**. The immunoassay cards **are very sensitive** and can detect p30 at very low levels that may be present in body fluids **other than seminal fluid**"), attached;[10] 2005 Seratec Card Protocol, p.3 ("**<u>inconclusive</u>**: Due to the increase in sensitivity using Seratec seminal fluid (PSA) test, **the analyst is advised to have a second positive test result before confirming seminal fluid is present** in a stain extract (e.g. positive AP test, spermatozoa observed in the pellet, or male profile present in the sperm DNA fraction). If the only positive test result obtained from the stain extract is the Seratec PSA card, the conclusion for this situation would be 'seminal fluid **could not be confirmed**.'"), attached.[11]

---

[10]Likewise, in this case, the acid phophatase (AP) test and the sperm searches were negative.  Thus, unlike the FBI, the California protocols do not permit the confirmation of semen with a positive p30 test alone and certainly not with "very weak, very weak, weak" results.

[11]The Seratec Card test is now used by the FBI to test for p30 and was substituted for the ABA card after accuracy problems were detected with the ABA card – the card used in this case.  NT 9/24/10, 76-78.  Thus, even the protocols by the manufacturer of the presumably more accurate Seratec test card now used by the FBI, cautions that a positive test card alone, does not confirm the presence of semen.  The other tests that Seratec advises a forensic analyst should consider in conjunction with their test card (AP test, identifiable sperm or male DNA), were <u>ALL NEGATIVE</u> in Mr. Bourgeois case.

USCA5 4453

27.    Given the extremely inflammatory and prejudicial nature of the alleged "semen" evidence, and its unquestionable impact on the jury's deliberations at both the guilt/innocence and the penalty phases of trial, defense counsel had a duty to use P-179 as part of a challenge to the Government's evidence that "semen" was present and JG-1999 was sexually abused.  Counsel's performance was deficient for failing to utilize P-179 and as a result Mr. Bourgeois was prejudiced.  Strickland v. Washington, 466 U.S. 688 (1984).

## PART FOUR

### P-179 IS MATERIAL TO PETITIONER'S BRADY CLAIM AND DEMONSTRATES STRICKLAND PREJUDICE.

28.    Kyles v. Whitely, 514 U.S. 419 (1995), sets forth the long-standing materiality standard governing non-disclosed exculpatory evidence.   The "touchstone of materiality is . . . not whether the defendant would more likely or not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial. . . ." Kyles, 514 U.S. at 434.  Thus, to show materiality, Petitioner need not demonstrate that the non-suppressed evidence would have been inadequate to convict or to sustain a death verdict –  "sufficiency of [the remaining] evidence [is not] the touchstone" of materiality.  Id., at 435 n.8.  Instead, materiality is established when a defendant demonstrates:

19

USCA5 4454

> [A] 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. Accordingly, a 'reasonable probability' of a different result is shown when the Government's evidentiary suppression 'undermines confidence in the outcome of the trial.'

Kyles, id. at 434, quoting United States v. Bagley, 473 U.S. 667, 678 (1985); Dickson v. Quaterman, 453 F.3d 643, 647 (5th Cir. 2006) ("Evidence is material under Brady where there exists a 'reasonable probability' that had the evidence been disclosed the result at trial would have been different. . . A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome") (quoting Bagley, 473 U.S. at 682); Graves v. Dretke, 442 F.3d 334, 339-40 (5th Cir. 2006) (same).

29.    Brady's materiality prong is identical to the "prejudice" standard applied to Sixth Amendment claims of ineffective assistance of counsel. Gonzales v. Quarterman, 458 F. 3d 384, 390 (5th Cir. 2006) ("[th]e test for prejudice under Brady and Strickland is the same"). Accordingly, the Brady materiality inquiry, like the Strickland prejudice inquiry, properly focuses on whether the withheld evidence would have had an effect **on even a single juror**. Wiggins v. Smith , 539 U.S. 510, 537 (2003) ("Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance."); Williams v. Taylor, 529 U.S. 362, 393-95

20

USCA5 4455

(2000) (ratifying effect on a single juror standard applied by Virginia trial court);

Soffar v. Dretke, 368 F.3d 441, 479 (5th Cir. 2004) (petitioner was prejudiced because

"there is a reasonable probability that at least one juror would have refused to return

a verdict of guilty").  Thus, if even a single juror reasonably could have found

Petitioner not guilty or found a mitigating circumstance that was not found, or might

have differently balanced the aggravating and mitigating circumstances, confidence in

the outcome is undermined and a new trial and penalty hearing is required.

30.    Obviously, in this case, the evidence of sexual assault upon this child was

highly inflammatory.  All things being equal, this evidence would have understandably

turned any jury against Petitioner.  However, in addition to the obvious inflammatory

nature of this evidence, it caused specific damage to Petitioner's trial defense.

Petitioner's trial theory attempted to show that Robin was the perpetrator.  See e.g. Tr.,

3/16/04, 34 (defense closing argument) ("I think you have the right to wonder whether

Robin Bourgeois committed these acts against this child"); id. at 35 ("I just want to

make it clear.  Mr. Tinker and my position is that Alfred Bourgeois did not kill this

child"); id. at 38 ("And she – by the way, in the first – the first – the CPS interview,

[AB-1994] said that her mother [Robin] came up with the idea of lets put the baby

down and say she fell out of the truck"); id. at 40 ("Robin Bourgeois is the one who

has, as Mr. Tinker told you, the motive.  The motive for killing this baby").  This

21

theory was obliterated by the allegations of sexual assault and presence of semen, which could only have been perpetrated by Petitioner as the only male reported to have access to the child. Thus, the semen/sexual assault evidence all but doomed Petitioner's defense.

31.    The evidence of the alleged semen was particularly damaging at sentencing, during the jury's life or death deliberations. Again, in addition to the generally inflammatory and highly prejudicial nature of such evidence, it also supported the statutory aggravating circumstance that the killing was committed in a heinous, atrocious or depraved manner. 18 U.S.C. § 3592(c)(6). This evidence was specifically used by the Government as a basis for arguing in favor of the death penalty, Tr. 3/24/04, 70; 75-76, (e.g., "Was he laughing when he bit her, or he burns her, **or he put his filthy semen in her little body**").

32.    Moreover, in addition to its support for a specific aggravating circumstances, any reasonable jury would have weighted this evidence in its deliberative weighing process. See 18 U.S.C. § 3593(e) (jury "shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death").

33.    As set forth in Parts One and Three above, P-179 further undermines the

USCA5 4457

Government's contention that "semen" was detected.[12]  Had P-179 been disclosed or

utilized by trial counsel, there is a reasonable probability that at least one juror would

not have convicted Mr. Bourgeois.  Even more so, however, there is a reasonable

probability that at least one juror would have believed that Mr. Bourgeois had not

sexually assaulted his daughter.  Even if they believed he was guilty of murder and

deserved to spend his life in prison, absent the evidence of sexual assault, there is a

reasonable probability that at least one juror would not have sentenced him to death.

Accordingly, the p30 test results reflected in P-179 were highly material and Petitioner

was greatly prejudiced by the Government's non-disclosure.  If P-179 was disclosed,

counsel's deficient failure to use the document was highly prejudicial.  Indeed, due to

the Government's failure to disclose P-179 and/or trial counsels' ineffectiveness, the

jury was left to weigh unrebutted, inaccurate, false and highly inflammatory evidence

when deciding if Mr. Bourgeois should live or die – Petitioner was prejudiced.

WHEREFORE, for all of the above reasons and based on the entire record of

this matter, the Court should permit Amendment of Petitioner's Section 2255 Motion

to include the Ground for Relief set forth herein, that the Government failed to disclose

---

[12] Petitioner will discuss all of the evidence contradicting the Government's assertion that "semen" was detected in post hearing briefing.

23

USCA5 4458

P-179 to trial counsel.[13]  Upon permitting such amendment, the Court should permit

further development and litigation of this Ground for relief, including further

development of the record with respect to the Government's non-disclosure.

Additionally, the Court should consider the within Supplement to the existing claim

of ineffective assistance of counsel related to Claim IV.

Respectfully Submitted,

/s/ Michael Wiseman

_____

Michael Wiseman
Victor Abreu
Elizabeth Larin
James McHugh
Federal Community Defender
Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West, The Curtis Center
Philadelphia, PA 19106
Counsel for Petitioner
Alfred Bourgeois

Dated:      Philadelphia, PA
            November 15, 2010

---

[13]The Proposed Amendment is attached here as an Exhibit.

24

USCA5 4459

## Certificate of Service

I, Michael Wiseman, hereby certify that on this 15th day of November, 2010 I served the foregoing on the following person by ECF Filing:

Tony Roberts
Mark Dowd
Patti Booth
Elsa Salinas-Patterson

/s/ Michael Wiseman

_____

Michael Wiseman

USCA5 4460



**Standard Operating Procedures**
*DNA*
*Subject: P30 Identification*

*DRN: DNA-04-09*
*Version: 01*
*Page 1 of 3*

Uncontrolled Copy - Prepared for distribution
11/10/2010wy

# P30 IDENTIFICATION

## 1    Scope

The cells that line the ducts of the prostate make a protein known as p30 or prostate-specific antigen (PSA).  The protein is secreted into seminal fluid to a concentration of approximately 0.24-5.5 mg/mL.  p30 has been detected in non-prostatic sources such as normal and abnormal breast tissue, various breast fluids (milk, nipple aspirate, cyst fluid), amniotic fluid, and female serum.

p30 is considered to be a presumptive test for semen. The presence of p30 indicates, but does not confirm the presence of semen. Semen can only be confirmed by the presence of spermatozoa.

The ABAcard p30 test is a qualitative detection method specifically designed for forensic presumptive identification of semen.  Sample is added to a sample well where any detectable p30 present in the sample will bind with mobile p30 antibody.  The resultant mobile antigen-antibody complex migrates through an absorbent strip to an area where immobile p30 antibody is bound.  The mobile antigen-antibody complex binds to the immobile antibody creating an antibody-antigen-antibody sandwich.  When the p30 concentration in the sample exceeds 4 ng/mL, pink dye particles become visible in the area of immobilized antibody.  The resultant pink band indicates a positive result.

## 2    Safety

Body fluids and extracts may contain infective agents. Use universal precautions during evidence handling. Appropriate personal protective equipment must be worn during use. Clothing may protect unbroken skin; broken skin must be covered.

## 3    Related Documents

DNA-03-02 Physical Evidence Examination

DNA-04-07 Body Fluid Stain Extraction

LAB-DNA-01/LAB-DNA-02 Biological Screening Worksheet

LAB-DNA-05 p30\HemaTrace Testing Worksheet

LAB-DNA-10 ABAcard Reagent Quality Control Form

## 4    Equipment, Materials, and Reagents

*OneStep* ABAcard p30 test strips

dlH$_2$O

timer

## 5    Standards and Controls

The lot of ABAcard test devices must be quality control tested using a known semen sample and reagent blank (dlH$_2$O) prior to the first use of the lot.  An aliquot of the dlH$_2$O used to quality control test the kit must be retained in the kit for use as extraction solution.

USCA5 4461



**Standard Operating Procedures**
*DNA*
*Subject: P30 Identification*

*DRN: DNA-04-09*
*Version: 01*
*Page 2 of 3*

The examiner may choose to also run a substrate control extracted in the same manner as the suspected semen stain.

Each individual test card contains a control line "C". If the control line "C" does not appear, the test is invalid.

## 6    Procedure

1.    Allow the sample(s) and control(s) to warm to room temperature if they have been refrigerated.

2.    For each sample and control:

  a)    *Perform DNA-04-07 Body Fluid Stain Extraction procedure.*

  b)    *Unwrap an ABAcard device and dropper.*

  c)    *Add 200 µL (8 drops with provided dropper) of sample to the sample well "S" of the device.*

  d)    *Positive results may be called at any time within 10 minutes. Negative results may not be called without waiting a full 10 minutes.*

3.    Samples that produce a negative result but that show strong positive acid phosphatase activity must be diluted 1:100 and re-tested.

## 7    Interpretation

The appearance of a pink line at the "C" (control) area is expected for all tests and must be present. Absence of the "C" line is an inconclusive result. The appearance of a pink line at the "T" (test) area is a positive result and indicates, but does not confirm the presence of semen. The p30 concentration in the applied solution is at least 4 ng/mL, equivalent to approximately a 1:1,000,000 dilution of semen. The absence of a pink line at the "T" area after 10 minutes is a negative result and indicates that semen is absent, below the detection threshold, or above the high dose threshold.

## 8    Records

The lot of ABAcard test devices and the quality control test results shall be recorded on the ABAcard Reagent Quality Control Form.

Evidence and test observations shall be recorded on the p30/HemaTrace Testing Worksheet, Biological Screening Worksheet, and as necessary, in data notes.

A photocopy or photograph of the test card device at the final reading may be prepared.

## 9    Literature and Supporting Documentation

Gaensslen RE. Sourcebook in Forensic Serology, Immunology, and Biochemistry. US Department of Justice, National Institute of Justice. 1983. Sections 10 and14.

Baechtel SF. Chapter 7. The identification and individualization of semen stains. Richard Saferstein, ed. Forensic Science Handbook, Volume 2. Prentice-hall, Inc. Englewood Cliffs, New Jersey. 1988. pp. 364-366.

Effective Date: 01/11/2010

Uncontrolled Printed Copy

Uncontrolled Copy - Prepared for distribution 11/10/2010wy

USCA5 4462



**Standard Operating Procedures**
*DNA*
*Subject: P30 Identification*

*DRN: DNA-04-09*
*Version: 01*
*Page 3 of 3*

Abacus Diagnostics. OneStep ABAcard p30 test for the forensic identification of semen. Product insert. 1999.

Benton KA, Donahue JA, and Valadez M, Jr. Analysis of the ABAcard OneStep PSA test for use in the forensic laboratory. Texas Department of Public Safety Crime Laboratory Service. 1998. Unpublished.

Ulutin HC and Pak Y Prostate specific antigen in the female body: Its role in breast cancer prognosis. Radiation Medicine. 2000. 18(5), pp. 273-276.

Yu H. Clinical implications of prostate-specific antigen in men and women. J Gender-Specific Medicine. 2000. 3(2), pp. 45-48, 53.

Diamandis EP and Yu H. Nonprostatic sources of prostate-specific antigen. Urological Clinics of North America. 1997. 24(2), pp. 275-282.

Uncontrolled Copy - Prepared for distribution
11/10/2010wy

USCA5 4463



| METHODS MANUAL | Document No.<br>MM II-G | Revision No.:<br>2 | Effective Date:<br>02/07/05 | Page<br>1 of 3 |
|---|---|---|---|---|

# SERATEC® CARD PROTOCOL

## 1  PURPOSE

The identification of seminal fluid (prostate specific antigen) in a stain extract using an immuno-assay technique.

## 2  METHOD

### 2.1  Introduction

Prostate specific antigen (PSA) or p30 is a glycoprotein found in human seminal fluid.  This protein is formed in the prostate and secreted into seminal fluid, although it has been reportedly found in elevated amounts in serum of some men,  possibly as an indication of prostatic cancer (Hochmeister, et al, 1999), in breast milk of lactating women (Yu and Diamandis, 1995) and as well in the amniotic fluids of women (Yu and Diamandis, 1995. There is no correlation apparent between number of sperm and  the level  of PSA found in seminal fluid, therefore PSA can be detected in semen of  a male with a low sperm count (oligospermatic), an azoospermatic male (no mature sperm in semen) or a male who has had a vasectomy.

The detection of PSA in semen can be done through various immunological based tests including crossover and rocket electrophoresis. The Seratec® PSA Test for the forensic identification of semen by Seratec Diagnostica® is a membrane immuno-assay that qualitatively detects PSA in semen. The principle of the test is the PSA will interact with a red colored gold labeled monoclonal anti-PSA-antibody (epitope 1) to form a mobile antigen antibody complex. The complex migrates down the membrane via capillary action and is captured by a second immobile monoclonal mouse anti-PSA-antibody (epitope 2). If there is sufficient PSA (> 2 ng PSA/ ml) in the test sample, then a red line forms where the immobile anti-PSA antibody is located ("T" area).

An internal control (an immobile polyclonal anti-mouse-antibody) detects the presence of unbound antibody-dye conjugates which form a red line in the control ("C") area.  An internal standard, also a polyclonal anti-mouse antibody, has an adjusted level of antibody which shows the color intensity of a result equivalent to 4 ng PSA/ml.  The presence of these two lines is independent of the presence of PSA in the test sample.

A positive test is indicated by the presence of three pink lines (at the test, the internal standard, and the control areas). A negative result is indicated by the presence two pink lines at the internal standard and the control areas. An inconclusive result is obtained if there is no line formed in the control area.  The test is time sensitive and the results should be read within 10 minutes.

USCA5 4464

| Document No.<br>MM II-G | Rev No.:<br>2 | Title:<br>Seratec® Card Protocol | Page 2 of 3 |
|---|---|---|---|

## 2.2 Procedure

Prepare stain extract as previously described in the SERI Methods Manual Section VII-C.

Add 125 µl of the extract to the test well of the Seratec® card. The test sample should be prepared according to results obtained with the acid phosphatase test. If the acid phosphatase results are strong, the test sample should be diluted prior to being added to the test well, but if the acid phosphatase results are weak or negative, the extract should be added directly to the test well.

Read the test results within 10 minutes. A positive result maybe seen immediately.

## 3  REAGENTS/ MATERIALS

Phosphate Buffered Saline (PBS), pH 7.4

Seratec® card

## 4  NOTES

### 4.1  Interpretation of Results



**Positive:** Line 1 (result), Line 2 (internal standard), and line 3 (control) are present.

**Negative:** Line 1 (result) does not appear, but Line 2 and Line 3 (control) is present.

Note:
Some negative results may be caused by:    1) prozone (see section 4.3)
                                           2) too highly diluted sample

**Invalid:** If line 3 (control) does not show up, the test is invalid and should be repeated.

USCA5 4465

| Document No. | Rev No.: | Title: | | Page 3 of 3 |
|---|---|---|---|---|
| MM II-G | 2 | Seratec® Card Protocol | | |

-c- Inconclusive: Due to the increase in sensitivity using the Seratec® seminal fluid (PSA) test, the analyst is advised to have a second positive test result before confirming seminal fluid is present in a stain extract (e.g., positive AP test, spermatozoa observed in the pellet, or a male profile present in the sperm DNA fraction). If the only positive test result obtained from the stain extract is the Seratec® PSA card, the conclusion for this situation would be "seminal fluid could not be confirmed".

## 4.2 Detection Limits

Lower: 2 ng PSA / ml (approximately 1/ 1 000 000 dilution of 3000 µg/ml of PSA*)

Upper: 500 µg PSA / ml

* 3000 µg /ml is used at SERI based on the philosophy that at least 97% of known neat semen samples fall below 3000 µg/ml and stains will also experience some loss due to drying and degradation.

## 4.3 Prozone (High Dose Hook Effect)

If the concentration of PSA is too high (> 500 ng PSA/ml), a false negative result may occur. If the sample has a very high amount of PSA, the PSA will not only bind to the mobile mouse anti-PSA antibody but it will also migrate down to the test area and bind with the immobile anti-PSA antibody. The bound PSA prevents the immobile antibody from capturing the labeled antibody-antigen complex. The result obtained appears as a negative result.

## 5 REFERENCES

Seratec® PSA Semiquant information insert. Seratec Diagnostica®.

Hochmeister, M. N., Budowle, B., Rudin, O., Gehrig, C., Borer, U., Thali, M., and Dirnhofer, R. "Evaluation of Prostate Specific Antigen (PSA) Membrane Test Assays for the Forensic Identification of Seminal Fluid." *J. Forensic Sci.* 1999: 44:1057-1060.

Yu H., Diamandis, E.P. "Prostate-Specific Antigen in Milk of Lactating Women." *Clin. Chem.* 1995: 41(1): 54-58.

Yu H., Diamandis, E.P. "Prostate-Specific Antigen Immunoreactivity in Amniotic Fluid." *Clin. Chem.* 1995: 41(2): 204-210.

| Supercedes Doc No.: | Rev No.: | Written by: | Revised by: | Approved by: | Date Approved: |
|---|---|---|---|---|---|
| MM II-G | 1 | Janet Hanniman | Gary Harmor | Brian Wraxall | 02/07/05 |

USCA5 4466

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____    :

UNITED STATES OF AMERICA,    :          No. Cr-C-02-216
                             :          No. Cv-07-223
            Respondent,      :     Honorable Janis Graham Jack,
                             :               U.S.D.J.
     -against-               :
                             :
ALFRED BOURGEOIS,            :          Electronically Filed
                             :
            Petitioner.      :
_____    :

**PETITIONER'S PROPOSED AMENDMENT TO HIS SECTION 2255 MOTION**

1.    Petitioner files the foregoing Amendment to his already-filed Section 2255 Motion and its prior Amendments.

2.    This Amendment is a supplement to – and does not replace – the prior Section 2255 Motion.

3.    All prior allegations contained in the initial Section 2255 Motion are incorporated as if fully set forth herein.

**This Amendment Is Timely**

4.    Section 2255 provides that the one year statute of limitations begins to run from "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence."  28 U.S.C. § 2255.  Here, despite diligent efforts to uncover the existence of these documents, counsel did not

USCA5 4467

learn of the existence of the document and the exculpatory evidence contained within it until the Government's disclosure, mid-hearing, on September 23, 2010. Accordingly, the amended claim is timely under Section 2255.

### AMENDED GROUND FOR RELIEF

**THE GOVERNMENT VIOLATED PETITIONER'S RIGHT TO DUE PROCESS GUARANTEED BY THE FIFTH, SIXTH AND EIGHTH AMENDMENTS WHEN IT FAILED TO DISCLOSE P-179, WHICH CONTAINS EXCULPATORY EVIDENCE RELEVANT TO THE GUILT AND PENALTY PHASE OF TRIAL AND WHICH SUPPORTS PETITIONER'S CHALLENGE TO THE GOVERNMENT'S ASSERTION THAT SEMEN WAS PRESENT IN THE VICTIM'S RECTUM.**

5.      At trial and during these § 2255 proceedings, Mr. Bourgeois sought the timely disclosure of all exculpatory evidence pursuant to Brady v. Maryland, 373 U.S. 83 (1963).

6.      Nevertheless, it was not until the middle of the evidentiary hearing, on the evening of September 23, 2010, that the Government provided Petitioner's counsel with document P-179.

7.      P-179, entitled "P30 Test Results" indicates that on the three swabs, Q5-Q7, that were subjected to p30 testing by the FBI, the results were "very weak, very weak and weak," respectively.  Within the context of the issues before the Court these results are exculpatory and should have been disclosed.

8.      P-179's notation that the p30 test performed by the FBI lab technicians produced weak results, is critical evidence necessary to attack the Government's

USCA5 4468

assertion that Mr. Bourgeois sexually assaulted the victim.  In addition, in conjunction with the FBI's own serology protocols, P-180, demonstrate that the Government's evidence that semen was definitively detected in the rectum of JG-1999 was erroneous, and, as Petitioner has alleged in Claim IV, scientifically unsupportable.

9.      FBI Procedures for the Serological Identification of Biological Substances on Evidentiary Materials (2002), Chapter 11 states:

> Attempts to identify human semen in some categories of evidence **MUST** be approached through the identification of spermatozoa rather than by the detection of human specific proteins, such as p30.  These categories would include ... stain extracts that possess **borderline levels of p30**.

P-180.

10.      Thus, under the FBI's own protocols, P-179 reveals that the p30 results in this case cannot be considered confirmatory of the presence of semen.  The government experts were aware of the results of their own test – that the p30 results were "weak, very weak, and very weak."  Thus, they knowingly mislead the jury when they testified that the p30 results definitively identified the presence of semen in the victim's rectum.

11.      The law governing these issues is well settled.  The Due Process Clause of the Fifth Amendment to the United States Constitution requires a prosecutor to disclose favorable evidence to the accused.  Brady v. Maryland, 373 U.S. 83, 87 (1963); Giglio v. United States, 405 U.S. 150, 153-56 (1972); United States v. Bagley,

USCA5 4469

473 U.S. 667, 676 (1985); Kyles v. Whitley, 514 U.S. 419, 437 (1995).  Evidence is

"material" under Brady and its progeny when "[t]he favorable evidence could

reasonably be taken" to put the case "in such a different light as to undermine

confidence in the verdict." Kyles, 514 U.S. at 435.  Indeed, the purpose of the Brady

doctrine is "[t]o ensure that a miscarriage of justice does not occur." Bagley, 473 U.S.

675.

12.    "[A] conviction obtained through use of false evidence, known to be such

by representatives of the State, must fall under the Fourteenth Amendment." Napue v.

Illinois, 360U.S. 264, 269 (1959). Thus, due process is violated "where previously

undisclosed evidence revealed that the prosecution introduced trial testimony that it

knew or should have known was perjured." Kyles v. Whitley, 514 U.S. 419, 443

(1995). "The same result obtains when the State, although not soliciting false evidence,

allows it to go uncorrected when it appears." Napue, 360 U.S. at 269.

13.    The duty to disclose is especially important in capital cases where

heightened safeguards, greater protections for the defendant and a heightened scope

of judicial review are required by the United States Constitution.  See, e.g., Beck v.

Alabama, 447 U.S. 625 (1980); Caldwell v. Mississippi, 472 U.S. 320 (1985).

14.    As a result of the failure to disclose of the information in P-179, and the

resultant violation of Mr. Bourgeois' rights as guaranteed by the Fifth, Sixth and

Eighth Amendments, Mr. Bourgeois is entitled to a new trial and/or sentencing hearing.

USCA5 4470

California Department of Justice
Bureau of Forensic Services

| Document number: TP-2 | Biology | |
|---|---|---|
| Issued by: Bureau Chief | Technical Procedures | Page 1 of 144 |

# Biology Technical Procedures

## Table of Contents

Introduction.................................................................................................................. 5
Section 0.1 General Evidence Examination Techniques ........................................... 7
Section 1 - Safety..................................................................................................... 10
    Overview............................................................................................................. 10
    Scope.................................................................................................................. 10
    Section 1.1 Introduction..................................................................................... 10
    Section 1.2 Materials and Equipment ................................................................ 11
    Section 1.3 Procedures...................................................................................... 11
    Section 1.4 References....................................................................................... 13
Section 2 – Quality Control ...................................................................................... 14
    Definitions........................................................................................................... 14
    Scope.................................................................................................................. 14
    Section 2.1 Introduction/Scope.......................................................................... 16
    Section 2.2 Instrument/Equipment Checks........................................................ 16
    Section 2.3 AntiSera and Critical Reagent Checks............................................ 18
    Section 2.4 Reference Collections .................................................................... 20
Section 3 - Blood ...................................................................................................... 21
    Overview............................................................................................................. 21
    Case Approach................................................................................................... 21
Section 3.1 Presumptive Blood Tests ...................................................................... 24
    Section 3.1.1 Scope/Introduction....................................................................... 24
    Section 3.1.2 Hemastix Test .............................................................................. 24
    Section 3.1.3 Phenolphthalein, Leucomalachite Green, and o-Tolidine Tests .... 25
    Section 3.1.4 Interpretation/Reporting............................................................... 27
    Section 3.1.5 References.................................................................................... 28
    Section 3.1.6 Appendix...................................................................................... 29
Section 3.2 Species Determination .......................................................................... 32
    Section 3.2.1 Scope/Introduction....................................................................... 32
    Section 3.2.2 Materials, Reagents, and Equipment .......................................... 32
    Section 3.2.3 Procedures................................................................................... 33
    Section 3.2.4 Interpretation/Reporting............................................................... 35
    Section 3.2.5 References.................................................................................... 36
Section 3.3 Immunoassay Test for Human Blood ..................................................... 37
    Section 3.3.1 Scope/Introduction....................................................................... 37
    Section 3.3.2 Materials, Reagents, and Equipment .......................................... 37
    Section 3.3.3 Procedures................................................................................... 37
    Section 3.3.4 Interpretation/Reporting............................................................... 38
    Section 3.3.5 References.................................................................................... 39
Section 3.4 Latent Blood Detection .......................................................................... 41
    Section 3.4.1 Scope/Introduction....................................................................... 41

California Department of Justice
Bureau of Forensic Services

| Document number: TP-2 | **Biology** | |
|---|---|---|
| Issued by: Bureau Chief | **Technical Procedures** | Page 2 of 144 |

Section 3.4.2 Materials, Reagents, and Equipment ................................................. 42
Section 3.4.2.1 Leuco Crystal Violet Materials and Reagents ................................ 42
Section 3.4.2.2 Fluorescin Materials and Reagents ............................................... 43
Section 3.4.2.3 Luminol Materials and Reagents ................................................... 44
Section 3.4.3 Safety ................................................................................................ 45
Section 3.4.4 Procedures ......................................................................................... 45
Section 3.4.5 Photo documentation ......................................................................... 46
Section 3.4.6 Interpretation/Reporting ................................................................... 47
Section 3.4.7 References .......................................................................................... 47
Section 4 - Semen .......................................................................................................... 49
Overview ................................................................................................................... 49
Case Approach .......................................................................................................... 49
Section 4.1 Acid Phosphatase ........................................................................................ 52
Section 4.1.1 Scope/Introduction ............................................................................ 52
Section 4.1.2 Materials, Reagents, and Equipment ................................................. 52
Section 4.1.2.1 alpha-Napthyl Acid Phosphate Materials and Reagents ................ 53
Section 4.1.2.2 p-Nitrophenyl Phosphate Materials and Reagents ......................... 54
Section 4.1.2.3 Thymolphthalein Monophosphate (TPMP) Materials and Reagents ..... 55
Section 4.1.3 Procedures .......................................................................................... 55
Section 4.1.4 Interpretation/Reporting ................................................................... 57
Section 4.1.5 References .......................................................................................... 58
Section 4.2 p30 Determination ...................................................................................... 60
Section 4.2.1 Scope/Introduction ............................................................................ 60
Section 4.2.2 Materials, Reagents, and Equipment ................................................. 60
Section 4.2.3 Procedures .......................................................................................... 63
Section 4.2.4 Interpretation/Reporting ................................................................... 65
Section 4.2.5 References .......................................................................................... 67
Section 4.3 p30 Immunoassay Tests .............................................................................. 69
Section 4.3.1 Scope/Introduction ............................................................................ 69
Section 4.3.2 Materials, Reagents, and Equipment ................................................. 69
Section 4.3.3 Procedures .......................................................................................... 69
Section 4.3.4 Interpretation/Reporting ................................................................... 71
Section 4.3.5 References .......................................................................................... 73
Section 4.4 Sperm Extraction and Staining for Microscopic Exam ............................... 74
Section 4.4.1 Scope/Introduction ............................................................................ 74
Section 4.4.2 Materials, Reagents, and Equipment ................................................. 74
Section 4.4.2.1 Dye Preparation ............................................................................. 75
Section 4.4.2.2 Epithelial Digest Solutions ............................................................ 76
Section 4.4.3 Sample Extraction ............................................................................. 77
Section 4.4.4 Slide Preparation ............................................................................... 78
Section 4.4.5 Slide Staining ..................................................................................... 78
Section 4.4.6 Microscopic Examination .................................................................. 79
Section 4.4.7 Interpretation ..................................................................................... 81
Section 4.4.8 References .......................................................................................... 81
Section 4.5 SPERM HY-LITER for Identification of Human Spermatozoa ................... 83
Section 4.5.1 Scope/Introduction ............................................................................ 83

USCA5 4472

California Department of Justice
Bureau of Forensic Services

| Document number: TP-2 | Biology | |
|---|---|---|
| Issued by: Bureau Chief | Technical Procedures | Page 3 of 144 |

Section 4.5.2 Materials, Reagents, and Equipment ....................................................... 84
Section 4.5.2.1 Reagent Preparation ............................................................................ 84
Section 4.5.3 Sample Extraction ................................................................................... 85
Section 4.5.4 Slide Preparation .................................................................................... 86
Section 4.5.5 Microscopic Examination ....................................................................... 87
Section 4.5.6 Interpretation .......................................................................................... 89
Section 4.5.7 References ............................................................................................... 89
Section 5 - Saliva ............................................................................................................. 90
Overview ....................................................................................................................... 90
Case Approach .............................................................................................................. 90
Section 5.1 Amylase Radial Diffusion ............................................................................ 92
Section 5.1.1 – Scope/Introduction .............................................................................. 92
Section 5.1.2 – Materials, Reagents, and Equipment ................................................... 92
Section 5.1.2.1 Reagent Preparation ............................................................................ 93
Section 5.1.3 Procedure ................................................................................................ 95
Section 5.1.4 Interpretation/Reporting ......................................................................... 96
Section 5.1.5 References ............................................................................................... 98
Section 6 - Urine .............................................................................................................. 99
Overview ....................................................................................................................... 99
Case Approach .............................................................................................................. 99
Section 6.1 Urine Tests .................................................................................................. 100
Section 6.1.1 Scope/Introduction ............................................................................... 100
Section 6.1.2 Stain Localization ................................................................................. 100
Section 6.1.3 DMAC Test for Urea ............................................................................ 101
Section 6.1.4 Urease Test for Urea ............................................................................. 102
Section 6.1.5 BUN Test for Urea ................................................................................ 103
Section 6.1.6 Creatinine Test (Jaffe Reaction) ........................................................... 105
Section 6.1.7 Interpretation/Reporting ....................................................................... 108
Section 6.1.8 References ............................................................................................. 109
Section 7 – Fecal Material ............................................................................................. 110
Overview ..................................................................................................................... 110
Case Approach ............................................................................................................ 110
Section 7.1 Fecal Material Tests ................................................................................... 111
Section 7.1.1 Scope/Introduction ............................................................................... 111
Section 7.1.2 Macroscopic Examination – Physical Properties .................................. 111
Section 7.1.3 Microscopic Examination (Optional) ................................................... 111
Section 7.1.4 Urobilin Test for Feces ......................................................................... 112
Section 7.1.5 Interpretation/Reporting ....................................................................... 113
Section 7.1.6 References ............................................................................................. 114
Section 8 – Protein Staining .......................................................................................... 115
Overview ..................................................................................................................... 115
Section 8.1 Protein Staining Procedures ....................................................................... 116
Section 8.1.1 Scope/Introduction ............................................................................... 116
Section 8.1.2 Materials, Reagents, and Equipment .................................................... 116
Section 8.1.2.1 Coomassie Blue Materials and Reagents ........................................... 116
Section 8.1.2.2 Amido Black Materials and Reagents ................................................ 117

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4473

California Department of Justice
Bureau of Forensic Services

| Document number: TP-2 | Biology | |
|---|---|---|
| Issued by: Bureau Chief | Technical Procedures | Page 4 of 144 |

Section 8.1.2.3 Silver Stain Materials and Reagents .......................................................... 118
Section 8.1.3 Procedures ................................................................................................. 119
Section 8.1.4 Interpretation ............................................................................................. 121
Section 8.1.5 References .................................................................................................. 121
Section 9 – Vaginal Material ............................................................................................ 123
Overview ....................................................................................................................... 123
Case Approach .............................................................................................................. 123
Section 9.1 Lugol's Test .................................................................................................. 124
Section 9.1.1 Scope/Introduction ..................................................................................... 124
Section 9.1.2 Materials, Reagents, and Equipment .......................................................... 124
Section 9.1.3 Procedure .................................................................................................. 125
Section 9.1.4 Interpretation/Reporting ............................................................................. 125
Section 9.1.5 References .................................................................................................. 127
Section 10 Validation ...................................................................................................... 128
Section 10.1 Validation of the SPERM HY-LITER for Identification of Human Spermatozoa ............... 129
10.1.1 Scope/Introduction .............................................................................................. 129
10.1.2 Sensitivity ........................................................................................................... 130
10.1.3 Specificity ........................................................................................................... 130
Section 11 - Abbreviations .............................................................................................. 131
Section 12 Manual History .............................................................................................. 142

USCA5 4474

California Department of Justice
Bureau of Forensic Services

| Document number: TP-2 | Biology | Section 4: Semen |
|---|---|---|
| Issued by: Bureau Chief | Technical Procedures | Page 49 of 144 |

## Section 4 - Semen

## Overview

**Introduction**

The identification of semen or its components can be a significant finding in a forensic examination. This part of the Biology Technical Procedure Manual contains information regarding the identification of these biological materials.

## Case Approach

**Definition**

Semen consists of spermatozoa and seminal fluid. Seminal fluid includes components such as acid phosphatase and p30, among many other components. Forensic examiners test for spermatozoa, acid phosphatase, and/or p30 to identify or indicate the presence of semen or seminal fluid.

**Technical procedures**

Technical procedures relevant to the identification of semen are contained in the accompanying sections of this manual:

| Section | Topic |
|---|---|
| 4.1 | Acid Phosphatase |
| 4.2 | p30 Determination |
| 4.3 | p30 Immunoassay Test |
| 4.4 | Sperm Extraction |

**Locating semen**

Most of the semen encountered in forensic situations are dried stains or swabs from sexual assault exams. In general, if the evidence item is not a swab, the examination begins by locating a possible semen stain. Consider the following when examining items for semen stains:

A semen stain may be observed as a crusty yellow to white stain, but this will vary depending on the age of the stain and the substrate.

Semen may also be mixed with other body fluids such as saliva and blood, which may alter its physical appearance.

Semen stains may or may not fluoresce with the use of an alternate light source (ALS) and therefore the use of an ALS can aid in locating a potential semen stain.

Some semen stains are not visible without the use of an ALS.

Tactile examination, stereomicroscopy, and chemical mapping can aid in locating stains.

USCA5 4475

PageID #: 6369

California Department of Justice
Bureau of Forensic Services

| Document number: TP-2 | Biology | Section 4: Semen |
|---|---|---|
| Issued by: Bureau Chief | Technical Procedures | Page 50 of 144 |

**Once a potential semen stain is located**

Document the location of the stain on the item using photographs, notes, and/or drawings

The stain or swab is then examined for acid phosphatase, spermatozoa, and/or p30.

It is the responsibility of the analyst to determine the appropriate tests given the evidence type and case history.

It is important to minimize contamination and ensure that sufficient sample is preserved for possible DNA analysis.

**Minimum analysis guidelines**

Information about the case should be reviewed to determine what items should be examined. Items chosen for analysis should follow the guidelines below.

Items other than swabs should be examined visually, tactilely, and using an alternate light source when possible.

All items to be tested for semen, including swabs, should be screened with AP reagents. Overlays or general swabbing may be performed on large items for AP testing.

Where appropriate, (positive AP stains, stains that the analyst feels could be a semen stain) slides should be made to look for the presence of spermatozoa.

In the case of intimate samples, such as vaginal swabs and underwear, if the AP test is negative and the microscopic examination does not show the presence of spermatozoa, then a p30 test must be run. The analyst may choose to run p30 on other items as well, as appropriate for the case

If sperm are found, no further examination is required, but may sometimes be appropriate.

USCA5 4476

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology** | Section 4: Semen |
|---|---|---|
| Issued by: Bureau Chief | **Technical Procedures** | Page 51 of 144 |

**Possible conclusions**

The following table shows examples of what conclusions may be made based upon certain analysis schemes.

| Tests Conducted | Acid Phosphatase (this test is not required if sperm is found) | Microscopy for Sperm | p30 (Rocket or Crossover) | p30 (one step immunoassay card) | Conclusion |
|---|---|---|---|---|---|
| Results | Negative | | | | Negative presumptive test for seminal fluid |
| Results | Negative | Negative | | | Negative presumptive test for seminal fluid, no sperm observed |
| Results | Negative | Positive | | | Sperm Observed |
| Results | Negative | Positive | Positive | or Positive | Semen detected |
| Results | Positive | Negative | Negative | or Negative | AP detected, seminal fluid not confirmed |
| Results | Positive | Positive | | | Semen detected |
| Results | Positive | Negative | Positive | | Seminal fluid detected |
| Results | Positive | Negative | | Positive | Seminal fluid detected |
| Results | Negative | Negative | Positive | | Seminal fluid detected* |
| Results | Negative | Negative | | Positive | p30 detected** |
| Results | Negative | Negative | Negative | or Negative | No semen detected |

*For p30 rocket or crossover, a positive result alone (without sperm or AP results) will allow you to make the statement of "seminal fluid detected."

**For p30 immunoassay cards, a positive result alone (without sperm or AP results) will allow you to make the statement of "p30 was detected." However, your report should include a statement that explains that other body fluids may react with these test cards. The immunoassay cards are very sensitive and can detect p30 at the very low levels that may be present in body fluids other than seminal fluid.

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4477

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 309 of 2006
PageID #: 6371

California Department of Justice
Bureau of Forensic Services

| Document number: TP-2 | Biology | Section 4.1: Acid Phosphatase |
|---|---|---|
| Issued by: Bureau Chief | Technical Procedures | Page 52 of 144 |

## Section 4.1 Acid Phosphatase

## Section 4.1.1 Scope/Introduction

**Introduction**  Any one of these three different tests may be utilized to examine materials for the presence of acid phosphatase (AP), an enzyme found in seminal fluid.

The procedure is similar for each test.
Acid phosphatase catalyzes the hydrolysis of the ester-linked phosphate group in the chemical.
The result is a change in color.

The table below contains the chemicals (test names), the hydrolysis product, and the resulting color.

| Test Name | Product & Color |
|---|---|
| -naphthyl acid phosphate | -naphthol which complexes with the diazo dye (GBC or NDR) is **purple** (GBC) **or brick red** (NDR) |
| p-nitrophenol phosphate | p-nitrophenol, which in the presence of base, is **bright yellow** |
| thymolphthalein monophosphate | thymolphthalein, which in the presence of base, is **blue** |

**Reagent checks and documentation**  Reagents are checked each day that they are used.  Observations (i.e., color changes) and test results (i.e., positive, negative, or inconclusive) must be recorded in your case notes, along with the lot number of reagents and reference collection materials used.  Include a statement that the reagents functioned as expected and are suitable for use.

## Section 4.1.2 Materials, Reagents, and Equipment

**Materials and reagents**  The materials and reagents needed for each of the following tests are listed separately in the following sections:

| Test | Section |
|---|---|
| -naphthyl acid phosphate | 4.1.2.1 |
| p-nitrophenol phosphate | 4.1.2.2 |
| thymolphthalein monophosphate | 4.1.2.3 |

USCA5 4478

California Department of Justice
Bureau of Forensic Services

| Document number: TP-2 | **Biology** | Section 4.1: Acid Phosphatase |
| Issued by: Bureau Chief | **Technical Procedures** | Page 53 of 144 |

| | |
|---|---|
| **Equipment** | Each test uses the following equipment:<br>pH meter<br>Filter paper (e.g., 1MM-3MM Whatman)<br>Swabs<br>Spot plates or equivalent<br>Pipettes |

## Section 4.1.2.1 alpha-Napthyl Acid Phosphate Materials and Reagents

| | |
|---|---|
| **Materials and reagents** | Citric acid, anhydrous<br>   -Naphthyl acid phosphate<br>Sodium hydroxide (NaOH)<br>Fast Garnet GBC salt (GBC) or Naphthanil Diazo Red AL (NDR)<br>Purified water |
| **Reagent preparation - buffer** | <u>Citric Acid Buffer</u><br>   Dissolve and mix:<br>      18.9 g citric acid, anhydrous<br>      In 900 mL purified water<br>   Adjust pH to 4.9 with NaOH and then adjust volume to 1 L |
| **Reagents for one-step method** | Prepare the buffer<br>                                        -naphthyl phosphate, GBC salt, or NDR and buffer<br>in a 1:1:1 ratio (e.g., 10 mg/10 mg/ 10 mL for a purchased GBC concentration of 70%.<br>This ration can be adjusted based upon the concentration of the purchased GBC). |
| **Reagents for two-step method** | Follow the steps below to prepare reagents for the two-step method: |

| Step | Action |
|---|---|
| 1 | Prepare the buffer |
| 2 | Make solution #1<br>   Dissolve and mix:<br>      10 mg   -naphthyl acid phosphate<br>      In 5 mL citric acid buffer<br>   Allow to come to room temp |
| 3 | Prepare solution #2 – Chromogen<br><u>For GBC:</u><br>   Dissolve and mix:<br>      10 mg GBC |

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4479

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology** | Section 4.1: Acid Phosphatase |
|---|---|---|
| Issued by: Bureau Chief | **Technical Procedures** | Page 54 of 144 |

|  | In 5 mL citric acid buffer<br>Allow to come to room temperature<br><br>**Or**<br>For NDR:<br>  Dissolve and mix:<br>    10 mg NDR<br>    In 5 mL citric acid buffer<br>    Allow to come to room temperature |
|---|---|

## Section 4.1.2.2 p-Nitrophenyl Phosphate Materials and Reagents

**Materials and reagents**

Sodium acetate
Sodium hydroxide (NaOH)
Acetic acid
Sodium carbonate ($Na_2CO_3$)
Purified water
p-Nitrophenyl phosphate

**Reagent preparation - buffer**

Acetate Buffer
  Dissolve and mix:
    68 g sodium acetate
    25 mL acetic acid
    In 400 mL purified water
  Adjust to pH 4.8
  Add water to bring the volume up to 500 mL

**Reagents for two-step method**

Follow the steps below to prepare reagents for the two-step method:

| Step | Action |
|---|---|
| 1 | Prepare the buffer |
| 2 | Make solution #1<br>  Dissolve and mix:<br>    5 mg p-nitrophenyl phosphate<br>    In 10 mL acetate buffer |
| 3 | Prepare solution #2<br>  20-25% NaOH solution<br><br>  **Or** |

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4480

California Department of Justice
Bureau of Forensic Services

| Document number: TP-2 | **Biology** | Section 4.1: Acid Phosphatase |
|---|---|---|
| Issued by: Bureau Chief | **Technical Procedures** | Page 55 of 144 |

| | Or 15% Na$_2$CO$_3$ solution |
|---|---|

## Section 4.1.2.3 Thymolphthalein Monophosphate (TPMP) Materials and Reagents

**Materials and reagents**

Citric acid, anhydrous
Sodium carbonate (Na$_2$CO$_3$)
Sodium hydroxide (NaOH)
Purified water
Thymolphthalein monophosphate, disodium salt (TPMP)

**Reagent preparation - buffer**

<u>Citric Acid Buffer</u>
   Dissolve and mix:
      18.9 g Citric acid, anhydrous
      In 900 mL water
   Adjust pH to 4.9 with NaOH and then adjust volume to 1 L

**Reagents for two-step method**

Follow the steps below to prepare reagents for the two-step method:

| Step | Action |
|---|---|
| 1 | Prepare the buffer |
| 2 | Make solution #1<br>  Dissolve and mix:<br>    20 mg TPMP<br>    In 100 mL citric acid buffer<br>  If necessary, filter solution #1 |
| 3 | Prepare solution #2<br>  20-25% NaOH solution<br><br>**Or**<br>  Dissolve and mix:<br>    1.06 g Na$_2$CO$_3$<br>    0.40 g NaOH<br>    In 80 mL purified water<br>  Add water to bring the volume up to 100 mL |

## Section 4.1.3 Procedures

USCA5 4481

California Department of Justice
Bureau of Forensic Services

| Document number: TP-2 | Biology | Section 4.1: Acid Phosphatase |
|---|---|---|
| Issued by: Bureau Chief | Technical Procedures | Page 56 of 144 |

**Test selection and reagent check**

Decide which acid phosphatase test you will use.

Decide if the spot test procedure or the overlay procedure will be used.

Test the reagents against a semen standard and reagent blank , to demonstrate that the reagents are working properly. This must be done each day the reagents are used.

**Spot test procedure**

Follow the steps below to perform a spot test for acid phosphatase:

| Step | Action |
|---|---|
| 1 | Cut a small portion of the stain for testing, and place it in the well of a spot plate or equivalent. Test a substrate control in the same manner as the sample stain if available/appropriate. Alternatively, a stain can be swabbed and the resulting swab tested directly with the reagents.<br><br>**Note:** For example, cut 1-2 mm from a swab |
| 2 | Test the stain using one of the methods below:<br><br>**Two-Step Method**<br>( *p-nitrophenylphosphate test, thymolphthalein monophosphate test, or the - naphthyl acid phosphate test. Use corresponding solutions #1 and #2.*)<br>　Add 1-2 drops of solution #1 and wait approximately 1-3 minutes.<br>　Add 1-2 drops of solution #2.<br><br>**One-Step Method**<br>( *-naphthyl acid phosphate)*<br>　Add 1-2 drops of the working solution.<br>　Monitor and record any color changes for up to 5 minutes. |
| 3 | Watch for the rapid development of the appropriate color for each test, as this indicates the presence of acid phosphatase. There are two colors listed for -naphthyl acid phosphate because it is dependent on the dye that is used.<br><br>表格:<br>| Test | Color Change |<br>| -Naphthyl acid phosphate | GBC=Purple NDR= Brick red |<br>| p-Nitrophenyl phosphate | Bright yellow |<br>| Thymolphthalein monophosphate | Blue |<br><br>**Note:** Low levels of acid phosphatase can result in slow color changes. |
| 4 | Record the results of the test in the notes. Include the approximate time for the color reaction to occur if the color development is not immediate. |

**Overlay procedure**

Follow the steps below to prepare an overlay to test for acid phosphatase:

| Step | Action |
|---|---|
| 1 | Lay item on clean surface. Panties can be cut along the side seams to form a single layer. |

USCA5 4482

California Department of Justice
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology** | Section 4.1: Acid Phosphatase |
|---|---|---|
| Issued by: Bureau Chief | **Technical Procedures** | Page 57 of 144 |

| | |
|---|---|
| 2 | Place filter paper (e.g., 1MM-3MM Whatman) large enough to cover the area of interest over the item and mark orientation guides (e.g., outline of garment) on the filter paper with water insoluble ink or pencil. |
| 3 | Dampen the filter paper with purified water or appropriate buffer. |
| 4 | Realign the filter paper over area of interest and cover with a protective layer. To ensure good contact of filter paper with the area of interest, place weight on top of the protective layer or apply pressure. Run a known semen stain concurrently. Do not let the filter paper dry. |
| 5 | Remove weight and protective layer. |
| 6 | Test the overlay using one of the methods below:<br><br>**Two-Step Method**<br>*(p-nitrophenylphosphate test, thymolphthalein monophosphate test, or the -naphthyl acid phosphate test. Use corresponding solutions #1 and #2.)*<br>Apply solution #1 to the side of filter paper that was in contact with the area of interest. Wait approximately 1-3 minutes.<br>Apply solution #2.<br>Record the immediate color changes.<br><br>**One-Step Method**<br>*( -naphthyl acid phosphate)*<br>Apply the one-step reagent to the side of the filter paper that was in contact with the area of interest.<br>Monitor and record any color changes for up to 5 minutes. |
| 7 | Document the location of any color changes in case notes or photograph the overlay. The table below reflects the color changes observed with a positive acid phosphatase result for each test. There are two colors listed for -naphthyl acid phosphate because it is dependent on the dye that is used.<br><br>| Test | Color Change |<br>|---|---|<br>| -Naphthyl acid phosphate | GBC=Purple NDR= Brick red |<br>| p-Nitrophenyl phosphate | Bright yellow |<br>| Thymolphthalein monophosphate | Blue | |

## Section 4.1.4 Interpretation/Reporting

**Interpretational guidelines**
The rapid development of the appropriate color change, as described in the procedures above, indicates a high level of acid phosphatase. Low levels of acid phosphatase may be present when slow color changes are observed or when a pale yellow color is obtained for the p-Nitrophenol phosphate test or a pale blue color is obtained for the thymolphthalein monophosphate test.

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4483

California Department of Justice
Bureau of Forensic Services

| Document number: TP-2 | **Biology** | Section 4.1: Acid Phosphatase |
|---|---|---|
| Issued by: Bureau Chief | **Technical Procedures** | Page 58 of 144 |

Acid phosphatase is present in high concentration in seminal fluid. The enzyme is present at lower concentrations in other body fluids including: vaginal secretions, saliva, milk, and feces. Other sources of acid phosphatase include: plants, fungi, and bacteria. Sources other than semen generally produce weak acid phosphatase reactions.

A negative acid phosphatase reaction does not necessarily mean that semen is not present. It may be possible to get a negative acid phosphatase reaction from a stain and still find p30 and/or spermatozoa.

**Reporting guidelines**

The table below contains reporting guidelines based upon results of the acid phosphatase test:

| If the Acid Phosphatase test was… | Then the results may be reported as.. |
|---|---|
| Positive | "A presumptive test for acid phosphatase, a component of seminal fluid (as well as vaginal fluid), was positive." |
| Negative | "No acid phosphatase, a component of seminal fluid, was detected." |
| Inconclusive* | "A presumptive test for seminal fluid was inconclusive." |

Within the Positive row:

| If … | Then the report should indicate that... |
|---|---|
| further testing is not performed | "Seminal fluid was not confirmed" |

* Inconclusive is when you cannot tell if there has been the appropriate color change due to substrate interference (e.g., bloody vaginal swab, feces, fabric dyes),

# Section 4.1.5 References

**References**

Biology methods manual. London, England: Metropolitan Police Forensic Science Laboratory, 1978.

Gaensslen RE. Sourcebook in forensic serology, immunology and biochemistry. US Government Printing Office, 1983.

Hartnett C, Tate D. p-Nitrophenyl phosphate test as a substitute for fast blue B. Tieline Spring 1981;7(1):56.

Kind SS. The acid phosphatase test. Methods of Forensic Science 1964;3:267-288.

USCA5 4484

California Department of Justice
Bureau of Forensic Services

| Document number: TP-2 | Biology | Section 4.3: p30 Immunoassay |
|---|---|---|
| Issued by: Bureau Chief | Technical Procedures | Page 69 of 144 |

## Section 4.3 p30 Immunoassay Tests

## Section 4.3.1 Scope/Introduction

**Introduction**

The one step immunoassay cards are commercially produced test cards for the rapid and qualitative detection of p30. Prostate specific antigen (PSA) or p30 is glycoprotein found in high concentrations in seminal fluid. These test cards are designed to qualitatively detect p30 utilizing an immunoassay technique in which a conjugated dye labeled antibody forms a complex with the p30 antigen.

## Section 4.3.2 Materials, Reagents, and Equipment

**Materials, reagents, and equipment**

One step p30 immunoassay test card (ABAcard® or Seratec®)
Purified water or Phosphate Buffered Saline (PBS)
Micro spin vials or equivalent
Pipette (or provided dropper)
Miscellaneous laboratory supplies

## Section 4.3.3 Procedures

**Quality check and Documentation**

Each lot of p30 immunoassay test cards will be checked prior to use in casework (see the Quality Control Procedures and logs).

Observations and test results must be recorded in your case notes, along with the lot number and expiration date of the immunoassay test card(s).

USCA5 4485

California Department of Justice
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology** | Section 4.3: p30 Immunoassay |
|---|---|---|
| Issued by: Bureau Chief | **Technical Procedures** | Page 70 of 144 |

**Procedure**     Follow the steps below to test for the presence of p30 using an immunoassay test card:

| Step | Action |
|---|---|
| 1 | Cut an appropriate size of the questioned swab or stain and place in the bottom of a micro spin vial. A substrate control should be analyzed in the same manner as the questioned swab or stain when available/appropriate. A reagent blank will be run with each set of samples. **Note:** if the substrate control is negative, then it is not necessary to also run a reagent blank. A positive control is run as a dilution series for each lot during the QC check and does not need to be repeated at the time of casework. It is the analyst's responsibility to ensure the QC check has been successfully completed prior to using the immunoassay cards on casework. **Note:  Liquid samples should not be tested directly.  The p30 test cards are only suitable for use on dried stains.** |
| 2 | Extract the cutting with purified water or PBS and bring to a final volume of approximately 200-400  L. |
| 3 | Periodically agitate sample (e.g., with a toothpick).  Allow sample to extract for at least 15 minutes. |
| 4 | Optional – piggyback and centrifuge.  A slide can be made from the cellular pellet. |
| 5 | Pipette extract into the sample well of the immunoassay card.  The amount can vary depending upon the manufacturer of the card, but the total sample volume shall be sufficient to elute through the immunoassay card.  For example, if using the ABAcard® p30 test cards, add 200 μL of sample to the sample well. |

USCA5 4486

California Department of Justice
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology** | Section 4.3: p30 Immunoassay |
|---|---|---|
| Issued by: Bureau Chief | **Technical Procedures** | Page 71 of 144 |

**Example ABAcard®**

Control section
Test section

Sample well



| Step | Action |
|---|---|
| 6 | Examine the test window for the presence of colored bands in the control and test sections of the window (and appearance of the internal standard line if using the Seratec® cards). Read the result within 10 minutes.<br><br>Any bands that appear later than 10 minutes are not considered valid. If a band does appear after 10 minutes, the analyst may consider repeating the test after diluting the sample, or testing another portion of the stain.<br><br>***Note:*** If no test band appears and it is suspected that semen is present (i.e., a strong, fast acid phosphatase response), the extract may be too concentrated. This is known as the "high dose hook effect." If this is suspected, dilute the extract 1:10 to 1:100 and re-run the test.<br><br>***Note:*** If no control band(s) appears (and if applicable, no internal standard band appears), the test is invalid and should be repeated. |
| 7 | Document (i.e., photograph, sketch, or diagram) the results in the case notes. |

## Section 4.3.4 Interpretation/Reporting

**Interpretational guidelines**

If p30 is present, a complex forms with the mobile antibody in the membrane. This antibody-antigen complex migrates through the membrane and reacts with a second fixed anti-human p30 antibody. A colored line forms when the p30-dye labeled antibody reacts with the fixed antibody.

As an internal control, a second colored line should form at the control (C) area. These are dye conjugates that cannot bind to the antibody in the test area, but are captured in the control area. Some manufacturers (i.e., Seratec®) produce a card that contains an internal standard that forms a third band.

The presence of colored lines in the control and test areas indicates a positive result. If applicable (i.e., if using a Seratec® card), a colored line must also be observed in the internal standard area for a positive result.

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4487

California Department of Justice
Bureau of Forensic Services

| Document number: TP-2 | Biology | Section 4.3: p30 Immunoassay |
|---|---|---|
| Issued by: Bureau Chief | Technical Procedures | Page 72 of 144 |

A line only in the control position (and presence of the internal standard line for the Seratec® card) indicates no p30 detected.

If no control band appears (and if applicable, no internal standard band appears), the test is invalid and should be repeated.

While more concentrated semen samples will generally produce test results in a shorter period of time, no interpretation regarding the intensity of either the test or the control band(s) should be made.

### ABAcard® p30 Test summary:

| Control (C) | Test (T) | Result (p30) |
|---|---|---|
| (+) colored line present | (+) colored line present | positive |
| (+) colored line present | (-) colored line absent | negative |
| (-) colored line absent | (+/-) colored line present or absent | invalid |

### Seratec® p30 Test summary:

| Control (C) | Test (T) | Internal Standard | Result (p30) |
|---|---|---|---|
| (+) colored line present | (+) colored line present | (+) colored line present | positive |
| (+) colored line present | (-) colored line absent | (+) colored line present | negative |
| or (-) colored line absent | (+/-) colored line present or absent | or (-) colored line absent | invalid |

**Reporting guidelines**

The following are examples of wording than can be used in the report.

| If ... | Then the results may be reported as... |
|---|---|
| the p30 test card is positive | "p30, a protein found in seminal fluid, was detected." |
| the p30 test card is positive and, a positive acid phosphatase result was obtained | "Seminal fluid was detected." |
| the p30 test card is negative | "No p30, a protein found in seminal fluid, was detected." |
| no control band(s) appears (and if applicable, no internal standard band appears), the test is invalid and should be repeated. If the test is not repeated or if the same results are obtained with additional testing, then the report may read: | "No results were obtained." |

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4488

California Department of Justice
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology** | Section 4.3: p30 Immunoassay |
|---|---|---|
| Issued by: Bureau Chief | **Technical Procedures** | Page 73 of 144 |

## Section 4.3.5 References

References

Benton KA, Donahue JA, Valadez M Jr. Analysis of the ABAcard OneStep PSA test for use in the forensic laboratory. Texas Department of Public Safety.

Graves HCB, Sensabaugh GF, Blake ET. Postcoital detection of a male specific semen protein. New England Journal of Medicine 1985:312-338.

Hochmeister M., et al. Evaluation of prostate-specific antigen (PSA) membrane test assays for the forensic identification of seminal fluid. Journal of Forensic Science 1999;44:1057-1060.

Identification of Semen using Anti-p30. SERI Product Information Brochure.

LAPD SID Serology Unit SOP #SERO-S&S-04B, revision date 10/01/99, pp.7.

OneStep ABAcard p30 test technical information sheet, Abacus Diagnostics, 1998.

Poyntz FM, Martin PD. Comparison of p30 and acid phosphatase levels in post-coital vaginal swabs from donor and casework studies. Forensic Science International 1984;24(1):17-25.

Rawlinson L, Wraxall B. Semen quantitation utilizing p30 antigen. Interamerican Congress of Forensic Sciences November 1982.

Sensabaugh G. Isolation and characterization of a semen specific protein from human seminal plasma. A potential new marker for semen identification. Journal of Forensic Science 1978;23(1).

Simich JP, et al. Validation of the use of a commercially available kit for the identification of prostate specific antigen (PSA) in semen stains. Journal of Forensic Science 1999;44(6):1229-1231.

Spear TF. Khoskebari, N. The evaluation of ABAcard p30 test for the identification of semen. CCI.

Wraxall B, Blake E. The identification of semen using anti-p30. SERI Semen Manual, 1981.

Wraxall B, DeHaan L. The use of p30 antiserum in sexual assault cases. Journal of Forensic Science Society 1984;24:343.

USCA5 4489

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology** **Technical Procedures** | Section 4.4: Sperm Extraction and Staining |
|---|---|---|
| Issued by: Bureau Chief | | Page 74 of 144 |

# Section 4.4 Sperm Extraction and Staining for Microscopic Exam

## Section 4.4.1 Scope/Introduction

**Introduction**

Spermatozoa can be removed from fabric or a swab by soaking a portion of the sample in an appropriate extracting solution, such as:
- purified water,
- diluted Woolite,
- saline, phosphate buffered saline,
- 5% ammonium hydroxide, or
- proteinase K in sodium dodecyl sulfate solution*

After a sample has been extracted, the cell pellet will be placed on a glass slide and examined microscopically for the presence of spermatozoa. Alternatively, a small portion of the sample can be teased on a slide in a small amount of liquid and examined microscopcally.

It is acceptable to microscopically examine slides using only water as a medium. However, if no intact sperm are observed, the slide must be stained and re-examined.

*Note:* Extracting with proteinase K will digest the epithelial material, leaving the sperm. Digesting the sample to remove epithelial material can speed up the analysis process however, it is only recommended when sufficient sample is available so that sufficient material is still available for DNA analysis.

**Reagent checks and documentation**

Dyes/reagents are checked when they are prepared and/or when a new lot number is purchased. They are checked using a known sperm slide using the procedure for the stain used. The results are recorded in the reagent log, along with any changes to staining times, if needed.

Observations (e.g., type and density of material present on slide) and test results (e.g., presence or absence of spermatozoa and epithelial cells) must be recorded in your case notes, along with the lot number of reagents and reference collection materials used.

## Section 4.4.2 Materials, Reagents, and Equipment

**Materials and reagents**

- Acetone
- 5% Ammonium hydroxide ($NH_4OH$)
- Alcohol

USCA5 4490

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology**<br>**Technical Procedures** | Section 4.4: Sperm Extraction<br>and Staining |
|---|---|---|
| Issued by: Bureau Chief | | Page 75 of 144 |

- Aluminum sulfate
- Crystal (methyl) violet
- Indigo carmine
- Iodine ($I_2$)
- Mounting media (e.g., Cytoseal)
- Nuclear fast red
- Picric acid
- Potassium iodide
- Proteinase K (pro K)
- Purified water
- Saline
- Sodium dodecyl sulfate (SDS)
- Woolite

**Equipment**
- Cover slips
- Disposable culture tubes
- Microcentrifuge tubes
- Microscope
- Microspin baskets
- Pipettes
- Slides

# Section 4.4.2.1 Dye Preparation

**Solution preparation – Christmas tree stain solutions**

Dyes may be purchased or prepared. Instructions for their preparation follow.

Nuclear Fast Red Stain
- Dissolve and mix:
  - 5 g aluminum sulfate
  - 100 mL hot purified water
- Add:
  - 0.1 g nuclear fast red
- Allow to cool, then filter

Picroindigocarmine Stain
- Purchase or prepare a saturated picric acid solution (4 g picric acid in 300 mL purified water)
- Add:
  - 1 g indigo carmine to 300 mL saturated picric acid solution.
- Filter

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4491

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | Biology Technical Procedures | Section 4.4: Sperm Extraction and Staining |
|---|---|---|
| Issued by: Bureau Chief | | Page 76 of 144 |

**Solution preparation – Gram modified Christmas tree solutions**

If using the Gram Modified Christmas tree staining procedure, the following additional dye preparation follows.

0.5% Crystal (methyl) violet in purified water

Gram's Iodine
• Dissolve and mix:
  - 1 g iodine
  - 2 g potassium iodide
  - 300 mL purified water

## Section 4.4.2.2 Epithelial Digest Solutions

**Solution preparation – epithelial digest solutions**

Stain Extraction Buffer (SEB)
1.21 g Tris
3.72 g EDTA
5.84 g NaCl
1 liter distilled water
pH 8.2
In a beaker mix approximately 800 ml water with the measured chemicals. pH to 8.2 with NaOH. **Note:** EDTA will not go into solution without a pH change.

SEB with SDS:
2% SDS in Stain Extraction Buffer (e.g., 2 g SDS/100 ml)
**Note:** Solution may need to be warmed for the SDS to go into solution

Pro K Solution:
2% Pro K in SEB with SDS (e.g., 2 mg/100 ul)

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4492

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | Biology Technical Procedures | Section 4.4: Sperm Extraction and Staining |
|---|---|---|
| Issued by: Bureau Chief | | Page 77 of 144 |

## Section 4.4.3 Sample Extraction

**Sample evaluation**

Evaluate the sample:

| Whenever ... | Then ... |
|---|---|
| possible | use the same cutting that was used for acid phosphatase (only if the $Na_2CO_3$/NaOH preparation is used as the second solution) and/or p30 testing. |
| the sample is limited | take precautions to ensure there is enough material for DNA analysis. |
| needed | the epithelial material in the sample may be digested to leave only the sperm. |

**Sample extraction**

Extract the sample:

| Step | Action |
|---|---|
| 1 | Place the cutting in a microcentrifuge tube. |
| 2 | Add enough extracting solution to completely cover the sample. |
| 3 | Periodically vortex and/or agitate the sample (e.g., with a clean toothpick). |
| 4 | Let the sample stand for about 30 minutes at room temperature. |
| 5 | Then, vortex and/or agitate the sample again. |
| 6 | Remove the sample from the microcentrifuge tube and, |
| 7 | Place the sample in a microspin basket (or equivalent). |
| 8 | Centrifuge. |
| 9 | Prepare the slide from the cellular pellet. |
| Note: | If an epithelial cell digest is a possibility: The extractant should be water, retain the sample cutting and prepare a slide from a portion of the cellular pellet only. |

**Epithelial material digestion**

To digest the epithelial material:

| Step | Action |
|---|---|
| 1 | Place the cutting in a microcentrifuge tube (or return the original cutting to the remainder of the original extract). |
| 2 | Add about 200 ul of SEB with SDS. |
| 3 | Add about 5 ul of the Proteinase K Solution. |
| 4 | Agitate and/or vortex the sample. |
| 5 | Incubate the sample at about 56° C for approximately 1 hour. |
| 6 | Vortex the sample again. |
| 7 | Remove the sample from the microcentrifuge tube and, |

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4493

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology**<br>**Technical Procedures** | Section 4.4: Sperm Extraction<br>and Staining |
|---|---|---|
| Issued by: Bureau Chief | | Page 78 of 144 |

| | |
|---|---|
| 8 | Place the sample in a microspin basket (or equivalent). |
| 9 | Centrifuge. |
| 10 | Remove most of supernatant without disturbing the pellet. |
| Option | The pellet may be washed 2 to 3 times with distilled water. |
| 11 | Prepare the slide from the cellular pellet. |

**Sample teasing**  Instead of extracting material in a microspin tube, the analyst may aggressively tease a portion of the sample with water directly on a microscope slide. After teasing, remove the remainder of the substrate, heat fix the slide and stain as usual.

*Note:* If no sperm are seen, consideration can be given to preparation of another slide by a different technique.

## Section 4.4.4 Slide Preparation

**Slide preparation**

| Step | Action |
|---|---|
| 1 | Prepare a slide by one of these methods:<br>• Transfer a suitable portion of the pellet to a microscope slide.<br>• Aggressively tease a portion of the sample directly onto the slide.<br>• Or use a hospital prepared slide<br><br>*Note:* the supernatant may be used for other analyses. |
| 2 | Gently heat fix the slide, or allow the slide to dry completely and fix with ethanol. |

## Section 4.4.5 Slide Staining

**Christmas tree staining**  To stain the slide using the Christmas tree stain:

| Step | Action |
|---|---|
| 1 | Cover sample area on slide with nuclear fast red stain and let it stand for a minimum of one minute. Do not let sample area dry out.<br><br>*Note:* the timing depends upon the concentration of the stain solution. Purchased stains tend to be less concentrated than the dye preparations listed in this method. As such, they may require more time to be effective. |

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4494

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology** **Technical Procedures** | Section 4.4: Sperm Extraction and Staining |
|---|---|---|
| Issued by: Bureau Chief | | Page 79 of 144 |

| 2 | Wash away nuclear fast red stain solution with gentle stream of purified water, being careful not to dislodge pellet. |
|---|---|
| 3 | Cover sample area with picroindigocarmine stain for up to one minute.  *Note:* the timing depends upon the concentration of the stain solution. |
| 4 | Rinse the slide with alcohol (e.g., ethanol or reagent alcohol) and dry. |

**Gram modified Christmas tree staining**

In the instances where large numbers of yeast and/or bacteria are suspected, the slide may be stained with crystal violet followed by Gram's iodine stains **prior** to Christmas tree stain:

| Step | Action |
|---|---|
| 1 | Stain with aqueous crystal violet for 1 minute. |
| 2 | Rinse with water. |
| 3 | Stain with Gram's iodine for 1 minute. |
| 4 | Rinse with acetone and allow to dry. |
| 5 | Proceed with Christmas tree stains, described above. |

## Section 4.4.6 Microscopic Examination

**Microscopic examination**

| Step | Action |
|---|---|
| 1 | Once the slides are prepared, the sample area is covered with mounting media and a cover slip. |
| 2 | Examine the slides (e.g., at 200x to 400x) for the presence of spermatozoa using light, phase contrast, or differential interference contrast (DIC) microscopy. Record the type of microscopy, the magnification, and any observations in your notes. |
| 3 | Using light microscopy of slides stained with Christmas tree stain: <br> • epithelial material will appear green, and <br> • nuclear material will appear red or pink <br><br> For example, stained spermatozoa typically appear as follows: <br><br> <table><tr><td>**Part**</td><td>**Color**</td></tr><tr><td>Posterior head</td><td>red</td></tr><tr><td>Acrosomal cap</td><td>pink</td></tr><tr><td>Mid-piece</td><td>green to blue</td></tr><tr><td>Tail</td><td>green to blue</td></tr></table> |

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4495

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | Biology Technical Procedures | Section 4.4: Sperm Extraction and Staining |
|---|---|---|
| Issued by: Bureau Chief | | Page 80 of 144 |

| | *Note:* sperm heads can be identified by the characteristic pink cap and red bottom staining, as well as by size and shape. |
|---|---|

**Example** Photomicrograph of epithelial cells, sperm and yeast stained with Gram modified Christmas tree stain. Picture courtesy of Ed Jones, Ventura County Sheriff's Department



| Step | Action |
|---|---|
| 4 | Using phase contrast microscopy, the bottom (posterior) portion of the stained sperm head typically glow white and the acrosomal cap appears much darker.<br><br>Using DIC microscopy, cellular material has a three-dimensional appearance. The acrosomal cap, neck, and tail are clearly defined, as is the nucleus and cellular membrane of nucleated e-cells. DIC is in gray-scale; no staining will be visible. |
| 5 | Using light microscopy of slides stained with Gram modified Christmas tree stain:<br>• epithelial material will appear green,<br>• nuclei inside epithelial cells appear purple,<br>• gram-positive bacteria stain deep violet<br>• gram-negative bacteria remain unstained<br>• sperm cells are as described in 2, above |

USCA5 4496

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | Biology Technical Procedures | Section 4.4: Sperm Extraction and Staining |
|---|---|---|
| Issued by: Bureau Chief | | Page 81 of 144 |

| 6 | Note the sperm density. The following notations may be used: |
|---|---|
| | <table><tr><td>**If ...**</td><td>**Then ...**</td></tr><tr><td>no sperm cells seen</td><td>Negative</td></tr><tr><td>difficult to find</td><td>1+</td></tr><tr><td>some were seen in some fields</td><td>2+</td></tr><tr><td>some or many in most fields</td><td>3+</td></tr><tr><td>many in most or all fields</td><td>4+</td></tr></table> |
| 7 | Information on whether spermatozoa with tails were observed should also be recorded in your notes. |
| 8 | The presence of significant amounts of bacteria or epithelial cells should also be recorded in notes. |

## Section 4.4.7 Interpretation

**Reporting guidelines**

| When ... | Then results may be reported as... |
|---|---|
| spermatozoa are observed | "Spermatozoa were observed." |
| no spermatozoa are observed | "No spermatozoa were observed." |
| one spermatozoon is observed | "One sperm was observed." |

| If ... | Then ... |
|---|---|
| the cell morphology is not clear, the staining is not distinct, or if debris/material on the slide obscures viewing, | an inconclusive result may be reported. |

## Section 4.4.8 References

**References**

Biology methods manual. Metropolitan Police Forensic Science Laboratory, London, England, 1978.

Boudreau AJ, Cortner GV. California Association of Criminalists Seminar, October, 1978.

Blake ET, Cook C, Bashinski J. Presented at the 67th semi-annual seminar, California Association of Criminalists, May 15-17, 1986.

Gaensslen R, Mertens J, Lee H, Stolorow M. Staining and extraction techniques, proceeding of a forensic science symposium on the analysis of sexual assault evidence. FBI Academy,

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4497

| | | |
|---|---|---|
| **California Department of Justice** | | |
| **Bureau of Forensic Services** | | |
| Document number: TP-2 | **Biology** **Technical Procedures** | Section 4.4: Sperm Extraction and Staining |
| Issued by: Bureau Chief | | Page 82 of 144 |

1983.

Gaensslen R. Sourcebook in forensic serology, immunology, and biochemistry. U.S. Government Printing Office, 1983.

Hartnett C. Woolite safely soaks sperm cells from cloth. Tieline, Spring 1981;7(1):54.

Manual of histologic staining methods of the armed forces institute of pathology. Luna LG, editor. New York: McGraw-Hill Book Co., 1968.

Oppitz E. A new color method for proof of sperm in moral crimes. Arkiv fur Krimin 1969;144:145-148. (Translation by Stone IC, Southwestern Institute of Forensic Sciences, Criminal Investigation Lab. Updated Feb. 1975).

Stone IC. Staining of spermatozoa with kenochtrot and picroindigocarmine for microscopical identification. 1972.

Kind SS. The acid phosphatase test. In: Methods of forensic science, Curry, A. editor. London: Insterscience, 1964.

Willott GM, Allard J. Spermatozoa – their persistence after sexual intercourse. Forensic Science International 1982;19:135-154.

Chapman, RL, Brown, NM, Keating SM. The isolation of spermatozoa from sexual assault swabs using proteinase K. Journal of the Forensic Science Society 1989;29(3):207-212.

Belschner, Kay and the entire Biology TAG. Finding the Needle in the Haystack. CAC News, 2nd Qtr 2007 pp 10 – 12.

Norris, JV, Manning, K, Linke, SJ, Ferrance, JP, Landers, JP, Espedited, Chemically enhance sperm cell recovery from cotton swabs for rape kit analysis, JFS, Vol. 52, No. 4, pp 800-805 7/07.

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4498

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology** | Section 4.5 Sperm HY-LITER |
|---|---|---|
| Issued by: Bureau Chief | **Technical Procedures** | Page 83 of 144 |

## Section 4.5 SPERM HY-LITER for Identification of Human Spermatozoa

## Section 4.5.1 Scope/Introduction

**Introduction**    SPERM HY-LITER uses a reagent that fluorescently labels human sperm heads.

Samples may be extracted and air dried on a slide, or hospital prepared smear slides may be used. The slides undergo a process of fixing, preparation, blocking, and staining. The slides may then be examined with the use of a fluorescent microscope. Human spermatozoa produce a green fluorescence while other cellular material does not.

**Theory**    The following is from the Installation and Training Manual for the Sperm HY-LITER:

The SPERM HY-LITER staining kit contains two fluorescent dyes that can only be visualized using a fluorescent microscope fitted with a fluorescent light source and appropriate filters.

There are least three different fluorescent light sources that can be used on modern fluorescent microscopes, mercury burners, metal halide lamps, and LEDs. Any of these light sources are appropriate, in combination with a reflected light illuminator to visualize SPERM HY-LITER stained preparations.

Using appropriate filters (called 'cubes') installed on a fluorescent microscope, both human sperm heads and nuclei can be independently visualized. A specialized dual filter cube can also be optimized for your laboratory's particular brand of microscope such that both human sperm heads and other cell nuclei can be observed simultaneously. This additional filter cube provides a satisfying, useful, and efficient analysis of smear and extracts slides that contain large amounts of biological material and is another confirmatory step in the process of sperm identification from sexual assault evidence.

The mouse monoclonal antibody that binds specifically to human sperm heads, and thereby provides the unique specificity of SPERM HY-LITER has been chemically tagged with Alexa 488. This fluorophore has an excitation maximum of ~488-494 nm and an emission maximum of ~519-526 nm.

The fluorescent DNA stain, 4',6-diamidino-2-phenylindole (DAPI) which will stain all cell nuclei without specificity, has an excitation maximum of ~340-350 nm and an emission maximum of ~450-460 nm. This fluorophore has a particularly large quantum efficiency and will appear very bright with any of the fluorescent light sources described above. DAPI binds primarily to the minor groove in A/T rich regions of DNA.

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4499

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology** | Section 4.5 Sperm HY-LITER |
|---|---|---|
| Issued by: Bureau Chief | **Technical Procedures** | Page 84 of 144 |

| | |
|---|---|
| **Reagent checks and documentation** | Reagents are checked when a new lot number is purchased. They are checked using a slide of known sperm and epithelial cells using the procedure. The results are recorded in the reagent log. |
| | Observations (e.g., type and density of material present on slide) and test results (e.g., presence or absence of spermatozoa and epithelial cells) must be recorded in your case notes, along with the lot number of reagents and reference collection materials used. |

## Section 4.5.2 Materials, Reagents, and Equipment

| | |
|---|---|
| **Materials and reagents** | • DDT<br>• KOH or NaOH<br>• PBS<br>• SPERM HY-LITER Kit (store 2-8°C)<br>• Mounting medium |
| **Equipment** | • Microscope slides (regular or hydrophobic masked)<br>• Cover slips<br>• Hydrophobic slide pen<br>• Microcentrifuge tubes<br>• Fluorescent Microscope<br>• Microspin baskets<br>• Wash Bottle<br>• Pipettes |

## Section 4.5.2.1 Reagent Preparation

| | |
|---|---|
| **Wash Buffer** | Make a 1:10 dilution of the wash buffer from the HY-LITER kit with purified water. This may be made in quantity and placed in a wash bottle for use. The buffer is stable diluted. Store at room temperature. |
| **1M KOH or 1M NaOH** | Either 1M KOH or 1M NaOH is needed. Both do not need to be made.<br><br>For 1M KOH, dissolve 5.6 grams KOH in 100 ml purified water.<br><br>For 1M NaOH, dissolve 4.0 grams NaOH in 100 ml purified water. |

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4500

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology** | Section 4.5 Sperm HY-LITER |
| Issued by: Bureau Chief | **Technical Procedures** | Page 85 of 144 |

**DTT Solution**

Add 0.154 grams DTT to 0.7 ml purified water. Add 0.11 ml of either 1M KOH or 1M NaOH. Mix to dissolve. Aliquot into small tubes (approximately 20 ul per tube) and freeze. Frozen aliquots have a 2 year shelf life. Alternatively, purchased DTT solution of the correct concentration and pH can be used.

**Sample Preparation Solution + DTT**

This solution must be made just prior to use. The volume prepared depends on the size of the area to be stained on the slide (See section 4.5.4 for approximate amounts needed). For every drop of reagent required, mix 37 ul of Sample Preparation Solution from the HY-LITER kit (Reagent 2) with 3 ul DTT solution.

## Section 4.5.3 Sample Extraction

**Sample extraction**

Extract the sample:

| Step | Action |
|------|--------|
| 1 | Place the cutting in a microcentrifuge tube. |
| 2 | Add enough extracting solution (PBS is the preferred extracting solution) to completely cover the sample. |
| 3 | Periodically vortex and/or agitate the sample (e.g., with a clean toothpick). |
| 4 | Let the sample stand for about 30 minutes at room temperature. |
| 5 | Then, vortex and/or agitate the sample again. |
| 6 | Remove the sample from the microcentrifuge tube and, |
| 7 | Place the sample in a microspin basket (or equivalent). |
| 8 | Centrifuge. |
| 9 | Prepare the slide from the cellular pellet. |

**Sample teasing**

Instead of extracting material in a microspin tube, the analyst may aggressively tease a portion of the sample with PBS directly on a microscope slide. After teasing, remove the remainder of the substrate, air dry the slide and stain as usual.

*Note:* If no sperm are seen, consideration can be given to preparation of another slide by a different technique.

**Previously Stained Slides**

Slides that have been previously stained with Christmas Tree stain may be restained with the HY-LITER kit as long as the slides were not heat fixed. Heat fixing the slide raises the background fluorescence of the slide.

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4501

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology** | Section 4.5 Sperm HY-LITER |
|---|---|---|
| Issued by: Bureau Chief | **Technical Procedures** | Page 86 of 144 |

## Section 4.5.4 Slide Preparation

**General Information**

The amount of the reagents used per slide depends on the size of the area on the slide that needs to be stained. The dropper bottles in the HY-LITER kit are designed to deliver approximately 37 ul per drop if the bottle is held vertically. Use the following guidelines to determine the amount of reagent to use:

| Approximate size of area on slide | 6 mm | 8 mm | 11 mm | Large smear |
|---|---|---|---|---|
| Number of drops of reagent | 1 | 1 | 2 | 6-12 |

**Slide preparation**

| Step | Action |
|---|---|
| 1 | Use a cleaned regular slide or a hydrophobic masked slide. Prepare the slide by one of these methods: <br><br> • Transfer a suitable portion of the pellet to a microscope slide. <br> • Aggressively tease a portion of the sample directly onto the slide. <br> • Or use a hospital prepared slide <br><br> *Note:* the supernatant may be used for other analyses. |
| 2 | Allow the slide to air dry. <br><br> *Note:* It is important not to heat fix the slide. Heat fixing the slide raises the background fluorescence of the slide. |
| 3 | Add enough Fixative Solution (Reagent 1) from the HY-LITER kit to cover the cellular material and allow to incubate at room temperature for approximately 10 minutes (9-15 minutes). |
| 4 | Quickly rinse the slide with the prepared wash buffer (1.5-2 ml). |
| 5 | Add enough Sample Preparation Solution + DTT to cover the cellular material and allow to incubate at room temperature for 30 minutes (plus or minus 5 minutes). <br><br> *Note:* Fecal materials will consume the DTT. If slides are made from fecal materials, add an additional 20 ul of the DTT solution to the slide prior to the 30 minute incubation. |

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4502

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology** | Section 4.5 Sperm HY-LITER |
|---|---|---|
| Issued by: Bureau Chief | **Technical Procedures** | Page 87 of 144 |

| 6 | Quickly rinse the slide with the prepared wash buffer (1.5-2 ml). |
|---|---|
| 7 | Add enough Blocking Solution (Reagent 3) from the HY-LITER kit to cover the cellular material and allow to incubate at room temperature for a minimum of 30 minutes. Do not allow to dry. |
| 8 | Quickly rinse the slide with the prepared wash buffer (1.5-2 ml). |
| 9 | Add enough Sperm Head Staining Solution (Reagent 4) from the HY-LITER kit to cover the cellular material and allow to incubate at room temperature for approximately 30 minutes (plus or minus 1 minute). |
| 10 | Quickly rinse the slide with the prepared wash buffer (1.5-2 ml). |

## Section 4.5.5 Microscopic Examination

Microscopic examination

| Step | Action |
|---|---|
| 1 | Once the slides are prepared, the sample area is covered with mounting media (provided in the HY-LITER kit or Cytoseal) and a cover slip. |
| 2 | Examine the slides (e.g., at 200x to 400x) for the presence of spermatozoa using phase contrast and fluorescence. Record the type of microscopy, the magnification, and any observations in your notes. |
| 3 | Using fluorescence microscopy, what is observed depends on the filter used. DAPI filter – All cell nuclei appear blue. FITC filter – Only human sperm heads are observed, and appear green. Acrosomal caps are still visible. Slides can also be examined with a combination of FITC and DAPI filters, or in combination with phase contrast. |

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4503

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology** | Section 4.5 Sperm HY-LITER |
|---|---|---|
| Issued by: Bureau Chief | **Technical Procedures** | Page 88 of 144 |

**Example**    Photomicrograph Post-Coital Sample, Smear slide *with* Sperm, FITC filter.



Dual Color Fluorescence Sperm and Epithelial Cells Simultaneously.



Both photographs courtesy of Independent Forensics DNA Testing and Technologies

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4504

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | Biology | Section 4.5 Sperm HY-LITER |
|---|---|---|
| Issued by: Bureau Chief | Technical Procedures | Page 89 of 144 |

| 4 | Note the sperm density. The following notations may be used: |
|---|---|
| | |

| If ... | Then ... |
|---|---|
| no sperm cells seen | Negative |
| difficult to find | 1+ |
| some were seen in some fields | 2+ |
| some or many in most fields | 3+ |
| many in most or all fields | 4+ |

| 5 | Information on whether spermatozoa with tails were observed should also be recorded in your notes. |
|---|---|
| 6 | The presence of significant amounts of bacteria or epithelial cells should also be recorded in notes. |

## Section 4.5.6 Interpretation

**Reporting guidelines**

| When ... | Then results may be reported as... |
|---|---|
| spermatozoa are observed | "Spermatozoa were observed." |
| no spermatozoa are observed | "No spermatozoa were observed." |
| one spermatozoon is observed | "One sperm was observed." |

## Section 4.5.7 References

**References**

Willott GM, Allard J. Spermatozoa – their persistence after sexual intercourse. Forensic Science International 1982;19:135-154.

SPERM HY-LITER Installation and Training Manual, Independent Forensics DNA Testing and Technologies.

Mado Vandewoestyne, David Van Hoofstat, Filip Van Nieuwerburgh & Dieter Deforce Automatic detection of spermatozoa for laser capture microdissection. Int J Legal Med 2008

USCA5 4505

CRC-02-216

ALFRED BOURGEOIS
#9891-1079
P.O. Box 33
Terre Haute, IN
** 11-2010 **

United States Courts
Southern District of Texas
FILED

NOV 15 2010

David J. Bradley, Clerk of Court

To: Honorable JUDGE JANIS GRAM JACK
UNITED STATES DISTRICT COURT
Suite 124
1133 North Shoreline Boulevard
Corpus Christi, TX 78401

11-2010

IMMEDIATE ATTENTION

Honorable; upto ATTENDING THE EVIDENTIARY
HEARING from SEPTEMBER 20, 2010 To SEPTEMBER
24, 2010, MR. Bourgeois believes that I HAVE
BEEN COMPLETELY CHEATED and SHORT-
CHANGED BY THE MISREPRESENTATION
AND SERVICES OF DEFENDER Association
OF PHILADELPHIA Counsels OF Record. MR.
BOURGEOIS am VERY HIGHLY DISTURBED,
FRUSTRATED, UPSET, and IMPORTANTLY
VERY DISAPPOINTED that Counsels OF Record
HAS BEEN INVOLVED IN THIS CASE SINCE
September 2001 upto arriving THE EVIDENTIARY
HEARING to observe NUMEROUS UN-PROFESSIONAL
MISTAKES AND WRONGS such as NUMEROUS
TWISTS AND TURNS CONTRADICTED PETITIONER'S
BRIEF where Counsels OF Record FAILED
TO MEET Obligations AND EXPECTATIONS
IN THE BEST INTEREST OF THEIR
CLIENT. MR. BOURGEOIS has been very Restless
And UN-PEACEFUL and Ask that Counsel's OF
RECORD BE TERMINATED, DISMISS, OR RELEASE
FROM FURTHER DUTIES ON Alfred BOURGEOIS
CASE FOR INEFFECTIVE COUNSEL'S OF RECORD

USCA5 4506

11.2010 **REASONS FOR RELEASE OF DUTIES**

(1) COUNSEL'S WERE POORLY UN-PREPARED by NUMEROUS SUBPOENAS going to JAILHOUSE INFORMANT'S WERE all SENT to BAD ADDRESSES IS JUST DISTURBING AND, VERY SUSPICIOUS, DUE to the IMPORTANCE OF BRADY Claims AS OUTLINED IN PETITIONERS BRIEF WHEREAS MR. BOURGEOIS HAD NO CONTROL OF AND IS NO FAULT OF PETITIONER, COUNSEL'S OF RECORD WERE INEFFECTIVE.

(2.) **LACK OF MIS-TRUST**
MR. BOURGEOIS OBSERVED that COUNSELS OF RECORD took FALSE STATEMENT'S OF A FAMILY MEMBER whom WROTE THE GOVERNMENT IN RESPOND TO STATEMENT'S Lloyd FERINAND, JR did NOT say, JUDGE JACK so that you know MANY WITNESSES ARMS ARE BEING TWISTED TO BOLSTER Up A MENTAL CLAIM that MR. BOURGEOIS CARE LESS about with NUMEROUS SERIOUS LEGAL ISSUES ARE BEING OVERLOOKED TO BOLSTER A MENTAL CLAIM WHEREAS COUNSELS OF RECORD ARE PLACING THEIR OWN BEST INTEREST INSTEAD of THEIR CLIENT WITH MY LIFE AT STAKE. MANY WITNESSES ARE BEING DRAGGED INTO COURT WHEREAS MR. BOURGEOIS HAS NO IDEA what they're going to TESTIFY About and SEVERAL I had no IDEA they WERE TESTIFYING becouse MR. BOURGEOIS have been BARRED from REVIEWING THEIR STATEMENT'S and SEVERAL I COMPLETELY DISAPPROVE and had any KNOWLEGE about what they WERE TESTIFYING about by NO MEANS WHATSOEVER IS JUST DISTURBING, all this FOR A MENTAL RETARDATION CLAIM.

USCA5 4507

## PAGE 3

TERMINATE AND DISMISSAL OF SERVICES
To: Honorable JUDGE JACK

(3) MR. BOURGEOIS cannot have an EFFECTIVE APPEAL's IF COUNSEL'S OF RECORD ARE COMPLETELY BANNING THEIR CLIENT FROM REVIEWING INVESTIGATIVE REPORTS OF Defendant Own WITNESSES BEFORE bringing these people to COURT, I AM BEING VIOLATED TO EFFECTIVE COUNSEL's which IS UN-Constitutional AND VIOLATES MR. BOURGEOIS SIX Amendment REGHTS. SEVERAL WITNESSES have already TESTIFIED That MR. BOURGEOIS DIS·approve OF because OF CRIMINAL HISTORY and others REALLY don't know MR. BOURGEOIS AS WELL as already have BEEN described, I WILL NOT TOLERATE this all for a MENTAL Retardation CLAIM I CARE LESS About, for Example BEVERLY FRANK DOES not know MR. BOURGEOIS BY NO MEANS, and I TOLD COUNSEL's OF RECORD this Long before they USED her, I FEEL AS MR. BOURGEOIS HAS NO VOICE IN THE BAD DECISIONS AND VERY POOR Judgement's BEING MADE and HAVE ALREADY BEEN MADE IN REFGRENCE TO MY LIFE AT STAKE.

(B)
CLAUDIA WilLIams and I DID not GREW up as close as she described and By NO MEANS helped MR. BOURGEOIS with HOME WORK OF No-KIND, though SHES my sister she and I BY NO MEANS ARE CLOSE and did not grow up IN THE SAME house UNtil my TEEN age YEARS, I WILL NOT TOLERATE this ...

USCA5 4508

Page 3b

HONORABLE JUDGE Jack, Just so you know as I SAID ON the VIDEO Cam with DR. PRICE IN April 2010, MR. BOURGEOIS was CLOSER to Lloyd FERINAND JR, and my BABY SISTER MICHELLE (WARREN) by NO MEANS I WILL Support BEVELY FRANK TESTimony, SHE DO NOT KNOW MR. BOURGEOIS. I DO NOT Support Claudia WILLIams TESTimony By NO MEANS, for WE WERE NEVER close, WE GREW UP IN TWO DIFFERENT PLACES AND Again MR. BOURGEOIS DO NOT Support CARL HENRY Testimony By NO MEONS, NO-ONE CONFRONTED MR. BOURGEOIS about any of these WITNESSES. JUDGE JACK AS for MR. KERRY BROWN I also DO NOT SUPPORT HIS TESTImony By NO MEANS, again A Lot of ARMS have BEEN TWISTED all for A MENTAL CLAIm and MR. BOURGEOIS Will NOT and Cannot Support Any OF This, AND I DISAPPROVE OF Each OF THESE TESTimony for SERIOUS REASONS, NO·ONE from my DEFENSE TEAm CONFRONTED MR. BOURGEOIS about any of what these foresaid PEOPLE were gonna say, Alfred BOURGEOIS was NOT and have just REVIEWED these INVESTIGATIon REPORTS and DID NOT HAVE ANY KNOWLEGE ON and UPON THE Day all FOUR TESTIFIED, again I Cannot TOLERATE any of this Just for A MENTAL CLAIm that MR. BOURGEOIS CARE-LESS About with my LIFE AT STAKE and many more SERIOUS LEGAL ISSUES UN-RESOLVED, If COUNSEL'S OF RECORD spent more TIME ON SERIOUS LEGAL ISSUES as they DID with A MENTAL CLAIm would BE a more Successful APPEALS, they're INEFFECTIVE.

USCA5 4509

<u>PAGE 4</u>

TO: HONORABLE JACK.

(4.)

COUNSEL'S OF RECORD ARE NOT BY NO MEANS PLACING MR. BOURGEOIS BEST OF INTEREST by placing A MENTAL Retardation CLAIM OVER SO much AT STAKE with MR. BOURGEOIS LIFE. COUNSEL'S OF RECORD DO NOT HAVE MR. BOURGEOIS APPROVAL IN USING Such WITNESSES As BEVERLY FRANK who I only KNEW at 5 year old when I LIVED with her GRANDmother IN 1969. IN 1971 I was 7 year old and did not SEEN BEVERLY FRANK again until I married ROBIN BOURGEOIS IN 1995, as for Claudia Williams and I have never ever gotten close as small children and other REASONS to shame to talk about, but this why I'm so DISappointed, FRUSTRATED, and UPSET Judge JACK BECAUSE VERY POOR Judgement's as well as BAD DECISIONS are Completely BEING Made and MR. BOURGEOIS am the ONE gonna get blame when things Blow Up, I SEE this coming as with Trial COUNSEL John Gilmore have already TESTIFIED PER HEARING I told Him to USE CARL HENRY IN my PUNISHING Phase, I DISapprove CARL HENRY then, I MR. BOURGEOIS DISapprove EVEN upto this Day because I know CARL HENRY backgRoUND as A CONVICTED FELONY of INSURANCE FRAUD SO WHEN these COUNSEL'S do not let their CLIENT REVIEW Investigative Reports NOR allow their CLIENT have A Voice before making VERY POOR BAD Judgement's then ALFRED BOURGEOIS gets all the Blame, well HE TOLD me when I DISapprove; and will not TOLERATE this any longer fighting for my LIFE AT STAKE. COUNSEL'S OF RECORD ARE INEFFECTIVE IN this APPEAL PROCESS.

USCA5 4510

11-2010 TERMINATE and DISMISSAL OF SERVICES

To: HONORABLE JUDGE JACK

(5) For Example as with another Witness that MR. BOURGEOIS DISAPPROVED from Day ONE.

Claudia Williams. Is Alfred Bourgeois sister only by Blood of my Abusive Mom Esther Bourgeois. As A child Claudia and MR. Bourgeois had a very Enstranged Relationship. As she broke down crying Per Evidentiary Hearing about how my mom cut off the edge of Alfred Bourgeois finger and also the Bloody Baths but what Claudia failed to say is she was so DECEITful as a Child where as she would only come by my mom only on the WEEKENDS, she would get Into mis-deceptive behavior where she gets Into Trouble and put the blame on Alfred which she contributed to this Physical Abuse then take off for the full WEEK. Claudia Ferinand and I by no means are close and even as a grown lady WE have had many Disputes over Money she borrowed from MR. Bourgeois then when it's time to pay back she picks a Fight, and another Shameful Situation she and I are at each other Throats because I Disapprove of which caused serious Friction with other Family members, but I Disapprove of Claudia Williams Testimony all together because WE are not and never will be close by and from Un-Related Circumstances to this Case by all means and the situation WE both have FRICTION about goes FAR beyond the Alfred Bourgeois Case, It's A "Personal Family Dyfunction and Serious Dispute Un-RESolved BY All Means." Claudia has never lived with Miss Mary in the years MR. Bourgeois lived there at age 5 IN 1969 until her Death in 1981 when MR. Bourgeois WAS 17 years old, If my sister can't USE you for her Benefit, then you are her worst NIGHt-more. WE fl Not agree at all

USCA5 4511

USCA5 4512



NAME: Alfred Bour____

LEG# _____

FEDERAL TRANSFER CENTER

P.O. BOX 898801

OKLAHOMA CITY, OK 73189-8801

OKLAHOMA CITY OK 731__

LEGAL MAIL

Honorable ____

United States District ____

Suite ____

1133 North Shoreline Boulevard

Corpus Christi Tx
                    78401

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____
                                                    :
UNITED STATES OF AMERICA,            :            No. Cr-C-02-216
                                                    :            No. Cv-07-223
                     Respondent,            :      Honorable Janis Graham Jack
                                                    :              U.S.D.J.
          -against-                                 :
                                                    :          Electronically Filed
ALFRED BOURGEOIS,                       :
                                                    :
                     Petitioner.                   :
_____    :

**NOTICE OF FILING**

PLEASE TAKE NOTICE that Alfred Bourgeois, through counsel, hereby files the trial depositions of William Russell Oliver, M.D. and Manfred Schenk, each taken on October 28, 2010. These transcripts were received in counsel's office on November 16, 2010.[1]

Respectfully Submitted,

/s/ Michael Wiseman
_____
Michael Wiseman
Counsel for Petitioner

Dated:        November 17, 20
                  Philadelphia, PA

_____

[1]Counsel also received videotapes of each deposition. He is inquiring of the Court's deputy as to the best manner in which to accomplish filing of the tapes.

**USCA5 4513**

**Certificate of Service**

I, Michael Wiseman, hereby certify that on this 17th day of November, 2010, I served the foregoing on the following persons by ECF filing:

Tony Roberts
Patti Booth
Mark Dowd
Elsa Salinas-Patterson
Counsel for the Government

/s/    Michael Wiseman
_____
Michael Wiseman

USCA5 4514

184256 eb

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

UNITED STATES OF AMERICA *
            Respondent,   *
against                   * No. Cr-C-02-216
                          * No. Cv-07-223
ALFRED BOURGEOIS          *
            Petitioner.   *

VIDEOTAPED DEPOSITION OF
WILLIAM RUSSELL OLIVER, MD, MS, MPA

UPON RECEIPT OF SIGNATURE, THE ORIGINAL OF THIS
DEPOSITION WILL BE IN THE CUSTODY OF:
James McHugh, Esquire
Federal Community Defender Office
For the Eastern District of Pennsylvania
Defender Association of Philadelphia
601 Walnut Street, Suite 540 West, Curtis Building
Philadelphia, PA  19106

Date                 Edith A. Boggs, CSR

10-28-10             HOUSTON, TEXAS



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4515

DEPOSITION OF WILLIAM RUSSELL OLIVER, MD, MS, MPA

DEPOSITION AND ANSWERS of WILLIAM RUSSELL OLIVER, MD, MS, MPA, taken before Edith A. Boggs, a certified shorthand reporter in Harris County for the State of Texas, taken at the offices of Esquire Deposition Solutions, 1221 Lamar Street, Suite 1305, Houston, Texas, on the 28th day of October, 2010, between the hours of 11:39 a.m. and 1:49 p.m.



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4516

           A P P E A R A N C E S


       ATTORNEY FOR PETITIONER:
           Federal Community Defender Office
           For the Eastern District of Pennsylvania
           Defender Association of Philadelphia
           601 Walnut Street
           Suite 540 West, Curtis Building
           Philadelphia, PA  19106

           BY:  JAMES MCHUGH, ESQUIRE

       ATTORNEYS FOR RESPONDENT:
           U.S. Department of Justice
           United States Attorney's Office
           919 Milam, Suite 1500
           P.O. Box 61129 (77208-1129)
           Houston, Texas  77002
           BY:  TONY R. ROBERTS, ESQUIRE
           AND MARK M. DOWD, ESQUIRE

           AND

           U.S. Department of Justice
           United States Attorney's Office
           800 North Shoreline, Suite 500
           Corpus Christi, Texas  78401
           BY:  PATTI BOOTH, ESQUIRE
           AND ELSA SALINAS, ESQUIRE


       ALSO PRESENT:

           Ms. Kathrin Hennig
           Mr. Sean Pieternelle, Videographer

       REPORTED BY:
           Ms. Edith A. Boggs



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4517

William Russell Oliver, MD, MSc, MPA                    October 28, 2010

4

                              EXAMINATION INDEX

        QUESTIONS BY                                    PAGE

        Mr. Dowd                                        5

        Mr. McHugh                                      11

        Mr. Dowd                                        17

        Mr. McHugh                                      37

        Mr. Dowd                                        97

        Mr. McHugh                                      106


                           INDEX OF EXHIBITS


        NO.    MARKED    DESCRIPTION

        P-127  52        2002 version of the SWGIT guidelines for
        Recommendations and Guidelines for the Use of Digital
        Image Processing in the Criminal Justice System
        P-182  66        Excerpt from Workshop #19, Forensic
        Image and Video Processing

        P-183  73        SOP from the FBI

        P-184  86        Excerpt from Workshop #6, So You Think
        You Know Digital Imaging?  SWGIT Advice to All AAFS
        Disciplines

        P-185  116       Workshop #19, Forensic Image and Video
        Processing
        P-186  116       Workshop #6, So You Think You Know
        Digital Imaging?  SWGIT Advice to All AAFS Disciplines



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4518

William Russell Oliver, MD, MS, MPA                    October 28, 2010

5

PROCEEDINGS

THE VIDEOGRAPHER:  Today's date is October 28th, 2010.  The time is approximately 11:39.  We are now on the record.

(Whereupon, the witness was placed under oath by the court reporter.)

MR. DOWD:  All right.  And this is the deposition of William R. Oliver, MD, MS, MPA, and my name is Mark Dowd.  I'm with the United States Attorney's office in the Southern District of Texas.

And if there's no other objections, I'll go ahead and proceed.

WILLIAM RUSSELL OLIVER, MD, MS, MPA

was called as a witness and, being first duly sworn by the notary, testified as follows:

EXAMINATION

Q.   (BY MR. DOWD)   Sir, would you state your full name and spell your last name for the record, please.

A.   Sure.  I'm William Russell Oliver, O L I V E R.

Q.   All right.  Dr. Oliver, and let me, first of all, start with your educational background.  Could you advise us of your educational background?

A.   Sure.  I received a bachelor's degree in microbiology from the University of Oklahoma.

Following that, I went to Vanderbilt School of



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

USCA5 4519

William Russell Oliver, MD, MSc, MPA                    October 28, 2010

6

Medicine in Nashville, Tennessee where I received my medical degree.

Following that, I went to the University of North Carolina at Chapel Hill where I simultaneously did a residency in anatomic and clinical pathology, fellowship in forensic pathology and graduate school in computer science.

At the end of that, I received a master's degree in computer science with an emphasis on image processing and computer vision under Steve Pizer there.  Then -- and also the fellowship in forensic pathology.

From there, I went to -- oh, wait a minute. That's about it for -- oh, wait a minute.  Sorry.  One more thing.

Then I guess it would be 2003, I received a master's degree in justice administration from Columbus State University in Columbus, Georgia.  Also during that period, I've gone to various training programs in programming and such as that.

Q.  Relating to computer programming?

A.  Related to computer science, yes.

Q.  Computer science.  All right.  And what has been your professional background?

A.  My professional background, following my training, I went to the military and was a staff



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4520

pathologist in the Department of Molecular Pathology at the Armed Forces Institute of Pathology, as well as a deputy medical examiner with the Office of the Armed Forces Medical Examiner.

While with the -- while with the Armed Forces Institute of Pathology, I was also the head of the digital image processing laboratory there.  My job tasks were primarily having to do with image processing and visualization issues, writing visualization algorithms for confocal microscopy and --

Q.  Say that again.

A.  Visualization algorithms for confocal microscopy, C O N F O C A L, which is just a type of three-dimensional microscope.  And I was doing three-dimensional -- writing algorithms to allow people to see what we saw in three dimensions --

Q.  Okay.

A.  -- as well as doing image analysis issues and image processing and enhancement for the Office of the Armed Forces Medical Examiner, dealing primarily with hostage issues, terrorism and force protection issues.

From -- after spending 12 years at the Armed Forces Institute of Pathology both as an active duty officer and as a civilian Department of Defense employee, I then went to the Georgia Bureau of



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4521

William Russell Oliver, MD, MSci, MPA                    October 28, 2010

8

Investigation and was regional medical examiner for North -- Northwest Georgia.

Following that, I was recruited as a tenured full professor at Brody School of Medicine at East Carolina University where I am now professor of pathology and director of autopsy, forensic services at Brody School of Medicine, East Carolina University.

Q.   All right.  Oh, go ahead.  Did I cut you off?

A.   Well, and during this period, I was also network administrator for the scientific computing network at the Armed Forces Institute of Pathology.

Q.   And -- and what is your present employment?

A.   I am professor of pathology and director of autopsy and forensic services at Brody School of Medicine, East Carolina University.

Q.   And do you also serve as a medical examiner?

A.   Yes.

Q.   And in what area?

A.   I serve 22 -- approximately 22 counties in Northeastern North Carolina.

Q.   All right.  Are you a member of any professional organizations?

A.   Yes, I am.

Q.   And what are those?

A.   They include the American Academy of Forensic



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4522

Sciences, the National Association of Medical Examiners, the Institute of Electrical and Electronic Engineers, the Association for Computing Machinery, the Association of Old Crows, which is an electronic warfare group.  I see a smile there.  Let's see.  And the American -- sorry -- the College of American Pathologists and the Association -- American Society of Clinical Pathology.

Q.  All right.  And do you hold any professional certificates, licenses, awards?  Have you contributed to any publications in the area of forensic pathology or forensic imaging?

A.  Yes, I have.

Q.  And what are those?

A.  I am licensed to practice medicine in Georgia and North Carolina.  Awards I've received include the Government Computing News -- one of the Government Computing News 100 most influential IT professionals in the late 1990s, I think it was 1998.  I was a finalist for the Berry Prize in military medicine, again, in '98 or '99.

Q.  And what is that?

A.  That's just an award for contributions in military medicine --

Q.  All right.

A.  -- given out by the federal government.  I


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4523

William Russell Oliver, MD, MSc, MPA                October 28, 2010

10

received a commendation for work I did after 9-11 in evaluation of the Pentagon attack, and I received a letter of commendation from Janet Reno for my work in image processing in the Rodney King case way back in 1992.

Q.   What was your contribution regarding the Pentagon attack?

A.   I was one of the pathologists that did the autopsies on the victims.

Q.   Okay.

A.   Let's see.  That was -- that was awards.

Q.   Those are awards.

A.   What were some of the other --

Q.   Okay.  What about publications?

A.   Oh, publications.  I've been published in a number of journals -- oh, sorry.  Okay.  Stop moving. Okay.

I've been published in a number of journals, including the Journal of Forensic Sciences, the American Journal of Forensic Medicine and Pathology, the International Journal of Intelligence and Counter Intelligence and the Journal of Surgical Oncology, Journal of Sex and Marital Therapy and a number of IEEE and SPIE proceedings.

Q.   All right.  Now, could you describe your



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4524

background and experience as relates to photo or image enhancement and related disciplines?

A.   Sure.  As I said, I have a master's degree in computer science with an emphasis on computer vision and computer science.  I -- I did image enhancement and image analysis professionally for the military for 12 years.  I lecture and teach on image analysis and image processing.  For instance, I give a workshop -- part of a workshop every year at the American Academy of Forensic Sciences and lecture extensively on it.

Q.   All right.  And have you previously been qualified as an expert in forensic pathology and forensic imaging?

A.   Yes, I have.

Q.   Okay.  And could you tell us on how many occasions?

A.   Actually, no.  I didn't -- I never kept track while I was in the Army.

Q.   All right.

MR. DOWD:  We would -- we would -- we would offer Dr. Oliver as an expert in forensic pathology and forensic imaging.  Any objection?

MR. MCHUGH:  Let me ask some questions.

MR. DOWD:  Go ahead.

EXAMINATION



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4525

Q.  (BY MR. MCHUGH)  Good morning, Dr. Oliver.

A.  Good morning.

Q.  I wanted to focus in on some training that you've received.  What training have you received in digital imaging process?

A.  It was essentially the primary focus of my master's degree.

Q.  So -- and when was that?

A.  That was 19 -- I want to say 1990.

Q.  Okay.  And --

A.  And following that, I also have received training in programming various image processing packages and evaluating images that way.  So, if you -- unfortunately, I don't have my CV handy but AVS programming, AVS Express programming, things like that, Open GL programming.

Q.  Well, I'd ask you to be more specific.  You said you had your master's --

A.  Uh-huh.

Q.  -- and you did digital imaging processing?

A.  Right.

Q.  And then you said you had received additional training but can you specifically tell us where and what -- who was that from?

A.  Sure.  AVS training was from AVS.  AVS --



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4526

Q.  And what's AVS?

A.  Advanced Visualization Systems.

Q.  And who --

A.  It is a -- it is a -- it is a company that does visualization software that basically is a tool kit that you build visualization software out of.

Q.  Okay.

A.  Okay.  AVS Express training, Open GL training. Open GL is a -- again, it's an API programming interface for doing three dimensional graphics in the computer. It's --

Q.  Now, are you going to trainings or are you -- are you simply receiving these materials in the mail?  Are you actually --

A.  No.  I went to the training.

Q.  Went to the trainings to then use these programs; is that right?

A.  Yes.

Q.  Okay.  The --

THE VIDEOGRAPHER:  Excuse me, Counsel, do you have your mic on?

MR. MCHUGH:  It's right here.  Sorry.

Q.  (BY MR. MCHUGH)  So -- so, that's your -- so, your digital image training is your master's degree?

A.  Uh-huh.


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4527

William Russell Oliver, MD, MSc, MPA                    October 28, 2010

14

Q.  And then these other subsequent trainings that you went to; is that right?

A.  Yes.

Q.  Okay.  Now, what about enhancing images from digital images, enhancing digital images, did you study that at any time in school?

A.  That's part of that.

Q.  That's -- so, the enhancement you also studied in your master's program?

A.  Yes.

Q.  And when you say that was part of your master's program, were you actually taking courses in enhancing of images or were you studying that?

A.  I was actually taking courses.

Q.  All right.  And do you recall the names of those courses?

A.  No, but I can -- no, but I can tell you that, for instance, my advisor was Steve Pizer, who developed the Contrast-Limited Adaptive Histogram Equalization.

Q.  Right.  And -- now, as far as employment, with the digital imaging process, where have you been employed where you've used the digital imaging process?

A.  At the Armed Forces Institute of Pathology.

Q.  Okay.  And was that the primary focus of your job?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4528

A.   It was about 70 percent of my job.

Q.   Okay.  And what was the other 30 percent?

A.   Forensic pathology.  Standard regular forensic pathology.

Q.   And what were you -- what digital images were you using at the Armed Forces Institute?

A.   I was using surveillance images.  I was using images from autopsies.  I was using remote sensing images.  I was using data from microscopy, like confocal microscopy images.

Q.   And how about employment where you were enhancing digital images, same question as --

A.   And the same answer.

Q.   So, it would be the Armed Forces Institute?

A.   Right.

Q.   So, when you were being trained, you were being trained at the same time in both digital process -- imaging processing as well as enhancement?

A.   Yes.

Q.   And then in your employment, it was at the Armed Forces Institute, both enhancement and digital imaging process --

A.   Yes.

Q.   -- is that right?

Besides the Armed Forces Institute -- and by the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4529

way, what years were you there, if you recall?

A.   1990 to 2003.

Q.   Okay.  And besides that 13-year period, have you ever been employed in an area where you were using digital enhancing images, things of that nature?

A.   I've done it as part of my work off and on while at the GBI and at U -- and at ECU and, in addition, I did it as a private consultant.

Q.   Okay.  And would that be as an expert witness?

A.   Yes.

Q.   Private consultant.  Okay.  What is the breakdown of the -- you've testified in court many times; is that right?

A.   Yes.

Q.   Okay.  What is the breakdown as far as testifying for the defense versus the government, if you are able to make an approximation?

A.   Mostly for the prosecution.  Oddly enough for -- when I consulted for the defense, it usually ended up not going to trial.

Q.   Okay.  But the -- would it be over 50 percent?

A.   Oh, no.  No.  No.  It would probably be 80 to 90 percent for prosecution.

Q.   Okay.

MR. MCHUGH:  I have nothing further.


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4530

William Russell Oliver, MD, MPA                    October 28, 2010

17

MR. DOWD:  Okay.  Do you object to the doctor's qualification?

MR. MCHUGH:  No, I do not.

MR. DOWD:  Okay.

FURTHER EXAMINATION

Q.  (BY MR. DOWD)  Dr. Oliver, in -- in the case before the Court, United States versus Bourgeois, were you asked to review autopsy photos and to identify and count injuries depicted on those photographs?

A.  Yes, I was.

Q.  All right.  And in connection with that, did you -- did you have -- did you enhance these photographs for the purpose -- for the purpose of identifying or actually drawing attention to these particular injuries?

A.  I used it for image exploration.

Q.  Explain, if you would, briefly what that entails.

A.  All right.  In image analysis, one of the problems is frequently not whether or not data is present in an image.  The problem is whether or not the analyst notices the data in an image.

To give sort of a classic trivial example, many magazines have these little puzzles where they'll have two pictures side by side -- excuse me -- they'll have two pictures side by side or one above the other and the question will be, "What are the differences between this


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4531

18

picture and that picture," and you'll have one where the hem of a skirt will be a little higher or one tire will be black wall instead of white wall.

THE WITNESS:  Thank you very much.

A.   And it will become -- you know, it becomes not an issue of whether or not the data is present in the image, it becomes an issue of whether or not the analyst or, in this case the person reading the magazine, notices all of these differences.

So, it is not uncommon for image analysts to manipulate images in many different ways in order to bring features -- to make features more apparent or less apparent in order to essentially break out of the perceptual boundaries that come from looking at images.

Very frequently when people look at an image, they expect to see certain things, and so, they either do or they don't.  And what you need to do is you need to sort of break out of that.

And in -- in the intelligence community, they use what are called light boxes in which they'll have a picture that's displayed on an image and they'll magnify it and change the contrast and move it around and crop it and turn it upside down and all sorts of other things in order to modify how people look at the image.  That's called image exploration.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4532

William Russell Oliver, MD, MSCJA                    October 28, 2010

19

And then what you do is if you notice something in the image, then you go back to the original and you say, "Well, wait a minute.  Is this something real or is this something that is an artifact or -- or what is it?" And then you go back to the original image and do your interpretation.

Q.  (BY MR. DOWD)  All right.  So, the thrust of your presentation was to draw the jury and the judge's attention to a particular aspect of a photograph --

A.  Yes.

Q.  -- of an injury that you identified on the original?

A.  Yes.

Q.  Okay.  Now, what method did you ultimately use to demonstrate these -- these aspects to the jury?

A.  The illustrations I used had been modified using Contrast-Limited Adaptive Histogram Equalization.

Q.  All right.  And can you give us just a brief description of what that is?

A.  Sure.  You can break it down by the -- by the -- by the name.  It's a contrast enhancement method, which means that it takes features -- some features in an image and it changes their relative importance.  It makes some more -- more obvious and some less obvious.

Many methods of contrast adjustment do so by



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4533

manipulating the histogram, and there are numerous ways of doing that.

Q.   And the histogram is what?

A.   The histogram is simply a graph or collection noting the number of pixels at a given gray scale or at a given color.  The most -- the most classic and simplest is what's called a histogram stretch.  If you can imagine that your display goes from zero to 255 but you took an image that's low contrast, and so, when you display it, it only goes from 50 to 150, okay, histogram stretching will take that 50 and move it down to zero and the 150 and move it up to 255 and multiply everything else to fit the same pattern between the two so that the darks are darker and the brights are brighter and everything is more obvious in between.

Histogram equalization makes the assumption that everything in the contrast is best achieved when all of the bends in the histogram have the same number of pixels, and so, it attempts to do that, and that's called histogram equalization.

The problem with histogram equalization is that one part of the image may be very bright and one part of the image may be very dark.  And so, you end up losing contrast in both because all the bright pixels are eaten up there and all the dark pixels are eaten up over



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4534

William Russell Oliver, MD, MSci, MPA                    October 28, 2010

21

there.

So, adaptive methods attempt to do their processes on local regions in the image.  Okay?  And those are called adaptive methods.  And so, adaptive histogram equalization applies a histogram equalization to local regions in the image to increase contrast everywhere.

It was originally developed for use in x-rays and CT scans.  One of the problems with CT scans, you know, computed tomography, and most people are familiar with that, is that there is a lot more data in a CT scan than can be displayed, so that if you want to look at the bone and see the details in the bone and you move the contrast over to look at the bone, then the lungs are all black.  In contrast, if you want to look at the lungs and you move -- you fix the contrast so that you can see what's in the lungs, then the bones are all white, and that's called windowing.

In other words, because you've got -- let's say you have data from zero to a thousand but you can only see in the display from zero to 200, then you just take that window from zero to 200 and move it up and down that scale of 1 to -- zero to a thousand.

So, people said, "Well, wouldn't it be better if you could show the appropriate part of the image in the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4535

William Russell Oliver, MD, MPA                    October 28, 2010

22

appropriate window, the bone in the bone window and the lung in the lung window and the soft tissue in the soft tissue window."

And so, that's why it was -- these adaptive methods were developed was to look at a place and say, "Oh, wait a minute.  This should be in the bone window," and do the visualization as if it were in the bone window, move over and say, "Oh, wait a minute.  This is in the lung window.  This is lung, so, it should be in the lung window."

Q.  All right.  And how long is this contrast enhancement technique that you're describing -- how long has that been in use in the medical field and in photography?

A.  Since the mid to late 1980s.

Q.  All right.  And is it -- is it -- well, let me ask you this:  Why did you use that method in your presentation to the -- to the jury?

A.  Because I -- I thought it might be helpful for them to help them notice things.

Q.  All right.  And what -- what does this contrast method do that would help or assist the jury to notice what you're drawing their attention to?

A.  It makes features a little bit more -- it sometimes makes features a little bit more -- more



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4536

23

obvious.

Q.  Okay.

A.  Okay?  It's essentially -- the problem one -- I could have -- I could have just as easily, for instance, used line drawings but the problem with using line drawings or -- or I could have hired an artist to paint it and -- but the problem with doing both of those things is that sometimes there's a perceptional difficulty with going from the line drawing back to the original image but if you change the contrast and -- so that the actual feature becomes more obvious, then in looking back at the original image, it's a little bit more easy to do the comparison and say, "Oh, yes, that's what he's talking about."

Q.  Okay.  Now, in your -- in your -- you said that you counted the injuries?

A.  Yes.

Q.  And did you make that count from the original autopsy photos?

A.  Yes.

Q.  You didn't use the -- your -- let's -- let's say your enhanced images to count injuries?

A.  No.  I used the enhanced -- I used the enhanced images to draw my -- I mean, I used the enhanced images basically to draw my attention to things and then went



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4537

back to the original image to discern whether or not it was an artifact or whether it was something else.

Q.  All right.  And did you suggest that -- that -- that same procedure to the jury and to the judge, to go back to the original to identify the actual injuries?

A.  Yes.

Q.  Okay.  Now, what about Mr. Schenk's claim that the numerous layers of modification of -- the original photo underwent creates a situation where the known or potential rate of error is impossible to determine?  And he's talking about going from the original print to the digitized version and then to the enhanced version.

A.  That -- the statement that there is -- that the rate of error is unknown implies there's a specific test for which there is a rate of error.  Since no test was done based on the enhanced image, then there -- then it's -- the question essentially does not apply.

Q.  Okay.  What about Mr. Schenk's claim that the lossless compression is the scientific standard and that your use of the lossey compression fails that standard?

A.  The -- there -- there are a couple of issues with that.  The first is that, once again, there's a difference between a demonstration and a medical illustration and the images that I actually did the work on -- I mean, that I actually looked at.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4538

William Russell Oliver, MD, MSc, MPA                    October 28, 2010

25

So, the prints that I received, obviously, were prints. They're not -- they're not compressed at all. The images that were taken with the digital camera that Dr. Rouse -- that Dr. Rouse took, the JPEG was the native format. There is always loss of information when you change to JPEG format.

The question -- the fact of the matter is, particularly with received imagery, is that you have what you have. And so, with the imagery that Dr. Rouse gave me, they were taken with JPEG images.

It turns out that most forensic pathologists take their imagery with JPEG images, and I do as well. There are practical reasons for that. And the primary practical reason is that the features that you are taking photographs of are adequately demonstrated using JPEG images.

Q. All right. So, just to understand the -- the -- the process here, Dr. Rouse took 35 millimeter photos at the autopsy scene and then stored those and sent those to you in JPEG format?

A. No.

Q. Okay. Go ahead and explain that.

A. There were two -- there were two sets of imagery that I received. One was a set of photographic prints and the other was a set of JPEG images on a disk.



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4539

William Russell Oliver, MD, MSc, MPA                October 28, 2010

26

Q.   Okay.  And --

A.   They were -- they were disjoint sets.  They were different groups of images.

Q.   All right.  And you made your -- your count of the injuries and your identification of injuries on the prints that you were sent?

A.   I used -- I used both.

Q.   Okay.

A.   The prints were the most useful.

Q.   Okay.  All right.  What about Dr. -- Mr. Schenk's claim that the original 35 millimeter photos were the best evidence and that your digitized unenhanced images were not the equivalent of the best evidence?  Let's start with the first part of it --

A.   Okay.

Q.   -- that the 35 millimeter photos were the best evidence.

A.   Well, the 35 millimeter photos were what I received.

Q.   Uh-huh.

A.   And -- and, in fact, yes, they -- they are the best evidence, and that's what I used for making my conclusions.

Q.   Okay.  And then as far as the -- your digitized unenhanced images, then you digitized those?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4540

A.  Right.  I then digitized them, and that's what I used as the basis for the image exploration thing that I talked about and also for creating the demonstration for court.

Q.  All right.  And what about his claim that those unenhanced -- those digitized unenhanced images were not equivalent to the best evidence or to the original prints?

A.  That's absolutely correct.

Q.  Okay.  But did you use the -- your digitized version to count the injuries or to identify injuries on the -- on the child?

A.  No.  The -- the Power Point presentation was my report.

Q.  Okay.  And did you suggest to the jury or to the judge that they -- they should use the digitized -- the unenhanced digitized version to count the injuries or to identify injuries on the child?

A.  The -- the -- what -- what I suggested to them is that if they could not see the images, see the injuries on the images, then they should not believe me.  Even -- even with the degraded images that were present in the Power Point, the injuries were still present, just as -- as you -- as you saw on the image in the previous testimony.



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4541

William Russell Oliver, MD, MSc, MPA                    October 28, 2010

28

Q.  Okay.  And what about Mr. Schenk's claim that you could not substitute enhancement for details lost during the digital conversion?

A.  That's correct.

Q.  And what about his claim that the technique that you used -- that you used is neither well known, regulated, regarded or accepted within the U.S. or international forensic community?

A.  Well, certainly to the degree that medicine is a -- is -- is forensic, it certainly has both a long and extensive history of use and an extensive history in the peer-reviewed literature.

Q.  All right.  And what about Mr. Schenk's claim that the -- you said going back to the '80s?

A.  Yes.

Q.  What about Mr. Schenk's claim that the method used by you had not been tested and had not been suggested to -- subjected to peer review and publication in the medical community?

A.  There is a long history of publication about this method in both the computer science and the medical literature.

Q.  Okay.  Involving both medical imaging or x-rays as well as --

A.  As well as --



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4542

William Russell Oliver, MD, MSci, MPA PageID #: 6436                    October 28, 2010

29

Q.  -- photographic enhancement?

A.  As well as -- photographic -- as well as photographs of fungi, photographs of blood cells, photographs of all sorts of stuff.

Q.  Okay.  Now, there are limitations in counting injuries from photographs, it's not the same as being at the autopsy and seeing -- seeing the body, correct?

A.  Yes.

Q.  Okay.  And did you discuss -- did you discuss that limitation with the Court and with the jury?

A.  Yes, I did.

Q.  Okay.

MR. DOWD:  And for the record, I think that occurred on day 5 at Page 196 in the transcript.

Q.  (BY MR. DOWD)  If you came across an area which contained a large bruise that could have resulted from numerous bruises or numerous impacts on that -- on that singular area, did you ever count that as multiple bruises or did you always count that as a single bruise?

A.  When there was some data, I counted them as individual -- as single bruises.

Q.  Okay.  Now, there -- there was an objection at trial as far as the prejudice of the use of your presentation before the jury, right?

A.  As I remember.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4543

30

Q.  As a Rule 403 objection.  Did you use or did you attempt to use either your digitized versions of the original prints or your enhanced versions to supplant or replace the original prints that -- that were before the Court?

A.  I don't know what that means.

Q.  You digitized the prints --

A.  Uh-huh.

Q.  -- as far as the Power Point presentation and then you enhanced those?

A.  Yes.

Q.  To demonstrate or direct the jury's attention to particular areas to -- to identify injuries?

A.  Right, just to draw attention to things.  Right.

Q.  Right.  But did you ever suggest that they should use those instead of the original autopsy photographs --

A.  No.

Q.  -- to identify or count any injuries?

A.  No.

Q.  Okay.  And so that the -- your use of the digitized versions and the enhanced versions were just an aid to the jury to help them direct their attention to the area where you believed an injury had occurred?

A.  Yes.

Q.  Okay.  And did you point that out to the Court



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4544

PageID #: 6438

31

and to the jury on a number of occasions during --
during the trial?

A.  Yes.

Q.  Okay.  Now, on -- I'm referring to Mr. Schenk's
report of May 11, 2007.  On Page 2, he suggests that you
used the enhanced photographs to identify the numerous
issues you discussed in your testimony, and he
identifies 25 to 26 whip marks, 78 healed scars, 73 to
105 nonspecific contusions, 8 pattern contusions, 9 to
10 abrasions, on and on.  And then, again, did you --
did you count any of the injuries that you didn't see on
the original autopsy photos?

A.  No.

Q.  Okay.  Mr. Schenk suggests that you counted
injuries that were not visibly present in the original
photographs.  Is that an accurate assessment?

A.  No.

Q.  Okay.  Mr. Schenk suggests that to test the
accuracy of the enhanced photographic method that you
used, you have to compare them to the original photos.
However, Mr. Schenk suggests that you never compared the
enhanced -- the enhanced photos to the originals, you
only -- you only compared them back to your digitized
versions.  Is that -- is that correct?

A.  It is correct that's what he says.  His statement



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4545

William Russell Oliver, MD, MPA October 28, 2010

32

is incorrect.

Q. That's not what you did?

A. That is not what I did.

Q. Okay. I don't want to get into too much -- too technical here but what is the -- what is the effect of the reliability of reproducing an image via scanner at 600 DPI of a 35 millimeter photo with 3600 DPI?

A. The issue primarily has to do with what is the -- from an image analysis point of view, it has to do with what is the -- what is the best resolution necessary to evaluate the feature that you want to look at in the image.

For one thing, if you're talking about digitizing a print at 3600 DPI, you're actually digitizing the print at a much higher resolution than -- than information within the image.

As I -- as I stated in my response, there are studies now that show sort of what the resolution of a photographic image, particularly a photographic image that's being hand held in an autopsy type -- an autopsy type situation is significantly lower than that.

So, if digitizing is much higher than the resolution of the information in the image, it's not particularly useful.

The study by Herb is actually not in an autopsy



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4546

suite.  It's actually a best situation where it was a tri -- you know, a tripod stabilized camera using high quality film, et cetera, et cetera, et cetera, and it showed that, in fact, the pipeline of image creation provides a resolution that it does not require that kind of digitization.

Q.  Okay.  What about Mr. Schenk's claim that the conversion to digital forces a much narrower color spectrum?

A.  I think what he means is color gamut and the -- in most -- particularly systems in the -- I don't actually remember when this trial originally was.  What was it, 2004 or --

MR. MCHUGH:  '4.

A.  Certainly in 2004, scanners at the time did have a narrower gamut.

Q.  (BY MR. DOWD)  All right.  And what about the shift in aspect ratio from 3 -- 3 times 2 versus 4 times 3, would that impact the reliability of the digitized image to the original -- back to the original 35 -- 35 millimeter photo?

A.  It -- it is a source of error, and if one were doing measurements from the photograph, then it -- one would have to make sure that that did not impact upon it.  If one is simply doing recognition, then no, it has



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4547

no impact.

Q.  Okay.  Is photographic information further lost as the images are compressed in converting them to a JPEG file?

A.  Yes.

Q.  Okay.  Now, if -- if you have a negative, you know, that's taken of the scene and you process it and produce two different prints, will those prints be exactly the same?

A.  No.

Q.  And why is that?

A.  It's because the response in both the paper and the optical pipeline is subject both to mechanical and user change.  And I mean, basically, you know, you talk about interpolation, the -- the -- the colors you see in a photographic print are the result of a chemical process that is essentially the equivalent of an interpolation and essentially no two -- no two -- and it's a function of -- of the manufacturing of the paper, it's a function -- particularly if it's done in a darkroom by a human, it's a function of how the print is made by the human, or even if it's done in a machine, it's done with the calibration of the machine.  All of those will introduce their own changes.

But, in fact -- and, in fact, the very pattern of



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4548

the silver will change things but, in fact, you know, those differences are usually not perceivable but when they are perceivable, they are perceivable in a way that is not particularly important to the viewer.

One of the things to remember is that, in fact, most color films explicitly do not represent reality as -- as people see them because color films are modified to make colors more aesthetically pleasing.

And what that means is that, for instance, particularly with, for instance, Echtochrome and Kodachrome, they'll -- they have different color balances.  Frequently they're a little bit redder.  They will tend to oversaturate the flesh tones because when people take pictures of family members, they want them to look rosy red and nice looking and not pale and cadaverous.

Q.  The way they look in real life?

A.  Yeah, the way they look in real life.  And so, it turns out that every step along the way, there is the interpolation and modification --

Q.  Which --

A.  -- both in chemical -- both in wet and digital imaging.

Q.  All right.  So, in that regard -- so, the negative would be the best evidence as -- as relates to



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4549

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 381 of 2006
William Russell Oliver, MD, MSCI MPA PageID #: 6443                    October 28, 2010

36

the prints?

A.  Well, unfortunately, I mean, sort of -- in sort of an abstract way, that would be true but then you can't look at a negative, and so, whenever you go from the negative to something you can see, there will be loss of data.

Q.  All right.  So, in other words, to -- to make your presentation to the jury, you wouldn't be able to just take a -- ask the jury to look at a negative against the light and identify injuries?

A.  No.

Q.  Okay.  Now, will you agree that there's some loss of accuracy when you digitize a print into the digitized version that you made and that was seen by the jury?

A.  Yes.

Q.  All right.  And -- and that loss of accuracy, would that result in less features being visible or evident?

A.  It -- it would make -- it would result in small features being less evident, not the features I used for diagnosis, however, or -- and, in particular, not the features that I wanted to display.

Q.  So, if the jury only saw the digitized version and the enhanced version, they would actually be -- they would actually see less than if they saw the original



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4550

William Russell Oliver, MD, MSc, MPA                    October 28, 2010

37

autopsy photo?

A.  Yes.  That is, unfortunately, the nature of virtually all courtroom displays.

Q.  All right.  They would see fewer injuries in -- in -- in principal than --

A.  Right.

Q.  -- than were on the original autopsy prints?

A.  Yes.

Q.  Okay.

MR. DOWD:  I'll pass the witness.

MR. MCHUGH:  Thank you.

FURTHER EXAMINATION

Q.  (BY MR. MCHUGH)  Good morning, although it's afternoon.

Dr. Oliver, I'm going to ask you to look at what we've marked as P-181.

A.  Uh-huh.

Q.  I'm going to talk about that for a little bit, if you could.

A.  Okay.

Q.  Can you identify that, please?

A.  It looks like a print from one of the slides from my Power Point exhibit.

Q.  And is that -- not just a print but does it depict the protocol that you used in -- in this



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4551

particular case?

A.  Yes.

Q.  Okay.  And there's -- appears to be two numbers, 1, 2 and then I'm not sure there's a 3 but it goes 5, 6 and 7; is that right?

A.  Yes.  Unfortunately, that's the outlining problem with the Power Point.  Yes.

Q.  Okay.  And this protocol that was used, can you tell me or identify for me a peer-reviewed article that peer reviews this protocol from 1 through 7, let's say, since there's no 3 but I'll --

A.  Okay.  Well, this is not a sequential protocol.  These are individual things.  So, there is peer review that -- literature that discusses color balancing.  There's peer literature review -- there's peer-review literature that discusses histogram stretching.  There's peer-reviewed literature that discusses histogram stretching.  There's peer-reviewed literature that discusses histogram equalization.  There is peer-reviewed literature that involves wavelet packet construction.  There is peer-reviewed literature that takes about glare estimation.  There's peer-reviewed literature that talks about unsharp masking.  And there's peer-reviewed literature that discusses blind deconvolution.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4552

William Russell Oliver, MD, MPA                    October 28, 2010

39

Q.  Right.

A.  So --

Q.  But your protocol, the one that you've used in this case, is there a peer-reviewed article that discusses all of these as you have them here?

A.  Well, there -- it's just -- it's just a list. So, as just a list, each object on the list has a peer-reviewed literature.

Q.  But as the -- in combination because you're not --

A.  No.  These are -- these are not done in combination.  These are --

Q.  Well, this is the process you followed, isn't it?

A.  This is -- each one of these were done separately.

Q.  I understand.

A.  Right.  And so --

Q.  Each step creating a protocol?

A.  And each -- and each of these has peer-reviewed literature.

Q.  Is there an article --

A.  Uh-huh.

Q.  -- just name me one --

A.  Uh-huh.

Q.  -- that discusses the process that you used in


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4553

total from 1 through 7?

A.  That -- for each one of these, yes, there is.  I don't --

Q.  Not for each one.  The protocol that you used in this case --

A.  Uh-huh.

Q.  -- 1 through 7, half a page.

A.  Right, but this is -- this is not a sequential protocol.  That's what I'm --

Q.  Would the answer be no, that you're not aware of --

A.  You're asking me to --

MR. DOWD:  I would just ask that the doctor be permitted to finish his answer.

A.  Yeah, let me answer the question.

Q.  (BY MR. MCHUGH)  Sure.

A.  Okay.  This is not a sequential protocol.

Q.  This is your protocol.

A.  This is not a sequential protocol.  Do you understand what sequential means?

Q.  1, 2, 3.

A.  Right.  Right.  And so, I did not do histogram stretch followed by histogram equalization.  This is a collection.  The reason they're numbered is merely because one has to somehow put them down.  I could have



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

USCA5 4554

William Russell Oliver, MD, MPA    PageID#: 6448    October 28, 2010

41

just as easily said -- put histogram as number 1 and CLAHE as -- as number 2.  Okay?

The reason these are -- these are not -- these are simply classifications.  The reason the basic image adjustment is number 1 and the things underneath that and then the contrast enhancement is number 2 is just to classify them --

Q.  Okay.

A.  -- so people know what I did.

Q.  Although we wouldn't know in what order from reading this?

A.  There is no order.  They're not done one after the other.

Q.  Okay.

A.  That's what I'm trying to tell you.

Q.  Now --

A.  They're done independently.

Q.  You called it a collection; is that right?

A.  Yes.

Q.  Could you please tell me of one peer-reviewed article that discusses the collection that you used here in the same article?

A.  No, I don't know of any.

Q.  Okay.  Now, the -- was there a software used during this process?



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4555

A.  Yes.

Q.  Okay.  And who created that software?

A.  Advanced Digitalization Systems.

Q.  You had no -- you didn't create a software that was used in this protocol?

A.  Yes.

Q.  Okay.  What software did you create?

A.  I created the algorithm that was implemented into AVS.

Q.  Okay.  Now, that software -- where is it indicated that you're using your own software in this list of protocols, this collection?

A.  No.  This is a list of the algorithms, not the software packages.

Q.  Okay.  So, there's no mention in your collection of protocols that you used that you utilized your own software; is that right?

A.  Not that I know of.

Q.  Okay.  Now, this software that you created, when did you create it?

A.  I created it in part while I was a graduate student and then modified it during the years following.

Q.  Okay.  Well, how many times did you modify it?

A.  I modified it a few times, mostly to -- to include libraries to allow input of different formats of



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4556

William Russell Oliver, MD, MPA                    October 28, 2010

43

images.

Q.  So -- now, when you -- when you were working on this case, had -- do you have a name for your software?

A.  No.

Q.  Okay.  It's just -- do you have it stored in your computer?

A.  Not now.

Q.  Okay.  Where -- where is the software that you -- that you used in this case?

A.  It was at the Armed Forces Institute of Pathology.

Q.  So, it was something you created while you were working there?

A.  Yes.

Q.  Okay.  Now, had it ever been sold or used for public consumption, this software?

A.  No.

Q.  Okay.  Besides yourself, who else tested the software?

A.  No one.

Q.  Okay.  So, the software that you used in this case has not been tested by anybody other than yourself?

A.  No.

Q.  Okay.  And are there any peer-reviewed articles concerning the software that you created?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4557

A.  Concerning the algorithm I created, yes.

Q.  Okay.  What is the name of that -- well, the algorithm you created was published?

A.  The algorithm is Contrast-Limited Adaptive Histogram Equalization.

Q.  Okay.  I'm talking about the software.  You said that you -- no one else used it but yourself.

A.  Well, a lot of people use the algorithm.  The specific implementation was -- was part of my personal image processing armamentarium.

Q.  Okay.  But the implementation was the -- we can agree that you created a software; is that right?

A.  I created a program, yes.

Q.  Okay.  Has -- and we've established that no one else has used it but yourself?

A.  That particular program, though many people have used the algorithm.

Q.  I understand.

A.  Okay.

Q.  That particular program, has that been subject to peer review, to your knowledge?

A.  No.

Q.  Okay.  And the -- who determines when you're -- when you're using your software whether or not it's -- it's calibrated correctly?



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4558

A.  I do.

Q.  Okay.  Does anybody back you up and do a blind analysis of whether it's calibrated correctly?

A.  No.

Q.  Okay.  Now, at the time of the trial, were there any standards that governed the protocol that you've established here or that we're talking about here, P-181?

A.  I think that the Scientific Working Group on Imaging Technology has -- had promulgated guidelines by that time.

Q.  SWGIT, is that --

A.  Yes.

Q.  So, you -- it was your understanding that they had promulgated guidelines --

A.  Yes.

Q.  -- at the time of this trial?

A.  I wrote them, so, yes.

Q.  Okay.  Did anybody -- when you wrote the -- when you wrote the guidelines, who -- who did they -- who were they vetted with?

A.  They were -- they were vetted through the Federal Bureau of Investigation.  They were also published -- promulgated through the -- I think it's called the Institute for Identification.  It's the IAI is what it's



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4559

called -- for public comment, and they're up for six months or so for public comment, and then we look at the public comments and modify things in response to that.

Q.  Now, when you're utilizing -- let's talk about the bigger aspect of what you did, the CLAHE.  Who picked the parameters that you used?

A.  I did.

Q.  Okay.  Did you record or log the parameters?

A.  No.

Q.  Okay.  And why not?

A.  Because these were not the basis of a decision, and so, a lot of the things you're talking about are important if you're going to do analysis based on the processing.  Since the analysis was not based on the processing, then I did not.

Q.  Why is it important to record those things?  You said it --

A.  So that someone else can -- can do the same thing, can --

Q.  And why is that -- why is that important?

A.  Because people come to depositions like this.

Q.  Well, would it also have something to do with determining whether or not the -- the conclusions are valid and whether or not there's errors that were made?

A.  Well, no conclusions were based on it --



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4560

William Russell Oliver, MD, MPA                    October 28, 2010

47

Q.  I understand that --

A.  -- so --

Q.  -- but we're talking about why it's important.

A.  Well --

Q.  You said there are instances where it's important.

A.  Right.  Had I been making conclusions based on it, then I would have included that so it could have been reviewed for the conclusions based upon it.

Q.  And -- and I believe the distinction you're making is that the conclusions you made were on the 30 -- were from the 35 millimeter photographs; is that right?

A.  They were from the prints.

Q.  Right.  Of the photographs?

A.  Yes.  And from the -- and from the images on the disks that I received.

Q.  Okay.  So, you did -- so, in reaching your conclusions, you did rely -- what was the difference? Was the 35 millimeter photographs -- prints, were they also autopsy photographs?

A.  Yes.

Q.  And then you also received the exact same images but that had been submitted on a disk?

A.  No.  They were different photographs.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4561

William Russell Oliver, MD, MSci, MPA                    October 28, 2010

48

Q.  Okay.  Do you know who took them or why they were different?

A.  I believe Dr. Rouse took them.

Q.  Both sets?

A.  I don't know.

Q.  Okay.

A.  I believe Dr. Rouse took the disk.  I don't know who took the other ones.

Q.  Okay.  So, obviously, the disks --

A.  Excuse me.

Q.  The disks contained a number of autopsy slides --

A.  Yes.

Q.  -- since Dr. Rouse was the pathologist?

A.  Yes.

Q.  So, going back to why it's important you said in certain instances to record and log the parameters, can you just tell me why that is?

A.  What -- if -- if a -- if there are conclusions based on it, then you need to do that so that people who are reviewing it can come to the same conclusion.

Q.  Okay.  And so, the -- did you save any -- and I know you comment on it in your -- your list of protocols.  Did you save any intermediate photographs -- or images that you created, I should say?

A.  No.  The SWGIT guidelines explicitly state that



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4562

that's not necessary.

Q.  That you don't need to.  So, in this particular -- and the SWGIT guidelines were in place at that time?

A.  Yes.

Q.  Okay.  And so, you did not save any of the -- and how many, approximately, intermediate photographs -- or images did you create before you got to the final versions?

A.  Well, there was no final version.

Q.  Well, the version that was -- ended up in the Power Point.

A.  Since I did not keep track of the order in which I did them, I can't say.

Q.  Okay.  Now, you said that the reason that you don't have to keep track of your steps and log things is because you didn't rely on the conclusions -- your conclusions were based on the original 35 millimeter photographs or prints but, in fact, what did you tell the jury were the original photographs?

A.  Well, I said -- basically, when I said original, I was talking about the images that I was displaying, yes.

Q.  And those images that you were displaying were, in fact, the digitally -- the digital images that you



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4563

had taken from the -- from Dr. Rouse; is that right?

A.   They were -- they were the -- the ones that I used for display were all prints, as I remember, were all -- were all digitized from prints.

Q.   Okay.  So, they -- but they were all digitized?

A.   Yes.

Q.   Okay.  So, you said that you didn't log in things because you were basing your conclusion on the 35 millimeter photographs or prints, is that right, but --

A.   Actually, for the digitized images, I did record the log -- I did log the parameter, the 600 DPI.

Q.   Okay.  But for the -- for purposes of the jury, you said that the reason to do that is because you're not basing your conclusion on it, you don't need to do it; is that right?

A.   Uh-huh.

Q.   But with the jury, your direction to the jury was that you called the originals -- when you said, "Go back to the originals," you, in fact, were pointing to your digitized version of the photographs; is that right?

A.   Right, because I have to show them something.

Q.   Well --

A.   And -- and as far as I was concerned, they were fair and accurate representations of the features that I saw in the -- in the photographic prints.


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4564

Q.   And that's based on your opinion; is that right?

A.   Absolutely.

Q.   Okay.  So -- but -- but when you told the jury that they were to go back to the original, you were not, in fact, showing them the originals, were you?

A.   No.  I was showing them the unenhanced images.

Q.   Right.  But digitized?

A.   But digitized.

Q.   Okay.  And, in fact, digitized with JPEG; is that right?

A.   No.

Q.   They were not?

A.   No.  As I remember, they were digitized with TIFF because, basically, I have -- the software that I used to do the processing required Targa, and so, I -- I -- I either digitized to TIFF or Targa.

Q.   Now, do you consider your -- the protocols that you used traditional or nontraditional?

A.   From the sense of --

Q.   Under the SWGIT guidelines.

A.   The first -- that's why I have -- it's separated into two groups.  The first three, color balancing, cropping and standard digitization parameterization, are all the first, and the others, contrast enhancement is nontraditional.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4565

Q. Is nontraditional?

A. Right.

Q. Okay. So, let's take a look at this. I'm going to show you what I've marked as P-127, and are you familiar with this document?

A. Yes, I am.

Q. Okay. And what is this?

A. This is -- looks like the 2002 version of the SWGIT guidelines for Recommendations and Guidelines for the Use of Digital Image Processing in the Criminal Justice System.

Q. So, are these the -- the image -- are these the guidelines that you said that you wrote?

A. Part of them.

Q. Okay. Well, right but, I mean, these are --

A. We're a large group. I wrote -- I wrote some of them and I -- some of them. I, obviously, didn't write the whole entire thing.

Q. Okay. So -- all right. Let's start with the -- the background part on Page 1.

A. Okay.

Q. It indicates there that, "Digital imaging -- image processing is an accepted practice in forensic science. It is the position of the SWGIT" -- I'll -- I'll use the acronym -- "that any changes to an image



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4566

William Russell Oliver, MD, MSCI, MPA                    October 28, 2010

53

made through digital imaging process are acceptable in forensic application provided the following criteria are met."

A.   Uh-huh.

Q.   Number one, "The original image is preserved."

A.   Uh-huh.

Q.   And two, "The processing steps are logged when they include techniques other than used in traditional photographic darkrooms."

A.   Uh-huh.

Q.   And you did not do that, did you, the -- log the processing steps?

A.   I -- no, I did not.

Q.   Okay.  And then the next one down, "The end result is presented as an enhanced image, which may -- may be produced -- may be reproduced by applying the logged steps to the original image;" is that right?

A.   That's right.

Q.   So, we couldn't do that under the SWGIT guidelines because the logged steps were not saved?

A.   Yes.

Q.   Okay.  Now, I wanted to talk to you about nontraditional enhancement techniques.

A.   Uh-huh.

Q.   So, go back a few pages.  I believe you said the


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4567

William Russell Oliver, MD, MPA                    October 28, 2010

54

CLAHE was a nontraditional enhancement?

A.   Yes.

Q.   That portion of your protocol.

A.   Uh-huh.

Q.   And, again, the date of this is January of '03; is that right?

A.   Could be.  Let's see.  Yes.

Q.   Okay.  And just, if you could, do you agree with the -- with the paragraph that states, "Some nontraditional image enhancement processes are used and accepted by a variety of scientific fields, such as medicine, aerospace and cartography;" is that right?

A.   Cartography, yes.

Q.   Cartography.  Right.  That's not what we were doing here in this case, right, this was a forensic case?

A.   It was medicine.

Q.   Right.  Well, this -- well, but the -- but the use of the medicine was in a forensic setting, is that fair to say?

A.   But it was medicine, yes.

Q.   Right.  But can we agree it was used in a forensic setting?

A.   Yes.

Q.   Okay.  And then they said, "These processes have



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4568

William Russell Oliver, MD, MSci, MPA                October 28, 2010

55

no direct counterpart within traditional silver based photography.  In fact, only recently have they been applied within the forensic environment, therefore, their general acceptance may be subject to challenge."  Now, do you agree with that statement as it was made back in January of 2003?

A.  Yes.

Q.  Okay.  And so, putting it in context of what you were doing, is the CLAHE that you were using, SWGIT had established or was saying in January of 2003 that it may be subject to general acceptance, is that fair to say?

A.  Subject to challenge.

Q.  Right.  That it --

A.  Right.

Q.  There may be challenges or there's -- there's questions as to its general acceptance and it may be subject to challenge, is that --

A.  Uh-huh.

Q.  Is that a fair characterization?

MR. DOWD:  I would object.  I think the document speaks for itself.

MR. MCHUGH:  Okay.  I think so.

Q.  (BY MR. MCHUGH)  Do you agree with what the document says?

A.  Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4569

56

Q.  Okay.  And, again, the -- you weren't using -- you were using nontraditional enhancement techniques but you didn't document your steps; is that right?

A.  Because I wasn't using it as the basis of my conclusion.

Q.  Right.  But the jury was told that the digital imaging were the originals and you told the jury to base their conclusions off of the original, is that fair to say?

A.  The original -- that's basic -- that's not nontraditional.  Okay?  The stuff that I was telling them to base it on was not the nontraditional part of it.

Q.  Well --

A.  The nontraditional part was the contrast enhancement.

Q.  Okay.

A.  When I told them to go back and look at the original photograph, meaning at the time the unenhanced photograph, that actually is all basic adjustment.

Q.  All right.  But let me -- let me talk about that for a second.  The jury had to do two things in order to reach their conclusion under your demonstration; is that right?  They had to look at your enhancements and then they had to go back to the originals; is that right?



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4570

A.   Uh-huh.

Q.   The nontraditional was part of the enhancements?

A.   Yes.

Q.   Okay.  And that part, I believe you've agreed, you did not document?

A.   Right, because it was not the basis of the conclusion.  It was a medical illustration simply to draw attention to things.

Q.   But the jury has to do two things in order for you -- if your presentation has any merit whatsoever, you're -- you're getting up there with your enhancements --

A.   Uh-huh.

Q.   -- and what you call the originals; is that right?

A.   Uh-huh.  Yes.

Q.   Otherwise, we wouldn't have the enhancements?

A.   Right.

Q.   Okay.  So, there's -- there's two parts to what you're presenting to the jury and asking them to do?

A.   Yes, but I could have done it with just the -- just the originals except that as is the case with courtroom demonstrations, sometimes it helps to have illustrations to demonstrate what you're looking at.

Q.   Well, you did a lot more than just illustrate,



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4571

you found a significantly more number of injuries than Dr. Rouse who performed the autopsy, isn't that fair to say, and presented those to the jury?

A.   Dr. Rouse did not enumerate the injuries, as far as I know.

Q.   Well, obviously, she --

A.   And so, I don't know exactly how many she found.

Q.   Well, she enumerated a significant number of injuries, didn't she?

A.   Right.  And, in fact, when she reviewed my report, she did not disagree with it.

Q.   Okay.  Where did she do that?

A.   She did it as part of the quality assurance program at the Armed Forces Institute of Pathology. This report was vetted through the QA process, which involved both Dr. Rouse and a number of other pathologists.

Q.   And does Dr. Rouse -- or did Dr. Rouse have any training in digital imaging or digital imaging enhancement?

A.   No.  She correlated it with what she knew, having done the autopsy itself.

Q.   So, she did not have any idea of the basis for your enhancements, and specifically P-181, the protocol, is that fair to say?



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4572

William Russell Oliver, MD, MPA                    October 28, 2010

59

A.  No, she was referring to her personal experience with the autopsy.

Q.  Okay.  In her personal experience with the autopsy, she did not list near the number of injuries you did, is that fair to say?

A.  I don't remember how many she listed.

Q.  Okay.  But you would agree that you found a number of more injuries than she did, even though you don't remember the specific --

A.  I don't remember the specifics.

MR. DOWD:  I think that's been asked and answered, and I would object.

Q.  (BY MR. MCHUGH)  Now, I want to talk to you about error rate.  In this particular collection of -- of tasks or collection of steps that you took, P-181, is there a known error rate, as far as you know?

A.  For -- error rate for what?

Q.  Error rate for -- for accurately enhancing digital images.

A.  That's -- that's not -- define accurate.

Q.  Define accurate?

A.  Yes.

Q.  Correctly.

A.  Okay.  The question becomes -- there -- there -- in image analysis, there are tasks to do.  In other



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4573

William Russell Oliver, MD, MS, MPA                October 28, 2010

60

words, can you or can you not identify certain things. Okay?

So, if you're going to ask is there an error rate, the question would be, well, if you're given -- given a hundred things to identify and you use these images, do you identify them more correctly. That presumes, once again, that you are using those images as the basis of your conclusion.

Since there's no task that I did using -- that involves a conclusion based upon the processed image, then there is -- there is no right or wrong -- there's no answer based on the -- on the processed image, thus, there's no right or wrong answer based on the image, thus, the error rate -- that's why I'm asking, what --

Q.  Well, are you --

A.  -- what answer --

Q.  -- aware that any testing, validation studies, things of that nature --

A.  Uh-huh.

Q.  -- that have be done -- that have been done on your protocol to develop an error rate as to whether or not images were -- images or wounds in this particular case were identified that actually didn't exist, for example?

A.  Oh, so -- oh, to go back to -- to -- then you're



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4574

William Russell Oliver, MD, MSc, MPA                October 28, 2010

61

talking about general forensic pathology, and the answer to that is as far as I know, there is no double blinded study on wound interpretation that provides an error rate.  All I can say is that it is generally accepted within the community.  There is a literature on evaluating image -- evaluating contusions and such from photographs.  There is training involved on it, and there is testing involved on it.

Q.  But, you know, you fall back into that generally accepted methods of pathology.  I want to talk about what you did in this case.

A.  What I did --

Q.  Are you aware -- just -- if the question is that -- if the answer is that there's no known error rate, that's fine but are you aware of an error rate for the protocol, the collection of steps you took, whatever order you did them in, that you applied in this case?

A.  There are studies that look at the effect of using ancillary images in diagnoses that show that depending upon the strength of the feature, it either has no effect or it increases -- it increases accuracy.

Q.  But any of those studies --

A.  And so --

Q.  -- deal with -- I'm sorry.

MR. DOWD:  I'd just ask that he could



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4575

62

finish.

Q. (BY MR. MCHUGH) Go ahead.

A. And so, in that sense, yes, it decreases error by -- between 9 and 15 percent depending upon how obvious the feature is. Clearly, if the feature is extraordinarily obvious, then doing contrast enhancement will not -- will not change the fact that you see -- you notice something that's very, very obvious. If it is not very obvious, then doing contrast enhancement will increase the likelihood that you notice it, and that is -- that is what the studies and the medical literature have repeatedly shown.

Q. Well, that's assuming that the injury exists, is that right, as opposed to an error?

A. Yes.

Q. Okay. Now, back to the -- this particular protocol that you used. Do you know of any error rate, any -- these studies that you talk about, have any of them studied your protocol and your seven steps?

A. Well, I'm only talking about one step.

Q. I'm talking about seven.

A. Well, once again, you're -- you're creating a connection that doesn't exist.

Q. What --

A. So --



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4576

William Russell Oliver, MD, MPA                    October 28, 2010

63

Q.  It's a simple question.  Do you know of an error rate that has been promulgated and tested for the protocol that you developed, the seven steps?

A.  They're not seven steps.  It's just a collection of seven things.

Q.  Seven things that you did?

A.  The seven things that I did.

Q.  In whatever order.

A.  Each one -- each one has its own literature.

Q.  Okay.  But -- but, again, this particular task that you performed, you used all seven?

A.  I used them independently.

Q.  Uh-huh.

A.  Okay?  So, independently, each one has its own literature.

Q.  And collectively, does -- collectively --

A.  All right.

Q.  -- does -- is there an error rate talking about what you used here?

A.  There is one for each one.  I mean, that's all I can say.

Q.  Well, you can answer the question.

A.  And -- and -- and for the -- for the connection that doesn't exist that you're asking for, no.

Q.  No what?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4577

64

A.   There is no literature.

Q.   There is no error rate?

A.   There is no literature that describes an error rate.

Q.   Which means there's no study of an error rate, is that --

A.   Yes.

Q.   Okay.  Now, you used wavelet; is that right?

A.   Yes.

Q.   Okay.  What is that?

A.   A wavelet is a -- a wavelet is a small function that is band limited in frequency space that allows you to blur images in a particular way.  In particular, wavelets separate out high -- the way that they tend to be used is they tend to separate out high versus low frequency components or blurred or sharp components, and they do it regarding a specific derivative or direction in the image, so that what normally happens in classic wavelet decomposition is that you have an image, you do the wavelet decomposition and you get four images, each one of one quarter size.  One image will have the edges in the up and down direction, one image will have the edges in the right and left direction, and one image will have the edges in the diagonals.  Okay?

And then the fourth image will be a -- the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4578

remaining lower resolution image.  This is performed iteratively until you decompose the image down to individual pixels, and that's called a wavelet decomposition.

Q.  Okay.  Now, that is one of the steps in here; is that right?

A.  Uh-huh.  Yes.

Q.  And you said that each one of these steps has a validation study that has been done and specifically to determine an error rate.  What is a -- can you tell me what the validation study that has been done to determine the accuracy or an error rate of the wavelet decomposition?

A.  Well, I would refer you to Larry Clark's paper on -- on the use of wavelet packet -- on the use of wavelet packet construction in doing image processing on -- on the internals.  I don't have -- obviously, I don't have the reference right at my hand.

Q.  But it's by Larry Clark?

A.  Larry Clark.

Q.  And -- and do you know the title of the -- of the the --

A.  No, I don't know the title.

Q.  Okay.  Okay.  Now, I want to show you -- what's our next exhibit -- a document which I've marked as



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4579

William Russell Oliver, MD, MSc, MPA                October 28, 2010

66

P-182.  And can you identify that for the record?

A.  Yes.  This is a workshop on forensic and -- image and video processing done last year in Denver at the American Academy of Forensic Sciences.

Q.  And, in fact, on the very first page, you were the co-chair; is that correct?

A.  Yes.

Q.  Okay.  And this was -- this particular document that I show -- I'm showing you, if you look to about the third or fourth page in --

A.  Uh-huh.

Q.  -- it was a workshop by Zeno Geradts; is that right?

A.  Yes.

Q.  And it concerned forensic image and video processing; is that right?

A.  Yes.

Q.  Okay.  And is he a member of SWGIT?

A.  No.

Q.  Is -- what is he the chair of?  On the front, it says chair and then you're co-chair; is that right?

A.  Right, of the workshop.

Q.  Okay.  And -- but he's, obviously, in the -- a member of the American Academy of Forensic Science, is that fair to say?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4580

William Russell Oliver, MD, MSc, MPA                October 28, 2010

67

A.  Yes.

Q.  Okay.  A well-respected scientist in his field or in this field, is that fair to say?

A.  Yes.  Uh-huh.

Q.  Okay.  And I would ask you to go to the section or -- and this is -- obviously, appears to be a -- a printout of his Power Point presentation; is that right?

A.  I don't know.  Okay.

Q.  Well, you taught at this seminar, too; is that right?

A.  Right.

Q.  Okay.  And you had -- you had one that was a Power Point presentation; is that right?

A.  Yes, I did.  Uh-huh.

Q.  And under methods --

A.  Uh-huh.

Q.  -- do you see there where he discusses wavelet?

A.  Yes.

Q.  Okay.  And it states there, "Unknown risk"?

A.  Yes.

Q.  Okay.  Wouldn't -- wouldn't it be fair to say that what he taught at this workshop and what he's indicating there under the methods, that wavelet -- wavelet, in at least his opinion, has an unknown risk of


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4581

68

error, obviously?

A.  I -- to be honest with you, I didn't attend his session but the Power Point, obviously, says what it says.

Q.  Okay.  So, would -- if that's, in fact, what he taught at that presentation, would you say that you disagree with the chair of the present -- of the workshop?

MR. DOWD:  I would object to asking an opinion as to just a bullet on a Power Point presentation because I don't think that is self-explanatory.  I know it says unknown risk but I don't know what he --

Q.  (BY MR. MCHUGH)  Well, did you ever --

MR. MCHUGH:  Okay.  I may need to clarify.

Q.  (BY MR. MCHUGH)  Did you ever --

MR. MCHUGH:  Or try to clarify.

Q.  (BY MR. MCHUGH)  Did you ever discuss with him error rates in wavelets?

A.  No.

Q.  You've never discussed that with him?

A.  No.

Q.  And you were on the faculty of this but you're saying you did not attend his particular session?

A.  Yes.  Unfortunately, particularly in 2009 --

Toll Free: 800.969.3027
Facsimile: 210.558.3670



ESQUIRE
an Alexander Gallo Company

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4582

wait.  This is 2010.

Q.  Right, this was 2009.

A.  This was 2009.  I'm sorry.  I was thinking 2008. In 2010, they scheduled me for two workshops at exactly the same time.  So, I was running in between them.

Q.  Okay.

A.  That actually happens pretty commonly.  When I -- I tend to give multiple workshops.

Q.  Uh-huh.

A.  So, very commonly, I'm running in and out of these things, and sometimes I just show up for mine.

Q.  Okay.  But -- so, you've never discussed with Zeno Geradts the issue concerning a rate of error or an error rate with wavelets --

A.  No.

Q.  -- is that right?

And we kind of agree, though, that the wavelet that's mentioned there is what's in your protocol, is that right, that -- and I don't mean the exact type but the concept?

A.  It's the concept, the class.

Q.  That's what I meant.

A.  Yes.

Q.  Okay.  Now, I want to talk to you a little bit about the compression or digitalization compression.



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4583

70

A.   Uh-huh.

Q.   I believe you agreed with Mr. Schenk that details in accuracy are lost when items are compressed using a lossey compression; is that right?

A.   Yes.

Q.   And you, in fact, received digital images with JPEG; is that right?

A.   Yes.

Q.   Okay.  That's a lossey compression; is that right?

A.   Yes.

Q.   Okay.  Did you use those digital images at all?

A.   Yes.

Q.   What did you use them for?

A.   I -- I reviewed them.

Q.   Okay.  Did you use them at any time during your Power Point?

A.   I don't think so but I might have.

Q.   Okay.  Is there any -- if they came in a -- in a -- in a digital form, is there a reason that you can think of that you wouldn't have used them?

A.   No, I can't think of a reason I wouldn't have used them --

Q.   Okay.  Is it your best --

A.   -- unless they just didn't demonstrate something


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4584

I wanted to demonstrate.

Q.  Right.  But you said earlier that they were Dr. Rouse's autopsy photos, is that right, or at least she had taken them?

A.  Right, but maybe -- but there often are duplicates.  So, I'm not going to show -- I mean, this is -- the thing I did was a courtroom demonstration.  It's not useful to keep showing, you know, the same photograph over and over again.

Q.  I understand.  But based on your -- your records and your notes of this Power Point that you created, you're not sure whether you used all or some of the scanned photographs --

A.  Right.

Q.  -- or the JPEG digital images?

A.  For the -- for my conclusions, I used -- I looked at all of them.

Q.  We're talking about the presentation to the jury now, though.

A.  Okay.  Not my conclusion?

Q.  Yes.

A.  Okay.

Q.  Okay.  And I believe you were asked by Mr. Dowd did you rely on both for your conclusions.

A.  Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4585

William Russell Oliver, MD, MPA                October 28, 2010

Q.   Okay.   So, when you reached your conclusions, you not only relied on the original 35 millimeter prints --

A.   Uh-huh.

Q.   -- but you also relied on the JPEG digitized versions; is that right?

A.   Well, the JPEG photographs.  They're -- they're not -- they're different photos.  They're not -- there's are not JPEG versions of the -- of the prints.

MR. DOWD:  Could we clarify, are you talking about the JPEGs that Dr. Rouse sent to --

MR. MCHUGH:  Yeah, that's what I'm trying to talk about here.

A.   Yeah, they're different -- they're different sets of photos.

Q.   (BY MR. MCHUGH)  So, you get something from Dr. Rouse that's in JPEG disk?

A.   Right.

Q.   Then you got a set of 35 millimeter prints that you believe came from Dr. Rouse also; is that right?

A.   Right.

Q.   Okay.  Did you utilize both -- you -- I'm not talking about the jury now.  Did you utilize both in forming your conclusions?

A.   Yes.

Q.   Okay.  So, you did rely, at least a portion of,


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4586

William Russell Oliver, MD, MPA                October 28, 2010

73

on lossey compression, is that fair to say?

A.  On -- yeah, the photographs that were taken at autopsy as JPEG photos, yes.

Q.  Okay.  And, obviously, that was some -- something that you -- that you utilized in your conclusion stated before the jury?

A.  Yes.

Q.  Okay.  Now, I want to talk to you about that. Did the -- let me see here.  Do you know what -- how -- what -- what form of JPEG she used or did you have any information from her as to the type of JPEG she was using or --

A.  No.

Q.  -- the calibration?

Okay.  I'm going to ask you to take a minute and look at what's been marked as P-183 and tell me if you've had an opportunity if you can identify it?

A.  It looks like a -- an SOP from the FBI.

Q.  Okay.  Are you familiar with these type of documents?

A.  Yes.

Q.  Okay.  Do you review these in your normal course of professional life?

A.  I've never reviewed the FBI one.

Q.  Okay.  Now, at the top, it indicates a synopsis


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4587

74

to establish the standard minimum operating guidelines

for all photographic operations using digital images

capturing devices, is that fair to say?

A.  Uh-huh.

Q.  Okay.  And it was done in an -- the next line

down, it was done in an effort to regulate the use of

digital imaging technology by FBI personnel and

Photographic Operations and Imaging Services Unit?

A.  Uh-huh.

Q.  Okay.  So, those -- essentially, this is an

operating procedure that the FBI is going to rely upon

in 2005?

A.  Yes.  Uh-huh.

Q.  And the date of it is June of 2005?

A.  Okay.

Q.  Well, I mean, I'm asking you.

A.  Yes.  Okay.  Okay.

Q.  I can't testify.

A.  All right.  Sorry.

Q.  Is it -- does it appear that it's dated June 17th

of 2005?

A.  Yes.

Q.  Okay.  And just the first sentence of the scope,

can you just read that first sentence for us?

A.  Scope, "The following are the basic minimum


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4588

guidelines for the use of digital photography technology for the capture and storage of imagery which at the time of its creation is reasonably and foreseeably likely to be of evidentiary value."

Q.   Okay.   So, what we can agree upon is that what's contained in this document are minimum guidelines; is that right?

A.   Uh-huh.

Q.   Okay.   So, then I would ask you to continue further with the document, and in looking underneath standard operating guidelines for digital photography, do you see that on the second page?

A.   Yes.

Q.   Okay.   And it starts to talk about SWGIT; is that right?

A.   Yes.

Q.   Okay.   And it indicates there on the second page that SWGIT has noted that generally a single frame of standard 35 color -- color film is demonstrably superior quality to its digital imagery equivalent, is that fair to say?

A.   Yes.

Q.   Okay.   And was that an accurate description by the FBI's SOPs of SWGIT at that time?

A.   At that time, though it's obviously changed.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4589

Q.  Okay.  Well, we'll get to that.  And then the next sentence is -- or a sentence or two down it says, "Moreover, film is typically more sensitive to a wider range of light values within a single image and has a better ability to accurately capture colors -- color fidelity than do most digital cameras."  Do you agree with that?

A.  Yes.

Q.  Okay.  And then the last sentence of that paragraph, "It is for these reasons that SWGIT advises the use of film in most law enforcement applications."  Do you agree with that?

A.  Yes.

Q.  Okay.  And right underneath that is in all capitals and underlined and what does it state?

A.  "Avoid lossey compression digital imagery when possible."

Q.  Okay.  And, in fact, this particular case, you didn't avoid it because you, in fact, were provided with JPEG photos?

A.  Yes.

Q.  Okay.  Now, what is the next sentence about what SWGIT advised?

A.  "SWGIT also advises against the use of lossey compression when shooting digital images because lossey



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4590

William Russell Oliver, MD, MPA                    October 28, 2010

77

compression, most frequently utilized in digital cameras using the JPEG standard, further reduces the quality of information contained in the data file, which generates and comprises the captured image."

Q.   And so, do you agree with that?

A.   For the type of photographs they do, yes.

Q.   Okay.  Well, are you making a distinction that there's some -- they talked about photographs being used -- to be used of any evidentiary value.  Are you making a distinguish that I'm not picking up on?

A.   Perhaps in that they don't do autopsies.  They don't do autopsy photography, and, in fact, the standard in autopsy photography is to use JPEGs.

Q.   And who is that standard?

A.   National Association of Medical Examiners.  It is an informal standard and, in fact, the most recent --

Q.   Can I stop you?  What do you mean by informal standard?  I'm not sure that -- isn't that an oxymoron?

A.   No, not really.  It is -- it is -- it is -- it is the -- it is the de facto standard practice.

Q.   What is de facto standard practice?

A.   In that if you go and look at virtually all -- or most image -- at autopsy facilities, they use JPEG imaging.

Q.   So, are you saying that the autopsy -- that the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4591

de facto practice amongst pathologists is below the
basic minimum guidelines that the FBI established?

A.  It's because of a different purpose.  And, in
fact, the SWGIT guidelines themselves state that the
type of compression should be dictated by the use of the
imagery.

Q.  Okay.  But in this particular case, it's said to
be of evidentiary value; is that right?

A.  This is the FBI -- this is the FBI standard for
photographs they deal with.

Q.  Right.  But --

A.  And for SWGIT -- and the SWGIT guidelines are
different.

Q.  Okay.  But the -- the pathologists we're talking
about, certainly their photographs are being used for
evidence; is that right?

A.  Yes, they are.

Q.  And the FBI is talking about minimum standards
for evidentiary value; is that right?

A.  Yes.

Q.  So, what we're saying is that -- you're telling
us that there's a de facto or informal standard that is
followed by forensic pathologists that is less than the
FBI's minimum?

A.  That is -- that is different than that by the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4592

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 424 of 2006
William Russell Oliver, MD, MSc, MPA PageID #: 6486                    October 28, 2010

79

FBI.

Q.   Well, the FBI is specifically saying don't --
avoid lossey compression; isn't that right?

A.   Which is for --

MR. DOWD:  I'm going to object.  I think
it's been asked and answered.

A.   Yeah.  Which is for a different domain, yes.

Q.   (BY MR. MCHUGH)  But we can agree that the domain
that the FBI is talking about is use in evidence, is
that fair?

A.   Yes.

Q.   And pathology photographs are certainly
foreseeable to be used as evidence in a forensic
setting?

A.   And the -- and the FBI does not do autopsies.

Q.   Okay.  And so, that's the distinction is because
it's an autopsy photo versus a fingerprint photo or a
mugshot or things of -- that's what you're saying is the
difference?

A.   Yes.  And I'd be happy to explain it to you if
you want me to explain it at length.

Q.   That's -- I'm sure you'll have an opportunity.

A.   Okay.

Q.   We need to take a break at this point because
they have to change the video.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4593

William Russell Oliver, MD, MPA                    October 28, 2010

80

A.   Okay.

THE VIDEOGRAPHER:   The time is approximately 1:01.  We are now off the record.

(Short recess.)

THE VIDEOGRAPHER:   This is the beginning of tape two.  The time is approximately 1:07.  We are now back on the record.

Q.   (BY MR. MCHUGH)  Doctor, I was going over with you the FBI -- I believe you called them standard -- SOPs or minimum operating guidelines?

A.   Standard operating procedure.

Q.   Right.  P-183.  And I just was going back to the area where we stopped.  There's a sentence there that says -- talking about avoiding lossey compression, and in discussing lossey compression, I'm referring right here.

A.   Uh-huh.  Uh-huh.

Q.   "Frequent -- frequently this means that fine variations in color across a surface may be eliminated to make the image data file smaller and, therefore, easier to store or transmit."  Do you agree that that is a possibility that can occur when one uses a lossey compression such as JPEG?

A.   Yes.

Q.   Okay.  And then the last -- I believe the last



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4594

William Russell Oliver, MD, MSCIMFA                    October 28, 2010

81

thing I wanted to -- well, two other points on this.

For the -- the next paragraph down, it indicates, "For

these reasons and other reasons, POISU and the Forensic

Audio, Video and Image Analysis Unit strongly advise

against the use of lossey compression (JPEG) when

capturing digital photographs."  Do you agree with that?

        A.  Yes.

                MR. DOWD:  Do you agree that that's -- that

that's part of their standard procedure or do you

agree --

        A.  Yeah, it's part of their standard procedure.

        Q.  (BY MR. MCHUGH)  Okay.  But do you follow that --

or do you agree with that as a matter of principle?

        A.  All right.  Say it again.  I'm sorry.

        Q.  Okay.  Do you agree with that statement as a

matter of principle?

        A.  Where -- where is it one more time?  Read it

again to me.

        Q.  I'm sorry.  I can just point it to you.  Right

there.

        A.  Oh, the part about many cameras don't allow it

and you have to use JPEG sometimes, and so, do these

things?

        Q.  No.  The statement that the FBI subcommittees

that they're talking about here --



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4595

William Russell Oliver, MD, MSc, MPA                    October 28, 2010

82

A.   Uh-huh.

Q.   -- strongly advise against the use of lossey compression when capturing digital photographs.  Do you agree with that procedure that the FBI follows?

A.   I -- I agree that they advise that, yes.

Q.   Do you think it's an unnecessary advisement?

A.   It depends upon the use for which the imagery is used.

Q.   Okay.  How about if it's being used in a courtroom in a capital case?

A.   It depends upon the feature in the image.

Q.   Okay.  And by feature, what do you mean?

A.   The thing you're looking at.

Q.   Okay.  What if it's --

A.   You know, for -- for instance, if you look at one of these images, if the question is are those legs, then it doesn't matter whether it's --

Q.   Doesn't matter?  What if we're --

A.   -- whether it's JPEG or not.

Q.   What if we're looking at numerous, numerous small, various size injuries that Dr. Rouse testified were very hard to see, would it then matter as far as use of JPEG?

A.   It would depend upon whether or not, in fact, they were still visible in the image and, if not, then



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4596

you -- you would have to say, "Look, they're not visible in this image."

Q.   Okay.  So, that would be -- you would agree in that context then JPEG would -- should be avoided, is that fair to say, in --

A.   To the degree -- to the degree that you can --

Q.   Okay.

A.   -- you know.

Q.   And I know in this case, you couldn't because that's, in fact, how you got them?

A.   Yes.

Q.   Is that fair to say?

A.   Right.

Q.   Now, just turning to the -- talking about the next page where it talks about capture, do you see that?

A.   Yes.

Q.   And going to the bottom, it indicates, "To preserve the integrity of the photographic process, there should be no" -- and no is underlined and capitalized -- "deletion of images during the course of the mission/investigation.  This includes the last images captured."  Now, that's -- is that, in fact, the FBI saying that you're supposed to save your intermediate images?  Is that --

A.   That is explicitly not what they're saying.


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4597

William Russell Oliver, MD, MSc, MPA                    October 28, 2010

84

Q.   What are they saying?

A.   They're saying that when you're capturing images --

Q.   Uh-huh.

A.   -- the image that you captured should be kept. What they're specifically talking about here is the fact that when you're at a crime scene --

Q.   Uh-huh.

A.   -- sometimes you'll be taking pictures, on and on and on, and occasionally as may happen, you'll end up taking a picture of your foot or it will be up there, you'll have the lens cap on or something like that, and it is a common process for some crime scene investigation units to say, "Well, those don't have anything to do with it," and then what happens, of course, later is that counsel will come back and say, "Obviously, you've deleted the image that makes all the difference."

Q.   Okay.

A.   So, that's what they're saying to avoid.

Q.   And so, what you're saying is it is important to document from beginning to end what steps were taken even if some of those steps were not fruitful, is that fair to say, for completeness of the investigation?

A.   During -- no.  All I'm saying here is that during



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4598

William Russell Oliver, MD, MSc, MPA                    October 28, 2010

image capture such as -- all I'm saying is that the guideline here states that during image capture, such as a crime scene, you shouldn't delete images even if -- even if they are images of your foot.

Q.  Okay.

A.  That's all it says.

Q.  Okay.  Do you agree with this statement concerning lossey compression, "Lossey compression reduces the amount of image detail and can make it impossible to detect -- to detect manipulation artifacts"?  Do you agree with that?

A.  Yes.

Q.  Okay.  Now I'm going to have you look at another document we'll go through from the workshop.  This is number 6.

MR. MCHUGH:  What are we up to?  P --

Q.  (BY MR. MCHUGH)  And, again, this is a -- I'll -- I'll tell you what it is, it's a -- a portion of the workshop number 6 but I will -- we do have a copy of the entire workshop that I'll be happy to provide for your review.  I simply parsed out what I -- various specific presentations.  And so, can you identify this -- who presented this workshop?

A.  It was -- Richard Vorder Bruegge and myself are the two co-chairs.  There was -- I'm sure there were



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4599

other people.  I bet Carl Kriigel presented and some other people presented as well.

Q.  Well, in fact, looking at the very first page, the -- what appears to be the first slide in the packet --

A.  Oh, Carl Kriigel.  There you go, Carl.

Q.  Okay.

A.  All right.

Q.  And, in fact, is Carl, in that particular Power Point slide, identified as the chair of SWGIT?

A.  Yes.

Q.  Okay.  So, he's -- is that the head man of SWGIT?

A.  He's -- he's currently the chair.

Q.  Okay.  And, again, this was -- what's been marked as P-184 is the February of 2009 workshop that you attended?

A.  Yes.

Q.  Okay.  I'm just going to ask you to go to the second page where he outlines the SWGIT position on digital imaging.  Do you see that?

A.  Excuse me.  Yes.

Q.  Okay.  And it says, "Changes to an image made through digital image processing are acceptable in forensic applications provided," and then he lists fourth -- four factors -- I'm sorry -- five factors?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4600

William Russell Oliver, MD, MPA PageID #: 6494                    October 28, 2010

87

Looks like --

A. Oh, I see where you are. Okay.

Q. I want to talk to you about that. So -- so, he's stating that the SWGIT position on imaging -- digital imaging is acceptable in forensic applications if, one, the original image is preserved; is that right?

A. Yes.

Q. Okay. And, of course, that happened in this case?

A. Yes.

Q. The processing steps are logged, and you would agree with me that that did not happen in this case?

A. Right.

Q. And number three, the end result presented as processed or working copy image; is that right?

A. Yes.

Q. Okay. And four, documenting processing steps so a comparably trained person can understand the process and repeat comparable information from the image, is that fair to say?

A. Yes. Uh-huh.

Q. Well, obviously, that couldn't be done in this case because, as you said, the protocol that you had wasn't even in the order that you used; is that right?

A. The -- the -- once again, the ordering is



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4601

William Russell Oliver, MD, MPA                    October 28, 2010

arbitrary because they're not done in order.  They're done independently.

The second thing is that these guidelines are for the use of image processing from which you are deriving a conclusion.

Q.  Now, where does he say that?

A.  Well, I don't know but I happen -- being -- being the chairman of the image analysis subcommittee of this -- of the SWGIT, I happen to know that that's the position of SWGIT.

Q.  Well, I'm just asking you --

A.  And, in fact, I can't -- I can't -- this is a Power Point bullet.

Q.  Right.

A.  Okay.  And so, it is the position of SWGIT -- and I will affirm it regardless of what the bullets on this Power Point state -- is that these apply to processing where you're drawing a conclusion from the processed image.

Q.  Okay.  But -- but you would agree with me in the chairman's presentation, he states that it's acceptable in forensic applications, he doesn't limit it to applications where conclusions are being drawn from, can we agree that it doesn't state that there?

A.  It is not -- no, that is not one of the bullets.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4602

89

Q.   Okay.   And you would agree with me that you could not -- somebody could not pick up your protocol and start from where you were and get to you were -- to get to where you ended up by following your protocol, is that fair to say?

A.   Oh, they probably could.   They probably --

Q.   Well, how about if they don't know your parameters, could you say --

A.   Because -- because -- because, in fact, there are very limited -- in this particular process, there are very limited parameters and they tend to lead to the same place.

Q.   Well --

A.   So, in fact, for this kind of thing, yes, the bottom line is that if they -- if they simply modify parameters a bit, they end up at the same place.

Q.   But they wouldn't get there the same way you got there unless it was by luck, is that what you're saying?

A.   No.   No.   I mean, once again, this is -- as I said in there, this is an exploration process.

Q.   Right.

A.   So, if they -- if they did exploration and varied parameters by not very much, they would end up at a similar place.

Q.   But by following what you've provided -- because



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4603

I guess what I'm asking is this -- this list of your parameters -- or I'm sorry -- your -- your protocols, P-181, is that the only document that exists today that documents what you did in this case?

A.    Yes.

Q.    Okay.  And you've told us already that you didn't -- that this is in no particular order --

A.    Right.

Q.    -- is that right?

So, the person would have to -- if they wanted to follow you step by step, they would just have to guess at what order to go in, is that fair to say?

A.    The order has nothing to do with it.

Q.    Well, I'm just talking about re -- what they say here is, "Can understand the process and repeat comparable information from the image."  So --

A.    Yes, they could -- regardless of the order in which they did them, they would send up at the same place.  That's what I'm saying.

Q.    And that's only if they used the same parameters that you did not identify, is that fair?

MR. DOWD:  I would object as asked and answered.

MR. MCHUGH:  Yeah, I'm going to move on.

Q.    (BY MR. MCHUGH)  Now, moving on to Page 6 of the



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4604

SWGIT chairman, Mr. Kriigel's Power Point presentation, it talks about nontraditional enhancement.  Do you see that?

A.  Yes.

Q.  And he has an indication that says caution; is that right?

A.  Uh-huh.

Q.  Do you agree with the statement that he has underneath that that, "Application in high degree of these techniques can affect color, increase noise, cause detail loss and/or introduce artifacts"?

A.  Yes.

Q.  Okay.  And we've already established that the CLAHE that you used in this case is a nontraditional enhancement technique?

A.  Yes.

Q.  Okay.  Okay.  Now, I believe you testified in various different jurisdictions that you would not make a medical diagnosis unless you looked at the originals, is that fair to say?

A.  Yes.

Q.  Okay.  Would it also be fair to say that you won't do that because the originals are clearly -- the original photographs are clearly the best evidence that you want to review?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4605

92

A.  Yes.

Q.  Okay.  In this particular case when you made your presentation to the jury, they were not provided during your presentation with the originals; is that right?

A.  Right, because the images, I felt, were a fair and accurate representation of the features I wanted to demonstrate.

Q.  Okay.  But you didn't tell the jury that they weren't looking at the originals; is that right?

MR. DOWD:  I would object.  That's been asked and answered.

MR. MCHUGH:  Okay.  I just have a couple more questions here.

Q.  (BY MR. MCHUGH)  You told the jury that the originals were, in fact, the digitized images; is that right?

A.  I referred to them as the originals because I was -- what I meant was unenhanced.

Q.  Okay.  Well, you were wrong about that, is that right, when you called them the originals?

A.  In the sense that they were unenhanced and they demonstrated in a fair and accurate manner the features in the original images I wanted to display, they were the original images.

Q.  So, you're saying the digitized images were, in



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4606

William Russell Oliver, MD, MSc, MPA                    October 28, 2010

93

fact, the original images?

A.   I'm saying that they were a fair and accurate representation --

Q.   Okay.

A.   -- of the features in the original images that I wanted to display.

Q.   But what -- let's break it down.

A.   Okay.

Q.   I only have a few questions here.

A.   Correct.

Q.   When you told the jury that, "You need to go back to the originals," and you pointed --

A.   Uh-huh.

Q.   -- to the Power Point presentation --

A.   Right.

Q.   -- you were, in fact, referring to the digitized images?

A.   Yes, I was.

Q.   Okay.  And you would agree with me that those were not the originals as we've just discussed about you making a medical diagnosis?

A.   Yes.

Q.   Okay.  And what you're telling me -- so, when you told the jury that those were the originals, that, in fact, was incorrect as far as --



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4607

William Russell Oliver, MD, MSCJA                    October 28, 2010

94

          MR. DOWD:  Asked and answered.

     A.   They were correct to the degree that they were
fair and accurate representations --

     Q.   (BY MR. MCHUGH)  Right.

     A.   -- of the features in the original images that I
wanted to demonstrate in the demonstration in the Power
Point presentation.

     Q.   But we have to rely on you for that, that they're
fair and accurate representations; isn't that right?

     A.   Absolutely --

     Q.   Okay.

     A.   -- since I'm the one that did the analysis.

     Q.   Right.  But you're asking the jury to do the
analysis, is that fair?

     A.   I'm asking the jury to notice the features that I
used in my analysis, and this was a fair and accurate
representation of those features.

     Q.   I just wanted to ask you some questions that came
out on direct examination now.  The -- I think you
stated that, in fact, Power Point will result -- when
something is converted from Power Point will result in
some detail and accuracy loss, is that fair to say?

     A.   Right.  It has more to do with the display than
the Power Point.

     Q.   Well, isn't that what this is all about as to



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4608

what's being displayed?

A.  Right, but the fact of the matter is that it doesn't matter how many pixels are in an image, if you have a 1 K by -- by 780 K display, then it will be at 1 K by 780 K.

Q.  What did you mean when you said it depends whether it's recognition versus measurement?  Do you remember when you testified about that?

A.  Sure.

Q.  Okay.  Was that in the Power Point context?

A.  Yes.

Q.  Okay.  And you said it would be okay if it's used for recognition?

A.  Uh-huh.

Q.  But could -- could create issues if it's used for measurement?

A.  Yes.

Q.  Okay.  What do you mean by measurement?

A.  All right.  In the image that you -- that you used as -- as --

Q.  157?

A.  Right.

Q.  Okay.

A.  Okay.  Recognition is that's a foot, that's a hand.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4609

William Russell Oliver, MD, MPA                     October 28, 2010

96

Q. Okay.

A. Okay? Measurement would be the hand -- the foot is exactly, you know, 16.56 centimeters long.

Q. Okay. So, if we were looking at measurements of injuries or measurements of what appear to be injuries, Power Point would not be a good program to use for that, is that fair to say?

A. In general, no.

Q. Okay. You mentioned when there was talk about -- you corrected Mr. Schenk about color gamut?

A. Yes.

Q. Do you remember that? And it was talking about scanning?

A. Yes.

Q. And I believe you indicated that there would be -- scanners back at that time would have a narrower gamut; is that right?

A. Yes.

Q. What does that mean?

A. That means that the -- that the number of colors that can be recorded from the scanner is fewer and somewhat different than the number of colors that can be recorded in the -- in the print.

Q. Okay. So, there would be loss of detail and accuracy back at the time that this was being done



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4610

in the -- you would agree then in the scanning of these photographs?

A.   Yes.

Q.   Okay.

MR. MCHUGH:  If I may just have a minute. That's all I have.

FURTHER EXAMINATION

Q.   (BY MR. DOWD)  Dr. Oliver, just a few more questions.

A.   Excuse me.

Q.   Explain the -- the reason that there's a difference between the FBI standard against using JPEG format for evidentiary photographs and the SWGIT standard which -- which permits the use of JPEG format.

A.   The -- the bottom line is that the degree -- the question -- the question boils down to the size of the feature that is being used and what the -- what the image is being used for, so that, for instance, if I take a photograph of a gunshot wound and I want to show that there is a gunshot wound on the left thigh, all right, those are very big features, making it a JPEG image will not change that data.  You'll still see the gunshot wound, so that when you get up on the stand and it is a fair and accurate representation of that gunshot wound on that thigh.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4611

98

And so, how much -- how much one should or should not do compression or -- or change the size of the image, et cetera, et cetera, is a function of really how the image is being used.

Q.   All right.  And you said that the JPEG format is the de facto standard for autopsy photos?

A.   Yes.

Q.   And what are the reasons for that?  Is it out of convenience or uniformity --

A.   It is --

Q.   -- or --

A.   Yeah, it is primarily out of convenience.  And the fact is -- and the fact that the features that people are taking photographs of are accurate -- are fairly and accurately represented in those photographs and they work.

Q.   All right.

A.   The issue frequently comes from the fact -- and to use an example, let's say that I have a 100 by 100 pixel image and it shows -- it shows a little circle in the middle.  All right?  And I use -- I also have the same image but -- a photograph of the same thing but it's JPEG'd but it's a 10,000 by 10,000 pixel image. All right?

Q.   Uh-huh.


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4612

A.  It is rather arbitrary to say that oh, no, the 100 by 100 pixel image is a better -- is a better image because it is not stored in lossey compression than the 10,000 by 10,000 pixel image because it has undergone JPEG compression, particularly if the feature that you're looking at is of a size that is greater than the loss of information associated with the JPEG compression.

If using JPEG compression destroy the usefulness of an image, then -- or any kind of that kind of stuff, then we basically could never look at images in -- in textbooks because those have low resolution.  We could never look at a television set.  We could never display an image in court.

Q.  Because those are all reduced to JPEG format?

A.  Well, they're not all reduced to JPEG but they all have reduced resolution.

Q.  Okay.  All right.  And I just want to make sure I understood this or make this clear.  As you -- did -- was your testimony that you relied upon the JPEGs produced and shared with you by Dr. Rouse of the autopsy and did you say that those were accurate depictions of -- well, to the extent that you had duplicates of those JPEG images in the autopsy prints, was your testimony that those were -- that those were virtually



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4613

the same, that they were accurate depictions of --

A. Well, there were two --

Q. -- of the duplicate prints?

A. There were two different sets of photographs.

Q. Uh-huh.

A. One -- one group -- going back to what the SOP was at -- at the AFIP, the -- the prints were most likely taken by the staff photographers. I don't -- I don't know whether it was Dr. Rouse or the staff photographers who took the ones that were on the disk, and some of those were useful and some of them weren't.

Q. Did you say there was some duplication --

A. Well, there were duplications of --

Q. -- from the autopsy prints versus the JPEG from the autopsies?

A. They were not duplications of the same photograph. They were duplicate views of the same area on the body.

Q. Okay.

A. Okay.

Q. And you had testified that -- that the JPEG images were accurate depictions of that scene?

A. To the degree that they demonstrated what I wanted to demonstrate.

Q. Which was the injuries?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4614

A. Yes.

Q. Okay. Now, why in the -- I'm talking about the SWGIT protocol, which describes the need to log the processing steps, and you indicated that it wasn't necessary in what you were performing. Why is that?

A. Because there was no test, there was no question that was answered by the processing. So, the issue merely becomes are these -- are these images convenient.

Q. To demonstrate --

A. To demonstrate something, yes.

Q. Okay. And you indicated that you had picked the parameters that you used for the enhancements?

A. Yes.

Q. I believe you indicated that those, again, were not that important?

A. Well, they're important but they're -- but they're easily -- they're easily varied. I mean, basically, there are two parameters to the Contrast-Limited Adaptive Histogram Equalization, and those are the size of the -- of the adaptive regions and the degree of clipping.

And so, you -- I mean, basically, if you're doing this kind of image exploration, you'll basically do a number of them and change the parameters.

Q. Okay. Now, I wanted to ask you about the --



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4615

William Russell Oliver, MD, MPA                   October 28, 2010

explain, if you would, the -- I want to get to the software and the algorithms in the CLAHE.  Explain how the software is used in conjunction with the algorithms that -- for the CLAHE.  And I'm -- I know I'm very inartfully putting this to you but I just want to understand, we've distinguished the software that you -- that you wrote to --

A.  Uh-huh.

Q.  -- in which the CLAHE algorithms -- what does the software do?

A.  Okay.  An algorithm is simply a -- a standardized set of steps to get from one place to another.  That's all an algorithm is.

Q.  Okay.

A.  Okay.  That, in turn, needs to be encoded into computer code, and that is implementation into that computer code.

Q.  All right.

A.  All right?  Those programs are frequently called software to distinguish them from the actual physical computer itself, which is called hardware.

Q.  Okay.

A.  Okay?  Frequently -- I mean, there are numerous larger software packages for which -- that provide essentially front ends and back ends to algorithms


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4616

because you don't want to have to write, you know, your own dials and buttons and all that kind of stuff that most people think of when they think of a graphical user interface for a program.  Okay?

And they provide, you know, different -- different things to make -- make the coding of these things easier.

And so, the -- the algorithm was developed in the 1980s.  The implementation that I did was, for the most part, done at the University of North Carolina, and I used the UNC implementation, for which then I basically put what are called wrappers around.  And wrappers are essentially little programs that will take input, pass it to the software and take output and pass it to the software, and that's what I did.

Q.  You indicate that the algorithms, in conjunction with this -- this enhancement process --

A.  Uh-huh.

Q.  -- have been tested?

A.  They have -- they have been tested, yes, in various -- in various situations.

Q.  All right.  But that the software that you wrote had not been tested?

A.  Right.

Q.  And what's the significance of whether or not the



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4617

software has been tested or not, your software?

A.  The significance would be that, you know, for instance, the algorithm might say that -- that A should go in five steps from 1 to -- 1 to 10 by steps of two, zero to 9 by steps -- zero to 10 by steps of two.  And one person may accidentally write it incorrectly so that it goes up by steps of three.  Okay?  And that would make things work wrong.

Q.  Okay.

A.  Okay?  The way -- you know, there are two or three ways you can -- you can look at this to see whether or not things are working out right, and the simplest way is to take known images, run it through and see whether or not you get the results you think you should get, which I did.  I mean, that's the way you test software.

Q.  And that's why you're confident that your software was working properly?

A.  Right, plus the fact that it was an implementation that was done at UNC by the people -- you know, basically, by the group there, including myself, who worked on this algorithm.

Q.  Okay.  So, the software was developed by you but it was also in connection with these other --

A.  Right.  The algorithm was mostly developed by



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4618

William Russell Oliver, MD, MSc, MPA                    October 28, 2010

105

Robert Cromartie and Brad Hemminger.  And then there was another implementation that was done by -- I'm blanking on his name now.  I want to say -- not Yon Cooter.  It was -- I forget what his name is.  Hold on just for a second.  I can't remember his name but it was published in Graphic Gems and the actual code for that was published.  Graphic Gems IV back in 1994.

Q.  And, Dr. Oliver, you had looked at the workshop presentation on forensic image and video processing in Denver on February 17th, 2009.  And you were the co-chair of this?

A.  Yes.

Q.  What -- what -- did -- what presentation did you make?

A.  I did a presentation on medical imaging.

Q.  Okay.  On this very topic?

A.  Yes.

Q.  And -- and P-184 -- is that right -- P-184 in Colorado on -- well, I guess it's just the day before, February 16th, 2009, you -- you made a presentation at that workshop and that was the -- that was the So You Think You Know Digital Imaging, SWGIT Advice to All AAFS Disciplines.  Do you remember what presentation you made at that one, at that workshop?

A.  No, but I'm sure you can remind me.



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4619

Q.   Is it Meeting Resolution and Color Accuracy Needs?

A.   Okay.

Q.   Does that sound familiar?

A.   Sure, that's something I would lecture on.

Q.   Okay.  All right.

MR. DOWD:  Were you going to offer these?

MR. MCHUGH:  I have mine marked as a -- as a piece of those just for, you know, purposes of the examination.  These are the complete copies if you want to mark them.  Do you want the whole thing in?  I have no problem with that.  Yeah, we'll mark them.

MR. DOWD:  Okay.  Yeah, we'd like to -- if you're not going to offer it, we'd like to offer the complete workshop, and that's on the February 16 one.

MR. MCHUGH:  And there's 19 and number 6.

MR. DOWD:  Do you have the complete one on the other one, too?

MR. MCHUGH:  Yes.

MR. DOWD:  Oh, I'm sorry.  Okay.  Otherwise, we would pass Dr. Oliver.

FURTHER EXAMINATION

Q.   (BY MR. MCHUGH)  Okay.  I just have a few questions to follow up, Dr. Oliver.

A.   Sure.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4620

William Russell Oliver, MD, MSci, MPA                October 28, 2010

107

Q.   In -- in the redirect, you talked about the difference between using the FBI standard versus the SWGIT standard, and I thought you said it had to do with the size of the feature; is that right?

A.   And the use of the image, yes.

Q.   And you -- okay.  But you used an example of identifying a gunshot?

A.   Yes.

Q.   I'm not sure I follow you on that.  So, are you saying that if the image is larger, then you -- you don't need to follow the FBI standard?

A.   No.  I'm saying that the usefulness -- that the issue comes with the size of the feature relative to the -- to the -- relative to the question at hand.

To -- to give you an example, I can pull out my -- I can pull out my camera on my telephone, which is a low resolution camera, all right, and then take a picture of you and ask the question do you have two eyes or three eyes.  And I can look at the image, no, he's got two eyes.  Okay.  And I can do that with a relatively low resolution image.  Okay?

The reason that people talk about this JPEG compression is because you lose resolution, and basically what you're doing is you're taking a -- say a 10 megapixel image and giving you the equivalent



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4621

William Russell Oliver, MD, MPA                    October 28, 2010

108

resolution of an 8 megapixel image.  You're losing those 2 megapixels worth of data.

So, if the feature in question is a feature that is easily visible at that 8 megapixels rather than at the 10 megapixels, then, in fact, it will have no effect on the actual analysis of the image.

Q.  But -- but -- but we're talking about the standards here, and so, are you saying that the FBI standards are -- that the standards that they give, and they call them minimum standards --

A.  Uh-huh.

Q.  -- it's your testimony that they will not apply if the image is one that's large, in your opinion, like a gunshot, then these standards --

A.  Well --

Q.  -- for use of evidence are not applicable? That's what I'm trying to get at here.

A.  The -- the SOP for the FBI --

Q.  Yes.

A.  -- is an SOP for the FBI.

Q.  Right.

A.  And the S -- and I presume the FBI follows it in all cases.

Q.  Okay.  So, the FBI doesn't make the distinction that you're making here, I just want to clarify that,


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4622

right?  The FBI seems to say, from this SOP, that it's in all cases where the photograph -- or the image, I should say --

A.  Uh-huh.

Q.  -- is going to be used -- or to have evidentiary value; is that right?

A.  Well, actually, it says here that there are many cases where, in fact, it's not possible.

Q.  Right.

A.  And that, in fact, you can still use them for evidentiary value given these certain things.

Q.  If certain steps are followed.

A.  I'll also -- I'll also move forward and say also, for instance, the home office of the United Kingdom specifically states that format is -- format is not a determining factor in the usefulness of forensic images.

Q.  But -- but under the F --

A.  So, if you're going to talk about different standards, you should recognize that, in fact, there are both different standards and different SOPs, and an SOP for a particular organization is not a universally accepted standard.

Q.  Well, I'm only talking about the FBI here.

A.  Right.

Q.  We're in America.  It's a federal case.



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4623

A.  Right.

Q.  Federal prosecutors.

A.  Right.

Q.  Federal defender.

A.  Right.

Q.  FBI.  Okay?

A.  And if the FBI were doing this, they would use their own SOPs.

Q.  And that would be what's listed here?

A.  And that's what's listed there.

Q.  Okay.  And --

A.  Not being part of the FBI --

Q.  I understand.

A.  -- I don't use the FBI SOPs.

Q.  I understand that.  But you would agree with me that the FBI standard does not say that the standard is waiveable based on --

MR. DOWD:  I'm going to object.  The FBI SOP speaks for itself.

MR. MCHUGH:  Okay.

MR. DOWD:  And I think we've beaten this to death.

Q.  (BY MR. MCHUGH)  Now, the SWGIT standard --

A.  Uh-huh.

Q.  So, you're comparing the FBI standard, and I



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4624

believe counsel asked you --

A. Uh-huh.

Q. -- between the SWGIT standard and the FBI standard, are you saying the SWGIT standard depends on the size of the feature that's being analyzed?

A. No. It depends on the use of the image.

Q. Okay. So, if it's not in the FBI standard about the size of the feature and it's not in the SWGIT standard, why was it in your answer on --

A. Because as -- as an image scientist, I know what I'm doing.

Q. Okay. So, we -- I thought the question was what does the FBI say you should do and what SWGIT says you should do is standard?

A. No. I was explaining to you why the distinction you're being made in a practical sense, and the question that came to me is well, why is it, for instance, that autopsy pathologists don't do this. The reason -- and I gave you the reason autopsy pathologists tend not to do this.

Q. Why is that? Because of the size of the features?

A. Right, because it's not feasible.

Q. Are you familiar with the term petechia?

A. Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4625

Q.   Okay.  Is that large or small?

A.   That depends on where -- what -- where -- where it is in the image.

Q.   But it can be very small; is that right?

A.   If we're -- if I were taking a picture of someone in that building over there, it would be very small, yes.

Q.   Right.

A.   If I were taking pictures like this, it would be very big.

Q.   Right.  But --

A.   It's a -- it's a function of the size of the feature in the image.

Q.   Okay.

A.   It's not an absolute large or small issue.

Q.   Okay.  Maybe I misunderstood your answer then.

Now, you said that the JPEG, it's the de facto standard and I just -- where are you coming up with this de facto?  Whose standard is it?

A.   Okay.  Basically, this came up in -- in numerous discussions that I've had with other forensic pathologists since this is an area of interest of mine, and the -- the response I've gotten from those forensic pathologists -- and I've queried many, many of them -- is that, in fact, they tend to take photographs in JPEG



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4626

William Russell Oliver, MD, MPA                                    October 28, 2010

113

because it adequately -- it adequately shows what they want to show and, in fact, in my autopsy suite in the Offices of the Chief Medical Examiner of North Carolina in Raleigh, in the Office of the Chief Medical Examiner in Georgia, in the Regional Medical Examiner Offices in Georgia and in numerous other offices, the standard is to use JPEGs.

Q.  So -- so, it was based on your standards in Georgia and your conversation with other forensic pathologists that you --

A.  Right.  You have to remember there are only about 400 of us.

Q.  Right.  In SWGIT?

A.  No.  In the nation.

Q.  Okay.  And it's your -- your testimony that you're confident that from that, you can testify that there's a de facto standard of using JPEG?

A.  That it is acceptable in the profession.

Q.  Okay.

A.  Okay?

Q.  I thought it was --

A.  Which -- which -- which makes it a de facto standard, right?

Q.  Okay.  Now, the -- you talked about logging the parameters, counsel asked you about that.  Would it be



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4627

William Russell Oliver, MD, MSc, DMP                         October 28, 2010

114

fair to say that if someone -- and the reason to log the parameters is that someone can go back and reproduce what you did.  In this particular case, someone would have to figure out the size of the CLAHE that you decided to use; is that right?

A.  The contextual region.

Q.  Right.  I think you called it the size, you can choose a certain region size?

A.  Of the adaptive region.

Q.  They would have to get that right; is that right?

A.  No.  They'd have to get -- they'd have to get somewhere -- somewhere anywhere chose.  It wouldn't have to be the same one.

Q.  But they would have to get close to the size, is that fair to say?

A.  Yes.

Q.  And then they'd have to determine the degree of clipping that you used?

A.  Yes.

Q.  Okay.  And how many variations on that are there?

A.  As many as you want.

Q.  Okay.  So, they'd have to determine the size, the degree of clipping and then they would have to know that you used your own software; is that right?

A.  No.  Almost all the permutations would give



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4628

William Russell Oliver, MD, MSc, MPA                    October 28, 2010

115

similar answers.

Q.   Well, they'd have to know that -- well, they have to know that you used your wrappers on your software, is that fair to say?

A.   No.  They'd use their own.

Q.   Okay.  So that --

A.   All that does -- all that does is say, "Oh, I can use this -- this -- this image coming in."  People -- if they did it in Photoshop as a plug-in, they would use Photoshop as their wrapper.  If they did it in AVS, they'd use AVS as their wrapper.

Q.   Okay.

A.   If they did it in ITK or VTK, they'd use VTK as their wrapper.

Q.   All right.  So -- so, you don't agree with the fact they'd have to know your software and they'd have to know your wrappers but you do agree that they'd have to accurately establish the size of the CLAHE, the square that you used; is that right?

A.   Not accurately.  Anywhere -- anywhere nearby.

Q.   In the ball park?

A.   Yeah.

Q.   And figure out the degree of clipping?

A.   Anywhere in the ball park.

Q.   Okay.



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4629

MR. MCHUGH:  That's all I have.

MR. DOWD:  Okay.  Nothing further.

THE VIDEOGRAPHER:  The time is approximately 1:46.  We are now off the record.

(Off the record.)

THE VIDEOGRAPHER:  The time is approximately 1:47.  We're now back on the record.

MR. MCHUGH:  Petitioner at this time offers P -- exhibit which is marked P-185, which is a complete copy of workshop number 19, which has been referenced in the testimony of Dr. Oliver.

MR. DOWD:  No objection.

MR. MCHUGH:  And P-186, which is a complete copy of workshop number 6 that was referenced during the testimony of Dr. Oliver.

MR. DOWD:  No objection.

THE VIDEOGRAPHER:  The time is approximately 1:47.  We are now off the record.

MR. DOWD:  We're still on the record.

MR. MCHUGH:  I'm sorry.  And I offer all my exhibits in addition to this.

MR. DOWD:  Oh, and you're offering everything else?

MR. MCHUGH:  Yeah.

MR. DOWD:  Okay.  What are the numbers of



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4630

William Russell Oliver, MD, MS, MPA                October 28, 2010

117

those?

MR. MCHUGH:  We are offering -- in addition to the exhibits that we just offered, we're offering Exhibit 182, 183, 184, 127, which was premarked.  Didn't we refer to that?

MR. DOWD:  That was used earlier?

MR. MCHUGH:  Yes.

MR. DOWD:  Oh, there is it is.  Okay.

MR. MCHUGH:  And that's it.

MR. DOWD:  All right.  Thank you.

(Whereupon at 1:49 p.m. the
deposition was concluded.)



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4631

William Russell Oliver, MD, MSc, MPA                    October 28, 2010

118

E R R A T A    S H E E T

Correction                                    Page        Line

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4632

William Russell Oliver, MD, MS, MPA                          October 28, 2010

119

       I, WILLIAM RUSSELL OLIVER, MD, MS, MPA, have read
the foregoing deposition and hereby affix my signature
that same is true and correct, except as noted above.

                    _____
                    WILLIAM RUSSELL OLIVER, MD, MS, MPA

THE STATE OF _____
COUNTY OF _____
Before me, _____, on this day personally
appeared WILLIAM RUSSELL OLIVER, MD, MS, MPA, known to
me (or proved to me under oath or through
_____) (description of identity card or other
document) to be the person whose name is subscribed to
the foregoing instrument and acknowledged to me that
they executed the same for the purposes and
consideration therein expressed.

Given under my hand and seal of office this _____ day
of _____, _____.
_____
NOTARY PUBLIC IN AND FOR
THE STATE OF _____



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4633

William Russell Oliver, MD, MS, MPA                    October 28, 2010

120

STATE OF TEXAS         *
COUNTY OF HARRIS       *

            I, the undersigned certified shorthand reporter
and notary public in and for the State of Texas, certify
that the facts stated in the foregoing pages are true
and correct.
            I further certify that I am neither attorney or
counsel for, nor related to or employed by, any of the
parties to the action in which this deposition is taken
and, further, that I am not a relative or employee of
any counsel employed by the parties hereto, or
financially interested in the action.

            SUBSCRIBED AND SWORN TO under my hand and seal of
office on this the 10th day of November, 2010.


            EDITH A. BOGGS, CSR
            Certified Shorthand Reporter and
            Notary Public in and for
            the State of Texas
Notary Expires:  5-10-2012
Certificate No. 3022
Expiration date:  12-31-2011
Esquire Deposition Solutions, LLC
Registration No. 3



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4634

William Russell Oliver, MD, MS, MPA                    October 28, 2010

121

**A**

**AAFS**
4:20,23
105:22
**ability**
76:5
**able**
16:16 36:8
**abrasions**
31:10
**absolute**
112:15
**absolutely**
27:9 51:2
94:10
**abstract**
36:3
**Academy**
8:25 11:9
66:4,24
**acceptable**
53:1 86:23
87:5 88:21
113:18
**acceptance**
55:4,11,16
**accepted**
28:7 52:23
54:11 61:4
61:10
109:22
**accidentally**
104:6
**accuracy**
31:19 36:13
36:16 61:21
65:12 70:3
94:22 96:25
106:1
**accurate**
31:16 50:24
59:20,21
75:23 92:6
92:22 93:2
94:3,9,16
97:24 98:14
99:22 100:1

100:22
**accurately**
59:18 76:5
98:15
115:18,20
**achieved**
20:17
**acknowledged**
119:8
**acronym**
52:25
**action**
120:6,7
**active**
7:23
**actual**
23:11 24:5
102:20
105:6 108:6
**adaptive**
14:19 19:17
21:2,4,4
22:4 44:4
101:19,20
114:9
**addition**
16:7 116:21
117:2
**additional**
12:22
**adequately**
25:15 113:1
113:1
**adjustment**
19:25 41:5
56:20
**administr...**
6:16
**administr...**
8:10
**Advanced**
13:2 42:3
**Advice**
4:20,23
105:22
**advise**
5:22 81:4
82:2,5

**advised**
76:23
**advisement**
82:6
**advises**
76:10,24
**advisor**
14:18
**aerospace**
54:12
**aesthetic...**
35:8
**affect**
91:10
**affirm**
88:16
**affix**
119:1
**AFIP**
100:7
**afternoon**
37:14
**agree**
36:12 44:12
54:8,22
55:5,23
59:7 69:17
75:5 76:6
76:12 77:5
79:8 80:21
81:6,8,10
81:13,15
82:4,5 83:3
85:7,11
87:12 88:20
88:24 89:1
91:8 93:19
97:1 110:15
115:15,17
**agreed**
57:4 70:2
**ahead**
5:12 8:8
11:24 25:22
62:2
**aid**
30:22
**ALFRED**

1:6
**algorithm**
42:8 44:1,3
44:4,8,17
102:11,13
103:8 104:3
104:22,25
**algorithms**
7:9,12,15
42:13 102:2
102:3,9,25
103:16
**allow**
7:15 42:25
81:21
**allows**
64:12
**America**
1:4 109:25
**American**
8:25 9:5,6,7
10:19 11:9
66:4,24
**amount**
85:9
**analysis**
7:18 11:6,7
17:17 32:9
45:3 46:13
46:14 59:25
81:4 88:8
94:12,14,16
108:6
**analyst**
17:20 18:7
**analysts**
18:10
**analyzed**
111:5
**anatomic**
6:5
**ancillary**
61:19
**and/or**
91:11
**answer**
15:13 40:10
40:14,15

60:12,13,16
61:1,14
63:22 111:9
112:16
**answered**
59:12 79:6
90:23 92:11
94:1 101:7
**answers**
2:11 115:1
**anybody**
43:22 45:2
45:19
**API**
13:9
**apparent**
18:12,13
**appear**
74:20 96:5
**appeared**
119:6
**appears**
38:3 67:6
86:4
**applicable**
108:16
**application**
53:2 91:9
**applications**
76:11 86:24
87:5 88:22
88:23
**applied**
55:3 61:17
**applies**
21:5
**apply**
24:17 88:17
108:12
**applying**
53:16
**appropriate**
21:25 22:1
**approxima...**
5:3 8:19
49:7 80:2,6
116:3,6,17



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4635

William Russell Oliver, MD, MS, MPA                    October 28, 2010

122

| | | | | |
|---|---|---|---|---|
| **approxima...**<br>16:17 | 46:5<br>**aspects** | 8:6,14 17:8<br>23:19 25:19 | 48:15 50:18<br>51:4 53:25 | 107:24<br>112:20 |
| **arbitrary**<br>88:1 99:1 | 19:15<br>**assessment** | 29:7 30:16<br>31:12 32:20 | 55:6 56:18<br>56:25 60:25 | **basing**<br>50:8,14 |
| **area**<br>8:18 9:10 | 31:16<br>**assist** | 32:20,25<br>37:1,7 | 61:9 62:16<br>80:7,12 | **basis**<br>27:2 46:11 |
| 16:4 29:15<br>29:18 30:23 | 22:22<br>**associated** | 47:21 48:11<br>58:2,22 | 84:16 93:11<br>96:16,25 | 56:4 57:6<br>58:23 60:8 |
| 80:13<br>100:17 | 99:7<br>**Association** | 59:2,4 71:3<br>73:3 77:12 | 100:6<br>102:25 | **beaten**<br>110:21 |
| 112:22<br>**areas** | 1:15 3:5 9:1<br>9:3,3,7 | 77:13,23,25<br>79:17 98:6 | 105:7 114:2<br>116:7 | **beginning**<br>80:5 84:22 |
| 30:13<br>**armamenta...** | 77:15<br>**assuming** | 99:21,24<br>100:14 | **background**<br>5:21,22 6:23 | **believe**<br>27:21 47:10 |
| 44:10<br>**Armed** | 62:13<br>**assumption** | 111:18,19<br>113:2 | 6:24 11:1<br>52:20 | 48:3,7<br>53:25 57:4 |
| 7:2,3,5,20<br>7:22 8:11 | 20:16<br>**assurance** | **avoid**<br>76:16,19 | **balances**<br>35:12 | 70:2 71:23<br>72:19 80:9 |
| 14:23 15:6<br>15:14,20,25 | 58:13<br>**attack** | 79:3 84:20<br>**avoided** | **balancing**<br>38:14 51:22 | 80:25 91:17<br>96:15 |
| 43:10 58:14<br>**Army** | 10:2,7<br>**attempt** | 83:4<br>**avoiding** | **ball**<br>115:21,24 | 101:14<br>111:1 |
| 11:18<br>**article** | 21:2 30:2<br>**attempts** | 80:14<br>**AVS** | **band**<br>64:12 | **believed**<br>30:23 |
| 38:9 39:4,21<br>41:21,22 | 20:19<br>**attend** | 12:14,15,25<br>12:25,25 | **base**<br>56:7,12 | **bends**<br>20:18 |
| **articles**<br>43:24 | 68:2,24<br>**attended** | 13:1,8 42:9<br>115:10,11 | **based**<br>24:16 46:13 | **Berry**<br>9:19 |
| **artifact**<br>19:4 24:2 | 86:16<br>**attention** | **award**<br>9:22 | 46:14,25<br>47:7,9 | **best**<br>20:17 26:12 |
| **artifacts**<br>85:11 91:11 | 17:14 19:9<br>22:23 23:25 | **awards**<br>9:9,15 10:11 | 48:19 49:18<br>51:1 55:1 | 26:13,16,22<br>27:7 32:10 |
| **artist**<br>23:6 | 30:12,14,22<br>57:8 | 10:12<br>**aware** | 60:10,12,13<br>71:10 | 33:1 35:25<br>70:24 91:24 |
| **asked**<br>17:8 59:11 | **attorney**<br>3:3 120:5 | 40:10 60:17<br>61:13,15 | 110:17<br>113:8 | **bet**<br>86:1 |
| 71:23 79:6<br>90:22 92:11 | **ATTORNEYS**<br>3:9 | **a.m**<br>2:17 | **basic**<br>41:4 56:10 | **better**<br>21:24 76:5 |
| 94:1 111:1<br>113:25 | **Attorney's**<br>3:10,16 5:10 | ——— **B** ——— | 56:20 74:25<br>78:2 | 99:2,2<br>**big** |
| **asking**<br>40:12 57:20 | **Audio**<br>81:4 | **bachelor's**<br>5:23 | **basically**<br>13:5 23:25 | 97:21 112:10<br>**bigger** |
| 60:14 63:24<br>68:9 74:16 | **autopsies**<br>10:9 15:8 | **back**<br>10:4 19:2,5 | 34:14 49:21<br>51:14 99:11 | 46:5<br>**bit** |
| 88:11 90:1<br>94:13,15 | 77:11 79:15<br>100:15 | 23:9,12<br>24:1,5 | 101:18,22<br>101:23 | 22:24,25<br>23:12 35:12 |
| **aspect**<br>19:9 33:18 | **autopsy** | 28:14 31:23<br>33:20 45:2 | 103:11<br>104:21 | 37:18 69:24<br>89:16 |



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4636

William Russell Oliver, MD, MS, MPA                    October 28, 2010

123

black
 18:3 21:15
blanking
 105:2
blind
 38:24 45:2
blinded
 61:2
blood
 29:3
blur
 64:13
blurred
 64:16
body
 29:7 100:18
Boggs
 1:19 2:12
  3:25 120:11
boils
 97:16
bone
 21:13,13,14
  22:1,1,6,7
bones
 21:17
BOOTH
 3:18
bottom
 83:17 89:15
  97:15
boundaries
 18:14
Bourgeois
 1:6 17:7
Box
 3:11
boxes
 18:20
Brad
 105:1
break
 18:13,18
  19:20 79:24
  93:7
breakdown
 16:11,15

brief
 19:18
briefly
 17:16
bright
 20:22,24
brighter
 20:15
brights
 20:14
bring
 18:12
Brody
 8:4,6,14
Bruegge
 85:24
bruise
 29:16,19
bruises
 29:17,19,21
build
 13:6
building
 1:16 3:6
  112:6
bullet
 68:10 88:13
bullets
 88:16,25
Bureau
 7:25 45:23
buttons
 103:2

_____
        C
_____
C
 3:1 7:13,13
cadaverous
 35:16
calibrated
 44:25 45:3
calibration
 34:23 73:14
call
 57:14 108:10
called
 5:14 18:20

 18:25 20:7
 20:20 21:4
 21:18 41:18
 45:24 46:1
 50:18 65:3
 80:9 92:20
 102:19,21
 103:12
 114:7
camera
 25:3 33:2
  107:16,17
cameras
 76:6 77:1
  81:21
cap
 84:12
capital
 82:10
capitalized
 83:20
capitals
 76:15
capture
 75:2 76:5
  83:15 85:1
  85:2
captured
 77:4 83:22
  84:5
capturing
 74:3 81:6
  82:3 84:2
card
 119:7
Carl
 86:1,6,6,9
Carolina
 6:4 8:4,7,15
  8:20 9:15
  103:10
  113:3
cartography
 54:12,13,14
case
 10:4 17:6
  18:8 38:1
  39:4 40:5

 43:3,9,22
 54:15,16
 57:22 60:23
 61:11,17
 76:18 78:7
 82:10 83:9
 87:9,12,23
 90:4 91:14
 92:2 109:25
 114:3
cases
 108:23 109:2
  109:8
cause
 91:10
caution
 91:5
cells
 29:3
centimeters
 96:3
certain
 18:16 48:16
  60:1 109:11
  109:12
  114:8
certainly
 28:9,10
  33:15 78:15
  79:12
Certificate
 120:14
certificates
 9:9
certified
 2:12 120:2
  120:12
certify
 120:3,5
cetera
 33:3,3,3
  98:3,3
chair
 66:20,21
  68:7 86:10
  86:13
chairman
 88:8 91:1

chairman's
 88:21
challenge
 55:4,12,17
challenges
 55:15
change
 18:22 23:10
  25:6 34:14
  35:1 62:7
  79:25 97:22
  98:2 101:24
changed
 75:25
changes
 19:23 34:24
  52:25 86:22
Chapel
 6:4
character...
 55:19
chemical
 34:16 35:22
Chief
 113:3,4
child
 27:12,18
choose
 114:8
chose
 114:12
Christi
 3:17
circle
 98:20
civilian
 7:24
CLAHE
 41:2 46:5
  54:1 55:9
  91:14 102:2
  102:4,9
  114:4
  115:18
claim
 24:7,18
  26:11 27:5



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4637

William Russell Oliver, MD, MS, MPA                    October 28, 2010

124

28:1,5,13
28:16 33:7
**clarify**
68:15,17
72:9 108:25
**Clark**
65:19,20
**Clark's**
65:14
**class**
69:21
**classic**
17:21 20:6
64:18
**classific...**
41:4
**classify**
41:7
**clear**
99:19
**clearly**
62:5 91:23
91:24
**clinical**
6:5 9:7
**clipping**
101:21
114:18,23
115:23
**close**
114:14
**code**
102:16,17
105:6
**coding**
103:6
**collection**
20:4 40:24
41:18,21
42:12,15
59:14,15
61:16 63:4
**collectively**
63:16,16
**College**
9:6
**color**

20:6 33:8,10
35:6,7,11
38:14 51:22
75:19,19
76:5 80:19
91:10 96:10
106:1
**Colorado**
105:19
**colors**
34:15 35:8
76:5 96:20
96:22
**Columbus**
6:16,17
**combination**
39:9,12
**come**
18:14 46:21
48:20 84:16
**comes**
98:18 107:13
**coming**
112:18 115:8
**commendation**
10:1,3
**comment**
46:1,2 48:22
**comments**
46:3
**common**
84:13
**commonly**
69:7,10
**community**
1:14 3:4
18:19 28:8
28:19 61:5
**company**
13:4
**comparable**
87:19 90:16
**comparably**
87:18
**compare**
31:20
**compared**

31:21,23
**comparing**
110:25
**comparison**
23:13
**complete**
106:10,15,17
116:9,13
**completeness**
84:24
**components**
64:16,16
**compressed**
25:2 34:3
70:3
**compression**
24:19,20
69:25,25
70:4,9 73:1
76:16,25
77:1 78:5
79:3 80:14
80:15,23
81:5 82:3
85:8,8 98:2
99:3,5,8,9
107:23
**comprises**
77:4
**computed**
21:10
**computer**
6:6,9,10,20
6:21,22
11:4,4,5
13:10 28:21
43:6 102:16
102:17,21
**computing**
8:10 9:3,16
9:17
**concept**
69:20,21
**concerned**
50:23 66:15
**concerning**
43:25 44:1
69:13 85:8

**concluded**
117:12
**conclusion**
48:20 50:8
50:14 56:5
56:23 57:7
60:8,10
71:20 73:5
88:5,18
**conclusions**
26:23 46:23
46:25 47:7
47:9,11,19
48:18 49:17
49:18 56:8
71:16,24
72:1,23
88:23
**confident**
104:17
113:16
**confocal**
7:10,12 15:9
**conjunction**
102:3 103:16
**connection**
17:11 62:23
63:23
104:24
**consider**
51:17
**considera...**
119:9
**construction**
38:21 65:16
**consultant**
16:8,11
**consulted**
16:19
**consumption**
43:16
**contained**
29:16 48:11
75:6 77:3
**context**
55:8 83:4
95:10
**contextual**

114:6
**continue**
75:9
**contrast**
18:22 19:21
19:25 20:9
20:17,24
21:6,14,15
21:16 22:11
22:21 23:10
41:6 51:24
56:15 62:6
62:9
**Contrast-...**
14:19 19:17
44:4 101:19
**contributed**
9:9
**contribution**
10:6
**contribut...**
9:22
**contusions**
31:9,9 61:6
**convenience**
98:9,12
**convenient**
101:8
**conversation**
113:9
**conversion**
28:3 33:8
**converted**
94:21
**converting**
34:3
**Cooter**
105:3
**copies**
106:10
**copy**
85:19 87:15
116:10,14
**Corpus**
3:17
**correct**
27:9 28:4



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4638

William Russell Oliver, MD, MS, MPA                    October 28, 2010

125

29:7 31:24
31:25 66:6
93:10 94:2
119:2 120:4
**corrected**
96:10
**Correction**
118:3
**correctly**
44:25 45:3
59:23 60:6
**correlated**
58:21
**counsel**
13:20 84:16
111:1
113:25
120:5,7
**count**
17:9 23:18
23:22 26:4
27:11,17
29:18,19
30:18 31:11
**counted**
23:16 29:20
31:14
**Counter**
10:21
**counterpart**
55:1
**counties**
8:19
**counting**
29:5
**County**
2:13 119:5
120:1
**couple**
24:21 92:12
**course**
73:22 83:20
84:16 87:8
**courses**
14:12,14,16
**court**
1:3 5:6
16:12 17:7

27:4 29:10
30:5,25
99:14
**courtroom**
37:3 57:23
71:7 82:10
**co-chair**
66:6,21
105:11
**co-chairs**
85:25
**create**
42:4,7,20
49:8 95:15
**created**
42:2,8,19,21
43:12,25
44:1,3,12
44:13 48:24
71:11
**creates**
24:9
**creating**
27:3 39:18
62:22
**creation**
33:4 75:3
**crime**
84:7,13 85:3
**Criminal**
4:16 52:10
**criteria**
53:2
**Cromartie**
105:1
**crop**
18:22
**cropping**
51:23
**Crows**
9:4
**Cr-C-02-216**
1:5
**CSR**
1:19 120:11
**CT**
21:9,9,11

**currently**
86:13
**Curtis**
1:16 3:6
**CUSTODY**
1:13
**cut**
8:8
**CV**
12:14
**Cv-07-223**
1:6

──────────
          D
──────────

**dark**
20:23,25
**darker**
20:14
**darkroom**
34:21
**darkrooms**
53:9
**darks**
20:14
**data**
15:9 17:18
17:20 18:6
21:11,20
29:20 36:6
77:3 80:20
97:22 108:2
**date**
1:19 5:2
54:5 74:14
120:15
**dated**
74:20
**day**
2:16 29:14
105:19
119:6,10
120:9
**de**
77:20,21
78:1,22
98:6 112:17
112:19
113:17,22

**deal**
61:24 78:10
**dealing**
7:20
**death**
110:22
**decided**
114:5
**decision**
46:11
**decompose**
65:2
**decomposi...**
64:19,20
65:4,13
**deconvolu...**
38:25
**decreases**
62:3
**defender**
1:14,15 3:4
3:5 110:4
**defense**
7:24 16:16
16:19
**define**
59:20,21
**degraded**
27:22
**degree**
5:23 6:2,8
6:16 11:3
12:7 13:24
28:9 83:6,6
91:9 94:2
97:15
100:23
101:21
114:17,23
115:23
**delete**
85:3
**deleted**
84:17
**deletion**
83:20
**demonstrably**

75:19
**demonstrate**
19:15 30:12
57:24 70:25
71:1 92:7
94:6 100:24
101:9,10
**demonstrated**
25:15 92:22
100:23
**demonstra...**
24:23 27:3
56:23 71:7
94:6
**demonstra...**
57:23
**Denver**
66:3 105:10
**Department**
3:10,15 7:1
7:24
**depend**
82:24
**depending**
61:20 62:4
**depends**
82:7,11 95:6
111:4,6
112:2
**depict**
37:25
**depicted**
17:9
**depictions**
99:22 100:1
100:22
**deposition**
1:11,13 2:8
2:11,14 5:8
117:12
119:1 120:6
120:15
**depositions**
46:21
**deputy**
7:3
**derivative**
64:17


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4639

William Russell Oliver, MD, MS, MPA                October 28, 2010

126

deriving
 88:4
describe
 10:25
describes
 64:3 101:3
describing
 22:12
description
 4:13 19:19
  75:23 119:7
destroy
 99:9
detail
 85:9 91:11
  94:22 96:24
details
 21:13 28:2
  70:2
detect
 85:10,10
determine
 24:10 65:10
  65:12
  114:17,22
determines
 44:23
determining
 46:23 109:16
develop
 60:21
developed
 14:18 21:8
  22:5 63:3
  103:8
  104:23,25
devices
 74:3
diagnoses
 61:19
diagnosis
 36:21 91:19
  93:21
diagonals
 64:24
dials
 103:2

dictated
 78:5
difference
 24:23 47:19
  79:19 84:18
  97:12 107:2
differences
 17:25 18:9
  35:2
different
 18:11 26:3
  34:8 35:11
  42:25 47:25
  48:2 72:7
  72:13,13
  78:3,13,25
  79:7 91:18
  96:22 100:4
  103:5,6
  109:18,20
  109:20
difficulty
 23:9
digital
 4:15,20,23
  7:7 12:4,20
  13:24 14:5
  14:5,21,22
  15:5,12,17
  15:21 16:5
  25:3 28:3
  33:8 35:22
  49:25 52:10
  52:22 53:1
  56:6 58:19
  58:19 59:19
  70:6,12,20
  71:15 74:2
  74:7 75:1
  75:11,20
  76:6,16,25
  77:1 81:6
  82:3 86:20
  86:23 87:4
  105:22
digitaliz...
 42:3 69:25
digitally

 49:25
digitization
 33:6 51:23
digitize
 36:13
digitized
 24:12 26:12
  26:24,25
  27:1,6,10
  27:16,17
  30:2,7,21
  31:23 33:19
  36:13,23
  50:4,5,10
  50:20 51:7
  51:8,9,13
  51:16 72:4
  92:15,25
  93:16
digitizing
 32:13,14,22
dimensional
 13:10
dimensions
 7:16
direct
 30:12,22
  55:1 94:19
direction
 50:17 64:17
  64:22,23
director
 8:6,13
disagree
 58:11 68:7
discern
 24:1
disciplines
 4:20,23 11:2
  105:23
discuss
 29:9,9 68:18
discussed
 31:7 68:21
  69:12 93:20
discusses
 38:14,16,17
  38:19,24

 39:5,25
  41:21 67:18
discussing
 80:15
discussions
 112:21
disjoint
 26:2
disk
 25:25 47:24
  48:7 72:16
  100:10
disks
 47:17 48:9
  48:11
display
 20:8,10
  21:21 36:22
  50:3 92:23
  93:6 94:23
  95:4 99:13
displayed
 18:21 21:12
  95:1
displaying
 49:22,24
displays
 37:3
distinction
 47:10 77:7
  79:16
  108:24
  111:15
distinguish
 77:10 102:20
distingui...
 102:6
District
 1:3,3,15 3:4
  5:10
doctor
 40:13 80:8
doctor's
 17:2
document
 52:5 55:21
  55:24 56:3
  57:5 65:25

 66:8 75:6
  75:10 84:22
  85:14 90:3
  119:8
documenting
 87:17
documents
 73:20 90:4
doing
 7:14,18
  13:10 20:2
  23:7 33:23
  33:25 54:15
  55:9 62:6,9
  65:16
  101:22
  107:24
  110:7
  111:11
domain
 79:7,8
double
 61:2
Dowd
 3:13 4:4,6,8
  5:7,9,17
  11:20,24
  17:1,4,6
  19:7 29:13
  29:15 33:17
  37:10 40:13
  55:20 59:11
  61:25 68:9
  71:23 72:9
  79:5 81:8
  90:22 92:10
  94:1 97:8
  106:7,13,17
  106:20
  110:18,21
  116:2,12,16
  116:19,22
  116:25
  117:6,8,10
DPI
 32:7,7,14
  50:11
Dr



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4640

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 472 of 2006
PageID #: 6534
William Russell Oliver, MD, MS, MPA                    October 28, 2010

127

5:20 11:21
12:1 17:6
25:4,4,9,18
26:10 37:15
48:3,7,13
50:1 58:2,4
58:16,18,18
71:2 72:10
72:15,19
82:21 97:8
99:21 100:9
105:8
106:21,24
116:11,15
**draw**
19:8 23:24
  23:25 30:14
  57:8
**drawing**
17:14 22:23
  23:9 88:18
**drawings**
23:5,6
**drawn**
88:23
**duly**
5:14
**duplicate**
100:3,17
**duplicates**
71:6 99:23
**duplication**
100:12
**duplications**
100:13,16
**duty**
7:23

---
**E**
---
**E**
3:1,1 5:19
  118:1,1,1
**earlier**
71:2 117:6
**easier**
80:21 103:7
**easily**
23:4 41:1

101:17,17
108:4
**East**
8:4,7,15
**Eastern**
1:15 3:4
**easy**
23:13
**eaten**
20:24,25
**eb**
1:1
**Echtochrome**
35:10
**ECU**
16:7
**edges**
64:21,23,24
**Edith**
1:19 2:12
  3:25 120:11
**educational**
5:21,22
**effect**
32:5 61:18
  61:21 108:5
**effort**
74:6
**either**
18:16 30:2
  51:16 61:20
**Electrical**
9:2
**electronic**
9:2,4
**eliminated**
80:19
**ELSA**
3:18
**emphasis**
6:9 11:4
**employed**
14:22 16:4
  120:5,7
**employee**
7:25 120:6
**employment**

8:12 14:20
  15:11,20
**encoded**
102:15
**ended**
16:19 49:11
  89:4
**ends**
102:25,25
**enforcement**
76:11
**Engineers**
9:2
**enhance**
17:12
**enhanced**
23:22,23,23
  23:24 24:12
  24:16 30:3
  30:10,21
  31:6,19,22
  31:22 36:24
  53:15
**enhancement**
7:19 11:2,5
  14:8 15:18
  15:21 19:21
  22:12 28:2
  29:1 41:6
  51:24 53:23
  54:1,10
  56:2,16
  58:20 62:6
  62:9 91:2
  91:15
  103:17
**enhancements**
56:24 57:2
  57:12,17
  58:24
  101:12
**enhancing**
14:4,5,12
  15:11 16:5
  59:18
**entails**
17:16
**entire**

52:18 85:20
**enumerate**
58:4
**enumerated**
58:8
**environment**
55:3
**equalization**
14:19 19:17
  20:16,20,21
  21:5,5
  38:19 40:23
  44:5 101:19
**equivalent**
26:13 27:7
  34:17 75:20
  107:25
**error**
24:10,14,15
  33:22 59:14
  59:16,17,18
  60:3,14,21
  61:3,14,15
  62:3,14,17
  63:1,18
  64:2,3,5
  65:10,12
  68:1,19
  69:13,14
**errors**
46:24
**Esquire**
1:14 2:14
  3:7,13,13
  3:18,18
  120:15
**essentially**
12:6 18:13
  23:3 24:17
  34:17,18
  74:10
  102:25
  103:13
**establish**
74:1 115:18
**established**
44:14 45:7
  55:10 78:2

91:13
**estimation**
38:22
**et**
33:3,3,3
  98:3,3
**evaluate**
32:11
**evaluating**
12:13 61:6,6
**evaluation**
10:2
**evidence**
26:12,13,17
  26:22 27:7
  35:25 78:16
  79:9,13
  91:24
  108:16
**evident**
36:18,20
**evidentiary**
75:4 77:9
  78:8,19
  97:13 109:5
  109:11
**exact**
47:23 69:19
**exactly**
34:9 58:7
  69:4 96:3
**examination**
4:1 5:16
  11:25 17:5
  37:12 94:19
  97:7 106:10
  106:22
**examiner**
7:3,4,20 8:1
  8:16 113:3
  113:4,5
**Examiners**
9:1 77:15
**example**
17:21 60:24
  98:19 107:6
  107:15
**Excerpt**



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4641

William Russell Oliver, MD, MS, MPA                    October 28, 2010

128

4:17,19
**excuse**
13:20 17:23
  48:10 86:21
  97:10
**executed**
119:9
**exhibit**
37:23 65:25
  116:9 117:4
**exhibits**
4:11 116:21
  117:3
**exist**
60:23 62:23
  63:24
**exists**
62:13 90:3
**expect**
18:16
**experience**
11:1 59:1,3
**expert**
11:12,21
  16:9
**Expiration**
120:15
**Expires**
120:14
**explain**
17:16 25:22
  79:20,21
  97:11 102:1
  102:2
**explaining**
111:15
**explicitly**
35:6 48:25
  83:25
**exploration**
17:15 18:25
  27:2 89:20
  89:22
  101:23
**Express**
12:15 13:8
**expressed**
119:9

**extensive**
28:11,11
**extensively**
11:10
**extent**
99:23
**extraordi...**
62:6
**eyes**
107:18,19,20

—————————
              **F**
—————————
**F**
7:13 109:17
**facilities**
77:23
**fact**
25:7 26:21
  33:4 34:25
  34:25 35:1
  35:5 49:19
  49:25 50:19
  51:5,9 55:2
  58:10 62:7
  66:5 68:5
  70:6 76:18
  76:19 77:12
  77:16 78:4
  82:24 83:10
  83:22 84:6
  86:3,9
  88:12 89:9
  89:14 92:15
  93:1,16,25
  94:20 95:2
  98:13,13,18
  104:19
  108:5 109:8
  109:10,19
  112:25
  113:2
  115:16
**facto**
77:20,21
  78:1,22
  98:6 112:17
  112:19
  113:17,22

**factor**
109:16
**factors**
86:25,25
**facts**
120:3
**faculty**
68:23
**fails**
24:20
**fair**
50:24 54:20
  55:11,19
  56:8 58:2
  58:25 59:5
  66:25 67:3
  67:22 73:1
  74:3 75:20
  79:10 83:5
  83:12 84:24
  87:20 89:5
  90:12,21
  91:20,22
  92:5,22
  93:2 94:3,9
  94:14,16,22
  96:7 97:24
  114:1,15
  115:4
**fairly**
98:15
**fall**
61:9
**familiar**
21:10 52:5
  73:19 106:4
  111:24
**family**
35:14
**far**
14:20 16:15
  26:24 29:23
  30:9 50:23
  58:4 59:16
  61:2 82:22
  93:25
**FBI**
4:18 73:18

73:24 74:7
74:11 78:2
78:9,9,18
79:1,2,9,15
80:9 81:24
82:4 83:23
97:12 107:2
107:11
108:8,18,20
108:22,24
109:1,23
110:6,7,12
110:14,16
110:18,25
111:3,7,13
**FBI's**
75:24 78:24
**feasible**
111:23
**feature**
23:11 32:11
  61:20 62:5
  62:5 82:11
  82:12 97:17
  99:5 107:4
  107:13
  108:3,3
  111:5,8
  112:13
**features**
18:12,12
  19:22,22
  22:24,25
  25:14 36:17
  36:20,20,22
  50:24 92:6
  92:22 93:5
  94:5,15,17
  97:21 98:13
  111:22
**February**
86:15 105:10
  105:20
  106:15
**federal**
1:14 3:4
  9:25 45:22
  109:25

110:2,4
**fellowship**
6:5,11
**felt**
92:5
**fewer**
37:4 96:21
**fidelity**
76:6
**field**
22:13 67:2,3
**fields**
54:11
**figure**
114:4 115:23
**file**
34:4 77:3
  80:20
**film**
33:3 75:19
  76:3,11
**films**
35:6,7
**final**
49:8,10
**finalist**
9:18
**financially**
120:7
**fine**
61:15 80:18
**fingerprint**
79:17
**finish**
40:14 62:1
**first**
5:14,20
  24:22 26:14
  51:21,22,24
  66:5 74:23
  74:24 86:3
  86:4
**fit**
20:13
**five**
86:25 104:4
**fix**



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4642

William Russell Oliver, MD, MS, MPA                    October 28, 2010

129

21:16
**flesh**
35:13
**focus**
12:3,6 14:24
**follow**
81:12 90:11
106:24
107:9,11
**followed**
39:13 40:23
78:23
109:12
**following**
5:25 6:3,24
8:3 12:11
42:22 53:2
74:25 89:4
89:25
**follows**
5:15 82:4
108:22
**foot**
84:11 85:4
95:24 96:2
**force**
7:21
**forces**
7:2,4,5,20
7:23 8:11
14:23 15:6
15:14,21,25
33:8 43:10
58:14
**foregoing**
119:1,8
120:3
**forensic**
4:17,21 6:6
6:11 8:6,14
8:25 9:10
9:11 10:19
10:20 11:10
11:12,13,21
11:22 15:3
15:3 25:11
28:8,10
52:23 53:2

54:15,19,23
55:3 61:1
66:2,4,15
66:24 78:23
79:13 81:3
86:24 87:5
88:22 105:9
109:16
112:21,23
113:9
**foreseeable**
79:13
**foreseeably**
75:3
**forget**
105:4
**form**
70:20 73:10
**format**
25:5,6,20
97:13,14
98:5 99:15
109:15,15
**formats**
42:25
**forming**
72:23
**forward**
109:13
**found**
58:1,7 59:7
**four**
64:20 86:25
87:17
**fourth**
64:25 66:10
86:25
**frame**
75:18
**frequency**
64:12,16
**Frequent**
80:18
**frequently**
17:18 18:15
35:12 77:1
80:18 98:18
102:19,23

**front**
66:20 102:25
**fruitful**
84:23
**full**
5:17 8:3
**function**
34:19,20,21
64:11 98:3
112:12
**fungi**
29:3
**further**
16:25 17:5
34:2 37:12
75:10 77:2
97:7 106:22
116:2 120:5
120:6

_____
**G**
_____
**gamut**
33:10,16
96:10,17
**GBI**
16:7
**Gems**
105:6,7
**general**
55:4,11,16
61:1 96:8
**generally**
61:4,9 75:18
**generates**
77:3
**Georgia**
6:17 7:25
8:2 9:14
113:5,6,9
**Geradts**
66:12 69:13
**getting**
57:11
**give**
11:8 17:21
19:18 69:8
107:15
108:9

114:25
**given**
9:25 20:5,6
60:4,5
109:11
119:10
**giving**
107:25
**GL**
12:16 13:8,9
**glare**
38:22
**go**
5:11 8:8
11:24 19:2
19:5 24:4
25:22 36:4
50:18 51:4
53:25 56:18
56:25 60:25
62:2 67:5
77:22 85:14
86:6,18
90:12 93:11
104:4 114:2
**goes**
20:8,10 38:4
104:7
**going**
13:12 16:20
23:9 24:11
28:14 37:15
37:18 46:13
48:15 52:3
60:3 71:6
73:15 74:11
79:5 80:8
80:12 83:17
85:13 86:18
90:24 100:6
106:7,14
109:5,18
110:18
**good**
12:1,2 37:13
96:6
**gotten**
112:23

**governed**
45:6
**government**
9:16,16,25
16:16
**graduate**
6:6 42:21
**graph**
20:4
**Graphic**
105:6,7
**graphical**
103:3
**graphics**
13:10
**gray**
20:5
**greater**
99:6
**group**
9:4 45:9
52:16 100:6
104:21
**groups**
26:3 51:22
**guess**
6:15 90:1,11
105:19
**guideline**
85:2
**guidelines**
4:15,15
45:10,15,20
48:25 49:3
51:20 52:9
52:9,13
53:20 74:1
75:1,6,11
78:2,4,12
80:10 88:3
**gunshot**
97:19,20,23
97:24 107:7
108:14

_____
**H**
_____
**H**
118:1



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

**USCA5 4643**

William Russell Oliver, MD, MS, MPA                    October 28, 2010

130

| | | | | |
|---|---|---|---|---|
| **half** | **hereto** | **identific...** | 33:20 41:4 | 23:24,24 |
| 40:7 | 120:7 | 26:5 45:25 | 44:10 52:10 | 24:24 25:3 |
| **hand** | **high** | **identified** | 52:12,23,25 | 25:10,12,16 |
| 32:20 65:18 | 33:2 64:14 | 19:11 60:23 | 53:5,15,17 | 25:25 26:3 |
| 95:25 96:2 | 64:15 91:9 | 86:10 | 54:10 59:25 | 26:12,25 |
| 107:14 | **higher** | **identifies** | 60:10,12,13 | 27:6,20,21 |
| 119:10 | 18:2 32:15 | 31:8 | 61:6 64:18 | 27:22 34:3 |
| 120:8 | 32:22 | **identify** | 64:19,21,22 | 43:1 47:16 |
| **handy** | **Hill** | 17:8 24:5 | 64:23,25 | 47:23 48:24 |
| 12:14 | 6:4 | 27:11,18 | 65:1,2,16 | 49:8,22,24 |
| **happen** | **hired** | 30:13,18 | 66:2,15 | 49:25 50:10 |
| 84:10 87:12 | 23:6 | 31:6 36:10 | 76:4 77:4 | 51:6 59:19 |
| 88:7,9 | **histogram** | 37:21 38:9 | 77:23 80:20 | 60:6,7,22 |
| **happened** | 14:19 19:17 | 60:1,5,6 | 81:4 82:11 | 60:22 61:19 |
| 87:8 | 20:1,3,4,7 | 66:1 73:17 | 82:25 83:2 | 64:13,20 |
| **happens** | 20:10,16,18 | 85:22 90:21 | 84:5,17 | 70:6,12 |
| 64:18 69:7 | 20:20,21 | **identifying** | 85:1,2,9 | 71:15 74:2 |
| 84:15 | 21:5,5 | 17:13 107:7 | 86:22,23 | 76:25 82:16 |
| **happy** | 38:16,17,19 | **identity** | 87:6,15,19 | 83:20,22,24 |
| 79:20 85:20 | 40:22,23 | 119:7 | 88:4,8,19 | 84:3 85:3,4 |
| **hard** | 41:1 44:5 | **IEEE** | 90:16 95:3 | 92:5,15,23 |
| 82:22 | 101:19 | 10:23 | 95:19 97:18 | 92:24,25 |
| **hardware** | **history** | **illustrate** | 97:22 98:3 | 93:1,5,17 |
| 102:21 | 28:11,11,20 | 57:25 | 98:4,20,22 | 94:5 99:11 |
| **Harris** | **hold** | **illustration** | 98:23 99:2 | 99:24 |
| 2:13 120:1 | 9:8 105:4 | 24:24 57:7 | 99:2,4,10 | 100:22 |
| **head** | **home** | **illustrat...** | 99:14 | 101:8 |
| 7:6 86:12 | 109:14 | 19:16 57:24 | 101:23 | 104:13 |
| **healed** | **honest** | **image** | 105:9 107:5 | 109:16 |
| 31:8 | 68:2 | 4:16,17,21 | 107:10,19 | **imagine** |
| **held** | **hostage** | 6:9 7:7,8 | 107:21,25 | 20:8 |
| 32:20 | 7:21 | 7:18,19 | 108:1,6,13 | **imaging** |
| **help** | **hours** | 10:4 11:1,5 | 109:2 111:6 | 4:20,23 9:11 |
| 22:20,22 | 2:17 | 11:6,7,7 | 111:10 | 11:13,22 |
| 30:22 | **Houston** | 12:12 13:24 | 112:3,13 | 12:5,20 |
| **helpful** | 1:22 2:15 | 17:15,17,19 | 115:8 | 14:21,22 |
| 22:19 | 3:12 | 17:20 18:7 | **imagery** | 15:18,21 |
| **helps** | **human** | 18:10,15,21 | 25:8,9,12,23 | 28:23 35:23 |
| 57:23 | 34:21,22 | 18:24,25 | 75:2,20 | 45:10 52:22 |
| **hem** | **hundred** | 19:2,5,23 | 76:16 78:6 | 53:1 56:7 |
| 18:2 | 60:5 | 20:9,22,23 | 82:7 | 58:19,19 |
| **Hemminger** | | 21:3,6,25 | **images** | 74:7,8 |
| 105:1 | **I** | 23:10,12 | 12:13 14:4,5 | 77:24 86:20 |
| **Hennig** | | 24:1,16 | 14:5,13 | 87:4,5 |
| 3:21 | **IAI** | 27:2,24 | 15:5,7,8,9 | 105:15,22 |
| **Herb** | 45:25 | 32:6,9,12 | 15:10,12 | **impact** |
| 32:25 | **idea** | 32:16,19,19 | 16:5 18:11 | 33:19,24 |
| | 58:23 | 32:23 33:4 | 18:14 23:22 | 34:1 |



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4644

William Russell Oliver, MD, MS, MPA                    October 28, 2010

131

| | | | | |
|---|---|---|---|---|
| **impacts** | **indicate** | 35:10 82:15 | **Involving** | 97:14,21 |
| 29:17 | 103:16 | 97:18 104:3 | 28:23 | 98:5 99:5,7 |
| **implement...** | **indicated** | 109:14 | **issue** | 99:9,15,16 |
| 44:9,11 | 42:11 96:15 | 111:17 | 18:6,7 32:8 | 99:24 |
| 102:16 | 101:4,11,14 | **instances** | 69:13 98:18 | 100:14,21 |
| 103:9,11 | **indicates** | 47:5 48:16 | 101:7 | 107:22 |
| 104:20 | 52:22 73:25 | **Institute** | 107:13 | 112:17,25 |
| 105:2 | 75:17 81:2 | 7:2,6,23 | 112:15 | 113:17 |
| **implemented** | 83:17 | 8:11 9:2 | **issues** | **JPEGs** |
| 42:8 | **indicating** | 14:23 15:6 | 7:9,18,21,21 | 72:10 77:13 |
| **implies** | 67:24 | 15:14,21,25 | 24:21 31:7 | 99:20 113:7 |
| 24:14 | **indication** | 43:10 45:25 | 95:15 | **JPEG'd** |
| **importance** | 91:5 | 58:14 | **items** | 98:23 |
| 19:23 | **individual** | **instrument** | 70:3 | **judge** |
| **important** | 29:21 38:13 | 119:8 | **iteratively** | 24:4 27:16 |
| 35:4 46:13 | 65:3 | **integrity** | 65:2 | **judge's** |
| 46:16,20 | **influential** | 83:18 | **ITK** | 19:8 |
| 47:3,6 | 9:17 | **intelligence** | 115:13 | **June** |
| 48:15 84:21 | **informal** | 10:21,22 | **IV** | 74:14,20 |
| 101:15,16 | 77:16,17 | 18:19 | 105:7 | **jurisdict...** |
| **impossible** | 78:22 | **interest** | | 91:18 |
| 24:10 85:10 | **information** | 112:22 | _____**J**_____ | **jury** |
| **inartfully** | 25:5 32:16 | **interested** | | 19:8,15 |
| 102:5 | 32:23 34:2 | 120:7 | **James** | 22:18,22 |
| **include** | 73:11 77:3 | **interface** | 1:14 3:7 | 24:4 27:15 |
| 8:25 9:15 | 87:19 90:16 | 13:9 103:4 | **Janet** | 29:10,24 |
| 42:25 53:8 | 99:7 | **intermediate** | 10:3 | 30:22 31:1 |
| **included** | **injuries** | 48:23 49:7 | **January** | 36:8,9,14 |
| 47:8 | 17:9,14 | 83:24 | 54:5 55:6,10 | 36:23 49:20 |
| **includes** | 23:16,22 | **internals** | **job** | 50:12,17,17 |
| 83:21 | 24:5 26:5,5 | 65:17 | 7:7 14:25 | 51:3 56:6,7 |
| **including** | 27:11,11,17 | **internati...** | 15:1 | 56:22 57:9 |
| 10:19 104:21 | 27:18,20,23 | 10:21 28:8 | **Journal** | 57:20 58:3 |
| **incorrect** | 29:6 30:13 | **interpola...** | 10:19,20,21 | 71:18 72:22 |
| 32:1 93:25 | 30:18 31:11 | 34:15,18 | 10:22,23 | 73:6 92:3,8 |
| **incorrectly** | 31:15 36:10 | 35:20 | **journals** | 92:14 93:11 |
| 104:6 | 37:4 58:1,4 | **interpret...** | 10:16,18 | 93:24 94:13 |
| **increase** | 58:9 59:4,8 | 19:6 61:3 | **JPEG** | 94:15 |
| 21:6 62:10 | 82:21 96:5 | **introduce** | 25:4,6,10,12 | **jury's** |
| 91:10 | 96:5 100:25 | 34:24 91:11 | 25:16,20,25 | 30:12 |
| **increases** | **injury** | **investiga...** | 34:4 51:9 | **justice** |
| 61:21,21 | 19:11 30:23 | 8:1 45:23 | 70:7 71:15 | 3:10,15 4:16 |
| **independe...** | 62:13 | 84:14,24 | 72:4,6,8,16 | 6:16 52:11 |
| 41:17 63:12 | **input** | **involved** | 73:3,10,11 | |
| 63:14 88:2 | 42:25 103:13 | 58:16 61:7,8 | 76:20 77:2 | _____**K**_____ |
| **INDEX** | **instance** | **involves** | 77:23 80:23 | **K** |
| 4:1,11 | 11:8 14:18 | 38:20 60:10 | 81:5,22 | 95:4,4,5,5 |
| | 23:4 35:9 | | 82:19,23 | **Kathrin** |
| | | | 83:4 97:12 | |


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4645

William Russell Oliver, MD, MS, MPA                    October 28, 2010

132

| | | | | |
|---|---|---|---|---|
| 3:21 | 44:21 | 84:12 | **literature** | 104:11 |
| **keep** | **known** | **letter** | 28:12,22 | 107:19 |
| 49:13,16 | 24:9 28:6 | 10:3 | 38:14,15,16 | **looked** |
| 71:8 | 59:16 61:14 | **let's** | 38:17,18,20 | 24:25 71:16 |
| **kept** | 104:13 | 9:5 10:11 | 38:21,23,24 | 91:19 105:8 |
| 11:17 84:5 | 119:6 | 21:19 23:21 | 39:8,20 | **looking** |
| **kind** | **Kodachrome** | 23:21 26:13 | 61:5 62:12 | 18:14 23:12 |
| 33:5 69:17 | 35:11 | 38:10 46:4 | 63:9,15 | 35:15 57:24 |
| 89:14 99:10 | **Kriigel** | 52:3,19 | 64:1,3 | 75:10 82:13 |
| 99:10 | 86:1,6 | 54:7 93:7 | **little** | 82:20 86:3 |
| 101:23 | **Kriigel's** | 98:19 | 17:22 18:2 | 92:9 96:4 |
| 103:2 | 91:1 | **libraries** | 22:24,25 | 99:6 |
| **King** | | 42:25 | 23:12 35:12 | **looks** |
| 10:4 | **L** | **licensed** | 37:18 69:24 | 37:22 52:8 |
| **Kingdom** | **L** | 9:14 | 98:20 | 73:18 87:1 |
| 109:14 | 5:19 7:13 | **licenses** | 103:13 | **lose** |
| **kit** | **laboratory** | 9:9 | **LLC** | 107:23 |
| 13:5 | 7:7 | **life** | 120:15 | **losing** |
| **knew** | **Lamar** | 35:17,18 | **local** | 20:23 108:1 |
| 58:21 | 2:15 | 73:23 | 21:3,6 | **loss** |
| **know** | **large** | **light** | **log** | 25:5 36:6,12 |
| 4:20,23 18:5 | 29:16 52:16 | 18:20 36:10 | 46:8 48:16 | 36:16 91:11 |
| 21:9 30:6 | 108:13 | 76:4 | 49:16 50:7 | 94:22 96:24 |
| 33:2 34:7 | 112:1,15 | **likelihood** | 50:11,11 | 99:7 |
| 34:14 35:1 | **larger** | 62:10 | 53:11 101:3 | **lossey** |
| 41:9,10,23 | 102:24 | **limit** | 114:1 | 24:20 70:4,9 |
| 42:18 48:1 | 107:10 | 88:22 | **logged** | 73:1 76:16 |
| 48:5,7,22 | **Larry** | **limitation** | 53:7,17,20 | 76:24,25 |
| 58:5,7 | 65:14,19,20 | 29:10 | 87:11 | 79:3 80:14 |
| 59:16 61:2 | **late** | **limitations** | **logging** | 80:15,22 |
| 61:9 62:17 | 9:18 22:15 | 29:5 | 113:24 | 81:5 82:2 |
| 63:1 65:21 | **law** | **limited** | **long** | 85:8,8 99:3 |
| 65:23 67:9 | 76:11 | 64:12 89:10 | 22:11,12 | **lossless** |
| 68:12,13 | **layers** | 89:11 | 28:10,20 | 24:19 |
| 71:8 73:9 | 24:8 | **line** | 96:3 | **lost** |
| 82:15 83:8 | **lead** | 23:5,5,9 | **look** | 28:2 34:2 |
| 83:9 88:7,9 | 89:11 | 74:5 89:15 | 18:15,24 | 70:3 |
| 89:7 96:3 | **lecture** | 97:15 118:3 | 21:12,14,15 | **lot** |
| 100:9 102:4 | 11:7,10 | **list** | 22:5 32:11 | 21:11 44:8 |
| 103:1,5 | 106:5 | 39:6,7,7 | 35:15,17,18 | 46:12 57:25 |
| 104:2,10,21 | **left** | 42:12,13 | 36:4,9 | **low** |
| 105:22 | 64:23 97:20 | 48:22 59:4 | 37:15 46:2 | 20:9 64:15 |
| 106:9 | **legs** | 90:1 | 52:3 56:18 | 99:12 |
| 111:10 | 82:16 | **listed** | 56:24 61:18 | 107:17,21 |
| 114:23 | **length** | 59:6 110:9 | 66:9 73:16 | **lower** |
| 115:2,3,16 | 79:21 | 110:10 | 77:22 82:15 | 32:21 65:1 |
| 115:17 | **lens** | **lists** | 83:1 85:13 | **luck** |
| **knowledge** | | 86:24 | 99:11,13 | 89:18 |



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

**USCA5 4646**

William Russell Oliver, MD, MS, MPA                    October 28, 2010

133

| | | | |
|---|---|---|---|
| **lung**<br>22:2,2,9,9<br>22:10<br>**lungs**<br>21:14,16,17<br><br>— **M** —<br>**M**<br>3:13<br>**machine**<br>34:22,23<br>**Machinery**<br>9:3<br>**magazine**<br>18:8<br>**magazines**<br>17:22<br>**magnify**<br>18:21<br>**mail**<br>13:13<br>**making**<br>26:22 47:7<br>47:11 77:7<br>77:10 93:21<br>97:21<br>108:25<br>**man**<br>86:12<br>**manipulate**<br>18:11<br>**manipulating**<br>20:1<br>**manipulation**<br>85:10<br>**manner**<br>92:22<br>**manufactu...**<br>34:19<br>**Marital**<br>10:23<br>**mark**<br>3:13 5:9<br>106:11,12<br>**marked**<br>4:13 37:16<br>52:4 65:25 | 73:16 86:14<br>106:8 116:9<br>**marks**<br>31:8<br>**masking**<br>38:23<br>**master's**<br>6:8,16 11:3<br>12:7,18<br>13:24 14:9<br>14:11<br>**materials**<br>13:13<br>**matter**<br>25:7 81:13<br>81:16 82:17<br>82:18,22<br>95:2,3<br>**McHugh**<br>1:14 3:7 4:5<br>4:7,9 11:23<br>12:1 13:22<br>13:23 16:25<br>17:3 33:14<br>37:11,13<br>40:16 55:22<br>55:23 59:13<br>62:2 68:14<br>68:15,16,17<br>68:18 72:11<br>72:15 79:8<br>80:8 81:12<br>85:16,17<br>90:24,25<br>92:12,14<br>94:4 97:5<br>106:8,16,19<br>106:23<br>110:20,23<br>116:1,8,13<br>116:20,24<br>117:2,7,9<br>**MD**<br>1:11 2:8,11<br>5:8,13<br>119:1,3,6<br>**mean**<br>23:24 24:25 | 34:14 36:2<br>52:15 63:20<br>69:19 71:6<br>74:16 77:17<br>82:12 89:19<br>95:6,18<br>96:19<br>101:17,22<br>102:23<br>104:15<br>**meaning**<br>56:19<br>**means**<br>19:22 30:6<br>33:10 35:9<br>40:20 64:5<br>80:18 96:20<br>**meant**<br>69:22 92:18<br>**measurement**<br>95:7,16,18<br>96:2<br>**measurements**<br>33:23 96:4,5<br>**mechanical**<br>34:13<br>**medical**<br>6:2 7:3,4,20<br>8:1,16 9:1<br>22:13 24:23<br>28:19,21,23<br>57:7 62:11<br>77:15 91:19<br>93:21<br>105:15<br>113:3,4,5<br>**medicine**<br>6:1 8:4,7,15<br>9:14,19,23<br>10:20 28:9<br>54:12,17,19<br>54:21<br>**Meeting**<br>106:1<br>**megapixel**<br>107:25 108:1<br>**megapixels**<br>108:2,4,5 | **member**<br>8:21 66:18<br>66:24<br>**members**<br>35:14<br>**mention**<br>42:15<br>**mentioned**<br>69:18 96:9<br>**merely**<br>40:24 101:8<br>**merit**<br>57:10<br>**met**<br>53:3<br>**method**<br>19:14,21<br>22:17,22<br>28:16,21<br>31:19<br>**methods**<br>19:25 21:2,4<br>22:5 61:10<br>67:16,24<br>**mic**<br>13:21<br>**microbiology**<br>5:24<br>**microscope**<br>7:14<br>**microscopy**<br>7:10,12 15:9<br>15:10<br>**mid**<br>22:15<br>**middle**<br>98:21<br>**Milam**<br>3:11<br>**military**<br>6:25 9:19,23<br>11:6<br>**millimeter**<br>25:18 26:11<br>26:16,18<br>32:7 33:21<br>47:12,20 | 49:18 50:9<br>72:2,18<br>**mine**<br>69:11 106:8<br>112:22<br>**minimum**<br>74:1,25 75:6<br>78:2,18,24<br>80:10<br>108:10<br>**minute**<br>6:12,13 19:3<br>22:6,8<br>73:15 97:5<br>**mission/i...**<br>83:21<br>**misunders...**<br>112:16<br>**modification**<br>24:8 35:20<br>**modified**<br>19:16 35:8<br>42:22,24<br>**modify**<br>18:24 42:23<br>46:3 89:15<br>**Molecular**<br>7:1<br>**months**<br>46:2<br>**morning**<br>12:1,2 37:13<br>**move**<br>18:22 20:11<br>20:12 21:13<br>21:16,22<br>22:8 90:24<br>109:13<br>**moving**<br>10:16 90:25<br>**MPA**<br>1:11 2:8,12<br>5:8,13<br>119:1,3,6<br>**mugshot**<br>79:18<br>**multiple**<br>29:18 69:8 |



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4647

William Russell Oliver, MD, MS, MPA                    October 28, 2010

134

| | | | | |
|---|---|---|---|---|
| **multiply** | 28:6 120:5 | 17:20 18:9 | 5:11 | 113:6 |
| 20:12 | **network** | **noting** | **obvious** | **oh** |
| | 8:9,10 | 20:5 | 19:24,24 | 6:12,13 8:8 |
| ―――――― | **never** | **November** | 20:15 23:1 | 10:15,16 |
| **N** | 11:17 31:21 | 120:9 | 23:11 62:5 | 16:22 22:6 |
| **N** | 68:21 69:12 | **number** | 62:6,8,9 | 22:8 23:13 |
| 3:1 7:13 | 73:24 99:11 | 10:16,18,23 | **obviously** | 60:25,25 |
| **name** | 99:13,13 | 20:5,18 | 25:1 48:9 | 81:21 86:6 |
| 5:9,18,18 | **News** | 31:1 41:1,2 | 52:17 58:6 | 87:2 89:6 |
| 19:21 39:23 | 9:16,17 | 41:5,6 | 65:17 66:23 | 99:1 106:20 |
| 43:3 44:2 | **nice** | 48:11 53:5 | 67:6 68:1,3 | 115:7 |
| 105:3,4,5 | 35:15 | 58:1,8,16 | 73:4 75:25 | 116:22 |
| 119:8 | **noise** | 59:4,8 | 84:17 87:22 | 117:8 |
| **names** | 91:10 | 85:15,19 | **occasionally** | **okay** |
| 14:15 | **nonspecific** | 87:14 96:20 | 84:10 | 7:17 10:10 |
| **narrower** | 31:9 | 96:22 | **occasions** | 10:14,16,17 |
| 33:8,16 | **nontradit...** | 101:24 | 11:16 31:1 | 11:15 12:10 |
| 96:16 | 51:18,25 | 106:16 | **occur** | 13:7,8,19 |
| **Nashville** | 52:1 53:23 | 116:10,14 | 80:22 | 14:4,24 |
| 6:1 | 54:1,10 | **numbered** | **occurred** | 15:2 16:3,9 |
| **nation** | 56:2,11,12 | 40:24 | 29:14 30:23 | 16:11,15,21 |
| 113:14 | 56:15 57:2 | **numbers** | **October** | 16:24 17:1 |
| **National** | 91:2,14 | 38:3 116:25 | 2:16 5:2 | 17:4 19:14 |
| 9:1 77:15 | **normal** | **numerous** | **Oddly** | 20:10 21:3 |
| **native** | 73:22 | 20:1 24:8 | 16:18 | 23:2,3,15 |
| 25:5 | **normally** | 29:17,17 | **offer** | 24:7,18 |
| **nature** | 64:18 | 31:6 82:20 | 11:21 106:7 | 25:22 26:1 |
| 16:5 37:2 | **North** | 82:20 | 106:14,14 | 26:8,10,15 |
| 60:18 | 3:16 6:3 8:2 | 102:23 | 116:20 | 26:24 27:10 |
| **near** | 8:20 9:15 | 112:20 | **offered** | 27:15 28:1 |
| 59:4 | 103:10 | 113:6 | 117:3 | 28:23 29:5 |
| **nearby** | 113:3 | | **offering** | 29:9,12,22 |
| 115:20 | **Northeastern** | ―――――― | 116:22 117:2 | 30:20,25 |
| **necessary** | 8:20 | **O** | 117:3 | 31:4,14,18 |
| 32:10 49:1 | **Northwest** | **O** | **offers** | 32:4 33:7 |
| 101:5 | 8:2 | 5:19 7:13,13 | 116:8 | 34:2,6 |
| **need** | **notary** | **oath** | **office** | 36:12 37:9 |
| 18:17,17 | 5:15 119:12 | 5:6 119:7 | 1:14 3:4,10 | 37:20 38:3 |
| 48:19 49:2 | 120:3,12,14 | **object** | 3:16 5:10 | 38:8,12 |
| 50:14 68:15 | **noted** | 17:1 39:7 | 7:3,19 | 40:17 41:2 |
| 79:24 93:11 | 75:18 119:2 | 55:20 59:12 | 109:14 | 41:8,14,24 |
| 101:3 | **notes** | 68:9 79:5 | 113:4 | 42:2,7,10 |
| 107:11 | 71:11 | 90:22 92:10 | 119:10 | 42:15,19,23 |
| **needs** | **notice** | 110:18 | 120:9 | 43:5,8,15 |
| 102:15 106:2 | 19:1 22:20 | **objection** | **officer** | 43:18,21,24 |
| **negative** | 22:22 62:8 | 11:22 29:22 | 7:24 | 44:2,6,11 |
| 34:6 35:25 | 62:10 94:15 | 30:1 116:12 | **offices** | 44:14,19,23 |
| 36:4,5,9 | **notices** | 116:16 | 2:14 113:3,5 | 45:2,5,19 |
| **neither** | | **objections** | | |


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4648

William Russell Oliver, MD, MS, MPA                    October 28, 2010

135

46:8,10
47:18 48:1
48:6,9,21
49:6,15
50:5,7,12
51:3,9 52:3
52:7,15,19
52:21 53:14
53:22 54:8
54:25 55:8
55:22 56:1
56:11,17
57:4,19
58:12 59:3
59:7,24
60:2 62:16
63:10,14
64:8,10,24
65:5,24,24
66:8,18,23
67:2,5,9,13
67:20,22
68:5,15
69:6,12,24
70:9,12,16
70:19,24
71:20,22,23
72:1,21,25
73:4,8,15
73:19,22,25
74:5,10,15
74:17,17,23
75:5,9,14
75:17,23
76:1,9,14
76:18,22
77:7 78:7
78:14 79:16
79:23 80:1
80:25 81:12
81:15 82:9
82:12,14
83:3,7
84:19 85:5
85:7,13
86:7,12,14
86:18,22
87:2,8,17
88:15,20

89:1 90:6
91:13,17,17
91:22 92:2
92:8,12,19
93:4,8,19
93:23 94:11
95:10,12,12
95:18,23,24
96:1,2,4,9
96:24 97:4
99:18
100:19,20
101:2,11,25
102:11,14
102:15,22
102:23
103:4 104:7
104:9,10,23
105:16
106:3,6,13
106:20,23
107:6,20,21
108:24
110:6,11,20
111:7,12
112:1,14,16
112:20
113:15,19
113:20,24
114:20,22
115:6,12,25
116:2,25
117:8
**Oklahoma**
5:24
**Old**
9:4
**Oliver**
1:11 2:8,11
5:8,13,19
5:20 11:21
12:1 17:6
37:15 97:8
105:8
106:21,24
116:11,15
119:1,3,6
**once**

24:22 60:7
62:22 87:25
89:19
**Oncology**
10:22
**ones**
48:8 50:2
100:10
**Open**
12:16 13:8,9
**operating**
74:1,11
75:11 80:10
80:11
**operations**
74:2,8
**opinion**
51:1 67:25
68:10
108:13
**opportunity**
73:17 79:22
**opposed**
62:14
**optical**
34:13
**order**
18:11,13,24
41:10,12
49:13 56:22
57:9 61:17
63:8 87:24
88:1 90:7
90:12,13,17
**ordering**
87:25
**organization**
109:21
**organizat...**
8:22
**original**
1:12 19:2,5
19:12 23:10
23:12,18
24:1,5,8,11
26:11 27:7
30:3,4,16
31:12,15,20

33:20,20
36:25 37:7
49:18,20,21
51:4 53:5
53:17 56:8
56:10,19
72:2 87:6
91:24 92:23
92:24 93:1
93:5 94:5
**originally**
21:8 33:12
**originals**
31:22 50:18
50:19 51:5
56:7,25
57:14,22
91:19,23
92:4,9,15
92:17,20
93:12,20,24
**outlines**
86:19
**outlining**
38:6
**output**
103:14
**oversaturate**
35:13
**oxymoron**
77:18

───────────
           **P**
───────────
**P**
3:1,1 85:16
116:9
**PA**
1:16 3:6
**packages**
12:12 42:14
102:24
**packet**
38:20 65:15
65:16 86:5
**page**
4:3 29:14
31:5 40:7
52:20 66:5

66:10 75:12
75:17 83:15
86:3,19
90:25 118:3
**pages**
53:25 120:3
**paint**
23:6
**pale**
35:15
**paper**
34:12,19
65:14
**paragraph**
54:9 76:10
81:2
**parameter**
50:11
**parameter...**
51:23
**parameters**
46:6,8 48:16
89:8,11,16
89:23 90:2
90:20
101:12,18
101:24
113:25
114:2
**park**
115:21,24
**parsed**
85:21
**part**
11:8 14:7,11
16:6 20:22
20:22 21:25
26:14 42:21
44:9 52:14
52:20 56:12
56:15 57:2
57:4 58:13
81:9,11,21
103:10
110:12
**particular**
17:14 19:9
30:13 36:21



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4649

William Russell Oliver, MD, MS, MPA                    October 28, 2010

136

| | | | | |
|---|---|---|---|---|
| 38:1 44:16 | **PATTI** | 97:14 | 30:16 31:6 | 106:9 |
| 44:20 49:3 | 3:18 | **permitted** | 31:16 47:12 | **Pieternelle** |
| 59:14 60:22 | **peer** | 40:14 | 47:15,20,21 | 3:22 |
| 62:16 63:10 | 28:18 38:10 | **permutations** | 47:25 48:23 | **pipeline** |
| 64:13,13 | 38:13,15 | 114:25 | 49:7,19,20 | 33:4 34:13 |
| 66:8 68:24 | 44:21 | **person** | 50:9,20 | **pixel** |
| 76:18 78:7 | **peer-review** | 18:8 87:18 | 61:7 71:13 | 98:20,23 |
| 86:9 89:10 | 38:15 | 90:10 104:6 | 72:6 73:2 | 99:2,4 |
| 90:7 92:2 | **peer-revi...** | 119:8 | 77:6,8 | **pixels** |
| 109:21 | 28:12 38:9 | **personal** | 78:10,15 | 20:5,19,24 |
| 114:3 | 38:17,18,20 | 44:9 59:1,3 | 79:12 81:6 | 20:25 65:3 |
| **particularly** | 38:21,22,24 | **personally** | 82:3 91:24 | 95:3 |
| 25:8 32:19 | 39:4,8,19 | 119:6 | 97:2,13 | **Pizer** |
| 32:24 33:11 | 41:20 43:24 | **personnel** | 98:14,15 | 6:10 14:18 |
| 34:20 35:4 | **Pennsylvania** | 74:7 | 100:4 | **place** |
| 35:10 68:25 | 1:15 3:4 | **petechia** | 112:25 | 22:5 49:3 |
| 99:5 | **Pentagon** | 111:24 | **photography** | 89:12,16,24 |
| **parties** | 10:2,6 | **Petitioner** | 22:14 55:2 | 90:19 |
| 120:6,7 | **people** | 1:7 3:3 | 75:1,11 | 102:12 |
| **parts** | 7:15 18:15 | 116:8 | 77:12,13 | **placed** |
| 57:19 | 18:24 21:10 | **Philadelphia** | **photos** | 5:5 |
| **pass** | 21:24 35:7 | 1:15,16 3:5 | 17:8 23:19 | **please** |
| 37:10 103:13 | 35:14 41:9 | 3:6 | 25:18 26:11 | 5:18 37:21 |
| 103:14 | 44:8,16 | **photo** | 26:16,18 | 41:20 |
| 106:21 | 46:21 48:19 | 11:1 24:9 | 31:12,20,22 | **pleasing** |
| **pathologist** | 86:1,2 | 32:7 33:21 | 71:3 72:7 | 35:8 |
| 7:1 48:13 | 98:14 103:3 | 37:1 79:17 | 72:14 73:3 | **plug-in** |
| **pathologists** | 104:20 | 79:17 | 76:20 98:6 | 115:9 |
| 9:6 10:8 | 107:22 | **photograph** | **Photoshop** | **plus** |
| 25:11 58:17 | 115:8 | 19:9 33:23 | 115:9,10 | 104:19 |
| 78:1,14,23 | **perceivable** | 56:19,20 | **physical** | **point** |
| 111:18,19 | 35:2,3,3 | 71:9 97:19 | 102:20 | 27:13,23 |
| 112:22,24 | **percent** | 98:22 | **pick** | 30:9,25 |
| 113:10 | 15:1,2 16:21 | 100:17 | 89:2 | 32:9 37:23 |
| **pathology** | 16:23 62:4 | 109:2 | **picked** | 38:7 49:12 |
| 6:5,6,11 7:1 | **perceptional** | **photograp...** | 46:6 101:11 | 67:7,14 |
| 7:2,6,23 | 23:8 | 100:8,10 | **picking** | 68:3,10 |
| 8:5,11,13 | **perceptual** | **photographic** | 77:10 | 70:17 71:11 |
| 9:7,10 | 18:14 | 25:24 29:1,2 | **picture** | 79:24 81:19 |
| 10:20 11:12 | **performed** | 31:19 32:19 | 18:1,1,21 | 86:10 88:13 |
| 11:21 14:23 | 58:2 63:11 | 32:19 34:2 | 84:11 | 88:17 91:1 |
| 15:3,4 | 65:1 | 34:16 50:25 | 107:18 | 93:14 94:7 |
| 43:11 58:14 | **performing** | 53:9 74:2,8 | 112:5 | 94:20,21,24 |
| 61:1,10 | 101:5 | 83:18 | **pictures** | 95:10 96:6 |
| 79:12 | **period** | **photographs** | 17:23,24 | **pointed** |
| **pattern** | 6:18 8:9 | 17:9,12 | 35:14 84:9 | 93:12 |
| 20:13 31:9 | 16:3 | 25:15 29:3 | 112:9 | **pointing** |
| 34:25 | **permits** | 29:3,4,6 | **piece** | 50:19 |



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4650

William Russell Oliver, MD, MS, MPA                    October 28, 2010

137

points
81:1
POISU
81:3
portion
54:3 72:25
  85:18
position
52:24 86:19
  87:4 88:10
  88:15
possibility
80:22
possible
76:17 109:8
potential
24:10
Power
27:13,23
  30:9 37:23
  38:7 49:12
  67:7,14
  68:3,10
  70:17 71:11
  86:9 88:13
  88:17 91:1
  93:14 94:6
  94:20,21,24
  95:10 96:6
practical
25:13,14
  111:16
practice
9:14 52:23
  77:20,21
  78:1
prejudice
29:23
premarked
117:4
present
3:20 8:12
  17:19 18:6
  27:22,23
  31:15 68:7
presentation
19:8 22:18
  27:13 29:24

30:9 36:8
57:10 67:7
67:14 68:6
68:11 71:18
88:21 91:1
92:3,4
93:14 94:7
105:9,13,15
105:20,23
presentat...
85:22
presented
53:15 58:3
  85:23 86:1
  86:2 87:14
presenting
57:20
preserve
83:18
preserved
53:5 87:6
presume
108:22
presumes
60:7
pretty
69:7
previous
27:24
previously
11:11
primarily
7:8,20 32:8
  98:12
primary
12:6 14:24
  25:13
principal
37:5
principle
81:13,16
print
24:11 32:14
  32:15 34:16
  34:21 36:13
  37:22,24
  96:23
printout

67:7
prints
25:1,2,24
  26:6,9 27:8
  30:3,4,7
  34:8,8 36:1
  37:7 47:14
  47:20 49:19
  50:3,4,9,25
  72:2,8,18
  99:24 100:3
  100:7,14
private
16:8,11
Prize
9:19
probably
16:22 89:6,6
problem
17:19 20:21
  23:3,5,7
  38:6 106:12
problems
17:18 21:9
procedure
24:4 74:11
  80:11 81:9
  81:11 82:4
proceed
5:12
proceedings
5:1 10:24
process
12:5 14:21
  14:22 15:17
  15:22 25:18
  34:7,17
  39:13,25
  41:25 53:1
  58:15 83:18
  84:13 87:18
  89:10,20
  90:15
  103:17
processed
60:10,12
  87:15 88:18
processes

21:3 54:10
  54:25
processing
4:16,17,22
  6:9 7:7,8
  7:19 10:4
  11:8 12:12
  12:20 15:18
  44:10 46:14
  46:15 51:15
  52:10,23
  53:7,12
  65:16 66:3
  66:16 86:23
  87:11,17
  88:4,17
  101:4,7
  105:9
produce
34:8
produced
53:16 99:21
profession
113:18
professional
6:23,24 8:21
  9:8 73:23
professio...
11:6
professio...
9:17
professor
8:4,5,13
program
14:9,12
  44:13,16,20
  58:14 96:6
  103:4
programming
6:19,20
  12:12,15,15
  12:16 13:9
programs
6:18 13:16
  102:19
  103:13
promulgated
45:10,15,24

63:2
properly
104:18
prosecution
16:18,23
prosecutors
110:2
protection
7:21
protocol
37:25 38:8
  38:10,12
  39:3,18
  40:4,9,17
  40:18,19
  42:5 45:6
  54:3 58:24
  60:21 61:16
  62:17,19
  63:3 69:18
  87:23 89:2
  89:4 101:3
protocols
42:12,16
  48:23 51:17
  90:2
proved
119:7
provide
85:20 102:24
  103:5
provided
53:2 76:19
  86:24 89:25
  92:3
provides
33:5 61:3
public
43:16 46:1,2
  46:3 119:12
  120:3,12
publication
28:18,20
publications
9:10 10:14
  10:15
published
10:15,18



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4651

William Russell Oliver, MD, MS, MPA                    October 28, 2010

138

44:3 45:23
105:5,7
**pull**
107:15,16
**purpose**
17:13,13
78:3
**purposes**
50:12 106:9
119:9
**put**
40:25 41:1
103:12
**putting**
55:8 102:5
**puzzles**
17:22
**P-127**
4:15 52:4
**P-181**
37:16 45:8
58:24 59:15
90:3
**P-182**
4:17 66:1
**P-183**
4:18 73:16
80:12
**P-184**
4:19 86:15
105:18,18
**P-185**
4:21 116:9
**P-186**
4:23 116:13
**p.m**
2:17 117:11
**P.O**
3:11

---

**Q**

**QA**
58:15
**qualifica...**
17:2
**qualified**
11:12

**quality**
33:3 58:13
75:20 77:2
**quarter**
64:21
**queried**
112:24
**question**
15:12 17:25
24:17 25:7
40:15 59:24
60:4 61:13
63:1,22
82:16 97:16
97:16 101:6
107:14,18
108:3
111:12,16
**questions**
4:3 11:23
55:16 92:13
93:9 94:18
97:9 106:24

---

**R**

**R**
3:1,13 5:8
5:19 118:1
118:1
**Raleigh**
113:4
**range**
76:4
**rate**
24:10,14,15
59:14,16,17
59:18 60:4
60:14,21
61:4,15,15
62:17 63:2
63:18 64:2
64:4,5
65:10,12
69:13,14
**rates**
68:19
**ratio**
33:18

**reach**
56:23
**reached**
72:1
**reaching**
47:18
**read**
74:24 81:17
119:1
**reading**
18:8 41:11
**real**
19:3 35:17
35:18
**reality**
35:6
**really**
77:19 98:3
**reason**
25:14 40:24
41:3,4
49:15 50:13
70:20,22
97:11
107:22
111:18,19
114:1
**reasonably**
75:3
**reasons**
25:13 76:10
81:3,3 98:8
**recall**
14:15 16:1
**RECEIPT**
1:12
**received**
5:23 6:1,8
6:15 9:15
10:1,2 12:4
12:4,11,22
25:1,8,24
26:19 47:17
47:23 70:6
**receiving**
13:13
**recess**
80:4

**recognition**
33:25 95:7
95:13,24
**recognize**
109:19
**Recommend...**
4:15 52:9
**record**
5:4,18 29:13
46:8,16
48:16 50:10
66:1 80:3,7
116:4,5,7
116:18,19
**recorded**
96:21,23
**records**
71:10
**recruited**
8:3
**red**
35:15
**redder**
35:12
**redirect**
107:1
**reduced**
99:15,16,17
**reduces**
77:2 85:9
**refer**
65:14 117:5
**reference**
65:18
**referenced**
116:10,14
**referred**
92:17
**referring**
31:4 59:1
80:15 93:16
**regard**
35:24
**regarded**
28:7
**regarding**
10:6 64:17

**regardless**
88:16 90:17
**region**
114:6,8,9
**regional**
8:1 113:5
**regions**
21:3,6
101:20
**Registration**
120:16
**regular**
15:3
**regulate**
74:6
**regulated**
28:7
**related**
6:21 11:2
120:5
**relates**
11:1 35:25
**Relating**
6:20
**relative**
19:23 107:13
107:14
120:6
**relatively**
107:21
**reliability**
32:6 33:19
**relied**
72:2,4 99:20
**rely**
47:19 49:17
71:24 72:25
74:11 94:8
**remaining**
65:1
**remember**
29:25 33:12
35:5 50:3
51:13 59:6
59:9,10
95:8 96:12
105:5,23



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

**USCA5 4652**

William Russell Oliver, MD, MS, MPA                    October 28, 2010

139

| | | | | |
|---|---|---|---|---|
| 113:11 | 107:17,21 | 30:14,14,15 | 98:5,17,21 | **Russell** |
| **remind** | 107:23 | 33:17 35:24 | 98:24 99:18 | 1:11 2:8,11 |
| 105:25 | 108:1 | 36:7,16 | 102:18,19 | 5:13,19 |
| **remote** | **Respondent** | 37:4,6 38:5 | 103:22,24 | 119:1,3,6 |
| 15:8 | 1:5 3:9 | 39:1,17 | 104:12,19 | |
| **Reno** | **response** | 40:8,22,22 | 104:25 | _____ S |
| 10:3 | 32:17 34:12 | 41:18 42:17 | 105:18 | |
| **repeat** | 46:3 112:23 | 44:12 47:7 | 106:6 107:4 | **S** |
| 87:19 90:15 | **result** | 47:13,15 | 107:17 | 3:1 108:22 |
| **repeatedly** | 34:16 36:17 | 50:1,9,15 | 108:21 | 118:1 |
| 62:12 | 36:19 53:15 | 50:20,21 | 109:1,6,9 | **SALINAS** |
| **replace** | 87:14 94:20 | 51:1,7,10 | 109:24 | 3:18 |
| 30:4 | 94:21 | 52:2,15,19 | 110:1,3,5 | **save** |
| **report** | **resulted** | 53:17,18 | 111:23 | 48:21,23 |
| 27:14 31:5 | 29:16 | 54:6,12,14 | 112:4,8,11 | 49:6 83:23 |
| 58:11,15 | **results** | 54:15,18,22 | 113:11,13 | **saved** |
| **REPORTED** | 104:14 | 55:13,14 | 113:23 | 53:20 |
| 3:24 | **review** | 56:3,6,21 | 114:5,7,10 | **saw** |
| **reporter** | 17:8 28:18 | 56:24,25 | 114:10,24 | 7:16 27:24 |
| 2:13 5:6 | 38:13,15 | 57:6,15,18 | 115:15,19 | 36:23,25 |
| 120:2,12 | 44:21 73:22 | 58:10 60:11 | 117:10 | 50:25 |
| **represent** | 85:21 91:25 | 60:13 62:14 | **risk** | **saying** |
| 35:6 | **reviewed** | 63:17 64:8 | 67:20,25 | 55:10 68:24 |
| **represent...** | 47:9 58:10 | 64:23 65:6 | 68:12 | 77:25 78:21 |
| 92:6 93:3 | 70:15 73:24 | 65:18 66:13 | **Robert** | 79:2,18 |
| 94:17 97:24 | **reviewing** | 66:16,21,22 | 105:1 | 83:23,25 |
| **represent...** | 48:20 | 67:8,11,12 | **ROBERTS** | 84:1,2,20 |
| 50:24 94:3,9 | **reviews** | 67:14 69:2 | 3:13 | 84:21,25 |
| **represented** | 38:10 | 69:16,19 | **Rodney** | 85:1 89:18 |
| 98:15 | **Richard** | 70:4,7,10 | 10:4 | 90:19 92:25 |
| **reproduce** | 85:24 | 71:2,3,5,14 | **rosy** | 93:2 107:10 |
| 114:2 | **right** | 72:5,17,19 | 35:15 | 107:12 |
| **reproduced** | 5:7,20 6:22 | 72:20 74:19 | **Rouse** | 108:8 111:4 |
| 53:16 | 8:8,21 9:8 | 75:7,15 | 25:4,4,9,18 | **says** |
| **reproducing** | 9:24 10:25 | 76:14 78:8 | 48:3,7,13 | 31:25 55:24 |
| 32:6 | 11:11,19 | 78:11,16,19 | 50:1 58:2,4 | 66:21 68:3 |
| **require** | 12:21 13:17 | 79:3 80:12 | 58:16,18,18 | 68:4,12 |
| 33:5 | 13:22 14:2 | 80:15 81:14 | 72:10,16,19 | 76:2 80:14 |
| **required** | 14:15,20 | 81:19 83:13 | 82:21 99:21 | 85:6 86:22 |
| 51:15 | 15:15,24 | 86:8 87:6 | 100:9 | 91:5 109:7 |
| **residency** | 16:13 17:11 | 87:13,15,24 | **Rouse's** | 111:13 |
| 6:5 | 17:17 19:7 | 88:14 89:21 | 71:3 | **scale** |
| **resolution** | 19:18 22:11 | 90:8,9 91:6 | **Rule** | 20:5 21:23 |
| 32:10,15,18 | 22:16,21 | 92:4,5,9,16 | 30:1 | **scan** |
| 32:23 33:5 | 24:3 25:17 | 92:20 93:15 | **run** | 21:11 |
| 65:1 99:12 | 26:4,10 | 94:4,9,13 | 104:13 | **scanned** |
| 99:17 106:1 | 27:1,5 | 94:23 95:2 | **running** | 71:13 |
| | 28:13 29:24 | 95:19,22 | 69:5,10 | **scanner** |
| | | 96:17 97:21 | | 32:6 96:21 |



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4653

William Russell Oliver, MD, MS, MPA                    October 28, 2010

140

| | | | | |
|---|---|---|---|---|
| **scanners** 33:15 96:16 | **section** 67:6 | **sequential** 38:12 40:8 40:17,19,20 | **showed** 33:4 | **situations** 103:21 |
| **scanning** 96:13 97:1 | **see** 7:16 9:5,5 10:11 18:16 21:13,17,21 27:20,20 31:11 34:15 35:7 36:5 36:25 37:4 54:7 62:7 67:18 73:9 75:12 82:22 83:15 86:20 87:2 91:2 97:22 104:11,14 | **serve** 8:16,19 | **showing** 51:5,6 66:9 71:8 | **six** 46:1 |
| **scans** 21:9,9 | | **services** 8:6,14 74:8 | **shown** 62:12 | **size** 64:21 82:21 97:16 98:2 99:6 101:20 107:4,13 111:5,8,21 112:12 114:4,7,8 114:14,22 115:18 |
| **scars** 31:8 | | **session** 68:3,24 | **shows** 98:20,20 113:1 | |
| **scene** 25:19 34:7 84:7,13 85:3 100:22 | | **set** 25:24,25 72:18 99:13 102:12 | **side** 17:23,23,24 17:24 | |
| **scheduled** 69:4 | | **sets** 25:23 26:2 48:4 72:13 100:4 | **signature** 1:12 119:1 | **skirt** 18:2 |
| **Schenk** 31:14,18,21 70:2 96:10 | | **setting** 54:19,23 79:14 | **significance** 103:25 104:2 | **slide** 86:4,10 |
| **Schenk's** 24:7,18 26:10 28:1 28:13,16 31:4 33:7 | **seeing** 29:7,7 | **seven** 62:19,21 63:3,4,5,6 63:7,11 | **significant** 58:8 | **slides** 37:22 48:11 |
| | **seen** 36:14 | | **significa...** 32:21 58:1 | **small** 36:19 64:11 82:21 112:1 112:4,6,15 |
| **school** 5:25 6:6 8:4 8:6,14 14:6 | **self-expl...** 68:12 | **Sex** 10:23 | **silver** 35:1 55:1 | |
| **science** 6:7,9,21,22 11:4,5 28:21 52:24 66:24 | **seminar** 67:10 | **shared** 99:21 | **similar** 89:24 115:1 | **smaller** 80:20 |
| | **send** 90:18 | **sharp** 64:16 | **simple** 63:1 | **smile** 9:5 |
| | **sense** 51:19 62:3 92:21 111:16 | **shift** 33:18 | **simplest** 20:7 104:13 | **Society** 9:7 |
| **Sciences** 9:1 10:19 11:10 66:4 | **sensing** 15:8 | **shooting** 76:25 | **simply** 13:13 20:4 33:25 41:4 57:7 85:21 89:15 102:11 | **soft** 22:2,2 |
| **scientific** 8:10 24:19 45:9 54:11 | **sensitive** 76:3 | **Shoreline** 3:16 | | **software** 13:5,6 41:24 42:2,4,7,10 42:11,14,17 42:19 43:3 43:8,16,19 43:21,25 44:6,12,24 51:14 102:2 102:3,6,10 102:20,24 103:14,15 103:22 104:1,1,16 104:18,23 114:24 |
| **scientist** 67:2 111:10 | **sent** 25:19 26:6 72:10 | **Short** 80:4 | **simultane...** 6:4 | |
| **scope** 74:23,25 | **sentence** 74:23,24 76:2,2,9,22 80:13 | **shorthand** 2:13 120:2 120:12 | **single** 29:19,21 75:18 76:4 | |
| **seal** 119:10 120:8 | | **show** 21:25 32:18 50:21 52:4 61:19 65:24 66:9 69:11 71:6 97:19 113:2 | **singular** 29:18 | |
| **Sean** 3:22 | **separate** 64:14,15 | | **Sir** 5:17 | |
| **second** 56:22 75:12 75:17 86:19 88:3 105:5 | **separated** 51:21 | | **situation** 24:9 32:21 33:1 | |
| | **separately** 39:15 | | | |


**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4654

William Russell Oliver, MD, MS, MPA                    October 28, 2010

141

| | | | | |
|---|---|---|---|---|
| 115:3,16 | 12:23 58:24 | 113:8 | 6:10 14:18 | 55:4,11,12 |
| **sold** | 65:9 79:2 | **start** | **stop** | 55:17 |
| 43:15 | 84:6 109:15 | 5:21 26:14 | 10:16 77:17 | **subjected** |
| **Solutions** | **specifics** | 52:19 89:3 | **stopped** | 28:18 |
| 2:15 120:15 | 59:10 | **starts** | 80:13 | **submitted** |
| **somebody** | **spectrum** | 75:14 | **storage** | 47:24 |
| 89:2 | 33:9 | **state** | 75:2 | **subscribed** |
| **somewhat** | **spell** | 2:13 5:17 | **store** | 119:8 120:8 |
| 96:22 | 5:18 | 6:17 48:25 | 80:21 | **subsequent** |
| **SOP** | **spending** | 76:15 78:4 | **stored** | 14:1 |
| 4:18 73:18 | 7:22 | 88:17,24 | 25:19 43:5 | **substitute** |
| 100:6 | **SPIE** | 119:4,13 | 99:3 | 28:2 |
| 108:18,20 | 10:24 | 120:1,3,13 | **Street** | **suggest** |
| 109:1,20 | **square** | **stated** | 1:16 2:15 | 24:3 27:15 |
| 110:18 | 115:19 | 32:17 73:5 | 3:5 | 30:15 |
| **SOPs** | **stabilized** | 94:20 120:3 | **strength** | **suggested** |
| 75:24 80:10 | 33:2 | **statement** | 61:20 | 27:19 28:18 |
| 109:20 | **staff** | 24:13 31:25 | **stretch** | **suggests** |
| 110:8,14 | 6:25 100:8,9 | 55:5 81:15 | 20:7 40:23 | 31:5,14,18 |
| **sorry** | **stand** | 81:24 85:7 | **stretching** | 31:21 |
| 6:13 9:6 | 97:23 | 91:8 | 20:11 38:16 | **suite** |
| 10:16 13:22 | **standard** | **states** | 38:18 | 1:16 2:15 |
| 61:24 69:3 | 15:3 24:19 | 1:3,4 3:10 | **strongly** | 3:6,11,16 |
| 74:19 81:14 | 24:20 51:23 | 3:16 5:9 | 81:4 82:2 | 33:1 113:2 |
| 81:19 86:25 | 74:1 75:11 | 17:7 54:9 | **student** | **superior** |
| 90:2 106:20 | 75:19 77:2 | 67:20 85:2 | 42:22 | 75:19 |
| 116:20 | 77:12,14,16 | 88:21 | **studied** | **supplant** |
| **sort** | 77:18,20,21 | 109:15 | 14:8 62:19 | 30:3 |
| 17:21 18:18 | 78:9,22 | **stating** | **studies** | **supposed** |
| 32:18 36:2 | 80:9,11 | 87:4 | 32:18 60:17 | 83:23 |
| 36:2 | 81:9,11 | **step** | 61:18,22 | **sure** |
| **sorts** | 97:12,14 | 35:19 39:18 | 62:11,18 | 5:19,23 11:3 |
| 18:23 29:4 | 98:6 107:2 | 62:20 90:11 | **study** | 12:25 19:20 |
| **sound** | 107:3,11 | 90:11 | 14:5 32:25 | 33:24 38:4 |
| 106:4 | 109:22 | **steps** | 61:3 64:5 | 40:16 71:12 |
| **source** | 110:16,16 | 49:16 53:7 | 65:9,11 | 77:18 79:22 |
| 33:22 | 110:23,25 | 53:12,17,20 | **studying** | 85:25 95:9 |
| **Southern** | 111:3,4,4,7 | 56:3 59:15 | 14:13 | 99:18 |
| 1:3 5:10 | 111:9,14 | 61:16 62:19 | **stuff** | 105:25 |
| **space** | 112:18,19 | 63:3,4 65:5 | 29:4 56:11 | 106:5,25 |
| 64:12 | 113:6,17,23 | 65:8 84:22 | 99:10 103:2 | 107:9 |
| **speaks** | **standardized** | 84:23 87:11 | **subcommittee** | **surface** |
| 55:21 110:19 | 102:11 | 87:17 101:4 | 88:8 | 80:19 |
| **specific** | **standards** | 102:12 | **subcommit...** | **Surgical** |
| 12:17 24:14 | 45:6 78:18 | 104:4,4,5,5 | 81:24 | 10:22 |
| 44:9 59:9 | 108:8,9,9 | 104:7 | **subject** | **surveillance** |
| 64:17 85:21 | 108:10,14 | 109:12 | 34:13 44:20 | 15:7 |
| **specifically** | 109:19,20 | **Steve** | | **SWGIT** |



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4655

William Russell Oliver, MD, MS, MPA                    October 28, 2010

142

```
    4:15,20,23      100:8 120:6   technical         104:1            22:20  23:8
   45:12 48:25     takes           32:5          testified          23:25 30:14
   49:3 51:20      19:22 38:22   technique        5:15 16:12         35:1,5
   52:9,24         talk            22:12 28:5       82:21 91:17      38:13 41:5
   53:19 55:9      34:14 37:18     91:15           95:8 100:21       46:3,12,16
   66:18 75:14      46:4 53:22   techniques      testify            49:16 50:7
   75:18,24         56:21 59:13   53:8,23 56:2    74:18 113:16       56:22 57:8
   76:10,23,24      61:10 62:18    91:10         testifying          57:9 60:1,5
   78:4,12,12       69:24 72:12  technology       16:15              60:18 63:5
   86:10,12,19      73:8 75:14     45:10 74:7    testimony           63:6,7
   87:4 88:9        87:3 96:9      75:1           27:25 31:7         69:11 79:18
   88:10,15         107:22       telephone         99:20,25         81:23 103:6
   91:1 97:13       109:18         107:16          108:12           103:7 104:8
   101:3          talked         television        113:15           104:12
   105:22          27:3 77:8       99:13          116:11,15         109:11
   107:3            107:1        tell            testing          think
   110:23           113:24        11:15 12:23     60:17 61:8       4:19,23 9:18
   111:3,4,8      talking          14:17 38:9    Texas              29:13 33:10
   111:13          23:14 24:11     41:15,20       1:3,22 2:14       45:9,24
   113:13           32:13 44:6     48:17 49:19     2:16 3:12        55:20,22
sworn               45:7 46:12     65:10 73:16     3:17 5:10        59:11 68:11
 5:14 120:8         47:3 49:22     85:18 92:8      120:1,3,13       70:18,21,22
synopsis            61:1 62:20   telling        textbooks          79:5 82:6
 73:25              62:21 63:18   56:11 78:21     99:12            94:19 103:3
System              71:18 72:9     93:23        Thank              103:3
 4:16 52:11         72:22 78:14  tend             18:4 37:11       104:14
systems             78:18 79:9    35:13 64:14     117:10           105:22
 13:2 33:11         80:14 81:25    64:15 69:8   Therapy            110:21
  42:3              83:14 84:6     89:11          10:23            114:7
                    90:14 96:12    111:19       they'd           thinking
──────────────      101:2 108:7    112:25        114:11,11,17      69:3
        T           109:23       Tennessee        114:22         third
T                 talks            6:1            115:2,5,11       66:10
 118:1,1           38:23 83:15  tenured           115:13,16      thought
take                91:2          8:3             115:16,17       22:19 107:3
 20:11 21:21      tape           term            thigh             111:12
  25:11 35:14      80:6           111:24          97:20,25         113:21
  36:9 52:3       Targa          terrorism      thing            thousand
  73:15 79:24      51:15,16       7:21            6:14 27:2        21:20,23
  97:19           task           test             32:13 46:19    three
  103:13,14        60:9 63:10     24:14,15        52:18 71:7      7:16 13:10
  104:13          tasks            31:18 101:6     81:1 82:13      51:22 87:14
  107:17           7:7 59:15,25    104:16         88:3 89:14      104:7,11
  112:25          taught         tested           98:22           107:19
taken              67:10,23       28:17 43:18     106:11         three-dim...
 2:12,14 25:3       68:6           43:22 63:2   things            7:14,15
  25:10 34:7      teach            103:19,20     12:15 16:5      thrust
  50:1 71:4        11:7            103:23         18:16,23        19:7
  73:2 84:22
```


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4656

William Russell Oliver, MD, MS, MPA                    October 28, 2010

143

**TIFF**
 51:13,16
**time**
 5:3 14:6
   15:17 33:15
   45:5,11,17
   49:4 56:19
   69:5 70:16
   75:2,24,25
   80:2,6
   81:17 96:16
   96:25 116:3
   116:6,8,17
**times**
 16:12 33:18
   33:18 42:23
   42:24
**tire**
 18:2
**tissue**
 22:2,3
**title**
 65:21,23
**today**
 90:3
**Today's**
 5:2
**told**
 51:3 56:6,7
   56:18 90:6
   92:14 93:11
   93:24
**tomography**
 21:10
**tones**
 35:13
**TONY**
 3:13
**tool**
 13:5
**top**
 73:25
**topic**
 105:16
**total**
 40:1
**track**
 11:17 49:13

 49:16
**traditional**
 51:18 53:8
   55:1
**trained**
 15:16,17
   87:18
**training**
 6:18,25 12:3
   12:4,11,23
   12:25 13:8
   13:8,15,24
   58:19 61:7
**trainings**
 13:12,16
   14:1
**transcript**
 29:14
**transmit**
 80:21
**tri**
 33:2
**trial**
 16:20 29:23
   31:2 33:12
   45:5,17
**tripod**
 33:2
**trivial**
 17:21
**true**
 36:3 119:2
   120:3
**try**
 68:17
**trying**
 41:15 72:11
   108:17
**turn**
 18:23 102:15
**turning**
 83:14
**turns**
 25:11 35:19
**two**
 17:23,24
   20:13 25:23
   25:23 34:8

 34:18,18
 38:3 51:22
 53:7 56:22
 57:9,19
 69:4 76:2
 80:6 81:1
 85:25 100:2
 100:4
 101:18
 104:4,5,10
 107:18,20
**type**
 7:13 32:20
   32:21 69:19
   73:11,19
   77:6 78:5
**typically**
 76:3

———————————
         **U**
———————————
**U**
 16:7
**Uh-huh**
 12:19 13:25
   26:20 30:8
   37:17 39:22
   39:24 40:6
   50:16 53:4
   53:6,10,24
   54:4 55:18
   57:1,13,16
   60:19 63:13
   65:7 66:11
   67:4,15,17
   69:9 70:1
   72:3 74:4,9
   74:13 75:8
   80:17,17
   82:1 84:4,8
   87:21 91:7
   93:13 95:14
   98:25 100:5
   102:8
   103:18
   108:11
   109:4
   110:24
   111:2

**ultimately**
 19:14
**UNC**
 103:11
   104:20
**uncommon**
 18:10
**undergone**
 99:4
**underlined**
 76:15 83:19
**underneath**
 41:5 75:10
   76:14 91:9
**undersigned**
 120:2
**understand**
 25:17 39:16
   40:20 44:18
   47:1 71:10
   87:18 90:15
   102:6
   110:13,15
**understan...**
 45:14
**understood**
 99:19
**underwent**
 24:9
**unenhanced**
 26:12,25
   27:6,6,17
   51:6 56:19
   92:18,21
**unfortuna...**
 12:14 36:2
   37:2 38:6
   68:25
**uniformity**
 98:9
**Unit**
 74:8 81:4
**United**
 1:3,4 3:10
   3:16 5:9
   17:7 109:14
**units**
 84:14

**universally**
 109:21
**University**
 5:24 6:3,17
   8:5,7,15
   103:10
**unknown**
 24:14 67:20
   67:25 68:12
**unnecessary**
 82:6
**unsharp**
 38:23
**upside**
 18:23
**use**
 4:15 13:16
   18:19 19:14
   21:8 22:13
   22:17 23:21
   24:20 27:10
   27:16 28:11
   29:23 30:1
   30:2,16,20
   44:8 52:10
   52:25 54:19
   60:5 65:15
   65:15 70:12
   70:14,16
   74:6 75:1
   76:11,24
   77:13,23
   78:5 79:9
   81:5,22
   82:2,7,23
   88:4 96:6
   97:14 98:19
   98:21 107:5
   108:16
   109:10
   110:7,14
   111:6 113:7
   114:5 115:5
   115:8,9,11
   115:13
**useful**
 26:9 32:24
   71:8 100:11


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4657

William Russell Oliver, MD, MS, MPA                    October 28, 2010

144

| | | | | |
|---|---|---|---|---|
| **usefulness** | 4:15 24:12 | **visualiza...** | **wavelet** | **we've** |
| 99:9 107:12 | 24:12 27:11 | 7:9,9,12 | 38:20 64:8 | 37:16 44:14 |
| 109:16 | 27:17 36:14 | 13:2,5,6 | 64:11,11,19 | 91:13 93:20 |
| **user** | 36:23,24 | 22:7 | 64:20 65:3 | 102:6 |
| 34:14 103:3 | 49:10,11 | **Vorder** | 65:12,15,16 | 110:21 |
| **uses** | 50:20 52:8 | 85:24 | 67:18,24,25 | **whatsoever** |
| 80:22 | **versions** | **VTK** | 69:17 | 57:10 |
| **usually** | 30:2,3,21,21 | 115:13,13 | **wavelets** | **whip** |
| 16:19 35:2 | 31:24 49:9 | | 64:14 68:19 | 31:8 |
| **utilize** | 72:5,8 | ─────── | 69:14 | **white** |
| 72:21,22 | **versus** | **W** | **way** | 18:3 21:18 |
| **utilized** | 16:16 17:7 | **wait** | 10:4 12:13 | **wider** |
| 42:16 73:5 | 33:18 64:15 | 6:12,13 19:3 | 16:1 35:3 | 76:3 |
| 77:1 | 79:17 95:7 | 22:6,8 69:1 | 35:17,18,19 | **William** |
| **utilizing** | 100:14 | **waiveable** | 36:3 64:13 | 1:11 2:8,11 |
| 46:4 | 107:2 | 110:17 | 64:14 89:17 | 5:8,13,19 |
| **U.S** | **vetted** | **wall** | 104:10,13 | 119:1,3,6 |
| 3:10,15 28:7 | 45:21,22 | 18:3,3 | 104:15 | **window** |
| | 58:15 | **Walnut** | **ways** | 21:22 22:1,1 |
| ──── V ──── | **victims** | 1:16 3:5 | 18:11 20:1 | 22:2,3,6,8 |
| **V** | 10:9 | **want** | 104:11 | 22:9,10 |
| 5:19 | **video** | 12:9 21:12 | **well-resp...** | **windowing** |
| **valid** | 4:17,21 66:3 | 21:15 32:4 | 67:2 | 21:18 |
| 46:24 | 66:15 79:25 | 32:11 35:14 | **went** | **witness** |
| **validation** | 81:4 105:9 | 59:13 61:10 | 5:25 6:3,12 | 5:5,14 16:9 |
| 60:17 65:9 | **Videographer** | 65:24 69:24 | 6:25 7:25 | 18:4 37:10 |
| 65:11 | 3:22 5:2 | 73:8 79:21 | 13:15,16 | **words** |
| **value** | 13:20 80:2 | 87:3 91:25 | 14:2 23:25 | 21:19 36:7 |
| 75:4 77:9 | 80:5 116:3 | 97:19 99:18 | **weren't** | 60:1 |
| 78:8,19 | 116:6,17 | 102:1,5 | 56:1 92:9 | **work** |
| 109:6,11 | **VIDEOTAPED** | 103:1 105:3 | 100:11 | 10:1,3 16:6 |
| **values** | 1:11 | 106:10,11 | **West** | 24:24 98:16 |
| 76:4 | **view** | 108:25 | 1:16 3:6 | 104:8 |
| **Vanderbilt** | 32:9 | 113:2 | **wet** | **worked** |
| 5:25 | **viewer** | 114:21 | 35:22 | 104:22 |
| **variations** | 35:4 | **wanted** | **we'll** | **working** |
| 80:19 114:20 | **views** | 12:3 36:22 | 76:1 85:14 | 43:2,13 45:9 |
| **varied** | 100:17 | 53:22 71:1 | 106:12 | 87:15 |
| 89:22 101:17 | **virtually** | 81:1 90:10 | **we're** | 104:12,18 |
| **variety** | 37:3 77:22 | 92:6,23 | 45:7 47:3 | **workshop** |
| 54:11 | 99:25 | 93:6 94:6 | 52:16 71:18 | 4:17,19,21 |
| **various** | **visible** | 94:18 | 78:14,21 | 4:23 11:8,9 |
| 6:18 12:12 | 36:17 82:25 | 100:24 | 82:18,20 | 66:2,12,22 |
| 82:21 85:21 | 83:1 108:4 | 101:25 | 108:7 | 67:23 68:8 |
| 91:18 | **visibly** | **warfare** | 109:25 | 85:14,19,20 |
| 103:21,21 | 31:15 | 9:4 | 112:5 116:7 | 85:23 86:15 |
| **version** | **vision** | **wasn't** | 116:19 | 105:8,21,24 |
| | 6:10 11:4 | 56:4 87:24 | 117:3 | 106:15 |
| | | 101:4 | | |


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4658

William Russell Oliver, MD, MS, MPA                    October 28, 2010

145

116:10,14
**workshops**
69:4,8
**worth**
108:2
**wouldn't**
21:24 36:8
41:10 57:17
67:22,22
70:21,22
89:17
114:12
**wound**
61:3 97:19
97:20,23,25
**wounds**
60:22
**wrapper**
115:10,11,14
**wrappers**
103:12,12
115:3,17
**write**
52:17 103:1
104:6
**writing**
7:9,15
**wrong**
60:11,13
92:19 104:8
**wrote**
45:18,19,20
52:13,16,16
102:7
103:22

————————
**X**
**x-rays**
21:8 28:23

————————
**Y**
**yeah**
35:18 40:15
72:11,13
73:2 79:7
81:11 90:24
98:12
106:12,13

115:22
116:24
**year**
11:9 66:3
**years**
7:22 11:7
16:1 42:22
**Yon**
105:3

————————
**Z**
**Zeno**
66:12 69:13
**zero**
20:8,11
21:20,21,22
21:23 104:5
104:5

————————
**#**
**#19**
4:17,21
**#6**
4:19,23

————————
**0**
**03**
54:5

————————
**1**
**1**
21:23 38:4
38:10 40:1
40:7,21
41:1,5
52:20 95:4
95:4 104:4
104:4
**1:01**
80:3
**1:07**
80:6
**1:46**
116:4
**1:47**
116:7,18
**1:49**
2:17 117:11

**10**
31:10 104:4
104:5
107:25
108:5
**10th**
120:9
**10,000**
98:23,23
99:4,4
**10-28-10**
1:22
**100**
9:17 98:19
98:19 99:2
99:2
**105**
31:9
**106**
4:9
**11**
4:5 31:5
**11:39**
2:17 5:3
**116**
4:21,23
**12**
7:22 11:6
**12-31-2011**
120:15
**1221**
2:15
**127**
117:4
**13-year**
16:3
**1305**
2:15
**15**
62:4
**150**
20:10,12
**1500**
3:11
**157**
95:21
**16**

106:15
**16th**
105:20
**16.56**
96:3
**17**
4:6
**17th**
74:20 105:10
**182**
117:4
**183**
117:4
**184**
117:4
**184256**
1:1
**19**
12:9 106:16
116:10
**19106**
1:16 3:6
**196**
29:14
**1980s**
22:15 103:9
**1990**
12:9 16:2
**1990s**
9:18
**1992**
10:5
**1994**
105:7
**1998**
9:18

————————
**2**
**2**
31:5 33:18
38:4 40:21
41:2,6
108:2
**200**
21:21,22
**2002**
4:15 52:8

**2003**
6:15 16:2
55:6,10
**2004**
33:13,15
**2005**
74:12,14,21
**2007**
31:5
**2008**
69:3
**2009**
68:25 69:2,3
86:15
105:10,20
**2010**
2:16 5:3
69:1,4
120:9
**22**
8:19,19
**25**
31:8
**255**
20:8,12
**26**
31:8
**28th**
2:16 5:3

————————
**3**
**3**
33:18,18,19
38:4,11
40:21
120:16
**30**
15:2 47:12
**3022**
120:14
**35**
25:18 26:11
26:16,18
32:7 33:20
33:20 47:12
47:20 49:18
50:8 72:2
72:18 75:19



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4659

William Russell Oliver, MD, MS, MPA                    October 28, 2010

146

**3600**
32:7,14
**37**
4:7

**4**

**4**
33:14,18
**400**
113:12
**403**
30:1

**5**

**5**
4:4 29:14
38:4
**5-10-2012**
120:14
**50**
16:21 20:10
20:11
**500**
3:16
**52**
4:15
**540**
1:16 3:6

**6**

**6**
38:4 85:15
85:19 90:25
106:16
116:14
**600**
32:7 50:11
**601**
1:16 3:5
**61129**
3:11
**66**
4:17

**7**

**7**
38:5,10 40:1

40:7
**70**
15:1
**73**
4:18 31:8
**77002**
3:12
**77208-1129**
3:11
**78**
31:8
**780**
95:4,5
**78401**
3:17

**8**

**8**
31:9 108:1,4
**80**
16:22
**80s**
28:14
**800**
3:16
**86**
4:19

**9**

**9**
31:9 62:4
104:5
**9-11**
10:1
**90**
16:22
**919**
3:11
**97**
4:8
**98**
9:19
**99**
9:20



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

**USCA5 4660**

184256 eb

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

UNITED STATES OF AMERICA *
       Respondent,  *
against               * No. Cr-C-02-216
                    * No. Cv-07-223
ALFRED BOURGEOIS     *
       Petitioner.  *

VIDEOTAPED DEPOSITION OF
MANFRED SCHENK

UPON RECEIPT OF SIGNATURE, THE ORIGINAL OF THIS
DEPOSITION WILL BE IN THE CUSTODY OF:
James McHugh, Esquire
Federal Community Defender Office
For the Eastern District of Pennsylvania
Defender Association of Philadelphia
601 Walnut Street, Suite 540 West, Curtis Building
Philadelphia, PA  19106

Date                Edith A. Boggs, CSR

10-28-10           HOUSTON, TEXAS



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4661

DEPOSITION OF MANFRED SCHENK


DEPOSITION AND ANSWERS of MANFRED SCHENK, taken before Edith A. Boggs, a certified shorthand reporter in Harris County for the State of Texas, taken at the offices of Esquire Deposition Solutions, 1221 Lamar Street, Suite 1305, Houston, Texas, on the 28th day of October, 2010, between the hours of 10:11 a.m. and 11:19 a.m.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4662

A P P E A R A N C E S

ATTORNEY FOR PETITIONER:
    Federal Community Defender Office
    For the Eastern District of Pennsylvania
    Defender Association of Philadelphia
    601 Walnut Street
    Suite 540 West, Curtis Building
    Philadelphia, PA   19106

    BY:  JAMES MCHUGH, ESQUIRE

ATTORNEYS FOR RESPONDENT:
    U.S. Department of Justice
    United States Attorney's Office
    919 Milam, Suite 1500
    P.O. Box 61129 (77208-1129)
    Houston, Texas   77002
    BY:  TONY R. ROBERTS, ESQUIRE
    AND MARK M. DOWD, ESQUIRE

    AND

    U.S. Department of Justice
    United States Attorney's Office
    800 North Shoreline, Suite 500
    Corpus Christi, Texas   78401
    BY:  PATTI BOOTH, ESQUIRE
    AND ELSA SALINAS, ESQUIRE


ALSO PRESENT:

    Ms. Kathrin Hennig
    Mr. Sean Pieternelle, Videographer
    Dr. William Oliver

REPORTED BY:
    Ms. Edith A. Boggs


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4663

Manfred Schenk                                                  October 28, 2010

4

EXAMINATION INDEX


QUESTIONS BY                                          PAGE


Mr. McHugh                                            5

Mr. Roberts                                           10

Mr. McHugh                                            18

Mr. Roberts                                           33

Mr. McHugh                                            43


INDEX OF EXHIBITS


NO.    MARKED    DESCRIPTION


P-97    5        CV of Manfred Schenk


P-142   19       Letter dated 5-11-07 from Cherry
Biometrics to James McHugh

P-157   27       (Also marked as 100)  Photograph

P-181   28       Image Enhancement Protocol of William R.
Oliver, MD, Armed Forces Institute of Pathology



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4664

PROCEEDINGS

THE VIDEOGRAPHER:  Today's date is October 28th, 2010.  The time is approximately 10:22 (sic).  We are now on the record.

MANFRED SCHENK

was called as a witness and, being first duly sworn by the notary, testified as follows:

EXAMINATION

Q.  (BY MR. MCHUGH)  Can you state your name for the record.

A.  Manfred Schenk.

Q.  Mr. Schenk, I'm showing you what has been previously marked as P-97, and is that a copy of your resume or curriculum vitae?

A.  It is.

Q.  Okay.  I wanted to go over some background information with you.  Can you describe for us your educational background?

A.  I have an associate degree in engineering, electrical -- chemical engineering -- excuse me -- and a bachelor's degree in mathematics from the University of -- State University of New Jersey in Rutgers and a master's degree in mathematics from the University of Michigan.

Q.  Okay.  And can you describe for us your


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4665

employment history?

A. Yes. I -- I started out in -- at -- at IBM working on -- I mean, on various types of computer systems, specifically in the area of business analysis, bond analysis and also demand deposit accounting.

Q. Okay.

A. From there, I went on to do consulting work for various organizations, including NASA and ITT and the United States Navy and those kinds of organizations.

Q. Okay. And with the United States Navy, can you just give us a flavor of what you were doing with the United States Navy?

A. Yes. I was working on -- on several different projects. One of them was electronic countermeasures. And so, what we were trying to do is -- is to prevent missiles from destroying our ships.

So, we developed electronic countermeasures in order to steer a missile off course such that it wouldn't hit a ship. So, that was one particular project.

Another project was I was working on cryptographic communication systems for the Tritan submarine.

And then a third project was working on electro optic equipment where we were attempting to, again, see



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4666

missiles coming toward us, et cetera, et cetera, but using the electro optic spectrum rather than -- rather than radar and doing electronic countermeasures.  So, this was a passive electro optic system that we were developing.

Q.  Okay.  Did you also do some work for NASA?

A.  I did, yes.  I worked on the lunar landing project.  Specifically my work there was involved in lunar landing radar, and we were determining the distance of the land module as it descended onto the moon's surface.

Q.  And did you work on more than one lunar landing or do you know what missions?

A.  Well, as far as I know, my software participated in all of them, and there were a total of six lunar landing missions that actually landed on the moon.

Q.  Okay.  Now, how are you presently employed?

A.  I'm working with -- in -- in the capacity of a senior scientist with Cherry Biometrics.

Q.  And in the course of your employment with Cherry Biometrics, have you been involved with the creation and analysis of digital imaging systems?

A.  I have, right.  Cherry Biometrics or in that -- on that particular occasion, the name was a little bit different, called DSP.  They were a subcontractor to IBM


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4667

and Sony and various other organizations that had -- but mainly IBM -- that had banded together in order to develop a system called Image Plus.

And what it was was the digitization of -- well, of many, many things but today we're discussing pictures.  So, it was the digitization of pictures and the storage of those particular pictures in rather large computer depositories for -- for -- for -- to index that information and also to have the ability in order to retrieve that information.

Q.  Okay.  And the -- the Image Plus, was it also used or you partnered with police departments?

A.  Yes, indeed.  It was used in various police departments to -- to collect mugshots and combine it with textural information and combine it with fingerprints and everything that's associated in a police department environment.

Q.  Okay.  And so, those would be items of data that could be relied upon in a forensic setting, is that fair to say, a courtroom setting?

A.  Of course, yes.

Q.  Have you also researched and helped design issues concerning ultrasounds?

A.  Indeed, I have.  For Riverside Research, our mission was -- they had successfully been able to use



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4668

ultrasound and ultrasound signatures in order to characterize cancerous tissue, neoplasm.

And we attempted -- in order to extend that particular research they had -- had been successful in as far as the human eye is concerned, and we attempted to further that into the area of prostate cancer.

Q.  Okay.

A.  So --

Q.  And you are presently employed today as a senior scientist with Cherry Biometrics; is that correct?

A.  I am, yes.

Q.  Okay.  I wanted to just go over some of your professional memberships.  Are you a member of the International Association of Pattern Recognition?

A.  I am.

Q.  Okay.  And how about the -- are you a member of the Institute for Electrical and Electronic Engineers?

A.  I am.

Q.  Okay.  And were you -- are you a member of the Association of Imaging and Information Management?

A.  I'm not at the moment.  I was for a number of years when we -- when I was involved with Cherry Biometrics doing the digital imaging repositories, et cetera, et cetera.

Q.  So, you were a member of that --



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4669

A.  Yes.

Q.  -- that association?

And how about the National Institute of Standards and Technology?

A.  Yes, I'm a voting member there, and the -- the idea is in order to develop standards which, you know, are used throughout the world in regards to the biometric characteristics associated with identifying people.

MR. MCHUGH:  Okay.  Tony, do you want to do some examination now or --

MR. ROBERTS:  Yes, I would.  Thank you.

MR. MCHUGH:  Okay.  I'm going to offer Mr. Schenk as an expert in the area of digital imaging and digital images.

MR. ROBERTS:  Digital imaging and digital images?

MR. MCHUGH:  Yes.

MR. ROBERTS:  As an expert.

EXAMINATION

Q.  (BY MR. ROBERTS)  Mr. Schenk, if I understand right, I'm looking at your -- your CV, and listening to your -- your testimony, you have no medical training, do you?

A.  No, I do not.



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4670

Manfred Schenk                                         October 28, 2010

11

Q.  You have no -- as such, you, obviously, wouldn't be able to give us a medical diagnosis on an injury, would you?

A.  No, I cannot.

Q.  You wouldn't be able to give us a medical conclusion as to whether something on an image was actual -- actually an injury or a cut or a bruise, would you, a medical diagnosis?

A.  No, I cannot.

Q.  What is your understanding of Dr. Oliver's testimony and why he relied on the images that he did? What is your understanding?

MR. MCHUGH:  Well, I'm going to object if it's not going to --

MR. ROBERTS:  It has relevance with regard to whether he's an expert and the image enhancement aspect.

Q.  (BY MR. ROBERTS)  So, I'm just wondering what your understanding is of why Dr. Oliver was relying on these images?

A.  The impression that I had was that Dr. Oliver is taking the images and he's attempting to extract more information from those images than is -- than there is in the original images, and the idea that -- that AIM and the ISO communities associated with image processing



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4671

is that you attempt to preserve as much of the image as possibly preservable and be able to digitize it and store it and be able to retrieve it as faithfully as possible.

Q.  So, if -- would -- in your opinion -- well, let me ask you this:  On -- on your biometrics, I understand -- I was trying to follow what you said a moment ago.  Your -- your role in biometrics, can you repeat that?  Tell me exactly what it is you do with regard to biometrics at this point.

A.  We are attempting to categorize for that matter my -- on my association with NIST and biometrics is that attempting to develop standards or have developed standards in regards to how to identify people and -- and what particular characteristics or images and how they should be formulated and stored in -- in -- in computers in order to be able to --

Q.  So, it's a storage process, it's not an image enhancement process?

A.  That is correct.  It is -- it is -- it is the processing that is associated and involved with the storage and retrieval of -- well, in this case, pictures.

Q.  Okay.  And your research and design with regard to ultrasounds, did -- how did that involve digital --


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4672

13

digital imaging and digital enhancements?  Did it?

A.  Well, it involved the -- what I call the
characterization, that is to say, normal -- normal
tissue has a particular ultrasound signature.  A
cancerous tissue has a slightly different --

Q.  But, again, you're not a medical person, so, are
you giving us a medical diagnosis of what these -- what
these bodily features are?

A.  I'm giving you what the image signature
characteristics are using ultrasound equipment in
regards to different tissues.

Q.  Okay.  That doesn't deal with digital
enhancement, does it?

A.  It doesn't enhance.  It characterizes.  It
describes what the differences are.

Q.  How about your expertise in NASA?  That's very
impressive with you working on the lunar landings.  I
just don't understand how that involves digital imaging
and enhancing of images.

A.  Well, radars, you know, can be considered images.
You know, we have different types of radars, which
ultimately lead to images but in the NASA case, my
little contribution there, we were just attempting to
measure distances, et cetera, et cetera.  So --

Q.  What -- and you were a consultant for NASA and a


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4673

consultant for the Navy.  What exactly were you -- was your role?  Did they ask you information or did they give you actual images and ask you to assess whether or not they retained or lost information in their images?

A.  My function in those environments was the development of computer software equipment -- excuse me -- of software development, whatever.  So, I wrote computer programs.

Q.  Computer programs.  On your -- when you were -- in -- in some of your past experience, you were dealing with image storage.  Did you ever analyze those images?

A.  We analyzed them in order to make sure that they were faithful.

Q.  When you said "we," I'm asking really about you. Did you actually analyze photographs?

A.  Yes, I analyzed photographs.

Q.  And how much of your time was spent analyzing the photographs that you were storing?

A.  Probably not that much.

Q.  Can you give us a percentage?  3 percent?  5 percent?

A.  Perhaps 5 -- perhaps 5 percent, yes.

Q.  Okay.  So, most of your time was -- dealt with, again, the programming and the storage of images and not the analysis?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4674

A.  That is correct.  Yes.

Q.  I -- I notice that you said you were part of the International Association of Pattern Recognition.  I have a document I want to ask you about.

MR. ROBERTS:  I have a copy for you.

MR. MCHUGH:  Thank you.

Q.  (BY MR. ROBERTS)  I just actually went to the International Association of Pattern Recognition.  I was kind of curious.  This is a print-off of one of their first pages.  It's an overview.  And I'm going to ask you to look at the introduction, purpose and technical committees that's listed there and ask -- and ask you if that looks accurate to you?

MR. ROBERTS:  I'll mark that for the purposes of this hearing.  And I have no idea what number we're up to.

Q.  (BY MR. ROBERTS)  Does that look accurate to you?

A.  Sounds good to me.

Q.  So, it's a nonprofit, scientific and professional organization.  I'm sorry.  The International Association for Pattern Recognition, which is what you told us you were a part of, you're a member of it?

A.  I'm a member of it, that's all.

Q.  And this states that it is an international association of nonprofit scientific and professional



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4675

organizations --

MR. MCHUGH:  It's "or professional."

MR. ROBERTS:  That's what I said, "or professional."

MR. MCHUGH:  You said "at."

Q.  (BY MR. ROBERTS)  "Or professional organizations."  There's a parenthetical there that says, "Being national, multinational, or international in scope," parenthetical end, "concerned with pattern recognition, computer vision and image processing in a broad sense."  That's the first line there.  What my question is is that organization -- is one of the -- one of the functions or points of this organization to address fingerprint identity?

A.  Yes, it is.  It can be.

Q.  Is that -- is that how it got its genesis?

A.  I wouldn't think so.  I would think it would be much, much broader than that.  As you indicated, you have various committees that are in a -- that are in a quite diverse field.

Q.  Okay.  And do people that are members of this often go out and testify with regard to image enhancements?

A.  I do not know that.

Q.  You don't know that.  Do you -- do you know why



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4676

Manfred Schenk                                    October 28, 2010

17

when I -- when someone clicks on the link that says officers and members directory, why your name doesn't appear?

A.  Because I'm not an officer.  I'm a member.

Q.  It says officers and members directory.  Would you expect your name to be in there if someone clicked on that?

A.  I am a member.

Q.  Okay.  So, it would surprise you to find out that if someone clicked on that, your name is not listed in there?

A.  It would surprise me, yes.

Q.  A minute ago you mentioned about your experience in accurately preserving digital photographs.  What my question was is -- is was your focus on -- on making sure that they were accurately preserved more than your focus being on whether they were -- whether they had lost data or whether they had been distorted in their preservation?

A.  The focus was both.  Obviously, you don't want to lose any data, and so, therefore, the focus is on -- on the preserving.

Q.  In your role, have you -- have you done contrast enhancements as part of your analysis?

A.  I have not.



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4677

Q.   You have not?

A.   No.

Q.   Okay.

        MR. ROBERTS:   I'm going to object to him being an expert in digital imaging and images.  We don't have a judge here to decide.  You can, obviously, proceed forward, and I'll just ask that -- that the record reflect our objection.

        MR. MCHUGH:   Sure.

        MR. ROBERTS:   And we'd ask the judge to -- we'd ask Judge Jack to render an opinion as to whether or not he's an expert.  He can still testify about his own personal information if it was useful to the judge. So, we'll just proceed at this point.

        MR. MCHUGH:   Okay.

        FURTHER EXAMINATION

Q.   (BY MR. MCHUGH)   Mr. Schenk, are all the opinions you're going to give here today given to a reasonable degree of scientific certainty?

A.   Yes.

Q.   Okay.  Did our office retain you or Cherry Biometrics in the matter of United States versus Alfred Bourgeois?

A.   Yes.

Q.   Okay.  And did we provide you with various



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4678

19

materials to review as a result of your office being

retained?

    A.  You did.

    Q.  And did this material include copies of 35

millimeter photographs?

    A.  Yes.

    Q.  And unenhanced digital images?

    A.  Yes.

    Q.  As well as enhanced digital images; is that

right?

    A.  Yes.

    Q.  And we're talking about the images that were

enhanced by Dr. Oliver; is that correct?

    A.  Yes.

    Q.  Okay.  And did you and Mr. Cherry prepare a

report after you analyzed the materials that you had?

    A.  We did.

    Q.  Okay.  And I'm going to show you what has been

marked as -- previously marked as P-142, and if you

could just identify that for the record.

    A.  Yes, that is the report that Mr. Cherry and I

prepared.

    Q.  Okay.  Let me just put that here.  Now, I want to

ask you some substantive questions about the analysis

that you performed.  When 35 millimeter photographs are



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4679

scanned, is it possible to lose detail and accuracy of those photographs?

A.   Well, in the process of digitization of anything, the possibility exists that, in fact, you will -- that you will lose some information.  So, just in the process of converting of something from one format to -- to another -- another, the possibility exists of loss of -- loss of -- of information.

Q.   And can you just explain to us briefly why there's that possibility that things could -- that detail and accuracy can be lost?

A.   Well, in the process of -- of scanning in this case a photograph or whatever, it is -- most -- many, many scanners, the majority of scanners do not have a sufficient amount of -- of detail in -- in -- in -- in regards to converting that into a digital format than -- than presumably what is visually perceivable to the human eye.

So, our digitization processes are not -- are not as accurate as the human eye is accurate, et cetera, et cetera.  So -- and, of course, there's always interpretations that, in fact, must occur, and you attempt to do the very best that you can in order to preserve the image and the image quality.  However, ultimately, in the end, a computer decision is made, and


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4680

hopefully it is -- it is as accurate as it can be.

Q.   And when you say a computer decision, what do you mean by that?

A.   Well, if -- if a -- if a computer is attempting to or for that matter -- for that matter, a charge coupled device which is actually reading the -- a particular point or a particular line on a picture, it -- it, in fact, has to take into consideration what is the -- what is the luminosity of that particular point and what is the chroma, the color of that particular point and then store that particular information for -- for that particular pixel.

So, how those -- how those analog to digital conversions, in -- in fact, are done is -- is really the whole essence of preserving the accuracy and faithfulness of -- of that particular picture and its -- its preservation within a picture repository, you know, such that it can be retrieved.

Q.   And was it your understanding in this case that Dr. Oliver did -- did scan 35 millimeter photographs into a computer base?

A.   That's the impression that I have, yes.

Q.   Okay.  Now, I wanted to move on to another question.  Having reviewed the -- the images here, when scanned images are compressed using a lossey



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4681

22

compression, again, the same question, is it possible to lose detail and accuracy in those images?

A. Of course, yes, it is.

Q. And can you explain to us why that is?

A. Well, in the -- in the process of -- of digitizing a -- a particular picture, there are many, many repetitions of -- of color and chroma and quality, et cetera, et cetera, et cetera.

In a -- in a lossey compression, you're attempting in order -- to combine all of those similar cells and characteristics in order to save basically computer space, and so, that's really -- that is really the whole purpose of -- of compression.  Otherwise, there is no point in -- in compressing a particular picture.

Q. Okay.  And was it your understanding from your review of the materials that Dr. Oliver received images that had been compressed using a lossey compression?

A. That is my impression, yes.

Q. Okay.  And was that JPEG?

A. Yes.

Q. Okay.  And would JPEG be a lossey compression?

A. It would, yes.

Q. Okay.  Now, there's a -- there's a concept that's known as aspect ratio.  Can you kind of discuss or


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4682

describe what that is for us?  And in context of using 35 millimeter photos and displaying them on a motion screen or a flat screen, in that context that the -- a discussion of aspect ratio.

A.  Well, a typical 35 millimeter film is 36 millimeters by 24 millimeters.  So, that's an aspect ratio of -- of 3 -- of 3 to 2.  If you now attempt to display that on a -- on a normal regular monitor, the aspect ratio of that is typically 4 by 3.

So, what you are doing is you're taking something that is basically the dimension of 3 by 2 and converting it to a dimension -- to a dimension that is 4 by 3.

Well, you have to multiply one dimension by 1.3, 3, and you have to multiply the other dimension, the vertical dimension, by 1.5.  So, you know, the potential there is of distortion, whatever.

If you're talking about a flat panel monitor, which, you know, the more modern ones, LCDs, et cetera, et cetera, whatever, they typically have an aspect ratio of 16 by 9.  So, the exaggeration is even larger in that particular case.

Q.  With the -- with the scenario that we had in this case, which was 35 millimeters photos being displayed on a screen, does that also create a possibility for loss of detail and accuracy?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4683

A.  Yes, it does.

Q.  Okay.  Now, I wanted to talk to you a little bit about the conversion to Power Point.  What affect -- or can you discuss with us -- discuss with us whether that would have an effect on the images?

A.  Well, Power Point --

MR. ROBERTS:  I'll object to that until he's established that he is versed in Power Point.

Q.  (BY MR. MCHUGH)  Are you familiar with the Power Point program?

A.  I'm familiar with -- with Power Point and with its usage, yes.

Q.  Okay.

MR. MCHUGH:  You can cross.  I'll just --

MR. ROBERTS:  All right.  Proceed.

Q.  (BY MR. MCHUGH)  Okay.  You can answer the questions as to the effects of the conversion into Power Point.

A.  My impression of -- of Power Point and its particular images are that they nowhere nearly digitize and represent what a 35 millimeter film and/or a photograph from a 35 millimeter film would, in fact, represent.  So, I would -- I would -- I would -- I would suspect that there would be significant amount of loss of detail by using a Power Point.



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

USCA5 4684

Q.   And why is that?  Why would there be loss of detail if one uses Power Point?

A.   Well, let's assume that a Power Point presentation is, well, perhaps operating at -- at 300 DPI, whereas, a digitization of a -- of a photograph is usually in excess of 3,600 DPI.  So, you have a -- you have a factor there of let's say 1 -- 1 to 12.

So, what you're in effect doing is rather than taking 12 times the detail, you know, you are only taking 1 out of 12 samples, et cetera, et cetera, in order to represent that area.  So --

Q.   Okay.  And was it your understanding in this case that a Power Point presentation was conducted?

A.   That's my understanding, yes.

Q.   Okay.  I want to talk to you about the issue of interpolation.  Can you tell us what that is?

A.   Well, that's when basically neighboring pixels are -- are affecting the storage and/or the -- the retrieval of -- of new -- of a particular photographic pixel.  So, normally in photographs, you tend to smooth the -- the images, et cetera, et cetera, where you take into consideration neighboring -- you know, the luminosity and the chroma value of neighboring pixels and storing a -- an average value for -- for those particular pixel cells, et cetera.



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4685

So, in interpolation, as I said, you -- you are taking the values of neighboring cells and pixels into consideration in regards to making a decision as to what -- how you're going to characterize the current pixel that is under consideration.

Q.  And when you say you are taking into consideration, is it the actual person or is it the computer that's doing it?

A.  No, it's the computer that, obviously, does it, yes, that is making those particular decisions but, obviously, the computer has been programmed by someone in order to -- you know, in -- in order to make those particular decisions.  So, you know, ultimately, someone made that particular decision at a particular point in time.

Q.  Okay.  And can that affect coloration in -- in images --

A.  Indeed, it can.

Q.  -- interpolation?  And how so?

A.  Well, as I said, in a -- you're attempting to smooth a particular picture and if you have -- if you have edges, et cetera, et cetera, then you are changing the luminosity and chroma value of those particular edges and in -- and in the process of interpolating, et cetera, et cetera, you may, in fact, smear or fuzz or,


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4686

you know, distort or whatever the -- those particular neighboring values.  So, that's where the whole process of interpolation gets into it.

Q.  And chroma value, is that -- is that another word for color?

A.  Yes, it is.

Q.  Okay.

A.  Correct.  Yes.

Q.  Now, I'm going to show you -- did you see examples of -- I'm not going to go through every photograph that was displayed at the court during the trial but I'm -- I'm going to show you -- did you see examples of interpolation in the enhanced images that you reviewed?

A.  Yes, I did.

Q.  Okay.  I'm going to show you which was marked at the time of trial as Government Exhibit 157.  Have you reviewed this photograph before?

A.  Yes, I have.

Q.  Okay.  Is this an example of what you were talking about and, if so, can you please describe that for us?

A.  Yes.  Perhaps interpolation is occurring at -- and in regards to -- in regards to chroma values being --



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4687

MR. ROBERTS:  I'm sorry, did you say "perhaps"?

A.  My eye can perceive differences in chroma -- chroma value associated with the left leg in the sense that there's a greenish -- greenish hue on the top of the left leg.  There's a -- there are various magenta hues in the -- in the right leg and in the area of the glove, which in the unenhanced images is -- is quite distinct, you ultimately see interpolation occurring around the -- well, in one particular case around the finger where the chroma -- the color values, in fact, are altered from the -- from the leg to the glove.

Q.  (BY MR. MCHUGH)  And when -- and when you say the finger, are you actually referring to the thumb?

A.  I'm -- excuse me.  I'm referring to the thumb, yes.

Q.  And so, is that an example of what you described as interpolation affecting an image?

A.  Yes.

Q.  Okay.  Now, I just want to show you what I've marked as P-181.  And have you seen this document before?

A.  Yes.

Q.  Okay.  Is it fair to say that this was the protocol that was employed by Dr. Oliver in this case?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4688

A.   Yes.

Q.   Your understanding of that?

A.   That's my understanding, yes.

Q.   Okay.  And I just have a few questions about that.  Are you aware of any articles -- peer-reviewed articles that cover the protocols from 1 to 7 in this -- are you aware of any articles that peer review the --

MR. ROBERTS:  I was going to wait until the end.  I'm going to go ahead and object to the relevance of his entire testimony because of the --

MR. MCHUGH:  I only have a few questions.

MR. ROBERTS:  Yeah, we'll let you -- we'll let you go on but I'm just going to -- the relevance of his testimony as far as the scientific approach because I don't think it's relevant to how Dr. Oliver applied it.  So, I just wanted to state that for the record.

MR. MCHUGH:  Okay.  I only have a few more questions.

Q.   (BY MR. MCHUGH)  Mr. Schenk, let me strike the last question and ask this question:  Before you are protocols that were employed by Dr. Oliver in this case; is that correct?  Is that your understanding?

A.   Yes.

Q.   Okay.  Are you aware of any peer-reviewed articles concerning these protocols from -- I believe


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4689

the number is 1 down to 7?

A. No, I'm not aware of any peer-reviewed articles that cover those -- cover all of those items.

Q. Okay. And how about, again, as far as the question, are you aware of any type of error rate for the protocols as employed as a whole by Dr. Oliver?

A. I am not.

Q. Okay. Now, I just wanted to ask you what is the importance in science of an error rate?

MR. ROBERTS: I object. That's a legal conclusion.

Q. (BY MR. MCHUGH) Okay. You can answer it but --

A. Well, if your error rate is -- I mean, is -- is -- is too high, then, obviously, the entire process that -- in fact, that you're using, it's faulty. And so, therefore, why use it?

The whole purpose is in order to preserve images in digitized form without error or absolutely as little error as -- as possible. If -- if an error -- if a particular process introduces an error rate, you know, that is -- you know, that is so high, you know, as to distort those particular images, then, you know, there is no value in -- in storing distorted images, you know.

Q. Well, let's ask it a different way or have you comment on a different area. What if there is no known



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4690

Manfred Schenk                                      October 28, 2010

31

error rate, how valuable then is the process?

MR. ROBERTS:  Same objection.  Legal conclusion -- or it calls for a legal conclusion and is not really -- is not really relevant.

Q.  (BY MR. MCHUGH)  In the scientific community that you've been working in for many, many years, if you do not know the error rate of a certain protocol or process, how valuable would that be to you, as a scientist?

A.  It would be very suspect because you need to know, you know, what your error rate is and, I mean, theoretically, your error rate should be, you know, as close to zero as you could possibly achieve it and, you know -- and beyond that point, if your error rate is sufficiently high, you know, as I said before, what value is -- is a digitized image, I mean, if, in fact, it is subject to a significant percentage of error.

Q.  Okay.  And would you be able in a scientific setting to make conclusions based on a protocol or a process of which you did not know the error rate?

A.  No.

Q.  Valid conclusions, I should say.

A.  No.  No, I could not make any valid conclusions.

Q.  And why not?

A.  Well, again, the whole purpose is -- is in order



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4691

32

to preserve images, it is not in order to alter them.

Q.  I'm not talking about images.  I'm just talking about error rate in a scientific setting.  If you didn't know the error rate for a particular protocol or process, why wouldn't you be able to draw valid conclusions based on that protocol or process?

A.  Well, if your error rate is -- is high, then -- then the process -- the process is meaningless.

Q.  Okay.

MR. MCHUGH:  I have no -- no other questions.  Tony, I --

MR. ROBERTS:  Okay.

MR. MCHUGH:  -- assume there's no objection to the admission of the exhibits but we can do that when you're done.

MR. ROBERTS:  Which exhibits?

MR. MCHUGH:  The CV, the report, the --

MR. ROBERTS:  I do object to his report.  It contains legal conclusions at the end with regard to Daubert.

MR. MCHUGH:  And I didn't question him about that but --

MR. ROBERTS:  But it's in the report, so, I'd -- and he's testified, so, I would object to that coming in but other than that, I don't object.


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4692

MR. MCHUGH:  Okay.  And then we also had the one photograph that I referred to by its trial exhibit number.

MR. DOWD:  Can we just --

MR. ROBERTS:  Can we go off the record for a minute?

MR. MCHUGH:  Sure.

THE VIDEOGRAPHER:  The time is approximately 11:03 (sic).  We're now off the record.

(Short recess.)

THE VIDEOGRAPHER:  The time is approximately 11:15 (sic).  We're now back on the record.

FURTHER EXAMINATION

Q.  (BY MR. ROBERTS)  Mr. Schenk, would you take the document that is Exhibit 181, and you stated a few minutes ago that the information -- this information on there used by Dr. Oliver, that, to your knowledge, there's no peer review on any of that information?

A.  The sum total of this 1 through 7, no, I'm not aware of any.

Q.  Okay.  So, you don't -- let's take the number -- the second number down under contrast enhancement, 1, you have no knowledge of any histograms stretch peer review?

A.  That's -- the whole -- the whole idea of


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4693

enhancement is -- is enanthema to digital processing.

Q.  Okay.  Let me -- perhaps you didn't understand my question.  Are you telling us that there's no peer review of histogram stretch?

A.  I'm -- I'm not aware of any.  I'm sure that there must be, yes.

Q.  Okay.  And are you telling us there's no -- on number two, histogram equalization, are you telling us there's no peer review on that either?

A.  I -- I'm not aware of any.  As I said, I'm -- I'm not into the enhancement of -- of pictures.

Q.  Okay.  So, under number 6, the unsharp masking, are you telling us there's no -- there is no -- do you see where that is at the bottom?

A.  Yes, I do.

Q.  Number 6, unsharp masking, are you telling us there's no peer review of that either?

A.  I'm not aware of any.

Q.  And what about number 7, the blind -- and I have a problem with this word -- deconvolution, I can't seem to get that out, but are you telling us there's no peer review on that either?

A.  Again, I'm not aware of any.

Q.  Okay.  So, your testimony about the methodology used by Dr. Oliver is that you're not aware of any peer


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4694

review, you're not telling us that there is no peer review?

A. That is correct.

Q. Okay.

A. I am unaware of any peer review that covers all of these seven items.

Q. And if we presented you with peer review, you wouldn't even know what it is, would you, on those items?

A. Well, perhaps I would and perhaps I wouldn't. I haven't been presented any.

Q. All right. Fair enough.

Your work with NASA and the lunar landing, did -- did we use any -- any images of the lunar landing? Did they take any photos? Were there any photographs from way off? Because NASA has got all this great equipment that they can use to take photos. Back when you were working, did they utilize photographs to take pictures of the lunar landing?

A. Sure.

Q. And when they projected those photographs and they actually used them, when they showed them to students and everything, did -- those photographs were not the same exact image that was used when the -- when the lunar landing took place, were they?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4695

A.  Can you clarify your question?

Q.  Sure.  When -- when we had a lunar landing and we wanted to tell people about the lunar landing occurring, we were showing them photographs or images of what took place a long time ago by using images, didn't we?  Isn't that how we communicated to other people in the future?

A.  Sure.  Sure.  Sure.  We were transmitting images, very, very fuzzy ones, and mainly -- the first ones that were received were, I believe, in goldstone in Australia and, ultimately, patched through back to the United States that, in fact, indeed we had landed and -- and here are the images from the surface of the moon.

Q.  And did anybody question the validity of the landing because the photographs didn't have all the exact pixels and digital imaging?

A.  Certainly not at the time.  We were delighted that, in fact, it had occurred but we've had lots and lots of conspiracy theories since then, yes.

Q.  Well, are you here today to tell us that we didn't know we landed on the moon because the pixels weren't -- weren't right on the photographs?

A.  No, I'm not telling you that at all.

Q.  Okay.  But -- and, in essence, there was -- there is a -- an area for which we utilize photographs that had been either enhanced or changed to some extent to



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4696

prove that there actually were lunar landings?

A.    Well, the original pictures we got back were, of course, not pictures.  They were screened -- screened images, et cetera, et cetera, and, obviously, when the astronauts came back and they had lots and lots of pretty pictures that -- that they -- that were developed and that showed what it showed.

Q.    Did -- when they developed those pictures from the astronauts, did they ever put them into a slide show or put them into any kind of a computer program to show other people?

A.    I'm sure that they did.  I'm sure --

Q.    Did you ever see any of them?

A.    Oh, yes, I saw them.

Q.    Did you -- and the images that were used by the astronauts that took the original photographs and the images that you saw in those -- in those shows, did -- was there a significant change in what the astronauts saw?

A.    I don't know what it is that the astronauts saw.

Q.    Well, you saw the photographs that were in the pictures that you saw, correct?

A.    Yes.

Q.    And were they -- were they reliable enough for you to look at them and determine that what the



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4697

astronauts said they saw was accurate?

A.   I liked what I saw, yes.

Q.   Okay.  Let me ask you about -- you know, I'm -- I'm sure you've -- at some point in your life, you're aware that automobile accidents happen and someone goes out and take photographs of what happens in an automobile accident.  Those photographs that are taken at that location, if they were put into a computer and shown to a mechanic, would you expect -- even though they may have gone through the interpolation, would you still expect a mechanic to be able to look at those images and be able to ascertain what damage actually occurred to a car?

A.   Hopefully, yes, but, you know, sometimes, depending upon photography and how well that's done, you know, shadows can -- can maybe look like dents or dents can look like shadows or something of that particular nature.  So, it all depends upon how -- how carefully those pictures were taken to begin with.

Q.   Okay.  But, in general, a mechanic -- you would expect a mechanic, rather than someone that deals with photo imaging, to be able to identify damage to a car?

A.   Yes, I would.

Q.   Okay.  And kind of the same goes for -- for looking at like picture 157 or Government Exhibit -- or



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4698

it's actually labeled as Government Exhibit 157, it was the photo that you reviewed earlier of the child's legs, you would expect that -- let me ask you by you looking at this, you're not able to tell us what is or is not an injury, right?

A.  I'm -- I'm not medically trained, that is correct, yes.

Q.  Okay.  But you would expect a physician that looks at this to maybe be able to identify an injury?

MR. MCHUGH:  I'm going to object.  It calls for speculation.

Q.  (BY MR. ROBERTS)  Well, this deals with the photo enhancement.  It's kind of the same question with regard to the mechanic.  And so, my question is would you expect a -- because of photos and your use of photos and your use of images, would you expect a doctor to be able to look at a photo, whether this one or some other one, and be able to identify injuries?

A.  I guess I would expect a doctor -- in order to be able to identify injuries, yes.

Q.  Okay.  Do you have any idea how this particular document, the one that was handed to you, the one that you looked at, do you have -- do you know exactly how that one, this particular piece of paper was produced?

A.  I do not know exactly how -- how it was produced.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4699

It is -- it is, obviously, an image, you know, that became part of the exhibits, and I presume that Dr. Oliver used some of these particular techniques in order to generate -- enhance that particular image.

Q.  But are you aware that Dr. Oliver didn't use this particular piece of paper when he was making his assessment?

A.  I don't know what it is that Dr. Oliver used or did not use in terms of making his assessment.  I mean, his testimony --

Q.  You don't know what he used in making his assessment?

MR. MCHUGH:  Let him finish.

A.  His -- his -- his testimony is, from what I understand, that he went back to the original images, et cetera, et cetera, and made his diagnoses and conclusions from -- from there.  However, those particular enhanced images there --

Q.  (BY MR. ROBERTS)  Well, let me -- I'm going to ask you to take the photo back again and put it in front of you for a moment.

A.  Okay.

MR. MCHUGH:  I've got him a copy.

Q.  (BY MR. ROBERTS)  From this photograph, you are able to identify a thumb, are you not?



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4700

A.   I was able to identify a thumb, yes.

Q.   You were able to -- you were able to identify a thumb?

A.   Yes.

Q.   You can identify what part of the body that the child -- is there, is two legs, correct?

A.   Yes.

Q.   How many toes does she have on her right foot?

A.   One, two, three, four, five.  Five.

Q.   Okay.  Do you recognize an arrow that's above the left leg?

A.   I do.

Q.   Do you recognize a couple of marks on the leg that's just -- where the arrow is pointing to?

A.   I do.

Q.   Do you recognize -- look on the top left corner.  What do you see in the top left corner?

A.   I see a hand.

Q.   Is it an adult hand or a child hand?

A.   It's a child hand.

Q.   Okay.  In -- in reviewing photographs -- and you mentioned 35 millimeter photographs in your testimony -- is it important whether you're looking at a negative or a print for you to be able to give an opinion about whether that 35 millimeter picture that was taken is --



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4701

42

is reliable?  Does it matter to you whether it's a negative or a print?

A.  No, because a negative can be made into a positive, and I -- I presume that in the process of that photographic chemical transition or whatever else, that that is done accurately.  We've been doing it for 150 years or plus, whatever.

Q.  Just a moment.

Mr. Schenk, in your opinion, would two different prints from the same negative be pixel by pixel the same?

A.  Theoretically, they would be, yes, if they were faithfully reproducing a particular picture.  One would hope that would be the case, yes.

Q.  Okay.  You mentioned interpolation.  I just wanted to ask you do you agree that some digital cameras actually use interpolation to produce a larger image than the sensor captures when the -- at the moment in time the picture is taken?

A.  Yes.  Well, that's always the case.

Q.  And the photo that comes out that is actually ultimately printed, is that still a reliable photo?

A.  One would hope so, yes.

Q.  I want to just touch on just a minute about your knowledge or use of Power Point.  Have you ever created



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4702

a Power Point presentation yourself?

A.   I have not, no.

Q.   Do you know how photos are scanned into Power Point?

A.   Using a scanner, I would presume.

Q.   Okay.  So, you don't know exactly, you're presuming?

A.   I'm presuming.

Q.   Okay.  I don't have any other questions for you right now.

A.   Thank you.

FURTHER EXAMINATION

Q.   (BY MR. MCHUGH)  I just have a follow up on the Power Point.  I understand that you -- Power Point is a type of program or software; is that right.

A.   It's a software developed by -- presumably by Microsoft.  It's one of their Office products, et cetera, et cetera, and it's typically done for presentation purposes.

Q.   Okay.

A.   And, you know, obviously, there -- it's the equivalent of a slide show, and you would have, you know, flip chart type -- you know, type information and/or in this case pictures.  So, however those particular Power Points -- well, if you wish, you -- I


an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4703

mean, you could call them slides --

MR. ROBERTS:  I'm going to object as speculation.  He said he's never used Power Point. So --

MR. MCHUGH:  But he said that he's familiar --

Q.  (BY MR. MCHUGH)  You've familiar with software, you've created software, you've developed software; is that right?

A.  I have, yes.

Q.  And Power Point is a software, you're at least familiar with that; is that right?

A.  Yes.

Q.  Okay.  In converting an image into a software program, are there possibilities for loss of detail and accuracy?

A.  Yes, of course.

Q.  And I believe you explained to us on direct what that problem would be with Power Point.  So, I'm not going to ask you about that.

A.  Okay.

MR. MCHUGH:  That's all I have.

THE VIDEOGRAPHER:  The time is approximately 11:29 (sic).  We're now off the record.

(Whereupon at 11:19 a.m. the


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4704

Manfred Schenk

October 28, 2010

45

deposition was concluded.)



ESQUIRE

an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4705

Manfred Schenk                                                    October 28, 2010

46

E R R A T A    S H E E T

Correction                                    Page        Line

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4706

I, MANFRED SCHENK, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
MANFRED SCHENK


THE STATE OF _____
COUNTY OF _____
Before me, _____, on this day personally appeared MANFRED SCHENK, known to me (or proved to me under oath or through _____) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.
Given under my hand and seal of office this _____ day of _____, _____.


_____
NOTARY PUBLIC IN AND FOR
THE STATE OF _____


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4707

STATE OF TEXAS        *
COUNTY OF HARRIS      *

          I, the undersigned certified shorthand reporter
and notary public in and for the State of Texas, certify
that the facts stated in the foregoing pages are true
and correct.
          I further certify that I am neither attorney or
counsel for, nor related to or employed by, any of the
parties to the action in which this deposition is taken
and, further, that I am not a relative or employee of
any counsel employed by the parties hereto, or
financially interested in the action.

          SUBSCRIBED AND SWORN TO under my hand and seal of
office on this the 10th day of November, 2010.


          EDITH A. BOGGS, CSR
          Certified Shorthand Reporter and
          Notary Public in and for
          the State of Texas
Notary Expires:  5-10-2012
Certificate No. 3022
Expiration date:  12-31-2011
Esquire Deposition Solutions, LLC
Registration No. 3


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4708

Manfred Schenk                                          October 28, 2010

49

---

**A**

ability
 8:9
able
 8:25 11:2,5
   12:2,3,17
   31:18 32:5
   38:11,12,22
   39:4,9,16
   39:18,20
   40:25 41:1
   41:2,2,24
absolutely
 30:18
accident
 38:7
accidents
 38:5
accounting
 6:5
accuracy
 20:1,11
   21:15 22:2
   23:25 44:16
accurate
 15:13,17
   20:20,20
   21:1 38:1
accurately
 17:14,16
   42:6
achieve
 31:13
acknowledged
 47:8
action
 48:6,7
actual
 11:7 14:3
   26:7
address
 16:14
admission
 32:14
adult
 41:19
affect

 24:3 26:16
affix
 47:1
ago
 12:8 17:13
   33:16 36:5
agree
 42:16
ahead
 29:9
AIM
 11:24
Alfred
 1:6 18:22
alter
 32:1
altered
 28:12
AMERICA
 1:4
amount
 20:15 24:24
analog
 21:13
analysis
 6:4,5 7:22
   14:25 17:24
   19:24
analyze
 14:11,15
analyzed
 14:12,16
   19:16
analyzing
 14:17
and/or
 24:21 25:18
   43:24
answer
 24:16 30:12
ANSWERS
 2:11
anybody
 36:13
appear
 17:3
appeared

 47:6
applied
 29:15
approach
 29:14
approxima...
 5:3 33:8,11
   44:23
area
 6:4 9:6
   10:14 25:11
   28:7 30:25
   36:24
Armed
 4:18
arrow
 41:10,14
articles
 29:5,6,7,25
   30:2
ascertain
 38:12
asking
 14:14
aspect
 11:17 22:25
   23:4,6,9,19
assess
 14:3
assessment
 40:7,9,12
associate
 5:19
associated
 8:16 10:8
   11:25 12:21
   28:4
association
 1:15 3:5
   9:14,20
   10:2 12:12
   15:3,8,20
   15:25
assume
 25:3 32:13
astronauts
 37:5,9,16,18

 37:20 38:1
attempt
 12:1 20:23
   23:7
attempted
 9:3,5
attempting
 6:25 11:22
   12:11,13
   13:23 21:4
   22:10 26:20
attorney
 3:3 48:5
ATTORNEYS
 3:9
Attorney's
 3:10,16
Australia
 36:9
automobile
 38:5,7
average
 25:24
aware
 29:5,7,24
   30:2,5
   33:20 34:5
   34:10,18,23
   34:25 38:5
   40:5
a.m
 2:16,17
   44:25

---

**B**

bachelor's
 5:21
back
 33:12 35:17
   36:10 37:2
   37:5 40:15
   40:20
background
 5:16,18
banded
 8:2
base

 21:21
based
 31:19 32:6
basically
 22:11 23:11
   25:17
believe
 29:25 36:9
   44:18
best
 20:23
beyond
 31:14
biometric
 10:8
biometrics
 4:16 7:19,21
   7:23 9:10
   9:23 12:6,8
   12:10,12
   18:22
bit
 7:24 24:2
blind
 34:19
bodily
 13:8
body
 41:5
Boggs
 1:19 2:12
   3:25 48:11
bond
 6:5
BOOTH
 3:18
bottom
 34:14
Bourgeois
 1:6 18:23
Box
 3:11
briefly
 20:9
broad
 16:11
broader

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4709

Manfred Schenk                                      October 28, 2010

50

16:18
**bruise**
11:7
**Building**
1:16 3:6
**business**
6:4

---
**C**
---

**C**
3:1
**call**
13:2 44:1
**called**
5:6 7:25 8:3
**calls**
31:3 39:10
**cameras**
42:16
**cancer**
9:6
**cancerous**
9:2 13:5
**capacity**
7:18
**captures**
42:18
**car**
38:13,22
**card**
47:7
**carefully**
38:18
**case**
12:22 13:22
  20:13 21:19
  23:21,23
  25:12 28:10
  28:25 29:21
  42:14,20
  43:24
**categorize**
12:11
**cells**
22:11 25:25
  26:2
**certain**

31:7
**Certainly**
36:16
**certainty**
18:19
**Certificate**
48:14
**certified**
2:12 48:2,12
**certify**
48:3,5
**cetera**
7:1,1 9:24
  9:24 13:24
  13:24 20:20
  20:21 22:8
  22:8,8
  23:18,19
  25:10,10,21
  25:21,25
  26:22,22,25
  26:25 37:4
  37:4 40:16
  40:16 43:18
  43:18
**change**
37:18
**changed**
36:25
**changing**
26:22
**character...**
10:8 12:15
  13:10 22:11
**character...**
13:3
**characterize**
9:2 26:4
**character...**
13:14
**charge**
21:5
**chart**
43:23
**chemical**
5:20 42:5
**Cherry**

4:15 7:19,20
  7:23 9:10
  9:22 18:21
  19:15,21
**child**
41:6,19,20
**child's**
39:2
**Christi**
3:17
**chroma**
21:10 22:7
  25:23 26:23
  27:4,24
  28:3,4,11
**clarify**
36:1
**clicked**
17:6,10
**clicks**
17:1
**close**
31:13
**collect**
8:14
**color**
21:10 22:7
  27:5 28:11
**coloration**
26:16
**combine**
8:14,15
  22:10
**comes**
42:21
**coming**
7:1 32:25
**comment**
30:25
**committees**
15:12 16:19
**communicated**
36:6
**communica...**
6:22
**communities**
11:25

**community**
1:14 3:4
  31:5
**compressed**
21:25 22:18
**compressing**
22:14
**compression**
22:1,9,13,18
  22:22
**computer**
6:3 8:8 14:6
  14:8,9
  16:10 20:25
  21:2,4,21
  22:12 26:8
  26:9,11
  37:10 38:8
**computers**
12:17
**concept**
22:24
**concerned**
9:5 16:9
**concerning**
8:23 29:25
**concluded**
45:1
**conclusion**
11:6 30:11
  31:3,3
**conclusions**
31:19,22,23
  32:6,19
  40:17
**conducted**
25:13
**considera...**
21:8 25:22
  26:3,5,7
  47:9
**considered**
13:20
**conspiracy**
36:18
**consultant**
13:25 14:1

**consulting**
6:7
**contains**
32:19
**context**
23:1,3
**contrast**
17:23 33:22
**contribution**
13:23
**conversion**
24:3,17
**conversions**
21:14
**converting**
20:6,16
  23:11 44:14
**copies**
19:4
**copy**
5:13 15:5
  40:23
**corner**
41:16,17
**Corpus**
3:17
**correct**
9:10 12:20
  15:1 19:13
  27:8 29:22
  35:3 37:22
  39:7 41:6
  47:2 48:4
**Correction**
46:3
**counsel**
48:5,7
**counterme...**
6:14,17 7:3
**County**
2:13 47:5
  48:1
**couple**
41:13
**coupled**
21:6
**course**



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4710

Manfred Schenk                                      October 28, 2010

51

| | | | | |
|---|---|---|---|---|
| 6:18 7:20 | **data** | 38:15 | **device** | **displayed** |
| 8:21 20:21 | 8:18 17:18 | **depends** | 21:6 | 23:23 27:11 |
| 22:3 37:3 | 17:21 | 38:18 | **diagnoses** | **displaying** |
| 44:17 | **date** | **deposit** | 40:16 | 23:2 |
| **court** | 1:19 5:2 | 6:5 | **diagnosis** | **distance** |
| 1:3 27:11 | 48:15 | **deposition** | 11:2,8 13:7 | 7:10 |
| **courtroom** | **dated** | 1:11,13 2:8 | **differences** | **distances** |
| 8:20 | 4:15 | 2:11,14 | 13:15 28:3 | 13:24 |
| **cover** | **Daubert** | 45:1 47:1 | **different** | **distinct** |
| 29:6 30:3,3 | 32:20 | 48:6,15 | 6:13 7:25 | 28:9 |
| **covers** | **day** | **depositories** | 13:5,11,21 | **distort** |
| 35:5 | 2:15 47:6,10 | 8:8 | 30:24,25 | 27:1 30:22 |
| **create** | 48:9 | **descended** | 42:9 | **distorted** |
| 23:24 | **deal** | 7:10 | **digital** | 17:18 30:23 |
| **created** | 13:12 | **describe** | 7:22 9:23 | **distortion** |
| 42:25 44:8 | **dealing** | 5:17,25 23:1 | 10:14,15,16 | 23:16 |
| **creation** | 14:10 | 27:21 | 10:16 12:25 | **District** |
| 7:21 | **deals** | **described** | 13:1,1,12 | 1:3,3,15 3:4 |
| **cross** | 38:21 39:12 | 28:17 | 13:18 17:14 | **diverse** |
| 24:14 | **dealt** | **describes** | 18:5 19:7,9 | 16:20 |
| **cryptogra...** | 14:23 | 13:15 | 20:16 21:13 | **doctor** |
| 6:22 | **decide** | **description** | 34:1 36:15 | 39:16,19 |
| **Cr-C-02-216** | 18:6 | 4:13 47:7 | 42:16 | **document** |
| 1:5 | **decision** | **design** | **digitization** | 15:4 28:21 |
| **CSR** | 20:25 21:2 | 8:22 12:24 | 8:4,6 20:3 | 33:15 39:22 |
| 1:19 48:11 | 26:3,14 | **destroying** | 20:19 25:5 | 47:7 |
| **curious** | **decisions** | 6:16 | **digitize** | **doing** |
| 15:9 | 26:10,13 | **detail** | 12:2 24:20 | 6:11 7:3 |
| **current** | **deconvolu...** | 20:1,11,15 | **digitized** | 9:23 23:10 |
| 26:4 | 34:20 | 22:2 23:25 | 30:18 31:16 | 25:8 26:8 |
| **curriculum** | **Defender** | 24:25 25:2 | **digitizing** | 42:6 |
| 5:14 | 1:14,15 3:4 | 25:9 44:15 | 22:6 | **DOWD** |
| **Curtis** | 3:5 | **determine** | **dimension** | 3:13 33:4 |
| 1:16 3:6 | **degree** | 37:25 | 23:11,12,12 | **DPI** |
| **CUSTODY** | 5:19,21,23 | **determining** | 23:13,14,15 | 25:5,6 |
| 1:13 | 18:19 | 7:9 | **direct** | **Dr** |
| **cut** | **delighted** | **develop** | 44:18 | 3:22 11:10 |
| 11:7 | 36:16 | 8:3 10:6 | **directory** | 11:19,21 |
| **CV** | **demand** | 12:13 | 17:2,5 | 19:13 21:20 |
| 4:14 10:22 | 6:5 | **developed** | **discuss** | 22:17 28:25 |
| 32:17 | **dents** | 6:17 12:13 | 22:25 24:4,4 | 29:15,21 |
| **Cv-07-223** | 38:16,16 | 37:6,8 | **discussing** | 30:6 33:17 |
| 1:6 | **department** | 43:16 44:8 | 8:5 | 34:25 40:2 |
| | 3:10,15 8:17 | **developing** | **discussion** | 40:5,8 |
| **D** | **departments** | 7:5 | 23:4 | **draw** |
| **damage** | 8:12,14 | **development** | **display** | 32:5 |
| 38:12,22 | **depending** | 14:6,7 | 23:8 | **DSP** |



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4711

Manfred Schenk                                              October 28, 2010

52

| | | | | |
|---|---|---|---|---|
| 7:25 | **engineering** | **established** | 20:4,7 | 35:12 |
| **duly** | 5:19,20 | 24:8 | **expect** | **faithful** |
| 5:6 | **Engineers** | **et** | 17:6 38:9,11 | 14:13 |
| | 9:17 | 7:1,1 9:23 | 38:21 39:3 | **faithfully** |
| **E** | **enhance** | 9:24 13:24 | 39:8,15,16 | 12:3 42:13 |
| **E** | 13:14 40:4 | 13:24 20:20 | 39:19 | **faithfulness** |
| 3:1,1 46:1,1 | **enhanced** | 20:20 22:8 | **experience** | 21:16 |
| 46:1 | 19:9,13 | 22:8,8 | 14:10 17:13 | **familiar** |
| **earlier** | 27:13 36:25 | 23:18,19 | **expert** | 24:9,11 44:6 |
| 39:2 | 40:18 | 25:10,10,21 | 10:14,19 | 44:7,12 |
| **Eastern** | **enhancement** | 25:21,25 | 11:16 18:5 | **far** |
| 1:15 3:4 | 4:18 11:16 | 26:22,22,24 | 18:12 | 7:14 9:5 |
| **eb** | 12:19 13:13 | 26:25 37:4 | **expertise** | 29:14 30:4 |
| 1:1 | 33:22 34:1 | 37:4 40:15 | 13:16 | **faulty** |
| **edges** | 34:11 39:13 | 40:16 43:17 | **Expiration** | 30:15 |
| 26:22,24 | **enhancements** | 43:18 | 48:15 | **features** |
| **Edith** | 13:1 16:23 | **exact** | **Expires** | 13:8 |
| 1:19 2:12 | 17:24 | 35:24 36:15 | 48:14 | **Federal** |
| 3:25 48:11 | **enhancing** | **exactly** | **explain** | 1:14 3:4 |
| **educational** | 13:19 | 12:9 14:1 | 20:9 22:4 | **field** |
| 5:18 | **entire** | 39:23,25 | **explained** | 16:20 |
| **effect** | 29:10 30:14 | 43:6 | 44:18 | **film** |
| 24:5 25:8 | **environment** | **exaggeration** | **expressed** | 23:5 24:21 |
| **effects** | 8:17 | 23:20 | 47:9 | 24:22 |
| 24:17 | **environments** | **examination** | **extend** | **financially** |
| **either** | 14:5 | 4:1 5:8 | 9:3 | 48:7 |
| 34:9,17,22 | **equalization** | 10:11,20 | **extent** | **find** |
| 36:25 | 34:8 | 18:16 33:13 | 36:25 | 17:9 |
| **electrical** | **equipment** | 43:12 | **extract** | **finger** |
| 5:20 9:17 | 6:25 13:10 | **example** | 11:22 | 28:11,14 |
| **electro** | 14:6 35:16 | 27:20 28:17 | **eye** | **fingerprint** |
| 6:24 7:2,4 | **equivalent** | **examples** | 9:5 20:18,20 | 16:14 |
| **electronic** | 43:22 | 27:10,13 | 28:3 | **fingerprints** |
| 6:14,17 7:3 | **error** | **excess** | | 8:16 |
| 9:17 | 30:5,9,13,18 | 25:6 | **F** | **finish** |
| **ELSA** | 30:19,19,20 | **excuse** | **fact** | 40:13 |
| 3:18 | 31:1,7,11 | 5:20 14:6 | 20:4,22 21:8 | **first** |
| **employed** | 31:12,14,17 | 28:15 | 21:14 24:22 | 5:6 15:10 |
| 7:17 9:9 | 31:20 32:3 | **executed** | 26:25 28:11 | 16:11 36:8 |
| 28:25 29:21 | 32:4,7 | 47:8 | 30:15 31:16 | **five** |
| 30:6 48:5,7 | **Esquire** | **exhibit** | 36:11,17 | 41:9,9 |
| **employee** | 1:14 2:14 | 27:17 33:2 | **factor** | **flat** |
| 48:6 | 3:7,13,13 | 33:15 38:25 | 25:7 | 23:3,17 |
| **employment** | 3:18,18 | 39:1 | **facts** | **flavor** |
| 6:1 7:20 | 48:15 | **exhibits** | 48:3 | 6:11 |
| **enanthema** | **essence** | 4:11 32:14 | **fair** | **flip** |
| 34:1 | 21:15 36:23 | 32:16 40:2 | 8:19 28:24 | 43:23 |
| | | **exists** | | |



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4712

Manfred Schenk                                    October 28, 2010

53

| | | | | |
|---|---|---|---|---|
| **focus** 17:15,17,20 17:21 | **genesis** 16:16 | 41:18,19,19 41:20 47:10 48:8 | **IBM** 6:2 7:25 8:2 | **imaging** 7:22 9:20,23 10:14,16 |
| **follow** 12:7 43:13 | **give** 6:11 11:2,5 14:3,20 18:18 41:24 | **handed** 39:22 | **idea** 10:6 11:24 15:15 33:25 39:21 | 13:1,18 18:5 36:15 38:22 |
| **follows** 5:7 | **given** 18:18 47:10 | **happen** 38:5 | **identify** 12:14 19:20 38:22 39:9 | **importance** 30:9 |
| **foot** 41:8 | **giving** 13:7,9 | **happens** 38:6 | 39:18,20 40:25 41:1 41:2,5 | **important** 41:23 |
| **Forces** 4:18 | **glove** 28:8,12 | **Harris** 2:13 48:1 | **identifying** 10:8 | **impression** 11:21 21:22 22:19 24:19 |
| **foregoing** 47:1,8 48:3 | **go** 5:16 9:12 16:22 27:10 29:9,13 33:5 | **hearing** 15:15 | **identity** 16:14 47:7 | **impressive** 13:17 |
| **forensic** 8:19 | | **helped** 8:22 | **image** 4:18 8:3,11 11:6,16,25 12:1,18 | **include** 19:4 |
| **form** 30:18 | **goes** 38:5,24 | **Hennig** 3:21 | 13:9 14:11 16:10,22 20:24,24 | **including** 6:8 |
| **format** 20:6,16 | **going** 10:13 11:13 11:14 15:10 18:4,18 19:18 26:4 27:9,10,12 27:16 29:8 29:9,13 39:10 40:19 44:2,20 | **hereto** 48:7 | 28:18 31:16 35:24 40:1 40:4 42:17 44:14 | **index** 4:1,11 8:8 |
| **formulated** 12:16 | | **high** 30:14,21 31:15 32:7 | **images** 10:15,17 11:11,20,22 11:23,24 | **indicated** 16:18 |
| **forward** 18:7 | | **histogram** 34:4,8 | 12:15 13:19 13:20,22 14:3,4,11 | **information** 5:17 8:9,10 8:15 9:20 11:23 14:2 14:4 18:13 20:5,8 21:12 33:16 33:16,18 43:23 |
| **four** 41:9 | | **histograms** 33:23 | 14:24 18:5 19:7,9,12 21:24,25 | |
| **front** 40:20 | | **history** 6:1 | 22:2,17 24:5,20 25:21 26:17 | |
| **function** 14:5 | | **hit** 6:19 | 27:13 28:8 30:17,22,23 | |
| **functions** 16:13 | **goldstone** 36:9 | **hope** 42:14,23 | 32:1,2 35:14 36:4 | **injuries** 39:18,20 |
| **further** 9:6 18:16 33:13 43:12 48:5,6 | **good** 15:18 | **hopefully** 21:1 38:14 | 36:5,7,12 37:4,15,17 38:12 39:16 40:15,18 | **injury** 11:2,7 39:5 39:9 |
| **future** 36:6 | **Government** 27:17 38:25 39:1 | **hours** 2:16 | | **Institute** 4:18 9:17 10:3 |
| **fuzz** 26:25 | **great** 35:16 | **Houston** 1:22 2:15 3:12 | | **instrument** 47:8 |
| **fuzzy** 36:8 | **greenish** 28:5,5 | **hue** 28:5 | | **interested** 48:7 |
| ——— **G** ——— | **guess** 39:19 | **hues** 28:7 | | **internati...** 9:14 15:3,8 15:20,24 16:8 |
| **general** 38:20 | ——— **H** ——— | **human** 9:5 20:18,20 | | |
| **generate** 40:4 | **H** 46:1 **hand** | ——— **I** ——— | | |


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4713

Manfred Schenk                                          October 28, 2010

54

| | | | | |
|---|---|---|---|---|
| **interpola...** | **Justice** | 36:20 | 24:2 30:18 | **M** |
| 26:24 | 3:10,15 | **landing** | **LLC** | 3:13 |
| **interpola...** | | 7:7,9,12,16 | 48:15 | **magenta** |
| 25:16 26:1 | **K** | 35:13,14,19 | **location** | 28:6 |
| 26:19 27:3 | **Kathrin** | 35:25 36:2 | 38:8 | **majority** |
| 27:13,23 | 3:21 | 36:3,14 | **long** | 20:14 |
| 28:9,18 | **kind** | **landings** | 36:5 | **making** |
| 38:10 42:15 | 15:9 22:25 | 13:17 37:1 | **look** | 17:15 26:3 |
| 42:17 | 37:10 38:24 | **large** | 15:11,17 | 26:10 40:6 |
| **interpret...** | 39:13 | 8:7 | 37:25 38:11 | 40:9,11 |
| 20:22 | **kinds** | **larger** | 38:16,17 | **Management** |
| **introduces** | 6:9 | 23:20 42:17 | 39:17 41:16 | 9:20 |
| 30:20 | **know** | **LCDs** | **looked** | **Manfred** |
| **introduction** | 7:13,14 10:6 | 23:18 | 39:23 | 1:11 2:8,11 |
| 15:11 | 13:20,21 | **lead** | **looking** | 4:14 5:5,11 |
| **involve** | 16:24,25,25 | 13:22 | 10:22 38:25 | 47:1,3,6 |
| 12:25 | 21:17 23:15 | **left** | 39:3 41:23 | **mark** |
| **involved** | 23:18 25:9 | 28:4,6 41:11 | **looks** | 3:13 15:14 |
| 7:8,21 9:22 | 25:22 26:12 | 41:16,17 | 15:13 39:9 | **marked** |
| 12:21 13:2 | 26:13 27:1 | **leg** | **lose** | 4:13,17 5:13 |
| **involves** | 30:20,21,21 | 28:4,6,7,12 | 17:21 20:1,5 | 19:19,19 |
| 13:18 | 30:22,23 | 41:11,13 | 22:2 | 27:16 28:21 |
| **ISO** | 31:7,11,11 | **legal** | **loss** | **marks** |
| 11:25 | 31:12,14,15 | 30:10 31:2,3 | 20:7,8 23:24 | 41:13 |
| **issue** | 31:20 32:4 | 32:19 | 24:24 25:1 | **masking** |
| 25:15 | 35:8 36:20 | **legs** | 44:15 | 34:12,16 |
| **issues** | 37:20 38:3 | 39:2 41:6 | **lossey** | **master's** |
| 8:22 | 38:14,16 | **Letter** | 21:25 22:9 | 5:23 |
| **items** | 39:23,25 | 4:15 | 22:18,22 | **material** |
| 8:18 30:3 | 40:1,8,11 | **let's** | **lost** | 19:4 |
| 35:6,9 | 43:3,6,21 | 25:3,7 30:24 | 14:4 17:18 | **materials** |
| **ITT** | 43:23,23 | 33:21 | 20:11 | 19:1,16 |
| 6:8 | **knowledge** | **life** | **lots** | 22:17 |
| | 33:17,23 | 38:4 | 36:17,18 | **mathematics** |
| **J** | 42:25 | **liked** | 37:5,5 | 5:21,23 |
| **Jack** | **known** | 38:2 | **luminosity** | **matter** |
| 18:11 | 22:25 30:25 | **line** | 21:9 25:23 | 12:11 18:22 |
| **James** | 47:6 | 16:11 21:7 | 26:23 | 21:5,5 42:1 |
| 1:14 3:7 | | 46:3 | **lunar** | **McHugh** |
| 4:16 | **L** | **link** | 7:7,9,12,15 | 1:14 3:7 4:5 |
| **Jersey** | **labeled** | 17:1 | 13:17 35:13 | 4:7,9,16 |
| 5:22 | 39:1 | **listed** | 35:14,19,25 | 5:9 10:10 |
| **JPEG** | **Lamar** | 15:12 17:10 | 36:2,3 37:1 | 10:13,18 |
| 22:20,22 | 2:14 | **listening** | **l.5** | 11:13 15:6 |
| **judge** | **land** | 10:22 | 23:15 | 16:2,5 18:9 |
| 18:6,10,11 | 7:10 | **little** | | 18:15,17 |
| 18:13 | **landed** | 7:24 13:23 | **M** | 24:9,14,16 |
| | 7:16 36:11 | | | 28:13 29:11 |



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4714

Manfred Schenk                                    October 28, 2010

55

```
29:17,19          19:5,25          N                 48:3,12,14        19:1 43:17
30:12 31:5         21:20 23:2       3:1              noted             47:10 48:9
32:10,13,17        23:5 24:21      name               47:2            officer
32:21 33:1         24:22 41:22      5:9 7:24         notice            17:4
33:7 39:10         41:25             17:2,6,10        15:2            officers
40:13,23        millimeters          47:8           November          17:2,5
43:13 44:5         23:6,6,23       NASA              48:9            offices
44:7,22         minute             6:8 7:6          number            2:14
MD                 17:13 33:6         13:16,22,25     9:21 15:16      Oh
4:18               42:24             35:13,16         30:1 33:3        37:14
mean            minutes           national           33:21,22       Okay
6:3 21:3           33:16            10:3 16:8         34:8,12,16      5:16,25 6:6
30:13 31:11     missile           nature             34:19            6:10 7:6,17
31:16 40:9         6:18             38:18                             8:11,18 9:7
44:1            missiles          Navy             _____        9:12,16,19
meaningless        6:16 7:1         6:9,10,12             O           10:10,13
32:8            mission             14:1           _____        12:24 13:12
measure            8:25            nearly           oath              14:23 16:21
13:24           missions           24:20            47:7             17:9 18:3
mechanic           7:13,16         need            object            18:15,21,25
38:9,11,20      modern             31:10            11:13 18:4        19:15,18,23
38:21 39:14        23:18           negative          24:7 29:9        21:23 22:16
medical         module             41:23 42:2,3      30:10 32:18      22:20,22,24
10:23 11:2,5       7:10             42:10            32:24,25         24:2,13,16
11:8 13:6,7     moment            neighboring        39:10 44:2       25:12,15
medically          9:21 12:8        25:17,22,23    objection          26:16 27:7
39:6               40:21 42:8       26:2 27:2        18:8 31:2        27:16,20
member             42:18           neither           32:13            28:20,24
9:13,16,19      monitor            48:5            obviously          29:4,17,24
9:25 10:5          23:8,17         neoplasm          11:1 17:20       30:4,8,12
15:22,23        moon               9:2              18:6 26:9        31:18 32:9
17:4,8             7:16 36:12      never             26:11 30:14      32:12 33:1
members            36:20            44:3             37:4 40:1        33:21 34:2
16:21 17:2,5    moon's            new               43:21            34:7,12,24
memberships        7:11            5:22 25:19      occasion           35:4 36:23
9:13            motion            NIST              7:24             38:3,20,24
mentioned          23:2            12:12           occur             39:8,21
17:13 41:22     move              nonprofit         20:22            40:22 41:10
42:15              21:23           15:19,25        occurred          41:21 42:15
methodology     mugshots          normal           36:17 38:13       43:6,9,20
34:24              8:14            13:3,3 23:8     occurring          44:14,21
Michigan        multinati...      normally         27:23 28:9      Oliver
5:24               16:8            25:20             36:3            3:22 4:18
Microsoft       multiply          North            October           11:19,21
43:17              23:13,14        3:16             2:16 5:2         19:13 21:20
Milam          _____        notary           offer            22:17 28:25
3:11                 N            5:7 47:12         10:13            29:15,21
millimeter     _____                        office            30:6 33:17
                                                   1:14 3:4,10
                                                   3:16 18:21
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4715

Manfred Schenk                                    October 28, 2010

56

| | | | | |
|---|---|---|---|---|
| 34:25 40:3<br>40:5,8 | **panel**<br>23:17 | 34:25 35:1<br>35:5,7 | 19:25 20:2<br>21:20 25:20 | 12:10 18:14<br>21:7,10,11 |
| **Oliver's**<br>11:10 | **paper**<br>39:24 40:6 | **peer-revi...**<br>29:5,24 30:2 | 35:15,18,21<br>35:23 36:4 | 22:14 24:3<br>24:6,8,10 |
| **ones**<br>23:18 36:8,8 | **parenthet...**<br>16:7,9 | **Pennsylvania**<br>1:15 3:4 | 36:14,21,24<br>37:16,21 | 24:11,18,19<br>24:25 25:2 |
| **operating**<br>25:4 | **part**<br>15:2,22 | **people**<br>10:9 12:14 | 38:6,7<br>41:21,22 | 25:3,13<br>26:14 31:14 |
| **opinion**<br>12:5 18:11<br>41:24 42:9 | 17:24 40:2<br>41:5 | 16:21 36:3<br>36:6 37:11 | **photography**<br>38:15 | 38:4 42:25<br>43:1,4,14 |
| **opinions**<br>18:17 | **participated**<br>7:14 | **perceivable**<br>20:17 | **photos**<br>23:2,23 | 43:14 44:3<br>44:11,19 |
| **optic**<br>6:25 7:2,4 | **particular**<br>6:19 7:24 | **perceive**<br>28:3 | 35:15,17<br>39:15,15 | **pointing**<br>41:14 |
| **order**<br>6:18 8:2,9 | 8:7 9:4<br>12:15 13:4 | **percent**<br>14:20,21,22 | 43:3 | **points**<br>16:13 43:25 |
| 9:1,3 10:6<br>12:17 14:12 | 21:7,7,9,11<br>21:11,12,16 | **percentage**<br>14:20 31:17 | **physician**<br>39:8 | **police**<br>8:12,13,17 |
| 20:23 22:10<br>22:11 25:11 | 22:6,14<br>23:21 24:20 | **performed**<br>19:25 | **picture**<br>21:7,16,17 | **positive**<br>42:4 |
| 26:12,12<br>30:17 31:25 | 25:19,25<br>26:10,13,14 | **person**<br>13:6 26:7 | 22:6,15<br>26:21 38:25 | **possibili...**<br>44:15 |
| 32:1 39:19<br>40:3 | 26:14,21,23<br>27:1 28:10 | 47:7 | 41:25 42:13<br>42:19 | **possibility**<br>20:4,7,10 |
| **organization**<br>15:20 16:12 | 30:20,22<br>32:4 38:17 | **personal**<br>18:13 | **pictures**<br>8:6,6,7 | 23:24 |
| 16:13 | 39:21,24 | **personally**<br>47:6 | 12:23 34:11<br>35:18 37:2 | **possible**<br>12:4 20:1 |
| **organizat...**<br>6:8,9 8:1 | 40:3,4,6,18<br>42:13 43:25 | **Petitioner**<br>1:7 3:3 | 37:3,6,8,22<br>38:19 43:24 | 22:1 30:19 |
| 16:1,7 | **parties**<br>48:6,7 | **Philadelphia**<br>1:15,16 3:5 | **piece**<br>39:24 40:6 | **possibly**<br>12:2 31:13 |
| **original**<br>1:12 11:24 | **partnered**<br>8:12 | 3:6 | **Pieternelle**<br>3:22 | **potential**<br>23:15 |
| 37:2,16<br>40:15 | **passive**<br>7:4 | **photo**<br>38:22 39:2 | **pixel**<br>21:12 25:20 | **Power**<br>24:3,6,8,9 |
| **overview**<br>15:10 | **patched**<br>36:10 | 39:12,17<br>40:20 42:21 | 25:25 26:5<br>42:10,10 | 24:11,17,19<br>24:25 25:2 |
| | **Pathology**<br>4:18 | 42:22 | **pixels**<br>25:17,23 | 25:3,13<br>42:25 43:1 |
| ———————<br>**P** | **pattern**<br>9:14 15:3,8 | **photograph**<br>4:17 20:13 | 26:2 36:15<br>36:20 | 43:3,14,14<br>43:25 44:3 |
| **P**<br>3:1,1 | 15:21 16:9 | 24:22 25:5<br>27:11,18 | **place**<br>35:25 36:5 | 44:11,19 |
| **PA**<br>1:16 3:6 | **PATTI**<br>3:18 | 33:2 40:24 | **please**<br>27:21 | **prepare**<br>19:15 |
| **Page**<br>4:3 46:3 | **peer**<br>29:7 33:18 | **photographic**<br>25:19 42:5 | **plus**<br>8:3,11 42:7 | **prepared**<br>19:22 |
| **pages**<br>15:10 48:3 | 33:23 34:3<br>34:9,17,21 | **photographs**<br>14:15,16,18<br>17:14 19:5 | **point** | **PRESENT**<br>3:20 |
| | | | | **presentation** |



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4716

Manfred Schenk                                                    October 28, 2010

57

25:4,13
43:1,19
**presented**
35:7,11
**presently**
7:17 9:9
**preservable**
12:2
**preservation**
17:19 21:17
**preserve**
12:1 20:24
30:17 32:1
**preserved**
17:16
**preserving**
17:14,22
21:15
**presumably**
20:17 43:16
**presume**
40:2 42:4
43:5
**presuming**
43:7,8
**pretty**
37:6
**prevent**
6:15
**previously**
5:13 19:19
**print**
41:24 42:2
**printed**
42:22
**prints**
42:10
**print-off**
15:9
**Probably**
14:19
**problem**
34:20 44:19
**proceed**
18:7,14
24:15
**PROCEEDINGS**

5:1
**process**
12:18,19
20:3,5,12
22:5 26:24
27:2 30:14
30:20 31:1
31:8,20
32:5,6,8,8
42:4
**processes**
20:19
**processing**
11:25 12:21
16:10 34:1
**produce**
42:17
**produced**
39:24,25
**products**
43:17
**professional**
9:13 15:19
15:25 16:2
16:4,6
**program**
24:10 37:10
43:15 44:15
**programmed**
26:11
**programming**
14:24
**programs**
14:8,9
**project**
6:20,21,24
7:8
**projected**
35:21
**projects**
6:14
**prostate**
9:6
**protocol**
4:18 28:25
31:7,19
32:4,6

**protocols**
29:6,21,25
30:6
**prove**
37:1
**proved**
47:6
**provide**
18:25
**public**
47:12 48:3
48:12
**purpose**
15:11 22:13
30:17 31:25
**purposes**
15:15 43:19
47:9
**put**
19:23 37:9
37:10 38:8
40:20
**P-142**
4:15 19:19
**P-157**
4:17
**P-181**
4:18 28:21
**P-97**
4:14 5:13
**P.O**
3:11

_____
**Q**
_____
**quality**
20:24 22:7
**question**
16:12 17:15
21:24 22:1
29:20,20
30:5 32:21
34:3 36:1
36:13 39:13
39:14
**questions**
4:3 19:24
24:17 29:4

29:11,18
32:11 43:9
**quite**
16:20 28:8

_____
**R**
_____
**R**
3:1,13 4:18
46:1,1
**radar**
7:3,9
**radars**
13:20,21
**rate**
30:5,9,13,20
31:1,7,11
31:12,14,20
32:3,4,7
**ratio**
22:25 23:4,7
23:9,19
**read**
47:1
**reading**
21:6
**really**
14:14 21:14
22:12,12
31:4,4
**reasonable**
18:18
**RECEIPT**
1:12
**received**
22:17 36:9
**recess**
33:10
**recognition**
9:14 15:3,8
15:21 16:10
**recognize**
41:10,13,16
**record**
5:4,10 18:8
19:20 29:16
33:5,9,12
44:24

**referred**
33:2
**referring**
28:14,15
**reflect**
18:8
**regard**
11:15 12:10
12:24 16:22
32:19 39:13
**regards**
10:7 12:14
13:11 20:16
26:3 27:24
27:24
**Registration**
48:16
**regular**
23:8
**related**
48:5
**relative**
48:6
**relevance**
11:15 29:9
29:13
**relevant**
29:15 31:4
**reliable**
37:24 42:1
42:22
**relied**
8:19 11:11
**relying**
11:19
**render**
18:11
**repeat**
12:9
**repetitions**
22:7
**report**
19:16,21
32:17,18,23
**REPORTED**
3:24
**reporter**



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4717

Manfred Schenk                                    October 28, 2010

58

| | | | | |
|---|---|---|---|---|
| 2:12 48:2 | 36:21 39:5 | **scanner** | **sense** | **six** |
| 48:12 | 41:8 43:10 | 43:5 | 16:11 28:4 | 7:15 |
| **repositories** | 43:15 44:9 | **scanners** | **sensor** | **slide** |
| 9:23 | 44:12 | 20:14,14 | 42:18 | 37:9 43:22 |
| **repository** | **Riverside** | **scanning** | **setting** | **slides** |
| 21:17 | 8:24 | 20:12 | 8:19,20 | 44:1 |
| **represent** | **Roberts** | **scenario** | 31:19 32:3 | **slightly** |
| 24:21,23 | 3:13 4:6,8 | 23:22 | **seven** | 13:5 |
| 25:11 | 10:12,16,19 | **Schenk** | 35:6 | **smear** |
| **reproducing** | 10:21 11:15 | 1:11 2:8,11 | **shadows** | 26:25 |
| 42:13 | 11:18 15:5 | 4:14 5:5,11 | 38:16,17 | **smooth** |
| **research** | 15:7,14,17 | 5:12 10:14 | **ship** | 25:20 26:21 |
| 8:24 9:4 | 16:3,6 18:4 | 10:21 18:17 | 6:19 | **software** |
| 12:24 | 18:10 24:7 | 29:19 33:14 | **ships** | 7:14 14:6,7 |
| **researched** | 24:15 28:1 | 42:9 47:1,3 | 6:16 | 43:15,16 |
| 8:22 | 29:8,12 | 47:6 | **Shoreline** | 44:7,8,8,11 |
| **Respondent** | 30:10 31:2 | **science** | 3:16 | 44:14 |
| 1:5 3:9 | 32:12,16,18 | 30:9 | **Short** | **Solutions** |
| **result** | 32:23 33:5 | **scientific** | 33:10 | 2:14 48:15 |
| 19:1 | 33:14 39:12 | 15:19,25 | **shorthand** | **Sony** |
| **resume** | 40:19,24 | 18:19 29:14 | 2:12 48:2,12 | 8:1 |
| 5:14 | 44:2 | 31:5,18 | **show** | **sorry** |
| **retain** | **role** | 32:3 | 19:18 27:9 | 15:20 28:1 |
| 18:21 | 12:8 14:2 | **scientist** | 27:12,16 | **Sounds** |
| **retained** | 17:23 | 7:19 9:10 | 28:20 37:9 | 15:18 |
| 14:4 19:2 | **Rutgers** | 31:9 | 37:10 43:22 | **SOUTHERN** |
| **retrieval** | 5:22 | **scope** | **showed** | 1:3 |
| 12:22 25:19 | | 16:9 | 35:22 37:7,7 | **space** |
| **retrieve** | —— **S** —— | **screen** | **showing** | 22:12 |
| 8:10 12:3 | **S** | 23:3,3,24 | 5:12 36:4 | **specifically** |
| **retrieved** | 3:1 46:1 | **screened** | **shown** | 6:4 7:8 |
| 21:18 | **SALINAS** | 37:3,3 | 38:9 | **spectrum** |
| **review** | 3:18 | **seal** | **shows** | 7:2 |
| 19:1 22:17 | **samples** | 47:10 48:8 | 37:17 | **speculation** |
| 29:7 33:18 | 25:10 | **Sean** | **sic** | 39:11 44:3 |
| 33:24 34:4 | **save** | 3:22 | 5:3 33:9,12 | **spent** |
| 34:9,17,22 | 22:11 | **second** | 44:24 | 14:17 |
| 35:1,2,5,7 | **saw** | 33:22 | **signature** | **standards** |
| **reviewed** | 37:14,17,19 | **see** | 1:12 13:4,9 | 10:3,6 12:13 |
| 21:24 27:14 | 37:20,21,22 | 6:25 27:9,12 | 47:1 | 12:14 |
| 27:18 39:2 | 38:1,2 | 28:9 34:14 | **signatures** | **started** |
| **reviewing** | **says** | 37:13 41:17 | 9:1 | 6:2 |
| 41:21 | 16:8 17:1,5 | 41:18 | **significant** | **state** |
| **right** | **scan** | **seen** | 24:24 31:17 | 2:13 5:9,22 |
| 7:23 10:22 | 21:20 | 28:21 | 37:18 | 29:16 47:4 |
| 19:10 24:15 | **scanned** | **senior** | **similar** | 47:12 48:1 |
| 28:7 35:12 | 20:1 21:25 | 7:19 9:9 | 22:10 | 48:3,13 |
| | 43:3 | | | |



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4718

Manfred Schenk                                              October 28, 2010

59

```
   33:15 48:3        1:16 2:15         10:4              40:25 41:1        47:2 48:3
states                 3:6,11,16     tell                 41:3            trying
 1:3,4 3:10         sum              12:9 25:16          time              6:15 12:7
   3:16 6:9,10      33:19              36:3,19            5:3 14:17,23     two
   6:12 15:24       sure               39:4                26:15 27:17    34:8 41:6,9
   18:22 36:11      14:12 17:16       telling              33:8,11          42:9
steer                 18:9 33:7        34:3,7,8,13         36:5,16        type
 6:18                 34:5 35:20        34:16,21           42:19 44:23    30:5 43:15
storage               36:2,7,7,7       35:1 36:22        times             43:23,23
 8:7 12:18,22         37:12,12       tend                 25:9           types
   14:11,24           38:4            25:20              tissue           6:3 13:21
   25:18           surface           terms               9:2 13:4,5     typical
store               7:11 36:12       40:9               tissues          23:5
 12:3 21:11        surprise          testified           13:11          typically
stored              17:9,12          5:7 32:24          today            23:9,19
 12:16             suspect           testify             8:5 9:9           43:18
storing             24:24 31:10      16:22 18:12          18:18 36:19   ─────────────
 14:18 25:24       sworn             testimony          Today's               U
   30:23            5:6 48:8         10:23 11:11         5:2            ─────────────
Street             system             29:10,14          toes            ultimately
 1:16 2:15          7:4 8:3            34:24 40:10        41:8           13:22 20:25
   3:5             systems             40:14 41:22       told              26:13 28:9
stretch             6:4,22 7:22      Texas               15:21            36:10 42:22
 33:23 34:4       ─────────────       1:3,22 2:13       Tony            ultrasound
strike                  T              2:15 3:12         3:13 10:10      9:1,1 13:4
 29:19             ─────────────       3:17 48:1,3        32:11           13:10
students           T                   48:13            top             ultrasounds
 35:23              46:1,1           textural            28:5 41:16      8:23 12:25
subcontra...       take              8:15                 41:17         unaware
 7:25               21:8 25:21       Thank              total           35:5
subject               33:14,21       10:12 15:6          7:15 33:19     undersigned
 31:17                35:15,17,18      43:11            touch           48:2
submarine             38:6 40:20     theoretic...        42:24          understand
 6:23              taken             31:12 42:12        trained         10:21 12:7
subscribed          2:11,13 38:7     theories            39:6            13:18 34:2
 47:8 48:8            38:19 41:25     36:18             training          40:15 43:14
substantive          42:19 48:6      things             10:23          understan...
 19:24             talk              8:5 20:10          transition      11:10,12,19
successful          24:2 25:15       think               42:5            21:19 22:16
 9:4               talking           16:17,17          transmitting      25:12,14
successfully        19:12 23:17       29:15              36:7            29:2,3,22
 8:25                 27:21 32:2     third              trial           unenhanced
sufficient            32:2           6:24                27:12,17       19:7 28:8
 20:15             technical         three                33:2         United
sufficiently        15:11            41:9               Tritan          1:3,4 3:10
 31:15             techniques        thumb               6:22            3:16 6:9,10
Suite               40:3             28:14,15          true              6:12 18:22
                   Technology                                            36:10
```

Manfred Schenk                                      October 28, 2010

60

| | | | | |
|---|---|---|---|---|
| **University** 5:21,22,23 | **vertical** 23:15 | 33:12 44:24 | **1.3** 23:13 | **19106** 1:16 3:6 |
| **unsharp** 34:12,16 | **Videographer** 3:22 5:2 | **we've** 36:17 42:6 | **10** 4:6 | |
| **usage** 24:12 | 33:8,11 44:23 | **William** 3:22 4:18 | **10th** 48:9 | **2** |
| **use** 8:25 30:16 | **VIDEOTAPED** 1:11 | **wish** 43:25 | **10-28-10** 1:22 | **2** 23:7,11 |
| 35:14,17 39:15,16 | **vision** 16:10 | **witness** 5:6 | **10:11** 2:16 | **2010** 2:16 5:3 |
| 40:5,9 42:17,25 | **visually** 20:17 | **wondering** 11:18 | **10:22** 5:3 | 48:9 |
| **useful** 18:13 | **vitae** 5:14 | **word** 27:4 34:20 | **100** 4:17 | **24** 23:6 |
| **uses** 25:2 | **voting** 10:5 | **work** 6:7 7:6,8,12 | **11:03** 33:9 | **27** 4:17 |
| **usually** 25:6 | | 35:13 | **11:15** 33:12 | **28** 4:18 |
| **utilize** 35:18 36:24 | **W** | **worked** 7:7 | **11:19** 2:16 44:25 | **28th** 2:15 5:3 |
| **U.S** 3:10,15 | **wait** 29:8 | **working** 6:3,13,21,24 | **11:29** 44:24 | |
| | **Walnut** 1:16 3:5 | 7:18 13:17 31:6 35:18 | **12** 25:7,9,10 | **3** |
| **V** | **want** 10:10 15:4 | **world** 10:7 | **12-31-2011** 48:15 | **3** 14:20 23:7,7 |
| **valid** 31:22,23 | 17:20 19:23 25:15 28:20 | **wouldn't** 6:19 11:1,5 | **1221** 2:14 | 23:9,11,12 23:14 48:16 |
| 32:5 | 42:24 | 16:17 32:5 35:8,10 | **1305** 2:15 | **3,600** 25:6 |
| **validity** 36:13 | **wanted** 5:16 9:12 | **wrote** 14:7 | **150** 42:6 | **300** 25:4 |
| **valuable** 31:1,8 | 21:23 24:2 29:16 30:8 | | **1500** 3:11 | **3022** 48:14 |
| **value** 25:23,24 | 36:3 42:16 | **Y** | **157** 27:17 38:25 | **33** 4:8 |
| 26:23 27:4 28:4 30:23 | **way** 30:24 35:16 | **Yeah** 29:12 | 39:1 | **35** 19:4,25 |
| 31:16 | **went** 6:7 15:7 | **years** 9:22 31:6 | **16** 23:20 | 21:20 23:2 23:5,23 |
| **values** 26:2 27:2,24 | 40:15 | 42:7 | **18** 4:7 | 24:21,22 41:22,25 |
| 28:11 | **weren't** 36:21,21 | **Z** | **181** 33:15 | **36** 23:5 |
| **various** 6:3,8 8:1,13 | **West** 1:16 3:6 | **zero** 31:13 | **184256** 1:1 | |
| 16:19 18:25 28:6 | **we'll** 18:14 29:12 | | **19** 4:15 | **4** |
| **versed** 24:8 | 29:12 | **1** | | **4** 23:9,12 |
| **versus** 18:22 | **we're** 8:5 15:16 19:12 33:9 | **1** 25:7,7,10 29:6 30:1 33:19,22 | | **43** 4:9 |
| | | | | **5** |


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4720

Manfred Schenk                                    October 28, 2010

61

**5**
 4:5,14 14:20
  14:22,22
**5-10-2012**
 48:14
**5-11-07**
 4:15
**500**
 3:16
**540**
 1:16 3:6

---
**6**

**6**
 34:12,16
**601**
 1:16 3:5
**61129**
 3:11

---
**7**

**7**
 29:6 30:1
  33:19 34:19
**77002**
 3:12
**77208-1129**
 3:11
**78401**
 3:17

---
**8**

**800**
 3:16

---
**9**

**9**
 23:20
**919**
 3:11



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

**USCA5 4721**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-216 |
| | § | |
| ALFRED NMI BOURGEOIS | § | |

**ORDER**

On this day came on to be considered several motions filed by Bourgeois.  The Court

orders as follows:

1.  Bourgeois has filed a motion to take depositions of two individuals.  (DE 602).
    The Government will respond to that motion within ten (10) days from the entry
    of this Order.

2.  The Court **GRANTS** Bourgeois' unopposed motion to admit Petitioner's hearing
    exhibit P-180.  (DE 603).

3.  Bourgeois has filed a renewed motion to amend and supplement the fourth claim
    in his section 2255 motion.  (DE 605).  Bourgeois has also submitted exhibits in
    support of that motion as separate docket entries.  (DE 606, 607).  The Court does
    not accept piecemeal filings.  The Court **STRIKES** docket entries 605, 606, and
    607 from the record and **ORDERS** Bourgeois to refile them as one pleading.  The
    Government will file a response to that pleading within ten (10) days of its filing.

SIGNED and ORDERED this 17th day of November, 2010.

_____
Janis Graham Jack
United States District Judge

1 / 1

USCA5 4722

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

——————————————————————— :
                                                      :
UNITED STATES OF AMERICA,          :          No. Cr-C-02-216
                                                      :          No. Cv-07-223
                    Respondent,               :          Honorable Janis Graham Jack,
                                                      :          U.S.D.J.
          -against-                               :
                                                      :
ALFRED BOURGEOIS,                     :          Electronically Filed
                                                      :
                    Petitioner.               :
——————————————————————— :

**PETITIONER'S RENEWED MOTION TO AMEND**
**AND**
**SUPPLEMENT TO CLAIM IV**
**OF HIS *MOTION FOR RELIEF PURSUANT TO 28 U.S.C. SECTION 2255***
**AND**
**CONSOLIDATED MEMORANDUM OF LAW[1]**

Petitioner, Alfred Bourgeois, through counsel, renews his motion to amend

Claim IV and pursuant to this Court's Order also supplements that claim, as follows.

**Background**

1.     Pending before the Court is Petitioner's *Motion for Relief Pursuant to 28*

*U.S.C. Section 2255*.  This Court heard evidence on September 10 and 20-24, 2010.

---

[1]All emphasis is added unless otherwise indicated.  Transcripts of the trial and section 2255 hearing are cited by "Tr." followed by the date and a page cite.

USCA5 4723

Three depositions have been completed pursuant to this Court's authorization in order to further complete the record.[2]

2.     Petitioner raised as a ground for relief an allegation that his trial counsel ineffectively failed to challenge the Government's evidence that semen was recovered from the rectum of JG-1999.  See Claim IV, *Petition*.   Specifically, Petitioner alleged that counsel ineffectively failed to challenge the FBI's assertion that a positive p30 test, alone, despite overwhelming evidence to the contrary (a negative acid phosphatase (AP) test, negative smear slide sperm search, negative microscopic pellet sperm search, negative autosomal DNA test, negative Y chromosomal DNA test (YSTR), and no sign of physical trauma to JG-1999), could support a claim that "semen" was detected.

3.     During the evidentiary hearing on this claim, the Government revealed **for the first time to undersigned counsel** the existence of a document, identified and admitted at the hearing as Petitioner's Hearing Exhibit, P-179 (a copy is attached to this pleading).  This document was not in the file provided to undersigned counsel by trial counsel; it was not among the documents sent to trial counsel's DNA expert, Dr. Elizabeth Johnson – even though counsel sent to her a variety of other documents relevant to these issues – nor did trial counsel make reference to this document in his

---

[2]Petitioner has taken the depositions of Dr. Price, Dr. Oliver and Manfred Schenk.

USCA5 4724

cross-examination of FBI serology and DNA witnesses at trial, when it would have been only logical for him to have utilized this document.  Based on these factors, discussed in detail herein, it is apparent that P-179 had never before been disclosed to the defense.

4.      Shortly after this document came to undersigned counsel's attention on September 23, 2010 during the course of the evidentiary hearing, Attorney Abreu advised the Court that Petitioner would be filing a motion to amend the Section 2255 Motion to include a new claim that the Government's non-disclosure of this critical document violated Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.

5.      Without hearing argument and without any written submission, this Court denied Petitioner's oral motion to amend the petition and announced that it would not permit an amendment because such an amendment would be "futile" because, in the Court's view, Petitioner had not demonstrated non-disclosure of the document.[3] Tr.

---

[3]The Court's decision to deny amendment on the ground of futility, without affording an opportunity for Petitioner to prove non-disclosure of P-179, was an abuse of discretion and error. Fed.R.Civ.P., Rule 15 provides the standard governing a motion for leave to amend.  Rule 15(a) provides that "leave [to amend] shall be freely given when justice so requires."  Jamieson By and Through Jamieson v. Shaw, 772 F.2d 1205, 1208 (5th Cir. 1985).  Failure to abide by this Rule can constitute an abuse of discretion.  Indeed, in Jamieson, the Court of Appeals explained that where resolution of factual issues is essential to the proper evaluation of the issues before the court, amendment should be freely allowed:

USCA5 4725

9/24/10, 60-63.

6. Petitioner submits that the Court should reconsider that decision. As set forth in the body of this document, non-disclosure is evident based on the trial record, the pre-trial discovery provided by the Government and by the events that transpired at the hearing. Petitioner herein makes the showing of non-disclosure that he would have made had the Court not made its oral ruling prohibiting amendment. Alternatively, should the Court remain unconvinced that Petitioner has demonstrated non-disclosure of P-179, Petitioner would move to conduct deposition(s) of the person or persons who were responsible for the ostensible trial level non-disclosure. To date,

---

> We do not hold that Rule 15(a) requires the district court in every case to grant leave to amend when the amended complaint states a cause of action. ... However, where, as here, the only proffered justification for denial is futility, the determination that the complaint is legally sufficient and not cumulative deprives the district court of all "substantial reason" to deny leave and severely restricts its discretion to do so. In such a case, leave to amend should be granted. Justice requires no less.

Id., 1211.

Here, Petitioner's motion to amend based on the Government's suppression of exculpatory evidence is "legally sufficient" and "not cumulative." This Court should allow amendment to consider this claim. This is particularly so when the basis for finding futility has not yet been the subject of adversarial testing. As shown, infra, the Court did not permit Petitioner the opportunity to prove non-disclosure, although Petitioner submits that non-disclosure is plain on the current record. Therefore, the Court cannot deny amendment without permitting further factual development on this question.

4

USCA5 4726

the record is devoid of any such evidence. <u>Jamieson</u>, 772 F.2d at 1211.

## Structure of this Submission

7.      Petitioner seeks to accomplish several things in this submission and accordingly offers this statement regarding structure.

8.      First, he will explain the critical nature of P-179 as a factual matter. Whether viewed through the prism of <u>Brady</u> or <u>Strickland</u> ineffectiveness, this document was, or would have been, highly material to trial counsel's efforts to show that semen was not recovered from JG-1999 rectum.  Second, he will set forth the facts showing non-disclosure of this document.  Should the Court remain unconvinced regarding non-disclosure, Petitioner will alternatively propose brief and truncated discovery to resolve this question.  Third, he will supplement the ineffective assistance of counsel claim with respect to P-179 and the other documents and proofs that counsel failed to effectively utilize.  Fourth, he will explain that the failure to disclose this document was material under <u>Brady</u> and its progeny, or alternatively, that trial counsel's deficient failure to use the document if in fact is was disclosed, caused Petitioner prejudice.[4]

---

[4]The Fourth Section will address <u>Brady</u> materiality and <u>Strickland</u> prejudice because the Supreme Court has held that these two questions are co-extensive. <u>Kyles v. Whitley</u>, 514 U.S. 419, 436 (1995).

USCA5 4727

## PART ONE

### EXHIBIT P-179 FURTHER PROVES THAT SEMEN WAS NOT PRESENT IN THE RECTUM OF JG-1999.

9.      P-179, entitled "P30 Test Results" indicates that on the three swabs, Q5-Q7, that were subjected to p30 testing by the FBI, the results were "very weak, very weak and weak," respectively.  Within the context of the issues before the Court these results are highly relevant and extraordinarily exculpatory as to guilt and punishment.

10.      FBI Procedures for the Serological Identification of Biological Substances on Evidentiary Materials (2002), Chapter 11 states:

> Attempts to identify human semen in some categories of evidence **MUST** be approached through the identification of spermatozoa rather than by the detection of human specific proteins, such as p30.  These categories would include ... stain extracts that possess **borderline levels of p30**.

FBI Procedures, admitted at hearing as Exhibit P-180.

11.      Thus, in this case, because the previously undisclosed P-179 reveals "borderline levels of p30," (weak to very weak), the FBI was required to confirm the presence of any alleged semen through the identification of spermatozoa – not solely a p30 test.  Notably, no sperm were ever detected in this case.  Indeed, the smear slide which was inspected by the FBI was NEGATIVE for the presence of any spermatozoa. The microscopic sperm searches conducted **on all three swabs** by Technical Associates at the request of Dr. Elizabeth Johnson were also NEGATIVE for the

6

USCA5 4728

presence of spermatozoa.

12. P-179, in conjunction with the FBI's own serology protocols, P-180, demonstrate that the Government's evidence that semen was definitively detected in the rectum of JG-1999 was scientifically unsupportable.

## PART TWO

### P-179 WAS NOT DISCLOSED TO TRIAL COUNSEL. SHOULD THE COURT REMAIN UNCONVINCED DESPITE THE OVERWHELMING EVIDENCE OF NON-DISCLOSURE, PETITIONER SEEKS FURTHER FACTUAL DEVELOPMENT.

13. It is manifest that P-179 was not disclosed to trial counsel. That P-179 was not provided to the defense at the time of trial is clear from the trial record, the post-conviction evidentiary hearing testimony and the pre-hearing discovery conducted by Petitioner and the Government. This fact is shown by the following:

A. P-17 is not among the almost 12,000 pages that were disclosed to undersigned counsel by Mr. Tinker and Mr. Gilmore. As the Court knows, that Bate-stamped file was provided to the Government. Neither undersigned counsel nor the Government have located P-179 in the Gilmore/Tinker file.

B. Mr. Tinker provided his trial DNA expert, Dr. Elizabeth Johnson, with the discovery that was provided to him by the Government. P-179 was not included in the materials that Mr. Tinker provided to her. By itself, this strongly supports Petitioner's view that the document was not disclosed by the Government to trial counsel.

C. Mr. Tinker did not use P-179 at points of his examinations of witnesses during which it would have been expected and logical

7

USCA5 4729

that competent counsel would have used it.

These points are addressed in detail below.

## The Trial Record

14.    At trial, FBI serologist Caroline Zervos and DNA analyst Anthony Onorato testified that the results of the p30 testing conducted by the FBI on Q5-Q7 were positive.  Tr., 3/5/04, 87 (Zervos); id., 118, 128-29 (Onorato).  At no time did either FBI witness state that the actual results, reflected in P-179, were "very weak," "very weak" and "weak."  See generally Tr., 3/5/04 see also testimony of Jerrilyn Conway, Tr., 9/24/10, 68 (Q: Do you recall in your review of the trial transcript whether Carolyn Zervos or Anthony Onorato ever mentioned that the results were very weak, very weak and weak? A: I don't think that they did").  Additionally, at no time did trial counsel, Mr. Tinker, ask an single question or make any argument which reflected his knowledge of the results of the FBI p30 testing set forth in P-179.  See generally Tr., 3/5/04, even though he was cross examining the Government's witnesses in an attempt to show that semen was not present.

## Evidentiary Hearing Testimony

15.    Dr. Elizabeth Johnson's evidentiary hearing testimony also makes clear that she was **not** provided P-179 at the time of her consultation with trial counsel or at any time thereafter.

8

USCA5 4730

16.     Petitioner asked Dr. Johnson to explain the significance between the "weak positive" result she obtained using the Seratec card and the "positive result" obtained by the FBI using the ABA card.  NT 9/22/10 at 18.  Had Dr. Johnson or Petitioner ever previously seen P-179, these questions would have been irrelevant because P-179 indicates that both tests obtained "weak" to "very weak" positive results.[5]

17.     Dr. Johnson first learned that the FBI had obtained a "weak" positive result when she was asked the significance of that result on cross-examination by the Government at the section 2255 hearing:

Q:      And what was Mr. Tinker supposed to draw from the Fact that your, the FBI had a weak positive on the p30 test? You look –

A:      Okay.

Q:      **You look surprised**.

A:      **The FBI did not report a strength of their test.  They just reported it positive.**

Q:      Oh.  Did you look – you didn't look at the FBI raw data?

A:      There is no raw data on the ABA test card.  They should have made photographs –

---

[5]Dr Johnson went on to explain why a positive p30 test, let alone a "weak" positive result, without any other evidence was <u>not</u> indicative of the presence of semen. Tr., 9/22/10, 18-19.

9

USCA5 4731

Q:      On p30?

A:      Right.

Q:      Oh, ABA card.  I'm sorry. Go ahead.

A:      They – any decent laboratory would photograph the results, and they did
        not.  And there is no way for me to review the actual test itself.  It's just
        a notation, a note in a worksheet.

Q:      So you weren't provided any information regarding the FBI test which
        resulted in a weak positive?

A:      They recorded it as positive.  **They didn't note that it was weak**.

Q:      Okay.

A:      **So I have no way of determining it was very positive or weak
        positive**.

Id., 78-79.  Dr. Johnson's "surprise" about the FBI's "weak" positive result prompted

an objection by Petitioner and a renewed request for any all information contained in

the FBI file.

> MR. ABREU:  Your Honor, may I object at this moment ... And make
> a request here?  I personally, Your Honor, have not seen the FBI's raw
> data.  The witness has indicated that she's never seen the raw data.  I
> want to know if there in fact is raw data that we should be looking at and
> whether in fact the FBI did have a weak positive.  I know I've made a
> request for that information but I have not seen that.
>
> * * *
>
> I know we don't have anything that says weak positive.  All we have is
> a check mark on a test that says it was positive.  That's the only thing
> we've ever seen, the only thing we've ever provided to Ms. Johnson.

10

USCA5 4732

And if that does exist, I would actually like to see that information, Your Honor.  That's my request.

Id., 79, 80-81.  After further discussion between the parties and the Court about what documents had been provided at the time of trial, Petitioner reiterated what information he was requesting from the FBI and why he believed that information regarding the "weak" positives in P-179 had not been disclosed at the time of trial:

> MR. ABREU: Even if, in fact, the FBI did not photograph these test cards, I don't know if Mr. Dowd is asking questions regarding documents that I still haven't seen, which are whether the FBI recorded a week positive or a regular positive.  Again, we've presented evidence that a weak positive versus a positive is relevant.  If, in fact, it was a weak positive, I suspect Mr. Tinker would have wanted to use that at trial to say, "This is not necessarily semen because of the weak positive."  I suspect that's what he would have tried to use it for.  If that's information, I would like to see it.  It might implicate Brady.  I think I'd like to see that information, Your Honor, from the FBI, if they have bench notes and specific documents related to the testing and the card.
>
> THE COURT:  Where did you see it Mr. Dowd?
>
> MR. DOWD:  I was told by Ms. Jerrilyn Conway, Your Honor, our expert witness --
>
> THE COURT:  And she's going to be here?
>
> Mr. DOWD:  She's flying in this afternoon ... Will be here at 3:45.  And I understand it was material that had been shared.  But that will, I'll be able to put testimony on on that.

Id., 86-87.

18.    Later that night, in response to Petitioner's request, the Government

11

USCA5 4733

provided Petitioner with a copy of P-179, and the following day, Petitioner informed

the Court why he believed it had not been produced at the time of trial.

> MR. ABREU:  Last night Mr. Dowd did provide me with this particular
> document which I will now show the Court.  It relates to Q5, in particular
> of note, Q5, Q6, and Q7, which are the three swabs which the FBI
> alleged had tested positive for semen.  As the Court can note, in their
> notes and remarks it indicates regarding Q5 that it was very weak, Q6
> very weak, Q7 weak.  There certainly was no testimony at trial regarding
> the strength of those tests.  I can assure Your Honor that I have never
> seen this particular document and that if I had seen it, I most certainly
> would have used it and I most certainly would have had our experts
> address the significance of this particular document.
>
> * * *
>
> I think there might be perhaps a contention by the Government at some
> point that it went directly also from the FBI to Ms. Johnson back at the
> time of trial; however, Ms. Johnson testified yesterday that she had never
> seen any notes regarding the strength of the FBI testing, that that
> information was not something she had ever seen.  And if you look at her
> report produced in 2004, she indicates a weak positive on our tests but
> she never makes any indication at that point about whether their test was
> weak positive or strong positive because she didn't have that information.

Tr., 9/23/10, 40, 43.

### The Discovery Process

19.    The Government's failure to provide P-179 at the time of trial is proven

not only by the trial record and Dr. Johnson's "surprised" hearing testimony, but also

by the post-conviction discovery process.  On September 9, 2009 the Court ordered

Petitioner to produce to the Government every document received from trial counsel's

12

USCA5 4734

files.  In compliance, on November 9, 2009 Petitioner provided the Government with

everything – 11,611 pages – from trial counsel's file.[6]  However, as the record

indicates, P-179 was not part of those thousands of pages.

> MR. ABREU  ... I searched our entire file which was gathered from trial
> counsel which consists of 12,000 pages, I searched, did an electronic
> search with the term P30 and I, and this document was not part of those
> records.  Mr. Dowd also did a search of the files that were disclosed to us
> in April of this year and that document was not part of those.  They are
>
> MR. DOWD:  Well, we are not sure about that.  We are still doing a
> search on that, Your Honor.
>
> MR. ABREU:  Right, Your Honor, so it's a document, the documents
> that we searched are the 12,000 pages that we provided to the
> Government as part of discovery, so if they want to search that they
> certainly can search it as well for that document.  And Mr. Dowd is
> actually correct, they are in the process of checking additionally.
> However, when that's complete, Your Honor, I suspect that I will have
> a motion to amend our claim to include a Brady violation.  And let me
> just make this clear, I am not saying that Ms. Booth or any member of the
> U.S. Attorney's Office failed to disclose it to trial counsel, because the
> information that I have here indicates that Ms. Booth turned over
> everything that she got from the FBI and I will concede that at this point.
> My questions is whether the FBI actually provided the U.S. Attorney's
> Office with this particular document which I am saying is particularly
> relevant.  And I also can't imagine Mr. Tinker, or perhaps I can but Mr.
> Tinker was certainly trying to dispute the evidence of the semen and here
> he has, here is a document that indicates very weak, very weak and weak,

---

[6]The only documents not provided were about twenty pages which were
provided to the Court for in camera review.  The Court sustained Petitioner's privilege
arguments and those documents have not been provided.  Counsel represents, and the
Court can certainly confirm, that P-179 was not included in the in camera documents.

13

USCA5 4735

and I know that that was never used at the time of the trial. So, what I am requesting again, Your Honor, is for the FBI to provide me with a copy of every single document in their file related to the testing of these materials. I would then like to review those documents before Ms. Conway testifies, or any witness for the Government testifies in this particular matter. I should also note that Ms. Conway is not the person who testified at trial, she has never been a part of this case, so I am not sure that she would even know what was turned over at any point, but I would – so for that reason I would really like to see that entire file and I think I am entitled to that file, Your Honor.

Tr., 9/23/10, 41.

20.    Subsequently, the Government attempted to showing that P-179 was disclosed. However, that attempt was not done through adversarial testing. Rather, it was done through the unsworn statements of an AUSA Mark Dowd, who did not even have personal knowledge of the relevant facts. Because the Government proceeded through unsworn representations, Mr. Dowd was not subject to cross examination, or to legal objections regarding his basis of knowledge.

21.    The Government did not bring any witness who had actual knowledge of the alleged transmission of the document to the defense.

22.    After Mr. Dowd's explanation, counsel advised the Court that they would move to amend to include a claim that the Government's failure to provide this document to trial counsel violated Brady v. Maryland, 373 U.S. 83 (1963) and its progeny. The Court immediately said it would not permit amendment because doing

14

USCA5 4736

so would be "futile." Tr. 9/24/10, 63.

23. In addition to granting the motion to Amend the pleading, should this Court continue to harbor any doubt about non-disclosure, it should provide Petitioner with the required tools to further prove that the document was not provided to his trial counsel. First, he should be permitted to depose the person or persons identified by the Government as responsible for the copying and transmission of the FBI documents related to this issue. Mr. Dowd's unsworn statements are not a sufficient evidentiary basis upon which to conclude whether the document was provided. Second, he should be permitted to inspect the original FBI file– which to date he has not been permitted to inspect. The Government has provided him with what purports to be a copy of the file, but has not permitted him to view the original. If the copy is complete, the Government should have no reluctance to permit inspection of the original. Third, counsel should be permitted to depose those in the FBI who may have been responsible for or have knowledge of the non-disclosure.

## PART THREE

### SUPPLEMENT TO INEFFECTIVENESS CLAIM REGARDING P-179

24. At trial, Mr. Tinker attempted to argue that there was no evidence that semen had been detected in the rectum of JG-1999. See e.g. Tr. 3/16/04, 43 ('There's no evidence of semen, I suggest to you, being found on this child"). Mr. Tinker,

15

USCA5 4737

however, failed to present **any** evidence that "there's no semen," and this Court, appropriately sustained a Government objection to Mr. Tinker's argument. See Tr. 3/16/04, 43-45 ("Ms. Booth: Your Honor, I have to object. That is a mischaracterization of the evidence. The Court: That is sustained ... The test was positive for semen. They sent it off for an extra DNA test. That came back no DNA from your client. Don't refer again, there was").

25.    Although, as set forth above, Petitioner believes that P-179 was not disclosed at the time of trial, if P-179 was provided to counsel, they were ineffective for failing to utilize the document and the evidence contained therein, in conjunction with all the other evidence that could have presented, see Claim IV,  to support their argument that no semen was detected in JG-1999's rectum.[7]

26.    Indeed, the FBI's **sole** reliance on the "very weak, very weak and weak" positive p30 results reflected in P-179 would have supported an argument by trial counsel that, in the absence of detectable acid phosphatase, sperm or male DNA, the

---

[7]This Court previously ruled that Petitioner may supplement Claim IV to include an allegation of ineffectiveness regarding P-179. Tr. 9/24/10, 63 ("I'm not going to allow you to amend for the Brady claim ... But if you want to use it for ineffective, you can use it for ineffective"). Herein, Petitioner only sets forth the facts necessary to supplement Claim IV to in include an allegation of counsel's ineffectiveness for failing to utilize P-179. Petitioner will set forth all of the evidence of trial counsel's ineffectiveness regarding claim IV which was developed at the evidentiary hearing in the forthcoming post-hearing briefing and oral argument.

16

USCA5 4738

Government's allegation that "semen" was detected was scientifically unsupportable.

See P-180, FBI Procedures for the Serological Identification of Biological Substances

on Evidentiary Materials (2002), 11("Attempts to identify human semen in some

categories of evidence **MUST** be approached through the identification of spermatozoa

rather than by the detection of human specific proteins, such as p30.  These categories

would include ... stain extracts that possess **borderline levels of p30**");[8] see also Texas

Department of Public Safety, DNA-04-09, p.1 ("P30 Identification ... p30 is

considered to be a **presumptive** test for semen.  The presence of p30 indicates, **but**

**does not confirm** the presence of semen.  Semen can **only** be confirmed by the

presence of spermatozoa"), attached;[9] California Department of Justice Bureau of

Forensic Services, Biology Technical Procedures, p. 51 ("Section 4 – Semen ... for p30

immunassay cards, a positive result **alone** (without sperm or AP results) will allow you

---

[8]Thus, the FBI's very own protocols require the identification of sperm to confirm the presence of semen when, as in this case, you have borderline levels of p30. The two separate sperm searches conducted in the case were negative.

[9]Texas DPS policy conforms with the evidentiary hearing testimony of Alan Keel who stated that a p30 test can be used in conjunction with other evidence to indicated the presence of semen but the only stand alone confirmatory test for semen was the identification of spermatozoa.  See e.g. P-88, 2007 Report of Forensic Science Associates, 20 (" And since sperm are only found in semen, the observation of sperm is proof of the presence of semen.  In the criminal justice context, the observation of sperm is the only definitive proof of the presence of semen from a forensic specimen"). In this case, all searches for the presence of spermatozoa were negative.

17

USCA5 4739

to make the statement of 'p30 detected.'  **However, your report should include a statement that explains that the other body fluids may react with these test cards**. The immunoassay cards **are very sensitive** and can detect p30 at very low levels that may be present in body fluids **other than seminal fluid**"), attached;[10] 2005 Seratec Card Protocol, p.3 ("**inconclusive**: Due to the increase in sensitivity using Seratec seminal fluid (PSA) test, **the analyst is advised to have a second positive test result before confirming seminal fluid is present** in a stain extract (e.g. positive AP test, spermatozoa observed in the pellet, or male profile present in the sperm DNA fraction). If the only positive test result obtained from the stain extract is the Seratec PSA card, the conclusion for this situation would be 'seminal fluid **could not be confirmed**.'"), attached.[11]

---

[10]Likewise, in this case, the acid phophatase (AP) test and the sperm searches were negative.  Thus, unlike the FBI, the California protocols do not permit the confirmation of semen with a positive p30 test alone and certainly not with "very weak, very weak, weak" results.

[11]The Seratec Card test is now used by the FBI to test for p30 and was substituted for the ABA card after accuracy problems were detected with the ABA card – the card used in this case.  NT 9/24/10, 76-78.  Thus, even the protocols by the manufacturer of the presumably more accurate Seratec test card now used by the FBI, cautions that a positive test card alone, does not confirm the presence of semen.  The other tests that Seratec advises a forensic analyst should consider in conjunction with their test card (AP test, identifiable sperm or male DNA), were ALL NEGATIVE in Mr. Bourgeois case.

18

USCA5 4740

27. Given the extremely inflammatory and prejudicial nature of the alleged "semen" evidence, and its unquestionable impact on the jury's deliberations at both the guilt/innocence and the penalty phases of trial, defense counsel had a duty to use P-179 as part of a challenge to the Government's evidence that "semen" was present and JG-1999 was sexually abused. Counsel's performance was deficient for failing to utilize P-179 and as a result Mr. Bourgeois was prejudiced. Strickland v. Washington, 466 U.S. 688 (1984).

**PART FOUR**

**P-179 IS MATERIAL TO PETITIONER'S BRADY CLAIM AND DEMONSTRATES STRICKLAND PREJUDICE.**

28. Kyles v. Whitely, 514 U.S. 419 (1995), sets forth the long-standing materiality standard governing non-disclosed exculpatory evidence. The "touchstone of materiality is . . . not whether the defendant would more likely or not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial. . . ." Kyles, 514 U.S. at 434. Thus, to show materiality, Petitioner need not demonstrate that the non-suppressed evidence would have been inadequate to convict or to sustain a death verdict – "sufficiency of [the remaining] evidence [is not] the touchstone" of materiality. Id., at 435 n.8. Instead, materiality is established when a defendant demonstrates:

19

USCA5 4741

> [A] 'reasonable probability' of a different result, <u>and the adjective is important</u>. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.  Accordingly, a 'reasonable probability' of a different result is shown when the Government's evidentiary suppression 'undermines confidence in the outcome of the trial.'

<u>Kyles</u>, <u>id.</u> at 434, <u>quoting</u> <u>United States v. Bagley</u>, 473 U.S. 667, 678 (1985); <u>Dickson v. Quaterman</u>, 453 F.3d 643, 647 (5th Cir. 2006) ("Evidence is material under Brady where there exists a 'reasonable probability' that had the evidence been disclosed the result at trial would have been different. . . A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome") (quoting <u>Bagley</u>, 473 U.S. at 682); <u>Graves v. Dretke</u>, 442 F.3d 334, 339-40 (5th Cir. 2006) (same).

29.    <u>Brady</u>'s materiality prong is identical to the "prejudice" standard applied to Sixth Amendment claims of ineffective assistance of counsel.  <u>Gonzales v. Quarterman</u>, 458 F. 3d 384, 390 (5th Cir. 2006) ("[th]e test for prejudice under <u>Brady</u> and <u>Strickland</u> is the same").  Accordingly, the <u>Brady</u> materiality inquiry, like the <u>Strickland</u> prejudice inquiry, properly focuses on whether the withheld evidence would have had an effect **on even a single juror**. <u>Wiggins v. Smith</u> , 539 U.S. 510, 537 (2003) ("Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance."); <u>Williams v. Taylor</u>, 529 U.S. 362, 393-95

20

USCA5 4742

(2000) (ratifying effect on a single juror standard applied by Virginia trial court); Soffar v. Dretke, 368 F.3d 441, 479 (5th Cir. 2004) (petitioner was prejudiced because "there is a reasonable probability that at least one juror would have refused to return a verdict of guilty"). Thus, if even a single juror reasonably could have found Petitioner not guilty or found a mitigating circumstance that was not found, or might have differently balanced the aggravating and mitigating circumstances, confidence in the outcome is undermined and a new trial and penalty hearing is required.

30. Obviously, in this case, the evidence of sexual assault upon this child was highly inflammatory. All things being equal, this evidence would have understandably turned any jury against Petitioner. However, in addition to the obvious inflammatory nature of this evidence, it caused specific damage to Petitioner's trial defense. Petitioner's trial theory attempted to show that Robin was the perpetrator. See e.g. Tr., 3/16/04, 34 (defense closing argument) ("I think you have the right to wonder whether Robin Bourgeois committed these acts against this child"); id. at 35 ("I just want to make it clear. Mr. Tinker and my position is that Alfred Bourgeois did not kill this child"); id. at 38 ("And she – by the way, in the first – the first – the CPS interview, [AB-1994] said that her mother [Robin] came up with the idea of lets put the baby down and say she fell out of the truck"); id. at 40 ("Robin Bourgeois is the one who has, as Mr. Tinker told you, the motive. The motive for killing this baby"). This

21

USCA5 4743

theory was obliterated by the allegations of sexual assault and presence of semen, which could only have been perpetrated by Petitioner as the only male reported to have access to the child.   Thus, the semen/sexual assault evidence all but doomed Petitioner's defense.

31.    The evidence of the alleged semen was particularly damaging at sentencing, during the jury's life or death deliberations. Again, in addition to the generally inflammatory and highly prejudicial nature of such evidence, it also supported the statutory aggravating circumstance that the killing was committed in a heinous, atrocious or depraved manner.  18 U.S.C. § 3592(c)(6).  This evidence was specifically used by the Government as a basis for arguing in favor of the death penalty, Tr. 3/24/04, 70; 75-76, (e.g., "Was he laughing when he bit her, or he burns her, **or he put his filthy semen in her little body**").

32.    Moreover, in addition to its support for a specific aggravating circumstances, any reasonable jury would have weighted this evidence in its deliberative weighing process. See 18 U.S.C. § 3593(e) (jury "shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death").

33.    As set forth in Parts One and Three above, P-179 further undermines the

22

USCA5 4744

Government's contention that "semen" was detected.[12]  Had P-179 been disclosed or utilized by trial counsel, there is a reasonable probability that at least one juror would not have convicted Mr. Bourgeois.  Even more so, however, there is a reasonable probability that at least one juror would have believed that Mr. Bourgeois had not sexually assaulted his daughter.  Even if they believed he was guilty of murder and deserved to spend his life in prison, absent the evidence of sexual assault, there is a reasonable probability that at least one juror would not have sentenced him to death.  Accordingly, the p30 test results reflected in P-179 were highly material and Petitioner was greatly prejudiced by the Government's non-disclosure.  If P-179 was disclosed, counsel's deficient failure to use the document was highly prejudicial.  Indeed, due to the Government's failure to disclose P-179 and/or trial counsels' ineffectiveness, the jury was left to weigh unrebutted, inaccurate, false and highly inflammatory evidence when deciding if Mr. Bourgeois should live or die – Petitioner was prejudiced.

WHEREFORE, for all of the above reasons and based on the entire record of this matter, the Court should permit Amendment of Petitioner's Section 2255 Motion to include the Ground for Relief set forth herein, that the Government failed to disclose

---

[12] Petitioner will discuss all of the evidence contradicting the Government's assertion that "semen" was detected in post hearing briefing.

23

USCA5 4745

P-179 to trial counsel.[13]   Upon permitting such amendment, the Court should permit

further development and litigation of this Ground for relief, including further

development of the record with respect to the Government's non-disclosure.

Additionally, the Court should consider the within Supplement to the existing claim

of ineffective assistance of counsel related to Claim IV.

Respectfully Submitted,

/s/ Michael Wiseman

_____
Michael Wiseman
Victor Abreu
Elizabeth Larin
James McHugh
Federal Community Defender
Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West, The Curtis Center
Philadelphia, PA 19106
Counsel for Petitioner
Alfred Bourgeois

Dated:      Philadelphia, PA
            November 15, 2010

---

[13]The Proposed Amendment is attached here as an Exhibit.

24

USCA5 4746

## Certificate of Service

I, Michael Wiseman, hereby certify that on this 15th day of November, 2010 I served the foregoing on the following person by ECF Filing:

Tony Roberts
Mark Dowd
Patti Booth
Elsa Salinas-Patterson

/s/ Michael Wiseman

_____
Michael Wiseman

USCA5 4747

Uncontrolled Copy - Prepared for distribution 11/10/2010wy

| | **Standard Operating Procedures** | *DRN: DNA-04-09* |
|---|---|---|
| | *DNA* | *Version: 01* |
| | *Subject: P30 Identification* | *Page 1 of 3* |

# P30 IDENTIFICATION

## 1    Scope

The cells that line the ducts of the prostate make a protein known as p30 or prostate-specific antigen (PSA).  The protein is secreted into seminal fluid to a concentration of approximately 0.24-5.5 mg/mL.  p30 has been detected in non-prostatic sources such as normal and abnormal breast tissue, various breast fluids (milk, nipple aspirate, cyst fluid), amniotic fluid, and female serum.

p30 is considered to be a presumptive test for semen. The presence of p30 indicates, but does not confirm the presence of semen. Semen can only be confirmed by the presence of spermatozoa.

The ABAcard p30 test is a qualitative detection method specifically designed for forensic presumptive identification of semen.  Sample is added to a sample well where any detectable p30 present in the sample will bind with mobile p30 antibody.  The resultant mobile antigen-antibody complex migrates through an absorbent strip to an area where immobile p30 antibody is bound.  The mobile antigen-antibody complex binds to the immobile antibody creating an antibody-antigen-antibody sandwich.  When the p30 concentration in the sample exceeds 4 ng/mL, pink dye particles become visible in the area of immobilized antibody.  The resultant pink band indicates a positive result.

## 2    Safety

Body fluids and extracts may contain infective agents. Use universal precautions during evidence handling. Appropriate personal protective equipment must be worn during use. Clothing may protect unbroken skin; broken skin must be covered.

## 3    Related Documents

DNA-03-02 Physical Evidence Examination

DNA-04-07 Body Fluid Stain Extraction

LAB-DNA-01/LAB-DNA-02 Biological Screening Worksheet

LAB-DNA-05 p30\HemaTrace Testing Worksheet

LAB-DNA-10 ABAcard Reagent Quality Control Form

## 4    Equipment, Materials, and Reagents

*OneStep* ABAcard p30 test strips

dlH$_2$O

timer

## 5    Standards and Controls

The lot of ABAcard test devices must be quality control tested using a known semen sample and reagent blank (dlH$_2$O) prior to the first use of the lot.  An aliquot of the dlH$_2$O used to quality control test the kit must be retained in the kit for use as extraction solution.

---

Uncontrolled Printed Copy

USCA5 4748

| | | |
|---|---|---|
| | **Standard Operating Procedures** | *DRN: DNA-04-09* |
| | *DNA* | *Version: 01* |
| | *Subject: P30 Identification* | *Page 2 of 3* |

Uncontrolled Copy - Prepared for distribution 11/10/2010wy

The examiner may choose to also run a substrate control extracted in the same manner as the suspected semen stain.

Each individual test card contains a control line "C". If the control line "C" does not appear, the test is invalid.

## 6      Procedure

1.      Allow the sample(s) and control(s) to warm to room temperature if they have been refrigerated.

2.      For each sample and control:

   *a)      Perform DNA-04-07 Body Fluid Stain Extraction procedure.*

   *b)      Unwrap an ABAcard device and dropper.*

   *c)      Add 200 µL (8 drops with provided dropper) of sample to the sample well "S" of the device.*

   *d)      Positive results may be called at any time within 10 minutes. Negative results may not be called without waiting a full 10 minutes.*

3.      Samples that produce a negative result but that show strong positive acid phosphatase activity must be diluted 1:100 and re-tested.

## 7      Interpretation

The appearance of a pink line at the "C" (control) area is expected for all tests and must be present. Absence of the "C" line is an inconclusive result. The appearance of a pink line at the "T" (test) area is a positive result and indicates, but does not confirm the presence of semen. The p30 concentration in the applied solution is at least 4 ng/mL, equivalent to approximately a 1:1,000,000 dilution of semen. The absence of a pink line at the "T" area after 10 minutes is a negative result and indicates that semen is absent, below the detection threshold, or above the high dose threshold.

## 8      Records

The lot of ABAcard test devices and the quality control test results shall be recorded on the ABAcard Reagent Quality Control Form.

Evidence and test observations shall be recorded on the p30/HemaTrace Testing Worksheet, Biological Screening Worksheet, and as necessary, in data notes.

A photocopy or photograph of the test card device at the final reading may be prepared.

## 9      Literature and Supporting Documentation

Gaensslen RE. Sourcebook in Forensic Serology, Immunology, and Biochemistry. US Department of Justice, National Institute of Justice. 1983. Sections 10 and14.

Baechtel SF. Chapter 7. The identification and individualization of semen stains. Richard Saferstein, ed. Forensic Science Handbook, Volume 2. Prentice-hall, Inc. Englewood Cliffs, New Jersey. 1988. pp. 364-366.

USCA5 4749

**Standard Operating Procedures**
DNA
Subject: P30 Identification

DRN: DNA-04-09
Version: 01
Page 3 of 3

Abacus Diagnostics. OneStep ABAcard p30 test for the forensic identification of semen. Product insert. 1999.

Benton KA, Donahue JA, and Valadez M, Jr. Analysis of the ABAcard OneStep PSA test for use in the forensic laboratory. Texas Department of Public Safety Crime Laboratory Service. 1998. Unpublished.

Ulutin HC and Pak Y Prostate specific antigen in the female body: Its role in breast cancer prognosis. Radiation Medicine. 2000. 18(5), pp. 273-276.

Yu H. Clinical implications of prostate-specific antigen in men and women. J Gender-Specific Medicine. 2000. 3(2), pp. 45-48, 53.

Diamandis EP and Yu H. Nonprostatic sources of prostate-specific antigen. Urological Clinics of North America. 1997. 24(2), pp. 275-282.

Uncontrolled Copy - Prepared for distribution 11/10/2010wy

USCA5 4750

| METHODS MANUAL | Document No.<br>MM II-G | Revision No.:<br>2 | Effective Date:<br>02/07/05 | Page<br>1 of 3 |
|---|---|---|---|---|

# SERATEC® CARD PROTOCOL

## 1 PURPOSE

The identification of seminal fluid (prostate specific antigen) in a stain extract using an immuno-assay technique.

## 2 METHOD

### 2.1 Introduction

Prostate specific antigen (PSA) or p30 is a glycoprotein found in human seminal fluid. This protein is formed in the prostate and secreted into seminal fluid, although it has been reportedly found in elevated amounts in serum of some men, possibly as an indication of prostatic cancer (Hochmeister, *et al*, 1999), in breast milk of lactating women (Yu and Diamandis, 1995) and as well in the amniotic fluids of women (Yu and Diamandis, 1995. There is no correlation apparent between number of sperm and the level of PSA found in seminal fluid, therefore PSA can be detected in semen of a male with a low sperm count (oligospermatic), an azoospermatic male (no mature sperm in semen) or a male who has had a vasectomy.

The detection of PSA in semen can be done through various immunological based tests including crossover and rocket electrophoresis. The Seratec® PSA Test for the forensic identification of semen by Seratec Diagnostica® is a membrane immuno-assay that qualitatively detects PSA in semen. The principle of the test is the PSA will interact with a red colored gold labeled monoclonal anti-PSA-antibody (epitope 1) to form a mobile antigen antibody complex. The complex migrates down the membrane via capillary action and is captured by a second immobile monoclonal mouse anti-PSA-antibody (epitope 2). If there is sufficient PSA (> 2 ng PSA/ ml) in the test sample, then a red line forms where the immobile anti-PSA antibody is located ("T" area).

An internal control (an immobile polyclonal anti-mouse-antibody) detects the presence of unbound antibody-dye conjugates which form a red line in the control ("C") area. An internal standard, also a polyclonal anti-mouse antibody, has an adjusted level of antibody which shows the color intensity of a result equivalent to 4 ng PSA/ml. The presence of these two lines is independent of the presence of PSA in the test sample.

A positive test is indicated by the presence of three pink lines (at the test, the internal standard, and the control areas). A negative result is indicated by the presence two pink lines at the internal standard and the control areas. An inconclusive result is obtained if there is no line formed in the control area. The test is time sensitive and the results should be read within 10 minutes.

USCA5 4751

| Document No.<br>MM II-G | Rev No.:<br>2 | Title:<br>Seratec® Card Protocol | Page 2 of 3 |
|---|---|---|---|

## 2.2 Procedure

Prepare stain extract as previously described in the SERI Methods Manual Section VII-C.

Add 125 µl of the extract to the test well of the Seratec® card. The test sample should be prepared according to results obtained with the acid phosphatase test.  If the acid phosphatase results are strong, the test sample should be diluted prior to being added  to the test well, but if the acid phosphatase results are weak or negative, the extract should be added directly to the test well.

Read the test results within 10 minutes. A positive result maybe seen immediately.

## 3  REAGENTS/ MATERIALS

Phosphate Buffered Saline (PBS), pH 7.4

Seratec® card

## 4  NOTES

### 4.1  Interpretation of Results



**Test Device**

Result Window — C — T — Test Well

Line 3   Line 2   Line 1   Test Well

Positive:  Line 1 (result), Line 2 (internal standard),  and line 3 (control) are present.

Negative: Line 1 (result) does not appear, but Line 2 and Line 3 (control) is present.

Note:
Some negative results may be caused by:     1) prozone (see section 4.3)
                                            2) too highly diluted sample

Invalid: If line 3 (control) does not show up, the test is invalid and should be repeated.

USCA5 4752

| Document No. | Rev No.: | Title: | | Page 3 of 3 |
|---|---|---|---|---|
| MM II-G | 2 | Seratec® Card Protocol | | |

-c- Inconclusive: Due to the increase in sensitivity using the Seratec® seminal fluid (PSA) test, the analyst is advised to have a second positive test result before confirming seminal fluid is present in a stain extract (e.g., positive AP test, spermatozoa observed in the pellet, or a male profile present in the sperm DNA fraction). If the only positive test result obtained from the stain extract is the Seratec® PSA card, the conclusion for this situation would be "seminal fluid could not be confirmed".

## 4.2 Detection Limits

Lower: 2 ng PSA / ml (approximately 1/ 1 000 000 dilution of 3000 µg/ml of PSA*)

Upper: 500 µg PSA / ml

* 3000 µg /ml is used at SERI based on the philosophy that at least 97% of known neat semen samples fall below 3000 µg/ml and stains will also experience some loss due to drying and degradation.

## 4.3 Prozone (High Dose Hook Effect)

If the concentration of PSA is too high (> 500 ng PSA/ml), a false negative result may occur. If the sample has a very high amount of PSA, the PSA will not only bind to the mobile mouse anti-PSA antibody but it will also migrate down to the test area and bind with the immobile anti-PSA antibody. The bound PSA prevents the immobile antibody from capturing the labeled antibody-antigen complex. The result obtained appears as a negative result.

## 5 REFERENCES

Seratec® PSA Semiquant information insert. Seratec Diagnostica®.

Hochmeister, M. N., Budowle, B., Rudin, O., Gehrig, C., Borer, U., Thali, M., and Dirnhofer, R. "Evaluation of Prostate Specific Antigen (PSA) Membrane Test Assays for the Forensic Identification of Seminal Fluid." *J. Forensic Sci.* 1999: 44:1057-1060.

Yu H., Diamandis, E.P. "Prostate-Specific Antigen in Milk of Lactating Women." *Clin. Chem.* 1995: 41(1): 54-58.

Yu H., Diamandis, E.P. "Prostate-Specific Antigen Immunoreactivity in Amniotic Fluid." *Clin. Chem.* 1995: 41(2): 204-210.

| Supercedes Doc No.: | Rev No.: | Written by: | Revised by: | Approved by: | Date Approved: |
|---|---|---|---|---|---|
| MM II-G | 1 | Janet Hanniman | Gary Harmor | Brian Wraxall | 02/07/05 |

USCA5 4753

California Department of Justice
Bureau of Forensic Services

| Document number: TP-2 | Biology | |
|---|---|---|
| Issued by: Bureau Chief | Technical Procedures | Page 1 of 144 |

## Biology Technical Procedures

## Table of Contents

Introduction .......................................................................................................................... 5
Section 0.1 General Evidence Examination Techniques ....................................................... 7
Section 1 - Safety ................................................................................................................ 10
  Overview ........................................................................................................................... 10
  Scope ................................................................................................................................. 10
  Section 1.1 Introduction .................................................................................................... 10
  Section 1.2 Materials and Equipment ............................................................................... 11
  Section 1.3 Procedures ...................................................................................................... 11
  Section 1.4 References ....................................................................................................... 13
Section 2 – Quality Control ................................................................................................ 14
  Definitions ......................................................................................................................... 14
  Scope ................................................................................................................................. 14
  Section 2.1 Introduction/Scope ......................................................................................... 16
  Section 2.2 Instrument/Equipment Checks ........................................................................ 16
  Section 2.3 AntiSera and Critical Reagent Checks ........................................................... 18
  Section 2.4 Reference Collections ..................................................................................... 20
Section 3 - Blood ................................................................................................................ 21
  Overview ........................................................................................................................... 21
  Case Approach ................................................................................................................... 21
Section 3.1 Presumptive Blood Tests ................................................................................. 24
  Section 3.1.1 Scope/Introduction ...................................................................................... 24
  Section 3.1.2 Hemastix Test .............................................................................................. 24
  Section 3.1.3 Phenolphthalein, Leucomalachite Green, and o-Tolidine Tests ................ 25
  Section 3.1.4 Interpretation/Reporting .............................................................................. 27
  Section 3.1.5 References .................................................................................................... 28
  Section 3.1.6 Appendix ...................................................................................................... 29
Section 3.2 Species Determination ..................................................................................... 32
  Section 3.2.1 Scope/Introduction ...................................................................................... 32
  Section 3.2.2 Materials, Reagents, and Equipment .......................................................... 32
  Section 3.2.3 Procedures .................................................................................................... 33
  Section 3.2.4 Interpretation/Reporting .............................................................................. 35
  Section 3.2.5 References .................................................................................................... 36
Section 3.3 Immunoassay Test for Human Blood ............................................................... 37
  Section 3.3.1 Scope/Introduction ...................................................................................... 37
  Section 3.3.2 Materials, Reagents, and Equipment .......................................................... 37
  Section 3.3.3 Procedures .................................................................................................... 37
  Section 3.3.4 Interpretation/Reporting .............................................................................. 38
  Section 3.3.5 References .................................................................................................... 39
Section 3.4 Latent Blood Detection .................................................................................... 41
  Section 3.4.1 Scope/Introduction ...................................................................................... 41

USCA5 4754

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology** | |
|---|---|---|
| Issued by: Bureau Chief | **Technical Procedures** | Page 2 of 144 |

Section 3.4.2 Materials, Reagents, and Equipment .................................................... 42
Section 3.4.2.1 Leuco Crystal Violet Materials and Reagents ................................. 42
Section 3.4.2.2 Fluorescin Materials and Reagents ................................................. 43
Section 3.4.2.3 Luminol Materials and Reagents ..................................................... 44
Section 3.4.3 Safety ................................................................................................... 45
Section 3.4.4 Procedures ........................................................................................... 45
Section 3.4.5 Photo documentation ........................................................................... 46
Section 3.4.6 Interpretation/Reporting ...................................................................... 47
Section 3.4.7 References ............................................................................................ 47
Section 4 - Semen ........................................................................................................... 49
Overview ..................................................................................................................... 49
Case Approach ............................................................................................................ 49
Section 4.1 Acid Phosphatase ........................................................................................ 52
Section 4.1.1 Scope/Introduction .............................................................................. 52
Section 4.1.2 Materials, Reagents, and Equipment ................................................... 52
Section 4.1.2.1 alpha-Napthyl Acid Phosphate Materials and Reagents ................. 53
Section 4.1.2.2 p-Nitrophenyl Phosphate Materials and Reagents .......................... 54
Section 4.1.2.3 Thymolphthalein Monophosphate (TPMP) Materials and Reagents ...... 55
Section 4.1.3 Procedures ............................................................................................ 55
Section 4.1.4 Interpretation/Reporting ...................................................................... 57
Section 4.1.5 References ............................................................................................ 58
Section 4.2 p30 Determination ....................................................................................... 60
Section 4.2.1 Scope/Introduction .............................................................................. 60
Section 4.2.2 Materials, Reagents, and Equipment ................................................... 60
Section 4.2.3 Procedures ............................................................................................ 63
Section 4.2.4 Interpretation/Reporting ...................................................................... 65
Section 4.2.5 References ............................................................................................ 67
Section 4.3 p30 Immunoassay Tests ............................................................................... 69
Section 4.3.1 Scope/Introduction .............................................................................. 69
Section 4.3.2 Materials, Reagents, and Equipment ................................................... 69
Section 4.3.3 Procedures ............................................................................................ 69
Section 4.3.4 Interpretation/Reporting ...................................................................... 71
Section 4.3.5 References ............................................................................................ 73
Section 4.4 Sperm Extraction and Staining for Microscopic Exam ............................... 74
Section 4.4.1 Scope/Introduction .............................................................................. 74
Section 4.4.2 Materials, Reagents, and Equipment ................................................... 74
Section 4.4.2.1 Dye Preparation ............................................................................... 75
Section 4.4.2.2 Epithelial Digest Solutions .............................................................. 76
Section 4.4.3 Sample Extraction ................................................................................ 77
Section 4.4.4 Slide Preparation ................................................................................. 78
Section 4.4.5 Slide Staining ...................................................................................... 78
Section 4.4.6 Microscopic Examination .................................................................... 79
Section 4.4.7 Interpretation ....................................................................................... 81
Section 4.4.8 References ............................................................................................ 81
Section 4.5 SPERM HY-LITER for Identification of Human Spermatozoa .................. 83
Section 4.5.1 Scope/Introduction .............................................................................. 83

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4755

California Department of Justice
Bureau of Forensic Services

| Document number: TP-2 | Biology | |
|---|---|---|
| Issued by: Bureau Chief | Technical Procedures | Page 3 of 144 |

Section 4.5.2 Materials, Reagents, and Equipment ........................................................... 84
Section 4.5.2.1 Reagent Preparation ................................................................................... 84
Section 4.5.3 Sample Extraction ......................................................................................... 85
Section 4.5.4 Slide Preparation ........................................................................................... 86
Section 4.5.5 Microscopic Examination ............................................................................. 87
Section 4.5.6 Interpretation ................................................................................................. 89
Section 4.5.7 References ...................................................................................................... 89
Section 5 - Saliva .................................................................................................................... 90
Overview .............................................................................................................................. 90
Case Approach ..................................................................................................................... 90
Section 5.1 Amylase Radial Diffusion .................................................................................... 92
Section 5.1.1 – Scope/Introduction ..................................................................................... 92
Section 5.1.2 – Materials, Reagents, and Equipment ......................................................... 92
Section 5.1.2.1 Reagent Preparation ................................................................................... 93
Section 5.1.3 Procedure ....................................................................................................... 95
Section 5.1.4 Interpretation/Reporting ................................................................................ 96
Section 5.1.5 References ...................................................................................................... 98
Section 6 - Urine ..................................................................................................................... 99
Overview .............................................................................................................................. 99
Case Approach ..................................................................................................................... 99
Section 6.1 Urine Tests .......................................................................................................... 100
Section 6.1.1 Scope/Introduction ........................................................................................ 100
Section 6.1.2 Stain Localization .......................................................................................... 100
Section 6.1.3 DMAC Test for Urea ..................................................................................... 101
Section 6.1.4 Urease Test for Urea ...................................................................................... 102
Section 6.1.5 BUN Test for Urea ......................................................................................... 103
Section 6.1.6 Creatinine Test (Jaffe Reaction) ................................................................... 105
Section 6.1.7 Interpretation/Reporting ................................................................................ 108
Section 6.1.8 References ...................................................................................................... 109
Section 7 – Fecal Material ...................................................................................................... 110
Overview .............................................................................................................................. 110
Case Approach ..................................................................................................................... 110
Section 7.1 Fecal Material Tests ............................................................................................. 111
Section 7.1.1 Scope/Introduction ........................................................................................ 111
Section 7.1.2 Macroscopic Examination – Physical Properties ......................................... 111
Section 7.1.3 Microscopic Examination (Optional) ........................................................... 111
Section 7.1.4 Urobilin Test for Feces .................................................................................. 112
Section 7.1.5 Interpretation/Reporting ................................................................................ 113
Section 7.1.6 References ...................................................................................................... 114
Section 8 – Protein Staining .................................................................................................... 115
Overview .............................................................................................................................. 115
Section 8.1 Protein Staining Procedures ................................................................................ 116
Section 8.1.1 Scope/Introduction ........................................................................................ 116
Section 8.1.2 Materials, Reagents, and Equipment ............................................................. 116
Section 8.1.2.1 Coomassie Blue Materials and Reagents ................................................... 116
Section 8.1.2.2 Amido Black Materials and Reagents ........................................................ 117

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4756

California Department of Justice
Bureau of Forensic Services

| Document number: TP-2 | Biology | |
|---|---|---|
| Issued by: Bureau Chief | Technical Procedures | Page 4 of 144 |

Section 8.1.2.3 Silver Stain Materials and Reagents ........................................................ 118
Section 8.1.3 Procedures ................................................................................................ 119
Section 8.1.4 Interpretation ........................................................................................... 121
Section 8.1.5 References ................................................................................................ 121
Section 9 – Vaginal Material ............................................................................................. 123
Overview ....................................................................................................................... 123
Case Approach ............................................................................................................... 123
Section 9.1 Lugol's Test ..................................................................................................... 124
Section 9.1.1 Scope/Introduction ................................................................................... 124
Section 9.1.2 Materials, Reagents, and Equipment ......................................................... 124
Section 9.1.3 Procedure ................................................................................................. 125
Section 9.1.4 Interpretation/Reporting ........................................................................... 125
Section 9.1.5 References ................................................................................................ 127
Section 10 Validation ........................................................................................................ 128
Section 10.1 Validation of the SPERM HY-LITER for Identification of Human Spermatozoa ............... 129
10.1.1 Scope/Introduction ............................................................................................. 129
10.1.2 Sensitivity .......................................................................................................... 130
10.1.3 Specificity ......................................................................................................... 130
Section 11 - Abbreviations ................................................................................................ 131
Section 12 Manual History ................................................................................................ 142

USCA5 4757

California Department of Justice
Bureau of Forensic Services

| Document number: TP-2 | Biology | Section 4: Semen |
|---|---|---|
| Issued by: Bureau Chief | Technical Procedures | Page 49 of 144 |

## Section 4 - Semen

## Overview

**Introduction**    The identification of semen or its components can be a significant finding in a forensic examination. This part of the Biology Technical Procedure Manual contains information regarding the identification of these biological materials.

## Case Approach

**Definition**    Semen consists of spermatozoa and seminal fluid. Seminal fluid includes components such as acid phosphatase and p30, among many other components. Forensic examiners test for spermatozoa, acid phosphatase, and/or p30 to identify or indicate the presence of semen or seminal fluid.

**Technical procedures**    Technical procedures relevant to the identification of semen are contained in the accompanying sections of this manual:

| Section | Topic |
|---|---|
| 4.1 | Acid Phosphatase |
| 4.2 | p30 Determination |
| 4.3 | p30 Immunoassay Test |
| 4.4 | Sperm Extraction |

**Locating semen**    Most of the semen encountered in forensic situations are dried stains or swabs from sexual assault exams. In general, if the evidence item is not a swab, the examination begins by locating a possible semen stain. Consider the following when examining items for semen stains:

A semen stain may be observed as a crusty yellow to white stain, but this will vary depending on the age of the stain and the substrate.

Semen may also be mixed with other body fluids such as saliva and blood, which may alter its physical appearance.

Semen stains may or may not fluoresce with the use of an alternate light source (ALS) and therefore the use of an ALS can aid in locating a potential semen stain.

Some semen stains are not visible without the use of an ALS.

Tactile examination, stereomicroscopy, and chemical mapping can aid in locating stains.

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4758

California Department of Justice
Bureau of Forensic Services

| Document number: TP-2 | **Biology** | Section 4: Semen |
|---|---|---|
| Issued by: Bureau Chief | **Technical Procedures** | Page 50 of 144 |

| | |
|---|---|
| **Once a potential semen stain is located** | Document the location of the stain on the item using photographs, notes, and/or drawings The stain or swab is then examined for acid phosphatase, spermatozoa, and/or p30. It is the responsibility of the analyst to determine the appropriate tests given the evidence type and case history. It is important to minimize contamination and ensure that sufficient sample is preserved for possible DNA analysis. |
| **Minimum analysis guidelines** | Information about the case should be reviewed to determine what items should be examined. Items chosen for analysis should follow the guidelines below. Items other than swabs should be examined visually, tactilely, and using an alternate light source when possible. All items to be tested for semen, including swabs, should be screened with AP reagents. Overlays or general swabbing may be performed on large items for AP testing. Where appropriate, (positive AP stains, stains that the analyst feels could be a semen stain) slides should be made to look for the presence of spermatozoa. In the case of intimate samples, such as vaginal swabs and underwear, if the AP test is negative and the microscopic examination does not show the presence of spermatozoa, then a p30 test must be run. The analyst may choose to run p30 on other items as well, as appropriate for the case If sperm are found, no further examination is required, but may sometimes be appropriate. |

USCA5 4759

California Department of Justice
Bureau of Forensic Services

| Document number: TP-2 | Biology | Section 4: Semen |
|---|---|---|
| Issued by: Bureau Chief | Technical Procedures | Page 51 of 144 |

**Possible conclusions**   The following table shows examples of what conclusions may be made based upon certain analysis schemes.

| Tests Conducted | Acid Phosphatase (this test is not required if sperm is found) | Microscopy for Sperm | p30 (Rocket or Crossover) | p30 (one step immunoassay card) | Conclusion |
|---|---|---|---|---|---|
| Results | Negative | | | | Negative presumptive test for seminal fluid |
| Results | Negative | Negative | | | Negative presumptive test for seminal fluid, no sperm observed |
| Results | Negative | Positive | | | Sperm Observed |
| Results | Negative | Positive | Positive | or Positive | Semen detected |
| Results | Positive | Negative | Negative | or Negative | AP detected, seminal fluid not confirmed |
| Results | Positive | Positive | | | Semen detected |
| Results | Positive | Negative | Positive | | Seminal fluid detected |
| Results | Positive | Negative | | Positive | Seminal fluid detected |
| Results | Negative | Negative | Positive | | Seminal fluid detected* |
| Results | Negative | Negative | | Positive | p30 detected** |
| Results | Negative | Negative | Negative | or Negative | No semen detected |

*For p30 rocket or crossover, a positive result alone (without sperm or AP results) will allow you to make the statement of "seminal fluid detected."

**For p30 immunoassay cards, a positive result alone (without sperm or AP results) will allow you to make the statement of "p30 was detected." However, your report should include a statement that explains that other body fluids may react with these test cards. The immunoassay cards are very sensitive and can detect p30 at the very low levels that may be present in body fluids other than seminal fluid.

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4760

California Department of Justice
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology** | Section 4.1: Acid Phosphatase |
|---|---|---|
| Issued by: Bureau Chief | **Technical Procedures** | Page 52 of 144 |

## Section 4.1 Acid Phosphatase

## Section 4.1.1 Scope/Introduction

**Introduction**   Any one of these three different tests may be utilized to examine materials for the presence of acid phosphatase (AP), an enzyme found in seminal fluid.

> The procedure is similar for each test.
> Acid phosphatase catalyzes the hydrolysis of the ester-linked phosphate group in the chemical.
> The result is a change in color.

The table below contains the chemicals (test names), the hydrolysis product, and the resulting color.

| Test Name | Product & Color |
|---|---|
| -naphthyl acid phosphate | -naphthol which complexes with the diazo dye (GBC or NDR) is **purple** (GBC) **or brick red** (NDR) |
| p-nitrophenol phosphate | p-nitrophenol, which in the presence of base, is **bright yellow** |
| thymolphthalein monophosphate | thymolphthalein, which in the presence of base, is **blue** |

**Reagent checks and documentation**   Reagents are checked each day that they are used. Observations (i.e., color changes) and test results (i.e., positive, negative, or inconclusive) must be recorded in your case notes, along with the lot number of reagents and reference collection materials used. Include a statement that the reagents functioned as expected and are suitable for use.

## Section 4.1.2 Materials, Reagents, and Equipment

**Materials and reagents**   The materials and reagents needed for each of the following tests are listed separately in the following sections:

| Test | Section |
|---|---|
| -naphthyl acid phosphate | 4.1.2.1 |
| p-nitrophenol phosphate | 4.1.2.2 |
| thymolphthalein monophosphate | 4.1.2.3 |

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4761

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology** | Section 4.1: Acid Phosphatase |
|---|---|---|
| Issued by: Bureau Chief | **Technical Procedures** | Page 53 of 144 |

| | |
|---|---|
| **Equipment** | Each test uses the following equipment:<br> pH meter<br> Filter paper (e.g., 1MM-3MM Whatman)<br> Swabs<br> Spot plates or equivalent<br> Pipettes |

## Section 4.1.2.1 alpha-Napthyl Acid Phosphate Materials and Reagents

| | |
|---|---|
| **Materials and reagents** | Citric acid, anhydrous<br>  -Naphthyl acid phosphate<br> Sodium hydroxide (NaOH)<br> Fast Garnet GBC salt (GBC) or Naphthanil Diazo Red AL (NDR)<br> Purified water |
| **Reagent preparation - buffer** | <u>Citric Acid Buffer</u><br> Dissolve and mix:<br>  18.9 g citric acid, anhydrous<br>  In 900 mL purified water<br> Adjust pH to 4.9 with NaOH and then adjust volume to 1 L |
| **Reagents for one-step method** | Prepare the buffer<br>                    -naphthyl phosphate, GBC salt, or NDR and buffer in a 1:1:1 ratio (e.g., 10 mg/10 mg/ 10 mL for a purchased GBC concentration of 70%. This ration can be adjusted based upon the concentration of the purchased GBC). |

| | |
|---|---|
| **Reagents for two-step method** | Follow the steps below to prepare reagents for the two-step method: |

| Step | Action |
|---|---|
| 1 | Prepare the buffer |
| 2 | Make solution #1<br>  Dissolve and mix:<br>   10 mg  -naphthyl acid phosphate<br>   In 5 mL citric acid buffer<br>  Allow to come to room temp |
| 3 | Prepare solution #2 – Chromogen<br> <u>For GBC:</u><br>  Dissolve and mix:<br>   10 mg GBC |

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4762

California Department of Justice
Bureau of Forensic Services

| Document number: TP-2 | Biology | Section 4.1: Acid Phosphatase |
|---|---|---|
| Issued by: Bureau Chief | Technical Procedures | Page 54 of 144 |

> In 5 mL citric acid buffer
> Allow to come to room temperature
>
> **Or**
>
> For NDR:
>    Dissolve and mix:
>        10 mg NDR
>        In 5 mL citric acid buffer
>    Allow to come to room temperature

# Section 4.1.2.2 p-Nitrophenyl Phosphate Materials and Reagents

**Materials and reagents**

Sodium acetate
Sodium hydroxide (NaOH)
Acetic acid
Sodium carbonate ($Na_2CO_3$)
Purified water
p-Nitrophenyl phosphate

**Reagent preparation – buffer**

Acetate Buffer
   Dissolve and mix:
      68 g sodium acetate
      25 mL acetic acid
      In 400 mL purified water
   Adjust to pH 4.8
   Add water to bring the volume up to 500 mL

**Reagents for two-step method**

Follow the steps below to prepare reagents for the two-step method:

| Step | Action |
|---|---|
| 1 | Prepare the buffer |
| 2 | Make solution #1<br>   Dissolve and mix:<br>      5 mg p-nitrophenyl phosphate<br>      In 10 mL acetate buffer |
| 3 | Prepare solution #2<br>   20-25% NaOH solution<br><br>   Or |

USCA5 4763

California Department of Justice
Bureau of Forensic Services

| Document number: TP-2 | **Biology** | Section 4.1: Acid Phosphatase |
|---|---|---|
| Issued by: Bureau Chief | **Technical Procedures** | Page 55 of 144 |

| | Or 15% Na₂CO₃ solution |
|---|---|

# Section 4.1.2.3 Thymolphthalein Monophosphate (TPMP) Materials and Reagents

**Materials and reagents**

Citric acid, anhydrous
Sodium carbonate (Na₂CO₃)
Sodium hydroxide (NaOH)
Purified water
Thymolphthalein monophosphate, disodium salt (TPMP)

**Reagent preparation - buffer**

Citric Acid Buffer
  Dissolve and mix:
    18.9 g Citric acid, anhydrous
    In 900 mL water
  Adjust pH to 4.9 with NaOH and then adjust volume to 1 L

**Reagents for two-step method**

Follow the steps below to prepare reagents for the two-step method:

| Step | Action |
|---|---|
| 1 | Prepare the buffer |
| 2 | Make solution #1 |
| |    Dissolve and mix: |
| |      20 mg TPMP |
| |      In 100 mL citric acid buffer |
| |    If necessary, filter solution #1 |
| 3 | Prepare solution #2 |
| |    20-25% NaOH solution |
| | |
| | **Or** |
| |    Dissolve and mix: |
| |      1.06 g Na₂CO₃ |
| |      0.40 g NaOH |
| |      In 80 mL purified water |
| |    Add water to bring the volume up to 100 mL |

# Section 4.1.3 Procedures

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4764

California Department of Justice
Bureau of Forensic Services

| Document number: TP-2 | Biology | Section 4.1: Acid Phosphatase |
|---|---|---|
| Issued by: Bureau Chief | Technical Procedures | Page 56 of 144 |

**Test selection and reagent check**

Decide which acid phosphatase test you will use.

Decide if the spot test procedure or the overlay procedure will be used.

Test the reagents against a semen standard and reagent blank , to demonstrate that the reagents are working properly. This must be done each day the reagents are used.

**Spot test procedure**

Follow the steps below to perform a spot test for acid phosphatase:

| Step | Action |
|---|---|
| 1 | Cut a small portion of the stain for testing, and place it in the well of a spot plate or equivalent. Test a substrate control in the same manner as the sample stain if available/appropriate. Alternatively, a stain can be swabbed and the resulting swab tested directly with the reagents. <br><br> *Note:* For example, cut 1-2 mm from a swab |
| 2 | Test the stain using one of the methods below: <br><br> **Two-Step Method** <br> *( p-nitrophenylphosphate test, thymolphthalein monophosphate test, or the - naphthyl acid phosphate test. Use corresponding solutions #1 and #2.)* <br> Add 1-2 drops of solution #1 and wait approximately 1-3 minutes. <br> Add 1-2 drops of solution #2. <br><br> **One-Step Method** <br> *( -naphthyl acid phosphate)* <br> Add 1-2 drops of the working solution. <br> Monitor and record any color changes for up to 5 minutes. |
| 3 | Watch for the rapid development of the appropriate color for each test, as this indicates the presence of acid phosphatase. There are two colors listed for -naphthyl acid phosphate because it is dependent on the dye that is used. <br><br> <table><tr><th>Test</th><th>Color Change</th></tr><tr><td>-Naphthyl acid phosphate</td><td>GBC=Purple NDR= Brick red</td></tr><tr><td>p-Nitrophenyl phosphate</td><td>Bright yellow</td></tr><tr><td>Thymolphthalein monophosphate</td><td>Blue</td></tr></table> <br> *Note:* Low levels of acid phosphatase can result in slow color changes. |
| 4 | Record the results of the test in the notes. Include the approximate time for the color reaction to occur if the color development is not immediate. |

**Overlay procedure**

Follow the steps below to prepare an overlay to test for acid phosphatase:

| Step | Action |
|---|---|
| 1 | Lay item on clean surface. Panties can be cut along the side seams to form a single layer. |

USCA5 4765

California Department of Justice
Bureau of Forensic Services

| Document number: TP-2 | Biology | Section 4.1: Acid Phosphatase |
| Issued by: Bureau Chief | Technical Procedures | Page 57 of 144 |

| 2 | Place filter paper (e.g., 1MM-3MM Whatman) large enough to cover the area of interest over the item and mark orientation guides (e.g., outline of garment) on the filter paper with water insoluble ink or pencil. |
|---|---|
| 3 | Dampen the filter paper with purified water or appropriate buffer. |
| 4 | Realign the filter paper over area of interest and cover with a protective layer.<br>To ensure good contact of filter paper with the area of interest, place weight on top of the protective layer or apply pressure.<br>Run a known semen stain concurrently.<br>Do not let the filter paper dry. |
| 5 | Remove weight and protective layer. |
| 6 | Test the overlay using one of the methods below:<br><br>**Two-Step Method**<br>*(p-nitrophenylphosphate test, thymolphthalein monophosphate test, or the -naphthyl acid phosphate test. Use corresponding solutions #1 and #2.)*<br>Apply solution #1 to the side of filter paper that was in contact with the area of interest. Wait approximately 1-3 minutes.<br>Apply solution #2.<br>Record the immediate color changes.<br><br>**One-Step Method**<br>*( -naphthyl acid phosphate)*<br>Apply the one-step reagent to the side of the filter paper that was in contact with the area of interest.<br>Monitor and record any color changes for up to 5 minutes. |
| 7 | Document the location of any color changes in case notes or photograph the overlay. The table below reflects the color changes observed with a positive acid phosphatase result for each test. There are two colors listed for -naphthyl acid phosphate because it is dependent on the dye that is used.<br><br>Test / Color Change table below |

| Test | Color Change |
|---|---|
| -Naphthyl acid phosphate | GBC=Purple NDR= Brick red |
| p-Nitrophenyl phosphate | Bright yellow |
| Thymolphthalein monophosphate | Blue |

## Section 4.1.4 Interpretation/Reporting

**Interpretational guidelines**  The rapid development of the appropriate color change, as described in the procedures above, indicates a high level of acid phosphatase. Low levels of acid phosphatase may be present when slow color changes are observed or when a pale yellow color is obtained for the p-Nitrophenol phosphate test or a pale blue color is obtained for the thymolphthalein monophosphate test.

USCA5 4766

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 598 of 2006
PageID #: 6660

| Document number: TP-2 | **Biology** | Section 4.1: Acid Phosphatase |
|---|---|---|
| Issued by: Bureau Chief | **Technical Procedures** | Page 58 of 144 |

Acid phosphatase is present in high concentration in seminal fluid. The enzyme is present at lower concentrations in other body fluids including: vaginal secretions, saliva, milk, and feces. Other sources of acid phosphatase include: plants, fungi, and bacteria. Sources other than semen generally produce weak acid phosphatase reactions.

A negative acid phosphatase reaction does not necessarily mean that semen is not present. It may be possible to get a negative acid phosphatase reaction from a stain and still find p30 and/or spermatozoa.

**Reporting guidelines**

The table below contains reporting guidelines based upon results of the acid phosphatase test:

| If the Acid Phosphatase test was… | Then the results may be reported as.. | |
|---|---|---|
| Positive | "A presumptive test for acid phosphatase, a component of seminal fluid (as well as vaginal fluid), was positive." | |
| | **If …** | **Then the report should indicate that…** |
| | further testing is not performed | "Seminal fluid was not confirmed" |
| Negative | "No acid phosphatase, a component of seminal fluid, was detected." | |
| Inconclusive* | "A presumptive test for seminal fluid was inconclusive." | |

* Inconclusive is when you cannot tell if there has been the appropriate color change due to substrate interference (e.g., bloody vaginal swab, feces, fabric dyes),

# Section 4.1.5 References

**References**

Biology methods manual. London, England: Metropolitan Police Forensic Science Laboratory, 1978.

Gaensslen RE. Sourcebook in forensic serology, immunology and biochemistry. US Government Printing Office, 1983.

Hartnett C, Tate D. p-Nitrophenyl phosphate test as a substitute for fast blue B. Tieline Spring 1981;7(1):56.

Kind SS. The acid phosphatase test. Methods of Forensic Science 1964;3:267-288.

USCA5 4767

California Department of Justice
Bureau of Forensic Services

| Document number: TP-2 | Biology | Section 4.3: p30 Immunoassay |
|---|---|---|
| Issued by: Bureau Chief | Technical Procedures | Page 69 of 144 |

## Section 4.3 p30 Immunoassay Tests

## Section 4.3.1 Scope/Introduction

**Introduction**

The one step immunoassay cards are commercially produced test cards for the rapid and qualitative detection of p30. Prostate specific antigen (PSA) or p30 is glycoprotein found in high concentrations in seminal fluid. These test cards are designed to qualitatively detect p30 utilizing an immunoassay technique in which a conjugated dye labeled antibody forms a complex with the p30 antigen.

## Section 4.3.2 Materials, Reagents, and Equipment

**Materials, reagents, and equipment**

One step p30 immunoassay test card (ABAcard® or Seratec®)
Purified water or Phosphate Buffered Saline (PBS)
Micro spin vials or equivalent
Pipette (or provided dropper)
Miscellaneous laboratory supplies

## Section 4.3.3 Procedures

**Quality check and Documentation**

Each lot of p30 immunoassay test cards will be checked prior to use in casework (see the Quality Control Procedures and logs).

Observations and test results must be recorded in your case notes, along with the lot number and expiration date of the immunoassay test card(s).

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4768

California Department of Justice
Bureau of Forensic Services

| Document number: TP-2 | Biology | Section 4.3: p30 Immunoassay |
|---|---|---|
| Issued by: Bureau Chief | Technical Procedures | Page 70 of 144 |

**Procedure**

Follow the steps below to test for the presence of p30 using an immunoassay test card:

| Step | Action |
|---|---|
| 1 | Cut an appropriate size of the questioned swab or stain and place in the bottom of a micro spin vial.<br><br>A substrate control should be analyzed in the same manner as the questioned swab or stain when available/appropriate.<br><br>A reagent blank will be run with each set of samples. **Note:** if the substrate control is negative, then it is not necessary to also run a reagent blank.<br><br>A positive control is run as a dilution series for each lot during the QC check and does not need to be repeated at the time of casework. It is the analyst's responsibility to ensure the QC check has been successfully completed prior to using the immunoassay cards on casework.<br><br>**Note:** Liquid samples should not be tested directly. The p30 test cards are only suitable for use on dried stains. |
| 2 | Extract the cutting with purified water or PBS and bring to a final volume of approximately 200-400 L. |
| 3 | Periodically agitate sample (e.g., with a toothpick). Allow sample to extract for at least 15 minutes. |
| 4 | Optional – piggyback and centrifuge. A slide can be made from the cellular pellet. |
| 5 | Pipette extract into the sample well of the immunoassay card. The amount can vary depending upon the manufacturer of the card, but the total sample volume shall be sufficient to elute through the immunoassay card. For example, if using the ABAcard® p30 test cards, add 200 µL of sample to the sample well. |

USCA5 4769

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology** | Section 4.3: p30 Immunoassay |
|---|---|---|
| Issued by: Bureau Chief | **Technical Procedures** | Page 71 of 144 |

**Example**
**ABAcard®**

Control section
Test section

Sample well



| Step | Action |
|---|---|
| 6 | Examine the test window for the presence of colored bands in the control and test sections of the window (and appearance of the internal standard line if using the Seratec® cards). Read the result within 10 minutes.<br><br>Any bands that appear later than 10 minutes are not considered valid. If a band does appear after 10 minutes, the analyst may consider repeating the test after diluting the sample, or testing another portion of the stain.<br><br>*Note:* If no test band appears and it is suspected that semen is present (i.e., a strong, fast acid phosphatase response), the extract may be too concentrated. This is known as the "high dose hook effect." If this is suspected, dilute the extract 1:10 to 1:100 and re-run the test.<br><br>*Note:* If no control band(s) appears (and if applicable, no internal standard band appears), the test is invalid and should be repeated. |
| 7 | Document (i.e., photograph, sketch, or diagram) the results in the case notes. |

## Section 4.3.4 Interpretation/Reporting

**Interpretational guidelines**

If p30 is present, a complex forms with the mobile antibody in the membrane. This antibody-antigen complex migrates through the membrane and reacts with a second fixed anti-human p30 antibody. A colored line forms when the p30-dye labeled antibody reacts with the fixed antibody.

As an internal control, a second colored line should form at the control (C) area. These are dye conjugates that cannot bind to the antibody in the test area, but are captured in the control area. Some manufacturers (i.e., Seratec®) produce a card that contains an internal standard that forms a third band.

The presence of colored lines in the control and test areas indicates a positive result. If applicable (i.e., if using a Seratec® card), a colored line must also be observed in the internal standard area for a positive result.

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4770

California Department of Justice
Bureau of Forensic Services

| Document number: TP-2 | Biology | Section 4.3: p30 Immunoassay |
|---|---|---|
| Issued by: Bureau Chief | Technical Procedures | Page 72 of 144 |

A line only in the control position (and presence of the internal standard line for the Seratec® card) indicates no p30 detected.

If no control band appears (and if applicable, no internal standard band appears), the test is invalid and should be repeated.

While more concentrated semen samples will generally produce test results in a shorter period of time, no interpretation regarding the intensity of either the test or the control band(s) should be made.

**ABAcard® p30 Test summary:**

| Control (C) | Test (T) | Result (p30) |
|---|---|---|
| (+) colored line present | (+) colored line present | positive |
| (+) colored line present | (-) colored line absent | negative |
| (-) colored line absent | (+/-) colored line present or absent | invalid |

**Seratec® p30 Test summary:**

| Control (C) | Test (T) | Internal Standard | Result (p30) |
|---|---|---|---|
| (+) colored line present | (+) colored line present | (+) colored line present | positive |
| (+) colored line present | (-) colored line absent | (+) colored line present | negative |
| or (-) colored line absent | (+/-) colored line present or absent | or (-) colored line absent | invalid |

**Reporting guidelines**

The following are examples of wording than can be used in the report.

| If ... | Then the results may be reported as... |
|---|---|
| the p30 test card is positive | "p30, a protein found in seminal fluid, was detected." |
| the p30 test card is positive and, a positive acid phosphatase result was obtained | "Seminal fluid was detected." |
| the p30 test card is negative | "No p30, a protein found in seminal fluid, was detected." |
| no control band(s) appears (and if applicable, no internal standard band appears), the test is invalid and should be repeated. If the test is not repeated or if the same results are obtained with additional testing, then the report may read: | "No results were obtained." |

USCA5 4771

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | Biology | Section 4.3: p30 Immunoassay |
|---|---|---|
| Issued by: Bureau Chief | Technical Procedures | Page 73 of 144 |

## Section 4.3.5 References

**References**

Benton KA, Donahue JA, Valadez M Jr. Analysis of the ABAcard OneStep PSA test for use in the forensic laboratory. Texas Department of Public Safety.

Graves HCB, Sensabaugh GF, Blake ET. Postcoital detection of a male specific semen protein. New England Journal of Medicine 1985:312-338.

Hochmeister M., et al. Evaluation of prostate-specific antigen (PSA) membrane test assays for the forensic identification of seminal fluid. Journal of Forensic Science 1999;44:1057-1060.

Identification of Semen using Anti-p30. SERI Product Information Brochure.

LAPD SID Serology Unit SOP #SERO-S&S-04B, revision date 10/01/99, pp.7.

OneStep ABAcard p30 test technical information sheet, Abacus Diagnostics, 1998.

Poyntz FM, Martin PD. Comparison of p30 and acid phosphatase levels in post-coital vaginal swabs from donor and casework studies. Forensic Science International 1984;24(1):17-25.

Rawlinson L, Wraxall B. Semen quantitation utilizing p30 antigen. Interamerican Congress of Forensic Sciences November 1982.

Sensabaugh G. Isolation and characterization of a semen specific protein from human seminal plasma. A potential new marker for semen identification. Journal of Forensic Science 1978;23(1).

Simich JP, et al. Validation of the use of a commercially available kit for the identification of prostate specific antigen (PSA) in semen stains. Journal of Forensic Science 1999;44(6):1229-1231.

Spear TF. Khoskebari, N. The evaluation of ABAcard p30 test for the identification of semen. CCI.

Wraxall B, Blake E. The identification of semen using anti-p30. SERI Semen Manual, 1981.

Wraxall B, DeHaan L. The use of p30 antiserum in sexual assault cases. Journal of Forensic Science Society 1984;24:343.

USCA5 4772

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | Biology Technical Procedures | Section 4.4: Sperm Extraction and Staining |
|---|---|---|
| Issued by: Bureau Chief | | Page 74 of 144 |

## Section 4.4 Sperm Extraction and Staining for Microscopic Exam

## Section 4.4.1 Scope/Introduction

**Introduction**   Spermatozoa can be removed from fabric or a swab by soaking a portion of the sample in an appropriate extracting solution, such as:
- purified water,
- diluted Woolite,
- saline, phosphate buffered saline,
- 5% ammonium hydroxide, or
- proteinase K in sodium dodecyl sulfate solution*

After a sample has been extracted, the cell pellet will be placed on a glass slide and examined microscopically for the presence of spermatozoa. Alternatively, a small portion of the sample can be teased on a slide in a small amount of liquid and examined microscopcally.

It is acceptable to microscopically examine slides using only water as a medium. However, if no intact sperm are observed, the slide must be stained and re-examined.

*Note:* Extracting with proteinase K will digest the epithelial material, leaving the sperm. Digesting the sample to remove epithelial material can speed up the analysis process however, it is only recommended when sufficient sample is available so that sufficient material is still available for DNA analysis.

**Reagent checks and documentation**   Dyes/reagents are checked when they are prepared and/or when a new lot number is purchased. They are checked using a known sperm slide using the procedure for the stain used. The results are recorded in the reagent log, along with any changes to staining times, if needed.

Observations (e.g., type and density of material present on slide) and test results (e.g., presence or absence of spermatozoa and epithelial cells) must be recorded in your case notes, along with the lot number of reagents and reference collection materials used.

## Section 4.4.2 Materials, Reagents, and Equipment

**Materials and reagents**
- Acetone
- 5% Ammonium hydroxide (NH$_4$OH)
- Alcohol

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4773

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology** **Technical Procedures** | Section 4.4: Sperm Extraction and Staining |
|---|---|---|
| Issued by: Bureau Chief | | Page 75 of 144 |

- Aluminum sulfate
- Crystal (methyl) violet
- Indigo carmine
- Iodine ($I_2$)
- Mounting media (e.g., Cytoseal)
- Nuclear fast red
- Picric acid
- Potassium iodide
- Proteinase K (pro K)
- Purified water
- Saline
- Sodium dodecyl sulfate (SDS)
- Woolite

**Equipment**

- Cover slips
- Disposable culture tubes
- Microcentrifuge tubes
- Microscope
- Microspin baskets
- Pipettes
- Slides

## Section 4.4.2.1 Dye Preparation

**Solution preparation – Christmas tree stain solutions**

Dyes may be purchased or prepared. Instructions for their preparation follow.

Nuclear Fast Red Stain
- Dissolve and mix:
  - 5 g aluminum sulfate
  - 100 mL hot purified water
- Add:
  - 0.1 g nuclear fast red
- Allow to cool, then filter

Picroindigocarmine Stain
- Purchase or prepare a saturated picric acid solution (4 g picric acid in 300 mL purified water)
- Add:
  - 1 g indigo carmine to 300 mL saturated picric acid solution.
- Filter

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4774

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology** **Technical Procedures** | Section 4.4: Sperm Extraction and Staining |
|---|---|---|
| Issued by: Bureau Chief | | Page 76 of 144 |

| | |
|---|---|
| **Solution preparation – Gram modified Christmas tree solutions** | If using the Gram Modified Christmas tree staining procedure, the following additional dye preparation follows. <br><br> 0.5% Crystal (methyl) violet in purified water <br><br> Gram's Iodine <br> • Dissolve and mix: <br>   - 1 g iodine <br>   - 2 g potassium iodide <br>   - 300 mL purified water |

## Section 4.4.2.2 Epithelial Digest Solutions

| | |
|---|---|
| **Solution preparation – epithelial digest solutions** | Stain Extraction Buffer (SEB) <br> 1.21 g Tris <br> 3.72 g EDTA <br> 5.84 g NaCl <br> 1 liter distilled water <br> pH 8.2 <br> In a beaker mix approximately 800 ml water with the measured chemicals. pH to 8.2 with NaOH. **Note:** EDTA will not go into solution without a pH change. <br><br> SEB with SDS: <br> 2% SDS in Stain Extraction Buffer (e.g., 2 g SDS/100 ml) <br> **Note:** Solution may need to be warmed for the SDS to go into solution <br><br> Pro K Solution: <br> 2% Pro K in SEB with SDS (e.g., 2 mg/100 ul) |

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4775

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | Biology Technical Procedures | Section 4.4: Sperm Extraction and Staining |
|---|---|---|
| Issued by: Bureau Chief | | Page 77 of 144 |

## Section 4.4.3 Sample Extraction

**Sample evaluation**

Evaluate the sample:

| Whenever ... | Then ... |
|---|---|
| possible | use the same cutting that was used for acid phosphatase (only if the $Na_2CO_3$/NaOH preparation is used as the second solution) and/or p30 testing. |
| the sample is limited | take precautions to ensure there is enough material for DNA analysis. |
| needed | the epithelial material in the sample may be digested to leave only the sperm. |

**Sample extraction**

Extract the sample:

| Step | Action |
|---|---|
| 1 | Place the cutting in a microcentrifuge tube. |
| 2 | Add enough extracting solution to completely cover the sample. |
| 3 | Periodically vortex and/or agitate the sample (e.g., with a clean toothpick). |
| 4 | Let the sample stand for about 30 minutes at room temperature. |
| 5 | Then, vortex and/or agitate the sample again. |
| 6 | Remove the sample from the microcentrifuge tube and, |
| 7 | Place the sample in a microspin basket (or equivalent). |
| 8 | Centrifuge. |
| 9 | Prepare the slide from the cellular pellet. |
| Note: | If an epithelial cell digest is a possibility: The extractant should be water, retain the sample cutting and prepare a slide from a portion of the cellular pellet only. |

**Epithelial material digestion**

To digest the epithelial material:

| Step | Action |
|---|---|
| 1 | Place the cutting in a microcentrifuge tube (or return the original cutting to the remainder of the original extract). |
| 2 | Add about 200 ul of SEB with SDS. |
| 3 | Add about 5 ul of the Proteinase K Solution. |
| 4 | Agitate and/or vortex the sample. |
| 5 | Incubate the sample at about 56° C for approximately 1 hour. |
| 6 | Vortex the sample again. |
| 7 | Remove the sample from the microcentrifuge tube and, |

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
**Revision 9, Issue Date 03/29/10**

USCA5 4776

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | Biology Technical Procedures | Section 4.4: Sperm Extraction and Staining |
|---|---|---|
| Issued by: Bureau Chief | | Page 78 of 144 |

| 8 | Place the sample in a microspin basket (or equivalent). |
|---|---|
| 9 | Centrifuge. |
| 10 | Remove most of supernatant without disturbing the pellet. |
| Option | The pellet may be washed 2 to 3 times with distilled water. |
| 11 | Prepare the slide from the cellular pellet. |

**Sample teasing**   Instead of extracting material in a microspin tube, the analyst may aggressively tease a portion of the sample with water directly on a microscope slide. After teasing, remove the remainder of the substrate, heat fix the slide and stain as usual.

*Note:* If no sperm are seen, consideration can be given to preparation of another slide by a different technique.

## Section 4.4.4 Slide Preparation

**Slide preparation**

| Step | Action |
|---|---|
| 1 | Prepare a slide by one of these methods:<br>• Transfer a suitable portion of the pellet to a microscope slide.<br>• Aggressively tease a portion of the sample directly onto the slide.<br>• Or use a hospital prepared slide<br><br>*Note:* the supernatant may be used for other analyses. |
| 2 | Gently heat fix the slide, or allow the slide to dry completely and fix with ethanol. |

## Section 4.4.5 Slide Staining

**Christmas tree staining**   To stain the slide using the Christmas tree stain:

| Step | Action |
|---|---|
| 1 | Cover sample area on slide with nuclear fast red stain and let it stand for a minimum of one minute. <u>Do not let sample area dry out.</u><br><br>*Note:* the timing depends upon the concentration of the stain solution. Purchased stains tend to be less concentrated than the dye preparations listed in this method. As such, they may require more time to be effective. |

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4777

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | Biology<br>Technical Procedures | Section 4.4: Sperm Extraction<br>and Staining |
|---|---|---|
| Issued by: Bureau Chief | | Page 79 of 144 |

| | |
|---|---|
| 2 | Wash away nuclear fast red stain solution with gentle stream of purified water, being careful not to dislodge pellet. |
| 3 | Cover sample area with picroindigocarmine stain for up to one minute.<br><br>*Note:* the timing depends upon the concentration of the stain solution. |
| 4 | Rinse the slide with alcohol (e.g., ethanol or reagent alcohol) and dry. |

**Gram modified Christmas tree staining** In the instances where large numbers of yeast and/or bacteria are suspected, the slide may be stained with crystal violet followed by Gram's iodine stains **prior** to Christmas tree stain:

| Step | Action |
|---|---|
| 1 | Stain with aqueous crystal violet for 1 minute. |
| 2 | Rinse with water. |
| 3 | Stain with Gram's iodine for 1 minute. |
| 4 | Rinse with acetone and allow to dry. |
| 5 | Proceed with Christmas tree stains, described above. |

## Section 4.4.6 Microscopic Examination

**Microscopic examination**

| Step | Action |
|---|---|
| 1 | Once the slides are prepared, the sample area is covered with mounting media and a cover slip. |
| 2 | Examine the slides (e.g., at 200x to 400x) for the presence of spermatozoa using light, phase contrast, or differential interference contrast (DIC) microscopy. Record the type of microscopy, the magnification, and any observations in your notes. |
| 3 | Using light microscopy of slides stained with Christmas tree stain:<br>• epithelial material will appear green, and<br>• nuclear material will appear red or pink<br><br>For example, stained spermatozoa typically appear as follows:<br><br>

| Part | Color |
|---|---|
| Posterior head | red |
| Acrosomal cap | pink |
| Mid-piece | green to blue |
| Tail | green to blue |
 |

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4778

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology** **Technical Procedures** | Section 4.4: Sperm Extraction and Staining |
|---|---|---|
| Issued by: Bureau Chief | | Page 80 of 144 |

| | *Note:* sperm heads can be identified by the characteristic pink cap and red bottom staining, as well as by size and shape. |
|---|---|

---

**Example**    Photomicrograph of epithelial cells, sperm and yeast stained with Gram modified Christmas tree stain.  Picture courtesy of Ed Jones, Ventura County Sheriff's Department



| Step | Action |
|---|---|
| 4 | Using phase contrast microscopy, the bottom (posterior) portion of the stained sperm head typically glow white and the acrosomal cap appears much darker. <br><br> Using DIC microscopy, cellular material has a three-dimensional appearance. The acrosomal cap, neck, and tail are clearly defined, as is the nucleus and cellular membrane of nucleated e-cells.  DIC is in gray-scale; no staining will be visible. |
| 5 | Using light microscopy of slides stained with Gram modified Christmas tree stain: <br> • epithelial material will appear green, <br> • nuclei inside epithelial cells appear purple, <br> • gram-positive bacteria stain deep violet <br> • gram-negative bacteria remain unstained <br> • sperm cells are as described in 2, above |

USCA5 4779

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology** **Technical Procedures** | Section 4.4: Sperm Extraction and Staining |
|---|---|---|
| Issued by: Bureau Chief | | Page 81 of 144 |

| 6 | Note the sperm density. The following notations may be used: |
|---|---|
| | <table><tr><td>**If ...**</td><td>**Then ...**</td></tr><tr><td>no sperm cells seen</td><td>Negative</td></tr><tr><td>difficult to find</td><td>1+</td></tr><tr><td>some were seen in some fields</td><td>2+</td></tr><tr><td>some or many in most fields</td><td>3+</td></tr><tr><td>many in most or all fields</td><td>4+</td></tr></table> |
| 7 | Information on whether spermatozoa with tails were observed should also be recorded in your notes. |
| 8 | The presence of significant amounts of bacteria or epithelial cells should also be recorded in notes. |

## Section 4.4.7 Interpretation

**Reporting guidelines**

| When ... | Then results may be reported as... |
|---|---|
| spermatozoa are observed | "Spermatozoa were observed." |
| no spermatozoa are observed | "No spermatozoa were observed." |
| one spermatozoon is observed | "One sperm was observed." |

| If ... | Then ... |
|---|---|
| the cell morphology is not clear, the staining is not distinct, or if debris/material on the slide obscures viewing, | an inconclusive result may be reported. |

## Section 4.4.8 References

**References**

Biology methods manual. Metropolitan Police Forensic Science Laboratory, London, England, 1978.

Boudreau AJ, Cortner GV. California Association of Criminalists Seminar, October, 1978.

Blake ET, Cook C, Bashinski J. Presented at the 67th semi-annual seminar, California Association of Criminalists, May 15-17, 1986.

Gaensslen R, Mertens J, Lee H, Stolorow M. Staining and extraction techniques, proceeding of a forensic science symposium on the analysis of sexual assault evidence. FBI Academy,

**+++ALL PRINTED COPIES ARE UNCONTROLLED+++**
**Revision 9, Issue Date 03/29/10**

USCA5 4780

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | Biology Technical Procedures | Section 4.4: Sperm Extraction and Staining |
|---|---|---|
| Issued by: Bureau Chief | | Page 82 of 144 |

1983.

Gaensslen R. Sourcebook in forensic serology, immunology, and biochemistry. U.S. Government Printing Office, 1983.

Hartnett C. Woolite safely soaks sperm cells from cloth. Tieline, Spring 1981;7(1):54.

Manual of histologic staining methods of the armed forces institute of pathology. Luna LG, editor. New York: McGraw-Hill Book Co., 1968.

Oppitz E. A new color method for proof of sperm in moral crimes. Arkiv fur Krimin 1969;144:145-148. (Translation by Stone IC, Southwestern Institute of Forensic Sciences, Criminal Investigation Lab. Updated Feb. 1975).

Stone IC. Staining of spermatozoa with kenochtrot and picroindigocarmine for microscopical identification. 1972.

Kind SS. The acid phosphatase test. In: Methods of forensic science, Curry, A. editor. London: Insterscience, 1964.

Willott GM, Allard J. Spermatozoa – their persistence after sexual intercourse. Forensic Science International 1982;19:135-154.

Chapman, RL, Brown, NM, Keating SM. The isolation of spermatozoa from sexual assault swabs using proteinase K. Journal of the Forensic Science Society 1989;29(3):207-212.

Belschner, Kay and the entire Biology TAG. Finding the Needle in the Haystack. CAC News, 2nd Qtr 2007 pp 10 – 12.

Norris, JV, Manning, K, Linke, SJ, Ferrance, JP, Landers, JP, Espedited, Chemically enhance sperm cell recovery from cotton swabs for rape kit analysis, JFS, Vol. 52, No. 4, pp 800-805 7/07.

USCA5 4781

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology** | Section 4.5 Sperm HY-LITER |
|---|---|---|
| Issued by: Bureau Chief | **Technical Procedures** | Page 83 of 144 |

## Section 4.5 SPERM HY-LITER for Identification of Human Spermatozoa

## Section 4.5.1 Scope/Introduction

**Introduction**    SPERM HY-LITER uses a reagent that fluorescently labels human sperm heads.

Samples may be extracted and air dried on a slide, or hospital prepared smear slides may be used. The slides undergo a process of fixing, preparation, blocking, and staining. The slides may then be examined with the use of a fluorescent microscope. Human spermatozoa produce a green fluorescence while other cellular material does not.

**Theory**    The following is from the Installation and Training Manual for the Sperm HY-LITER:

The SPERM HY-LITER staining kit contains two fluorescent dyes that can only be visualized using a fluorescent microscope fitted with a fluorescent light source and appropriate filters.

There are least three different fluorescent light sources that can be used on modern fluorescent microscopes, mercury burners, metal halide lamps, and LEDs. Any of these light sources are appropriate, in combination with a reflected light illuminator to visualize SPERM HY-LITER stained preparations.

Using appropriate filters (called 'cubes') installed on a fluorescent microscope, both human sperm heads and nuclei can be independently visualized. A specialized dual filter cube can also be optimized for your laboratory's particular brand of microscope such that both human sperm heads and other cell nuclei can be observed simultaneously. This additional filter cube provides a satisfying, useful, and efficient analysis of smear and extracts slides that contain large amounts of biological material and is another confirmatory step in the process of sperm identification from sexual assault evidence.

The mouse monoclonal antibody that binds specifically to human sperm heads, and thereby provides the unique specificity of SPERM HY-LITER has been chemically tagged with Alexa 488. This fluorophore has an excitation maximum of ~488-494 nm and an emission maximum of ~519-526 nm.

The fluorescent DNA stain, 4',6-diamidino-2-phenylindole (DAPI) which will stain all cell nuclei without specificity, has an excitation maximum of ~340-350 nm and an emission maximum of ~450-460 nm. This fluorophore has a particularly large quantum efficiency and will appear very bright with any of the fluorescent light sources described above. DAPI binds primarily to the minor groove in A/T rich regions of DNA.

USCA5 4782

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology** | Section 4.5 Sperm HY-LITER |
|---|---|---|
| Issued by: Bureau Chief | **Technical Procedures** | Page 84 of 144 |

| | |
|---|---|
| **Reagent checks and documentation** | Reagents are checked when a new lot number is purchased. They are checked using a slide of known sperm and epithelial cells using the procedure. The results are recorded in the reagent log. |
| | Observations (e.g., type and density of material present on slide) and test results (e.g., presence or absence of spermatozoa and epithelial cells) must be recorded in your case notes, along with the lot number of reagents and reference collection materials used. |

## Section 4.5.2 Materials, Reagents, and Equipment

| | |
|---|---|
| **Materials and reagents** | • DDT<br>• KOH or NaOH<br>• PBS<br>• SPERM HY-LITER Kit (store 2-8°C)<br>• Mounting medium |
| **Equipment** | • Microscope slides (regular or hydrophobic masked)<br>• Cover slips<br>• Hydrophobic slide pen<br>• Microcentrifuge tubes<br>• Fluorescent Microscope<br>• Microspin baskets<br>• Wash Bottle<br>• Pipettes |

## Section 4.5.2.1 Reagent Preparation

| | |
|---|---|
| **Wash Buffer** | Make a 1:10 dilution of the wash buffer from the HY-LITER kit with purified water. This may be made in quantity and placed in a wash bottle for use. The buffer is stable diluted. Store at room temperature. |
| **1M KOH or 1M NaOH** | Either 1M KOH or 1M NaOH is needed. Both do not need to be made.<br><br>For 1M KOH, dissolve 5.6 grams KOH in 100 ml purified water.<br><br>For 1M NaOH, dissolve 4.0 grams NaOH in 100 ml purified water. |

USCA5 4783

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology** | Section 4.5 Sperm HY-LITER |
|---|---|---|
| Issued by: Bureau Chief | **Technical Procedures** | Page 85 of 144 |

**DTT Solution**

Add 0.154 grams DTT to 0.7 ml purified water. Add 0.11 ml of either 1M KOH or 1M NaOH. Mix to dissolve. Aliquot into small tubes (approximately 20 ul per tube) and freeze. Frozen aliquots have a 2 year shelf life. Alternatively, purchased DTT solution of the correct concentration and pH can be used.

**Sample Preparation Solution + DTT**

This solution must be made just prior to use. The volume prepared depends on the size of the area to be stained on the slide (See section 4.5.4 for approximate amounts needed). For every drop of reagent required, mix 37 ul of Sample Preparation Solution from the HY-LITER kit (Reagent 2) with 3 ul DTT solution.

## Section 4.5.3 Sample Extraction

**Sample extraction**

Extract the sample:

| Step | Action |
|---|---|
| 1 | Place the cutting in a microcentrifuge tube. |
| 2 | Add enough extracting solution (PBS is the preferred extracting solution) to completely cover the sample. |
| 3 | Periodically vortex and/or agitate the sample (e.g., with a clean toothpick). |
| 4 | Let the sample stand for about 30 minutes at room temperature. |
| 5 | Then, vortex and/or agitate the sample again. |
| 6 | Remove the sample from the microcentrifuge tube and, |
| 7 | Place the sample in a microspin basket (or equivalent). |
| 8 | Centrifuge. |
| 9 | Prepare the slide from the cellular pellet. |

**Sample teasing**

Instead of extracting material in a microspin tube, the analyst may aggressively tease a portion of the sample with PBS directly on a microscope slide. After teasing, remove the remainder of the substrate, air dry the slide and stain as usual.

*Note:* If no sperm are seen, consideration can be given to preparation of another slide by a different technique.

**Previously Stained Slides**

Slides that have been previously stained with Christmas Tree stain may be restained with the HY-LITER kit as long as the slides were not heat fixed. Heat fixing the slide raises the background fluorescence of the slide.

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4784

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology** | Section 4.5 Sperm HY-LITER |
| Issued by: Bureau Chief | **Technical Procedures** | Page 86 of 144 |

## Section 4.5.4 Slide Preparation

**General Information**

The amount of the reagents used per slide depends on the size of the area on the slide that needs to be stained. The dropper bottles in the HY-LITER kit are designed to deliver approximately 37 ul per drop if the bottle is held vertically. Use the following guidelines to determine the amount of reagent to use:

| Approximate size of area on slide | 6 mm | 8 mm | 11 mm | Large smear |
|---|---|---|---|---|
| Number of drops of reagent | 1 | 1 | 2 | 6-12 |

**Slide preparation**

| Step | Action |
|---|---|
| 1 | Use a cleaned regular slide or a hydrophobic masked slide. Prepare the slide by one of these methods:<br><br>• Transfer a suitable portion of the pellet to a microscope slide.<br>• Aggressively tease a portion of the sample directly onto the slide.<br>• Or use a hospital prepared slide<br><br>*Note:* the supernatant may be used for other analyses. |
| 2 | Allow the slide to air dry.<br><br>*Note:* It is important not to heat fix the slide. Heat fixing the slide raises the background fluorescence of the slide. |
| 3 | Add enough Fixative Solution (Reagent 1) from the HY-LITER kit to cover the cellular material and allow to incubate at room temperature for approximately 10 minutes (9-15 minutes). |
| 4 | Quickly rinse the slide with the prepared wash buffer (1.5-2 ml). |
| 5 | Add enough Sample Preparation Solution + DTT to cover the cellular material and allow to incubate at room temperature for 30 minutes (plus or minus 5 minutes).<br><br>*Note:* Fecal materials will consume the DTT. If slides are made from fecal materials, add an additional 20 ul of the DTT solution to the slide prior to the 30 minute incubation. |

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4785

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology** | Section 4.5 Sperm HY-LITER |
|---|---|---|
| Issued by: Bureau Chief | **Technical Procedures** | Page 87 of 144 |

| 6 | Quickly rinse the slide with the prepared wash buffer (1.5-2 ml). |
|---|---|
| 7 | Add enough Blocking Solution (Reagent 3) from the HY-LITER kit to cover the cellular material and allow to incubate at room temperature for a minimum of 30 minutes. Do not allow to dry. |
| 8 | Quickly rinse the slide with the prepared wash buffer (1.5-2 ml). |
| 9 | Add enough Sperm Head Staining Solution (Reagent 4) from the HY-LITER kit to cover the cellular material and allow to incubate at room temperature for approximately 30 minutes (plus or minus 1 minute). |
| 10 | Quickly rinse the slide with the prepared wash buffer (1.5-2 ml). |

## Section 4.5.5 Microscopic Examination

Microscopic examination

| Step | Action |
|---|---|
| 1 | Once the slides are prepared, the sample area is covered with mounting media (provided in the HY-LITER kit or Cytoseal) and a cover slip. |
| 2 | Examine the slides (e.g., at 200x to 400x) for the presence of spermatozoa using phase contrast and fluorescence. Record the type of microscopy, the magnification, and any observations in your notes. |
| 3 | Using fluorescence microscopy, what is observed depends on the filter used.<br><br>DAPI filter – All cell nuclei appear blue<br>FITC filter – Only human sperm heads are observed, and appear green. Acrosomal caps are still visible.<br><br>Slides can also be examined with a combination of FITC and DAPI filters, or in combination with phase contrast. |

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4786

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology** | Section 4.5 Sperm HY-LITER |
|---|---|---|
| Issued by: Bureau Chief | **Technical Procedures** | Page 88 of 144 |

**Example**   Photomicrograph Post-Coital Sample, Smear slide *with* Sperm, FITC filter.



Dual Color Fluorescence Sperm and Epithelial Cells Simultaneously.



Both photographs courtesy of Independent Forensics DNA Testing and Technologies

USCA5 4787

**California Department of Justice**
**Bureau of Forensic Services**

| Document number: TP-2 | **Biology** | Section 4.5 Sperm HY-LITER |
|---|---|---|
| Issued by: Bureau Chief | **Technical Procedures** | Page 89 of 144 |

| 4 | Note the sperm density. The following notations may be used: |
|---|---|

| If ... | Then ... |
|---|---|
| no sperm cells seen | Negative |
| difficult to find | 1+ |
| some were seen in some fields | 2+ |
| some or many in most fields | 3+ |
| many in most or all fields | 4+ |

| 5 | Information on whether spermatozoa with tails were observed should also be recorded in your notes. |
|---|---|
| 6 | The presence of significant amounts of bacteria or epithelial cells should also be recorded in notes. |

## Section 4.5.6 Interpretation

Reporting guidelines

| When ... | Then results may be reported as... |
|---|---|
| spermatozoa are observed | "Spermatozoa were observed." |
| no spermatozoa are observed | "No spermatozoa were observed." |
| one spermatozoon is observed | "One sperm was observed." |

## Section 4.5.7 References

References

Willott GM, Allard J. Spermatozoa – their persistence after sexual intercourse. Forensic Science International 1982;19:135-154.

SPERM HY-LITER Installation and Training Manual, Independent Forensics DNA Testing and Technologies.

Mado Vandewoestyne, David Van Hoofstat, Filip Van Nieuwerburgh & Dieter Deforce Automatic detection of spermatozoa for laser capture microdissection. Int J Legal Med 2008

+++ALL PRINTED COPIES ARE UNCONTROLLED+++
Revision 9, Issue Date 03/29/10

USCA5 4788

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____    :

UNITED STATES OF AMERICA,    :      No. Cr-C-02-216

   :      No. Cv-07-223

           Respondent,    :     Honorable Janis Graham Jack,

   :         U.S.D.J.

      -against-    :

   :

ALFRED BOURGEOIS,    :      Electronically Filed

   :

      Petitioner.    :

_____    :

**PETITIONER'S PROPOSED AMENDMENT TO HIS SECTION 2255 MOTION**

1.    Petitioner files the foregoing Amendment to his already-filed Section 2255 Motion and its prior Amendments.

2.    This Amendment is a supplement to – and does not replace – the prior Section 2255 Motion.

3.    All prior allegations contained in the initial Section 2255 Motion are incorporated as if fully set forth herein.

### This Amendment Is Timely

4.    Section 2255 provides that the one year statute of limitations begins to run from "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255. Here, despite diligent efforts to uncover the existence of these documents, counsel did not

USCA5 4789

learn of the existence of the document and the exculpatory evidence contained within it until the Government's disclosure, mid-hearing, on September 23, 2010. Accordingly, the amended claim is timely under Section 2255.

### AMENDED GROUND FOR RELIEF

**THE GOVERNMENT VIOLATED PETITIONER'S RIGHT TO DUE PROCESS GUARANTEED BY THE FIFTH, SIXTH AND EIGHTH AMENDMENTS WHEN IT FAILED TO DISCLOSE P-179, WHICH CONTAINS EXCULPATORY EVIDENCE RELEVANT TO THE GUILT AND PENALTY PHASE OF TRIAL AND WHICH SUPPORTS PETITIONER'S CHALLENGE TO THE GOVERNMENT'S ASSERTION THAT SEMEN WAS PRESENT IN THE VICTIM'S RECTUM.**

5.      At trial and during these § 2255 proceedings, Mr. Bourgeois sought the timely disclosure of all exculpatory evidence pursuant to Brady v. Maryland, 373 U.S. 83 (1963).

6.      Nevertheless, it was not until the middle of the evidentiary hearing, on the evening of September 23, 2010, that the Government provided Petitioner's counsel with document P-179.

7.      P-179, entitled "P30 Test Results" indicates that on the three swabs, Q5-Q7, that were subjected to p30 testing by the FBI, the results were "very weak, very weak and weak," respectively.  Within the context of the issues before the Court these results are exculpatory and should have been disclosed.

8.      P-179's notation that the p30 test performed by the FBI lab technicians produced weak results, is critical evidence necessary to attack the Government's

USCA5 4790

assertion that Mr. Bourgeois sexually assaulted the victim.  In addition, in conjunction with the FBI's own serology protocols, P-180, demonstrate that the Government's evidence that semen was definitively detected in the rectum of JG-1999 was erroneous, and, as Petitioner has alleged in Claim IV, scientifically unsupportable.

9.      FBI Procedures for the Serological Identification of Biological Substances on Evidentiary Materials (2002), Chapter 11 states:

> Attempts to identify human semen in some categories of evidence **MUST** be approached through the identification of spermatozoa rather than by the detection of human specific proteins, such as p30.  These categories would include ... stain extracts that possess **borderline levels of p30**.

P-180.

10.     Thus, under the FBI's own protocols, P-179 reveals that the p30 results in this case cannot be considered confirmatory of the presence of semen.  The government experts were aware of the results of their own test – that the p30 results were "weak, very weak, and very weak."  Thus, they knowingly mislead the jury when they testified that the p30 results definitively identified the presence of semen in the victim's rectum.

11.     The law governing these issues is well settled.  The Due Process Clause of the Fifth Amendment to the United States Constitution requires a prosecutor to disclose favorable evidence to the accused.  Brady v. Maryland, 373 U.S. 83, 87 (1963); Giglio v. United States, 405 U.S. 150, 153-56 (1972); United States v. Bagley,

USCA5 4791

473 U.S. 667, 676 (1985); <u>Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995).  Evidence is "material" under Brady and its progeny when "[t]he favorable evidence could reasonably be taken" to put the case "in such a different light as to undermine confidence in the verdict." <u>Kyles</u>, 514 U.S. at 435.  Indeed, the purpose of the Brady doctrine is "[t]o ensure that a miscarriage of justice does not occur." <u>Bagley</u>, 473 U.S. 675.

12.   "[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959). Thus, due process is violated "where previously undisclosed evidence revealed that the prosecution introduced trial testimony that it knew or should have known was perjured." <u>Kyles v. Whitley</u>, 514 U.S. 419, 443 (1995). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." <u>Napue</u>, 360 U.S. at 269.

13.   The duty to disclose is especially important in capital cases where heightened safeguards, greater protections for the defendant and a heightened scope of judicial review are required by the United States Constitution.  <u>See</u>, <u>e.g.</u>, <u>Beck v. Alabama</u>, 447 U.S. 625 (1980); <u>Caldwell v. Mississippi</u>, 472 U.S. 320 (1985).

14.   As a result of the failure to disclose of the information in P-179, and the resultant violation of Mr. Bourgeois' rights as guaranteed by the Fifth, Sixth and Eighth Amendments, Mr. Bourgeois is entitled to a new trial and/or sentencing hearing.

USCA5 4792

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Respondent, | § | |
| | § | |
| vs. | § | CR. No. C-02-216 |
| | § | C.A. No. C-07-223 |
| ALFRED BOURGEOIS, | § | |
| Petitioner. | § | |

GOVERNMENT'S RESPONSE TO PETITIONER'S MOTION FOR
ADDITIONAL THIRTY DAYS AND OPPOSITION TO THE MOTION FOR LEAVE
OF COURT TO TAKE DEPOSITIONS OF WILLIAM MAY AND ADAM LONGORIA

TO THE HONORABLE JUDGE OF SAID COURT:

The United States of America, hereinafter "the government," by and through the United

States Attorney for the Southern District of Texas, files this Response to Petitioner's Motion for

Additional Thirty Days and Motion to Depose William May and Adam Longoria.  Additionally, the

Government herein moves for the production of evidence relevant to Dr. Jan E. Leestma's, M.D.,

M.M..

On November 15, 2010, Petitioner filed a series of motions related to the evidentiary hearing

in this case.  Those motions do not accurately reflect the government's position on the subject matter

contained within those motions.  On November 17, 2010, this Court Ordered the government to file

a response to Petitioner's motion to take depositions.  The government herein files this motion in

compliance with this Court's Order and in an effort to clarify the government's position on

Petitioner's motions.

USCA5 4793

I.

### **Petitioner's "Unopposed" Motion for Additional Thirty Days to submit Evidence in Support of Claim III**

On November 14, 2010, the Assistant Federal Public Defender submitted the following request to the government via an email:

> Judge Jack gave us additional time to get supporting documents from our expert and/or conduct a deposition in support of the claim. Unfortunately, the slides were not completed and mailed to Dr. Leetsma until October 13, 2010. Apparently, the slides were delayed because the original slides are never released and new slides have to be prepared from the original blocks.

> This process took significantly longer because Dr. Rouse is no longer at that facility and a new doctor had to prepare the slides from the original blocks. Anyway, because of the delay in getting him the slides and other commitments out of the country, Dr. Leetsma has not completed his review and I would like to ask Judge Jack for some additional time for him to do that. Would you guys be opposed to that -- I'm thinking no more than 30 days. Please let me know and I apologize for any inconvenience this may cause and certainly appreciate the consideration.

The government responded to this request stating that we do not oppose an additional 30 days. In so responding, the government interpreted the request to mean "30 additional days to review the slides." However, the motion Petitioner subsequently filed clearly requests "an additional thirty (30) days, until December 15, 2010 in which to <u>depose</u> Dr. Leestma." (*See* Document 604, page 6, paragraph 12) (emphasis added). Petitioner's motion then states that the government is not opposed to this Motion. That is not entirely correct.

The government is not opposed to Petitioner's request that Dr. Leestma have an additional thirty days to review the autopsy slides. However, the government is currently opposed to the taking of a deposition of Dr. Leestma. Importantly, Petitioner has not yet provided the government with a report by Dr. Leestma, a curriculum vitae, or Rule 26 disclosures. Until the government receives these documents, the government is in no position to evaluate the necessity of a deposition.

2

USCA5 4794

The issue in Claim III is whether the United States had jurisdiction over the murder. The Petitioner claims that the assault that killed the child did not occur on the naval station. On September 24, 2010, the last day of the evidentiary hearing, Petitioner acknowledged that this Court called this claim "absurd" during the April 20, 2010 hearing. (Evidentiary Hearing, September 24, 2010, page 238). Petitioner also reminded the Court that the Court had previously said the Petitioner could "proffer two affidavits from [a] doctor" on this issue. Petitioner was unable to produce the affidavits at the evidentiary hearing stating that there was difficultly in locating the original autopsy slides. This Court authorized a subpoena for the release of the autopsy slides to Petitioner's expert. Petitioner's counsel requested permission to file their affidavits by November 15, 2010. This Court then said that "if we're going to do that, we're going to depose them." (Evidentiary Hearing, September 24, 2010, page 240). This Court then recalled that Mr. Bourgeois' own testimony contradicted the theory in Claim III. *Id*. This Court then reiterated that it would not "let them do that without a deposition." *Id*. at page 241.

The government is presently uncertain about the need for a deposition as the Petitioner has not submitted any report or other evidence from any doctor supporting the contention that the fatal assault occurred prior to Mr. Bourgeois arriving on the naval station. Moreover, to the best of our collective recollection, the government does not recall Petitioner identifying the doctor upon whom they would rely for this opinion until the November 14, 2010 email quoted above. Thus, we have absolutely no basis to evaluate the need for a deposition at this time.

As such, we are not opposed to Petitioner's motion for an additional 30 days for the doctor to evaluate the autopsy slides. However, at this time, the government does oppose Petitioner's request to depose Dr. Jan Leestma. Until such time as the government receives the necessary

3

USCA5 4795

documents to evaluate Dr. Leestma's qualifications and conclusions, the government cannot in good faith agree to another deposition well beyond the date of the evidentiary hearing. Additionally, it might be necessary for the government to have Dr. Leestma's report reviewed by someone of similar qualifications and possibly even have that individual deposed in response to Dr. Leestma's conclusions.

The government herein requests Petitioner to provide the relevant documents to enable the government to evaluate the qualifications and conclusions of Dr. Leestma. The government also requests an opportunity to review Dr. Leestma's conclusions and opinions at least 10 days prior to any proposed deposition. Upon review of the relevant documents, it is conceivable that the government could move this Court to deny a deposition on this matter. In any event, the government has not agreed to extent the November 15, 2010 deadline for depositions at this time, particularly for an expert who has not submitted a report. We should also note that Petitioner never attempted to set a date for a deposition of Dr. Leestma prior to this Court's November 15, 2010, date for completing all deposition testimony.

II.

**Petitioner's Motion to take Depositions of William May and Adam Longoria**

On November 15, 2010, the date in which this Court required Petitioner to have all additional depositions completed for the Section 2255 motion, Petitioner filed a motion seeking leave of court to take two additional depositions. Petitioner claims that he filed *ex parte* motions on September 3, 2010, for the issuance and service of subpoenas to compel William May and Adam Longoria to be present at the September 20, 2010 evidentiary hearing. Petitioner notes that this Court granted his *ex parte* motions. Petitioner failed to present testimony from William May or Adam Longoria

4

USCA5 4796

at the evidentiary hearing.  Petitioner now seeks leave of court to depose these two individuals.  The government opposes Petitioners motion for leave of court to depose William May and Adam Longoria.

## A.    <u>Untimely Notice to the Court of Witnesses Absence</u>

Petitioner's counsel did not raise the issue of these witnesses absence until Wednesday, September 22, 2010; the final day that this Court had allotted for Petitioner to present his evidence.  On page 21 and 22 of the September 22, 2010 transcript, Mr. McHugh informed this Court that Mr. May and a couple of other witnesses "had not appeared."  This Court reminded counsel that their original deadline for presenting evidence "was over at noon today."  (Evidentiary Hearing, September 22, 2010, page 23).  This Court added:

> It's a little late to demand attendance from people that you were – it's 1:15 on Wednesday.  The time that I gave you was till noon today to present your case.  It's a little late to talk about compulsory process .... you should have brought it in a timely fashion.

*Id*.  The government maintains that Petitioner's request is untimely and should be denied.

## B.    <u>Adam Longoria</u>

Petitioner requests leave of court to depose Mr. Longoria "because he is a critical and necessary witness and was not brought to the hearing pursuant to the properly filed motion for subpoena and the Court's order compelling service of a subpoena on him." (Doc. 602, Petitioner's Motion, p. 1-2).  However, the true reason Mr. Longoria was not present at the hearing is because Petitioner's counsel failed to file a writ although they knew Mr. Longoria was in prison in another state.

Petitioner called Jennifer Valdez as a witness at the evidentiary hearing.  (Evidentiary Hearing, September 22, 2010, page 24).  Ms. Valdez was the former wife of Adam Longoria.  *Id.*

5

USCA5 4797

at 25.  Ms. Valdez testified about Mr. Longoria being presently incarcerated.  After Ms. Valdez'

testimony, Mr. James McHugh informed this Court that the U.S. Marshals "might be better able to

speak" about why Mr. Longoria was not present in court.  *Id* at 31.  One of the U.S. Marshals stated

that they received a subpoena but not a writ.  *Id*.  This Court asked Mr. McHugh whether

Petitioner's trial team had asked for a writ to be issued.  Mr. McHugh ultimately admitted that they

failed to request a writ.  *Id*. at 32.

According to Petitioner, Adam Longoria was a homicide suspect in Kansas at the time of the

September 20, 2010 evidentiary hearing.  (Doc. 602, Petitioner's Motion, p.2).  Petitioner claims that

the United States Marshal did not notify Petitioner of the need for a writ for Adam Longoria until

September 20, 2010.  However, the record indicates that Petitioner's counsel was aware that Mr.

Longoria was incarcerated in another state prior to September 20, 2010 and failed to request a writ.

Mr. Longoria was not present at the hearing due to Petitioner's failure to file the writ, and they

should not be permitted to depose this witness well after the court's original and subsequent

deadlines for presenting evidence.  Indeed, even the instant request was not submitted to this Court

until the very day in which this Court required Petitioner's additional depositions to be concluded.

## C.    <u>William May</u>

Petitioner also moved this Court to compel service of a subpoena on Mr. May.  Petitioner

provided a Corpus Christi address to the U.S. Marshals.  This Court informed Petitioner that Mr.

May was residing in Irving, Texas.  During the evidentiary hearing, this Court reminded Petitioner's

counsel that the Court had informed them that Mr. May was living in the Dallas area, and noted that

Petitioner's counsel had him served in Corpus at an address where they knew he would not be

located.  (Evidentiary Hearing, September 22, 2010, page 32-33).

USCA5 4798

Petitioner claims that Mr. James McHugh asked Assistant United States Attorney Tony Roberts whether the government would agree to deposing Mr. May at a later date to be decided by the parties. Petitioner states that AUSA Roberts said "he would have to check with other members of the prosecution team and would thereafter advise petitioner's counsel of the government's position." Petitioner claims that the government failed prior to the Petitioner resting to provide its position concerning taking the deposition of Mr. May.

First, the government's recollection of the events with regard to the request to depose Mr. May is a bit different than those recited by Petitioner's counsel. The government recalls Mr. McHugh informing AUSA Roberts during a recess that Petitioner intended to request this Court to permit a deposition of Mr. May after the evidentiary hearing. AUSA Roberts recalls immediately discussing this matter with the other members of the government team and informing Petitioner's counsel, during the same recess, that the government would oppose the request to depose Mr. May. Second, the government does not recall Petitioner's counsel making a specific request on the record to depose Mr. May. If Petitioner's counsel had made such a motion, the government would have objected on the record. In light of Petitioner failing to provide an accurate address to the U.S. Marshals to effectuate service of the subpoena and failing to move the Court to permit a post-hearing deposition of Mr. May, the government concluded that Petitioner decided to forgo moving to take Mr. May's deposition.

USCA5 4799

**D.** **The government opposes Petitioner's motion to depose Mr. May and Mr. Longoria**

The government opposes Petitioner's request to depose Mr. Longoria and Mr. May. This Court extended the original deadline of noon on September 22, 2010 and permitted Petitioner to continue presenting evidence until the end of the day on September 22, 2010. This Court granted Petitioner an extra day of depositions on September 10, 2010, prior to the evidentiary hearing, enabling the testimony of two additional expert witnesses to be presented. This court also permitted two additional depositions after the conclusions of the evidentiary hearing. Petitioner's counsel has failed to demonstrate cause for their failure to call Mr. Longoria and Mr. May during the evidentiary hearing. Any evidence presented by Mr. Longoria and Mr. May would only be relevant to the *Brady* claims in which Petitioner claims that AUSA Patti Booth failed to reveal "promises" made to various prisoner witnesses. The substance of those claims are contained in the pleadings and provide a sufficient basis for this Court to make a determination with regard to the issues raised. This Court should deny Petitioner's motion for leave of court to depose Mr. Longoria and Mr. May for its untimeliness and because the issue can be resolved on the current record.

USCA5 4800

Respectfully submitted,

JOSÉ ANGEL MORENO
United States Attorney

PATTI BOOTH
Assistant United States Attorney

ELSA SALINAS
Assistant United States Attorney

MARK DOWD
Assistant United States Attorney


   *s/ Tony R. Roberts*
TONY R. ROBERTS
Assistant United States Attorney
TX Bar No. 17022000
S.Dist.Tx.  26173
P.O. Box 61129
Houston, Texas  77208-1129

9

USCA5 4801

CERTIFICATE OF SERVICE

I, Tony R. Roberts, Assistant United States Attorney, do hereby certify that a copy of the

above Response to Petitioner's Motion for Additional Thirty Days and Motion to Depose

William May and Adam Longoria was placed in the mail on November 29, 2010, via certified

mail, return receipt requested to:

Michael Wisemen
Victor Abreu
James McHugh
Maureen Kearney Rowley
Elizabeth Larin
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106

      *s/ Tony R. Roberts*
TONY R. ROBERTS
Assistant United States Attorney

10

USCA5 4802

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA,           §
    Respondent,                     §
                                    §
vs.                                 §   CR. No. C-02-216
                                    §   C.A. No. C-07-223
ALFRED BOURGEOIS,                   §
    Petitioner.                     §

ORDER

Petitioner's Motion for Additional Thirty Days to permit Dr. Jan Leestma to review autopsy slides is GRANTED.  Dr. Leestma must submit a report to the government no later than _____.

Petitioner's Motion for Leave of Court to depose William May and Adam Longoria is hereby DENIED.

The clerk of this Court shall send a copy of this Order to the parties by any receipted means.

Signed at Corpus Christi, Texas, this _____ day of _____ 2010.


_____
JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

USCA5 4803

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Respondent, | § | |
| | § | |
| vs. | § | CR. No. C-02-216 |
| | § | C.A. No. C-07-223 |
| ALFRED BOURGEOIS, | § | |
| Petitioner. | § | |

ORDER

Petitioner's Motion for Additional Thirty Days to permit Dr. Jan Leestma to review

autopsy slides is GRANTED.  Dr. Leestma must submit a report to the government no later than

_____.

Petitioner's Motion for Leave of Court to depose William May and Adam Longoria is

hereby DENIED.

The clerk of this Court shall send a copy of this Order to the parties by any receipted

means.

Signed at Corpus Christi, Texas, this _____ day of _____ 2010.


_____
JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

USCA5 4804

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

ALFRED BOURGEOIS,                       §
    Petitioner,                         §
                                 §        Civil No. C-07-223
        v.                               §        (Criminal No. C-02-216)
                                 §
UNITED STATES OF AMERICA,                §
    Respondent.                         §

GOVERNMENT'S RESPONSE TO BOURGEOIS' MOTION TO
AMEND AND PROPOSED AMENDMENT TO HIS MOTION
PURSUANT TO 28 U.S.C. SECTION 2255

I.

On November 18, 2010, Bourgeois filed the above Motions. The court ordered the Government to respond within ten days. The government files this response to Bourgeois' subject motions. Bourgeois seeks to amend his original Section 2255 Motion by supplementing Claim IV to include an alleged violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

As the government advised Counsel for Bourgeois at the time of the evidentiary hearing, the government is unopposed to Bourgeois' Motion to Amend, but contests and denies his Amended Claim of an alleged *Brady* violation, or ineffective assistance of Trial Counsel, and demands strict proof thereof.

USCA5 4805

II.

Background

The government relies upon the sworn affidavit of Debora Hohle, a legal administrative specialist and litigation support staff member of the U.S. Attorney's Office, Corpus Christi Division, who is knowledgeable about the matters involved herein (Attached as Government's Exhibit 1). Ms. Hohle was Office Manager at the time of the trial, and was directly and indirectly involved in preparing and providing discovery materials to both trial and habeas defense counsel. The government further relies upon the FBI Lab Protocols of 2002 and 2010, quoted by Bourgeois herein.

The document alleged to have been withheld from trial counsel, identified as Petitioner's 179 (P-179), is a single page from the more than 350 page FBI Lab Report. As demonstrated by the attached affidavit, the assigned Trial AUSA requested the FBI lab report from the FBI in October, 2003, in preparation for trial. As per the packing slip, it appears the FBI shipped the materials to the government on, or shortly after, October 29, 2003. The materials received from the FBI Lab included the more than 350 page FBI Lab Report (including P-179), photos and a cd containing additional materials. As per office procedure, the FBI Lab Report was copied in preparation for discovery. Multiple copies would have been made during this time: a copy for the defense, as well as several working copies for the

-2-

USCA5 4806

prosecution.

On November 7, 2003, a staff member from Douglas Tinker's (Trial Defense Counsel) Office received and signed for discovery materials, which included a copy of the FBI Lab Report.  The Lab Report provided to the defense was 358 pages long, with one duplicated page.  The question of whether these discovery materials contained the subject document (P-179) will be addressed shortly as the relevant events are unfolded.

Following Bourgeois' conviction and the filing of the subject Section 2255 Motion, present Counsel reports that Trial Counsel provided Bourgeois' § 2255 Counsel with a reported 12,000[1] pages of materials utilized by Trial Counsel, including discovery materials received from the government.  Present Counsel reports, that on the basis of several computer word searches, that the missing document (P-179) was not within the documents received from Trial Counsel. Present Counsel for Bourgeois provided a copy of these 12,000 pages to the government in discovery.  The government reports that the missing document (P-179) is not within the 12,000 pages provided by the Public Defender to the government. Significantly, although the government provided 357 pages of Lab Report to Trial

---

[1]  Although the parties refer to the number as 12,000 in discussions with the court, the exact number is reported to be 11,611.

USCA5 4807

Counsel on November 7, 2003, only 354 pages of Lab Report are contained within the 12,000 pages Trial Counsel provided to § 2255 Counsel, and which were later provided to the government.

Pursuant to discovery in preparation for the instant § 2255 proceeding, the government sought to provide present Counsel with a copy of the FBI Lab Report on April 10, 2010.  From the time of the original trial to the time of the Section 2255 Motion, the government retained what it believed to be several complete copies of the FBI Lab Report.  Unfortunately, and inadvertently, the set of copies of the Lab Report chosen recently to provide copies of the Lab Report to present Counsel, although 365 pages, did not contain P-179.

A review of the five sets of copies of the FBI Lab Report retained by the government from the time of the original prosecution to the present reveals that three of the sets of copies contain P-179, while in two of the sets, P-179 is missing.  The two sets missing P-179 are AUSA working copies.  As the attached affidavit reveals, the multiple sets of copies of the Lab Reports were kept together and were accessible to the three Trial AUSAs, as well as their litigation and support staff.

As the undersigned was assigned to handle the serology issues for the Section 2255 evidentiary hearing, the undersigned had direct discussion regarding discovery with present Counsel (Abreu). The undersigned provided Counsel with the present

-4-

USCA5 4808

FBI Protocol as well as that for 2002 (applicable at the time of the initial lab testing),
for the particular lab procedures conducted, and relevant articles provided by the FBI
regarding the procedures performed and the interpretation of these procedures.  The
undersigned also directed the FBI Lab Forensic Examiner and expert witness in the
§ 2255 hearing, Jerrilyn Conway, to discuss with Counsel any questions he may have
regarding the FBI Lab Protocols, the procedures performed by the FBI herein and the
significance of the lab results.  This telephone conversation between Counsel and Ms.
Conway occurred well prior to the evidentiary hearing.

In preparation for the evidentiary hearing involving Bourgeois' Section 2255
Motion, the FBI expert assigned to the case, Jerrilyn Conway, alerted the undersigned
to P-179 and discussed the significance of it.  Ms. Conway advised that P-179 was
contained in the original FBI Lab Report, of which she had recently obtained a copy.
During the testimony of Bourgeois' serology expert, Dr. Elizabeth Johnson, the
undersigned broached the significance of P-179 with her.  Dr. Johnson testified that
she was unaware of P-179.  At which point, Counsel for Bourgeois suggested that he
was unaware of P-179 as well.

The court directed the parties to further investigate the matter.  Later that day,
Counsel for Bourgeois reported that the missing document was not within the 12,000
pages of material received from Trial Counsel.  The government explained that it

-5-

USCA5 4809

believed it had provided Trial Counsel with the complete Lab Report, including P-179, as it appears in several of the government's sets of copies of the Lab Report. The government reasoned then and reasons here that, as the missing document appears in several sets of the Lab Report copies, its absence in two sets would not have been the result of a copier malfunction. Rather, the record suggests that the missing P-179 document was removed by staff during trial preparation, and not returned to the respective set of copies. The government provided a copy of the Lab Report to Trial Counsel within several days of receiving the Lab Report from the FBI. This copy set was not part of the government's working file. It was provided to Trial Counsel long before government Counsel began accessing the remaining copy sets in trial preparation.

The fact the missing document was not within the 12,000 pages Trial Counsel provided to § 2255 Counsel does not demonstrate it was absent from the copy of the Lab Report provided by the government to Trial Counsel. Although the government provided Trial Counsel with 357 pages of FBI Lab Report, only 354 pages of Lab Report appear in the 12,000 pages of materials supplied by Trial Counsel.

III.

<u>Significance of P-179</u>

The government contests several of Bourgeois' characterizations within his

-6-

USCA5 4810

subject Motion.  Bourgeois suggests the FBI's 2002 serology Protocols (P-180), "demonstrates that the Government's evidence that semen was definitively detected in the rectum of JG-1999 was erroneous, and as Petitioner has alleged in Claim IV, scientifically unsupportable".  This conclusion is diametrically contrary to the credible testimony of the government's forensic expert, Jerrilyn Conway, and misconstrues the FBI Serology Protocol on this issue (Conway testimony, p. 83-84).

The protocol for sperm searches in the FBI Laboratory is outlined in the 2002 protocol as well as the 2010 protocol.  Bourgeois provides the court a partial quote from Chapter 11 of the FBI Protocol in Paragraph 9 of his subject motion.  The full quote from the Protocol demonstrates the proper context.

See (PROCEDURE FOR THE MICROSCOPIC IDENTIFICATION OF SPERMATOZOA, 2002, p.11-1):

> "Attempts to identify human semen in some categories of evidence must be approached through an identification of spermatozoa rather than by detection of human semen-specific proteins, such as p30.  These categories would include smear slide material submitted by contributors; unusual stain materials that defy attempts toward solubilization of protein components; and stain extracts that possess borderline levels of p30."

This statement identifies the types of evidence that are not suitable for protein (P-30) detection, such as smear slides (the stain is on a glass slide and not on material that can be cut and extracted). The borderline levels of P-30 refers to samples that are

-7-

USCA5 4811

negative with the P-30 test but that can still be searched for sperm. It does not require that the FBI test stains with weak P-30 results for sperm. Here, the P-30 was contained within swabs obtained at autopsy.

In the current FBI protocol, the language is even more specific (Procedures for the Microscopic Identification of Spermatozoa, Sero111-3.doc, Issue Date 02/08/10, p.1 of 16):

> "Identification of human semen can be accomplished by either the observation of a human spermatozoon (i.e., sperm cell) or by the immunologic detection of the soluble plasma protein, prostate-specific antigen (PSA) present in seminal plasma, also known as P30."

Also see (p.12 of 16):

> "10.2    While the absence of intact human spermatozoa indicates that no semen was detected on an item, the failure to detect intact spermatozoa in biological material is not the basis for a conclusive determination that human semen was not present."

And see (p. 13 of 16):

> "10.4    Because the cellular structure of human spermatozoa is susceptible to damage from the uncontrolled conditions to which a semen stain may be exposed between the time of its disposition and the time of its collection, the sensitivity of microscopically based methods of semen detection may be reduced for a particular specimen. For this reason, microscopic smear searches are generally conducted on smear slides submitted as items of evidence (i.e., vaginal smear slide, oral smear slide, etc.) only when prostate specific antigen (PSA) testing of that slide's corresponding evidence specimen (i.e., vaginal swab, oral swab, etc.) does not detect human semen or if such specimens are not available for PSA testing. Similarly, smear slides are generally not

USCA5 4812

prepared in the Laboratory and searched from evidence items amenable to PSA tsting for the presence of human semen (i.e., vaginal swab, oral swab, etc.).”

Though the language of the current protocol is more specific and contains more information and detail, it is the same practice the FBI was using in 2002 and the interpretation of the test cards is the same.

The government contests Bourgeois’ claim that the FBI’s Protocols suggest that the P-30 test as performed in this case is not a “confirmatory” test for semen. Again this claim is diametrically contrary to the testimony of the government’s forensic expert, Jerrilyn Conway, and misconstrues the FBI Serology Protocol on this issue. Ms. Conway testified that the P-30 test used herein was a “qualitative” test, the weakness of the positive result only suggests the limited amount of P-30 present, it does not question the presence of P-30 (Conway’s testimony, p. 13-14).

The FBI Protocol directly refutes Bourgeois’ claims. See p. 6-2 of that protocol (PROCEDURE FOR HUMAN SEMEN IDENTIFICATION BY THE ONESTEP ABAcard® PSA TEST):

“1.      POSITIVE FOR PRESENCE OF SEMEN: A pink line has developed in both the “T” test area and the “C” control area of the OneStep ABACard®.”

Additionally, see: the current protocol (Procedures for Human Semen Identification by the Prostate Specific Antigen Test, Sero105-3.doc, Issue Date:

USCA5 4813

02/08/10, p.19 of 24):

> "10.2   A faint positive result indicates that semen is present on an item. The faint nature of the positive results is recorded in the case work documentation to capture semi-quantitative information that may be of value in determining what, if any, additional tests are conducted on a stain (i.e., DNA testing, etc.) and/or the amount of stain consumed for such a test(s)."

Also see: (p.19 of 24):

> "10.4    Because PSA may be present in male body fluids at levels detectable by the PSA test card but at concentrations less than that present in human semen (by several orders of magnitude), these test procedures are designed to desensitize the PSA test card by reducing the mass of recovered PSA applied to it. Using these procedures, only levels of PSA present in human semen will yield a mass of PSA (after procedural dilution) that when applied to the PSA test card will remain sufficiently high to give a positive test result."

The designation of "weak" or "very weak" in the raw data of a positive P-30 test result in no way demeans the positive result, it is only intended to alert the forensic examiner as to whether the sample represents a good candidate for additional testing, such as a DNA test.

To the extent Bourgeois argues that the negative Acid Phosphatase test conducted by Dr. Elizabeth Johnson 18 months after the autopsy, "the negative smear slide sperm search, negative microscopic pellet sperm search, negative autosomal DNA test, negative Y chromomosomal DNA test, and no sign of physical trauma" challenges the results of the P-30 test, the government contests Bourgeois' claim. Ms.

USCA5 4814

Conway explained how the subject P-30 test results were reliable in light of the negative results described (Conway testimony pp. 28-29, 31, 50-51). As Ms. Conway testified, AP deteriorates at a faster rate than PSA, and is typically undetectable under optimal circumstances after 14 hours (Conway's testimony, p. 7-9, 15, 28). Ms. Conway also challenged Dr. Johnson's mathematical calculations regarding her expectation for finding sperm on the sample (Conway's testimony, p. 16-18). Ms. Conway also testified that the FBI Protocol involving identifying sperm required a finding of an intact sperm, tail and head (Conway's testimony, p. 24, 47), diminishing the significance of the FBI's negative finding of sperm. Ms. Conway conclusively eliminated the potential for non semen sources to trigger a positive result in the FBI's P-30 test (Conway's testimony, p. 19-27, 41).

IV.

Legal Principles

*Brady* prohibits the Government from suppressing evidence favorable to the accused "where the evidence is material either to guilt or to punishment." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194. When a defendant seeks a new trial on the basis of a *Brady* violation, he must show that "(1) the prosecution did not disclose the evidence; (2) the evidence was favorable to the defense; and (3) the evidence was material." *United States v. Fernandez,* 559 F.3d 303, 319 (5th Cir.), *cert. denied,* --- U.S. ----, 129 S.Ct.

-11-

USCA5 4815

2783 (2009) (quoting *United States v. Infante,* 404 F.3d 376, 386 (5th Cir.2005)).

Evidence is "material" if there is "a reasonable probability that, had the evidence been

disclosed to the defense, the result of the proceeding would have been different."

*Severns,* 559 F.3d at 278 (citation omitted). A "reasonable probability" is a

probability sufficient to undermine confidence in the outcome. *Id.* (citations omitted).

*United States v. Davis*, 609 F.3d 663, 696 (5th Cir. 2010). A "reasonable probability"

of a different result is accordingly shown when the government's evidentiary

suppression "undermines confidence in the outcome of the trial." *United States v.*

*Bagley,* 473 U.S. 667-78, 105 S.Ct. 3375, 3381 (1985), *Kyles v. Whitley,* 514 U.S.

419, 433, 115 S.Ct. 1555, 1565 (1995).

As the government has shown above, Bourgeois has not shown that the

government suppressed P-179 or withheld it from Trial Counsel.

Even if the court determined that Trial Counsel did not receive P-179, it does

not represent exculpatory evidence. The "very weak" P-30 finding remains a positive

finding for P-30 (Conway's testimony, p. 13-14, 28-29). It was corroborated by

Bourgeois's expert Dr. Johnson's P-30 test results. The government asserts that the

credible evidence before the court reveals that the positive P-30 test results

established incontrovertably the presence of semen in the victim. The admission of

P-179 at trial would not have refuted the positive P-30 test results. In light of the

-12-

USCA5 4816

other overwhelming evidence of guilt, the absence of P-179 at trial does not undermine confidence in the outcome of the verdict.

To the extent Bourgeois claims, in the alternative, that Trial Counsel was constitutionally ineffective for failing to utilize P-179 during trial, for the reasons discussed above, he fails to demonstrate the necessary prejudice from such failure. The P-30 test result is a confirmatory test for the presence of semen, and is not impugned by a "weak" or "very weak" designation.

USCA5 4817

V.

Accordingly, the undersigned moves the court to deny Bourgeois' Amended

Claim alleging a *Brady* violation. To the extent Bourgeois alleges in the alternative

that Trial Counsel was constitutionally ineffective for failing to utilize P-179 at trial

to contest the government's P-30 positive test results, the undersigned moves the

court to deny his claim and to enter the attached proposed order.


Respectfully submitted,


JOSE ANGEL MORENO.
United States Attorney


 /s/ Mark M. Dowd
MARK M. DOWD
Assistant United States Attorney
P.O. Box 61129
Houston, Texas  77208
(713) 567-9102

-14-

USCA5 4818

# CERTIFICATE OF SERVICE

I, Mark M. Dowd, Assistant United States Attorney, certify that a copy of this Response to Bourgeois' Allegation of *Brady* violation has been served by placing it in the United States mail, postage prepaid, on November 29, 2010, addressed to:  Mr. Victor Abreu Esq., Capital Habeas Corpus Unit, Federal Community Defender for the Eastern District of Pennsylvania, Suite 545 West-The Curtis Center, Philadelphia, PA 19016.

/s/ Mark M. Dowd
MARK M. DOWD
Assistant United States Attorney

USCA5 4819

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ALFRED BOURGEOIS, | § | |
| Petitioner, | § | |
| | § | Civil No. C-07-223 |
| v. | § | (Criminal No. C-02-216) |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| Respondent. | § | |

ORDER

The Court GRANTS Bourgeois Motion to Amend his original Motion brought

pursuant to 28 U.S.C. § 2255.  The Court however DENIES his Amendment to his

original Claim IV, in which he alternatively alleges a *Brady* violation, and ineffective

assistance by Trial Counsel for their failure to confront the government's positive P-

30 test result as being a "weak" or "very weak" result.  Bourgeois fails to demonstrate

the government suppressed the "weak" or "very weak" raw data.  Even if Bourgeois

could demonstrate that Trial Counsel had not been provided with the raw data

suggesting the test result was "weak" or "very weak", Bourgeois fails to demonstrate

such document was exculpatory, or that its absence at trial undermines confidence in

the outcome of the trial.

-16-

USCA5 4820

To the extent Bourgeois complains Trial Counsel's was constitutionally ineffective for failure to utilize the raw data of the P-30 test result suggesting the positive result was "weak" or "very weak", Bourgeois fails to demonstrate the necessary prejudice.

Accordingly, the Court DENIES the Amendment to Bourgeois' original Claim IV.

| | |
|---|---|
| Date | HON. JANIS GRAHAM JACK |
| | UNITED STATES DISTRICT JUDGE |

USCA5 4821

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ALFRED BOURGEOIS | § | |
| Petitioner | § | Civil No. C-07-223 |
| v. | § | (Criminal No. C-02-216-SS) |
| | § | |
| UNITED STATES OF AMERICA | § | |
| Respondent | § | |
| | § | |
| | § | |

## AFFIDAVIT

My name is Debra Hohle. I currently provide trial litigation support to the Assistant United States Attorneys in the Corpus Christi and Victoria Divisions, in the Southern District of Texas. Preforming in this capacity I assisted in preparation of material for the Section 2255 Evidentiary Hearing in the above referenced case.

At the time of the criminal trial, I served as Office Manager of the Corpus Christi & Victoria Divisions. Although I did not personally perform the duties described below, I can say that Office Procedures were followed when providing discovery in U.S. v Alfred Bourgeois. As discovery was received from investigative agencies it was made available to Defense Counsel in compliance with Rule 16(a)(1)(C)F.R. CRIM.P., as evidenced by the Corpus Christi and Victoria Division's Receipts for discovery records. Items are provided to Defense Counsel via two methods. For discovery material deemed only subject to inspection, Defense Counsel was provided a room to complete that inspection. For discovery material capable of being copied, a copy is made of such material and provided to Defense Counsel.

During the discovery process in this case Mr Tinker, Mr.Gilmore and a designated

USCA5 4822

representative from their office received discovery material. One of the Agency reports received, copied and provided to Defense Counsel was the FBI Lab Report.

The government prosecutor requested by letter copies of all FBI's reports, notes, photographs, etc., in late October, 2003. I can not provide the exact date that the FBI Lab Report was received at the U.S. Attorneys Office, but the packing slip from the FBI Lab reflects that it was prepared for shipping on Wednesday, October 29, 2003, and that the shipping method was via Federal Express. The packing slip is attached as Attachment A. There is also a letter within our file from the FBI Lab dated October 27, 2003, which accompanied the Lab Report received by our Office. This FBI letter references the inclusion of a CD containing data files. This FBI letter was included in the copy of the FBI Lab Report provided to Mr. Wiseman (Government Bates Number AB216_Page_00071).

In reviewing the files in our office this year, I located the copy of the FBI Lab Report located in a gray sleeved file folder which has a hand written "post it" labeled "Original". This "Original" file includes a copy of correspondence dated October 27, 2003, from the Director of FBI Laboratory. This file folder also contains various documents reflecting the dissemination of the FBI Lab Report, to include a copy of packing slip Number 58692 dated October 29, 2003. The packing slip (Attachment A) referenced discovery for file 020718001 NH HZ and 020904008 HZ 70A-HO-60227. Affixed to the packing slip is a hand written note. The hand written note dated November 7, 2003, states "Was not able to copy CD. Gave only copy to Defense. If we want another FBI lab will provide". (Attachment B). I also located a discovery receipt dated November 7, 2003, signed by Tina Morales, a representative from Mr. Tinker and Mr. Gilmore's Office. The discovery receipt reflects various items, including the CD and the

2

USCA5 4823

FBI Lab Report which were provided to Defense Counsel (Attachment C). The discovery receipt reflects 358 pages were provided to the defense as the FBI Lab Report.

In addition to the copy made for the defense, as is the Office practice, other copies of the FBI Lab Report were made for use by the prosecution team. Three Assistant U.S. Attorneys were assigned to the prosecution in this case. In this case, in addition to the copy prepared for the defense, four other copies of the Lab Report were made for use by the prosecution team. In March, 2004, I transported three sets of boxes containing files for this case to our trial preparation room located at the Federal Courthouse. One set consisted of the originals, one set was a duplicate of the originals, and one set was of witness folders. Witness folders contained copies of exhibits and reports relevant to that witness' testimony. In addition, each AUSA had copies of the material related to that portion of the case each was assigned. At the conclusion of the trial, the three sets of files prepared and utilized during trial preparation described above were returned to the U.S. Attorneys Office and placed in a closed room. Since 2004, the files were accessed only as needed for preparation of our appellate response and for preparation for the § 2255 Evidentiary Hearing.

During preparation for the evidentiary hearing, files from these boxes were removed when needed in response for discovery, or for hearing preparation. Material was removed from the trial boxes and placed on a working table for review. As items were identified they were placed in a stack for scanning and bate stamping. I pulled three file folders each containing a copy of the FBI Lab Report from the trial boxes located in Alphabet tab F. The file folders were placed on the table for review in the order removed from the boxes; the gray sleeved file jacket, the red wood sleeved file jacket and a green file folder. It was by happenstance that the green

3

file folder was on top of the stack as file folders were placed on the table. The green folder contained three hundred and sixty-five pages. It was determined that The FBI Lab Report was to be scanned and bate stamped for submission to Mr. Wiseman. The green file folder then was removed from the top of the stack and placed with the other items set aside for scanning. These items were then emailed to Mr. Wiseman on April 08, 2010. (Attachment D).

During the course of the evidentiary hearing held the week of September 24, 2010, the government asked Dr. Elizabeth Johnson about the FBI Lab result for the P-30 test which resulted in a positive but "very weak" result. Dr. Johnson testified she was unaware of the "very weak" finding. At this point, the Federal; Public Defender also advised he was unaware of this "very weak" finding. The court instructed the parties to look into the matter. The document from the FBI Lab Report which reported the "very weak" positive P-30 result was later marked and introduced into evidence as Exhibit P-179.

At the time of the hearing, I determined that P-179 was not within the scanned copy of the FBI lab report provided to Mr. Wiseman on April 8, 2010. I returned to the U.S. Attorneys Office and retrieved three files containing the FBI Lab Report. I brought them to the Federal Court House and reviewed them. Upon examination of our hard copy set of the FBI Lab Report scanned and sent to Mr. Wiseman, it was determined that the page marked P-179 was not in the file. Examination of the FBI Lab Report the gray and red wood sleeved file folders revealed that both included the page marked as Exhibit P-179. In addition, the copy of the FBI Lab Report provided by Ms. Jerrilyn Conway (FBI Forensic Examiner who testified at the evidentiary hearing) was reviewed, it included the page marked as Exhibit P-179. At the time of the evidentiary hearing, a copy of the entire FBI Lab file provided by Ms. Conway was copied and

4

USCA5 4825

given to Mr. Wiseman.

Since the evidentiary hearing I have reviewed five copies of the FBI Lab Report located in the boxes of material utilized during trial. Three copies include the page identified as Exhibit P-179 and two copies do not. The files which included Exhibit P-179 were in a gray sleeved file jacket (post it note labeled original), a red wood sleeved folder and a gray sleeved file folder labeled Ornorato and Zervos respectively. Onorato and Zervos were the FBI Lab personnel who testified at trial regarding this issue. The copies of the FBI Lab report that did not include P-179 were in green file folders. After further review, the two green folders appear to be AUSA working copies. Of the five sets of copies of the FBI Lab Report in our possession, none of them contains the same exact number of pages.

As reflected in Mr. Abreu's motion, the 12000 pages of scanned material provided to the Government by the Federal Public Defender were reviewed by the government. While completing this review I found two references to the term P-30 (Defense Bates No. 00619 and 006503), neither of which were the document marked Exhibit P-179. During the review of this material which consisted of a various array of documents, I found many documents to be incomplete, or duplicates, and in a state of disarray. I recognized several documents that were provided to Mr. Tinker and Mr. Gilmore during the discovery process for trial, such as FBI 302's and letters authored by Mr. Bourgeois. Within two different boxes of the 12000 pages provided

5

USCA5 4826

to the Government by the Federal Public Defenders I located three hundred fifty-three different

pages of the FBI Lab Report provided to Mr. Tinker and Mr. Gilmore during discovery at trial.


_____

DEBRA HOHLE
Legal Administrative Specialist


THE STATE OF TEXAS

COUNTY OF NUECES

        Subscribed and sworn to before me on the 29th day of November, 2010, by Debra Hohle

_____
DIANNA K. WINSTEAD
NOTARY PUBLIC
IN AND FOR THE STATE OF TEXAS


DIANNA K. WINSTEAD
MY COMMISSION EXPIRES
September 20, 2011

My commission expires:_____9-20-11_____

6

USCA5 4827

# ATTACHMENT A

USCA5 4828

FD-750 (1-6-88)

## FEDERAL BUREAU OF INVESTIGATION

INVOICE NUMBER

**58692**

DATE:    10/29/03

CONSIGNEE AND DESTINATION

S
H  Ms. Patti Booth
I  Assistant United States Attorney
P  Office of the United States Attorney
   Southern District of Texas
T  One Shoreline Plaza
O  800 North Shoreline Boulevard, Suite 500
   Corpus Christi, Texas  78401

ATTENTION:

Patti Booth 364-        **INVOICE OF CONTENTS**
(361) 888-3111

PURCHASE ORDER NUMBER

FBI _____
  ☐ (PPMS)    ☐ (BPA)    ☐ (Warranty)

VENDOR RETURN AUTHORIZATION #

_____

FILE # _____

Discovery Request for 020718001 NH HZ and 020904008 HZ 70A-HO-60227
FBI, Houston

REMARKS:

_____

FOR ADDITIONAL INFORMATION REGARDING THIS ORDER CONTACT

NAME __Caroline Zervos (DMAUI)_____    TELEPHONE NO. 703-632-7486_____

SHIPMENT PACKAGED BY __CZ/zof_____    SHIPPING METHOD ____FEDEX_____

NUMBER OF CARTONS _____1_____    SHIP NO. _____

## PACKING SLIP

"ATTACHMENT A"

USCA5 4829

# ATTACHMENT B

USCA5 4830

FD-750 (1-6-88)

**FEDERAL BUREAU OF INVESTIGATION**

INVOICE NUMBER

## 58692

DATE:          10/29/03

CONSIGNEE AND DESTINATION

S  Ms. Patti Booth
H  Assistant United States Attorney
I  Office of the United States Attorney
P  Southern District of Texas
   One Shoreline Plaza
T  800 North Shoreline Boulevard, Suite 500
O  Corpus Christi, Texas  78401

ATTENTION:

Patti Booth 364-      **INVOICE OF CONTENTS**

(361) 888-3111

PURCHASE ORDER NUMBER

FBI _____

☐ (PPMS)   ☐ (BPA)   ☐ (Warranty)

VENDOR RETURN AUTHORIZATION #

_____

FILE # _____

Discovery Request for 020716001 NH HZ and 020904008 HZ 70A-HO-60227
FBI, Houston

*Was not able to copy CD. Gave only copy to Defense. If we want another FBI Lab will provide.*

*11/7/03*

REMARKS:

NAME __Carrillo_____

SHIPMENT PACKAGED BY __CL/gof__    SHIPPING METHOD __FEDEX__

NUMBER OF CARTONS ____1____    SHIP NO. _____

## PACKING SLIP

"ATTACHMENT B"

USCA5 4831

# ATTACHMENT C

USCA5 4832

To: Defense Counsel
From: U.S. Attorney's Office

Date: 11-7-03

## RECEIPT FOR DISCOVERY MATERIALS AND ACKNOWLEDMENT
## OF CONDITIONS FOR RETENTION AND USE

CRIMINAL CASE NO. CR-C-02-216

U.S. vs. ALFRED BOURGEOIS

I am the attorney of record for ALFRED BOURGEOIS. I hereby acknowledge receipt of a copy the investigative report(s) in the above-referenced case. I acknowledge that any documents and tangible objects (as set forth in Rule 16(a)(1)(C), F.R. CIM.P.) Received by me or made available for my inspection and copying, are turned over to me in compliance with my request for said documents and tangible objects. The undersigned defense attorney, having received open file discovery, hereby agrees to disclose to the government prior to Final Pre-Trial Conference the following; all documents and tangible objects, reports of examinations and test, and expert witnesses. The undersigned defense attorney accepts this form as the government's written demand for notice of alibi and agrees to comply with FRCP 12.1 and 16. I further acknowledge and agree to comply with the government's request for permission to inspect and copy or photograph such documents and tangible objects (as set forth in Rule 16(b)(1)(A), F.R. Crim.P.) within the possession or control of the defendant and which the defendant intends to introduce as evidence in chief at trial. I realize that these reports or documents remain the property of the United States Attorney, must be retained by me in my file, must be returned to the United States Attorney upon demand, copies cannot be made, and if relieved as counsel I will return such reports to the United States Attorney's Office or deliver new counsel if and when I confirm that new counsel is attorney of record and has signed an acknowledgment such as this.

_____ Copies made @.25 cents a page

Total Amount Owed ____-0-____

* Please make checks payable to
  U.S. Department of Justice
  1 audio CD - Albert Bourgeois, 10-17-03 @ 1822
  1 CD - 70A-HO-60227, FBI Houston
      020718001NHHZ, 020904008HZ
  Documents, 358 pages
  ********************************

_Tina Morales_
Attorney for Defendant ( Please Print )

_622 So Tancahua_
Address

_Corpus Christi, Tx 78401_
City, State, Zip

_361-882-3635_
Telephone/Fax Number

**Federal Defenders Only:**
I acknowledge receipt of _____ copies and agree to pay the sum of $____-0-____ for copying charges when billed by the United States Attorney.

Cc: Administrative Division
revised 12/21/99

"ATTACHMENT C"

USCA5 4833

# ATTACHMENT D

USCA5 4834

## Hohle, Debra (USATXS)

| | |
|---|---|
| **From:** | Hohle, Debra (USATXS) |
| **Sent:** | Thursday, April 08, 2010 4:51 PM |
| **To:** | Michael_Wiseman@fd.org |
| **Cc:** | Roberts, Tony (USATXS); Dowd, Mark (USATXS); Booth, Patti (USATXS); Salinas, Elsa (USATXS) |
| **Subject:** | C-02-216  emails |

Mr. Wiseman you should have received emails numbered 1-6 containing a bates number 1 through 573.

| | | |
|---|---|---|
| Robin Bourgelos | pages | 1-17 |
| Orlando Campos | pages | 18-25 |
| Hickey/Cellmark | pages | 26-70 |
| FBI LAB | pages | 71-496 |
| Kagen-Hallet | pages | 497-498 |
| Adam Longoria | pages | 499-512 |
| Derrick Moore | pages | 513-558 |
| Willie Taylor | pages | 559-573 |

Please let me know if you have any questions.

Debbie

Debra Hohle
Legal Administration Specialist
Corpus Christi Division
Office - 361-888-3111
Direct - 361-903-7903
Cell -   361-443-6741

**Tracking:**

1

"ATTACHMENT D"

PAGE 1

USCA5 4835

**Hohle, Debra (USATXS)** ___

| | |
|---|---|
| **From:** | Hohle, Debra (USATXS) |
| **Sent:** | Thursday, April 08, 2010 4:26 PM |
| **To:** | 'Michael_Wiseman@fd.org' |
| **Subject:** | email 2 |



FBI LAB REPORT
102703.PDF


Debra Hohle
Legal Administration Specialist
Corpus Christi Division
Office - 361-888-3111
Direct - 361-903-7903
Cell -   361-443-6741

USCA5 4836

## Hohle, Debra (USATXS)

**From:**        Hohle, Debra (USATXS)
**Sent:**        Thursday, April 08, 2010 4:29 PM
**To:**          'Michael_Wiseman@fd.org'
**Subject:**     Email 3


**SEROLOGY**
**.OTOCOL FBI LAB.PI**

**CELLMARK**
**102703.PDF**


Debra Hohle
Legal Administration Specialist
Corpus Christi Division
Office - 361-888-3111
Direct - 361-903-7903
Cell -    361-443-6741

1

"ATTACHMENT D"

PAGE 3

USCA5 4837

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-216 |
| | § | |
| ALFRED NMI BOURGEOIS | § | |

**ORDER**

On December 1, 2010, the Court held a telephonic hearing in the above-styled case.  At the hearing, the Court ordered as follows:

1.    Pursuant to Bourgeois' statement that he is satisfied with his attorneys' representation, his motion for new counsel (DE 608) is **DENIED AS MOOT**.

2.    The Court will hold a hearing for oral argument on January 13, 2011, at 8:00 a.m.

3.    The Court **DENIES** Bourgeois' motion to take depositions (DE 602) with respect to Adam Longoria.  Bourgeois, however, may call Bill May and James Sales to testify at the beginning of the January 13, 2011 hearing.  Bourgeois will arrange for Mr. May to appear by video conference.  The Federal Bureau of Prisons will make Bourgeois available by telephone for that portion of the hearing in which the parties will present evidence.

4.    The Court **GRANTS IN PART** Bourgeois' motion for an extension of time to depose Dr. Jan E. Leestma.  (DE 604).  Bourgeois will supply Dr. Leestma's curriculum vita, a list of cases in which he has testified, and other Rule 26 disclosure material by Friday, December 3, 2010.  The Government will file an advisory with the Court before noon on Friday, December 3, 2010, indicating the location of the slides of the victim's brain and, if they are still in existence, when

1 / 2

USCA5 4838

they can be sent to Bourgeois' expert.  If the slides no longer exist, Bourgeois will

provide a report from Dr. Leestma on or before December 10, 2010.  The

deposition of Dr. Leestma will follow as soon as possible.

5.      The Court **GRANTS** Bourgeois' motion to amend and supplement claim IV.

(DE 611).

SIGNED and ORDERED this 2nd day of December, 2010.

_____
Janis Graham Jack
United States District Judge

2 / 2

USCA5 4839

AO 435
(Rev. 03/08)

Administrative Office of the United States Courts

**TRANSCRIPT ORDER**

*Please Read Instructions:*

| | | |
|---|---|---|
| 1. NAME  Aaron Butler, Paralegal | 2. PHONE NUMBER  215-928-0520 | 3. DATE  12/02/10 |

| | | | |
|---|---|---|---|
| 4. MAILING ADDRESS  Federal Defenders, 601 Walnut St., Ste 545W | 5. CITY  Philadelphia | 6. STATE  PA | 7. ZIP CODE  19106 |

| 8. CASE NUMBER  2:02-cr-00216 | 9. JUDGE  Janis Graham Jack | DATES OF PROCEEDINGS |  |
|---|---|---|---|
|  |  | 10. FROM  12-1-10 | 11. TO  12-1-10 |

| 12. CASE NAME  USA v. Alfred Bourgeois | LOCATION OF PROCEEDINGS | |
|---|---|---|
|  | 13. CITY  Corpus Christi | 14. STATE  TX |

**15. ORDER FOR**

☐ APPEAL  ☐ CRIMINAL  ☐ CRIMINAL JUSTICE ACT  ☐ BANKRUPTCY

☐ NON-APPEAL  ☐ CIVIL  ☐ IN FORMA PAUPERIS  ☐ OTHER (Specify)

**16. TRANSCRIPT REQUESTED** (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

| PORTIONS | DATE(S) | PORTION(S) | |
|---|---|---|---|
| ☐ VOIR DIRE | | ☐ TESTIMONY (Specify Witness) | United States Courts Southern District of Texas **FILED** |
| ☐ OPENING STATEMENT (Plaintiff) | | | |
| ☐ OPENING STATEMENT (Defendant) | | | **DEC 02 2010** |
| ☐ CLOSING ARGUMENT (Plaintiff) | | ☐ PRE-TRIAL PROCEEDING (Spcy) | |
| ☐ CLOSING ARGUMENT (Defendant) | | | David J. Bradley, Clerk of Court |
| ☐ OPINION OF COURT | | | |
| ☐ JURY INSTRUCTIONS | | ☒ OTHER (Specify) | |
| ☐ SENTENCING | | Telephone Conference | 12-1-10 |
| ☐ BAIL HEARING | | | |

**17. ORDER**

| CATEGORY | ORIGINAL (Includes Certified Copy to Clerk for Records of the Court) | FIRST COPY | ADDITIONAL COPIES | |
|---|---|---|---|---|
| ORDINARY | ☒ | ☐ | NO. OF COPIES | |
| 14-Day | ☐ | ☐ | NO. OF COPIES | |
| EXPEDITED | ☐ | ☐ | NO. OF COPIES | |
| DAILY | ☐ | ☐ | NO. OF COPIES | |
| HOURLY | ☐ | ☐ | NO. OF COPIES | |
| REALTIME | ☐ | ☐ | | |

**CERTIFICATION (18. & 19.)**
By signing below, I certify that I will pay all charges
(deposit plus additional).

| 18. SIGNATURE  *[signature]* | ☐ EMAIL ONLY REQUIRED |
|---|---|
|  | ☐ EMAIL AND HARD COPY REQUIRED |
| 19. DATE  12-2-10 | ☐ EMAIL ADDRESS:  aaron_butler@fd.org |

**20. TRANSCRIPT TO BE PREPARED BY**

| | |
|---|---|
| ORDER RECEIVED | |
| DEPOSIT PAID | DEPOSIT PAID |
| TRANSCRIPT ORDERED | TOTAL CHARGES |
| TRANSCRIPT RECEIVED | LESS DEPOSIT |
| ORDERING PARTY NOTIFIED TO PICK UP TRANSCRIPT | TOTAL REFUNDED |
| PARTY RECEIVED TRANSCRIPT | TOTAL DUE |

DISTRIBUTION:  COURT COPY  TRANSCRIPTION COPY  ORDER RECEIPT  ORDER COPY

USCA5 4840
Fax sent by :

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA,           §
    Respondent,                     §
                                    §
vs.                                 §    CR. No. C-02-216
                                    §    C.A. No. C-07-223
ALFRED BOURGEOIS,                   §
    Petitioner.                     §

GOVERNMENT'S STATUS UPDATE ON LOCATION OF BRAIN SLIDES

TO THE HONORABLE JUDGE OF SAID COURT:

The United States of America, hereinafter "the government," by and through the United States Attorney for the Southern District of Texas, files this Status Update regarding the location of the brain slides that were not contained in the autopsy slides previously provided to Petitioner.

On December 1, 2010, this Court held a telephone conference to address several motions filed by Petitioner. During that hearing, Petitioner stated that Petitioner had not received the brain slides from the autopsy of the deceased child. The Court Ordered the government to attempt to locate the brain slides and submit a status update by noon, December 3, 2010. The government herein complies with the Court's Order.

The autopsy was performed by Dr. Elizabeth Rouse and was conducted at Wilford Hall. Dr. Rouse requested a Neuropathology Consultation from the University of Texas Health Science Center at San Antonio. When the Petitioner requested the autopsy slides this year, the government contacted Dr. Rouse and learned that the autopsy slides were most likely located at Wilford Hall. The government so informed Petitioner. At some point, the autopsy slides were sent to Petitioner but the brain slides were not included.

USCA5 4841

In response to this Court's December 1, 2010 Order, the government emailed Dr. Rouse inquiring about the location of the brain slides and simultaneously contacted the Department of Pathology at the University of Texas Health Science Center.  Anne Stevens, the Administrative Assistant who previously assisted the government in locating the Neuropathology Consultation Report of Dr. Kathleen Kagan-Hallet, was no longer working in that department.  However, Dr. Jennifer Rulon and Administrative Assistant Ginger ("Virginia") Blaha offered to assist in trying to locate the brain slides.  Dr. Rulon was not able to locate the slides at the Medical Examiner's Office and even inquired of Dr. James Feig at Wilford Hall with no luck.  Ginger Blaha decided to look up the case number in the old log books and found that the case was listed within the VA archives.  She went to the VA and was escorted into the basement level storage room where records are archived.  This afternoon, Ms. Blaha informed the government that she had searched through many drawers of slides and believes that she has located the brain slides from the instant case.

Undersigned counsel asked Ms. Blaha to retain the slides while the government informs this Court and Petitioner that the slides have been located.  Ms. Blaha assured Undersigned counsel that she will hold the brain slides until contacted by this Court and instructed upon what steps to take regarding the slides.

2

USCA5 4842

Respectfully submitted,

JOSÉ ANGEL MORENO
United States Attorney

PATTI BOOTH
Assistant United States Attorney

ELSA SALINAS
Assistant United States Attorney

MARK DOWD
Assistant United States Attorney


   *s/ Tony R. Roberts*
TONY R. ROBERTS
Assistant United States Attorney
TX Bar No. 17022000
S.Dist.Tx.  26173
P.O. Box 61129
Houston, Texas  77208-1129

3

USCA5 4843

CERTIFICATE OF SERVICE

I, Tony R. Roberts, Assistant United States Attorney, do hereby certify that a copy of the

above Status Update regarding the brain slides was placed in the mail on December 3, 2010, via

certified mail, return receipt requested to:

Michael Wisemen
Victor Abreu
James McHugh
Maureen Kearney Rowley
Elizabeth Larin
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106


*s/ Tony R. Roberts*
TONY R. ROBERTS
Assistant United States Attorney

USCA5 4844

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____

UNITED STATES OF AMERICA,      :                No. Cr-C-02-216
                               :                No. Cv-07-223
        Respondent,            :        Honorable Janis Graham Jack,
                               :                 U.S.D.J.
    -against-                  :
                               :
ALFRED BOURGEOIS,              :          Electronically Filed
                               :
        Petitioner.            :
_____      :


**PETITIONER'S UNOPPOSED MOTION FOR ISSUANCE OF SUBPOENA
DUCES TECUM IN ADVANCE OF HEARING**

COMES NOW, Petitioner, ALFRED BOURGEOIS, by and through undersigned counsel, and in accordance with Federal Rule of Criminal Procedure 17(b), and Section 1825 of Title 28, United States Code, respectfully moves this Court to order the issuance of a subpoena duces tecum requiring Dr. Jennifer Rulon and Administrative Assistant Ginger "Virginia" Blaha, University of Texas Health Science Center, Department of Pathology, 6431 Fannin Street, Houston, TX 77030, (713) 500-4472, to produce the documents requested herein in advance of hearing. In support of this motion, Petitioner states as follows:

1.      Petitioner was charged with the 2002 beating death of his daughter, JG-1999.  On March 16, 2004 he was convicted by a jury of one count of first-degree

USCA5 4845

premeditated murder (18 U.S.C.A. § 1111(a)). Following a sentencing hearing, the jury returned a verdict of death.  Petitioner was formally sentenced to death by this Court on March 24, 2004.

2.      In Claim III of his Petition for a Writ of Habeas Corpus, Petitioner alleged that the Government lacked jurisdiction as no reasonable view of the Government's evidence existed upon which a reasonable factfinder could conclude that the fatal injuries to JG-1999 were inflicted on the Corpus Christi Naval Air Station.  See Petitioner's Memorandum of Law at 26-31. Specifically, Petitioner alleged that the subdural hematoma identified as the cause of death by the medical examiner, Dr. Elizabeth Rouse, resulted from an injury that occurred before Petitioner arrived at the naval base.  Id.; see also Neuropathology Report of Dr. Kathleen Kagan-Hallet, MD, contained in *PA*, document # 50.  Thus, despite the fact that JG-1999 died on the base, the Government lacked jurisdiction to try and convict Mr. Bourgeois.  Id.;  18 U.S.C. § 3236 (murder is "committed at the place where the injury was inflicted . . . which caused the death, without regard to the place where the death occurs").

3.      At Petitioner's request, forensic neuropathologist, Dr. Jan E. Leestma is currently evaluating all of the available evidence regarding the cause of death and the age and timing of the alleged fatal subdural hematoma.

4.      In an effort to assist Dr. Leestma complete his analysis, on December 1,

USCA5 4846

2010 this Court ordered the Government to report on the whereabouts of the brain slides relied upon by Dr. Elizabeth Rouse and Dr. Kathleen Kagen-Hallet at the time of trial to determine the cause of death.  On December 2, 2010 the Government filed a Status Update on the location of slides confirming that slides were currently located at the University of Texas Health Science Center, Department of Pathology, 6431 Fannin Street, Houston, TX 77030.

5.    Final arguments in this matter are scheduled for January 13, 2011.  The Court has ordered that Dr. Leestma's deposition be completed "as soon as possible." See Court's Order, December 2, 2010.

6.    Accordingly, Petitioner respectfully requests that this Court issue a subpoena requiring Dr. Jennifer Rulon and Administrative Assistant Ginger "Virginia" Blaha, University of Texas Health Science Center, Department of Pathology, 6431 Fannin Street, Houston, TX 77030, (713) 500-4472, to produce all of the brain slides, photographs and impressions, regarding the autopsy of JG-1999, currently in their possession in advance of the hearing:

7.    In order to expedite Dr. Leestma's review, Petitioner respectfully requests that in lieu of personal appearance by Dr. Rulon or Ms. Blaha, the slides, photographs and impressions should be immediately delivered to:

Dr. Jan E. Leestma, 1440 North Kingsbury Street. Suite 210, Chicago IL 60642.

USCA5 4847

8. Undersigned counsel will provide Dr. Rulon, Ms. Blaha and the University of Texas Health Science Center, Department of Pathology, their Federal Express account number to expedite delivery of the materials to Dr. Leestma. Upon completion of his review and report, and unless needed for his deposition, Dr. Leestma will return all of the slides, photographs and impressions to the University of Texas Department of Pathology.

9. Petitioner is unable to pay the costs of the subpoena. He has previously been found eligible for appointed counsel.

10. Petitioner has consulted with counsel for Respondents, Tony R. Roberts, Assistant United States Attorney, who indicated that the Government is NOT opposed to this request.

WHEREFORE, Petitioner respectfully requests that this Court grant this motion for the issuance of a subpoena duces tecum and payment of expenses.

Respectfully submitted,

By   /s/Victor J. Abreu
MICHAEL WISEMAN
VICTOR J. ABREU
Federal Community Defender Office
for the Eastern District of Pennsylvania

Capital Habeas Corpus Unit
Suite 545 West - The Curtis Center
Philadelphia, PA 19106
215-928-0520

USCA5 4848

Date: December 3, 2010

### CERTIFICATE OF SERVICE

I, Victor J. Abreu, hereby certify that on this 2nd day of December, 2010 I

served the foregoing upon the following persons by e-file:


Tony R. Roberts
United States Attorney's Office
PO Box 61129
Houston, TX 77208-1129
Tony.Roberts@usdoj.gov


/s/ Victor J. Abreu

_____

USCA5 4849

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____
                                                        :
UNITED STATES OF AMERICA,            :           No. Cr-C-02-216
                                                        :           No. Cv-07-223
                     Respondent,                 :      Honorable Janis Graham Jack,
                                                        :                 U.S.D.J.
           -against-                                 :
                                                        :
ALFRED BOURGEOIS,                       :           Electronically Filed
                                                        :
           Petitioner.                               :
_____ :

## ORDER FOR ISSUANCE OF SUBPOENA DUCES TECUM IN ADVANCE OF HEARING

NOW on this _____day of December, 2010, upon consideration of

Petitioner's unopposed motion for issuance of a subpoena duces tecum requiring the

production of documents in advance of hearing, it is hereby ORDERED that

Petitioner's motion is GRANTED.

It is hereby ORDERED that a subpoena shall be issued to Dr. Jennifer Rulon

and Administrative Assistant Ginger "Virginia" Blaha, University of Texas Health

Science Center, Department of Pathology, 6431 Fannin Street, Houston, TX 77030,

(713) 500-4472, to produce all of the brain slides, photographs and impressions,

regarding the autopsy of JG-1999, currently in their possession in advance of the

USCA5 4850

hearing:

It is further ORDERED that in lieu of  personal appearance, the slides, photographs and impressions will immediately be delivered to:

Dr. Jan E. Leestma, 1440 North Kingsbury Street. Suite 210,
Chicago IL 60642.

It is further ORDERED that upon completion of his review and report, and unless needed for his upcoming deposition, Dr. Leestma will return all of the slides, photographs and impressions to University of Texas Health Science Center, Department of Pathology.

It is further ORDERED that a subpoena shall be served by the United States Marshals  and that the costs incurred by the process and the fees of the subpoena shall be paid in the same manner in which similar costs and fees are paid in the case of a subpoenaed issued on behalf of the government.

_____
Janis Graham Jack
United States District Judge

USCA5 4851

✎AO89  (Rev. 7/95) Subpoena in a Criminal Case

UNITED STATES DISTRICT COURT

**SOUTHERN** _____ **DISTRICT OF** _____ **TEXAS** _____

UNITED STATES

**V.**

**SUBPOENA IN A
CRIMINAL CASE**

ALFRED NMI BOURGEOIS

Case Number:     C-02-216

TO:    Dr, Jennifer Rulon and Ginger "Viginia" Blaha
University of Texas Health Science Center
Department. of Pathology
6431 Fannin Street,
Houston, TX 77030
(713) 500-4472

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified or any subsequent place, date and time set by the court, to testify in the above referenced case.  This subpoena remain in effect until you are granted leave to depart by the court or by an officer acting on behalf of the court.

| PLACE | COURTROOM |
|---|---|
| | District Judge |
| | Janis Graham Jack |
| UNITED STATES COURTHOUSE | DATE AND TIME |
| 1133 NORTH SHORELINE BLVD. | Monday 1/13/11 at 8:00 |
| CORPUS CHRISTI, TEXAS 78401 | a.m. |

☒ YOU ARE ALSO COMMANDED to bring with you the following document(s) or object(s):

All of the brain slides, photographs and impressions, regarding the autopsy of JG-1999, currently in your possession. However, in lieu of personal appearance, the slides, photographs and impressions shall immediately be delivered, via Federal Express to:

Dr. Jan E. Leestma, 1440 North Kingsbury Street. Suite 210, Chicago IL 60642.

| U.S. MAGISTRATE JUDGE OR CLERK OF COURT | DATE |
|---|---|
| DAVID J. BRADLEY, CLERK | |
| (By) Deputy Clerk | |

USCA5 4852

ATTORNEY'S NAME, ADDRESS AND PHONE NUMBER:
Victor J. Abreu , Esq. , Assistant Federal Public Defender

Curtis Center, Suite 545 West, Independence Square West, Philadelphia, PA 19106; (215) 928-0520

AO89  (Rev. 7/95)  Subpoena in a Criminal Case (Reverse)

| PROOF OF SERVICE | | |
|---|---|---|
| RECEIVED | DATE | PLACE |
| SERVED | DATE | PLACE |
| SERVED ON (PRINT NAME) | | FEES AND MILEAGE TENDERED TO WITNESS<br><br>☐  YES    ☐  NO    AMOUNT _____ |
| SERVED BY (PRINT NAME) | | TITLE |

DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information

Executed on _____        _____
DATE                                SIGNATURE OF SERVER


_____
ADDRESS OF SERVER


ADDITIONAL INFORMATION

USCA5 4853

USCA5 4854

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____
                                        :
UNITED STATES OF AMERICA,               :         No. Cr-C-02-216
                                        :         No. Cv-07-223
            Respondent,                 :    Honorable Janis Graham Jack,
                                        :              U.S.D.J.
      -against-                         :
                                        :
ALFRED BOURGEOIS,                       :       Electronically Filed
                                        :
            Petitioner.                 :
_____         :

**PETITIONER'S RENEWED UNOPPOSED MOTION FOR
ISSUANCE OF SUBPOENA DUCES TECUM
IN ADVANCE OF HEARING**

COMES NOW, Petitioner, ALFRED BOURGEOIS, by and through

undersigned counsel, and in accordance with Federal Rule of Criminal Procedure

17(b), and Section 1825 of Title 28, United States Code, respectfully moves this

Court to order the issuance of subpoena duces tecum requiring Ms. Kristine

McAshan, Supervisor, Patient Accounts – Healthcare and Dr. Jennifer Rulon,

University of Texas Health Science Center, Department of Pathology, 7703 Floyd

Curl Drive, San Antonio, TX 78229, (210) 567-4150, to produce the documents

requested herein in advance of hearing.  In support of this motion, Petitioner states

as follows:

USCA5 4855

1.      In an effort to assist Dr. Leestma complete his analysis related to claim III of the petition for a writ of habeas corpus, on December 1, 2010 this Court ordered the Government to report on the whereabouts of the brain slides relied upon by Dr. Elizabeth Rouse and Dr. Kathleen Kagen-Hallet at the time of trial to determine the cause of death.  On December 2, 2010 the Government filed a Status Update on the location of slides confirming that slides were currently in the possession of Ms. Ginger Blaha and Dr. Jennifer Rulon at the University of Texas Health Science Center (UTHSC),

2.      On December 3, 2010, Petitioner filed a motion for subpoena directing UTHSC, Ms. Blaha and Dr. Rulon, to deliver the slides, via Federal Express, at Petitioner's expense, to Dr. Leestma in Chicago. IL.  On December 6, 2010, the Government informed Petitioner that the requests for materials should be forwarded to Ms. Kristine McAshan, Supervisor, Patient Accounts, UTHSC, San Antonio, TX.

3.      On December 7, 2010, Petitioner contacted Ms. McAshan and per her request provided her with relevant case information and counsel's Federal Express account number to expedite delivery of the slides to Dr. Leestma.  On December 8, 2010, Ms. McAshan informed counsel that a subpoena directed at **her** – instead of Ms. Blaha and UTHSC – and Dr. Rulon would be required to release the slides.

4.      Accordingly, Petitioner respectfully requests that this Court issue a subpoena requiring Ms. Kristine McAshan, Supervisor, Patient Accounts –

USCA5 4856

Healthcare and Dr. Jennifer Rulon, University of Texas Health Science Center, Department of Pathology, 7703 Floyd Curl Drive, San Antonio, TX 78229, (210) 567-4150, to produce all of the slides, photographs and impressions, regarding the neuropathology consultation requested by Dr. Elizabeth Rouse of JG-1999, conducted by Dr. Kathleen Kagen-Hallet, accession # 02-CX-235, date cut 7/1/02, report date 9/17/02, currently in their possession in advance of the hearing:

5.     In order to expedite Dr. Leestma's review, Petitioner respectfully requests that in lieu of  personal appearance by Ms. McAshan and Dr. Rulon, the slides, photographs and impressions should be immediately delivered to:

Dr. Jan E. Leestma, 1440 North Kingsbury Street. Suite
210, Chicago IL 60642

6.     Undersigned counsel has provided Ms. McAshan  and the University of Texas Health Science Center, Department of Pathology, their Federal Express account number to expedite delivery of the materials to Dr. Leestma.  Upon completion of his review and report, and unless needed for his deposition, Dr. Leestma will return all of the slides, photographs and impressions to the University of Texas Department of Pathology.

7.     Petitioner is unable to pay the costs of the subpoena.  He has previously been found eligible for appointed counsel.

8.     Petitioner has consulted with counsel for Respondents, Tony R. Roberts,

USCA5 4857

Assistant United States Attorney, who indicated that the Government is NOT opposed

to this request.

WHEREFORE, Petitioner respectfully requests that this Court grant this motion

for the issuance of a subpoena duces tecum and payment of expenses.

Respectfully submitted,


By___/s/Victor J. Abreu_____
MICHAEL WISEMAN
VICTOR J. ABREU
Federal Community Defender Office
for the Eastern District of Pennsylvania

Capital Habeas Corpus Unit
Suite 545 West - The Curtis Center
Philadelphia, PA 19106
215-928-0520

Date: December 8, 2010

## CERTIFICATE OF SERVICE

I, Victor J. Abreu, hereby certify that on this 8th day of December, 2010
I served the foregoing upon the following persons by e-file:


Tony R. Roberts
United States Attorney's Office
PO Box 61129
Houston, TX 77208-1129
Tony.Roberts@usdoj.gov


/s/ Victor J. Abreu

_____
Victor J. Abreu

USCA5 4858

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____
                                          :
UNITED STATES OF AMERICA,      :          No. Cr-C-02-216
                                          :          No. Cv-07-223
             Respondent,        :      Honorable Janis Graham Jack,
                                          :               U.S.D.J.
        -against-               :
                                          :
ALFRED BOURGEOIS,              :        Electronically Filed
                                          :
         Petitioner.            :
_____ :

**ORDER FOR ISSUANCE OF SUBPOENA DUCES TECUM
IN ADVANCE OF HEARING**

NOW on this _____day of December, 2010, upon consideration of

Petitioner's renewed unopposed motion for issuance of a subpoena duces tecum

requiring the production of evidence in advance of hearing, it is hereby ORDERED

that Petitioner's motion is GRANTED.

It is hereby ORDERED that a subpoena shall be issued to Ms. Kristine

McAshan, Supervisor, Patient Accounts – Healthcare and Dr. Jennifer Rulon,

University of Texas Health Science Center, Department of Pathology, 7703 Floyd

Curl Drive, San Antonio, TX 78229, (210) 567-4150, to forthwith produce all of the

slides, photographs and impressions, regarding the neuropathology consultation

USCA5 4859

requested by Dr. Elizabeth Rouse of JG-1999, conducted by Dr. Kathleen Kagen-

Hallet, accession # 02-CX-235, date cut 7/1/02, report date 9/17/02, currently in their

possession in advance of the hearing:

It is further ORDERED that in lieu of  personal appearance, the slides,

photographs and impressions will immediately be delivered by overnight carrier (at

Petitioner's expense) to:

> Dr. Jan E. Leestma, 1440 North Kingsbury Street
> Suite 210 Chicago IL 60642.

It is further ORDERED that upon completion of his review and report, and

unless needed for his upcoming deposition, Dr. Leestma will return all of the slides,

photographs and impressions to University of Texas Health Science Center,

Department of Pathology.

It is further ORDERED that a subpoena shall be served by the United States

Marshals  and that the costs incurred by the process and the fees of the subpoena shall

be paid in the same manner in which similar costs and fees are paid in the case of a

subpoenaed issued on behalf of the government.


_____

Janis Graham Jack
United States District Judge


USCA5 4860

✎AO89  (Rev. 7/95) Subpoena in a Criminal Case

UNITED STATES DISTRICT COURT

SOUTHERN          DISTRICT OF          TEXAS

|  |  |
|---|---|
| UNITED STATES<br><br>V.<br><br>ALFRED NMI BOURGEOIS | **SUBPOENA IN A<br>CRIMINAL CASE**<br><br>Case Number:      C-02-216 |

TO:   Ms. Kristine McAshan and Dr. Jennifer Rulon
      University of Texas Health Science Center
      Department of Pathology
      7703 Floyd Curl Drive,
      San Antonio, TX 78229
      (210) 567-4150

☒ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified or any subsequent place, date and time set by the court, to testify in the above referenced case.  This subpoena remain in effect until you are granted leave to depart by the court or by an officer acting on behalf of the court.

| PLACE<br><br>UNITED STATES COURTHOUSE<br>1133 NORTH SHORELINE BLVD.<br>CORPUS CHRISTI, TEXAS 78401 | COURTROOM<br>District Judge<br>Janis Graham Jack |
|---|---|
| | DATE AND TIME<br> Monday 1/13/11 at 8:00 a.m. |

☒ YOU ARE ALSO COMMANDED to bring with you the following document(s) or object(s):

All of the slides, photographs and impressions, regarding the neuropathology consultation requested by Dr. Elizabeth Rouse of JG-1999, conducted by Dr. Kathleen Kagen-Hallet, accession # 02-CX-235, date cut 7/1/02, report date 9/17/02, currently in your possession. However, in lieu of personal appearance, the slides, photographs and impressions **shall immediately be delivered, via Federal Express to**:

   Dr. Jan E. Leestma, 1440 North Kingsbury Street. Suite 210, Chicago IL 60642.

| U.S. MAGISTRATE JUDGE OR CLERK OF COURT<br><br> DAVID J. BRADLEY, CLERK | DATE |
|---|---|
| (By) Deputy Clerk | |

ATTORNEY'S NAME, ADDRESS AND PHONE NUMBER:

USCA5 4861

Victor J. Abreu , Esq. , Assistant Federal Public Defender

Curtis Center, Suite 545 West, Independence Square West, Philadelphia, PA 19106; (215) 928-0520

AO89  (Rev. 7/95)  Subpoena in a Criminal Case (Reverse)

| PROOF OF SERVICE | | |
|---|---|---|
| RECEIVED | DATE | PLACE |
| SERVED | DATE | PLACE |
| SERVED ON (PRINT NAME) | | FEES AND MILEAGE TENDERED TO WITNESS |
| | | ☐  YES    ☐  NO    AMOUNT _____ |
| SERVED BY (PRINT NAME) | | TITLE |

| DECLARATION OF SERVER |
|---|
| I declare under penalty of perjury under the laws of the United States of America that the foregoing information |
| Executed on _____ |
| DATE |
| SIGNATURE OF SERVER |
| ADDRESS OF SERVER |

ADDITIONAL INFORMATION

USCA5 4862

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. Cr-C-02-216 |
|  | : | No. Cv-07-223 |
| Respondent, | : | Honorable Janis Graham Jack |
|  | : | U.S.D.J. |
| -against- | : |  |
|  | : | Electronically Filed |
| ALFRED BOURGEOIS, | : |  |
|  | : |  |
| Petitioner. | : |  |

_____   :

**NOTICE OF FILING**

Alfred Bourgeois, through counsel, hereby PROVIDES NOTICE that he is today providing and "filing" video tapes of the depositions of William Russell Oliver, M.D., Manfred Schenk taken on October 28, 2010, and Randall Price, Ph.D. taken on November 10, 2010, by forwarding the same today via overnight delivery to Sondra Scotch, Case Manager.  Copies of the videos will also be provided today to Government counsel via overnight deliver.  The transcript of each deposition has already been filed directly with the Court.

Respectfully Submitted,

/s/ Michael Wiseman
_____
Michael Wiseman
Counsel for Petitioner

Dated:      December 9, 2010
            Philadelphia, PA

USCA5 4863

**Certificate of Service**

I, Michael Wiseman, hereby certify that on this 9th day of December, 2010, I served the foregoing on the following persons by ECF filing:

Tony Roberts
Patti Booth
Mark Dowd
Elsa Salinas-Patterson
Counsel for the Government

/s/    Michael Wiseman
_____
Michael Wiseman

USCA5 4864

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-216 |
| | § | |
| ALFRED NMI BOURGEOIS | § | |

## ORDER

On this day came on to be considered Petitioner's renewed unopposed motion for issuance of a subpoena duces tecum requiring the production of evidence in advance of hearing, it is hereby **ORDERED** that Petitioner's motion is **GRANTED**.

It is hereby **ORDERED** that a subpoena shall be issued to Ms. Kristine McAshan, Supervisor, Patient Accounts – Healthcare and Dr. Jennifer Rulon, University of Texas Health Science Center, Department of Pathology, 7703 Floyd Curl Drive, San Antonio, TX 78229, (210) 567-4150, to forthwith produce all of the slides, photographs and impressions, regarding the neuropathology consultation requested by Dr. Elizabeth Rouse of JG-1999, conducted by Dr. Kathleen Kagen-Hallet, accession # 02-CX-235, date cut 7/1/02, report date 9/17/02, currently in their possession in advance of the hearing:

It is further **ORDERED** that in lieu of personal appearance, the slides, photographs and impressions will immediately be delivered by overnight carrier (at Petitioner's expense) to:

Dr. Jan E. Leestma, 1440 North Kingsbury Street

Suite 210 Chicago IL 60642.

It is further **ORDERED** that upon completion of his review and report, and unless needed for his upcoming deposition, Dr. Leestma will return all of the slides, photographs and impressions to University of Texas Health Science Center, Department of Pathology.

USCA5 4865

It is further **ORDERED** that a subpoena shall be served by the United States Marshals

and that the costs incurred by the process and the fees of the subpoena shall be paid in the same

manner in which similar costs and fees are paid in the case of a subpoenaed issued on behalf of

the government.

SIGNED and ORDERED this 9th day of December, 2010.

Janis Graham Jack
United States District Judge

2 / 2

USCA5 4866

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

————————————————————

UNITED STATES OF AMERICA,     :     No. Cr-C-02-216

             :     No. Cv-07-223

     Respondent,     :     Honorable Janis Graham Jack

             :     U.S.D.J.

     -against-     :

             :     Electronically Filed

ALFRED BOURGEOIS,     :

             :

     Petitioner.     :

————————————————————  :

### NOTICE OF FILING

PLEASE TAKE NOTICE that Alfred Bourgeois, through counsel, hereby files

the trial depositions of J. Randall Price, Ph.D. taken on November 10, 2010.

Respectfully Submitted,

/s/ Michael Wiseman

——————————————
Michael Wiseman
Counsel for Petitioner

Dated:     December 9, 2010
              Philadelphia, PA

USCA5 4867

**Certificate of Service**

I, Michael Wiseman, hereby certify that on this 9th day of December 2010, I served the foregoing on the following persons by ECF filing:

Tony Roberts
Patti Booth
Mark Dowd
Elsa Salinas-Patterson
Counsel for the Government

/s/     Michael Wiseman

_____

Michael Wiseman

USCA5 4868

186810 eb

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

UNITED STATES OF AMERICA *
        Respondent,   *
against               * No. Cr-C-02-216
                    * No. Cv-07-223
ALFRED BOURGEOIS      *
        Petitioner.   *


VIDEOTAPED DEPOSITION OF
RANDALL PRICE, PhD

UPON RECEIPT OF SIGNATURE, THE ORIGINAL OF THIS
DEPOSITION WILL BE IN THE CUSTODY OF:
Michael Wiseman, Esquire
Federal Community Defender Office
For the Eastern District of Pennsylvania
Defender Association of Philadelphia
601 Walnut Street, Suite 540 West, Curtis Building
Philadelphia, PA  19106


Date                   Edith A. Boggs, CSR


11-10-10            HOUSTON, TEXAS



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4869

Case 2:19-cv-00392-JMS-DLP Document 10-3 Filed 10/18/19 Page 701 of 2006
Randall Price, Ph.D. PageID #: 6763 November 10, 2010

2

DEPOSITION OF RANDALL PRICE, PhD

DEPOSITION AND ANSWERS of RANDALL PRICE, PhD, taken before Edith A. Boggs, a certified shorthand reporter in Harris County for the State of Texas, taken at the offices of Esquire Deposition Solutions, 1221 Lamar Street, Suite 1305, Houston, Texas, on the 10th day of November, 2010, between the hours of 9:51 a.m. and 11:58 a.m.



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4870

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 702 of 2006
Randall Price, Ph.D.          PageID #: 6764              November 10, 2010

3

A P P E A R A N C E S

ATTORNEYS FOR PETITIONER:
        Federal Community Defender Office
        For the Eastern District of Pennsylvania
        Defender Association of Philadelphia
        601 Walnut Street
        Suite 540 West, Curtis Building
        Philadelphia, PA   19106

        BY:  MICHAEL WISEMAN, ESQUIRE
        AND ELIZABETH LARIN, ESQUIRE

ATTORNEYS FOR RESPONDENT:
        U.S. Department of Justice
        United States Attorney's Office
        919 Milam, Suite 1500
        P.O. Box 61129 (77208-1129)
        Houston, Texas   77002
        BY:  TONY R. ROBERTS, ESQUIRE
        AND MARK M. DOWD, ESQUIRE

        AND

        U.S. Department of Justice
        United States Attorney's Office
        800 North Shoreline, Suite 500
        Corpus Christi, Texas   78401
        BY:  PATTI BOOTH, ESQUIRE
        AND ELSA SALINAS, ESQUIRE

        ALSO PRESENT:

        Mr. Sean Pieternelle, Videographer

        REPORTED BY:



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4871

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 703 of 2006
Randall Price, Ph.D.        PageID #: 6765              November 10, 2010

4

EXAMINATION INDEX

QUESTIONS BY                                      PAGE


Mr. Wiseman                                        5

Mr. Dowd                                           31

Mr. Wiseman                                        47

Mr. Dowd                                           56

Mr. Wiseman                                        61

Mr. Dowd                                           66

Mr. Wiseman                                        66

INDEX OF EXHIBITS

NO.    MARKED    DESCRIPTION

1      5         Excerpt from trial transcript

2      8         Appendix C

3      11        Weiner and Gelbort chart

4      49        Table



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4872

PROCEEDINGS

THE VIDEOGRAPHER:  Today's date is November 10th, 2010.  The time is approximately 9:51.  We are now on the record.

RANDALL PRICE, PhD

was called as a witness and, being first duly sworn by the notary, testified as follows:

EXAMINATION

Q.  (BY MR. WISEMAN)  Good morning, Dr. Price.

A.  Good morning.

Q.  I'd like to start off by marking as an exhibit for the deposition a four-page transcript excerpt from your testimony.

(Exhibit 1 marked.)

MR. WISEMAN:  And for the record, that is Pages 214 through 217 of the proceedings of September 23rd, 2010.  And we may be referring to portions of that and, of course, if counsel has other areas they want to explore, they can do that as well.

Q.  (BY MR. WISEMAN)  At Page 215, in response to Mr. Dowd's question, "Uh-huh," which is at Line 16 of Page 214, you began talking about scatter, and what I'd like to direct your attention to is on Page 215 starting at line 3, you -- you say, "I used the norms that have been more recently published.  They break it down to age



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4873

and education.  So, if you compare him" -- meaning Mr. Bourgeois -- "to people of his age and education, his performance on those tests, the category tests, the trails test, it's not deficient.  In fact, it's average to low average on those, which is higher than his IQ."

So, I think Mr. Dowd made a representation in court that the norms you were applying in that portion of your testimony were the Heaton norms; is that correct?

A.  As I recall, he asked me what norms I used, and I told him --

Q.  Okay.

A.  -- it was the Heaton norms.

Q.  Okay.  Now, which particular Heaton norms were you applying?  Were you applying the pre 2004 or the ones that were published in 2004?

A.  It's my -- well, I used the 2004, and it's my understanding is that the norms that were published in '91 were combined with the newer, updated, additional subjects.  And so, it really would be both would be the answer but the actual set of norms that I consulted were those published in 2004.

Q.  All right.  And the ones that were published in 2004 adjust not only for age and education but for gender and race; is that correct?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4874

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 706 of 2006
Randall Price, Ph.D.          PageID #: 6768               November 10, 2010

7

A.  You can adjust for all those things with the 2004 ones, yes.

Q.  Okay.  And is there a reason then that in your testimony that I just read to you that you did not include gender and race in your -- in your answer?

A.  No.  It's really a matter of habit to say age and education because many, if not most, neuropsychological tests are -- the norms are adjusted for gender.  I didn't include that.  A lot of them are also adjusted for age, and it wasn't anything intentional that I didn't say age, education, gender and ethnicity.

Q.  All right.  Well, I'm going to mark them in a moment but the -- the actual Heaton norms relevant to your conclusions with respect to categories and trails, in fact, adjust for not only age and education but for race and gender, in other words, you can't break them out separately?

A.  You can -- yes, you can.  You can first use the norms for the entire Heaton sample, which would be a current representative sample of the United States, and then when you break them out, you can break them out for age, education and gender, and then you can take a further analysis and break them out for age, education, gender and ethnicity.

Q.  And what did you do in this case when you reached



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

USCA5 4875

Case 2:19-cv-00392-JMS-DLP     Document 10-3     Filed 10/18/19     Page 707 of 2006
Randall Price, Ph.D.          PageID #: 6769                    November 10, 2010

8

the conclusions that I just read to you?

A.  Well, I had calculated all those factors, and my testimony, I was looking at the norms for age, education and gender.

Q.  And so, you did not take into account the racial or the ethnicity norm?

A.  Not in my testimony, no.

Q.  What part or what appendix of the Heaton norms would one see a breakdown -- well, you know what, let me -- let me -- let me do it this way:  I'm going to mark a series of -- of -- well, it's one exhibit and it's --

(Exhibit 2 marked.)

Q.  (BY MR. WISEMAN)  I have marked what I'll represent to you are portions -- relevant portions of the Heaton norms.  Why don't you flip through that and -- just to see if it looks complete to you.

A.  It does.

Q.  Okay.  And turning to the third page in, as an example, Appendix D presents the norms for a male with 12 years of education between ages 35 to 39 who's a Caucasian?

A.  Yes.

Q.  Okay.  Are you saying that there's another appendix that would have simply this information or this



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4876

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 708 of 2006
Randall Price, Ph.D.        PageID #: 6770              November 10, 2010

9

analysis broken down without accounting for race in the 2004 norms?

A.  No.  There's another section that would be for African Americans.

Q.  Right.

A.  Yes.

Q.  Okay.  And we'll get to that section as well but my question then is -- and I just want to be clear for the record that when you talked about there are analyses you can do that don't take into account race, the Heaton norms that you applied in your testimony took into account race?

A.  Yes.  I guess that the addition of the African American norms in 2004 was what I was referring to that would take into account an individual's race.

Q.  Okay.  Now, how did you -- what -- what race did you consider Mr. Bourgeois -- or do you consider Mr. Bourgeois in terms of the application of these norms?

A.  Well, in the application of these norms, I did it all three ways, the total Heaton sample, the Caucasian sample and the African American sample.

Q.  Okay.  And that's because Mr. Bourgeois is, for lack of a better phrase, of mixed race?

A.  Race is difficult to define.  Usually it's



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4877

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 709 of 2006
Randall Price, Ph.D.         PageID #: 6771              November 10, 2010

10

defined by the person's self identification.  I wasn't sure.  I wanted to analyze this all -- all the ways to see what the differences would be, and I was not sure of his race, that's correct.

Q.  Okay.  And the Heaton manual which you -- or the portion of the Heaton manual that you provided to Mr. Dowd and he sent it on to us, does not provide guidance to the practitioner as to how to define race for these purposes?

A.  I don't recall if -- I believe it leaves that up to the clinician, yes.

Q.  All right.  And so, the idea that a person -- well, let's go through the various possibilities.  If a person -- we -- do you do it by -- by skin tone, the pigment of the person's skin?

A.  Well, what -- my study of literature is that it's usually self identification.

Q.  Okay.  And in Mr. Bourgeois' case, you may recall -- or do you recall that he identified to Dr. Estrada in his report that he was -- was of mixed race?

A.  Yes.

Q.  Dr. Estrada reported it as Mr. Bourgeois is, quote, black white.  Do you recall that in his report?

A.  No, I don't.

Q.  Okay.


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4878

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 710 of 2006
Randall Price, Ph.D.    PageID #: 6772    November 10, 2010

11

A.   No.

Q.   All right.

MR. WISEMAN:  I would like to mark another exhibit.

(Exhibit 3 marked.)

Q.  (BY MR. WISEMAN)  And why don't you take a minute to familiarize yourself with that.

A.  (Witness complies.)

MR. DOWD:  While we have a little break here, can I get a clarification on the source of this Appendix C?

MR. WISEMAN:  It's from the Heaton Norms Manual.

MR. DOWD:  The latest one?  2004 or --

MR. WISEMAN:  Yeah.

MS. LARIN:  It should be the same cover actually.

MR. DOWD:  As what you saw.  Okay.

A.  Okay.

Q.  (BY MR. WISEMAN)  Okay.  Now, what I wanted to do was going through, starting with categories, we can see Dr. Weiner's raw score and I just want to walk -- I want you to walk us through how one applies these Heaton norms and what -- what the -- what the conclusions are from that application.  So, could you, use -- using



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4879

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 711 of 2006
Randall Price, Ph.D.          PageID #: 6773                    November 10, 2010

12

Exhibit 2 and taking the raw score of 94 errors, show us -- and tell us if you agree with what's on this chart with respect to the -- the conclusions.

A. Okay. First, you would take the raw score. And we're using the raw scores from Weiner at this time?

Q. Well, starting with Weiner.

A. Okay.

Q. Right.

A. You would take the errors on the category test, which is 94.

Q. And we're looking at Appendix C, the first page of Exhibit 2?

A. Yes.

Q. Okay.

A. That's what I was going to say.

Q. Okay.

A. All right. So, you would go to Appendix C, and under the second column where it says executive functions, you'll see categories error in the first column and then you would go down to 90 -- the category that includes 93, and then you read -- over to the left, you see that it has a scale score of 5.

Q. Okay. And on -- just to interrupt, on my -- the chart that was marked as 3, that is noted as a standard score. I guess the correct phraseology should be scale



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4880

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 712 of 2006
Randall Price, Ph.D.    PageID #: 6774    November 10, 2010

13

score?

A.   Yes.   That's correct.

Q.   Okay.

A.   Yes.

Q.   Well, with that correction, why don't you continue.

A.   Okay.   Okay.   Which gives you a scale score of 5 on categories, on the category test, which would be equivalent to the 5th percentile if you considered all of the Heaton norms all combined.

Q.   Okay.

A.   But to then break this down into age and education, you then take that scale score of 5, go to Appendix D and to obtain the T-score for a male Caucasian age 35 to 39, my -- well, you didn't ask me that yet.

So, then you would take the scale score of 5 and go to Appendix D.   Again, in that second column, executive functions, and go down the left on scale score to 5, read across and that's a T-score of 29.

Q.   And for the record, that's Page 3 of the exhibit?

A.   Yes, it's the third page in, yes.

Q.   Okay.

A.   Okay.   And then you would go back to -- let me see the page -- Page 5 into the record -- into this



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4881

Exhibit 2, which is for a male, 12 years of education, 35 to 39 years of age, African American, far left-hand side, scale score of 5, read across and that's a T-score of 33.

Q.  Okay.  And the T-score cut-off that indicates a deficiency or an impairment is a 39; is that right?

A.  I'd -- I'd have to check that.

Q.  Okay.  Do you agree with the designation on Exhibit 3 that the category score of 29 is in the moderate organic brain dysfunction range?

A.  Yes.

Q.  And the score of 33 is in the mild organic brain dysfunction range?

A.  Yes.

Q.  So, doing the same thing then for trails B, which is at the bottom of Exhibit 3, why don't you see if you agree with --

A.  Okay.

Q.  -- the representations on the chart.

A.  Okay.  Trails B --

MR. DOWD:  Is that designated TPT-B on --

MR. WISEMAN:  No, it's at the very bottom.

MR. DOWD:  Oh, the very bottom.  I'm sorry.

A.  Go to Appendix C, under executive functions, trails B, go down to the category that would include 93



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4882

seconds, read back to the scale score, and that would be a scale score of 8.

MR. DOWD:  What -- what page is that on again?

THE WITNESS:  It's on the first page of the Exhibit 2.

Q.  (BY MR. WISEMAN)  Okay.

A.  So, you get a scale score of 8.  And then go to Appendix D, 12 years of education, male, the third page in, age 35 to 39, Caucasian, and go to the scale score of 8, read across to trails B, and that is a T-score of 37.

Q.  Okay.  And doing the same thing then for the African American appendix, what would the result be?  I guess this is Page 5 again of the exhibit?

A.  Page 5 of the exhibit, scale score of 8, read across, would be a T-score of 45.

Q.  All right.  So, the -- and do you agree that a scale -- I'm sorry -- a T-score of 37 on trails B is in the mildly impaired range?

A.  Yes.

Q.  And a score of 45 is not in the impaired range?

A.  Yes.  That's correct.

Q.  So, if you could explain for the record and for Judge Jack what's going on with respect to how a person



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4883

Case 2:19-cv-00392-JMS-DLP     Document 10-3     Filed 10/18/19     Page 715 of 2006
Randall Price, Ph.D.          PageID #: 6777          November 10, 2010

16

can be impaired under one analysis but not another? What -- how does race figure into -- to -- to the same person being impaired under one analysis but not the other?

A.   Well, using the norms most similar to the person, including race, that -- what the literature describes race as an adjustment as a proxy for other factors in the person's life, cultural enrichment, educational opportunities, quality of education and a socioeconomic status.  It stands as a proxy for that.  And to avoid over identifying or -- you would get a greater degree of impairment comparing someone to Caucasians as you would to comparing them to African Americans.

Q.   And do you agree that the -- the Heaton norms, taking into account race, seeks to explain why empirically African Americans, as a group, score lower on these types of tests?

A.   I don't know that the Heaton norms attempt to explain it.  They use race as an adjustment but I don't know that they -- there are studies per se that explain why it is that race makes a difference but it does, in the Heaton manual, describe those as being something -- like I said, it's a proxy for other things, including socioeconomic status, cultural experiences, educational experiences.


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4884

Case 2:19-cv-00392-JMS-DLP   Document 10-3   Filed 10/18/19   Page 716 of 2006
Randall Price, Ph.D.          PageID #: 6778          November 10, 2010

17

Q.  Now, there is -- well, withdrawn.

Dr. Reitan, who was one of the co-designers, authors of the Halstead-Reitan battery, does not advocate the use of the Heaton norms, do you agree?

A.  I agree.

Q.  And would you agree that there are some -- given that fact, that there's some controversy within the -- within the field as to whether the Heaton norms ought to ever be applied or -- or not?

A.  Well, there is -- there remains some controversy about which set of norms even above and beyond the Heaton are the Reitan stage, and there is some controversy over that, yes.

Q.  All right.  And Dr. Weiner, in his administration, apparently falls on the side of the controversy that says you don't use the Heaton norms, he didn't use them?

A.  He didn't use them.

Q.  And Dr. Gelbort --

MR. DOWD:  I would -- I would -- would ask what the source of that is?  Is that in his report or in the testimony?

Q.  (BY MR. WISEMAN)  Well, based on your review of his data, would you agree that he did not use them?

A.  Well, I should say I didn't see any reference to


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4885

them in his --

Q.  Okay.

A.  -- affidavit or his report.

Q.  And the scores that he reflects and the impairments that he notes do not rely on the Heaton norms; is that right?

A.  It was not reflected in his report or affidavit.

Q.  Okay.  But how about his raw data?  That's what, I guess, I'm asking.

A.  I didn't see any -- in his raw data, any analysis using the Heaton norms.

Q.  Now, I guess -- and not to be irritating about it, I guess I was a little unclear as to what you meant in some of your testimony here.  So, let me try to, you know, hash that out and we can go from there.

As I understood -- and please correct me if I'm misunderstanding.  What I understood your testimony to be was that given Mr. Bourgeois' performance on categories and trails, with the Heaton norms applied, that those scores were not deficient?

A.  That's correct.

Q.  And that, moreover, they compared favorably -- or I shouldn't say favorably -- they were higher than his IQ scores, relatively speaking?

A.  They would not be expected based on his IQ



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4886

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 718 of 2006
Randall Price, Ph.D.        PageID #: 6780        November 10, 2010

19

scores, that's -- that's correct.

Q.  All right.  Now, taking the first part of what you just said or what you just agreed with, that Mr. Bourgeois is not impaired in categories and trails, you would agree that at least on the application of the Caucasian norms, he is moderately impaired on categories, correct?

A.  On the data from Dr. Weiner?

Q.  Yes.  I'm sorry.

A.  Based on the analysis that you presented to me in Exhibit 3, Dr. Weiner's data on the category would indicate moderate impairment.

Q.  And do you have any -- any disagreement with the presentation of the data with respect to categories on -- on Exhibit 3?

A.  No.  The only difference I have is that it was my understanding that at the time of Mr. Weiner's evaluation --

Q.  Dr. Weiner.

A.  I'm sorry -- at the time of Dr. Weiner's examination, Mr. Bourgeois was 40 years old, and that's the ones I used.  If he indeed was 39, then this would be correct.

Q.  Okay.  And if he was 40, he would be even more impaired?



an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4887

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 719 of 2006
Randall Price, Ph.D.    PageID #: 6781    November 10, 2010

20

A.  No.  He would be a little less impaired.

Q.  Less impaired.  Oh, right.  Because he's older.

A.  Yeah.

Q.  But still impaired?

A.  But still falling at the mild level on -- yes.

MR. DOWD:  Can we agree to Mr. Bourgeois' age at the time of the --

MR. WISEMAN:  Yeah.  That's what I'm trying to figure out.

MR. DOWD:  Oh, okay.

MR. WISEMAN:  I believe he was born in June of '64, and these tests were administered, I believe, in March of '04, which would make him 39.

MS. LARIN:  On 2-28.

MR. WISEMAN:  Oh, 2-28.  Okay.  So, it's right on top of it.  2-28-04, which would make him 39 at the time of the administration.

THE WITNESS:  Okay.

MR. WISEMAN:  I'm -- just for the record, I'm reading from Exhibit 31 from the hearing, which is the face sheet of Dr. Weiner's raw data.

Q.  (BY MR. WISEMAN)  All right.  So, with that correction, it would appear that what's on table -- chart 3 -- or Exhibit 3 is accurate with respect to categories and the Caucasian score?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4888

A.  Yes.

Q.  Okay.  And with respect to the application of the Heaton norms to categories, you would agree that a 33 is in the mild range of impairment on categories?

A.  Yes.

Q.  Okay.  So, in your testimony at Page 215 -- and you may not have meant to say this but I just want it to be clear for the record -- when you say on categories, he's not deficient, in fact, he's in the average to low average, that's not accurate, as we've just seen, he's in either the moderate or the mildly impaired range?

A.  That's correct.  When compared to Caucasians, that is correct.

Q.  And when compared to African Americans, it's also correct, isn't it?  33 is in the impaired range, as you just agreed?

MR. DOWD:  Well, I think that misrepresents the testimony, and I don't think -- the question was is 33 in the mild range of impairment on the categories tests.  It didn't distinguish under which sample.

MR. WISEMAN:  All right.  Well, let's -- let's start off again then.

Q.  (BY MR. WISEMAN)  Do you agree that the T-score for Mr. Bourgeois on categories on Dr. Weiner's administration is a 33?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4889

A.  Yes.

Q.  And I thought you had agreed that a 33 is in the mildly impaired range?

A.  Yes.

Q.  Okay.  So, your testimony that he was in the low average to average range on categories is not accurate, he's impaired on that -- on that test?

A.  Looking at my analysis, he is impaired unless you compare him to African Americans, yes.  That's correct.

Q.  Yeah.  Yeah, I'm -- I'm -- I have to apologize. I'm not following you.  The Exhibit 3, the category under Dr. Weiner that says, "T-score male African Americans" -- you're with me now?

A.  Yes, I am.

Q.  Okay.

A.  I'm sorry.  I'm sorry.  I am.  That -- using Dr. Weiner's data in all those categories, he would be at the mild level of impairment.

Q.  Okay.

A.  Yes.

Q.  I think I know where you're going.

A.  Okay.

Q.  Okay.  So, to sort of wrap this part up, the portion of your testimony then where you say he's average to low average on categories was -- was an error



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4890

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 722 of 2006
Randall Price, Ph.D.        PageID #: 6784                November 10, 2010

23

of some sort?  And I'm not throwing stones here.  I just want the record to be clear.  That was not accurate testimony?

A.  I would say that it's not complete, and in that regard, it would not be accurate.

Q.  Okay.

A.  That Dr. Weiner's data would show mild impairment on category, that's correct.

Q.  Now, why don't we move on to Dr. Gelbort on -- in regard to categories.  And we don't have to necessarily spend time going through the -- the whole process but would you agree with the representations on Exhibit 3 as to the -- the raw score standard and the two T-Scores for Dr. Gelbort's administration of categories?

A.  I would.  It's the same.  My analysis of the data from Dr. Gelbort's 2007 evaluation with regard to the categories yields the -- the same numbers that appear on Exhibit 3.

Q.  Okay.  And so, if you compare Mr. Bourgeois to Caucasians, he is mildly impaired at 34, would you agree with that?

A.  Yes.

Q.  And he is not impaired on the comparison to African Americans, which is 40?

A.  That's correct.



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4891

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 723 of 2006
Randall Price, Ph.D.        PageID #: 6785        November 10, 2010

24

Q.  And 40, although not impaired, would be in the borderline range of impairment?

A.  A T-score of 40 would fall at the low average level.

Q.  Low average.  Now, you talked about another analysis you did.  I wrote it down but I'm not sure I remember it.  It was the analysis for Caucasians, African Americans.  I think you called it the -- the summary score?

A.  Well, you know, the first step in utilizing the Heaton norms, when you obtain that scale score in Appendix -- in Appendix C --

Q.  Yeah.

A.  -- that scale score, of course, takes into account the whole sample.  I mean, that's -- and you then go into Appendix D to adjust it for the demographics.

So, you can take that scale score for the whole sample and convert that scale score to a T-score or to an index score, which -- wherein lies some of the -- of the misunderstanding here, I think.

You can convert all these scores to an index score, which would be the same metric that the IQ scores are on and -- which would facilitate a comparison --

Q.  I see.


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4892

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 724 of 2006
Randall Price, Ph.D.            PageID #: 6786                November 10, 2010

25

A.   -- which is what I did, and I think that's where --

Q.   Right.

A.   -- some of the misunderstanding is.

Q.   Okay.  So, the -- the -- just so I understand what you just said, the -- what you said about the scale score for Weiner was that that was the 5th percentile, using the analysis you just talked about?

A.   On the category test?

Q.   Yes.

A.   Yes.

Q.   Where would that come out on the scale score for Gelbort?  Where would that 6 come out, what percentile?

A.   At the 9th percentile.

Q.   And where in the Heaton manual does it say to do that type of percentile conversion?  Is that in the Heaton manual?

A.   No, I don't think so.

Q.   And is it in the Halstead-Reitan manual?

A.   Oh, no, it's not in there at all.

Q.   Now, I guess the other area that I wanted to ask you about was -- and, again, this may be my misunderstanding of what you were trying to do in your testimony or what your answers were.

Were you opining at all on Mr. Bourgeois' overall


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4893

Randall Price, Ph.D.                                      November 10, 2010

26

brain impairment or lack thereof?

A. No.

Q. And looking at the -- the scores reflected on Dr. Weiner's chart -- I'm sorry. It's not Dr. Weiner's chart. It's Exhibit 3, which has Dr. Weiner's scores reflected. Would you agree that that is a profile of a person with -- with brain impairment, applying the Heaton norms?

A. Well, I would agree that these scores on the tests that were administered using the overall Heaton norms would be consistent with impairment in those areas that are sensitive to brain dysfunction.

Q. Okay. And so, leaving aside the issue of localization, you don't disagree with Dr. Weiner's overall conclusion that Mr. Bourgeois, on his testing, came up as a person with organic brain dysfunction?

A. I -- I don't know. I didn't do an analysis to arrive at that opinion. I was instead looking at these scores and comparing them to his IQ.

And so, clinically speaking, when you have someone with low intelligence, it's more difficult to arrive at that opinion, and that would be the problem I would have with it.

Q. So, is what you're saying that given Mr. Bourgeois' low intelligence, it could be that that



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4894

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 726 of 2006
Randall Price, Ph.D.          PageID #: 6788          November 10, 2010

27

could -- well, withdrawn.

Just so we're clear on the meaning of some of these numbers on -- on Exhibit 3, with regard to T-scores, 35 to 39 is mild impairment?

A.   35 to 39 is mild impairment, yes.

Q.   30 to 34 is mild to moderate?

A.   Yes.

Q.   And 25 to 29 is moderate?

A.   Yes.

MR. WISEMAN:  If we can have a two-minute break, I think we might be at our conclusion.

MR. DOWD:  Okay.

THE VIDEOGRAPHER:  The time is approximately 10:30.  We are now off the record.

(Short recess.)

THE VIDEOGRAPHER:  The time is approximately 10:34.  We're now back on the record.

MR. WISEMAN:  I have no other questions.

I would like to move for the admission of Exhibits 2 and 3.

MR. DOWD:  As far as No. 3, did -- did -- has Dr. Price verified that the scores reflected on here, the norms reflected are all accurate according to Dr. Weiner's and Dr. Gelbort's --

MR. WISEMAN:  I will -- I assume the answer



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4895

to that is no.

Or what is the answer?

THE WITNESS:  I verified that his analysis for category and trails B is accurate as depicted on here.

MR. DOWD:  Accurately depicts --

THE WITNESS:  Yes.

MR. DOWD:  Or accurately reflects the results of the tests that -- and the raw data that --

THE WITNESS:  No.  No.  It accurately reflects the application of the Heaton norms the way it's presented here on those two tests.  I went through that actually on the category test and checked it here and I -- trails B, we did that, too.

MR. WISEMAN:  We did trails B.

THE WITNESS:  Yeah.

MR. WISEMAN:  Maybe what --

MR. DOWD:  Are the raw scores here also?

MR. WISEMAN:  Right.  Maybe, so we don't have to --

THE WITNESS:  No.  The application of the Heaton norms.

MR. WISEMAN:  Maybe what we should do is before you cross -- redirect, maybe we should let Dr. Price --



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4896

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 728 of 2006
Randall Price, Ph.D.          PageID #: 6790                    November 10, 2010

29

MR. DOWD:  Cross.

MR. WISEMAN:  I just crossed.

MR. DOWD:  I thought it was your witness.  I would have been nicer to him.

MR. WISEMAN:  Okay.

MR. DOWD:  Okay.

MR. WISEMAN:  Before you examine -- how about that?

MR. DOWD:  Okay.

MR. WISEMAN:  -- maybe we should let Dr. Price spend a few minutes -- or as much time as he needs with Exhibit 2 and he can --

MR. DOWD:  Sure.

MR. WISEMAN:  -- make sure that the application has no errors, and then we won't have to come back.

MR. DOWD:  Yeah.  Subject to that analysis, we have no objection to Exhibit 3 coming in.  And --

MR. WISEMAN:  So, do you want to do that, Dr. Price, and we'll --

THE WITNESS:  Okay.  So, the task is to -- as presented here, to -- to verify the application of the Heaton norms to the raw scores that are presented here?

MR. DOWD:  And see if the raw scores are



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4897

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 729 of 2006
Randall Price, Ph.D.    PageID #: 6791    November 10, 2010

30

accurate, too.

MR. WISEMAN:  I can give you the data.

MS. LARIN:  We have the raw scores.

MR. WISEMAN:  Here's that.

MS. LARIN:  No, this is it.

THE WITNESS:  That might be a problem to -- for me to verify the raw scores sitting here, I would need all the manuals and --

MR. DOWD:  All right.

THE WITNESS:  -- all that but I can do this part.

MS. LARIN:  That's the raw scores.

MR. WISEMAN:  Yeah.  I'm just showing you Page 7 of Exhibit 31.  Would that enable you to check the raw scores as depicted on the exhibit with what --

THE WITNESS:  Well, here's what I can do from this:  I can see -- anybody could see --

MR. WISEMAN:  Right.

THE WITNESS:  -- if these scores as depicted on this summary are accurate on Exhibit 3 but what I'm hearing that you're asking me if I can do is to verify the accuracy of the raw scores.

MR. WISEMAN:  Right.  I don't think we can expect you to do that last part.  Why don't you -- and if counsel agrees, why don't you see if chart -- Exhibit


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4898

Case 2:19-cv-00392-JMS-DLP   Document 10-3   Filed 10/18/19   Page 730 of 2006
Randall Price, Ph.D.          PageID #: 6792          November 10, 2010

31

3 accurately depicts the -- the scores obtained by Dr. Weiner and then, based on those scores, see if the Heaton norms are appropriately applied or accurately applied on -- on Exhibit 3.

MR. DOWD:  Can you do that?

THE WITNESS:  I can do that.

MR. DOWD:  Okay.

MR. WISEMAN:  Why don't we take as long as we need.

THE VIDEOGRAPHER:  The time is approximately 10:37.  We're now off the record.

(Short recess.)

THE VIDEOGRAPHER:  The time is approximately 11:01.  We are now back on the record.

MR. DOWD:  All right.  Thank you.

Back on the record.

Dr. Randall Price is still under oath, and my name is Mark Dowd, and I'll examine Dr. Price.

EXAMINATION

Q.  (BY MR. DOWD)  Doctor, explain the function and purpose of establishing and using norms in interpreting raw scores obtained specifically in the trail making and the category test.

A.  Well, a raw score doesn't mean anything.  A raw score is either the number of errors, how long it took


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4899

Case 2:19-cv-00392-JMS-DLP   Document 10-3   Filed 10/18/19   Page 731 of 2006
Randall Price, Ph.D.        PageID #: 6793        November 10, 2010

32

somebody to complete a test, and without comparing that
to a group of people -- to a similar group of people,
the raw score itself doesn't have any meaning to us in
neuropsychology.

So, you have a group of people, and you have how
they did on that, and then you can compare an
individual's raw score to the group of people that are
similar to them.

Q.  All right.  And did Doctors Weiner and Gelbort
identify the norms that they applied to raw scores they
obtained on those tests from Mr. Bourgeois?

A.  I did not see any identification of the specific
norms that they used.

Q.  All right.  Now, can -- can demographic factors
affect the interpretation of raw scores?

A.  Yes.

Q.  And what's the basis of your saying that?

A.  Well, we certainly have a plethora of studies in
neuropsychology that show the more education a person
has, for various reasons, even comfort in taking tests
and knowledge and experience and how to learn that they
gather through education, they score higher on the same
tests than someone with lower education.

We know that as we -- as people get older, they
score lower on certain neuropsychological tests.



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4900

Largely, that's because of speed and then other kinds of factors.

So, the way I would say this is that the neuropsychological tests do not only reflect brain dysfunction.  They reflect other things about our abilities and other factors go into the way a person performs on the neuropsychological tests other than if there's anything wrong with their brain or not.

Those factors, the demographics, have an effect on the scores.  Also, if they're depressed, other extraneous factors, if they're not putting forth good effort, all those things can affect the scores, and the clinician would take those into account.

Their prior intelligence, how intelligent they are, you expect a person to score similarly on the neuropsychological test as they would score on an IQ test.

Q.  All right.  And other than age and education, any other main demographic -- demographic features impact the interpretation of these raw scores?

A.  Age, education, gender, ethnicity are -- have been studied and are incorporated into what we've referred to here as the Heaton norms.

Q.  All right.  And how are these -- you were evaluating and comparing the impact of these Heaton



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4901

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 733 of 2006
Randall Price, Ph.D.          PageID #: 6795                     November 10, 2010

34

norms on -- on scale scores, is that right, earlier in your testimony?

A. Yes. That's right. You take a raw score in the Heaton norm system, convert it to a scale score, and then you adjust that for the demographics to arrive at what -- Heaton norms produces a T-score.

Q. Uh-huh.

A. So, there's all these different scores. And that's the way it works with the Heaton norms.

Q. All right. And -- and the purpose of applying these demographic adjustments to the scores is to do what? To make the results more accurate or --

A. Right. It's to make the results more accurate in terms of accounting for what you could refer to as normal variables, as opposed to some kind of pathology --

Q. Uh-huh.

A. -- so that you don't -- you cut down on what we would call false positives, saying somebody has brain dysfunction when they don't.

Q. All right. And is it fair to say that the more -- the more that the demographic applied reflects the testee's background, the more accurate the results will be?

A. Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4902

Q.   Okay.   Now, we've determined that Mr. Bourgeois reported that he was of mixed race?

A.   Yes.

Q.   Do you know how Mr. Bourgeois was -- was raised, if he was raised in a Caucasian community or a Caucasian family or an African American family?

A.   It's my understanding from the records that he was raised in an African American family, in an African American community.

Q.   All right.   And how would that relate to applying the African American demographic to his raw scores?

A.   Well, it would speak to the side of using those norms and analyzing his scores.

Q.   Okay.   Now, how -- how did they -- how do they come up with the numbers, the relational numbers in -- in comparing let's say an African American versus a Caucasian?   How do they determine at what levels -- at what score levels these relate to, the particular numbers?   Is this done by testing or how is this done?

A.   Well, there's a sample of Caucasians for different ages, different levels of education and gender, and they give the test to them, get the raw scores, calculate averages, percentiles, et cetera, and that's the norms.

And then in a separate sample, in a separate



Toll Free: 800.969.3027
Facsimile:  210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4903

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 735 of 2006
Randall Price, Ph.D.    PageID #: 6797    November 10, 2010

36

study, a group -- in the case of the Heaton norms, a group of about 500 African Americans were studied and applying -- using the raw scores they obtained in calculating the norms on that group to see -- to adjust for the proxy variable of ethnicity.

Q. Okay. So, it's done by testing?

A. Yes.

Q. Sampling?

A. Yes.

Q. All right. Now, I guess we've demonstrated Dr. Weiner used the Reitan sample -- or norms, I should say?

A. Well, you know, I don't know that for a fact --

Q. Okay.

A. -- because they were not listed in his report. My experience, looking at them, would lead me to conclude that he did but --

Q. Okay. But he's --

A. -- I don't know for sure.

Q. But you can say that he did not apply the Heaton norms?

A. I didn't see any indication that he did, no.

Q. Okay. And the Heaton norms establish more selective standards, in other words --

MR. WISEMAN: Objection to leading.


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4904

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 736 of 2006
Randall Price, Ph.D.    PageID #: 6798    November 10, 2010

37

Q.   (BY MR. DOWD)  How do the Heaton norms compare with the -- the Reitan norms as relating to their selectivity?

A.   Well, the Heaton norms are anywhere from 10 to 20 years more current.  There's a larger sample size, considerably larger sample size, and the Heaton norms, again, are broken down into the demographic groups.

Q.   All right.  And -- and for Mr. Bourgeois, did you specific -- specifically apply the Heaton norms in evaluating the raw scores obtained by Dr. Weiner and Dr. Gelbort on the trail making and categories tests?

A.   I did.

Q.   And what were the results of your analysis?

A.   All of them?

Q.   Yes.  Well, it's, what, six?

A.   Yeah.  I mean, I looked at six tests, two administrations of three tests.

Q.   Uh-huh.  And -- and I forgot to ask you about Dr. Gelbort.  Did -- does the -- does the record indicate that Dr. Gelbort as well used the Reitan norms or the Heaton norms?

A.   Well, I don't see any indication of the use of Heaton norms.

Q.   All right.

A.   Just my experience led me to conclude that he was


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4905

Case 2:19-cv-00392-JMS-DLP   Document 10-3   Filed 10/18/19   Page 737 of 2006
Randall Price, Ph.D.          PageID #: 6799          November 10, 2010

38

using the Reitan norms.

Q.  Reitan.  Okay.

A.  It could have been another set.  There's other sets of norms for individual tests.

Q.  Right.

A.  There's a whole book of different norms that people can use and --

Q.  Okay.

A.  -- there's others out there that he could have used.

Q.  But you used the -- you used the Heaton norms in your analysis?

A.  Yes.

Q.  And why is that?  Why did you choose those norms?

A.  Well, it's the most recent comprehensive set of norms adjusted for demographic variables.  It's -- in -- even as long ago as 2000, 75 percent of board certified neuropsychologists used the Heaton norms, and it's the trend.  It's the -- you know, even though there's some controversy over it still, it's the most utilized system in neuropsychology.

Q.  All right.  And is -- are they used because of -- are they chosen because of ease of use or accuracy or why is it the trend to move toward the Heaton norms?

A.  Well, I would say accuracy and that the


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4906

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 738 of 2006
Randall Price, Ph.D.          PageID #: 6800              November 10, 2010

39

demographic variables, applying those helps us to understand a person's score better in clinical practice.

Q. All right. And in applying those Heaton norms to Mr. Bourgeois' raw data scores from the categories, trails A and B test given by Dr. Weiner and Dr. Gelbort, what were your conclusions?

A. I probably -- there's a step that's missing and -- that we touched on and that is that, you know, I also converted these scores to the metric that's like IQ scores --

Q. Uh-huh.

A. -- because I wasn't trying to analyze these to opine about whether or not, you know, they indicated brain dysfunction. I was looking at the issue of mental retardation, and so, to compare apples and apples, I combined -- I converted T-scores to standard scores.

Q. Uh-huh.

A. A T-score has a mean or an average of 50, and a standard score has a mean or an average of 100, like IQ tests. And it's the same point on the distribution but just to convert those so I could compare it to what his measured intelligence has been.

Q. All right. And -- and if you could -- it's not a long process. If you could go through for the record your valuation, you know, how did you -- applying the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4907

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 739 of 2006
Randall Price, Ph.D.         PageID #: 6801                November 10, 2010

40

Heaton norms to his raw data, what numbers did you come up with and then how did you relate those numbers to your valuation of whether that was consistent with Mr. Bourgeois' mental retardation?

A.    Okay.  Well -- okay.  All right.  On Dr. Weiner's administration of the booklet category test, when compared to Caucasian individuals of his age and education and gender, the standard score was a 71.  When compared to African Americans, the standard score was 78.

On Dr. Weiner's administration of trail making test part A, when compared to Caucasians of his age, education and gender, the standard score was 92.  When compared to African Americans, it was 101.

Dr. Weiner's administration of trail making test part B, when compared to individuals of his age, education and gender that were Caucasians, his standard score would be an 84.  When compared to similar African Americans, his standard score was a 96.

On Dr. Gelbort's 2007 evaluation, the administration of the booklet category test, when compared to Caucasians that were of his age, education and gender, the standard score was 76.  When compared to African Americans, it's 85.

Dr. Gelbort's administration of the trail making



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4908

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 740 of 2006
Randall Price, Ph.D.          PageID #: 6802                November 10, 2010

41

test part A, when compared to Caucasians of his education, age and gender, the standard score was 93. When compared to African Americans, it was 101.

Dr. Gelbort's administration of the trail making test part B, when administered to -- when compared to Caucasians of his age, education and gender, the standard score was 90. When compared to African Americans, it was 101.

Q. All right. And these standard scores that you're discussing, those are the standard scores obtained by using the specific norms of Caucasian of his age and educational background for the first one, and then the second one was African Americans of his age and educational background?

A. Yes. Technically, it's the age, education and the demographic variables yield a T-score with a mean of 50.

Q. Uh-huh.

A. And then I converted those to standard scores so that I could compare them to the IQ scores.

Q. Okay. And go ahead and compare those standard scores to -- to an evaluation whether or not they are consistent with someone who is mentally retarded.

A. Okay. Well, these would not be consistent with somebody that's mentally retarded. On Dr. Weiner's



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4909

administration of the category test, the results fall at the borderline level, which is consistent with five out of the six IQ scores he's obtained.

The -- Dr. Weiner's administration of the trail making test A fall at the average level, which is higher than you would expect with someone of his intelligence.

Q.  In other words, the average level of intelligence?

A.  Yes.

Q.  Okay.

A.  And trail making test B from Dr. Weiner, those results fall at the low average to average level, which is inconsistent with mental retardation.

Dr. Gelbort's data, the booklet category test -- or the category test, the -- when compared to Caucasians, it falls at the borderline level of IQ analysis, which would be consistent, and when compared to African Americans, it's 85, which is also consistent with borderline intelligence.

Trail making test A with Dr. Gelbort, they fell in the average level when compared to both Caucasians and African Americans.

Q.  Average level of intelligence?

A.  Average level of intelligence.

Trail making test B from Dr. Gelbort, again, fall



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4910

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 742 of 2006
Randall Price, Ph.D.        PageID #: 6804                November 10, 2010

43

at the average level when compared to the metric of IQ tests.

Q.  All right.  One moment, please.

Now, in your earlier testimony, you -- I just want to clarify this.  You had indicated that you did not apply the ethnicity demographic factor in your testimony.  Are you suggesting you did not apply the ethnicity factor in your valuation, in your conclusions here?

A.  I did analyze the data as compared to the entire sample to the African -- African American sample and the Caucasian sample, yes.  To get a --

Q.  Okay.

A.  -- whole picture of it, I did, yes.

Q.  So, earlier in your testimony, you were just suggesting that you didn't elaborate on that in your actual testimony?

A.  I didn't.

Q.  Okay.  And your understanding, you had indicated that ethnicity is used as a proxy for other issues impacting a testee, such as socioeconomic range, other -- I don't recall your full testimony but is your understanding of Mr. Bourgeois' upbringing consistent with using that ethnicity as -- as a proxy for -- well, actually, using the African American demographic, is



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4911

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 743 of 2006
Randall Price, Ph.D.          PageID #: 6805                     November 10, 2010

44

that consistent with Mr. Bourgeois' background as relates to the -- to the proxies in which they represent?

A. Yes.

Q. Okay. Because he -- he had -- it was -- came from limited means, opportunities, et cetera?

MR. WISEMAN: Objection to leading.

Q. (BY MR. DOWD) And -- and what is the nature of the controversy on whether or not the Heaton -- the more specific Heaton norms should be used, which include the -- you know, the demographics of age, education, ethnicity and -- what's the last one -- oh, and gender? What is the nature of the controversy about using those, applying those?

A. Well, Dr. Reitan, who is -- could be considered the father of clinical neuropsychology --

Q. Uh-huh.

A. -- who really started the field in the 1950s, his approach to analyzing this data was to get a sample of people that were normal, neurologically normal --

Q. Uh-huh.

A. -- a sample of people that were known by medical testing even following them and they were known to have brain damage --

Q. Uh-huh.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4912

Case 2:19-cv-00392-JMS-DLP     Document 10-3     Filed 10/18/19     Page 744 of 2006
Randall Price, Ph.D.          PageID #: 6806          November 10, 2010

45

A.   -- and then comparing the two.  His position -- Dr. Reitan's position is that you -- that age and education and gender don't influence the scores of brain damaged individuals like they do with normal individuals.  That's his -- his position.

The other position is that -- using the demographics, is that you compare the raw scores of people to people similar to them and then you can see how they fall and you can compare interrelated tests for pattern analysis and strengths and weaknesses and use other techniques to analyze the data, and their view is to have a cut score that just says brain damaged or not isn't as accurate.  That's the issue.

Q.   Okay.  Now, during the break, you were asked to look at defense -- or Mr. Bourgeois' Exhibit No. 3 and try to verify if the application of the Heaton norms was accurately reflected in the -- in the scale used here.  Were you able to do that?

A.   Yes.

Q.   Okay.  And we also wanted to see if you could verify if the raw scores listed on the exhibit accurately reflected the raw scores obtained by Doctors Weiner and Gelbort.  Are you able to do that?

A.   No.  I can -- I can verify -- with the one minor exception of changing standard score to scale score, I



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4913

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 745 of 2006
Randall Price, Ph.D.        PageID #: 6807                November 10, 2010

46

can verify that using these raw scores, the application of the Heaton norms to those raw scores is accurate.  I can't verify the accuracy of those raw scores as I sit here today.

Q.  All right.

MR. DOWD:  Just for the record, we would object to the introduction of Exhibit 3 unless we can in some way verify the -- that the raws scores reflected on there are accurate.

Q.  (BY MR. DOWD)  Let's see here, Doctor.

MR. WISEMAN:  By the way, you didn't state your position with respect to Exhibit 2 on the record, just for --

MR. DOWD:  Oh, I'm sorry.  And Exhibit 2 is the appendix?

MR. WISEMAN:  Yes.

MR. DOWD:  We have no objection to -- to this, I think.  Let me ask the doctor.

Q.  (BY MR. DOWD)  Dr. Price, you had an opportunity to look at Exhibit 2, which is reflected -- you have a copy there?

A.  Yes.

Q.  And is that -- does that accurately reflect the Heaton norms -- application of those norms to the scale scores?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4914

Case 2:19-cv-00392-JMS-DLP   Document 10-3   Filed 10/18/19   Page 746 of 2006
Randall Price, Ph.D.        PageID #: 6808        November 10, 2010

47

A.   To the best of my knowledge, this is a copy of the appropriate pages of the Heaton norms.

Q.   Okay.

A.   Yes.

MR. DOWD:  We don't object to Exhibit 2.

MR. WISEMAN:  Okay.

MR. DOWD:  I'll pass the witness.

FURTHER EXAMINATION

Q.   (BY MR. WISEMAN)  Okay.  Just a little follow-up, Doctor.

You were talking about the demographics incorporated in the Heaton norms and in the same discussion, you also mentioned depression and effort as potentially impacting a test taker.  And I just want to be clear for the record, the Heaton norms do not address factors such as depression or effort, would you agree?

A.   That's correct.

Q.   So, the Heaton norms only address the area of demographics, i.e., race, gender, age, education?

A.   That's -- that's -- that is correct, and I think that's what I added, those other things were clinical factors --

Q.   I see.

A.   -- that the clinician would look at, not the Heaton norms, though.


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4915

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 747 of 2006
Randall Price, Ph.D.         PageID #: 6809              November 10, 2010

48

Q.  Right.  And I thought what you said on my initial questioning today was that because you had a question as to Mr. Bourgeois' ethnicity and because there isn't guidance from the various manuals and literature as to how to resolve those questions, you, therefore, applied both the Caucasian and the African American Heaton norms in your analysis?

A.  Yes.  That's correct.  There is -- I would say there is guidance about how to apply the ethnicity in that the customary and usual approach is the self identification of the person.  So, that's the only guidance I know of.

Q.  Okay.  Now, you talked about converting the scale scores to -- I'm sorry -- the T-scores to -- to a standard score.  All right.  Let me start over.

You -- you testified that you took the standard scores for a variety of these tests and you arrived at a percentile score that would be placed on a bell curve, much like an MR score would?

A.  Yes.

Q.  Okay.  And I thought what you said was that the T-score -- the mean for a T-score is 50 and that's why the conversion is necessary, so you can compare apples and apples?

A.  Yes.


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4916

Q.  If the T-score average -- or mean, I should say, is 50, then why don't you simply double the scale score to arrive at that percentile score?  Is there some other chart that -- that you're referring to?

A.  It would -- I can see why you would ask that. I've never -- never been asked that.  It just doesn't work out that way.

Q.  Because.

A.  For instance -- and I have a table that does this, and that's the reason I can say that.  If you have a T-score of 31, the standard score is 72.

Now, if I can explain that as to why you don't just double it, the -- that the metric is different because the standard deviation would not be the same. For instance, with a standard score of a hundred, with standard scores, the mean is a hundred, the standard deviation is 10.  With T-scores, the mean is 50.

Let me have just a minute here.

The standard deviation is 7.  So, it -- you can't just double it because of that.

Q.  Okay.  Can I see what you're referring to?

A.  Sure.

MR. WISEMAN:  Could we have this marked, please.

(Exhibit 4 marked.)



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4917

Q.   (BY MR. WISEMAN)  I've marked the chart that you handed me, Doctor, and it's Exhibit 4.  Can you tell us from where this originates?  Where did you get it?

A.   If I recall correctly, Dr. Munro Cullum at the University of Texas Southwestern School of Medicine put this together from the different sources, using the Wechsler, the Heaton interpretations, and then the stat -- the statistical analysis of scores, which is found in many books, that would say that any point on that distribution -- assuming that it's normal, any point on that distribution can be represented by three different kinds of scores, standard scores where the mean is 10 -- I mean, scale scores where the mean is 10, standard scores where the mean is 100, T-scores where the mean is 50.  And you can convert -- and you can also do a percentile.

And the advice that's given to us is to use one and convert all your scores to this same kind of score so that you can compare them.  Many people prefer the percentiles because it's less -- less confusing and less standard scale scores and all that but the idea is to get it so you can compare it.  So, it's what he's done, and I think that's where I got this many --

Q.   And --

A.   -- years ago.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4918

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 750 of 2006
Randall Price, Ph.D.          PageID #: 6812          November 10, 2010

51

Q.  And so, I guess the question relevant to mental retardation then is that the DSM and all the different authorities we discussed at the hearing in chief as to how to diagnose MR or the lack thereof doesn't suggest that one engage in the type of conversions that you have discussed here today for diagnostic purposes?

A.  I'm sorry.

Q.  Okay.

A.  I don't understand that question.

Q.  Sure.  Let me -- let me try it again.

The DSM and the AAMR and its successive -- successor publication talk about a diagnosis of MR as being based on an IQ score, not on a conversion such as the one you've discussed today?

A.  Okay.  I'm following you.  Those sources -- those authoritative sources on the diagnosis of mental retardation say use an IQ test, not neuropsychological tests.

So, it's not really about my conversion of scores.  It's about they say you don't use neuropsychological tests of memory, abstract thinking, et cetera, to diagnose mental retardation.

Q.  Right.  And I guess we're -- we're discussing this because you've opined that his performance on certain of the neuropsychological tests are, in your


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4919

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 751 of 2006
Randall Price, Ph.D.        PageID #: 6813                November 10, 2010

52

words, inconsistent with MR, and that's why we're having this discussion.  So, I just want to be clear, and you agree, I take it, that for diagnostic purposes, we look at the gold standard IQ test?

A.  That's true.  It's not that you would ignore any other information as it might relate to their cognitive functioning but the -- the bottom line diagnosis is based on IQ tests, adaptive behavior and the time in life it begins.

Q.  Okay.  And the -- during your discussion of the conversion with Mr. Dowd, you were using a phrase that the converted scores fall at a particular level of intelligence, and my question with regard to that is -- and I think that you just said -- these neuropsychological tests don't measure intelligence, they measure for the presence or absence of organicity, correct?

A.  I would agree with all of that and it was well phrased except the end of it, that they measure organicity.  I would say that, you know, they -- neuropsychological tests are intended to measure brain dysfunction but we now know that many other factors contribute to those but that's not the thrust of your question, I know.  Just --

Q.  Okay.  I'll stand corrected with great pride.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4920

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 752 of 2006
    Randall Price, Ph.D.         PageID #: 6814               November 10, 2010

53

A.    It was a good question.

Q.    Thank you.  And a fine answer.

Now, just so we can try to resolve the question about the raw scores on -- on Exhibit 3, I'm going to hand you a copy of Exhibit 31, Page 7, which for the record is Dr. Weiner's score sheet for the Halstead-Reitan Neuropsychological Test Battery For Adults, and if we can just go down -- and I know you can't vouch for the way in which he administered the test but I just want to make sure either what we've got -- what he put down on his score sheet is accurately reflected on Exhibit 3 and, if not, you'll let us know, and if you can't tell, let us know that.

Categories, 94 errors, is that accurate?

A.    That's the number on his summary sheet.

Q.    That's -- that's all I'm asking for.

A.    Okay.

Q.    I know you can't go deeper than that.

A.    Okay.

Q.    TPT-DL, 3.33?

A.    I -- you know, I can't verify that because there's a nomograph that we would use to convert. That's -- that's -- that's the dominant hand, and you see on the summary sheet that it looks like -- it's 10 minutes, and it looks like a 3 in parentheses, and I --


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4921

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 753 of 2006
Randall Price, Ph.D.          PageID #: 6815              November 10, 2010

54

this is a 3.33.  So, I mean, I can certainly see the comparison there but I -- I really couldn't verify that as being accurate.

Q.  Okay.  And then TPT-NDR?

A.  I really would need to look at the manuals for this.

Q.  Okay.  TPT-B?

A.  Same thing.  I --

Q.  B is both hands?

A.  Yes.

Q.  All right.  And where it says both hands on the score sheet, it says 9 minutes, 32 seconds?

A.  Yes.

Q.  All right.  And you don't feel comfortable extrapolating from that to the .95?

A.  Right.

Q.  Okay.  How about TPT-Total, 1.16?

A.  I don't know.  The total times 26 minutes and 50 seconds, and I couldn't verify that that's the conversion for raw score.

Q.  TPT-Memory, 6?

A.  6 is the same that's on the summary sheet.

Q.  Okay.  So, that you can verify?

A.  Uh-huh.

Q.  At least as -- under the parameters we're working



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4922

under?

A. Right.

Q. TPT-Localization is a 1. I think you can do that as well?

A. Yes.

Q. That's on the score sheet. All right. We have finger tapping at 50, DL?

A. Finger tapping, 50, that's what's on the summary sheet.

Q. Okay. So, that's accurate.

Tapping NDR, 46?

A. That's for nondominant hand, and that's the same.

Q. All right. And seashore rhythm at a 23, that's on the score sheet?

A. Yes, that's on the score sheet. I don't know what 23C means but -- 23 correct, that's what that means.

Q. 23 correct?

A. Yes.

Q. 9 errors?

A. Yes.

Q. That's what it means. And then speech sounds, 9 errors is also on the score sheet?

A. Yes.

Q. And trails A and B, I think we've covered, 32 and



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4923

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 755 of 2006
Randall Price, Ph.D.        PageID #: 6817                    November 10, 2010

56

93?

A.   Yes.

Q.   Okay.  So, with the exception of those few TPT scores that you would need a manual, you can say that what's reflected in the raw scores on Exhibit 3 are -- are accurately taken from Dr. Weiner's score sheets?

A.   From the summary sheet, yes.

Q.   Yes.  Okay.

MR. WISEMAN:  With that, I will -- I mean, obviously, the judge will have to make a decision but I would renew the offer, and I would suggest that whatever the doctor can't verify would go to the weight and not the admissibility of this exhibit.

MR. DOWD:  I'll ask the doctor a few more questions when you're finished --

MR. WISEMAN:  Okay.

MR. DOWD:  -- and then I'll voice my objection.

MR. WISEMAN:  Okay.  Okay.  That's all I have.  Thank you.

FURTHER EXAMINATION

Q.   (BY MR. DOWD) Just a little bit longer, doctor.

Now, the Heaton norms didn't address depression or lack of effort on the part of the testee, I think you testified to that earlier?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4924

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 756 of 2006
Randall Price, Ph.D.          PageID #: 6818          November 10, 2010

57

A.  Yes.  They -- they don't address those clinical factors at all.

Q.  All right.  And those are addressed by the -- by the clinician, the person administering the test?

A.  Yes.

Q.  All right.  And did -- do you remember whether Dr. Weiner or Dr. Gelbort suggested that Mr. Bourgeois did not provide full effort on the taking of these tests?

MR. WISEMAN:  I'm going to object to this as beyond the scope of the deposition.  I -- you know, this is going rather far afield.

MR. DOWD:  Well, I'm just following up with a question that you brought up relating to the Heaton norms don't address depression and effort.

Q.  (BY MR. DOWD)  Doctor, if you could answer.  If you recall, do you recall if Dr. Weiner and Dr. Gelbort observed whether or not Mr. Bourgeois was giving full effort?

A.  My recall of that would -- is not clear.

Q.  If you don't recall -- if you don't recall, that's fine.

A.  Not for sure.  I mean, I remember something but --

Q.  It will be in the record.


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4925

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 757 of 2006
Randall Price, Ph.D.          PageID #: 6819          November 10, 2010

58

And as far as the guidance on whether to apply the demographic for ethnicity, is -- in your opinion, is that -- is there guidance that suggests that you should apply that demographic?

A.  Yes, I think there is guidance.  I think that I described in this case, I think one should look at all the norms for this in this -- in this case, yeah.

Q.  Okay.  And if -- my earlier question might not have been clear but do you know whether Mr. Bourgeois' background and upbringing is consistent with the proxies that form the basis of applying the African American ethnicity norm?

A.  That's my understanding and -- from both my evaluation of him and the records, yes.

Q.  Okay.  Now, as far as this issue about the DSM suggests that you should use, you know, IQ -- excuse me -- IQ scores to determine mental retardation, what's -- what's the -- why did you feel that you were able to give an opinion as to applying these neuropsychological tests to -- as to whether or not those are consistent with a finding of mental retardation?

A.  Well, I think you look at all the information you have to see what's consistent and what isn't consistent, and if you have other test scores -- just like if you



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

USCA5 4926

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 758 of 2006
Randall Price, Ph.D.          PageID #: 6820          November 10, 2010

59

had a school file and there were tests -- nonIQ tests in the school file, you would -- you would look to see if those were consistent or inconsistent with an opinion about mental retardation.

Q. And is this evaluation, comparing the results of the neuropsychological test to whether it's consistently -- consistent with mental retard -- with a finding of mental retardation, I mean, is that an evaluation that is rarely done or is that a standard evaluation done by, you know, psychologists, on the issue of mental retardation?

A. It would not be typical -- when asked to evaluate if somebody was mentally retarded or not, it would not be typical to administer a battery of neuropsychological tests.

Q. Okay. Now, on Exhibit No. 3, the -- you were not able to verify the -- that the raw scores reflected on the exhibit, in fact, reflect accurately the results of Dr. Weiner's and Dr. Gelbort's administration of the categories, trails making -- and trail making tests to Mr. Bourgeois, and what -- what -- what would you need to --

MR. WISEMAN: I'm going to object. That, I think, that mischaracterizes the doctor's testimony.

Q. (BY MR. DOWD) Well, let me ask you: Were you



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4927

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 759 of 2006
Randall Price, Ph.D.          PageID #: 6821              November 10, 2010

60

able to -- to verify that raw score data reflected on
Exhibit 3 accurately reflects the results of the -- Dr.
Weiner's and Dr. Gelbort's administration of those tests
I just talked about to Mr. Bourgeois?

A.  I -- I can't do that here today, no.

Q.  And what would you need to do that?  I mean,
what -- what would -- what, if anything, would enable
you to do that, to verify whether this is accurate,
Exhibit 3?

A.  Well, I could -- I could verify as to whether or
not the -- the scoring on the raw data was accurate and
that the final scores were consistent with this, with
all the manuals and everything --

Q.  Uh-huh.

A.  -- here.

Q.  Uh-huh.

A.  What I couldn't do, of course, is to verify
anything about the administration of the test but --

Q.  Uh-huh.

A.  -- I could assume that was -- that was correct
and analyze the scoring if I had all the materials here.

Q.  Okay.  And you don't?

A.  No.

Q.  Now, the -- once the raw data is obtained, it's
then transferred onto a summary sheet?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4928

A.  Typically.

Q.  Okay.  And that's another step in the process that -- that was done and you can't determine whether that was done accurately as well?

A.  Well, I mean, I could -- given the raw data and the summary sheet, I mean, I could -- here today, I could go back and look at those to see if it was transferred correctly to the summary sheet, but I mean --

Q.  Okay.  But -- but your -- your testimony assumes that that transfer was done accurately as well?

A.  Yes.

Q.  Okay.

MR. DOWD:  We would renew our objection to Exhibit No. 3 because the -- I don't think that the raw data information has been verified.

MR. WISEMAN:  Well, let me ask a few more questions then about it.

FURTHER EXAMINATION

Q.  (BY MR. WISEMAN)  Just -- I know -- we've gotten maybe a little bit confused here collectively.  What we've asked you to do is look at Dr. Weiner's data sheet to see if the information on that data sheet was accurately placed on the Exhibit 3 raw score category.

MR. DOWD:  Just for clarification, you're



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4929

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 761 of 2006
Randall Price, Ph.D.          PageID #: 6823          November 10, 2010

62

talking about the summary sheet?

MR. WISEMAN:  I'm talking about Page 7 of Exhibit 31, which is the Halstead-Reitan Neuropsychological Test Battery Result Summary Sheet.

MR. DOWD:  Summary sheet.  Okay.

Q.  (BY MR. WISEMAN)  So, the -- my question then is that is it your understanding what you've been asked to do is to see to the extent it's possible, without additional materials, whether the numbers on that document were accurately placed on Exhibit 3 in the raw score category?

A.  I was asked to do that, yes.

Q.  Okay.  And you were able to do that for all but four of the TPT scores?

A.  That's correct.

Q.  Okay.  Now, the other questions Mr. Dowd just asked you were whether you -- whether you have an opinion or can you tell as to whether or not Dr. Weiner accurately administered and scored the testing.  Is that your understanding of what he was asking?

A.  Yes.

Q.  Okay.  I just want to read to you your testimony in response to my questions at the hearing.

MR. DOWD:  Let me -- let me just voice an objection.  That wasn't the question but that would be



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

USCA5 4930

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 762 of 2006
Randall Price, Ph.D.          PageID #: 6824          November 10, 2010

63

my objection.

MR. WISEMAN:  Okay.

MR. DOWD:  But I know the witness has already said that --

MR. WISEMAN:  That was his understanding, yes.

MR. DOWD:  Right.

Q.   (BY MR. WISEMAN)  On Page 238 of the transcript of September 23rd, line 20, I asked you, "Leaving aside the controversy between the parties here as to whether Mr. Bourgeois is entitled to a formal diagnosis of mental retardation, you would agree that, at best, he is borderline deficient in his intellectual functioning?"

And your answer is, "That's the best measurement of his cognitive IQ that we have.  I agree with that, yes."

Question, "Okay.  And I don't see in your report any criticism of the administration.  You read the data from both Doctors -- "

Answer, "Yes."

Question -- "Gelbort and Weiner?"

Answer, "Yes."

Question, "I don't see any report or critique in your report that they administered the tests incorrectly or that they scored them incorrectly?"


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4931

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 763 of 2006
Randall Price, Ph.D.         PageID #: 6825                    November 10, 2010

64

Answer, "That's correct."

So, you had no quarrel with the actual -- to the extent one can tell, you weren't in the room -- the actual administration and scoring of Dr. Weiner's testing?

A.   Wait.  Don't close that.

MR. DOWD:  Do you need to -- Doctor, this is your copy of the -- of your testimony if you need to look at that.

THE WITNESS:  Okay.

A.   As I --

MR. DOWD:  I'm sorry, what page was that on?

MR. WISEMAN:  238 to 239.

MR. DOWD:  Okay.

THE WITNESS:  Whoops.  That's --

MR. DOWD:  That's yours.  That's your testimony, Doctor.

THE WITNESS:  Okay.

A.   Okay.  I have a two-part answer to that --

Q.   (BY MR. WISEMAN)  Okay.

A.   -- if you'll let me do that.  I don't, as -- I didn't, as I sat there during the hearing, and I don't, as I sit here today, have a quarrel with that.  I didn't -- I don't.  I don't know.  I just don't know if -- but I'll -- at the hearing, I was answering the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4932

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 764 of 2006
Randall Price, Ph.D.        PageID #: 6826        November 10, 2010

65

question that you asked.  And you said, "I don't see any
report or critique in your report that they administered
the test incorrectly?"

And so, I answered, "That's correct."

Q.  Okay.

A.  It wasn't in the report.  I mean, there wasn't
anything.  And so, maybe that's a little confusing, and
maybe I'm --

Q.  Well --

A.  -- splitting hairs but --

Q.  Yeah, I mean, maybe -- maybe, maybe not but let's
ask it this way:  I mean, if you thought that Dr. Weiner
had, you know, grossly or even in some minor but
material way made a mistake in his testing, you would
have pointed that out to counsel and it would have been
in your report and presumably in your testimony, you
would have talked about that if he made a mistake?

A.  I think I would have talked about that.  I don't
know that I would answer that I would have put it in my
report, though.

Q.  Okay.  All right.  Well, final question then
about this Exhibit 3.  During the break, you checked the
scale scores and you checked the T-scores and you didn't
find any errors in Exhibit 3?

A.  That's correct.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4933

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 765 of 2006
Randall Price, Ph.D.          PageID #: 6827                    November 10, 2010

66

Q.  Okay.  And that would be true of -- well, withdrawn.

MR. WISEMAN:  Okay.  That's really it unless Mr. Dowd -- and we would renew our -- we would renew our offer and, obviously, the judge will make a decision.

FURTHER EXAMINATION

Q.  (BY MR. DOWD)  Doctor, as far as this issue about whether or not you have any information that Dr. Weiner administered the testing properly or improperly, what -- can you draw any conclusions on that from the -- his reporting the raw data or can you -- can you address that at all?  Is there a way for you to determine whether or not he -- he administered the tests properly or improperly?

A.  No, not -- not the administration, no.

Q.  Okay.

FURTHER EXAMINATION

Q.  (BY MR. WISEMAN)  Well, to be clear, administration, scoring, if there were scoring errors, you could see that, correct?

A.  Correct.

Q.  Okay.  And if there was an error in the administration that reflected in the scoring itself, you would be able to determine that?

A.  Okay.  Yeah.  I'm following you now.  There would



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4934

be some instances where, by analyzing the scoring, you could see if there was a problem in the administration. They would be very specific things, though.

Q.  Okay.  And you didn't sit through the entire -- well, you didn't sit through the testimony of Dr. Price, did you -- of Doctor --

A.  No.

Q.  I -- I -- I -- I'll rephrase that.

You didn't sit through the testimony of Dr. Gelbort?

A.  No.

Q.  All right.  Have you had a chance to review his transcript?

A.  No.

Q.  All right.  Have you talked with Dr. Moore about his views of the accuracy of the administration and scoring of Dr. Gelbort's testing -- I'm sorry -- Dr. Weiner's testing?

A.  No.

MR. WISEMAN:  Okay.  Nothing else.

MR. DOWD:  That's all we have.

THE VIDEOGRAPHER:  The time is approximately 11:58.  We are now off the record.

(Whereupon at 11:58 a.m. the deposition was concluded.)



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4935

E R R A T A    S H E E T

Correction                                    Page        Line

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4936

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 768 of 2006
Randall Price, Ph.D.          PageID #: 6830                November 10, 2010

69

I, RANDALL PRICE, PhD, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
RANDALL PRICE, PhD


THE STATE OF _____
COUNTY OF _____
Before me, _____, on this day personally appeared RANDALL PRICE, PhD, known to me (or proved to me under oath or through _____) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.
Given under my hand and seal of office this _____ day of _____, _____.


_____
NOTARY PUBLIC IN AND FOR
THE STATE OF _____



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4937

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 769 of 2006
Randall Price, Ph.D.          PageID #: 6831              November 10, 2010

70

STATE OF TEXAS        *
COUNTY OF HARRIS      *

        I, the undersigned certified shorthand reporter
and notary public in and for the State of Texas, certify
that the facts stated in the foregoing pages are true
and correct.
        I further certify that I am neither attorney or
counsel for, nor related to or employed by, any of the
parties to the action in which this deposition is taken
and, further, that I am not a relative or employee of
any counsel employed by the parties hereto, or
financially interested in the action.

        SUBSCRIBED AND SWORN TO under my hand and seal of
office on this the 23rd day of November, 2010.


        EDITH A. BOGGS, CSR
        Certified Shorthand Reporter and
        Notary Public in and for
        the State of Texas
Notary Expires:  5-10-2012
Certificate No. 3022
Expiration date:  12-31-2011
Esquire Deposition Solutions, LLC
Registration No. 3



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

USCA5 4938

Randall Price, Ph.D.                                  November 10, 2010

71

| A | actual | 67:2,16 | ages | 22:8 23:15 |
|---|---|---|---|---|

**A**

**AAMR**
51:11
**abilities**
33:6
**able**
45:18,23
58:19 59:17
60:1 62:13
66:24
**absence**
52:16
**abstract**
51:21
**account**
8:5 9:10,12
9:15 16:15
24:15 33:13
**accounting**
9:1 34:14
**accuracy**
30:22 38:23
38:25 46:3
67:16
**accurate**
20:24 21:10
22:6 23:2,5
27:23 28:4
30:1,20
34:12,13,23
45:13 46:2
46:9 53:14
54:3 55:10
60:8,11
**accurately**
28:6,8,10
31:1,3
45:17,22
46:23 53:11
56:6 59:18
60:2 61:4
61:11,24
62:10,19
**acknowledged**
69:8
**action**
70:6,7

**actual**
6:21 7:13
43:17 64:2
64:4
**adaptive**
52:8
**added**
47:21
**addition**
9:13
**additional**
6:19 62:9
**address**
47:15,18
56:23 57:1
57:15 66:11
**addressed**
57:3
**adjust**
6:24 7:1,15
24:16 34:5
36:4
**adjusted**
7:8,9 38:16
**adjustment**
16:7,19
**adjustments**
34:11
**administer**
59:14
**administered**
20:12 26:10
41:5 53:9
62:19 63:24
65:2 66:9
66:13
**administe...**
57:4
**administr...**
17:15 20:17
21:25 23:14
40:6,11,15
40:21,25
41:4 42:1,4
59:19 60:3
60:18 63:18
64:4 66:15
66:19,23

67:2,16
**administr...**
37:17
**admissibi...**
56:13
**admission**
27:19
**Adults**
53:8
**advice**
50:17
**advocate**
17:4
**affect**
32:15 33:12
**affidavit**
18:3,7
**affix**
69:1
**afield**
57:12
**African**
9:4,13,22
14:2 15:14
16:13,16
21:14 22:9
22:12 23:24
24:8 35:6,8
35:8,11,16
36:2 40:9
40:14,18,24
41:3,7,13
42:18,22
43:11,11,25
48:6 58:11
**age**
5:25 6:2,24
7:6,10,11
7:15,22,23
8:3 13:12
13:15 14:2
15:10 20:7
33:18,21
40:7,12,16
40:22 41:2
41:6,11,13
41:15 44:11
45:2 47:19

**ages**
8:21 35:21
**ago**
38:17 50:25
**agree**
12:2 14:8,17
15:18 16:14
17:4,5,6,24
19:5 20:6
21:3,23
23:12,20
26:6,9
47:16 52:3
52:18 63:12
63:15
**agreed**
19:3 21:16
22:2
**agrees**
30:25
**ahead**
41:21
**ALFRED**
1:6
**AMERICA**
1:4
**American**
9:14,22 14:2
15:14 35:6
35:8,9,11
35:16 43:11
43:25 48:6
58:11
**Americans**
9:4 16:13,16
21:14 22:9
22:13 23:24
24:8 36:2
40:9,14,19
40:24 41:3
41:8,13
42:18,22
**analyses**
9:9
**analysis**
7:23 9:1
16:1,3
18:10 19:10

22:8 23:15
24:6,7 25:8
26:17 28:3
29:17 37:13
38:12 42:17
45:10 48:7
50:8
**analyze**
10:2 39:12
43:10 45:11
60:21
**analyzing**
35:13 44:19
67:1
**answer**
6:21 7:5
27:25 28:2
53:2 57:16
63:14,20,22
64:1,19
65:19
**answered**
65:4
**answering**
64:25
**answers**
2:11 25:24
**anybody**
30:17
**apologize**
22:10
**apparently**
17:15
**appear**
20:23 23:17
**appeared**
69:6
**appendix**
4:17 8:8,20
8:25 11:11
12:11,17
13:14,18
14:24 15:9
15:14 24:12
24:12,16
46:15
**apples**
39:15,15



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4939

Randall Price, Ph.D.                                      November 10, 2010

72

| | | | | |
|---|---|---|---|---|
| 48:23,24 | 6:10 45:14 | 2:16,17 | **bit** | 33:8 34:19 |
| **application** | 49:6 59:12 | 67:24 | 56:22 61:21 | 39:14 44:24 |
| 9:18,20 | 61:22 62:7 | | **black** | 45:3,12 |
| 11:25 19:5 | 62:12,17 | **———— B ————** | 10:23 | 52:21 |
| 21:2 28:11 | 63:9 65:1 | **B** | **board** | **break** |
| 28:21 29:15 | **asking** | 14:15,20,25 | 38:17 | 5:25 7:16,21 |
| 29:22 45:16 | 18:9 30:21 | 15:11,19 | **Boggs** | 7:21,23 |
| 46:1,24 | 53:16 62:20 | 28:4,14,15 | 1:19 2:12 | 11:9 13:12 |
| **applied** | **Association** | 39:5 40:16 | 70:11 | 27:11 45:14 |
| 9:11 17:9 | 1:15 3:5 | 41:5 42:11 | **book** | 65:22 |
| 18:19 31:3 | **assume** | 42:25 54:9 | 38:6 | **breakdown** |
| 31:4 32:10 | 27:25 60:20 | 55:25 | **booklet** | 8:9 |
| 34:22 48:5 | **assumes** | **back** | 40:6,21 | **broken** |
| **applies** | 61:10 | 13:24 15:1 | 42:14 | 9:1 37:7 |
| 11:23 | **assuming** | 27:17 29:16 | **books** | **brought** |
| **apply** | 50:10 | 31:14,16 | 50:9 | 57:14 |
| 36:20 37:9 | **attempt** | 61:7 | **BOOTH** | **Building** |
| 43:6,7 48:9 | 16:18 | **background** | 3:19 | 1:16 3:6 |
| 58:1,4 | **attention** | 34:23 41:12 | **borderline** | |
| **applying** | 5:23 | 41:14 44:1 | 24:2 42:2,16 | **———— C ————** |
| 6:7,15,15 | **attorney** | 58:10 | 42:19 63:13 | **C** |
| 26:7 34:10 | 70:5 | **based** | **born** | 3:1 4:17 |
| 35:10 36:3 | **ATTORNEYS** | 17:23 18:25 | 20:11 | 11:11 12:11 |
| 39:1,3,25 | 3:3,10 | 19:10 31:2 | **bottom** | 12:17 14:24 |
| 44:14 58:11 | **Attorney's** | 51:13 52:8 | 14:16,22,23 | 24:12 |
| 58:19 | 3:11,17 | **basis** | 52:7 | **calculate** |
| **approach** | **authorita...** | 32:17 58:11 | **Bourgeois** | 35:23 |
| 44:19 48:10 | 51:16 | **battery** | 1:6 6:2 9:17 | **calculated** |
| **appropriate** | **authorities** | 17:3 53:7 | 9:18,23 | 8:2 |
| 47:2 | 51:3 | 59:14 62:4 | 10:18,22 | **calculating** |
| **appropria...** | **authors** | **began** | 18:18 19:4 | 36:4 |
| 31:3 | 17:3 | 5:22 | 19:21 20:6 | **call** |
| **approxima...** | **average** | **begins** | 21:24 23:19 | 34:19 |
| 5:3 27:13,16 | 6:4,5 21:9 | 52:9 | 25:25 26:15 | **called** |
| 31:10,13 | 21:10 22:6 | **behavior** | 26:25 32:11 | 5:6 24:8 |
| 67:22 | 22:6,25,25 | 52:8 | 35:1,4 37:8 | **card** |
| **area** | 24:3,5 | **believe** | 39:4 40:4 | 69:7 |
| 25:21 47:18 | 39:18,19 | 10:10 20:11 | 43:23 44:1 | **case** |
| **areas** | 42:5,7,12 | 20:12 | 45:15 48:3 | 7:25 10:18 |
| 5:18 26:11 | 42:12,21,23 | **bell** | 57:7,18 | 36:1 58:6,7 |
| **arrive** | 42:24 43:1 | 48:18 | 58:9 59:21 | **categories** |
| 26:18,22 | 49:1 | **best** | 60:4 63:11 | 7:14 11:21 |
| 34:5 49:3 | **averages** | 47:1 63:12 | **Box** | 12:19 13:8 |
| **arrived** | 35:23 | 63:14 | 3:12 | 18:19 19:4 |
| 48:17 | **avoid** | **better** | **brain** | 19:7,14 |
| **aside** | 16:10 | 9:24 39:2 | 14:10,12 | 20:25 21:3 |
| 26:13 63:9 | **a.m** | **beyond** | 26:1,7,12 | 21:4,8,19 |
| **asked** | | 17:11 57:11 | 26:16 33:4 | 21:24 22:6 |



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

**USCA5 4940**

Randall Price, Ph.D.                                    November 10, 2010

73

```
  22:17,25          14:19 20:24    come                67:25            convert
  23:10,14,17       26:4,5          25:12,13           conclusion        24:19,22
  37:11 39:4        30:25 49:4       29:16 35:15        26:15 27:11       34:4 39:21
  53:14 59:20       50:1             40:1              conclusions        50:15,18
category           check            comfort            7:14 8:1          53:22
 6:3 12:9,20        14:7 30:14       32:20              11:24 12:3      converted
   13:8 14:9       checked           comfortable        39:6 43:8        39:9,16
   14:25 19:11      28:13 65:22      54:14              66:10            41:19 52:12
   22:11 23:8        65:23          coming            confused         converting
   25:9 28:4       chief             29:18             61:21            48:13
   28:13 31:23      51:3            community         confusing         copy
   40:6,21         choose            1:14 3:4          50:20 65:7        46:21 47:1
   42:1,14,15       38:14            35:5,9           consider            53:5 64:8
   61:24 62:11     chosen           compare           9:17,17          Corpus
Caucasian          38:23             6:1 22:9         considerably      3:18
 8:22 9:21         Christi            23:19 32:6       37:6            correct
   13:15 15:10      3:18              37:1 39:15      considera...       6:9,25 10:4
   19:6 20:25      clarifica...       39:21 41:20     69:9               12:25 13:2
   35:5,5,17        11:10 61:25       41:21 45:7      considered         15:23 18:16
   40:7 41:11      clarify            45:9 48:23       13:9 44:15        18:21 19:1
   43:12 48:6       43:5              50:19,22        consistent         19:7,23
Caucasians         clear            compared          26:11 40:3        21:12,13,15
 16:12 21:12        9:8 21:8         18:22 21:12        41:23,24        22:9 23:8
   23:20 24:7        23:2 27:2        21:14 40:7        42:2,17,18      23:25 47:17
   35:20 40:12       47:15 52:2       40:9,12,14       43:23 44:1       47:20 48:8
   40:17,22          57:20 58:9       40:16,18,22      58:10,21,24      52:17 55:16
   41:1,6            66:18            40:23 41:1       58:24 59:3       55:18 60:20
   42:16,21        clinical          41:3,5,7         59:7 60:12       62:15 64:1
certain             39:2 44:16       42:15,17,21     consistently      65:4,25
 32:25 51:25        47:21 57:1       43:1,10          59:7             66:20,21
certainly          clinically       comparing        consulted         69:2 70:4
 32:18 54:1         26:20            16:12,13         6:21            corrected
Certificate        clinician          26:19 32:1     continue          52:25
 70:14              10:11 33:13       33:25 35:16     13:6            correction
certified            47:24 57:4       45:1 59:5      contribute        13:5 20:23
 2:12 38:17        close            comparison        52:23            68:3
   70:2,12          64:6             23:23 24:24     controversy      correctly
certify            cognitive          54:2            17:7,10,13       50:4 61:8
 70:3,5            52:6 63:15       complete           17:16 38:20     counsel
cetera             collectively      8:17 23:4         44:9,13         5:18 30:25
 35:23 44:6         61:21            32:1              63:10            65:15 70:5
   51:22           column           complies         conversion         70:7
chance              12:18,20        11:8              25:16 48:23     County
 67:12               13:18          comprehen...       51:13,19        2:13 69:5
changing           combined         38:15             52:11 54:20       70:1
 45:25              6:19 13:10      conclude         conversions      course
chart                39:16           36:17 37:25     51:5             5:18 24:14
 4:18 12:2,24                       concluded                          60:17
```


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4941

Randall Price, Ph.D.                                    November 10, 2010

74

| court | 44:24 | 39:1 41:16 | 49:14,17,19 | 64:17 66:7 |
|---|---|---|---|---|
| 1:3 6:7 | **damaged** | 43:6,25 | **diagnose** | 67:6 |
| **cover** | 45:4,12 | 58:2,4 | 51:4,22 | **Doctors** |
| 11:16 | **data** | **demographics** | **diagnosis** | 32:9 45:22 |
| **covered** | 17:24 18:8 | 24:17 33:9 | 51:12,16 | 63:19 |
| 55:25 | 18:10 19:8 | 34:5 44:11 | 52:7 63:11 | **doctor's** |
| **co-designers** | 19:11,14 | 45:7 47:11 | **diagnostic** | 59:24 |
| 17:2 | 20:21 22:17 | 47:19 | 51:6 52:3 | **document** |
| **criticism** | 23:7,15 | **demonstrated** | **difference** | 62:10 69:7 |
| 63:18 | 28:9 30:2 | 36:10 | 16:21 19:16 | **doing** |
| **critique** | 39:4 40:1 | **Department** | **differences** | 14:15 15:13 |
| 63:23 65:2 | 42:14 43:10 | 3:11,16 | 10:3 | **dominant** |
| **cross** | 44:19 45:11 | **depicted** | **different** | 53:23 |
| 28:24 29:1 | 60:1,11,24 | 28:4 30:15 | 34:8 35:21 | **double** |
| **crossed** | 61:5,16,22 | 30:19 | 35:21 38:6 | 49:2,13,20 |
| 29:2 | 61:23 63:18 | **depicts** | 49:13 50:6 | **Dowd** |
| **Cr-C-02-216** | 66:11 | 28:6 31:1 | 50:12 51:2 | 3:14 4:6,8 |
| 1:5 | **date** | **deposition** | **difficult** | 4:10 6:6 |
| **CSR** | 1:19 5:2 | 1:11,13 2:8 | 9:25 26:21 | 10:7 11:9 |
| 1:19 70:11 | 70:15 | 2:11,14 | **direct** | 11:14,18 |
| **Cullum** | **day** | 5:12 57:11 | 5:23 | 14:21,23 |
| 50:4 | 2:15 69:6,10 | 67:25 69:1 | **disagree** | 15:3 17:20 |
| **cultural** | 70:9 | 70:6,15 | 26:14 | 20:6,10 |
| 16:8,24 | **decision** | **depressed** | **disagreement** | 21:17 27:12 |
| **current** | 56:10 66:5 | 33:10 | 19:13 | 27:21 28:6 |
| 7:20 37:5 | **deeper** | **depression** | **discussed** | 28:8,18 |
| **Curtis** | 53:18 | 47:13,16 | 51:3,6,14 | 29:1,3,6,9 |
| 1:16 3:6 | **Defender** | 56:23 57:15 | **discussing** | 29:13,17,25 |
| **curve** | 1:14,15 3:4 | **describe** | 41:10 51:23 | 30:9 31:5,7 |
| 48:18 | 3:5 | 16:22 | **discussion** | 31:15,18,20 |
| **CUSTODY** | **defense** | **described** | 47:13 52:2 | 37:1 44:8 |
| 1:13 | 45:15 | 58:6 | 52:10 | 46:6,10,14 |
| **customary** | **deficiency** | **describes** | **distinguish** | 46:17,19 |
| 48:10 | 14:6 | 16:6 | 21:20 | 47:5,7 |
| **cut** | **deficient** | **description** | **distribution** | 52:11 56:14 |
| 34:18 45:12 | 6:4 18:20 | 4:15 69:7 | 39:20 50:10 | 56:17,22 |
| **cut-off** | 21:9 63:13 | **designated** | 50:11 | 57:13,16 |
| 14:5 | **define** | 14:21 | **District** | 59:25 61:14 |
| **Cv-07-223** | 9:25 10:8 | **designation** | 1:3,3,15 3:4 | 61:25 62:5 |
| 1:6 | **defined** | 14:8 | **DL** | 62:16,24 |
|  | 10:1 | **determine** | 55:7 | 63:3,7 64:7 |
| **D** | **degree** | 35:17 58:17 | **doctor** | 64:12,14,16 |
|  | 16:11 | 61:3 66:12 | 31:20 46:10 | 66:4,7 |
| **D** | **demographic** | 66:24 | 46:18 47:10 | 67:21 |
| 8:20 13:14 | 32:14 33:19 | **determined** | 50:2 56:12 | **Dowd's** |
| 13:18 15:9 | 33:19 34:11 | 35:1 | 56:14,22 | 5:21 |
| 24:16 | 34:22 35:11 | **deviation** | 57:16 64:7 | **Dr** |
| **damage** | 37:7 38:16 |  |  | 5:9 10:19,22 |



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4942

Randall Price, Ph.D.                                    November 10, 2010

75

| | | | |
|---|---|---|---|
| 11:22 17:2 17:14,19 19:8,11,19 19:20 20:21 21:24 22:12 22:16 23:7 23:9,14,16 26:3,4,5,14 27:22,24,24 28:24 29:10 29:20 31:1 31:17,18 36:11 37:10 37:11,19,20 39:5,5 40:5 40:11,15,20 40:25 41:4 41:25 42:4 42:11,14,20 42:25 44:15 45:2 46:19 50:4 53:6 56:6 57:7,7 57:17,17 59:19,19 60:2,3 61:22 62:18 64:4 65:12 66:8 67:5 67:10,15,17 67:17 **draw** 66:10 **DSM** 51:2,11 58:15 **duly** 5:6 **dysfunction** 14:10,13 26:12,16 33:5 34:20 39:14 52:22 ——————— **E** **E** 3:1,1 68:1,1 68:1 | **earlier** 34:1 43:4,15 56:25 58:8 **ease** 38:23 **Eastern** 1:15 3:4 **eb** 1:1 **Edith** 1:19 2:12 70:11 **education** 6:1,2,24 7:7 7:11,15,22 7:23 8:3,21 13:13 14:1 15:9 16:9 32:19,22,23 33:18,21 35:21 40:8 40:13,17,22 41:2,6,15 44:11 45:3 47:19 **educational** 16:8,24 41:12,14 **effect** 33:9 **effort** 33:12 47:13 47:16 56:24 57:8,15,19 **either** 21:11 31:25 53:10 **elaborate** 43:16 **ELIZABETH** 3:8 **ELSA** 3:19 **empirically** 16:16 **employed** 70:5,7 **employee** | 70:6 **enable** 30:14 60:7 **engage** 51:5 **enrichment** 16:8 **entire** 7:19 43:10 67:4 **entitled** 63:11 **equivalent** 13:9 **error** 12:19 22:25 66:22 **errors** 12:1,9 29:15 31:25 53:14 55:20,23 65:24 66:19 **Esquire** 1:14 2:14 3:7,8,14,14 3:19,19 70:15 **establish** 36:23 **establishing** 31:21 **Estrada** 10:20,22 **et** 35:23 44:6 51:22 **ethnicity** 7:11,24 8:6 33:21 36:5 43:6,8,20 43:24 44:12 48:3,9 58:2 58:12 **evaluate** 59:12 **evaluating** 33:25 37:10 | **evaluation** 19:18 23:16 40:20 41:22 58:14 59:5 59:9,10 **examination** 4:1 5:8 19:21 31:19 47:8 56:21 61:19 66:6 66:17 **examine** 29:7 31:18 **example** 8:20 **exception** 45:25 56:3 **excerpt** 4:16 5:12 **excuse** 58:16 **executed** 69:8 **executive** 12:18 13:19 14:24 **exhibit** 5:11,14 8:11 8:13 11:4,5 12:1,12 13:21 14:1 14:9,16 15:6,15,16 19:11,15 20:20,24 22:11 23:12 23:18 26:5 27:3 29:12 29:18 30:14 30:15,20,25 31:4 45:15 45:21 46:7 46:12,14,20 47:5 49:25 50:2 53:4,5 53:12 56:5 56:13 59:16 59:18 60:2 | 60:9 61:15 61:24 62:3 62:10 65:22 65:24 **Exhibits** 4:13 27:20 **expect** 30:24 33:15 42:6 **expected** 18:25 **experience** 32:21 36:16 37:25 **experiences** 16:24,25 **Expiration** 70:15 **Expires** 70:14 **explain** 15:24 16:15 16:19,20 31:20 49:12 **explore** 5:19 **expressed** 69:9 **extent** 62:8 64:3 **extraneous** 33:11 **extrapola...** 54:15 ——————— **F** **face** 20:21 **facilitate** 24:24 **fact** 6:4 7:15 17:7 21:9 36:13 59:18 **factor** 43:6,8 **factors** |



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4943

Randall Price, Ph.D.                                November 10, 2010

76

8:2 16:7
32:14 33:2
33:6,9,11
47:16,22
52:22 57:2
**facts**
70:3
**fair**
34:21
**fall**
24:3 42:1,5
42:12,25
45:9 52:12
**falling**
20:5
**falls**
17:15 42:16
**false**
34:19
**familiarize**
11:7
**family**
35:6,6,8
**far**
14:2 27:21
57:12 58:1
58:15 66:7
**father**
44:16
**favorably**
18:22,23
**features**
33:19
**Federal**
1:14 3:4
**feel**
54:14 58:18
**fell**
42:20
**field**
17:8 44:18
**figure**
16:2 20:9
**file**
59:1,2
**final**
60:12 65:21

**financially**
70:7
**find**
65:24
**finding**
58:21 59:8
**fine**
53:2 57:22
**finger**
55:7,8
**finished**
56:15
**first**
5:6 7:18
12:4,11,19
15:5 19:2
24:10 41:12
**five**
42:2
**flip**
8:16
**following**
22:11 44:23
51:15 57:13
66:25
**follows**
5:7
**follow-up**
47:9
**foregoing**
69:1,8 70:3
**forgot**
37:18
**form**
58:11
**formal**
63:11
**forth**
33:11
**found**
50:9
**four**
62:14
**four-page**
5:12
**full**
43:22 57:8

57:18
**function**
31:20
**functioning**
52:7 63:13
**functions**
12:19 13:19
14:24
**further**
7:23 47:8
56:21 61:19
66:6,17
70:5,6

___G___

**gather**
32:22
**Gelbort**
4:18 17:19
23:9 25:13
32:9 37:11
37:19,20
39:5 42:20
42:25 45:23
57:7,17
63:21 67:10
**Gelbort's**
23:14,16
27:24 40:20
40:25 41:4
42:14 59:19
60:3 67:17
**gender**
6:25 7:5,8
7:11,16,22
7:24 8:4
33:21 35:22
40:8,13,17
40:23 41:2
41:6 44:12
45:3 47:19
**give**
30:2 35:22
58:19
**given**
17:6 18:18
26:24 39:5
50:17 61:5

69:10
**gives**
13:7
**giving**
57:18
**go**
10:13 12:17
12:20 13:13
13:18,19,24
14:24,25
15:8,10
18:15 24:16
33:6 39:24
41:21 53:8
53:18 56:12
61:7
**going**
7:12 8:10
11:21 12:15
15:25 22:21
23:11 53:4
57:10,12
59:23
**gold**
52:4
**good**
5:9,10 33:11
53:1
**gotten**
61:20
**great**
52:25
**greater**
16:11
**grossly**
65:13
**group**
16:16 32:2,2
32:5,7 36:1
36:2,4
**groups**
37:7
**guess**
9:13 12:25
15:15 18:9
18:12,13
25:21 36:10
51:1,23

**guidance**
10:8 48:4,9
48:12 58:1
58:3,5

___H___

**H**
68:1
**habit**
7:6
**hairs**
65:10
**Halstead-...**
17:3 25:19
53:7 62:3
**hand**
53:5,23
55:12 69:10
70:8
**handed**
50:2
**hands**
54:9,11
**Harris**
2:13 70:1
**hash**
18:15
**hearing**
20:20 30:21
51:3 62:23
64:22,25
**Heaton**
6:8,13,14
7:13,19 8:8
8:16 9:10
9:21 10:5,6
11:12,23
13:10 16:14
16:18,22
17:4,8,12
17:16 18:5
18:11,19
21:3 24:11
25:15,17
26:8,10
28:11,22
29:23 31:3
33:23,25



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4944

Randall Price, Ph.D.                                    November 10, 2010

77

```
34:4,6,9          impaired          38:4              46:7              53:8,12,13
36:1,20,23        15:20,22          individuals       IQ                53:18,21
37:1,4,6,9         16:1,3 19:4      40:7,16 45:4      6:5 18:24,25      54:18 55:15
37:21,23           19:6,25          45:5              24:23 26:19       57:11 58:9
38:11,18,24        20:1,2,4         individual's       33:16 39:9       58:16 59:10
39:3 40:1          21:11,15         9:15 32:7          39:19 41:20      61:20 63:3
44:9,10            22:3,7,8         influence          42:3,16          64:24,24
45:16 46:2         23:20,23         45:3               43:1 51:13       65:13,19
46:24 47:2         24:1             information        51:17 52:4      knowledge
47:12,15,18       impairment        8:25 52:6          52:8 58:16       32:21 47:1
47:25 48:6        14:6 16:12        58:23 61:16        58:17 63:15     known
50:7 56:23         19:12 21:4       61:23 66:8        irritating        44:22,23
57:14              21:19 22:18      initial           18:12             69:6
helps              23:7 24:2        48:1              issue
39:1               26:1,7,11        instance          26:13 39:14     ─────────────
hereto             27:4,5           49:9,15            45:13 58:15           L
70:7              impairments       instances          59:11 66:7     lack
higher            18:5              67:1              issues            9:24 26:1
6:5 18:23         improperly        instrument        43:20            51:4 56:24
32:22 42:5        66:9,14           69:8              i.e              Lamar
hours             include           intellectual      47:19            2:14
2:16              7:5,9 14:25       63:13                              Largely
Houston            44:10            intelligence     ─────────────     33:1
1:22 2:15         includes          26:21,25               J          larger
3:13              12:21             33:14 39:22      Jack              37:5,6
hundred           including         42:6,8,19        15:25            LARIN
49:15,16          16:6,23           42:23,24         judge             3:8 11:16
                  inconsistent      52:13,15         15:25 56:10       20:14 30:3
─────────────     42:13 52:1        intelligent       66:5             30:5,12
      I            59:3             33:14            June              latest
idea              incorporated      intended         20:11            11:14
10:12 50:21       33:22 47:12       52:21            Justice           lead
identific...      incorrectly       intentional      3:11,16          36:16
10:1,17           63:24,25          7:10                              leading
32:12 48:11        65:3            interested      ─────────────      36:25 44:7
identified        index             70:7                  K           learn
10:19             4:1,13 24:20     interpret...     kind              32:21
identify           24:22           32:15 33:20      34:15 50:18       leaves
32:10             indicate          interpret...    kinds             10:10
identifying       19:12 37:20       50:7            33:1 50:12        leaving
16:11             indicated         interpreting    know              26:13 63:9
identity          39:13 43:5        31:21           8:9 16:18,20      led
69:7               43:19            interrelated     18:15 22:21      37:25
ignore            indicates         45:9             24:10 26:17      left
52:5              14:5              interrupt         32:24 35:4       12:21 13:19
impact            indication        12:23            36:13,13,19      left-hand
33:19,25          36:22 37:22       introduction     38:19 39:8       14:2
impacting         individual                         39:13,25        let's
43:21 47:14                                          44:11 48:12
                                                     52:20,22,24
```



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4945

Randall Price, Ph.D.                                    November 10, 2010

78

| | | | | |
|---|---|---|---|---|
| 10:13 21:21<br>21:22 35:16<br>46:10 65:11<br>**level**<br>20:5 22:18<br>24:4 42:2,5<br>42:7,12,16<br>42:21,23,24<br>43:1 52:12<br>**levels**<br>35:17,18,21<br>**lies**<br>24:20<br>**life**<br>16:8 52:9<br>**limited**<br>44:6<br>**line**<br>5:21,24 52:7<br>63:9 68:3<br>**listed**<br>36:15 45:21<br>**literature**<br>10:16 16:6<br>48:4<br>**little**<br>11:9 18:13<br>20:1 47:9<br>56:22 61:21<br>65:7<br>**LLC**<br>70:15<br>**localization**<br>26:14<br>**long**<br>31:8,25<br>38:17 39:24<br>**longer**<br>56:22<br>**look**<br>45:15 46:20<br>47:24 52:3<br>54:5 58:6<br>58:23 59:2<br>61:7,22<br>64:9<br>**looked**<br>37:16 | **looking**<br>8:3 12:11<br>22:8 26:3<br>26:18 36:16<br>39:14<br>**looks**<br>8:17 53:24<br>53:25<br>**lot**<br>7:9<br>**low**<br>6:5 21:9<br>22:5,25<br>24:3,5<br>26:21,25<br>42:12<br>**lower**<br>16:16 32:23<br>32:25<br><br>――――――<br>**M**<br>――――――<br>**M**<br>3:14<br>**main**<br>33:19<br>**making**<br>31:22 37:11<br>40:11,15,25<br>41:4 42:5<br>42:11,20,25<br>59:20,20<br>**male**<br>8:20 13:14<br>14:1 15:9<br>22:12<br>**manual**<br>10:5,6 11:13<br>16:22 25:15<br>25:17,19<br>56:4<br>**manuals**<br>30:8 48:4<br>54:5 60:13<br>**March**<br>20:13<br>**mark**<br>3:14 7:12<br>8:11 11:3 | 31:18<br>**marked**<br>4:15 5:14<br>8:13,14<br>11:5 12:24<br>49:23,25<br>50:1<br>**marking**<br>5:11<br>**material**<br>65:14<br>**materials**<br>60:21 62:9<br>**matter**<br>7:6<br>**mean**<br>24:15 31:24<br>37:16 39:18<br>39:19 41:16<br>48:22 49:1<br>49:16,17<br>50:13,13,13<br>50:14,15<br>54:1 56:9<br>57:23 59:8<br>60:6 61:5,6<br>61:9 65:6<br>65:11,12<br>**meaning**<br>6:1 27:2<br>32:3<br>**means**<br>44:6 55:16<br>55:17,22<br>**meant**<br>18:13 21:7<br>**measure**<br>52:15,16,19<br>52:21<br>**measured**<br>39:22<br>**measurement**<br>63:14<br>**medical**<br>44:22<br>**Medicine**<br>50:5<br>**memory** | 51:21<br>**mental**<br>39:14 40:4<br>42:13 51:1<br>51:16,22<br>58:17,21<br>59:4,7,8,11<br>63:12<br>**mentally**<br>41:23,25<br>59:13<br>**mentioned**<br>47:13<br>**metric**<br>24:23 39:9<br>43:1 49:13<br>**Michael**<br>1:14 3:7<br>**Milam**<br>3:12<br>**mild**<br>14:12 20:5<br>21:4,19<br>22:18 23:7<br>27:4,5,6<br>**mildly**<br>15:20 21:11<br>22:3 23:20<br>**minor**<br>45:24 65:13<br>**minute**<br>11:6 49:18<br>**minutes**<br>29:11 53:25<br>54:12,18<br>**mischarac...**<br>59:24<br>**misrepres...**<br>21:17<br>**missing**<br>39:7<br>**mistake**<br>65:14,17<br>**misunders...**<br>18:17 24:21<br>25:4,23<br>**mixed** | 9:24 10:20<br>35:2<br>**moderate**<br>14:10 19:12<br>21:11 27:6<br>27:8<br>**moderately**<br>19:6<br>**moment**<br>7:13 43:3<br>**Moore**<br>67:15<br>**morning**<br>5:9,10<br>**move**<br>23:9 27:19<br>38:24<br>**Munro**<br>50:4<br><br>――――――<br>**N**<br>――――――<br>**N**<br>3:1<br>**name**<br>31:18 69:8<br>**nature**<br>44:8,13<br>**NDR**<br>55:11<br>**necessarily**<br>23:10<br>**necessary**<br>48:23<br>**need**<br>30:8 31:9<br>54:5 56:4<br>59:21 60:6<br>64:7,8<br>**needs**<br>29:11<br>**neither**<br>70:5<br>**neurologi...**<br>44:20<br>**neuropsyc...**<br>7:7 32:25<br>33:4,7,16 |



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4946

Randall Price, Ph.D.                                November 10, 2010

79

51:17,21,25
52:15,21
53:7 58:20
59:6,14
62:4
**neuropsyc...**
38:18
**neuropsyc...**
32:4,19
38:21 44:16
**never**
49:6,6
**newer**
6:19
**nicer**
29:4
**nomograph**
53:22
**nondominant**
55:12
**nonIQ**
59:1
**norm**
8:6 34:4
58:12
**normal**
34:15 44:20
44:20 45:4
50:10
**norms**
5:24 6:7,8
6:10,13,14
6:18,21 7:8
7:13,19 8:3
8:8,16,20
9:2,11,14
9:19,20
11:12,24
13:10 16:5
16:14,18
17:4,8,11
17:16 18:6
18:11,19
19:6 21:3
24:11 26:8
26:11 27:23
28:11,22
29:23 31:3

31:21 32:10
32:13 33:23
34:1,6,9
35:13,24
36:1,4,11
36:21,23
37:1,2,4,6
37:9,20,21
37:23 38:1
38:4,6,11
38:14,16,18
38:24 39:3
40:1 41:11
44:10 45:16
46:2,24,24
47:2,12,15
47:18,25
48:6 56:23
57:15 58:7
**North**
3:17
**notary**
5:7 69:12
70:3,12,14
**noted**
12:24 69:2
**notes**
18:5
**November**
2:16 5:2
70:9
**number**
31:25 53:15
**numbers**
23:17 27:3
35:15,15,19
40:1,2 62:9

─────────────
        **O**
─────────────

**oath**
31:17 69:7
**object**
46:7 47:5
57:10 59:23
**objection**
29:18 36:25
44:7 46:17
56:18 61:14

62:25 63:1
**observed**
57:18
**obtain**
13:14 24:11
**obtained**
31:1,22
32:11 36:3
37:10 41:10
42:3 45:22
60:24
**obviously**
56:10 66:5
**offer**
56:11 66:5
**office**
1:14 3:4,11
3:17 69:10
70:9
**offices**
2:14
**oh**
14:23 20:2
20:10,15
25:20 44:12
46:14
**okay**
6:12,14 7:3
8:19,24 9:7
9:16,23
10:5,18,25
11:18,19,20
12:4,7,14
12:16,23
13:3,7,7,11
13:23,24
14:5,8,18
14:20 15:7
15:13 18:2
18:8 19:24
20:10,15,18
21:2,6 22:5
22:15,19,22
22:23 23:6
23:19 25:5
26:13 27:12
29:5,6,9,21
31:7 35:1

35:14 36:6
36:14,18,23
38:2,8 40:5
40:5 41:21
41:24 42:10
43:13,19
44:5 45:14
45:20 47:3
47:6,9
48:13,21
49:21 51:8
51:15 52:10
52:25 53:17
53:19 54:4
54:7,17,23
55:10 56:3
56:8,16,19
56:19 58:8
58:15 59:16
60:22 61:2
61:10,13
62:5,13,16
62:22 63:2
63:17 64:10
64:14,18,19
64:20 65:5
65:21 66:1
66:3,16,22
66:25 67:4
67:20
**old**
19:21
**older**
20:2 32:24
**once**
60:24
**ones**
6:16,23 7:2
19:22
**opine**
39:13
**opined**
51:24
**opining**
25:25
**opinion**
26:18,22
58:2,19

59:3 62:18
**opportuni...**
16:9 44:6
**opportunity**
46:19
**opposed**
34:15
**organic**
14:10,12
26:16
**organicity**
52:16,20
**ORIGINAL**
1:12
**originates**
50:3
**ought**
17:8
**overall**
25:25 26:10
26:15

─────────────
        **P**
─────────────

**P**
3:1,1
**PA**
1:16 3:6
**page**
4:3 5:20,22
5:23 8:19
12:11 13:21
13:22,25,25
15:3,5,9,15
15:16 21:6
30:14 53:5
62:2 63:8
64:12 68:3
**pages**
5:16 47:2
70:3
**parameters**
54:25
**parentheses**
53:25
**part**
8:8 19:2
22:23 30:11



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4947

Randall Price, Ph.D.                                    November 10, 2010

80

30:24 40:12
40:16 41:1
41:5 56:24
**particular**
6:14 35:18
52:12
**parties**
63:10 70:6,7
**pass**
47:7
**pathology**
34:16
**pattern**
45:10
**PATTI**
3:19
**Pennsylvania**
1:15 3:4
**people**
6:2 32:2,2,5
32:7,24
38:7 44:20
44:22 45:8
45:8 50:19
**percent**
38:17
**percentile**
13:9 25:7,13
25:14,16
48:18 49:3
50:16
**percentiles**
35:23 50:20
**performance**
6:3 18:18
51:24
**performs**
33:7
**person**
10:12,14
15:25 16:3
16:5 26:7
26:16 32:19
33:6,15
48:11 57:4
69:7
**personally**
69:6

**person's**
10:1,15 16:8
39:2
**Petitioner**
1:7 3:3
**PhD**
1:11 2:8,11
5:5 69:1,3
69:6
**Philadelphia**
1:15,16 3:5
3:6
**phrase**
9:24 52:11
**phrased**
52:19
**phraseology**
12:25
**picture**
43:14
**Pieternelle**
3:22
**pigment**
10:15
**placed**
48:18 61:24
62:10
**please**
18:16 43:3
49:24
**plethora**
32:18
**point**
39:20 50:9
50:11
**pointed**
65:15
**portion**
6:7 10:6
22:24
**portions**
5:17 8:15,15
**position**
45:1,2,5,6
46:12
**positives**
34:19

**possibili...**
10:13
**possible**
62:8
**potentially**
47:14
**practice**
39:2
**practitioner**
10:8
**pre**
6:15
**prefer**
50:19
**presence**
52:16
**PRESENT**
3:21
**presentation**
19:14
**presented**
19:10 28:12
29:22,23
**presents**
8:20
**presumably**
65:16
**Price**
1:11 2:8,11
5:5,9 27:22
28:25 29:11
29:20 31:17
31:18 46:19
67:5 69:1,3
69:6
**pride**
52:25
**prior**
33:14
**probably**
39:7
**problem**
26:22 30:6
67:2
**proceedings**
5:1,16
**process**

23:11 39:24
61:2
**produces**
34:6
**profile**
26:6
**properly**
66:9,13
**proved**
69:6
**provide**
10:7 57:8
**provided**
10:6
**proxies**
44:2 58:10
**proxy**
16:7,10,23
36:5 43:20
43:24
**psycholog...**
59:10
**public**
69:12 70:3
70:12
**publication**
51:12
**published**
5:25 6:16,18
6:22,23
**purpose**
31:21 34:10
**purposes**
10:9 51:6
52:3 69:9
**put**
50:5 53:11
65:19
**putting**
33:11
**P.O**
3:12

_____
       **Q**
_____
**quality**
16:9
**quarrel**

64:2,23
**question**
5:21 9:8
21:18 48:2
51:1,9
52:13,24
53:1,3
57:14 58:8
62:6,25
63:17,21,23
65:1,21
**questioning**
48:2
**questions**
4:3 27:18
48:5 56:15
61:18 62:16
62:23
**quote**
10:23

_____
       **R**
_____
**R**
3:1,14 68:1
68:1
**race**
6:25 7:5,16
9:1,10,12
9:15,16,24
9:25 10:4,8
10:20 16:2
16:6,7,15
16:19,21
35:2 47:19
**racial**
8:5
**raised**
35:4,5,8
**Randall**
1:11 2:8,11
5:5 31:17
69:1,3,6
**range**
14:10,13
15:20,22
21:4,11,15
21:19 22:3
22:6 24:2



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

**USCA5 4948**

Randall Price, Ph.D.                                         November 10, 2010

81

43:21
**rarely**
59:9
**raw**
11:22 12:1,4
12:5 18:8
18:10 20:21
23:13 28:9
28:18 29:23
29:25 30:3
30:7,12,15
30:22 31:22
31:24,24
32:3,7,10
32:15 33:20
34:3 35:11
35:22 36:3
37:10 39:4
40:1 45:7
45:21,22
46:1,2,3
53:4 54:20
56:5 59:17
60:1,11,24
61:5,15,24
62:10 66:11
**raws**
46:8
**reached**
7:25
**read**
7:4 8:1
12:21 13:20
14:3 15:1
15:11,16
62:22 63:18
69:1
**reading**
20:20
**really**
6:20 7:6
44:18 51:19
54:2,5 66:3
**reason**
7:3 49:10
**reasons**
32:20
**recall**

6:10 10:10
10:19,19,23
43:22 50:4
57:17,17,20
57:21,21
**RECEIPT**
1:12
**recess**
27:15 31:12
**record**
5:4,15 9:9
13:21,25
15:24 20:19
21:8 23:2
27:14,17
31:11,14,16
37:19 39:24
46:6,12
47:15 53:6
57:25 67:23
**records**
35:7 58:14
**redirect**
28:24
**refer**
34:14
**reference**
17:25
**referred**
33:23
**referring**
5:17 9:14
49:4,21
**reflect**
33:4,5 46:23
59:18
**reflected**
18:7 26:3,6
27:22,23
45:17,22
46:8,20
53:12 56:5
59:17 60:1
66:23
**reflects**
18:4 28:8,11
34:22 60:2
**regard**

23:5,10,16
27:3 52:13
**Registration**
70:16
**Reitan**
17:2,12
36:11 37:2
37:20 38:1
38:2 44:15
**Reitan's**
45:2
**relate**
35:10,18
40:2 52:6
**related**
70:5
**relates**
44:2
**relating**
37:2 57:14
**relational**
35:15
**relative**
70:6
**relatively**
18:24
**relevant**
7:13 8:15
51:1
**rely**
18:5
**remains**
17:10
**remember**
24:7 57:6,23
**renew**
56:11 61:14
66:4,4
**rephrase**
67:8
**report**
10:20,23
17:21 18:3
18:7 36:15
63:17,23,24
65:2,2,6,16
65:20

**reported**
3:24 10:22
35:2
**reporter**
2:12 70:2,12
**reporting**
66:11
**represent**
8:15 44:3
**represent...**
6:6
**represent...**
14:19 23:12
**represent...**
7:20
**represented**
50:11
**resolve**
48:5 53:3
**respect**
7:14 12:3
15:25 19:14
20:24 21:2
46:12
**Respondent**
1:5 3:10
**response**
5:20 62:23
**result**
15:14 62:4
**results**
28:9 34:12
34:13,23
37:13 42:1
42:12 59:5
59:18 60:2
**retard**
59:7
**retardation**
39:15 40:4
42:13 51:2
51:17,22
58:17,22
59:4,8,11
63:12
**retarded**
41:23,25

59:13
**review**
17:23 67:12
**rhythm**
55:13
**right**
6:23 7:12
9:5 10:12
11:2 12:8
12:17 14:6
15:18 17:14
18:6 19:2
20:2,16,22
21:21 25:3
28:19 30:9
30:18,23
31:15 32:9
32:14 33:18
33:24 34:1
34:3,10,13
34:21 35:10
36:10 37:8
37:24 38:5
38:22 39:3
39:23 40:5
41:9 43:3
46:5 48:1
48:15 51:23
54:11,14,16
55:2,6,13
57:3,6 63:7
65:21 67:12
67:15
**ROBERTS**
3:14
**room**
64:3

---
**S**
---
**S**
3:1 68:1
**SALINAS**
3:19
**sample**
7:19,20 9:21
9:22,22
21:20 24:15
24:19 35:20



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4949

Randall Price, Ph.D.                                    November 10, 2010

82

35:25 36:11
37:5,6
43:11,11,12
44:19,22
**Sampling**
36:8
**sat**
64:22
**saw**
11:18
**saying**
8:24 26:24
32:17 34:19
**says**
12:18 17:16
22:12 45:12
54:11,12
**scale**
12:22,25
13:7,13,17
13:19 14:3
15:1,2,8,10
15:16,19
24:11,14,18
24:19 25:6
25:12 34:1
34:4 45:17
45:25 46:24
48:13 49:2
50:13,21
65:23
**scatter**
5:22
**school**
50:5 59:1,2
**scope**
57:11
**score**
11:22 12:1,4
12:22,25
13:1,7,13
13:17,19
14:3,9,12
15:1,2,8,10
15:16,22
16:16 20:25
23:13 24:9
24:11,14,18

24:19,20,23
25:7,12
31:24,25
32:3,7,22
32:25 33:15
33:16 34:3
34:4 35:18
39:2,19
40:8,9,13
40:18,19,23
41:2,7
45:12,25,25
48:15,18,19
49:2,3,11
49:15 50:18
51:13 53:6
53:11 54:12
54:20 55:6
55:14,15,23
56:6 60:1
61:24 62:11
**scored**
62:19 63:25
**scores**
12:5 18:4,20
18:24 19:1
24:22,23
26:3,5,9,19
27:22 28:18
29:23,25
30:3,7,12
30:15,19,22
31:1,2,22
32:10,15
33:10,12,20
34:1,8,11
35:11,13,23
36:3 37:10
39:4,9,10
39:16 41:9
41:10,19,20
41:22 42:3
45:3,7,21
45:22 46:1
46:2,3,8,25
48:14,17
49:16 50:8
50:12,12,13

50:14,18,21
51:20 52:12
53:4 56:4,5
58:17,25
59:17 60:12
62:14 65:23
**scoring**
60:11,21
64:4 66:19
66:19,23
67:1,17
**se**
16:20
**seal**
69:10 70:8
**Sean**
3:22
**seashore**
55:13
**second**
12:18 13:18
41:13
**seconds**
15:1 54:12
54:19
**section**
9:3,7
**see**
8:9,17 10:3
11:21 12:19
12:22 13:25
14:16 17:25
18:10 24:25
29:25 30:17
30:17,25
31:2 32:12
36:4,22
37:22 45:8
45:20 46:10
47:23 49:5
49:21 53:24
54:1 58:24
59:2 61:7
61:23 62:8
63:17,23
65:1 66:20
67:2
**seeks**

16:15
**seen**
21:10
**selective**
36:24
**selectivity**
37:3
**self**
10:1,17
48:10
**sensitive**
26:12
**sent**
10:7
**separate**
35:25,25
**separately**
7:17
**September**
5:16 63:9
**series**
8:11
**set**
6:21 17:11
38:3,15
**sets**
38:4
**sheet**
20:21 53:6
53:11,15,24
54:12,22
55:6,9,14
55:15,23
56:7 60:25
61:6,8,22
61:23 62:1
62:4,5
**sheets**
56:6
**Shoreline**
3:17
**Short**
27:15 31:12
**shorthand**
2:12 70:2,12
**show**
12:1 23:7

32:19
**showing**
30:13
**side**
14:3 17:15
35:12
**signature**
1:12 69:1
**similar**
16:5 32:2,8
40:18 45:8
**similarly**
33:15
**simply**
8:25 49:2
**sit**
46:3 64:23
67:4,5,9
**sitting**
30:7
**six**
37:15,16
42:3
**size**
37:5,6
**skin**
10:14,15
**socioecon...**
16:9,24
43:21
**Solutions**
2:14 70:15
**somebody**
32:1 34:19
41:25 59:13
**sorry**
14:23 15:19
19:9,20
22:16,16
26:4 46:14
48:14 51:7
64:12 67:17
**sort**
22:23 23:1
**sounds**
55:22
**source**



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4950

Randall Price, Ph.D.                                November 10, 2010

83

```
  11:10  17:21   start            successor       taker           testee's
sources          5:11  21:22       51:12           47:14           34:23
50:6  51:15        48:15          suggest         takes           testified
  51:16          started          51:4  56:11      24:14           5:7  48:16
SOUTHERN         44:18           suggested        talk              56:25
1:3              starting         57:7             51:12           testimony
Southwestern     5:23  11:21     suggesting       talked           5:13  6:8  7:4
50:5               12:6           43:7,16          9:9  24:5          8:3,7  9:11
speak            stat            suggests           25:8  48:13       17:22  18:14
35:12            50:8             58:3,16           60:4  65:17       18:17  21:6
speaking         state           Suite             65:18  67:15      21:18  22:5
18:24  26:20     2:13  46:11      1:16  2:15      talking            22:24  23:3
specific           69:4,12         3:6,12,17       5:22  47:11        25:24  34:2
32:12  37:9        70:1,3,13     summary            62:1,2            43:4,7,15
  41:11  44:10   stated           24:9  30:20     tapping            43:17,22
  67:3           70:3              53:15,24         55:7,8,11         59:24  61:10
specifically     States           54:22  55:8     task               62:22  64:8
31:22  37:9      1:3,4  3:11       56:7  60:25      29:21             64:17  65:16
speech             3:17  7:20      61:6,8  62:1   Technically         67:5,9
55:22            statistical       62:4,5          41:15           testing
speed            50:8            sure             techniques         26:15  35:19
33:1             status           10:2,3  24:6     45:11             36:6  44:23
spend            16:10,24          29:13,14       tell               62:19  64:5
 23:11  29:11    step              36:19  49:22    12:2  50:2         65:14  66:9
splitting         24:10  39:7      51:10  53:10     53:13  62:18      67:17,18
65:10             61:2             57:23           64:3            tests
stage            stones          sworn            terms             6:3,3  7:8
17:12            23:1             5:6  70:8         9:18  34:14       16:17  20:12
stand            Street          system           test               21:20  26:10
52:25            1:16  2:15       34:4  38:20      6:4  12:9          28:9,12
standard           3:5                              13:8  22:7        32:11,20,23
 12:24  23:13    strengths       ─────────────      25:9  28:13       32:25  33:4
  39:16,19       45:10                ─── T          31:23  32:1       33:7  37:11
  40:8,9,13      studied         T                   33:16,17         37:16,17
  40:17,19,23     33:22  36:2     68:1,1             35:22  39:5       38:4  39:20
  41:2,7,9,10    studies         table               40:6,12,15       43:2  45:9
  41:19,21       16:20  32:18     4:19  20:23        40:21  41:1       48:17  51:18
  45:25  48:15   study             49:9             41:5  42:1,5       51:21,25
  48:16  49:11    10:16  36:1    take               42:11,14,15       52:8,15,21
  49:14,15,16    Subject          7:22  8:5         42:20,25          57:9  58:20
  49:16,19        29:17            9:10,15          47:14  51:17       59:1,1,15
  50:12,14,21    subjects          11:6  12:4,9     52:4  53:7        59:20  60:3
  52:4  59:9     6:20              13:13,17         53:10  57:4        63:24  66:13
standards        subscribed        24:18  31:8      58:25  59:6     Texas
36:24            69:8  70:8        33:13  34:3      60:18  62:4       1:3,22  2:13
stands           successive        52:3            65:3               2:15  3:13
16:10            51:11           taken            testee              3:18  50:5
                                  2:11,13  56:6    43:21  56:24       70:1,3,13
                                   70:6
```


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4951

Randall Price, Ph.D.                                      November 10, 2010

84

**Thank**
 31:15  53:2
   56:20
**thereof**
 26:1  51:4
**thing**
 14:15  15:13
   54:8
**things**
 7:1  16:23
   33:5,12
   47:21  67:3
**think**
 6:6  21:17,18
   22:21  24:8
   24:21  25:1
   25:18  27:11
   30:23  46:18
   47:20  50:23
   52:14  55:3
   55:25  56:24
   58:5,5,6,23
   59:24  61:15
   65:18
**thinking**
 51:21
**third**
 8:19  13:22
   15:9
**thought**
 22:2  29:3
   48:1,21
   65:12
**three**
 9:21  37:17
   50:11
**throwing**
 23:1
**thrust**
 52:23
**time**
 5:3  12:5
   19:17,20
   20:7,17
   23:11  27:13
   27:16  29:11
   31:10,13
   52:8  67:22

**times**
 54:18
**today**
 46:4  48:2
   51:6,14
   60:5  61:6
   64:23
**Today's**
 5:2
**told**
 6:11
**tone**
 10:14
**TONY**
 3:14
**top**
 20:16
**total**
 9:21  54:18
**touched**
 39:8
**TPT**
 56:3  62:14
**TPT-B**
 14:21  54:7
**TPT-DL**
 53:20
**TPT-Local...**
 55:3
**TPT-Memory**
 54:21
**TPT-NDR**
 54:4
**TPT-Total**
 54:17
**trail**
 31:22  37:11
   40:11,15,25
   41:4  42:4
   42:11,20,25
   59:20
**trails**
 6:4  7:14
   14:15,20,25
   15:11,19
   18:19  19:4
   28:4,14,15

 39:5  55:25
   59:20
**transcript**
 4:16  5:12
   63:8  67:13
**transfer**
 61:11
**transferred**
 60:25  61:8
**trend**
 38:19,24
**trial**
 4:16
**true**
 52:5  66:1
   69:2  70:3
**try**
 18:14  45:16
   51:10  53:3
**trying**
 20:8  25:23
   39:12
**turning**
 8:19
**two**
 23:13  28:12
   37:16  45:1
**two-minute**
 27:10
**two-part**
 64:19
**type**
 25:16  51:5
**types**
 16:17
**typical**
 59:12,14
**Typically**
 61:1
**T-score**
 13:14,20
   14:3,5
   15:11,17,19
   21:23  22:12
   24:3,19
   34:6  39:18
   41:16  48:22

 48:22  49:1
   49:11
**T-Scores**
 23:13  27:4
   39:16  48:14
   49:17  50:14
   65:23

———————— **U** ————————
**Uh-huh**
 5:21  34:7,17
   37:18  39:11
   39:17  41:18
   44:17,21,25
   54:24  60:14
   60:16,19
**unclear**
 18:13
**undersigned**
 70:2
**understand**
 25:5  39:2
   51:9
**understan...**
 6:18  19:17
   35:7  43:19
   43:23  58:13
   62:7,20
   63:5
**understood**
 18:16,17
**United**
 1:3,4  3:11
   3:17  7:20
**University**
 50:5
**upbringing**
 43:23  58:10
**updated**
 6:19
**use**
 7:18  11:25
   16:19  17:4
   17:16,17,18
   17:24  37:22
   38:7,23
   45:10  50:17
   51:17,20

 53:22  58:16
**usual**
 48:10
**usually**
 9:25  10:17
**utilized**
 38:20
**utilizing**
 24:10
**U.S**
 3:11,16

———————— **V** ————————
**valuation**
 39:25  40:3
   43:8
**variable**
 36:5
**variables**
 34:15  38:16
   39:1  41:16
**variety**
 48:17
**various**
 10:13  32:20
   48:4
**verified**
 27:22  28:3
   61:16
**verify**
 29:22  30:7
   30:21  45:16
   45:21,24
   46:1,3,8
   53:21  54:2
   54:19,23
   56:12  59:17
   60:1,8,10
   60:17
**versus**
 35:16
**Videographer**
 3:22  5:2
   27:13,16
   31:10,13
   67:22
**VIDEOTAPED**
 1:11



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4952

Randall Price, Ph.D.                                November 10, 2010

85

| | | | | |
|---|---|---|---|---|
| view | 17:14 19:8 | 8:14 11:3,6 | 34:9 | 100 |
| 45:11 | 19:19 22:12 | 11:12,15,20 | **wrap** | 39:19 50:14 |
| **views** | 25:7 31:2 | 14:22 15:7 | 22:23 | **101** |
| 67:16 | 32:9 36:11 | 17:23 20:8 | **wrong** | 40:14 41:3,8 |
| **voice** | 37:10 39:5 | 20:11,15,19 | 33:8 | **11** |
| 56:17 62:24 | 42:11 45:23 | 20:22 21:21 | **wrote** | 4:18 |
| **vouch** | 57:7,17 | 21:23 27:10 | 24:6 | **11-10-10** |
| 53:9 | 62:18 63:21 | 27:18,25 | | 1:22 |

**W**

**Wait**
64:6
**walk**
11:22,23
**Walnut**
1:16 3:5
**want**
5:18 9:8
11:22,22
21:7 23:2
29:19 43:5
47:14 52:2
53:10 62:22
**wanted**
10:2 11:20
25:21 45:20
**wasn't**
7:10 10:1
39:12 62:25
65:6,6
**way**
8:10 28:11
33:3,6 34:9
46:8,11
49:7 53:9
65:12,14
66:12
**ways**
9:21 10:2
**weaknesses**
45:10
**Wechsler**
50:7
**weight**
56:12
**Weiner**
4:18 12:5,6

**Weiner's**
11:22 19:11
19:17,20
20:21 21:24
22:17 23:7
26:4,4,5,14
27:24 40:5
40:11,15
41:25 42:4
53:6 56:6
59:19 60:3
61:22 64:4
67:18
**went**
28:12
**weren't**
64:3
**West**
1:16 3:6
**we'll**
9:7 29:20
**we're**
12:5,11 27:2
27:17 31:11
51:23,23
52:1 54:25
**we've**
21:10 33:22
35:1 36:10
53:10 55:25
61:20,22
**white**
10:23
**Whoops**
64:15
**Wiseman**
1:14 3:7 4:5
4:7,9,11
5:9,15,20

28:15,17,19
28:23 29:2
29:5,7,10
29:14,19
30:2,4,13
30:18,23
31:8 36:25
44:7 46:11
46:16 47:6
47:9 49:23
50:1 56:9
56:16,19
57:10 59:23
61:17,20
62:2,6 63:2
63:5,8
64:13,20
66:3,18
67:20
**withdrawn**
17:1 27:1
66:2
**witness**
5:6 11:8
15:5 20:18
28:3,7,10
28:16,21
29:3,21
30:6,10,16
30:19 31:6
47:7 63:3
64:10,15,18
**words**
7:16 36:24
42:7 52:1
**work**
49:7
**working**
54:25
**works**

**Y**

**yeah**
11:15 20:3,8
22:10,10
24:13 28:16
29:17 30:13
37:16 58:7
65:11 66:25
**years**
8:21 14:1,2
15:9 19:21
37:5 50:25
**yield**
41:16
**yields**
23:17

**0**

**04**
20:13

**1**

**1**
4:16 5:14
55:3
**1.16**
54:17
**10**
37:4 49:17
50:13,13
53:24
**10th**
2:15 5:3
**10:30**
27:14
**10:34**
27:17
**10:37**
31:11

**11:01**
31:14
**11:58**
2:16 67:23
67:24
**12**
8:21 14:1
15:9
**12-31-2011**
70:15
**1221**
2:14
**1305**
2:15
**1500**
3:12
**16**
5:21
**186810**
1:1
**19106**
1:16 3:6
**1950s**
44:18

**2**

**2**
4:17 8:13
12:1,12
14:1 15:6
27:20 29:12
46:12,14,20
47:5
**2-28**
20:14,15
**2-28-04**
20:16
**20**
37:4 63:9



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4953

Randall Price, Ph.D.                                    November 10, 2010

86

**2000**
 38:17
**2004**
 6:15,16,17
  6:22,24 7:1
  9:2,14
  11:14
**2007**
 23:16 40:20
**2010**
 2:16 5:3,17
  70:9
**214**
 5:16,22
**215**
 5:20,23 21:6
**217**
 5:16
**23**
 55:13,16,18
**23C**
 55:16
**23rd**
 5:17 63:9
  70:9
**238**
 63:8 64:13
**239**
 64:13
**25**
 27:8
**26**
 54:18
**29**
 13:20 14:9
  27:8

───────── 3 ─────────

**3**
 4:18 5:24
  11:5 12:24
  13:21 14:9
  14:16 19:11
  19:15 20:24
  20:24 22:11
  23:12,18
  26:5 27:3

 27:20,21
 29:18 30:20
 31:1,4
 45:15 46:7
 53:4,12,25
 56:5 59:16
 60:2,9
 61:15,24
 62:10 65:22
 65:24 70:16
**3.33**
 53:20 54:1
**30**
 27:6
**3022**
 70:14
**31**
 4:6 20:20
  30:14 49:11
  53:5 62:3
**32**
 54:12 55:25
**33**
 14:4,12 21:3
  21:15,19,25
  22:2
**34**
 23:20 27:6
**35**
 8:21 13:15
  14:2 15:10
  27:4,5
**37**
 15:12,19
**39**
 8:21 13:15
  14:2,6
  15:10 19:22
  20:13,16
  27:4,5

───────── 4 ─────────

**4**
 4:19 49:25
  50:2
**40**
 19:21,24
  23:24 24:1

 24:3
**45**
 15:17,22
**46**
 55:11
**47**
 4:7
**49**
 4:19

───────── 5 ─────────

**5**
 4:5,16 12:22
  13:7,13,17
  13:20,25
  14:3 15:15
  15:16
**5th**
 13:9 25:7
**5-10-2012**
 70:14
**50**
 39:18 41:17
  48:22 49:2
  49:17 50:15
  54:18 55:7
  55:8
**500**
 3:17 36:2
**540**
 1:16 3:6
**56**
 4:8

───────── 6 ─────────

**6**
 25:13 54:21
  54:22
**601**
 1:16 3:5
**61**
 4:9
**61129**
 3:12
**64**
 20:12
**66**

 4:10,11

───────── 7 ─────────

**7**
 30:14 49:19
  53:5 62:2
**71**
 40:8
**72**
 49:11
**75**
 38:17
**76**
 40:23
**77002**
 3:13
**77208-1129**
 3:12
**78**
 40:10
**78401**
 3:18

───────── 8 ─────────

**8**
 4:17 15:2,8
  15:11,16
**800**
 3:17
**84**
 40:18
**85**
 40:24 42:18

───────── 9 ─────────

**9**
 54:12 55:20
  55:22
**9th**
 25:14
**9:51**
 2:16 5:3
**90**
 12:20 41:7
**91**
 6:19
**919**

 3:12
**92**
 40:13
**93**
 12:21 14:25
  41:2 56:1
**94**
 12:1,10
  53:14
**95**
 54:15
**96**
 40:19



Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 630
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

USCA5 4954

USM-285 is a 5-part form. Fill out the form and print 5 copies. Sign as needed and route as specified below.

**U.S. Department of Justice**
United States Marshals Service

# PROCESS RECEIPT AND RETURN
See *"Instructions for Service of Process by U.S. Marshal"*

| PLAINTIFF<br>UNITED STATES | COURT CASE NUMBER<br>C-02-216, C-07-223 (JGJ) |
|---|---|
| DEFENDANT<br>ALFRED BOURGEOIS | TYPE OF PROCESS<br>Subpoena Duces Tecum |

**SERVE AT** {
NAME OF INDIVIDUAL, COMPANY, CORPORATION. ETC. TO SERVE OR DESCRIPTION OF PROPERTY TO SEIZE OR CONDEMN

Kristine McAshan, Supervisor, Patient Accounts - Healthcare, (210) 567-4150

ADDRESS *(Street or RFD, Apartment No., City, State and ZIP Code)*

University of Texas Health Science Center, Dept. of Pathology, 7703 Floyd Curl Drive, San Antonio, TX 78229

| SEND NOTICE OF SERVICE COPY TO REQUESTER AT NAME AND ADDRESS BELOW | | |
|---|---|---|
| Federal Community Defender Office<br>Attn: Michael Wiseman<br>601 Walnut Street, Suite 545 West<br>Philadelphia, PA 19106 | Number of process to be<br>served with this Form 285 | 1 |
| | Number of parties to be<br>served in this case | 1 |
| | Check for service<br>on U.S.A. | |

SPECIAL INSTRUCTIONS OR OTHER INFORMATION THAT WILL ASSIST IN EXPEDITING SERVICE *(Include Business and Alternate Addresses, All Telephone Numbers, and Estimated Times Available for Service)*:

Fold                                                                                                                     Fold

Please produce all of the slides, photographs and impressions re. the neuropathology consultation requested by Dr. Elizabeth Rouse of JG-1999, conducted by Dr. Kathleen Kagen-Hallet, accession # 02-CX-235, date cut 7/1/02, report date 9/17/02, immediately by overnight mail (at Petitioner's expense) to: Dr. Jan E. Leestma , 1440 North Kingsbury Street, Suite 210, Chicago, IL 60642.

| Signature of Attorney other Originator requesting service on behalf of: | ☐ PLAINTIFF<br>☒ DEFENDANT | TELEPHONE NUMBER<br>215-928-0520 | DATE<br>12/9/10 |
|---|---|---|---|

## SPACE BELOW FOR USE OF U.S. MARSHAL ONLY-- DO NOT WRITE BELOW THIS LINE

| I acknowledge receipt for the total number of process indicated.<br>*(Sign only for USM 285 if more than one USM 285 is submitted)* | Total Process | District of Origin<br>No. | District to Serve<br>No. | Signature of Authorized USMS Deputy or Clerk | Date |
|---|---|---|---|---|---|

I hereby certify and return that I ☐ have personally served , ☐ have legal evidence of service, ☐ have executed as shown in "Remarks", the process described on the individual , company, corporation, etc., at the address shown above on the on the individual , company, corporation, etc. shown at the address inserted below.

☐ I hereby certify and return that I am unable to locate the individual, company, corporation, etc. named above *(See remarks below)*

| Name and title of individual served *(if not shown above)* | ☐ A person of suitable age and discretion then residing in defendant's usual place of abode |
|---|---|
| Address *(complete only different than shown above)* | Date | Time | ☐ am<br>☐ pm |
| | Signature of U.S. Marshal or Deputy | | |

| Service Fee | Total Mileage Charges<br>including *endeavors)* | Forwarding Fee | Total Charges | Advance Deposits | Amount owed to U.S. Marshal* or<br>(Amount of Refund*)<br><br>$0.00 |
|---|---|---|---|---|---|

REMARKS:

**PRINT 5 COPIES:**
1. CLERK OF THE COURT
2. USMS RECORD
3. NOTICE OF SERVICE
4. BILLING STATEMENT*: To be returned to the U.S. Marshal with payment, if any amount is owed. Please remit promptly payable to U.S. Marshal.
5. ACKNOWLEDGMENT OF RECEIPT

PRIOR EDITIONS MAY BE USED

Form USM-285
Rev. 12/80

USCA5 4955

USM-285 is a 5-part form. Fill out the form and print 5 copies. Sign as needed and route as specified below.

PageID #: 6849

U.S. Department of Justice
United States Marshals Service

## PROCESS RECEIPT AND RETURN
*See "Instructions for Service of Process by U.S. Marshal"*

| PLAINTIFF<br>UNITED STATES | COURT CASE NUMBER<br>C-02-216, C-07-223 (JGJ) |
|---|---|
| DEFENDANT<br>ALFRED BOURGEOIS | TYPE OF PROCESS<br>Subpoena Duces Tecum |

**SERVE AT**

NAME OF INDIVIDUAL, COMPANY, CORPORATION. ETC. TO SERVE OR DESCRIPTION OF PROPERTY TO SEIZE OR CONDEMN

Dr. Jennifer Rulon, (210) 567-4150

ADDRESS *(Street or RFD, Apartment No., City, State and ZIP Code)*

University of Texas Health Science Center, Dept. of Pathology, 7703 Floyd Curl Drive, San Antonio, TX 78229

| SEND NOTICE OF SERVICE COPY TO REQUESTER AT NAME AND ADDRESS BELOW | | |
|---|---|---|
| Federal Community Defender Office<br>Attn: Michael Wiseman<br>601 Walnut Street, Suite 545 West<br>Philadelphia, PA 19106 | Number of process to be served with this Form 285 | 1 |
| | Number of parties to be served in this case | 1 |
| | Check for service on U.S.A. | |

SPECIAL INSTRUCTIONS OR OTHER INFORMATION THAT WILL ASSIST IN EXPEDITING SERVICE *(Include Business and Alternate Addresses, All Telephone Numbers, and Estimated Times Available for Service)*:

Fold                                                                    Fold

Please produce all of the slides, photographs and impressions re. the neuropathology consultation requested by Dr. Elizabeth Rouse of JG-1999, conducted by Dr. Kathleen Kagen-Hallet, accession # 02-CX-235, date cut 7/1/02, report date 9/17/02, immediately by overnight mail (at Petitioner's expense) to: Dr. Jan E. Leestma , 1440 North Kingsbury Street, Suite 210, Chicago, IL 60642.

| Signature of Attorney other Originator requesting service on behalf of: | ☐ PLAINTIFF<br>☒ DEFENDANT | TELEPHONE NUMBER<br>215-928-0520 | DATE<br>12/9/10 |
|---|---|---|---|

## SPACE BELOW FOR USE OF U.S. MARSHAL ONLY-- DO NOT WRITE BELOW THIS LINE

| I acknowledge receipt for the total number of process indicated. *(Sign only for USM 285 if more than one USM 285 is submitted)* | Total Process | District of Origin<br>No. _____ | District to Serve<br>No. _____ | Signature of Authorized USMS Deputy or Clerk | Date |
|---|---|---|---|---|---|

I hereby certify and return that I ☐ have personally served , ☐ have legal evidence of service, ☐ have executed as shown in "Remarks", the process described on the individual , company, corporation, etc., at the address shown above on the on the individual , company, corporation, etc. shown at the address inserted below.

☐ I hereby certify and return that I am unable to locate the individual, company, corporation, etc. named above *(See remarks below)*

| Name and title of individual served *(if not shown above)* | ☐ A person of suitable age and discretion then residing in defendant's usual place of abode |
|---|---|
| Address *(complete only different than shown above)* | Date | Time | ☐ am ☐ pm |
| | Signature of U.S. Marshal or Deputy | | |

| Service Fee | Total Mileage Charges including *endeavors)* | Forwarding Fee | Total Charges | Advance Deposits | Amount owed to U.S. Marshal* or (Amount of Refund*) |
|---|---|---|---|---|---|
| | | | | | **$0.00** |

REMARKS:

PRINT 5 COPIES: 1. CLERK OF THE COURT
2. USMS RECORD
3. NOTICE OF SERVICE
4. BILLING STATEMENT*: To be returned to the U.S. Marshal with payment, if any amount is owed. Please remit promptly payable to U.S. Marshal.
5. ACKNOWLEDGMENT OF RECEIPT

PRIOR EDITIONS MAY BE USED

Form USM-285
Rev. 12/80

USCA5 4956

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____
                                        :
UNITED STATES OF AMERICA,               :        No. Cr-C-02-216
                                        :        No. Cv-07-223
              Respondent,               :     Honorable Janis Graham Jack,
                                        :             U.S.D.J.
     -against-                          :
                                        :
ALFRED BOURGEOIS,                       :        Electronically Filed
                                        :
              Petitioner.               :
_____       :

### PETITIONER'S STATUS REPORT ON PRODUCTION AND DELIVERY OF AUTOPSY SLIDES TO DR. JAN LEESTMA.

COMES NOW, Petitioner, ALFRED BOURGEOIS, by and through undersigned counsel, and hereby files this status report on the production and delivery of the autopsy brain slides and related material to Dr. Jan E. Leestma.

1.     On December 8, 2010, Mr. Bourgeois filed *Petitioner's Renewed Unopposed Motion for Issuance of Subpoena Duces Tecum in Advance of Hearing*. Specifically, Petitioner requested that this Court issue a subpoena requiring Ms. Kristine McAshan, Supervisor, Patient Accounts – Healthcare and Dr. Jennifer Rulon, University of Texas Health Science Center, Department of Pathology, 7703 Floyd Curl Drive, San Antonio, TX 78229, (210) 567-4150, to produce all of the slides, photographs and impressions, regarding the

USCA5 4957

neuropathology consultation requested by Dr. Elizabeth Rouse of JG-1999,

conducted by Dr. Kathleen Kagen-Hallet, accession # 02-CX-235, date cut 7/1/02,

report date 9/17/02, currently in their possession in advance of the hearing.

Furthermore, in order to expedite Dr. Leestma's review, Petitioner requested that

in lieu of  personal appearance by Ms. McAshan and Dr. Rulon, the slides,

photographs and impressions should be immediately delivered to: Dr. Jan E.

Leestma, 1440 North Kingsbury Street. Suite 210, Chicago IL 60642.  This Court

promptly granted Petitioner's motion on December 9, 2010.  The Court also

ordered that the subpoena be served by the United States Marshals.

2.     Since that date counsel for Petitioner and the Government have both

been in constant communication with Ms. McAshan who has informed us that as

of this date, no subpoena has been served.  Petitioner's counsel's office have also

been in repeated contact with the United States Marshal' Office in Corpus

Christie, TX and San Antonio, TX who have not advised counsel about the

reasons the subpoena has not been served but have now informed counsel that it

will be served "early this week."

3.     As the Court ordered, counsel for Petitioner and the Government are

endeavoring to complete Dr. Leestma's review, report and deposition by the

January 13, 2011 argument date.  Although all counsel will continue to work in

the collaborative manner that has marked these proceedings and strive to comply

USCA5 4958

with the Court's deadline, because of this delay, Dr. Leestma has not been able to

complete his report and is now on vacation until January 5, 2011.  Counsel will

continue to urge the Marshal's office to immediately serve the subpoena and will

keep the Court informed and seek the Court's advice and perhaps intervention if

the subpoena is not served promptly.

Respectfully submitted,


By  /s/Victor J. Abreu
MICHAEL WISEMAN
VICTOR J. ABREU
Federal Community Defender Office
Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West - The Curtis Center
Philadelphia, PA 19106
215-928-0520

Date: December 20, 2010

USCA5 4959

**CERTIFICATE OF SERVICE**

I, Victor J. Abreu, hereby certify that on this 20th day of December, 2010 I served the foregoing upon the following persons by e-file:

Tony R. Roberts
United States Attorney's Office
PO Box 61129
Houston, TX 77208-1129
Tony.Roberts@usdoj.gov


/s/ Victor J. Abreu

_____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| **V.** | § | **CRIMINAL NO. C-02-216,** |
| | | **C-07-223** |
| **ALFRED BOURGEOIS** | § | |

### MOTION FOR ISSUANCE AND SERVICE OF WITNESS SUBPOENA

COMES NOW the defendant, Alfred Bourgeois, by and through his attorneys, the Federal Community Defender Office, and in accordance with Federal Rule of Criminal Procedure 17(b), and Section 1825 of Title 28, United States Code, respectfully moves this Court to order the issuance of a witness subpoena attached hereto and the payment of witness expenses requiring the following person: William May, 1900 Anna Drive, Irving, TX 75061; to appear via video-conference on January 13, 2011  at 8:00 a.m. at the defendant's 2255 evidentiary hearing.  In support of this motion, the defendant shows the Court the following:

**I.**

Mr. Bourgeois has been convicted of capital murder.

**II.**

This witness is needed to present an adequate defense in Mr. Bourgeois' 2255 hearing.

**III.**

The defendant is indigent and cannot afford the costs of the subpoena.

USCA5 4961

WHEREFORE, PREMISES CONSIDERED, the defendant respectfully requests that this

Court order the above-named witness to appear at the hearing via video-conference in this case at

8:00 a.m. on January 13, 2011, and that it grant this motion for the issuance of the witness

subpoena and payment of the witness expenses in the same manner as a witness subpoenaed on

behalf of the government.

Respectfully submitted,

By __/s/Michael Wiseman_____
MICHAEL WISEMAN
VICTOR ABREU
Capital Habeas Corpus Unit
Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 545 West - The Curtis Center
Philadelphia, PA 19106
215-928-0520

Date: December 20, 2010

USCA5 4962

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**


| UNITED STATES OF AMERICA | § | |
|---|---|---|
| V. | § | CRIMINAL NO. C-02-216, |
| | | C-07-223 |
| ALFRED BOURGEOIS | § | |


**ORDER FOR ISSUANCE OF WITNESS SUBPOENA**

CAME ON to be considered the defendant's motion for issuance of a witness subpoena.

The Court has considered the motion and determined:

(1) that the defendant has made a satisfactory showing that he is financially unable to pay the fees of the witness; and

(2) that the presence of the witness is necessary to an adequate defense of this cause. it is hereby--

ORDERED that a witness subpoena for: William May, 1900 Anna Drive, Irving, TX

75061 shall be served by the United States Marshals and that the costs incurred by the process

and the fees of the witnesses shall be paid in the same manner in which similar costs and fees are

paid in the case of a witness subpoenaed on behalf of the government.

SIGNED at CORPUS CHRISTI, Texas this the _____ day of December, 2010.


Judge Janis Graham Jack

USCA5 4963

USM-285 is a 5-part form. Fill out the form and print 5 copies. Sign as needed and route as specified below.

**U.S. Department of Justice**
United States Marshals Service

# PROCESS RECEIPT AND RETURN
See *"Instructions for Service of Process by U.S. Marshal"*

| PLAINTIFF United States | COURT CASE NUMBER C-02-216, C-07-223 (JGJ) |
|---|---|
| DEFENDANT Alfred Bourgeois | TYPE OF PROCESS Subpoena |

**SERVE AT** { NAME OF INDIVIDUAL, COMPANY, CORPORATION. ETC. TO SERVE OR DESCRIPTION OF PROPERTY TO SEIZE OR CONDEMN
William Edward May, Jr. 1900 Anna Drive, Irving, TX 75061, (361) 549-5340
ADDRESS *(Street or RFD, Apartment No., City, State and ZIP Code)*

| SEND NOTICE OF SERVICE COPY TO REQUESTER AT NAME AND ADDRESS BELOW | | |
|---|---|---|
| Federal Community Defender Office Attn: Michael Wiseman 601 Walnut Street, Suite 545 West Philadelphia, PA 19106 | Number of process to be served with this Form 285 | 1 |
| | Number of parties to be served in this case | 1 |
| | Check for service on U.S.A. | |

SPECIAL INSTRUCTIONS OR OTHER INFORMATION THAT WILL ASSIST IN EXPEDITING SERVICE *(Include Business and Alternate Addresses, All Telephone Numbers, and Estimated Times Available for Service):*

Fold

Fold

Signature of Attorney other Originator requesting service on behalf of:

☐ PLAINTIFF
☒ DEFENDANT

| TELEPHONE NUMBER | DATE |
|---|---|
| (215) 928-0520 | 12/20/10 |

## SPACE BELOW FOR USE OF U.S. MARSHAL ONLY-- DO NOT WRITE BELOW THIS LINE

| I acknowledge receipt for the total number of process indicated. *(Sign only for USM 285 if more than one USM 285 is submitted)* | Total Process | District of Origin No. | District to Serve No. | Signature of Authorized USMS Deputy or Clerk | Date |
|---|---|---|---|---|---|
| | | | | | |

I hereby certify and return that I ☐ have personally served , ☐ have legal evidence of service, ☐ have executed as shown in "Remarks", the process described on the individual , company, corporation, etc., at the address shown above on the on the individual , company, corporation, etc. shown at the address inserted below.

☐ I hereby certify and return that I am unable to locate the individual, company, corporation, etc. named above *(See remarks below)*

| Name and title of individual served *(if not shown above)* | ☐ A person of suitable age and discretion then residing in defendant's usual place of abode |
|---|---|
| Address *(complete only different than shown above)* | Date | Time | ☐ am ☐ pm |
| | Signature of U.S. Marshal or Deputy |

| Service Fee | Total Mileage Charges including *endeavors* | Forwarding Fee | Total Charges | Advance Deposits | Amount owed to U.S. Marshal* or (Amount of Refund*) |
|---|---|---|---|---|---|
| | | | | | **$0.00** |

REMARKS:

PRINT 5 COPIES:
1. CLERK OF THE COURT
2. USMS RECORD
3. NOTICE OF SERVICE
4. BILLING STATEMENT*: To be returned to the U.S. Marshal with payment, if any amount is owed. Please remit promptly payable to U.S. Marshal.
5. ACKNOWLEDGMENT OF RECEIPT

PRIOR EDITIONS MAY BE USED

Form USM-285
Rev. 12/80

USCA5 4964

AO 89  (Rev. 01/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

| | |
|---|---|
| United States of America<br>v.<br><br>_____<br>*Defendant* | )<br>)<br>)   Case No.<br>)<br>) |

### SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To:

**YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | Courtroom No.: |
|---|---|
| | Date and Time: |

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

Date: _____

*CLERK OF COURT*

_____
*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* _____
_____ , who requests this subpoena, are:

USCA5 4965

AO 89  (Rev. 01/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No.

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the subpoena on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the subpoena at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the subpoena on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because _____ ; or

❏ Other *(specify):*

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

USCA5 4966

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| **V.** | § | **CRIMINAL NO. C-02-216,** |
| | | **C-07-223** |
| **ALFRED BOURGEOIS** | § | |

**MOTION FOR ISSUANCE AND SERVICE OF WITNESS SUBPOENA**

COMES NOW the defendant, Alfred Bourgeois, by and through his attorneys, the Federal Community Defender Office, and in accordance with Federal Rule of Criminal Procedure 17(b), and Section 1825 of Title 28, United States Code, respectfully moves this Court to order the issuance of a witness subpoena attached hereto and the payment of witness expenses requiring the following person: James Sales, Nueces County District Attorney's Office,  901 Leopard Street, Rm 206, Corpus Christi, TX 78401; to appear on January 13, 2011 at 8:00 a.m. at the defendant's 2255 evidentiary hearing.  In support of this motion, the defendant shows the Court the following:

**I.**

Mr. Bourgeois has been convicted of capital murder.

**II.**

This witness is needed to present an adequate defense in Mr. Bourgeois' 2255 hearing.

**III.**

The defendant is indigent and cannot afford the costs of the subpoena.

WHEREFORE, PREMISES CONSIDERED, the defendant respectfully requests that this Court order the above-named witness to appear at the hearing in this case at 8:00 a.m. on January

**USCA5 4967**

13, 2011, and that it grant this motion for the issuance of the witness subpoena and payment of the

witness expenses in the same manner as a witness subpoenaed on behalf of the government.

Respectfully submitted,


By   /s/Michael Wiseman
MICHAEL WISEMAN
VICTOR ABREU
Capital Habeas Corpus Unit
Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 545 West - The Curtis Center
Philadelphia, PA 19106
215-928-0520

Date: December 20, 2010

USCA5 4968

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| V. | § | CRIMINAL NO. C-02-216, C-07-223 |
| ALFRED BOURGEOIS | § | |

## ORDER FOR ISSUANCE OF WITNESS SUBPOENA

CAME ON to be considered the defendant's motion for issuance of a witness subpoena.

The Court has considered the motion and determined:

(1) that the defendant has made a satisfactory showing that he is financially unable to pay the fees of the witness; and

(2) that the presence of the witness is necessary to an adequate defense of this cause. it is hereby--

ORDERED that a witness subpoena for: James Sales Nueces County District Attorney's

Office 901 Leopard Street, Rm 206, Corpus Christi, Texas 78401;  shall be served by the United

States Marshals and that the costs incurred by the process and the fees of the witnesses shall be

paid in the same manner in which similar costs and fees are paid in the case of a witness

subpoenaed on behalf of the government.

SIGNED at CORPUS CHRISTI, Texas this the _____ day of December, 2010.

_____

Judge Janis Graham Jack

USCA5 4969

USM-285 is a 5-part form. Fill out the form and print 5 copies. Sign as needed and route as specified below.

**U.S. Department of Justice**
United States Marshals Service

# PROCESS RECEIPT AND RETURN
See "Instructions for Service of Process by U.S. Marshal"

| PLAINTIFF<br>United States | COURT CASE NUMBER<br>C-02-216, C-07-223 (JGJ) |
|---|---|
| DEFENDANT<br>Alfred Bourgeois | TYPE OF PROCESS<br>Subpoena |

**SERVE AT** {

NAME OF INDIVIDUAL, COMPANY, CORPORATION. ETC. TO SERVE OR DESCRIPTION OF PROPERTY TO SEIZE OR CONDEMN

James Sales Nueces County District Attorney's Office 901 Leopard Street, Rm 206 Corpus Christi, Texas 78401

ADDRESS *(Street or RFD, Apartment No., City, State and ZIP Code)*

| SEND NOTICE OF SERVICE COPY TO REQUESTER AT NAME AND ADDRESS BELOW | | |
|---|---|---|
| Federal Community Defender Office<br>Attn: Michael Wiseman<br>601 Walnut Street, Suite 545 West<br>Philadelphia, PA 19106 | Number of process to be served with this Form 285 | 1 |
| | Number of parties to be served in this case | 1 |
| | Check for service on U.S.A. | |

SPECIAL INSTRUCTIONS OR OTHER INFORMATION THAT WILL ASSIST IN EXPEDITING SERVICE *(Include Business and Alternate Addresses,* *All Telephone Numbers, and Estimated Times Available for Service)*:

Fold                                                                                                    Fold

| Signature of Attorney other Originator requesting service on behalf of: | ☐ PLAINTIFF<br>☒ DEFENDANT | TELEPHONE NUMBER<br>(215) 928-0520 | DATE<br>12/20/10 |
|---|---|---|---|

## SPACE BELOW FOR USE OF U.S. MARSHAL ONLY-- DO NOT WRITE BELOW THIS LINE

| I acknowledge receipt for the total number of process indicated.<br>*(Sign only for USM 285 if more than one USM 285 is submitted)* | Total Process | District of Origin<br>No. ____ | District to Serve<br>No. ____ | Signature of Authorized USMS Deputy or Clerk | Date |
|---|---|---|---|---|---|

I hereby certify and return that I ☐ have personally served , ☐ have legal evidence of service, ☐ have executed as shown in "Remarks", the process described on the individual , company, corporation, etc., at the address shown above on the on the individual , company, corporation, etc. shown at the address inserted below.

☐ I hereby certify and return that I am unable to locate the individual, company, corporation, etc. named above *(See remarks below)*

| Name and title of individual served *(if not shown above)* | ☐ A person of suitable age and discretion then residing in defendant's usual place of abode |
|---|---|
| Address *(complete only different than shown above)* | Date / Time ☐ am ☐ pm |
| | Signature of U.S. Marshal or Deputy |

| Service Fee | Total Mileage Charges including *endeavors* | Forwarding Fee | Total Charges | Advance Deposits | Amount owed to U.S. Marshal* or (Amount of Refund*)<br><br>**$0.00** |
|---|---|---|---|---|---|

REMARKS:

PRINT 5 COPIES: 1. CLERK OF THE COURT
2. USMS RECORD
3. NOTICE OF SERVICE
4. BILLING STATEMENT*: To be returned to the U.S. Marshal with payment, if any amount is owed. Please remit promptly payable to U.S. Marshal.
5. ACKNOWLEDGMENT OF RECEIPT

PRIOR EDITIONS MAY BE USED

Form USM-285
Rev. 12/80

**USCA5 4970**

AO 89 (Rev. 01/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT
for the

_____ District of _____

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No. |
| | ) |
| _Defendant_ | ) |

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To:

**YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | Courtroom No.: |
|---|---|
| | Date and Time: |

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

Date: _____

*CLERK OF COURT*

_____
*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* _____
_____ , who requests this subpoena, are:

USCA5 4971

AO 89 (Rev. 01/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No.

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❐ I personally served the subpoena on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❐ I left the subpoena at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❐ I served the subpoena on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because _____ ; or

❐ Other *(specify):*

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

USCA5 4972

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-216-1 |
| | § | |
| ALFRED NMI BOURGEOIS | § | |

**ORDER FOR ISSUANCE OF WITNESS SUBPOENA**

CAME ON to be considered the defendant's motion for issuance of a witness subpoena.

The Court has considered the motion and determined:

(1)    that the defendant has made a satisfactory showing that he is financially unable to

pay the fees of the witness; and

(2)    that the presence of the witness is necessary to an adequate defense of this cause.

it is hereby--

ORDERED that a witness subpoena for: William May, 1900 Anna Drive, Irving, TX

75061 shall be served by the United States Marshals and that the costs incurred by the process

and the fees of the witnesses shall be paid in the same manner in which similar costs and fees are

paid in the case of a witness subpoenaed on behalf of the government.

SIGNED and ORDERED this 21st day of December, 2010.

Janis Graham Jack
United States District Judge

1 / 1

USCA5 4973

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA §

§

VS. §    CRIMINAL ACTION NO. C-02-216-1

§

ALFRED NMI BOURGEOIS §

## ORDER FOR ISSUANCE OF WITNESS SUBPOENA

CAME ON to be considered the defendant's motion for issuance of a witness subpoena.

The Court has considered the motion and determined:

(1)    that the defendant has made a satisfactory showing that he is financially unable to

pay the fees of the witness; and

(2)    that the presence of the witness is necessary to an adequate defense of this cause.

it is hereby--

ORDERED that a witness subpoena for: James Sales Nueces County District Attorney's

Office 901 Leopard Street, Rm 206, Corpus Christi, Texas 78401; shall be served by the United

States Marshals and that the costs incurred by the process and the fees of the witnesses shall be

paid in the same manner in which similar costs and fees are paid in the case of a witness

subpoenaed on behalf of the government.

SIGNED and ORDERED this 21st day of December, 2010.

Janis Graham Jack
United States District Judge

1 / 1

USCA5 4974

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| **V.** | § | **CRIMINAL NO. C-02-216,** |
| | | **C-07-223** |
| **ALFRED BOURGEOIS** | § | |

**MOTION FOR ISSUANCE AND SERVICE OF WITNESS SUBPOENA**

COMES NOW the defendant, Alfred Bourgeois, by and through his attorneys, the Federal Community Defender Office, and in accordance with Federal Rule of Criminal Procedure 17(b), and Section 1825 of Title 28, United States Code, respectfully moves this Court to order the issuance of a witness subpoena attached hereto and the payment of witness expenses requiring the following person: James Sales, 111 S Saint Marys Street, Suite 203, Beeville TX, 78102; to appear on January 13, 2011 at 8:00 a.m. at the defendant's 2255 evidentiary hearing. In support of this motion, the defendant shows the Court the following:

**I.**

Mr. Bourgeois has been convicted of capital murder.

**II.**

This witness is needed to present an adequate defense in Mr. Bourgeois' 2255 hearing.

**III.**

The defendant is indigent and cannot afford the costs of the subpoena.

WHEREFORE, PREMISES CONSIDERED, the defendant respectfully requests that this Court order the above-named witness to appear at the hearing in this case at 8:00 a.m. on January

USCA5 4975

13, 2011, and that it grant this motion for the issuance of the witness subpoena and payment of the

witness expenses in the same manner as a witness subpoenaed on behalf of the government.


Respectfully submitted,


By   /s/Michael Wiseman
MICHAEL WISEMAN
VICTOR ABREU
Capital Habeas Corpus Unit
Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 545 West - The Curtis Center
Philadelphia, PA 19106
215-928-0520

Date: December 28, 2010

USCA5 4976

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| V. | § | CRIMINAL NO. C-02-216, C-07-223 |
| ALFRED BOURGEOIS | § | |

## ORDER FOR ISSUANCE OF WITNESS SUBPOENA

CAME ON to be considered the defendant's motion for issuance of a witness subpoena.

The Court has considered the motion and determined:

(1) that the defendant has made a satisfactory showing that he is financially unable to pay the fees of the witness; and

(2) that the presence of the witness is necessary to an adequate defense of this cause. it is hereby--

ORDERED that a witness subpoena for: James Sales Bee County District Attorney's Office 111 S. Saint Marys Street, Suite 203, Beeville, Texas 78102;  shall be served by the United States Marshals and that the costs incurred by the process and the fees of the witnesses shall be paid in the same manner in which similar costs and fees are paid in the case of a witness subpoenaed on behalf of the government.

SIGNED at CORPUS CHRISTI, Texas this the _____ day of December, 2010.

_____
Judge Janis Graham Jack

USCA5 4977

USM-285 is a 5-part form. Fill out the form and print 5 copies. Sign as needed and route as specified below.

**U.S. Department of Justice**
United States Marshals Service

# PROCESS RECEIPT AND RETURN
See *"Instructions for Service of Process by U.S. Marshal"*

| PLAINTIFF United States | COURT CASE NUMBER C-02-216, C-07-223 (JGJ) |
|---|---|

| DEFENDANT Alfred Bourgeois | TYPE OF PROCESS Subpoena |
|---|---|

**SERVE AT** {

NAME OF INDIVIDUAL, COMPANY, CORPORATION. ETC. TO SERVE OR DESCRIPTION OF PROPERTY TO SEIZE OR CONDEMN

James Sales Bee County District Attorney's Office 111 S. Saint Marys Street, Suite 203 Beeville, Texas 78102

ADDRESS *(Street or RFD, Apartment No., City, State and ZIP Code)*

| SEND NOTICE OF SERVICE COPY TO REQUESTER AT NAME AND ADDRESS BELOW | | |
|---|---|---|
| Federal Community Defender Office<br>Attn: Michael Wiseman<br>601 Walnut Street, Suite 545 West<br>Philadelphia, PA 19106 | Number of process to be served with this Form 285 | 1 |
| | Number of parties to be served in this case | 1 |
| | Check for service on U.S.A. | |

SPECIAL INSTRUCTIONS OR OTHER INFORMATION THAT WILL ASSIST IN EXPEDITING SERVICE *(Include Business and Alternate Addresses, All Telephone Numbers, and Estimated Times Available for Service):*

Fold                                                                                      Fold

| Signature of Attorney other Originator requesting service on behalf of: /s/ Michael Wiseman | ☐ PLAINTIFF ☒ DEFENDANT | TELEPHONE NUMBER (215) 928-0520 | DATE 12/28/10 |
|---|---|---|---|

## SPACE BELOW FOR USE OF U.S. MARSHAL ONLY-- DO NOT WRITE BELOW THIS LINE

| I acknowledge receipt for the total number of process indicated. *(Sign only for USM 285 if more than one USM 285 is submitted)* | Total Process | District of Origin No. ____ | District to Serve No. ____ | Signature of Authorized USMS Deputy or Clerk | Date |
|---|---|---|---|---|---|

I hereby certify and return that I ☐ have personally served , ☐ have legal evidence of service, ☐ have executed as shown in "Remarks", the process described on the individual , company, corporation, etc., at the address shown above on the on the individual , company, corporation, etc. shown at the address inserted below.

☐ I hereby certify and return that I am unable to locate the individual, company, corporation, etc. named above *(See remarks below)*

| Name and title of individual served *(if not shown above)* | ☐ A person of suitable age and discretion then residing in defendant's usual place of abode |
|---|---|
| Address *(complete only different than shown above)* | Date | Time | ☐ am ☐ pm |
| | Signature of U.S. Marshal or Deputy | | |

| Service Fee | Total Mileage Charges including *endeavors* | Forwarding Fee | Total Charges | Advance Deposits | Amount owed to U.S. Marshal* or (Amount of Refund*) **$0.00** |
|---|---|---|---|---|---|

REMARKS:

PRINT 5 COPIES:
1. CLERK OF THE COURT
2. USMS RECORD
3. NOTICE OF SERVICE
4. BILLING STATEMENT*: To be returned to the U.S. Marshal with payment, if any amount is owed. Please remit promptly payable to U.S. Marshal.
5. ACKNOWLEDGMENT OF RECEIPT

PRIOR EDITIONS MAY BE USED

Form USM-285
Rev. 12/80

USCA5 4978

AO 89  (Rev. 01/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT
### for the

_____ District of _____

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| | ) | |
| _____ | ) | |
| *Defendant* | | |

### SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To:

**YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | Courtroom No.: |
|---|---|
| | Date and Time: |

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

Date:  _____

*CLERK OF COURT*

_____
*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* _____
_____ , who requests this subpoena, are:

USCA5 4979

AO 89  (Rev. 01/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No.

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❐  I personally served the subpoena on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❐  I left the subpoena at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❐  I served the subpoena on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❐  I returned the subpoena unexecuted because _____ ; or

❐  Other *(specify):*

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

USCA5 4980

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-216 |
| | § | |
| ALFRED NMI BOURGEOIS | § | |

## ORDER FOR ISSUANCE OF WITNESS SUBPOENA

CAME ON to be considered the defendant's motion for issuance of a witness subpoena.

The Court has considered the motion and determined:

(1)     that the defendant has made a satisfactory showing that he is financially unable to pay the fees of the witness; and

(2)     that the presence of the witness is necessary to an adequate defense of this cause. it is hereby—

ORDERED that a witness subpoena for: James Sales Bee County District Attorney's

Office 111 S. Saint Marys Street, Suite 203, Beeville, Texas 78102; shall be served by the

United States Marshals and that the costs incurred by the process and the fees of the witnesses

shall be paid in the same manner in which similar costs and fees are paid in the case of a witness

subpoenaed on behalf of the government.

SIGNED and ORDERED this 28th day of December, 2010.

_____
Janis Graham Jack
United States District Judge

1 / 1

USCA5 4981

```
                    IN THE UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF TEXAS
                         CORPUS CHRISTI DIVISION


UNITED STATES OF AMERICA,        *    CRIMINAL ACTION
                                 *
          PLAINTIFF,             *    CR-C-02-216(1)
                                 *
VS.                              *
                                 *    CORPUS CHRISTI, TEXAS
ALFRED BOURGEOIS,                *    DECEMBER 1, 2010
                                 *    2:27 P.M.
          DEFENDANT.            *
                                 *
* * * * * * * * * * * * * * * * *


                 TRANSCRIPT OF TELEPHONE CONFERENCE

           BEFORE THE HONORABLE JANIS GRAHAM JACK
                  UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:         MS. PATTI HUBERT BOOTH
                            MS. ELSA SALINAS
                            OFFICE OF THE U.S. ATTORNEY
                            800 NORTH SHORELINE, SUITE 500
                            CORPUS CHRISTI, TEXAS 78401

                            MR. TONY R. ROBERTS
                            MR. MARK MICHAEL DOWD
                            OFFICE OF THE U.S. ATTORNEY
                            P. O. BOX 61129
                            HOUSTON, TEXAS 77208

              (APPEARANCES CONTINUED ON PAGE 2)


COURT RECORDER:             MS. VELMA GANO


      PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
        TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
              MOLLY CARTER, P. O. BOX 270203
        CORPUS CHRISTI, TEXAS 78427 (361) 945-2525
```

USCA5 4982

APPEARANCES:  (CONTINUED)


FOR THE DEFENDANT:          MR. VICTOR JULIO ABREU
                           MR. MICHAEL WISEMAN
                           OFFICE OF THE FEDERAL PUBLIC DEFENDER
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 545
                           PHILADELPHIA, PENNSYLVANIA 19106

USCA5 4983

(The proceedings began at 2:27 p.m.)

(Call to Order of the Court.)

THE DEFENDANT: Yes, ma'am. At the time that I wrote the letter, I was very angry, because I didn't think I got a fair --

MR. ROBERTS: Your Honor, the Government is all on the phone as well.

THE COURT: Yeah. Well --

THE CLERK: I was told by the Defense Counsel that everything had been resolved in that regard.

MR. WISEMAN: Yes, Your Honor. This is Michael Wiseman. What Mr. Bourgeois was about to tell you was that he has calmed down a bit since he wrote the letter. He signed a document today which we can present to the Court, if the Court likes, indicating he wants us to stay on the case.

THE COURT: Is that right, Mr. Bourgeois?

THE DEFENDANT: Yes, ma'am.

THE COURT: Okay. Okay. Then we'll go on to the next matter.

THE CLERK: Would you like for me to call the case?

THE COURT: Yes.

THE CLERK: Criminal Action C-02-216, United States of America versus Alfred Bourgeois. May I have appearances, please?

MR. WISEMAN: Michael Wiseman for Mr. Bourgeois.

USCA5 4984

MR. ABREU:  Good afternoon, Your Honor.  Victor Abreu on behalf of Mr. Bourgeois.

MS. BOOTH:  Patti Hubert Booth for the United States.

MS. SALINAS:  Elsa Salinas on behalf of the United States.

MR. ROBERTS:  Tony Roberts for the United States.

MR. DOWD:  Mark Dowd for the United States, Your Honor.

THE COURT:  Okay.  There are several motions pending. There's a motion to take Bill May's deposition and Bill May's client, former client's deposition.  Is that right?

MR. ABREU:  That is correct, Your Honor.  Those are pending.

THE COURT:  Who's speaking?

MR. ABREU:  This is Mr. Abreu, and I'll identify myself from now on, Your Honor, when I speak.

THE COURT:  Okay.  Thank you.  Well, the problem -- of course, the Government's opposed.  And the problem with that is that when you all first filed the ex parte subpoena for Bill May, I immediately contacted you and said, "He's not at that address.  He lives out of town.  And I've got his ex-wife's address, and you can contact her there for his new address in the Dallas area."  And you all assured me that you had your own way to find these things and didn't need that.

So a month and a half later, you still didn't find

USCA5 4985

him.  You didn't call his ex-wife, and you didn't make any effort to do that.

MR. ABREU:  Your Honor, unfortunately Mr. McHugh, who has been dealing with this --

THE COURT:  Your name, please?

MR. ABREU:  This is Victor Abreu, Your Honor. Unfortunately, Mr. McHugh, who's been dealing with this issue directly, could not be with us today.  We would --

THE COURT:  Well, I spoke directly with Mr. Wiseman at the time.

MR. ABREU:  Regarding where she might be located, and I think Mr. Wiseman did pass that information on to our investigator, who did take some efforts to try and locate --

THE COURT:  No, actually I said, "Do you want his ex-wife's name and her address?  If so, Ms. Scotch has it. Please call her if there's any problem."

And he said, "Oh, we've got a great investigator. It's not going to be a problem."

MR. ABREU:  Well, I think that he did find her, Your Honor.  I don't think that that was the problem.  I think she, at first, was reluctant to provide definitive information to our investigator.  But I think in the end they did find her.

THE COURT:  Well, and the other thing I said is that we've had him appear from that place in Dallas, and we had his address, if you wanted us to look it up.  And nobody asked us

USCA5 4986

to do that.  So that ship has sailed.

MR. ABREU:  Can I make just a brief request, given what Your Honor is saying?  This is what I was going to request regarding all the motions, as a matter of fact.  The Government filed, night before last, several responses Your Honor had ordered to our motions.  And what we were asking for, we would ask for just a couple of days to file or reply to those motions.  And perhaps --

THE COURT:  Let me tell you this.

MR. ABREU:  Yes.

THE COURT:  It's over with Bill May.  I told you exactly how we could, I could help you find him.  We can look it up in our records, because we did a video deposition of him from a place in Dallas a year or two before.  I told you immediately, contacted you immediately when the ex parte motion to depose Bill May was filed, or subpoena him was filed, that he was not at that address, and he wasn't --

MR. WISEMAN:  Your Honor, this is Michael Wiseman.  I think the problem from --

THE COURT:  You remember all that, Mr. Wiseman.

MR. WISEMAN:  I'm sorry?

THE COURT:  You remember all that.

MR. WISEMAN:  Well, I certainly remember that part.  Unfortunately, Mr. McHugh, who was actually dealing with Mr. May and Mr. Longoria couldn't be with us this afternoon.

USCA5 4987

He actually has things to say in response.  Unfortunately, I don't know what those things are.  And that's why we would want --

THE COURT:  Well, I don't know what he could say in response, when you never called us back.  We had his address --

MR. WISEMAN:  Right.  As Mr. Abreu --

THE COURT:  -- from the video deposition.

MR. WISEMAN:  Right.  As Mr. Abreu said, though, I don't think that was the particular problem.  And I honestly don't know, sitting here right now, what the problem is.  But we would like an opportunity to just present a short reply on that issue.  Obviously, on the other motions, which are more significant in terms of their complexity --

THE COURT:  And I can't remember -- Ms. Scotch, can you look on the docket and see when that first ex parte motion to subpoena Bill May was filed?  Because that was when we called Mr. Wiseman about it.

THE CLERK:  Yes.  I'll look that up right now.

THE COURT:  Thanks.  And all this conversation was unknown to the Government, but it should be known at this point.  And I would --

MR. WISEMAN:  Your Honor, this is Michael Wiseman.  I remember the day.  It was when we were in your courtroom for the April 20th argument about the scope of the hearing.

THE COURT:  Right.  That was the April 20th --

USCA5 4988

MR. WISEMAN:  Or maybe it was the day that we did Mr., Dr. Gelbort actually.

THE COURT:  No, I asked to follow up on that.  We'll look and see, but I think it was the April hearing.  It was whenever you filed it.

MR. ABREU:  It would have been after the April hearing, I believe, Your Honor.

THE COURT:  Okay.  Well, let's see when it was filed.

(PAUSE.)

THE CLERK:  The subpoena order that was signed for Mr. May, that was signed on September the 3rd.  But I know that we talked about that at, on one of the last days of the evidentiary hearing, which that was in September.

THE COURT:  Well, no, we talked about it before September.  No, we talked about it when it was filed.

MR. ABREU:  This is Victor Abreu, Your Honor.  I think it might have actually come up, and I was not present, but I remember Mr. Wiseman talking to us about it when he returned from --

MR. WISEMAN:  Yes.

MR. ABREU:  -- having taken Dr. Gelbort's deposition, which would have been --

THE COURT:  Right, in court, because it was around that time.  You filed it in September.  We heard -- we had a September hearing with the doctor.

USCA5 4989

MR. ABREU:  I think it was September 10th or so, Your Honor.

THE COURT:  Yeah.

MR. WISEMAN:  Your Honor, this is Michael Wiseman.  I don't think we're debating any question about the Court having been extremely accommodating --

THE COURT:  No, no, I know that.

MR. WISEMAN:  -- and trying to assist us.

THE COURT:  I understand that.

MR. WISEMAN:  Right.  Our point is that the member of our team who has information to make our point is not on the phone.  He was at the prison today visiting with Mr. Bourgeois.

THE COURT:  Well, I understand that.

MR. WISEMAN:  So we're just at a disadvantage.

THE COURT:  Can't you reach him by cell phone?

MR. WISEMAN:  I expect he's en route home right now.  You know, he was at the prison and is now coming back.  I don't honestly know where he is.  I mean, we've been e-mailing each other trying to coordinate the time for this call, and he hasn't responded.  So I can only assume he hasn't been getting the e-mails.  He does have a BlackBerry, but he's en route.

MR. ABREU:  He may be mid-flight, for all we know.

MR. WISEMAN:  Yeah, yeah, exactly.  So, you know, in regard to the May/Longoria matter, we just want to put our position on paper so that the record's complete for --

USCA5 4990

THE COURT:  I assumed you did when you wanted to take it out of time.  And the Longoria --

MR. WISEMAN:  Well, I understand, but --

THE COURT:  The Longoria guy, he has been in the Bureau of Prisons for some time, or at least in a prison, and it requires a writ to get him here, you know, when you -- in March I told you that.

MR. WISEMAN:  Right.  Again, I think Mr. McHugh is handling him, and I don't know what the back and forth was and what he knew and when he knew it, and so I'm --

THE COURT:  It doesn't matter.  I know what you all knew and when you knew it.  And what you did with the information is something else.  But we had Mr. May's address.  And I told you we would search for it and get it for you if you needed it.  And you told me, Mr. Wiseman, if there was any problem at all, you would get back to me.

Now, here we are in December, when I want to set the final arguments hearing, and you want to do more depositions.  And I can understand the doctor thing.  You can do that one.  But not the May and Longoria one.  That was well within -- you know, this has got, I have given you incredible amounts of time and leeway to do this.  And that time is now up.

So the question remains when can you do the, take the testimony of the doctor?

Oh, and by the way, I'm allowing you to amend for the

USCA5 4991

Brady deal, because I figure we had it at the hearing anyway.

MR. ABREU:  I missed the last part, Your Honor.  This is Victor Abreu.  Because you figured what?  I'm sorry.

THE COURT:  I'm allowing you to amend to add the other point in the 2255 for -- I think it was a Brady claim, wasn't it?

MR. ABREU:  Yes, Your Honor.

THE COURT:  Yeah.  You know, because we tried it anyway.

MR. ABREU:  And so we could present argument at that time, at the appropriate time?

THE COURT:  Absolutely.

MR. ABREU:  Okay.

MR. WISEMAN:  Your Honor --

THE COURT:  I mean, you know, I feel like we had, we tried it during the hearing.

MR. WISEMAN:  Your Honor, this is Michael Wiseman.  I think we appreciate the ability to amend, or the Court's ruling on amendment.  But from our perspective, given the Government's response, we think there is a little bit more hearing that's required on that, either by deposition or in court hearing.  And we were going to put that forth --

THE COURT:  You can do it at the time of arguments.  You know, that's it.  I mean, I have the affidavit from Ms. Hohle.

USCA5 4992

MR. WISEMAN:  Do we not get to cross-examine?

THE COURT:  You can put her on the stand.  You can put her on the stand when we have the final arguments hearing.

MR. WISEMAN:  Okay.

THE COURT:  And that's what you want to do.  Right?

MR. ABREU:  That's what I understood, Your Honor.

THE COURT:  Yeah.  I'm not accepting affidavits from anybody else.  That's only reasonable.

MR. WISEMAN:  Exactly.

MR. ABREU:  That's right.  That's fair.  Okay.  Thank you, Your Honor.

THE COURT:  The U.S. Attorney should make her available at the closing arguments hearing.  So the only other issue then, as I understand from the Government's response -- now I have forgotten the name of the doctor.

MR. ABREU:  His name is Dr. Leestma, Your Honor.

THE COURT:  Okay.

MR. ABREU:  May I quickly address that point, Your Honor?

THE COURT:  Yes.

MR. ABREU:  This is Victor Abreu, obviously.  Just one point of clarification, Your Honor, and I wanted to make sure the Government Counsel was aware of that.  And I think that they would agree with this, that, you know, there is somewhat of a little bit of congestion or confusion about

USCA5 4993

whether their, our motion was unopposed or not.  And I just wanted to clarify that that was certainly not intentional and that it was based on my reading of what Your Honor had said in --

THE COURT:  I don't have any problem with that.  I understood the response --

MR. ABREU:  Okay.  I just wanted to make sure that everybody was aware that I wasn't --

THE COURT:  No.

MR. ABREU:  -- trying to misrepresent what the Government --

THE COURT:  No.

MR. ABREU:  -- was opposed or unopposed to.

THE COURT:  No.  Those are the kind of things that are just misunderstandings, miscommunications.

MR. ABREU:  Okay.  Thank you.

THE COURT:  So I didn't want to delay the hearing for another 30 days.  I would like you to get the deposition done ASAP.

MR. ABREU:  Yes.

THE COURT:  When can you get it done?

MR. ABREU:  I think that -- here's the only thing we're waiting for, Your Honor.  There are slides that Dr. Kagen-Hallet, who is now deceased, relied on.  There were specific brain slides.  Those, for some reason, were not

USCA5 4994

included in the package of slides that were previously sent to Dr. Leestma.

We could probably do a deposition now, but to do as thorough a job as Your Honor wanted us to have done regarding everything you wanted our new doctor to look at, it would be best if he could look at those brain slides as well.

THE COURT:  Where are those slides?

MR. ABREU:  They were not with that particular package, and I was hoping perhaps Mr. Roberts could speak with Dr. Rouse, the autopsy doctor.  Perhaps she knows.

THE COURT:  I wanted to have the hearing to see if Mr. Roberts, Ms. Booth, Ms. Salinas, Mr. Dowd has some kind of update on where those slides were.

MR. ABREU:  And we had tried previously in the past to speak directly to Dr. Rouse, and she wouldn't speak to us. And I understand her point.

THE COURT:  That's okay.

MR. ABREU:  Right.  So, but I know --

THE COURT:  So let's -- who has a response on the Government's side about the slides?

MR. ROBERTS:  Your Honor, this is Tony Roberts for the United States.  This is the -- I thought that the autopsy slides were all sent after the last time when we had this, when we had a discussion during the evidentiary hearing.  So actually, it's a surprise to me actually to know that they have

USCA5 4995

not received all the autopsy slides at this point.

MR. ABREU:  Let me just clarify the point.  All the autopsy slides were sent except -- and that's what our motion says -- except the brain slides that were separately reviewed by Dr. Kagen-Hallet, not Dr. Rouse.

THE COURT:  Can you track those down, Mr. Roberts?

MR. ROBERTS:  I will make every effort, Your Honor. The neurologist, Ms. Kagen-Hallet, is now deceased.  And as has been represented to the Court from the Federal Public Defender, someone else has actually looked at those slides and sent some information on to them.  But I was not aware until this point that the actual brain slides were not sent.  So I will track that down and --

THE COURT:  I tell you what, why don't you look that up and file an advisory for the Court -- let's see, today's Wednesday -- by Friday at noon.

Now it's possible, Mr. Abreu and Mr. Wiseman, that those things are gone.

MR. ABREU:  It's possible.  And then we would like to proceed on the deposition without them, Your Honor.

THE COURT:  Okay.  Because we need to know rather quickly, because I'd like to set a date --

MR. ABREU:  Right.

THE COURT:  -- in December.  You all need more frequent flier miles, Mr. Wiseman and Mr. Abreu.

USCA5 4996

MR. WISEMAN: Oh, I just can't wait to get them.

THE COURT: I know. I know. I'd like to do this in December.

MR. ABREU: A date in December, Your Honor?

THE COURT: I would like a date in December. Tell me -- now you made me feel bad, without even saying anything.

MR. ABREU: And I'll tell you why that is, only, Your Honor, because I have a, my family is headed to visit my parents in Florida from December 21st through the 29th.

THE COURT: And this is Mr. --

MR. ABREU: Abreu, Your Honor.

THE COURT: Okay. Well, let's see if we can do it before then.

MR. ROBERTS: Your Honor, this is Tony Roberts --

MR. WISEMAN: Now you're going to hear some moans from Mr. Roberts.

THE COURT: Who's moaning now?

MR. ABREU: I think everybody was collectively moaning.

MR. WISEMAN: Mr. Wiseman's moaning. I've got a Third Circuit argument, followed by a filing deadline on the 13th, so I've got --

THE COURT: And?

MR. WISEMAN: -- nothing, I can't even think about it till, you know, after the 13th. And that doesn't give us much

USCA5 4997

time to get ready.

THE COURT:  So?

MR. ROBERTS:  Your Honor, this is --

THE COURT:  I'm sorry, Mr. Wiseman.

MR. WISEMAN:  I'm sorry?

THE COURT:  I can't help but tease you.  I'm sorry.

Okay.  Look, everybody, we're going to do this in mid-January.  We'll pick a date.

MR. WISEMAN:  Excellent.

THE COURT:  Now, this is -- two other things.  You want to get the information from Mr. May that he, his client, Longoria, was offered a deal?

MR. WISEMAN:  Correct.

THE COURT:  Is that it?

MR. WISEMAN:  Yes.

MR. ABREU:  That's correct, Your Honor.

THE COURT:  Do you need Longoria for that, or can you do it with May?

MR. WISEMAN:  I think we could do it with May.  I believe.  What do you think, Mr. Abreu?

MR. ABREU:  If the Court is denying Longoria, we certainly will try to do it with Mr. May.

THE COURT:  Well --

MR. WISEMAN:  Mr. Abreu is more practical than --

THE COURT:  I thought I already heard from

Mr. Longoria at some point.

MR. WISEMAN:  No.

MR. ABREU:  No, you have not, Your Honor.

THE COURT:  Okay.

MR. ABREU:  Mr. Longoria is the gentleman who's in -- gentleman I say -- the person who was in prison in Kansas awaiting murder charges.

MS. SALINAS:  This is Elsa Salinas, Your Honor.  You heard from his girlfriend in the --

THE COURT:  I heard from his girlfriend at the trial.

MS. BOOTH:  No.  No.  That was Orlando Campos' girlfriend.

MS. SALINAS:  Oh, I'm sorry.

MS. BOOTH:  What you've seen are letters that he wrote.

MS. SALINAS:  That's right.

THE COURT:  Mr. Longoria.

MS. BOOTH:  That are in the pleadings.

MR. WISEMAN:  That's correct, Your Honor.

MS. SALINAS:  That's correct.

THE COURT:  So why don't we do -- and if you can do it -- and Mr. Abreu's going to do it.  Right?

MR. ABREU:  Mr. McHugh will.  But I will -- one of us will do it, Your Honor.

THE COURT:  I want it done by the 15th.  And this is

USCA5 4999

the only way I will authorize it.  Mr. May goes to a video conference center.  You all do it in your offices, by however you want to do it, or wherever your nearest video conference center is.

MR. WISEMAN:  Okay.  And I'm missing an important detail, which was the date.

THE COURT:  I'm sorry?

MR. WISEMAN:  I'm missing an important detail, the date.

THE COURT:  By the 15th of December.

MR. WISEMAN:  Okay.

THE COURT:  The U.S. Attorneys have video conferencing in Houston.  They have video conferencing in our courthouse.  You can use that.  But I think actually you may have to, we have to worry about whether they can all interface, okay, so you may have to go to a video conference center.

Now, the last time we did this with Mr. May, he actually went -- he appeared by video conference in the courtroom.  He went to the federal courthouse in Dallas.

MR. ABREU:  Okay.

THE COURT:  Now, I can do that if you want him to appear in January.

MS. BOOTH:  I thought this had to be done by December the 15th.

THE COURT:  Well, if you want a deposition of him in

USCA5 5000

advance, it has to be done by December 15th.  If you just want him to appear by video deposition, he can go to a federal courthouse, and we can hook it up in my courtroom for the arguments.

MR. WISEMAN:  So we could do his testimony at the same time as we do the argument.  Okay.

THE COURT:  Which do you want to do?

MR. WISEMAN:  I think the latter sounds better.  This is Michael Wiseman.

THE COURT:  Well, it should be cheaper.

MR. WISEMAN:  Be cheaper, and I think -- I don't know what Mr. McHugh's schedule is.  It may be pressing him to get it done next week.

MR. ABREU:  I think it might also be more convenient for --

THE COURT:  I thought we went over this during the trial, though.  Wasn't Mr. Longoria, didn't he appear at the trial?

MR. ABREU:  At the trial in 2003?  Yes.  He was present at the -- in 2004.  He was present at trial, Your Honor, not at the hearing in 2010.

THE COURT:  Yeah, I know.  But weren't these questions asked of him in 2003?

MR. ABREU:  Oh, no, Your Honor.  These are somewhat different.  They're based on a post-trial letter that was

USCA5 5001

written on his behalf.

THE COURT:  By Ms. Booth?

MS. BOOTH:  Uh-huh.

MR. ABREU:  By the Government, Your Honor.

THE COURT:  But I remember, I thought we talked about this at the time, that -- I thought Ms. Booth actually came forward and said, "I want you to know that this is what may happen."

MR. ABREU:  I don't believe that's the case, Your Honor.

MS. BOOTH:  On Orlando Campos --

THE COURT:  Is that the one?

MS. BOOTH:  Orlando Campos, I believe the record's going to show that he was going to ask for us to write a letter, we might write a letter.  I think that was on the record.  I don't remember exactly how it was.

THE COURT:  Okay.

MS. BOOTH:  We made no promises to Mr. Adam Longoria. None.  But subsequent, years -- I guess it was -- there's a letter in there that says, "I know you promised me nothing," but he wrote like a month after the trial.

THE COURT:  Right.

MS. BOOTH:  "But would you let my wife visit?"  Well, we made no, you know, nothing happened.

Then I was approached, I think, by Chris Gale and

USCA5 5002

asked if I would write a letter for his parole was coming up. And at that point I said, "Okay, I will."  And I just wrote a letter saying, "He asked for nothing, and we promised him nothing, but he did testify honorably."

THE COURT:  Okay.

MS. BOOTH:  And that's all that's in the letter.

THE COURT:  Okay.

MR. ABREU:  I think the question before the Court is whether there were some implicit promises that were made and whether some other post-testimony action was taken on his behalf or, you know --

MS. BOOTH:  No, there wasn't.

MR. ABREU:  -- born out.

MS. BOOTH:  Nothing.

MR. ABREU:  Well, I guess that's the issue for the Court.  And that's why we want him to testify.

THE COURT:  I know, but is Mr. May going to say that he thought that you were going to do something?

MR. ABREU:  I missed that, Your Honor.  I'm sorry.

THE COURT:  Have you -- you've talked to Mr. May. Has he said that he thought that Ms. Booth was going to do something before he testified?

MR. ABREU:  That is what his affidavit reflects.

MS. BOOTH:  No, that's not what his affidavit said.

MR. ABREU:  Let me -- Ms. Booth, Ms. Booth --

USCA5 5003

MS. BOOTH:  His affidavit said he spoke to Jimmy Sales.

MR. ABREU:  Ms. Booth, Ms. Booth --

THE COURT:  Okay.

MS. BOOTH:  Let's get this straight.

MR. ABREU:  I don't have his affidavit in front of me.

MS. BOOTH:  Okay.

MR. ABREU:  Mr. McHugh is not on the phone.  And I'm trying to go by my best of recollections here.  The allegation is that there was a benefit that was received that was not revealed to the jury.  That is the issue before the Court. That's what we're trying to get --

MS. BOOTH:  But don't represent that that's what Bill May said, because that's not what's in your affidavit.

MR. ABREU:  I'm going to pull it up right now.

MS. BOOTH:  Right.

MR. ABREU:  I'm going to pull it up.

MS. BOOTH:  Your affidavit says he talked to Jimmy Sales.

MR. ABREU:  And what does that mean?

THE COURT:  Jimmy Sales was in the District Attorney's Office.

MS. BOOTH:  Was in the District Attorney's Office.

THE COURT:  Not in the U.S. Attorney's Office.

USCA5 5004

MS. BOOTH:  Right.

THE COURT:  I just remember something about this, I guess just from reading your 2255.

MS. BOOTH:  Right.  Right.  There's letters in there from -- and then there's a letter from him in 2007, Adam Longoria, from prison, saying that I never wrote a letter for him, that if I didn't get him out, that he was going to tell everybody that he lied at the trial.

THE COURT:  Okay.

MS. BOOTH:  And that letter's in there.

MR. ABREU:  I have Mr. May's affidavit --

MS. BOOTH:  He didn't know that I had written that --

MR. ABREU:  I have Mr. May's affidavit up, Your Honor -- it's Victor Abreu -- and I can read it if the Court would like.

THE COURT:  Okay.  Go ahead.

MR. ABREU:  I just pulled it up.  "I'm presently retired from the practice of law and residing in Corpus Christi, Texas.  In 1978 I was admitted to practice law in the State of Texas."

THE COURT:  Well, skip down to the good part.

MR. ABREU:  All right, let's see.  "On November 13th, 2003, after my appearance on behalf of Mr. Adam Longoria, Mr. Longoria was in custody in Nueces County prison, charged with aggravated robbery."

USCA5 5005

THE COURT:  When did he enter an appearance?

MR. ABREU:  Say again, Your Honor?

THE COURT:  When did you say he entered an appearance?

MR. ABREU:  November 13th, 2003.

THE COURT:  And when was the trial for Mr. Bourgeois?

MS. BOOTH:  January of 2004.

THE COURT:  Okay.  Keep going.

MR. ABREU:  "On that charge, Mr. Longoria was facing a mandatory sentence of 25 years to 99 years."  Then it gives the case number.  "Mr. Longoria, at the time of the robbery offense, was three months into a 10-year probation sentence arising in Nueces County from a plea of guilty of evading arrest or detention using a vehicle and for endangering a child."  It gives the case number to that as well.

"This probationary sentence resulted only after the State had agreed to waive the habitual offender mandatory sentencing enhancement.

"I knew, based on these two cases, that Mr. Longoria was facing a life sentence, or the equivalent, if he had been convicted of bank robbery.  Mr. Longoria's defense to the bank robbery was that he did it but was forced to do it by members of a gang he belonged to, the Texas Syndicate.  I knew this would be a very difficult defense to prevail upon in front of a jury.

USCA5 5006

"At some point in the winter or spring of 2004, Mr. Longoria advised that he was considering cooperating with the FBI against Mr. Alfred Bourgeois in his federal capital case.  I then recalled receiving a telephone call from AUSA Ms. Patti Booth.  She asked if it would be okay to speak with Mr. Longoria, and I granted her permission to do so.

"Sometime after the phone call with Ms. Booth, Mr. Longoria told me that he had, in fact, spoken with Ms. Booth.  He was expecting that she would help him after his testimony in the Bourgeois case.  I told him that in my experience, if he testified well in the Bourgeois case, he could expect to get some type of benefit in the Nueces County case.

"Mr. Longoria testified against Mr. Bourgeois in his federal capital case in March 2004.

"On April 19th, 2004, I appeared in Nueces County Court.  Mr. Longoria's robbery case and his probation violation were" -- something is crossed out -- "were listed for disposition that day.

"I spoke with the State Prosecutor Jimmy Sales and asked him if he had spoken with Ms. Booth.  He told me that he had spoken to her.  Assistant District Attorney Sales dropped the habitual offender mandatory aspects of the robbery case and offered Mr. Longoria a seven-year sentence on the robbery case and a seven-year sentence on the probation violation case.

USCA5 5007

These sentences were to run concurrently.  He also offered to reduce the sentence even further to five years if Mr. Longoria cooperated as a witness in a state case in the next 30 days.

"The main reason for Mr. Sales dropping the habitual offender mandatory aspects of the robbery case and offering Mr. Longoria a total of seven years incarceration was because of his conversation with Ms. Patti Booth and his testimony in the Bourgeois case."

THE COURT:  Okay.  That is --

MR. ABREU:  "I hereby certify."  That's what Mr. Bill May would say.

THE COURT:  Okay.  Let me tell you, that's too many hearsays.  That's too many hearsays to go through.  Maybe you want to depose Jim Sales, or Sells, or Sales.

MS. BOOTH:  Uh-huh.

THE COURT:  That would probably be more to the point.

MR. ABREU:  Well, we would choose to do both, Your Honor.  And I, going back to my earlier point, I don't think I misrepresented anything.  Just on my recollection, I think that the implication is that there was a deal in place.

THE COURT:  No, I don't believe that.

MS. BOOTH:  No.

THE COURT:  I don't see that from that.  I don't see that from the affidavit.  But I can tell you this -- and he testified in front of me under oath that there was no deal in

USCA5 5008

place.  He's written a letter saying there was no, that is Longoria, that there was no deal in place.

What you can do -- where is Mr. Sales?  Is it Sells or Sales?

MR. ABREU:  I think he also wrote a subsequent letter that said that there was a deal in place.

MS. BOOTH:  No.  He wrote a subsequent letter saying that --

THE COURT:  I know.  You've already said.

MS. BOOTH:  -- if I didn't do something for him, that he would say that he lied at the trial.  That's what --

MR. ABREU:  That's the third, I think that's the third letter -- or affidavit, I'm sorry.  That was the third letter, but he wrote an affidavit that was different.

THE COURT:  Ms. Booth --

MR. WISEMAN:  Mr. Abreu, isn't there the letter from Ms. Booth to the probation or parole authorities?  That's also --

MS. BOOTH:  Yes.  And that's --

THE COURT:  She's already said that.

MS. BOOTH:  Yes.

MR. ABREU:  That's part of the record.

THE COURT:  Let me ask you this.  Wait, wait, wait.  Ms. Booth, one more time --

MS. BOOTH:  Yes, ma'am.

USCA5 5009

THE COURT:  -- where is Mr. Sales?  Or Sales.

MS. BOOTH:  Mr. Sales, I believe, is a Prosecutor for Bee County, with Martha Warner.  And he may be starting back over at Nueces with the new D.A., Mark Skurka.

THE COURT:  Oh, okay.  All right.  Is that new District Attorney, he's in now.  I saw it in the paper.  Right?

MS. BOOTH:  Well, he'll start in January.

THE COURT:  No, not the new District Attorney in Nueces County.  He started now.

MS. BOOTH:  Oh, did he?

THE COURT:  Yes.

MS. BOOTH:  Okay.  I haven't read the papers.

THE COURT:  Yeah.  No, no, no.  The paper said he got sworn in a week or so ago.

MS. BOOTH:  Okay.

THE COURT:  So he's there.

MS. BOOTH:  And Ms. Jimenez is out.  Okay.

THE COURT:  Well, I don't know if she's out, but she's no longer District Attorney.

So then why don't you bring Sales to the thing, too.

MR. WISEMAN:  Okay.

THE COURT:  I was asking Ms. Booth.  I thought --

MR. WISEMAN:  Oh.  I didn't know if you wanted us to issue a subpoena or --

THE COURT:  Either one of you can do it.  But get May

USCA5 5010

and Sales.  May can appear by video conferencing from a district, from a federal courthouse.

Ms. Scotch, do you remember how we did that last time?  Ms. Scotch?  Uh-oh.

MS. BOOTH:  Uh-oh.

THE CLERK:  I'm sorry, Judge.  What did you just ask me?

THE COURT:  Do you remember how we had Mr. May up here last time from a courthouse in Dallas?

THE CLERK:  I know that he appeared by video conference, and he went to, he offered to -- it was a, I think it was a -- he offered to go to Dallas, to the courthouse and appear, and they just set it up for us through the District Court.

THE COURT:  Okay.  So Ms. Thompson can set that up?

THE CLERK:  Yes.  We just need to contact the Federal District Court over there.  And if they've got availability, they should be able to accommodate that.

THE COURT:  Okay.  So y'all need to set that up with Mr. May.  Mr. Wiseman?

MR. WISEMAN:  Yes.

THE COURT:  And I'll tell you the truth, Mr. Wiseman, I don't think I would benefit from hearing from Mr. Longoria with what's going on in --

MR. WISEMAN:  I think, I think we would be satisfied

USCA5 5011

with Mr. May and Mr. Sales.

THE COURT:  Okay.

MR. WISEMAN:  I think that would, under the circumstances, I think that would make sense.

THE COURT:  And so, Ms. Scotch, what we want is a day in January.

MR. ROBERTS:  Your Honor, this is Tony Roberts.  Can we just go back to Dr. Leestma for a minute?  Because as we noted in our response, we don't have a report from him yet.  We don't have a CV.  We don't have a Rule 26 disclosure.  And you've given them until December the 15th to do a deposition.

THE COURT:  No, I want that done even quicker.  I was talking about Bill May.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  But I think before we set that up -- and if we have to get on a conference call again, we'll do it tomorrow or the next day, any time -- I want you to file by noon on Friday the status of those brain slides.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  And then I think I can expect, all of us, after he, the expert has had an opportunity to look at those brain slides -- he can't file a report if he doesn't have the brain slides.

MR. ABREU:  That's what we're trying to get to, Your Honor.

USCA5 5012

32

THE COURT:  But I think, Mr. Wiseman and Mr. Abreu, you can at least file a CV.

MR. ABREU:  That's fine, Your Honor.

THE COURT:  With the U.S. Attorney.  And a list of other cases he's testified in, that kind of thing.

MR. ABREU:  Your Honor, what I had previously suggested to Mr. Roberts was certainly I would provide him with all Rule 26 disclosures and a full report, as soon as that stuff was, the additional slides were, if still available, provided, so he could provide a report.

THE COURT:  Okay.  Well, you can do -- you can do everything but the report.

MR. ABREU:  Before any deposition, certainly with enough time before any deposition.

THE COURT:  You can do -- let me explain.  You're going to do that, you're going to file by Friday noon his CV, all the prior cases he's testified in, everything but his report without the brain slides.  Now, if we find out Friday at noon that there are no brain slides, then he can file a report by next Friday, a week from Friday.

MR. WISEMAN:  That's fine.  I think Mr. Abreu --

MR. ABREU:  I'm just taking notes.  Sorry.

MR. WISEMAN:  Yeah, okay.

MR. ABREU:  I'm just writing so I don't forget anything.

USCA5 5013

THE COURT:  Ms. Scotch, do we have Mr. Cutler on the line?

THE CLERK:  Oh, yes.

THE COURT:  Okay.  Mr. Cutler, are you there?  Ms. Scotch?

MR. CUTLER:  Yes, Judge.

THE COURT:  Oh, good.  Is that you?  Okay.

MR. CUTLER:  Yes.

THE CLERK:  How much time were we looking at setting aside?

THE COURT:  I'll give them half a day.  Pick a time in January.

THE CLERK:  Do you want that morning time, since they would be coming in the day before?

THE COURT:  What do you all want?  Morning?  You'll be here the night before; is that right?

MR. WISEMAN:  Well, if we're going to do witnesses, it would make more sense to do the argument in the afternoon. We could do the witnesses in the morning.

THE COURT:  No.  You're going to do the whole thing in the morning.

MR. WISEMAN:  The whole thing?

THE COURT:  The whole thing.

MR. WISEMAN:  I thought there was going to be a morning for each claim.  I'm kidding, Your Honor.

USCA5 5014

THE COURT:  I know that.

MR. WISEMAN:  Isn't it wonderful that I can maintain some sense of humor?

THE COURT:  I appreciate it.  I really do, Mr. Wiseman.  I thought you might have lost your sense of humor after your last visit.

THE CLERK:  I was looking at January the 19th.

MR. WISEMAN:  Ooh.  You know, that's the one day I was going to ask not to give us, because I have a hearing in Philadelphia that day.  I'm good any other day of the month.

MS. BOOTH:  Couldn't we do it at the beginning of the month, Your Honor?

THE CLERK:  January the 13th?

THE COURT:  13th.  Is there a Friday?

MR. WISEMAN:  That's fine for --

THE CLERK:  That's a Thursday.

MR. ABREU:  13th is fine.

THE COURT:  Mr. Roberts?  Ms. Booth?

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  Ms. Booth?  Ms. Salinas?

MS. BOOTH:  I guess that's fine.

THE COURT:  What's wrong, Ms. Booth?

MS. BOOTH:  Oh, I have a -- well, I've got several set for trial in January, and my husband comes home in January, and I was just --

USCA5 5015

THE COURT:  When in January?

MS. BOOTH:  January the 15th through the -- and I -- but you know, we'll do it.

THE COURT:  Well, wouldn't you like to have this over with?

MS. BOOTH:  Yeah.  I'm just worried about -- but we'll just do it.  I'll just -- we'll just do it on the 13th.

THE COURT:  Okay.  Now, let's get this straight about Mr. Bourgeois's presence.  Are you satisfied -- you had earlier said you didn't need him here at all.  But now that there's going to be evidence presented, would you like him on the phone for that portion?

MR. WISEMAN:  Yes, Your Honor.  I assume that's --

THE COURT:  So we'll do the evidence first.  We'll start at 8:00 in the morning --

MR. WISEMAN:  Okay.

THE COURT:  -- Ms. Scotch?

THE CLERK:  Yes, Your Honor.

THE COURT:  And we'll do the evidence first, and then arguments after that.  We have, we discovered -- actually, I don't think it matters.  You all know the situation at Terra Haute, which I just found out about today.  You have to really reserve far in advance the phone lines that are not recorded. And we thought we were going to have an ex parte hearing that we wanted nonrecorded today.  But I don't think we'll have the

USCA5 5016

same issue, because you don't mind if this hearing is recorded by the prison system, since it's going to be public anyway.

MR. WISEMAN:  No.

THE CLERK:  And I'm sorry, Your Honor.  This is a legal line.  They did -- they were able to give me a non, an attorney line.

THE COURT:  Okay.  Well, it doesn't matter, Ms. Scotch.  I don't want -- there's no reason to tie up an attorney line from another attorney and another client if we can do it on the recorded line.  I don't think it's going to matter.  Mr. Wiseman, what's your thoughts?

MR. WISEMAN:  Whatever's convenient for the Court and the prison system.  Doesn't matter to us.

THE COURT:  Well, I was thinking actually of the convenience of the other inmates and the lawyers.

MR. WISEMAN:  Yeah, well everybody.

THE COURT:  Because I think that unless there's something you want to discuss privately with your client, I think that we can do this and still have him present, if that's okay with you, if you consider that present.

MR. WISEMAN:  Yeah.  I think for these purposes, that would be --

THE COURT:  Okay.

MR. WISEMAN:  -- that would be fine.

THE COURT:  Yeah, and we'll do it on a recorded call,

USCA5 5017

so that it doesn't -- they apparently have very limited nonrecorded phone lines.

MR. WISEMAN:  Yeah.

THE COURT:  So are we set okay for that, Ms. Scotch, so you can notify the prison that we need him on a -- a recorded phone line is fine at that time.

THE CLERK:  Yes, Your Honor.

THE COURT:  And I picked 8:00 o'clock in the morning, Mr. Wiseman and Ms. Booth, Roberts, Dowd, Salinas, Abreu, because Indiana is an hour later, and it's easier for us to work that in at 8:00 o'clock our time, be free for him to have his roll call and lunch later in the morning.

MR. ABREU:  That's certainly fine for me, Your Honor. This is Victor Abreu.

THE COURT:  Okay.  We're all done.  We're set.

MR. WISEMAN:  Okay.  I appreciate it, Your Honor.

MR. DOWD:  Your Honor, Mark Dowd.  I had one question about the argument.  Will the Court be permitting the Government attorneys to break up the argument into four, into the four parties, the four lawyers?

THE COURT:  You can do it any way you want.

MR. DOWD:  Okay, Judge.

MR. ABREU:  We would certainly have the same request, Your Honor, on that.

THE COURT:  Same way with the Movant.  Absolutely.

USCA5 5018

38

MR. ABREU:  Thank you, Your Honor.

THE COURT:  And we'll go Point 1, and then respond, Point 2, then respond, that sort of thing?

MR. WISEMAN:  Yes.  That sounds good.

THE COURT:  Okay.  Anything else?

MR. WISEMAN:  Not from Petitioner, Your Honor.

MR. ROBERTS:  Not from the United States, Your Honor.

THE COURT:  Okay.  Thank you all very much.  You're excused.

(Proceedings concluded at 3:03 p.m.)

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ Molly Carter                    December 29, 2010
Molly Carter                        Date

USCA5 5019

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

UNITED STATES OF AMERICA

v.                                          Case No.: 2:02–cr–00216
                                            Judge Janis Graham Jack

Alfred NMI Bourgeois

                    Defendant


NOTICE OF FILING OF OFFICIAL TRANSCRIPT

An official transcript has been filed in this case and it may contain information protected under the E–Government Act of 2002, and Fed. R. Civ. P. 5.2(a) or Fed. R. Crim. P. 49.1(a).

Transcripts will be electronically available on PACER to the public 90 days after their filing with the court. To comply with privacy requirements of Fed. R.Civ.P.5.2 and Fed. R. Crim. P. 49.1(a), the parties must ensure that certain protected information is redacted from transcripts prior to their availability on PACER.

If redaction is necessary, the parties must file a statement of redaction listing the items to be redacted, citing the transcript's docket number, the item's location by page and line, and including only the following portions of the protected information. This statement must be filed within 21 days of the transcript being filed. A suggested form for the statement of redaction is available at http://www.txs.uscourts.gov.

- the last four digits of the social security number or taxpayer identification number;
- the year of the individual's birth;
- the minor's initials;
- the last four digits of the financial account number; and
- the city and state of the home address (criminal cases only).

Any additional redaction requires a separate motion and Court approval.

A party may review the transcript at the Clerk's Office public terminals or purchase it by following the instruction on our website at http://www.txs.uscourts.gov or by calling (361)888–3142 . A party is only responsible for reviewing the:

- opening and closing statements made on the party's behalf;
- statements of the party;
- testimony of any witness called by the party; and
- any other portion of the transcript as ordered by the court.

Redaction is your responsibility. The Clerk, court reporter, or transcriber will not review this transcript for compliance.

David Bradley, Clerk

USCA5 5020

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____        :
                                         :
UNITED STATES OF AMERICA,                :        No. Cr-C-02-216
                                         :        No. Cv-07-223
                 Respondent,             :     Honorable Janis Graham Jack,
                                         :            U.S.D.J.
            -against-                    :
                                         :
ALFRED BOURGEOIS,                        :        Electronically Filed
                                         :
                 Petitioner.             :
_____        :

**GOVERNMENT AND PETITIONER'S JOINT MOTION FOR BRIEF
CONTINUANCE OF HEARING AND ARGUMENT**

COMES NOW, Petitioner, ALFRED BOURGEOIS, by and through undersigned counsel, and in conjunction with counsel for the Government, files this joint motion for a brief continuance of the upcoming hearing and final argument and in support of this motion states as follows:

1.      The conclusion of Petitioner's evidentiary hearing in support of his Petition for a Writ of Habeas Corpus and final arguments on all claims is currently scheduled for January 13, 2011.

2.      One of the claims pending before the Court alleges that the Government lacked jurisdiction to prosecute Mr. Bourgeois as no reasonable view of the

1

USCA5 5021

Government's evidence existed upon which a reasonable factfinder could conclude that the fatal injuries to JG-1999 were inflicted on the Corpus Christi Naval Air Station. See Claim III, Petitioner's Memorandum of Law at 26-31. In relation to this claim, Petitioner expects to present the testimony of Forensic Neuropathologist, Dr. Jan E. Leestma, and the Court has Ordered that Dr. Leestma's deposition be conducted "as soon as possible" upon completion of his review of all relevant material, completion of his report and before the January 13th argument. See Order, 12/02/10 (Document #614).

3.     As the Court is well aware, Petitioner and the Government have been diligently attempting to procure the necessary brain slides for Dr. Leestma, to complete his review and report on this matter. See Petitioner's Status Report, 12/20/10 (Document #624). After much effort, just yesterday, January 3, 2011, counsel were notified that the slides were being shipped to Dr. Leestma in Chicago, IL from the University of Texas Health Science Center in San Antonio, TX. Dr. Leestma's office will presumably receive the slides today, January 4, 2011, and he may, at the earliest, be able to complete his review of the slides upon his return from vacation on January 5, 2011. Dr. Leestma will then need to prepare a report of his conclusions and may be able to do that, if all goes well, by the close of business on Friday January 7, 2011.

4.     Unfortunately, under the current time frame, there is insufficient time for

USCA5 5022

the Government to receive Dr. Leestma's report, review it, consult with its own expert

if necessary, and prepare to conduct a competent deposition before the January 13th

scheduled argument.  Indeed, given the logistics of counsel's presence in Philadelphia,

Houston and Corpus Christi, and Dr. Leestma's presence in Chicago, even scheduling

a deposition before counsel are required to travel to Corpus Christi for the scheduled

argument is likely not possible.  Accordingly, Petitioner and the Government are jointly

requesting a brief (30-45 days) continuance of the January 13th hearing and argument.

5.     Counsel believe that a brief continuance is in the best interest of all parties

and the Court.  Indeed, counsel are eager to complete all outstanding litigation during

their next appearance before the Court and brief continuance will promote judicial

economy and avoid  any further piecemeal litigation.   Accordingly, the parties

respectfully propose that the Court postpone the upcoming argument and that the Court

allow Dr. Leestma's deposition be conducted later this month but before January 31,

2011.  Additionally, the parties are currently consulting their schedules and by January

14, 2010, counsel will report to the Court when in late February or early March, 2011,

all counsel are available to conclude the hearing and present final arguments.

6.     Undersigned counsel for Petitioner and counsel for the Government,

Assistant United States Attorneys Tony Roberts, Esq, Patti Booth Esq., and Mark

Dowd, Esq., have all consulted on this matter, are in agreement and jointly file this

3

USCA5 5023

motion.  Counsel for the Government have also reviewed this motion before filing and

agreed to its content.

WHEREFORE, all parties respectfully requests that this Court grant this

motion for a brief continuance of the January 13, 2011 hearing and argument.

Respectfully submitted,


By  /s/Victor J. Abreu
MICHAEL WISEMAN
VICTOR J. ABREU
Federal Community Defender Office
for the Eastern District of Pennsylvania

Capital Habeas Corpus Unit
Suite 545 West - The Curtis Center
Philadelphia, PA 19106
215-928-0520


Date: December 3, 2010

4

USCA5 5024

**CERTIFICATE OF SERVICE**

I, Victor J. Abreu, hereby certify that on this 4nd day of January, 2011 I
served the foregoing upon the following persons by e-file:

Tony R. Roberts
United States Attorney's Office
PO Box 61129
Houston, TX 77208-1129
Tony.Roberts@usdoj.gov


/s/ Victor J. Abreu

_____

USCA5 5025

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____  :

UNITED STATES OF AMERICA,      :        No. Cr-C-02-216
                               :        No. Cv-07-223
          Respondent,          :     Honorable Janis Graham Jack,
                               :            U.S.D.J.
     -against-                 :
                               :
ALFRED BOURGEOIS,              :        Electronically Filed
                               :
          Petitioner.          :
_____  :

**ORDER**

NOW on this _____ day of January, 2011, upon consideration of the

Government and Petitioner's joint motion for continuance of the January 13, 2011

hearing and argument, it is hereby ORDERED that the joint motion is GRANTED.

It is further ORDERED that the deposition of Dr. Leestma shall be conducted

before January 31, 2011.

It is further ORDERED that by January 14, 2011, the parties shall advise the

Court as to their earliest availability for completion of the hearing and final arguments.

_____
Janis Graham Jack
United States District Judge

USCA5 5026

✎AO89  (Rev. 7/95) Subpoena in a Criminal Case

UNITED STATES DISTRICT COURT

**SOUTHERN**                    **DISTRICT OF**                    **TEXAS**

UNITED STATES

**V.**

                    **SUBPOENA IN A**
                    **CRIMINAL CASE**

ALFRED NMI BOURGEOIS                    Case Number:        C-02-216

TO:    Custodian of Records,

       Wilford Hall Medical Center, Medical Law office,

       2000 Berdquist Drive, Suite 1

☒  YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified
    or any subsequent place, date and time set by the court, to testify in the above referenced case.  This subpoena
    remain in effect until you are granted leave to depart by the court or by an officer acting on behalf of the court.

| PLACE | COURTROOM |
|---|---|
| UNITED STATES COURTHOUSE | District Judge |
| 1133 NORTH SHORELINE BLVD. | Janis Graham Jack |
| CORPUS CHRISTI, TEXAS 78401 | DATE AND TIME |

**USCA5 5027**

|  | Monday 9/20/10 at 8:00 a.m. |

☒ YOU ARE ALSO COMMANDED to bring with you the following document(s) or object(s):

Any and all slides, photographs and impressions prepared during the course of the autopsy by Dr. Elizabeth A. Rouse , Maj., USAF, MC, FS, Assistant Medical Examiner, Office of the Armed Forces Medical Examiner, of Jakerren Gunter; SSAN: 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; Date of Birth: 10/05/99; Date/Time of Death: 6/28/02, 1105; Autopsy No. A02-42; AFIP No. 2846051; Rank: Civilian; Place of Death: Driscoll Children's Hospital, Corpus Christi, TX; Place of Autopsy: Driscoll Children's Hospital, Corpus Christi, TX; Date/time of autopsy: 6/02/29, 1330.

| U.S. MAGISTRATE JUDGE OR CLERK OF COURT<br><br> DAVID J. BRADLEY, CLERK | DATE |
|---|---|
| (By) Deputy Clerk | |

ATTORNEY'S NAME, ADDRESS AND PHONE NUMBER:
Victor J. Abreu , Esq. ,  Assistant Federal Public Defender

Curtis Center, Suite 545 West, Independence Square West, Philadelphia, PA 19106; (215) 928-0520

AO89  (Rev. 7/95)  Subpoena in a Criminal Case (Reverse)

| PROOF OF SERVICE | | |
|---|---|---|
| RECEIVED | DATE | PLACE |
| SERVED | DATE | PLACE |
| SERVED ON (PRINT NAME) | FEES AND MILEAGE TENDERED TO WITNESS<br><br>☐  YES    ☐  NO    AMOUNT _____ | |
| SERVED BY (PRINT NAME) | TITLE | |

DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information

Executed on _____          _____
                          DATE                                    SIGNATURE OF SERVER

USCA5 5028

ADDRESS OF SERVER

ADDITIONAL INFORMATION

USCA5 5029

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

UNITED STATES OF AMERICA

v.                                                  Case No.: 2:02–cr–00216
                                                    Judge Janis Graham Jack

Alfred NMI Bourgeois

                          Defendant

---

**NOTICE OF SETTING**

**TAKE NOTICE THAT A PROCEEDING IN THIS CASE HAS BEEN SET FOR
THE PLACE, DATE AND TIME SET FORTH BELOW.**

**Before the Honorable**

Janis Graham Jack

**PLACE:**

United States District Court
1133 N. Shoreline Blvd.
Corpus Christi, TX

**DATE:** 1/7/11

**TIME:** 09:30 AM

**TYPE OF PROCEEDING:** Motion Hearing
Motion to Continue – #633

Date:    January 6, 2011

                                                    David Bradley, Clerk

USCA5 5030

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS


_____
                                              :
UNITED STATES OF AMERICA,         :          No. Cr-C-02-216
                                              :          No. Cv-07-223
                    Respondent,           :      Honorable Janis Graham Jack
                                              :               U.S.D.J.
          -against-                          :
                                              :         Electronically Filed
ALFRED BOURGEOIS,                    :
                                              :
                    Petitioner.             :
_____ :


**NOTICE OF DEPOSITION**


     PLEASE TAKE NOTICE that on the 10th day of January, 2011 Petitioner will
take the Trial Deposition by Oral Testimony of **JAN EDWARD LEESTMA, M.D.**,
in the above captioned matter, starting at 1:00 p.m. at the following location:


Esquire Deposition Services
311 West Monroe Street, # 1200
Chicago, Illinois 60606


Petitioner's counsel will appear at the above site, and it is counsel's understanding
that Respondents' counsel will appear by video connection. Said deposition will be
video recorded and transcribed and the video and transcript will be filed with the
Court.


                                        /s/ Michael Wiseman

                                        _____
                                        Michael Wiseman


Dated:        January 7, 2011


USCA5 5031

## Certificate of Service

I, Michael Wiseman, hereby certify that on this 7th day of January 2011, I served the foregoing on the following persons by ECF Filing and email:

Tony Roberts, Esq.
Mark Dowd, Esq.
Patti Booth, Esq.
Office of the United States Attorney

/s/ Michael Wiseman

_____

Michael Wiseman

USCA5 5032

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA          §
                                  §
VS.                               §    CRIMINAL ACTION NO. C-02-216
                                  §
ALFRED NMI BOURGEOIS             §

## ORDER

The Court denies the parties' joint motion for a continuance.  (DE 633).

SIGNED and ORDERED this 7th day of January, 2011.

_____
Janis Graham Jack
United States District Judge

1 / 1

USCA5 5033

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Respondent, | § | |
| | § | |
| vs. | § | CR. No. C-02-216 |
| | § | C.A. No. C-07-223 |
| ALFRED BOURGEOIS, | § | |
| Petitioner. | § | |

GOVERNMENT'S MOTION TO PRESENT TESTIMONY
OF DR. ELIZABETH ROUSE DURING HEARING ON
JANUARY 13, 2011 BY TELEPHONE

TO THE HONORABLE JUDGE OF SAID COURT:

The United States of America, hereinafter "the government," by and through the United

States Attorney for the Southern District of Texas, files this Motion seeking permission to present

live testimony via telephone from Dr. Elizabeth Rouse at the hearing on January 13, 2011. The

government believes this testimony is necessary in direct response to specific conclusions made by

Dr. Jan Leetsma during his deposition – conclusions that are not contained in his January 7, 2011

report. (Appendix 1). Those conclusions directly contradict Dr. Rouse's testimony and the autopsy

report with regard to the manner and timing of death.

This Court permitted Petitioner to depose Dr. Leetsma. Dr. Leetsma completed his expert

witness report on January 7, 2011.[1]  The government received an electronic copy of Dr. Leetsma's

---

[1]  During Dr. Leetsma's deposition testimony, the government learned that Dr. Leetsma had provided Petitioner's counsel with an **initial report** on or about December 15, 2010.  Indeed, Dr. Leetsma's January 7, 2011 report indicates that it is an "appended report to the original report of 12/15/2010."  To date, Petitioner has not provided the government with a copy of the December 15, 2010 report.  The government specifically requested a copy of that report during the January 7, 2011 deposition upon learning of its existence.  Had the government had the

USCA5 5034

report at 3:47 p.m. central time on Friday, January 7, 2011.  The government immediately reviewed Dr. Leetsma's report and emailed the report to Dr. Rouse asking her to review it and contact us.  Dr. Rouse contacted the government Monday morning, January 10, 2011, to discuss Dr. Leetsma's report and conclusions.  Importantly, Dr. Rouse opined that Dr. Leetsma's conclusions appeared to be fairly consistent with the conclusions in the June 2002 autopsy report with the exception of three comments.  In Dr. Rouse's opinion, the three unsupportable statements in Dr. Leetsma's report are: 1) that it cannot be known if the acute component contributed or caused death, 2) that it cannot be determined whether [the physical trauma that caused the subdural hematoma] was inflicted or accidental, and 3) that "the child may have had a coagulopathy which appears to have included a sagittal sinus thrombosis and possibly cortical venous infarctions.  These processes could have resulted in the child's death at any time with or without any new episode of trauma."

Dr. Rouse opined that the report does not appear to contain any firm conclusion about an alternative cause of death or any conclusion that the fatal injury could not have occurred while Petitioner was on the Corpus Christi Naval Air Station.  As expected, the report and proposed opinion of Dr. Leetsma appeared to be only offering "possible" alternatives.  With that consultation, and bearing in mind that Court's desire to complete this matter this week, the government participated in Dr. Leetsma's deposition at 1:00 p.m. on Monday, January 10, 2011 without further objection or delay fully expecting Dr. Leetsma to testify in accordance with his written report.

Unfortunately, Dr. Leetsma's deposition testimony went beyond the conclusions contained in his report.  Dr. Leetsma testified that he disagreed with Dr. Rouse's conclusion on the cause of

---

December 15, 2010 report, the government might have been able to better prepare for the January 7, 2011 deposition.

USCA5 5035

death and testified that the real cause of death in his opinion was due to "increased intra cranial pressure." He added that while there was evidence of a "small volume" of a subdural hematoma, that it was his opinion that the "primary cause of the increased intra cranial pressure" was due to a "venous infarction." He further testified that the medical evidence he reviewed was not consistent with the victim being assaulted with a fatal blow while on the Corpus Christi Naval Air Station because the true cause of death would date the fatal injury well beyond the two or three days prior to death. He also testified that he disagreed with Dr. Rouse's conclusion that there was evidence of an impact to the child's brain consistent with the pressure of a car crash These conclusions were not contained in Dr. Leetsma's report.

Moreover, it is possible that undersigned counsel has not specifically and correctly conveyed Dr. Leetsma's testimony verbatim as the government does not currently have a report with these conclusions. However, the transcript of Dr. Leetsma's testimony will be produced on Wednesday, January 12, 2011 according to the recorder and transcriber. The government intends to immediately email the transcript to Dr. Rouse and ask her to review it. The government moves this Court to permit Dr. Rouse to provide telephone testimony at the hearing on Thursday, January 13, 2011 in direct response to the conclusions of Dr. Leetsma that were not contained in Dr. Leetsma's report. Additionally, the government moves this Court to permit Dr. Rouse to testify without having to prepare the normally required report due to the fact that Dr. Rouse will not even receive Dr. Leetsma's transcribed testimony until January 12, 2011. The government only intends to ask Dr. Rouse to respond to the conclusions of Dr. Leetsma which were not contained in Dr. Leetsma's report. Even if this Court does not find Dr. Leetsma's testimony credible, the government now

3

USCA5 5036

believes that Dr. Rouse's response might be necessary for a full comprehension of this issue upon

appellate review.

                Respectfully submitted,

                JOSÉ ANGEL MORENO
                United States Attorney

                TONY ROBERTS
                Assistant United States Attorney

                ELSA SALINAS
                Assistant United States Attorney

                MARK DOWD
                Assistant United States Attorney

By:   s/ Patti Hubert Booth
        PATTI HUBERT BOOTH
        Assistant United States Attorney
        Federal I.D. No. 19500
        State Bar I.D. No. 02650500
        800 N. Shoreline Blvd., Suite 500
        Corpus Christi, Texas 78401
        (361) 888-3111

USCA5 5037

CERTIFICATE OF SERVICE AND CONSULTATION

I, Patti Booth, Assistant United States Attorney, do hereby certify that a I have attempted to

contact Michael Wiseman, but have been unable to reach him for comment as to the above Motion

to Permit Dr. Rouse to Testify at the January 13, 2011 hearing.

I, Patti Booth, Assistant United States Attorney, do hereby certify that a copy of the above

Motion to Permit Dr. Rouse to Testify at the January 13, 2011 hearing was emailed and placed in

the mail on January 11, 2011, via certified mail, return receipt requested to:

Michael Wisemen
Victor Abreu
James McHugh
Maureen Kearney Rowley
Elizabeth Larin
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106


                                        s/ PATTI BOOTH
                                        PATTI BOOTH
                                        Assistant United States Attorney

USCA5 5038

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA,            §
    Respondent,                          §
                                      §
vs.                                  §     CR. No. C-02-216
                                      §     C.A. No. C-07-223
ALFRED BOURGEOIS,                    §
    Petitioner.                          §

ORDER

Government Motion to receive telephone testimony from Dr. Elizabeth Rouse at the

January 13, 2011 hearing in this case is GRANTED.  Dr. Rouse will not be required to prepare a

report so long as her testimony is responsive to Dr. Leestma's conclusions from Dr. Leetsma's

deposition testimony.

Additionally, Petitioner is Ordered to provide the government with a copy of Dr.

Leetsma's December 15, 2010 initial report by 4:00 p.m. on January 12, 2011.

The clerk of this Court shall send a copy of this Order to the parties by any receipted

means.

Signed at Corpus Christi, Texas, this _____ day of _____ 2011.


_____
JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

USCA5 5039

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____
                                             :
UNITED STATES OF AMERICA,          :            No. Cr-C-02-216
                                             :            No. Cv-07-223
            Respondent,                 :       Honorable Janis Graham Jack,
                                             :            U.S.D.J.
      -against-                            :
                                             :
ALFRED BOURGEOIS,                  :            Electronically Filed
                                             :
            Petitioner.                    :
_____   :

**PETITIONER'S RESPONSE IN PARTIAL OPPOSITION
TO THE GOVERNMENT'S *MOTION TO PRESENT TESTIMONY
OF DR. ELIZABETH ROUSE DURING HEARING
ON JANUARY 13, 2011 BY TELEPHONE***

Petitioner, Alfred Bourgeois, through undersigned counsel, files this *Response in Partial Opposition* to the Government's *Motion to Present Testimony of Dr. Elizabeth Rouse During Hearing on January 13, 2011 by Telephone* (*Motion*).

1.      The Government filed its *Motion* earlier today seeking to take the testimony of Dr. Elizabeth Rouse by telephone on January 13, 2011. Petitioner has no objection to the Court hearing from Dr. Rouse. To the contrary, Petitioner is heartened at the opportunity finally to hear from Dr. Rouse. There are many questions which were left unanswered by her trial testimony relevant to the

1

USCA5 5040

jurisdictional question before the Court in these proceedings.  Petitioner has long-requested to hear from her.  *See e.g.*, Transcript of Oral Argument, 4/20/10 at 45 (Petitioner: "[we are] curious that the Government has not got a declaration from Dr. Rouse rebutting our claim"); at 46 (Petitioner: "We are going to present expert testimony, we expect Dr. Rouse will be here."); at 51(Petitioner: "it seems pretty plain to us that at a minimum Dr. Rouse needs to explain why that right-sided subdural hematoma, which she said was the cause of death, didn't, happened on the Naval base."); at 55 (Petitioner: "I want Dr. Rouse here. I want to talk to Dr. Rouse. I want to cross-examine her, as trial counsel should have cross-examined her, about what the cause of death was and when it happened . . .").

2.    Although Petitioner very much wishes to hear from Dr. Rouse, he opposes the portion of the Government's *Motion* that makes the highly unusual request that this expert witness be permitted to testify without providing a written report of her opinions.  In an email exchange between counsel yesterday, Petitioner asked the Government to provide "a brief report by Wed evening.  Whatever else it contains, we of course would like to know if she will attempt to date the fatal injury(s) and the basis for doing so" (Email message from Wiseman to Roberts sent at 4:36 CST on January 10, 2011).  In recognition of the time constraints, Petitioner did not demand a full and formal report.  Rather, a brief report addressing the issues

2

USCA5 5041

before the Court produced on the evening of January 12, 2011, was all the Petitioner requested. He believes that prior to cross examining this witness he should be entitled to review the doctor's written opinion as to how she can date the fatal injuries (if she can) and state to a reasonable degree of scientific certainty that they were inflicted "within the special maritime and territorial jurisdiction of the United States," 18 U.S.C. §1111(b) – if she can. Failure to provide the report would violate Fed.R.Civ.P. 26 and, in the circumstances of this case, the due process clause of the Fifth Amendment.

       3. Alternatively, if provision of a report is not practicable, Petitioner should be afforded the opportunity to conduct an *ex parte* telephone interview of the witness sometime during the day of January 12, 2011.[1]

---

[1]There are a host of purported factual assertions contained in the Government's *Motion* about Dr. Leestma's deposition testimony, with which Petitioner steadfastly disagrees. Nonetheless, because these disagreements are not relevant to the instant *Motion*, Petitioner does not respond to them.

USCA5 5042

Respectfully Submitted,

/s/ Michael Wiseman

Michael Wiseman
Federal Community Defender
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, Pennsylvania 19106
215-928-0520

Dated:        Philadelphia, PA
              January 11, 2011

### Certificate of Service

I, Michael Wiseman, hereby certify that on January 10, 2011 he served
the foregoing on Government's counsel by electronic case filing:

Tony Roberts, Esq.
Patti H. Booth, Esq.
Mark Dowd, Esq.
Elsa Patterson-Salinas

/s/ Michael Wiseman

Michael Wiseman

4

USCA5 5043

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-216 |
| | § | |
| ALFRED NMI BOURGEOIS | § | |

ORDER

Government Motion to receive telephone testimony from Dr. Elizabeth Rouse at the

January 13, 2011 hearing in this case (D.E. 638) is GRANTED. Dr. Rouse will not be required to

prepare a report so long as her testimony is responsive to Dr. Leestma's conclusions from Dr.

Leetsma's deposition testimony.

Additionally, Petitioner is Ordered to provide the government with a copy of Dr.

Leetsma's December 15, 2010 initial report by 4:00 p.m. on January 12, 2011.

The clerk of this Court shall send a copy of this Order to the parties by any receipted

means.

SIGNED and ORDERED this 11th day of January, 2011.

_____
Janis Graham Jack
United States District Judge

1 / 1

USCA5 5044

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____

UNITED STATES OF AMERICA,        :            No. Cr-C-02-216

                               :            No. Cv-07-223

             Respondent,      :   Honorable Janis Graham Jack

                               :            U.S.D.J.

      -against-               :

                               :      Electronically Filed

ALFRED BOURGEOIS,           :

                               :

          Petitioner.       :

_____  :

### NOTICE OF FILING

PLEASE TAKE NOTICE that Alfred Bourgeois, through counsel, hereby files

the trial deposition (with exhibits) of Jan Leestma, M.D. taken on January 10, 2011.

Respectfully Submitted,

/s/ Michael Wiseman

_____

Michael Wiseman
Counsel for Petitioner

Dated:     January 12, 2011
           Philadelphia, PA

USCA5 5045

## Certificate of Service

I, Michael Wiseman, hereby certify that on this 12th day January, 20101, I served the foregoing on the following persons by ECF filing:

Tony Roberts
Patti Booth
Mark Dowd
Elsa Salinas-Patterson
Counsel for the Government

/s/    Michael Wiseman

_____

Michael Wiseman

USCA5 5046

Jan Leestma                                              January 10, 2011

                                                                    1

                IN THE UNITED STATES DISTRICT COURT

              FOR THE SOUTHERN DISTRICT OF TEXAS


    UNITED STATES OF AMERICA,          )

                      Respondent,      )    No. Cr-C-02-216

            -against-                  )    No. Cv-07-223

    ALFRED BOURGEOIS,                   )

                      Petitioner.      )


              The videotaped videoteleconference

    deposition of JAN E. LEESTMAN, M.D., called for

    examination, taken pursuant to the Federal Rules of

    Civil Procedure of the United States District Courts

    pertaining to the taking of depositions, taken

    before ANNE E. FOGARTY, a Notary Public within and

    for the County of Cook, State of Illinois, and a

    Certified Shorthand Reporter, CSR No. 84-3870, of

    said state, at Suite 1200, 311 West Monroe Street,

    Chicago, Illinois, on the 10th day of January, A.D.

    2011, at 12:48 p.m.

USCA5 5047

Jan Leestma                                              January 10, 2011

2

PRESENT:

      UNITED STATES ATTORNEY'S OFFICE,

      (919 Milam, Suite 1500,

      Houston, Texas 77002,

      713-567-9810), by:

      MR. TONY R. ROBERTS,

      tony.roberts@usdoj.gov, and

      MR. MARK M. DOWD,

         appeared via videoteleconference on

          behalf of the Respondent;


      FEDERAL COMMUNITY DEFENDER OFFICE,

      Capital Habeas Unit,

      (Suite 545 West - Curtis Building,

      Independence Square West,

      Philadelphia, Pennsylvania 19106,

      215-928-0520), by:

      MR. VICTOR ABREU,

      victor_abreu@fd.org,

      MS. ELIZABETH LARIN and

      MR. MICHAEL WISEMAN,

         appeared on behalf of the Petitioner.

USCA5 5048

Jan Leestma                                          January 10, 2011

3

ALSO PRESENT:

        MR. JOSEPH ELSEY, Videographer,

            Esquire Deposition Solutions.

REPORTED BY:   ANNE E. FOGARTY, CSR No. 84-3870.

USCA5 5049

Jan Leestma                                        January 10, 2011

4

THE VIDEOGRAPHER:  Good afternoon.  We are going on the video record at 12:48 p.m.

This is Tape 1 to the videotaped deposition of Dr. Jan Edward Leestma in the matter of United States of America versus Alfred Bourgeois being heard before the U.S. District Court for the Southern District of Texas, Case No. CR-C-02-216 and CV-07-223.

This deposition is being held at 311 West Monroe Street, Chicago, Illinois, on January 10, 2011.  My name is Joseph Elsey, and I'm the videographer.  The court reporter is Anne Fogarty.

Counsel, will you please introduce yourselves and affiliations and the witness will be sworn.

MR. ABREU:  Good afternoon.  Victor Abreu on behalf of Mr. Bourgeois.

MS. LARIN:  And Elizabeth Larin on behalf of Mr. Bourgeois.

MR. WISEMAN:  And Michael Wiseman for Mr. Bourgeois.

MR. ROBERTS:  Tony Roberts for the United States.

USCA5 5050

Jan Leestma                                    January 10, 2011

5

MR. DOWD:  Mark Dowd for the United States.

(WHEREUPON, the witness was duly sworn.)

MR. ABREU:  And just before we begin, Tony, Mr. Roberts, my understanding is that any objection will be made contemporaneously during these proceedings; is that correct?

MR. ROBERTS:  Correct.

MR. ABREU:  You ready, Tony?

MR. ROBERTS:  We're ready.

JAN E. LEESTMA, M.D., called as a witness herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ABREU:

Q.   Good afternoon, Dr. Leestma.  Could you please tell us how you're currently employed?

A.   I am employed, self-employed as a consultant in forensic neuropathology and have been for -- full-time, more or less, for about the past four or five years, but before that 25 years doing this same kind of work.

(WHEREUPON, a certain document was marked Defendant's Deposition

USCA5 5051

Jan Leestma                                    January 10, 2011

6

                    Exhibit No. 1, for identification,

                    as of 01/10/2011.)

BY MR. ABREU:

        Q.    Let me show you what I am now marking as

Defense Exhibit No. 1 and ask you if you recognize

that particular document.

        A.    I do.

        Q.    What is that document?

        A.    That is a current curriculum vitae.

        MR. ABREU:  Okay.  Mr. Roberts, do you have a

copy?

        MR. ROBERTS:  I have the copy that you sent

me.

        MR. ABREU:  Yeah.

        MR. ROBERTS:  If you could tell me how many

pages you got there.

        MR. ABREU:  Sure.

                I have eight pages.

        MR. ROBERTS:  That's consistent with mine.

        MR. ABREU:  Last dated as of November 2010,

Tony.  Mr. Roberts, sorry.

        MR. ROBERTS:  Yes.  That's consistent as well.

        MR. ABREU:  Okay.

USCA5 5052

Jan Leestma                                              January 10, 2011

7

BY MR. ABREU:

Q.     Dr. Leestma, we're going to be brief on qualifications and your background, but could you please just highlight your educational background for us, please.

A.     Sure.  I graduated from college in 1960, Hope College in Holland, Michigan, a premed major, chemistry and biology.  I then attended the University of Michigan School of Medicine in Ann Arbor from 1960 to '64 graduating with a doctor of medicine degree.  I then pursued my postgraduate education in pathology, University of Colorado Medical Center in Denver.  The first two years there, '64 to '66, were spent doing anatomic or general pathology residency.  That was followed by one year of neuropathology training in Colorado.  I then transferred for my last year of neuropathology training to the Albert Einstein College of Medicine in the Bronx, New York, and completed that in 1968.

Then entered the military service, U.S. Air Force Medical Corps, as a captain and was assigned to the Armed Forces Institute of Pathology at Walter Reed Army Medical Center in Washington, DC, where I remind for three years, assigned first

USCA5 5053

Jan Leestma                                            January 10, 2011

8

to the genitourinary pathology branch of AFIP and
then two years in the neuropathology branch, before
being honorably discharged in 1971 with the rank of
major, U.S. Air Force Medical Corps.

Then you want my -- the remainder of my
professional career?

Q. Yeah. Well, you indicated that you were
now working as a private --

A. Yeah.

Q. -- consultant in the field of forensic
pathology. Can you tell us a little bit about what
you did before that?

A. Oh, sure. I -- when I left the service
I came to Chicago and joined Northwestern University
Medical School's faculty as an assistant professor
in pathology and neurology and the chief of
neuropathology services. Continued at Northwestern
until, let's see, when was it, it was -- well, 1981,
having then taken a sabbatical leave to the
Karolinka, K-a-r-o-l-i-n-s-k-a, Institute in
Stockholm, Sweden, as a guest researcher for a year.

In '82 when I came back to Chicago I
transferred to the Northwestern Children's Hospital
as the chief of neuropathology, and at that time

USCA5 5054

Jan Leestma                                          January 10, 2011

9

then as associate professor with tenure.

I stayed at Northwestern until 1985 when I went to the University of Chicago as a full professor of pathology and neurology and associate dean in the medical school and division for life sciences.

In the course of these activities I also attended the J.L. Kellogg Graduate School of Management and received the equivalent now known as an MBA degree, it was Master of Management then. That was in 1986.

In 1987 I joined the Chicago Institute of Neurosurgery and Neuroresearch as an associate medical director and neuropathologist, and I remind with that organization until it -- until I retired, essentially, from hospital practice, and that would have been in the early part of the year 2000, 2001, something like that.

I then had a number of other opportunities that I was working with in a part-time basis. One with Cook County Medical Examiner's Office for about 11 years in the '70s and early '80s as a neuropathology consultant and assistant medical examiner there. I've had other consulting

USCA5 5055

Jan Leestma                                    January 10, 2011

10

situations as well, but since about 2003, 4, 5, something like that, I've essentially been retired from academic practice and hospital practice and have concentrated on my consulting practice.

Q.    Okay.  And in your capacity as a forensic neuropathologist have you worked on cases for both the defense and the prosecution?

A.    Yes, I have.

Q.    And are you currently involved in cases for both the defense and the prosecution?

A.    Correct.

Q.    Have you published in the field of neuropathology and forensic neuropathology?

A.    Yes, I have.

Q.    Can you delineate some of that for us, please.

A.    The most recent would be a book called Forensic Neuropathology which was published in 2009 by Taylor and Francis.  This would be a second edition of that book, the prior one was done about 20 years before that.  The most recent is a contribution to a book called Sudden Death in Epilepsy, Forensic and Clinical Issues, and I was one of the editors and contributing authors to that

USCA5 5056

Jan Leestma                                    January 10, 2011

11

book.  The lead editor was Lathers, L-a-t-h-e-r-s,
Schraeder, S-c-h-r-a-e-d-e-r, and then eventually
myself.  And that was just published in 2010.  That
would be my 105th publication.

Q.    And are you -- do you hold any
professional memberships or affiliations at the
moment related to forensic neuropathology?

A.    Yes.  I'm a member of the American
Association of Neuropathologists, and I have been a
member of that organization for probably close to
30 years now.  I'm also a fellow with the American
Academy of Forensic Sciences and have been a member
of that organization for six or eight years now.

Q.    I noticed in your CV an affiliation with
the Juvenile Protective Association of Chicago?

A.    Yes, that's correct.

Q.    Can you tell us what that organization
is?

A.    The JPA, as it's known locally, is a
social welfare agency serving by direct social
services and other means the families of neglected
and abused children with the goal of trying to
maintain the family structure and working with the
courts as well as the Department of Children and

USCA5 5057

Jan Leestma                                    January 10, 2011

12

Family Services to try to help these disturbed families.  And I've been on the board of directors there for probably 25 years now.

Q.    Have you been qualified as an expert in the field of neuropathology?

A.    Yes.  In the court systems my count is about 40 states, in Canada, as well as the United Kingdom.

Q.    And when you say 40 -- okay.

And that's been in the field of neuropathology.  How about in the field of forensic neuropathology?

A.    That's usually what it works out to be, but I'm usually qualified as a neuropathologist and then sometimes they add the other descriptive.

MR. ABREU:  At this time I would offer Dr. Leestma as an expert in the field of neuropathology.

Mr. Roberts, you have any questions on voir dire?

MR. ROBERTS:  No.

MR. ABREU:  Or voir dire, sorry.  I forgot -- I'm not in Texas anymore.

MR. ROBERTS:  Either way we don't have any

USCA5 5058

Jan Leestma                                    January 10, 2011

13

questions on voir dire.

MR. ABREU:  All right.

BY MR. ABREU:

Q.    Dr. Leestma, were you asked to consult on the case of the United States against Alfred Bourgeois?

A.    Yes, I was.

Q.    And what were you asked to do in that particular case?

A.    I was basically asked to take a look at the case materials and try to determine what happened and when to the decedent, Jakarenn Gunter.

Q.    Okay.  And in your capacity in that particular case did you review any materials?

A.    Yes, I did.

Q.    What materials did you review?

A.    These are written down in my report and they have --

Q.    Let me -- before we go any further, let me mark that, if I can, what I'm now marking as Defense Exhibit No. 2, and just ask you to quickly identify that particular document.

(WHEREUPON, a certain document was

marked Defendant's Deposition

USCA5 5059

Jan Leestma                                    January 10, 2011

14

                    Exhibit No. 2, for identification,

                    as of 01/10/2011.)

BY THE WITNESS:

       A.    Yes.  This would be an appended final

report of my findings and analysis on this case

dated January 7 or 9, as the case may be, 2011.

       MR. ROBERTS:  I'm sorry.  Why would it be

dated January 7 or 9?  I only have a January 9.

       THE WITNESS:  Yeah.  I --

       MR. ROBERTS:  I'm sorry, I only have a January

7.

       THE WITNESS:  Okay.  I think it would be --

let me explain that.  These would be exactly the

same report, one would probably have been printed on

January 7, and the artifact of my word processing

program is it changes the date every time I print

one off.  So I didn't notice that.

       MR. ABREU:  Mr. Roberts, I will forward you a

copy of this January 9 report and you can compare it

to the January 7 report, if you would like.

       MR. ROBERTS:  Okay.

       MR. ABREU:  Can we -- there is no way to do

that by e-mail right now.  Tony, I'll send you a

copy, okay?

USCA5 5060

Jan Leestma                                    January 10, 2011

15

MR. ROBERTS:  All right.

MR. ABREU:  I can attest it's the same exact document just printed on two different dates.

MR. ROBERTS:  Well, I want to reserve my -- any objections to the document until I see and compare and make sure it's the exact same thing.

MR. ABREU:  Absolutely.  Let me mark -- Dr. Leestma has a copy that has January 7 on it and I will mark that version as well, Tony, so we have them both.

MR. ROBERTS:  All right.

MR. ABREU:  I will mark that as Defendant's Exhibit 2A.

(WHEREUPON, a certain document was marked Defendant's Deposition Exhibit No. 2A, for identification, as of 01/10/2011.)

BY MR. ABREU:

Q.   Let me just ask Dr. Leestma:  Is that the same document that you saw that was Document No. 2, Defendant's Exhibit 2?  Is it a similar document, should I ask?

A.   It looks the same.

I'm going to take that off, that's my

USCA5 5061

Jan Leestma                                    January 10, 2011

16

airline schedule.  I don't know how that got on there.  That's not important.

Let's see here.  Yes, I cannot pick up any difference there.  I think this is simply the date relating to when it was printed, that's all.

MR. ABREU:  Okay.  Well, now both documents, Defendant's Exhibit 2 and 2A, will be part of the record.

MR. ROBERTS:  Okay.

BY MR. ABREU:

Q.    So, Doctor, could you now tell us the list of materials you reviewed in relation to this particular case?

A.    Sure.  The so-called direct appeal opinion by Mr. Bourgeois.  Trial testimony transcripts and opening statement of Booth; EMT Burgess; Dr. Benton; Dr. -- or McLaughlin; Dr. Kuffel; K-u-f-f-e-l; Dr. Rouse, R-o-u-s-e; Dr. Oliver; Dr. Senn, S-e-n-n; Dr. Chrz, C-h-r-z; Dr. Akhtar, A-k-h-t-a-r; Beckett, B-e-c-k-e-t-t. Transcript of April 20, 2010, hearing before Judge Jack, J-a-c-k.  Forensic odontology reports of Dr. Senn, S-e-n-n, and Dr. Chrz, C-h-r-z.  Autopsy report of Dr. Rouse.  Neuropathology report of

USCA5 5062

Jan Leestma                                       January 10, 2011

17

Dr. Kagan, K-a-g-a-n, Hallet, H-a-l-l-e-t.  I think it is supposed to be two Ts.  Affidavit of Dr. Spitz, S-p-i-t-z.  The visceral autopsy slides from Wilford Hall Medical Center.  Medical records and reports relating to Jakarenn Gunter, G-u-n-t-e-r.  A CT scan disk of the child Gunter. Brain autopsy slides and photographs.  Autopsy photographs.  Copy of handwritten notes of U.S. Attorney with respect to Dr. Rouse R-o-u-s-e.

Q.    And upon completion of your review of those materials I take it is when you prepared your report?

A.    Yes, that's true.

Q.    And that is a report that has been identified as Defendant's Exhibit 2 and/or 2A?

A.    Yes, correct.

Q.    In the first line of your report you note that at -- and I'll read it.  "At your request I now offer an appended report to the original report of December 15, 2010, because I have received information that was not available at the time of the original report."

Is there a separate report related to December 15, 2010?

USCA5 5063

Jan Leestma                                            January 10, 2011

18

        A.    Essentially no.  This is -- I mean,
there was a prior report in which it has essentially
everything that is in this one but some disclaimer
saying I haven't gotten all the material, therefore
my report -- I reserve the right to append it and
change it.  That's about the only difference.

        Q.    And do you recall what additional
materials you were specifically waiting?

        A.    Yes.  I was waiting the brain autopsy
slides and some photographs.  And I don't remember
whether the CT scan had come at that time or not.
It was the last couple of things on that list.

        Q.    Okay.  So this particular report
Defendant's 2A and 2 -- I'll just call it
Defendant's Exhibit 2 -- was completed after you
reviewed those additional materials that you were --

        A.    That's right.

        Q.    -- relating to us?

        A.    I had the complete file, as far as I
knew, and at that time everything I needed.

        Q.    And do you recall what date, was that
the January 7 date that was completed?

        A.    Yeah.  It would have been -- yeah.
That's right.

USCA5 5064

Jan Leestma                                        January 10, 2011

19

Q.    Now, you indicated that you reviewed the testimony of Dr. Elizabeth Rouse from trial; is that correct?

A.    I did.

Q.    And upon reviewing that particular testimony what is your understanding of her testimony regarding the cause of death and the timing of the cause of death?

A.    With -- let me take the second first. The timing issues were estimates, as I recall, within some days or longer of the death of this particular child, that there were conditions ongoing in this child that were responsible and that it wasn't pinned down to a specific time by hour but indicated -- Dr. Rouse indicated some time frames.

Her conclusion I may not use the right word, the exact words, but essentially inflicted blunt force trauma to the head with subdural hematoma as the cause of death.

Q.    Okay.  What is a subdural hematoma?

A.    This is a collection of blood beneath the dural membrane of the covering of the brain but above the brain.  So it represents blood collecting in a potential space in the dura.

USCA5 5065

Jan Leestma                                            January 10, 2011

20

MR. ROBERTS:  I'm sorry.  Dr. Leestma, I can't tell if you're actually reading something or if you're actually testifying because you're looking down.

THE WITNESS:  No, no.  No, I'm not reading anything.

MR. ROBERTS:  I'm just trying to make sure since I'm not in the room if you're reading something that I know what it is.

THE WITNESS:  No, no.

MR. ABREU:  Let me -- and also let me clarify, he's just looking down, he's not reading anything, Mr. Roberts.

MR. ROBERTS:  Okay.  Thank you.

MR. ABREU:  Sure.  And the only thing in front of him right now is his own report, but he's not reading that.

THE WITNESS:  I got to look somewhere and that was where it was.  I can look at you.

BY THE WITNESS:

A.   All right.  Let's see.  Where I was?

BY MR. ABREU:

Q.   You were explaining, Doctor, what a subdural hematoma is.

USCA5 5066

Jan Leestma                                          January 10, 2011

21

        A.    Yes.  Okay.

              A subdural hematoma is blood collecting
in the lower level of the dura above the brain, and
that's basically it.

        Q.    Okay.  And the dura being what, just so
we're clear?

        A.    Okay.  The dura is part of the so called
meninges of the brain, and it is a parchment-like
membrane about the thickness of a file card, but
much more flexible, that's approximated to the
undersurface of the skull.  And beneath that
particular membrane is another one technically still
part of the dura called the arachnoid membrane, and
that is a very thin, translucent one about the
thickness of Saran Wrap, or food wrap.  And blood
collecting between those two membranes is a
subdural.

        Q.    And so just to make clear.  A subdural
hematoma exists between the dura and what we would
call the skull?

        A.    The arachnoid.

        Q.    The arachnoid?

        A.    Correct.  If it is -- if it were blood
as you described there beneath the skull but above

USCA5 5067

Jan Leestma                                          January 10, 2011

22

the dura, that would be called an epidural hematoma, and there is not one of those in this case.

Q.    Okay.  Are there different types of subdural hematomas?

A.    Yes.  There are somewhat arbitrary designations of these, so-called acute, subacute and chronic subdural hematomas, and this relates to their relative time of duration.

Q.    So can you explain just the difference quickly.

A.    Okay.  If somebody fell down or was struck or whatever and developed an acute subdural hematoma, these usually develop at least some times within minutes, sometimes within hours of an injury, and that would by all rights be called by a surgeon, a pathologist or a radiologist, three different perspectives there, an acute subdural hematoma. Now, that remains in that so-called acute phase for several days.  Each of these disciplines might have different definitions in how they make that diagnosis.  So acute is an arbitrary designation from zero to three or four, five days, or something like that in existence.

A subacute subdural then picks up where

USCA5 5068

Jan Leestma                                             January 10, 2011

23

that one leaves off, five days up to about ten days
or two weeks, at which time there are different
components that are present, healing is going on.
It has many different characteristics.  That would
be a subacute subdural.

          And then from about ten days to two
weeks on, onward, it would be referred to as a
chronic subdural hematoma.

     Q.    So the term "acute" as it is used in
this particular field refers to the recency of the
hematoma, not necessarily the gravity of the
hematoma?

     A.    That's true.  It's strictly a time of
duration, time of existence measurement, which I
hasten to add, again, is something somebody
arbitrarily defines.  And they can define what they
go into that, but it is still an arbitrary
designation.

     Q.    Now, upon your review of the materials
in this particular case, did you determine a cause
of death?

     A.    Yes.

     Q.    And what did you determine the cause of
death to be?

USCA5 5069

Jan Leestma                                        January 10, 2011

24

A.    The cause of death in this child was increased intracranial pressure which had its consequences causing her to remain comatose, nonresponsive, nonbreathing, and ultimately destroyed the circulation of the brain so that she essentially became brain dead.

Q.    Okay.  Before we talk about what might have caused the intracranial pressure, the increased intracranial pressure, can you just briefly describe what you mean by intracranial pressure?

A.    Okay.  Sure.  If I were to drill a hole through my scalp into the skull and actually put a pressure measuring device there, which can be done, neurosurgeons do it all the time, one would get a measurement of about either five to ten millimeters of mercury.  This is the equivalent of about the pressure in a large vein in your body.  It can be measured in other ways but that's usually what it is.  Under ten millimeters of mercury is the normal range, and probably the upper normal range of intracranial pressure.

Q.    Okay.  Before I forget I know that you had mentioned earlier that Dr. Rouse gave estimates about -- or what you reviewed and referred to as

USCA5 5070

Jan Leestma                                    January 10, 2011

25

estimates about the timing of the injury.  Do you recall what the estimates she gave were?

A.    From many hours, days, sometimes a week. It varied depending on how the question was asked to her, as I recall.  So it was not a precise hour or interval but a range of times.

Q.    Now, getting back to the intracranial pressure which you determined to be the cause of death, what in your opinion caused the increased intracranial pressure in this particular case?

A.    Okay.  Several things.  One of them would be the subdural hematoma that was present. Though this, in my view, is a rather minor component of the intracranial pressure increase because of the relatively small volume estimated of that subdural hematoma.

Q.    Let me just ask you.  When you say small volume, can you describe what the volume was that was reflected in the materials you reviewed?

A.    The only estimate of volume that I recall seeing was in the autopsy report in which the volume of the hematoma was estimated to be about two milliliters.  My own examination of the photographs showing the subdural led me to believe it's probably

**USCA5 5071**

Jan Leestma                                        January 10, 2011

26

a bit more than that, but not markedly much more. So that's a relatively small volume subdural hematoma.

Q.    Okay.

A.    You want me to go on with the --

Q.    Yeah.  With the causes of the intracranial pressure.

A.    Okay.  Probably the most significant are injuries to the brain, which I consider to be due to venous thrombosis; that is, clotting of cerebral vein, veins, and the superior sagittal sinus.

MR. ROBERTS:  I'm sorry.  Could you spell that, venous what?

THE WITNESS:  Okay.  The superior, that's common spelling; sagittal, s-a-g-i-t-t-a-l, midline, meaning; sinus, s-i-n-u-s.

BY THE WITNESS:

A.    And this is a large venous channel that is within the dura coming from the front -- under the skull, the full length of the skull underneath, and ultimately draining blood from the brain into the jugular system and back to the main circulation.

And there was a thrombosis, a clotting of that structure which led to infarctions in the

USCA5 5072

Jan Leestma                                     January 10, 2011

27

brain and cerebral edema and bleeding.

BY MR. ABREU:

Q.    Let me just stop you for a second and ask you if you could tell us when you say infarctions what do you mean by those?

A.    Well, there are two kinds of infarcts, generally.  One in which arterial blood supply is interfered with such that a part of the body, the brain or the heart or whatever, doesn't receive its blood supply and then it is injured because of that.  It dies.

Another kind would be what I'm talking about here is a venous infarct, meaning obstruction of the draining veins of an organ such that blood comes into that organ but can't get out.  And that may result in rupture of veins, it may result because there is no blood flow in that circumstance, death and infarction of brain tissue with the attendant complications of that problem.

Q.    And when you say cerebral edema, do you mean swelling?  Is that what edema means?

A.    Well, edema -- yes, it does result in swelling of the brain, but that comes about because basically water is not being compartmentalized as it

USCA5 5073

Jan Leestma                                        January 10, 2011

28

should and leaks out of the capillary bed of the brain into the brain, and it can do that on the basis of many different things.

Q. Getting back to the venous thrombosis which you identified, is that in your opinion the primary cause of the intracranial pressure?

A. It is -- yes. If we're dealing about primary processes, yes, I would say that that is certainly the more important one.

Now, I'd hasten to add that once this child decompensated and couldn't breathe on her own anymore, that adds an additional load to the brain itself. Meaning that circulation, oxygenation of the blood is altered, and that will cause brain swelling too. So at the end result of it it's a component of several different things.

Q. Okay. And if I could summarize those, and you can tell me if I'm missing something, the --

MR. ROBERTS: I think I'll object to your summary and let the doctor testify.

MR. ABREU: I'll ask it and then you can object when I ask the question.

BY MR. ABREU:

Q. In terms of the intracranial pressure,

USCA5 5074

Jan Leestma                                        January 10, 2011

29

what you've identified thus far, and you can tell me
if I'm missing anything, is the venous thrombosis?

    A.    Yes.

    Q.    The subdural hematoma?

    A.    Correct.

    Q.    And the decompensation that occurred
post-injury?

    A.    Which resulted in circulatory
embarrassment and probably not enough oxygen in the
blood reaching the brain.

    Q.    And when I say post-injury, I'm
referring to the intracranial pressure and edema
that you've described?

    A.    Correct.

    Q.    Did you have an opportunity to review
the slides, and we'll call them the Kagan-Hallet
slides that we all were waiting for for so long?

    A.    That's right.  I did.

    Q.    How many slides did you receive?  What
did you specifically receive, should I ask?

    A.    Okay.  Let me get my log of that.
    I received five microscopic slides.

    Q.    In your report you indicated that there
were six microscopic slides.

USCA5 5075

Jan Leestma                                        January 10, 2011

30

A.    That's erroneous.  The only images I have are five and I don't know where the six came from.

Q.    So that's just an error in your report?

A.    That's an error, yeah.

Q.    Okay.  And what did you do with those slides upon your receipt?

A.    Well, when I got them I took them to my Xerox machine, put them down on the copy machine, made an image of what those labels were.  Went to my microscope and began to look at those slides under the microscope noting my contemporaneous comments beside those slide images.  And in the process made a number of photographs, photomicrographs of those slides, I believe nine in number.

Q.    Let me go back, because I just realized I neglected to ask you about the thrombosis which you identified as the primary cause of the intracranial pressure.

Is there a way to should I say date or age when that particular process began?

A.    Yes, from several different modalities.  The first might be clinically, for which I don't have a lot of information but I'm just talking in

USCA5 5076

Jan Leestma                                      January 10, 2011

31

the ideal sense.  If in the case of a child the child displayed irritability, nausea, vomiting, lethargy, excess sleepiness, seizures, a bunch of activities like that, while in and of themselves those are rather nonspecific findings, against later information those could be important in aging and dating a process because you could say there was something going on here which subsequently turned out to be XYZ and that can give you information.

          The second kind of thing would be a neuroimaging study, like a CT scan or an MRI.  This can give you a view of what's going on inside the head and can help you sometimes in aging and dating. It's not as precise as would be desired, but it can give you information.

          And then we go to, in this particular case, the autopsy which provides the actual tissue to be examined and there are means by which pathologists can look at, for example, a subdural hematoma and put some aging and dating on it.  The hemorrhage, a blood clot, can be aged and dated within some limits.  Looking at the brain itself, if there is a brain injury there is a time course of events that are played out microscopically and those

USCA5 5077

Jan Leestma                                    January 10, 2011

32

too can give you rather precise information about the age and date of the lesions.

Q.    Okay.  And in this particular case given the information that you had available to you at the time, were you able to date or age this particular process of the venous thrombosis?

A.    Some aspects of it, yes.

Q.    What was your estimation of that?

A.    Okay.  First of all, we have a microscopic tissue slide of the superior sagittal sinus of the dura in which there is a blood clot present.  That blood clot contains some recent and preserved red blood cells, but most of it is a degenerate clot.  In other words, the red cell elements have deteriorated, other blood clot elements, namely fibrin, f-i-b-r-i-n, have replaced that.  And then there are some cellular reactions within that clot and at the margin of it that tell us that this clot has been there for some days and at one point may have been not in the section we see but upstream or downstream attached to the wall of the sagittal sinus and inciting a reaction there.

So this gives us -- the recent red blood cells could be anywhere two to three days from the

USCA5 5078

Jan Leestma                                          January 10, 2011

33

time of death.  The blood clot itself is probably more than that, several days.  And that's about as good as we can do with that particular component.

Q.    When you say slides, do you mean that was one of the Kagan-Hallet slides?

A.    That's right.  Let's see if there is a block number on this thing.  No, they didn't measure, they didn't mention -- they didn't assign a separate number to it, but there is one slide that contains two fragments of dura, one of which contains this thrombus that I'm talking about.

Q.    Do the Kagan-Hallet slides also reveal the subdural hematoma that both -- that Dr. Rouse testified about?

A.    Correct.

Q.    What else do those slides reveal?

A.    Those particular slides showed a blood clot and a reaction on top of it.  Namely, there are some relatively preserved red blood cells that could be a few days of age from death and a layer of reactive cells on top of that that indicate the healing process, and those vary in thickness and character such that one can say they're certainly present a week or more, and in some areas might be

USCA5 5079

Jan Leestma                                                      January 10, 2011

34

ten days to two weeks from death.

Q.    Is that specifically related to the thrombosis?

A.    No.  Well, I mean, it may have been caused by the thrombosis, but this is blood in the subdural space that is undergoing healing and reaction and that's what I'm replying to.

Q.    That's what I wanted to clarify, whether the discussion you talked about -- what you mentioned about the healing process, whether it was in relation to the thrombosis or something else?

A.    It is something else.  This is the actual subdural clot.

Q.    And -- so I guess you kind of got a little bit ahead of me which is why we missed each other.  The slides also show the subdural hematoma?

A.    Yes, they do.

Q.    Okay.  And the process which you just described, or the information you just described about the healing, that was related to the subdural hematoma?

A.    Yes.

Q.    Can you just repeat, because I was behind, what in your best estimation the age of that

USCA5 5080

Jan Leestma                                              January 10, 2011

35

particular process as reflected in those slides is?

A.    Okay.  The estimate of the age of the healing of the subdural hematoma, or the reaction that we're talking about, on the order of ten days to two weeks.  And I don't disagree with Dr. Hallet's estimate of it, that would be about right.

Q.    And when you say you don't disagree with Dr. Hallet's estimate of it, I take it that's from your review of her report?

A.    Correct.

(WHEREUPON, a certain document was marked Defendant's Deposition Exhibit No. 3, for identification, as of 01/10/2011.)

BY MR. ABREU:

Q.    Let me show you what I am marking as Defense Exhibit No. 3 and I ask you if you recognize that particular document?

A.    Yeah, I do.  This is the neuropathology consulting report by Dr. Kagan-Hallet, and the date of that report is 9/17/02.

MR. ABREU:  Mr. Roberts, do you have a copy of that?

USCA5 5081

Jan Leestma                                              January 10, 2011

36

        MR. ROBERTS:  Yes, I do.

BY MR. ABREU:

        Q.    And your findings regarding that
particular subdural hematoma, is that consistent, or
consistent with what Dr. Hallet reported --

        A.    Yeah.

        Q.    -- in her report of 9/17/02?

        A.    Yes.

        MR. ABREU:  Can I have just a moment?  I'm
asking and there's no judge in the room.

        MR. WISEMAN:  I'm sure Judge Jack would give
you all the time you need.

                (WHEREUPON, a short pause was had.)

BY MR. ABREU:

        Q.    Let me ask you about Dr. Hallet's
report.  She mentions on Page 2 regarding -- the
section says Neuropathologic Diagnosis.

        A.    I see that.

        Q.    Okay.  She then mentions "Cerebral
edema, mild to moderate, hemorrhagic necrosis of
cerebellar tonsillar tips, (right), subdural
hematoma, mostly recent, minimal organization
(approximately ten days' duration)."

                Could you tell us what the term -- what

USCA5 5082

Jan Leestma                                           January 10, 2011

37

medical term -- the medical term "minimal organization" means, from a medical perspective I should say?

A.    Well, let me back up one moment and say when you have blood in the subdural compartment it incites a chemical reaction that the body and the dura respond to.  They bring in cells, essentially to try to get rid of that blood, and other cells wake up and become activated to try to wall that off, eventually to dissolve that blood clot and heal it, and that is the process called organization.

And under the microscope we can look at what cellular constituents are there, how many of them, how much, how extensive, and make some estimates on the age of that subdural hematoma. This is based on some work that comes from a long time ago, 1936, but never mind, it's never been supplanted, and it's the road map that most pathologists use to make estimates of this sort.

So that's what we're talking about.

Q.    Okay.  And further down she mentions, "Cerebral white matter: Organized contusion infarcts (seven plus days' duration)."

A.    Right.

USCA5 5083

Jan Leestma                                    January 10, 2011

38

Q.    Are those the same infarcts that you noticed or that you described when you reviewed the slides?

A.    Yes.  I would say -- I would use different terms.  She says contusion infarcts, meaning that physical trauma caused these.  I am unconvinced of that.  I think these are due to venous infarctions due to the cerebral venous thrombosis that I've talked about, which she does not mention.

MR. ABREU:  Let me show you what I'm now marking as Defendant's Exhibit 4, is that correct, and Defendant's Exhibit 5 and ask you to identify those documents.

(WHEREUPON, certain documents were marked Defendant's Deposition Exhibits No. 4 and 5, for identification, as of 01/10/2011.)

BY THE WITNESS:

A.    Both 4 and 5 are prints that I made from a computer disk that contained the CT radiographic study done on June 27, 2002.  The time is listed as 1807 hours on that date.

USCA5 5084

Jan Leestma                                    January 10, 2011

39

BY MR. ABREU:

Q.    That was at Driscoll Children's Hospital?

A.    It was.

Q.    And that CT scan was done by Driscoll Children's Hospital?

A.    Apparently so.

Q.    Of Jakarenn Gunter?

A.    Say again.

Q.    Of Jakarenn Gunter?

A.    Yes.  That's the name all of this material, all of this information appears on the actual images.  I took -- selected a couple of them from this disk and caused them to be printed out, and these are the exhibits that we have before me.

MR. ABREU:  And, Mr. Roberts, do you have a copy of those?

MR. ROBERTS:  I do not, not in front of me.

MR. ABREU:  All right.  Well, we have them here, but I don't know how helpful that is.  They're part of the materials that were sent to Dr. Leestma in the beginning of case.

MR. ROBERTS:  Can you tell me -- can you tell me where in his report he refers to those CT scans,

USCA5 5085

Jan Leestma                                          January 10, 2011

40

because there is nowhere in his report that actually refers or says that he's going to rely on those, other than the fact that he looked at them.

MR. ABREU:  I think that's what it says, that he looked at them and he reviewed them.

MR. ROBERTS:  Right.  But you're about to give me testimony that is not included in his report with regard to the CT scans, and I'm going to object to that.  I'm not prepared to address that, it's not in his report anywhere.

MR. ABREU:  It is something that he relied on and something that he can talk about and is the basis -- one of the bases of his conclusion regarding the thrombosis and the subdural hematoma. So your objection is noted.

MR. ROBERTS:  Well, I think I'm going to -- I'll let you go ahead.

MR. ABREU:  Okay.

BY MR. ABREU:

Q.    Doctor, is the venous thrombosis that you mentioned and testified to previously reflected in those particular CT scans?

A.    Maybe.

Q.    What do you mean by that?

USCA5 5086

Jan Leestma                                    January 10, 2011

41

A.    At the posterior part of the --

MR. ROBERTS:  I'll object to testimony based on a maybe, unless he's medically -- has some kind of medical probability that they're there, I'm going to object to that testimony.

MR. ABREU:  I'll rephrase the question.

BY MR. ABREU:

Q.    Doctor, can you explain why you -- explain -- how about this, just explain your answer for us.

A.    Sure.  There is a finding present in the two panels that I have, Exhibit 4 and 5, in which a sort of a Y-shaped structure in the posterior part of the brain image that probably represents the superior sagittal sinus and that should be filled with completely white density, which is blood.  It appears that it is not, it appears somewhat gray, and that may indicate a so-called radiological sign known as the empty delta sign in which one is looking at a blood clot that has aged and doesn't contain as much red blood cells as other parts of the study.  And this may represent an actual view of the thrombus in the superior sagittal sinus.  This is -- I'm well aware of the difficulty in being

USCA5 5087

Jan Leestma                                        January 10, 2011

42

absolutely certain about this from this study. That's a well-known radiological problem and that's why I couch my answer in that sort of indeterminate way.  It may represent --

MR. ROBERTS:  I just want to be clear that my -- I'm sorry, Doctor.  I thought you were finished.

THE WITNESS:  That's all right.

MR. ABREU:  He is finished now, Mr. Roberts.

MR. ROBERTS:  I just want to be clear that I still object to the testimony.  I don't think the rephrasing of your question changed the fact that this is not in his report.

MR. ABREU:  Let me refer -- Mr. Roberts, if I can, I think to take care of your question I think it does refer to it in his report, let me just find it real quick.  Just give me a second to find my copy of the report.

Mr. Roberts, if you go to Page 3 of his report, third paragraph -- second full paragraph on that page but third paragraph on that page.  Last sentence starts, "My examination of the CT scans reveals a relatively small recent subdural along the falx, mostly posteriorly along with some mixed

USCA5 5088

Jan Leestma                                        January 10, 2011

43

density material that probably represents the older component of the subdural mentioned above."

MR. ROBERTS:  All right.  I was aware of that part but I wasn't relating his testimony to that, so that clarifies.

MR. ABREU:  Okay.  Thank you, Mr. Roberts.

BY MR. ABREU:

Q.    Doctor, I guess my reading of that also answers my next question, which is whether the subdural hematoma is reflected in those particular scans?

A.    Yes, it is.

Q.    Okay.  Could you describe for us what those scans reveal about any particular swelling in the brain related to this particular child?

A.    Okay.  Both of them reveal the fact that the brain is, colloquially, tight up against the undersurface of the skull.  That there is very little, if any, overlying cerebral spinal fluid, which would have a black color density to it. That's gone.  The brain completely fills the cranial space.

Furthermore, the ventricles of the brain are smaller than would normally be the case, which

USCA5 5089

Jan Leestma                                        January 10, 2011

44

further indicates a sign of increased intracranial pressure and absorption of cerebral spinal fluid to make way for the swelling.

Q.    And just Mr. Roberts doesn't have it in front of him, what is it about those photographs that shows you, in fact -- if you could just describe what you're looking at that shows that for us.

A.    Okay.  The skull is depicted in these studies as a white rim.  Underneath that there should be a black rim showing the convolutions of the brain or outlining them, and that would represent the normal cerebral spinal fluid that overlies the cerebral hemispheres.  That's gone.  The brain has swollen to obliterate that fluid-filled space.  It does that because the brain is swollen and there is most likely increased intracranial pressure driving that.

Q.    The subdural hematoma which you indicated was present or visible in those CT scans, in your opinion is that -- is that hematoma large enough to cause all of the swelling that's visible in those CT scans?

A.    In my opinion no.

USCA5 5090

Jan Leestma                                        January 10, 2011

45

Q.    Is the venous thrombosis that you testified about in your opinion large enough to cause the swelling that's visible in that -- in those CT scans?

A.    It's certainly capable of it, and I believe that to be the most reasonable explanation. Plus the additive effect of what was going on when the child was hospitalized.

Q.    Let me ask you about did you -- any retinal bleeding, did you read anything regarding retinal bleeding in this particular child?

A.    Yes.

Q.    Did you review the testimony of Dr. Akhtar who described the retinal bleeding?

A.    I did, and it was described clinically.

Q.    Okay.  Do you have an opinion, Doctor, regarding whether the retinal -- what the cause of the retinal bleeding in this particular case was?

A.    Yes, I do.

Q.    What is that opinion?

A.    It's a consequence of the increased intracranial pressure this child had.

Q.    Can you describe or explain, I should say, what you mean by that?

USCA5 5091

Jan Leestma                                      January 10, 2011

46

A.    Okay.   As we asked sometime back what intracranial pressure was, I said the normal would be under ten millimeters of mercury, or thereabouts. That is also the pressure that veins have in them. If the pressure environment inside the cranial cavity is greater than that, it has the potential and consequence of impeding venous outflow from the optic nerve and eye.   Meaning that blood is coming into the eye by the arterial tree and it can't get out because the venous outflow tract is obstructed because of the pressure, and that causes backup of blood and rupture into the retina and in the optic nerve sheath.

Q.    Dr. Rouse testified at trial, and I believe it's in the transcript at Pages 58 and 59, that the retinal bleeding is not likely -- is not likely to have occurred, the retinal bleeding that was present in this particular case was not likely to have occurred without an impact in the magnitude of a car accident.   Do you agree with, Dr. Rouse?

A.    No, I don't.

Q.    Can you tell us why?

A.    First of all, physical forces generally do not and cannot cause the kind of retinal bleeding

USCA5 5092

Jan Leestma                                           January 10, 2011

47

we see here.  They can certainly lead to it if you have a car crash and a giant subdural or tremendous cerebral edema, that's going to produce intracranial pressure which can produce the retinal hemorrhages. But directly as a result of physical forces, that would not be acceptable or is not scientifically proven.

MR. ABREU:  Just a moment, please.

(WHEREUPON, a short pause was had.)

BY MR. ABREU:

Q.    Let me just ask a couple questions. Doctor, we just have a few more questions and then --

Now taking into account the evidence in this particular case that Mr. Bourgeois and his family arrived on the naval base sometime -- actually, the evidence at trial is that he arrived at 10:03 a.m. on the morning of June 27, 2008.

A.    Okay.

Q.    And that 911 was called at 11:45 a.m. on that same day.

A.    Okay.

Q.    And that she died approximately 24 hours later at 11:05 a.m. June 28.

USCA5 5093

Jan Leestma                                        January 10, 2011

48

A.    That's my understanding.

Q.    Okay.  Is what you observed about the subdural hematoma consistent with an injury that was inflicted within the 24-hour period that she was on the Corpus Christi Naval Air Station?

A.    No.

Q.    What -- can you explain that, please.

A.    Well, there are two components to the subdural hematoma.  The chronic component, which we've already discussed, aged and dated ten days to two weeks before this incident.  The fresh blood or more recent blood cannot be accurately aged and dated within about three days, two days from the time of death.  So it is possible that some blood that is in this compound subdural hematoma came during the time period you just discussed, but there is absolutely no way I can tell you if that happened.

Q.    Within three days?

A.    I cannot.

Q.    Okay.  Does the new blood prove that there was injury on the base itself?

A.    No.

Q.    Why not?

USCA5 5094

Jan Leestma                                                    January 10, 2011

49

A.    Simply because we have no reliable means to age and date it.  If we could say this blood is one or two hours old, or whatever the time frame, critical time frame is, then I could answer that question.  The problem is we don't have the technique, technology and knowledge to be able to do that.  Our knife is -- our window is a couple of days and cannot be improved upon.

Q.    Can a previously existing subdural hematoma or chronic subdural hematoma bleed without additional injury?

A.    Yes, it can.

Q.    Is the intracranial pressure that you identify as the cause of death in this particular case, can that be the result of a head injury that occurred on the military base within that 24-hour period that we described in the previous question?

A.    It could have -- it could represent a component of this problem.  Again, I can't assess what percentage that might be or even if it occurred.

Q.    Okay.  What about the thrombosis that you identified?

A.    The thrombosis antedates this whole

USCA5 5095

Jan Leestma                                                      January 10, 2011

50

business by several days.

Q.    Yes.  I was asked if you could explain what you mean by "this whole business"?

A.    Well, I mean the collapse and decompensation of this child that was discovered at the naval base and leading to the hospitalization and then ultimately the child's death 24 hours or so later.  The thrombosis antedates that whole business, that whole process by several days most likely.

Q.    Lastly, Doctor.  Based on everything that you saw that was presented at trial that you reviewed is there sufficient scientific evidence to conclude that the child, Jakarenn Gunter, died as a result of an injury that was inflicted on the naval base?

A.    No.

Q.    Can you again just briefly describe why?

A.    First of all, the aging and dating of the acute component of the subdural we have imprecision there, we can't do any better than a couple of days.  Meaning if -- I couldn't tell you whether a red blood cell in that clot came five minutes before the heart stopped in this child or

USCA5 5096

Jan Leestma                                        January 10, 2011

51

two days before.  I can't.  I can't do it.  So that limits that.

We have other processes that are involved in this child.  The older component of the subdural.  The cerebral thrombosis clearly predates the arrival of this child at the naval base.  The bruising on the scalp and so forth and so on, of which there are a number of them, all of those have both acute and chronic components and the issue is the same.  I can't tell you if bleeding that is there of an acute nature or recent nature precisely when it occurred or how it occurred.

MR. ABREU:  Can we just take a two-minute break, five-minute break?

MR. ROBERTS:  Make it ten.

MR. ABREU:  Ten minutes, Tony?

MR. ROBERTS:  Just take ten.

MR. ABREU:  Okay.

THE VIDEOGRAPHER:  Going off the video record at 1:45 p.m.  This is the end of Tape No. 1.

(WHEREUPON, a recess was had.)

THE VIDEOGRAPHER:  Going back on the video record at 1:53 p.m.  This is the beginning of Tape No. 2.

USCA5 5097

Jan Leestma                                        January 10, 2011

52

MR. ROBERTS:  Are we on?

THE VIDEOGRAPHER:  Yes, we are.

MR. ROBERTS:  Okay.

CROSS-EXAMINATION

BY MR. ROBERTS:

Q.    Dr. Leestma, I want to start with some of your CV because I noticed in here that you've been quite a few different places and -- but you indicated to us that you kind of retired around 2000, 2001 from, and I think you said from hospital-type work; is that correct?

A.    Yes.  The -- because of the closing of a couple of hospitals, there would be a couple of different dates there.  I think in just checking my CV, the last major contact I had with my Chicago Institute of Neurosurgery group was in 2003.  I ceased activity with that organization at that time. I had a brief return to hospital practice at the Children's Memorial Hospital for two years between 2003 and 2005 on a part-time basis, and then when that engagement ended with their full time neuropath person coming then I retired for good from that.

Q.    And during your career did you -- did you actually perform autopsies?

USCA5 5098

Jan Leestma                                              January 10, 2011

53

A.    Sure.

Q.    Since 2001 how many autopsies have you performed?

A.    Probably none.

Q.    Probably none or -- I'm sorry, probably none?  I don't understand that answer.

A.    I don't think that -- I could during the period of 2003 to 5 at the Children's Hospital I may have been involved in some autopsies there supervising residents.  Senior staff people generally do not do the autopsies, they supervise them, and I would have probably done that.  That's why I don't have a record of it and I don't remember.

Q.    Okay.  But I noticed in your -- one thing that I didn't see in your CV was any list of cases that you testified on.  Earlier in your testimony you mentioned the fact that -- you were asked a question about how you testified for both the defense and government.  Why don't you tell us how often you've testified for -- how many cases have you testified for a prosecutor, as a witness that's been called as a prosecutor?

MR. ABREU:  Let me just put an objection on

USCA5 5099

Jan Leestma                                    January 10, 2011

54

the record regarding the question.  The list of cases was provided to the government through Rule 26 disclosures, so the government has been provided a list of cases.

MR. ROBERTS:  We've been provided a list of the cases that he's testified on?

MR. ABREU:  Yes, Mr. Roberts, in Rule 26 disclosures.  They were provided actually weeks and weeks ago.

MR. ROBERTS:  Okay.  It wasn't included in the information.  I just asked him -- I said it wasn't included on his CV.

MR. ABREU:  Oh, that's true.  It's not on his CV, but it's a separate list that you were provided previously.

MR. ROBERTS:  Right.  So I'm asking him about the time he's testified.

BY MR. ROBERTS:

Q.    So you said earlier you've testified for both the government and the defense.  So how many times have you testified for the government?

A.    The most recent one, let me put it this way -- and I'm guessing because I don't have that document in front me.  But late '90s I testified

USCA5 5100

Jan Leestma                                    January 10, 2011

55

twice for the District Attorney in San Diego on a child abuse case there that came to trial twice.  I testified both times.  And that would be --

Q.    In late '90s?  I'm sorry, in the late '90s?

A.    Yeah.  '97, '98 maybe.

Q.    That would have been the case of People v. Johnson?

A.    Yes, that's the one.  Correct.

Q.    All right.

A.    And that would be the last time probably I testified for the prosecution.  I am currently engaged by the prosecutor locally on a couple of homicide cases, which have not come to trial yet and I haven't been disclosed.

Q.    Okay.  I understand -- I know next week you're going -- or later this week you're going to Hawaii to testify on a case?

A.    Yes.

Q.    And I guess there was apparently a conflict with you being able to be available for us this Thursday because you're supposed to testify in that case on Thursday?

A.    That's right.  I'm leaving on a plane

USCA5 5101

Jan Leestma                                          January 10, 2011

56

tomorrow morning to fly to Honolulu to give

testimony in that case.

        Q.    Okay.  And I'm kind of looking at your

statement that you said that you're a consultant

now.  So all of your time, all the income that

you're drawing right now is from testifying as an

expert witness in cases?

        A.    Well, testimony may not culminate -- you

know, result in every case.  My earned income -- I

have retirement income, but it has nothing to do

with any of this.  My earned income has to do with

professional consulting on cases like this and

others, civil and criminal matters.

        Q.    I've got a list of about ten cases that

you testified in in 2010?

        A.    Yeah.

        Q.    And all of those were for the defense;

is that correct?

        A.    You have the advantage of me.  I'll

trust you with what you say.  That's likely true.

Criminal cases for sure it would be defense.  If

there was a civil trial in there, it would be a

50/50 chance whether I was retained by the defendant

or the plaintiff.

**USCA5 5102**

Jan Leestma                                           January 10, 2011

57

Q.    Okay.  And then I'm looking at 2009 and there is -- I think there are about six cases listed here and they were all for the defense.  One medical malpractice case --

A.    Correct.

Q.    -- but all the times in a criminal matter you were testifying for the defense.

A.    That would be --

Q.    Does that sound correct?

A.    That's my best recollection also.

Q.    And then 2008 I've got a list of about nine cases and all of them for the defense, unless -- except for medical malpractice cases.  So every time you were involved in a criminal matter you're all testifying for the defense in 2008, does that sound right?

A.    That would be a fair statement historically, sure.

Q.    And I've got about seven cases listed in 2007 that seems to follow the same pattern where mostly for the defense -- all for the defense except for one civil case.  That sound about right?

A.    That would be the pattern.  And most of the criminal cases are child abuse cases and the

USCA5 5103

Jan Leestma                                          January 10, 2011

58

issues that are involved I'm offering defense
opinions on those.

Q.    You just reminded me of something.  I
want to finish this thought before I go to that
issue, though, but it looks like in '06 you
testified in about 13 cases and in '05 it was about
18, and it seems like the numbers were closer to
like 15 and 20 up until 2007.  Do you have any
reason why the cases have decreased?

A.    No.  I think some of it might be that I
just didn't want to do as many cases, I wanted to
take some time off.  I have no other explanation for
it.

Q.    Well, you would agree, wouldn't you,
that these cases take a lot of time, they take a lot
of time reviewing the documents.  I mean, it's
pretty -- even six cases a year is a considerable
load to keep up with the actual facts and the
evidence in a case, wouldn't you?

A.    I think that's a fair statement, yes.

Q.    What I'm curious about on your CV, you
mentioned the Juvenile Protection Association of
Chicago, are those cases generally about abused and
neglected children where you were working with those

USCA5 5104

Jan Leestma                                                    January 10, 2011

59

families?

A.    I'm not directly working with them.  I'm on the board of directors and have had various involvements with that organization over the years.  But that would be the focus of what they do, direct social services to those kinds of families and sometimes acting as a friend of the court or a mediator or what have you with the court system.

Q.    I'm just curious about your statement in your direct testimony about maintaining the family structure.  Is it the goal of that organization to keep the family together even if the child is being adduced and neglected?

A.    No.  This is -- obviously the safety of the child is foremost.  The goal is to try to maintain the family unit and restore it to some sort of level of functioning so that that's possible and they go to great lengths to do that.  But the primary focus is the safety of the child, and if the social workers and the team feel that the child is in danger, of course they're going to recommend that the child be taken out.

Q.    Okay.  I just -- because the only thing you mentioned was maintaining family structure so I

USCA5 5105

Jan Leestma                                        January 10, 2011

60

just was curious if there was another aspect to what you did with them?

A.    No.   It's not the end of the day, it's the goal, and they've been remarkably successful at that over the years.  But obviously if a child is in danger and they feel that that is so, then that isn't going to be possible.

Q.    The book that you published in 2009 that you're the author of, is that -- since you haven't done any autopsies in a while is that more of a theoretical book for practitioners to consider or is it more of a practical --

A.    It's all of those things.  It represents 40 years in the business and collected materials and experience over that time as well as the literature and scholarship.  The fact that I'm not doing autopsies doesn't -- hasn't changed in a long time. I haven't been doing them because that hasn't been my job.  But the material there is current and represents the work of myself and others.

Q.    When you were testifying on direct examination you were asked a question about what you were asked to do in this case, and you stated you were asked to try to determine what happened and

USCA5 5106

Jan Leestma                                    January 10, 2011

61

when it happened.  Did anyone talk to you about the importance of that in this case?

        A.    Well, sure.  This is -- like many of these, aging and dating of the process is an important forensic aspect of the case because it may have importance with an accused individual or other things that are important in the adjudication of the case.  So that's what I was asked to do and I did.

        Q.    If I understand correctly, many of your -- much of your testimony in some of the other cases where you were working where there is a defendant accused of a murder one of the -- one of the ways that your testimony is utilized is to establish that the time of death was done at a time different than when the defendant could have done it.  Is that accurate?

        A.    That often comes up.  This case is not dissimilar from many of them that I'm involved with that the whole issue is when did some process happen given external history, stories, whatever, and how can looking at the objective case of evidence, that is the autopsy the slides, the scans and things that can't be changed by anybody, how can I answer questions or can I answer some of those questions.

USCA5 5107

Jan Leestma                                          January 10, 2011

62

That's generally what I do.

Q.    One of the issue about how Jakarenn died you mentioned that it was the pressure, and you would agree, would you not, that there's -- I mean, there are various aspects that happen to an individual, not particularly in this case, I'm not getting into the details of this case yet.  I'm just talking about in general when someone dies from pressure on the cranium, it -- I mean, it can be -- those pressures can be caused from various aspects, correct?

A.    Sure.  It can have many causes. Anything that changes the intracranial pressure volume dynamic or teeter-totter can have profound effects, and ultimately intracranial pressure is a very, very common mechanism by which death occurs in head trauma cases.

Q.    Do you recall how many head injuries that Jakarenn actually had?

A.    That becomes a matter of argument.  Now, you speak of -- if we're talking about scalp --

Q.    Well, let me --

A.    Scalp --

Q.    If you don't mind, let me rephrase the

USCA5 5108

Jan Leestma                                              January 10, 2011

63

question again, then.

A.    Okay.

Q.    Because you're exactly right.  I'm not asking you about an opinion, I'm asking you about what the evidence presented.  Do you recall what the evidence in this case showed as to the number of head injuries to Jakarenn?

A.    In terms of impacts to the scalp, that could be a point of some argument.  There certainly is a large area of impact, a couple of centimeters or so in diameter about where I'm indicating, upper right side of the scalp.  There are -- there's another one behind I believe the right ear and that represents another impact site.  There are a number of scalp bruises in the posterior part of the scalp; it's difficult to tell when those occurred or how they occurred.  So one could say does this represent a separate incident or a collective of one event that may have had multiple impacts.  I think -- I can't globally answer that.  I can say there are estimates that are there, some -- but then we could argue about does that really represent an impact site, and there are some of them that are difficult in that regard.

USCA5 5109

Jan Leestma                                      January 10, 2011

64

Q.    Well, would you agree that medical examiners and pathologists sometimes are at a disadvantage when they're -- when they're conducting an examination because all they can look at is what happened to the individual and they don't know what witnesses observed and sometimes they're at a disadvantage for trying to figure out the cause of death?

A.    Oh, that is true, but it's a question of objective evidence versus, quote, anecdotal evidence, which may or may not be appropriate. the -- the bottom line is the forensic pathologist has to take a look at what's before him or her, and then other questions then can come.  If there is a scenario saying an individual hit this person 20 times on the head and there is one impact site, obviously there is going to be a disparity there. But the final thing comes from -- and the big power comes from the objective evidence that here is what we see physically and then that has to be evaluated against historical accounts or witnesses or whatever.

Q.    Did you -- did you identify -- do you remember -- did you actually read all of Dr. Rouse's

USCA5 5110

Jan Leestma                                          January 10, 2011

65

testimony in this case?

          A.    Yes.  I have that transcript, I went
through it, I can't for a moment replay it for you,
but I did look at it, yes.

          Q.    Did you read her report sentence by
sentence, her autopsy report?

          A.    I did, yes.

          Q.    And did you identify anything in her
autopsy report that you think was incorrect?

          A.    Well, let me look at it a moment and --

               Okay.  We can start on the first page.
Closed head injury, (a) multiple areas of subgaleal
hemorrhage, I don't agree with that.

               Ten impact sites identified.  That we
might part company on as to what represents a
qualified impact site or not.  We might argue with
that.

               The right subdural hematoma recent with
minimal organization.  I think there is a lot more
than minimal organization and healing going on
there, and it probably would be more appropriate to
describe this as an acute or recent and chronic
subdural hematoma.

          Q.    Let me ask you about that real quick,

**USCA5 5111**

Jan Leestma                                      January 10, 2011

66

too, because I think that you hit on an important aspect.  The fact that there is acute, which means recent, and chronic, which means older injuries --

A.    Right.

Q.    -- makes it -- I mean, it makes it more difficult to be able to parcel out when -- what injury is what and what actually caused whatever ultimately resulted from the injuries; is that correct?

A.    That's a fair estimate, yes, it does.

Q.    In your report you actually acknowledge that there was recent bleeding --

A.    Of course.

Q.    -- do you not?

A.    Yeah.  Sure.  Of course.

Q.    And I think you even say that the recent -- I'm looking for the part that I recall you saying where it recently -- I think it's Page 2, the first full paragraph, second actual paragraph.  And you acknowledge that the bleeding could have appeared immediately before the child died or up to two to three days previously.  But then you state that it cannot be known if the acute component contributed or caused the death?

USCA5 5112

Jan Leestma                                       January 10, 2011

67

A.    That's right.

Q.    Now, is that -- is that excluding what any eyewitness might have seen?  I mean, you're not considering what an eyewitness, you're just looking at the medical evidence?

A.    That's right.  Just looking at the medical evidence.

Q.    But the evidence -- you mentioned the phrase earlier about decomposition.  Or decompensated?

A.    Right.

Q.    Tell us -- I mean, I think I understand what decompensated means with relation to looking at somebody that's just injured, but tell me in your terms what that means from a pathologist.

A.    Okay.  When I was referring to it, I think we're on the same page here.  When a child decompensates, let's make it two cases, this is a child who would then become unresponsive eventually, perhaps lethargic, sleepy or irritable, and then by decompensating I'm talking about becoming unconscious and usually quitting breathing and in need then of immediate medical assistance and resuscitation.

USCA5 5113

Jan Leestma                                                    January 10, 2011

68

        Q.    And so if someone standing there
watching an individual get assaulted and they
immediately go limp, isn't that a part of the
determination and assessment that a pathologist or a
medical examiner would want to know and apply to the
determination of the cause of death?

        A.    Well, that certainly would be a witness
account, and you usually have subsidiary evidence
adding to that by an emergency team or a doctor or
nurse or somebody who responds and says this child
at this about time quit breathing and fell apart.

        Q.    Now, you mentioned the -- some of the
subdurals and some of the injuries being on the
right side back of the child's head and up around
the ear area where some of the -- or some of the
subdural hematoma was, and that was where a good
portion of the recent bleeding was, was it not?

        A.    The skin or scalp impact back behind the
ear looks like it has age on it.  Microscopic
examination of that also sustains that, that there
is a chronic component to that.  The association
with the subdural, where the impact sites are on the
scalp, does not necessarily correlate with where the
subdurals are inside the head, so they could be due

USCA5 5114

Jan Leestma                                              January 10, 2011

69

to the same event or it might be due to some --
another one.

Q.    Were you aware that there was actually a
witness to when this injury took place?

A.    I'm told there is.

Q.    And were you aware that that witness
actually testified that the defendant, Alfred
Bourgeois, grabbed the child and slammed her -- the
child's facing her, so the right side of her head is
facing the outside, and that child was slammed up
against the inside of the cab three or four times?
Are you aware of that?

A.    Yes.

Q.    And the testimony was, and I think you
wrote it in your report, that the child then went
limp immediately thereafter?

A.    That's what was reported and testified
to, I understand.

Q.    And if that was accurate, based on your
expertise as a pathologist, wouldn't that play an
essential role in your determination as to what the
cause of death was?

A.    Those kinds of bits of information are
interesting and important and need to be evaluated

USCA5 5115

Jan Leestma                                    January 10, 2011

70

against the objective evidence that is found at

autopsy and in other things that can't be changed.

To take any witness account as the absolute truth

and completely authoritative, I've learned a long

time ago that this -- you have to be very careful

there.  It may have happened that way, and it may

not have happened that way too.  So to make that --

Q.    Doctor --

A.    -- trump the objective evidence, that

isn't what I do.  I have to keep with the objective

evidence in front of me and take these things into

account which may be or may not be completely --

complete, correct or true.

Q.    Okay.  I'm going to ask you the question

again, sir.

A.    Sure.

Q.    I think it's pretty straightforward.  If

that were given to you as evidence in the case,

you're the pathologist and/or the medical examiner,

would that not play a vital role in your

determination -- I'll take the word "vital" out.

Would that not play a role in your determination in

evaluating the cause of death?

A.    It plays a role but it's not the last

USCA5 5116

Jan Leestma                                     January 10, 2011

71

word.

Q.    Okay.  Can you think of any reason why a seven-year-old would make something like that up --

MR. ROBERTS:  Objection.  Objection, that's irrelevant.

BY MR. ABREU:

Q.    I'm going to ask you to answer the question.  My response to that is it's not irrelevant because a medical examiner -- you're telling me that you would --

MR. ABREU:  It also calls for speculation. I'm sorry, go ahead, finish your point and then I'll object.

MR. ROBERTS:  My point is that if a medical examiner is going to factor in the witness statements then it does become a factor as far as relevance and credibility.

MR. ABREU:  Well, it also goes -- it's speculative and it asks the doctor to speculate about another witness's motives.

MR. ROBERTS:  Understood.

BY THE WITNESS:

A.    My answer to that is I don't know what to make of those things.  I think you have to say,

USCA5 5117

Jan Leestma                                          January 10, 2011

72

all right, this is a set of historical facts which
may or may not be complete or correct for a variety
of reasons.  And the pathologist then has to look at
what they've got in front of them and say what
matches up, what can I tell, what can't I tell, and
what limit do I have on my opinion in that regard.
And that's part of the problem of going backward
from the objective evidence to create a scenario and
see if it matches up, it may be very, very difficult
and subject to error and interpretive problems.
BY MR. ROBERTS:

    Q.    Just so I might point out, on the first
page of your report you state that the -- down
the -- it's the first full paragraph after your list
of 13 things that you considered.  You state that on
the morning of July 27, 2002.  Is that another
error, typo in your report?

    A.    I think I'm confused here.  Ask the
question again.  It's all right.

    Q.    The statement that -- I mean, you say
that you thought the incident occurred in July.
Basically my question is were you aware it occurred
in June?

    A.    Well, those were the dates that I'm

USCA5 5118

Jan Leestma                                              January 10, 2011

73

aware of.  July 27 is when this man was -- had his family there at the naval base and allegedly these events occurred.

Q.    Okay.  So that's -- your statement is you believe it all occurred in July?

A.    Well, I don't know whether I believe it or not.  Those are facts that were presented to me in multiple documents, the autopsy report and so forth.  I have no reason to question that.

Q.    And you also, in your report, that same paragraph, you note that "Bourgeois was reported to have slammed the child's head against a window in the truck" --

A.    Yep.

Q.    -- "and the dashboard.  After this occurrence the child was said to have become limp and unconscious."  Are you telling us and telling our judge that you would -- you would not consider that -- that statement and that piece of evidence in your determinations?

MR. ABREU:  Objection, that's not what the witness has stated.

BY THE WITNESS:

A.    I'm just listing in my report what was

USCA5 5119

Jan Leestma                                    January 10, 2011

74

immortalized in the case record.  Whether those facts are true or not, I cannot say for a variety of reasons.  I'm not saying they didn't happen, I just cannot verify that objectively, independently with the material I have.

BY MR. ROBERTS:

Q.    Could -- in your opinion could a two-year-old child who suffered a fatal blow that's going to result in a hematoma, subdural hematoma that kills the child, would that child be able to continue to walk, talk, sing and function in a normal manner as people observe them?

A.    I'm assuming this is a hypothetical question then, correct?

Q.    It is a hypothetical question.

A.    Well, we have to define what a fatal blow is.  There are circumstances in which a child may suffer an injury and be out and essentially on their way to dying relatively immediately.  There are other circumstances in which an injury later proves to be fatal, sometimes minutes, hours, days or more.  So it's not a simple problem that I can answer easily.

Q.    If the evidence that was presented to

USCA5 5120

Jan Leestma                                              January 10, 2011

75

you was that the last physical assault to the child's head occurred -- if the last physical impact to the child's head -- let's just say not the last, we're going to take two separate incidents.

If you were given evidence that the last time the child's head was impacted in an assaulted manner and had any major impact was three days out from going to the hospital, and then the child is on a base and singing ABCs, moving around like a normal two-year-old would, and then subsequent to that, within an hour, the child's head is slammed against the inside of a cab four times and the child goes limp, would that have any impact on your conclusion of what injury would have caused the death?

A.    If we're simply looking at the historical account, I'm sure that can make sense. The problem, and it comes to me, is looking backwards what injuries that I can see in the microscopic slides and photographs in this child that are unequivocally caused on the morning of July 27, 2002, I can't tell you.  All of the ones that were sampled histologically have age on them.

There is also recent hemorrhage in some of these impact sites.  Did that come as a

USCA5 5121

76

consequence of just the process or is that a result of some impacts that occurred on the 27th, I can't tell you that.

What you say may be true.  I just can't verify it.

Q.    Okay.  I want to go to the last, Page 3 of your report and the last paragraph on that report.  You've got a couple statements in there I want to ask you about.

Third line down towards the end you say that it cannot be determined -- let me back up.  I'm going to read the whole sentence.  It's the third sentence starting at the beginning.  "The subdural hematoma's cause is likely physical trauma but it cannot be determined whether this was inflicted or accidental."

A.    Correct.

Q.    What do you mean?  What do you mean it cannot be determined whether it is inflicted or accidental?

A.    If you gave me a microscopic slide and photographs of the subdural hematoma and you said I want you to tell me how this occurred, I can tell you physically how it occurred but I have no way to

USCA5 5122

Jan Leestma                                        January 10, 2011

77

determine whether this was an inflicted injury or
one that occurred in a fall or an accident.

Q.    So again --

A.    I can't do it.

Q.    -- this is -- this paragraph has nothing
to do with the evidence in the case, it has only to
do with the medical examination that you were
conducting?

A.    Exactly.  It's the objective evidence of
looking at the material that I know something about
and can opine about.  I cannot -- the test is doing
just what I've suggested.  Show me a case, give me
no facts at all, and let me see what I can come up
with.  And to be able to come up with an inflicted
subdural versus an accidental one there is no way I
can do it.

Q.    Okay.  I just want to clarify that, that
your report is excluding the evidence in the case
and just looking at medical evidence?

A.    I'm confining it to what I can deal
with, which is the objective evidence of the autopsy
and the other materials that can't be altered or
changed by anyone.

Q.    Okay.  Down -- I note just a few

USCA5 5123

Jan Leestma                                          January 10, 2011

78

sentences down from that, and I can count them for you, the sentence that starts with "impact."

A.    We're on that last paragraph, right?

Q.    We're going to stay in that paragraph for a few minutes, please.

A.    Okay.  That's fine.

Q.    Okay.  So we're on the sentence that starts with "impact," period, and it says "Nevertheless."

A.    I'm struggling to find that.

Q.    It's about midway down.

A.    Okay.

Q.    It has got the word "impact," period, and "Nevertheless."

MR. DOWD:  The line, not the sentence.

BY THE WITNESS:

A.    Oh, yes.  I see it.  Okay.  Right.

BY MR. ABREU:

Q.    It says, "Nevertheless, it appears that the child's condition deteriorated after the reported incident in the father's truck."

A.    Yes.

Q.    Was that -- so that's a statement that you accepted?

USCA5 5124

Jan Leestma                                    January 10, 2011

79

A.    I haven't accepted it, I'm just simply saying that was what was reported and at this point I have no reason to doubt that that occurred.  It's just that I can't turn around and say, yes, I see that in my material.

Q.    Do you have -- did you have any evidence or any indication or anything through your medical information that you reviewed that indicated to you the child's condition deteriorated and went all the way to decompensated any time before the incident on the base?

A.    I don't have any information about that. I have some information that the child had been ill and there were some problems, but in terms of decompensating, becoming unconscious and unresponsive I have no information about that.

Q.    Help me out with that.  You said you have some information the child may be ill.  What are you referring to?

A.    It's my understanding that the child had been ill.  There had been vomiting.  The child apparently at some point was reported to have drunk her own urine because she was hungry or thirsty. And, you know, it sounds to me like this child had

USCA5 5125

Jan Leestma                                          January 10, 2011

80

been ill in some fashion prior to this incident.

Q.    You understand -- you understand that the child was forced to drink urine by the defendant, right?

A.    I do not know that.

MR. ABREU:  I would object, Your Honor.

Sorry.  I would object.  There are two different portions of testimony.  There's testimony that the child drank her own urine on her own -- drank his urine, I'm sorry, on her own.  And then when confronted there's additional evidence that then she was forced to drink additional urine. That's correct.

MR. ROBERTS:  Well, I'll let the record speak for that --

MR. ABREU:  Absolutely.

MR. ROBERTS:  -- and the Judge knows the record.

BY MR. ROBERTS:

Q.    Let me move to this area on this paragraph where you say, "The brain lesions range from possibly a few days in age to days to weeks old."

A.    Yes.

USCA5 5126

Jan Leestma                                           January 10, 2011

81

Q.    So you're including all the chronic and the acute injuries and you're saying that they range from a few days to a couple of weeks?

A.    That's right.

Q.    And you understand that -- well, earlier you were asked a question about the fact of the child dying, or the child being brought on to the base and then within a day dying, but you understand it was a couple of days before the autopsy was done because the child was moved to another place, right?

A.    Yes.  I know there was a delay there.

Q.    So then you come to this point, and this is really -- I want to go back to your testimony before we read the next sentence, because you told us that it was your belief that the cause of death was increased intracranial pressure, right?

A.    Yes, correct.

Q.    You gave us -- you actually said there were three causes but you only listed two of them. And you said one of them, one of the causes was a subdural hematoma, but you said that was a small volume so you kind of discounted that?

A.    Yes, that's correct.

Q.    Then you went to this idea that I

USCA5 5127

Jan Leestma                                      January 10, 2011

82

believe was this venous infarctions?

        A.    Yes, I did.

        Q.    That was the second cause, and you said
that was a primary cause of this child's pressure on
the brain, on the cranium?

        A.    I believe that was certainly the more
impressive one and quantitatively the more serious.

        Q.    Okay.  In your report the only time that
you mentioned this venous infarctions, and I may be
saying that wrong.

             Infarctions, thanks.  Mark Dowd is
better at pronouncing these words than me.

             The only time you mention that is here
in this last sentence in your entire report.  So
does -- what I'm asking is it appears to me that the
conclusions you make on the venous infarctions
relates to the coagulopathy; is that right?

        A.    Yes.  But I hasten to point out that I
did discuss this business of a clot on the bottom
paragraph of Page 2 and --

        Q.    I understand that.  I'm sorry, I did
note that the thrombus was noted up there and the
lot, but you're not saying the clot, the blood clot
was the pressure, are you?

USCA5 5128

Jan Leestma                                          January 10, 2011

83

A.    It's indicative of a disorder of coagulation that then leads to venous infarction and the edema and swelling and other things that attend that.

Q.    Well, I noticed in your testimony that you said -- I mean, you sounded very certain that this existed in this child and it was the primary cause of death, but in your report you say the child may have had?

A.    Oh, I don't know.  Oh, well, all right. In terms of --

Q.    Between the time you've done your report and the time you're testifying all of a sudden you've become more firm in this conviction.  Why?

A.    The child has a thrombosis in a structure that is dangerous to be thrombosed.  It usually comes from some disorder of blood coagulation, largely dehydration, there may be other factors.  In terms of a measurable coagulopathy, in other words, clinical blood studies to show that, I don't have those and I don't know -- it's probably why I was somewhat equivocating there.  But you can't change the objective finding.  There it is.

Q.    Okay.  So I just want to clarify.

USCA5 5129

Jan Leestma                                            January 10, 2011

84

You've gone away -- now in your testimony you've gone away from the may have to you're absolutely sure that this existed in this child?

A.    This particular lesion exists.  Whether this child has a demonstrable, measurable coagulopathy is another matter.  I don't have anymore information and that's probably why I equivocated there.

Q.    And in your -- I mean, isn't that basically a bleeding disorder?

A.    Coagulopathy can be bleeding or clotting or both, so it's a general term of some disorder of blood clotting.

Q.    Would you expect that kind of thing to be found in a detailed medical examination of a child?  If the doctor was trying to do a thorough examination of the child, would you expect that to be identified and notated in the child's records?

A.    It can be identified, and in fact children who are in the state this child was in, comatose, nonbreathing on a respirator, virtually all of them are coagulopathic at that particular time and that can be measured clinically by doing blood tests.

USCA5 5130

Jan Leestma                                              January 10, 2011

85

Q.    Can it also be observed because the blood will just come right out of the catheters?

A.    It can.  Sometimes the manifestation of this externally is that there is oozing around every IV site and every catheter.  I don't know that that occurred in this case.

Q.    You say in your -- going back to the first page of your report that you read Dr. Benton's testimony?

A.    I must have.  I don't have any recollection right now of it, but I did look at it, yes.

Q.    Dr. Benton was a doctor in Louisiana.  Does that refresh your memory at all?

A.    It does not.

Q.    Dr. Benton was a doctor that did a full examination on this child in May before any injuries were placed on this child.  Does that remind you of anything?

A.    What you say may be correct.  I simply don't recall.

Q.    Well, I'm sorry, Doctor, I was just asking -- I mean, you said -- you listed the trial testimony transcripts of Dr. Benton, so I'm trying

USCA5 5131

Jan Leestma                                          January 10, 2011

86

to figure out if you actually read Dr. Benton's testimony and understood that he performed a full examination on this child?  Do you know that?

        A.    I simply don't recall.  I got that material, I must have looked at it, I don't have any independent recollection of what that contained right now.

        Q.    Well, are you knowledgeable about pediatricians and the fact that a pediatrician giving an examination to a child would be able to catch something like this if the doctor is giving a thorough examination of the child?

        MR. ABREU:  I going to object.  It goes beyond what the scope of what the doctor was asked to do, which was determine what in his opinion was the cause of death and the timing of any injuries related to the cause of death as presented through the government's witnesses.  Dr. Benton did not testify regarding the cause of death at any point, and so my objection is on that basis, the relevance of Dr. Benton's testimony to the cause of death.

        MR. ROBERTS:  My response is that Dr. Leestma has stated that the cause of death was primarily related to this venous infarction and that a doctor

USCA5 5132

Jan Leestma                                            January 10, 2011

87

giving an examination should have been able to find that, and we have medical evidence that contradicts that.  So I'm asking --

MR. ABREU:  Well -- I'm sorry.

MR. ROBERTS:  My response is --

MR. ABREU:  Finish your point.  Sorry, Tony.  Finish your point.

BY MR. ROBERTS:

Q.    Well, I'm just going to say -- my question is are you aware that Dr. Benton did a full evaluation of this child in May on the same year?

A.    I am, and I don't recall what the content of that was.  That doesn't speak to what is going on proximate to the decompensation and death in this child.  I would not expect, unless this child had hemophilia or some other problem like that, that any abnormality of coagulation would have been detected months before.

MR. ROBERTS:  Let me just have a moment to confer with counsel.

THE VIDEOGRAPHER:  Do you want to go off?
          Going off the video record at 2:37 p.m.
                (WHEREUPON, a recess was had.)
THE VIDEOGRAPHER:  Back on the video record at

USCA5 5133

Jan Leestma                                                    January 10, 2011

88

2:41 p.m.

BY MR. ROBERTS:

Q.    Dr. Leestma, it's accurate, is it not, that even a child that -- let's just say that Jakarenn had no other injuries, no other head injuries except for what happened on the base. Let's say she didn't have all the chronic, she only had acute.  She's injured, she ends up the hospital a day later before she dies, and then the autopsy is done a day or two later.  You would still expect to see some healing because of the fact that she was there and she was still alive for a day, it just wouldn't be extensive healing, correct?

A.    That's right.  A 24-hour-old injury may show virtually no healing or the very early beginning of healing-type reactions.  What you say is correct.

Q.    So I guess what's really difficult about this case is that this child was routinely beaten for six weeks, and of course we have -- for hypothetical purposes someone observes this child get slapped upside of a cab four times and then we've got both acute and chronic, so it makes it very difficult to -- for you all -- for you as a

USCA5 5134

Jan Leestma                                              January 10, 2011

89

pathologist or even a medical examiner to pinpoint exactly which injury occurred when. Is that basically true?

A.    Yes.  That's a fair statement of the problem.

MR. ROBERTS:  All right.  I don't really have any other questions.

REDIRECT EXAMINATION

BY MR. ABREU:

Q.    The question that the prosecutor or the government just asked you regarding the problem in dating a particular injury in this particular case, was that something from your recollection that was covered in Dr. Rouse's testimony?

A.    Only in general terms in terms of her estimates, it wasn't very specific, in other words, days and some of them to weeks.  And I don't think that question was answered in her testimony.

Q.    Do you recall her being asked by the government or by defense counsel whether it was a problem to date these particular injuries?

A.    I don't recall a question of that kind.

Q.    Do you recall any testimony by her to the extent that dating these kinds of injuries is a

USCA5 5135

Jan Leestma                                    January 10, 2011

90

problem and can be a problem?

MR. ROBERTS:  I'm going to object.  The record is going to show what was asked.

MR. ABREU:  Very true.  I'll move on, Tony.

BY MR. ABREU:

Q.    The government asked you about cases you've testified in before in terms of your testimony for the defense or the prosecution; is that correct?

A.    Yes, they did.

(WHEREUPON, a certain document was marked Defendant's Deposition Exhibit No. 6, for identification, as of 01/10/2011.)

BY MR. ABREU:

Q.    Let me show you what I've marked as Defense Exhibit No. 6 and ask you if you recognize that particular document?

A.    Yes.  This is a -- what shall I call it? A spreadsheet that I've created to keep track of my cases because of federal requirements since 1992.

MR. ABREU:  And just for clarity sake, Tony, that is the same document that was provided to you through Rule 26 disclosures.

USCA5 5136

Jan Leestma                                                    January 10, 2011

91

BY MR. ABREU:

Q.    The cases that are listed on that particular document, those are cases that you've been retained in?

A.    Those are cases only in which I gave sworn testimony.

Q.    Okay.

A.    So it would be an incomplete listing of my entire case work because many of those things may not have culminated in sworn testimony.

Q.    And so I guess my question is are there cases, and obviously based on what you just said, are there cases where you are consulted but don't provide testimony?

A.    Absolutely.  In fact, that's more common than not.

Q.    And that is sometimes in the cases where you work for the defense?

A.    It could be -- yes.  For anyone.

Q.    And on occasion that's because you don't have information that's helpful for the defense?

A.    Or the prosecution.  That may be true that the retaining counsel feels that they don't wish to use my testimony or the content of my

USCA5 5137

Jan Leestma                                                    January 10, 2011

92

opinion for what they do.  Or the case gets settled, pled out, otherwise goes away so I never end up testifying.

Q.    In this particular case when you were retained by Mr. Bourgeois's defense team you were not asked to opine on the credibility of any lay witness; is that correct?

A.    No.

Q.    Were you asked to opine on the credibility of any witness?

A.    No.

Q.    What were you asked to do, just repeat it, please.

A.    To simply try to figure out what happened to this child and if possible to put it against the time frame.  When.

Q.    Let me ask you to take a look at the autopsy report, which I don't have in front of me. I don't know what the exhibit number is.  Actually, the autopsy report was not marked.

A.    No.

Q.    But you made reference to it earlier.

MR. ABREU:  Mr. Roberts, do you have a copy of the autopsy report, Dr. Rouse's?

USCA5 5138

Jan Leestma                                    January 10, 2011

93

MR. ROBERTS:  I do.

BY MR. ABREU:

Q.    Let me ask you, Doctor, what date is the autopsy that occurred in this particular case, if you look at --

A.    The autopsy was done on 29 June 2008.

Q.    Okay.  So earlier when Mr. Roberts was asking you about your report which indicates that the autopsy took place in July and that the child was alive in July, is that an error on your part?

A.    Well, I'm confused.  The events on the naval base and so forth were reported to me to be in July.  The autopsy obviously can't antedate that, so I don't know which is correct.  I mean, the 28 June time of death, and I have it in my mind and records that it's 28 July.  So somebody's wrong.

Q.    Does that make any difference regarding your conclusions in this particular case?

A.    No.  That -- it's simply an error somewhere, maybe on my part.

Q.    Assuming the facts as described to you by the government in terms of what happened on the military base as testified to at the time of trial regarding the child being hit against the truck, the

USCA5 5139

Jan Leestma                                    January 10, 2011

94

window of the truck as described by the government, if it did happen as described, and assuming that to be true, does that change your opinion about the cause of the death in this particular case?

A.    No.

Q.    Does that change your opinion about the age of the processes that led to the cause of death in this particular case?

A.    No.  I can't do any better than what I've done.  And it doesn't change anything.

Q.    And when you say you cannot do any better, is there something that another pathologist can do better?

A.    I seriously doubt it.

Q.    And why is that?

A.    I don't know anyone who has a magical formula to break down into smaller increments this two- to three-day acute injury scenario.  Red blood cells just don't change over that period of time. It's at the three-day mark and beyond that they begin to undergo some changes.  The inflammatory reactions that can occur with an impact to the scalp, or any other place, are so variable between individuals that I know of no reliable reproducible

USCA5 5140

Jan Leestma                                        January 10, 2011

95

scale that someone can use.  That means they may have opinions on this matter, but I don't know of any reliable method that can sharpen our razor, so to speak, or turn up the power of the microscope to answer these kinds of question.

Q.    Okay.  Let me just ask you very briefly about the thrombosis and the infarct that the government also asked about and we asked about.  Are those two different things, because I'm confused a little bit about that?

A.    Well, I think they're linked up.  In other words, the -- by looking at the clot I can't tell you what it did except where it is, it's the sagittal sinus, and there are then corresponding lesions in the cerebral cortex that show a necrotizing or infarctive process that is in the process of resolving itself, of healing.  There are inflammatory cells there, there are capillaries that are proliferating.  Those things take time and that's where I'm coming back to this time frame of a week or two weeks' duration of some of these injuries.

Q.    And, again, is that one of the sources of the intracranial pressure that you describe?

USCA5 5141

Jan Leestma                                          January 10, 2011

96

A.    Yes.

Q.    The government asked you about Dr. Benton's testimony, if you recall reading Dr. Benton's testimony.

A.    I must have.  I simply can't play it back for you right now.  I'm not sure what's in it.

Q.    If the record reflects that Dr. Benton performed a sexual assault -- he did an examination -- let's say he just did an examination for sexual assault on the child.  Would you expect him to have done any testing for -- to identify a thrombosis as you've described during the course of a sexual assault examination?

A.    That would not normally be a part of it. If there were any suspicion of a bleeding disorder, bruisability, blood clots some place, of course it would have been appropriate.  But for the context you're talking about I would not expect him to do that.

Q.    The government asked you about whether you were aware that the autopsy took place a day after she died, I think was the question.  When do these processes that we see, the healing and changes that we see and that you've testified about, when do

USCA5 5142

Jan Leestma                                              January 10, 2011

97

they stop occurring?

A.    They basically stop within a short, a very short period of time after the heartbeat ceases and the pulse is gone and there is no blood pressure anymore.

Q.    At the time of death?

A.    Yeah.  I mean, we argue about what is the time of death.  Well, basically it's when the brain dies.  But in the clinical sense when the heart ceases to function and there is no resuscitation or artificial support for that, that's the time of death.  At that point cellular processes wind down over a period of minutes or hours.  And then the body is usually refrigerated, which stops virtually everything else.  So the delay of a couple of days in an autopsy probably has little or no meaning for the questions we're trying to answer here.

Q.    And, lastly, the government asked you regarding whether a child who had suffered an injury that led to this type of subdural hematoma could have acted normally for several days before dying.  Is that possible?

A.    Sure.  A subdural hematoma is

USCA5 5143

Jan Leestma                                                    January 10, 2011

98

essentially silent until some volumetric change occurs that overrides the ability to compensate for it and/or the volume gets large enough that the child can't compensate anymore.  And I don't think either of those processes are evident in this particular case.  So a child can have a subdural, be cranking along as far as anybody knows completely normally, and when symptoms appear it's due to volumetric change far exceeding what we see here.

MR. ABREU:  That's all I have.

RECROSS-EXAMINATION

BY MR. ROBERTS:

Q.   First of all, Doctor, I want to ask about your report.  I guess you had -- you had a portion of your report completed by December 15th and I think you testified earlier that you had given that report to the public defender?

A.   Yeah --

Q.   The December 15?

A.   -- my first draft was December 15, but it clearly didn't have the brain slides, I didn't have autopsy photographs, I think, and therefore in that report I said this is an interim or, what shall I say, a tentative report and I reserve the right to

USCA5 5144

Jan Leestma                                    January 10, 2011

99

then append it later when I have this information.

Q.   And did you make any conclusions in that report?

A.   I probably did.  They're very similar to what we have here.  I was making use of Dr. Hallet's verbal descriptions of what she said she found in the subdural hematoma as to age.  I had said in that draft I can't confirm these things because I haven't looked at the slides yet, and when I did then obviously I could and no disagreement there.

MR. ROBERTS:  As an aside, I'm going to request that the defense provide a copy of the report that was submitted on December 15 since the only report I've received to date was the one given to us on Friday, January 7.  So I will request that on the side.

BY MR. ROBERTS:

Q.   Moving on to the second issue.  I want to ask you, we went over this list.  I also have a very lengthy list and several pages of cases you've testified in.  Do you make the same amount per hour on each case that you testify on?

A.   No.

Q.   What is your normal rate per hour?

USCA5 5145

Jan Leestma                                    January 10, 2011

100

        A.      My rate that I quote people without any

other negotiation or any other information is

out-of-court work, case preparation and all of that

$400 per hour, sworn testimony $600 per hour.  That

is subject to negotiation and sometimes limitation

by whoever is retaining me.  There may be a

government limit, there may be a cap, or whatever it

is.  At that point I chose then to decide whether

I'm going to do it under those circumstances or not.

Occasionally I will do a pro bono case with no

recompense at all.

        Q.      Let me ask you about -- I want to go

back to the autopsy.  And I notice there is a -- you

all mentioned the -- referencing the autopsy report

and the report by the neuropathology consultation.

I noticed that the date of the cut of the

neuropathologist was not until July 1?

        A.      That's what it says, yes.

        Q.      Would -- if the brain had been cut on

any earlier or closer to the date of actual death

would that have revealed anything different than

what you found out later on?  Would it be better to

have it cut earlier?

        A.      Actually this is sort of quick.  If in

USCA5 5146

Jan Leestma                                            January 10, 2011

101

fact the autopsy was done on the 29th, this mean the brain was cut a couple days later.  That usually means that it didn't have a chance to fix in formaldehyde very long.  Usually I would expect it to be two, three weeks, or a month later.  I don't know why it occurred in this case, but never mind that, it did.

Q.    Okay.  But that doesn't change the -- by getting it quicker doesn't change any of your ability to assess the -- whether it's acute versus chronic and which one --

A.    No, that wouldn't affect this at all. Those processes stop when the child died and nothing would really change that.

Q.    One last question, and that goes back to Dr. Benton.  I know you don't recall all of the testimony that he provided, but on Page 29 of his testimony he states that he gave a physical exam that is a head-to-toe physical -- he gave a physical exam and his physical exams are head-to-toe physical exams.  Now, does that sound like to you that it's just a sexual assault examination?

A.    I don't know.  I don't know what he -- you know, what would be a normal so-called sexual

USCA5 5147

Jan Leestma                                        January 10, 2011

102

assault exam.  I would imagine any physician would be ill-advised to simply look through the drinking straw at the only thing there.  They should do a physical exam of the child, and how extensive it is I can only speculate.  But he must have examined this child a little bit more than simply the genital area.

Q.    Okay.  With your experience on the Juvenile Protection Association of Chicago, I mean, have you seen children that have been brought in where alleged negligence is involved, do the physicians just limit their examinations of those children?

A.    Well, I'm not usually involved on the day-to-day cases that come through except as they might be presented at a conference or, you know, when the board meets and an ideal case is presented or a recent one is presented.  So I don't know what the normal ebb and flow of those things is.

MR. ABREU:  It's probably a little unfair since you're not a pediatrician, so I'll pass the witness.

THE WITNESS:  I am not a pediatrician, never have been.

USCA5 5148

Jan Leestma                                              January 10, 2011

103

MR. WISEMAN:  Would you like to be?

THE WITNESS:  Never will be.

MR. ABREU:  Mr. Roberts, we have no further questions on this side either.

MR. ROBERTS:  All right.  We're -- we don't have any further questions either.  Correct, Mark?

MR. ABREU:  We'll see you on Thursday.

MR. ROBERTS:  All right.

MR. ABREU:  Thank you, Mark.

THE VIDEOGRAPHER:  Going off the video record at 2:59 p.m.  This is the end of Tape No. 2.

FURTHER DEPONENT SAITH NAUGHT.

USCA5 5149

Jan Leestma                                              January 10, 2011

104

STATE OF ILLINOIS )

) SS:

COUNTY OF C O O K )

I, ANNE E. FOGARTY, a Notary Public within and for the County of Cook, State of Illinois, and a Certified Shorthand Reporter, CSR No. 84-3870, of said state, do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was reported stenographically by me, was thereafter reduced to typewriting under my personal direction and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken before me at the time and place specified;

That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my

USCA5 5150

Jan Leestma                                              January 10, 2011

105

hand of office at Chicago, Illinois, this 11th day

of January, 2011.




                    Notary Public, Cook County,

                    Illinois.

                    My commission expires 7/31/12.



CSR Certificate No. 84-3870.

USCA5 5151

Jan Leestma                                    January 10, 2011

                                                             106

                              EXAMINATION

  WITNESS                              EXAMINATION

  JAN E. LEESTMAN, M.D.

        By Mr. Abreu                        5

        By Mr. Roberts                      52

        By Mr. Abreu                        89

        By Mr. Roberts                      98


                          E X H I B I T S
  NUMBER                          MARKED FOR ID

  Defendant's Deposition Exhibit

        Exhibit No. 1                       6

        Exhibit No. 2                       14

        Exhibit No. 2A                      15

        Exhibit No. 3                       35

        Exhibit No. 4                       38

        Exhibit No. 5                       38

        Exhibit No. 6                       90

USCA5 5152

Jan Leestma

January 10, 2011

107

```
         A

A.D
1:19

ABCs
75:9

ability
98:2 101:10

able
32:5 49:6
55:21 66:6
74:10 77:14
86:10 87:1

abnormality
87:17

ABREU
2:18 4:17
5:4,9,15 6:3,
10,14,17,20,
23 7:1 12:16,
22 13:2,3
14:18,22
15:2,7,12,18
16:6,10
20:11,15,22
27:2 28:21,23
35:16,23
36:2,9,14
38:11 39:1,
16,19 40:4,
11,18,19
41:6,7 42:9,
14 43:6,7
47:8,10
51:13,16,18
53:24 54:7,13
71:6,11,18
73:21 78:18
80:6,16 86:13
87:4,6 89:9
90:4,5,15,22
91:1 92:23
93:2 98:10
102:20 103:3,
```

```
7,9 106:4,6

absolute
70:3

Absolutely
15:7 42:1
48:17 80:16
84:2 91:15

absorption
44:2

abuse
55:2 57:24

abused
11:22 58:23

academic
10:3

Academy
11:12

acceptable
47:6

accepted
78:24 79:1

accident
46:20 77:2

accidental
76:16,20
77:15

account
47:14 68:8
70:3,12 75:16

accounts
64:21

accurate
61:16 69:19
88:3

accurately
48:12

accused
61:6,12

acknowledge
66:11,20

acted
```

```
97:22

acting
59:7

action
104:23

activated
37:9

activities
9:7 31:4

activity
52:17

actual
31:17 34:13
39:13 41:22
58:18 66:19
100:20

acute
22:6,12,17,
18,21 23:9
50:20 51:9,11
65:22 66:2,23
81:2 88:8,23
94:18 101:10

add
12:15 23:15
28:10

adding
68:9

additional
18:7,16 28:12
49:11 80:11,
12

additive
45:7

address
40:9

adds
28:12

adduced
59:13

adjudication
61:7
```

```
advantage
56:19

affect
101:12

Affidavit
17:2

affiliation
11:14

affiliations
4:15 11:6

AFIP
8:1

afternoon
4:1,17 5:16

age
30:21 32:2,5
33:20 34:24
35:2 37:15
49:2 68:19
75:22 80:22
94:7 99:7

aged
31:21 41:20
48:10,12

agency
11:20

aging
31:6,13,20
50:19 61:4

ago
37:17 54:9
70:5

agree
46:20 58:14
62:4 64:1
65:13

ahead
34:15 40:17
71:12

Air
7:21 8:4 48:5
```

```
airline
16:1

Akhtar
16:20 45:14

A-k-h-t-a-r
16:20

Albert
7:18

ALFRED
1:7 4:5 13:5
69:7

alive
88:12 93:10

alleged
102:11

allegedly
73:2

along
42:23,24 98:7

already
48:10

ALSO
3:1 9:7 11:11
20:11 33:12
34:16 43:8
46:4 57:10
68:20 71:11,
18 73:10
75:23 85:1
95:8 99:19

altered
28:14 77:22

AMERICA
1:4 4:5

American
11:8,11

amount
99:21

analysis
14:5

anatomic
```

USCA5 5153

Jan Leestma                                              January 10, 2011

108

| | | | | |
|---|---|---|---|---|
| 7:14 | **Apparently** | 33:24 65:12 | **asks** | **attest** |
| **and/or** | 39:7 55:20 | **argue** | 71:19 | 15:2 |
| 17:15 70:19 | 79:22 | 63:22 65:16 | **aspect** | **Attorney** |
| 98:3 | **appeal** | 97:7 | 60:1 61:5 | 17:9 55:1 |
| **anecdotal** | 16:14 | **argument** | 66:2 | 104:20,21 |
| 64:10 | **appear** | 62:20 63:9 | **aspects** | **ATTORNEY'S** |
| **Ann** | 98:8 | **Armed** | 32:7 62:5,10 | 2:2 |
| 7:10 | **appeared** | 7:22 | **assault** | **author** |
| **ANNE** | 2:9,22 66:21 | **Army** | 75:1 96:8,10, | 60:9 |
| 1:15 3:22 | **appears** | 7:23 | 13 101:22 | **authoritativ** |
| 4:12 104:4 | 39:12 41:17 | **around** | 102:1 | **e** |
| **another** | 78:19 82:15 | 52:9 68:14 | **assaulted** | 70:4 |
| 21:12 27:12 | **append** | 75:9 79:4 | 68:2 75:6 | **authors** |
| 60:1 63:13,14 | 18:5 99:1 | 85:4 | **assess** | 10:24 |
| 69:2 71:20 | **appended** | **arrival** | 49:19 101:10 | **autopsies** |
| 72:16 81:10 | 14:4 17:19 | 51:6 | **assessment** | 52:24 53:2,9, |
| 84:6 94:12 | **apply** | **arrived** | 68:4 | 11 60:10,17 |
| **answer** | 68:5 | 47:16,17 | **assign** | **Autopsy** |
| 41:9 42:3 | **appropriate** | **arterial** | 33:8 | 16:23 17:3,7 |
| 49:4 53:6 | 64:11 65:21 | 27:7 46:9 | **assigned** | 18:9 25:21 |
| 61:23,24 | 96:17 | **artifact** | 7:22,24 | 31:17 61:22 |
| 63:20 71:7,23 | **approximated** | 14:15 | **assistance** | 65:6,9 70:2 |
| 74:23 95:5 | 21:10 | **artificial** | 67:23 | 73:8 77:21 |
| 97:17 | **approximatel** | 97:11 | **assistant** | 81:9 88:9 |
| **answered** | **y** | **aside** | 8:15 9:23 | 92:18,20,24 |
| 89:18 | 36:23 47:23 | 99:11 | **associate** | 93:4,6,9,13 |
| **answers** | **April** | **asked** | 9:1,4,13 | 96:21 97:16 |
| 43:9 | 16:21 | 13:4,8,10 | **Association** | 98:22 100:13, |
| **antedate** | **arachnoid** | 25:4 46:1 | 11:9,15 58:22 | 14 101:1 |
| 93:13 | 21:13,21,22 | 50:2 53:19 | 68:21 102:9 | **available** |
| **antedates** | **arbitrarily** | 54:11 60:22, | **assuming** | 17:21 32:4 |
| 49:24 50:8 | 23:16 | 23,24 61:8 | 74:13 93:21 | 55:21 |
| **anybody** | **arbitrary** | 81:6 86:14 | 94:2 | **aware** |
| 61:23 98:7 | 22:5,21 23:17 | 89:11,19 | **attached** | 41:24 43:3 |
| **anymore** | **Arbor** | 90:3,6 92:6, | 32:21 | 69:3,6,12 |
| 12:23 28:12 | 7:10 | 9,12 95:8 | **attend** | 72:22 73:1 |
| 84:7 97:5 | **area** | 96:2,20 97:19 | 83:3 | 87:10 96:21 |
| 98:4 | 63:10 68:15 | **asking** | **attendant** | **B** |
| **anywhere** | 80:20 102:7 | 36:10 54:16 | 27:19 | |
| 32:24 40:10 | **areas** | 63:4 82:15 | **attended** | **B** |
| **apart** | | 85:23 87:3 | 7:8 9:8 | 106:9 |
| 68:11 | | 93:8 | | **back** |
| | | | | 8:22 25:7 |

USCA5 5154

Jan Leestma                                          January 10, 2011
                                                               109

26:22 28:4 30:16 37:4 46:1 51:22 68:14,18 76:11 81:13 85:7 87:24 95:20 96:6 100:13 101:15

**background**
7:3,4

**backup**
46:11

**backward**
72:7

**backwards**
75:18

**base**
47:16 48:22 49:16 50:6,16 51:6 73:2 75:9 79:11 81:8 88:6 93:12,23

**based**
37:16 41:2 50:11 69:19 91:12

**bases**
40:13

**basically**
13:10 21:4 27:24 72:22 84:10 89:3 97:2,8

**basis**
9:21 28:3 40:13 52:20 86:20

**beaten**
88:19

**Beckett**
16:20

**B-e-c-k-e-t-t**
16:20

**becoming**
67:21 79:15

**bed**
28:1

**began**
30:11,21

**beginning**
39:22 51:23 76:13 88:16

**behalf**
2:10,22 4:18,19

**being**
4:6,9 8:3 21:5 27:24 41:24 55:21 59:12 68:13 81:7 89:19 93:24

**belief**
81:15

**believe**
25:24 30:15 45:6 46:15 63:13 73:5,6 82:1,6

**beneath**
19:21 21:11,24

**Benton**
16:17 85:13, 16,24 86:18 87:10 96:7 101:16

**Benton's**
85:8 86:1,21 96:3,4

**beside**
30:13

**best**
34:24 57:10

**better**
50:21 82:12 94:9,12,13 100:22

**between**
21:16,19 52:19 83:12 94:23

**beyond**
86:13 94:20

**big**
64:18

**biology**
7:8

**bit**
8:11 26:1 34:15 95:10 102:6

**bits**
69:23

**black**
43:20 44:11

**bleed**
49:10

**bleeding**
27:1 45:10, 11,14,18 46:16,17,24 51:10 66:12, 20 68:17 84:10,11 96:15

**block**
33:7

**blood**
19:21,23 21:2,15,23 26:21 27:7, 10,14,17 28:14 29:10

31:21 32:11, 12,13,15,23 33:1,17,19 34:5 37:5,8, 10 41:16,20, 21 46:8,12 48:11,12,14, 21 49:2 50:23 82:23 83:17, 20 84:13,24 85:2 94:18 96:16 97:4

**blow**
74:8,17

**blunt**
19:18

**board**
12:2 59:3 102:17

**body**
24:17 27:8 37:6 97:14

**bono**
100:10

**book**
10:17,20,22 11:1 60:8,11

**Booth**
16:16

**both**
10:7,10 15:10 16:6 33:13 38:20 43:16 51:9 53:19 54:20 55:3 84:12 88:23

**bottom**
64:12 82:19

**BOURGEOIS**
1:7 4:5,18, 20,22 13:6 16:15 47:15 69:8 73:11

**Bourgeois's**
92:5

**Brain**
17:7 18:9 19:22,23 21:3,8 24:5,6 26:9,21 27:1, 9,18,23 28:2, 12,14 29:10 31:22,23 41:14 43:15, 17,21,23 44:12,15,16 80:21 82:5 97:9 98:21 100:19 101:2

**branch**
8:1,2

**break**
51:14 94:17

**breathe**
28:11

**breathing**
67:22 68:11

**brief**
7:2 52:18

**briefly**
24:9 50:18 95:6

**bring**
37:7

**Bronx**
7:19

**brought**
81:7 102:10

**bruisability**
96:16

**bruises**
63:15

**bruising**
51:7

**Building**

USCA5 5155

Jan Leestma                                                    January 10, 2011
                                                                           110

2:14

**bunch**
31:3

**Burgess**
16:17

**business**
50:1,3,9
60:14 82:19

_____ C _____

**C**
104:3

**cab**
69:11 75:12
88:22

**call**
18:14 21:20
29:16 90:19

**called**
1:11 5:12
10:17,22
21:7,13 22:1,
15 37:11
47:20 53:23

**calls**
71:11

**came**
8:14,22 30:2
48:15 50:23
55:2

**Canada**
12:7

**cannot**
16:3 46:24
48:12,20 49:8
66:23 74:2,4
76:11,15,19
77:11 94:11

**cap**
100:7

**capable**
45:5

**capacity**
10:5 13:13

**capillaries**
95:18

**capillary**
28:1

**Capital**
2:13

**captain**
7:21

**car**
46:20 47:2

**card**
21:9

**care**
42:15

**career**
8:6 52:23

**careful**
70:5

**Case**
4:7 13:5,9,
11,14 14:5,6
16:13 22:2
23:20 25:10
31:1,17 32:3
39:22 43:24
45:18 46:18
47:15 49:15
55:2,7,18,23
56:2,9 57:4,
22 58:19
60:23 61:2,5,
8,17,21 62:6,
7 63:6 65:1
70:18 74:1
77:6,12,18
85:6 88:19
89:12 91:9
92:1,4 93:4,
18 94:4,8
98:6 99:22
100:3,10

101:6 102:17

**cases**
10:6,9 53:17,
21 54:2,4,6
55:14 56:7,
12,14,21
57:2,12,13,
19,24 58:6,9,
11,15,17,23
61:11 62:17
67:18 90:6,21
91:2,3,5,12,
13,17 99:20
102:15

**catch**
86:11

**catheter**
85:5

**catheters**
85:2

**cause**
19:7,8,19
23:20,23 24:1
25:8 28:6,14
30:18 44:22
45:3,17 46:24
49:14 64:7
68:6 69:22
70:23 76:14
81:15 82:3,4
83:8 86:16,
17,19,21,23
94:4,7

**caused**
24:8 25:9
34:5 38:6
39:14 62:10
66:7,24
75:14,20

**causes**
26:6 46:11
62:12 81:19,
20

**causing**
24:3

**cavity**
46:6

**ceased**
52:17

**ceases**
97:3,10

**cell**
32:14 50:23

**cells**
32:13,24
33:19,21
37:7,8 41:21
94:19 95:18

**cellular**
32:17 37:13
97:12

**Center**
7:13,23 17:4

**centimeters**
63:10

**cerebellar**
36:21

**cerebral**
26:10 27:1,20
36:19 37:22
38:8 43:19
44:2,13,14
47:3 51:5
95:15

**certain**
5:23 13:23
15:14 35:12
38:15 42:1
83:6 90:11

**certainly**
28:9 33:23
45:5 47:1
63:9 68:7
82:6

**Certificate**

105:10

**Certified**
1:17 104:6

**certify**
104:7

**chance**
56:23 101:3

**change**
18:6 83:23
94:3,6,10,19
98:1,9 101:8,
9,14

**changed**
42:12 60:17
61:23 70:2
77:23

**changes**
14:16 62:13
94:21 96:23

**channel**
26:18

**character**
33:23

**characterist
ics**
23:4

**checking**
52:14

**chemical**
37:6

**chemistry**
7:8

**Chicago**
1:19 4:10
8:14,22 9:3,
12 11:15
52:15 58:23
102:9 105:1

**chief**
8:16,24

**child**

USCA5 5156

Jan Leestma                                            January 10, 2011
                                                                    111

17:6 19:12,13 24:1 28:11 31:1,2 43:15 45:8,11,22 50:5,14,24 51:4,6 55:2 57:24 59:12,15,19,20,22 60:5 66:21 67:17,19 68:10 69:8,10,15 73:16 74:8,10,17 75:8,12,19 79:13,18,20,21,24 80:3,9 81:7,10 83:7,8,15 84:3,5,16,17,20 85:17,18 86:3,10,12 87:11,15,16 88:4,19,21 92:15 93:9,24 96:10 97:20 98:4,6 101:13 102:4,6

**children**
11:22,24 58:24 84:20 102:10,13

**Children's**
8:23 39:2,6 52:19 53:8

**child's**
50:7 68:14 69:9 73:12 75:2,3,6,11 78:20 79:9 82:4 84:18

**chose**
100:8

**Christi**
48:5

**chronic**
22:7 23:8 48:9 49:10 51:9 65:22 66:3 68:21 81:1 88:7,23 101:11

**Chrz**
16:19,23

**C-h-r-z**
16:19,23

**circulation**
24:5 26:22 28:13

**circulatory**
29:8

**circumstance**
27:17

**circumstances**
74:17,20 100:9

**Civil**
1:13 56:13,22 57:22

**clarifies**
43:5

**clarify**
20:11 34:8 77:17 83:24

**clarity**
90:22

**clear**
21:6,18 42:5,10

**clearly**
51:5 98:21

**Clinical**
10:23 83:20 97:9

**clinically**

30:23 45:15 84:23

**close**
11:10

**Closed**
65:12

**closer**
58:7 100:20

**closing**
52:12

**clot**
31:21 32:11,12,14,15,18,19 33:1,18 34:13 37:10 41:20 50:23 82:19,23 95:12

**clots**
96:16

**clotting**
26:10,23 84:11,13

**coagulation**
83:2,18 87:17

**coagulophathic**
84:22

**coagulopathy**
82:17 83:19 84:6,11

**collapse**
50:4

**collected**
60:14

**collecting**
19:23 21:2,16

**collection**
19:21

**collective**
63:18

**college**
7:6,7,18

**colloquially**
43:17

**color**
43:20

**Colorado**
7:12,16

**comatose**
24:3 84:21

**come**
18:11 55:14 64:14 75:24 77:13,14 81:12 85:2 102:15

**comes**
27:15,23 37:16 61:17 64:18,19 75:17 83:17

**coming**
26:19 46:8 52:22 95:20

**commencement**
104:8

**comments**
30:12

**commission**
105:7

**common**
26:15 62:16 91:15

**COMMUNITY**
2:12

**company**
65:15

**compare**
14:19 15:6

**compartment**
37:5

**compartmentalized**
27:24

**compensate**
98:2,4

**complete**
18:19 70:13 72:2

**completed**
7:19 18:15,22 98:15

**completely**
41:16 43:21 70:4,12 98:7

**completion**
17:10

**complications**
27:19

**component**
25:13 28:16 33:3 43:2 48:9 49:19 50:20 51:4 66:23 68:21

**components**
23:3 48:8 51:9

**compound**
48:15

**computer**
38:21

**concentrated**
10:4

**concerning**
104:10

**conclude**
50:14

**conclusion**
19:16 40:13 75:13

USCA5 5157

Jan Leestma                                                    January 10, 2011
                                                                          112

conclusions
82:16 93:18
99:2
condition
78:20 79:9
conditions
19:12
conducting
64:3 77:8
confer
87:20
conference
102:16
confining
77:20
confirm
99:8
conflict
55:21
confronted
80:11
confused
72:18 93:11
95:9
consequence
45:21 46:7
76:1
consequences
24:3
consider
26:9 60:11
73:18
considerable
58:17
considered
72:15
considering
67:4
consistent
6:19,22 36:4,
5 48:3

constituents
37:13
constitutes
104:15
consult
13:4
consultant
5:19 8:10
9:23 56:4
consultation
100:15
consulted
91:13
consulting
9:24 10:4
35:21 56:12
contact
52:15
contain
41:21
contained
38:21 86:6
contains
32:12 33:10,
11
contemporane
ous
30:12
contemporane
ously
5:6
content
87:13 91:24
context
96:17
continue
74:11
Continued
8:17
contradicts

87:2
contributed
66:24
contributing
10:24
contribution
10:22
contusion
37:22 38:5
conviction
83:14
convolutions
44:11
Cook
1:16 9:21
104:5 105:5
copy
6:11,12
14:19,24 15:8
17:8 30:9
35:23 39:17
42:18 92:23
99:12
Corps
7:21 8:4
Corpus
48:5
correct
5:7,8 10:11
11:16 17:16
19:3 21:23
29:5,14 33:15
35:11 38:12
52:11 55:9
56:18 57:5,9
62:11 66:9
70:13 72:2
74:14 76:17
80:13 81:17,
23 85:20
88:13,17 90:9
92:7 93:14
103:6

correctly
61:9
correlate
68:23
correspondin
g
95:14
cortex
95:15
couch
42:3
couldn't
28:11 50:22
Counsel
4:14 87:20
89:20 91:23
104:20,21
count
12:6 78:1
County
1:16 9:21
104:3,5 105:5
couple
18:12 39:13
47:11 49:7
50:22 52:13
55:13 63:10
76:8 81:3,9
97:15 101:2
course
9:7 31:23
59:21 66:13,
15 88:20
96:12,16
COURT
1:1 4:6,12
12:6 59:7,8
Courts
1:13 11:24
covered
89:14

covering
19:22
cranial
43:21 46:5
cranium
62:9 82:5
cranking
98:7
crash
47:2
Cr-C-02-216
1:5 4:7
create
72:8
created
90:20
credibility
71:17 92:6,10
criminal
56:13,21
57:6,14,24
critical
49:4
C R O S S -
EXAMINATION
52:4
CSR
1:17 3:22
104:6 105:10
CT
17:6 18:11
31:11 38:21
39:5,24 40:8,
22 42:22
44:20,23 45:4
culminate
56:8
culminated
91:10
curious
58:21 59:9

USCA5 5158

Jan Leestma                                              January 10, 2011
                                                                     113

60:1

**current**
6:9 60:19

**currently**
5:17 10:9
55:12

**curriculum**
6:9

**Curtis**
2:14

**cut**
100:16,19,23
101:2

**CV**
11:14 52:7,15
53:16 54:12,
14 58:21

**Cv-07-223**
1:6 4:8

**D**

**danger**
59:21 60:6

**dangerous**
83:16

**dashboard**
73:15

**date**
14:16 16:5
18:21,22
30:20 32:2,5
35:21 38:23
49:2 89:21
93:3 99:14
100:16,20

**dated**
6:20 14:6,8
31:21 48:10,
13

**dates**
15:3 52:14
72:24

**dating**
31:7,13,20
50:19 61:4
89:12,24

**day**
1:19 47:21
60:3 81:8
88:9,10,12
96:21 105:1

**days**
19:11 22:19,
22 23:1,6
25:3 32:19,24
33:2,20 34:1
35:4 48:10,
13,19 49:8
50:1,9,22
51:1 66:22
74:21 75:7
80:22 81:3,9
89:17 97:16,
22 101:2

**days'**
36:23 37:23

**day-to-day**
102:15

**DC**
7:24

**dead**
24:6

**deal**
77:20

**dealing**
28:7

**dean**
9:5

**Death**
10:22 19:7,8,
11,19 23:21,
24 24:1 25:9
27:18 33:1,20
34:1 48:14
49:14 50:7

61:14 62:16
64:8 66:24
68:6 69:22
70:23 75:14
81:15 83:8
86:16,17,19,
21,23 87:14
93:15 94:4,7
97:6,8,12
100:20

**decedent**
13:12

**December**
17:20,24
98:15,19,20
99:13

**decide**
100:8

**decompensate
d**
28:11 67:10,
13 79:10

**decompensate
s**
67:18

**decompensati
ng**
67:21 79:15

**decompensati
on**
29:6 50:5
87:14

**decompositio
n**
67:9

**decreased**
58:9

**defendant**
56:23 61:12,
15 69:7 80:4

**Defendant's**

5:24 13:24
15:12,15,21
16:7 17:15
18:14,15
35:13 38:12,
13,16 90:12
106:11

**DEFENDER**
2:12 98:17

**Defense**
6:5 10:7,10
13:21 35:18
53:20 54:20
56:17,21
57:3,7,12,
15,21 58:1
89:20 90:8,17
91:18,21 92:5
99:12

**define**
23:16 74:16

**defines**
23:16

**definitions**
22:20

**degenerate**
32:14

**degree**
7:11 9:10

**dehydration**
83:18

**delay**
81:11 97:15

**delineate**
10:15

**delta**
41:19

**demonstrable**
84:5

**density**
41:16 43:1,20

**Denver**

7:13

**Department**
11:24

**depending**
25:4

**depicted**
44:9

**DEPONENT**
103:12

**deposition**
1:11 3:3 4:4,
9 5:24 13:24
15:15 35:13
38:16 90:12
104:12,17
106:11

**depositions**
1:14

**describe**
24:9 25:18
43:13 44:7
45:23 50:18
65:22 95:24

**described**
21:24 29:13
34:19 38:2
45:14,15
49:17 93:21
94:1,2 96:12

**descriptions**
99:6

**descriptive**
12:15

**designation**
22:21 23:18

**designations**
22:6

**desired**
31:14

**destroyed**
24:5

**detailed**

USCA5 5159

Jan Leestma                                            January 10, 2011
                                                                   114

84:15

**details**
62:7

**detected**
87:18

**deteriorated**
32:15 78:20
79:9

**determinatio
n**
68:4,6 69:21
70:21,22

**determinatio
ns**
73:20

**determine**
13:11 23:20,
23 60:24 77:1
86:15

**determined**
25:8 76:11,
15,19

**develop**
22:13

**developed**
22:12

**device**
24:13

**diagnosis**
22:21 36:17

**diameter**
63:11

**didn't**
14:17 33:7,8
53:16 58:11
74:3 88:7
98:21 101:3

**died**
47:23 50:14
62:2 66:21
96:22 101:13

**Diego**
55:1

**dies**
27:11 62:8
88:9 97:9

**difference**
16:4 18:6
22:9 93:17

**different**
15:3 22:3,16,
20 23:2,4
28:3,16 30:22
38:5 52:8,14
61:15 80:8
95:9 100:21

**difficult**
63:16,23 66:6
72:9 88:18,24

**difficulty**
41:24

**dire**
12:20,22 13:1

**DIRECT**
5:14 11:20
16:14 59:5,10
60:21

**direction**
104:14

**directly**
47:5 59:2
104:22

**director**
9:14

**directors**
12:2 59:3

**disadvantage**
64:3,7

**disagree**
35:5,8

**disagreement**
99:10

**discharged**
8:3

**disciplines**
22:19

**disclaimer**
18:3

**disclosed**
55:15

**disclosures**
54:3,8 90:24

**discounted**
81:22

**discovered**
50:5

**discuss**
82:19

**discussed**
48:10,16

**discussion**
34:9

**disk**
17:6 38:21
39:14

**disorder**
83:1,17
84:10,12
96:15

**disparity**
64:17

**displayed**
31:2

**dissimilar**
61:18

**dissolve**
37:10

**DISTRICT**
1:1,2,13 4:6,
7 55:1

**disturbed**
12:1

**division**
9:5

**doctor**
7:10 16:11
20:23 28:20
40:20 41:8
42:6 43:8
45:16 47:12
50:11 68:9
70:8 71:19
84:16 85:13,
16,22 86:11,
14,24 93:3
98:13

**document**
5:23 6:6,8
13:22,23
15:3,5,14,
20,22 35:12,
19 54:24
90:11,18,23
91:3

**documents**
16:6 38:14,15
58:16 73:8

**doesn't**
27:9 41:20
44:4 60:17
87:13 94:10
101:8,9

**doing**
5:21 7:14
60:16,18
77:11 84:23

**doubt**
79:3 94:14

**DOWD**
2:8 5:1 78:15
82:11

**down**
13:17 19:14
20:4,12 22:11
30:9 37:21

72:13 76:10
77:24 78:1,11
94:17 97:13

**downstream**
32:21

**Dr**
4:4 5:16 7:2
12:17 13:4
15:8,19
16:17,18,19,
20,23,24
17:1,3,9
19:2,15 20:1
24:23 33:13
35:6,9,21
36:5,15 39:21
45:14 46:14,
20 52:6 64:24
85:8,13,16,
24 86:1,18,
21,22 87:10
88:3 89:14
92:24 96:3,4,
7 99:5 101:16

**draft**
98:20 99:8

**draining**
26:21 27:14

**drank**
80:9,10

**drawing**
56:6

**drill**
24:11

**drink**
80:3,12

**drinking**
102:2

**Driscoll**
39:2,5

**driving**
44:18

USCA5 5160

Jan Leestma                                                    January 10, 2011
                                                                          115

**drunk**
79:22
**due**
26:9 38:7,8
68:24 69:1
98:8
**duly**
5:2,12 104:9
**dura**
19:24 21:3,5,
7,13,19 22:1
26:19 32:11
33:10 37:7
**dural**
19:22
**duration**
22:8 23:14
36:23 37:23
95:21
**during**
5:6 48:16
52:23 53:7
96:12
**dying**
74:19 81:7,8
97:22
**dynamic**
62:14

— **E** —

**E**
1:11,15 3:22
5:11 104:4
106:3,9
**Each**
22:19 34:15
99:22
**ear**
63:13 68:15,
19
**earlier**
24:23 53:17
54:19 67:9

81:5 92:22
93:7 98:16
100:20,23
**early**
9:17,22 88:15
**earned**
56:9,11
**easily**
74:23
**ebb**
102:19
**edema**
27:1,20,21,
22 29:12
36:20 47:3
83:3
**edition**
10:20
**editor**
11:1
**editors**
10:24
**education**
7:12
**educational**
7:4
**Edward**
4:4
**effect**
45:7
**effects**
62:15
**eight**
6:18 11:13
**Einstein**
7:18
**Either**
12:24 24:15
98:5 103:4,6
**elements**
32:15,16

**ELIZABETH**
2:20 4:19
19:2
**ELSEY**
3:2 4:11
**e-mail**
14:23
**embarrassmen
t**
29:9
**emergency**
68:9
**employed**
5:17,18
**employee**
104:19,20
**empty**
41:19
**EMT**
16:17
**end**
28:15 51:20
60:3 76:10
92:2 103:11
**ended**
52:21
**ends**
88:8
**engaged**
55:13
**engagement**
52:21
**enough**
29:9 44:22
45:2 98:3
**entered**
7:20
**entire**
82:14 91:9
**environment**

46:5
**epidural**
22:1
**Epilepsy**
10:23
**equivalent**
9:9 24:16
**equivocated**
84:8
**equivocating**
83:22
**erroneous**
30:1
**error**
30:4,5 72:10,
17 93:10,19
**Esquire**
3:3
**essential**
69:21
**essentially**
9:16 10:2
18:1,2 19:17
24:6 37:7
74:18 98:1
**establish**
61:14
**estimate**
25:20 35:2,6,
9 66:10
**estimated**
25:15,22
**estimates**
19:10 24:23
25:1,2 37:15,
19 63:21
89:16
**estimation**
32:8 34:24
**evaluated**
64:20 69:24

**evaluating**
70:23
**evaluation**
87:11
**event**
63:18 69:1
**events**
31:24 73:3
93:11
**eventually**
11:2 37:10
67:19
**evidence**
47:14,17
50:13 58:19
61:21 63:5,6
64:10,11,19
67:5,7,8 68:8
70:1,9,11,18
72:8 73:19
74:24 75:5
77:6,9,18,
19,21 79:6
80:11 87:2
**evident**
98:5
**exact**
15:2,6 19:17
**exactly**
14:13 63:3
77:9 89:2
**exam**
101:18,20
102:1,4
**examination**
1:12 5:14
25:23 42:22
60:22 64:4
68:20 77:7
84:15,17
85:17 86:3,
10,12 87:1
89:8 96:9,13

USCA5 5161

Jan Leestma                                              January 10, 2011

116

101:22 104:9
106:1,2

**examinations**
102:12

**examined**
5:13 31:18
102:5

**examiner**
9:24 68:5
70:19 71:9,15
89:1

**examiners**
64:2

**Examiner's**
9:21

**example**
31:19

**exams**
101:20,21

**exceeding**
98:9

**excess**
31:3

**excluding**
67:2 77:18

**Exhibit**
6:1,5 13:21
14:1 15:13,
16,21 16:7
17:15 18:15
35:14,18
38:12,13
41:12 90:13,
17 92:19
106:11,12,
13,14,15,16,
17,18

**Exhibits**
38:17 39:15

**existed**
83:7 84:3

**existence**

22:23 23:14

**existing**
49:9

**exists**
21:19 84:4

**expect**
84:14,17
87:15 88:10
96:10,18
101:4

**experience**
60:15 102:8

**expert**
12:4,17 56:7

**expertise**
69:20

**expires**
105:7

**explain**
14:13 22:9
41:8,9 45:23
48:7 50:2

**explaining**
20:23

**explanation**
45:6 58:12

**extensive**
37:14 88:13
102:4

**extent**
89:24

**external**
61:20

**externally**
85:4

**eye**
46:8,9

**eyewitness**
67:3,4

_____

_____ **F** _____

**facing**

69:9,10

**fact**
40:3 42:12
43:16 44:6
53:18 60:16
66:2 81:6
84:19 86:9
88:11 91:15
101:1

**factor**
71:15,16

**factors**
83:19

**facts**
58:18 72:1
73:7 74:2
77:13 93:21

**faculty**
8:15

**fair**
57:17 58:20
66:10 89:4

**fall**
77:2

**falx**
42:24

**families**
11:21 12:2
59:1,6

**family**
11:23 12:1
47:16 59:10,
12,16,24 73:2

**far**
18:19 29:1
71:16 98:7,9

**fashion**
80:1

**fatal**
74:8,16,21

**father's**
78:21

**Federal**
1:12 2:12
90:21

**feel**
59:20 60:6

**feels**
91:23

**fell**
22:11 68:11

**fellow**
11:11

**fibrin**
32:16

**f-i-b-r-i-n**
32:16

**field**
8:10 10:12
12:5,10,11,
17 23:10

**figure**
64:7 86:1
92:14

**file**
18:19 21:9

**filled**
41:15

**fills**
43:21

**final**
14:4 64:18

**find**
42:16,17
78:10 87:1

**finding**
41:11 83:23

**findings**
14:5 31:5
36:3

**fine**
78:6

**finish**

58:4 71:12
87:6,7

**finished**
42:7,9

**firm**
83:14

**first**
5:12 7:13,24
17:17 19:9
30:23 32:9
46:23 50:19
65:11 66:19
72:12,14 85:8
98:13,20

**five**
5:21 22:22
23:1 24:15
29:22 30:2
50:23

**five-minute**
51:14

**fix**
101:3

**flexible**
21:10

**flow**
27:17 102:19

**fluid**
43:19 44:2,13

**fluid-filled**
44:16

**fly**
56:1

**focus**
59:5,19

**FOGARTY**
1:15 3:22
4:13 104:4

**follow**
57:20

**followed**
7:15

**USCA5 5162**

Jan Leestma

follows
5:13
food
21:15
Force
7:21 8:4
19:18
forced
80:3,12
Forces
7:22 46:23
47:5
foregoing
104:12
foremost
59:15
forensic
5:19 8:10
10:6,13,18,
23 11:7,12
12:11 16:22
61:5 64:12
forget
24:22
forgot
12:22
formaldehyde
101:4
formula
94:17
forth
51:7 73:9
93:12
forward
14:18
found
70:1 84:15
99:6 100:22
four
5:21 22:22
69:11 75:12

88:22
fragments
33:10
frame
49:3,4 92:16
95:20
frames
19:15
Francis
10:19
fresh
48:11
Friday
99:15
friend
59:7
front
20:15 26:19
39:18 44:5
54:24 70:11
72:4 92:18
full
9:3 26:20
42:20 52:21
66:19 72:14
85:16 86:2
87:10
full-time
5:20
function
74:11 97:10
functioning
59:17
further
13:19 37:21
44:1 103:3,6,
12
Furthermore
43:23

― G ―

gave

24:23 25:2
76:21 81:18
91:5 101:18,
19
general
7:15 62:8
84:12 89:15
generally
27:7 46:23
53:11 58:23
62:1
genital
102:6
genitourinar
y
8:1
getting
25:7 28:4
62:7 101:9
giant
47:2
give
31:9,12,15
32:1 36:11
40:6 42:17
56:1 77:12
given
32:3 61:20
70:18 75:5
98:16 99:14
104:15
gives
32:23
giving
86:10,11 87:1
globally
63:20
go
13:19 23:17
26:5 30:16
31:16 40:17
42:19 58:4

59:18 68:3
71:12 76:6
81:13 87:21
100:12
goal
11:22 59:11,
15 60:4
goes
71:18 75:12
86:13 92:2
101:15
going
4:2 7:2 15:24
23:3 31:8,12
40:2,8,16
41:4 45:7
47:3 51:19,22
55:17 59:21
60:7 64:17
65:20 70:14
71:7,15 72:7
74:9 75:4,8
76:12 78:4
85:7 86:13
87:9,14,22
90:2,3 99:11
100:9 103:10
gone
43:21 44:14
84:1,2 97:4
Good
4:1,17 5:16
33:3 52:22
68:16
gotten
18:4
government
53:20 54:2,3,
20,21 89:11,
20 90:6 93:22
94:1 95:8
96:2,20 97:19
100:7

government's
86:18
grabbed
69:8
Graduate
9:8
graduated
7:6
graduating
7:10
gravity
23:11
gray
41:17
great
59:18
greater
46:6
group
52:16
guess
34:14 43:8
55:20 88:18
91:11 98:14
guessing
54:23
guest
8:21
Gunter
13:12 17:5,6
39:8,10 50:14
G-u-n-t-e-r
17:6

― H ―

H
106:9
Habeas
2:13
Hall
17:4

USCA5 5163

Jan Leestma                                          January 10, 2011
                                                                 118

| | | | | |
|---|---|---|---|---|
| **Hallet**<br>17:1 36:5<br>**H-a-l-l-e-t**<br>17:1<br>**Hallet's**<br>35:6,9 36:15<br>99:5<br>**hand**<br>105:1<br>**handwritten**<br>17:8<br>**happen**<br>61:19 62:5<br>74:3 94:2<br>**happened**<br>13:12 48:18<br>60:24 61:1<br>64:5 70:6,7<br>88:6 92:15<br>93:22<br>**hasn't**<br>60:17,18<br>**hasten**<br>23:15 28:10<br>82:18<br>**haven't**<br>18:4 55:15<br>60:9,18 79:1<br>99:8<br>**Hawaii**<br>55:18<br>**head**<br>19:18 31:13<br>49:15 62:17,<br>18 63:7 64:16<br>65:12 68:14,<br>24 69:9 73:12<br>75:2,3,6,11<br>88:5<br>**head-to-toe**<br>101:19,20<br>**heal** | 37:10<br>**healing**<br>23:3 33:22<br>34:6,10,20<br>35:3 65:20<br>88:11,13,15<br>95:17 96:23<br>**healing-type**<br>88:16<br>**heard**<br>4:6<br>**hearing**<br>16:21<br>**heart**<br>27:9 50:24<br>97:10<br>**heartbeat**<br>97:3<br>**held**<br>4:9<br>**help**<br>12:1 31:13<br>79:17<br>**helpful**<br>39:20 91:21<br>**hematoma**<br>19:19,20<br>20:24 21:2,19<br>22:1,13,17<br>23:8,11,12<br>25:12,16,22<br>26:3 29:4<br>31:20 33:13<br>34:16,21 35:3<br>36:4,22 37:15<br>40:14 43:10<br>44:19,21<br>48:3,9,15<br>49:10 65:18,<br>23 68:16 74:9<br>76:22 81:21<br>97:21,24 99:7<br>**hematomas** | 22:4,7<br>**hematoma's**<br>76:14<br>**hemispheres**<br>44:14<br>**hemophilia**<br>87:16<br>**hemorrhage**<br>31:21 65:13<br>75:23<br>**hemorrhages**<br>47:4<br>**hemorrhagic**<br>36:20<br>**her**<br>19:6,16 24:3<br>25:5 28:11<br>35:10 36:7<br>64:13 65:5,6,<br>8 69:8,9<br>79:23 80:9,10<br>89:15,18,19,<br>23<br>**hereby**<br>104:7<br>**herein**<br>5:12 104:11<br>**hereto**<br>104:22<br>**hereunto**<br>104:24<br>**highlight**<br>7:4<br>**histological<br>ly**<br>75:22<br>**historical**<br>64:21 72:1<br>75:16<br>**historically**<br>57:18 | **history**<br>61:20<br>**hit**<br>64:15 66:1<br>93:24<br>**hold**<br>11:5<br>**hole**<br>24:11<br>**Holland**<br>7:7<br>**homicide**<br>55:14<br>**Honolulu**<br>56:1<br>**Honor**<br>80:6<br>**honorably**<br>8:3<br>**Hope**<br>7:7<br>**Hospital**<br>8:23 9:16<br>10:3 39:3,6<br>52:18,19 53:8<br>75:8 88:8<br>**hospitalizat<br>ion**<br>50:6<br>**hospitalized**<br>45:8<br>**hospitals**<br>52:13<br>**h o s p i t a l -<br>t y p e**<br>52:11<br>**hour**<br>19:14 25:5<br>75:11 99:21,<br>24 100:4 | **hours**<br>22:14 25:3<br>38:23 47:23<br>49:3 50:7<br>74:21 97:13<br>**Houston**<br>2:4<br>**hungry**<br>79:23<br>**hypothetical**<br>74:13,15<br>88:21<br><br>**I**<br>**ID**<br>106:10<br>**idea**<br>81:24<br>**ideal**<br>31:1 102:17<br>**identificati<br>on**<br>6:1 14:1<br>15:16 35:14<br>38:18 90:13<br>**identified**<br>17:15 28:5<br>29:1 30:18<br>49:23 65:14<br>84:18,19<br>**identify**<br>13:22 38:13<br>49:14 64:23<br>65:8 96:11<br>**ill**<br>79:13,18,21<br>80:1<br>**ill-advised**<br>102:2<br>**Illinois**<br>1:16,19 4:10<br>104:1,6 |

USCA5 5164

Jan Leestma                                          January 10, 2011
                                                                  119

105:1,6
**image**
30:10 41:14
**images**
30:1,13 39:13
**imagine**
102:1
**immediate**
67:23
**immediately**
66:21 68:3
69:16 74:19
**immortalized**
74:1
**impact**
46:19 63:10,
14,22 64:16
65:14,16
68:18,22
75:2,7,13,24
78:2,8,13
94:22
**impacted**
75:6
**impacts**
63:8,19 76:2
**impeding**
46:7
**importance**
61:2,6
**important**
16:2 28:9
31:6 61:5,7
66:1 69:24
**imprecision**
50:21
**impressive**
82:7
**improved**
49:8
**incident**

48:11 63:18
72:21 78:21
79:10 80:1
**incidents**
75:4
**incites**
37:6
**inciting**
32:22
**included**
40:7 54:10,12
**including**
81:1
**income**
56:5,9,10,11
**incomplete**
91:8
**incorrect**
65:9
**increase**
25:14
**increased**
24:2,8 25:9
44:1,17 45:21
81:16
**increments**
94:17
**Independence**
2:15
**independent**
86:6
**independentl
y**
74:4
**indeterminat
e**
42:3
**indicate**
33:21 41:18
**indicated**

8:7 19:1,15
29:23 44:20
52:9 79:8
**indicates**
44:1 93:8
**indicating**
63:11
**indication**
79:7
**indicative**
83:1
**indirectly**
104:22
**individual**
61:6 62:6
64:5,15 68:2
**individuals**
94:24
**infarct**
27:13 95:7
**infarction**
27:18 83:2
86:24
**infarctions**
26:24 27:5
38:8 82:1,9,
11,16
**infarctive**
95:16
**infarcts**
27:6 37:22
38:1,5
**inflammatory**
94:21 95:18
**inflicted**
19:17 48:4
50:15 76:15,
19 77:1,14
**information**
17:21 30:24
31:6,9,15
32:1,4 34:19

39:12 54:11
69:23 79:8,
12,13,16,18
84:7 91:21
99:1 100:2
**injured**
27:10 67:14
88:8
**injuries**
26:9 62:18
63:7 66:3,8
68:13 75:18
81:2 85:17
86:16 88:5,6
89:21,24
95:22
**injury**
22:14 25:1
31:23 48:3,22
49:11,15
50:15 65:12
66:7 69:4
74:18,20
75:14 77:1
88:14 89:2,12
94:18 97:20
**inside**
31:12 46:5
68:24 69:11
75:12
**Institute**
7:22 8:20
9:12 52:16
**interested**
104:22
**interesting**
69:24
**interfered**
27:8
**interim**
98:23
**interpretive**
72:10

**interval**
25:6
**intracranial**
24:2,8,9,10,
21 25:7,10,14
26:7 28:6,24
29:12 30:19
44:1,18 45:22
46:2 47:3
49:13 62:13,
15 81:16
95:24
**introduce**
4:14
**involved**
10:9 51:4
53:9 57:14
58:1 61:18
102:11,14
**involvements**
59:4
**irrelevant**
71:5,9
**irritability**
31:2
**irritable**
67:20
**issue**
51:9 58:5
61:19 62:2
99:18
**Issues**
10:23 19:10
58:1
**IV**
85:5

---
J
---

**J.L**
9:8
**Jack**
16:22 36:11

USCA5 5165

Jan Leestma                                    January 10, 2011
                                                           120

| | | | |
|---|---|---|---|
| **J-a-c-k** 16:22 | 5:4 7:4 11:3 13:21 15:3,19 18:14 20:7,12 21:5,18 22:9 24:9 25:17 27:3 30:4,16, 24 34:18,19, 23 36:9 41:9 42:5,10,16, 17 44:4,6 47:8,11,12 48:16 50:18 51:13,17 52:14 53:24 54:11 58:3,11 59:9,23 60:1 62:7 67:4,6, 14 72:12 73:24 74:3 75:3 76:1,4 77:12,17,19, 24 79:1,4 83:24 85:2,22 87:9,19 88:4, 12 89:11 90:22 91:12 92:12 94:19 95:6 96:9 101:22 102:12 | 8:20 **K-a-r-o-l-i-n-s-k-a** 8:20 **keep** 58:18 59:12 70:10 90:20 **Kellogg** 9:8 **kills** 74:10 **kind** 5:22 27:12 31:10 34:14 41:3 46:24 52:9 56:3 81:22 84:14 89:22 **kinds** 27:6 59:6 69:23 89:24 95:5 **Kingdom** 12:8 **knew** 18:20 **knife** 49:7 | **knowledge** 49:6 **knowledgeable** 86:8 **known** 9:9 11:19 41:19 66:23 **knows** 80:17 98:7 **Kuffel** 16:18 **K-u-f-f-e-l** 16:18 |
| **Jakarenn** 13:12 17:5 39:8,10 50:14 62:2,19 63:7 88:5 | | | **L** |
| **JAN** 1:11 4:4 5:11 106:3 | | | **labels** 30:10 |
| **January** 1:19 4:11 14:6,8,10, 15,19,20 15:8 18:22 99:15 105:2 | | | **large** 24:17 26:18 44:21 45:2 63:10 98:3 |
| **job** 60:19 | | | **largely** 83:18 |
| **Johnson** 55:8 | | | **LARIN** 2:20 4:19 |
| **joined** 8:14 9:12 | | | **Last** 6:20 7:17 18:12 42:21 52:15 55:11 70:24 75:1,2, 3,5 76:6,7 78:3 82:14 101:15 |
| **JOSEPH** 3:2 4:11 | | | |
| **JPA** 11:19 | | | |
| **Judge** 16:21 36:10, 11 73:18 80:17 | | | **Lastly** 50:11 97:19 |
| **jugular** 26:22 | **Juvenile** 11:15 58:22 102:9 | **know** 16:1 20:9 24:22 30:2 39:20 55:16 56:9 64:5 68:5 71:23 73:6 77:10 79:24 80:5 81:11 83:10, 21 85:5 86:3 92:19 93:14 94:16,24 95:2 101:6,16,23, 24 102:16,18 | **late** 54:24 55:4 |
| **July** 72:16,21 73:1,5 75:21 93:9,10,13, 16 100:17 | **K** | | **later** 31:5 47:24 50:8 55:17 74:20 88:9,10 |
| | **K** 104:3 | | |
| | **Kagan** 17:1 | | |
| **June** 38:22 47:18, 24 72:23 93:6,14 | **K-a-g-a-n** 17:1 | | |
| | **Kagan-Hallet** 29:16 33:5,12 35:21 | | |
| **just** | **Karolinka** | | |

| | |
|---|---|
| 99:1 100:22 101:2,5 | |
| **Lathers** 11:1 | |
| **L-a-t-h-e-r-s** 11:1 | |
| **lay** 92:6 | |
| **layer** 33:20 | |
| **lead** 11:1 47:1 | |
| **leading** 50:6 | |
| **leads** 83:2 | |
| **leaks** 28:1 | |
| **learned** 70:4 | |
| **least** 22:13 | |
| **leave** 8:19 | |
| **leaves** 23:1 | |
| **leaving** 55:24 | |
| **led** 25:24 26:24 94:7 97:21 | |
| **Leestma** 4:4 5:11,16 7:2 12:17 13:4 15:8,19 20:1 39:21 52:6 86:22 88:3 | |
| **LEESTMAN** 1:11 106:3 | |

USCA5 5166

Jan Leestma                                        January 10, 2011
121

left
8:13
length
26:20
lengths
59:18
lengthy
99:20
lesion
84:4
lesions
32:2 80:21
95:15
less
5:20
lethargic
67:20
lethargy
31:3
let's
8:18 16:3
20:21 33:6
67:18 75:3
88:4,7 96:9
level
21:3 59:17
life
9:5
likely
44:17 46:16,
17,18 50:10
56:20 76:14
limit
72:6 100:7
102:12
limitation
100:5
limits
31:22 51:2
limp
68:3 69:16

73:16 75:13
line
17:17 64:12
76:10 78:15
linked
95:11
list
16:12 18:12
53:16 54:1,4,
5,14 56:14
57:11 72:14
99:19,20
listed
38:22 57:2,19
81:19 85:23
91:2
listing
73:24 91:8
literature
60:15
little
8:11 34:15
43:19 95:10
97:16 102:6,
20
load
28:12 58:18
locally
11:19 55:13
log
29:21
long
29:17 37:16
60:17 70:4
101:4
longer
19:11
look
13:10 20:18,
19 30:11
31:19 37:12
64:4,13 65:4,

10 72:3 85:11
92:17 93:5
102:2
looked
40:3,5 86:5
99:9
looking
20:3,12 31:22
41:20 44:7
56:3 57:1
61:21 66:17
67:4,6,13
75:15,17
77:10,19
95:12
looks
15:23 58:5
68:19
lot
30:24 58:15
65:19 82:23
Louisiana
85:13
lower
21:3

─────────── M ───────────

M
2:8
M.D
1:11 5:11
106:3
machine
30:9
magical
94:16
magnitude
46:19
main
26:22
maintain
11:23 59:16

maintaining
59:10,24
major
7:7 8:4 52:15
75:7
making
99:5
malpractice
57:4,13
man
73:1
Management
9:9,10
manifestatio
n
85:3
manner
74:12 75:7
map
37:18
margin
32:18
MARK
2:8 5:1 13:20
15:7,9,12
82:11 94:20
103:6,9
marked
5:24 13:24
15:15 35:13
38:16 90:12,
16 92:20
106:10
markedly
26:1
marking
6:4 13:20
35:17 38:12
Master
9:10
matches

72:5,9
material
18:4 39:12
43:1 60:19
74:5 77:10
79:5 86:5
materials
13:11,14,16
16:12 17:11
18:8,16 23:19
25:19 39:21
60:14 77:22
matter
4:4 37:22
57:7,14 62:20
84:6 95:2
matters
56:13 104:11
MBA
9:10
McLaughlin
16:17
mean
18:1 24:10
27:5,21 33:4
34:4 40:24
45:24 50:3,4
58:16 62:4,9
66:5 67:3,12
72:20 76:18
83:6 84:9
85:23 93:14
97:7 101:1
102:9
meaning
26:16 27:13
28:13 38:6
46:8 50:22
97:17
means
11:21 27:21
31:18 37:2
49:1 66:2,3

USCA5 5167

Jan Leestma

January 10, 2011

122

67:13,15 95:1
101:3

**measurable**
83:19 84:5

**measure**
33:8

**measured**
24:18 84:23

**measurement**
23:14 24:15

**measuring**
24:13

**mechanism**
62:16

**mediator**
59:8

**Medical**
7:13,21,23
8:4,15 9:5,
14,21,23 17:4
37:1,2 41:4
57:3,13 64:1
67:5,7,23
68:5 70:19
71:9,14 77:7,
19 79:7 84:15
87:2 89:1

**medically**
41:3

**Medicine**
7:9,11,18

**meets**
102:17

**member**
11:8,10,12

**memberships**
11:6

**membrane**
19:22 21:9,
12,13

**membranes**
21:16

**Memorial**
52:19

**memory**
85:14

**meninges**
21:8

**mention**
33:8 38:10
82:13

**mentioned**
24:23 34:10
40:21 43:2
53:18 58:22
59:24 62:3
67:8 68:12
82:9 100:14

**mentions**
36:16,19
37:21

**mercury**
24:16,19 46:3

**method**
95:3

**MICHAEL**
2:21 4:21

**Michigan**
7:7,9

**microscope**
30:11,12
37:12 95:4

**microscopic**
29:22,24
32:10 68:19
75:19 76:21

**microscopica
lly**
31:24

**midline**
26:15

**midway**
78:11

**Milam**
2:3

**mild**
36:20

**military**
7:20 49:16
93:23

**milliliters**
25:23

**millimeters**
24:15,19 46:3

**mind**
37:17 62:24
93:15 101:6

**mine**
6:19

**minimal**
36:22 37:1
65:19,20

**minor**
25:13

**minutes**
22:14 50:24
51:16 74:21
78:5 97:13

**missed**
34:15

**missing**
28:18 29:2

**mixed**
42:24

**modalities**
30:22

**moderate**
36:20

**moment**
11:7 36:9
37:4 47:8
65:3,10 87:19

**Monroe**
1:18 4:10

**month**
101:5

**months**
87:18

**morning**
47:18 56:1
72:16 75:20

**most**
10:17,21 26:8
32:13 37:18
44:17 45:6
50:9 54:22
57:23

**mostly**
36:22 42:24
57:21

**motives**
71:20

**move**
80:20 90:4

**moved**
81:10

**moving**
75:9 99:18

**MRI**
31:11

**multiple**
63:19 65:12
73:8

**murder**
61:12

**must**
85:10 86:5
96:5 102:5

**myself**
11:3 60:20

**N**

**name**
4:11 39:11

**namely**
32:16 33:18

**nature**
51:11

**NAUGHT**
103:12

**nausea**
31:2

**naval**
47:16 48:5
50:6,15 51:6
73:2 93:12

**necessarily**
23:11 68:23

**necrosis**
36:20

**necrotizing**
95:16

**need**
36:12 67:23
69:24

**needed**
18:20

**neglected**
11:21 30:17
58:24 59:13

**negligence**
102:11

**negotiation**
100:2,5

**nerve**
46:8,13

**neuroimaging**
31:11

**neurology**
8:16 9:4

**neuropath**
52:21

**Neuropatholo
gic**
36:17

**neuropatholo**

USCA5 5168

Jan Leestma                                                    January 10, 2011

123

gist
9:14 10:6
12:14 100:17

Neuropatholo
gists
11:9

neuropatholo
gy
5:19 7:16,17
8:2,17,24
9:23 10:13,18
11:7 12:5,11,
12,18 16:24
35:20 100:15

Neuroresearc
h
9:13

neurosurgeon
s
24:14

Neurosurgery
9:13 52:16

never
37:17 92:2
101:6 102:23
103:2

Nevertheless
78:9,14,19

New
7:19 48:21

nine
30:15 57:12

nonbreathing
24:4 84:21

nonresponsiv
e
24:4

nonspecific
31:5

normal

24:19,20
44:13 46:2
74:12 75:9
99:24 101:24
102:19

normally
43:24 96:14
97:22 98:8

Northwestern
8:14,17,23
9:2

Notary
1:15 104:4
105:5

notated
84:18

note
17:18 73:11
77:24 82:22

noted
40:15 82:22

notes
17:8

nothing
56:10 77:5
101:13

notice
14:17 100:13

noticed
11:14 38:2
52:7 53:15
83:5 100:16

noting
30:12

November
6:20

nowhere
40:1

number
9:19 30:14,15
33:7,9 51:8
63:6,14 92:19

106:10

numbers
58:7

nurse
68:10

———————
O
———————

O
104:3

object
28:19,22 40:8
41:2,5 42:11
71:13 80:6,7
86:13 90:2

objection
5:5 40:15
53:24 71:4
73:21 86:20

objections
15:5

objective
61:21 64:10,
19 70:1,9,10
72:8 77:9,21
83:23

objectively
74:4

obliterate
44:15

observe
74:12

observed
48:2 64:6
85:1

observes
88:21

obstructed
46:10

obstruction
27:13

obviously
59:14 60:5

64:17 91:12
93:13 99:10

occasion
91:20

Occasionally
100:10

occur
94:22

occurred
29:6 46:17,19
49:16,21
51:12 63:16,
17 72:21,22
73:3,5 75:2
76:2,23,24
77:2 79:3
85:6 89:2
93:4 101:6

occurrence
73:16

occurring
97:1

occurs
62:16 98:2

odontology
16:22

offer
12:16 17:19

offering
58:1

OFFICE
2:2,12 9:22
105:1

Oh
8:13 54:13
64:9 78:17
83:10

Okay
6:10,23 10:5
12:9 13:13
14:12,21,24
16:6,9 18:13

19:20 20:14
21:1,5,7
22:3,11 24:7,
11,22 25:11
26:4,8,14
28:17 29:21
30:6 32:3,9
34:18 35:2
36:19 37:21
40:18 43:6,
13,16 44:9
45:16 46:1
47:19,22
48:2,21 49:22
51:18 52:3
53:15 54:10
55:16 56:3
57:1 59:23
63:2 65:11
67:16 70:14
71:2 73:4
76:6 77:17,24
78:6,7,12,17
82:8 83:24
91:7 93:7
95:6 101:8
102:8

old
49:3 80:23

older
43:1 51:4
66:3

Oliver
16:19

once
28:10

ones
75:21

ongoing
19:12

onward
23:7

oozing

USCA5 5169

Jan Leestma                                              January 10, 2011

                                                                    124

85:4

**opening**
16:16

**opine**
77:11 92:6,9

**opinion**
16:15 25:9
28:5 44:21,24
45:2,16,20
63:4 72:6
74:7 86:15
92:1 94:3,6

**opinions**
58:2 95:2

**opportunitie
s**
9:20

**opportunity**
29:15

**optic**
46:8,12

**order**
35:4

**organ**
27:14,15

**organization**
9:15 11:10,
13,17 36:22
37:2,11 52:17
59:4,11
65:19,20

**Organized**
37:22

**original**
17:19,22

**outcome**
104:23

**outflow**
46:7,10

**outlining**
44:12

**out-of-court**
100:3

**outside**
69:10

**over**
59:4 60:5,15
94:19 97:13
99:19

**overlies**
44:14

**overlying**
43:19

**overrides**
98:2

**oxygen**
29:9

**oxygenation**
28:13

———————
        **P**
———————

**Page**
36:16 42:19,
21 65:11
66:18 67:17
72:13 76:6
82:20 85:8
101:17

**pages**
6:16,18 46:15
99:20

**panels**
41:12

**paragraph**
42:20,21
66:19 72:14
73:11 76:7
77:5 78:3,4
80:21 82:20

**parcel**
66:6

**parchment-
like**

21:8

**part**
9:17 16:7
21:7,13 27:8
39:21 41:1,13
43:4 63:15
65:15 66:17
68:3 72:7
93:10,20
96:14

**particular**
6:6 13:9,14,
22 16:13
18:13 19:5,12
21:12 23:10,
20 25:10
30:21 31:16
32:3,5 33:3,
17 35:1,19
36:4 40:22
43:10,14,15
45:11,18
46:18 47:15
49:14 84:4,22
89:12,21
90:18 91:3
92:4 93:4,18
94:4,8 98:6

**particularly**
62:6

**parties**
104:21

**parts**
41:21

**part-time**
9:20 52:20

**pass**
102:21

**pathologist**
22:16 64:12
67:15 68:4
69:20 70:19
72:3 89:1

94:12

**pathologists**
31:19 37:19
64:2

**pathology**
7:12,15,22
8:1,11,16 9:4

**pattern**
57:20,23

**pause**
36:13 47:9

**pediatrician**
86:9 102:21,
23

**pediatrician
s**
86:9

**Pennsylvania**
2:16

**people**
53:10 55:7
74:12 100:1

**percentage**
49:20

**perform**
52:24

**performed**
53:3 86:2
96:8

**period**
48:4,16 49:17
53:8 78:8,13
94:19 97:3,13

**person**
52:22 64:15

**personal**
104:14

**perspective**
37:2

**perspectives**
22:17

**pertaining**
1:14

**Petitioner**
1:8 2:22

**phase**
22:18

**Philadelphia**
2:16

**photographs**
17:7,8 18:10
25:23 30:14
44:5 75:19
76:22 98:22

**photomicrogr
aphs**
30:14

**phrase**
67:9

**physical**
38:6 46:23
47:5 75:1,2
76:14 101:18,
19,20 102:4

**physically**
64:20 76:24

**physician**
102:1

**physicians**
102:12

**pick**
16:3

**picks**
22:24

**piece**
73:19

**pinned**
19:14

**pinpoint**
89:1

**place**
69:4 81:10

**USCA5 5170**

Jan Leestma                                          January 10, 2011
                                                              125

93:9 94:23
96:16,21
104:18

**placed**
85:18

**places**
52:8

**plaintiff**
56:24

**plane**
55:24

**play**
69:20 70:20,
22 96:5

**played**
31:24

**plays**
70:24

**please**
4:14 5:17
7:4,5 10:16
47:8 48:7
78:5 92:13

**pled**
92:2

**plus**
37:23 45:7

**point**
32:20 63:9
71:12,14
72:12 79:2,22
81:12 82:18
86:19 87:6,7
97:12 100:8

**portion**
68:17 98:15

**portions**
80:8

**possible**
48:14 59:17
60:7 92:15
97:23

**possibly**
80:22

**posterior**
41:1,13 63:15

**posteriorly**
42:24

**postgraduate**
7:11

**post-injury**
29:7,11

**potential**
19:24 46:6

**power**
64:18 95:4

**practical**
60:12

**practice**
9:16 10:3,4
52:18

**practitioner
s**
60:11

**precise**
25:5 31:14
32:1

**precisely**
51:11

**predates**
51:5

**premed**
7:7

**preparation**
100:3

**prepared**
17:11 40:9

**PRESENT**
2:1 3:1 23:3
25:12 32:12
33:24 41:11
44:20 46:18

**presented**
50:12 63:5
73:7 74:24
86:17 102:16,
17,18

**preserved**
32:13 33:19

**pressure**
24:2,8,9,10,
13,17,21
25:8,10,14
26:7 28:6,24
29:12 30:19
44:2,18 45:22
46:2,4,5,11
47:4 49:13
62:3,9,13,15
81:16 82:4,24
95:24 97:4

**pressures**
62:10

**pretty**
58:17 70:17

**previous**
49:17 104:8

**previously**
40:21 49:9
54:15 66:22

**primarily**
86:23

**primary**
28:6,8 30:18
59:19 82:4
83:7

**print**
14:16

**printed**
14:14 15:3
16:5 39:14

**prints**
38:20

**prior**

10:20 18:2
80:1

**private**
8:8

**pro**
100:10

**probability**
41:4

**probably**
11:10 12:3
14:14 24:20
25:24 26:8
29:9 33:1
41:14 43:1
53:4,5,12
55:11 65:21
83:21 84:7
97:16 99:4
102:20

**problem**
27:19 42:2
49:5,19 72:7
74:22 75:17
87:16 89:5,
11,21 90:1

**problems**
72:10 79:14

**Procedure**
1:13

**proceedings**
5:7 104:16

**process**
30:13,21 31:7
32:6 33:22
34:10,18 35:1
37:11 50:9
61:4,19 76:1
95:16,17

**processes**
28:8 51:3
94:7 96:23
97:12 98:5
101:13

**processing**
14:15

**produce**
47:3,4

**professional**
8:6 11:6
56:12

**professor**
8:15 9:1,4

**profound**
62:14

**program**
14:16

**proliferatin
g**
95:19

**pronouncing**
82:12

**prosecution**
10:7,10 55:12
90:8 91:22

**prosecutor**
53:22,23
55:13 89:10

**Protection**
58:22 102:9

**Protective**
11:15

**prove**
48:21

**proven**
47:7

**proves**
74:21

**provide**
91:14 99:12

**provided**
54:2,3,5,8,
14 90:23
101:17

**USCA5 5171**

Jan Leestma

**provides**
31:17

**proximate**
87:14

**Public**
1:15 98:17
104:4 105:5

**publication**
11:4

**published**
10:12,18 11:3
60:8

**pulse**
97:4

**purposes**
88:21

**pursuant**
1:12

**pursued**
7:11

**put**
24:12 30:9
31:20 53:24
54:22 92:15

———— **Q** ————

**qualificatio
ns**
7:3

**qualified**
12:4,14 65:16

**quantitative
ly**
82:7

**question**
25:4 28:22
41:6 42:12,15
43:9 49:5,17
53:19 54:1
60:22 63:1
64:9 70:14
71:8 72:19,22

73:9 74:14,15
81:6 87:10
89:10,18,22
91:11 95:5
96:22 101:15

**questions**
12:19 13:1
47:11,12
61:24 64:14
89:7 97:17
103:4,6

**quick**
42:17 65:24
100:24

**quicker**
101:9

**quickly**
13:21 22:10

**quit**
68:11

**quite**
52:8

**quitting**
67:22

**quote**
64:10 100:1

———— **R** ————

**R**
2:6

**radiographic**
38:21

**radiological**
41:18 42:2

**radiologist**
22:16

**range**
24:20 25:6
80:21 81:2

**rank**
8:3

**rate**

99:24 100:1

**razor**
95:3

**reaching**
29:10

**reaction**
32:22 33:18
34:7 35:3
37:6

**reactions**
32:17 88:16
94:22

**reactive**
33:21

**read**
17:18 45:10
64:24 65:5
76:12 81:14
85:8 86:1

**reading**
20:2,5,8,12,
17 43:8 96:3

**ready**
5:9,10

**real**
42:17 65:24

**realized**
30:16

**really**
63:22 81:13
88:18 89:6
101:14

**reason**
58:9 71:2
73:9 79:3

**reasonable**
45:6

**reasons**
72:3 74:3

**recall**
18:7,21 19:10
25:2,5,21

62:18 63:5
66:17 85:21
86:4 87:12
89:19,22,23
96:3 101:16

**receipt**
30:7

**receive**
27:9 29:19,20

**received**
9:9 17:20
29:22 99:14

**recency**
23:10

**recess**
51:21 87:23

**recognize**
6:5 35:18
90:17

**recollection**
57:10 85:11
86:6 89:13

**recommend**
59:21

**recompense**
100:11

**record**
4:2 16:8
51:19,23
53:13 54:1
74:1 80:14,18
87:22,24 90:2
96:7 103:10
104:15

**records**
17:4 84:18
93:15

**R E C R O S S -
EXAMINATION**
98:11

**red**
32:13,14,23

33:19 41:21
50:23 94:18

**REDIRECT**
89:8

**reduced**
104:14

**Reed**
7:23

**refer**
42:14,16

**reference**
92:22

**referencing**
100:14

**referred**
23:7 24:24

**referring**
29:12 67:16
79:19

**refers**
23:10 39:24
40:2

**reflected**
25:19 35:1
40:21 43:10

**reflects**
96:7

**refresh**
85:14

**refrigerated**
97:14

**regard**
40:8 63:24
72:6

**regarding**
19:7 36:3,16
40:14 45:10,
17 54:1 86:19
89:11 93:17,
24 97:20

**related**

USCA5 5172

Jan Leestma                                              January 10, 2011
                                                                    127

| | | | | |
|---|---|---|---|---|
| 11:7 17:23 34:2,20 43:15 86:17,24 | **reminded** 58:3 | **Reporter** 1:17 4:12 104:6 | **response** 71:8 86:22 87:5 | **reveals** 42:23 |
| **relates** 22:7 82:17 | **repeat** 34:23 92:12 | **reports** 16:22 17:5 | **responsible** 19:13 | **review** 13:14,16 17:10 23:19 29:15 35:10 45:13 |
| **relating** 16:5 17:5 18:18 43:4 | **rephrase** 41:6 62:24 | **represent** 41:22 42:4 44:13 49:18 63:17,22 | **restore** 59:16 | **reviewed** 16:12 18:16 19:1 24:24 25:19 38:2 40:5 50:13 79:8 |
| **relation** 16:12 34:11 67:13 | **rephrasing** 42:12 | **represents** 19:23 41:14 43:1 60:13,20 63:14 65:15 | **result** 27:16,22 28:15 47:5 49:15 50:15 56:9 74:9 76:1 | |
| **relative** 22:8 104:19, 20 | **replaced** 32:16 | | | **reviewing** 19:5 58:16 |
| **relatively** 25:15 26:2 33:19 42:23 74:19 | **replay** 65:3 | **reproducible** 94:24 | **resulted** 29:8 66:8 | **rid** 37:8 |
| **relevance** 71:17 86:20 | **replying** 34:7 | **request** 17:18 99:12, 15 | **resuscitatio n** 67:24 97:11 | **right** 13:2 14:23 15:1,11 18:5, 17,24 19:16 20:16,21 29:18 33:6 35:7 36:21 37:24 39:19 40:6 42:8 43:3 54:16 55:10,24 56:6 57:16,22 63:3,12,13 65:18 66:4 67:1,6,11 68:14 69:9 72:1,19 78:3, 17 80:4 81:4, 10,16 82:17 83:10 85:2,11 86:7 88:14 89:6 96:6 98:24 103:5,8 |
| **reliable** 49:1 94:24 95:3 | **report** 13:17 14:5, 14,19,20 16:24 17:12, 14,17,19,20, 22,23 18:2,5, 13 20:16 25:21 29:23 30:4 35:10, 21,22 36:7,16 39:24 40:1,7, 10 42:13,16, 18,20 65:5,6, 9 66:11 69:15 72:13,17 73:8,10,24 76:7,8 77:18 82:8,14 83:8, 12 85:8 92:18,20,24 93:8 98:14, 15,17,23,24 99:3,13,14 100:14,15 | **requirements** 90:21 | **retained** 56:23 91:4 92:5 | |
| **relied** 40:11 | | **researcher** 8:21 | **retaining** 91:23 100:6 | |
| **rely** 40:2 | | **reserve** 15:4 18:5 98:24 | **retina** 46:12 | |
| **remain** 24:3 | | **residency** 7:15 | **retinal** 45:10,11,14, 17,18 46:16, 17,24 47:4 | |
| **remainder** 8:5 | | **residents** 53:10 | **retired** 9:15 10:2 52:9,22 | |
| **remains** 22:18 | | **resolving** 95:17 | **retirement** 56:10 | |
| **remarkably** 60:4 | | **respect** 17:9 | **return** 52:18 | |
| **remember** 18:10 53:14 64:24 | | **respirator** 84:21 | | |
| | **REPORTED** 3:22 36:5 69:17 73:11 78:21 79:2,22 93:12 104:13 | **respond** 37:7 | **reveal** 33:12,16 43:14,16 | |
| **remind** 7:24 9:14 85:18 | | **Respondent** 1:5 2:10 | **revealed** 100:21 | **rights** 22:15 |
| | | **responds** 68:10 | | **rim** |

USCA5 5173

Jan Leestma                                          January 10, 2011
                                                              128

44:10,11

**road**
37:18

**ROBERTS**
2:6 4:23 5:5,
8,10 6:10,12,
15,19,21,22
12:19,21,24
14:7,10,18,
21 15:1,4,11
16:9 20:1,7,
13,14 26:12
28:19 35:23
36:1 39:16,
18,23 40:6,16
41:2 42:5,9,
10,14,19
43:3,6 44:4
51:15,17
52:1,3,5
54:5,7,10,
16,18 71:4,
14,21 72:11
74:6 80:14,
17,19 86:22
87:5,8,19
88:2 89:6
90:2 92:23
93:1,7 98:12
99:11,17
103:3,5,8
106:5,7

**role**
69:21 70:20,
22,24

**room**
20:8 36:10

**Rouse**
16:18,24 17:9
19:2,15 24:23
33:13 46:14,
20

**R-o-u-s-e**
16:18 17:9

**Rouse's**
64:24 89:14
92:24

**routinely**
88:19

**Rule**
54:2,7 90:24

**Rules**
1:12

**rupture**
27:16 46:12

**S**

**S**
106:9

**sabbatical**
8:19

**safety**
59:14,19

**sagittal**
26:11,15
32:10,22
41:15,23
95:14

**s-a-g-i-t-t-a-l**
26:15

**SAITH**
103:12

**sake**
90:22

**sampled**
75:22

**San**
55:1

**Saran**
21:15

**saw**
15:20 50:12

**saying**
18:4 64:15

66:18 74:3
79:2 81:2
82:10,23

**says**
36:17 38:5
40:2,4 68:10
78:8,19
100:18

**scale**
95:1

**scalp**
24:12 51:7
62:21,23
63:8,12,15
68:18,23
94:23

**scan**
17:6 18:11
31:11 39:5

**scans**
39:24 40:8,22
42:22 43:11,
14 44:20,23
45:4 61:22

**scenario**
64:15 72:8
94:18

**schedule**
16:1

**scholarship**
60:16

**School**
7:9 9:5,8

**School's**
8:15

**Schraeder**
11:2

**S-c-h-r-a-e-d-e-r**
11:2

**sciences**
9:6 11:12

**scientific**
50:13

**scientifically**
47:6

**scope**
86:14

**second**
10:19 19:9
27:3 31:10
42:17,20
66:19 82:3
99:18

**section**
32:20 36:17

**see**
8:18 15:5
16:3 20:21
32:20 33:6
36:18 47:1
53:16 64:20
72:9 75:18
77:13 78:17
79:4 88:11
96:23,24 98:9
103:7

**seeing**
25:21

**seen**
67:3 102:10

**seizures**
31:3

**selected**
39:13

**self-employed**
5:18

**send**
14:23

**Senior**
53:10

**Senn**
16:19,23

**S-e-n-n**
16:19,23

**sense**
31:1 75:16
97:9

**sent**
6:12 39:21

**sentence**
42:22 65:5,6
76:12,13
78:2,7,15
81:14 82:14

**sentences**
78:1

**separate**
17:23 33:9
54:14 63:18
75:4

**serious**
82:7

**seriously**
94:14

**service**
7:20 8:13

**services**
8:17 11:21
12:1 59:6

**serving**
11:20

**set**
72:1 104:24

**settled**
92:1

**seven**
37:23 57:19

**seven-year-old**
71:3

**sexual**

USCA5 5174

Jan Leestma                                           January 10, 2011
                                                                  129

| | | | | |
|---|---|---|---|---|
| 96:8,10,13 | 75:15 79:1 | 31:3 | 53:5 55:4 | 26:15 |
| 101:22,24 | 85:20 86:4 | **sleepy** | 71:12 80:7,10 | **spent** |
| **shall** | 92:14 93:19 | 67:20 | 82:21 85:22 | 7:14 |
| 90:19 98:23 | 96:5 102:2,6 | **slide** | 87:4,6 | **spinal** |
| **sharpen** | **sing** | 30:13 32:10 | **sort** | 43:19 44:2,13 |
| 95:3 | 74:11 | 33:9 76:21 | 37:19 41:13 | **Spitz** |
| **sheath** | **singing** | **slides** | 42:3 59:16 | 17:3 |
| 46:13 | 75:9 | 17:3,7 18:10 | 100:24 | **S-p-i-t-z** |
| **short** | **sinus** | 29:16,17,19, | **sound** | 17:3 |
| 36:13 47:9 | 26:11,16 | 22,24 30:7, | 57:9,16,22 | **spreadsheet** |
| 97:2,3 | 32:11,22 | 11,15 33:4,5, | 101:21 | 90:20 |
| **Shorthand** | 41:15,23 | 12,16,17 | **sounded** | **Square** |
| 1:17 104:6 | 95:14 | 34:16 35:1 | 83:6 | 2:15 |
| **show** | **s-i-n-u-s** | 38:3 61:22 | **sounds** | **SS** |
| 6:4 34:16 | 26:16 | 75:19 98:21 | 79:24 | 104:2 |
| 35:17 38:11 | **sir** | 99:9 | **sources** | **staff** |
| 77:12 83:20 | 70:15 | **small** | 95:23 | 53:10 |
| 88:15 90:3,16 | **site** | 25:15,17 26:2 | **SOUTHERN** | **standing** |
| 95:15 | 63:14,23 | 42:23 81:21 | 1:2 4:7 | 68:1 |
| **showed** | 64:16 65:16 | **smaller** | **space** | **start** |
| 33:17 63:6 | 85:5 | 43:24 94:17 | 19:24 34:6 | 52:6 65:11 |
| **showing** | **sites** | **so-called** | 43:22 44:16 | **starting** |
| 25:24 44:11 | 65:14 68:22 | 16:14 22:6,18 | **speak** | 76:13 |
| **shows** | 75:24 | 41:18 101:24 | 62:21 80:14 | **starts** |
| 44:6,7 | **situations** | **social** | 87:13 95:4 | 42:22 78:2,8 |
| **side** | 10:1 | 11:20 59:6,20 | **specific** | **State** |
| 63:12 68:14 | **six** | **Solutions** | 19:14 89:16 | 1:16,18 66:22 |
| 69:9 99:16 | 11:13 29:24 | 3:3 | **specifically** | 72:13,15 |
| 103:4 | 30:2 57:2 | **somebody** | 18:8 29:20 | 84:20 104:1, |
| **sign** | 58:17 88:20 | 22:11 23:15 | 34:2 | 5,7 |
| 41:18,19 44:1 | **skin** | 67:14 68:10 | **specified** | **stated** |
| **significant** | 68:18 | **somebody's** | 104:18 | 60:23 73:22 |
| 26:8 | **skull** | 93:16 | **speculate** | 86:23 |
| **silent** | 21:11,20,24 | **somewhat** | 71:19 102:5 | **statement** |
| 98:1 | 24:12 26:20 | 22:5 41:17 | **speculation** | 16:16 56:4 |
| **similar** | 43:18 44:9 | 83:22 | 71:11 | 57:17 58:20 |
| 15:21 99:4 | **slammed** | **somewhere** | **speculative** | 59:9 72:20 |
| **simple** | 69:8,10 73:12 | 20:18 93:20 | 71:19 | 73:4,19 78:23 |
| 74:22 | 75:11 | **sorry** | **spell** | 89:4 |
| **simply** | **slapped** | 6:21 12:22 | 26:12 | **statements** |
| 16:4 49:1 | 88:22 | 14:7,10 20:1 | **spelling** | 71:16 76:8 |
| | **sleepiness** | 26:12 42:6 | | |

USCA5 5175

Jan Leestma                                      January 10, 2011

130

**STATES**
1:1,4,13 2:2
4:5,24 5:1
12:7 13:5
101:18

**Station**
48:5

**stay**
78:4

**stayed**
9:2

**stenographic**
**ally**
104:13

**Stockholm**
8:21

**stop**
27:3 97:1,2
101:13

**stopped**
50:24

**stops**
97:14

**stories**
61:20

**straightforw**
**ard**
70:17

**straw**
102:3

**Street**
1:18 4:10

**strictly**
23:13

**struck**
22:12

**structure**
11:23 26:24
41:13 59:11,
24 83:16

**struggling**
78:10

**studies**
44:10 83:20

**study**
31:11 38:22
41:22 42:1

**subacute**
22:6,24 23:5

**subdural**
19:18,20
20:24 21:2,
17,18 22:4,7,
12,17,24
23:5,8 25:12,
15,24 26:2
29:4 31:19
33:13 34:6,
13,16,20 35:3
36:4,21 37:5,
15 40:14
42:23 43:2,10
44:19 47:2
48:3,9,15
49:9,10 50:20
51:5 65:18,23
68:16,22 74:9
76:13,22
77:15 81:21
97:21,24 98:6
99:7

**subdurals**
68:13,24

**subgaleal**
65:12

**subject**
72:10 100:5

**submitted**
99:13

**subsequent**
75:10

**subsequently**
31:8

**subsidiary**
68:8

**successful**
60:4

**Sudden**
10:22 83:13

**suffer**
74:18

**suffered**
74:8 97:20

**sufficient**
50:13

**suggested**
77:12

**Suite**
1:18 2:3,14

**summarize**
28:17

**summary**
28:20

**superior**
26:11,14
32:10 41:15,
23

**supervise**
53:11

**supervising**
53:10

**supplanted**
37:18

**supply**
27:7,10

**support**
97:11

**supposed**
17:2 55:22

**Sure**
6:17 7:6 8:13
15:6 16:14
20:7,15 24:11
36:11 41:11

53:1 56:21
57:18 61:3
62:12 66:15
70:16 75:16
84:3 96:6
97:24

**surgeon**
22:15

**suspicion**
96:15

**sustains**
68:20

**Sweden**
8:21

**swelling**
27:21,23
28:15 43:14
44:3,22 45:3
83:3

**swollen**
44:15,17

**sworn**
4:16 5:3,13
91:6,10 100:4
104:10

**symptoms**
98:8

**system**
26:22 59:8

**systems**
12:6

———— **T** ————

**T**
106:9

**take**
13:10 15:24
17:11 19:9
35:9 42:15
51:13,17
58:12,15
64:13 70:3,
11,21 75:4

92:17 95:19

**taken**
1:12,14 8:19
59:22 104:17

**taking**
1:14 47:14

**talk**
24:7 40:12
61:1 74:11

**talked**
34:9 38:9

**talking**
27:12 30:24
33:11 35:4
37:20 62:8,21
67:21 96:18

**Tape**
4:3 51:20,23
103:11

**Taylor**
10:19

**team**
59:20 68:9
92:5

**technically**
21:12

**technique**
49:6

**technology**
49:6

**t e e t e r -**
**t o t t e r**
62:14

**tell**
5:17 6:15
8:11 11:17
16:11 20:2
27:4 28:18
29:1 32:18
36:24 39:23
46:22 48:17
50:22 51:10

USCA5 5176

Jan Leestma                                         January 10, 2011

131

| | | | | |
|---|---|---|---|---|
| 53:20 63:16 67:12,14 72:5 75:21 76:3,23 95:13 | **testifying** 20:3 56:6 57:7,15 60:21 83:13 92:3 | **thickness** 21:9,15 33:22 | **three** 7:24 22:16,22 32:24 48:13, 19 66:22 | 61:14 68:11 70:5 75:6 79:10 82:8,13 83:12,13 |
| **telling** 71:10 73:17 | **testimony** 16:15 19:2,6, | **thin** 21:14 | 69:11 75:7 81:19 101:5 | 84:23 92:16 93:15,23 94:19 95:19, |
| **ten** 23:1,6 24:15, 19 34:1 35:4 36:23 46:3 48:10 51:15, 16,17 56:14 65:14 | 7 40:7 41:2,5 42:11 43:4 45:13 53:18 56:2,8 59:10 61:10,13 65:1 69:14 80:8 81:13 83:5 | **thing** 15:6 20:15 31:10 33:7 53:16 59:23 64:18 84:14 102:3 | **three-day** 94:18,20 **thrombosed** 83:16 **thrombosis** | 20 97:3,6,8, 12 104:18 **times** 22:13 25:6 54:21 55:3 57:6 64:16 |
| **tentative** 98:24 **tenure** 9:1 | 84:1 85:9,24 86:2,21 89:14,18,23 90:8 91:6,10, | **things** 18:12 25:11 28:3,16 60:13 61:7,22 70:2, | 26:10,23 28:4 29:2 30:17 32:6 34:3,5, 11 38:9 | 69:11 75:12 88:22 **timing** 19:8,10 25:1 |
| **term** 23:9 36:24 37:1 84:12 | 14,24 96:3,4 100:4 101:17, 18 104:15 | 11 71:24 72:15 83:3 91:9 95:9,19 99:8 102:19 | 40:14,20 45:1 49:22,24 50:8 51:5 83:15 95:7 96:12 | 86:16 **tips** 36:21 **tissue** |
| **terms** 28:24 38:5 63:8 67:15 79:14 83:11, 19 89:15 90:7 93:22 | **testing** 96:11 **tests** 84:24 **TEXAS** | **think** 14:12 16:4 17:1 28:19 38:7 40:4,16 42:11,15 | **thrombus** 33:11 41:23 82:22 **Thursday** | 27:18 31:17 32:10 **together** 59:12 **told** |
| **test** 77:11 | 1:2 2:4 4:7 12:23 **Thank** 20:14 43:6 | 52:10,14 53:7 57:2 58:10,20 63:19 65:9,19 66:1,16,18 | 55:22,23 103:7 **tight** 43:17 | 69:5 81:14 **tomorrow** 56:1 |
| **testified** 5:13 33:14 40:21 45:2 46:14 53:17, 19,21,22 54:6,17,19, 21,24 55:3,12 56:15 58:6 69:7,17 90:7 93:23 96:24 98:16 99:21 | 103:9 **thanks** 82:11 **themselves** 31:4 **theoretical** 60:11 **thereabouts** 46:3 **thereafter** | 67:12,17 69:14 70:17 71:2,24 72:18 89:17 95:11 96:22 98:4, 16,22 **third** 42:20,21 76:10,12 **thirsty** | **time** 8:24 12:16 14:16 17:21 18:11,20 19:14,15 22:8 23:2,13,14 24:14 31:23 32:5 33:1 36:12 37:17 38:22 48:14, 16 49:3,4 | **tonsillar** 36:21 **TONY** 2:6 4:23 5:4, 9 6:21 14:23 15:9 51:16 87:6 90:4,22 **tony.roberts @usdoj.gov** 2:7 |
| **testify** 28:20 55:18, 22 86:19 99:22 104:10 | 69:16 104:13 **therefore** 18:4 98:22 | 79:23 **thorough** 84:16 86:12 **thought** 42:6 58:4 72:21 | 52:17,21 54:17 55:11 56:5 57:14 58:12,15,16 60:15,17 | **top** 33:18,21 **towards** |

USCA5 5177

Jan Leestma                                                  January 10, 2011

132

76:10

**track**
90:20

**tract**
46:10

**training**
7:16,18

**Transcript**
16:21 46:15
65:2 104:12

**transcripts**
16:16 85:24

**transferred**
7:17 8:23

**translucent**
21:14

**trauma**
19:18 38:6
62:17 76:14

**tree**
46:9

**tremendous**
47:2

**Trial**
16:15 19:2
46:14 47:17
50:12 55:2,14
56:22 85:23
93:23

**truck**
73:13 78:21
93:24 94:1

**true**
17:13 23:13
54:13 56:20
64:9 70:13
74:2 76:4
89:3 90:4
91:22 94:3
104:15

**trump**
70:9

**trust**
56:20

**truth**
70:3 104:10

**try**
12:1 13:11
37:8,9 59:15
60:24 92:14

**trying**
11:22 20:7
64:7 84:16
85:24 97:17

**Ts**
17:2

**turn**
79:4 95:4

**turned**
31:8

**twice**
55:1,2

**two**
7:13 8:2 15:3
17:2 21:16
23:2,6 25:22
27:6 32:24
33:10 34:1
35:5 41:12
48:8,11,13
49:3 51:1
52:19 66:22
67:18 75:4
80:7 81:19
88:10 95:9,21
101:5

**two-**
94:18

**two-minute**
51:13

**two-year-old**
74:8 75:10

**type**
97:21

**types**
22:3

**typewriting**
104:14

**typo**
72:17

_____
U
_____

**U.S**
4:6 7:21 8:4
17:9

**ultimately**
24:4 26:21
50:7 62:15
66:8

**unconscious**
67:22 73:17
79:15

**unconvinced**
38:7

**Under**
24:19 26:19
30:11 37:12
46:3 100:9
104:14

**undergo**
94:21

**undergoing**
34:6

**underneath**
26:20 44:10

**understand**
53:6 55:16
61:9 67:12
69:18 80:2
81:5,8 82:21

**understandin
g**
5:5 19:6 48:1
79:20

**Understood**
71:21 86:2

**undersurface**
21:11 43:18

**unequivocall
y**
75:20

**unfair**
102:20

**Unit**
2:13 59:16

**UNITED**
1:1,4,13 2:2
4:5,23 5:1
12:7 13:5

**University**
7:9,12 8:14
9:3

**unless**
41:3 57:13
87:15

**unresponsive**
67:19 79:16

**upper**
24:20 63:11

**upside**
88:22

**upstream**
32:21

**urine**
79:23 80:3,9,
10,12

**use**
19:16 37:19
38:4 91:24
95:1 99:5

**usually**
12:13,14
22:13 24:18
67:22 68:8
83:17 97:14
101:2,4
102:14

**utilized**
61:13

_____
V
_____

**v**
55:8

**variable**
94:23

**varied**
25:4

**variety**
72:2 74:2

**various**
59:3 62:5,10

**vary**
33:22

**vein**
24:17 26:11

**veins**
26:11 27:14,
16 46:4

**venous**
26:10,13,18
27:13 28:4
29:2 32:6
38:8 40:20
45:1 46:7,10
82:1,9,16
83:2 86:24

**ventricles**
43:23

**verbal**
99:6

**verify**
74:4 76:5

**version**
15:9

**versus**
4:5 64:10
77:15 101:10

**via**
2:9

**USCA5 5178**

Jan Leestma                                              January 10, 2011

133

| | | | | |
|---|---|---|---|---|
| **VICTOR** 2:18 4:17 | **vomiting** 31:2 79:21 | **ways** 24:18 61:13 | 100:7 | 31:22 32:18 48:4,13,19 |
| **victorabreu@ fd.org** 2:19 | **W** | **week** 25:3 33:24 55:16,17 95:21 | **WHEREOF** 104:24 | 49:16 75:11 81:8 97:2 104:5 |
| **video** 4:2 51:19,22 87:22,24 103:10 | **waiting** 18:8,9 29:17 **wake** 37:9 | **weeks** 23:2,7 34:1 35:5 48:11 | **WHEREUPON** 5:2,23 13:23 15:14 35:12 36:13 38:15 47:9 51:21 87:23 90:11 | **witness** 4:15 5:2,12 14:3,9,12 20:5,10,18, 20 26:14,17 |
| **Videographer** 3:2 4:1,12 51:19,22 52:2 87:21,24 103:10 | **walk** 74:11 **wall** 32:21 37:9 | 54:8,9 80:22 81:3 88:20 89:17 101:5 **weeks'** 95:21 | **whether** 18:11 34:8,10 43:9 45:17 50:23 56:23 | 38:19 42:8 53:22 56:7 68:7 69:4,6 70:3 71:15,22 73:22,23 |
| **videotaped** 1:10 4:3 | **Walter** 7:23 | **welfare** 11:20 | 73:6 74:1 76:15,19 77:1 84:4 89:20 | 78:16 92:7,10 102:22,23 103:2 104:9, |
| **videotelecon ference** 1:10 2:9 | **want** 8:5 15:4 26:5 42:5,10 52:6 58:4,11 68:5 76:6,9,23 | **we'll** 29:16 103:7 **well-known** 42:2 | 96:20 97:20 100:8 101:10 **white** 37:22 41:16 44:10 | 24 106:2 **witnesses** 64:6,21 86:18 **witness's** |
| **view** 25:13 31:12 41:22 | 77:17 81:13 83:24 87:21 98:13 99:18 | **went** 9:3 30:10 65:2 69:15 | **whoever** 100:6 | 71:20 **word** 14:15 19:17 |
| **virtually** 84:21 88:15 97:15 | 100:12 **wanted** 34:8 58:11 | 79:9 81:24 99:19 **We're** | **whole** 49:24 50:3,8, 9 61:19 76:12 | 70:21 71:1 78:13 **words** |
| **visceral** 17:3 | **Washington** 7:23 | 5:10 7:2 21:6 28:7 35:4 37:20 62:21 | 104:10 **Wilford** 17:4 | 19:17 32:14 82:12 83:20 89:16 95:12 |
| **visible** 44:20,22 45:3 | **wasn't** 19:14 43:4 54:10,11 89:16 | 67:17 75:4,15 78:3,4,7 97:17 103:5 | **wind** 97:13 | **work** 5:22 37:16 52:11 60:20 |
| **vitae** 6:9 **vital** | **watching** 68:2 **water** | **West** 1:18 2:14,15 4:10 | **window** 49:7 73:12 94:1 | 91:9,18 100:3 **worked** 10:6 |
| 70:20,21 **voir** 12:20,22 13:1 | 27:24 **way** 12:24 14:22 | **we've** 48:10 54:5 88:23 | **WISEMAN** 2:21 4:21 36:11 103:1 | **workers** 59:20 **working** |
| **volume** 25:15,18,20, 22 26:2 62:14 81:22 98:3 | 30:20 42:4 44:3 48:17 54:23 70:6,7 74:19 76:24 | **whatever** 22:12 27:9 49:3 61:20 | **wish** 91:24 **within** 1:15 19:11 | 8:8 9:20 11:23 58:24 59:2 61:11 |
| **volumetric** 98:1,9 | 77:15 79:10 | 64:22 66:7 | 22:14 26:19 | |

**USCA5 5179**

Jan Leestma                                              January 10, 2011
                                                                    134

| | | | | |
|---|---|---|---|---|
| **works** 12:13 | 73:14 **York** 7:19 | **11th** 105:1 | **1986** 9:11 | 16:21 17:20, 24 56:15 |
| **wouldn't** 58:14,19 69:20 88:13 101:12 | **yourselves** 4:15 | **1200** 1:18 | **1987** 9:12 | **2011** 1:20 4:11 14:6 105:2 |
| **Wrap** 21:15 | **Y-shaped** 41:13 | **1248** 1:20 4:2 | **1992** 90:21 | **215-928-0520** 2:17 |
| **written** 13:17 | _____ Z | **13** 58:6 72:15 | _____ 2 | **237** 87:22 |
| **wrong** 82:10 93:16 | **zero** 22:22 | **14** 106:13 | **2** 13:21 14:1 15:21 16:7 | **24** 47:23 50:7 |
| **wrote** 69:15 | _____ 0 | **145** 51:20 | 17:15 18:14, 15 36:16 51:24 66:18 | **241** 88:1 |
| _____ X | **01/10/2011** 6:2 14:2 15:17 35:15 38:18 90:14 | **15** 17:20,24 58:8 98:19,20 99:13 106:14 | 82:20 103:11 106:13 | **24-hour** 48:4 49:16 |
| **X** 106:9 | _____ ' | **1500** 2:3 | **20** 10:21 16:21 58:8 64:15 | **24-hour-old** 88:14 |
| **Xerox** 30:9 | **'05** 58:6 | **153** 51:23 | **2000** 9:17 52:10 | **25** 5:21 12:3 |
| **XYZ** 31:9 | **'06** 58:5 | **15th** 98:15 | **2001** 9:17 52:10 53:2 | **259** 103:11 |
| _____ Y | _____ 1 | **18** 58:7 | **2002** 38:22 72:16 75:21 | **26** 54:2,7 90:24 |
| **Yeah** 6:14 8:7,9 14:9 18:23 26:6 30:5 35:20 36:6 55:6 56:16 66:15 97:7 98:18 | **1** 4:3 6:1,5 51:20 100:17 106:12 | **1807** 38:23 | **2003** 10:1 52:16,20 53:8 | **27** 38:22 47:18 72:16 73:1 75:21 |
| | **10** 4:11 | **19106** 2:16 | **2005** 52:20 | **27th** 76:2 |
| | **1003** 47:18 | **1936** 37:17 | **2007** 57:20 58:8 | **28** 47:24 93:14, 16 |
| **year** 7:16,17 8:21 9:17 58:17 87:11 | **105th** 11:4 | **1960** 7:6,10 | **2008** 47:18 57:11, 15 93:6 | **29** 93:6 101:17 |
| | **10th** 1:19 | **1968** 7:19 | **2009** 10:18 57:1 60:8 | **29th** 101:1 |
| **years** 5:21 7:13,24 8:2 9:22 10:21 11:11, 13 12:3 52:19 59:4 60:5,14 | **11** 9:22 | **1971** 8:3 | **2010** 6:20 11:3 | **2A** 15:13,16 16:7 17:15 18:14 106:14 |
| | **1105** 47:24 | **1981** 8:18 | | |
| **Yep** | **1145** 47:20 | **1985** 9:2 | | _____ 3 |

USCA5 5180

Jan Leestma                                    January 10, 2011
                                                          135

**3**
35:14,18
42:19 76:6
106:15
**30**
11:11
**311**
1:18 4:10
**35**
106:15
**38**
106:16,17
_____ 4 _____
**4**
10:1 38:12,
17,20 41:12
106:16
**40**
12:7,9 60:14
**400**
100:4
_____ 5 _____
**5**
10:1 38:13,
17,20 41:12
53:8 106:4,17
**50/50**
56:23
**52**
106:5
**545**
2:14
**58**
46:15
**59**
46:15
_____ 6 _____
**6**
90:13,17
106:12,18

**600**
100:4
_____
_____ ' _____
**'64**
7:10,14
**'66**
7:14
_____ 7 _____
**7**
14:6,8,11,
15,20 15:8
18:22 99:15
**7/31/12**
105:7
_____ ' _____
**'70s**
9:22
_____ 7 _____
**713-567-9810**
2:5
**77002**
2:4
_____ ' _____
**'80s**
9:22
**'82**
8:22
_____ 8 _____
**84-3870**
1:17 3:22
104:7 105:10
**89**
106:6
_____ 9 _____
**9**
14:6,8,19
**9/17/02**
35:22 36:7

**90**
106:18
_____ ' _____
**'90s**
54:24 55:4,5
_____ 9 _____
**911**
47:20
**919**
2:3
_____ ' _____
**'97**
55:6
_____ 9 _____
**98**
106:7
_____ ' _____
**'98**
55:6

USCA5 5181


DEFENDANT'S EXHIBIT

# Curriculum Vitae

[As of November, 2010]

## JAN EDWARD LEESTMA, B.A., M.D., M.M.

PERSONAL: Married with two adult children and four grandchildren.

Born: November 30, 1938. Flint, Michigan.

Office Address: 1440 North Kingsbury, Suite 210, Chicago IL 60642.
Phone: (312) 988-2500, Fax: (312) 988-7257, Email: Jleestma@aol.com

### EDUCATION:

*Undergraduate: Hope College, Holland, Michigan: 1956-60. A.B. in Chemistry and Biology
*Medical School: University of Michigan: 1960-64. M.D.
*Residency: University of Colorado Medical Center, Denver: Anatomic Pathology, 1964-66; Neuropathology, 1966- 67.
*Fellowship (Neuropathology): Albert Einstein College of Medicine, Bronx Municipal Hospital Center, Bronx, NY, 1967-68.
*Sabbatical: Guest Researcher (Experimental Neuropathology): Karolinska Institute, Huddinge University Hospital, Institute of Pathology, Stockholm, Sweden, 1981-82.
*Graduate School: J.L. Kellogg Graduate School of Management, Northwestern University. Executive Master's Program. Masters of Management Degree (M.M.), 1986.

### MILITARY SERVICE:

* Captain, USAF, MC: Armed Forces Institute of Pathology, Washington, D.C. (Genitourinary Pathology Branch), 1968-69.
* Major, USAF, M.C.: Armed Forces Institute of Pathology, Washington, D.C. (Neuropathology Branch), 1969- 71.
* Honorably Discharged: 1971.

### LICENSURE-BOARDS:

* State of Michigan: Medical License, 1965-to present. [#026842]
* State of Illinois: Licensed as Physician and Surgeon, 1971-to present. [36-44272]
* American Board of Pathology: Certified, Anatomic Pathology (1970); Neuropathology (1970).

### ACADEMIC APPOINTMENTS:

* Instructor: University of Colorado School of Medicine (Pathology). 1967-68.
* Assistant Professor: Northwestern University School of Medicine (Pathology and Neurology). 1971-75.
* Associate Professor (Tenure): Northwestern University School of Medicine (Pathology and Neurology). 1975-1986.
* Professor: University of Chicago, Division of the Biological Sciences and the Pritzker School of Medicine (Pathology and Neurology). 1986-87.

### HOSPITAL APPOINTMENTS:

* National Naval Medical Center, Bethesda, Maryland: Consultant Neuropathologist, 1969-71.
* D.C. General Hospital, Washington, D.C.: Consultant Neuropathologist, 1969-71.
* Chicago Wesley Memorial Hospital, Chicago, IL: Associate Attending Physician, 1971-73.
* Passavant Memorial Hospital, Chicago, IL: Associate Attending Physician, 1971-73.
* Northwestern Memorial Hospital, McGaw Medical Center, Chicago, IL: Associate Attending Physician, 1973- 77; Attending Physician, 1977-1986.
* VA Lakeside Hospital, Chicago, IL: Consulting Neuropathologist, 1971-82.
* VA North Chicago (Downey), North Chicago, IL: Consulting Neuropathologist, 1972-82.
* West Suburban Hospital, Oak Park, IL: Consulting Neuropathologist, 1976-85.
* Children's Memorial Hospital, Chicago, IL: Attending Physician, 1982-2001.
* University of Chicago Hospitals and Clinics, Chicago, IL: Attending Physician, 1986-87.
* Columbus Hospital Medical Center, Chicago, IL: Attending Physician, 1987-2001. (Hospital closed).
* St. Joseph's Hospital, Chicago, IL: attending staff: 2001-2003; Emeritus: 2003.
* Advocate Illinois Masonic Hospital, Chicago, IL: Consulting Neuropathologist, 1991-2003.
* Advocate Ravenswood Hospital, Chicago, IL: Consulting Neuropathologist: 2001-2002.

USCA5 5182

* Neurosurgical and Orthopedic Institute of Chicago (formerly Ravenswood Hospital): 2002-2003; Emeritus: 2003.
*Children's Memorial Hospital, Northwestern University Medical Center, Chicago IL:Emeritus Attending Physician, 2003. Consulting Neuropathologist: Dec. 2003-2005.

OTHER APOINTMENTS AND PROFESSIONAL ACTIVITIES:

* Assistant Medical Examiner (Neuropathology), Office of the Medical Examiner, Cook County (Chicago), IL. 1977-1987.
* Private consultant practice in forensics and neuropathology: 1973-present
* Baxter-Travenol Laboratories Inc., Morton Grove, IL: Consultant. 1973-79; 80-82.
* American Association of Neuropathologists, Member: 1970-present.
 Member of Professional Affairs Committee;
  *Councilor to International Society of Neuropathology, 1985-89; Program Committee, 1986-1990.
*Cyberonics, Inc., Webster, TX: Consultant: 1996-99.
* Institute of Forensic Sciences of Puerto Rico (San Juan, PR): Neuropathology Consultant: 1997-2001.

ADMINISTRATIVE APPOINTMENTS:

* Northwestern University Medical Center: Director of Neuropathology, 1971-81. Director of Residency Training in Pathology. 1979-81; Chairman, Admissions Committee for Transfer Students (Northwestern University Medical School), 1977-79.
* Society of Sigma Xi, Northwestern University Chapter, President, 1981.
* Children's Memorial Hospital: Chief of Neuropathology, 1982-86.
* The Division of the Biological Sciences and Pritzker School of Medicine, University of Chicago: Dean of Students for the Division 1986-87.
* The Chicago Institute of Neurosurgery and Neuroresearch, Columbus Hospital: Associate Medical Director, 1987-1999.
*The Chicago Institute for Neurosurgery and Neuroresearch, Inc., Executive Director of Research, 1990-1999.
* Chief Executive Officer, Neurotherapeutics Management Co., Chicago, IL: 1994-1999.
* Co-Founder , Chief Medical Officer, Secretary-Secretary-Treasurer, and Board of Directors member: Nyxis Neurotherapies, Inc., Chicago, IL: 1999-2007.

* Member, Board of Directors, The Chicago Institute of Neurosurgery and Neuroresearch Medical Group: 1997-1999.
* Partner, The Chicago Institute of Neurosurgery and Neuroresearch Medical Group: 1987-2003.
* Advisory Board Member: The Falk Center for Molecular Therapeutics, Department of Biomedical Engineering, The McCormick School of Engineering and Applied Science, Northwestern University, Evanston, IL. (2003-present).
* Member, Board of Directors, and Secretary-Treasurer, Naurex Inc., 2007-present.

EDITORSHIPS/PARTICIPATIONS:

* The Year Book of Pathology and Clinical Pathology: Associate Editor, 1973-1980.
* Medical Trial Technique Quarterly: Editorial Board, 1977-1999.
* Periodic peer reviewer: New England Journal of Medicine; Journal of Neuropathology and Experimental Neurology; Journal of the American Medical Association; Epilepsia; Archives of Pathology and Laboratory Medicine, The American Journal of Forensic Medicine and Pathology, American Journal of Physicians and Surgeons, and other professional journals.
* Ad hoc grant reviews and site visits for National Science Foundation and the National Institutes of Health (NINCDS).
* Member: Consensus panel: Acoutic Neuroma-NIH, 1991.
* Editorial Board: American Journal of Forensic Medicine and Pathology: 2002-present.
* Editorial Board: The Open Forensic Science Journal. Bentham Science Publishers: 2009-present.

HONORS AND AWARDS:

* University of Michigan School of Medicine: Special Studies Program, 1962-64.
* American Cancer Society Fellow, 1967-68.
* Grantee, National Institutes of Health (RO-1), NINCDS, 1974-77.
* George H. Joost Outstanding Teacher in the Basic Sciences. Northwestern University School of Medicine, 1979.
* Guest Researcher, Karolinska Institutet (Pathology Institute-Huddinge Sjukhus), Stockholm, Sweden, 1981-82.

CIVIC INTERESTS:

USCA5 5183

* Juvenile Protective Association of Chicago (direct services to abused and neglected children and their families):   Board Member (1977-present); Assistant Treasurer (1980-82); Vice President (1983-85).
* Chicago Council on Foreign and Domestic Affairs: Executive Board, 1974-82; 87-89.
 * Horizon Hospice of Chicago: Board Member, 1988-1992. Medical advisor, 1992-1998.
* Board Member and Chairman of Grants Committee, The Columbus-Cabrini Medical Center Foundation, 1988-2000.
* Board Member and Secretary, The Chicago Institute for Neurosurgery and Neuroresearch, Inc. (not-for-profit research institute) Chicago: 1998-2004.

PROFESSIONAL MEMBERSHIPS:

* American Association of Neuropathologists: 1970-present.
* Chicago Institute of Medicine
* Illinois Society of Pathologists
* International Society of Neuropathology
*American Academy of Forensic Sciences: Associate Member, 2004-2006; Member, 2006-2009; Fellow, 2009-present.

**Lectures, Courses and Abstracts:** not listed.

## Professional Publications:

1. Miller, E.K., Willey, E.N., Leestma, J.E., and Riggs, J.L.: Non-immune fluorescent protein staining of neoplasms. Exp. & Molec. Path. 2:144-156, 1963.

2.Schneck, S.A., and Leestma, J.E.: The Central Nervous System.(Chapter 15). In-Ultrastructural Aspects of Disease (Ed.-King, D.W.), Hoeber, New York, 1966.

3.Schneck, S.A., and Leestma, J.E.: The Muscular System. (Chapter 13). In-Ultrastructural Aspects of Disease (Ed.-King, D.W.), Hoeber, New York, 1966.

4. Schneck, S.A., Fulginiti, V., and Leestma, J.: Measles virus and panencephalitis. Lancet 1:1381-1382., 1967.

5.Williamson, M.E., Leestma, J.E., Black, W.C., and King, D.W.: Histologic Patterns in Tumor Pathology. Hoeber, New York, 1968.

6.Leestma, J.E., and Koenig, K.L.: Sudden death  and phenothiazines: a current controversy. Arch.  Gen. Psychiat. 18:137- 148, 1968

7.Leestma, J.E., and Martin, E.: An electron probe andhistochemical study of the "ferruginated" neuron. Arch. Path. 86:597- 605, 1968.

8.Leestma, J.E., Bornstein, M.B., Sheppard, R.D., and Feldman,L.A.: Ultrastructural aspects of herpes simplex virus  infection in organized cultures of mammalian nervous tissue. Lab. Invest. 20:70-78, 1969.

9.Leestma, J.E., and Andrews, J.M.: The fine structure of the Marinesco Body. Arch. Path. 88:431-436, 1969.

10.Leestma, J.E. Major USAF MC: Armed Forces  Institute of Pathology CPC #7-69. American Registry of Pathology. Armed Forces Institute of Pathology, Washington, D.C., 1969.

11.Dehner, L.P., Leestma, J.E., and Price, E.B. Jr.: Renal cell carcinoma  in children: a clinical-pathologic study of 15  cases and review of literature. J. Pediat. 76:597-368, 1970.

12.Mostofi, F.K., and Leestma, J.E.: CONCEPTS OF DISEASE. A Textbook of  Human Pathology. Brunson, J.G., and Gall, E.A. (eds.), MacMillan, New York, 1971: Chapter 9.: Special Aspects of Cell Function,  Growth, and Structure—The Genitourinary Tract.

13. idem: Chapter 18.: Special Aspects of Inflammation and Circulatory Disorders--The Genitourinary Tract.

14. idem: Chapter 22.: Special Aspects of  Infection, Immunity, and Hypersensitivity--The Genitourinary Tract.

15. idem: Chapter 24.: Special Aspects of Neoplasms—The Genitourinary Tract.

16.Leestma, J.E., and Price, E.B. Jr.: Paraganglioma of the urinary bladder. Cancer 28:1063-1073,1971.

17.Mostofi, J.E., and Leestma, J.E.: Pathology of the Lower Urinary Tract and Male Genitalia (Chapter). In-PATHOLOGY. 6th, Ed., Anderson, W.A.D.(ed.), Mosby, St. Louis, 1971.

USCA5 5184

18.Hughes, J.R., Cayaffa, J., Leestma, J.E., and Mizuno, Y.: Alternating "wake" and "sleep" EEG patterns in a deeply comatose patient. Clin Electroenceph. 3:86-93, 1972.

19.Henry, J.M., and Leestma, J.E.: Glioblastoma and co-existent meningeal fibrosarcoma. A case study. Acta Neuropath. 23:334-337, 1973.

20.Leestma, J.E. (Sections on:CNS, eye, neuromuscular pathology): The Year Book of Pathology and Clinical Pathology. Year Book, Chicago, 1973.

21.Leestma, J.E. (Sections on:CNS, eye, neuromuscular pathology): The Year Book of Pathology and Clinical Pathology. Year Book, Chicago, 1974.

22.Leestma, J.E. (Sections on:CNS, eye, neuromuscular pathology): The Year Book of Pathology and Clinical Pathology. Year Book, Chicago, 1975.

23.Leestma, J.E.:Stroke:Clinical and Pathological Considerations. Med. Trial Tech. Quart. (fall),121-137, 1975.

24.Leestma, J.E. (Member of Collaborative Study on Cerebral Survival-NIH Contract N01-NS-1-2316): The Neuropathological Findings in Irreversible Coma. A Critique of the "Respirator Brain". Walker, A.E., Diamond, E.L., and Moseley,J.(eds). J. Neuropath. & Exp. Neurol. 34:295-323, 1975.

25.Leestma, J.E.:Velocity measurements of particulate neuroplasmic flow. J. Neurobiol. 7:173-183, 1976.

26.Hughes, J.R., Boshes, B., and Leestma, J.E.: Electro-clinical and pathological correlations in comatose patients. Clin. Electroenceph. 7:13-30, 1976.

27.Leestma, J.E., and Noronha, A.: Pure motor hemiplegia, medullary pyramid lesion, and olivary hypertrophy. J. Neurol. Neurosurg. & Psychiat. 39:877-884, 1976.

28.Leestma, J.E. (Sections on:CNS, eye, neuromuscular pathology): The Year Book of Pathology and Clinical Pathology. Year Book, Chicago, 1976.

29.Leestma, J.E., and Freeman, S.S.: Computer assisted analysis of particulate axoplasmic flow in organized CNS tissue cultures. J. Neurobiol. 8:453-467, 1977.

30.Sacks, J.G., O'Grady, R.B., Choromokos, E., and Leestma, J.E.: The pathogenesis of optic nerve drusen. A hypothesis. Arch. Ophthal. 95:425-428, 1977.

31.Leestma, J.E.: The Pathology of Spinal Cord Injury (Chapter): International Encyclopedia of Neurology, Psychiatry, Psychoanalysis, and Psychology, Wolman, B.J. (Ed.-in-Chief), New York, 1977.

32.Spehlmann, R., Gross, R.A., Ho, S.U., Leestma, J.E., and Norcross, C.A.: Visual evoked potentials and postmortem findings. Ann. Neurol. 2:531-534, 1977.

33.Leestma, J.E. (Section on:CNS, eye, neuromuscular pathology): The Year Book of Pathology and Clinical Pathology. Year Book, Chicago, 1977.

34.Spehlmann, R., Gross, R.A., Ho, S.U., Leestma, J.E., and Norcross, C.A.:Visual evoked responses and postmortem findings in a case of cortical blindness. Trans. Am. Nerol. Assn. 102:1-4, 1977.

35.Leestma, J.E. (Section on:CNS, eye, neuromuscular pathology): The Year Book of Pathology and Clinical Pathology, Year Book, Chicago, 1978.

36.Kubek, M.J., Wilber, J.F., and Leestma, J.E.: The identification of gonadotropic releasing hormone (GnRH) in hypothalamic and extrahypothalamic loci of the human nervous system. Horm. Met. Res. 11:26-29, 1979.

37.Kaplan, P.E., Santana, R., Cohen, J., and Leestma, J.: Glioblastoma multiforme presenting as stroke: an electrophysiological and clinicopathological case report. Arch Phys. Med. Rehab. 60:74-77, 1979.

38.Leestma, J.E.(Section on: CNS eye, neuromuscular, forensic pathology): The Year Book of Pathology. Year Book, Chicago 1979.

USCA5 5185

39. Szper, I, Oi, S., Leestma, J.E., Kim, K.S., and Wetzel, N.E.: Xanthogranuloma of the third ventricle. J. Neurosurg. 51:565-568, 1979.

40.Leestma, J.E., and Sepsenwol, S.: Sperm tail alterations in theWobbler mouse. J. Reprod. Fert. 58:267-70, 1980.

41.Leestma, J.E.(Section on:CNS, eye, neuromuscular, forensic pathology):The Year Book of Pathology and Clinical Pathology.Year Book, Chicago, 1980.

42.Leestma, J.E.: Werdnig-Hoffmann Disease (Infantile spinal muscular atrophy). Animal model of human disease (Wobbler Mouse). Amer. J. Path. 100:821-824, 1980.

43.Leestma, J.E.:Teaching Monograph. Brain Tumors. Amer. J. Path. 100:239- 316, 1980. ***(Also published for separate distribution and sale as a teaching monograph by Universities Associated for Research and Education in Pathology (UAREP), Bethesda, Md., 1980).

44.Molteni, A., Fors, E., and Leestma, J.: Sterility in Wobbler mice-a defect in cellular estradiol-binding activity. In-Endocrinological Cancer Ovarian function and Disease; Proc. 9th. Int. Study Group for Steroid Hormones. International Congress Series.Pgs. 389-392. (Eds., Adlercreutz, H, Bulbrook, RD, Van der Molen, HJ, Vermeulen, A, and Sciarra, F. Excerpta Medica, Amsterdam, 1980.

45.Kaplan, P.E., Hines, J.R., Leestma, J.E., and Ruder, H.J: Neuromuscular junction transmission deficit in a patient with primary hyperparathyroidism. EMG and Clin.Neurophysiol. 20:359-367, 1980.

46.Richardson, R.R., Noronha, A., Leestma, J., and Siqueira, E.: Multiple neoplastic associations with central and peripheral von Recklinghausen's Disease. Southern Med. J. 73:1074-1077, 1980.

47.Leestma, J.E. (Participating Review Pathologist and Coordinator for Northwestern University, UAREP Nitrite Project, FDA Contract #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): Re-evaluation of the Pathology Findings of Studies on Nitrite and Cancer. Histologic Lesion in Sprague-Dawley Rats. Final Report. Department of Health and Human Services. Public Health Service. Food and Drug Administration. Washington D.C., 1980.

48.Leestma, J.E. and Konakci, Y.: Sudden unexpected death due to neuroepithelial (colloid) cyst of the third ventricle. J. Forensic Sci. 26:486-491, 1981.

49.Jay, G.W., and Leestma, J.E.: Sudden death in epilepsy: a comprehensive review of the literature and proposed mechanisms. Acta Neurol. Scand. 63 (Suppl 82):1-66, 1981.

50.Lifschultz, B.D., Leestma, J.E., and Stryker, S.: Multiple fungal mycotic aneurysms and transverse myelopathy complicating repair of aortic coarctation. Ann. Thoracic Surg. 33:192-196,1982.

51.Kristensson, K., Oervell, C., Leestma, J., and Norrby, E.:Sendai virus infection in the brains of mice: distribution of viral antigens studied with monoclonal antibodies. J. Infect. Dis. 147:297-301, 1983.

52.Leestma, J.E., Kalelkar, M.B., Teas, S.S.: Ponto-medullary avulsion associated with cervical hyperextension. In: Trauma and Regeneration, Ed., H. Adams, Acta Neurochir. (Suppl 32) 69-73, 1983.

53.Leestma, J.E., Hughes, J.R., Diamond, E.R.: Temporal correlates in brain death: EEG and clinical relationships to the respirator brain. Arch. Neurology 41:147-152, 1984.

54.Leestma, J.E., Kalelkar, M.B., Teas, S., Jay, G.W., and Hughes, J.R.: Sudden unexpected death associated with seizures: analysis of 66 cases. Epilepsia 25:84-88, 1984.

55.Leestma, J.E.: Brain Tumors. Part One: Introduction to the pathology of brain tumors. Slide/Tape program. Audiovisual Medical Marketing and UAREP, New York-Washington D.C.,1984.

56.Leestma, J.E.: Brain Tumors. Part Two: Pathology of brain tumors. Slide/Tape program. Audiovisual Medical Marketing and UAREP, New York- Washington D.C., 1984.

57.Kristensson, K., Leestma, J., Lundh, B., Norrby, E.: Sendai virus infection in the mouse brain: virus spread and long term effects. Acta Neuropath. 63:89-95, 1984.

USCA5 5186

58. Leestma, J.E., Hughes, J.R., Teas, S.S., Kalelkar, M.B.: Sudden epilepsy deaths and the forensic pathologist. Am. J. Forensic Med. Pathol. 6:215-218, 1985.

59. Fernbach, S.K., Naidich, T.P., McLone, D.G., Leestma, J.E.: Primary intrathecal Wilms' tumor with diastematomyelia. J. Computer Assisted Tomography 8:523-528, 1984.

60. Leestma, J.E.: The Pathology of viral diseases of the nervous system (Chapter 16: pp. 704-787). In-General Neuropathology (Eds., Robertson, D.M., and Davis, R.), Williams and Wilkins, Baltimore, 1985.

61. Husain, A., and Leestma, J.E. : Astroblastoma: immunocytochemical and electron microscopic analysis. J. Neurosurgery 64:657-661, 1986.

62. Naidich, T.P., Radkowski, M.A., McLone, D.G., and Leestma, J.E.: Chronic cerebral herniation in shunted Dandy-Walker malformation. Radiology 158:431-434,1986.

63. Magee, D.J., and Leestma, J.E.: Use of neuropathologic evidence in will contests. Medical Trial Tech. Quarterly 33:121-139, 1986.

64. Taomoto K, Tomita T, Raimondi AJ, Leestma JE: Medulloblastomas in childhood: histological factors influencing patients' outcome. Child Nerv Syst 3:354-360, 1987.

65. Lifschultz, B.D., Donoghue, E.R., and Leestma, J.E., and Boade, W.A. (1987): Embolization of cotton pledgets following insertion of porcine cardiac valve bioprostheses. J. Forensic Sci. 32(6): 1796-1800, 1987.

66. Leestma, J.E.: Forensic Neuropathology, Raven Press, New York, 1988.

67. Burke, H.B., Richards, R.L., and Leestma, J.E.: Allocation of senior electives by auction. J. Med. Education 63:76, 1988.

68. Leestma, J.E., Walczak, T., Hughes, J.R., Kalelkar, M.B., and Teas, S.S. : A prospective study on sudden unexpected death in epilepsy. Ann. Neurology 26:195-203, 1989.

69. Gianaris, P.G., Leestma, J.E., Cerullo, L.J., and Butler, A.: Castleman's disease manifesting in the the central nervous system: case report with immunological studies. Neurosurgery 24:608-613, 1989.

70. Leestma JE: The neuropathologist as an expert witness. Med Trial Tech. Qtly. 28:170-183, 1989.

71. Leestma, JE: The Cardiovascular System (Chapter 30). In Medical Litigation Guide, F. Lane (Editor). Callaghan & Co., Deerfield IL. 1990.

72. Leestma, J.E.: Natural history of epilepsy [Chapter 1]. In: Epilepsy and Sudden Death , edited by C.M. Lathers and P. L. Schraeder, Marcel Dekker, New York, 1990, pp. 1-26.

73. Leestma, J.E.: Sudden unexpected death associated with seizures: a pathological review [Chapter 5]. In: Epilepsy and Sudden Death, edited by C.M. Lathers and P.L. Schraeder, Marcel Dekker, New York, 1990, pp. 61-88.

74. Lathers, C.M. and Leestma, J.E.: Psychoactive agents, epilepsy, arrhythmias and sudden death [Chapter 23]. In: Epilepsy and Sudden Death, edited by C.M. Lathers and P.L. Schraeder, Marcel Dekker, New York, 1990, pp. 447-484.

75. Chan AWK, Lathers CM, Leestma JE: Alcohol, arrhythmias, seizures and sudden death [Chapter 19]. In: Epilepsy and Sudden Death, edited by C.M. Lathers and P.L. Schraeder, Marcel Dekker, New York, 1990, pp. 329-374.

76. Leestma JE, Helenowski T: Bladeless knife cuts new ground. Chicago Medicine 93:20-23, 1990.

77. Leestma JE: Viral infections of the nervous system. In: Textbook of Neuropathology, 2nd edition, RL Davis and DM Robertson (eds). Williams and Wilkins, Baltimore. Chapter 15, pp. 804-903, 1991.

78. Leestma, JE: Neuropathology and pathophysiology of trauma and toxicity. In: Forensic Neuropsychology, edited by H.O. Doerr and A.S. Carlin, The Guilford Press, New York, 1991.

79. Leestma, J.E. (member of Consensus Development Panel, Walter E. Nance, M.D., Ph.D, Chairman): Acoustic Neuroma. Consensus Statement. NIH Consensus Development Conference, Dec. 11-13, 1991, Vol. 9, No. 4. National Institutes of Health, Bethesda, MD.

USCA5 5187

80. Leestma, JE: Forensic Neuropathology (Chapter 12). In: Pediatric Neuropathology, edited by S. Duckett. Williams & Wilkins, Baltimore, 1995.

81. Tennis, P., Cole, T.B., Annegers, J.F., Leestma, J.E., McNutt, M., and Rajput, A.: A cohort study of the incidence of sudden unexplained death in people with seizure disorder in Saskatchewan, Canada. Epilepsia 36:29-36, 1995.

82. Yamamoto H, Kaneko Y, Vandermeulen D, Kersey D, Mkrdichian E, Cerullo L, Leestma J, and Moskal JR: The expression of CMP-NeuAc:GalB1, 4GlcNAc a2,6 sialyltransferase (EC 2.4.99.1) and glycoproteins bearing a2,6-linked sialic acids in human brain tumours. Glycoconjugate J. 12:848-856, 1995.

83. Kaneko Y, Yamamoto H, Kersey D, Colley KJ, Leestma JE and Moskal JR: Expression of GalB1,4GlcNAc a-2,6 sialyltransferase and a-2,6-linked sialoglycoconjugates. II. Human brain tumors. Acta Neuropathol 91:284-292, 1996.

84. Leestma JE, Grutsch J, Mkrdichian E, Cerullo LJ: Prognosis of patients with primary malignant brain tumors: Is there any cause for optimism? Chicago Medicine 99:10-13, 1996.

85. Yamamoto H, Saito T, Kaneko Y, Kersey D, Yong VW, Mkrdichian E, Cerullo L, Leestma J, Moskal JR: $\alpha$2,3 sialyltransferase mRNA and $\alpha$2,-linked glycoprotein sialylation are increased in malignant gliomas. Brain Research 755:175-179, 1997.

86. Leestma, JE. Annegers, JF, Brodie, MJ, Brown, S, Schraeder, P, Siscovick, D, and Wannamaker, B, et al.: Sudden unexplained death in epilepsy (SUDEP) in a large clinical development program. Epilepsia 38:47-55, 1997.

87.Leestma JE: Chapter 11: Forensic Neuropathology. In: Neuropathology. The diagnostic approach. Edited by JH Garcia. Mosby-Yearbook, St. Louis, 1997.

88. Annegers JF, Coan SP, Hauser WA, Leestma J, Duffell W, Tarver B: Epilepsy, vagal nerve stimulation by the NCP® system, mortality, and sudden, unexpected, unexplained death. Epilepsia 39:206-212, 1998.

89. Leestma JE: Forensic considerations in sudden unexpected death in epilepsy. Epilepsia 38(suppl. 11): S63-S-66, 1997.

90. Leestma JE: Forensic neuropathological aspects of the aging brain. In: Pathology of the Aging Brain, S Duckett and J de la Torre (Editors), Oxford University Press, New York, 2001.

91.Yamamoto H, Swoger J, Greene S, Saito T, Hurh J, Sweeley, Leestma J, et al.: $\beta$1,6-N-Acetylglucosamine-bearing N-glycans in human gliomas: implications for a role in regulating invasivity. Cancer Research 60:134-142, 2000.

92. Leestma JE, Vicente Torres J: Unappreciated agenesis of the cerebellum in an adult: case report of a 38 year old man. Amer. J. Forensic Med Pathol. 21:155-161, 2000.

93. Kroes FA, Jastrow A, McLone MG, Yamamoto H, Colley P, Kersey DS, Yong VW, Mkrdichian E, Cerullo L, Leestma J, Moskal JR: The identification of novel therapeutic targets for the treatment of malignant brain tumors. Cancer Ltrs 156:191-198, 2000.

94. Annegers JF, Coan SP, Hauser WA, Leestma J: Epilepsy, vagal nerve stimulation by the NCP® system, all-cause mortality, and sudden, unexpected, unexplained death. Epilepsia 41:549-553, 2000.

95. Leestma JE: Occult/asymptomatic cranial injury in infancy: its significance for medical practice and forensic medicine. Lancet Neurology Network 4(2) 1, January 2001 [www.lancetneuronet.com].

96: Leestma JE: Neuropathological and Forensic Aspects of of Brain Death and the Respirator Brain: In: Clinical Guide to Brain Death . EFM Wijdicks (Ed), Lippincott Williams & Wilkins, Philadelphia, 2001.

97. Miller M, Leestma J, Barnes P, Carlstrom T, Gardner H, Plunkett J, Stephenson J, Thibault K, Uscinski R, Niedermier J, Galaznik J: A sojourn into the abyss: hypothesis, theory, and established truth in infant head injury. Pediatrics 113:432-433, 2004.

98. Leestma, JE: Case analysis of brain injured, admittedly shaken infants: 54 cases, 1969-2001. Amer J Foren Med Pathol 26:199-212, 2005.

99. Leestma JE: "Shaken baby" syndrome: confessions/admissions of alleged perpetrators as a

USCA5 5188

validation for the concept?  JAmer Phys & Surg, 2 (1): 14-16, 2006.

100. Emborg ME, Moirano J, Schaferrnak K, Moirano M, Evans M, Konecni T, Roitberg B, Pawar A, Mangubat E, Ma Y, Eidelberg D, Holden J, Kordower J, Leestma J: Basal ganglia lesions after MPTP administration in rhesus monkeys. Neurobiology of Disease 23:281-289, 2006.

101. Leestma JE: *Book Review*: Forensic Neuropathology and Neurology. Oehmichen M, Auer RN, König HG. Springer,-Verlag, Berlin, 2006. New Engl J Med: (July 2006).

102. Schafernak K., Yang XJ, Hsueh W, Leestma J, Stagl J,  Goldman, S: Pediatric renal cell carcinoma as a second malignancy: reports of two cases and a review of the literature. The Canadian J Urol 14:3739-3744, 2007.

103. Leestma, J., E.: Forensic Neuropathology, 2nd. Edition. Taylor & Francis, Boca Raton, FL, 2009.

104. Lathers, CM, Schraeder, PL, Bungo, MW, Leestma, JE (Eds.): Sudden death in epilepsy. Forensic and clinical issues. Taylor & Francis, Boca Raton, FL, 2010.

105. Leestma, JE: Forensic considerations and SUDEP, In: Sudden death in epilepsy. Forensic and clinical issues., Eds:  Lathers, CM, Schraeder, PL, Bungo, MW, Leestma, JE. Taylor & Francis, Boca Raton, FL, 2010.

USCA5 5189

DEFENDANT'S
EXHIBIT
2

# JAN E. LEESTMA, MD, MM
## NEUROPATHOLOGY

January 9, 2011

Victor Abreu, Esq.
Public Defender
Curtis Center, Suite 545, West
Philadelphia, PA  19106

Dear Mr. Abreu:

At your request I now offer an appended report to the original report of 12/15/2010, because I have received information that was not available to me at the time of the original report.

This report deals with the death of a minor child, Jakarenn Gunter. I was provided the following materials that form the basis of this report:

1. Direct appeal opinion (Bourgeois).
2. Trial testimony transcripts [opening statement, Booth; EMT Burgess; Dr. Benton; McLaughlin, Dr. Kuffel, Dr. Rouse, Dr. Oliver; Dr. Senn; Dr. Chrz; Dr. Akhtar, Beckett]
3. Transcript of April 20, 2010 hearing before Judge Jack.
4. Forensic odontology reports of Dr. Senn, Dr. Chrz.
5. Autopsy report of Dr. Rouse.
6. Neuropathology report of Dr. Kagan-Hallet.
7. Affidavit of Dr. Spitz.
8. Visceral autopsy slides,  A-02042, Wilford Hall Medical Center, TX.
9. Medical records and reports re: Jakarenn Gunter.
10. CT scan of Jakarenn Gunter.
11. Brain autopsy slides and photographs.
12. Autopsy photographs.
13. Copy of hand written notes of US Attorney re: Dr. Elizabeth Rouse.

To reiterate, very briefly, my understanding of the case is that the child, Jakarenn Gunter was a 2 year old female in the care of Mr. Bourgeois. The family of Mr. Bourgeois was frequently traveling with him in his commercial truck as he conducted his business of hauling freight. The Government has alleged that the child had apparently been maltreated and beaten by Bourgeois for some time before the child's death largely over matters concerned with toilet training. On the morning of July 27, 2002, Bourgeois arrived with goods on his truck to be delivered at the Corpus Christi Naval Air Station. During the course of positioning his truck at a loading dock at this facility an incident was reported to have occurred between Bourgeois and the deceased child during which Bourgeois was reported to have slammed the child's head against a window in the truck and the dashboard. After this occurrence the child was said to have become limp and unconscious. The child was brought to a medical facility where she never regained consciousness and died on July 28, 2002.

An autopsy was conducted by Dr. Rouse of the Armed Forces Medical Examiner's office. Dr. Rouse found multiple subgaleal hemorrhages (estimated 10 impacts), a 2ml. subdural hematoma with "minimal" organization, subarachnoid hemorrhage and cerebral edema, parenchymal brain damage including axonal pathology, bilateral retinal hemorrhages and optic nerve sheath hemorrhages, many areas of skin injuries of multiple ages. A recent bruise of the left shoulder was described also. She concluded that the child had died from closed head trauma with subdural hematoma with the manner of death homicide.

1440 North Kingsbury Street, Suite 210, Chicago, IL  60642
Telephone: (312-988-2500, FAX (312) 988-7257, Email: Jleestma@aol.com

USCA5 5190

A neuropathological examination of the brain was performed by Dr. Kagan-Hallett who reported the brain to be swollen, with a subarachnoid hemorrhage and a subdural hematoma that in its oldest portions was estimated to be a few weeks or approximately 10 days in duration. Dr. Kagan-Hallett also found axonal injury in the white matter with macrophage responses in the tissue. She also reported organizing contusion infarcts in the brain 7+ days in duration. The term "organizing" refers to a healing process ongoing in the hematoma that takes time to evolve indicating that the oldest part is 10 days or more old from time of death.

From the report of Dr. Kagan-Hallett, it is obvious that the child had a subdural hematoma, though it doesn't appear to be very large, and appears to have an acute component in addition to the component that was healing as discussed above. The older and larger component's age is derived from the microscopic appearance of the subdural hemorrhage and the healing process which occurs over time after the inception of the hematoma. This would clearly indicate that the oldest part of this lesion predated her final hospitalization by many days or longer. It is common to have relatively fresh red blood cells in a chronic subdural hematoma. Such cells could have appeared immediately before the child died or up to 2-3 days previously. Such "recent" bleeding cannot be aged any more precisely. It cannot be known when the most recent bleeding into the hematoma occurred within a window of two days or how it occurred. It also cannot be known if this acute component contributed or caused death.

My examination of the gross autopsy photographs relevant to the head and brain revealed a primarily right sided apparently recent subdural hematoma of the vertex dura from its external appearance. It appears relatively thin with a probable volume of a few ml. Photographs of the reflected scalp reveal subgaleal hemorrhage a few cm diameter above the temporalis muscle approximately over the coronal suture on the right side a few cm from the midline. The hemorrhage is dark red-black in color. The anterior reflected scalp has a number of apparent impact sites with the largest about 1 cm. These do not appear to be full thickness scalp hemorrhages and their age is not determinable from the photographs. The posterior scalp in the occipital region behind the right ear shows another subgaleal hemorrhage about 2 cm with indistinct margins and possibly some color changes tending toward brown rather than dark red-black.

My examination of the visceral autopsy slides revealed that several sections of the scalp had deep subcutaneous hemorrhages with inflammatory reactions of varying age and degree, ranging from bruises that had preserved red cells (2-3 days or less in age), early inflammatory cell changes (a few days or older), granulation tissue and early scar formation (a week plus), and essentially healed skin lesions (many weeks old). The lungs showed congestion, edema and an "early" pneumonia with pulmonary macrophage activation. The kidneys, adrenals, liver, spleen and gall bladder showed congestion. The pancreas was autolyzed. One section of what was probably the tongue showed old lesions in the process of healing. The heart showed an area of myocardial hemorrhage and necrosis with reactive cells present. I concluded that the child had an early pneumonia which is not uncommon on individuals maintained on a respirator but could have preceded hospitalization. The skin lesions clearly represent dermal injuries of multiple ages from within two days of death to many weeks before death. The tongue shows a healing injury. It seems inescapable that this child had been physically assaulted over a considerable period of time before death.

On 1/5/2011 I received 6 neuropathology brain slides from the University of Texas (Kagan-Hallett's slides). Examination of these materials revealed a slide of dura and superior sagittal sinus that contained a thin chronic subdural membrane attached to a recent blood clot. The thin membrane was composed of 3-5 layers of fibroblasts and other cells. This was not attached to the dura. The dura contained many layers of chronic inflammatory cells and fibroblasts attached to the arachnoid granulations. The thickness of these reactive cells were sufficient to place the age of the inception of the bleeding in that location to about 10 days from time of death in keeping with Dr. Kagan-Hallett's estimations in her report. In addition, I found a thrombus in the superior

USCA5 5191

sagittal sinus that was not attached to its wall and another thrombus separate from this one lying free. This was clearly a premortem thrombus and showed fibrin, layering and peripheral cellular reactions indicating it was likely attached to the wall of the sinus at one time. The estimation of this process' age is many days, perhaps a week from death

In addition I noted several necrotizing lesions of the surface of the brain that spilled over into the arachnoid and subarachnoid space. These all contained chronic inflammatory cells, some with pigment in them including macrophages and early capillary and vascular reactions to these processes. There was a chronic subarachnoid hemorrhage with recent component including chronic inflammatory cells. In one section this same process appeared to involve the subependymal brain tissue and ependyma. These lesions may represent venous infarctions whose most likely cause was cerebral venous thrombosis. The presence of macrophages, capillary reactions and pigmented macrophages makes these lesions probably about 7 days or more from the time of death.

Given the many scalp bruises of various ages it is reasonable to conclude that the child had suffered many impacts to the head over time which could have led to the subdural hematoma. It is not possible to determine if the physical actions ascribed to Mr. Bourgeois on July 27, 2002, caused new bleeding into the subdural hematoma since it is not possible to histologically age acute blood in a bruise more precisely than indicating that the red cells could have arrived in the hematoma anytime within about two days of death. My examination of the CT scans reveals a relatively small recent subdural hematoma along the falx, mostly posteriorly along with some mixed density material that probably represents the older component of the subdural mentioned above.

The finding of retinal hemorrhages and optic nerve sheath hemorrhages in this case do not provide any information regarding the mode of injury of this child. They only indicate that the child increased intracranial pressure during the course of her hospitalization prior to death. The cause of the increased intracranial pressure was in part due to cerebral edema which in turn has several causes (hypoxia-ischemia, prior old brain injury, new concussive head trauma, and other processes). The subarachnoid hemorrhage's cause may be due to reperfusion injuries secondary to resuscitation and disturbed perfusion of the brain in the face of high intracranial pressure and/or venous thrombosis intracranially. The myocardial focal hemorrhage and necrosis could have been due to an intracardiac injection during resuscitation, though I find no record of this having been done.

Regarding a critical question, that of when the fatal head injuries to the child were caused, it is clear that she had sustained a number of head impacts allegedly due to having been beaten over period of time. The subdural hematoma's cause is likely physical trauma but it cannot be determined whether this was inflicted or accidental. The role of the subdural hematoma in the death is somewhat problematic because its volume is so small (a few ml.). This volume should have been easily compensated for by reabsorption of cerebrospinal fluid and thus would not cause a fatal collapse by itself. Further, chronic subdural hematomas can bleed on their own without any new trauma after the initial event or can be exacerbated by new incidents of head impact. Nevertheless, it appears that the child's condition deteriorated after the reported incident in the father's truck. It should be pointed out, however, that there is very little information derived from the autopsy that can accurately pin point what physical injury resulted from this alleged incident or that it directly caused the child's death. Much of the pathology in this child is not acute. The scalp injuries are of variable ages in which the hemorrhages show aging of red cells, cellular repair and inflammatory reactions and healing-scarring. The brain lesions range from possibly a few days in age to days to weeks old. The child may have had a coagulopathy which appears to have included a sagittal sinus thrombosis and possibly cortical venous infarctions. These processes could have resulted in the child's death at any time with or without any new episode of trauma.

1440 North Kingsbury Street, Suite 210, Chicago, IL 60642
Telephone: (312-988-2500, FAX (312) 988-7257, Email: Jleestma@aol.com

USCA5 5192

I hold these opinions to a reasonable degree of medical and scientific certainty.

Sincerely yours,

Jan E. Leestma, MD, MM

1440 North Kingsbury Street, Suite 210, Chicago, IL  60642
Telephone: (312-988-2500, FAX (312) 988-7257, Email: Jleestma@aol.com

USCA5 5193



## JAN E. LEESTMA, MD, MM
### NEUROPATHOLOGY

January 7, 2011

Victor Abreu, Esq.
Public Defender
Curtis Center, Suite 545, West
Philadelphia, PA  19106

Dear Mr. Abreu:

At your request I now offer an appended report to the original report of 12/15/2010, because I have received information that was not available to me at the time of the original report.

This report deals with the death of a minor child, Jakarenn Gunter. I was provided the following materials that form the basis of this report:

1. Direct appeal opinion (Bourgeois).
2. Trial testimony transcripts [opening statement, Booth; EMT Burgess; Dr. Benton; McLaughlin, Dr. Kuffel, Dr. Rouse, Dr. Oliver; Dr. Senn; Dr. Chrz; Dr. Akhtar, Beckett]
3. Transcript of April 20, 2010 hearing before Judge Jack.
4. Forensic odontology reports of Dr. Senn, Dr. Chrz.
5. Autopsy report of Dr. Rouse.
6. Neuropathology report of Dr. Kagan-Hallet.
7. Affidavit of Dr. Spitz.
8. Visceral autopsy slides,  A-02042, Wilford Hall Medical Center, TX.
9. Medical records and reports re: Jakarenn Gunter.
10. CT scan of Jakarenn Gunter.
11. Brain autopsy slides and photographs.
12. Autopsy photographs.
13. Copy of hand written notes of US Attorney re: Dr. Elizabeth Rouse.

To reiterate, very briefly, my understanding of the case is that the child, Jakarenn Gunter was a 2 year old female in the care of Mr. Bourgeois. The family of Mr. Bourgeois was frequently traveling with him in his commercial truck as he conducted his business of hauling freight. The Government has alleged that the child had apparently been maltreated and beaten by Bourgeois for some time before the child's death largely over matters concerned with toilet training. On the morning of July 27, 2002, Bourgeois arrived with goods on his truck to be delivered at the Corpus Christi Naval Air Station. During the course of positioning his truck at a loading dock at this facility an incident was reported to have occurred between Bourgeois and the deceased child during which Bourgeois was reported to have slammed the child's head against a window in the truck and the dashboard. After this occurrence the child was said to have become limp and unconscious. The child was brought to a medical facility where she never regained consciousness and died on July 28, 2002.

An autopsy was conducted by Dr. Rouse of the Armed Forces Medical Examiner's office. Dr. Rouse found multiple subgaleal hemorrhages (estimated 10 impacts), a 2ml. subdural hematoma with "minimal" organization, subarachnoid hemorrhage and cerebral edema, parenchymal brain damage including axonal pathology, bilateral retinal hemorrhages and optic nerve sheath hemorrhages, many areas of skin injuries of multiple ages. A recent bruise of the left shoulder was described also. She concluded that the child had died from closed head trauma with subdural hematoma with the manner of death homicide.

1440 North Kingsbury Street, Suite 210, Chicago, IL  60642
Telephone: (312-988-2500, FAX (312) 988-7257, Email: Jleestma@aol.com

USCA5 5194

A neuropathological examination of the brain was performed by Dr. Kagan-Hallett who reported the brain to be swollen, with a subarachnoid hemorrhage and a subdural hematoma that in its oldest portions was estimated to be a few weeks or approximately 10 days in duration. Dr. Kagan-Hallett also found axonal injury in the white matter with macrophage responses in the tissue. She also reported organizing contusion infarcts in the brain 7+ days in duration. The term "organizing" refers to a healing process ongoing in the hematoma that takes time to evolve indicating that the oldest part is 10 days or more old from time of death.

From the report of Dr. Kagan-Hallett, it is obvious that the child had a subdural hematoma, though it doesn't appear to be very large, and appears to have an acute component in addition to the component that was healing as discussed above. The older and larger component's age is derived from the microscopic appearance of the subdural hemorrhage and the healing process which occurs over time after the inception of the hematoma. This would clearly indicate that the oldest part of this lesion predated her final hospitalization by many days or longer. It is common to have relatively fresh red blood cells in a chronic subdural hematoma. Such cells could have appeared immediately before the child died or up to 2-3 days previously. Such "recent" bleeding cannot be aged any more precisely. It cannot be known when the most recent bleeding into the hematoma occurred within a window of two days or how it occurred. It also cannot be known if this acute component contributed or caused death.

My examination of the gross autopsy photographs relevant to the head and brain revealed a primarily right sided apparently recent subdural hematoma of the vertex dura from its external appearance. It appears relatively thin with a probable volume of a few ml. Photographs of the reflected scalp reveal subgaleal hemorrhage a few cm diameter above the temporalis muscle approximately over the coronal suture on the right side a few cm from the midline. The hemorrhage is dark red-black in color. The anterior reflected scalp has a number of apparent impact sites with the largest about 1 cm. These do not appear to be full thickness scalp hemorrhages and their age is not determinable from the photographs. The posterior scalp in the occipital region behind the right ear shows another subgaleal hemorrhage about 2 cm with indistinct margins and possibly some color changes tending toward brown rather than dark red-black.

My examination of the visceral autopsy slides revealed that several sections of the scalp had deep subcutaneous hemorrhages with inflammatory reactions of varying age and degree, ranging from bruises that had preserved red cells (2-3 days or less in age), early inflammatory cell changes (a few days or older), granulation tissue and early scar formation (a week plus), and essentially healed skin lesions (many weeks old). The lungs showed congestion, edema and an "early" pneumonia with pulmonary macrophage activation. The kidneys, adrenals, liver, spleen and gall bladder showed congestion. The pancreas was autolyzed. One section of what was probably the tongue showed old lesions in the process of healing. The heart showed an area of myocardial hemorrhage and necrosis with reactive cells present. I concluded that the child had an early pneumonia which is not uncommon on individuals maintained on a respirator but could have preceded hospitalization. The skin lesions clearly represent dermal injuries of multiple ages from within two days of death to many weeks before death. The tongue shows a healing injury. It seems inescapable that this child had been physically assaulted over a considerable period of time before death.

On 1/5/2011 I received 6 neuropathology brain slides from the University of Texas (Kagan-Hallett's slides). Examination of these materials revealed a slide of dura and superior sagittal sinus that contained a thin chronic subdural membrane attached to a recent blood clot. The thin membrane was composed of 3-5 layers of fibroblasts and other cells. This was not attached to the dura. The dura contained many layers of chronic inflammatory cells and fibroblasts attached to the arachnoid granulations. The thickness of these reactive cells were sufficient to place the age of the inception of the bleeding in that location to about 10 days from time of death in keeping with Dr. Kagan-Hallett's estimations in her report. In addition, I found a thrombus in the superior

1440 North Kingsbury Street, Suite 210, Chicago, IL  60642
Telephone: (312-988-2500, FAX (312) 988-7257, Email: Jleestma@aol.com

USCA5 5195

sagittal sinus that was not attached to its wall and another thrombus separate from this one lying free. This was clearly a premortem thrombus and showed fibrin, layering and peripheral cellular reactions indicating it was likely attached to the wall of the sinus at one time. The estimation of this process' age is many days, perhaps a week from death

In addition I noted several necrotizing lesions of the surface of the brain that spilled over into the arachnoid and subarachnoid space. These all contained chronic inflammatory cells, some with pigment in them including macrophages and early capillary and vascular reactions to these processes. There was a chronic subarachnoid hemorrhage with recent component including chronic inflammatory cells. In one section this same process appeared to involve the subependymal brain tissue and ependyma. These lesions may represent venous infarctions whose most likely cause was cerebral venous thrombosis. The presence of macrophages, capillary reactions and pigmented macrophages makes these lesions probably about 7 days or more from the time of death.

Given the many scalp bruises of various ages it is reasonable to conclude that the child had suffered many impacts to the head over time which could have led to the subdural hematoma. It is not possible to determine if the physical actions ascribed to Mr. Bourgeois on July 27, 2002, caused new bleeding into the subdural hematoma since it is not possible to histologically age acute blood in a bruise more precisely than indicating that the red cells could have arrived in the hematoma anytime within about two days of death. My examination of the CT scans reveals a relatively small recent subdural hematoma along the falx, mostly posteriorly along with some mixed density material that probably represents the older component of the subdural mentioned above.

The finding of retinal hemorrhages and optic nerve sheath hemorrhages in this case do not provide any information regarding the mode of injury of this child. They only indicate that the child increased intracranial pressure during the course of her hospitalization prior to death. The cause of the increased intracranial pressure was in part due to cerebral edema which in turn has several causes (hypoxia-ischemia, prior old brain injury, new concussive head trauma, and other processes). The subarachnoid hemorrhage's cause may be due to reperfusion injuries secondary to resuscitation and disturbed perfusion of the brain in the face of high intracranial pressure and/or venous thrombosis intracranially. The myocardial focal hemorrhage and necrosis could have been due to an intracardiac injection during resuscitation, though I find no record of this having been done.

Regarding a critical question, that of when the fatal head injuries to the child were caused, it is clear that she had sustained a number of head impacts allegedly due to having been beaten over period of time. The subdural hematoma's cause is likely physical trauma but it cannot be determined whether this was inflicted or accidental. The role of the subdural hematoma in the death is somewhat problematic because its volume is so small (a few ml.). This volume should have been easily compensated for by reabsorption of cerebrospinal fluid and thus would not cause a fatal collapse by itself. Further, chronic subdural hematomas can bleed on their own without any new trauma after the initial event or can be exacerbated by new incidents of head impact. Nevertheless, it appears that the child's condition deteriorated after the reported incident in the father's truck. It should be pointed out, however, that there is very little information derived from the autopsy that can accurately pin point what physical injury resulted from this alleged incident or that it directly caused the child's death. Much of the pathology in this child is not acute. The scalp injuries are of variable ages in which the hemorrhages show aging of red cells, cellular repair and inflammatory reactions and healing-scarring. The brain lesions range from possibly a few days in age to days to weeks old. The child may have had a coagulopathy which appears to have included a sagittal sinus thrombosis and possibly cortical venous infarctions. These processes could have resulted in the child's death at any time with or without any new episode of trauma.

1440 North Kingsbury Street, Suite 210, Chicago, IL 60642
Telephone: (312-988-2500, FAX (312) 988-7257, Email: Jleestma@aol.com

USCA5 5196

I hold these opinions to a reasonable degree of medical and scientific certainty.

Sincerely yours,

Jan E. Leestma, MD, MM

1440 North Kingsbury Street, Suite 210, Chicago, IL  60642
Telephone: (312-988-2500, FAX (312) 988-7257, Email: Jleestma@aol.com

USCA5 5197



DEFENDANT'S
EXHIBIT
3



The University of Texas
Health Science Center at San Antonio
Mail Code 7750
7703 Floyd Curl Drive
San Antonio, Texas 78229-3900

Graduate School of Biomedical Sciences
Department of Pathology

(210) 567-4000

## NEUROPATHOLOGY CONSULTATION

### FOR THE BEXAR COUNTY FORENSIC SCIENCES CENTER

DATE CUT 7/1/02    PROSECTOR Dr E Rouse    ACCESSION #   02-CX-235

**HISTORY:** J.G. was a 2-and-a-half- year-old hispanic female toddler who sustained head trauma initially blamed on a "fall from the cab of a 18-wheeler". Her step-mother called the EMS and at the health care facility where she was seen, a lumbar puncture showed subarachnoid hemorrhage, and no skull fractures. She died at 11 AM the next day. Subsequently it became apparent that the child has been physically abused. At autopsy there was subgaleal bruising and subdural hematoma, as well as pattern injuries to the skin.

**GROSS OBSERVATIONS:** There is mild to moderate cerebral edema,and a accompanying portion of dura showed a thin subdural hematoma. . There is patchy subarachnoid hemorrhage. Coronal sections show fairly normal ventricular size ,no intraventricular blood, and no herniation hemorrhages, including no brainstem (Duret) hemorrhages. No gross abnormalities of the cortical ribbon or deep white matter are noted.–no midline (deep grey nuclear, callosal ) petechiae, tears but small areas of white matter softening and greyish discoloration (no xanthochromia) are seen.. Sections through lower brainstem and cerebellum are unremarkable.



**MICROSCOPIC FINDINGS & COMMENTS:** Sections of dura show mostly recent hemorrhage trapped among the arachnoid granulations. The "oldest" areas in these dural sections show a thin membrane (upper photo), histolog-ically consistent with a few weeks' duration. Sections of cerebral deep white matter (centrum semiovale) show, interestingly, prominent myelin tearing, foamy macrophages between the groups of disrupted white matter tracts ( top photo, next page, arrows, luxol fast blue/H&E stain). An ubiquitin stain of this particular section show prominent axonal swellings (inset, arrows) which could even be found on routine sections on other slides of similar areas. A few areas show contusion-infarcts in a stage of early organization (sheets of foamy macrophages consistent with at least a weeks' duration. Older, gliotic or cystic lesions are not identified. Focally severe acute neuronal hypoxic changes are also seen.

USCA5 5198

02-CX-235                                                          2

Myelin tearing and axonal bodies are easily found in
these sections but as you know the presence of <u>abundant</u>
axonal bodies cannot be reliably used to either precisely
"date" an injury or provide evidence of more than one
episode of head trauma.



**NEUROPATHOLOGIC DIAGNOSIS:**
Child's brain, representative sections: history of
head trauma)

Cerebral edema, mild to moderate
        Hemorrhagic necrosis of cerebellar
        tonsillar tips
(Right) subdural hematoma, mostly recent, min-
imal organization (approximately 10 days' duration)

Cerebral white matter: Organized contusion infarcts (7+
days' duration), myelin tearing and axonal bodies

*Kathleen K Ilh*
**KATHLEEN S KAGAN-HALLET MD**
**DEPARTMENT OF PATHOLOGY**
**ASSOCIATE PROFESSOR OF PATHOLOGY**
**(PEDIATRIC PATHOLOGY/ NEUROPATHOLOGY)**

**DATE** <u>09/17/02</u>

USCA5 5199

DEFENDANT'S EXHIBIT



USCA5 5200



USCA5 5201



**Listing of Forensic Cases: Jan E. Leestma, MD**

| YEAR | CASE IDENTIFICATION | NUMBER | STATE | RETAINING COUNSEL | SIDE |
|------|---------------------|--------|-------|-------------------|------|
| 1992 | Crown v. Healey | ? | Ontario | Bayne Sellar Boxall | Defense |
| 1992 | US v. Chase | 91-177 | SC | US Attorney, SC District | Prosec |
| 1992 | Toth v. Kelly, et al. | 89CV-72 | CO | Cooper & Kelly | Defense |
| 1992 | Rubenstein v. Britt, et al. | 89L07531 | IL | Paul Nemoy | Plaintiff |
| 1992 | Hubbartt v. City of Mattoon | 90-2122 | IL | Ronald Tulin | Plaintiff |
| 1992 | IL v. Buzinski | 91 CF69 | IL | Kane County States Atty | Prosec. |
| 1992 | McKee v. Sparrow Hosp, et al. | ? | MI | L Ray Bishop & Assoc | Plaintiff |
| 1992 | Livingston v. Segura | CV91-274 | NM | Atwood Malone Mann Turner | Defense |
| 1992 | Biggs v. Hunt's Maint Svc | C-111171 | IN | Terry Hiestand | Plaintiff |
| 1992 | State v. Turner | ? | IL | Kane County States Atty | Prosec. |
| 1992 | Kapustianek v. Flannery et al. | ? | IL | ISMIE & ?Lord Bissell Brook | Defense |
| 1992 | US v. York | ? | IL | United States Attorney, Chicago | Prosec. |
| 1993 | Reynard v. NEC America, et al. | 92-001749CI018 | FL | John Lloyd | Plaintiff |
| 1993 | Showalter v. West Sub. Hospital | 88L14914 | IL | French, Kezelis, Kominiarek | Defense |
| 1993 | Katz v. BPS Guard Svcs | ? | NJ | Zucker, Facher & Zucker | Defense |
| 1993 | Baffa v. Strzyz | 88L12568 | IL | Barnow & Hefty | Plaintiff |
| 1993 | Barrett v. Fenton, Tischler, et al. | 88L12017 | IL | Wildman Harrold Allen & Dixon | Defense |
| 1993 | State v. Forrestor | ? | CO | CO State Public Defender | Defense |
| 1993 | State v. Brooks and Bowles | ? | MD | St. Mary's County Prosecutor | Prosec |
| 1993 | Ziemann v. State Wisc, & Kriss | 93-CV0458 | WI | Whyte Hirschboeck Dudek | Plaintiff |
| 1994 | Barbarotta v. Sharma, et al. | 85L12501 | IL | Patrick Bradley | Plaintiff |
| 1994 | Baker v. Mt. Sinai, et al. | 87L25910 | IL | Jack Samuel Ring & Assoc. | Plaintiff |
| 1994 | Calhoun v. Cleveland Hts, et al. | 1:94:CV1813 | OH | Andrew Margolius | Plaintiff |
| 1994 | Kroeger v. Sifri, et al. | A8902687 | OH | Lawrence, Linder, McGrath | Plaintiff |
| 1994 | Strange v. LaRabida Hospital | 91L5825 | IL | Lord, Bissell, Brook | Defense |
| 1994 | Strappazon v. Little Co Mary | 87L23347 | IL | Sussman, Selig, Ross | Plaintiff |
| 1994 | Black v. Watts | 89L01334 | IL | Clausen Miller Gorman Caffrey, etc | Defense |
| 1994 | Hill v. Ingalls Memorial | 90L18196 | IL | Demos & Burke | Plaintiff |
| 1994 | Wolodko v. Thomas | 93L7619 | IL | Peter Coladarci | Plaintiff |
| 1994 | " " " | " | | " | " |
| 1994 | Butti v. Metrohealth | 237214 | OH | Michael F. Becker | Plaintiff |

USCA5 5202

| Year | Case | Case No. | State | Attorney/Firm | Role |
|---|---|---|---|---|---|
| 1994 | DeLong v. Blodgett Hospital | ? | MI | Gruel Mills Nims & Pylman | Defense |
| 1995 | Hicks v. Barnes, et al. | C-93-263 | OK | Best Sharp Holden Sheridan etc. | Defense |
| 1995 | Lampe v. Macy, et al. | | KA | Randall E. Fisher | Plaintiff |
| 1995 | Herrera v. Weiss Hospital, et al. | 91L09454 | IL | Epstein, Zaideman & Esrig | Plaintiff |
| 1995 | Angyal v. Wolski, et al. | 192CC3098 | KA | Bartimus, Kavanaugh & Frickleton | Plaintiff |
| 1995 | Krier v. Gardner, et al. | 94C2267 | KA | Hutton & Hutton | Plaintiff |
| 1995 | Baker v. Torres | 93L09267 | IL | Jack Samuel Ring & Assoc. | Plaintiff |
| 1995 | Outagamie County v. Mabrey | | WI | Vincent Biskupic, Country Atty | Prosec. |
| 1995 | Leech v. CJ Industries, et al. | 90L17118 | IL | McKenna, Storer, Rowe, White etc | Defense |
| 1995 | Boder v. Stairmaster/Cunard | CV940639ER | CA | Daar & Newman | Defense |
| 1995 | Quentere v. City Chicago | ? | IL | Corporation Counsel, Chicago | Defense |
| 1995 | Tucky v. Broward Cnty Sch Brd | ? | FL | Searcy, Denney, Scarola, et al. | Plaintiff |
| 1995 | Minnesota v. Roers | K9-95-169 | MN | Gray & Malacko | Defense |
| 1995 | Grady v. Turner | LKA 91 0478 | IL | Phelan Pope Cahill Devine | Plaintiff |
| 1995 | Crown v. Carey | ? | Ontario | Martin Hillyer Bryant | Defense |
| 1996 | Dunaway v. Rassel | CV93071164 | OH | Richard Lawrence & Assoc. | Plaintiff |
| 1996 | State of IL v. Hayunga | 94CF364 | IL | Butera & Butera | Defense |
| 1996 | Winston v. Mercuri, et al. | 91L10122 | IL | Lord, Bissell & Brook | Defense |
| 1996 | Campbell v. Peel, et al. | 93-04440 | FL | Stephens, Lynn, Klein, McNicholas | Defense |
| 1996 | Durbin v. Carle Clinic, et al. | 94L530 | IL | Craig & Craig | Defense |
| 1996 | Buckman v. Columbus Hosp | | IL | Material Witness | Neither |
| 1996 | Rothenberg v. Norenberg, et al. | 95-06303 CA 09 | FL | Leonard Zack Assoc. | Plaintiff |
| 1996 | Durbin v. Carle Clinic, et al. | 94L530 | IL | Craig & Craig | Defense |
| 1996 | State of Wisconsin v. Beard | ? | WI | Thomas Bauer & Assoc. | Defense |
| 1996 | Barbarotta v. Sharma, et al. | ? | IL | Patrick Bradley | Plaintiff |
| 1996 | Gatlin v. City of Chicago | 95C-2023 | IL | Corporation Counsel, Chicago | Defense |
| 1996 | Ellefsen v. Strzyz, et al. | 94 L 11849 | IL | Epstein, Zaideman & Essrig | Plaintiff |
| 1996 | State of Wisconsin v. Beard | ? | WI | Thomas Bauer & Assoc. | Defense |
| 1996 | State of Iowa v. Morales | Crim: 96328 | IA | Duffy, Spellman Ryan et al. | Defense |
| 1997 | State of Wisconsin v. Spern | 96-CF-61 | WI | Osinga & McClure | Defense |
| 1997 | Aulestia v. Economy Baler Co. | HUD-L-1670-94 | NJ | Perfilio & Marquet | Plaintiff |
| 1997 | Bolin v. Margolis | 92-L-7490 | IL | Epstein, Zaideman & Esrig | Plaintiff |
| 1997 | Poffenberger v. Franz | 96-3852 | OH | Jacobson, Maynard,Tuschman, etal | Defense |
| 1997 | Massachusetts v. Woodward | Middlesex County | MA | Silverglate & Good, et al. | Defense |

USCA5 5203

| Year | Case | Number | State | Counsel | Role |
|---|---|---|---|---|---|
| 1997 | Poffenberger v. Franz | 96-3852 | OH | Jacobson, Maynard, Tuschman, etal | Defense |
| 1997 | Kane v. Motorola | | IL | Barnow & Hefty | Plaintiff |
| 1997 | Gill v. CAMC, Lucente, et al. | 96-C-1692 | WVA | Payne, Loeb & Ray | Plaintiff |
| 1998 | Mearday (City of Chicago) | ? | IL | Paul D. Geiger | Defense |
| 1998 | Downs v. Hinsdale Hospital | 95-L-415 | IL | Kralovec, Jambois & Schwartz | Plaintiff |
| 1998 | Iowa v. Alstott | ? | IA | Rheinhart & Associates | Defense |
| 1998 | Bolyn v. Northwestern Memorial | 94L-1464 | IL | Price,Tunney, Loughnane, Reiter | Defense |
| 1998 | People v. Johnson | ? | CA | San Diego County Dist. Atty | Prosecut. |
| 1998 | People v. Scoon | ? | NY | Michael Dowd, Atty. | Defense |
| 1998 | Kressy v. West Suburban Hosp. | 93-L 6100 | IL | Power, Rogers & Smith | Plaintiff |
| 1998 | Hebert v. Pangle | 92L-225 | IL | Michael Cogan | Fact Wit. |
| 1998 | Regaldao v.City of Chicago | ? | IL | Corporation Counsel: Barber | Defense |
| 1998 | Vickers v. Adult Learning Svcs. | 97-11-NO | MI | Martin & Baillargeon | Defense |
| 1998 | Texas v. Brock | ? | TX | Peter Doyle, Atty. | Defense |
| 1998 | Weddle v. Ohio Valley Med Ctr | ? | WVa | Magaziner, Hooper, McGlade, Fitz | Plaintiff |
| 1998 | Weddle v. Reed | ? | Wva | Magaziner, Hooper, McGlade, Fitz | Plaintiff |
| 1998 | Gardner v. St. Lukes Hosp. | ? | FL | Gentry, Phillips & Hodak | Plaintiff |
| 1998 | Pennsylvania v. Wright | 4732 CA 1997 | PA | Wolfson & Assocaites | Defense |
| 1998 | Tolbert v. Regent Care Center | 97-PC-2500 | TX | Shields & Rusk | Plaintiff |
| 1998 | Investig. DeathFaith Allston | ? | IL | Philip Nathe | Defense |
| 1998 | Wimes v. St. Bernard Hosp. | ? | IL | Sussman, Selig, Ross | Plaintiff |
| 1998 | NJ v. Carey | | NJ | Schenck, Price, Smith & King | Defense |
| 1998 | State of Alaska v. Kaio | 3DI-A97-589CR | AK | Public Defender, Alaska | Defense |
| 1998 | Contreras v.Brinkman et al. | 95-LKA 879 | IL | Hofeld & Schaffner | Plaintiff |
| 1998 | Eappen v. Woodward, et al. | ? | MA | Sloane & Walsh | Defense |
| 1998 | Bock v. Palos Community, et al. | 94-L 3497D | IL | K.C. Miller | Plaintiff |
| 1999 | Tynes v. YWCA | 95-9949 CA27 | FL | Mark Wolin | Defense |
| 1999 | Long v. James | CIV 98-066-S | OK | Best, Sharp, Holden, et al. | Defense |
| 1999 | State of Alaska v. Kaio | 3DI-A97-589CR | AK | Public Defender, Alaska | Defense |
| 1999 | People v. Johnson | ? | CA | San Diego County Dist. Atty | Prosecut. |
| 1999 | Ortinau v.Singh et al. | ? | IL | Clancy & Stevens | Plaintiff |
| 1999 | Rymer v Milwaukee County | 98 CV 584 USDC | WI | Phillips & Sweeney | Plaintiff |
| 1999 | Cordera v MercyHospital | 97-133387 CA | FL | Wolpe & Liebowitz | Defense |
| 1999 | State v. Jacobazzi | ? | IL | Butera & Butera | Defense |
| 1999 | People v. Geister | ? | CA | Public Defender, Riverside County | Defense |

USCA5 5204

| Year | Case | Case No. | State | Attorney/Firm | Role |
|---|---|---|---|---|---|
| 1999 | Lalime v. Pediatric Assoc. | ? | CT | Koskoff, Koskoff & Bieder | Plaintiff |
| 1999 | State v. Heiman | ? | IL | Paul Geiger | Defense |
| 1999 | State v. Allstott | ? | IA | Public Defender (Williams) | Defense |
| 1999 | State v. Pudelski | ? | OH | Potash & Associates | Defense |
| 1999 | State v. Wier | 97-23172CF10A | FL | Public Defender | Defense |
| 1999 | Midwest Trust v. Hiefferman, et al. | 96 L 09001 | IL | Cassiday, Schade & Gloor | Fact Wit |
| 1999 | State v. Sobish | ? | WI | Dennis Massoglia | Defense |
| 1999 | Regalado v. City of Chicago | ? | IL | Corporation Counsel, Chicago | Defense |
| 1999 | State v. Cauley | ? | CO | Haddon, Morgan & Foreman | Defense |
| 1999 | State v. Terry | 99 CR-1208N | GA | Schneider & LaMalva | Defense |
| 1999 | Rodriguez v. Hendler, et al. | 94 L 14295 | IL | Donohue, Brown, Mathewson, Smyth | Defense |
| 1999 | State v. Braddy | ? | GA | Michael Moore | Defense |
| 2000 | State v. Mazur | ? | IL | Michael Close | Defense |
| 2000 | State v. Hoang | ? | GA | Novy, Jaymes & Vaughan | Defense |
| 2000 | State v. Passarelli | ? | PA | Al Flora | Defense |
| 2000 | Phelps v. Treadway, et al. | ? | MI | Braun Kendrick Finkbeiner | Defense |
| 2000 | Kuykindall v. Traisman, et al. | 93 L 13812 | IL | Stamos & Turco | Defense |
| 2000 | Sullivan v. City of Wichita, KA, et al. | | KA | Tracy Edingfield | Plaintiff |
| 2000 | Kuykindall v. Traisman, et al. | 93 L 13812 | IL | Stamos & Turco | Defense |
| 2000 | Sharifian v. Ratkovits, et al. | 1178-96-CnC | VT | Hall, Hess, Stewart, et al. | Plaintiff |
| 2000 | Sharifian v. Ratkovits, et al. | 1178-96-CnC | VT | Hall, Hess, Stewart, et al. | Plaintiff |
| 2000 | Sullivan v. City of Wichita, KA, et al. | | KA | Tracy Edingfield | Plaintiff |
| 2000 | Vickers v. Adult Learning Svcs. | 97-11-NO | MI | Martin & Baillargeon | Defense |
| 2000 | State v. Wadle | ? | CO | Dennis Hartley | Defense |
| 2000 | US Army v. Buber | ? | AK | JAG: Ft. Wainwright, AK | Defense |
| 2000 | Carpenter v. U Hosp Cleveland, et al. | #324095 | OH | Spangenberg, Shibley & Liber | Plaintiff |
| 2000 | State v. Sanders | ? | IL | Harry Sonnemaker | Defense |
| 2000 | State v. Bryant | ? | GA | John Timmons | Defense |
| 2000 | State v. Lam Nguyen | ? | CO | John T. Hyland | Defense |
| 2000 | State v. Ciambrone | ? | FL | James Slater/Pub Defender | Defense |
| 2000 | Kittles v. Choukas, et al. | ? | IL | James T. Ball | Plaintiff |
| 2000 | State v. Gotti | ? | KA | Warner Eisenbise/Elaine Sharp | Defense |
| 2001 | State v. Huerena | ? | WA | Thomas Phelan, Esq. | Defense |
| 2001 | State v. Embry | ? | KA | Lee Mc Master, Esq. | Defense |
| 2001 | State v. Westfall-Rooney | ? | FL | Andrew Metcalf | Defense |

USCA5 5205

| Year | Case | Number | State | Attorney | Side |
|------|------|--------|-------|----------|------|
| 2001 | State v. Skyles | ? | MO | Beger & Bushie | Defense |
| 2001 | State v. Burchell | ? | TN | Edward S. Ryan | Defense |
| 2001 | State v. Hidenrite | ? | KY | Kevin Laumas | Defense |
| 2001 | State v. Gamboa | ? | NY | Andrew C. Quinn | Defense |
| 2001 | State v. Wadle | ? | CO | Dennis Hartley | Defense |
| 2001 | State v. Thompson/Greenberg | ? | IL | Richard Butera | Defense |
| 2001 | State v. Beauchamp | ? | IN | Hoffman & Admire | Defense |
| 2001 | State v. Gray | ? | OR | Karen Zorn, Public Defender | Defense |
| 2001 | Williams V. Kaiser Foundation Health | ? | MD | Montedonico, Hamilton & Altman | Defense |
| 2001 | State v. Sherwood | ? | IN | Andrew Baldwin | Defense |
| 2001 | State v Sherwood | ? | IN | Andrew Baldwin | Defense |
| 2001 | State v Beauchamp | ? | IN | Hoffman & Admire | Defense |
| 2001 | State v Orr | ? | CO | Michael Mc Carthy | Defense |
| 2001 | State v Werts | ? | IA | John Wellman, Public Defender | Defense |
| 2001 | Crown v. Oforo-Anim | ? | U.K. | Knox-Ukiwa Solicitors | Defense |
| 2001 | State v Werts | ? | IA | John Wellman, Public Defender | Defense |
| 2001 | Sylva v. Anthony | ? | MA | Leonard Simon & Assoc. | Plaintiff |
| 2001 | State v. Levesque | ? | CA | Alt. State Public Defender, San Diego | Defense |
| 2002 | Christman v. Genesis Treatment Ctr. | ? | TX | Bruce E. Anderson | Defense |
| 2002 | State v. Andrade | ? | OR | David Rich | Defense |
| 2002 | State v. Calvert | ? | TN | David Baker, Pub Defender | Defense |
| 2002 | State v. Hedger | ? | IL | Patrick Cox | Defense |
| 2002 | Jardine v. City of Tempe AZ | ? | AZ | Cavanaugh Law Firm | Defense |
| 2002 | State v. Lemon | | AK | Public Defender | Defense |
| 2002 | State v. Leon | ? | CA | Public Defender | Defense |
| 2002 | State v. Garcia | ? | ID | Labrador Law Firm | Defense |
| 2002 | Juvenile Petition: Caradine | 01-JA 00006 | IL | Cook County Public Defender | Defense |
| 2002 | Edwards v. Sabat | ? | GA | Kevin Ward | Defense |
| 2002 | Commonwealth v. King | ? | KY | Grover Carrington | Defense |
| 2002 | Lalinde v. Miami Children's Hospital | ? | FL | Searcy Denney Scarola Barnhart & Shipley | Plaintiff |
| 2002 | State v. King | ? | ID | Public Defender | Defense |
| 2002 | State v. Lamont Johnson | ? | CA | Public Defender | Defense |
| 2002 | State v. Sissoko | ? | MD | J. Wyndal Gordon | Defense |
| 2002 | Edwards v. Sabat | ? | GA | Kevin Ward | Defense |
| 2002 | Childre v. State Farm Mutual, et al. | 01-CV-001521 | WI | Richard T. Mueller | Defense |
| 2002 | State v. Gibson | ? | IL | Jeffry Mandell | Defense |

USCA5 5206

USCA5 5207

| Year | Case | | State | Attorney | Side |
|------|------|---|-------|----------|------|
| 2002 | Crews v Spectrum Health, et al. | ? | MI | Smith, Haughey, Rice & Roegge | Defense |
| 2002 | State v Kershner | ? | ID | Public Defender | Defense |
| 2003 | State v Belahbib | ? | CA | Latimer and Kenkel | Defense |
| 2003 | Stave v. Haase | ? | NE | Kirk Naylor | Defense |
| 2003 | Iriondo v Hartford Hospital, et al. | ? | CT | Koskoff, Koskoff & Bieder | Plaintiff |
| 2003 | Milash v. Elmhurst Hospital, et al. | ? | IL | Kralovec, Jambois & Schwartz | Plaintiff |
| 2003 | State of Iowa v Saul | ? | IA | Public Defender, Williams Sioux City | Defense |
| 2003 | State of MI v Hawks | ? | MI | Claire Brown | Defense |
| 2003 | State of MI v Hawks | ? | MI | Bernard P. Cohen | Defense |
| 2003 | State of WI v Vyvyan | ? | WI | Wynne Laufenberg | Defense |
| 2003 | State of Iowa v Saul | ? | IA | Michael Williams, Pub Defender | Defense |
| 2003 | State of TX v. Charlene Plenellas | ? | TX | James Kreimeyer | Defense |
| 2003 | Scott v. McKechnie | ? | IL | Charles Hegel | Defense |
| 2003 | Scott v. McKechnie | ? | IL | Charles Hegel | Defense |
| 2003 | Brandon v. NW Community Hosp. | ? | IL | James Pancratz | Plaintiff |
| 2003 | State of Oregon v. Davis | ? | OR | Thomas Bostwick | Defense |
| 2003 | State of IL v. Kurtz | ? | IL | DuPage Public Defender: McCullough | Defense |
| 2003 | State of NC v. Peterson | ? | NC | David Rudolf | Defense |
| 2004 | State of TN v Greer | ? | TN | Mark Scruggs | Defense |
| 2004 | State of Ohio v. Vest | ? | OH | Jon Paul Rion | Defense |
| 2004 | State of Georgia v. Qasim | ? | GA | Public Defender: Sarina Woods | Defense |
| 2004 | State of IL v.Swart | ? | IL | Brian Telander | Defense |
| 2004 | State v. Laxton | ? | WVA | Mark Atkinson | Defense |
| 2004 | Apking v. Suburban Hts Med Ctr | ? | IL | Dennis Schoen | Plantiff |
| 2004 | State v. Marinda | ? | CA | John K. May | Defense |
| 2004 | State v. Scribner | ? | MN | Douglas Olson | Defense |
| 2004 | State v. Yurko | ? | FL | Mary Beth Fitzgibbons | Defense |
| 2004 | State v. Hidenrite | ? | KY | Joseph Flaherty | Defense |
| 2004 | State v. Finch | ? | NE | Bruce Teichman | Defense |
| 2004 | State v. Bulmer | ? | MI | Robert Elsey | Defense |
| 2004 | State v.Finch | ? | NE | Bruce Teichman | Defense |
| 2004 | State of NE v Stevens | ? | NE | Scott Sladek, Pub Defender | Defense |
| 2004 | Silvestro v. RI Hospital, et al. | ? | RI | Dan Sharp | Plantiff |
| 2004 | State v. Jacobazzi | ? | IL | Anthony Sassen | Defense |
| 2004 | Broers v. Chadalavada, et al. | ? | IL | Thomas Rausch | Defense |

| Year | Case | | State | Attorney | Side |
|---|---|---|---|---|---|
| 2004 | State v Mobley | ? | GA | Jerrell Ramsey | Defense |
| 2004 | Gingrich v. Jack Gray Transport | ? | IL | David Atlas | Defense |
| | | | | | |
| 2005 | State v Sherman Dorsey | ? | FL | Brevard Co. Pub. Defender | Defense |
| 2005 | Stave v. Schneider | ? | CO | Kenneth Eichner | Defense |
| 2005 | Nichols vs. Janowak | ? | IL | Hinshaw & Culbertson | Defense |
| 2005 | Commonwealth PA v Stajko | ? | PA | Public Defender Philadelphia | Defense |
| 2005 | State v Nail | ? | KY | Public Defender | Defense |
| 2005 | State v Sherman Dorsey | ? | FL | Brevard Co. Pub. Defender | Defense |
| 2005 | State of Utah v Tiscareno | ? | UT | James Bradshaw | Defense |
| 2005 | Epps v Drs. Enterline/McGraw | ? | NC | Twiggs, Beskind, Strickland | Plaintiff |
| 2005 | Commonwealth PA v Lauder | ? | PA | Patrick Tommassey | Defense |
| 2005 | DCFS v Wall | ? | IL | Stephen Komie | Defense |
| 2005 | State of WV v Morrison | ? | WV | Joseph Troisi | Defense |
| 2005 | Duncan vs CSX | ? | KY | Stuart & Branigin | Defense |
| 2005 | State NE v Stevens | ? | NE | Scott Sladek, Pub. Defender | Defense |
| 2005 | Danhof v Gibson | ? | MI | Garan, Lucow, Miller | Defense |
| 2005 | State of FL v Rios | ? | FL | Public Defender | Defense |
| 2005 | State of NY v Martin | ? | NY | Lewis Alperin | Defense |
| 2005 | York v. Norfolk Southern RR | ? | IN | Stuart & Branigin | Defense |
| 2005 | State v Ward | ? | WI | J Jackomino | Defense |
| | | | | | |
| 2006 | State of WV v Morrison | ? | WV | Joseph Troisi | Defense |
| 2006 | Commonwealth v Perrucio | ? | MA | John Schoenhorn | Defense |
| 2006 | State v. Mertz | ? | IL | Charles Giesen | Defense |
| 2006 | State v. Rios | ? | FL | Public Defender | Defense |
| 2006 | D.C v. Cassell | ? | Wash DC | Public Defender | Defense |
| 2006 | State v. Lauzon | ? | MI | Patrick Talab | Defense |
| 2006 | State v. Depaillat | ? | GA | BJ Bernstein | Defense |
| 2006 | State v. Evans | ? | IN | Cohen & Thiros | Defense |
| 2006 | DCFS IL v Wall | ? | IL | Stephen Comie & Assoc | Defense |
| 2006 | Chavez v City of Los Angeles | ? | CA | LA City Attorney | Defense |
| 2006 | State of OR v Davis | ? | OR | Jay Edwards | Defense |
| 2006 | McGowan v. State of KY | ? | KY | Cynthia Maynard | Defense |
| 2006 | State of Ohio v Wacks | ? | OH | Jon Paul Rion | Defense |
| | | | | | |
| 2007 | Sharp v. Scheck, et al. | ? | MA | Dan Sharp, et al. | Plaintiff |

USCA5 5208

| Year | Case | Number | State | Attorney | Side |
|---|---|---|---|---|---|
| 2007 | Smith v. Sturgis Hospital, et al. | ? | MI | Smith, Haughey, Rice, Roegge | Defense |
| 2007 | DCS Michigan v Townes | ? | MI | John Siver | Defense |
| 2007 | State v. Montalbano | ? | IL | Sreenan & Cain | Defense |
| 2007 | CA v. Phil Spector | ? | CA | Linda Kenney | Defense |
| 2007 | Wilkerson v. Kennywood Am. Pk. | ? | PA | Mannion & Gray | Defense |
| 2007 | PA v. Assaro | ? | PA | McGonagle | Defense |
| 2008 | Chavez v. City of Los Angeles | ? | CA | LA City Attorney | Defense |
| 2008 | State of WA v Pingle | ? | WA | James K. Morgan | Defense |
| 2008 | State of CA v Martinez-Salcedo | ? | CA | Mary Beth Acton | Defense |
| 2008 | State v Cervantes | ? | IL | Maureen Murphy | Defense |
| 2008 | Marsh v Chadwick et al | ? | CA | Dennis Atchley | Plaintiff |
| 2008 | State v Rieken | | IL | Sliwinski Atty | Defense |
| 2008 | State v Branham | ? | OH | Joseph E. Scott, Atty | Defense |
| 2008 | Gutierrez v Cedars Sinai Hospital | | CA | Harrison Summer, Atty | Plaintiff |
| 2008 | State v Cervantes | ? | IL | Maureen Murphy | Defense |
| 2009 | State v. Rieken | ? | IL | Sliwinski Atty | Defense |
| 2009 | State v. Burt-Gibbons | ? | OK | Zelbst & Holmes | Defense |
| 2009 | State v. Bringsosen | ? | WI | Frederick Zievers | Defense |
| 2009 | Lopez v State of TX | ? | TX | Heather Kirkwood | Defense |
| 2009 | State v. Adrian Thomas | 08-1074 | NY | J. Frost, Public Defender, Rens. Cty. | Defense |
| 2009 | Dupnock v Geisinger Clinic, et al. | ? | PA | Kornblau & Kornblau | Plaintiff |
| 2010 | State v. Mickey | ? | CA | Mark Simowitz | Defense |
| 2010 | Stave v. Fakoya | ? | NV | Norman Reed, Pub Def Clark Cty | Defense |
| 2010 | State v. Cuneo | ? | CO | Dennis Hartley | Defense |
| 2010 | Henderson v Crown | ? | UK | M. Topolski (London) | Appellant |
| 2010 | State v LeChez Graham | ? | IL | Kelly Bennett | Defense |
| 2010 | State v Hill | ? | IA | Michael Williams, Pub Defender | Defense |

USCA5 5209

USCA5 5210

| CASE TYPE | ACTIVITY | MISCELLANEOUS |
|---|---|---|
| Homicide | Trial | Alleged child abuse |
| Homicide | Trial | Delayed dth, assault |
| Med Malp | Deposition | Bad" baby..CPalsy |
| Med Malp | Deposition | Surgicel FB rxn, br tumor |
| Wrongful Dth | Deposition | Death in police custody |
| Homicide | Trial | Alleged child abuse |
| Med Malp | Deposition | Misdiagnosis brain tumor |
| Wrongful Dth | Deposition | Auto accident/stroke |
| Work Comp | Deposition | Workplace accid/stroke |
| Homicide | Trial | Alleged child abuse |
| Med Malp | Deposition | Radiation Impl/ Br tumor |
| Arson/Fraud | Trial | Arson/Murder/Insurance |
| | | |
| Product Liab | Deposition | Cellular phone-brain tumor |
| Med Malp | Deposition | Alleged fall in hospital |
| Wrongful Dth | Deposition | Death at Meadowlands |
| Med Malp | Deposition | Misdiagnosis brain tumor |
| Med Malp | Deposition | Alleged mistreat br tumor |
| Homicide | Trial | Alleged child abuse |
| Homicide | Trial | Alleged beating death |
| Wrongful Dth | Trial | Failure to dc/rx hydroceph |
| | | |
| Med Malp | Deposition | Post partum death |
| Med Malp | Deposition | Failure to treat brain hemorrh. |
| Wrongful Dth | Deposition | Death in police custody |
| Med Malp | Deposition | Failure to dx meningitis |
| Med Malp | Deposition | Cer. palsy accid death |
| Med Malp | Deposition | Intra-arterial dilantin |
| Med Malp | Deposition | Severe athero/stroke |
| Med Malp | Deposition | Pulmonary embolism |
| Wrongful Dth | Deposition | Hit and Run Automobile Fatality |
| " | Trial | " |
| Wrongful Dth | Trial | Failure to Dx and Rx |

| Med Malp | Deposition | "Bad" baby |
|---|---|---|
| Med Malp | Trial | Failure dx/rx head injury |
| Med Malp | Deposition | Brain tumor misdiagnosis |
| Med Malp | Deposition | Perinatal brain injury |
| Med Malp | Deposition | Failure to DX brain tumor |
| Med Malp | Deposition | Misdiagnosis brain tumor |
| Med Malp | Deposition | Failure to dx/tr cblr hemorr |
| Homicide | Trial | Alleged child abuse |
| Wrongful Dth | Deposition | Elevator accident |
| Wrongful Dth | Trial | Alleged fall in spa |
| Wrongful Dth | Deposition | Death in police custody |
| Wrongful Dth | Trial | Suffoc. in school bus |
| Homicide | Trial | Alleged child abuse |
| Wrongful Dth | Deposition | Child abuse homicide |
| Homicide | Trial | Alleged child abuse |
| Med Malp | Deposition | Misdiag/Rx brain tumor |
| Homicide | Trial | Alleged child abuse |
| Med Malp | Deposition | Post op intracran. hemorr. |
| Med Malp | Deposition | Ecclampsia death |
| Med Malp | Deposition | Seizure death |
| Med Malp | Deposition | Fatal viral encephalitis |
| Med Malp | Deposition | Misdiag/Rx brain tumor |
| Med Malp | Trial | Seizure death |
| Homicide | Deposition | Alleged child abuse |
| Med Malp | Deposition | Maternal death. eclampsia |
| Injury | Deposition | Alleged police beating |
| Med Malp | Deposition | Post-op bleeding |
| Homicide | Trial | Alleged child abuse |
| Homicide | Trial | Alleged child abuse |
| Homicide | Trial | Alleged child abuse |
| Wrongf Death | Deposition | Industrial Accident |
| Malpractice | Deposition | Delay diagnosis, Br tumor |
| Malpractice | Deposition | Failure to Dx AVM |
| Homcide | Trial | Alleged child abuse |

USCA5 5211

| | | |
|---|---|---|
| Malpractice | Trial | Failure to Dx AVM |
| Prod. Liability | Deposition | Cellular phone/Brain Tumor |
| Malpractice | Deposition | Brain death: organ removal |
| | | |
| Police Brutal. | Hearing | Alleged excessive force |
| Med Malpract. | Deposition | Wrongful death, resp. failure |
| Homicide | Video Dep. | Alleged child abuse |
| Med Malpract. | Deposition | Post-op epidural hematoma |
| Homicide | Trial | Alleged child abuse |
| Homicide | Trial | Alleged child abuse |
| Med. Malpract. | Deposition | Failure to Dx/Treat Fungus Inf. |
| Med. Malpract. | Deposition | Spinal injury/disk disease |
| Neglegence | Deposition | Police neglegence |
| Medical Negl. | Deposition | Epilepsy death |
| Homicide | Trial | Alleged child abuse |
| Med. Malpract. | Deposition | Wrongful death: subdural hem. |
| Med. Malpract. | Trial | Wrongful death: subdural hem. |
| Med Malpract. | Deposition | Hypoglycemia/brain damage |
| Homicide | Trial | Alleged child abuse |
| Medical Negl. | Video Dep. | Nursing Hm Fall, brain hemor. |
| Child Custody | Hearing | Alleged child abuse/neglect |
| Med, Malpract. | Deposition | Failure to Dx/Rx Subdural hem. |
| Attemp. Murder | Trial | Alleged child abuse |
| Homicide | Deposition | Bar fight fatality |
| Med Malpract | Deposition | Inappropriate vasc surgery |
| Wrong Death | Deposition | Child abuse/Civil Action |
| Med Malpract. | Deposition | Failure to DX/RX: Herpes enceph. |
| | | |
| Neglegence | Deposition | Alleged injury day care center |
| Wrong Death | Deposition | Alleged Police Brutality/Neglect |
| Homicide | Hearing | Bar fight fatality |
| Homicide | Trial | Alleged child abuse |
| Med Malpract. | Deposition | Failure Dx/Rx Aspergillus Infect. |
| Neglegence | Deposition | Neglegence/?SIDS/etc. |
| Neglegence | Deposition | Alleged fall in hosp., sp cord inj. |
| Homicide | Trial | Alleged child abuse |
| Homicide | Prel-Hearing | Alleged child abuse |

USCA5 5212

| | | |
|---|---|---|
| Med Malpract. | Deposition | Failure Dx/Rx Herpes neonatorum |
| Homicide | Trial | Altercation/death |
| Homicide | Deposition | Alleged child abuse |
| Homicide | Trial | Alleged child abuse |
| Homicide | Trial | Altercation/death |
| Med Malpract. | Deposition | Post OP cardiac death |
| Homicide | Trial | Alleged child abuse |
| Wrong Death | Trial | Alleged Police Brutality/Neglect |
| Homicide | Trial | Alleged child abuse |
| Homicide | Trial | Alleged child abuse |
| Med Malpract. | Deposition | Failure Dx/Rx Neurolept/Malig Syndr. |
| Homicide | Trial | Alleged child abuse |
| Homicide | Trial | Alleged child abuse |
| Homicide | Trial | Alleged child abuse |
| Homicide | Trial | Alleged child abuse |
| Med Malpract. | Deposition | Failure to Dx/Rx: unexp death |
| Med Malpract. | Deposition | Failure to Dx/Rx pneumonia |
| Wrongful Death | Deposition | Death during restraint |
| Med Malpract. | Trial | Failure to Dx/Rx pneumonia |
| Med Malpract. | Deposition | Failure to Dx/Treat Subdural hematoma |
| Med Malpract. | Trial | Failure to Dx/Treat Subdural hematoma |
| Wrongful Death | Trial | Death during restraint |
| Medical Negl. | Trial | Epilepsy death |
| Homicide | Trial | Alleged child abuse |
| Homicide | Trial | Alleged child abuse |
| Med Malpract. | Deposition | Misdiag. Brain Tumor (MS) |
| Homicide | Trial | Alleged child abuse |
| Homicide | Trial | Alleged child abuse |
| Homicide | Trial | Alleged child abuse |
| Homicide | Deposition | Alleged child abuse |
| Med Malpract. | Deposition | Failure to Dx/Rx deep facial abscess |
| Homicide | Trial | Alleged child abuse |
| Homicide | Trial | Alleged child abuse |
| Homicide | Trial | Alleged child abuse |
| Homicide | Deposition | Alleged child abuse |

USCA5 5213

| | | |
|---|---|---|
| Homicide | Trial | Alleged child abuse |
| Homicide | Trial | Alleged child abuse |
| Homicide | Trial | Alleged child abuse |
| Homicide | Trial | Alleged child abuse |
| Negl Homicide | Trial | Alleged child abuse |
| Child Custody | Hearing | Alleged child abuse |
| Homicide | Deposition | Alleged child abuse |
| Homicide | Trial | Alleged child abuse |
| Med Malprac. | Deposition | Failure to dx/treat aneurysm |
| Homicide | Deposition | Alleged child abuse |
| Homicide | Trial | Alleged child abuse |
| Homicide | Trial | Alleged child abuse |
| Homicide | Trial | Alleged child abuse |
| Homicide | Deposition | Alleged child abuse |
| Child Custody | Hearing | Alleged child abuse |
| Homicide | Trial | Alleged child abuse |
| Med Malprac. | Trial | Misdiag. Brain Tumor (MS) |
| Homicide | Trial | Alleged child abuse |
| | | |
| Med Malprac. | Video | Epilepsy Death |
| Homicide | Trial | Alleged child abuse |
| Homicide | Trial | Alleged child abuse |
| Homicide | Trial | Alleged child abuse |
| Wrongful DeathDeposition | | Death post seizure/restraint |
| Homicide | Trial | Alleged assult, SDH |
| Homicide | Trial | Alleged child abuse |
| Homicide | Trial | Alleged child abuse |
| Child Custody | Trial | Alleged child abuse |
| Pers Injury | Deposition | Alleged maltreatment of child |
| Homicide | Trial | Alleged child abuse |
| Med Malprac. | Deposition | Failure to Dx and treat shunt malfunction |
| Homicide | Trial | Alleged child abuse |
| Homicide | Trial | Alleged child abuse |
| Homicide | Trial | Alleged child abuse |
| Wrongful DeathDeposition | Trial | Alleged child abuse |
| Pers Injury | Deposition | Vehicular accident, delayed death |
| Child Abuse | Trial | Alleged bodily harm to infant by father |

USCA5 5214

| Med Malprac. | Deposition | Portacath misplacement, Pulm Embolism |
|---|---|---|
| Homicide | Trial | Alleged child abuse |
| Homicide | Trial | Allged child abuse |
| Homicide | Deposition | Allged child abuse |
| Med Malprac. | Deposition | Failure to Dx and treat spinal cord glioma |
| Med Malprac. | Deposition | Failure to Dx and treat Chr Subdurals |
| Homicide | Deposition | Alleged beating vs. GI bleed/Cirrhosis |
| Custody | Hearing | Alleged abuse of child by foster parent |
| Homicide | Trial | Alleged abuse of child |
| Custody | Hearing | Alleged abuse of foster child |
| Homicide | Trial | Alleged beating vs. GI bleed/Cirrhosis |
| Homicide | Trial | Alleged child abuse |
| Med Malprac. | Deposition | Operative injury to nerve in arm |
| Med Malprac. | Trial | Operative injury to nerve in arm |
| Med Malprac. | Deposition | Failure to Dx and treat sepsis/preemie |
| Homicide | Trial | Alleged child abuse |
| Child Abuse | Trial | Alleged child abuse |
| Homicide | Trial | Alleged murder of spouse |
| Homicide | Hearing | Alleged Shaken Baby Syndrome |
| Homicide | Trial | Alleged Child Abuse |
| Homicide | Trial | Alleged Child Abuse |
| Homicide | Trial | Alleged Child Abuse |
| Child Abuse | Trial | Alleged Child Abuse |
| Med Malprac | Deposition | Alleged failure to diagnose & treat |
| Homicide | Trial | Alleged Child Abuse |
| Homicide | Trial | Alleged Child Abuse |
| Homicide | Deposition | Appeal conviction for child abuse |
| Homicide | Trial | Alleged Child Abuse |
| Child Abuse | Deposition | Alleged Child Abuse |
| Child Abuse | Hearing | Post Conviction/new trial motion |
| Child Abuse | Trial | Alleged Child Abuse |
| Child Abuse | Deposition | Alleged Child Abuse |
| Med Malprac | Trial | Excessive anticoagulation, CNS hem. |
| Homicide | Hearing | Appeal conviction for child abuse |
| Med Malprac | Deposition | Failure to dx stroke in CT scan |

USCA5 5215

| | | |
|---|---|---|
| Child Abuse | Hearing | Alleged Shaken Baby Syndrome |
| Pers Injury | Deposition | Alleged brain injury/truck crash |
| | | |
| Homicide | Deposition | Alleged shaken baby syndrome |
| Homicide | Trial | Alleged shaken baby syndrome |
| Med Malpract | Deposition | Operative injury to brain, ENT surg. |
| Homicide | Trial | Alleged child abuse |
| Homicide | Trial | Alleged shaken baby syndrome |
| Homicide | Trial | Alleged shaken baby syndrome |
| Homicide | Trial | Alleged shaken baby syndrome |
| Med Malpract | Deposition | Quadriplegia following root injection |
| Homicide | Trial | Alleged shaken baby syndrome |
| Child Abuse | Hearing | Custody: alleged shaken baby |
| Homicide | Trial | Alleged shaken baby syndrome |
| Accident | Deposition | Fatal railway accident |
| Homicide | Trial | Alleged shaken baby syndrome |
| Med Malpract | Deposition | Accessory nerve injury during biopsy |
| Homicide | Deposition | Alleged shaken baby syndrome |
| Homicide | Trial | Alleged shaken baby syndrome |
| Accident | Deposition | Fatal railway accident |
| Homicide | Trial | Alleged shaken baby syndrome |
| | | |
| Homicide | Trial | Alleged shaken baby syndrome |
| Homicide | Hearing | Alleged shaken baby syndrome |
| Homicide | Trial | Alleged shaken baby syndrome |
| Homicide | Trial | Alleged shaken baby syndrome |
| Homicide | Hearing | Alleged shaken baby syndrome |
| Homicide | Trial | Alleged shaken baby syndrome |
| Homicide | Trial | Alleged shaken baby syndrome |
| Homicide | Trial | Alleged shaken baby syndrome |
| Custody | Hearing | Alleged abuse |
| Neglegence | Trial | Death during restraint |
| Homicide | Trial | Alleged child abuse |
| Homicide | Hearing | Alleged child abuse-appeal |
| Homicide | Trial | Alleged Vehicular Homicide |
| | | |
| Libel Suit | Deposition | Alleged libel action |

USCA5 5216

| Case Type | Proceeding | Description |
|---|---|---|
| Med Malpract | Deposition | Alleged drug overdose, abd surgery |
| Custody | Hearing | Alleged abuse of infant |
| Homicide | Trial | Death in a fight |
| Homicide | Trial | Alleged gunshot homicide |
| Wrongful death | Trial | Death in amusement park |
| Homicide | Appeal Hearing | Alleged shaken baby syndrome |
| Neglegence | Deposition | Death during restraint |
| Homicide | Trial | Alleged abuse of infant |
| Homicide | Trial | Alleged abuse of infant |
| Custody | Deposition | Alleged abuse of infant |
| Untruth Testim | Deposition | Untruthful testimony,Wrongful Convict. |
| Homicide | Frye Hearing | Alleged abuse of infant |
| Homicide | Trial | Alleged abuse of infant |
| Med Malpract | Deposition | Brain stem injury during surgery |
| Custody | Hearing | Alleged abuse of infant |
| Homicide | Trial | Alleged abuse of infant |
| Homicide | Trial | Alleged abuse of infant |
| Homicide | Trial | Alleged abuse of infant |
| Homicide | Appeal hearing | Alleged abuse of infant |
| Homicide | Trial | Alleged abuse of infant |
| Med Malpract | Trial | Sudden postop death |
| Homicide | Trial | Alleged abuse of infant |
| Homicide | Trial | Alleged abuse of infant |
| Homicide | Trial | Alleged abuse of infant |
| Homicide | Hearing | Alleged abuse of infant |
| Child Abuse | Trial | Alleged abuse of infant |
| Homicide | Deposition | Alleged abuse of infant |

USCA5 5217

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____ :
:
UNITED STATES OF AMERICA,   :      No. Cr-C-02-216
:      No. Cv-07-223
Respondent,   :   Honorable Janis Graham Jack,
:       U.S.D.J.
-against-   :
:
ALFRED BOURGEOIS,   :    Electronically Filed
:
Petitioner.   :
_____ :

**PETITIONER'S POINTS AND AUTHORITIES REGARDING
COUNSEL'S PENALTY PHASE INEFFECTIVENESS**

Petitioner, Alfred Bourgeois, through counsel, hereby submit these *Points and
Authorities* for use during the January 13, 2011 argument on counsel's ineffectiveness
for failing to present mitigating evidence at the penalty phase.[1]

**I.**     **United States Supreme Court Cases Addressing Generally Counsel
Ineffectiveness at the Penalty Phase of a Capital Trial**

Eddings v. Oklahoma, 455 U.S. 104, 115 (1982) ("Evidence of a
difficult family history and of emotional disturbance is **typically**
introduced by defendants in mitigation. See McGautha v. California,
402 U.S. 183, 187-188 . . . (1971).");

_____

[1]All emphasis is added.

1

USCA5 5218

Williams v. Taylor, 529 U.S. 362, 595-598 (2000) (counsel ineffective despite having **three mental health** professionals evaluate client because they failed to present evidence of childhood abuse, family dysfunction organic brain dysfunction and low intelligence, and having prepared for penalty hearing one week before trial);

Wiggins v. Smith, 539 U.S. 510, 516-17 (2003) (counsel ineffective for failing to present evidence of physical and sexual childhood abuse, family dysfunction cognitive dysfunction and emotional disturbance);

Smith v. Texas, 543 U.S. 37, 44 (2004) ("There is no question that a jury might well have considered petitioner's IQ scores [of 78]. . . as a reason to impose a sentence more lenient than death.");

Rompilla v. Beard, 545 U.S. 374, 392-93 (2005) (counsel ineffective although they interviewed numerous family members and had client evaluated by **three mental health professionals** for failing to conduct thorough investigation which would have revealed organic brain dysfunction, low intelligence, childhood abuse and family dysfunction);

Porter v. McCollum, 130 S.Ct. 447, 449 (2009) (counsel ineffective failed to present evidence of abusive childhood, impaired mental capacity and mental health impairments);

Sears v. Upton, 130 S.Ct. 3259, 3261-62 (2010) (counsel ineffective for failing to present evidence of low intellectual functioning, cognitive impairments, physical and sexual abuse and family dysfunction).

2

USCA5 5219

**II.  Fifth Circuit Cases Addressing Counsel Ineffectiveness at Penalty Phase of Capital Trial**

Walbey v. Quarterman, 2009 WL 113778, *8, 309 Fed.Appx. 795 (5th Cir. Jan. 19, 2009) (**on deficient performance**: counsel deficient for presenting only "scant" mitigating evidence; **on prejudice**: "Texas's next argument – that Walbey suffered no prejudice because the brutality of his crime eclipses any mitigating evidence – is a non-starter. ... To permit a jury to impose the death sentence solely because the facts are heinous and egregious would be to return to the days of inflicting capital punishment based on emotion and revenge .... Almost without exception, the cases we see in which conviction of a capital crime has produced a death sentence arise from extremely egregious, heinous, and shocking facts. But, if that were all that is required to offset prejudicial legal error and convert it to harmless error, habeas relief ... would virtually never be available, so testing for it would amount to a hollow judicial act.");

Lewis v. Dretke, 355 F.3d 364, 368 (5th Cir. 2003) (counsel ineffective for presenting only "skeletal" information about childhood abuse);

Moore v. Johnson, 194 F.3d 586, 613-614 (5th Cir. 1999) (counsel ineffective for failing to present evidence of borderline intelligence, organic brain dysfunction and childhood abuse).

**IV.  Neither the Court nor the Government May Divine Reasons for Counsel's Failures and Omissions – The Court May only Consider Counsel's Actual Reasons**

Wiggins, 539 U.S. at 526-27 ("[T]he 'strategic decision' the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing.");

USCA5 5220

Kimmelman v. Morrison, 477 U.S. 365, 386-87 (1986) (under Strickland, courts cannot use hindsight to supply a strategy for counsel);

Thomas v. Varner, 428 F.3d 491, 499 n.7 (3d Cir. 2005) ("We believe that an inquiry into whether counsel actually had some strategy is permissible ... Otherwise, incompetency of defense counsel could be rewarded by ingenuity on the part of a State's attorneys in supplying hypothetical strategies to explain defense counsel's uninformed prejudicial oversights.");

Alcala v. Woodford, 334 F.3d 862, 871 (9th Cir. 2003) ("We will not assume facts not in the record in order to manufacture a reasonable strategic decision for Alcala's trial counsel.");

Griffin v. Warden, 970 F.2d 1355, 1358 (4th Cir. 1992) ("courts should not conjure up tactical decisions an attorney could have made, but plainly did not" (citing Strickland; Kimmelman))

Respectfully Submitted,

/s/ Michael Wiseman

Michael Wiseman
Victor Abreu
James McHugh
Elizabeth Larin
Capital Habeas Corpus Unit
Federal Community Defender Office
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106

Dated:        January 12, 2011

4

USCA5 5221

## Certificate of Service

I, Michael Wiseman, hereby certify that on this 12th day of January, 2010 I served the foregoing on the following persons by filing the same through ECF:

Tony Roberts
Patti Booth
Mark Dowd
Elsa Salinas-Patterson

/s/ Michael Wiseman

Michael Wiseman

USCA5 5222

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

CASE NO.   CR-C-02-216

| | |
|---|---|
| | )(   **Judge**    Janis Graham Jack |
| **UNITED STATES OF AMERICA** | )( |
| | )(   **Courtroom Deputy**   Sondra Scotch |
| | )( |
| **vs.** | )(   **Court Recorder**   Velma Gano |
| | )( |
| **ALFRED BOURGEOIS** | )(   **Proceeding:**    Evidentiary Hearing |
| | )( |
| | )(   **Date:**    January 13, 2011 |
| | )( |
| | )(   **Exhibit List of:**   Govt |
| | )( |
| **Page  1  of  1  Pages** | )(   **Attorney:** P Booth, T Roberts, E Salinas, M Dowd |

| Exhibit No. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|---|---|---|---|---|
| 1 | **FBI Packing Slip** | ✓ | ✓ | | January 13, 2011 | |
| 2 | **FBI letter of October 27, 2003** | ✓ | ✓ | | January 13, 2011 | |
| 3 | **Defense discovery receipt** | ✓ | ✓ | | January 13, 2011 | |
| 4 | **FBI lab report** | ✓ | ✓ | | January 13, 2011 | |
| 5 | **Letter dated 3-28-04 to Becket from Longoria** | ✓ | ✓ | | January 13, 2011 | |
| | | | | | | |
| | | | | | | |

USCA5 5223

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

### CASE NO.   CR-C-02-216

| | |
|---|---|
| | Judge   Janis Graham Jack |
| UNITED STATES OF AMERICA | |
| | Courtroom Deputy   Sondra Scotch |
| vs. | |
| | Court Recorder   Velma Gano |
| ALFRED BOURGEOIS | |
| | Proceeding:   Evidentiary Hearing |
| | Date:   January 13, 2011 |
| | Exhibit List of:   Defense |
| Page  1  of  1  Pages | Attorney: M Wiseman, V Abreu, E Larin, J McHugh |

| Exhibit No. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|---|---|---|---|---|
| P-104 | Motion for Continuance in cause no. 02-cr-3585 E | ✓ | ✓ | | January 13, 2011 | |
| P-187 | Charge:  Robbery no. 03-cr-1884-E | ✓ | ✓ | | January 13, 2011 | |
| P-188 | Transcript - Motion to Revoke and Plea (10 pages) | ✓ | ✓ | | January 13, 2011 | |
| P-189 | Judicial Confession and Stipulation in no. 03-cr-1884E | ✓ | ✓ | | January 13, 2011 | |
| P-190 | Letter dated February 9, 2006 Texas Board of Pardons and Paroles | ✓ | ✓ | | January 13, 2011 | |
| | | | | | | |
| | | | | | | |

USCA5 5224

| ✎AO 435<br>(Rev. 03/08)<br>*Please Read Instructions:* | Administrative Office of the United States Courts<br><br>**TRANSCRIPT ORDER** | **FOR COURT USE ONLY**<br>**DUE DATE:** 1-27-11<br>2-28-11 |
|---|---|---|

| 1. NAME Kathrin Hennig | 2. PHONE NUMBER 215-928-0520 | 3. DATE 1/18/2011 |
|---|---|---|

| 4. MAILING ADDRESS 601 Walnut St. Suite 545 W. | 5. CITY Philadelphia | 6. STATE PA | 7. ZIP CODE 19106 |
|---|---|---|---|

| 8. CASE NUMBER 2:02-CV-00216 | 9. JUDGE Janis G. Jack | DATES OF PROCEEDINGS |
|---|---|---|

10. FROM 1/13/2011    11. TO 1/13/2011

| 12. CASE NAME USA v Bourgeois | LOCATION OF PROCEEDINGS |
|---|---|

13. CITY Corpus Christi    14. STATE TEXAS

**15. ORDER FOR**

- ☐ APPEAL
- ☐ NON-APPEAL
- ☐ CRIMINAL
- ☒ CIVIL (HABEAS)
- ☐ CRIMINAL JUSTICE ACT
- ☐ IN FORMA PAUPERIS
- ☐ BANKRUPTCY
- ☐ OTHER (Specify)

*United States Courts*
*Southern District of Texas*
*FILED*

16. TRANSCRIPT REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

DATE JAN 19 2011

*David J. Bradley, Clerk of Court*

| PORTIONS | DATE(S) | PORTION(S) | DATE |
|---|---|---|---|
| ☐ VOIR DIRE | | ☐ TESTIMONY (Specify Witness) | |
| ☐ OPENING STATEMENT (Plaintiff) | | | |
| ☐ OPENING STATEMENT (Defendant) | | | |
| ☐ CLOSING ARGUMENT (Plaintiff) | | ☐ PRE-TRIAL PROCEEDING (Spcy) | |
| ☐ CLOSING ARGUMENT (Defendant) | | | |
| ☐ OPINION OF COURT | | | |
| ☐ JURY INSTRUCTIONS | | ☒ OTHER (Specify) HEARING/ARGUMENT | 1/13/2011 |
| ☐ SENTENCING | | | |
| ☐ BAIL HEARING | | | |

**17. ORDER**

| CATEGORY | ORIGINAL<br>(Includes Certified Copy to Clerk for Records of the Court) | FIRST COPY | ADDITIONAL COPIES | NO. OF PAGES ESTIMATE | COSTS |
|---|---|---|---|---|---|
| ORDINARY | ☐ | ☒ | NO. OF COPIES | | |
| 14-Day | ☐ | ☐ | NO. OF COPIES | | |
| EXPEDITED | ☐ | ☒ | NO. OF COPIES DR. ROUSE'S TEST. ARGUMENT | | |
| DAILY | ☐ | ☐ | NO. OF COPIES | | |
| HOURLY | ☐ | ☐ | NO. OF COPIES | | |
| REALTIME | ☐ | ☐ | | | |

| CERTIFICATION (18. & 19.)<br>By signing below, I certify that I will pay all charges<br>(deposit plus additional). | ESTIMATE TOTAL | |
|---|---|---|

| 18. SIGNATURE *W. Hennig* | ☒ EMAIL ONLY REQUIRED<br>☐ EMAIL AND HARD COPY REQUIRED |
|---|---|
| 19. DATE 1/18/2011 | ☒ EMAIL ADDRESS: MICHAEL_WISEMAN@FD.ORG,<br>KATHRIN_HENNIG@FD.ORG |

| 20. TRANSCRIPT TO BE PREPARED BY<br>Velma Grano<br>Molly Carter | COURT ADDRESS |
|---|---|

| | DATE | BY | |
|---|---|---|---|
| ORDER RECEIVED | 1-19-11 | VG | |
| DEPOSIT PAID | — | | DEPOSIT PAID   —0— |
| TRANSCRIPT ORDERED | 1-20-11 | VG | TOTAL CHARGES |
| TRANSCRIPT RECEIVED | | | LESS DEPOSIT |
| ORDERING PARTY NOTIFIED TO PICK UP TRANSCRIPT | | | TOTAL REFUNDED |
| PARTY RECEIVED TRANSCRIPT | | | TOTAL DUE |

**DISTRIBUTION:**    COURT COPY    TRANSCRIPTION COPY    ORDER RECEIPT    ORDER COPY

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


UNITED STATES OF AMERICA,        *    CRIMINAL ACTION
                                 *
        PLAINTIFF,               *    CR-C-02-216(1)
                                 *
VS.                              *
                                 *    CORPUS CHRISTI, TEXAS
ALFRED BOURGEOIS,                *    JANUARY 13, 2011
                                 *    7:55 A.M.
        DEFENDANT.               *
                                 *
* * * * * * * * * * * * * * * * *


        PARTIAL TRANSCRIPT OF MISCELLANEOUS HEARING
           (TESTIMONY OF DR. ROUSE AND ARGUMENTS)

        BEFORE THE HONORABLE JANIS GRAHAM JACK
              UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:        MS. PATTI HUBERT BOOTH
                           MS. ELSA SALINAS
                           OFFICE OF THE U.S. ATTORNEY
                           800 NORTH SHORELINE, SUITE 500
                           CORPUS CHRISTI, TEXAS 78401

                           MR. TONY R. ROBERTS
                           MR. MARK MICHAEL DOWD
                           OFFICE OF THE U.S. ATTORNEY
                           P. O. BOX 61129
                           HOUSTON, TEXAS 77208

        (APPEARANCES CONTINUED ON PAGE 2)

COURT RECORDER:            MS. VELMA GANO


      PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
        TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
              MOLLY CARTER, P. O. BOX 270203
         CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

USCA5 5226

APPEARANCES:  (CONTINUED)


FOR THE DEFENDANT:          MR. VICTOR JULIO ABREU
                           MR. MICHAEL WISEMAN
                           MS. ELIZABETH A. LARIN
                           OFFICE OF THE FEDERAL PUBLIC DEFENDER
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 545
                           PHILADELPHIA, PENNSYLVANIA 19106

                           MR. JAMES McHUGH
                           FEDERAL COMMUNITY DEFENDER OFFICE
                           FOR THE EASTERN DISTRICT OF
                           PENNSYLVANIA
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 540
                           PHILADELPHIA, PENNSYLVANIA 19106

USCA5 5227

(The proceedings began at 7:55 a.m.)

(Call to Order of the Court.)

* * * * *

(Excerpt beginning at 10:40:00 a.m.)

ELIZABETH ROUSE, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. ROBERTS:

Q.   Dr. Rouse, for the record, you are testifying by telephone.  Where are you located today?

A.   I'm located in Bethesda, Maryland.

Q.   Okay.  What is your capacity out in Bethesda, Maryland, right now?

A.   I'm an assistant professor of pathology at the Uniformed Services University of the Health Sciences, Medical School.

        THE COURT:  Sorry.  You know what, could you -- Dr. Rouse, could you give us your full name, please?

        THE WITNESS:  Oh, it is Elizabeth Aldrich, A-L-D-R-I-C-H, Rouse, R-O-U-S-E.

        THE COURT:  Thank you very much.

BY MR. ROBERTS:

Q.   And are you the same Dr. Rouse that testified at the trial of United States versus Alfred Bourgeois back in 2004?

A.   Yes, I am.

Q.   And have you -- you've had an opportunity to review the transcript of Dr. Leestma's deposition?

USCA5 5228

Rouse - Direct                                          4

A.    Yes, I have.

Q.    Have you also had an opportunity to review the report that Dr. Leestma prepared that was dated June -- January 7th, 2011?

A.    Yes.

Q.    Okay.  The pages that you have on the transcript, I'm going to reference some pages, and I just want to make sure that we're going to be on the same pages.  So --

A.    Okay.  I have it in front of me.

Q.    You know, how many pages does your transcript show, as far as --

A.    The one I have has four to a page, and they are numbered, little numbers on each of the four.  So I go through -- at the end, it's all kinds of words and numbers, but it ends with 106.

Q.    Okay.  So for instance, on Page 24 of the transcript, at the very top of that page, there's an "A," and it says, "The cause of death in this child was increased intracranial pressure"?

A.    "Pressure," yes.

Q.    Okay.  I want to ask you about that statement from Dr. Leestma.  First of all, did you see that, such a conclusion in his report from the 7th of January?

A.    No, he does not.  He talks in the report about my findings, talks about Dr. Kagan-Hallet's report, his examination, he reviews the slides.  He does not actually render an opinion as to the cause of death, in his opinion.

USCA5 5229

Q.   Then further on in his, in the transcript on Page, Page 25, there's a question that is asked of him, the first full question, it says, "Now, getting back to the intracranial pressure" --

A.   Yes.

Q.   And then the question is, "What is your opinion, what, in your opinion, caused the increased intracranial pressure in this particular case?"  Do you see that?

A.   Yes.

Q.   And his answer was, "Several things.  One of them would be the subdural hematoma that was present."

A.   Yes.

Q.   And then he states, "In my view, it's a rather minor component."  I'd ask you for a minute to comment on that testimony.

A.   Yes.  Well, the -- and this will refer back to some of Dr. Kagan-Hallet's original review.  But the child has, if we step back, kind of away from the ages, if the child has blunt force injuries of the head, which is where the head impacts something else or something else impacts the head, but there's a transition of force between the head and another object.  And we have evidence of this by the bruises on the scalp, which is blood, you know, contact site.  We have injury evidence in the brain.  Now, again, we'll step away and not talk about the dates of those injuries.

USCA5 5230

The injuries, when an object hits the brain, forces are transmitted.  And that force causes destruction over a wide range of area.  You know, a very narrow object hitting the head would cause a narrower -- but the damage, the force is transmitted into that brain tissue.  And it causes destruction certainly or damage, perhaps more in one area, but then there's ill-defined damage that extends out.

And then in the brain, the brain responds to trauma in different ways.  For one thing, the brain is encased in the bony skull.  So as, in normal tissue, when the tissue is damaged, at the cellular level, the membranes of the cells are damaged and fluid starts leaking in and it swells.  In the brain's case, when the brain starts swelling, it's encased in bone, and so it can't expand.  When it starts swelling, it basically starts compressing itself.  You know, there's not the room for expansion.  And we call that edema.  That's fluid coming through.

From the beginning, Dr. Kagan-Hallet, at death, the child had marked, you know, had mild to moderate cerebral edema. That's swelling of the brain.  That was throughout the brain, not just under those areas of bruising.  But that indicates diffuse damage.

To kind of tie it to a more recent event, that's what the representative that was just shot, Giffords, they removed part of her skull to relieve that pressure.

USCA5 5231

Q.   You're referring now to the incident that happened in Arizona?

A.   So -- yes.  Yes.  I mean, that's been in the news a lot. But that's -- the brain swells, it's encased in the bone.

The other thing is there's bleeding that has occurred in this child from that blunt force injury to the head.  And that, the bleeding occurs because with the transmission of forces, blood vessels are damaged and blood starts leaking out.

In this case, she has an accumulation of subdural hemorrhage, which is blood in the subdural space, which Dr. Leestma speaks at length about what the subdural space is. She also has subarachnoid hemorrhage, which is beneath the arachnoid level.

Okay.  In the hospital when she first came in, she had subarachnoid hemorrhage, so that's a more recent bleeding, fresh blood in the subarachnoid space, as well as the subdural.

I agree with Dr. Leestma, the subdural is a small -- you know, space-wise, it was not a large collection of blood.  But there are other injuries to the brain that are all causing, that are -- there are other markers of injury to the brain. The actual neurons and tissue of the brain itself was damaged. There's swelling of the brain, which is also -- you know, the swelling itself causes damage.

So you have a complex constellation of things going on in response to that injury.  And so I don't think you can say the,

**USCA5 5232**

just the intracranial pressure is what's caused -- that's one of the physiologic responses that led to her death.  That's a --

Q.   Let me ask you about --

A.   That's a physiologic event, like bleeding out the increased cranial pressure.  The subdural contributed to it, you know, the mechanical space the blood was taking up.  The damage to the brain and the swelling of the brain all contributed to that increased cranial pressure.

There is a thrombus.  There is evidence of blood clotting. That can come about, just as the brain is damaged, the blood flow is impaired.

Q.   Let me stop you there for just a minute --

A.   I'm sorry?

Q.   -- and ask you a quick question about --

A.   Certainly.

Q.   Because Dr. Leestma obviously refers to this in very strong terms.  On Page 26 --

A.   Okay.

Q.   -- of his testimony --

A.   Yes.

Q.   -- he mentions, and it's the second A, in other words the second answer, with regard to the causes of the intracranial pressure, and Dr. Leestma says, "Probably the most significant are injuries to the brain, which I consider to be due to the

USCA5 5233

venous thrombosis, that is, clotting."

First of all, did you see anything in his January 7th, 2011, report that contained that conclusion?

A.   It's -- he mentions that there is a thrombus.  I mean, that's a blood clot in that vascular space, the sagittal sinus. On -- I'm looking.  On Page 3 of his report, the second -- I'm sorry -- the bottom of Page 2, he talks about, at the very end, "In addition, I found a thrombus in the superior sagittal sinus, which was not attached to its wall, and another thrombus which was lying free.  Clearly pre-mortem showed fibrin, layering and peripheral cellular, indicating it was attached to the wall of the sinus."  He felt it was days, perhaps a week from death.

Q.   Did he mention anywhere that --

A.   And then later on he talks about --

Q.   Can you hear me, Dr. Rouse?

A.   Oh, yes.  I'm sorry.

Q.   Okay.  Sorry.  I was just asking, you mentioned, you referenced that paragraph on the bottom of Page 2 and top of Page 3.  Anywhere in this report where he said it's the most significant part of the --

A.   No.  That's what I'm saying.  He mentions it, I thought, another time, but again does not -- let's see.  I'm trying to -- I don't want to miss --

Q.   I can lead you, the last time that I see it is at the

USCA5 5234

bottom of that Page 3, the very bottom paragraph.

A.    Yeah, "The child may have had a coagulopathy, which appears to have included a sagittal sinus thrombosis and possibly cortical venous infarctions.  These processes could have resulted in death at any time."  So no, he's clearly not saying it's a predominant finding.  There's other evidence of trauma that is much more pronounced in this child's brain. Dr. Kagan-Hallet talks about other findings that are much more pronounced than his report does.

The sagittal sinus, I don't disagree with that at all, that there is a thrombus.  I think that is a reflection of the injuries that have occurred to the brain.  As the brain is swelling, as the child is hospitalized, with, you know, organ system failure, blood flow is slowing down.  As blood flow slows down, it clots.  That's one of the things that can lead to blood clotting is stasis, or slowing of the blood.

This child, the brain has enough changes to easily understand why a thrombus could occur in the sagittal sinus.  I don't think the thrombus alone is a significant injury to the brain.  I think it's in response to the other injuries to the brain.

Q.    Now, he, on Page 38 of Dr. Leestma's testimony -- I'll give you a chance to turn there.

A.    Yes.

Q.    The first answer discusses, I guess, some of your

USCA5 5235

conclusions, and he says that you concluded that "contusion infarcts, meaning physical trauma caused these."  I guess we need to go back to the, some of the infarcts that he was referring to.

A.    Within the brain.  These are in the, these are all speaking of brain infarcts, yes.

Q.    And then he says --

A.    Sinus contusion infarcts.

Q.    Okay.  And he says he's unconvinced of that and thinks these are due to the venous infarctions.  Can you comment on that?

A.    Well, first of all, I alone am not, I'm not the only one calling them contusion infarcts.  Dr. Kagan-Hallet uses that term.  And "contusion" means bruised or impact.  Contusion is a blunt force.  So she's not available to speak now, but she felt they were resultant of trauma, as a neuropathologist.  I have experience in neuropathology, but I am not a board certified neuropathologist, so I wouldn't -- the other thing, this child has evidence of blunt force injury to the head.  There are bruises of the head, there's bleeding in the head, there's multi-focal swelling.  There's tearing -- he doesn't even mention, I don't see where he mentions the tearing of the myelin and the axonal body.  That's sheering of the fibers in the brain.  These are all traumatic.  The thrombus could not have caused all of those other things.  You would not get the

USCA5 5236

bruising from the thrombus.  You would not get the myelin tearing.  You would not get the hemorrhage in the retina.  The whole constellation is of trauma to the brain.

The military uses the term now, you know, "Total Brain Injury," TBI.  I mean, this is -- this child has microscopic evidence of trauma to the brain.  It shows up differently in different tissues.  In the white matter of the brain, there's swelling.  There's infarcts.  In the, you know, subdural space, there's a collection of blood.

You know, we see microscopically different manifestations, but it's all due to trauma.  Trauma explains all of the findings.  I don't see anything described by any of the neuropathologists, Dr. Leestma or Dr. Kagan-Hallet, or on my own examination, anything that was not explained by trauma.

For example, there was not a tumor of the brain.  There was not, you know, there was nothing there that cannot be explained by the trauma to the brain.

Q.   Did you recall that some other doctor had done a physical examination on this child just over a month before the child was killed?

A.   I believe the child was seen when she left the mother and grandmother's residence, shortly after that time frame.

Q.   And do you recall -- did you, were you presented at any time with any evidence that this child, JG1999, the victim in this case, had any kind of bleeding disorder?

USCA5 5237

A.    No.  By familial reports, her development was all normal, up until the time she left her biological mother's home.  And that examination, I believe it was an emergency room, but certainly it was by physicians.  They all gave no indication of any bleeding disorders, any marks on her body, any history of bleeding.  They gave her a completely normal physical exam.

Q.    And would you have expected -- and I'm probably going to destroy this, but a coagulopathy and a venous infarction to have shown up in a full medical examination of a small child?

A.    You would expect to see findings.  There would often either be a history of bleeding episodes, bleeding into joints.  Kids, toddlers when they're learning to walk, they bang around and bump and fall.  They bleed into joints.  Family history of bleeding disorders.

The other thing, she was also hospitalized prior to her death and had a lot of blood work drawn during those several days that she survived.  There was no evidence of any bleeding disorder at that time.  She did not bleed around her catheter site.  She did not bleed into her bladder.  You know, there was no evidence of a coagulopathy in this child, medically.

Q.    Now, on Page 46 of Dr. Leestma's testimony, he mentions your testimony about the retinal bleeding and that you had said that it was of the magnitude of a car accident.  And then he said he did not agree with you.  Can you comment on that as far as from your perspective?

USCA5 5238

A.    We see -- my understanding, again this is, you know, an ophthalmic, an ophthalmologist may be able to give you more specific, as far as pounds, you know, pounds of pressure or sheering type injuries.  But we do not see in minor trauma, you know, kids on the playground, bumping around, minor injuries, children do not get retinal hemorrhages.  If you looked at kids, you know, playing sports, those type of injuries.

I have seen retinal hemorrhages in people that have been victims of car accidents.  You know, things where there is a tremendous transmission of forces, they get retinal hemorrhages.

Clearly, there's different, you know, whether it's a sheering, a rotational injury, are indicative of -- you know, different forces transmitted result in retinal hemorrhages.  You know, the retinal hemorrhages are nice, you can see them on exam.  It's really the only part of the brain you can visualize, you know, in the physical exam.  And so we can see that in living victims as well as at autopsy.  And like I said, minor trauma typically does not cause bleeding in the retina.  Retinal hemorrhages indicate significant force.

Q.    Okay.  I'm going to back up in Dr. Leestma's testimony just a minute to Page 32, because he was asked several questions, both about your testimony and placing a date and time or age on the injuries.  And then he was asked if he could do so.  And I'll direct your attention to the question at the

USCA5 5239

top of Page 32 in his testimony, where he's asked, "In this particular case, given the information that you had available to you at the time, were you able to date or age this particular process of the venous thrombosis?"  Do you see that question?

A.    Yes.

Q.    And he says, "Yes, some aspects."  And then just below that, he begins to talk about the blood clot and it being just a -- he discusses that.

I wanted to ask you, first of all, about your response to that, in the sense of him being able to identify the timing of the -- the timing of the blood clot versus the timing of other recent bleeding.

THE COURT:  Are you differentiating here, Mr. Roberts, between the venous thrombus and the subdural hematoma and the subarachnoid hematoma?  Can you tell us, can you walk us through each one of these, Dr. Rouse --

THE WITNESS:  Well --

THE COURT:  -- and how you can age --

THE WITNESS:  Well, to the best of my ability, certainly.  When we're looking at dating, I think there are many, there are many physiologic factors that go into how the tissue responds after an injury.  And that's what we use to date.

You know, we know when an injury occurs, as healing

USCA5 5240

occurs, there is an orderly process that occurs.  You know, the blood cells, they start deteriorating, they break down.  You know, there are facts well-known.  So the order of things is, we can go through and say this is more recent than this one or not.

          The difficulty lies in how the body responds to those injuries.  The length of time varies widely, depending on physiologically the condition of that person.  And in this child, she was on life support, on a ventilator, you know, a lot of physiologic derangement in her last few days.  So I don't think you can use -- you know, I think that's just kind of, to me, throws in a margin of error with the timing, because her response, her body's healing was not normal in the last few days.

          THE COURT:  How long did she live when she got to the hospital?

          THE WITNESS:  I believe it was -- let me see.  I was going to say that it was -- that's well documented in the record.  She was found unresponsive on the 27th.  Okay.  It was actually just the following day, the 28th.

          THE COURT:  Okay.

          MR. WISEMAN:  Your Honor, if I could also clarify, I believe that the record shows she died approximately 25 hours after Mr. Bourgeois allegedly entered the base.

          THE COURT:  Thank you.

USCA5 5241

MR. WISEMAN:  If you look at the time.

THE WITNESS:  When looking -- again, kind of backing up on this child, she has many injuries of many, many ages, on different parts of her body.  Unfortunately, we cannot, with medical certainty, get down very close on the aging of any of the injuries.

We can, however, put them in categories of things that are more chronic, they're healing.  The body is clearly healing in response to this injury.  And some of those are where there's scarring.  You know, that clearly takes weeks for a scar to develop.

Other things show more along the time frame of about a week.  And when I say, "a week," seven days, ten days.  I can't differentiate between those two.  But you know, clearly a few days have passed from the time of injury.

And then she also has injuries that appear to have been in the last day or two.  And you know, one to three days. I don't think you can distinguish between one day and two days, particularly when her last day was very altered.

THE COURT:  Can I ask you, though, to walk us through the aging or nonaging of the venous thrombosis versus the subdural hematoma?

THE WITNESS:  Okay.  So -- yeah, so that's kind of the spectrum.  Working through her, let's start with the head injuries.  The scalp injuries, the bruising, which as we call

USCA5 5242

it subgaleal hemorrhage, that means bruising of the scalp --

and contusion is the same as a bruise -- those are recent.  And

I would say within days.  There's fresh blood in those bruises

of the scalp.  And they indicate an impact site.

As you move into the subdural hematoma, she has both.

She has evidence of organization, which is where, you know, the

blood vessels are coming in, the fibrin is laying down.

There's organization.  And Dr. Kagan-Hallet, and I would agree

with this, said approximately ten days.  I like, you know, like

I said, I would go the week to ten days.  I think, you know,

it's not -- there clearly is evidence in her hematoma of an

injury older than two to three days.  However, she also has

evidence of recent bleeding in that hematoma.  And Dr. Leestma

refers to this as well.

So she has acute, meaning -- like I said, I use the

two to three days for "acute" -- as well as one week old.  And

that fits with other injuries on her body.  She had some that

are weeks and months old.

As you go to the thrombus, that appears I think all

within a few days.

THE COURT:  What does that mean, "a few days"?  Like

the time --

THE WITNESS:  One to three days.

THE COURT:  One to three days?

THE WITNESS:  Is what I would range.  I would not,

USCA5 5243

with medical certainty, give any narrower than that.

THE COURT:  Okay.  Can I ask you another question?  And I'm sure you'll be asked at some point --

THE WITNESS:  Right.  Certainly.

THE COURT:  -- how you came up with that one to three-day time period on the venous thrombosis.  But I noticed in Dr. Leestma's -- I guess neither one of you are pediatricians.

THE WITNESS:  No.

THE COURT:  But just from somebody who has a minimal amount of medical knowledge, the brain fills the skull in an infant and toddler.  Is that correct?

THE WITNESS:  Correct.  I mean, there is fluid, cerebral spinal fluid in their membranes.

THE COURT:  No, I meant, in contrast to us older people, that the brain is shrinking, and there's a lot of extra room in there.

THE WITNESS:  Yes, exactly.  People with Alzheimer's have tremendous shrinking of the brain.

THE COURT:  Right.  But I mean, just as we get older, our brain shrinks.  And so you can have, at my age, at 64, a subdural hematoma that doesn't do to you what a, it would do to a toddler.

THE WITNESS:  Correct, yes.

THE COURT:  Is any of that in play here?

USCA5 5244

THE WITNESS:  Yes.  I mean, that's -- I don't --

THE COURT:  Because there's no room in a toddler's skull for that kind of thing, is there?

THE WITNESS:  Particularly when she's also getting other swelling in the brain, because that injury to her head was multiple areas.  She has multiple impact sites all over her scalp.  So her brain suffered contusions, blows, transmission of force, to the brain tissue, multiple areas of the brain.  Those are all starting to swell.  She's getting hemorrhage.  So that further decreases the room that's available.

THE COURT:  Thank you.

THE WITNESS:  And that's going to slow down the blood flow.  That easily explains the formation of a thrombus.  You know, it's all a constellation of injury that is acutely going on two to three days, on top of previous injury a week prior.

THE COURT:  Go ahead, Mr. Roberts.  Also, one more thing.

THE WITNESS:  Certainly.

THE COURT:  Dr. Rouse, have you got Dr. Leestma's deposition in front of you?

THE WITNESS:  Yes, I do.

THE COURT:  Would you look at the question at the bottom of 89 and his response at the top of 89 -- 88, the bottom of 88, the question by Mr. Roberts, and his response at the top of 89.

USCA5 5245

THE WITNESS:  Okay, 88.  "An acute," okay, "24-hour may show no healing or very" -- okay.  I'm sorry, the question -- the last question on 88?

THE COURT:  The question on Page 88, Line 18.

THE WITNESS:  Yes, so -- (Reading.)  Yes.

THE COURT:  Do you agree with that?

THE WITNESS:  Wait a minute.  She's routine for six weeks, and then someone sees an acute --

We can pinpoint within broad categories which are the more recent injuries, which are the older injuries, which are the very old injuries, but we can't pinpoint them.

MR. ROBERTS:  Can we clarify that she's reading the same question?

THE COURT:  Pardon?

MR. ROBERTS:  Would you like to clarify that she's actually reading the same --

THE COURT:  She is.  She read it out loud, half of it.

THE WITNESS:  Yes.  I guess it's, I mean, clearly the multitude of injuries makes this a complex picture.  We can categorize the injuries into, you know, ones that appear to be six weeks old, you know, five, six weeks old, to some that are, like I said, a week old, some that are days old.  You know, days, weeks or months.  We can't pinpoint exactly any injury, as far as pinpoint down to the day, this occurred on this date.

USCA5 5246

That is beyond medical --

BY MR. ROBERTS:

Q.    And Dr. Rouse, because of that, is there a -- what importance do you, as a medical examiner, place upon when a victim decompensates or place upon surrounding factual circumstances that are recorded to you in assessing when an injury occurred and when a death occurred?

A.    Well, certainly the circumstances help place how significant the injury is in resulting in the death.  For example, this child has evidence of brain injury that is a week old.  By all accounts, she was functioning neurologically fairly normally during that week.  She was conscious, talking, walking.

She has evidence microscopically of recent injury, days.  At a point on the 27th, clinically her neurologic status changed abruptly.  She lost consciousness, was no longer walking, talking.  That fits very well microscopically with the acute injuries.  The timing fits well.

If you have -- certainly people survive with neurologic injuries.  They reach a point, another injury added on top of that certainly can push them over to where it is nonsurvivable.

And so in this case she has a multitude of injuries.  In determining the significance of each of them, clearly she tolerated and was alive, physiologically tolerated the earlier injuries.  They did not result in her immediate death.  At some

USCA5 5247

point an acute injury, an injury occurred that caused her to decompensate.

Q.    Well, if you have hypothetically --

A.    The brain was not able to tolerate that amount of swelling.  She lost consciousness.

Q.    So hypothetically, if you had a -- if you were presented with a situation or a case where a child had both chronic, older and acute recent injuries, both of which may have contributed to a fatal injury and death, and you were presented with evidence or information that the child was active, singing ABCs just prior to the most recent injury, and then went limp immediately after that injury, would that play any role in making a determination in your --

A.    Absolutely.  We --

        MR. WISEMAN:  Objection, Your Honor.  Objection.  I think that hypothetical misstates the evidence.

        THE COURT:  Could you say it again?

        MR. ROBERTS:  Yes, Your Honor.

BY MR. ROBERTS:

Q.    I said if, hypothetically, if you had a victim who had both chronic older injuries and acute injuries, and that both of those contributed to her death, how much more would it play, would it be important to know information such as a child is active, singing her ABCs, just before the most recent injury, and then thereafter becoming immediately limp when they are

USCA5 5248

injured in a subsequent, recent injury?

MR. WISEMAN:  Same objection, Your Honor.

THE WITNESS:  We -- may I answer?

THE COURT:  Overruled.

THE WITNESS:  Yes, we would use the clinical evidence tremendously.  We'd never, or hope to never do the autopsy in a vacuum.  And we pull in clinical information and correlate it, and correlate her injuries, what we're seeing on the body with what was happening physiologically.  And absolutely the, when the time of the neurologic impairment would absolutely be taken in light of what we see microscopically.  And that is standard practice.  All autopsies, we use all the available information that we have at the time of the autopsy.  We look at the investigation, we review the medical records prior to performing the autopsy, because we look at all the microscopic and gross findings in light of the clinical scenario, what was going on with that individual.

BY MR. ROBERTS:

Q.    On Page 66 --

A.    Absolutely, because the significance, certainly many injuries can be tolerated.  There are certain ones that absolutely cannot be tolerated, are not compatible with life.  Sometimes it's a cumulative effect, and there's injury and injury and injury, and then it reaches a point where that last little extra bit of bleeding is what pushes it over to a

USCA5 5249

nonsurvivable incident.

Q.    On Page 66 of Dr. Leestma's deposition, the very last two sentences on that page.

A.    66, yes.

Q.    He's asked about a statement that actually does appear in his report, where it says --

MR. WISEMAN:  Your Honor, I'm going to object to the characterization by Mr. Roberts.

THE COURT:  Would you restate that, please?

MR. ROBERTS:  Yes, Your Honor.

BY MR. ROBERTS:

Q.    I'm referring to, on Page 66, Dr. Rouse, to a statement that appears in the report and that Dr. Leestma actually testified to regarding that, "It cannot be known if the acute component contributed or caused the death."  Do you see that?

A.    Wait a minute.  On Page 66?

Q.    At the very bottom of Page 66.

A.    Oh, "But then you state it cannot be known if the acute component contributed or caused the death."

Q.    Right.  And then, and then he, on Page, at the top of 67, his answer is "That's right."  And then I ask, I ask him immediately thereafter, "Is that excluding eyewitness testimony?"

And his answer is "Basically, yes.  I'm just looking at medical evidence."

USCA5 5250

Is that, in your opinion, is that possibly why there's a distinction between your conclusions and Dr. Leestma's conclusions?

A.   Well, I disagree with that statement.  As a forensic pathologist, witness accounts, certainly we take into account all the investigative information.  Some we discount, some does not fit, some fits.  I mean, but we consider all the information that's available.  And certainly it is only logical that the timing, if there is a newer injury and then an immediate physiologic response in the body, that they are tied together temporally, that one caused the other.  That is a logical conclusion.  And we would, we certainly look at the medical evidence, but that is always looked at in conjunction with clinical evidence, with eyewitness statements, with medical records, physicians' previous examinations.  We would pull that all together to come to our conclusion.

Q.   Okay.  I'm going to maybe go back just a little bit more to Page 47 of Dr. Leestma's deposition.

A.   47?  Yes.

Q.   And he's being questioned by Mr. Abreu, and there's a list of time factors there at the bottom.  It says, "Taking into account the evidence" -- it's halfway down -- "Taking into account the evidence in this particular case that Mr. Bourgeois and his family arrived on the naval base station sometime -- actually, the evidence at trial is that he arrived at 10:03

USCA5 5251

a.m. on the morning of June 27, 2008."

Dr. Leestma then says, "Okay."

Then Mr. Abreu continues, "And that 911 was called at 11:45 a.m. on the same day."

Dr. Leestma then says, "Okay."

Then Mr. Abreu continues, "And that she died approximately, approximately 24 hours later at 11:05 a.m. June 28."

A.    Yes.

Q.    And then we go to Page 48, where Dr. Leestma says, "That's my understanding."

Then he is asked a question, "Is what you observed about the subdural hematoma consistent with an injury that was inflicted within the 24-hour period that she was on the Corpus Christi Naval Air Station?"

And Dr. Leestma answers, "No."

How would you respond to that question?

A.    I would say yes, there is.  I mean, he even describes in his following answer the two components to the subdural, chronic and then the acute.  And I would argue that the acute does not conflict with occurring 24 hours prior to her death.

Q.    And let me ask this to you, just to clarify.  The fact that the child died at that time didn't mean that you immediately began the autopsy on the child.  Is that correct?

A.    Correct.  The autopsy was not performed till the following

USCA5 5252

day.

Q.    Okay.

A.    However, bleeding would not continue after death, once the blood pressure stopped.  So --

Q.    So --

A.    That delay, the delay from the time of death to autopsy, we're moving into the realm of decompositional changes, and this child was refrigerated.  That was not an issue.  Decomposition was not significant.

Q.    But when you're estimating back a day or two or three, does it take into account the day that, between the time of death and the autopsy?

A.    No.  We would be taking out that day.  Because the physiology stopped at the time of death.

Q.    Okay.  And I want to just reference a couple of pages in your testimony.  Did you have a chance to -- do you have your testimony in front of you?

A.    I have it in front of me.  And I have reviewed it.  I have not read every sentence, but I have it in front of me and I've reviewed it, yes.

Q.    Okay.  I wanted to reference Page 130.

A.    Page 130.

        MR. WISEMAN:  I don't have a 130.

        THE WITNESS:  I'm sorry, I didn't print it, so it's a little -- okay.  130, yes.

USCA5 5253

BY MR. ROBERTS:

Q.   Defense asks -- this is not important to you, but just for clarification of the record, there were multiple transcriptions of your testimony.  And so I'm going to refer to two separate pages --

A.   Okay.

Q.   -- when I mention this.  On the bottom of what, in one record, is Page 130 is also the bottom of Page 19 in a different docket and different volume.

A.   Okay.

Q.   This is all on day 5, March 8, 2004, when you testified in Corpus Christi.  And what I'm going to reference, what I want to reference is I had asked you a question during your direct examination, towards the bottom of that page.  Were you able to determine how recent or late these injuries may have been, after looking at the photos?  And -- I'm sorry.  I'm going to read the whole question.

A.   Yes.

Q.   "Are you able to, in looking at these photos and during your examination, were you able to determine how recent or late these injuries may have been?"

     And you responded, "These all appear to be what would, what we would call recent injuries."  And then you go on, and there's almost half a page there of you discussing the different colorations of the injury and stuff.

USCA5 5254

A.    Yes.

Q.    And then I ask you at the end another question.  "Would that be consistent with injuries in the past few days?"  And you said, "Yes."

Dr. Leestma commented that you weren't able to age the injuries any more than just these general statements.  Is there a reason for that?

A.    Well, I think, I think medically within a few days is as accurate as you can get.  I mean, I don't think you can, with medical accuracy, get narrower than a few days window of an injury.  And they -- there is good literature to support that, for example, bruises, the accuracy is limited in how closely we can age them.  There are so many different physiologic events for why, how quickly -- this is referring to bruises -- how quickly they break down.  The hydration status of the person, if the person has a fever, the age of the person.  Children heal differently than adults.  There are many, many variables. So, you know, certainly if we -- you know, really the only way to accurately follow would be to have a videotape of when the injury occurs and see the progression of the tissue.

Looking back, we can only get within, you know, a window. And there are clearly injuries that are days.  I agree microscopically we can get a little more accurate.  There are some that appear to be a week to ten days old.  And then clearly there are older injuries, the healing scars.

USCA5 5255

I feel within medical certainty that is as accurate as you can get, time line, on these injuries.

Q.   One last question.  On Page 50 of Dr. Leestma --

A.   Page 50 of that testimony or --

Q.   No, I was about to tell you.  On Page 50 of Dr. Leestma's testimony.

A.   Oh, okay.

Q.   Go back to that one.  Right in the middle of that page.  Just tell me when you get there.

A.   Oh, yes, I'm here.

Q.   Okay.

A.   "Lastly, doctor" --

Q.   Yes, "Lastly, Doctor, based on everything that you" -- well, this was a question posed to Dr. Leestma.  And it says, "Lastly, Doctor, based on everything that you saw that was presented at trial that you reviewed, is there sufficient scientific evidence to conclude that the child, JG1999, died as a result of an injury that was inflicted on the naval base?"

He answers, "No."

How would you answer that question?

A.   I would -- the -- medically, certainly, I cannot say whether it was on the naval base or just off the base.  And I can't get within that hour of, that window of hours of an injury.  But her injuries, her --

MR. WISEMAN:  I'm going to object to any testimony

USCA5 5256

beyond the medical opinion, Your Honor.  She said, "Medically I can't."  She's about to give another answer.  I'm not sure she's competent to give another answer.

THE COURT:  Overruled.  I'll hear it.  And if it's not any good, I won't pay any attention to it.

THE WITNESS:  Okay.  I'm just going specifically on the question.  It says, "Died as a result of the injury that was inflicted on the naval base."  Time-wise we put it, she has injuries that fit with the timing she was on the medical (sic) base.  The description by witnesses of what occurred on the medical (sic) base certainly would explain the injuries, would explain the trauma to the brain and would explain her clinical course.

I cannot narrow the injuries down to, I think you said she came on the base at 11:04 -- I'm sorry, the timing when she came on the base.  What pages are those on when they arrived on the base?  Okay.  They arrived on the base at 10:03 in the morning of June 27th.  There's no medical way to determine whether that injury was at 9:03 or 10:30.  We cannot get that narrow as far as when the injury occurred.  And that's where putting it together with the witness reports that she was conscious and awake at the time she was coming onto the base, injuries were described, an incident was described, and then she clinically decompensated, that corresponds with the injuries that we saw in autopsy.  And that is what caused her

USCA5 5257

death.

MR. ROBERTS:  Your Honor, we don't have any further questions at this time.

THE COURT:  Thank you.

CROSS-EXAMINATION

BY MR. WISEMAN:

Q.   Good morning, Dr. Rouse.  My name is Michael Wiseman, and I'm one of Mr. Bourgeois's attorneys.  I'm going to ask you some questions.  I think it's important to be extra precise here.  So when you use the term "a few days," do you use that in the common parlance of "a few" being three?

A.   I would say anywhere from one to three.

Q.   Okay.  So when you use "few," you really mean three, one through three?

A.   One to three.  And I don't think, like I said, you cannot get narrower than that.

Q.   Okay.

A.   It's clearly beyond a few hours.  It appears to be less than a week.

Q.   Now, you used a phrase that I wrote down that, I think you said that the victim here in total suffered from a whole brain trauma.  Is that the phrase you used?

A.   Yes.  She has evidence of diffuse, meaning multifocal, multiple areas of injury to her brain.

Q.   And I think some of the injuries you've indicated are a

USCA5 5258

week to ten days old?

A.   The subdural shows evidence of organization, which I would concur is a week to ten days of duration.  Minimal organization is how Dr. Kagan-Hallet described it.

Q.   And what you're calling the more recent injuries, the best you can do is tell us one to three days?

A.   Yes.  And that's for the more recent blood.

Q.   Okay.  Now, were you aware, when you rendered your opinions at trial -- and for the Court's purposes, I'm referring here to the Fifth Circuit opinion in this case, at Page 503 of the official report -- that, this is a quote, "He hit her in the head with a plastic baseball bat so many times that her head," quote, "was swollen like a football," closed quote.  Were you aware of that information at the time of your trial testimony?

A.   Yes, I was.

Q.   Okay.  And do you know when, in relationship to the child's death, she was beaten so badly that her head was swollen like a football?

A.   I would have to look at the record.  Off of the top of my head, I don't recall the timing.

         THE COURT:  Are you talking about two separate instances, Mr. Wiseman, or the one she just said she was aware of?

         MR. WISEMAN:  The one I just mentioned, that her head

USCA5 5259

was swollen like a football.

THE COURT:  Well, that, she just said she was aware of that before her trial testimony.  Are you talking about another one where she was --

MR. WISEMAN:  No, I'm talking about that one.

THE COURT:  The plastic baseball bat --

MR. WISEMAN:  Right.

THE COURT:  -- and the swelling.

MR. WISEMAN:  Right.

THE COURT:  Okay.  She said she was aware of that.

MR. WISEMAN:  That's right.

BY MR. WISEMAN:

Q.   And my next question was, how soon before the child's death that injury was sustained.

A.   How far before her death --

Q.   Yes.

A.   -- was the injury sustained?

Q.   Right.

A.   I would have to refer to the records.  I don't have her, I don't have all the investigative information with me.  I can take a look.

Q.   Okay.  Are you, do you recall that the beatings with the plastic bat occurred prior to the arrival on the Naval, on the Naval Air Station?

THE COURT:  Well, why don't you just tell her when --

USCA5 5260

THE WITNESS:  That was the report.

THE COURT:  What was the day that that alleged to have occurred?  It was a week or two before this, wasn't it?

MR. ROBERTS:  Yes, Your Honor.  It was --

THE COURT:  Substantially before.  Not just a moment before they got to the Navy Base.

MR. WISEMAN:  If the Court observes that as the case, then I'm satisfied --

THE COURT:  No, no, no.  I'm relying on my distant memory.

MR. WISEMAN:  Oh, okay.

THE COURT:  So you need to tell me if you all have information.

MR. ROBERTS:  Well, Your Honor, my recollection is that, I mean, because these, all these things happened over the six-week period, and the Bourgeois family were taking pictures and stuff, we don't have an exact date and time of when this particular incident happened.  It was just, there were so many of them that were testified about.  And then, of course, Alfred Bourgeois himself told people in jail that he had done these kind of things.  And so there was no date or time around that.  And I don't think we could actually narrow it down to a specific week.

THE COURT:  I just saw, I remembered somebody saying at some point he did the following, during the six weeks

USCA5 5261

period, and I guess I thought if it was right before the Navy Base, driving in, that somebody would have mentioned it.

MR. ROBERTS:  I think, Your Honor, our recollection is that AB1994 herself --

THE COURT:  She did.

MR. ROBERTS:  -- recalled having the bat.  And then he threw the bat out the window after the incident, or some sort, something of that nature.

THE COURT:  Have you got it in the trial transcript?

MR. WISEMAN:  I have it in AB1994's testimony.  She doesn't give a specific day.  I want to get the best reference I can.  Okay.  On questioning from Ms. Booth, at Page 16 of her testimony, she says that she found this bat, and it was in, while they were in Louisiana.

THE COURT:  It was in what?

MR. WISEMAN:  While they were in Louisiana --

THE COURT:  Yes.

MR. WISEMAN:  -- that she found the bat.  And then she's questioned about did anything bad happen with the bat, and she goes on to say how her father beat the victim with the bat.

BY MR. WISEMAN:

Q.   The venous thrombosis that Dr. Leestma discussed in his testimony, do you consider that to be the cause of death?

A.   Not in isolation, no.

USCA5 5262

Q.   And you didn't mention that particular condition in either your autopsy report or in your trial testimony?

A.   Not in isolation.  I called the cause of death a closed head injury, which encompasses a constellation of findings.  A closed head injury, as opposed to an open head injury, where there's skull fractures, penetration.  And --

Q.   Right.  You -- I'm sorry.  Go ahead.

A.   So I called it a closed head injury, with a subdural hematoma, because that is, was clearly evident.  There are many findings in the brain, axonal swelling, myelin tears.  I mean, there is a constellation of injuries that all fall under the blunt force closed head injury.

Q.   Okay.  You --

THE COURT:  I guess what you're talking about, I mean, the way I understand it is just a long time of injuries, six weeks worth of injuries.  When they occurred, we don't know, but there was certainly a trial finding that the coup de grâce occurred at the Navy station, when Mr. Bourgeois testified that she fell out of the truck on her head, and AB1994, however, testified that she was smashed against the window of the truck.

So it's a combination of all these events that ended in a single coup de grâce.  Is that your understanding?

THE WITNESS:  Are you speaking to me?

THE COURT:  Yes.

USCA5 5263

THE WITNESS:  Yes, yes, I would agree.  She had a multitude of injuries, the relative role of which I don't think you can dissect out.  But clearly that last injury pushed it till the brain could no longer compensate and resulted in her death.

BY MR. WISEMAN:

Q.   Doctor, Dr. Rouse, let's take a hypothetical.  Let's remove what the Court just called the coup de grâce of this being smashed against the windshield of the truck.

THE COURT:  I guess I said that because I thought that that was kind of the jury finding, after listening to the testimony.

MR. WISEMAN:  Well, right.  It was, in our view, the uncontested jury finding, because Counsel didn't explore any of these issues.

THE COURT:  I understand.  Thank you.

BY MR. WISEMAN:

Q.   Now, Doctor, let's take hypothetically a situation where you remove that hitting that AB1994 testified about.  Is it possible that a person with a constellation of injuries that this victim had would have died when she died anyway?  In other words, the bleeding, the swelling, all the things going on in her brain, could that have killed her on the naval base, even if this particular injury didn't get inflicted?

A.   You would have expected a different scenario, where she

USCA5 5264

would have had more symptoms leading up to the death, nausea, vomiting, being somnolent, sleepy, head -- you know, older people describe headaches, that she would have been irritable. There would have been signs, as she was incurring increasing intracranial pressure.

Q.    And if I told you that the record --

A.    -- rather than a very abrupt change.  You also have the acute bruising.  You cannot ignore the scalp hemorrhage, which are impact sites on the head, meaning her head hit -- either something hit her head or her head hit something.

Q.    And those you can't --

A.    -- around those same times.  So that cannot be -- those are impact places on the head, and that clearly identifies there is head trauma that occurred about the time of death, or about the time of the --

Q.    Okay, but those -- I'm sorry.  I keep interrupting you.  I can't see you, so it's hard to know when you're done.

        THE COURT:  Well, wait till she stops talking, and then you can talk.

        MR. WISEMAN:  Okay.

        THE COURT:  That's a clue.

BY MR. WISEMAN:

Q.    Are you finished?

A.    Yes.

Q.    The injuries to the scalp you agree at trial were a few,

USCA5 5265

quote-unquote, days old.  Do you recall that testimony?

A.   They were recent hemorrhage, yes.

Q.   Right.  Did you use the word "few"?

A.   I believe there were times I used "few" and "recent."
Again, I would put them in the one to three-day range.

MR. WISEMAN:  Just bear with me, Your Honor.  My computer shut off.

THE COURT:  No problem.  I feel your pain.

MR. WISEMAN:  The Government will stop at nothing.

THE COURT:  I know it.  It's a conspiracy.

MS. BOOTH:  Well, Judge, he knows it's not me because I don't know how to turn one on.

THE COURT:  Are you serious, Ms. Booth, you don't use a computer?

MS. BOOTH:  Yes, I do.

THE COURT:  Oh, okay.

MS. BOOTH:  But not very well.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.   Okay.  On Page 20 of your trial testimony, just so we --

THE COURT:  Is your computer back up?

MR. WISEMAN:  Yes.

THE WITNESS:  On Page 20.  I start at Page 92.

BY MR. WISEMAN:

Q.   All right.  Well, I guess jump ahead 20.

USCA5 5266

A.   To 112?  Page 112?  I'm going with the numbers at the top of the page.

Q.   Yes.

A.   Right-hand corner.

Q.   Well, I can read it to you.

Question:  "And so this, your finding would be consistent with injuries in the past few days?"

Answer:  "Yes."

That would be Lines 8 through 10.  And the context is you're discussing the injuries to the scalp.

So at the time of trial, you pinpointed, as best you coul, the scalp injuries to a few days.

A.   Correct.

Q.   If I were to tell you that the medical records from Driscoll Hospital showed that the victim was vomiting at the time she was brought in, or immediately before, would that change your response to the hypothetical with respect to whether there were clinical signs of decompensation?

A.   Vomiting is a sign of increasing -- is a sign of head trauma, clearly.  In a child that had an incident a week prior, and then was slowly succumbing to it, I would have expected symptoms for days prior to their final decompensation.

Q.   Okay.  And do you know for a fact that there weren't such symptoms?

A.   By report, the child was walking, talking, functioning

USCA5 5267

normal, by account.  All of the accounts I read, that the child was functioning at her normal level.

Q.    And whose accounts were these?

A.    I read the available investigative information.  I would have to refer to that to give actual quotes from it, but their description of their travels and the toilet training issues and whatnot.  There are photographs, and again I don't know the exact dates on all of those, but I do not recall any evidence of significant neurologic impairment prior to --

Q.    Right, and -- I'm sorry.  Go ahead.

A.    -- the day they drove onto the naval base.

Q.    And you would agree that you're relying on the absence of reports of what you're calling clinical signs of neurological decompensation.

A.    We use the physical findings in conjunction with the investigative information.

Q.    Right, and --

A.    Pull the two together, view each in light of the other.

Q.    Okay.  And my question, though, is you're relying on an absence of reports from lay people about clinical neurological findings.

A.    The witness descriptions -- and again, I would have to refer to those.  I'm speaking completely in a vacuum, not having any of those in front of me.  There, I believe there are fairly precise accounts of her doing activities of daily

USCA5 5268

living, functioning, neurologically normal.  She was conscious prior to driving onto the base.

Q.    Right.  And --

A.    The information that was provided.  Again, I would have to go back and could provide those for you if --

Q.    Again, in my hypothetical, if a person is succumbing to neurological damage, at some point they're going to be, go from conscious to unconscious.  Would you agree?

A.    Yes.

Q.    And the fact that she at some point became unconscious on the naval base does not by itself mean that she succumbed as a result of a particular injury.  You're making that conclusion, but it doesn't necessarily follow to a degree of medical certainty.  Is that right?

THE COURT:  I'm not understanding --

THE WITNESS:  There are recent bruises that indicate something happened to her head at that time.

BY MR. ABREU:

Q.    Right, which could be three days old.

A.    There's impact, recent impact to her head and a clinical decompensation.

Q.    Right.  And the clinical, the injuries that you just discussed could be up to three days old.

A.    The scalp, they're recent.  We cannot pinpoint them any, with medical accuracy.  You cannot narrow the window of when

USCA5 5269

those occurred.

Q.   Okay.  You met with --

A.   If she died from an injury that the insult that occurred a week prior, again, yes, at some point you would go from conscious to unconscious.  But you would anticipate days of symptoms prior, lethargy, not eating, vomiting for several days' duration, you know, that you would anticipate a constellation of symptoms.

Typically also it would be, the loss of consciousness would be closer to the insult, not a week later.  Typically it may be a day or two, but you would expect it to occur more recently and with symptoms in the intervening period.

Q.   You would agree that at the time of her death, her brain was severely swollen?

A.   Yes.  She had mild to moderate cerebral edema.

Q.   And the CAT scan report from Driscoll Hospital refers to a severe edema?  Are you aware of that?

A.   Yes.

Q.   And edema is -- well, is edema the medical terminology that we use for swollen, swelling?

A.   Yes, yes, fluid that is into the cells is edema.

Q.   All right.  Do you have any explanation for why Dr. Kagan-Hallet called it mild to moderate, and the Driscoll CAT scan referred to it as severe?

A.   I think those are, there's overlap, and those are broad

USCA5 5270

terms.  I cannot obviously speak for Dr. Kagan-Hallet.  She sees cases of people that die from the injuries.  Certainly in the hospital they would be looking at the majority of people that are at that time alive.  That's purely speculating on the difference.  But that is a -- that's not a, that is somewhat of a subjective assessment of a finding.  It's not a measurable, you know, 3 centimeters, 6 centimeters.  It is a global description of the amount of edema.  And I would attribute differences to a neuropathologist and a radiologist are looking at different, using different terminology, using different references.

Q.   Doctor, I'm going to put up on the overhead screen here something you obviously won't be able to see.

THE COURT:  Has that been admitted?

MR. WISEMAN:  Not yet.  So can I put it up on the overhead or put it up on --

THE COURT:  Well --

MR. ROBERTS:  Your Honor, I'm going to --

THE COURT:  Don't hold it up until it's been admitted.  I mean, she can't see it, and I'm not going to look at it until it's been admitted.

MR. WISEMAN:  Well, that's a good point.

MR. ROBERTS:  That's been admitted?

MR. WISEMAN:  No.

MS. BOOTH:  No, no.  And she's not going to look at

USCA5 5271

it.

MR. WISEMAN:  Do you object?

MR. ROBERTS:  Yeah, I do object.  They're my notes.

MR. WISEMAN:  Yeah.

MR. ROBERTS:  Yeah, unless you can tell me why my notes need to go into the record.

BY MR. WISEMAN:

Q.   Dr. Rouse, did you meet with Mr. Roberts prior to your testimony at trial?

A.   I believe we did, yes.

Q.   And how -- did you meet on one occasion or more than one occasion?

A.   I would have to refer to records.  I'm not --

Q.   Do you recall having a discussion with him about the jurisdictional questions related to your testimony?

A.   Jurisdiction is something we take into account, you know, in many phases in the autopsy and the investigation.  I don't recall what discussions I had specifically with Mr. Roberts versus other attorneys versus the NCIS agents.  But yes, jurisdiction had been discussed, prior to -- or was discussed prior to my testimony.

Q.   Okay.  And your understanding is that as a federal medical examiner, your involvement in the case required, all things being equal, that there be federal jurisdiction, or at least ostensible federal jurisdiction?

USCA5 5272

A.    That is our usual rule, by the U.S. code.

Q.    And your understanding further is that for there to be federal jurisdiction for you to get involved, the fatal injury has to have occurred on, within the special maritime and territorial jurisdiction of the United States?

A.    There are a variety --

MR. ROBERTS:  Your Honor, I object.  It calls for a legal conclusion.

THE COURT:  Sustained.

BY MR. WISEMAN:

Q.    Well, was that an issue that you ever talked with United States attorneys prior to your getting involved in the case?

MR. ROBERTS:  Objection, Your Honor.  There's no --

THE COURT:  Sustained.

MR. WISEMAN:  Your Honor, I've got a page of notes which Mr. Roberts was good enough to share with us months ago which indicates that a conversation with the witness, they discussed these topics.  I would offer the page of notes to show that this was an issue of concern to the Government and to the witness, and to find out what discussions may have been had pursuant to that concern.

MR. ROBERTS:  Your Honor, my response to that would be I wouldn't have any problem with the Court viewing the document, of course, so you could make this determination, but there's nothing in my notes that indicate the word

USCA5 5273

"jurisdiction."  They simply are my notes interpreting what the witness is telling me while I'm writing.  And I think it's entirely inappropriate to question a witness based on my notes.

THE COURT:  Sustained.  Just ask her if she had any questions about where the death occurred, if Mr. Roberts discussed it with her.

MR. WISEMAN:  Okay.

BY MR. WISEMAN:

Q.   Did Mr. Roberts and you have a discussion with respect to where the fatal injury --

THE COURT:  The importance, the importance of where the death occurred.  How about that?  Does that do what you want?

MR. WISEMAN:  Well, I'm not entirely sure what I want.

THE COURT:  Well, there you have it.

BY MR. WISEMAN:

Q.   Did you have a discussion with Mr. Roberts prior to your testimony as to where the fatal injuries occurred in this case?

A.   I cannot recall precisely, I mean, this many years later, who discussions were with.  Like I said, those issues are routinely discussed.  Jurisdiction becomes an issue from the time I first received a call about the death, working closely with NCIS, working with the local authorities.  I mean, we delineate jurisdictional issues prior to performing the

USCA5 5274

autopsy.  I don't recall what specific discussions I had with Mr. Roberts prior to my testimony.

Q.    All right.  Would it refresh your recollection if I told you that Mr. Roberts wrote a note that has a --

THE COURT:  Hold up.

MR. ROBERTS:  Objection.

THE COURT:  Sustained.

MR. WISEMAN:  Well, then I would offer the notes into evidence, Your Honor.  I'm trying to refresh the witness's recollection with a document.  It's a prior statement of the witness.

THE COURT:  She -- you don't have any indication that she knows anything about the document.

MR. WISEMAN:  It's -- Mr. Roberts just told you that these are his notes of his conversation with her --

THE COURT:  No.

MR. WISEMAN:  -- therefore, it's a prior statement of the witness.

THE COURT:  Okay.  It's not a prior statement of her. It's Mr. Roberts' statement, period.

MR. WISEMAN:  He just told you it was him writing down what she said.

THE COURT:  No, he didn't say that.

MR. WISEMAN:  I thought that's what he said.

MR. ROBERTS:  I said it's my interpretation of what

USCA5 5275

the witness is saying.

THE COURT:  Yeah, that's not the same thing.

BY MR. WISEMAN:

Q.   Do you agree, Doctor, that blood does not communicate easily between the brain and the retina?

A.   Blood communicates via blood vessels through those tissues.  As far as bleeding outside of the vascular space?

Q.   That's what I meant.  I'm sorry.

THE COURT:  You mean, you're talking about loose blood?

MR. WISEMAN:  Loose blood, yes.

THE COURT:  Not in vessels.

MR. WISEMAN:  Yes.

THE WITNESS:  No.  I mean, there -- the optic nerve is leaving the brain.  It's going back and fanning out in the retina.

BY MR. WISEMAN:

Q.   And do you also agree then that retinal bleeding can be a result of intracranial pressure that Dr. Leestma discussed in his deposition?

A.   Um --

THE COURT:  That what?  I'm sorry.  Would you say that again?  I didn't hear it.

MR. WISEMAN:  That retinal bleeding can be the result --

USCA5 5276

THE COURT:  Thank you.

MR. WISEMAN:  -- of intracranial pressure.

THE WITNESS:  Yes, I would not disagree that it can be the result of that.  That would -- I would refer to an ophthalmic pathologist.

MR. WISEMAN:  Your Honor, I'm going to ask the Court, since I didn't have the benefit of the report, just to have a few minute break to consult with my colleagues before I wrap up.

THE COURT:  Sure.

MR. WISEMAN:  Thank you.  Can we --

THE COURT:  Well, do you want to go outside?

MR. WISEMAN:  Yeah, that sounds good.

THE COURT:  That's fine.

MR. WISEMAN:  Okay.

MS. BOOTH:  Judge, would it be okay if we just like stopped for lunch and they could do it during their lunch hour?

MR. ROBERTS:  That way they don't have to rush.

MR. WISEMAN:  We're going to be done with her --

THE COURT:   I hate to keep her waiting during our lunch hour.

MS. BOOTH:  Oh, okay.  Yes, I forgot about her.

THE COURT:  I was thinking about her, not us.

MS. BOOTH:  Sorry, Dr. Rouse.

THE WITNESS:  Oh, that's okay.

USCA5 5277

THE COURT:  Of course, she can actually eat while she's, while we're doing this, and we wouldn't know the difference.

COURT RECORDER:  Off the record?

(Off the record from 11:50 a.m. to 11:53 a.m.)

MR. WISEMAN:  Thank you for that accommodation, Your Honor.

THE COURT:  Certainly.

BY MR. WISEMAN:

Q.   I have one more question, Dr. Rouse.  Did you meet with a Dr. Oliver prior to your testifying in this case at the time of trial?

A.   Bill Oliver?

Q.   Yeah.

A.   Yes.

Q.   You did meet with him?

THE COURT:  Yes.  She said, "Yes."

MR. WISEMAN:  All right.  Nothing else.  Thank you.

THE COURT:  Anything further, Mr. Roberts?

MR. ROBERTS:  We have nothing further, Your Honor.

THE COURT:  All right.  Thank you very much, Dr. Rouse, for accommodating us with your schedule.  You're excused.

THE WITNESS:  Okay.  Thank you very much.  Bye-bye.

THE COURT:  Okay.  Now do y'all want to break for

USCA5 5278

lunch, or do you want to start --

MR. WISEMAN:  I think we could probably use a short break maybe, like 40 minutes.

THE COURT:  You all tell me.

MR. WISEMAN:  Yeah, I understand.

THE COURT:  I have my lunch brought in.

MR. WISEMAN:  You do?

THE COURT:  So y'all are the ones who are having to go out and schlep around and --

MR. WISEMAN:  Schlep around?  Now I feel like I'm an old man.

THE COURT:  Sorry.

MR. WISEMAN:  1:00 o'clock will do fine with us. 1:00 o'clock?  Okay.

THE COURT:  1:00?

MR. WISEMAN:  1:00?

THE COURT:  No, you tell me.

MR. WISEMAN:  1:00.

THE COURT:  Forty minutes is fine.

MR. WISEMAN:  1:00.  1:00.

THE COURT:  1:00, going once --

MS. BOOTH:  The United States would ask for 1:00.

THE COURT:  1:00 o'clock then.  Thank you.  We're going to be finished for you to leave here at 3:30?

MR. WISEMAN:  I hope so.

USCA5 5279

THE COURT:  Okay.

MR. WISEMAN:  That's our hope.

MR. ROBERTS:  In that case, we'll argue --

THE COURT:  Mr. Bourgeois, are you on the phone?

THE DEFENDANT:  Yes, ma'am, Your Honor.

THE COURT:  Ms. Scotch, would you make arrangements for him to be back on the phone at about five of 1:00?

THE CLERK:  Yes, and I don't want him to hang up yet.

THE COURT:  Don't hang up yet, Mr. Bourgeois.

THE DEFENDANT:  Yes, ma'am, Your Honor.

(Court and Clerk conferring off the record.)

(Recess from 11:55 a.m. to 12:51 p.m.)

THE COURT:  Mr. Bourgeois, are you there?

THE DEFENDANT:  Yes, ma'am, Your Honor.

THE COURT:  Okay.  Thank you.  We're about to get started in a few minutes, and just wanted to make sure you were with us.

THE DEFENDANT:  Yes, ma'am, Your Honor.

MS. BOOTH:  Judge, I think we need to -- the way that we're going to argue, I hope you don't have any problems with it.  We're going issue by issue.  But the way that they broke their issues down and the way that we broke our issues down kind of, so it's going to be -- it's a good thing you're very, very bright, because --

THE COURT:  I'm not feeling it today.

USCA5 5280

MS. BOOTH:  Because all of us are going to be arguing different, different points.  And they kind of lap over each other.

THE COURT:  I wondered if we could -- okay.  It wouldn't be helpful then when Ms. Larin does mental retardation, and somebody responds to that?

MS. BOOTH:  Not --

MR. ROBERTS:  Yeah, that --

MS. BOOTH:  That one is okay.  Right.

MR. ROBERTS:  No, they're all like that.

THE COURT:  Could we do that?  Would you all mind?

MR. WISEMAN:  No, that's what we anticipated.

THE COURT:  Okay.

(Counsel conferring off the record.)

THE COURT:  Are we finished?

MS. BOOTH:  I still think it's going to be a little fuzzy.

THE COURT:  That's all right.  That's what I love about the FT, whatever, FTR Gold, is that I can listen to it late at night and hear the whole thing over again when I'm --

MS. BOOTH:  Oh, isn't that fun?

THE COURT:  -- coming up with something.

MS. BOOTH:  You can't get it to go in your car, though.

THE COURT:  No, thank God.

USCA5 5281

MS. BOOTH:  See, and that's a -- well, that used to work.

MR. ROBERTS:  Except for when you're traveling to Victoria.

MS. BOOTH:  Yeah, well it used to work for me because I could try a case and then listen to the tapes.

THE COURT:  Actually, I can burn a CD and put it in the car.  I'm just not of that mind.

MS. BOOTH:  Okay.

THE COURT:  Are we ready?

MR. WISEMAN:  Yeah.

THE COURT:  Is it okay?  Would you like to begin?

MR. WISEMAN:  We can get started, yeah.

THE COURT:  Is it okay with you all if we do one issue at a time?

MR. WISEMAN:  Yeah, yeah.

THE COURT:  And we're starting the mental retardation?

MS. LARIN:  Yes.

THE COURT:  Okay.

MS. LARIN:  Good afternoon.

THE COURT:  Start at the beginning where you were doing the do-over.

MS. LARIN:  Okay.

THE COURT:  Tell me again the factors.

USCA5 5282

MS. LARIN:  Okay.

THE COURT:  I know I've had them out of Atkins, but I want to do it again.

MS. LARIN:  So there are three prongs of the mental retardation definition.  The first is significantly subaverage IQ.  The second are deficits in adaptive functioning, and there's kind of two tests for that.  I'll talk about that.  And the third is onset of these symptoms before the age of 18.  And this definition has been accepted by the courts.

An important factor in this case to consider is that the definition of mental retardation is not a definition of exclusion.  The DSM states the diagnostic criteria for mental retardation do not exclude -- do not include an exclusion criteria.  Therefore, the diagnosis should be made that whenever the diagnostic criteria are met, regardless of and in addition to the presence of another disorder.

This means that as long as Mr. Bourgeois meets this three-prong test, he is mentally retarded.  He can still have other mental health problems, even many other mental health problems.  The presence or absence of other mental health problems does not change the fact that he is mentally retarded.

So the real debate in this case, in my opinion, is in regards to the question of adaptive deficits.  So I want to start my argument there.  There are two definitions or tests for deficiencies in adaptive deficits.  One, under the DSM, you

USCA5 5283

have to have deficits in two of ten areas.  And under the AAIDD, you have to have deficits in at least one of three domains.

And in this case --

THE COURT:  Wait a minute, the DSM, two out of ten, and what's the other one?

MS. LARIN:  One of three domains.

THE COURT:  By what?

MS. LARIN:  That's by the AAIDD, formerly the AAMR.

THE COURT:  Got it.

MS. LARIN:  In this case, Dr. Victoria Swanson tested and interviewed Mr. Bourgeois, interviewed eight people who knew about his functioning and his environment, and administered two retrospective tests of adaptive function regarding Mr. Bourgeois's functioning as a child.

In addition to having over 35 years experience of working exclusively in the field of mental retardation, Dr. Swanson was an excellent expert in this case because she's familiar with the local school system and the local supports and local culture.

In her considered opinion, Mr. Bourgeois meets both tests of adaptive deficits.  He has significant deficits in all three domains listed by the AAIDD.  That's conceptual, social and practical.  And under the DSM's rubric, Dr. Swanson opined that Mr. Bourgeois is significantly impaired in functional

USCA5 5284

academics, health and safety, and social interpersonal skills.

Dr. Swanson's opinion came under attack on several fronts during the course of this hearing, and I'd like to talk about those.

THE COURT:  Thank you.

MS. LARIN:  However, in sum, the attack was that according to the Government's experts, Mr. Bourgeois does not present himself as someone who is mentally retarded, and therefore cannot be mentally retarded.

The Government's response fails --

THE COURT:  And I understand.  I would think that you would be able to compensate in one area to hide the other areas --

MS. LARIN:  Yes.

THE COURT:  -- in many areas.

MS. LARIN:  And that's what Dr. --

THE COURT:  For instance, if we just deal with him in the verbal situation, and he seems very outstanding in verbal situation, it doesn't necessarily mean that we've ever, that I've ever observed him anything other than verbal communications, which are apparently pretty good, you know, from writing letters to me.  So I am interested in what you have to say about how you can mask that.

MS. LARIN:  Okay.

THE COURT:  But go ahead with your presentation.

USCA5 5285

MS. LARIN: Okay. Well, first, it's important to understand that the ability to mask certain deficits does not mean you're not mentally retarded. And that's why I went into the important precept that adaptive skill limitations often coexist with strengths. And that's why the DSM says you only need to be deficient in two of ten areas. You can be strong in eight areas, as long as you meet the other two prongs of the test and you're weak in two areas, significantly deficient in two areas.

THE COURT: What areas did she say he was deficient in under the DSM?

MS. LARIN: She listed functional academics, health and safety, and social interpersonal skills. And Dr. Moore agreed that you can be weak in two areas and strong in eight areas and still meet the definition for mental retardation.

THE COURT: Sorry, functional, academic, health and safety and --

MS. LARIN: Social interpersonal.

THE COURT: Thank you. So that's three out of ten?

MS. LARIN: Three out of ten. In this case, it seems clear that Mr. Bourgeois demonstrated relative strengths in the area of work. He presents well due to his loquacious manner, and he has a real ability to spell. These three relative strengths, however, do not, under the definition, overcome his significant deficits in intelligence and adaptive functioning.

**USCA5 5286**

The second debate presented was the question of how best to do a retrospective assessment of adaptive functioning. I hope this Court will consider that Dr. Swanson oversaw the most correct and accurate retrospective assessment possible under the circumstances, while the Government's expert, Dr. Moore's, was unreasonably truncated, failed to follow known best practices in the field, and focused on a time period that had little relevancy to the question of Mr. Bourgeois's mental retardation.

In addition to conducting a thorough evaluation of Mr. Bourgeois himself to assess his current adaptive functioning, including a skills test and a broad spectrum academic test, Dr. Swanson also interviewed eight people from Louisiana to help her learn about Mr. Bourgeois's developmental years.

Dr. Swanson chose Ms. Frank to complete a thorough assessment using two different instruments to measure adaptive functioning. Dr. Swanson decided Ms. Frank was an ideal respondent, because first, she was not close to Mr. Bourgeois and had had little to no relationship with him since he was a young child, thereby lessening the opportunity for bias.

Second, she had at one point served as sort of an assistant caregiver role to Mr. Bourgeois. And so she had a broad understanding of his abilities as a child.

And third, Ms. Frank had a clear and strong

USCA5 5287

recollection of Mr. Bourgeois's functioning at a certain specific age, age seven.

Dr. Swanson explained the difficulties of doing a retrospective evaluation of adaptive functioning.  However, she was impressed with Ms. Frank's ability to recall and her unbiased approach.

Dr. Swanson completed a Vineland using an interview type format, which allowed the doctor and the informant to have a dialogue and allowed, in Dr. Swanson's opinion, a more full and complete picture.

THE COURT:  You know, to me, it's not whether these witnesses were believable or their empiric evidence was credible, but whether or not this should have been brought to the attention of the jury, that it's a contrasting opinion.  No matter whether it's correct or not correct or what I believe is correct, it's just that you're saying this should have been explored and brought to the jury.

MS. LARIN:  Yes.  I agree, it should have been brought to the jury.  And I think that if you're looking at the question that way, Ms. Frank would have been a good witness for the jury.

THE COURT:  I'm not sure about that, because I remember the cross-examination on all of these witnesses that were brought in.  But the point is not necessarily -- well, you just feel that a bigger effort should have been made in all of

USCA5 5288

the areas that you've brought up, besides the mental retardation, all of them.

MS. LARIN:  Speaking of a bigger effort, Dr. Swanson didn't just stop with Ms. Frank.  She interviewed seven more people to learn about Mr. Bourgeois's functioning.  She visited his area where he grew up.  She visited his school and spoke to a special ed teacher who had knowledge about the lack of supports that were available to him when he was a child.  She talked to people who had worked with him when he first learned how to drive a truck.

And although she decided that none of them had a sufficient level of understanding or memory or broad enough experience with Mr. Bourgeois to complete a formal assessment, she was able to rely on them for small pieces of information to develop a large picture of his development and how he was able to learn or not learn.

And she learned from them that he did have significant difficulties, especially in areas like learning to drive, help with job applications, paperwork, bills, laundry, food preparation, the simple skills of life.

THE COURT:  I didn't know he had troubles with bills. I didn't remember that one.

MS. LARIN:  She said that he --

THE COURT:  Can you give me an example?

MS. LARIN:  Well, she said that he had to rely on his

USCA5 5289

brother to help with the bills and his wives, and that's what his sister Claudia had said.  So -- she was specifically asking about bills, which is why I --

THE COURT:  Okay.

MS. LARIN:  Dr. Swanson's assessment followed the best practices, as delineated by the office of both the ABAS, the ABAS, and the Vineland.  On the contrary, Dr. Moore performed a more truncated and focused evaluation, one that served to point out Mr. Bourgeois's strengths and ignored his weaknesses.  This is not the appropriate method for evaluating adaptive functioning.

Dr. Swanson explained that practitioners, when presented with a low IQ, as in this case, must evaluate the client's weaknesses.  When presented with an apparent strength, the doctor is expected to probe that area of functioning to learn how the person acquired his skills and if he did so with supports.  And Dr. Moore failed to follow these recommendations.

Dr. Moore's assessment notably failed to rely on the input of any of Mr. Bourgeois's relatives.  Dr. Moore interviewed two family members, one in the presence of Counsel and one out of the presence of Counsel.  He administered the ABAS to one sister, but determined that -- and refused to rely on the test results.  The other sister, admittedly a poor historian, refused to take the test.

USCA5 5290

After these two interviews, Dr. Moore did not attempt to make any further investigation into Mr. Bourgeois's childhood.  He did not talk to anyone from the school system, for example.  He did not speak to anyone who knew him when he was learning how to drive.  He did not speak with any of his neighbors.

He did interview Mr. Nate Banks, who, according to the Government, grew up with Mr. Bourgeois.  However, the Government did not call Mr. Banks to testify at the hearing, so we were not able to test his credibility as far as his recall to Mr. Bourgeois's functioning at the age of 18.

The remainder of Dr. Moore's assessment centered on interviews of former co-workers of Mr. Bourgeois in the latter part of his career as a truck driver.  These informants admittedly knew Mr. Bourgeois in a limited area of his life and only as an adult.  As such, they are not appropriate respondents under the best practices for retrospective evaluations of this developmental disorder.

Further, the authors of the ABAS, as published in ABAS 2 Clinical Use and Interpretations, their chapter on its use in the retrospective evaluation, recommend that the ABAS be given in an interview format when used in a retrospective evaluation, and that respondents only be asked to answer questions for areas of functioning that they have a clear knowledge and memory of.

USCA5 5291

Dr. Moore violated the recommendations of these authors by having the respondents complete the survey on their own and by having them answer questions in areas where they clearly had little to no knowledge.  In some areas, the informants indicated that they had to guess on more than 50 percent of their responses, and some up to 100 percent of their responses.

By all accounts, these test scores cannot be considered reliable.  At best, these respondents reveal what most of us could guess at, that Mr. Bourgeois has an area of strength in the area of work, specifically truck driving.  This strength, we know, cannot protect him from the diagnosis of mental retardation.  No matter the level of functioning Mr. Bourgeois displayed in the work domain, it does not erase the fact that he's significantly impaired in the domains of functional academics, health and safety, and social skills.

The final area --

THE COURT:  I watched last night an hour of him and his social skills with a big group of people.

MS. LARIN:  Oh, you did?

THE COURT:  It was one of the exhibits.

MS. LARIN:  A video?

THE COURT:  The video.

MS. LARIN:  He's a loquacious person.

THE COURT:  Didn't seem to be any problem with

USCA5 5292

interacting with the guests that he had.

MS. LARIN:  Well, I think that there is evidence in this case that he has significant problems in, especially with new people, they talked about a lot, in the family arena.  He has a different sort of problem in the social arena --

THE COURT:  Thank you.

MS. LARIN:  -- with intimate friends, but might not present as a problem.

THE COURT:  Thank you.

MS. LARIN:  A final area of dispute concerned the etiology of some of Mr. Bourgeois's recognized deficits.  As the Government identified, the million dollar question, in the direct of Dr. Price, "That's the million dollar question, Doctor.  How can we determine what the source, whether the problems he displays are symptomatic of mental retardation or are the result of a personality disorder?"

Dr. Price noted in his report and testimony that while Mr. Bourgeois may have some areas of relative weakness, he believed that they were better explained by Mr. Bourgeois's personality disorder and not by mental retardation.  This, however, ignores the precept and the DSM's directive that mental retardation is not a diagnosis of exclusion.  In other words, it doesn't matter what the cause of the deficit --

THE COURT:  You can have lots of other things besides mental retardation.

USCA5 5293

MS. LARIN:  Right.  And it doesn't matter what causes the deficit.  As long as it existed prior to the age of 18, or had its onset prior to the age of 18, it counts as a deficit for the diagnosis of mental retardation.

So in this case, even if it was a personality disorder that led to these deficits, it still counts for mental retardation.  And considering that Dr. Price testified that this personality disorder was a pervasive developmental problem -- I don't know if he used the word "developmental," but it's a pervasive problem that's been long standing in his life, I argue that that means it counts and probably had its onset prior to the age of 18, and it would meet the criteria.

Moving on to intellectual functioning, I think those are the three main debates about --

THE COURT:  Can I ask you about the mental retardation?  This was my concern, you know, about the significantly subnormal IQ.

MS. LARIN:  Uh-huh.

THE COURT:  I may have misinterpreted the whole thing, so you all have to explain it to me.  But when I saw Dr. Price's, the addition of his deposition --

MS. LARIN:  Uh-huh.

THE COURT:  -- he told the Court and the examiner that he applied the Heaton norms --

MS. LARIN:  Uh-huh.

USCA5 5294

THE COURT:  -- that the trial psychologist did not apply Heaton norms, because one of the Government's witnesses said he was kind of low functioning.

MS. LARIN:  Right.

THE COURT:  And the Heaton norms were demographic. And I can't remember, I'm missing one of them.  One of them was age, gender, education and race.  I think those were the four.

MS. LARIN:  Uh-huh.

THE COURT:  And that he did not apply race in Mr. Bourgeois because he relied on self-reporting as to what the race was, and Mr. Bourgeois reported that he was mixed race, which, as we know from the testimony, caused him significant problems as a child.

So the question you're asked, "Well, if you had applied the African American, the fourth part in the Heaton norms," and he said, "Well, he would have had a normal IQ."  I think I'm using the right words.

So wait -- so I'm looking and thinking while I'm listening to this, watching it last night, if he was raised in an African American family --

MS. LARIN:  Uh-huh.

THE COURT:  -- which all of his family was, except for Mr. Bourgeois, who was -- I think his father was white and his mother was black.  Is that right?

MS. LARIN:  I think his father was creole.

**USCA5 5295**

THE COURT:  Okay, creole.  I don't know what that means.

MS. LARIN:  Right.

THE COURT:  I thought it was a way of talking and not a --

MS. LARIN:  I thought it was a type of food.

THE COURT:  I don't know.  That's true.  And that his mother was African American.  But all of his siblings were African American, and he lived in an African American home, didn't have any contact with his father, whatever he was, till much later in his life.  Went to an African American school, had African American teachers, lived in an entirely African American community.

Then, and I'm listening to this, and whoever was the cross-examiner said, "Yes, you know, look at these factors." And Dr. Price said, "Yes, I should have applied --" that would be appropriate then to apply the fourth prong of the Heaton norms to look at his intelligence.

MS. LARIN:  Uh-huh.

THE COURT:  When he did that, it turns out he was normal.  So I -- now, this is where I'm confused, because I don't think I heard it.  I kept listening to it over and over again.  But I thought the Government examined him then to say -- because the trial psychologist did not use the Heaton norms.  They said go back and use the Heaton norms with this

USCA5 5296

data that trial psychologists presented.  And if you do that, what happens?  And I thought they said -- I thought he said that it comes out normal.  Who was the examiner in that, Mr. Dowd?

MR. DOWD:  Yes, Your Honor.  That's my memory as well.

THE COURT:  And I thought that can't be.  And so I kept listening to it over and over again.  And I thought that's what he said.  You asked him to apply --

MR. DOWD:  Apply.

THE COURT:  -- the Heaton norms --

MR. DOWD:  Yes, Your Honor.

THE COURT:  -- with race --

MR. DOWD:  Right.

THE COURT:  -- to the data.

MR. DOWD:  I think he did it both ways.

THE COURT:  He did it both ways --

MR. DOWD:  With and without.

THE COURT:  -- with no race and with race.

MR. DOWD:  Right.

THE COURT:  And if he applied the race, he turns out not to have a subclinical IQ, or whatever it is, a significantly -- that he's like 95 to 100.

MR. DOWD:  That was my understanding as well.

MS. LARIN:  If I could respond.

**USCA5 5297**

THE COURT:  That's what I want you to do.

MS. LARIN:  Okay.  The Heaton norms and the question of Heaton norms were not about the intelligence tests.  They were about the Halstead-Reitan neuropsychological test that looks at the question of brain damage and brain functioning.  And so there's, I mean, there's obviously an overlap regarding the etiology --

THE COURT:  Okay.

MS. LARIN:  -- of mental retardation, but --

THE COURT:  So then he -- because he had first testified that he had -- he was, in the initial 2255, that he had the symptoms of brain damage.

MS. LARIN:  Right.

THE COURT:  Which turns out not to be correct --

MS. LARIN:  Well --

THE COURT:  -- if he applies the African American prong of the Heaton norms.

MS. LARIN:  My recollection is that it was only on the categories test, which is one subtest of the Halstead-Reitan.  My recollection, it was in Dr. Gelbort's administration of the categories test --

THE COURT:  Okay.

MS. LARIN:  -- that the answer actually changed from below, from deficient to average.

THE COURT:  Okay.

USCA5 5298

MS. LARIN:  But that Dr. Weiner's Halstead-Reitan still showed plenty of deficiencies, but Mr. Wiseman's going to talk about that because it's not directly related to the intelligence question, because the neuropsych Halstead-Reitan is really about brain damage and not one of the prongs of the mental retardation test.  So the IQ test --

THE COURT:  But see, I thought he was saying that was the contributing factor to why he thought he was mentally retarded.

MS. LARIN:  Dr. Price?  I mean --

THE COURT:  Because I guess I -- I may have this wrong also, but I thought, and I'll look at it again --

MS. LARIN:  Uh-huh.

THE COURT:  -- with what you've explained to me --

MS. LARIN:  And there's a -- I encourage you to look at, one of the exhibits charts out the --

THE COURT:  Okay.

MS. LARIN:  -- you know, using race and not using race.  Or it's actually the white norms versus the black norms.

THE COURT:  Right.  And I can't -- and I agree with Dr. Price.

MS. LARIN:  Yes.

THE COURT:  It sounded to me more reasonable to apply the African American.

MS. LARIN:  Right.

**USCA5 5299**

THE COURT:  That fourth deal.

MS. LARIN:  Uh-huh.

THE COURT:  He kind of left out any race --

MS. LARIN:  Right.

THE COURT:  -- if I recall.  But then if you add back in Caucasian, it did this.  If you add back in African American, it did this.  But I thought that was what Dr., one of the doctors at the 2255 said that they thought that was the origin of his mental retardation, that the, some of the other categories could have been faked, but this one could not.

MS. LARIN:  It's true that brain damage is an etiological factor of mental retardation, but it's not the only one, so there's also prior childhood, lack of schooling.  Those are all considered etiologies.  You know, in utero sort of effects.  There's no real -- no one really knows what causes mental retardation.  It does support, I think brain damage supports a claim of mental retardation, but it's not considered --

THE COURT:  I got it.

MS. LARIN:  -- one of the prongs.

THE COURT:  I understand exactly.

MS. LARIN:  And I also encourage you to look at that again, because like I said, my recollection is it really, he only really in the end made a correction on one subtest, where he found him to be normal on one of the subtests.

**USCA5 5300**

THE COURT:  Okay.

MS. LARIN:  And actually Dr. Weiner's tests were still significantly impaired.

THE COURT:  Okay.

MS. LARIN:  So one of Dr. Gelbort's tests, the result was changed.

THE COURT:  Thank you.

MS. LARIN:  But to intellectual functioning, which is often, you know, conflated with kind of brain functioning in general, but they're actually two separate things and they have two separate tests.  And the IQ test goes to intellectual functioning.  And that's the first prong of the definition of mental retardation.  And it's a pretty straightforward prong. It relies on a test result.

THE COURT:  Has the Fifth Circuit recognized, or the Supreme Court recognized the use of -- you know, usually the theory is you have to have an IQ test very early in life to be mentally retarded, and you can maybe raise it as time goes on. But once it's set at mental retardation, considering whatever factors are -- so your people went back and used a retrospective way to diagnose mental retardation --

MS. LARIN:  Uh-huh.

THE COURT:  -- or adaptive deficits in various areas. Has that been recognized anywhere in the circuit law?

MS. LARIN:  Yeah, I mean, that's basically the only

way to do it in an Atkins case, because you're presented with a Defendant, usually post age 18, and you have to do a retrospective analysis.

THE COURT:  But I thought we talked about that that was used in some places, but not in this type of -- am I wrong about that?

MS. LARIN:  No, I think a retro -- usually the only question of retrospective analysis is regarding adaptive functioning.

THE COURT:  Okay.

MS. LARIN:  And that's kind of been the debate.

THE COURT:  Is that recognized by the Fifth Circuit?

MS. LARIN:  That has been recognized, yes.  I mean, there's -- it's a judgment that you need to make, whether you credit the adaptive functioning deficits that we presented. That's my understanding of the Fifth Circuit law.

THE COURT:  Okay.

MS. LARIN:  And you can rely on the experts, but it's in the end your decision.  But it's definitely, the analysis and the process of going back to someone's childhood and researching this the way you did is --

THE COURT:  Thank you.

MS. LARIN:  -- the accepted way to do it.

THE COURT:  Okay.

MS. LARIN:  Whereas intelligence tests, there's clear

**USCA5 5302**

law that says you don't need a specific IQ pre-18, IQ score pre-18, because there's an assumption that IQ is relatively stable over the course of someone's life, and if anything, it might increase.

THE COURT:  Right.

MS. LARIN:  So you can rely on your IQ that you get --

THE COURT:  That's why we heard testimony about people that decreased it when it was, he tested out in the 80s or something.

MS. LARIN:  Right.  I think I know what you're talking about.

THE COURT:  The what effect?  What was the effect? What's it called?

MS. LARIN:  The Flynn Effect.

THE COURT:  Flynn Effect.  Thank you.

MS. LARIN:  Yeah.  And that's to the question of using outdated norms and -- which were used in this case, but fortunately for my argument, it didn't really matter.

THE COURT:  Okay.

MS. LARIN:  Because even the outdated norms showed him to be in the range of mental retardation.

THE COURT:  Thank you.

MS. LARIN:  So in other cases, that's a much bigger issue.

USCA5 5303

Here, even under the outdated norms, he scored at a 75, which is within the accepted range under Atkins for mental retardation.  And all the experts --

THE COURT:  I just thought it was supposed to be under 75.  Not?

MS. LARIN:  It's 70 to 75 --

THE COURT:  Okay.

MS. LARIN:  -- is what it says, so I don't know how you want to interpret that, but --

THE COURT:  I got it, whether it's to 75 or through 75.

MS. LARIN:  Right.  Exactly.  You'll have to decide.

THE COURT:  Okay.

MS. LARIN:  My understanding is 75 is an accepted number in the range.

THE COURT:  Okay.  Thank you.

MS. LARIN:  And all of our experts agreed on my review of the testimony from the hearing that that was probably an overestimate.  They all agreed the Flynn Effect is kind of an accepted phenomenon, and so --

THE COURT:  I don't think the Fifth Circuit has accepted it.

MS. LARIN:  I don't think so either, but --

THE COURT:  Okay.

MS. LARIN:  Well, they haven't said they disagreed

**USCA5 5304**

with it, but they haven't said --

THE COURT:  Okay.

MS. LARIN:  -- "We're accepting it."  But the experts agree, you know, it's a phenomenon that happens, it's just how you should, whether you should rely on it and how much weight you should give it.  But generally it's accepted that that's probably an overestimated score, 75.  That's an overestimate of his actual IQ.

THE COURT:  Thank you.

MS. LARIN:  And I'd also wanted to just point out that the Government did not take the opportunity to retest Mr. Bourgeois's IQ.  And so you're left with the numbers 75 and 72, that I think are ample proof that we have met the first prong of the definition of mental retardation, of significantly subaverage intellectual functioning.

THE COURT:  Thank you.

MS. LARIN:  And finally, the last prong is onset prior to age 18.  And I've already basically touched on this.

THE COURT:  The retrospective.

MS. LARIN:  Right, because Dr. Swanson really did a thorough, did a lot of research into his functioning prior to the age of 18.  And she found that there were significant deficits.  If anything, he's improved since childhood, and that he had many more deficits as a child, including, you know, dressing himself, taking, doing basic things that other

USCA5 5305

children can do, he had trouble with.  And so I think we've met the third prong of onset prior to the age of 18.

THE COURT:  Thank you very much.

MS. LARIN:  Thank you very much, Your Honor.

THE COURT:  Who's going to respond to this point?

MR. ROBERTS:  I am, Your Honor.  Good afternoon, Your Honor.

THE COURT:  It's still good afternoon.  Thank you.

MR. ROBERTS:  It's still good afternoon.  Obviously the Petitioner has the burden here.  And they presented a case, I think you'll hear from most of us on the Government's side that it appears to us that they, that there are a number of expert witnesses out there that are specialists in this specific area, to the exclusion of additional, of all the evidence that you would consider normally, who have the ability to look at a certain area and reach a finding that would benefit a Defendant in a particular situation.

And what we believe happens, I mean, we're certainly in agreement that, of the three aspects of the test.  What I would ask the Court to do is to look closely at Dr. Moore's report, because he -- not only his first report, but his supplemental report, which is Government Exhibit 15, the original report, and 16 is the addendum.  And Dr. Moore addresses both the two different types of analyzing adaptive functioning and also addresses some of the concerns with the

USCA5 5306

status of the law, in the sense of what actually the definition of mental retardation is. But his explanations are far better than anything I'm going to be able to say, so I'm going to rely on that.

What I would like to point out, with the intellectual functioning, we are stuck with a test of 75. And if we didn't have a test of 75, we wouldn't even be discussing this, for the most part. So because they have a test of 75, we're not going to argue or address the issue of intellectual functioning that much.

We really, it would have been best for us to have a new test. But even our experts, and I think their experts agree, that after someone tests a certain number of times, they start to get the idea down, and subsequent tests are not often as correct as earlier tests.

And so for whatever, you know, for the various reasons and the various things that happened in this case, we have a test that's 75.

I think what the evidence showed, from our perspective, is we, the Flynn Effect is something that has been developed and applied only in a courtroom setting. It's not applied by psychologists or psychiatrists when they're trying to evaluate their patients. And so it is certainly a litigation tool to try to lower scores and enable people to apply this defense to them, or this aspect of mental

USCA5 5307

retardation.

At the same time, we noticed as we examined the experts in this area on intelligence functioning that malingering tests were not always applied the way they should have so we could determine whether or not Alfred Bourgeois's test scores were accurate and ultimately reflected a correct score, whether it was 75 or whether it's the 70 that Dr. Gelbort actually came to. So I guess I misspoke earlier when I said "75." We've got a test of 70 from Dr. Gelbort also.

So we're dealing with a situation where this Court is confronted with this concept of Flynn Effect and this concept of malingering that may or may not reveal to us the actual score. I'm not sure the Court has enough information to make a final determination. All we know is that the scores that exist currently put him in a range of borderline intelligence functioning.

And so we move on to the adaptive functioning and the onset before age of 18. Those two prongs of this test take on more significance. In the adaptive functioning area, Dr. Swanson was the primary witness that was presented to this Court in this area. And what was very intriguing about that is that Dr. Swanson actually had two reports.

I don't know if the Court remembers, but there was a report that was done before Dr. Swanson, or Dr. Moore tried to

USCA5 5308

do an assessment.  And Dr. Swanson's initial report, I actually believe the first report was not offered by the Petitioner. But the supplemental report was offered by Petitioner at, it was Petitioner's Exhibit 33.  It was a supplemental report.

When Dr. Swanson took the stand and testified, she was relying completely on that supplemental report and how she set out the different areas where there was deficiencies and why she came to the conclusion that there was mental retardation.

Well, when she was confronted with the fact that she did a report in June of '09 and that, and that was offered as Government Exhibit 175, she had to acknowledge that in the report, the first report that she did in June of '09, it lacked any of those findings.

And in fact, she didn't -- I don't know if the Court remembers exactly or not, but Judge, she did her report in June of '09.  Then we got Dr. Moore involved in the case, and he suggested that he needed to go out and interview witnesses in order to do a correct adaptive functioning.

He goes to Louisiana and is confronted with the Petitioner's Counsel at the very first time he tries to go and meet with a family member.  And at that point in time, Dr. Moore realized that it was going to be very difficult to get accurate readings from these family members.

And when he was confronted with the fact that these,

USCA5 5309

that the Counsel was going to be at the other interviews, he did decide to stop that and go to those other people that might be more objective.

And so, you know, the statement a few moments ago that Dr. Moore failed to talk to family members, well, there was a reason he didn't talk to any more family members. He had several of them set up to interview them that day.

Ultimately, he was able to get four people that he spoke to and did testing on. They're all reflected in his report. And Mr. Banks is a very important individual, because he is one of the few that actually knew Alfred Bourgeois in any significant fashion at or before the time he was 18. And so it was during the high school time. And that was very important, as Dr. Moore pointed out, to understanding the third prong about the onset with the age of 18.

Dr. Moore and Dr. Price both approached this case with trying to ascertain whether or not Alfred Bourgeois fit the definition of mental retardation. Both of them have a long video recording, long interview. And in the end, both of them came back and said he does not fit in any of the categories of mental retardation that they could apply.

So Nathan Banks, his assessment and his ratings, as you look through that, through the evidence presented in Dr. Moore's report, really indicates that there was no onset, if there was any mental retardation and adaptive functioning,

USCA5 5310

failed in any of the areas that are, that were considered.  The onset before the age of 18 just doesn't exist in this case.

The family members that were brought in --

THE COURT:  I remember.

MR. ROBERTS:  -- most of them --

THE COURT:  I know.

MR. ROBERTS:  -- and the co-workers that came in were very clear about his ability to function.  And so it's our belief and our contention that they have not met the requirements to establish mental retardation.

THE COURT:  Thank you.  Next point, Petitioner?

MR. WISEMAN:  Good afternoon, Your Honor.  I sent the Court a list of cases last night with all the points and authorities.

THE COURT:  Oh, yes.  I haven't read them.  I'm sorry.

MR. WISEMAN:  Yeah.  It's just a list of some parentheticals.  But the reason I sent them to you is that in trying to structure and think through what to say here today, I just kept thinking to myself, this is the quintessential case of ineffective assistance of counsel at penalty phase, and the seven or eight cases from the Supreme Court of the United States I provided you, and that smaller number of cases from the Fifth Circuit --

THE COURT:  I've read the memo, but not the cases.

USCA5 5311

MR. WISEMAN:  Oh, yes.  Right.

THE COURT:  Okay.

MR. WISEMAN:  I understand that.  But you know, when you look at them, you know --

THE COURT:  But it popped up on my screen between reading, watching the depositions of the other --

MR. WISEMAN:  Yeah, they all say "Alfred Bourgeois" on them.  I mean -- and I'm going to get into this in more detail, but you know, this case has all the elements of all of those Supreme Court cases.  You know, in the last ten years, the United States Supreme Court has decided five cases in this one area.  And they all sound like Bourgeois.  They're all cases that meet the elements, or I should say Mr. Bourgeois meets the elements of them.  And I'll talk about them.

Before getting into the specific evidence, though, I just want to comment on what I call the Columbo factor, or to give proper deference to Mr. Dowd, when he was examining Dr. Johnson, the DNA one, he characterized Mr. Tinker as having a sort of a Columbo-like persona, was referring to the television detective, you know, appears to be fumbling about, but in reality is, everything is for a purpose and --

THE COURT:  I got it.

MR. WISEMAN:  -- and he's quite bright.  I wasn't sure if you knew the story.  You know, and --

THE COURT:  I couldn't stand that series, by the way.

USCA5 5312

MR. WISEMAN:  I didn't like it myself, personally.

THE COURT:  And I liked Mr. Tinker very much.

MR. WISEMAN:  But I guess the point is that, you know, it sort of couples with this notion that, you know, Mr. Tinker is a legend.  I, unfortunately, only got to meet him a couple of times before he passed.  He seemed like a wonderful fellow.  But you know, it leaves us in a very difficult position, because then anything he did that's correct on its face, he did a good job.  And anything he did that's apparently incorrect on its face, well, he was still doing a good job, because he's like Columbo.  And it leaves us kind of wrestling with a ghost, in quite a literal sense.  And I'm not sure if that analysis really is useful.

THE COURT:  Obviously, I didn't use that one.

MR. WISEMAN:  Okay.

THE COURT:  I mean, I don't intend to, because I --

MR. WISEMAN:  All right.  Well, that's comforting.

THE COURT:  I did not find that to be flattering or truthful.

MR. WISEMAN:  Okay.  Well, that's --

THE COURT:  Either one.  So we can move on from Columbo.

MR. WISEMAN:  Excellent.  Excellent.  Strickland, of course, guides this Court's inquiry of deficient performance and prejudice.  At this point the case is 25 years old.  It's

USCA5 5313

quite familiar.  It's deficient performance, Counsel's presentation, although an objective stand, the reasonableness, prejudice has been characterized as not a stringent burden for us to meet.  We have to show that there's a reasonable probability of a different outcome.  A reasonable probability is one that undermines confidence.  And in a death penalty case, in a way jurisdiction like the Federal Death Penalty Act, Wiggins, at 537, of the decision says that if even one juror would have been persuaded to vote differently --

THE COURT:  I have read some of the cases on other occasions while we've been doing this, but I didn't read them last night.

MR. WISEMAN:  Okay.  No, I'm just, you know, just so I know the Court's --

THE COURT:  Mr. Bourgeois, are you still here?

THE DEFENDANT:  Yes, ma'am, Your Honor.

MR. WISEMAN:  I know the Court's going to, you know, go through all this, and I just wanted to, you know, put that out there so you'll have it for handy reference later.

So what types of unpresented mitigating evidence do we have here?  And here's where I think we have such a strong overlay with the cases that I filed with the Court.  We have abuse evidence, evidence of vicious childhood abuse.  And you know, that comes from several places.

We have red flags about that abuse.  I think we, I

USCA5 5314

remember vividly standing before Your Honor reading to you memos which subsequently were admitted into evidence -- I believe it was Petitioner's 61.  These were investigative memos written by Mr. Bierbaum to Mr. Tinker and Mr. Gilmore.  And you know, in them it's, you know, one after the other after the other accounts of Mr. Bourgeois being savagely abused by his mom and others.

We've got -- and by the way, that was admitted on Day 5, at Page 55 of the transcript.

We've got evidence of organic brain dysfunction.  I'm going to talk a little bit about the whole Heaton business and what that's about.

We certainly maintain Mr. Bourgeois is mentally retarded, and Counsel were ineffective for not exploring, presenting that.  But even if the Court makes a finding that he's not mentally retarded, they have a person who is of low intelligence.  Those IQ scores are clearly, at best, in the borderline range.  Every expert, both sides, agreed that at a minimum he had a low intelligence.  And again, the cases I presented, Your Honor, say the low intelligence is a mitigating factor that ought to be presented.

In this case, we also have a severe and crippling borderline personality disorder.  Dr. Price, in my examination of him, told this Court just how devastating that could be.  He agreed that Mr. Bourgeois had it.  Dr. --

USCA5 5315

THE COURT:  Yeah, but he also told me that that was the same thing that was consistent with being a sociopath.

MR. WISEMAN:  Well, you know, we're going to -- I'm going to talk about sociopathy in a second, but, you know --

THE COURT:  I knew you would.

MR. WISEMAN:  Yeah.  You know, a lot of things -- you know, lots of people drink Coca-Cola.  That doesn't mean all people who drink Coca-Cola are the same in other ways.  I mean, it's -- I'm not sure the logic plays out.  He may have features that are antisocial, but he is not an antisocial personality.  He's never been diagnosed as such.  And I'm going to get to that as well.  I'm just giving you the broad categories here.

The, Dr. Moore agreed with Dr. Price, borderline is here.  It's present.  And I would add that they all agree to the presence of all these mitigating facts.  This was not a dispute about --

THE COURT:  But the problem, when you make a legal decision as an attorney, about what to put on and whatnot to put on, is that going to do more prejudice to the jury --

MR. WISEMAN:  Sure.

THE COURT:  -- saying that this is a very dangerous person --

MR. WISEMAN:  Sure.

THE COURT:  -- by putting on that kind of evidence.  So that's something I'm not really impressed with.

USCA5 5316

MR. WISEMAN:  Okay.  Well, I'm hopefully going to turn that around as well.

So basically I counted up, we have undisputed evidence from nine mental health experts that Mr. Bourgeois was abused as a child, has organic brain dysfunction, low intelligence, and suffers from a crippling borderline personality disorder.

Now, none of the experts who testified or who have ever evaluated Mr. Bourgeois have diagnosed him as having an antisocial personality disorder.  The closest anyone comes is Dr. Price, who said he has some antisocial features.  All of my clients have antisocial features.  They're on death row.  You know, they stand convicted of having done obviously bad things.

THE COURT:  Heinous, heinous acts.

MR. WISEMAN:  Right.  And let me --

THE COURT:  And the funny thing I always thought of when I was a defense attorney is the more heinous the act, the less likely a jury would find them insane actually.

MR. WISEMAN:  Well, insanity, of course, is a different --

THE COURT:  I know that.  And we're not here on that.

MR. WISEMAN:  Yeah, right.

THE COURT:  But I just thought it was --

MR. WISEMAN:  You know, one of the cases I provided to you is a Fifth Circuit case called Walbey versus Quarterman.

USCA5 5317

And it speaks to the question Your Honor just posed.  It says, "Texas' next argument, that Walbey suffered no prejudice because the brutality of the crime eclipses any mitigating evidence, is a nonstarter."

"To permit a jury to impose the death sentence solely because the facts are heinous and egregious would be to return to the days of inflicting capital punishment based on emotion and revenge."

"Almost without exception, the cases we see in the conviction of a capital crime have produced the death sentence, are extremely egregious, heinous and shocking facts."

And you know, Henry, which is also a Texas case, talks about what Your Honor has posed as a dual-edged sword.  And I did not hear or read any explanation from either Tinker, Mr. Tinker or Mr. Gilmore, that those are the reasons they didn't put this stuff on.

And the other set of cases I provided Your Honor is that you can't, you can't substitute your judgment about what you would have done --

THE COURT:  I agree with you 100 percent.  And you know, this, it's very difficult to be in --

MR. WISEMAN:  Sure.

THE COURT:  -- this kind of a position and having watched the trial.  So last night several times when I was watching some of these videos that were very disturbing, I kept

USCA5 5318

saying, I kept thinking, "Remove, step back and remove yourself."

MR. WISEMAN:  Uh-huh, uh-huh.

THE COURT:  Because --

MR. WISEMAN:  Yeah.

THE COURT:  It's a different process.  That's all.

MR. WISEMAN:  Yeah.  Yeah.  And I think I remember quite clearly during the September hearing me having a bit of a hissy fit, one of several, I imagine, where Your Honor posed the same question.  I think I, in my little outburst, I said something like "The more horrible the facts, the more the need to present these types of mitigating factors, as it shows the jury why people behave in that way."

And Dr. Price, who's worked both sides of this issue --

THE COURT:  Well, you and I are in agreement on that.  It's just, I guess my finding will have to do with whether this was a strategic decision by the attorneys --

MR. WISEMAN:  Right.

THE COURT:  -- that would inflame, these people would inflame the jury.  And some of them would have, I think.  But I need to go back over each of the things, each of the testimonies and determine whether, whether I feel that it was good or bad, whether they should have at least been explored in front of the jury.  And I don't have any problem doing that.

USCA5 5319

MR. WISEMAN:  Yeah.  And it will be --

THE COURT:  And that's, to me, what my charge is.

MR. WISEMAN:  Absolutely.  We would agree that's your charge.

THE COURT:  I just hope I can do it right.

MR. WISEMAN:  I think what you're going to find, though, is there's no reason given, either in Mr. Tinker's interrogatory answers or Mr. Gilmore's declaration or his testimony, where he said, "I didn't want to put that on because."  There's other reasons, Mr. Gilmore said it was inconsistent with his --

THE COURT:  Take a break.

(Recess from 1:38 p.m. to 1:43 p.m.)

THE COURT:  Sorry.

MR. WISEMAN:  So this question about malingering, I know it came up a few times during the --

THE COURT:  Yes.

MR. WISEMAN:  -- the hearing.  And you know, I think we can put it to rest.  Dr. Weiner gave a malingering instrument called the Test of Memory Malingering.  And it was really a very simple test, and it's designed so that a person should get like basically 47 out of 50 at a minimum on each try.  And my recollection is that Mr. Bourgeois scored almost perfectly on it.

So for Mr. Bourgeois to have malingered -- and it's

USCA5 5320

used primarily as a test of whether you're malingering about your memory.  But the point is, you know, Mr. Bourgeois could have done that.  So he's sitting there taking this set of tests, and he gets the Test of Memory Malingering, and he scores almost perfectly, if not perfectly.  You know, for him to be malingering --

THE COURT:  I forgot what perfect means.

MR. WISEMAN:  Perfect means --

THE COURT:  Perfect means 100 percent malingering?

MR. WISEMAN:  No.  Perfect means he got everything right.  They're easy questions.  So if you get them a lot wrong, you're malingering.

THE COURT:  Okay.  I got it.

MR. WISEMAN:  Right.  And he got them all right.  So he would have to have known that that's a malingering test and to do really well on that but not do well on the IQ testing.

THE COURT:  Okay.

MR. WISEMAN:  And I, you know, that to me puts it to rest.  No doctor whose ever evaluated Mr. Bourgeois from either side has said he's a malingerer.  There's no evidence that he's malingering.

I know Your Honor made some observations about him filling out some of the --

THE COURT:  I can't help but notice, you know, his communications to me verbally and in writing have been very

USCA5 5321

sophisticated.

MR. WISEMAN:  Yeah.  But I think, you know, that's why we have tests, because you know, the tests are scientific, as opposed to anecdotal.  And that's the difference.

THE COURT:  But some of the tests are just for courtroom and not necessarily for treatments or regular evaluations.

MR. WISEMAN:  Oh, they're diagnostic.  I mean, they're clinical tests that are used in a forensic setting.

So you know, I think the other -- and I know -- I'm not sure how impressed you are with this fact, but you know, as someone who works with these tests on a regular basis, the fact that he would score so closely on two sets of IQ tests, three years apart, is phenomenal.  I mean, Einstein couldn't malinger at that well.  You would have to be a genius to malinger that well.  And whether Mr. Bourgeois is mentally retarded or not, I think we could all agree he's not a genius.  Sorry, Mr. Bourgeois.

THE COURT:  I understand that.  But I'm just -- sometimes I'm not sure I'm really impressed with IQ scores that are taken at this age, at the age of Mr. Bourgeois, two, three, four years or whatever.  I'm more impressed with what his, probably the retrospective studies were, to find out what it was at the time he was growing up.

MR. WISEMAN:  But that's on a different topic.  We're

USCA5 5322

dealing just with the -- I mean, I'm dealing globally with malingering. I think the fact that he scored so closely on IQ tests by itself three years apart is a strong indication that he's not malingering on the testing.

THE COURT: Thank you.

MR. WISEMAN: Okay. Dr. Price's deposition, just going to try to clear up a little bit more --

THE COURT: Please.

MR. WISEMAN: -- Ms. Larin. What Dr. Price did was he, the whole reason for that deposition was that he applied the Heaton norms, two of the subtests, the Halstead-Reitan battery, which is not an IQ set.

THE COURT: Okay. Tell me about Halstead-Reitan. Tell me again, because I obviously missed that.

MR. WISEMAN: All right. Halstead, Halstead-Reitan battery is the gold standard neuropsychological battery. It's composed of seven tests, seven main tests with a variety of subtests, yields about a dozen scores, something in that category.

Two of the subtests are Categories, and I believe Finger Tapping that Mr., or that Dr. Price -- Trails. I'm sorry. Right. Categories test and Trails test are the two that were the subject of the controversy that led to the deposition.

At the end of the day, what Dr. Price testified to

USCA5 5323

is, on Page 26 of his testimony, he said, quote, "I would agree that these scores on the tests that were administered" -- and he's referring to the Halstead, not just the two tests -- "that were administered using the overall Heaton norms would be consistent with impairment in those areas that are sensitive to brain dysfunction."

That was in response to my question of "Did the whole set of scores show the profile of a person who has brain dysfunction?"  That was his answer.

THE COURT:  Okay.  But then on cross-examination they talked about what part of the Halstead norms did you apply, what is it composed of.

MR. WISEMAN:  Right.

THE COURT:  And he did not apply the ethnic and/or race.

MR. WISEMAN:  But this was in response to my question of application of the Halstead norms -- of the Heaton norms. By the way, it was their witness.  I was cross-examining.  They were redirecting.

THE COURT:  Oh, I didn't know -- I didn't know that. Okay.

MR. WISEMAN:  Yeah, the deposition was a continuation.

THE COURT:  I thought you called him.

MR. WISEMAN:  No, no, no.  He's their witness.

USCA5 5324

That's why this is such an important answer.

THE COURT:  Got it.  Okay.

MR. WISEMAN:  Right.  He's their witness.  I was continuing my cross in that deposition.  They redirected.

So bottom line was he's a little less impaired if you apply the race norms aspect of Heaton.

THE COURT:  He said he was normal.

MR. WISEMAN:  Yeah, yeah.

THE COURT:  Wasn't less impaired.  He was normal.

MR. WISEMAN:  Yeah, he's, right, less impaired overall.  He's normal on that one test.

THE COURT:  Right.

MR. WISEMAN:  Okay.  But he's still, the overall profile of the Halstead-Reitan, is of a person who is impaired.

THE COURT:  See, I didn't get that from the deposition.

MR. WISEMAN:  Well, Page 26.

THE COURT:  I'll read it again.  I'll read it again.

MR. WISEMAN:  Okay.  Okay.  Dr. Moore --

THE COURT:  Or watch it again.

MR. WISEMAN:  Watch it again, right.  Watch it and read it.

THE COURT:  Pardon?

MR. WISEMAN:  Watch it and read it, because -- I'm just teasing.

USCA5 5325

THE COURT:  Well, I'm wondering, I couldn't find the video last -- no, I watched the video last night at the office till about 7:30.  Then I took all the rest of them home.

MR. WISEMAN:  Yeah, yeah.  So, you know, getting back to these cases.  You know, in Williams -- and this deals with the question of, you know, who puts on this stuff?  Does it really mitigate?  You know, Williams, we're dealing with childhood abuse, family dysfunction, organic brain dysfunction, low intelligence.  Alfred Bourgeois.

Wiggins, 2003, physical and sexual childhood abuse, family dysfunction, cognitive dysfunction, emotional disturbance, that's Bourgeois.  The emotional disturbance, of course, is the borderline personality, which all the doctors agreed, ours and theirs, was as a result of his childhood abuse and his parental abandonment.  His mother abused him and emotionally abandoned him by her treatment.

Smith v. Texas, IQ score of 78 is mitigating evidence that should be presented.

Rompilla, which I was fortunate enough to have done the evidentiary hearing in, in state court, we have organic brain dysfunction, low intelligence, childhood abuse, family dysfunction.

Porter versus McCollum, 2009, abusive childhood, impaired mental capacity, mental health impairments.

This last year, Sears v. Upton, cognitive

USCA5 5326

impairments, physical and sexual abuse, family dysfunction.

United States Supreme Court says this is stuff you put on.  This is quintessential mitigation in a capital case.  All the -- everyone's doing it.  You know, use the adage, all the kids are doing it.  This is the stuff you put on in a case like this.

Lewis v. Dretke --

THE COURT:  You know, when you first -- that's why I appointed these two guys, because they had more experience than anybody in the area.  And everybody knows that when you get a death penalty case appointed to you, the very first thing you start doing is preparing for mitigation.

MR. WISEMAN:  Sure.

THE COURT:  Guilt or innocence is usually a far gone conclusion.

MR. WISEMAN:  Right.

THE COURT:  Which is why I started giving them experts --

MR. WISEMAN:  Yes.

THE COURT:  -- over and over and over again.

MR. WISEMAN:  You gave them everything they asked for and then some.  And you didn't get your money's worth.  And you want to know something else?  On December 10th, 2003, there was a motions hearing you conducted in response to a motion for continuance.  Go read it.  Go read it again.  You took their

USCA5 5327

heads off, because they came in here with their mitigation people --

THE COURT:  I did.  I remember exactly.

MR. WISEMAN:  -- who had been working for months, months and months and months.

THE COURT:  And they said they weren't quite ready.  I said, "Huh-uh, that's not going to work."

MR. WISEMAN:  "That's not going to work.  And you know, you're responsible.  You're the ones who are responsible."

And you know, leaving aside what Dr. Cunningham ultimately would have said, forget his opinions.  As a fact witness, he laid out a documented history in which he was asked to work on the case for about a year.  He had nothing two weeks before trial.

THE COURT:  Oh, please don't talk about Dr. Cunningham.  Anybody else but him.

MR. WISEMAN:  Okay.  Dr. Yamamoto was working on this case for a year, and -- but the point being, Judge, he had nothing.  None of the work was done two weeks before trial.  You look at Williams v. Taylor, 2000, one week before trial is when Counsel began to prepare penalty phase.  That was deficient.

And when you say, how could Mr. Tinker and Mr. Gilmore, who are nice fellows, they're good lawyers, you

USCA5 5328

know, we're not here to trash them, how could they let this happen?  This train ran off the rails.  And how did it get off the rails?  You know, the mitigation people had their problems.  They weren't properly supervised.

And you know, it's interesting, Ms. Booth made a, asked the question of Mr. Gilmore in his examination, you know, "Is this the first time that you've had" -- I guess she used the term -- "luxury of mitigation speciality?"  And he said, "Yeah.  I never get that in state court."  Well, maybe that was the problem.  He just didn't know how to manage this, you know, set of specialists to get the result he needed.

The bottom line was Dr. Weiner did his evaluation after trial started.  That's outrageous, I mean, to do a neuropsychological evaluation after trial starts.  He gets a score of 75, which if you know anything about this area, is significant.  At a minimum, the Supreme Court says that's mitigating.  And Mr. Tinker never met with him.  He spoke to him for three minutes on the phone, according to Dr. Wiener.

So it was a failure to investigate that aspect.  And you know, I think that's symbolic of the kind of, you know, how this thing got off the rails.  And you know, again, we're not here to impugn anyone's integrity, or you know, call them names.  These are just facts that are in the record.

Let's see, I'm getting down to the end here.  I think Your Honor gets a lot of these points.  Oh, you know,

USCA5 5329

Dr. Estrada, I think, just needs a brief comment.  I mean, you know, he is an interesting fellow, also very likable fellow.  Ms. Larin and I met with him on a number of occasions.

You know, he maybe had the best perspective of anyone, because he sat through the whole trial, did the evaluation.

THE COURT:  He did.

MR. WISEMAN:  He was the professional.  And his conclusion, which wasn't shaken during his examination, was that the jury didn't hear the real story.  The jury heard his surmise about abuse.  The jury never heard actual evidence about the abuse.  And Lewis v. Dretke, which I provided to you, talks about presentation of skeletal childhood abuse being deficient.  Here, you don't even have a skeletal presentation.  You have supposition and surmise.

And so he feels, you know, professionally in his opinion, he was the Government's expert, he was your expert in this case, that the jury --

THE COURT:  He was the Defense expert, too.

MR. WISEMAN:  Well --

THE COURT:  Oddly enough, they both, the Government and the Defendants agreed to have --

MR. WISEMAN:  He wore many hats.  And I'm not disputing that.  But the point is, he started out retained by Ms. Booth.  He then examined for competency at the Court's

USCA5 5330

request.

THE COURT:  Right.

MR. WISEMAN:  He opined --

THE COURT:  Well, that's I guess what everybody agreed to, was to use him --

MR. WISEMAN:  Yes.

THE COURT:  -- for the competency.

MR. WISEMAN:  Right.  He didn't evaluate him for mitigation, however.

THE COURT:  No.

MR. WISEMAN:  Right.  So you know, that wasn't done, you know, by him.  But you know, he's, his opinion in the deposition was that the jury didn't hear the real mitigation in this case.  So prejudice is built in.  The jury didn't hear the real mitigation.  That's the Eighth Amendment gold standard.  And if that's the Eighth Amendment gold standard, you have to say, "Why did these lawyers not put this stuff on?  I gave them tens of thousands of dollars.  They had all this wonderful stuff to put on."  At a minimum, the IQ score.  Put on the IQ score.

Yeah, you know, I know what the answer is.  Mr. Bourgeois lied about being in a coma.  But that doesn't excuse you from sitting down with the experts.  They spent hours with Dr. Moore.  They spent hours with Dr. Price.  Mr. Tinker never spent a minute with Dr. Weiner.  He talked to

USCA5 5331

him on the phone.

Never sat down and said, "Okay, even if Mr. Bourgeois lied about being in a coma, are these test results valid?" Of course, Dr. Weiner would have said, "Yes, they are." And you know, that's just not proper performance in a capital case, with all respect, of course, to Mr. Tinker.

Let me just end with a couple more words about this whole idea that's in Mr. Gilmore's affidavit that he filed with the Court and we introduced into evidence during his examination. He said, "We didn't put on childhood abuse because it was inconsistent with the guilt phase." Now, first of all --

THE COURT:  I know there's case law about that.

MR. WISEMAN:  Yeah.

THE COURT:  Move on.

MR. WISEMAN:  Move on. All right. Excellent. I don't even have to talk about it. And the case law is in my favor.

THE COURT:  It is.

MR. WISEMAN:  You admit that?

THE COURT:  I do. I admit it.

MR. WISEMAN:  Okay. Excellent. And I'll say one more thing. He talked about abuse anyway. So it wasn't even a very insightful response on his part.

THE COURT:  He did talk about abuse. Dr. Estrada

USCA5 5332

talked about abuse.

MR. WISEMAN:  Right.  And you know, Mr. Tinker said that the Weiner evaluation, in his response to the Government's interrogatories, evaluation did not result in any useful information.  That's just not correct.  That's, you know, I don't know what he was remembering at that point.  Obviously he was at the end of his life.  His memory may not have been perfectly lucid at that point.  But obviously an IQ score of 75, organic deficits is very useful, as Dr. Price attested to in his examination.  There again, the Government's witness.

So I think that's all I have.  And I appreciate the Court listening and picking up on that --

THE COURT:  Who's going to respond to that?

MS. BOOTH:  First, Your Honor, I'd like to talk about the standard, which says, "To succeed on a claim like this of ineffective assistance of counsel, a Petitioner must first show that the Counsel's performance fell below an objective standard of reasonableness.  The reasonableness of the Counsel's challenged conduct must be judged on the facts of the particular case, viewed as of the time of the Counsel's conduct, and after, the review in court must strongly presume that the Counsel has exercised reasonable professional conduct."

What I want to do, when I speak to you about ineffective assistance of counsel --

USCA5 5333

THE COURT:  Yeah, I was going to say -- I didn't want to upset Mr. Wiseman, because he gets kind of upset -- that it's not for the attorneys Tinker or Gilmore to put on evidence of why they made their decisions.  I am to presume that they used, that their decisions were exercised as reasonable Counsel would do, and that they had, that they made strategic decisions not to put on Witness A, B, C or D.

MS. BOOTH:  And in this case --

THE COURT:  And the other problem is, is that I don't -- I can't remember, you can help me with it, Mr. Wiseman or Ms. Booth.  Did Mr. Bourgeois tell anybody about sexual abuse as a child?  See, he told Dr. Estrada that he had an idyllic childhood.

MS. BOOTH:  Prior, no.  Prior, no.

THE COURT:  Okay.  Do you have any information to that effect, that he told anybody prior to trial?

MS. BOOTH:  That Bourgeois did, Alfred Bourgeois.

THE COURT:  That Bourgeois -- that he had been --

MR. WISEMAN:  He told about physical abuse to Mr. Bierbaum.  He did not talk about sexual abuse to Mr. Bierbaum.

THE COURT:  Okay.  Thank you.

MS. BOOTH:  Severe discipline is what he talked about.

THE COURT:  Okay.

USCA5 5334

MS. BOOTH:  I think it's important, Judge, and you were here during those weeks, to remind us all -- and Defense Counsel weren't here -- that Mr. Tinker and Mr. Gilmore knew the jury that they had picked.  They knew the World War II veteran.  They knew the 4-H lady that had her daughter in the county show.  They knew the Texas Aggie that was Catholic that had the problem with the death penalty.  They knew to whom they were speaking.

And not only did they know that, but they -- there was a cadence and a theater in this courtroom that was going on during the trial that's not accurately reflected in the, in the record anywhere.  There's no one but you, Your Honor, that can remember and make your decision based on what was happening in the courtroom.

No one, nowhere in the record does it show how beautiful the witness, the child witness that came in here and testified was, the beautiful black child with the pink bow in her hair and the pink dress.  And when she spoke about the horrible things that her father did to her sister.  No -- that's not figured in here anywhere.

And so the theater that was happening and the decisions that were being made, the strategic decisions that were being made by Defense Counsel have to be looked at in that light also.

Nowhere in the record does it reflect how they sat

USCA5 5335

protectively by the Defendant, and how the Defendant looked, how Mr. Gilmore had taken great care to be sure that he looked -- well, he said, I think he testified he dressed him like a Marshal.

And the demeanor of the Defendant, when he sat in the courtroom, very, a very strong force. At that time he was probably about 40 pounds heavier, a handsome man, in good shape, very strong presence in the courtroom. Those are the things that are not reflected. And only this Court can remember those things.

I want to talk just a minute about Dr., I mean about John Gilmore and Douglas Tinker, about how both of these men have been practicing law, Gilmore 30 years, Tinker -- Lord, I don't know how many years. And both of these men have been prosecutors. Both of these men have been recognized by their colleagues as great lawyers. Not once, but on many occasions, Mr. Tinker being selected as one of the ten most, ten best criminal defense attorneys in the United States. Mr. Gilmore being, two times, in 2000 and 2008, being the outstanding criminal lawyer in the Nueces County --

THE COURT:  Criminal defense lawyer.

MS. BOOTH:  Criminal defense lawyer. So I want the record to be clear on those types of things, and to evaluate what's happening with those things in mind.

These men, and Mr. Gilmore testified, if you multiply

USCA5 5336

it out, he's probably tried about 600 cases, and a very successful man.  In fact, during voir dire, I would remind the Court, that there were numerous people in here that knew Mr. Gilmore and Mr. Tinker and about their abilities in the courtroom.  I mean, it really was prejudicial to the Government, there was so much good press going on for the defense attorneys.

THE COURT:  But if I recall, I didn't give y'all any strikes, I gave them all to the Defendants.

MS. BOOTH:  Yes.  Right.  And so these type of things, the relationship -- and the Court watched it clearer than I did.  I tried to keep an eye on it, because the prosecution sat with our back to the jury.  And Mr. Gilmore and Mr. Tinker were looking right at the jury.  And the Defendant was looking right at the jury.  And the Court can remember the, Mr. Tinker was engaging with the jury.  Mr. Gilmore a little more proper, but Mr. Tinker was engaging with the jury.

THE COURT:  You know what I remember about Mr. Tinker in this case, not just his performance, which I thought was superb, and I do -- and I'll relook, I'm not going to ignore your arguments on this or the case law.  But one time we came in and Mr. Bourgeois could do nothing but complain about Mr. Tinker.  And when he -- I don't remember what the occasion was, but it was just, he was -- and you know, when I was a defense attorney in those kind of, it just floored me.  I was

USCA5 5337

hurt.  And it affected the way I looked at my client later sometimes.  I pretended to do well.  But he didn't miss a beat.  Mr. Tinker did not miss a beat.  He never criticized his client.  He said, "Well, the reason he's saying that is" A, B and C, "and we're going to take care of it, and he's a good man," and you know, all those things.  I just thought he was so outstanding in believing in his client.  And --

MS. BOOTH:  And the --

THE COURT:  So I'll never forget that.

MS. BOOTH:  So those kind of things don't come out on paper.  And the strategy here, as Mr. Gilmore testified, and in the very limited interrogatories that we have from Mr. Tinker, we know that the strategy here was that Mr. Bourgeois did not kill this child; his wife did.  And that strategy held through the trial on the merits and on the penalty phase, that he did not do it.  So everything was pointed, every strategic decision was pointed in that way.

Now, we know from the record, from the evidentiary hearing, and the Court will remember from being in the courtroom and watching the Defendant, and there was even testimony from Dr. Estrada that the Defendant acted more like a part of the defense team, which he was as being the Defendant, but acted in a very professional manner.

We know from the record that there were numerous letters of instruction that were read here in the evidentiary

USCA5 5338

hearing, that Mr. Bourgeois was giving to his attorneys on what witnesses to call, on decisions, on pieces of evidence, on questions of motion to suppress, on different venue questions. The instructions were very, were voluminous, first of all, and they were very compelling, attention drawn to different compelling issues that needed to be addressed in the trial.

There was, from Mr. Gilmore, when I asked him, "How many Defendants have you come into contact with since you've been a lawyer for 30 years?"  So many Defendants.  And I asked him, "Did you ever have any question as to whether or not Mr. Bourgeois was mentally retarded?"  There was absolutely no indication that that would happen.

Now, let's talk about that, because the only doctor that had him before the trial ever started, I guess when he was virgin territory, was Dr. Estrada.  Now, we know Dr. Estrada is the only specialist that's been brought in here that's both a medical doctor, a psychiatrist, and a -- and a testing psychologist.  He is the only one.  And he had -- and he has not recanted the fact that Mr. Bourgeois is above average intelligence.

When they asked him about that in the deposition, he said, "Well, looking at that score of 75, that's why there's going to be different areas that's adapted that you need to address, because in effect, those IQ scores, that testing can be ineffective."  I mean, it can be wrong.

USCA5 5339

And his dealing with Mr. Bourgeois gave him the opinion that he was above average intelligence.  And he never recanted that.  He was the first doctor, the most qualified doctor, and that was his opinion.

Now, he also had an opportunity to observe Mr. Bourgeois like nobody else did.  He had him in a testing situation.  He got to see him when he was here in trial.  He got to hear him testify.

Now, that's the other thing I want to bring up.  The jury heard the testimony.  The jury got to see how he answered my question, how Mr. Bourgeois tried to turn questions around, how he answered the questions quickly, how different -- how he responded to different pictures of the baby.  They got to see and make their own evaluation.

So that doctor, Dr. Estrada, got to see him.  Then he got to see him when the jury was out, which is even more telling.  He got to observe him here when the jury goes out and he's talking to his lawyers and it's an informal setting.  And Dr. Estrada has never recanted the fact that he believes that this Defendant is above average intelligence.

Okay.  Now, it is clear that Defense Counsel are allowed to rely on the opinion of their experts.  And what did we hear from John Gilmore was the fact that he had used Dr. Estrada since 1994.  He doesn't even know how many cases. And the reason that he has used him -- and it's obvious,

USCA5 5340

because both the prosecution and the defense agree to use Dr. Estrada in this trial, that there's confidence on both sides of the street.  I think Mr. Gilmore said that he wasn't a whore.  That's the way he explained Dr. Estrada.  He called them like he saw them.

Now, later we find out that Dr. Estrada believes that he could have possibly testified that he was narcissistic, borderline personality disorder, which would equal the fact that he would be prone to rages and could just fly off the handle like that.  I mean, there's a lot of bad things that would be coming from that diagnosis.

So, let me back up.  That is the doctor that had, that evaluated Mr. Bourgeois before there was any indication or any reason for Mr. Bourgeois to be one way or the other.  Before he was enlightened on what could happen if you had a brain disorder.

Now, Dr. Weiner came in and did some testing on Mr. Bourgeois.  And Mr. Bourgeois lied to him about his medical history.  Mr. Bourgeois had pretty much lied to Dr. Estrada about part of his family history.

There is -- what would be expected of a Defense Counsel?  I mean, how is he supposed to know that the information that is being relayed from his client to a professional that can help him is not going to be true?  As it stood at that time, Gilmore and Tinker had to work from what

**USCA5 5341**

their client was relating to them.

Now, all of this talk of abuse, all of this that's come out years later didn't come out at that time. And why didn't it come out at that time? It didn't come out because Bourgeois lied. It didn't come out because Mama Bourgeois was still alive, and nobody wanted to say much, bad stuff about Mama Bourgeois.

And at that time, if you remember, Your Honor, the family was split. The family was split on how they felt about what was going on. In fact, it was Mr. Bourgeois's sister that came in here and testified, and it was very damning information.

THE COURT: Claudia?

MS. BOOTH: Claudia testified that he had said that she better go get her black dress on. There was all kinds of bad information that came from the family.

So although years later, now that Mr. Bourgeois has gotten the death penalty and it's a very horrible situation, we've got witnesses coming out, now that they know it's important that he be mentally retarded, that he be, that there be mental problems with him, everybody's coming out of the wood work.

THE COURT: And who was the woman that testified that he was a very poor student, and she had to help him, and Mr. Bourgeois made no Fs, and she made all the Fs?

USCA5 5342

MS. BOOTH:  Right.  I think that -- was that Ms. Frank?

THE COURT:  That was Ms. -- no, I don't think so.

MR. ABREU:  That was Claudia.

THE COURT:  No.

MS. BOOTH:  No, it wasn't Claudia.

THE COURT:  It wasn't a sister.

MS. BOOTH:  It may have been some other, but it wasn't his sister.  It was not Claudia.

THE COURT:  It is?

MS. BOOTH:  But anyway -- which Claudia, though?  There were two Claudias?  There was a Claudia Mitchell and another Claudia.

THE COURT:  *I, Claudius*.

MR. ABREU:  It was Claudia Mitchell, Your Honor.

THE COURT:  Claudia Mitchell.  Okay, not the sister.

MR. ABREU:  It was his sister who was also --

MS. BOOTH:  No, but that's a half-sister.  That's not the Claudia that came in.

THE COURT:  Yeah, there were two sisters -- right.

MS. BOOTH:  That's not the Claudia that came in and testified at the trial.

THE COURT:  Yes, I know.

MS. BOOTH:  That was a half-sister.

THE COURT:  There was another one that came in and

USCA5 5343

talked about the tutoring.  And when Ms. Booth cross-examined her -- that was one of the witnesses that Ms. Swanson used, I think.

MS. BOOTH:  Right.

THE COURT:  She didn't?  Never mind.

MS. BOOTH:  I need to go back and say that there, some of the efforts that Mr. Gilmore and Mr. Tinker took when they -- Mr. Gilmore was appointed by this Court because he had done at least ten to fifteen capital cases.  Mr. Gilmore testified that, when I asked him, "If you could pick anybody out, anywhere down here that the Judge could appoint, who would you pick to be your co-counsel?"  Of course he said, "Mr. Tinker."  Mr. Tinker's tried, in between the two men, probably there have been 25 capital murder cases that have been tried.

As soon as Mr. Gilmore got appointed and they knew which direction this case was going in, he tried --

THE COURT:  Because it was a while before the Justice Department certified it as a death penalty case.

MS. BOOTH:  Right.

THE COURT:  And as soon as that happened -- even before that happened, I said, "Mr. Gilmore, who do you want if it comes back like this?"  And he said, "Mr. Tinker."  I said, "Well, you'll get him."

MS. BOOTH:  And then he went and tried to secure

USCA5 5344

Mr. Cunningham as the mitigation specialist.  And then he was able to, which he's never had before, mitigation investigators, got to -- and he asked, the testimony was he asked Dr. Cunningham for names.  And those names came from Dr. Cunningham.  So that's when he hired Milstein, and Bierbaum kind of came along with Milstein.

So then they went and tried -- Mr. Tinker went and tried to get a semen expert, which he had seen Dr. Johnson testify, I mean, at a seminar and was impressed with her.  His affidavit talks about how many times he tried, or his interrogatories, how he tried to get in touch with her and had a very difficult time.

And then when we see this, what is it, two-page report that she handwritten and fast --

THE COURT:  From Vail or something?

MS. BOOTH:  Yes.

THE COURT:  From a ski resort.

MS. BOOTH:  You can see that Mr. Tinker was having problems.  And we were on a schedule.  This is not like the Public Defenders here have years to go out and they, of course they have a stable of experts that they use in all of -- like he says, everybody's doing it.  He has a stable.  Hindsight is very, very clear.  He has a stable of experts that he can bring in here.

But at the time, at the time Mr. Tinker was securing

the type of expert that he could get, with his mitigating --
they got a mitigation specialist.  They got a mitigation, two
mitigation investigators, their semen expert.  They hired, they
got Dr. Estrada to do the thing.  They went, and then
Dr. Weiner came in later as a reference from Dr. Estrada.

They also, the Court allowed them to get a voir dire
specialist who came in and sat with them during voir dire and
helped them pick their jury.  So they were --

THE COURT:  That's the one I thought looked old, and
she came up afterwards and told me that her mother had gone to
high school with me.

(Laughter.)

MS. BOOTH:  Not a good day.

THE COURT:  It was not a good day for me.

MS. BOOTH:  No, it's not a good day.

THE COURT:  And she said her mother said "hello."

MS. BOOTH:  So they filed over 46 different
documents, thousands of hours that they spent here in the
courtroom, and not, and in preparation of this case, and not
presenting the Court with full bills, I will --

THE COURT:  Yeah, I do want to -- I'll tell you on
the record that Mr. Tinker's bills will never reflect the
amount of hours he put in.  He would go for months, and every
time he would come in, I would say, "You've got to get -- "No,
I don't want to do this.  Forget about a bill."  "Mr. Tinker,

USCA5 5346

get me a bill."  And it was very, very difficult.  And I know he spent many, many hours that he never put on his hourly rate, because he told me that, and because that's how he -- lots of times, he just never turned in bills for court appointed things.  I said, "This is way too much for you to do."

He didn't have, as you know -- you all didn't know him -- but he didn't have a high regard for money.  He lived for years on a boat and used the marina shower and was not remotely concerned.

MS. BOOTH:  Now, I want to talk about Mr. Gilmore, and I'm sorry, I'm kind of distracted, about why he didn't ask for any kind of mental retardation, feel the need to go forward with that.  First of all, because he's -- the law allows him to rely on the expert that he's using.  Second of all, because he was dealing with the Defendant.  He was receiving instructions from the Defendant.  He was understanding that this man had been driving a huge tractor-trailer for 17 years.  All of those things indicating to him that there was no need to make that kind of request.

Now, why -- the testimony of why Dr. Cunningham wasn't used, if -- and I take exception with the way they, the way that Mr. Wiseman talked about the fact that they used the information that he was abused anyway.  Judge, what they were trying to do, and it's clear in the record, is never -- and even when they argued punishment, they never, ever, ever

USCA5 5347

admitted that Mr. Bourgeois was in any way guilty of this crime, always deflecting it on the wife, on Robin.

THE COURT:  Well, I do --

MS. BOOTH:  However, they did want a little bit of sympathy for him.  So, but they knew, sitting here in front of this jury, how far that was going to go.

THE COURT:  But there is case law that even if your defense is always that someone else did it, it doesn't excuse you from putting on mitigation evidence at the time of the sentencing.

MS. BOOTH:  What if you have a client that's telling you, "No, I don't want that kind of evidence on"?  And that's what the testimony was.  Mr. Bourgeois was driving this bus. He was driving this bus.  He told them which witnesses he wanted called.  In fact, there were -- you know, he is the one that, the testimony was, wanted -- I believe it was his cousin to come in and testify, had to have his cousin come testify. And that was the one that had three convictions for fraud.  But he insisted that that man be called.

Any mistake that was made was made because Mr. Bourgeois wanted it done.  And he had a right, it was a capital murder case, to make those kinds of request of his Counsel.  And that's what makes this claim of mental retardation absolutely so unbelievable; no matter what some test says.  Every day, dealing with this man, the Court got to

USCA5 5348

see him, the jury got to see him and hear him.  Dr. Estrada got to see him, hear him, listen to him, observe him.

THE COURT:  Yeah, I had said earlier in these proceedings I thought his demeanor was --

MS. BOOTH:  Certainly not the demeanor of someone with diminished capacity.

THE COURT:  It wasn't that.  It was that his demeanor, and Mr. Wiseman said he would explain all that, but his demeanor, he didn't seem at all concerned when those horrible pictures of his, of JG1999 were shown.  And the, and the testimony went on about how her skin was thickened like old leather.

MS. BOOTH:  From the biting.

THE COURT:  And her -- anyway.

MS. BOOTH:  And Judge, the powerful impact of the seven-year-old testifying -- well, she was seven when it happened -- of the nine-year-old --

THE COURT:  I think she was nine when she testified.

MS. BOOTH:  -- when she testified, testifying about watching her father bite her baby sister.  That kind of testimony, if Mr., you know, you can understand why Mr. Tinker and -- Mr. Tinker specifically, did not want to put a boiling pot in front of the jury for punishment.  He had a World War II veteran.  He had an Aggie.  He had women from farm areas.  That was not going to fly.  And those -- and Mr. Tinker knew that.

**USCA5 5349**

He had done this hundreds and hundreds of times, tried cases and been -- he's renowned for being successful.

So to go back now -- and the problem that I have with --

THE COURT:  And to second guess, that's -- I'm not supposed to second guess every strategic -- I am to assume that what they did was correct and understand that there may have been very good reasons not to put on some of this evidence.

When I heard some of these witnesses testify, I would never have put them on.  I would never have put on Dr. Cunningham.  And I can almost imagine, I can almost imagine Mr. Tinker talking to Mr. Cunningham and saying, "Say what?  What are you thinking?  We're not putting on this four-hour PowerPoint presentation."

And Mr. Cunningham, in spite of Mr. Wiseman filing a motion to protest, Mr. Cunningham was one angry witness.

MS. BOOTH:  And it's obvious why Mr. Tinker wouldn't want to put him on.

THE COURT:  He was angry.  He was angry that he didn't get to get on the stand and do his deal.

MS. BOOTH:  And he was probably angry he didn't get a recommendation from Mr. Gilmore either, and Mr. Gilmore testified to that.

THE COURT:  He didn't.  Next point?  Are you still with us, Mr. Bourgeois?

USCA5 5350

THE DEFENDANT:  Yes, ma'am, Your Honor.

THE COURT:  Okay.

MR. WISEMAN:  On this jurisdiction question, I think the Court is certainly aware that the Government has the burden at trial to prove that the fatal blow was struck within the special maritime and territorial jurisdiction of the United States, which in this case means the Naval Air Station. They've got to prove this element of the crime beyond a reasonable doubt.  They've got to prove that element of the crime beyond a reasonable doubt, whether it's contested or not.

We cited -- there's not a lot of law on this issue. We cited the only case that we could find that was related to it, United States versus Parker, 622 F2d 298, an Eighth Circuit case from 1980, which says that the analysis there is not one of whether the, whether a blow struck on, or an injury inflicted on the territory of the United States contributed to death.  It's got to be whether it was the proximate cause of death.

I think what we heard between Dr. Leestma and Dr. Rouse, we have agreement between the experts that the best they could do was to date the most recent injuries to one to three days, which means that from a scientific perspective, there is a lack of proof beyond a reasonable doubt that the injuries were inflicted at the Naval Air Station.

Of course, that's against the backdrop of the victim

USCA5 5351

having had, by all accounts, many, many weeks of abuse, having a globally impaired brain as a result of the abuse, having a severely edemic brain as a result of the abuse.

And so what it really boils down to then is the question of why is the Government so sure that the fatal blow was struck on the grounds of the Naval Air Station?  And I think there you have to look at the testimony of AB1994, who was identified at trial as "AB1994."  And her testimony in total says that he, meaning Mr. Bourgeois, took her, the victim, by the shoulders and he started hitting her head on the window.  And that's all she said.  There's no description of force.  There's no description of -- I think she responds that, to a leading question, which you know, with a child witness is understandable that it would be leading, but she responded to a leading question that it was maybe four times.

There's no connection between the time at which that injury was alleged to have been inflicted and when she went unconscious.  Her testimony is that after the, after the blows were struck -- or this is at Page 39 of her testimony, starting at Line 22.

Question:  "Let me ask you, you said she was making a sad face.  Was she awake or was she asleep?"

Answer:  Quote, "I don't know, I don't know.  I don't remember if her eyes were opened or closed.  But if I'm not mistaken, I think they were closed."

USCA5 5352

Question:  "Okay.  And so he told you to do what?"

"To put her right next to me."

"Were her clothes on?"

"Yes."

And then Line 11 on Page 40, "And when she was on the chair with you, was she awake or was she asleep?"

"She was awake, and then she just fell asleep."

So there's not the causation that Mr. Roberts implied in his questioning of Dr. Leestma that we have this, you know, clearly brutal force being inflicted at that moment, led by the instantaneous collapse of the victim.  It's just not in that testimony.  You can read it upside, you know, read it in and out.  It's not there.

Now, you know, we presented this claim as both a claim of insufficient evidence and as a claim of ineffective assistance of counsel, for not challenging the jurisdiction. And I think that, you know, as the Court I hope appreciates, this is a serious question.  I don't think this is a question that's easily answered, because the science doesn't allow it to be easily answered.

We've got two experts who are giving, you know, Dr. Leestma literally wrote a book, wrote the book, one of the books on this topic, giving a rather, you know, credible account of what the science says.  And Dr. Rouse didn't disagree with the science.  She's relying on her conclusion on

USCA5 5353

what she's calling clinical presentations.

Now, what are the clinical presentations?  We're dealing with, you know, Alfred Bourgeois, Robin Bourgeois, and a seven-year-old.  Those are the people who are going to be reporting what the clinical presentations were.

AB1994 Bourgeois told many stories.  She told what she later said was a lie her father told her to tell, that she fell off the truck.  And I --

THE COURT:  Actually, Mr. Bourgeois said that to the people who came on the Navy station, that she had just fallen off the truck.

MR. WISEMAN:  Right.  But my point is that AB1994 told a number of different versions of this.  And I'm not impugning her.  She's a child.  I mean, you know, I have my own.  I understand, children are children.  But that's not the kind of witness you want to hang federal jurisdiction on.

THE COURT:  You don't have any children that have been through what AB1994's been through.

MR. WISEMAN:  Lord knows, of course not.  I mean, you know, and I'm not arguing with that.  All I'm saying is that, you know, as an objective fact finder looking at reliance on a seven-year-old who's been through this kind of trauma, whose mother is a suspect, as she was at some point, whose mother told a number of different stories, I don't think you can rest federal jurisdiction on their failure to report clinical signs

USCA5 5354

of neurological deterioration.

This is a real issue.  And whether you think the evidence was sufficient or not, I think that's a close call, and I would point out Dr. Rouse at trial never dated the injuries.  This was all assumed.

Look at Ms. Booth's closing argument at Page 10, where she talks about federal jurisdiction.  All she says is, "This happened, this happened on the Navy Base."  That's all she says, because it was just sort of assumed.

This child's obviously horribly abused.  She collapsed on a Navy Base, without question, and conclusions were led to, I would submit, as to what the proximate cause was.  And there's a real question about whether the proximate cause were the blows to the head allegedly inflicted by Mr. Bourgeois --

THE COURT:  So you concede that she collapsed on the Navy Base?

MR. WISEMAN:  Well, I don't think there's any doubt about that.

THE COURT:  Okay.  Well, I didn't think so either.

MR. WISEMAN:  Yeah, yeah.  I don't think there's any doubt about that.

Now, Your Honor, I can see whoever's going to get up and respond saying --

THE COURT:  And she literally died in the children's

USCA5 5355

hospital, not in the Navy Base.

MR. WISEMAN:  I'm sorry?

THE COURT:  She died in the children's hospital.

MR. WISEMAN:  Yes, of course, the next day.  Correct.
I can see the argument being made, this isn't the kind of fight
you want to have in front of the World War II vet or the farm
lady or whatever.

THE COURT:  But it's a legal issue that could have
been brought up.  I understand that exactly.

MR. WISEMAN:  There you go.  It's a pretrial issue.
And as a pretrial issue, it's a serious issue.  I think it
could have led to plea negotiations, if it had been presented
pretrial.

THE COURT:  I don't know about that, but I can tell
you that it would be very difficult to bring it up legally when
your client has told everybody there at the Navy Station that
she fell out of the truck.  I think that would be difficult,
that she fell out of the truck on the Navy Base.

MR. WISEMAN:  I don't see where that would
necessarily -- and obviously you're the fact finder, but I
don't see where that cuts against the science that says you
can't date the injury to the Navy Base, and relying on this --

THE COURT:  I didn't hear any science that couldn't
do that.  But I'm talking about when you've got the
eyewitnesses there that said this is what happened, including

USCA5 5356

your client.

MR. WISEMAN:  Oh, that she, you know -- look, let's assume Mr. Bourgeois, for this argument, let's assume Mr. Bourgeois inflicted the injuries that AB1994 testified to, and the child collapsed.  That doesn't speak to the question of whether the injuries he inflicted were the cause of the collapse, the proximate cause of the collapse.  That question is a scientific one.  Even if you assume Dr. Rouse is correct, you need to look at clinical presentations --

THE COURT:  Well, but the abuse that killed this child began in Louisiana.

MR. WISEMAN:  Exactly.

THE COURT:  And continued -- and I agree with that.

MR. WISEMAN:  Right.

THE COURT:  And continued all the way through.  But the coup de grâce was administered on the Naval Air Station, the way I understand.

MR. WISEMAN:  We don't know that.

THE COURT:  All I know is what I heard your client say and what AB1994 testified to.  And your client said it occurred that she fell out of the truck on her head on the Navy Base.

MR. WISEMAN:  Yeah, so he's covering for having inflicted an injury on the naval base.  And that still doesn't mean that the injury he's covering for was the proximate cause

USCA5 5357

of death.  There's no scientific evidence that proves that.

THE COURT:  I don't like this argument, Mr. Wiseman. I think you need to move on.  And arguing with me is not going to help.  I've got all your written, unless there's something new, other than what's in your written.

MR. WISEMAN:  I was simply making my argument.  I'm sorry if the Court doesn't --

THE COURT:  No, no, no, I don't agree with you.

MR. WISEMAN:  All right.

THE COURT:  I just don't.  I told you from the beginning that was the weakest argument --

MR. WISEMAN:  Yeah.

THE COURT:  -- I had heard in a long time.  It has not strengthened as time has gone on.

MR. WISEMAN:  I have to say I'm surprised to hear that, but so be it.

THE COURT:  I understand that.  Thank you.  But I'll hear a response from the Government, short.

MS. SALINAS:  Yes, Your Honor.  Your Honor, the Government disagrees with the Defense Counsel's assessment that there was no testimony regarding the cause of death of this child.  And the Court did hear the testimony from all the witnesses, did get to hear AB1994's testimony about what occurred on that particular day, June 28th.  Where the record reflects that she said that her daddy got so angry that JG1999

USCA5 5358

had dropped, spilled over the potty, that he grabbed her and hit her head against that window and against the dashboard.

And I believe the testimony also says that she says afterwards that her body became limp, and she also mentions, and the Defense forgot to mention to the Court, that AB1994 states that white fluid started coming out of her mouth at that time. And immediately afterwards, her father concocts a story, and she sees her father putting the child on the floor -- on the ground, right by the trailer.

And so we also disagree with the fact, the conclusions by Dr. Rouse. Dr. Rouse was told, given, "Would it help you in your determination of trying to time these, the cause of death, that you had the testimony of AB1994?" And she said, "Of course it would," because they don't take these medical evaluations or examinations without looking at what occurred.

And she stated that the information she had about what had occurred, which is that which is testified by AB1994, were her dad grabbed her, and in his anger, thrust her against the window; that the recent hematoma, the recent bleeding, the acute bleeding was, did not conflict, she said, with the child's death within 24 hours.

And so even though medically she's saying she can't say it happened within one to three days, she only has a window of one to three days, she stated that given what that child

USCA5 5359

said, that the acute hemorrhaging does not conflict with the child's death within 24 hours of being on that base. And so we argue that jurisdiction is and was on the naval air base.

And Your Honor, I have nothing further on that issue of jurisdiction.

THE COURT: All right. Thank you. Next issue?

MR. ABREU: Good afternoon, Your Honor. I'll be discussing Claim 4 of the petition, which deals with trial counsel's ineffectiveness of failing to present evidence to rebut the allegation of sexual assault, sexual abuse and semen that was detected in the child victim, Your Honor.

Let me just start by talking briefly about something that Ms. Booth brought up, which was Dr. Johnson. And Ms. Booth alluded to, to an allegation that Dr. Johnson was late in getting her report in, and she was somehow hard to reach, and that Counsel, that that might account for why Counsel didn't use her.

Now, that was certainly stated in Mr. Tinker's interrogatory, and I'll deal with that in a second. But let me just point out that on February 17th, 2004, the Government filed in District Court, Document Number 187, not their first, not their second, but their third motion for reciprocal discovery requesting expert summaries from Dr. Joseph Rupp, Dr. Elizabeth Johnson, Dr. George Holden, Dr. Daniel W. Davis, Dr. Linda Norris (phonetic) and Dr. Donald Weiner.

USCA5 5360

Now, are we to believe that every single one of those doctors who they're requesting third, for the third time summaries from or reports from were all late?  I think at some point we have to put the responsibility on Counsel for getting those reports in on time, Your Honor.  And that's what we have with Dr. Johnson.

In addition, just a month before that, Mr. Tinker told the Court, and I quote, regarding Dr. Johnson's report, "As soon as she gets it and has an opportunity to test it, and I think she'll be prompt, she's been good about talking to me about issues."  That's what Mr. Tinker told the Court.  "She's been good about talking to me about issues."

So this notion that she was somehow hard to reach and that's why she didn't get a report in time, I think, is fallacious, Your Honor.

The question, as I began, is what evidence Counsel could have presented to rebut the evidence.  And first let me just briefly talk about what the evidence of sexual assault was.  One, you had Dr. Scott Benton, who testified that he had previously observed the, JG1999 in Louisiana, I believe, and subsequently viewed autopsy photos.

And what he testified was that when he first examined her, she didn't appear to have any evidence of sexual assault to her genitalia.  But when he examined her subsequently through autopsy photographs, she appeared to have contusions or

USCA5 5361

bruising in the genitalia.  That was his testimony on 3/5/04, Pages 43 to 46.

THE COURT:  I'm sorry, who testified to that?  I forgot.

MR. ABREU:  Dr. Scott Benton, Your Honor.

THE COURT:  Okay.  Thank you.

MR. ABREU:  Yes, Your Honor.  In Counsel's possession at that particular time, Your Honor, was Dr. Rouse's autopsy report.  And what does Dr. Rouse's autopsy report say?

THE COURT:  Would you turn that back on?  What's wrong?

MR. ABREU:  Is it on, Your Honor?

THE COURT:  It's coming.  Apparently it went to sleep.

MR. ABREU:  It reads, Your Honor, and I'm in the third paragraph under the, on Page 3, "External Examination," last couple of sentences, which start, "The external genitalia are those of a normal female child, and there is no evidence of any trauma to the labia or introitus.  The hymen is present and appears atraumatic.  The back is straight and the anus is unremarkable and atraumatic."

Trial counsel had in their possession at that time --

THE COURT:  I can't read that.  Would you blow that up a little bit higher --

MR. ABREU:  Yes, Your Honor.

USCA5 5362

THE COURT:  -- more, please, sir.

MR. ABREU:  Let me zoom then focus.  Am I in the right part?  Yes.  Is that clear, Your Honor?  And it simply starts with "The external genitalia."

THE COURT:  Thank you.

MR. ABREU:  Thank you, Your Honor.  So this document was in trial counsel's possession at the time.  And despite the fact that Dr. Benton was testifying to what he thought he observed on autopsy photographs, you have a report from the person who did the actual autopsy that shows no evidence of sexual trauma.  And despite having this particular report and despite the fact that Dr. Rouse testified at trial, trial counsel asked not a single question of Dr. Rouse regarding evidence of sexual assault that she might have observed.  Not a single question was asked.  The report was never introduced.

Here's an opportunity for Counsel, without the need of an expert.  The Government had already presented an expert.  She was sitting right here on the witness stand.  All you have to do is ask her a couple of questions, and directly we're refuting Dr. Benton's testimony that he saw evidence of sexual assault in photographs of the autopsy.

The evidence of sexual assault, Your Honor, was also presented through alleged testimony regarding, or I should say through testimony of alleged semen that was recovered, said to be recovered from JG1999's anus, Your Honor.

USCA5 5363

There are two components.  One has come up more recently, which is I guess the Brady aspect of this particular claim.  And maybe what I'll do is I'll address that first and then discuss the ineffectiveness angle to the claim, Your Honor.

To prove a Brady violation, Your Honor, what we've got to establish are two things.  One, that you have the failure to disclose a document, and two, that that particular document was material.  And if I can, let me just start with whether the document was material.  And by that, I mean how the document was important and how it could have been used.  And then I'll discuss nondisclosure and whatever evidence there is of nondisclosure.

The document that we're talking about that is in question here, Your Honor, is Document P-179.  I'll just grab that.

THE COURT:  The one that said "weak," and they didn't --

MR. ABREU:  Very.  Very.  That's absolutely right, Your Honor.

THE COURT:  Yes.  A weak positive or something, very weak.

MR. ABREU:  Q5, Q6 and Q7, which are the three individual rectal swabs that were taken.

THE COURT:  Yes, sir.

USCA5 5364

MR. ABREU:  They all test positive.  And then in the remarks, they indicate "very weak," "very weak," and "weak."

Now, why is that particular finding important?  At trial, there was no evidence about weak, very weak or weak.  It was just an allegation that they were positive.  Well, why is that important?  Why is the strength or, of those particular tests important?  It's important, Your Honor, because when you have borderline activity of p30 -- and let me just remind the Court what p30 is.  This was a test for p30, that particular protein which is found, which is prevalent in semen, but is also found in additional substances --

THE COURT:  Right.

MR. ABREU:  -- including female serum, female urine, amniotic fluid, male urine, to name some of those particular substances where it's found.

When you have borderline levels of p30, it requires the FBI to take specific action to confirm the presence of semen.  And what does the FBI manual, which was admitted as Petitioner's 180, say it requires the FBI do?  I'll read Chapter 11, Your Honor.

"Attempts to identify human semen in some categories of evidence must," I'll repeat, "must be approached through an identification of spermatozoa, rather than by detection of human specific protein, such as p30s.  These categories include smear slide materials submitted by contributors, unusual stain

USCA5 5365

materials that defy attempts towards the soluzation (phonetic)

of protein components, and -- and here's the relevant part --

and stain extracts that possess borderline levels of p30."

So what do we have in this case?

MR. DOWD:  Your Honor, I just want to make sure I preserve my objection.  I believe this is outside the scope of their 2255 allegation.  And I made an objection at trial, but I want to make sure I preserve that, that this is beyond the grounds that they initially alleged.

MR. ABREU:  I don't even begin to understand how that's possible.  Our allegation is that trial counsel failed to present available evidence that would have refuted that this in fact was semen, that there was a sexual assault.  This is the FBI manual, which in fact goes directly to --

THE COURT:  Mr. Dowd?

MR. DOWD:  And this is not one of the grounds that they listed in their 2255.  It's an attempt to expand the grounds of ineffective assistance that they've alleged, and they're not allowed to do that.

THE COURT:  I thought that they didn't get -- it was that they didn't get an expert on this.

MR. DOWD:  Didn't use Dr. Johnson.  But this was not one of the basis of the failing; had nothing to do with the FBI lab protocols.  It was that they had Dr. Johnson available. They didn't use her to confront this testimony from Dr. Benton

**USCA5 5366**

and about the PSA and the lab results from the FBI.  It had nothing to do with the FBI protocol, lab protocol.

MR. ABREU:  Your Honor, the allegation is that Counsel failed to rebut the evidence.  Dr. Johnson was one means --

THE COURT:  Why don't you read me that --

MR. ABREU:  -- by which he could have --

THE COURT:  Why don't you read me that allegation completely?

MR. ABREU:  Which allegation, Your Honor?

THE COURT:  Not the Brady, which was 179.

MR. ABREU:  Okay.

THE COURT:  That was a Brady.  I let you amend to add that.

MR. ABREU:  Correct.

THE COURT:  Right?

MR. ABREU:  Correct.

THE COURT:  But the one about the semen expert.

MR. ABREU:  I'll read it from our memorandum of law, Your Honor, I guess is what we --

THE COURT:  No, no the memorandum of law; the petition.

MR. DOWD:  No, not the memorandum of law; the 2255, Judge.

THE COURT:  The petition.

USCA5 5367

MS. BOOTH:  Yeah.

MR. ABREU:  Well, I'm confused by that allegation. Are they saying that we didn't challenge -- let me pull up the --

THE COURT:  Could you just, could you read the petition, Mr. Dowd?

MR. DOWD:  Judge, I don't have it.  It's this thick, and I didn't bring it.  I have a -- I have a summary that I prepared, and that's why I noted that this was outside the --

THE COURT:  Okay.  Hold on.  Let me get it.

MR. DOWD:  -- the scope of their complaint.  I can summarize it, Your Honor.

MR. ABREU:  I'll read it.  I'll read it.  I have it now, right now.

THE COURT:  Wait, wait.  Let me get it.

MR. ABREU:  Very first paragraph reads as follows, Your Honor.  In the heading, "Trial counsel were ineffective" --

THE COURT:  Let me, let me follow it.

MR. ABREU:  Oh, I'm sorry.  You have it.

THE COURT:  Hold on.

MR. ABREU:  Oh, I didn't know you had it.  I'm sorry, Your Honor.

THE COURT:  Wait a minute.  I know I told you to read it.  Now I've got it.

USCA5 5368

MR. ABREU:  Okay.

(PAUSE.)

THE COURT:  Okay.  Overruled.

MR. ABREU:  Thank you, Your Honor.

THE COURT:  I just have to check.

MR. ABREU:  So I'm going to just get back to the Brady allegations quickly, then I'll move over to the IAC allegation, because they do overlap a little bit, Your Honor.

So as I was saying, what the manual requires the FBI to do when you have borderline levels of p30 is confirm the presence of semen through the identification of spermatozoa. And what do we know in this particular case?  That every attempt to search for spermatozoa was negative.

THE COURT:  Where did you get that?

MR. ABREU:  I'm sorry, Your Honor?

THE COURT:  Did you get, did you put that in through an expert?

MR. ABREU:  Yes.

THE COURT:  Okay.

MR. ABREU:  Through the Government's expert, Ms. Conway, Your Honor.

THE COURT:  Okay.  I couldn't remember that particular line.

MR. ABREU:  Yeah, I read it.  It's in the transcript through testimony of Jerrilyn Conway, the Government's expert,

USCA5 5369

Your Honor.

THE COURT:  Well, I remember testifying that it could show up in many other things.

MR. ABREU:  That is correct, Your Honor.  And that is actually a point in our allegation as well, if you look at the petition in the memo of law, where we argue that at trial, if you look at the Government's experts at trial, they were Caroline Zervos, again Dr. Benton, and Mr. Onorato.  And the three of them, Your Honor, testified about where p30 is supposedly detectable.

And if you look at each of their testimony, none of them identified the female fluids that we were talking about, or any female fluids, except Dr. Benton who said, "And sometimes possibly breast milk."  But none of them said female urine or female serum.  And Ms. Conway --

THE COURT:  I thought -- wait a minute.  We did talk -- yeah, there was something about that, that the female urine had to be of a mature female, like from menarche on, I thought.

MR. ABREU:  No, there was no -- there was no testimony about that, Your Honor.

THE COURT:  I thought that's what she said.

MR. ABREU:  Your Honor asked a couple --

THE COURT:  Are you positive?

MR. ABREU:  I'm sorry.  I'm sorry I interrupted.

USCA5 5370

THE COURT: No, no. You're positive?

MR. ABREU: Yes. Your Honor asked a couple of questions about whether there's some hormonal connection to --

THE COURT: Right.

MR. ABREU: -- to --

THE COURT: So I was testifying.

MR. ABREU: And as I remember specifically, Ms. Johnson testified and said, "There's been no specific studies on children or not children."

THE COURT: Got it.

MR. ABREU: Right? "But we know that it's present in female" --

THE COURT: So she, no one testified that it could be present in a child this age? What I'm saying is there are no studies that show that --

MR. ABREU: That's absolutely correct.

THE COURT: Okay.

MR. ABREU: No one's tested if p30 is present in a child of this --

THE COURT: Okay. So that was why, in my mind, I ruled out that it could have been her urine. It could have been his urine that she was drinking.

MR. ABREU: And I guess I should address that as well, Your Honor, because what Dr. Johnson testified to was that when you have, as you have in this particular case, as a

USCA5 5371

scientist, you have -- here's what you're faced with. You're faced with a very weak positive p30 against two negative acid phosphatase tests, another enzyme that's present in semen. They tested for those. Those were negative.

THE COURT: Actually, I think the PSA is more, is -- was an advance on alkaline phosphatase.

MR. ABREU: I don't know if it was an advance. It's different, testing for two different things.

THE COURT: I know, but it is still a more sophisticated test.

MR. ABREU: It's more sensitive now, and I'll say why.

THE COURT: Yes.

MR. ABREU: It's more sensitive, because acid phosphatase is present at higher levels in a lot of other fluids, in female fluids included. All right? So when you have a positive acid phosphatase, you can't be certain that it's semen, because it's present in high, high levels in other things as well. P30 --

THE COURT: But the P, the p30 is much more sensitive to just --

MR. ABREU: Correct.

THE COURT: -- semen or the prostate -- whatever comes out of the prostate.

MR. ABREU: I would say more sensitive, and I would

USCA5 5372

not say just what comes out of the prostate.

THE COURT:  I understand that.

MR. ABREU:  Okay.

THE COURT:  But that's why when males get tested for their PSA --

MR. ABREU:  Absolutely.

THE COURT:  -- they no longer do the alkaline or the acid phosphatase from the '70s.

MR. ABREU:  Absolutely.

THE COURT:  It's a PSA.

MR. ABREU:  That's absolutely true.  And as a matter of fact --

THE COURT:  Not that it's exclusive for that, but I'm just saying --

MR. ABREU:  Correct.  And when p30 was first named, they named it Prostate Specific Antigen.

THE COURT:  PSA.

MR. ABREU:  And the reason that's a misnomer is because it's not specific to the antigen --

THE COURT:  Or the prostate.

MR. ABREU:  -- to the prostate, and not specific to males.

THE COURT:  I've got it.

MR. ABREU:  Okay.

THE COURT:  There's another one about to come out, by

USCA5 5373

the way.

MR. ABREU:  A new test?

THE COURT:  A new test, more specific even than for prostate cancer, out of Johns Hopkins.  I read about it.

MR. ABREU:  Okay.  So as I was saying, Your Honor, so what it requires them to do is to, is to identify through spermatozoa.  And when you have no spermatozoa detected in the microscopic smear slide that's created, no spermatozoa detected in the microscopic searches that were conducted by Dr. Johnson and Technical Associates, no male DNA in the autosomal DNA test that was conducted, no male DNA in the Y chromosomal test that was conducted, no A, no AP or p30 activity in the underwear of JG1999, no AP or p30 activity in the potty in which she was sitting and going in.  When you have all these negatives against this one, these weak positive p30s, a scientist has to ask themselves -- and this is what Dr. Johnson said -- what might have caused this particular positive p30 test.

And one of the things she was prepared to testify, as reflected in the note she sent Mr. Tinker about what she was prepared to testify about, was that it could have been microbial bacteria that caused a positive reaction.

Now, the Government asked their expert, Ms. Conway, whether that was possible, and she cited a study that said, well, they tested for some microbes, bacteria in this, and none of them tested positive for p30.  We asked her on cross about

USCA5 5374

it, and that particular study tested for seven different bacteria, rectal bacteria and whether they reacted with a p30 test.

I then asked her, "Well, how many bacteria would you expect to find?"  She goes -- I said, "Hundreds?"  And she said, "No, not, definitely not hundreds.  I don't know."

Well, I would ask Your Honor to just do a quick search yourself.  And Your Honor, I asked Mr. Keel about Wikipedia at one point.  "Sir, how many different bacteria are present inside a rectum?"  There are hundreds of bacteria in a rectum.  And each one of those carries hundreds of different proteins within them.

What we know about --

MR. DOWD:  Judge, I'm going to object.  I think we're going outside the record here.  Counsel's asking to do additional research.

THE COURT:  Well, I think we were both interested in this, so we can, you can move on.

MR. DOWD:  Okay.

THE COURT:  You are outside the record.

MR. ABREU:  We're making argument based on inferences from the record.  So here we are.

THE COURT:  A quick recovery.

MR. ABREU:  There we go.  Let me just say why, another reason why P-179 is important, Your Honor.  And Your

USCA5 5375

Honor may recall this particular chart, which was also used with Ms. Conway, the Government's expert. And it's also from the FBI lab manuals. And what it seems to indicate, and I hope I can get it close enough to show.

THE COURT: You can.

MR. ABREU: Okay. Is --

THE COURT: A little bit closer.

MR. ABREU: Okay. A little bit closer. When you have the test -- let me go back a little bit and move it down. When you have testing for semen, you have --

THE COURT: Oh, that's good.

MR. ABREU: Yeah. When you have swabs that you're testing for, you, as she testified and as the other experts testified, you test to, you do, you conduct a p30 examination. Correct? That's what it says you do. You come from swabs straight down to p30 examination. If it's positive, you conclude -- this is according to the FBI -- you conclude your search and you identify it and you write it down. If it's negative, you conduct a smear slide search for sperm.

Well, the argument Counsel could have made if he had P-179 and the weak positives that are reflected there, is that if the FBI was so certain they had positives in this particular case, why would they not stop their search right now, with that positive? Instead, they searched the smear slide, which is what Caroline Zervos, the FBI expert, testified she did. She

USCA5 5376

tested the smear slides.

So Counsel could have made an argument that the FBI was not sure they had positive p30 activity in this particular case because they took additional steps to try to confirm the presence of semen, in contravention of what their own manual says they're supposed to do.

So for those two reasons, P-179 that shows the weak activity of p30, is a material document. We have a question about whether that document was disclosed to trial counsel or not, whether we have that question.

I would submit, Your Honor, that the fact that it is not -- and maybe a little bit of history of how this even came to be. Dr. Johnson was on cross-examination by the Government when he asked, Mr. Dowd asked her about weak activity. And she made a comment to the extent of "I don't remember seeing anything that indicated weak activity." I at that point said, "Your Honor, I have not seen anything that said weak activity either."

So at that point the Government said that they would look into this matter further. And then P-179 was turned over. And I said I had never seen that document before. And the Government then put a couple of things on the record about why they believed that document hadn't been turned over.

Well, we know that that document was not in the materials that was turned over to us.

USCA5 5377

THE COURT:  But it doesn't mean that Mr. Tinker and Mr. Gilmore didn't get it.

MR. ABREU:  It doesn't conclusively mean that, but it's evidence of that and evidence of the fact that it's not in the page, the 12,000 pages that were turned over to, in those documents as well.

Now, obviously they put on testimony here today about how those particular documents were transferred to, to trial counsel.  But the one thing we know is that there's no definitive evidence that that particular document was transferred over.

But that -- put that aside.  Let's say the Court wants to make a finding that it was in fact disclosed.  We would obviously say it wasn't, but let's say the Court wants to make that finding.  Then we have a clear case of ineffective assistance of counsel, because for the same reasons I just told the Court P-179 was material, for a Brady claim, it's prejudicial for Counsel not to have used that particular document to make those same arguments that I just made.

THE COURT:  So whatever, whether they had it or they didn't have it --

MR. ABREU:  Either way.

THE COURT:  -- it's still ineffective assistance of counsel.

MR. ABREU:  Absolutely, Your Honor.  Absolutely.  Let

USCA5 5378

me just grab something, if I can, Your Honor.

THE COURT:  How many years have y'all been working on this case?

MR. ABREU:  We, I believe we were appointed in 2007, Your Honor.

THE COURT:  Okay.  And this is 2011.

MR. ABREU:  It is.  It is.

The evidence, Your Honor, at trial regarding the semen, specifically the semen, came from -- or p30, I should say, let me just talk about p30.  And that came from, again, Dr. Benton, Ms. Zervos and Mr. Onorato.

What trial counsel tried to establish, if you look at the transcript of March 16th, 2004, he tried to establish that in fact there was no sexual assault because there was no evidence of semen in this particular case.  When Counsel tried to make that argument that there is no evidence of semen --

THE COURT:  Sperm.

MR. ABREU:  Of semen, he specifically said.  And if you look at the transcript.

THE COURT:  Okay.

MR. ABREU:  March 16th, I made a note of it.  I don't know if I have it actually, but I could probably get it.  March 16th of '04, Mr. Tinker is making argument at closing and says to the extent that there's no semen in this case.

The Court stops him at that point -- and we cited

this in our brief, Your Honor, the reply brief.  The specific cite is there and the page is there so Your Honor can go there and take a look at that moment.

The Court stops him and says, "Stop right there, Mr. Tinker.  There is evidence that there was semen.  The FBI testified that there was semen detected through p30."

All right?  So we know that trial counsel was trying to prevent that evidence from being presented and thought it was important to refute that particular evidence.  The problem was that trial counsel did not put on any evidence to refute that particular allegation, and Your Honor's correctly pointed out, "You haven't put on anything that says this wasn't semen.  They said it was.  You've put on nothing to refute that."

Well, there was evidence that Counsel could have presented to refute that particular testimony.  We know that Dr. Johnson was appointed by the Court and approved for by the Court, at the court expense.  We know that Dr. Johnson is an expert who was at the time living in California and did send the report from Colorado.  But again, I read for the Court the instance of trial counsel assuring the Court that she had been prompt in her response.

There was also some questions asked of Dr. Johnson where she said, "No one told me a report was due by March 1st -- by February 26th."  Her report is dated March 1st.  "No one told me that it was dated -- due by February 26th," as the

USCA5 5380

Court had ordered.  "If someone had told me that, of course I would have got it to him sooner."

And here's an important point, Your Honor.  If I, as a trial attorney, know that the Government is going to present evidence that there's semen present in the rectum of a two-year-old, and I have an expert who's going to say that it isn't, that there's not sufficient evidence to say that it is semen, I don't care if my report's a week old.  I don't care if it's a month old.  I'm going to come to the Court and I'm going to say, Your Honor, "My report is late.  I know it's late.  But this is incredibly important evidence that has to be presented to this jury."  Mr. Tinker never did that in this particular case.  Even if it was one day late, he never did that.

And the reason we presented Mr. Keel, Your Honor, is to show that Dr. Johnson was not alone in her opinions.  This was not something that was just some cockamamie new idea she came up with herself that it might not be semen.  There were other experts who would have agreed.  So if he didn't like Dr. Johnson, if he decided not to use Dr. Johnson, if she was late, other experts were available.  This is an incredibly important point.

Let me go there for a second.  The Court has said that sitting here and just reading documents a couple, last night, you had to remind yourself to take a step back and not get personally involved.

USCA5 5381

THE COURT:  It is difficult when you tried the case. I think it's difficult when you tried the case and you, you know, approve all these experts and --

MR. ABREU:  I don't disagree that it's difficult. And I can't --

THE COURT:  Besides, it was a horrible case to sit through.

MR. ABREU:  I --

THE COURT:  And it's difficult for me just to hear it again actually.

MR. ABREU:  Let me say that --

THE COURT:  As it is, I'm sure, for the other people that sat through the trial.

MR. ABREU:  It's very difficult.  It's a difficult factual case, an emotional case.  And I can't imagine, you know, evidence that is more prejudicial than evidence that a man was anally raping his two-year-old daughter before he murdered her.  It's hard to imagine evidence that's more prejudicial than that.

You know, there's a gut, there's a palpable, there's a physical reaction that experienced judges, court personnel, defense attorneys get when you hear this evidence.  I can't imagine a jury of twelve lay people hearing that particular evidence and hearing that testimony, and that not being the end of this particular case.

USCA5 5382

THE COURT:  I can understand your saying that.  But I can also tell you that hearing all the rest of the evidence about the abuse, how he went, took AB1994 in the bedroom night after night and locked the door and stayed with her overnight -- none of us liked Ms. Robin Bourgeois, by the way -- it was very, very disturbing evidence.  Everything about the case was disturbing.  And put that in perspective, it may not have been the most telling part of the evidence, is all I'm saying.

MR. ABREU:  It was --

THE COURT:  So I mention that to you so you can argue with me about that.

MR. ABREU:  Yeah.  It was concrete, physical evidence of an alleged sexual abuse.  Everything else was innuendo, insinuation.  Nothing concrete like an FBI Agent getting on the stand and saying, "We found semen in this baby's rectum."

And I recall Ms. Booth's words during the penalty phase closing arguments.  "What did she feel like when he put his filthy semen in that baby?"

THE COURT:  I remember her closing arguments exactly.

MR. ABREU:  That may even be word for word what she said.  "Filthy semen in that baby."  That's what that evidence was.  That's how damaging that particular evidence was.

THE COURT:  She does have a way with words.

MR. ABREU:  The evidence, Your Honor, was damaging at

USCA5 5383

trial at the guilt phase.  But it was also particularly damaging at the penalty phase.  And let me just explain that, those two separate things.

The defense at trial, as Ms. Booth just admitted, or not admitted, as she just stated, I should say, was that Robin Bourgeois inflicted this, these injuries on this particular child.  Whether we, anybody here today agrees with that defense or thinks that defense was a good idea is irrelevant.  That was the defense Mr. Tinker and Mr. Gilmore presented.  And as such, it was incumbent of them to deal with any evidence that would significantly undermine that particular defense.

Here you have the only man who was alleged to have the opportunity to have sexually abused this particular child.  The Government's saying that you have semen in her rectum.  Well, any particular defense that you had to say "it wasn't me; it was my wife" at that point, is completely obliterated by this particular evidence.  So Mr. Tinker and Mr. Gilmore were obliged to do what they could to counter that evidence, to refute that evidence.  And they had the opportunity to do so.

At the penalty phase, Your Honor, where the jury is dealing with life and death decisions, and when the question is, is there a reasonable probability that one juror, one juror might have said, "I'm not going to vote to have this man executed; I think life without parole, the rest of his life in prison is sufficient punishment," if one juror had believed

USCA5 5384

that he had not been anally raping his two-year-old daughter, there is a reasonable probability, there is much more than a reasonable probability that one juror would have taken a step back and said, "Life without parole is sufficient."  Prejudice I think in this case for not challenging this evidence is probable.

I want to come back to just one quick point, Your Honor, on whether in fact this was semen or not semen.  And then I'm going to sit down because I've been talking for a long time.

Ms. Conway, the FBI Agent, testified that the FBI's methods of testing for p30 prevent the identification of any other substance other than semen.  Now, we submitted with our Brady amendment several manuals from other laboratories.  One in particular, Your Honor, to take note of is a Department of Public Safety, the Texas Department of Public Safety's own forensic crime lab procedures.

And what do they say when they have p30?  I'll read it.  I'll put it up.  I think I highlighted.  It will make it harder to read.

THE COURT:  That's all right.

MR. ABREU:  I'll just zoom it a little more out.

THE COURT:  Why don't you read it to me?

MR. ABREU:  I'll read it.

THE COURT:  Thank you.

USCA5 5385

MR. ABREU:  It says, "P30 is considered to be the presumptive test for semen.  The presence of p30 indicates but does not confirm the presence of semen.  Semen can only be confirmed by the presence of spermatozoa."  That's what the Department of Public Safety says when it comes to p30.

What does the California Department of Justice or Bureau of Forensic Services say about it?  "When you have, when you have a negative acid phosphatase test," as we do in this particular case, "when you have negative microscopy for sperm," as we do in this case, "but a positive p30," as we do in this particular case, "you can say that p30 was detected."

And what does that mean?  You go down, right down to the bottom here, and I will read that word for word for the Court.  "For p30 immunoassay cards, a positive result alone, without sperm or AP results, would allow you to make the statement of p30 was detected.  However, your report should include a statement that explains that other body fluid may react with these test scores.  The immunoassay cards are very sensitive and can detect p30 at very low levels that may be present in body fluids other than seminal fluid."  That's California's Forensic Lab manual.

If the FBI had a particular method for detecting semen using p30 that was so foolproof, why aren't they sharing it with California?  Why aren't they sharing it with the Texas Department of Public Safety?  Don't they want to solve crimes?

USCA5 5386

I'm assuming they do.  Why aren't these other labs relying on this supposedly foolproof method?  The answer is, there is no foolproof method.  That's the answer.

When you have a positive p30, in light of all these other negatives, you have to look at the surrounding evidence.  And all the surrounding evidence, all the surrounding physical evidence, all the surrounding science evidence was all negative in this particular case.

Lastly, Your Honor, let me just point the Court, we cited the case of Sofar v. Dretke in our pleading.  But I want to point the Court to a District Court opinion from the District of New Mexico.  And I have provided the Government with a copy, but I'd like to have the Court, the Court to have a copy, and just hand it --

THE COURT:  Why don't you just give me the cite?

MR. ABREU:  Well, I don't --

THE COURT:  I've got it all on Westlaw.

MR. ABREU:  I have it -- I don't have it.  I can get it.  I don't --

THE COURT:  Or Lexus Nexus.  I've got it all.

MR. ABREU:  Maybe somebody can look it up for me.

THE COURT:  I just have a particular dislike of somebody handing me cases.

MR. ABREU:  You do, okay.

THE COURT:  So I don't want you to -- continue on

USCA5 5387

that.

MR. ABREU:  I will tell you what the case says, and then we'll --

THE COURT:  But if you don't have a cite, then I'll take the case.

MR. ABREU:  Okay.  Well, we -- it's a slip opinion.

THE COURT:  It just slipped up some place?

MR. ABREU:  It slipped up.  Well --

THE COURT:  Okay.  Hand it to Ms. Scotch, and I'll be pleased to see it.

MR. ABREU:  And obviously it's not, it's not binding on the Court.  It's --

THE COURT:  Obviously not.

MR. ABREU:  Obviously not.  Correct.  Okay.

THE COURT:  But that's okay.  Sometimes it's good to see reasoning that makes sense.

MR. ABREU:  The case I was going to talk about is Theodore Largo's case, and I came across this case because it's one of the cases that Ms. Conway had been testifying in previously and it came across in her Rule 26 disclosures.  And I did a little research, and I came across the case of Theodore Largo, United States of America versus Theodore Largo's case.

In Mr. Largo's case, he was charged with sexually assaulting a young boy.  And the eyewitness testimony in Mr. Largo's case was that, I believe it was that his own sister

USCA5 5388

came in and saw Mr. Largo in a bedroom with his pants down around his waist, on top of a young boy.

THE COURT:  Ankles.

MR. ABREU:  Ankles.  On top of a young boy, using provocative gestures under covers of a bed.  The Government charged him with sexual assault.  The testimony in that particular case was -- the question was whether there was actual penetration to prove the sexual assault.

The evidence was a positive p30 test alone.  Again, you had no semen, you had no, no sperm detected.  You had none of the other things that might confirm the presence of semen.  All you had was a positive p30.  That's all you had.

Counsel in that particular case, trial counsel brought a Daubert challenge saying, "You can't confirm semen on a positive p30 test alone."  Judge Judith Herrera in the District of New Mexico, although she allowed the testimony to go forward under Daubert, because the FBI was able to qualify their methods for how they did it, she made this conclusion.

She said, "However, while the Defendant provides a compelling argument for the sole, that the sole use of a faint positive," just as we have here, "a faint positive reading for p30 on an anal swab as a confirmatory test for the presence of semen may be questionable, under Daubert's general rule calling for their admissibility, the Court cannot say these findings are so unreliable they must be excluded."

USCA5 5389

What I want the Court to take note of is that another Court has found the very test that we're talking about here to be questionable, just as counsel, trial counsel could have presented to the jury that it's questionable, that it might not be.  And that's where Counsel was ineffective.

Counsel had an opportunity to present that this evidence was questionable, and trial counsel should have presented it.

And I guess let me just close by addressing Mr. Tinker's and Mr. Gilmore's interrogatories on this particular matter.  And I have heard the Court say that the Court has to assume that they were acting effectively and that they had strategic reasons for the decisions that they made. That may be the case where you have no reasons on the record, Your Honor.  Here we have reasons on the record.  Trial counsel has told us the reason they didn't call Dr. Johnson.  And I go back and I ask the Court to look at Dr. Johnson's testimony, look at Mr. Keel's testimony, look at Dr. Johnson's report about what she could have said back at the time of trial.

They've told us that the reason they didn't call Dr. Johnson was because she didn't have her own lab and her report was late.  Well, I've already addressed the fact that her report was allegedly late.

She didn't have her own lab, Your Honor --

THE COURT:  Pardon?

USCA5 5390

MR. ABREU:  They also said because she didn't have her own lab is why they didn't call her.

THE COURT:  Well, she didn't do the tests herself. That was the problem.

MR. ABREU:  Correct.  That was a problem to them. Let me just point out that Caroline Zervos, who testified for the FBI at trial, didn't do her own testing.  She testified to the tests that were done by scientists at the FBI lab, at her direction.

THE COURT:  Well, but that's different.  Ms. Johnson didn't have any direction, the way I understood it.

MR. ABREU:  Yes, she did.  I'm sorry, Your Honor. She was affiliated with Technical Associates in California, and she directed the --

THE COURT:  I thought she just sent the samples someplace else and did not direct the tests.  I didn't hear evidence about that.

MR. ABREU:  No.  She -- they were done at her direction.  And as a matter of fact, if you go back to Ms. Conway's testimony, we admitted the reports from Technical Associates that were sent back to Ms. Johnson that was at her direction.  And that would be there and that will be shown.

Mr. Onorato, who testified, did not do his own testing.  The person that the Government called at the 2255 hearing, Ms. Conway, she testified about the results at the

USCA5 5391

hearing.  Not only didn't she do the testing, she wasn't even the person who testified at trial.  Those people didn't even come to testify.

So the idea that just because she didn't do the testing herself, but directed others to do it, is no reason not to have called this particular witness, Your Honor.

And so the Court, dealing with these particular, specific information from trial counsel about why they didn't use Ms. Johnson, the Court has to decide whether that decision was reasonable.  And when you weigh the evidence that could have been presented with the prejudicial weight of the evidence that did come in of the semen, those decisions not to present Ms. Johnson or any other expert to refute this evidence was not reasonable.  Thank you, Your Honor.

THE COURT:  Thank you, sir.  Mr. Dowd?

MR. DOWD:  Yes, Your Honor.  Thank you.

THE COURT:  How many more points are to be argued?

MR. WISEMAN:  I think three more after this is done.

THE COURT:  How long is that going to take you?

MR. McHUGH:  Your Honor, I think I probably --

THE COURT:  I'm just worried, Mr. Wiseman, about your plane.

MR. WISEMAN:  Oh, yeah.  Well, don't worry about that.  I appreciate it, though.

MR. McHUGH:  We can probably be done in 15 minutes.

USCA5 5392

THE COURT:  Okay.

MR. WISEMAN:  Thank you.

MR. DOWD:  Your Honor, I'm going to address these one by one.

THE COURT:  Okay.  Just make it rather quickly, please, if you can.

MR. DOWD:  I'll move through this, Judge.

THE COURT:  Thank you.

MR. DOWD:  First of all, the nature of this claim is failure to call the available scientific witnesses, or witness. And here the only available scientific witness available to Counsel was Dr. Elizabeth Johnson, who they had hired and paid to do this analysis and to be their expert.  Not Dr. Blake, not Dr. Spitz (phonetic), not Mr. Keel.  Those were not available to them.  So that's the analysis the Court should make.

So the first question goes to Dr. Johnson's reliability, availability, dependability.  And you heard John Gilmore testify at the evidentiary hearing that Dr. Johnson had been unavailable and undependable to the attorneys pretrial, and that the lawyers had lost confidence in her.

Indeed, the report that she sent, which they had to hound her for and sent to them, faxed to them from Colorado only four days before the hearing, is a handwritten note that she admitted that she had made from memory, not even with the file with her.  She was in Colorado on other matters.

USCA5 5393

So I know Counsel said that no matter what, he would have submitted this to the Court, but I mean frankly, I would be embarrassed to submit something like this to the Federal Court in a death penalty case.  But be that as it may, Dr. Johnson demonstrated that she was not a reliable source of an expert for trial counsel.

As to the -- now, they used, Doug Tinker did the best he could with what Dr. Johnson supplied him.  He cross-examined Government expert witnesses with Dr. Johnson's report, and after talking to Dr. Johnson.

But -- now addressing the probable impact of Dr. Johnson's testimony, her testimony at the evidentiary hearing, if that's any guide, it wouldn't have impacted the trial, the trial results.  Dr. Johnson's own PSA test for the rectal swab resulted in a weak but positive result.  This was the same as the FBI lab result, essentially confirming the FBI lab results.

Dr. Johnson's statistical analysis of the amount of semen to be expected was exposed by Jerrilyn Conway, the Government's serology expert from the FBI, as simplistic and unreliable.

Dr. Johnson's conclusions about the absence of any identifiable sperm in proving or disproving the positive PSA results was rebutted by Jerrilyn Conway.

Dr. Johnson's level of preparation, if the

USCA5 5394

evidentiary hearing is any guide, was suspect.  Although she proposed that female urine could have been the source of the positive PSA results, both in her report and on the stand, I think the Court asked if there had been any studies as to whether or not the urine of prepubescent or small girls could trigger a PSA or could, you know, could contain PSA.  And Dr. Johnson said that, no, there had been no studies on little girls.

But my memory of the testimony at that hearing was that Ms. Conway corrected that and said that there had been a study on little girls, and that PSA had been discovered but at levels so infinitesimal that it would in no way be able to trigger a positive PSA result.

But I think the most critical contribution Dr. Johnson would have made at trial would have been a negative contribution.  Again, based on her testimony at the evidentiary hearing, Dr. Johnson would have eliminated the victim's blood or serum as a potential source for the positive PSA results from the rectal swab.

Dr. Johnson testified -- if the Court remembers, that there was another swab taken from blood found in the little girl's underwear.  And that was, as Counsel has now conceded, that was negative for PSA.  So I asked Dr. Johnson, "Well then, if that's negative for PSA, then therefore we can conclude that this little girl's blood could not be the source of a positive

USCA5 5395

PSA from the rectal, from the rectal swabs?"  And she agreed. So I don't think her contribution would be very positive or favorable to Mr. Bourgeois.

And even without Dr. Johnson, Mr. Tinker was able to get the FBI serology expert, Caroline Zervos, to concede that she didn't know if digested animal protein could trigger a positive PSA result, which I thought was a very, very damaging to the Government's case, and very helpful to Mr. Bourgeois.

Now, as far as the issue about the inability to, the fact that the lab was not able to identify male DNA from this swab, this positive swab, that the AP test was negative, does not suggest that the PSA result was unreliable.  And this is disputed by Jerrilyn Conway.  The AP test is an enzyme, enzyme identification test, and it's only positive if the enzyme is still active, which would be very doubtful if spent any time in a rectum.  That's why the PSA test is a confirmatory test, not the AP test.

Now, I'll move on, unless the Court has any questions about that aspect, I'll move on to the Brady claim.  Now, the Court has heard testimony that the Government received 358 pages of the FBI lab report on, shortly after October 29th, perhaps November 1st, 2003, and that 358 pages were provided to the Defense as the FBI lab report copy on November 7th, one week.

And the fact that the P -- and P-179 appears in the

USCA5 5396

original set of the Government copy of the FBI lab report. That's the basis of the Government's belief that the preponderance of the evidence suggests that the trial defense attorneys in fact got a copy of P-179 in their discovery on November 7th of '03.

The fact that they don't appear in the 12,000 pages that Mr. Tinker shared with the Public Defender two years ago is not dispositive, because there are at least five other pages from that 358-page FBI lab report which are not contained within the 12,000 pages, as well as other discovery materials that had been supplied to Doug Tinker. I mean, that's the basis for that.

Now, going on to the, if the Court finds that, in fact, that P-179 was not provided to the Defense on November 7, 2003, the Government would argue that such, such a violation would not impact the conviction.

Let me first note that no deliberate Brady violation has been alleged or demonstrated. If any Brady violation occurred, it was inadvertent. And I want to remind the Court that it was the Government, during the evidentiary hearing with Dr. Johnson on the stand, who first broached the existence of P-179. When I asked Dr. Johnson what difference would it make, the FBI lab results indicated a very weak and weak positive result on the, on this particular swab. And at that point, she was surprised, and so, you know, I think that that speaks to

USCA5 5397

the inadvertence of any violation and also the Government's good faith during the hearing and during the prosecution.

Now, as to the impact of 179 on the trial, as Jerrilyn Conway testified, a very weak or weak positive finding on a p30 or PSA test is still a positive finding of semen. The weakness of the finding reflects the amount, as Jerrilyn Conway testified, reflects the amount of semen found, not whether it's semen or something else.

The fact that they have the notation "weak" is to alert the lab technicians that that sample would not be a good candidate for further testing, like DNA testing. That's the reason that they designate "weak" or "very weak." So I don't see how the, trying to impeach the lab results with the weak finding would have impacted the verdict. And again, Dr. Johnson found the same result, a weak, a weak result.

The other evidence before the Court further diminishes -- diminishes the significance of P-179. And again, I cite to the Court the fact that Dr. Johnson essentially eliminated the potential of the little girl's blood or serum as being a possible source of the rectal swab positive PSA.

And that was really the only other alternate source, other than Mr. Bourgeois's semen, in play at trial. Amniotic fluid, as Counsel's indicated --

THE COURT: Breast milk, yeah.

MR. DOWD: -- urine, breast milk, none of those

USCA5 5398

things, the testimony is that none of those things could possibly have triggered a positive PSA in these rectal swabs.

So, you know, I don't see that this would have been a game changer or would have affected the verdict. And the burden is that, you know, if this testimony could, any reasonable likelihood have affected the judgment of the jury. And I don't see how that's been demonstrated.

As far as some of the things that were argued earlier, I think that covered them. I think it's important to note that even in those other sources of PSA, urine, et cetera, et cetera, Jerrilyn Conway testified clearly that those are only detectable present at levels way below the threshold that would trigger a positive PSA.

THE COURT: Thank you.

MR. DOWD: So thank you, Your Honor.

THE COURT: In conclusion?

MR. McHUGH: Yes, Your Honor.

MR. WISEMAN: Your Honor, just so it's clear, I don't directly supervise Mr. McHugh.

THE COURT: Okay.

MR. WISEMAN: So I don't want him to feel rushed on my account.

MR. McHUGH: No, I don't feel rushed at all. Your Honor, I'm going to discuss --

THE COURT: Well, could I rush you? Go ahead.

USCA5 5399

MR. McHUGH:  Mr. Wiseman said, "I don't feel rushed."

THE COURT:  Okay.

MR. McHUGH:  I'm going to discuss Claims IV -- I'm sorry -- Claims V, VI, and VII --

THE COURT:  Okay.

MR. McHUGH:  -- the bite mark, the photo imaging and the final Brady claim.  Your Honor is aware that the bite mark testimony came in by the Government in the form of two experts.  It was mentioned by Ms. Booth, both in her opening and closing statements at the guilt phase, but as importantly, if not more importantly, it was mentioned by Ms. Booth in her penalty phase closing argument four times concerning the bite marks.  And this supported the aggravator that the murder was involved torture and serious physical injury, which goes together with Mr. Brady's argument concerning the semen, because Ms. Booth said, "He left his signature on her with his bite -- with his teeth and his semen."  And that was specifically at the penalty phase.

And I'd ask the Court to consider the case law is clear that you look at the performance of Counsel cumulatively at the penalty phase.  And not only does Counsel, as Mr. Wiseman argued, have the affirmative duty to present mitigating evidence, but as far as myself and Mr. Abreu are concerned, Counsel has a duty to rebut the aggravating circumstances that are presented by the Government at penalty

USCA5 5400

phase.

In this particular case, as to the bite mark, the Defense did not do that.  As I mentioned, the Government had two experts, Dr. Senn and Dr. Chrz.  In the Government, when the Government started out the investigation of the bite marks in this case, the first person that they presented, or that they contacted was Dr. Dailey.  Dr. Dailey testified live here during the 2255 hearing.  He did not testify at the trial.

And the reason he did not testify at the trial, Your Honor, is because he was twice given photographs and molds by the Government.  And on both occasions prior to trial, he said, "I cannot include or exclude any of the three molds."  And the molds were Robin, AB1994, and the decedent -- or I'm sorry -- the Defendant.

And Dr. Dailey, those two reports were provided to the Defense, prior to trial.  They didn't have to go out and search for an expert.  They simply had to subpoena Dr. Dailey.  Dr. Dailey would have been an incredibly powerful witness for the Defense at guilt and certainly at penalty.  Dr. Dailey was --

THE COURT:  Of course, there was the testimony of AB1994 --

MR. McHUGH:  Yes.

THE COURT:  -- that her father bit JG1999.

MR. McHUGH:  And that's what I -- I anticipated that

USCA5 5401

question.  That's a very good question from the Court.  What I would say to that --

THE COURT:  Finally somebody's saying that's a good question.

MR. McHUGH:  What I would say to that is, Your Honor, that the -- that testimony, as Mr. Wiseman touched on, was testimony from a witness that was seven years old, that was conflicted between her mother being a suspect, her father being a suspect, the fact that for a long time prior to trial, she had given inconsistent statements.  So how credible was that testimony?  In fact, we don't even have to guess, because the Government did not rely on that testimony.  The Government went out and got two experts, actually three, if you count Dr. Dailey.  So the Government did not rely on that testimony, as far as bite mark, because of the nature of that testimony.

And what do we have?  So we know that the Defense knows that they're coming forward with these experts.  And the case law is extensive when you talk about the power of an expert witness.  Now you don't have to rely on somebody who could be shading the truth --

THE COURT:  Do you, are you going to make any further argument, Mr. Wiseman?

MR. WISEMAN:  No, sir -- no, ma'am.  Sorry.

THE COURT:  Why don't you just, we'll send you a CD of the rest of the arguments, and why don't you go, get your

USCA5 5402

plane.

MR. WISEMAN:  Well, I think I have a few minutes.
I'll stay.  I appreciate the Court's concern.  I do.

THE COURT:  I am concerned, for your wife.

MR. WISEMAN:  Well, yeah, and you don't even know the
half of it.

THE COURT:  She might have more fun without you, but
that's neither here nor there.

Okay.  Go ahead.

MR. McHUGH:  So I hope that addresses the Court's
question, as far as the reliance on the civilian.  But the
Government -- or I'm sorry, the Defense knew in advance that
the Government was presenting these expert witnesses, which the
Government can argue are objective.  The Government can argue
are not biased in any way against any of the people that are in
the case, when you're considered all family members that are,
these witnesses were talking about.

And so here they have Dr. Dailey.  Dr. Dailey's
presumably the Government's first choice, because it's the
first person they contact.  He's a colonel in the United States
Army at this time, and he's employed with the Armed Service
Institute of Pathology.  And so what kind of a witness would
that have been for the Defense if they simply had subpoenaed
him?  I don't have to explain that to the Court.

With Dr. Dailey, not only did he not come to a

USCA5 5403

conclusion, include or exclude, but he gave four specific facts. It's in his report. He said that the bite marks were diffuse in the pictures, that the marker on the photographs was disturbed, that there was a ruler in a different spatial area, and that the three individuals' dentition was all very similar.

Now, Your Honor, think about that. Dr. Chrz testified, he was the most compelling of the bite mark witnesses, if you'll say, as far as how far he went with his conclusion. He actually identified Mr. Bourgeois as the probable biter. Well, Dr. Dailey would have absolutely rebutted Dr. Chrz.

Patti Booth argued, Ms. Booth argued the signature, that this is his signature. Dr. Dailey would have absolutely rebutted that.

Dr. Senn was the second of them. He said, "You can't ex- -- you can exclude Robin and you can exclude AB1994, but you can't exclude Alfred, or the Defendant."

THE COURT: Mr. Bourgeois.

MR. McHUGH: Yes. Well, think about that, Your Honor. Certainly Dr. Dailey would have rebutted that. Okay? More importantly, or as importantly, as we've heard here throughout the time, the Defense here was that Robin was the person who was abusing the decedent. And here, Dr. Dailey is saying, "You can't exclude her. You can't exclude Robin." So that would have certainly supported the defense, both at his

USCA5 5404

guilt phase and at the penalty phase.

Your Honor, under Strickland, Wiggins, the ABA guidelines, the Fifth Circuit and Sofar --

THE COURT:  There will be no talking about Mr. Wiseman.

MR. WISEMAN:  That includes you.

MS. LARIN:  That's for later.

THE COURT:  Absolutely.

MR. McHUGH:  The Defense has a duty, in a capital case, to consult with experts and to retain experts to rebut Government experts, and especially that duty is heightened at the penalty phase here.

And what I suggest to the Court is there can be no explanation why you would not call Dr. Dailey in a case like this where he has all these credentials and was actually retained by the Defense.

Your Honor, I'm moving on now from the Defense's failure to present evidence.  I'd also like to touch on the fact that the Defense failed to limit the Government's expert as far as the Daubert challenge and things of that nature.

They did not litigate a Daubert challenge concerning bite mark.  I suggest to the Court had that been done, they could have precluded -- certainly Dr. Chrz, as I said to the Court, was the -- had gone the furthest in his review of the bite marks.  And they certainly would have prevented,

USCA5 5405

eliminating Ms. Booth's comments that there was a signature left there, and I suggest also could have precluded the testimony of Dr. Senn.

You heard the testimony here of Dr. Bowers. Now I'm going to the Daubert. Dr. Bowers testified with Dr. Senn seated at counsel table for the Government. And Dr. Bowers went through his testimony, and I think what's most telling or one of the things that's most telling is all the things that he said that Dr. Senn had concluded when he presented to the National Academy of Sciences in 2007, and Dr. Senn did not get up on the stand and rebut this in any way.

And what he indicated was that -- this is Dr. Senn's presentation to the NAS -- that the uniqueness of human dentition has not been established. So if it hasn't been established in 2007, it certainly wasn't established at the time of this trial. The ability of dentition, even if it were unique, to transfer to skin has not, has not been established. That clear statement -- and this is when we kind of went over this in Federal Court about fingerprints -- a clear statement of the type, quality and the number of classic individual characteristics or other features required to indicate that a bite mark has reached a threshold of evidentiary value has not been established.

So the -- also, forensic odontologists certification organizations have not created or administered bite mark

USCA5 5406

analysis proficiency tests for board certified members.  These are touching right directly on the Daubert factors.  The ability to analyze and interpret the scope and extent of distortion of bite mark patterns on skin has not been demonstrated.  And the effects of distortion on comparison or modalities is not fully understood and has not been quantified.

This is all stuff that Dr. Senn, the Government's expert, would have conceded had they been questioned in a Daubert motion.  Certainly if he's saying it in 2007 to the National Academy of Sciences, he's going to say it in 2004.  Because if it's not in 2007, it certainly wasn't in 2004.

So with what you hear from the Government's expert about Dr. Senn, it would have knocked out Dr. Chrz, because Dr. Senn is saying you can't make an identification -- and that's exactly what Dr. Senn did, or Dr. Chrz did.

Also, there's this issue about a closed sample.  Dr. Senn received a closed sample.  And by that, I think the Court's aware of just three molds, and said, "Make your conclusions based on this."  And again, Dr. Senn had testified that that is not the way to do it.  You -- or I'm sorry -- the National Academy of Sciences have found you don't want to use a closed sample.

THE COURT:  What do you mean, like a lineup?  You take --

MR. McHUGH:  No, I think --

USCA5 5407

THE COURT: -- twenty people, strangers?

MR. McHUGH: Yes -- well, the way to do a lineup, the correct way to support, even a photo lineup, is to make sure you tell the --

THE COURT: No, I know that. But tell me about the dentition.

MR. McHUGH: Okay. Well, what I wanted to say about the dentition is I merely just want to read to you from the National Academy of Sciences report. It says, "As with other experience-based forensic methods, forensic odontology suffers from the potential for large bias among bite mark experts in evaluating a specific bite mark in cases which police agencies provide the suspects for comparison and a limited number of models from which to choose from in comparing the evidence."

So that's what I wanted to get at is --

THE COURT: You mean limited number of people?

MR. McHUGH: Yes.

THE COURT: Dentitions?

MR. McHUGH: In this case, I --

THE COURT: Well, that's -- I'm sorry, but that's ridiculous.

MR. McHUGH: Well --

THE COURT: In this case, there are three, you know, there are four people locked in a truck going across the country. And they're the only ones -- no one ever testified

USCA5 5408

that anybody was exposed to this child other than Robin

Bourgeois; the sister, AB1994; Mr. Bourgeois.  And obviously we

don't think she bit herself.

MR. McHUGH:  Right.  I understand that, Your Honor.

THE COURT:  So there are only the three people that

could be excluded.

MR. McHUGH:  Right, but when you --

THE COURT:  Or included.

MR. McHUGH:  But when you provide them with a limited

number and ask them to provide their analysis from that is what

I'm saying.  There was no testimony whatsoever that they said

it could be none of them, it could be one of the three.  When

you provide that limited, on an experience basis, what they're

saying is it leads to the false, to misidentifications.

THE COURT:  Well, but when they say, "These two can

be excluded and this one can't," it means maybe the whole rest

of the world can't be excluded.

MR. McHUGH:  If they had been cross-examined in that

way, I suggest to you that's right, Your Honor.  That would be,

that would be the way to go about it.  But they were not asked

that question.

THE COURT:  Well, I can see why, since there were

only three, you know, three people in the truck all this time.

MR. McHUGH:  Well, again, Your Honor --

THE COURT:  There's no indication other than they

USCA5 5409

spent some time with another couple, who actually, one of those people came and testified at trial, I think --

MR. McHUGH:  Right.

THE COURT:  -- that they were astonished at the treatment of the child, or at the condition of the child.  And Mr. Bourgeois said that was all the natural mother's fault.

MR. McHUGH:  And what I would also want to really focus the Court in on again is, but even if you, if you take that position, Robin is one of the people that the Defense, or the person the Defense is pointing the finger at, which is in that three.  And to not cross-examine Dr. Senn about that or present Dr. Dailey, guilty phase and certainly at penalty phase, is really a critical deficiency.

So, Your Honor, that's my position as far as the bite mark claim is concerned.  It's, why not present Dr. Dailey and why not present a Daubert challenge?  And all the argument I had on Daubert comes from Dr. Senn, the Government's own -- or the Government's own expert.

I would suggest to the Court Dr. Bowers' testimony is also very important in this.  I know the Court heard the testimony.  I'm talking about something that's obviously not even contested, Dr. Senn's.

So moving on to the Dr. Oliver and the photo imaging, Your Honor, what we know about that -- and this is similar to Mr. Abreu in a sense, is we're not, in this particular case, we

USCA5 5410

don't need to --

THE COURT:  Let me tell you my thought on this, so you can --

MR. McHUGH:  Sure.

THE COURT:  -- direct your attention toward it, is that Dr. Oliver and Mr. Shenk were talking about apples and oranges.  Mr. Shenk's whole testimony said he relied on the fact that Dr. Oliver gave his testimony based on the digital enhancements, when actually, when it was clarified, Dr. Oliver gave his testimony based on comparing the two and making sure they were similar.  Just one of them was blown up.  That, so that's my take on it.

MR. McHUGH:  Okay.

THE COURT:  So if I'm wrong, straighten me out here.

MR. McHUGH:  Okay.  If I may --

THE COURT:  You may.

MR. McHUGH:  -- I just wanted to talk about the deficient performance part in that, because I think that's important for the Court in this particular case.  And I think it's record based.

You had a situation, and this is in our brief, where Mr. Tinker was provided clearly with these enhanced images, I think approximately a year before the trial, a good bit of time before the trial.  And he stated on the record that he had not, never seen any enhancements of this nature, that this was not

USCA5 5411

something he understood.

And then the Court asked him, "Well, are you going to file" -- and during the trial -- "are you going to challenge this with a Daubert?"  And he said, "No."  And then after that is when he saw one for the first time.  And so there's no possibility that he could have made a reasonable strategic decision not to file a Daubert challenge, when he --

THE COURT:  Without knowing what he had to say?

MR. McHUGH:  Without knowing what this was all about.

THE COURT:  I thought he had a written report.

MR. McHUGH:  He had a PowerPoint presentation that had been presented to the Defense --

THE COURT:  Okay.

MR. McHUGH:  -- for a year before, but Mr. Tinker said he had not looked at it.  That's what he said on the record.  So I'll let the record speak for itself.  But I know we've briefed that in our petition, in our memorandum of law.

Also on this point, Your Honor, if they had talked to Dr. Dailey going back to the forensic odontologist, he, too, said at the hearing that he was provided with Dr. Oliver's enhanced images.  He had done 150 cases, and he had never seen anything like this before.  So if they had talked to Dr. Dailey, Mr. Tinker would have also known that this is fertile grounds here for a Daubert challenge.

Now, when we look, when you're talking about

USCA5 5412

Mr. Shenk and Mr., Dr. Oliver, when you're talking about apples and oranges, I believe, in the deposition of Dr. Oliver, he said he relied on both, the enhanced images and -- and he couldn't tell, he didn't remember which ones were which.  So I think if the Court will look at the record, on direct --

THE COURT:  You really did a good deposition of him.

MR. McHUGH:  I'm sorry?

THE COURT:  I thought you did such a good job with him.

MR. McHUGH:  Thank you, Your Honor.

The direct, he said that.  He said, "Yeah, I didn't rely on them, and you know, I looked at the original images."  But then on cross-examination, further on into the deposition, I believe that he does say, "Yes, I did rely on both to make my conclusions."  So I don't think it's apples and oranges, because I think Mr. Shenk was talking about the enhanced images.

So let me get into what Mr. Oliver, Dr. Oliver conceded.  Your Honor, could I use the ELMO just briefly?

THE COURT:  Sure.

MR. McHUGH:  Okay.  Well, this was --

THE COURT:  This is clear.

MR. McHUGH:  This is 181, which is the protocol that Dr. Oliver said that he utilized.  And this, of course, was talked about at the deposition.  So I just wanted the Court to

USCA5 5413

see it.  This was provided by Dr. Senn when he looked at Dr. Oliver's photographs.

So when I talked to Dr. Oliver -- and again, this is the Government's expert conceding this -- I said, "Please tell me" -- you have these seven steps.  I said, "Please tell me any peer-reviewed articles that discuss your protocol."  And at the very top he says --

THE COURT:  None.  It hadn't been peer-reviewed.  I remember that.

MR. McHUGH:  Never peer-reviewed.  So he finally conceded at the deposition, after much questioning.  He also said that, "Oh, by the way, that's -- those seven steps, you can do that in any order you want.  You can just pick whichever order you want."

He also talked about that there was no test for error rating.  He says he was not aware of any type of testing for error rate.  He told us --

THE COURT:  Yeah, I remember that.

MR. McHUGH:  He told us he created his own software.  Of course it's not in the protocol.

THE COURT:  That had not been peer-reviewed.

MR. McHUGH:  Not peer-reviewed.  He created it when he was in graduate school.  Had no name to it.  He had never sold it to the public.  He never tested it, except himself.  He was the person that calibrated it.  No one checked for

USCA5 5414

calibrations.  He chose the parameters to use.  He did --
despite when I confronted him with some SWGIT guidelines, which
is an acronym for the Scientific Working Group on Imaging
Technologies that he was a member of, and in fact held high
positions of, that you're supposed to document your steps and
save your intermediate images.  He didn't do any of that.

Despite the FBI standard operating procedures of the
minimum standards that you're supposed to save your steps and
document your procedures and save your intermediate photos for
evidentiary use, he didn't do that either.

And he also conceded, Your Honor, that in 2003, he
described his protocol as nontraditional use, which because it
was -- there's traditional photo imaging and nontraditional.
His, he conceded, was nontraditional.  And he conceded in 2003,
use of nontraditional enhancement techniques are subject to
challenges of general acceptance.

When you look at all those factors, Your Honor, I
suggest if a Daubert challenge had been brought for Dr. Oliver,
this Court would have granted that, would have granted that
challenge.

Now, we get into the apples and oranges, Your Honor.
You talk about the Dr. Oliver would say, "Well, I told the jury
to make their own decision, to look, to go back and look at the
original photos."  But what did he tell us at the deposition?
Well, actually, the photos that the jury looked at, or what I

USCA5 5415

was telling them were the originals were in fact not the originals.  They were digitally -- they were digitized enhancements, or I don't want to say enhancements, digitized versions of the photographs, the 35 millimeter photographs.  And how were they digitized?  At least some of them, the ones he got from Dr. Rouse --

THE COURT:  With his process.

MR. McHUGH:  -- with -- not with his, no, because the enhancement --

THE COURT:  Oh, that's right, the JPEG --

MR. McHUGH:  And the lossy.  Correct.  So before we even get to the enhancements, he received from Dr. Rouse JPEG digitized photographs that had been, used lossy compression.  Here again, he conceded that when you use JPEG, accuracy is lost.  There's a variation in colors.

What could be more important when you're trying to determine whether bruising exists and scarring exists and injuries exist?  Reduces detail and creates artifacts.  And of course, the Court's aware that, you know, basically that's something that wasn't in the original photograph.

He also conceded, as did Mr. Shenk, you know, stated on direct and he was challenged on direct, but then Dr. Oliver agreed with Mr. Shenk, that when you take that, you further put it into a PowerPoint presentation, the PowerPoint presentation can cause detail loss and accuracy loss.

USCA5 5416

All of these things are going on, and he's telling the jury and he's telling us that "Don't worry about what I did, because I always told the jury to go back to the original." And in fact, the original was not what he was telling the jury. It was the digitized versions.

So I would suggest to you, Your Honor, that when you look at that, Dr. Oliver, had he been challenged and questioned like he was in that deposition, he would have had significant issues as far as Daubert is concerned, certainly in 2004.

Furthermore, his presentation in this courtroom was not accurate. He told the jury they were looking at the originals, "and that's why you don't have to worry about what I say, because the jury makes the decision, because I told them to look at the originals." He didn't provide them with the original. He misled the jury.

That's what I have as far as the photo enhancements is concerned, Your Honor.

Moving on to my final piece of this claim is the Claim VII, which is the Brady claim. Your Honor, I would like to talk about two parts of that claim, Mr. Longoria and Mr. Campos. Mr. Campos, as we've alleged in our petition, testified at guilt and penalty. And again, I ask the Court to consider, this is two separate questions. Is it impact, is it material for purposes of guilt phase, and then cumulatively is it material for purposes of penalty phase.

USCA5 5417

Mr. Campos testified that he was promised nothing, that he got nothing, that there was nothing that could be done for him, that he had a state case.  Well, Ms. Booth testified today that she promised to write a letter for him.  She never did.  But she promised to write a letter for him.  So I suggest to you --

MR. DOWD:  I want to object.  I think that's a misconstruction of the evidence.

THE COURT:  She didn't say when she promised.  Would you like her to clarify that?

MR. McHUGH:  Sure.

THE COURT:  Ms. Booth?

MS. BOOTH:  Would I clarify?  Sure.  I realized when I was reading the record from the trial that at some point, and I don't remember if it was at penalty or if it was at -- that on -- when I was asking him questions here, I said something like, "Do you -- you know, the only thing I could do for you would be like to let the authorities know of your cooperation," or something like that.  But it was on the record.  And that's when I remembered it is when, for that particular situation, that I did, for Orlando, do that.  It was on the record.

MR. McHUGH:  I guess my question is, may I just --

THE COURT:  Go ahead --

MS. BOOTH:  I'm under oath.

MR. McHUGH:  You stated earlier today that you had

**USCA5 5418**

promised to write a letter.

MS. BOOTH:  No, I said -- I clarified it.  I said I either -- I did something, and it's in the record.  And that's what I was trying to tell you.

THE COURT:  She, I think -- you and I both thought the same thing, that she said she meant that she was going to write a letter for Mr. Campos.

MR. McHUGH:  Right.

MS. BOOTH:  Yeah.

THE COURT:  And you didn't do it.

MS. BOOTH:  Right.  Well, I said -- and there's something in the record.  I think if we go back, I said I was going to do something.  But I was just reflecting what I had read in the record.

THE COURT:  Oh, okay.  So whatever it is, she's saying, was in the record.

MS. BOOTH:  Was in the record, right, on trial.

MR. McHUGH:  So you're saying that you never had any discussions with Mr. Campos any time --

THE COURT:  No, she did.

MS. BOOTH:  No.

MR. McHUGH:  -- before trial, I was going to say, or before his testimony?

MS. BOOTH:  Mr. Campos, before -- and this is what I've said all along.  If I said it in the courtroom, I did it.

USCA5 5419

For the two that got 5K, 5K.  For Mr. Campos, I think I made the question -- look at the record, but it says something like, you know, "The only thing I could possibly do for you is just tell the authorities" -- because he was already sentenced -- "that you cooperated or that you testified."

THE COURT:  And that was a state thing?

MS. BOOTH:  And that was a state thing, right.

THE COURT:  Okay.  And then she forgot to do it.

MS. BOOTH:  Right.

MR. McHUGH:  I understand that.

MS. BOOTH:  He was -- yes.

THE COURT:  So now we got it straight.

MR. McHUGH:  Okay.  So I guess if I could just clarify one thing, prior to his testimony, not on the record, had you ever discussed with him writing a letter or doing anything on his behalf?

MS. BOOTH:  If I said it in the courtroom, I had asked -- told him.

MR. McHUGH:  You told him before the trial.

MS. BOOTH:  Right.  Right.  And anything I told him, I asked him in the courtroom.

THE COURT:  See?

MR. McHUGH:  So there we have it, Your Honor.  So it was before his testimony.

THE COURT:  Moving right along, yes.

USCA5 5420

MS. BOOTH:  Yes.

MR. McHUGH:  So --

THE COURT:  But she disclosed it on the record.

MR. McHUGH:  Well, the record speaks for itself.

THE COURT:  Right.

MR. McHUGH:  But this was --

MS. BOOTH:  Right.  Whatever it --

MR. McHUGH:  So we know that, I know earlier today, I believe, and obviously we have a record, that she said she had promised to write him a letter, in comparison --

THE COURT:  Or something.

MS. BOOTH:  Or something.

THE COURT:  Or called.  Now it turns out to be --

MS. BOOTH:  Whatever it --

THE COURT:  -- calling the state authorities.

MS. BOOTH:  Right.  And it's in the record.

THE COURT:  Did you tell the Defense Counsel that?

MS. BOOTH:  It was in the record.

THE COURT:  Oh, okay.

MS. BOOTH:  It was in the record.  I said it in front of the jury.

MR. McHUGH:  Was that as a result of Mr. Campos asking you?  Or did you just offer this to him prior to trial?  Prior to his testimony?

THE COURT:  Can I say what I think she said, and --

USCA5 5421

MS. BOOTH:  It's in the record, whatever --

MR. McHUGH:  No, because we're talking about prior to trial, which she's now said that she told him before, off the record.

THE COURT:  "That the only thing she could do for you --"

MS. BOOTH:  Uh-huh.

THE COURT:  Tell us again, Ms. Booth.

MS. BOOTH:  I think we need to get the transcript up, because when I had Orlando Campos on the stand, I said --

THE COURT:  Well, wait a minute.  What he's asking is what did you tell him before trial, Mr. Campos.

MS. BOOTH:  Okay.  I brought them out one at a time. And if you remember, I went out and talked to them first and they came back.

THE COURT:  Right.

MS. BOOTH:  Whatever I said, like there was two 5K departures.  And with Orlando Campos, who was totally different than --

THE COURT:  Because he had already been sentenced. He was in state custody.

MS. BOOTH:  Right, right.  And he had a three-year-old or a four-year-old, that he had called us because he had a three or four-year-old, that if it got abused like this child got abused, you know, that's why he came in.

USCA5 5422

And he --

THE COURT:  Okay.  So what did you tell him before --

MS. BOOTH:  Whatever it says on the record.  "The best thing I could do for you would be to tell the authorities that you cooperated here."

THE COURT:  You told him that before trial?

MS. BOOTH:  Yes.

MR. McHUGH:  I would just ask for --

THE COURT:  But I mean, just before you called him? Or you motioned back to the cell here.  You told him that right before the cell?

MS. BOOTH:  I told -- I only talked to Mr. Campos, I think, two times.  And if I -- and that's why I've been saying all along, if I said it on the record, that's what I told him.

THE COURT:  Okay.

MS. BOOTH:  Because it was different with each Defendant.

THE COURT:  Okay.

MS. BOOTH:  I mean, they were all different spots.

MR. McHUGH:  And I just have a question, Your Honor, to follow up.  When you talked to him outside the courtroom prior to his testimony, when you told him that, did he -- was that as a result of him asking you or --

MS. BOOTH:  Oh, he asked me for nothing.

MR. McHUGH:  He didn't say --

USCA5 5423

MS. BOOTH:  Mr. Campos came in because he had heard what Bourgeois had said and had listened to Bourgeois saying these things in the jail and was repulsed.

MR. McHUGH:  So --

MS. BOOTH:  And he had, he told me and he told the FBI that he had a small girl child, and if those kinds of things happened to her -- because the really bad things that happened that Mr. Bourgeois said, or that the Defendants, I mean the cooperating Defendants told me he said the Judge would not let us get in, like that he enjoyed --

THE COURT:  I wouldn't.

MS. BOOTH:  -- popping the butts of small children, that, all of those things about raping children, she did not let us get in.  And so those were other things that these guys could have testified to, which the Judge limited out.

MR. McHUGH:  So I guess my question would be is --

MS. BOOTH:  Well, that's why Orlando came to us.

MR. McHUGH:  Right.

MS. BOOTH:  Because he was repulsed at Bourgeois.

MR. McHUGH:  Well, then --

THE COURT:  So back to the question.

MS. BOOTH:  Yeah.

MR. McHUGH:  Right.  So then why did you -- so you're saying you just brought this up on your own about what you could do.

USCA5 5424

MS. BOOTH:  Right.  No.  Orlando never asked me for anything.  He never asked me for anything.

MR. McHUGH:  So why did you tell him that?

MS. BOOTH:  I was impressed with Orlando Campos.

MR. McHUGH:  Okay.  So --

MS. BOOTH:  You know, I mean, "There's nothing" -- I think it's more, "There's nothing I can do for you.  I mean, the best that I could do for you would be to tell somebody you cooperated."  I think that's what it says on the record.  Doesn't it?  What does it say?

THE COURT:  Have you got it?

MS. LARIN:  It says, the question is, "And are you just hoping that we will relay to authorities that you came in and testified in a murder case?"

THE COURT:  Oh, would you mind coming up to the microphone?

MS. LARIN:  Oh, I'm sorry.

THE COURT:  I am so sorry.

MS. LARIN:  Here, let's use this one.  It says, "And are you just hoping that we will relay to authorities that you came in and testified in a murder case?"  And he replies, "Yes, ma'am."

MR. McHUGH:  I guess my, my question would be is, what made you think he was hoping prior to his testimony?

MS. BOOTH:  Well, I probably -- I told him that.  I

USCA5 5425

can tell you that.  If I -- that's -- if I told him that, that I would tell the authorities that he came in, that's what I would ask when he came in here.

MR. McHUGH:  So he didn't express to you a hope.  That was your assumption?

MS. BOOTH:  No, that was my assumption that he would, yeah.  And I had told him the only thing I can do for you is this.

MR. McHUGH:  And that was done off the record?

MS. BOOTH:  What?  That was done when I was with him.

MR. McHUGH:  Okay.

MS. BOOTH:  When I met with him.

MR. McHUGH:  So --

THE COURT:  Are you ready to go on?

MR. McHUGH:  Yes, Your Honor.

THE COURT:  Thank you.

MR. McHUGH:  So again, I would argue that Mr. Campos was talked to prior to his testimony.  And I think that's very significant in this case, an inducement.  It does not have to be a promise.  I think the Court's well aware of the law of Brady.  And I also --

THE COURT:  Well, but the Defense Counsel knew about it.

MR. McHUGH:  Well, the Defense Counsel didn't know that there was this discussion in the back.  I know that wasn't

USCA5 5426

disclosed to the Defense.

THE COURT:  Well --

MS. BOOTH:  Oh --

THE COURT:  Ms. Booth?  Ms. Booth, you can respond.

MS. BOOTH:  I feel, I know that I -- if I said it on the record, I told them that I was going to say that.  I know that I did.

THE COURT:  Okay.

MS. BOOTH:  Because I was very careful about that.

MR. McHUGH:  Okay.

THE COURT:  So that's all we can say on that.

MS. BOOTH:  Uh-huh.

MR. McHUGH:  Then you know, Your Honor, obviously I'm hearing this for the first time, but obviously my first thought then is, well, that goes further to the ineffectiveness claim, because the Defense Counsel being told this and Mr. Gilmore, who the Government is arguing to you --

THE COURT:  Well, what is he supposed to say about that?

MR. McHUGH:  Well, obviously he could talk about inducement.  And I, and this dovetails nicely with Mr. Longoria, where he, as Ms. Booth, an experienced prosecutor said, he inferred to her that he was looking for --

THE COURT:  It didn't really say -- she didn't really say that.  It was lighter than that.

USCA5 5427

MR. McHUGH:  The point was she, as an experienced prosecutor, knew what he was getting at, and she gave him A to Z about what she thought about that.  And she's not going A to Z unless she knows where he's going with that.  So --

THE COURT:  No, no, no, she didn't say that.

MR. McHUGH:  But I can tell you --

THE COURT:  She said under no -- well, never mind. Move on.

MR. McHUGH:  Okay.

THE COURT:  The record is what it is.

MR. McHUGH:  Right.  But I will --

THE COURT:  And Mr. Wiseman's gone, so we don't have to worry about you hurrying.

MR. McHUGH:  But what I would like to say is, you know, the Government's talking about Mr. Gilmore.  He was the one that was handling these witnesses, how he has all these years of experience.  Well, to take Mr. Longoria, who by the way, Your Honor, I'm sure the Court remembers, he only testified at penalty phase.  So he's just a penalty phase Brady claim, and of course --

THE COURT:  I do remember.

MR. McHUGH:  Okay.  What Mr. Gilmore could have done with that knowledge that Mr., that Ms. Booth was aware that she got the impression that Mr. Longoria was looking for something, and in fact that's so far from how the testimony came in at

USCA5 5428

trial, that Mr. Longoria was just doing this out of the kindness of his heart and that he was just volunteering for nothing, in fact, that the letter to the Texas Board of Paroles said he didn't offer, or I didn't offer, he didn't request. That's what was, that was what was portrayed. But that's not what was -- that's not what the truth is. And the truth, what Mr. Gilmore could have done with that, I think, would be significant. And Mr. Longoria's testimony was very damaging. The Court remembers what he testified to.

THE COURT: Okay. Move on. We've covered that.

MR. McHUGH: Okay. So now, so we talk about that as far as this is inducement, does not need to be a promise. There's a lot of talk about promise. Let's look at what evidence we did present as far as the Brady claim.

First of all, Jennifer Valdez is Mr. Longoria's wife. She testified that Mr. Longoria told her that he was getting a deal in this case.

THE COURT: I don't think -- did I let her testify to that?

MR. McHUGH: Yes.

THE COURT: What's that noise?

MS. BOOTH: It's a radio.

MR. McHUGH: Maybe it's the prison.

MR. ROBERTS: Oh, it's at the prison. Sounds like it's at the prison, Your Honor.

USCA5 5429

THE COURT:  Oh, Mr. Bourgeois, is there noise where you are?

THE DEFENDANT:  Ma'am?

THE COURT:  Was there any background noise where you were?

THE DEFENDANT:  Yeah.  He was just checking to see if I was still on the phone.

THE COURT:  Oh, okay.  Thank you.

THE DEFENDANT:  Sorry about that, ma'am.

THE COURT:  Sorry.  We heard, we thought a radio had come on or something.

THE DEFENDANT:  Yeah, that was him.  He thought the phone had cut off.

THE COURT:  Thank you, sir.

THE DEFENDANT:  Thank you, Your Honor.

MR. McHUGH:  I think where the Court had limited the testimony concerning Brady was the prisoner witness whose name I don't recall, who testified during the 2255 as to -- but it wasn't dealing with Mr. Longoria.  But I believe Ms. Valdez was permitted to testify.

THE COURT:  She didn't testify at trial.

MR. McHUGH:  No, no, no.

THE COURT:  Okay.  That's what I'm talking about.  I wouldn't have let her testify to that at trial.

MR. McHUGH:  Well --

USCA5 5430

THE COURT:  Not that it was offered.

MR. McHUGH:  I think it's very, very important for the Court, when looking at this Brady claim --

THE COURT:  Look, as far as I'm concerned, that was all hearsay.

MR. McHUGH:  Okay.  Well --

THE COURT:  I'm not going to take that seriously, just like I told you there's no point in bringing Mr. Longoria. He's told me one story under oath, and it's not going to be real helpful to hear another one.

MR. McHUGH:  Okay.  And then I think the Court heard today the testimony of Bill May.  He filed a continuance.

THE COURT:  I heard the testimony of Bill May.  I know exactly what he said.

MR. McHUGH:  Okay.  And so we also know, when we're looking at the evidence, what Mr. Longoria got.  Mr. Longoria got an incredible deal.  He was facing 25 to life, mandatory minimum.  He got seven years, and violated his probation.

THE COURT:  I don't have any evidence from anybody that anybody offered him a deal.  Nobody offered Mr. May a deal.  Nobody offered Mr. Sales a deal.  No one put any pressure on any, any of those people.

MR. McHUGH:  Well --

THE COURT:  So that's it.

MR. McHUGH:  What I would say is that's not it for

USCA5 5431

one point, and that point is the fact that we do know that Ms. Booth said that her impression was that Mr. Longoria had inferred that he was looking for a favor.

THE COURT:  Move on from there.

MR. McHUGH:  Okay.  I just wanted to --

THE COURT:  Don't argue that any more.

MR. McHUGH:  I just wanted to --

THE COURT:  I'm done with that.

MR. McHUGH:  And Your Honor, I believe -- let me just -- that's all I have.

THE COURT:  Very good.  Thank you, sir.

MR. ROBERTS:  Your Honor, I'm going to argue, I'm going to address the bite mark issue, and then Mr. Dowd is going to address the Dr. Oliver and the Brady issue.

THE COURT:  Thank you.

MR. ROBERTS:  Your Honor, Dr. Senn and Dr. Chrz are solid witnesses.  I mean, they're here in trial.  There's no -- Dr. Senn's report actually was offered into evidence without objection from the Petitioner.

THE COURT:  Well, I think that's what they're -- I think -- well, anyway.

MR. ROBERTS:  It was during Dr. Bowers' testimony --

THE COURT:  The Petitioners are complaining that trial counsel did not get any witnesses to rebut that.  That's the complaint.  Not that Dr. Senn was a bad witness or that the

USCA5 5432

other guy was a bad witness, just that there was an alternative available to the Defendants that they didn't use.

MR. ROBERTS:  And the alternative available was Dr. Dailey.

THE COURT:  Yes.

MR. ROBERTS:  And we know -- we saw Dr. Dailey.  They described him as someone that could bring in good evidence.  And I would strongly disagree with that.  When we saw Dr. Dailey, he had an issue with Ms. Booth that they had discussed on the phone.  He was more interested in being paid.

THE COURT:  He wanted to be paid, and he was a Government employee.

MR. ROBERTS:  Yes.

THE COURT:  It was not a helpful thing to have.  He did.  Don't -- nobody shake their heads no.  That's what happened.  Ms. Booth said, "Didn't you ask me for X amount of money?"  And he didn't deny it.  And she told Mr. Tinker that, didn't you, Ms. Booth?  You said that to me.

MS. BOOTH:  Yes.  Oh, yeah.  Mr. Tinker knew.

THE COURT:  So Mr. Tinker wasn't going to go there either.

MR. ROBERTS:  They were --

THE COURT:  And that just wasn't going to happen.

MR. ROBERTS:  And then, of course, the last part with Dr. Dailey is he refused to review all the photos.  He only

USCA5 5433

reviewed the photos he wanted to review.  And so Dr. Dailey --

THE COURT:  The big issue was the money.  He wanted to be paid for his testimony, and he was a federal employee that was not supposed to be paid for that.

MR. ROBERTS:  Yes, Your Honor.  And so that --

THE COURT:  So she had to, Ms. Booth had to report that to Mr. Tinker and Mr. Gilmore.  And Ms. Booth decided she did not want anybody of that, in that category to testify, which is certainly reasonable.  And Mr. Tinker knew about it.  And it's certainly reasonable to know why they didn't call him.

MR. ROBERTS:  And then --

THE COURT:  So I think we can move on to the next argument.

MR. ROBERTS:  Dr. Bowers?  You want to talk about him?

THE COURT:  Not really, but go ahead.

MR. ROBERTS:  I was just going to remind you that we showed that he had gave different testimony in Alabama and California, so I think that's --

THE COURT:  In fact, he was not qualified as an expert some place, wasn't he?

MR. ROBERTS:  We -- yes.  He tried to qualify as an expert in enhancement, and we showed that he had no expertise in that area, at least nothing that had been peer-reviewed.  So you denied his --

USCA5 5434

THE COURT:  He was the Photo Shop guy.

MR. ROBERTS:  He tried to be the expert in that, but he also came in as a, he was a dentist and odontologist.

THE COURT:  A dentist who had gone to Photo Shop classes.

MR. ROBERTS:  Yes, Your Honor.  And then --

THE COURT:  Go ahead.

MR. ROBERTS:  -- taught himself --

THE COURT:  Moving on to the next.

MR. ROBERTS:  I was just -- as with the mental retardation issue, this is really a situation of your credibility determination on the experts.  And we just believe that our experts that presented evidence was reliable, and what they had in rebuttal was not.

THE COURT:  Mr. Dowd?

MR. DOWD:  Yes, Your Honor.  Your Honor, with your permission, I'll start with the challenge to Dr. Oliver.  It's alleged that they were ineffective for failing to litigate a Daubert challenge to Dr. Oliver's testimony.

And if the Court recalls, Mr. Tinker had questions about Dr. Oliver's testimony and asked for a hearing outside the presence of the jury.  An extensive hearing was conducted, in which Dr. Oliver explained his methods and what he intended to demonstrate.

And basically, he was hired to identify and count the

USCA5 5435

number of injuries on the child, to demonstrate these injuries to the jury.  He put together a PowerPoint presentation, put the original autopsy photographs, reformatted them into a PowerPoint presentation, which necessarily caused his originals --

THE COURT:  Well, don't you have -- I mean, you have to put in the originals into a scanner.

MR. DOWD:  Yes, Your Honor.

THE COURT:  And sometimes the -- even if they're taken with a digital camera --

MR. DOWD:  That's correct.

THE COURT:  -- the pixels on the digital camera are not necessarily going to be the same when you blow them up to another pixel?

MR. DOWD:  That's correct.

THE COURT:  Isn't that what the deal is?

MR. DOWD:  I'm not an expert, Your Honor, but I do understand that when you change the -- you have to change the format from 35 millimeter film --

THE COURT:  I always think of Jimmy Stewart.  Was it that, the movie the pixilated Mr. Smith goes to Washington or something?

MR. DOWD:  Mr. Smith goes to Washington, yes, Your Honor.

THE COURT:  When those, the older women came in and

USCA5 5436

testified he was pixilated?

MR. DOWD:  I don't recall that, Your Honor.

THE COURT:  Well --

MR. DOWD:  Wonderful memory.

THE COURT:  Every time I see pixels, I think of that movie.

MR. DOWD:  And to do that, he necessarily had to change the format to fit into the PowerPoint presentation.  And that actually caused a loss of detail, so that the autopsy originals, when compared to Dr. Oliver's new originals in the PowerPoint, Dr. Oliver's new originals had a loss of detail, so that injuries on the original autopsy photographs would be less visible on Dr. Oliver's original, what he described throughout the trial as the originals.  He was referring to his originals in the PowerPoint presentation.

But I think there's just a fundamental disagreement about the point of Dr. Oliver's testimony.  He, he, throughout his testimony, I read his testimony, he kept telling the Court and the jury, "If I identify an injury on here on the enhanced image that I'm making here, don't believe me unless you go back to the original and you can identify it on the original.  Then, you know, count that injury, or believe that there's an injury there."

THE COURT:  There were so many injuries that were reported at the autopsy.

USCA5 5437

MR. DOWD:  Hundreds.

THE COURT:  I mean hundreds of cords, cord injuries, or something that would be compatible with a cord.

MR. DOWD:  Yes, Your Honor.

THE COURT:  Burn marks on her.

MR. DOWD:  On --

THE COURT:  Her feet were thickened.  It was just unbelievable.

MR. DOWD:  Cigarette burns.

THE COURT:  Yes.

MR. DOWD:  But the enhanced photos were never presented, never described as the original.  And they were always just used as a demonstrative aid for the jury.  And so that's, I mean, that's the key to the case.  If Dr. Oliver was trying to demonstrate that these enhanced versions accurately depicted the original photographs, then we would have a, we would have a Daubert challenge.

THE COURT:  I thought the Petitioner just said that they showed bruises that weren't there on the original.

MR. DOWD:  Well, they said that what Dr. Oliver did is first he lost detail when he reduced the image --

THE COURT:  And then he enhanced it.

MR. DOWD:  -- and then he enhanced it, which created false detail and false coloring.  And that's true.  But what doctor, the way Dr. Oliver described it is he said, "Look, I'm

just doing this as a demonstrative aid.  I can take the original autopsy photos" --

THE COURT:  I didn't think it showed bruising, because the child was African American, and it was very difficult.

MR. DOWD:  Right.

THE COURT:  What it showed, if I recall, were the cord marks and the burn marks.

MR. DOWD:  Right.

THE COURT:  And the blows to her head.

MR. DOWD:  And bruising.

THE COURT:  And some bruising, but not much.

MR. DOWD:  Yes, Your Honor.  Yes, Your Honor.

THE COURT:  And some fresh scrapes on her head, the impact, as Dr. Rouse said.

MR. DOWD:  Yes, Your Honor but as Dr. Oliver described it, he said, "What I was trying to demonstrate would be the same as if I had come in on the original autopsy photographs and drew arrows to a particular spot and said, 'If you can see an injury there, there's an injury.  There's where I believe an injury was.'"  Instead of doing that, he enhanced the photographs to create, you know, color distinctions.

THE COURT:  I understand.  Anything else on that issue?

MR. DOWD:  I would suggest that under, as far as

**USCA5 5439**

applying a Daubert challenge to it, as a demonstrative aid, as demonstrative evidence and not as, what's the word, direct evidence, it doesn't have the same Daubert standard.  As long as it's reliable, then it's admissible.

So I'll leave that, and I'll move to the Brady violation, which won't take -- I think Ms. Booth has covered it, but I mean, the basic thing is Longoria swore at trial he didn't have a deal with the Government.  Four days after --

THE COURT:  I don't think we need to do anything more with that.

MR. DOWD:  Okay.  Okay.  I'll pass.

THE COURT:  The only thing I'd like to ask you all is one more shot at this, does anybody want to summarize what they, in some kind of written filing at all, about one more time what you think that has been shown during the hearing?  Other than -- you've had your closing arguments.

MR. ABREU:  Your Honor, I --

THE COURT:  If you want to let me know -- I tell you what.  Why don't you let me know --

MR. ABREU:  Your Honor, is it possible that we can have just a brief conversation with Mr. Wiseman and get back to the Court tomorrow for --

THE COURT:  That's what I was going to say.  Why don't you let me know.  You can let me know on Monday if you want.

USCA5 5440

MR. ABREU:  That would be fine, Your Honor.  Thank you very much.

THE COURT:  Oh, no.  Tuesday.

MR. ABREU:  Tuesday, yes.  By Tuesday, we'll let the Court know if that's going to be necessary or not.

THE COURT:  Call Ms. Scotch and call somebody in the U.S. Attorney's Office.  And if you want to do another written filing, I would be glad to see what you think in writing is the summary.  You know, mind you, I will have this recording that I can listen to any time.

MR. ABREU:  Right.

THE COURT:  And then I'll give you two weeks, each of you, if you want it.

MR. ABREU:  We'll certainly talk about that.

THE COURT:  What do you think, Mr. Roberts, Mr. Dowd, Ms. Salinas, Ms. Booth?

MR. ROBERTS:  I mean, I think at this point the Court has got so much information already that I'm not sure that we would --

THE COURT:  I just want to offer it just in case --

MR. ROBERTS:  Sure.

THE COURT:  -- there's something else out there that I have not paid proper attention to.

MR. ROBERTS:  I would say this, the United States, since they have the burden, if they have the desire to submit

USCA5 5441

something, we would just like a chance to respond to that.

THE COURT:  Okay.  I'll give them two weeks from Tuesday if they decide to do it, and give y'all ten days from their response.

MR. ROBERTS:  That should be fine, Your Honor.

THE COURT:  And then I also want to tell you something else, now that Mr. Wiseman's gone.  I so appreciate how you all have conducted yourselves in what I think is an extremely difficult job for both sides.  Not easy, and to see how the Petitioners' attorneys have really thrown their hearts into this and their best efforts is very, very impressive.  And for the Government, I think you all did an excellent job at trial, and you've done an excellent job here.  And it's a pleasure for me.  I think good lawyers make Judges better.  So I thank you all for your briefs, your arguments, the way you've presented your evidence.  Just don't tell Mr. Wiseman.

MR. ABREU:  I do want to thank the Court for hearing us, and I certainly want to thank Your Honor for the hospitality, and certainly the Court personnel.

THE COURT:  They're great.

MR. ABREU:  Really amazing at all times.  Always.  So thank you so much.

THE COURT:  You know Ms. Scotch has a, we finally got her a court BlackBerry, and she --

MR. ABREU:  That's the --

USCA5 5442

THE COURT:  But when she leaves here, she forwards her office phones to her BlackBerry.

MR. ABREU:  Well, I do recall there was a, I think a Saturday afternoon, and I sent an e-mail, and she was in D.C. with her children, and she was responding.  I said, "You're on vacation.  Cut it out."

THE COURT:  Well, actually, she was at a court -- she was our representative to a court deal in the Fifth Circuit, so --

MR. ABREU:  Well, thank you, everybody.

THE COURT:  Thank you all very much.

MR. ROBERTS:  Thank you, Your Honor.

MR. DOWD:  It's been a privilege and a pleasure.

THE COURT:  Good to see you all again.  Did you have something, Mr. Roberts?

MR. ROBERTS:  You still have Mr. Bourgeois on the phone?

THE COURT:  Mr. Bourgeois?

THE DEFENDANT:  Yes, ma'am, Your Honor.

THE COURT:  All right, you're excused.  Thank you.

THE DEFENDANT:  Thank you.  God bless you.

(Proceedings concluded at 4:16 p.m.)

USCA5 5443

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ Molly Carter                    January 27, 2011
Molly Carter                        Date

USCA5 5444

INDEX


GOVERNMENT'S WITNESSES:      DIRECT    CROSS    REDIRECT    RECROSS

ELIZABETH ROUSE              3        33


ARGUMENTS ON CLAIM I:
     BY MS. LARIN   . . . . . . . . . . . . . . . . . . . . .   58
     BY MR. ROBERTS   . . . . . . . . . . . . . . . . . . . .   81

ARGUMENTS ON CLAIM II:
     BY MR. WISEMAN   . . . . . . . . . . . . . . . . . . . .   86
     BY MS. BOOTH   . . . . . . . . . . . . . . . . . . . . .  108

ARGUMENTS ON CLAIM III:
     BY MR. WISEMAN   . . . . . . . . . . . . . . . . . . . .  126
     BY MS. SALINAS   . . . . . . . . . . . . . . . . . . . .  133

ARGUMENTS ON CLAIM IV:
     BY MR. ABREU   . . . . . . . . . . . . . . . . . . . . .  135
     BY MR. DOWD . . . . . . . . . . . . . . . . . . . . . .  168

ARGUMENTS ON CLAIMS V, VI & VII:
     BY MR. McHUGH . . . . . . . . . . . . . . . . . . . . .  175
     BY MR. ROBERTS   . . . . . . . . . . . . . . . . . . . .  207
     BY MR. DOWD . . . . . . . . . . . . . . . . . . . . . .  210

USCA5 5445

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**


UNITED STATES OF AMERICA

v.                                                            Case No.: 2:02–cr–00216
                                                             Judge Janis Graham Jack

Alfred NMI Bourgeois

                             Defendant


                    NOTICE OF FILING OF OFFICIAL TRANSCRIPT

An official transcript has been filed in this case and it may contain information protected under the
E–Government Act of 2002, and Fed. R. Civ. P. 5.2(a) or Fed. R. Crim. P. 49.1(a).

Transcripts will be electronically available on PACER to the public 90 days after their filing with the court.
To comply with privacy requirements of Fed. R.Civ.P.5.2 and Fed. R. Crim. P. 49.1(a), the parties must
ensure that certain protected information is redacted from transcripts prior to their availability on PACER.

If redaction is necessary, the parties must file a statement of redaction listing the items to be redacted, citing
the transcript's docket number, the item's location by page and line, and including only the following
portions of the protected information. This statement must be filed within 21 days of the transcript being
filed. A suggested form for the statement of redaction is available at http://www.txs.uscourts.gov.


   • the last four digits of the social security number or taxpayer identification number;
   • the year of the individual's birth;
   • the minor's initials;
   • the last four digits of the financial account number; and
   • the city and state of the home address (criminal cases only).


Any additional redaction requires a separate motion and Court approval.

A party may review the transcript at the Clerk's Office public terminals or purchase it by following the
instruction on our website at http://www.txs.uscourts.gov or by calling (361)888–3142 . A party is only
responsible for reviewing the:


   • opening and closing statements made on the party's behalf;
   • statements of the party;
   • testimony of any witness called by the party; and
   • any other portion of the transcript as ordered by the court.


Redaction is your responsibility. The Clerk, court reporter, or transcriber will not review this transcript for
compliance.


                              David Bradley, Clerk


USCA5 5446

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____

UNITED STATES OF AMERICA,
                    Respondent,

        -against-

ALFRED BOURGEOIS,

                    Petitioner.

_____

:
:
:
:
:
:
:
:
:
:
:
:

No. Cr-C-02-216
No. Cv-07-223
Honorable Janis Graham Jack,
U.S.D.J.

Electronically Filed

**PETITIONER'S MOTION TO REOPEN EVIDENTIARY
HEARING ON THE QUESTION OF THIS COURT'S JURISDICTION
AND MOTION FOR LIMITED PRE-HEARING DISCOVERY**

Petitioner, Alfred Bourgeois, through counsel, hereby move to reopen the

evidentiary hearing recently concluded by the Court in order to further develop the

record with regard to Claim III regarding Petitioner's contention that this Court

lacked jurisdiction to try Petitioner; that counsel ineffectively failed to challenge this

element of the offense, and that the Government failed to prove it.  In support he

states the following.

     1.     During oral argument on April 20, 2010, the Court denied an evidentiary

hearing on the jurisdiction claim raised in the Section 2255 Motion (Claim III).

Eventually, the Court permitted limited discovery in the form of an deposition of their

1

USCA5 5447

expert, Jan Leestma, M.D.  Due to difficulty in securing the autopsy slides, which were an essential component of Dr. Leestma's opinion, and at the Court's insistence on April 20, 2010 that Petitioner's expert review them, the deposition did not occur until January 10, 2011.  The Court then granted the Government's motion to permit the testimony of Dr. Elizabeth Rouse, which this Court heard by telephone on January 13, 2011.

2.      The deposition and testimony of Leestma and Rouse raise additional questions about this Court's lack of jurisdiction.  Dr. Rouse testified that her opinion that the fatal blows were struck on the Corpus Christi Naval Air Station was based on anecdotal information developed during the investigation.  Yet, when she was questioned at the hearing, she was understandably unable to recall precisely what she relied upon.  See e.g. Tr. 1/13/11, 43.  Additionally, without access to photos both admitted at trial and those seized from Petitioner following his arrest but which were not admitted at trial, current counsel could not properly cross examine Dr. Rouse.  Even if counsel had such photos available, her testimony by phone precluded use of them.

3.      Had the Court permitted full evidentiary development, as it permitted on April 20, 2010 for all other claims in the Section 2255 motion, Petitioner could have conducted orderly discovery and examination of this witness.  However, due to the

2

USCA5 5448

truncated nature of the hearing on this issue, counsel believe that the interest of justice requires further proceedings on this question. Counsel propose that the Court permit the defense to review all photos in the Government's possession that were retrieved from Mr. Bourgeois or his family, which depict the condition of the victim from when she entered Mr. Bourgeois custody until her death. These photos should then be provided to each side's experts so that they can further respond on this question. Once that has been done, the Court should schedule one additional hearing day at which Dr. Leestma and Dr. Rouse can testify.

4.      Additionally, Mr. Gilmore should be required to provide evidence on his ineffective failure to challenge jurisdiction. Counsel were not able to ask him about this as the Court denied a hearing on this claim. And, when the Government had an opportunity to propound interrogatories to Mr. Tinker, they failed to ask about this issue. See Exhibit P – 82 (Government's Interrogatories to Mr. Tinker); see also Exhibit P – 83 (Mr. Gilmore's Response Affidavit, also containing no mention of the jurisdictional issue).

5.      Counsel are filing this motion contemporaneously with a memorandum addressing, *inter alia*, the jurisdiction claim based on the existing record. They hereby incorporate that memorandum as if fully set forth herein.

USCA5 5449

Respectfully Submitted

/s/ Michael Wiseman

Michael Wiseman
Federal Community Defender
Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
Counsel for Petitioner,
Alfred Bourgeois

Dated:        February 1, 2011
              Philadelphia, PA

## Certificate of Service

I, Michael Wiseman, hereby certify that on February 1, 2011 he served
the foregoing on Government's counsel by electronic case filing:

Tony Roberts, Esq.
Patti H. Booth, Esq.
Mark Dowd, Esq.
Elsa Patterson-Salinas

/s/ Michael Wiseman

Michael Wiseman

4

USCA5 5450

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____
                                        :
UNITED STATES OF AMERICA,               :          No. Cr-C-02-216
                                        :          No. Cv-07-223
                    Respondent,         :     Honorable Janis Graham Jack,
                                        :              U.S.D.J.
          -against-                     :
                                        :
ALFRED BOURGEOIS,                       :         Electronically Filed
                                        :
                    Petitioner.         :
_____       :

**ORDER**

And Now, this ___ day of February, 2011 upon consideration of Petitioner's *Motion to Reopen Evidentiary Hearing on the Question of this Court's Jurisdiction and Motion for Limited Pre-Hearing Discovery* and the Government's Response, it is hereby Ordered:

1.     Petitioner's Motion is Granted.

2.     The Government shall permit inspection of all photos seized from Mr. Bourgeois depicting the victim while in his custody, said inspection to occur within ___ days of this order;

3.     The Government will then reproduce whatever of the photos counsel believe will aid their respective experts in either formulating or reaching an opinion as to where the fatal blows were struck;

4.     The photos will be provided to the experts within ___ days of defense counsel's inspection and the experts will prepare written reports within ___ days of receipt of the photos;

5.     A further hearing will be held.  Witnesses will be heard live.  Defense counsel shall secure the appearance of John Gilmore, Esq.

USCA5 5451

6.      The continued hearing is scheduled for _____ , 2011.


_____
Janis Graham Jack
USDJ

USCA5 5452

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____

UNITED STATES OF AMERICA,    :        No. Cr-C-02-216
                             :        No. Cv-07-223
            Respondent,      :    Honorable Janis Graham Jack,
                             :              U.S.D.J.
        -against-            :
                             :
ALFRED BOURGEOIS,            :        Electronically Filed
                             :
          Petitioner.        :
_____ :

**PETITIONER'S POST-ARGUMENT SUBMISSION**

> Michael Wiseman
> Victor Abreu
> James McHugh
> Elizabeth Larin
> Federal Community Defender
> Eastern District of Pennsylvania
> Capital Habeas Corpus Unit
> Suite 545 West – The Curtis Center
> Philadelphia, PA 19106
> 215-928-0520
>
> Counsel for Petitioner
> Alfred Bourgeois

Dated:    February 1, 2011
          Philadelphia, Pennsylvania

USCA5 5453

PRELIMINARY STATEMENT

Following the conclusion of the evidentiary hearing and oral argument on

January 13, 2011 the Court invited Petitioner to submit briefing by February 1, 2011

on any of the issues before the Court.[1]

Petitioner submits this brief addressing two issues: 1) the Court's lack of

jurisdiction (2255 Motion, Claim III); and 2) aspects of penalty phase ineffectiveness

(2255 Motion, Claim II).[2]

**Claim III.    This Court Lacks Jurisdiction; Counsel Ineffectively
Failed to Challenge the Court's Lack of Jurisdiction
and the Government Failed to Prove Jurisdiction by
Sufficient Evidence.**

This Court has expressed skepticism as to the merits of this claim: "I don't like

this argument, Mr. Wiseman. I think you need to move on . . . I told you from the

beginning that was the weakest argument – I have heard in a long time.  It has not

strengthened as time has gone on." Tr. 1/13/11, 133.  Counsel accept responsibility

for their failure to clearly articulate the merits, and attempt to do so again.

---

[1]Transcripts are cited as "Tr." followed by a date and page reference.  All emphasis is supplied unless otherwise noted.

[2]Counsel's choice to address just these two issues in this brief is not a waiver of any other issue before the Court.  Petitioner continues to press those other issues, but does not address them here, only because counsel believe that they have already been adequately addressed.

1

USCA5 5454

In addition to counsel's lack of clarity, the Court's observation that it did not see the merits of this claim must be evaluated against the backdrop that Petitioner has not been afforded a full hearing on it. This Court initially denied Petitioner a hearing on this claim – allowing a hearing on every other claim in the § 2255 Motion. It permitted limited discovery in the form of the deposition of Dr. Leestma. Due to difficulties in securing the autopsy slides – which the Court insisted must be reviewed by Petitioner's expert – that deposition was only conducted on January 10, 2011. The Government then moved to permit testimony from Dr. Rouse. This was done by telephone and without provision of a report. And, as shown below, it was done without Dr. Rouse having a recollection of critical facts.

In Petitioner's view he has presented a compelling if not meritorious claim even with the limited process afforded to him. However, should this Court still believe that this claim is meritless, the Court should grant Petitioner's motion, filed today, seeking to reopen the hearing for full evidentiary development.

Counsel appreciate that this Court remains convinced that Mr. Bourgeois horribly abused the victim and caused her death. The only tragedy worse than the death of the victim in this case, would be for this Court to permit the execution of an individual over whom it has no jurisdiction. Indeed, historically even when the Writ of Habeas Corpus was most truncated in its scope, it covered instances in which a

2

court lacked jurisdiction to try the prisoner. See, Franks v. Magnum, 237 U.S. 309 (1915) (expanding scope of Writ from whether court had jurisdiction over prisoner to other constitutional violations for which the prisoner had no remedy).

Mr. Bourgeois continues to deny responsibility for the death. However, for purposes of the following analysis, this Court may accept that Mr. Bourgeois committed the acts that led to his daughter's death. The question raised by this claim is whether the Government proved beyond a reasonable doubt that Mr. Bourgeois and the victim were on the grounds of the Corpus Christi Naval Air Station (CCNAS) at the time of the infliction of the proximate cause of death. The Government failed in this regard; trial counsel ineffectively failed to challenge this essential element of the offense and this Court lacks jurisdiction – this is plain and simple.

## A.    The Law.

The Government must prove every element of an offense beyond a reasonable doubt. Apprendi v. New Jersey, 530 U.S. 466 (2000); United States v. Gaudin, 515 U.S. 506, 510 (1995); United States v. Booker, 543 U.S. 220 (2005); In re Winship, 397 U. S. 358, 364 (1970) ("[W]e explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.")

The jurisdictional requirement that the murder be committed "within the special

USCA5 5456

maritime and territorial jurisdiction of the United States" is an element of the federal

crime of murder. See 18 U.S.C. §1111(b).  Additionally, 18 U.S.C. § 3236 states that

murder is "committed at the place where the injury was inflicted . . . which caused

the death, without regard to the place where the death occurs."[3]

There is little law interpreting § 3236 in circumstances like those present in this

case, i.e., when the deceased suffers blows and injuries both on and off federal lands.

Counsel have done exhaustive research and present the following as the only relevant

authority. The Court of Appeals for the Eighth Circuit utilizes a "proximate cause"

analysis.  Under this approach, federal jurisdiction is dependent on a demonstration

beyond a reasonable doubt that the injury that was the proximate cause of the death

was struck on federal lands.  See S1-8thCirPJI Modern Federal Jury Instructions-

Criminal, § 6.18.1111§ 6.18.1111 Introductory Comments to Homicide Instructions:

> Federal jurisdiction under 18 U.S.C. §§ 1111 and 1112 ultimately
> depends on the location of the offense. The location is determined by
> where the injury was inflicted or other means employed which caused
> the death, without regard to where the death actually occurred. 18 U.S.C.

---

[3]In United States v. Bell, 993 F.2d 427, 429 (5th Cir. 1993), the Fifth Circuit
Court of Appeals held that the jurisdiction element of the federal homicide statute had
to be proven only by a preponderance of the evidence.  This holding, however, has
been directly questioned, although not overruled, by three post-Apprendi decisions.
See, United States v. Reff, 479 F.3d 396,400 (5th Cir. 2007); United States v. Bailey,
169 Fed. Appx. 815, 821 (5th Cir. 2006); United States v. Perrien, 274 F.3d 936, 939,
n.1 (5th Cir. 2001).  This is an academic point because the Government's proof in this
case does not even meet the lower preponderance standard.

USCA5 5457

§ 3236; <u>United States v. Parker</u>, 622 F.2d 298, 302 (8th Cir.), <u>cert. denied</u>, 449 U.S. 851 (1980) . **If injuries are inflicted both outside and inside the federal boundary, the Eighth Circuit adopts a proximate cause analysis and requires the government to prove beyond a reasonable doubt that the victim died as a proximate result of the injuries inflicted within the federal boundary**. Id.

<u>United States v. Parker</u>, 622 F.2d 298 (8th Cir. 1980) (adopting proximate cause of death as the test when injuries contributing to death were struck on and off federal land). Despite this being a claim in this Section 2255 case for years, the Government has offered no contrary authority.

### B.     The Facts.

As the following review shows, jurisdiction was assumed by the Government, the Court and unfortunately defense counsel. While assumed, it was never proven.

### 1.     The Government's Trial Theory.

In its arguments to the jury, the Government never affirmatively or actually argued that the fatal blows were struck on federal land, or, more to the point, that the proximate cause of death were blows struck on federal lands. To the contrary, it portrayed the death of the victim as resulting from a "systemic execution" that occurred over time, and not from a single set of blows that occurred on the grounds of the CCNAS. <u>See</u> Tr. 3/16/02, 13 ("Ladies and gentlemen, ten injuries a day [for 30 days], a **systematic execution** of a baby. And that's what it was. A **systematic**

5

USCA5 5458

execution."); at 14 (same); at 16 ("This was a systematic execution. And not even --

and **not even a sterile, clean execution by a shot**. No, no, no, no, this was a torture,

**day by day**."); at 51 ("a **systematic murder** of a little child").  In fact, one can scour

the Government's guilt phase closing arguments in vain in search of even a hint of

an attempt to prove that the fatal blows were struck on federal land – there is none.

The only reference to the element of jurisdiction is the following:

> The last element that we have to prove is that it happened on a Special
> Territorial or Maritime Jurisdiction of the United States and that was
> because it was on the Navy base. That's why we had the FBI
> investigating and the Naval Criminal Investigative Service, and the
> Medical Examiner came from the Army.

Id., at 10.  This is nothing more than an attempt at boot-strapping.  Obviously, federal

jurisdiction is not established simply because the Government called in the FBI and

the Army Medical Examiner – that simply means that the body was discovered on

federal lands, and that all concerned authorities jumped to a conclusion about

jurisdiction.

This Court must ask why, if jurisdiction was so clear, did the Government shy

away from discussing it in its closing argument?  And, if it were so obvious, why did

Dr. Rouse (the Government's expert medical examiner) so carefully stay away from

testimony about it (discussed below).  And, this Court must ask why Government

counsel wrote a note to himself when he met with Dr. Rouse stating: "*If incident

USCA5 5459

occurred off mil base - <u>NO Jurisdiction</u>!*" (emphasis and capitalization in original)[4]

The Government, the Court and trial defense counsel assumed that there was jurisdiction in this case. That was an erroneous assumption and it was never proven.

### 2.    Dr. Rouse's Testimony.

In her trial testimony, Dr. Elizabeth Rouse (the Medical Examiner) assiduously avoided ever attempting to date the fatal blows. Petitioner has found nothing in her trial testimony which even attempts to do so, and he defies the Government to point to evidence to the contrary. There is none – her testimony assumed that the proximate cause of death was inflicted on federal lands, but she never testified to that effect.

In her post-conviction testimony Dr. Elizabeth Rouse indicated that she could only date the victim's more "recent" injuries [the ostensible fatal blows] to within one to three days. <u>See</u> Tr. 1/13/11, 33, 34 (Rouse can only date the "more recent injuries" to one to three days before death). Indeed, Dr. Rouse agreed with Dr. Leestma's opinion that one cannot medically date the injuries with any greater precision. In response to the Court's question, she particularly agreed with Dr. Leestma's deposition testimony that the injuries could not be dated. Tr. 1/13/11, 20-21 ("clearly

---

[4]This document was provided by the Government to counsel on April 19, 2010 and was attached as an Exhibit to *Petitioner's Unopposed Motion for an Additional Thirty Days to Submit Evidence in Support of Claim III to His Motion for Relief Pursuant to 28 U.S.C. Section 2255* (document # 604).

7

USCA5 5460

the multitude of [old and new] injuries makes this a complex picture. We can

categorize the injuries into [] ones that appear to be six weeks old, you know, five,

six weeks old, to some that are, like I said, a week old, some that are **days** old. . . We

can't pinpoint exactly any injury, as far as pinpoint down to the day, this occurred on

this date. . .").

Given the inability to date even the more recent injuries with greater precision,

Dr. Rouse testified that her conclusion that the fatal blows were struck on the grounds

of the CCNAS are based on anecdotal reports of the victim's functioning just before

her arrival at the CCNAS, on the description of the blows she received and her

subsequent deterioration. Id., 22 ("by all accounts, she was functioning

neurologically fairly normally during that week. She was conscious, talking,

walking); see also, id., 24:

> [W]e would use the clinical evidence tremendously. We'd never, or hope
> to never do the autopsy in a vacuum. And we pull in clinical information
> and correlate it, and correlate her injuries, what we're seeing on the body
> with what was happening physiologically. And absolutely the, when the
> time of the neurologic impairment would absolutely be taken in light of
> what we see microscopically. And that is standard practice. All
> autopsies, we use all the available information that we have at the time
> of the autopsy. We look at the investigation, we review the medical
> records prior to performing the autopsy, because we look at all the
> microscopic and gross findings in light of the clinical scenario, what was
> going on with that individual.

\*\*\*

8

USCA5 5461

I would -- the -- medically, certainly, **I cannot say whether it was on the naval base or just off the base**. And I can't get within that hour of, that window of hours of an injury. But her injuries . . . [t]ime-wise we put it, she has injuries that fit with the timing she was on the medical (sic) base. The description by witnesses of what occurred on the medical (sic) base certainly would explain the injuries, would explain the trauma to the brain and would explain her clinical course.  I cannot narrow the injuries down to, I think you said she came on the base at 11:04 -- I'm sorry, the timing  when she came on the base. What pages are those on when they arrived on the base? Okay. They arrived on the base at 10:03 in the morning of June 27th. **There's no medical way to determine whether that injury was at 9:03 or 10:30.** We cannot get that narrow as far as when the injury occurred. And **that's where putting it together with the witness reports that she was conscious and awake at the time she was coming onto the base, injuries were described, an incident was described, and then she clinically decompensated, that corresponds with the injuries that we saw in autopsy. And that is what caused her death**.

Tr. 1/13/11, 31-3.

Counsel have conducted an exhaustive search of the trial transcript and of the FBI 302 reports.  Contrary to Dr. Rouse's assumptions made in her post-conviction testimony, there is **no support**, anecdotal or otherwise, showing that the victim was "conscious, walking, talking" but suffered a rapid deterioration as a result of blows received on the CCNAS.[5]

While there were some witness accounts at trial about the victim's condition

---

[5]AB1994 provided some testimony about these issues – discussed below – but it came no where close to providing the types of information that Dr. Rouse assumed in her post-conviction testimony.

9

USCA5 5462

**weeks** before her death, there was **no** evidence regarding her functioning and condition in the days immediately preceding her arrival on the CCNAS – such evidence being the basis for Dr. Rouse's opinion. There was no evidence showing that the victim was functioning "normally" within the last days of her life. While there was not much showing that she was impaired in her last days, there is some evidence showing impairment during the time frame in question. The Bourgeois family visited with the Banks on June 9, 2002 – 16 days before death. Tr. 3/9/04, 105. Mrs. Banks testified that the the child "didn't hardly say anything" Id., 126, a sign that one would think would interest Dr. Rouse.

Even if one uses the outside date of ten to fourteen days before death as having relevance to the clinical picture ostensibly used by Dr. Rouse, there was no testimony describing the victim's condition, functioning or clinical picture, one way or the other.

In the absence of such clinical signs upon which to rely, the Government relies on two accounts to support its post-conviction position on jurisdiction. Those accounts are reviewed here.

### a.     The Trial Testimony of AB1994.

AB1994 was the only witness to the alleged delivery of the allegedly fatal blows. The portion of her testimony that addresses the events on the day that the

10

USCA5 5463

victim was taken to the hospital begins with the Government asking her if the truck was neat on that day. Tr. 3/4-5/04, 33-34, L 25, 1-2.[6] She was next asked if she recalled her father getting lost, although there was no description of whether they were on or off base at that time. Id., 34, L 20-21. She was asked if the truck "stalled" to which she replied that it "stopped." Id., L 22-25. AB1994 clearly did not recall that the truck "stalled" and was restarted by being "jump-started." She denied that they had a "problem" starting it (i.e., they were not jump-started). Id., 35, L 1-8. See also, id., 36, 10-11 ("Q: Do you remember anybody helping you start the truck? A: No."). The lack of testimony regarding getting a jump start is important, as the Government relied upon the jump start as a reference point for the truck being on the CCNAS.

In the next question and answer the witness recalled that they went to a "loading dock" Id., 35, L 9-10. However, there was no attempt to establish that the dock was on the grounds of the CCNAS, and since the truck made the earlier stop at Ingelside – and possibly others – that is an important omission in the proof.

Although AB1994 testified that her father asked for directions, there was no testimony provided by the Government that Mr. Bourgeois only asked for directions

---

[6]Petitioner cites the separately transcribed volume of testimony of AB1994 which is dated March 4-5, 2004 starting at 8:19 a.m. For precision, Petitioner also cites the lines of testimony, which are preceded by the letter "L."

11

USCA5 5464

while on the Naval Base, and therefore this testimony also does not establish that they were on the base at that time.  Id., 36, L 2-7.  As noted, AB1994 never testified that they were on the base when directions were sought.

Thus far in her testimony, there was no indication that the truck was on the grounds of the CCNAS.  The questioning then turned to the alleged incident in which Mr. Bourgeois struck the alleged fatal blows.  AB1994 testified that the potty tipped and her father became "mad."  Id., 36, L 12-25.  He stopped the truck.  He told AB1994 to give the baby to him.  He was mad and yelling, although the witness did not recall what he was saying .  Id., 37, L 8-16.  Her mother and other sister were sleeping at this time.  Id., 38, L 8-13.

Next, she indicated that her father took off the baby's pants and began to "spank" her.  Id., 38, L 16-17.  She then indicated that Mr. Bourgeois "took her by her shoulders, and he started hitting her head on the window."  Id., 38 L25, 39, L1.  He hit the back of her head on the window.  Id., 39, L 2-5.  He did this "four" times.  Id., 40, L 21-24.[7]  The baby had a "sad" face while this was happening.  Id., 39, L 14-

_____

[7]AB1994's testimony about the head banging is contradicted by the account provided to Special Agent Beckett. In her report of July 15, 2002 at 4, Agent Becket wrote:

In an interview of the Bourgeois' 7 year old daughter by Child Protective Services on June 28, 2002, she stated that on the morning in question (June 27, 2002), she and J.G. had been sitting in the front

12

15. She denied that anything was coming out of the baby's mouth while she was being banged against the window. Id., 41, L 2-3.[8]

AB1994 said that he father told her to then take her, put her pants on and put her "right next to my seat." Id., 39, 20-21.

The Government then attempted to show that the victim was rendered unconscious at that time – it was unable to do so:

Q:      . . . you said she was making a sad face. Was she awake,
        or was she asleep?

A:      I don't know. I don't know. I don't remember if her eyes were
        open or closed, but if I'm not mistaken I think they were closed.

Q:      Okay. And so he told you to do what?

A:      Put her right next to me.

Q:      Okay. Now, were her clothes back on?

A:      Yes.

---

passenger seat of the truck when her father, who was driving, stopped for directions. J.G. was sitting on her potty, moved a little bit, and accidentally spilled the contents of the potty. Her father became upset, grabbed J.G. and pulled her across his lap, face down. He began whipping J.G. until she started 'drooling' out of her mouth and nose.

[8]She did indicate that "white stuff" was "just blowing out" of her mouth while her mother was doing CPR (Id., 41, L 3-6), but there was no attempt on the part of the Government to draw a temporal connection between when and where the blows were struck and where the CPR was performed.

13

USCA5 5466

Q:    Okay.  Who put them on her?

A:    My dad.

Q:    And, 'put her right next to you,' what does that mean?

A:    Like this is my chair, and then I had to let her get on my chair with me.

Q:    And when she was on the chair with you, was she awake or was she asleep?

A:    **She was awake**, and then she just, like, fell asleep.

Id., 39 L 22 - 25, 40 L 1 - 13.

Without next establishing how much time elapsed, or what the location was of the truck, the witness next testified that Mr. Bourgeois got out of the truck to "make sure it's the right place" Id., 40, L 16-17.  Again, there was no indication that the truck was on federal lands at this point.  Nor was any attempt made to show how much time passed from the head banging incident to when Mr. Bourgeois got out of the truck to "make sure it's the right place."

> **b.    Clinical Signs Before the Blows: Reliance on Mr. Bourgeois' Admission that the Baby was Singing her ABC's.**

In the absence of any evidence, testimony or 302 reports showing the clinical condition of the baby in the days just before her death and before she went unconscious, the Government relied in the post-conviction proceedings on the alleged

14

USCA5 5467

fact that she was singing her ABC's immediately before the head blows were struck.

This, or course, was offered to show that the victim went from an intact clinical state,

to unconscious, as a result of the blows. This is an ultra-thin reed upon which to rely.

The Government asked Dr. Jan Leestma, Petitioner's post-conviction expert,

and Dr. Rouse, hypothetical questions that included an assumption that the child went

from singing her ABC's to "going limp." Tr. 1/10/11, 75 (Leestma); Tr. 1/13/11, 22-

23 (Rouse).[9]

What the Government left out of each hypothetical, or in its argument to the

Court, is that the only evidence that the child was signing her ABCs just before the

blows were struck, was from Mr. Bourgeois. Tr. 3/10/04, 51. Mr. Bourgeois'

testimony in this regard is hardly the type that this Court should feel confident in

relying upon. Leaving aside all questions of credibility, it is quite vague and does not

---

[9]Petitioner objected to the hypothetical question asked of Dr. Rouse on the ground that it assumed an incorrect fact. Id., 22. As the review of AB1994's testimony demonstrates, there was no evidence presented that the victim went "limp" immediately after the blows to the head, as the Government suggested in its hypothetical. To the contrary, AB1994 was clear on this point – she did not go limp: "**She was awake**, and **then** she just, like, fell asleep." Id., 40, L 12-13.

It is true that Robin Bourgeois described the child as "limp" when she awoke on the naval base and found her unconscious. Tr. 3/2-3/04, 133. However, as noted above, the Government failed to show that the child went limp after the blows testified to by AB1994. Obviously, the victim went limp at some point. But, the Government's burden was to show that she did so in immediate response to the blows – it did not carry that burden.

15

USCA5 5468

even remotely suggest that the victim was actually signing anything. The testimony in its entirely was: "Me, her [JG1999], AB 1994, we were singing ABC's. And I had AB 2001 on one lap, on the lap that was, I think closer to the door." Not the quality of testimony upon which to hinge a federal capital conviction.

The Government also offered similar testimony through two FBI agents. See Tr. 3/9/04, 186 (FBI Agent Harris testifying that Mr. Bourgeois had the baby on his lap and she was singing ABC's while he was broken down); Tr. 3/10/04, 100 (FBI Agent Scharn, same).

While it is clear that these statements from Mr. Bourgeois to the FBI agents were admissible as admissions, counsel find it extraordinary that the Government would even remotely credit this obvious attempt by Mr. Bourgeois to deflect culpability, e.g. the child was fine, she was singing her ABC's, in view of its refusal to believe any other aspect of his testimony. If the Government believes this, it must explain why this is accurate and the remainder of his testimony is a lie.

### C.    Other Potential Blows that Could have Caused Death.

Dr. Rouse testified that the victim suffered from "total brain injury" Tr. 1/13/11, 12. She described that the child had "diffuse, meaning multi-focal, multiple areas of injury to her brain. Id., 33. And, as noted above, even the most recent injuries could – from purely a medical perspective – have been up to three days old.

16

USCA5 5469

Given this timing, FBI 302 reports demonstrate a number of other potential causes of death. This Court should reopen the hearing as Petitioner has requested, so that Dr. Rouse and Dr. Leestma can opine upon the significance of the following evidence of the victim's clinical presentation in the days before her death and on other potential blows that could have caused her death. Based on Dr. Rouse's testimony, such evidence could be significant in determining whether the blows were struck days before the victim was on the naval base.

Robin Bourgeois was interviewed on June 28, 2002 and reported that "Two night prior to the incident (06/26/02), Robin witnessed Alfred hit JaKareen across the side of her head with his leather sandal that had thick rubber soles."

An FBI 302 dated July 2, 2002 indicates that Robin "first saw the scab on Ja'Kareen's forehead about two weeks before she died. They had been in a park in California." Mr. Bourgeois driver's log shows that the family was in California as late as June 21, 2002.

The same report indicates that "A couple of days before Ja'Karenn died, they were in Pensacola, Florida. While in the Air and Space museum there, Alfred commented on how slow Ja'Kareen was walking." Although Robin believed that this was due to the sores on her feet, difficulty in moving could be the type of clinical sign that Dr. Rouse would have considered. See Tr. 1/13/11, 22 ("she was conscious,

17

USCA5 5470

talking, **walking** . . .).  Evidence that she had difficulty walking could have been a positive neurologic sign.

In a March 27, 2003 FBI 302 report, Robin reported that "approximately three weeks before Ja'Karenn's death. Alfred Bourgeois hit Ja'Kareen hard enough to render her unconscious for several minutes."  Although Robin recalled that this event happened "approximately three weeks" before death, the statement was provided almost a year later and her recollection of the date of the incident could well be off.  A head injury with a loss of consciousness so close in time to the death would likely be of interest to the doctors.

There is also the evidence that Mr. Bourgeois beat the child with the baseball bat so hard that he head blew up like a football or watermelon.  United States v. Bourgeois, 423 F.3d 501, 503 (5th Cir. 2005).  Although AB1994 failed to provide even an approximate date or location of when this occurred, Tr. 3/4-5/04, 16-17, Robin Bourgeois indicated that the family was in California at the time of the beatings with the bat.  Tr. 3/2-3/04, 36.  As noted above, Mr. Bourgeois' log showed that the family was in California as late as June 21, 2002 – just days before the death.

### D.      Gaps in the Government's Proof.

The gaps in the Government's proof regarding jurisdiction fall into a number of categories, summarized here.

18

USCA5 5471

• Even assuming that AB1994 testified accurately, and accepting that the blows she described were the proximate cause of death, there was no evidence presented that the blows were struck on federal lands. The Government cannot "assume" away this lack of proof. It would be incumbent on the Government in its responsive submission to pinpoint precisely how they proved that the family was on the grounds of the base during the events recounted in AB1994's trial testimony. Petitioner's counsel have been through the record and they have found no such connection. To the contrary, the exacting review of her testimony done above, shows that this is a real gap in the proof.

• Given the lack of proof that the blows were struck on the base, there is nothing to suggest that the blows were not struck off-base, and the victim later collapsed on the base. This was a conclusion that Dr. Rouse could only exclude by reliance on AB1994 flawed testimony and the non-existent clinical picture.

• There is no evidence as to the force used by Mr. Bourgeois when he struck the child's head against the window. Absent this evidence, it is pure speculation to conclude the blows described by AB1994 were sufficient to cause a sub-dural hematoma and death – even assuming that everything else said by AB1994 fits the Government's theory. The Government's use of the phrase that the "child went limp" in its expert hypothetical questions is a misrepresentation of AB1994's

19

USCA5 5472

testimony.  She never testified that the child went limp.  She testified that she was awake and, at an undetermined time and location, she went to sleep.

●  There is no evidence that the victim's mental state was altered immediately after the blows to the head were struck.  As noted above, there is no evidence showing that she went limp or was unconsciousness on the grounds of the Air Station.  AB1994's testimony did not establish this link.

●  There is an almost complete absence of clinical signs showing that the victim was intact immediately before the blows against the window – leaving aside Mr. Bourgeois vague and self-serving statements that she was singing her ABC's.

●  Dr. Rouse's reliance on the lack of reporting of clinical signs of deterioration from lay people (one of whom was seven years old, and two of whom were suspected of complicity in the offense) in the days before the death, is of no probative value.

●  The Government cannot rely on the fact that, in its view, Mr. Bourgeois made up the story that the baby fell from the truck.  This does not even remotely mean that the death was caused by blows struck on the base.  At most it means that the baby lost consciousness on the base.  It says nothing about where the blows were struck.  In arguing that the killing was premeditated, the Government told the jury that "when his wife asked him, what are you going to say when this baby dies? He had an answer

20

USCA5 5473

like that, well, we're going to say, we're going to throw her on the side of the road. And the little girl just flipped to the side of the road that's swamp. And then we're going to drive to the next station." Tr. 3/16/04, 10. If this was the Government's theory, then it makes perfect sense that the baby lost consciousness off the base, and the plan was to dump her by the side of the truck when the family got to the base.

### Conclusion

When Dr. Rouse was asked by undersigned counsel the basis for her conclusion that the fatal blows were struck on federal land, she responded:

> There are photographs, and again I don't know the exact dates on all of those, but I do not recall any evidence of significant neurologic impairment prior to – the day they drove onto the naval base. . . . The witness descriptions – and again, I would have to refer to those. I'm speaking completely in a **vacuum**, not having any of those in front of me. There, I believe are fairly precise accounts of her doing activities of daily living, functioning neurologically normal.

Tr. 1/13/11, 43. Expert testimony on such an important question should be taken in a "vacuum." Counsel should have had the chance to test the expert's opinion by having her identify which lay accounts, which photos and which witness description s support her view. Counsel have tried to find them, and they are lacking. At a reopened hearing, counsel would expect the Government to provide whatever accounts it has to Dr. Rouse so that she can have some evidence to fill the vacuum.

This is not an easy issue. It is not easy for the lawyers and it is not easy even

21

USCA5 5474

for the experts.    Dr. Rouse testified that the victim had a "multitude of injuries mak[ing] this a complex picture.  Tr. 1/13/11, 21. Despite the complexity, the Government seeks easy answers.  But, hopefully counsel have been able to show that this is a serious question.  It is deserving of full evidentiary development.  The witnesses should appear.  The parties should review full reports.  The Court should be able to ask questions.  The experts should be able to pinpoint precisely what anecdotal evidence they rely upon.  They should be shown all relevant photographs illustrating the condition of the victim in the days leading up to her death.  On the current record, this Court cannot remain confident that jurisdiction was or is established.  The Court should either grant relief on this issue, or, at a minimum, grant Petitioner's accompanying motion to reopen the hearing.

In the final analysis, this cannot be an easy issue for the Court.  Recognition of the validity of this claim could mean that this Court would have to order the release of a person who has been condemned for a brutal act – albeit to be prosecuted by the appropriate entity that actually has jurisdiction.  This Court does not need counsel to remind it of its duty to uphold the Great Writ of Habeas Corpus and to grant relief from unconstitutional confinement when such is warranted. Petitioner has confidence that this Court will do its duty.

USCA5 5475

**Claim II.   Ineffective Assistance of Counsel for Failing to Present
Extant Mitigating Evidence.**

In order to meet the Strickland v. Washington, 466 U.S. 688 (1984) standard

for ineffective assistance of counsel, Petitioner must demonstrate deficient

performance and prejudice.  As noted during the argument, Mr. Bourgeois' history

of childhood sexual and physical abuse, low intelligence, organic brain dysfunction

and other psychological deficits are the types of mitigating evidence that are

commonly found presented in these cases.  As Petitioner's *Points and Authorities* –

submitted on the eve of argument – shows, this type of evidence is required to be

presented by the United States Supreme Court.  The Court appeared to agree with

counsel that prejudice was clear in this case.  In apparent response to counsel's

argument that counsel are required to present such evidence in the mitigation phase

of trial, the Court indicated that it would have to decide whether counsel had strategic

reasons for their decisions.  Tr. 1/13/11, 94 ("Well, you and I are in agreement on

that.  It's just, I guess my finding will have to do with whether this was a strategic

decision by the attorneys").

Accordingly, Petitioner will limit his submission to the question of deficient

performance.  Before addressing that, however, counsel believe it appropriate to

remind that Court that it promised that in evaluating Petitioner's contention that Mr.

23

USCA5 5476

Gilmore and Mr. Tinker were ineffective in the penalty phase, it would not require

counsel to "box with a ghost," Tr. 1/13/11, 88. The Court also agreed that it would

not view Mr. Tinker as a so-called "Colombo" type figure – one for whom apparent

lapses in performance or judgment were in reality stratagems. Id. 87-88.

While this Court articulated its view that it must therefore judge Mr. Tinker and

Mr. Gilmore's actual performance in this case based on the record, counsel feel

particularly obliged to address this point in response to the Government's oral

argument. During that argument, it, in effect, told this Court that its decision making

can start and stop with the fact that Mr. Tinker and Mr. Gilmore were and are

wonderfully talented attorneys who knew exactly what they were doing, and that they

had a reason for everything, even if that reason is not apparent from the record:

> I think it's important, Judge, and you were here during those weeks, to remind us all -- and Defense Counsel weren't here -- that Mr. Tinker and Mr. Gilmore knew the jury that they had picked. They knew the World War II veteran. They knew the 4-H lady that had her daughter in the county show. They knew the Texas Aggie that was Catholic that had the problem with the death penalty. They knew to whom they were speaking.
>
> And not only did they know that, but they -- there was a cadence and a theater in this courtroom that was going on during the trial that's not accurately reflected in the, in the record anywhere. There's no one but you, Your Honor, that can remember and make your decision based on what was happening in the courtroom.
>
> And so the theater that was happening and the decisions that were being

24

USCA5 5477

made, the strategic decisions that were being made by Defense Counsel have to be looked at in that light also.

Tr. 1/13/11, 110.

The Government's argument is improper in multiple respects. It assumes a level of competence in this case that is not based on counsel's actual actions in this case. Moreover, even assuming that counsel may have performed appropriately in court –which Petitioner certainly does not concede – so-called "courtroom theater" does not even begin to tell the story of counsel's lapses leading up to the start of the trial.

Current counsel instead will review just one aspect of trial counsel's actual, documented failure to perform effectively in pre-trial investigation of the penalty phase. This review will put the lie to the Government's contention that counsel had a firm grip on the events swirling around them. It will show that rather than being shrewd tacticians, they were not in control of the events surrounding the development of mitigating evidence.

Counsel well understand that this Court was not impressed with Dr. Cunningham. However, **counsel wish to be clear:** the following narrative is based on documents maintained by Dr. Cunningham and on proceedings in this Court. Indeed, the bulk of the evidence showing these lapses came from the mouth of this

25

USCA5 5478

Court.  The lapses that are apparent have nothing to do with the substance of Dr. Cunningham's opinions.

Dr. Cunningham was first contacted by Mr. Gilmore by email on June 30, 2003.  Mr. Gilmore asked about retaining him for the Bourgeois trial that was then set for mid-September.  Exhibit P - 8, p. 1.

Dr. Cunningham responded by email on July 1.  Among other things he advised Mr. Gilmore that he could not be ready by mid-September, "given the status of the mitigation case as it appears from your description."  Id., p. 2.  He cautioned Mr. Gilmore that it is often "time consuming" to secure the relevant records and to conduct the appropriate mitigation investigation, and he further advised him that he could not even begin to perform his function as a consulting psychologist, until that investigation were complete.  Id.

Mr. Gilmore next contacted Dr. Cunningham by email on July 7, 2003 to advise him that he was preparing a motion for continuance and asking when he could be ready for trial.  Dr. Cunningham responded that he could be ready by mid-January, 2004.  Exhibit P - 8, p. 4.

Dr. Cunningham next provided Mr. Gilmore with suggestions for mitigation specialists on July 9 (Exhibit P - 8, p. 11).

On July 18, 2003, the Court set a new trial date of February 14, 2004 (docket

USCA5 5479

entry # 76).  Dr. Cunningham was not advised of this date until he received an email

on July 25, 2003.  Exhibit P – 8, p. 15.

Despite requiring from July to January to be prepared (six months), counsel

took no action with respect to Dr. Cunningham until January 22, 2003.  This fact is

demonstrated by Dr. Cunningham's invoice (Exhibit P 151, p. 1)

According to Dr. Cunningham's records, his assistant called Mr. Tinker on

November 17, 2003.  Exhibit P - 167.  Mr. Tinker advised "that they have a few

investigators working on getting information.  Will send records to us sometime in

December, hopefully no later than mid-December."  Presumably because this

representation was contrary to the prior schedule worked out between Dr.

Cunningham and counsel, the doctor's assistant made the following additional

notation: "Attorneys are aware of the previous timeline **and are working with judge**

**to get a continuance/extension.**"  This was not true.  As the following events show,

counsel had not yet sought a continuance, and they certainly were not "working" with

the Court on this topic.

On December 1, 2003 Dr. Cunningham's assistant email Mr. Gilmore asking

for an update.  Exhibit P -8, p. 20.  Mr. Gilmore responded that he was "trying to get

a continuance" and that the case was then set for trial for February 16.  He also

reported to Dr. Cunningham that "the mitigation investigators say that they cannot be

27

USCA5 5480

finished by then." <u>Id.</u>  Dr. Cunningham's assistant responded, thanking Mr. Gilmore

for the update and stating "FYI, we have yet to receive any

records/information/materials for Dr. C to begin working on his report."  P - 8, p. 19.

Thus, from June 30 through December 1, 2003 (**five months**), neither Mr. Gilmore,

Mr. Tinker, nor either of the mitigation specialists had provided **any information** to

Dr. Cunningham.  This aspect of the case was no further along than when counsel

first contacted Dr. Cunningham.

In the meantime, on December 9, 2003 trial counsel filed a Motion to Continue.

Exhibit P – 144.  Counsel advised the Court that the mitigation specialists, Ms.

Milstein and Mr. Bierbaum, could not complete their mitigation investigation until

August, 2004, some six months later than the then current trial date of February,

2004.

In response to the Motion, the Court convened a hearing the next day.  It asked

the very appropriate question: "I want to know why they've delayed so much after I

appointed them some eight, nine months ago?" Tr. 12/10/03, 4.  The Court then

demanded that the mitigation specialists appear to explain themselves:

> I want him here. I'm not going to your representation because I'm going
> to tell you right now; **your representations have been untruthful** in
> the past about when the mitigation experts would be prepared. So I'm
> going to only hear from them and why it is they're do dilatory. So, if you
> want a continuance, that's the only way you're going to get one.

28

USCA5 5481

In October, and they'd already been working for a month, you told me it would be six months which would put us a month after the trial date. I said to Mr. Tinker, they've got to be ready by February 8th and he said,"I will get them ready." I had already appointed them several months prior to that. . . **I've given you numerous extensions and it's not going to happen again. These people have been appointed for many, many months. Now, I want to know -- I find this very close to bad faith**.

Id., 5.  The Court went on:

I authorized their hiring with the understanding that it would take "X" amount of time. And then we came back in October and here it's six more months which would have made it -- they were already working on it a month at that time. It was the end of October that Mr. Tinker and Mr. Gilmore came in.  It would have made it the end of March and I said that is not acceptable. They've got to be finished by trial. And Mr. Tinker said, "I will get them finished by trial." And I've got to rely on you to pick the experts of your choosing and have them work with the Court's Order. I've just got to be able to rely on you all to do that.

* * *

In your Motion in August the 12th , 2003, you said that Ms. Milstein and Mr. Bierbaum had already had an initial interview with your client. And I'll have to look back at the record on the 14th when we had the expert Ex-Parte hearing but I feel that you assured me that it was not going to interfere with the trial date at that time. And, now, in October, you told me it would take them six months. And I said get it done in five and you said it would be done. And, now, you're saying all of a sudden that they need until next August without any evidence whatsoever. So that's not going to happen today. So your Motion for Continuance is denied.

Id., 14, 16-17.

Counsel agreed to withdraw the continuance motion and did so on December

29

USCA5 5482

16, 2003. Exhibit 72. Without referencing the fact that the investigation was already well behind the schedule that counsel agreed to with Dr. Cunningham, they assured the Court in the Motion to Withdraw Motion for Continuance, that the work would be complete.

Neither the emails, Dr. Cunningham's invoice nor his ACT sheet (Exhibit 167) show any further contact between Dr. Cunningham and counsel until January 21, 2004. The first indication that Dr. Cunningham received anything from the mitigation specialists or from counsel is a invoice entry for January 31, 2004 indicating that he spent 80 minutes reviewing mitigation summaries.

Thus, despite this Court's accommodation of counsel's request for two mitigation specialists and Dr. Cunningham, and despite counsel's understanding with Dr. Cunningham that he would require months to prepare, he did not receive any mitigation summaries until two weeks before the scheduled start of trial. The Supreme Court has held that when counsel leave themselves such a truncated period of time to prepare a complex mitigation investigation, they perform deficiently. Williams v. Taylor, 529 U.S. 529, 535 (2000).

This Court needn't search for strategic reasons for counsel's penalty phase failures. The reasons are obvious – counsel were not properly prepared. Despite the Court's admonitions and observations, counsel continued to drag their feet and the

30

USCA5 5483

mitigation investigation continued to founder. Despite authorizing tens of thousands

of dollars in expert expenditures; despite giving counsel numerous continuances of

the trial date; notwithstanding counsel's repeated assurances that they would be ready

on the Court's schedule, counsel dropped the ball.  They were not prepared timely.

That is why counsel did not have Mr. Bourgeois seen by Dr. Weiner, the

neuropsychologist until **after trial started.**  That  is why counsel relied on Dr.

Estrada's speculation that Petitioner was an abused child, instead of presenting the

multitude of witnesses that were available in the Courthouse and ready to testify. <u>See</u>

Exhibit P – 61, containing summaries of the witnesses were could have testified to

the abuse.  And that is why Dr. Estrada, who all concerned have lauded as a fair,

objective and learned mental health professional opined:

> I do not believe that the jury in this case was provided with an accurate and complete picture of Mr. Bourgeois' mental health profile.  I do not come to this conclusion lightly.  But, he was presented only as an unrepentant and evil man.  While his actions were unquestionably "evil," it is equally unquestionable that there exists a reasonable and not particularly controversial mental health explanation for his actions. Had I been given the information that I now have, and had I been asked at the time of trial, I would have shared my opinions as contained in this Declaration.

Exhibit P – 11.  <u>See</u> <u>also</u>, Tr. 9/10/2010, 18-20 (same).

31

USCA5 5484

## CONCLUSION

For all of the above reasons, those presented in all prior written submissions, oral arguments, based upon the evidence presented at trial and in the Section 2255 proceedings, and based upon the entire record of these proceedings, Petitioner requested that he be granted the relief he requested in the Section 2255 Motion. Alternatively, he requests that the Court re-open the evidentiary hearing with respect to Claim III, as requested in the contemporaneously filed motion.

Michael Wiseman
Victor Abreu
James McHugh
Elizabeth Larin
Federal Community Defender
Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520

Counsel for Petitioner
Alfred Bourgeois

Dated:        February 1, 2011
              Philadelphia, Pennsylvania

32

USCA5 5485

**Certificate of Service**

I, Michael Wiseman, hereby certify that on this 1st day of February, 2011 the foregoing has been served upon the following persons by filing the same with the Court's ECF Filing System:

Tony Roberts
Patti Booth
Mark Dowd
Elas Salinas-Patterson

/s/ Michael Wiseman

Michael Wiseman

33

USCA5 5486

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA,           §
   Respondent-Plaintiff            §
                                  §      CR C-02-216
vs.                                 §      CV C-07-223
                                  §
ALFRED BOURGEOIS,                   §
   Petitioner-Defendant            §

GOVERNMENT'S UNOPPOSED MOTION FOR EXTENSION OF TIME
TO RESPOND TO PETITIONER'S POST-ARGUMENT SUBMISSION

I.

On January 13, 2011, at the close of argument on Mr. Bourgeois's Motion filed

pursuant to 28 U.S.C. § 2255, the court invited the parties to file written summations

of their analysis of the evidence and law as to Bourgeois's § 2255 claims.  The court

permitted Bourgeois 14 days to file his summation and the government 10 days to

respond.  On January 18, 2011, Bourgeois announced his intention to file his

summation within 14 days, or February 1, 2011.  On February 1, 2011, at

approximately 8:40 PM, Bourgeois filed his summation.  The government learned of

the filing the next morning, February 2, 2011.  The government seeks a four (4) day

extension of time to respond to his summation.

II.

The undersigned requests the additional four (4) day extension of time on behalf

USCA5 5487

of the government and the assigned Assistant United States Attorney.  The extension

is necessary in order for the government to finalize its response.

Not counting January 13th, when the court invited Mr. Bourgeois to file a

written summation, Mr. Bourgeois had a full 18 days to file his summation the

evening of February 1, 2011.  Mr. Bourgeois's written summation is 34 pages long

and contains a detailed analysis of the pertinent trial record, evidenced adduced for the

§ 2255 Motion, and relevant law.

In order to respond to Mr. Bourgeois's summation in a meaningful manner, the

government needs a few more days than the ten days allotted. For these reasons, the

United States respectfully requests that its briefing schedule be extended four (4) days,

to and including February 16, 2011.  If the government is able to complete the subject

response in less time, it will, of course, do so.

Respectfully submitted,

JOSE ANGEL MORENO
United States Attorney

/s/ Mark M. Dowd
MARK M. DOWD
Assistant United States Attorney
P.O. Box 61129
Houston, Texas  77208
(713) 567-9102

USCA5 5488

# CERTIFICATE OF CONSULTATION

I, Mark M. Dowd, Assistant United States Attorney, certify that on February 3, 2011, I consulted with Mr. Michael Wiseman, Counsel for Mr. Bourgeois, regarding the instant Motion, who advised he was unopposed to the Motion.

/s/ Mark M. Dowd
MARK M. DOWD
Assistant United States Attorney

-3-

USCA5 5489

# CERTIFICATE OF SERVICE

I, Mark M. Dowd, Assistant United States Attorney, certify that a copy of this

motion for extension will be served upon Counsel of Record by electronic notice upon

filing this Motion electronically with the court.


/s/ Mark M. Dowd
MARK M. DOWD
Assistant United States Attorney

USCA5 5490

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA,　　§
　　Respondent-Plaintiff　　　　§
　　　　　　　　　　　　　　§　CR C-02-216
vs.　　　　　　　　　　　　§　CV C-07-223
　　　　　　　　　　　　　　§
ALFRED BOURGEOIS,　　　　§
　　Petitioner-Defendant　　　§

## ORDER (PROPOSED) GRANTING EXTENSION OF TIME

The Government's motion for a four (4) day extension of time to file its response to Mr. Bourgeois's written summation regarding his Petition to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody Under 28 U.S.C. § 2255 is hereby GRANTED. The United States shall file its summation response not later than February 16, 2011.

_____　　　　_____
Date　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE

USCA5 5491

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA          §
                                  §
VS.                               §    CRIMINAL ACTION NO. C-02-216
                                  §
ALFRED NMI BOURGEOIS              §

### ORDER GRANTING EXTENSION OF TIME

The Government's motion for a four (4) day extension of time to file its response to Mr.

Bourgeois's written summation regarding his Petition to Vacate, Set Aside, or Correct Sentence

by a Person in Federal Custody Under 28 U.S.C. § 2255, D.E. 650), is hereby GRANTED. The

United States shall file its summation response not later than February 16, 2011.

SIGNED and ORDERED this 7th day of February, 2011.

_____
Janis Graham Jack
United States District Judge

1 / 1

USCA5 5492

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA,                §
   Respondent-Plaintiff               §
                                      §
                                      §    CR C-02-216
   vs.                                  §    CV C-07-223
                                      §
ALFRED BOURGEOIS,                        §
   Petitioner-Defendant               §

GOVERNMENT'S UNOPPOSED SECOND MOTION FOR
EXTENSION OF TIME TO RESPOND TO PETITIONER'S
POST-ARGUMENT SUBMISSION

I.

On January 13, 2011, at the close of argument on Mr. Bourgeois's Motion filed pursuant to 28 U.S.C. § 2255, the court invited the parties to file written summations of their analysis of the evidence and law as to Bourgeois's § 2255 claims. The court permitted Bourgeois 14 days to file his summation and the government 10 days to respond. On January 18, 2011, Bourgeois announced his intention to file his summation within 14 days, or February 1, 2011. On February 1, 2011, at approximately 8:40 PM, Bourgeois filed his summation. The government learned of the filing the next morning, February 2, 2011. The government sought and obtained an unopposed four (4) day extension of time to respond to his summation.

However, circumstances beyond the government's control suggest the government cannot meet its present deadline. AUSA Tony Robert's, who is

USCA5 5493

addressing the jurisdictional argument, was called up for military duty all last week due to an airplane crash on Saturday, which prevented him from working on the government's written summation. This week he is attending mandatory management training in South Carolina until Thursday. Frankly, the government did not expect the jurisdictional issue to garner the depth of focus presented in Mr. Bourgeois's final summation. Twenty-four pages of Mr. Bourgeois's summation are dedicated to the jurisdictional issue. Mr. Roberts needs to review the transcripts of the final arguments on January 13, 2011 (which are presently unavailable to him), in order to finalize the government's written summation on the jurisdictional issue. Accordingly, the government seeks a two (2) day extension in which to its written summation.

## II.

The undersigned requests the additional two (2) day extension of time on behalf of the government and the assigned Assistant United States Attorney. The extension is necessary in order for the government to finalize its response.

Not counting January 13th, when the court invited Mr. Bourgeois to file a written summation, Mr. Bourgeois had a full 18 days to file his summation the evening of February 1, 2011. If granted the additional two days will give the government sixteen days to file its written summation.

For these reasons, the United States respectfully requests that its briefing

-2-

USCA5 5494

schedule be extended two (2) days, to and including February 18, 2011.  If the

government is able to complete the subject response in less time, it will, of course, do

so.

Respectfully submitted,

JOSE ANGEL MORENO
United States Attorney

/s/ Mark M. Dowd
MARK M. DOWD
Assistant United States Attorney
P.O. Box 61129
Houston, Texas  77208
(713) 567-9102

-3-

USCA5 5495

## CERTIFICATE OF CONSULTATION

I, Mark M. Dowd, Assistant United States Attorney, certify that on February 15, 2011, I consulted with Mr. Michael Wiseman, Counsel for Mr. Bourgeois, regarding the instant Motion, who advised he was unopposed to the Motion.

/s/ Mark M. Dowd
MARK M. DOWD
Assistant United States Attorney

-4-

USCA5 5496

**CERTIFICATE OF SERVICE**

I, Mark M. Dowd, Assistant United States Attorney, certify that a copy of this

motion for extension will be served upon Counsel of Record by electronic notice upon

filing this Motion electronically with the court.


/s/ Mark M. Dowd
MARK M. DOWD
Assistant United States Attorney

USCA5 5498

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Respondent-Plaintiff | § | |
| | § | CR C-02-216 |
| vs. | § | CV C-07-223 |
| | § | |
| ALFRED BOURGEOIS, | § | |
| Petitioner-Defendant | § | |

## ORDER (PROPOSED) GRANTING EXTENSION OF TIME

The Government's motion for an additional two (2) day extension of time to file

its response to Mr. Bourgeois's written summation regarding his Petition to Vacate,

Set Aside, or Correct Sentence by a Person in Federal Custody Under 28 U.S.C. §

2255 is hereby GRANTED.  The United States shall file its summation response not

later than February 18, 2011.


_____          _____
Date                              UNITED STATES DISTRICT JUDGE

-6-

USCA5 5499

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA      §

§

VS.      §     CRIMINAL ACTION NO. C-02-216

§

ALFRED NMI BOURGEOIS      §

## ORDER GRANTING EXTENSION OF TIME

The Government's motion for an additional two (2) day extension of time to file its response to Mr. Bourgeois' written summation regarding his Petition to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody Under 28 U.S.C. §2255 (D.E, 652) is hereby GRANTED. The United States shall file its summation response not later than February 18, 2011.

SIGNED and ORDERED this 15th day of February, 2011.

_____
Janis Graham Jack
United States District Judge

1 / 1

USCA5 5500

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Respondent, | § | |
| | § | |
| vs. | § | CR. No. C-02-216 |
| | § | C.A. No. C-07-223 |
| ALFRED BOURGEOIS, | § | |
| Petitioner. | § | |

GOVERNMENT'S RESPONSE TO PETITIONER'S
POST-ARGUMENT SUBMISSION AND
OPPOSITION TO MOTION TO REOPEN EVIDENTIARY HEARING

TO THE HONORABLE JUDGE OF SAID COURT:

The United States of America, hereinafter "the government," by and through

the United States Attorney for the Southern District of Texas, files this Response to

Petitioner's Post-Argument Submission. This response includes the government's

opposition to Petitioner's Motion to Reopen the Evidentiary Hearing.

On January 13, 2011, at the close of oral argument on Petitioner's Motion filed

pursuant to 28 U.S.C. § 2255, this Court invited the parties to file written summations

of their analysis of the evidence and law as to Bourgeois's § 2255 claims. Petitioner

USCA5 5501

filed his summation on February 1, 2011.  The government's response is currently due on February 18, 2011.

## I.  Background

This Court held an evidentiary hearing in September 2010 to address a number of issues raised in Petitioner's 2255 Motion.  This Court initially limited the hearing to four days – two and a half days for Petitioner and one and half days for the government – and excluded some issues from the evidentiary hearing because those issues could be adequately decided on the record.  However, this Court generously and repeatedly expanded the time and manner in which Petitioner could present evidence and make the record.  This Court permitted Petitioner to depose a number of witnesses both before and after the evidentiary hearing.  Moreover, after concluding that Petitioner's challenge to the original jurisdiction of the underlying prosecution did not warrant or necessitate an evidentiary hearing, this Court went out of its way to permit Petitioner to make a record of Petitioner's challenge to the jurisdiction.  This included permitting the deposition of Dr. Leestma on January 10, 2011; a deposition that solely addressed the jurisdictional issue.

The government participated in the deposition with very minimal opportunity to prepare for the cross examination of the expert witness.  Dr. Leestma's report was provided to the government on Friday, late in the afternoon, January 7, 2011.  Thus,

2

USCA5 5502

the government had less than three days to review Dr. Leestma's highly technical testimony. Nevertheless, had Dr. Leestma testified consistent with and within the confines of his submitted report, it is likely that the government would not have found it necessary to request any rebuttal from Dr. Rouse. However, Dr. Leestma made conclusions that were not contained in his written report, and provided testimony that was inconsistent with standard processes of routine medical examinations. Because Dr. Leestma diverted from his written report, the government requested permission to have Dr. Rouse's telephonic testimony at the hearing on January 13, 2011.

This Court permitted Dr. Rouse to testify by telephone on January 13, 2011. During direct examination, the government limited its questions to Dr. Rouse by focusing upon specific testimony presented by Dr. Leestma and asking Dr. Rouse to comment on that testimony. One key distinction between Dr. Leestma and Dr. Rouse's testimony was Dr. Leestma's myopic focus upon the "medical evidence" to the exclusion of any circumstances reported by witnesses regarding when the victim decomposed. Based upon just the medical evidence, Dr. Leestma claimed the fatal injuries could not have occurred when the victim was on the Naval Station. Contrarily, Dr. Rouse testified that there were injuries that were one to three days old, and that non-medical evidence indicated that the victim decomposed after fatal injuries were inflicted while Petitioner was apparently located on the Naval Station.

3

USCA5 5503

## II. Opposition to Motion to Reopen the Evidentiary Hearing

The government opposes Petitioner's motion to reopen the evidentiary hearing. This Court has given Petitioner a great deal of latitude in presenting evidence in support of Petitioner's many issues. This Court initially ruled that Petitioner's jurisdictional challenge did not merit an evidentiary hearing. However, this Court ultimately permitted Petitioner to present some evidence in support of its jurisdictional challenge. Petitioner claims that the "deposition and testimony of Dr. Leestma and Rouse raise additional questions about this Court's lack of jurisdiction." (Petitioner's Motion to Reopen, p. 2). To the contrary, Dr. Rouse's testimony at trial and testimony on January 13, 2011, conclusively support a finding that proper jurisdiction lies with this Court.

> [the victim] has injuries that fit with the timing she was on the [military] base. The description by witnesses of what occurred on the [military] base certainly would explain the injuries, would explain the trauma to the brain and would explain her clinical course.

(Dr. Rouse's Testimony, January 13, 2011 Transcript, p. 32). While Dr. Rouse was not able to pin-point the exact time of any specific injury sustained by the victim based solely upon the medical evidence, neither Dr. Rouse nor the jury were required to ignore the eye-witness testimony of what occurred at the final stop on the Naval Base in reaching a conclusion that the fatal injury occurred on the Naval Base.

4

USCA5 5504

As with many other issues during the course of this habeas process, Petitioner's counsel seeks to have this Court view evidence narrowly based upon a defense expert's opinion but without reference or reliance upon other contextual evidence. Petitioner's counsel then asks this Court to reach conclusions that are contrary to the great weight of the evidence. Dr. Leetsma's conclusions should be disregarded by this Court because he refuses to consider anything other than the medical condition of the child's brain in reaching his conclusion that the fatal injury could not have occurred when the victim was on the Naval Station. Moreover, there is a serious question about Dr. Leetsma's credibility due to his admitted "equivocation" between his conclusions espoused during his deposition and the statements within his report. (Dr. Leetsma's Deposition Testimony, pages 83-84). Ultimately, Dr. Leetsma testified that there was not "sufficient scientific evidence to conclude that the child ... died as a result of an injury that was inflicted on the naval base," but he would not consider anything other than the medical evidence in making his decision. Dr. Leetsma's testimony alone might cause a jurist to question whether this Court has sufficient jurisdiction. However, when Dr. Leetsma's opinion is placed in context with the remaining record evidence in this case, and in light of Dr. Rouse's rebuttal to Dr. Leetsma's conclusions, the answer to the question of jurisdiction becomes

5

USCA5 5505

clear.  Petitioner has not sufficiently established a basis to reopen the evidentiary

hearing.  As such, his motion to reopen should be denied.

### III.  Response to Petitioner's Jurisdiction Issue

As Petitioner notes, this Court has expressed "skepticism" regarding the merits

of Petitioner's challenge to jurisdiction.  That skepticism is well founded as the

substance of this claim originally rested upon Petitioner's misapplication of a few

words in a neurology report that was not even entered into evidence at trial.  Now,

Petitioner encourages this Court to analyze this single issue from a premise that is

wholly contrary to the defense theory of the case; "for purposes of the following

analysis, this Court may accept that Mr. Bourgeois committed the acts that led to his

daughter's death."  (Petitioner's Post-Argument Submission, p.4).  It is not clear

whether Petitioner himself would actually agree with counsel's submission

considering that Petitioner has always maintained that he did not injure his daughter.

In any event, it is not intellectually honest to suggest that certain facts should be

altered in order to accurately evaluate a specific legal claim that rests among many

other legal claims. However, that is essentially how Petitioner approaches every issue

raised in his 2255 Motion.  He desires this Court to consider his claims in light of

only part of the evidence on many issues, and now, he asks this Court to invert his

prior position in order to frame his issue in a manner that he deems to present a better

6

USCA5 5506

context in which to prevail on his jurisdictional claim. The government suggests that this Court consider this issue, and every other issue, in light of the entire evidence to reach the appropriate and accurate conclusions upon the record as a whole.

The record as a whole establishes that Petitioner murdered his daughter within the special maritime and territorial jurisdiction of the United States. The case law in this Circuit appears to only require the jurisdictional element to be established by a preponderance of the evidence. *United States v. Bell*, 993 F.2d 427, 429 (5th Cir. 1993). Dr. Rouse performed the autopsy and determined that the injuries that caused the child's death were all "recent." Dr. Rouse testified at trial and reconfirmed during the January 13, 2011 hearing that the child's injuries and cause of death were consistent with the witness account of Petitioner slamming the child's head against the window in his truck four times. The chronology of events immediately after Petitioner's final assault on the child only permit one conclusion; that the final assault occurred while Petitioner was parked at the warehouse on the Naval Station. There is no evidence suggesting that Petitioner drove his truck another inch after committing the final assault. As such, the evidence at trial firmly established the jurisdictional element and nothing Petitioner has presented in his instant motion proves otherwise.

USCA5 5507

Petitioner cites the government's closing argument as evidence that the government failed to prove the jurisdictional element. Importantly, counsel's closing argument itself does not qualify as "evidence." In any event, Petitioner's analysis of the government's closing argument as a trial theory reveals a fundamental flaw in how the Federal Public Defender has approached many issues in this Motion. While clearly advancing very intellectual and theoretical points in his arguments, Petitioner's counsel does not account for foundational trial litigation techniques. For instance, he asserts that the government's argument that the killing was a "systematic execution" somehow excludes a conclusion that the "fatal blows were struck on federal land." However, it is common for trial counsel in closing argument to rely upon clear inferences from the evidence and to focus upon the issues that are being contested. It is very common for a trial attorney to mention only some elements of a crime and not argue about elements that are either conceded by the defendant or clearly established by the evidence. That is exactly what occurred here.

Even if the government was required to address every element in its closing argument, there is a portion of the closing rebuttal argument that impliedly addresses the jurisdictional element. In the closing rebuttal argument, the government articulated the manner of death reminding the jury how the defendant held the child up and slammed her into the window four times, she went limp and they exit the

8

USCA5 5508

truck. [Trial Transcript, March 16, 2004, DOC 339, p53].   Because the evidence demonstrated that the only time Petitioner and his daughter exited the truck after the fatal blows was on the Naval Station, this argument impliedly includes an argument that the fatal blows occurred on the Naval Station.

Petitioner then adds an argument that this Court expressly prohibited during the habeas hearings.   At the January 13, 2011 hearing, Mr. Wiseman attempted to cross examine Dr. Rouse with the government's work-product notes.   (Hearing Transcript, Jan 13, 2011, p. 50-51).   Notwithstanding this Court's clear ruling, Mr. Wiseman has now attached those very notes to his pleading and asks this Court to inquire about why the prosecutor's notes state "If incident occurred off mil base - NO Jurisdiction!."  Mr. Wiseman's attempt to side step this Court's clear ruling is highly inappropriate.   The work product of an attorney is rarely permitted to be used as evidence, and even when admitted, it is only admitted for very limited purposes. Here, the referenced and quoted statement is nothing more than an accurate statement - the federal government would not have jurisdiction in this case if the fatal blows occurred off the Naval Base.   Counsel's submission of this document is an attempt to bring evidence into the record that was specifically denied by this Court at the hearing.   That document proves nothing with regard to Dr. Rouse's testimony and ability to date the fatal injury.

9

Petitioner claims that Dr. Rouse "assiduously avoided ever attempting to date the fatal blows." (Petitioner's Post-Argument Submission, p.7). She did not avoid it. First, defense counsel at trial did not identify the jurisdiction as an issue to be challenged at trial. Petitioner claims that is ineffective assistance of counsel. The government responds that jurisdiction was not an issue because the evidence as a whole firmly established jurisdiction, and defense counsel are not constitutionally required to raise frivolous claims. Secondly, Dr. Rouse did testify that the injuries were "recent" and averred that the witness testimony of how the child was killed inside the truck while parked on the Naval Station is consistent with the fatal injuries. During the January 13, 2011 hearing, Dr. Rouse acknowledged that the medical evidence alone enabled her to only pin-point the timing of those fatal injuries to one to three days prior to the victim's death. However, Dr. Rouse answered affirmatively when asked if what could be observed about the subdural hematoma is "consistent with an injury that was inflicted within the 24-hour period that [the victim] was on the Corpus Christi Naval Air Station." (Transcript from January 13, 2011 hearing, p. 27). Dr. Rouse's testimony is substantive evidence affirming that this Court has proper jurisdiction in this case.

Petitioner also asserts that Dr. Rouse was not able to recall what other witnesses confirmed that the child was conscious and awake prior to the fatal blows

10

USCA5 5510

that caused the child to clinically decompose.    (Petitioner's Post-Argument Submission, p.9).    Petitioner asserts this failure to identify such witnesses as a foundational reason for reopening the evidentiary hearing.  However, the government again notes that it was Petitioner himself that testified under oath that the child was singing her ABC's immediately prior to the fatal blows.  While Petitioner's counsel suggests that reliance upon Petitioner's testimony is weak, it is precisely such statements from Petitioner that likely caused the defense counsel at trial to believe that jurisdiction was not an issue.  In any event, there is no apparent reason for Petitioner to fabricate the statement that the child was singing her ABC's while Petitioner was broken down on the Naval Station.  Absent a good reason to reject such a statement, it can be some evidence that a medical examiner could consider in attempting to determine when a victim might have clinically decomposed.

Petitioner claims there were other blows that could have caused death. (Petitioner's Post-Argument Submission, p. 16).  However, there was no evidence that the victim both became immediately unconscious, limp, or had a "sad face," and died within the following 24 hours after any other blow.  Petitioner again relies upon Dr. Leestma's testimony and attempts to discredit the testimony of Petitioner's then 9-year-old daughter.  The government has already addressed the credibility issues of Dr. Leestma; his testimony is not reliable in reaching a sound conclusion with regard

11

USCA5 5511

to which injuries actually were fatal.  While Petitioner does not credit the testimony

of Petitioner's then 9-year old daughter, the jury clearly found the 9-year-old daughter

very credible.  She testified that when Petitioner was slamming the victim against the

window, the victim was "making a like real, real sad face." (Trial Transcript, March

4, 2004, DOC 245, p.39).  When the government later characterized this as the victim

going limp, it was simply a fair comment on the evidence.  It is not unreasonable to

conclude that the 9-year-old's description of a "real, real sad face" was simply her

way of saying "the child went limp."  Clearly, the testimony that described the victim

after the "sad face" established that the victim was limp and clinically decomposed.

Petitioner's entire argument can be summed up as the government failed to

prove its case with absolute certainty.  It is understandable to some extent that any

reasonable jurist would prefer to be absolutely certain about every fact and element

of every offense, particularly when a sentence of death is involved.  However, the

government is not required to prove it's case to an absolute certainty.  It is rare to

have an eye-witness to a murder, and perhaps even more rare to have a 7-year-old

witness a murder by her father of her sister and be articulate enough at the age of 9

to testify about the event.  The evidence does not satisfy every aspect to an absolute

certainty, but the evidence strongly and sufficiently established that Alfred Bourgeois

committed premeditated murder when he slammed his two-year-old daughter into the

12

USCA5 5512

window area of his truck while he was parked and preparing to unload his truck on the Corpus Christi Naval Air Station. As such, this Court should reject Petitioner's jurisdictional challenge in this case, both substantively and with regard to the ineffective assistance allegation.

IV.  Response to Petitioner's Ineffective Assistance Issue

A.      Factual Background Regarding Mitigation

An understanding of the factual background in developing and presenting mitigation evidence on behalf of Mr. Bourgeois is critical to evaluating Trial Counsel's performance.

B.      Pre-Trial Preparation

The record establishes Counsel moved quickly to initiate a mitigation investigation. Counsel initially contacted Dr. Mark Cunningham (mitigation expert) on June 30, 2003. (Evidentiary Hearing, Gilmore testimony, p. 177; Cunningham testimony, p. 186). Trial Counsel were not permitted to actually hire a mitigation expert until after the government announced they were seeking the death penalty. (Evidentiary Hearing, Cunningham testimony, p. 189). The government first gave that notice on July 16, 2003. (Evidentiary Hearing, Cunningham testimony, p. 206; Doc. 74).   Dr. Cunningham recommended Lisa Milstein (Milstein) as a mitigation investigator. (Evidentiary Hearing, Gilmore testimony, pp.178-79, 222; Cunningham

13

USCA5 5513

testimony, p. 197).  Milstein brought Gerald Bernstein on to assist her. (Evidentiary Hearing, Cunningham testimony, p. 198).

As Dr. Cunningham's curriculum vitae demonstrates, he is a highly experienced mitigation expert. Lisa Milstein's resume is also impressive, demonstrating years of mitigation investigation training and experience, as well as lecturing on mitigation and other capital punishment topics in North America as well as in Europe. (Milstein resume).  As well as being an experienced mitigation investigator, Gerald Bierbaum was also an attorney, experienced in death penalty cases. (Evidentiary Hearing, Bierbaum testimony, pp. 257-58, 277).  Once Trial Counsel were authorized, Counsel quickly hired Milstein and Bierbaum in the Summer of 2003. (Evidentiary Hearing, Bierbaum testimony, pp. 259-60).  On July 18, 2003, the court's scheduling order set a trial date for February 16, 2004. (Evidentiary Hearing, Cunningham testimony, p. 206).  According to Dr. Cunningham, mitigation investigations commonly take a year to complete. (Evidentiary Hearing, Cunningham testimony, p. 196). Dr. Cunningham opined that this seven month period would barely be enough time to complete a comprehensive mitigation investigation, and only if the investigation was pursued aggressively. (Evidentiary Hearing, Cunningham testimony, p. 196).  Dr. Cunningham outlined the

14

vast scope of the comprehensive inter-generational investigation necessary. (Evidentiary Hearing, Cunningham testimony, pp. 192-95).

C.    Mitigation Investigation

Despite being hired in mid-Summer of 2003, Milstein and Bierbaum didn't interview Mr. Bourgeois for Mr. Bourgeois's first formal interview regarding mitigation matters until October 23, 2003. (Evidentiary Hearing, Cunningham testimony, pp. 299-300; Bierbaum testimony, pp. 259-60). Although noting he was not a mental health expert, Bierbaum did not notice any symptoms or indications that Mr. Bourgeois was mentally retarded. (Evidentiary Hearing, Bierbaum testimony, p. 284-86). During this all-important first formal interview, Mr. Bourgeois denied he suffered child abuse of any kind. Mr. Bourgeois did, however, report a head injury from a motorcycle accident in 1984, which resulted in his being in a coma for as long as three months. (Evidentiary Hearing, Bierbaum testimony, p. 261). This coma claim was repeated by Mr. Bourgeois to Dr. Cunningham on February 7, 2004. (Evidentiary Hearing, Cunningham testimony, pp. 234-36, 239-41). The coma claim was corroborated by Claudia Williams, Mr. Bourgeois's sister. (See: Evidentiary Hearing testimony of Williams, pp. 83-87.) This head injury/coma revelation was a critical lead and would have guided the mitigation investigation. (Evidentiary Hearing, Bierbaum testimony, p. 264).

15

It turned out to be a false-alley.  This coma report was ultimately wholly refuted by medical records obtained by the government shortly before trial. (Tinker Interrogatories # 3; Evidentiary Hearing, Cunningham testimony, p. 241). Mr. Bourgeois maintained this ruse throughout the mitigation investigation.  Dr. Weiner, hired to perform a neurological evaluation of Mr. Bourgeois, relied upon the coma claims in making his neurological assessments of Mr. Bourgeois. (Evidentiary Hearing, Dr. Weiner's testimony, p. 210-11). His findings were bolstered by Mr. Bourgeois's alleged coma-producing head injury.  The fact that the head injury and coma was a fabrication greatly compromised Dr. Weiner's findings, and any value Dr. Weiner would have been as a mitigation witness.  The government advised the defense team that it was prepared to offer the subject medical report, refuting the coma claims, into evidence if Dr. Weiner testified. (Tinker Interrogatories, #3). Understanding the damage of exposing the jury to the coma fabrication, the defense decided not to call Dr. Weiner. (Id.).

Mr. Bierbaum's perception of Mr. Bourgeois was consistent with that of Counsel Gilmore, a highly experienced and esteemed defense attorney, experienced with mentally retarded clients (Evidentiary Hearing, Gilmore testimony, pp. 134, 136-39, 142, 145, 212, 214), who likewise never saw any indication that Mr. Bourgeois was mentally retarded.

16

USCA5 5516

These defense death penalty practitioners' view was further corroborated by the conclusions of Dr. Estrada, a well-respected psychiatrist, who had performed a competency and a psychological evaluation of Mr. Bourgeois pre-trial, and noted Mr. Bourgeois's "above-average intelligence and memory". (Dr. Estrada Deposition p. 46). These initial evaluations of Mr. Bourgeois's intelligence were important as it guided the focus and scope of the mitigation investigation.

The mitigation investigation appears to have progressed slowly from the outset. Despite having been hired in mid-Summer, a review of the emailed mitigation reports reveals that it was not until November 11, 2003, that Gerald Bierbaum communicated the "Investigative Plan" to Trial Counsel. And, it was not until a March 17, 2004 email from Mr. Bierbaum to Trial Counsel, that Mr. Bierbaum identified a series of educational, employment, medical, government and financial records needed for the investigation. This is not to say that Mr. Bierbaum was wholly at fault. He was not the primary investigator. He was brought on by Milstein, who was the primary investigator. We know now the reason the mitigation investigation became woefully behind schedule and had been terribly neglected by December, 2003. Milstein reportedly developed a serious personal problem, and fundamentally failed to perform her duties. (Evidentiary Hearing, Cunningham testimony, p. 211). When Bierbaum expressed his dismay over the lack of progress and the sub-standard quality of work

17

USCA5 5517

being performed by Milstein, Milstein came up with excuse after excuse, even claiming she was suffering from a neurological condition and was undergoing medical treatment. (Evidentiary Hearing, Bierbaum testimony, pp. 266-67). None of this was ever communicated to Trial Counsel, an extraordinary circumstance with which Trial Counsel were saddled. Although Dr. Cunningham complained of the quality of the mitigation interviews and reports immediately to Bierbaum, he didn't alert Trial Counsel of the sub-standard quality of the mitigation reports until February 7, 2004. (Evidentiary Hearing, Cunningham testimony, pp. 225, 231, 307). Despite the delay and substandard quality of the mitigation investigation to date, Dr. Cunningham decided not to proceed with his investigation or interview with Mr. Bourgeois until the mitigation investigators report was finished. (Evidentiary Hearing, Cunningham testimony, p. 211).

As the trial approached, and the mitigation investigators reported the investigation was not complete and would need six additional months, Trial Counsel approached the court for a continuance, which was rejected. (Evidentiary Hearing, Cunningham testimony, pp. 209, 213-15). The mitigation investigation was completed expeditiously thereafter. Both investigators noted the reluctance of family members to discuss childhood abuse by Mr. Bourgeois's mother. (Mitigation Reports to Counsel).

18

USCA5 5518

D.    The Penalty Phase

Following Mr. Bourgeois's conviction, the court conducted the penalty phase of the trial. In addition to the hideous facts offered at the guilt phase, the government offered other substantial evidence in support of the alleged aggravating factors, devastating to Mr. Bourgeois defense.  The jury heard Mr. Bourgeois physically beat his mother-in-law in front of toddlers. (Penalty Phase, Day 1, pp 35-38).  He beat his numerous wives regularly. (Penalty Phase, Day 1, pp 44, 48, 61-63, 99-102; Day 2, pp. 81, 82, 87).  He engaged in sadistic bullying of young children relatives. (Penalty Phase, Day 1, pp 50-56).  He physically abused toddler relatives. (Penalty Phase, Day 1, pp 70-74, 78 (3 year old girl); 82-84, (3 or 4 year old son)).  He attacked a U.S. Marshal, while in custody. (Penalty Phase, Day 1, pp 109-13).  He pulled gun on his aunt & cousin, threatening to kill them (Penalty Phase, Day 1, pp. 115-17, 123-24). He was seen to be indifferent to the victim. (Penalty Phase, Day 1, p. 134).  He hired a prisoner, he believed to be a hitman to kill family members, who offered evidence against him: (Penalty Phase, Day 1, pp 155-62;  Cousin Lisa Monroe; (Penalty Phase, Day 1, pp 156-57, 162, 189, 196-99; Day 2, 81, 83; Robin Bourgeois; (Penalty Phase, Day 1, pp 161-62; Gaynelle Collins Bourgeois). Finally, the victim's family impact testimony was nothing short of heart-wrenching. (Penalty Phase, Day 1, pp 220-41).

Equally damaging was evidence that Mr. Bourgeois possessed some level of

19

USCA5 5519

business acumen and financial aptitude. (Penalty Phase, Day 1, pp 197-205). The

Trial Counsel were diligent throughout the proceedings, objecting to prejudicial or

inadmissible evidence. (Penalty Phase, Day 1, pp. 132, 137, 158, 160, 164, Day 2, p.

76-78).

Dr. Carlos Estrada, Board certified Psychiatrist, (Penalty Phase, Day 1, p. 252)

with a Fellowship in mental retardation, p. 257, trained in psychoanalysis, pp. 256-59,

with special expertise in child abuse, has conducted numerous evaluations for this

court, pp. 260-263. Dr. Estrada conducted an extensive background investigation on

Mr. Bourgeois, p. 275. On direct examination, Dr. Estrada noted the lack of

corroboration of Mr. Bourgeois's report that he had been in a coma as a result of the

1984 accident. (Penalty Phase, Day 1, pp. 275-76). Dr. Estrada administered the

MMPI personality test, conducted a clinical interview, and reviewed available

collateral sources for the risk assessment. (Penalty Phase, Day 1, p. 278). Dr. Estrada

spent over three hours interviewing Mr. Bourgeois, and conducted a thorough

psychiatric risk assessment of Mr. Bourgeois. (Penalty Phase, Day 1, pp. 252, 269,

272). Dr. Estrada reviewed statements by many of the witnesses who testified at trial,

pp. 269, 270, including family members, who reported Mr. Bourgeois's abuse at the

hands of his mother, rejection and abandonment; he reviewed 4 letters Mr. Bourgeois

wrote to Robin Bourgeois, Anthony Dumas, and Sherry Smith. (Penalty Phase, Day

20

USCA5 5520

1, p. 271).  Dr. Estrada listened to several recorded telephone conversations of Mr.

Bourgeois. (Penalty Phase, Day 1, p. 271). Dr. Estrada observed Mr. Bourgeois

throughout the trial, (Penalty Phase, Day 1, pp. 252, 272), collecting any additional

information available on Mr. Bourgeois, including the psychological reports of Drs.

Weiner and Cunningham[1], (Penalty Phase, Day 1, p. 272), and the psychological

report from a Sheriff's Office job application, when Mr. Bourgeois was 23 years old.

(Penalty Phase, Day 2, pp. 18-19).

> "My conclusions are that he meets a number of specific items that have
> been found associated with violence, and they include items in his
> background that we found, sadly enough, repeatedly occurring in
> children, and then leading to violence as adults. Particularly, we've
> found that being a subject of rejection, neglect, and abandonment, bing
> a survivor of actual physical or sexual or emotional abuse have a very
> high predisposition for violence as adults." .... So in terms of the
> background, I found these 5 elements of the background that Mr.
> Bourgeois shares with a group of individuals that show violent behavior
> as adults.  In terms of his personality, we look for 3 things in the
> assessment of personality. Number one, we look for items that will
> decrease the capacity for self-control, such as ... poor intelligence or
> judgment or poor control of emotions, whether its due to illness or to
> alcohol or to mental retardation ..."

(Penalty Phase, Day 1, pp.282-84).

---

[1] Upon hearsay objection, Dr. Estrada was ordered not to refer to Dr. Weiner's report, which had been excluded for all purposes. (Penalty Phase, Day 2, pp. 25-33), or to any aspects of Dr. Cunningham's report, which relied upon Dr. Weiner's report, specifically including allegations of sexual abuse of Mr. Bourgeois.

USCA5 5521

Dr. Estrada made several other damaging assessments of Mr. Bourgeois, "Mr. Bourgeois has the characteristics that in psychiatry we call a narcissistic personality disorder" ... an individual whose basic motivation in life is the aggrandizing of his self-esteem and importance". (Penalty Phase, Day 1, p. 284). "On the basis of the assessment of the background factors and his personality factors, my opinion is that Mr. Bourgeois has a much higher tendency toward violence than an ordinary person." (Penalty Phase, Day 1, p. 285). "Mr. Bourgeois' attitude throughout these proceedings has been one of a member of the defense team, and rather than the Defendant or the father of the victim." (Penalty Phase, Day 1, p. 286), even avoiding eye contact with his own 7 year old daughter. (Penalty Phase, Day 2, pp. 63-64).

On cross-examination, Trial Counsel essentially used Dr. Estrada effectively to analyze mitigation evidence known to him to the advantage of Mr. Bourgeois. On the basis of all the information obtained, Dr. Estrada concluded that Mr. Bourgeois was not truthful with him, when Mr. Bourgeois denied he had not been abused as a child. (Penalty Phase, Day 2, pp. 17, 22). Dr. Estrada noted that Mr. Bourgeois was vague and reluctant to discuss his childhood. However, after listening to the trial witnesses, Dr. Estrada concluded Mr. Bourgeois had been neglected by his parents, rejected by them, and abused by his mother, (Penalty Phase, Day 2, pp. 22-24, 44)

22

USCA5 5522

an illegitimate child, abandoned by his father, p. 24, and disciplined harshly as a child. (Penalty Phase, Day 2, p. 48).

Dr. Estrada explained that these factors did not excuse what Mr. Bourgeois had done, but provided a psychological explanation for what he had done. (Penalty Phase, Day 2, p. 24). Dr. Estrada explained that Mr. Bourgeois's narcissistic personality disorder was consistent with Mr. Bourgeois's childhood abuse and abandonment. (Penalty Phase, Day 2, p. 44). Dr. Estrada noted that Mr. Bourgeois was not a sociopath. (Penalty Phase, Day 2, p. 66).

Dr. Estrada explained that Mr. Bourgeois's reaction to the death of the victim (aloof, unemotional and otherwise preoccupied) is consistent with someone who abuses children and who has been abused themselves. (Penalty Phase, Day 2, pp. 36-39). Dr. Estrada explained that he had been hired by the government to evaluate whether Mr. Bourgeois's abuse of the victim was consistent with someone who had been abused as a child. Dr. Estrada testified that he had concluded that Mr. Bourgeois's abuse of the victim was wholly consistent with Mr. Bourgeois being abused as a child.

Dr. Estrada explained the psychological dynamic of the events resulting in the death of the child. At the time of the murder, Mr. Bourgeois was under a number of stresses: (1) his affair and his wife's discovery of his illegitimate child, (2) financial

23

USCA5 5523

stress, (3) serious marital problems with his wife, (4) and the confined space of the truck cab over a long period of time.  One minor event of the toilet spilling triggered an "explosion of anger" by Mr. Bourgeois against the child. (Penalty Phase, Day 2, p. 41).  Dr. Estrada explained that Mr. Bourgeois's violence was centered in intimate family settings, and opined that Mr. Bourgeois will adjust well in custody. (Penalty Phase, Day 2, p. 67).   Dr. Estrada's opinion adopted many of the findings of Dr. Cunningham, albeit in a shortened presentation, and without the pressure-cooker depiction. (Evidentiary Hearing, Cunningham testimony, pp. 261-75, 309-10). Although Dr. George Walker Holden was not permitted to testify regarding premeditation, Dr. Estrada's psychological explanation of how the murder occurred as the result of stressors culminating in Mr. Bourgeois's "explosion of anger" co-opted Dr. Holden's conclusion that the crime was not premeditated. (Evidentiary Hearing, Holden testimony, p. 11).

Trial Counsel then offered testimony that Mr. Bourgeois had been abused as a child.  Carl Henry, a close cousin, testified Mr. Bourgeois was abused by his mother. (Penalty Phase, Day 2, p. 113).  She whipped him with an extension chord. (Penalty Phase, Day 2, p. 115). And she hit him in the head with a telephone. (Penalty Phase, Day 2, p. 115).  He testified that Mr. Bourgeois had been teased about having no father.  (Penalty Phase, Day 2, p. 116). The Reverend Clayton (son of Mary

24

USCA5 5524

Clayton, with whom Mr. Bourgeois lived from pre-adolescent until the age of 16) testified Mr. Bourgeois had been abused by Mr. Bourgeois's mother. (Penalty Phase, Day 2, pp. 123, 125).

The mitigation evidence from family members that Mr. Bourgeois had been abused was not without cost. Even defense mitigation witnesses from the family were aware of allegations that Mr. Bourgeois beat young children. (Penalty Phase, Day 2, pp. 106-08, 110). In reading the mitigation reports there was more than suspicion that Mr. Bourgeois sexually molested young relatives.

Counsel developed any favorable evidence available; that Mr. Bourgeois was a hard-working man, and a good provider, and that sometimes times were happy and good. (Penalty Phase, Day 1, pp. 65, 103-04; Day 2, p. 46).

On Day 3, against his Counsels' advice, Mr. Bourgeois addressed the jury and proclaimed to the jury that he was innocent, that someone else had killed the child. (Penalty Phase, Day 3, p. 5).

V. Legal Analysis and Argument

A.    Preliminary Analysis:

There are several arguments Habeas Counsel has made which should be considered prior to evaluation of the substantive legal issues:

25

USCA5 5525

(1) To the extent Habeas Counsel argues that the court should not consider Trial Counsel's experience, courtroom skill or performance, the government disagrees. The court does not make its evaluation of ineffective assistance of counsel in a vacuum. The court should properly consider the considerable experience and courtroom skill of Counsel in its ineffective assistance evaluation.

This highlights the limitations of evaluating an attorney's performance by reading a sterile record. Appellate courts concede the limitation of the written record in making credibility determinations, which they leave to the jury or the trial court, because the appellate court was not there to see the presentation of the witnesses. It also ignores the membership of the jury, who will decide the case. There is a strong presumption that counsel's performance was reasonable and adequate, with great deference being shown to choices dictated by reasonable strategy. *Rogers,* 13 F.3d at 386; *see also Conklin v. Schofield,* 366 F.3d 1191, 1204 (11th Cir.2004), *cert. denied,* 544 U.S. 952, 125 S.Ct. 1703 (2005). "The presumption of reasonableness is even stronger when we are reviewing the performance of an experienced trial counsel." *Callahan v. Campbell,* 427 F.3d 897, 933 (11th Cir.2005).

(2) Habeas Counsel argues that, "Childhood sexual and physical abuse, low intelligence, organic brain dysfunction and other psychological deficits are the types of mitigating evidence that are commonly found presented in these cases".... "[T]his

26

USCA5 5526

type of evidence is required to be presented by the United States Supreme Court".

At oral argument Counsel used the analogy, "All the kids are doing it [presenting this

type of mitigation evidence] ".    To the extent Habeas Counsel seeks to classify

certain mental or psychological conditions as mitigation evidence *per se*, and which

should automatically be offered into evidence, the government disagrees, views any

such argument overly simplistic and contrary to the prejudice analysis required by

*Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052 (1984).

Each case, and each counsel's performance is judged on its own merits.

Counsel may well be justified in not introducing "mitigating" evidence. "The Sixth

Amendment entitles criminal defendants to the " 'effective assistance of counsel' "-

that is, representation that does not fall "below an objective standard of

reasonableness" in light of "prevailing professional norms." *Strickland v.*

*Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052 (1984) (quoting *McMann v.*

*Richardson,* 397 U.S. 759, 771, n. 14, 90 S.Ct. 1441 (1970)). That standard is

necessarily a general one. "No particular set of detailed rules for counsel's conduct

can satisfactorily take account of the variety of circumstances faced by defense

counsel or the range of legitimate decisions regarding how best to represent a

criminal defendant." *Bobby v. Van Hook*, 130 S.Ct. 13, 16 (2009) (quoting *Strickland*,

466 U.S., at 688-689, 104 S.Ct. 2052).  "There is no checklist for judicial evaluation

27

USCA5 5527

of attorney performance. Instead, the performance inquiry is on "whether counsel's assistance was reasonable considering all the circumstances" because no checklist for counsel's conduct "can take into account ... the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Woods v. Thaler*, 2010 WL 4272751, 7 (5th Cir. 2010) (quoting *Strickland,* at 688-89. Notwithstanding the constitutional stature of appropriate mitigating evidence in a capital case, counsel's failure to develop or present mitigating background evidence is not per se deficient performance. *Moore v. Johnson*, 194 F.3d 586, 615-22 (5th Cir. 1999), See *Ransom v. Johnson*, 126 F.3d 716, 723 (5th Cir.), *cert. denied*, 522 U.S. 944, 118 S.Ct. 361 (1997); *West*, 92 F.3d at 1408; *King v. Puckett*, 1 F.3d 280, 284 (5th Cir.1993). To the contrary, a considered strategic or tactical decision not to present mitigating evidence that is made after a thorough investigation of the law and facts relevant to all plausible lines of defense is presumed to be within the wide range of professionally reasonable assistance defined by *Strickland*, 104 S.Ct. at 2066; *Whitley*, 977 F.2d at 158; *Drew v. Collins*, 964 F.2d 411, 422 (5th Cir.1992); *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir.1992); *McCoy v. Lynaugh*, 874 F.2d 954, 964 (5th Cir.1989) (counsel's decision not to present mitigating evidence is entitled to deference when based upon an informed and reasoned practical judgment). Stated differently, *Strickland* requires that

28

we defer to counsel's decision not to present mitigating evidence or not to present a certain line of mitigating evidence when that decision is both fully informed and strategic, in the sense that it is expected, on the basis of sound legal reasoning, to yield some benefit or avoid some harm to the defense. *Strickland* does not, however, require deference to decisions that are not informed by an adequate investigation into the controlling facts and law. *Whitley*, 977 F.2d at 157-58; see also *Andrews v. Collins*, 21 F.3d 612, 623 (5th Cir.1994) (counsel's strategic decision entitled to deference because supported by an adequate investigation which included contact with at least 27 people); *Drew*, 964 F.2d at 423 (counsel's strategic decision entitled to deference because counsel made "reasonable inquiries" into Drew's mental state); *Wilkerson*, 950 F.2d at 1064-65 (affording strategic decision deference where record established the counsel retained an investigator to explore whether mitigating evidence relating to defendant's background or mental ability was available); *Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir.1990) ("Tactical decisions must be made in the context of a reasonable amount of investigation, not in a vacuum."); *McCoy*, 874 F.2d at 964 (finding scope of investigation reasonable where counsel investigated possibility of mitigating evidence by interviewing everyone on a list provided by the capital defendant and determined none of them had anything good to say about the defendant). Similarly, *Strickland* does not require deference to those

29

USCA5 5529

decisions of counsel that, viewed in light of the facts known at the time of the purported decision, do not serve any conceivable strategic purpose. See *Strickland*, 104 S.Ct. at 2061 ("Counsel may not exclude certain lines of defense for other than strategic reasons."); *Boyle v. Johnson*, 93 F.3d 180 (5th Cir.1996) (explaining basis for counsel's strategic decision not to offer mitigating evidence identified by the defendant), *cert. denied*, 519 U.S. 1120, 117 S.Ct. 968 (1997); *Whitley*, 977 F.2d at 158 ("Whether counsel's omission served a strategic purpose is a pivotal point in *Strickland* and its progeny. The crucial distinction between strategic judgment calls and just plain omissions has echoed in the judgments of this court.") (footnote omitted); *Bell v. Lynaugh*, 828 F.2d 1085, 1090 (5th Cir.1987) (when counsel makes an informed and considered decision not to present mitigating evidence, the issue becomes whether the decision was reasonable ); *Mattheson*, 751 F.2d at 1439-40 (explaining strategic purpose motivating counsel's decision to exclude evidence of mental impairment from sentencing phase); *Moore v. Maggio*, 740 F.2d 308, 315-19 (5th Cir.1984) (explaining basis of counsel's considered decision to limit investigation by excluding implausible lines of mitigating evidence).

(3)   Habeas Counsel argues the more heinous the facts, the more necessary mitigation evidence.  Again, the government disagrees with this simplistic analysis. As discussed above, whether to offer mitigation evidence is a complex evaluation by

30

USCA5 5530

Counsel, governed by much more than the heinous nature of the crime. The issue is governed by the *Strickland* analysis.

Granting the obvious motivation to offer psychological or mental health explanations for the crime to humanize the defendant and to counter any conclusion that the defendant is simply evil, the court must still consider whether such mitigation was credible, reasonably available, and would be effective in countering the conclusion the defendant simply acted upon evil impulses.

B.    Petitioner's burden:

1).   Counsel's standard of performance under *Strickland* and its progeny.

In a capital sentencing proceeding, "defense counsel has the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances." *Neal v. Puckett,* 239 F.3d 683, 688 (5th Cir.2001) (quoting *Baldwin v. Maggio,* 704 F.2d 1325, 1332-33 (5th Cir.1983)). Like any claim of ineffective assistance of counsel, we scrutinize the reasonableness of counsel's investigation in light of all relevant circumstances and give deference to counsel's decision to pursue a sound trial strategy. But in explaining how to assess investigation choices in *Wiggins v. Smith,* the Supreme Court noted: "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are

31

reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any effectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins,* 539 U.S. at 521-22 (quoting *Strickland,* 466 U.S. 690-91).

Did Counsel Conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances"?

The record establishes that Counsel moved quickly to initiate a mitigation investigation. Counsel initially contacted Dr. Mark Cunningham (mitigation expert) on June 30, 2003. (Evidentiary Hearing, Gilmore testimony, p. 177). Dr. Cunningham recommended Lisa Milstein (mitigation investigator). (Evidentiary Hearing, Gilmore testimony, pp.178-79, 222). Despite being hired in mid-Summer of 2003, Milstein and Bierbaum didn't interview Mr. Bourgeois for Mr. Bourgeois's first formal interview regarding mitigation matters until October 23, 2003. (Evidentiary Hearing, Cunningham testimony, pp. 299-300; Bierbaum testimony, pp. 259-60). Although noting he was not a mental health expert, Bierbaum did not notice any symptoms or indications that Mr. Bourgeois was mentally retarded. (Evidentiary Hearing,

32

Bierbaum testimony, p. 284-86). During this all-important first formal interview, Mr. Bourgeois did not report any child abuse. *Galloway v. Thaler*, 344 Fed.Appx. 64, 68-69, 2009 WL 2873910, 3 (5th Cir. 2009) (Petitioner failed to disclose sexual abuse to his attorneys despite their efforts to talk with him). This Court has consistently refused to hold attorneys responsible for introducing mitigation evidence that their client and other witnesses fail to disclose. *Johnson v. Cockrell*, 306 F.3d 249, 251-53 (5th Cir. 2002), *Soria v. Johnson,* 207 F.3d 232, 250-51 (5th Cir.2000); *West v. Johnson,* 92 F.3d 1385, 1408-09 (5th Cir.1996).

Mr. Bourgeois did, however, report a head injury which resulted in his being in a coma for two or three months in 1984. (Evidentiary Hearing, Bierbaum testimony, p. 261; Cunningham testimony, p. 234-36). The coma claim was corroborated by Claudia Williams, Mr. Bourgeois's sister. *See Strickland,* 466 U.S. at 691, 104 S.Ct. 2052 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.").

This head injury/coma revelation would have guided the mitigation investigation. It turned out to be a false-alley. This coma report was ultimately wholly refuted by medical records obtained by the government shortly before trial. (Interrogatories of Tinker, # 3; Evidentiary Hearing, Cunningham testimony, pp. 239-41). Mr. Bourgeois maintained this ruse throughout the mitigation investigation. Dr.

USCA5 5533

Weiner relied upon the coma claims in making his neurological assessments of Mr. Bourgeois. His findings were bolstered by Mr. Bourgeois's alleged coma-producing head injury. The fact that the coma was a fabrication greatly compromised Dr. Weiner's findings, and any value Dr. Weiner would have as a mitigation witness. The government advised the defense team that it was prepared to offer the subject medical report, refuting the coma claims, into evidence if Dr. Weiner testified. (See Tinker Interrogatories, # 3). *Smith v. Quarterman*, 471 F.3d 565, 576 (5th Cir. 2006) (would have been impeached on cross-examination with information that Smith and his mother had provided earlier to medical personnel and probation officers (regarding his head injury ...). So long as the decision not to introduce double-edged mitigating evidence was based on trial strategy rather than lack of investigation, "those questions are even less susceptible to judicial second-guessing." *Johnson v. Cockrell*, 306 F.3d at 251-53 (quoting *Kitchens v. Johnson,* 190 F.3d 698, 703 (5th Cir.1999)).

In addition to greatly undermining Dr. Weiner's findings, the impeaching evidence would have had an additional damaging impact on Mr. Bourgeois's case. It would have exposed Mr. Bourgeois and his sister as liars and successful manipulators of psychological experts, further compromising any beneficial psychological findings or presentation. See, e.g., *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 2474 (1986), *Basso v. Thaler*, 359 Fed.Appx. 504, 508, 2010

USCA5 5534

WL 28524, 3 (5th Cir. 2010) (unused mitigation evidence would have corroborated state's portrayal of Basso as a malingerer, manipulator and liar). Counsel made an informed trial decision not to use the potentially mitigating evidence because it could have a prejudicial backlash effect on the defense. Indeed, "[a] conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness". *Pondexter v. Quarterman*, 537 F.3d 511, 520 (5th Cir. 2008) *(quoting Crane v. Johnson,* 178 F.3d 309, 314 (5th Cir.1999)).

This coma false-alley was the product of Mr. Bourgeois, who fabricated the claim. In no way does responsibility for this misdirection of the mitigation investigation or the compromising of Dr. Weiner's findings accrue to the mitigation investigators or to Counsel. *Moody v. Polk*, 408 F.3d 141, 148-49 (4th Cir. 2005) (erroneous psychological report direct result of Petitioner's dishonesty, and not ineffective assistance of counsel), *Thomas v. Taylor,* 170 F.3d 466, 471 (4th Cir.1999).

Mr. Bierbaum's perception was consistent with that of Counsel Gilmore, a highly experienced and esteemed defense attorney experienced with mentally retarded clients (Evidentiary Hearing, Gilmore testimony, pp. 134, 136-39, 142, 145, 212, 214), who likewise never saw any indication that Mr. Bourgeois was mentally

35

USCA5 5535

retarded.  Although not mental health experts, Counsel may reasonably rely upon their own perceptions regarding their client's level of intelligence, and it may reasonably guide their trial strategies. *Riley v. Dretke*, 362 F.3d 302, 306-07 (5TH Cir. 2004) (Furthermore, because his own impressions led Wright to believe that Riley was not mentally retarded, Wright reasonably believed that the jury could have reached the same conclusion), *Boyd v. Johnson*, 167 F.3d 907, 910-11 (5TH Cir. 1999) (The evidence of Boyd's retardation must be considered in tandem with the impressions that he gave the attorneys. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.... In particular, what investigation decisions are reasonable depends critically on such information." *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. Boyd's attorneys testified that they did not believe Boyd was retarded, based on their observations and interactions with him, and the district court found this testimony to be credible).

These death penalty practitioners' view was corroborated by the conclusions of Dr. Estrada, a well-respected psychiatrist, who had performed a competency and a psychological evaluation of Mr. Bourgeois, and noted Mr. Bourgeois's above average intelligence level. (Dr. Estrada's Deposition, p. 46). These initial evaluations of Mr. Bourgeois's intelligence were important as it guided the focus and scope of the mitigation investigation.    In all, Trial Counsel and the mitigation investigators

36

interviewed more than 50 witnesses, at least once, in pursuit of beneficial mitigation evidence. (See Penalty Phase, Day 3, pp. 14-15; Evidentiary Hearing, Gilmore testimony, p. 184).

Both mitigation investigators observed in their reports to Trial Counsel that Mr. Bourgeois's family members were reluctant to discuss any child abuse by Mr. Bourgeois's mother. This reluctance diminished following the mother's death, which occurred following the trial but prior to this proceeding. (Evidentiary Hearing, Cunningham testimony, p. 279-80).

The record demonstrates Counsel conducted a reasonably substantial, independent investigation into potential mitigating circumstances.

Did Counsel place any limitation on the mitigation investigation? There's no indication in the record that Trial Counsel limited the mitigation investigation. As will be discussed, the mitigation investigators worked semi-autonomously from Trial Counsel, pursuing leads as they developed.

Trial Counsel did decide not to put certain mitigation evidence gathered before the jury. A critical factor guiding these decisions was Mr. Bourgeois unwavering defense that he did not commit the crime, rather that his wife committed the crime. (See Penalty Phase, Day 3, pp. 23-24; Evidentiary Hearing testimony, Gilmore, pp. 144-45, 178, 183). Mr. Bourgeois provided Trial Counsel with explicit instructions

37

USCA5 5537

to pursue this line of defense throughout the trial. (Evidentiary Hearing testimony, Gilmore, pp. 149-74).  Mr. Gilmore testified they didn't put on some of the psychological testimony because it presumed that Mr. Bourgeois had committed the offense, a position completely contrary to Mr. Bourgeois's guilt phase defense.  Mr. Bourgeois concurred with Trial Counsel's decisions in this regard. (Evidentiary Hearing testimony, Gilmore, pp. 182-83).

Although Habeas Counsel seems to argue that a conflict between the guilt defense and mitigation defense is irrelevant in evaluating Trial Counsel's decision not to offer such conflicting mitigation evidence, the ABA Guidelines and relevant caselaw is contrary to Habeas Counsel's position. The ABA Guidelines[23], which

---

[2] AMERICAN BAR ASSOCIATION GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES.

[3] *Strickland* stressed, however, that "American Bar Association standards and the like" are "only guides" to what reasonableness means, not its definition. 466 U.S., at 688, 104 S.Ct. 2052. We have since regarded them as such. See *Wiggins v. Smith,* 539 U.S. 510, 524, 123 S.Ct. 2527 (2003). What we have said of state requirements is *a fortiori* true of standards set by private organizations: "[W]hile States are free to impose whatever specific rules they see fit to ensure that criminal defendants are well represented, we have held that the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Roe v. Flores-Ortega,* 528 U.S. 470, 479, 120 S.Ct. 1029 (2000). *Bobby v. Van Hook*, 130 S.Ct. 13, 17 (2009).

38

USCA5 5538

Habeas Counsel has cited repeatedly to the court, counsel that a unified defense should be pursued and maintained.

> "Formulation of and adherence to a persuasive and understandable defense theory are vital in any criminal case. In a capital trial, the task of constructing a viable strategy is complicated by the fact that the proceedings are bifurcated. The client is entitled to have counsel insist that the state prove guilt beyond a reasonable doubt. [FN255] At the same time, if counsel takes contradictory positions at guilt/innocence and sentencing, credibility with the sentencer may be damaged and the defendant's chances for a non-death sentence reduced. Accordingly, it is critical that, well before trial, counsel formulate an integrated defense theory [FN256] that will be reinforced by its presentation at both the guilt and *1048 mitigation stages. [FN257] Counsel should then advance that theory during all phases of the trial, including jury selection, witness preparation, pretrial motions, opening statement, presentation of evidence, and closing argument." 31 Hofstra L. Rev. 913, 1047 -1048 (Summer2003).

> "The Importance of an Integrated Defense During the investigation of the case, counsel should begin to develop a theme that can be presented consistently through both the first and second phases of the trial. Ideally, "the theory of the trial must complement, support, and lay the groundwork for the theory of mitigation." [FN272] Consistency is crucial because, as discussed in the commentary to Guideline 10.10.1, counsel risks losing credibility by making an unconvincing argument in the first phase that the defendant did not commit the crime, then attempting to show in the penalty phase why the client committed the crime. [FN273] First phase defenses that seek to reduce the client's culpability for the crime (e.g., by negating intent) rather than to deny involvement altogether are more likely to be consistent with mitigating evidence of mental illness, retardation, domination by a co-defendant, substance abuse, or trauma. [FN274] But whether or not the guilt phase defense will be that the defendant did not *1060 commit the crime, counsel must be prepared from the outset to make the transition to the penalty phase. [FN275]".

39

USCA5 5539

31 Hofstra L. Rev. 913, 1059-60 (Summer2003). See: *Harris v. Vasquez*, 949 F.2d 1497, 1525 (9th Cir. 1990), "It was clearly within the "wide range of professionally competent assistance" for Ryan to choose not to present a psychiatric defense theory that could conflict with his alibi defense and his mitigation based on Harris's alleged remorse and his abusive childhood. It is also acceptable trial strategy to choose not to call psychiatrists to testify when they can be subjected to cross-examination based on equally persuasive psychiatric opinions that reach a different conclusion."

Here, Trial Counsel, with Mr. Bourgeois's concurrence, decided not to call Dr. Cunningham. One of the factors guiding this decision was the premise of Dr. Cunningham's prepared presentation that Mr. Bourgeois had committed the crime. Another reason was the government had an expert from the Bureau of Prisons, who would have countered Dr. Cunningham's prison risk assessment relating to murders committed in prison by capital prisoners. (Evidentiary Hearing, Cunningham testimony, pp. 289-95). This strategic decision was reasonable under the circumstances and consistent with Mr. Bourgeois's instructions to Counsel.

Habeas Counsel argues that the development and presentation of the mitigation evidence was wholly compromised by Trial Counsel's failure to supervise and coordinate the mitigation investigation, resulting in a fatally flawed and untimely investigation. Habeas Counsel argues the email traffic between the mitigation

40

USCA5 5540

investigators and Trial Counsel demonstrate Trial Counsel were deficient in supervising the mitigation investigators.

Although Habeas Counsel argues that Trial Counsel were ignorant as to the process and mechanics of developing mitigation evidence, the record rebuts this claim. Trial Counsel were both highly skilled death penalty practitioners. They were well aware of the importance of mitigation evidence and its presentation. Habeas Counsel points to some confusion between Trial Counsel, the mitigation specialists and Dr. Cunningham regarding whether the specialists were to send their reports directly to Dr. Cunningham or through Counsel. In one email between Counsel and Dr. Cunningham's assistant, Counsel seemed unsure whether the specialists would forward the mitigation reports directly to Dr. Cunningham. (Evidentiary Hearing, Cunningham testimony, pp. 303-08). Counsel asked Dr. Cunningham's assistant if the mitigation reports would be sent directly to Dr. Cunningham. Although the assistant forwarded Counsel's email to Dr. Cunningham, there's no indication that either Dr. Cunningham or the assistant responded to Counsel's question. (Id.). This confusion does not suggest Counsel were unaware of the substance of the mitigation investigation process, but perhaps of the procedure normally used by Dr. Cunningham and the specialists he recommended. Contrary to Dr. Cunningham's conclusion that Trial Counsel were unfamiliar with mitigation investigations on the basis of this

USCA5 5541

subject email, Dr. Cunningham's instructions to Trial Counsel would suggest that the mitigation reports would flow directly to Dr. Cunningham, without the supervision of Counsel.    In Dr. Cunningham's Declaration (Doc. 397-1, p. 112 of 191), Dr. Cunningham reported that he explained to Mr. Gilmore the role of the mitigation specialists, "I explained that the performance of an adequate forensic psychology evaluation required a comprehensive psycho-social investigation of adverse developmental and other mitigating factors by a mitigation investigator. I outlined that this mitigation investigator would gather all available records regarding the defendant's history, identify relevant family and other third parties such as teachers and coworkers, interview these individuals, and provide me with interview summaries and a life event time line.  My own interviews and evaluation could not reasonably begin prior to this investigation".

The undersigned has reviewed the correspondence with reports offered at the evidentiary hearing between the investigators, Dr. Cunningham and Trial Counsel. Some of the correspondence went directly from the investigators to Dr. Cunningham; some of it went from the investigators directly to Trial Counsel; and some went to both Dr. Cunningham and to Trial Counsel.  The correspondence further reveals how off-schedule the investigation became.  It appears it was not until November 11, 2003, that Gerald Bierbaum communicated the "Investigative Plan" to Trial Counsel,

42

USCA5 5542

despite having been hired in mid-Summer. And, it was not until a March 17, 2004 email from Mr. Bierbaum to Trial Counsel, that Mr. Bierbaum identified a series of educational, employment, medical, government and financial records needed for the investigation. The undersigned has not detected any delay to the investigation due to lack of instructions from Trial Counsel.

The record suggests Trial Counsel acted diligently and reasonably regarding the mitigation investigation. The government has a fundamental disagreement with the apparent position of Habeas Counsel in regards to the proper role of Trial Counsel in relation to the duties of the mitigation specialists. In an attempt to insure easy coordination between Dr. Cunningham and the mitigation investigators, Counsel asked Dr. Cunningham to recommend mitigation experts. Counsel contacted and hired the expert recommended by Dr. Cunningham. It turned out that the main mitigation investigator was apparently experiencing a serious personal incapacity, who wholly neglected her duties in this case, which caused the lengthy delay in completing the mitigation investigation. Here, Counsel hired a mitigation expert and two mitigation investigators at least seven months before the trial. The investigators obtained their leads directly from Mr. Bourgeois. The mitigation report was not completed until two weeks before the trial due to the incapacitation of one of the mitigation investigators.

43

USCA5 5543

Habeas Counsel's theory of ineffectiveness of counsel in this regard depends upon laying 100% of the blame for the problematic mitigation investigation on Trial Counsel, under the theory that Counsel was responsible for supervising the mitigation experts and monitoring their duties. This is an over-simplistic evaluation of the roles of the various members of a defense team in a death penalty case. The ABA presumes Counsel will rely upon the expertise of the psychological experts, including mitigation investigators. Counsel will be busy preparing the legal and factual aspects of the defense and should rely on the psychological experts to prepare their parts in the defense.

> "As reflected in Guideline 4.1 and the accompanying commentary, the provision of high quality legal representation in capital cases requires a team approach that combines the different skills, experience, and perspectives of several disciplines. [FN168] The team approach enhances the quality of representation by expanding the knowledge base available to prepare and present the case, increases efficiency by allowing attorneys to delegate many time-consuming tasks to skilled assistants and focus on the legal issues in the case, [FN169] improves the relationship with the client and his family by providing more avenues of communication, and provides more support to individual team members." (Emphasis added).

31 Hofstra L. Rev. 913, 1002 (Summer2003).

> "Counsel should conduct interviews of potential witnesses in the presence of a third person so that there is someone to call as a defense witness at trial. Alternatively, counsel should have an investigator or mitigation specialist conduct the interviews."(emphasis added).

USCA5 5544

31 Hofstra L. Rev. 913, 1020 (Summer2003)

> .... "As noted supra in the text accompanying note 103, a mitigation specialist who is trained to recognize and overcome these barriers, and who has the skills to help the client cope with the emotional impact of such painful disclosures [childhood sexual abuse], is invaluable in conducting this aspect of the investigation".(emphasis added).

31 Hofstra L. Rev. 913, 1022-26 (Summer2003). See: *Harris v. Vasquez*, 949 F.2d

1497, 1525 (9th Cir. 1990),

> "It is certainly within the "wide range of professionally competent assistance" for an attorney to rely on properly selected experts. Harris has not alleged any facts showing that Ryan should not have chosen the two psychiatrists who assisted the defense, or that Ryan had any reason to believe the defense psychiatrists were incompetent, or that their credentials were deficient in any way. As we have stated above, there is no evidence in the record regarding the two defense psychiatrists work or opinions other than Ryan's conclusory, self-serving declaration. It does not indicate that Ryan, untrained in psychiatry, questioned or should have questioned the competence of the psychiatrists or should have chosen a different defense at the guilt or penalty phase."

See: *Clark v. Mitchell*, 425 F.3d 270, 285-90 (6th Cir. 2005),

> It was not unreasonable for Clark's counsel, untrained in the field of mental health, to rely on the opinions of these professionals.[FN5] This conclusion is *286 supported by this court's decision in *Campbell,* 260 F.3d at 555-56. In *Campbell,* a defendant seeking habeas relief alleged that his counsel was ineffective for failing to suspect that he may have "suffered from [post-traumatic stress disorder] based on the facts and circumstances of his case." *Id.* at 555. This court rejected the defendant's argument, relying heavily on the fact that counsel had the defendant examined by a trained psychologist who failed to detect evidence of the defendant's possible mental disorder. *Id.* at 555-56. The court noted that there was "no evidence that [the trained psychologist] was incompetent,

45

USCA5 5545

or that [counsel] had any reason to question [the expert's] professional qualifications." *Id.* at 555. Thus, the court found that "it was objectively reasonable for ... counsel to rely upon [the trained psychologist's] diagnosis and ... trial counsel's failure to independently diagnose PTDS was not unreasonable." *Id.*

It is critical to understand that the errors of psychological experts are not automatically attributable to counsel. Additionally, there is no constitutionally recognized right to effective experts. See: *Skaggs v. Parker*, 235 F.3d 261, 265, 268 (6th Cir. 2000), counsel retained an individual as their psychological expert from recommendations of colleagues, without conducting an independent investigation into the expert's legitimacy. The expert turned out to be a charlatan, who testified in a manner seriously damaging to the defense. The 6th Circuit found counsels' performance in this regard was not ineffective assistance. See: *Wilson v. Greene*, 155 F.3d 396, 401 (4th Cir. 1998), "The Constitution does not entitle a criminal defendant to the effective assistance of an expert witness. To entertain such claims would immerse federal judges in an endless battle of the experts to determine whether a particular psychiatric examination was appropriate. *See Harris v. Vasquez,* 949 F.2d 1497, 1518 (9th Cir.1990); *Silagy v. Peters,* 905 F.2d 986, 1013 (7th Cir.1990). Furthermore, it would undermine the finality of criminal convictions, which would constantly be subject to psychiatric reappraisal years after the trial had ended. *Harris,* 949 F.2d at 1517-18; *Silagy,* 905 F.2d at 1013". See: *Wilson v. Greene*, 155 F.3d

USCA5 5546

396, 401 (4th Cir. 1998), "This circuit consistently has "rejected the notion that there

is either a procedural or constitutional rule of ineffective assistance of an expert

witness, rather than ineffective assistance of counsel." *Pruett v. Thompson,* 996 F.2d

1560, 1573 n. 12 (4th Cir.1993); *see also Poyner v. Murray,* 964 F.2d 1404, 1418

(4th Cir.1992); *Waye v. Murray,* 884 F.2d 765, 766-67 (4th Cir.1989) (per curiam).

For example, the defendant in *Waye* claimed that his psychiatrist had not performed

adequately because he had failed to emphasize Waye's diminished capacity in his trial

testimony. We rejected this claim and observed: [i]t will nearly always be possible in

cases involving the basic human emotions to find one expert witness who disagrees

with another and to procure an affidavit to that effect from the second prospective

witness. To inaugurate a constitutional or procedural rule of an ineffective expert

witness in lieu of the constitutional standard of an ineffective attorney, we think, is

going further than the federal procedural demands of a fair trial and the constitution

require". 884 F.2d at 767.  See:  *Moody v. Polk*, 408 F.3d 141, 150 (4th Cir. 2005),

"That the content of the outline itself was not consistent with Moody's present wishes

is no fault of trial counsel. Dr. Noble, not trial counsel, had ultimate responsibility for

his own expert report. And Dr. Noble informed trial counsel when he faxed them the

outline that "I will be doing my own last revisions and additions later this morning."

J.A. 294. Counsel bears no responsibility for Dr. Noble's failure to finalize his outline

USCA5 5547

in a form that did not include information about which he had doubts. To the extent that Moody raises a claim that Dr. Noble was ineffective, we reject that claim because we have consistently " 'rejected the notion that there is either a procedural or constitutional rule of ineffective assistance of an expert witness, rather than ineffective assistance of counsel.' " *Wilson v. Greene,* 155 F.3d 396, 401 (4th Cir.1998); *see also Thomas,* 170 F.3d at 472".

A review of the mitigation reports suggest the investigators operated fairly independently, without ongoing supervision from Trial Counsel, as the ABA Guidelines presume.  Mr. Bierbaum repeatedly noted the legal and strategic significance of evidence and information uncovered and appears to offer advice to Trial Counsel and to Dr. Cunningham regarding its significance, admission, and its presentation in mitigation.  Mr. Bierbaum did not appear to be in need of supervision from Trial Counsel.

Habeas Counsel complains, "the train was off the rails", as far as the mitigation investigation, due to the lack of supervision by Counsel. Borrowing Counsel's analogy, the government agrees that in December, 2002, when Trial Counsel approached the court for a continuance in order to permit the completion of the mitigation investigation, "the mitigation investigation was off the rails". Unbeknownst to Trial Counsel, and therefore unbeknownst to the court, one of

48

USCA5 5548

mitigation investigators was operating under a serious personal incapacitation. That's the reason the "ox was in the ditch". In response to the concerns of Mr. Bierbaum that the investigation was way behind schedule, Ms. Milstein claimed she had a neurological condition, which prevented her from completing her duties. The other investigator, although fully aware of Milstein's wholly deficient performance, declined to share this fact with Trial Counsel, believing it to be a medical problem. Yet somehow Habeas Counsel argues the sole responsibility for the breakdown in the mitigation investigation was the Trial Counsel's "lack of supervision". Again, the ABA Guidelines suggest these mitigation specialists are semi-autonomous professionals, responsible for conducting the mitigation investigation independently, to free Trial Counsel to handle other aspects of the case. Milstein's resume suggest the relative independence of the role she offered. What supervision by counsel were these professional experts lacking? The experts were aware of the trial setting, of their need to complete their work. The experts received their initial leads directly from Mr. Bourgeois, and developed other leads through their investigation. A personal incapacitation by a mitigation investigator could not be reasonably anticipated by Trial Counsel. Mr. Bourgeois fails to demonstrate Trial Counsel acted unreasonably in failing to identify and correct the underlying problem with the mitigation investigation.

49

USCA5 5549

Habeas Counsel argues Trial Counsel's failure to supervise the mitigation investigators and coordinate their work delayed the completion of the mitigation investigation and thus compromised Dr. Weiner's presentation, resulting in Counsel deciding not to call Dr. Weiner.

The government suggests Trial Counsel decided not to call Dr. Weiner for a different reason. As the government has explained above, Counsel hired Dr. Weiner for a neurological evaluation of Mr. Bourgeois. Dr. Weiner relied upon Mr. Bourgeois's claim of a 1984 head injury producing coma in making his neurological assessments of Mr. Bourgeois. (Evidentiary Hearing, Dr. Weiner's testimony, pp. 209-12). His findings were bolstered by Mr. Bourgeois's alleged coma-producing head injury. The fact that the coma was a fabrication greatly compromised Dr. Weiner's findings, and any value Dr. Weiner would have as a mitigation witness. The government advised the defense team that it was prepared to offer the subject medical report, refuting the coma claims, into evidence if Dr. Weiner testified. (See Tinker Interrogatories, # 3). *Smith v. Quarterman*, 471 F.3d 565, 576 (5th Cir. 2006) (would have been impeached on cross-examination with information that Smith and his mother had provided earlier to medical personnel and probation officers (regarding his head injury ...). So long as the decision not to introduce double-edged mitigating evidence was based on trial strategy rather than lack of investigation, "those questions

50

USCA5 5550

are even less susceptible to judicial second-guessing." *Johnson v. Cockrell*, 306 F.3d at 251-53 (quoting *Kitchens v. Johnson,* 190 F.3d 698, 703 (5th Cir.1999)).

In addition to greatly undermining Dr. Weiner's findings, the impeaching medical evidence would have had an additional damaging impact on Mr. Bourgeois's case. It would have exposed Mr. Bourgeois and his sister as liars and successful manipulators of psychological experts, further compromising any beneficial psychological findings. See, e.g., *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 2474 (1986), *Basso v. Thaler*, 359 Fed.Appx. 504, 508, 2010 WL 28524, 3 (5th Cir. 2010) (unused mitigation evidence would have corroborated state's portrayal of Basso as a malingerer, manipulator and liar). Counsel made an informed trial decision not to use the potentially mitigating evidence because it could have a prejudicial backlash effect on the defense. Trial Counsel's rationale not to call Dr. Weiner had nothing to do with the delay in the completion of the mitigation investigation.

This coma false-alley was the product of Mr. Bourgeois, who fabricated the claim. In no way does responsibility for this misdirection of the mitigation investigation or the compromising of Dr. Weiner's findings accrue to the mitigation investigators or to Counsel. *Moody v. Polk*, 408 F.3d 141, 148-49 (4th Cir. 2005) (erroneous psychological report direct result of Petitioner's dishonesty, and not

51

USCA5 5551

ineffective assistance of counsel), *Thomas v. Taylor,* 170 F.3d 466, 471 (4th Cir.1999).

Counsel made a reasonable decision under the circumstances not to call Dr. Weiner, intending to elicit mitigation evidence through Dr. Estrada, a government and court hired expert, who had been consulting with the defense throughout the prosecution.

Habeas Counsel argues that the email traffic between Trial Counsel and the mitigation investigators demonstrates Trial Counsel was deficient in failing to get the mitigation investigation report to Dr. Cunningham in a timely manner. This deficiency compromised Dr. Cunningham's preparation, resulting in a presentation/report found unacceptable by Counsel.

The mitigation investigation report didn't get to Dr. Cunningham in a timely manner, not because Trial Counsel failed to send it, but because the mitigation investigators failed to finish it in a timely manner. Again, the shortcomings of the mitigation investigators are not automatically attributable to Trial Counsel.

Additionally, as discussed above, Dr. Cunningham's proposed presentation presumed Mr. Bourgeois committed the offense, contrary to Mr. Bourgeois's position throughout the trial. The decision not to call Dr. Cunningham was made in consultation with Mr. Bourgeois. Trial Counsel noted they decided not to call Dr.

52

USCA5 5552

Cunningham because they were not impressed with Dr. Cunningham, nor with his Powerpoint presentation with the pressure cooker, or with his statistical analysis and conclusions re: the prospect of future dangerousness. (Evidentiary Hearing, Gilmore testimony, pp. 180-83, 207-11).  Trial Counsel provided additional thoughts on not calling Dr. Cunningham. (Evidentiary Hearing, Day 2, p. 5). "He would ... he would say things ... he would talk about how many people are in the penitentiary and how ... and that there are only 10 % commit murders.  Well, I think why the hell would I want the jury to know that?"

The strategy of Trial Counsel during the penalty phase was to avoid, as much as possible, an obvious conflict between Mr. Bourgeois's position at the guilt stage, that Robin Bourgeois killed the child, and risk further alienating the jury, but to provide a psychological explanation for what the jury found Mr. Bourgeois to have done, which supported a sentence of life imprisonment.  This was the best defense strategy reasonably available to Trial Counsel. As in the guilt stage, Trial Counsel argued the evidence of premeditation was insufficient and did not support a death sentence.

USCA5 5553

Assuming the additional evidence of child abuse and the evidence of sexual abuse obtained post-conviction by Habeas Counsel is true[4], which the government does not concede, the issue remains whether it was reasonably available to Trial Counsel at the time of the trial. The record suggests not. Trial Counsel's ability to present this information and other mitigation evidence was compromised by various factors: the family's reluctance to relate the extent and degree of child abuse by Bourgeois's mother, while the mother was still alive (Bourgeois's mother died following the trial); Trial Counsel was saddled with a mitigation specialist who, unbeknownst to Trial Counsel, to Dr. Cunningham, who recommended her, and to the court, was a cocaine addict, who explained her failure to make progress on the mitigation investigation with one false excuse after another; Trial Counsel were confronted with "dual sword" dilemma regarding Dr. Weiner's planned testimony and psychological conclusions, in that Dr. Weiner's report and conclusions relied upon the fabricated report by Mr. Bourgeois and his sister Claudia Williams, that Mr. Bourgeois had a head injury resulting in a coma for at least a couple weeks; neither Mr. Bourgeois nor Trial Counsel were comfortable with Dr. Cunningham as a witness or with his Powerpoint presentation, which effectively conceded Mr. Bourgeois

---

[4] The government is not inferring that the opposing Counsel would knowingly present information it does not believe to be true, rather, the government is suggesting that family members and friends may color their reports in an effort to save the life of their relative.

54

USCA5 5554

committed the murder, contradicting the defense Mr. Bourgeois insisted upon that

Robin Bourgeois committed the murder; and supplemental evidence of child abuse

to Mr. Bourgeois likely would open the door to additional negative evidence that Mr.

Bourgeois abused young children.

Counsel sought to avoid the negative impact occasioned by Drs. Weiner and

Cunningham's testimony by developing mitigation presentation through Dr. Estrada.

Trial Counsel provided Dr. Estrada with Dr. Weiner's report, which discussed Mr.

Bourgeois's childhood physical and sexual abuse. The government had provided Dr.

Estrada with Dr. Cunningham's report, which likewise discussed Mr. Bourgeois's

physical abuse. Rather than calling Drs. Weiner and Cunningham, Trial Counsel

decided to use Dr. Estrada, with whom Counsel had a long-standing relationship and

with whom Counsel had been consulting throughout the prosecution.  This was a

reasonable course under the circumstances as they existed. Strategic decisions after

reasonable evaluation are virtually unchallengeable.  Dr. Estrada discussed the child

abuse  reportedly  suffered  by  Mr.  Bourgeois,  and  provided  a  meaningful

psychological explanation for Mr. Bourgeois's abusive behavior and for the murder.

Although perhaps not as detailed or lengthy as would Dr. Cunningham's presentation,

Dr. Estrada's testimony did not share the drawbacks of Dr. Cunningham's and Dr.

Weiner's presentations.  As the ABA Guidelines discuss, presenting mitigation

55

USCA5 5555

evidence in light of an alibi guilt defense requires some level of subtlety. This Circuit has recognized that, in an appropriate capital case, counsel's decision to rely upon the jury's residual doubt about the defendant's guilt may be not only reasonable, but highly beneficial, to a capital defendant. See, e.g., *Andrews*, 21 F.3d at 623 n. 21. In at least some capital cases, the defendant might benefit at the sentencing phase of the trial from the jury's "residual doubts" about the evidence presented at the guilt phase.

> "[A]s several courts have observed, jurors who decide both guilt and penalty are likely to form residual doubts or 'whimsical' doubts ... about the evidence so as to bend them to decide against the death penalty. Such residual doubt has been recognized as an extremely effective argument for defendants in capital cases. To divide the responsibility ... to some degree would eliminate the influence of such doubts." 758 F.2d, at 247-248 (J. Gibson, J., dissenting) (citations omitted).

*Lockhart v. McCree*, 476 U.S. 162, 181, 106 S.Ct. 1758, 1769 (1986).

At the penalty phase, Trial Counsel argued that the government had not proven premeditation during the guilt phase, an indirect challenge to the guilty verdict, designed to invoke any residual doubt about the guilt verdict. Dr. Estrada's presentation in the penalty phase bolstered this argument.

As Trial Counsel presented a substantial mitigation presentation through Dr. Estrada, Habeas Corpus Counsel is placed in the position of demonstrating the presentation was insufficient. His burden of persuasion increases with the substance

56

USCA5 5556

of the mitigation evidence and testimony presented. *See, e.g., Dowthitt v. Johnson,* 230 F.3d 733, 743 (5th Cir.2000) (stating that the deferential review mandated by *Washington* requires courts to be "particularly wary" of claims that counsel failed to present "enough" evidence on a certain issue); *Kitchens v. Johnson,* 190 F.3d 698, 703 (5th Cir.1999) ("Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing."); *Prejean v. State,* 889 F.2d 1391, 1398-99 (5th Cir.1990) ("Although it is possible that [trial counsel] could have produced more of the same type of [mental capacity] evidence ... such detail is not required by [ *Washington*]."); *see also Wilson v. Ozmint,* 352 F.3d 847, 861-62 (4th Cir.2003) (finding counsel's decision not to present additional mitigating evidence reasonable in light of counsel's belief that "their best mitigation evidence had been presented," and "that the additional evidence would only have detracted from the power of the mitigation evidence that they had already presented").

2). Cases Cited in Mr. Bourgeois's Summation

Most of the cases cited by Habeas Counsel are easily factually distinguishable from the instant case.

57

USCA5 5557

(1)    *Walbey v. Quarterman,* 309 Fed. Appx. 804 (5th Cir. 2009): Habeas Counsel cited *Walbey* for the proposition that despite heinous nature of the crime, you must offer mitigation. In *Walbey*, Counsel permitted the grandmother to offer a false and uncorrected view of the mother as benign, although Walbey's mother provided Walbey a tortuous upbringing.  Counsel failed to prepare defense psychologist to testify. The government elicited damaging opinion testimony as to aggravating factors... from a woefully unprepared defense psychologist.  *Walbey* is distinguishable. In *Walbey*, the state's only argument regarding the prejudice prong was that the heinous nature of the crime trumped any error. The court rejected this argument, noting all death row crimes are heinous, thus rendering the prejudice analysis a hollow act. Here, in *Bourgeois*, as outlined above, there are many reasonable reasons Trial Counsel determined not to offer the specific mitigation evidence.

(2).    *Wiggins v. Smith,* 539 U.S. 510, 524, 525, 123 S.Ct. 2527 (2003): Habeas Counsel cites *Wiggins* for the proposition that physical abuse, sexual abuse, family dysfunction, cognitive dysfunction, emotional disturbances, and Borderline Personality Disorder constitute mitigation evidence, and that Counsel's decision to forego a mitigation presentation was ineffective assistance of counsel.

USCA5 5558

"Despite the fact that the Public Defender's office made funds available for the retention of a forensic social worker, counsel chose not to commission such a report. *Id.,* at 487.... Despite these well-defined [ABA] norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.... The scope of their investigation was also unreasonable in light of what counsel actually discovered in the DSS records. The records revealed several facts: Petitioner's mother was a chronic alcoholic; Wiggins was shuttled from foster home to foster home and displayed some emotional difficulties while there; he had frequent, lengthy absences from school; and, on at least one occasion, his mother left him and his siblings alone for days without food.... As the Federal District Court emphasized, any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses, particularly given the apparent absence of any aggravating factors in petitioner's background. 164 F.Supp.2d, at 559. Indeed, counsel uncovered no evidence in their investigation to suggest that a mitigation case, in its own right, would have been counterproductive, or that further investigation would have been fruitless".

Distinguishable:   In *Wiggins*, counsel failed to pursue mitigation evidence with no reasonable reason not to pursue the mitigation evidence.  Here, Counsel did pursue mitigation evidence, and presented significant mitigation evidence and psychological testimony in support of mitigation.

(3).   *Smith v. Texas,* 550 U.S. 297, 127 S.Ct. 1686 (2007): Habeas Counsel cites *Smith* for the proposition that a 78 IQ is mitigation evidence.  Distinguishable: In *Smith*, the court gave a "nullification instruction" effectively limiting the jury's

59

USCA5 5559

ability to consider Smith's 78 IQ. This was not an ineffective assistance analysis, it was an 8th Amendment evaluation.

(4).     *Rompilla v. Beard*, 545 U.S. 374, 391-92, 125 S.Ct. 2456 (2005): Habeas Counsel cites *Rompilla* for the proposition that organic brain dysfunction, low intelligence, childhood abuse, and family dysfunction represent mitigation evidence, and failure to offer these in mitigation was ineffective assistance.  In *Rompilla v. Beard*, the evidence which counsel failed to uncover and present-despite the fact that the prosecutors provided defense counsel with the file including the evidence-showed that: during Rompilla's childhood he was beaten by his father with fists, straps, belts and sticks; that Rompilla's father locked him and his brother in a wire mesh dog pen that was filthy and excrement-filled; and that Rompilla grew up in a home with no indoor plumbing and was not given proper clothing by his parents.

Distinguishable: In *Rompilla* the mitigation evidence was delivered on a silver platter and counsel still neglected to put it on. Here, Counsel worked desperately to obtain mitigation evidence, and despite numerous obstacles presented a meaningful mitigation case.

(5).     *Porter v. McCollom,* 130 S.Ct. 447 (2009): Habeas Counsel cites *Porter* for the proposition that childhood abuse, impaired mental capacity, and mental health

60

USCA5 5560

impairments represent mitigation evidence, and failure to offer these in mitigation

was ineffective assistance.

> "Although Porter had initially elected to represent himself, his standby counsel became his counsel for the penalty phase a little over a month prior to the sentencing proceeding before the jury. It was the first time this lawyer had represented a defendant during a penalty-phase proceeding. At the postconviction hearing, he testified that he had only one short meeting with Porter regarding the penalty phase. He did not obtain any of Porter's school, medical, or military service records or interview any members of Porter's family. In *Wiggins v. Smith,* 539 U.S. 510, 524, 525, 123 S.Ct. 2527 (2003), we held counsel "fell short of ... professional standards" for not expanding their investigation beyond the presentence investigation report and one set of records they obtained, particularly "in light of what counsel actually discovered" in the records. Here, counsel did not even take the first step of interviewing witnesses or requesting records. Cf. *Bobby v. Van Hook,* --- U.S. ----, ----, 130 S.Ct. 13, 18-19 (2009) (holding performance not deficient when counsel gathered a substantial amount of information and then made a reasonable decision not to pursue additional sources); *Strickland,* 466 U.S., at 699, 104 S.Ct. 2052 ("[Counsel's] decision not to seek more character or psychological evidence than was already in hand was ... reasonable"). Beyond that, like the counsel in *Wiggins,* he ignored pertinent avenues for investigation of which he should have been aware. The court-ordered competency evaluations, for example, collectively reported Porter's very few years of regular school, his military service and wounds sustained in combat, and his father's "over-disciplin[e]." Record 902-906. As an explanation, counsel described Porter as fatalistic and uncooperative. But he acknowledged that although Porter instructed him not to speak with Porter's ex-wife or son, Porter did not give him any other instructions limiting the witnesses he could interview. Counsel thus failed to uncover and present any evidence of Porter's mental health or mental impairment, his family background, or his military service. The decision not to investigate did not reflect reasonable professional judgment. *Wiggins, supra,* at 534, 123 S.Ct.

61

USCA5 5561

2527. Porter may have been fatalistic or uncooperative, but that does not obviate the need for defense counsel to conduct *some* sort of mitigation investigation. See *Rompilla, supra,* at 381-382, 125 S.Ct. 2456.

Distinguishable: In *Porter*, there was a gross failure by counsel to pursue any mitigation evidence at all. Again, here Counsel pursued mitigation evidence diligently, and presented a meaningful mitigation case.

(6). *Sears v. Upton,* 130 S.Ct. 3259 (2010): Habeas Counsel cites *Sears* for the proposition that cognitive impairment, physical/sexual abuse, and family dysfunction constitute mitigation evidence, and failure to offer these in mitigation was ineffective assistance. In *Sears*, the lower court found that counsel conducted a constitutionally deficient investigation into potential mitigation evidence of a brutal childhood. The lower court found that counsel did present mitigation evidence, that Sears came from a privileged background and was unlikely to re-offend, which defense was reasonable on the basis of the mitigation evidence counsel uncovered. The Supreme Court found however that the lower court failed to properly apply *Strickland*'s prejudice analysis as it relied too heavily on its conclusion that the mitigation defense presented was reasonable. The government disagrees with the holding in *Sears* and suggests that the dissent in *Sears* makes much more sense. *Sears* is also distinguishable. In *Sears*, Counsel ignored indications that considerable

62

USCA5 5562

mitigation evidence in the form of cognitive impairment, physical/sexual abuse, and

family dysfunction existed, opting to present evidence of an idyllic childhood. Again,

here Counsel pursued mitigation evidence diligently, and presented a meaningful

mitigation case.

(7). *Lewis v. Dretke,* 355 F.3d 364 (5th Cir. 2003): Habeas Counsel cites

*Lewis* for the proposition that significant physical abuse, and family dysfunction

constitute mitigation evidence, and failure to offer these in mitigation was ineffective

assistance.

> "In its current state, the record does not reveal whether defense counsel
> conducted an investigation into Lewis's childhood abuse and, if so,
> whether such investigation was sufficient under the aforementioned
> standards.... First, the testimony of Lewis's sisters is remarkably
> consistent. Each testified that their (and Lewis's) father beat all of them
> with extension cords, switches, sticks, or anything else within his reach.
> They testified further that he regularly made them undress, then whipped
> them in the area of their genitals, and that this conduct occurred at least
> every other day. According to Lewis's sisters, all of the children lived in
> constant fear of their father's rages, particularly when he was unable to
> get the drugs to which he was addicted.
>
> Each of Lewis's sisters testified that she attended his trial, but added that
> counsel never asked her to testify. Tammy Lewis testified further that
> defense counsel did not make an effort to speak with her; and that,
> despite her indication to counsel that she was willing to testify, counsel
> never followed up and never called her to the stand."

USCA5 5563

Distinguishable: In *Lewis*, there was a gross failure by counsel to pursue any mitigation evidence at all. Again, here Counsel pursued mitigation evidence diligently, and presented a meaningful mitigation case.

(8). *Williams v. Taylor*, 529 U.S. 362, 395-397, 120 S.Ct. 1495, 1514-15 (2000). Habeas Counsel offers *Williams* for the proposition that childhood abuse, family dysfunction, organic brain dysfunction, low intelligence represent mitigation factors, and failure to offer these in mitigation was ineffective assistance of counsel. Additionally, that late development of mitigation evidence constituted ineffective assistance of counsel as failure to conduct an independent investigation into mitigation matters. In *Williams*,

> the record establishes that counsel did not begin to prepare for that phase of the proceeding until a week before the trial. *Id.,* at 207, 227. They failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records. Had they done so, the jury would have learned that Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings,[FN19] that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody.
>
> The home was a complete wreck.... There were several places on the floor where someone had had a bowel movement. Urine was standing in several places in the bedrooms. There were dirty dishes scattered over

64

USCA5 5564

the kitchen, and it was impossible to step any place on the kitchen floor where there was no trash.... The children were all dirty and none of them had on under-pants. Noah and Lula were so intoxicated, they could not find any clothes for the children, nor were they able to put the clothes on them.... The children had to be put in Winslow Hospital, as four of them, by that time, were definitely under the influence of whiskey." App. 528-529. Counsel failed to introduce available evidence that Williams was "borderline mentally retarded" and did not advance beyond sixth grade in school. *Id.,* at 595. They failed to seek prison records recording Williams' commendations for helping to crack a prison drug ring and for returning a guard's missing wallet, or the testimony of prison officials who described Williams as among the inmates "least likely to act in a violent, dangerous or provocative way." *Id.,* at 569, 588. Counsel failed even to return the phone call of a certified public accountant who had offered to testify that he had visited Williams frequently when Williams was incarcerated as part of a prison ministry program, that Williams "seemed to thrive in a more regimented and structured environment," and that Williams was proud of the carpentry degree he earned while in prison. *Id.,* at 563-566.

"[A] s the Federal District Court correctly observed, the failure to introduce the comparatively voluminous amount of evidence that did speak in Williams' favor was not justified by a tactical decision to focus on Williams' voluntary confession. Whether or not those omissions were sufficiently prejudicial to have affected the outcome of sentencing, they clearly demonstrate**1515 that trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background. See 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed.1980). Id.

Distinguishable: Here, rather than ignoring obvious mitigation evidence readily available, Counsel hired mitigation experts seven months before trial, and pursued mitigation evidence diligently. In *Bobby v. Van Hook*, 130 S.Ct. 13, 18 (2009), the Supreme Court found that beginning their mitigation investigation 5 weeks before the

65

trial began reasonable performance. "And they looked into enlisting a mitigation specialist when the trial was still five weeks away". *Id*. Here, Counsel hired a mitigation expert and two mitigation specialists seven months before trial. Either Counsel or the investigators had interviewed over 50 witnesses in preparation for the penalty phase. Any delay or misdirection in the mitigation investigation was the fault of the mitigation investigators and Mr. Bourgeois, and not Trial Counsel. Here, Counsel presented a meaningful mitigation defense under the circumstances existing at the time. Trial Counsel's decisions and actions were reasonable under the circumstances. Mr. Bourgeois fails to demonstrate constitutionally deficient performance.

The cases cited by Habeas Counsel are distinguishable as they generally involve counsel who completely failed to investigate or present any mitigation evidence at all, despite obvious leads and sometimes declining to put on obvious mitigation evidence presented to them on a silver platter, and without any reasonable basis, or benefit to the defendant, to take such action.

The government believes the instant case is much more similar to that of the cases cited herein *supra,* and to the following cases: *Tucker v. Johnson*, 242 F.3d 617, 622 -624 (5th Cir. 2001), where additional mitigating evidence, including

USCA5 5566

evidence of physical and sexual abuse, was insufficient to establish ineffective assistance of trial counsel.  The trial testimony that Tucker had been removed from the custody of his mother demonstrated Tucker's home environment. Further, some of the newly proffered evidence arguably would have been aggravating as opposed to mitigating. For instance, a psychologist who examined Tucker wrote that there was a "psychological time bomb" in Tucker that "detonated" at the time of the murder. This is similar to the psychological evaluation of Mr. Bourgeois.  Even giving proper consideration to the "quality and volume of the additional mitigating evidence." *Neal v. Puckett,* 239 F.3d 683, 694 (5th Cir.2001), the court declined to find ineffective assistance of counsel.  See also, *Cardenas v. Cockrell*, WL 24057305, 16-17 (S.D.Tex.,2003), where Cardenas minimized counsel's efforts to provide a workable punishment phase defense. In the state *habeas* proceedings trial counsel submitted affidavit evidence indicating substantial investigation into possible avenues of mitigation. Trial counsel interviewed family members and friends, hired an investigator, and relied on the assistance of a competent psychological expert. In the state *habeas* evidentiary hearing, trial counsel testified about the efforts made to avoid a death sentence. The record demonstrates that trial counsel made a significant effort to mitigate against a sentence of death, notwithstanding strong evidence showing Petitioner's future dangerousness.  Again, arguing that counsel should have

67

put on a stronger case in mitigation creates a difficult burden for the Petitioner. *Tucker v. Johnson,* 242 F.3d 617, 622 (5th Cir.), *cert. denied,* 533 U.S. 972, 122 S.Ct. 18 (2001), *Dowthitt v. Johnson,* 230 F.3d 733, 743 (5th Cir.2000), *cert. denied,* 532 U.S. 915, 121 S.Ct. 1250 (2001); *see also Smith v. Cockrell,* 311 F.3d 661, 669 (5th Cir.2002). The 5th Circuit found that Cardenas failed to overcome the "the 'strong presumption' that a counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." *Bell,* 535 U.S. at ----, 122 S.Ct. at 1854 (quoting *Strickland,* 466 U.S. at 689). Here, there's no evidence that Trial Counsel shirked their duty to investigate possible mitigating evidence...." *Johnson v. Cockrell,* 306 F.3d 249, 252 (5th Cir.2002). By way of contrast, those cases in which the Supreme Court and the Fifth Circuit have recently granted habeas relief for counsel's ineffectiveness in the punishment phase have resulted from counsel's failure to make any meaningful investigation or to present any significant case in mitigation. *See Williams,* 529 U.S. at 395 (granting habeas relief when the defense's case in mitigation only relied on the fact that the defendant "turned himself in, altering the police to a crime they otherwise would never have discovered, expressing remorse for his actions, and cooperating with the police after that"); *Lockett,* 230 F.3d at 711 (holding in a pre-AEDPA case that the "record

68

overwhelmingly points to the conclusion that Lockett's counsel did little work in investigating possible bases for a *sentencing* defense for Lockett."); *Moore,* 194 F.3d at 617 ("To be clear, we are dealing here with counsel's complete, rather than partial, failure to investigate whether there was potentially mitigating evidence that could be presented during the punishment phase of Moore's trial."). "In assessing counsel's performance [at the sentencing phase], we look to such factors as what counsel did to prepare for sentencing, what mitigating evidence he had accumulated, what additional 'leads' he had, and what results he might reasonably have expected from these leads." *Neal,* 286 F.3d at 237.  Here, Trial Counsel conducted a dedicated and meaningful mitigation investigation and presented a meaningful mitigation defense under the circumstances. See also, *Parr v. Quarterman*, 472 F.3d 245, 256-58 (5th Cir. 2006).  Where the mitigation defense was not as effective as it might have been.  The jury did hear meaningful mitigation evidence.  Further, the State's case on punishment was strong. In addition to the facts of the crime, the State presented evidence of Parr's prior convictions for burglary and assault, Maria Cervantes testified that Jimenez told her that he and Parr shot Malek in the back of the head twice and planned to kill the children but the gun "messed up," and Parr's parole officer testified that Parr was on parole from the Texas Youth Commission when this crime was committed. The district court correctly concluded that Parr could not show prejudice and thus, was not

69

USCA5 5569

entitled to relief on this ground.  See, *Smith v. Quarterman*, 471 F.3d 565, 576 (5th

Cir. 2006), *Dowthitt v. Johnson*, 230 F.3d 733, 743-47 (5th Cir. 2000) (cold-blooded

nature of crime suggested additional mitigation would not have changed the verdict).

*Basso v. Thaler*, 359 Fed.Appx. 504, 508, 2010 WL 28524, 3 (5th Cir. 2010) (Her trial

counsel decided against presenting evidence of sexual abuse Basso suffered as a

child, because of the similarity of it to the abuse Basso and her co-defendants

inflicted on Musso), *Wesbrook v. Thaler*, 585 F.3d 245, 253 (5th Cir. 2009) (failing

to secure additional expert testimony regarding frontal lobe impairments is not an

objectively unreasonable application of *Strickland.)*.

If the court finds Trial Counsel deficient in any manner, Mr. Bourgeois must

also demonstrate prejudice under *Strickland* and its progeny.

3). Prejudice

"When considering *Strickland* prejudice, we review "the totality of  the

available mitigation evidence-both that adduced at trial, and the evidence adduced in

the habeas proceeding-in reweighing it against the evidence in aggravation." ("[W]e

reweigh the evidence in aggravation against the totality of available mitigating

evidence."). ("[T]he question is whether there is a reasonable probability that, absent

the errors, the sentencer ... would have concluded that the balance of aggravating and

70

USCA5 5570

mitigating circumstances did not warrant death." *Carty v. Thaler*, 583 F.3d 244, 263 (5th Cir. 2009).

Habeas Counsel offers Dr. Estrada's evaluation that the jury didn't get a complete picture of Mr. Bourgeois's mental health profile. "There is a reasonable and not particularly controversial mental health explanation for his actions". Providing this psychological explanation would have refuted the government's theory that Mr. Bourgeois was a monster who acted upon evil impulses.

The jury heard highly aggravating circumstances and considerable mitigation evidence. The question becomes, would the mitigation evidence and "revised" psychological opinions developed post-conviction, which were reasonably available to Trial Counsel, together with that offered at trial have convinced a single juror that the total mitigation evidence outweighed the aggravating factors, including the heinous nature of the crime.

There is some indication that the supplemental mitigation evidence has recently become available due to the death of Mr. Bourgeois's mother, and was not reasonably available at the time of trial. Claudia Williams testified at the Evidentiary Hearing in September, 2010, that some information regarding child abuse by Mr. Bourgeois's mother was not shared with investigators because of the shame of it and the fact that

71

USCA5 5571

their mother was still alive at the time of the trial. (Evidentiary Hearing, testimony of Claudia Williams, pp. 50-53). Brenda Goodman conceded she didn't share information regarding the sexual abuse of Mr. Bourgeois until recently, because she didn't want to talk about it earlier. (Evidentiary Hearing, Goodman testimony, p. 176). Such supplemental evidence should be discounted to the extent it was not reasonably available to Trial Counsel. Likewise, the opinions of the newly hired psychological experts were not reasonably available to Trial Counsel.

Would the supplemental mitigation evidence occasion the admission of damaging evidence? The evidentiary hearing suggests that additional mitigation evidence would have been a mixed bag, with the very same witnesses confirming that Mr. Bourgeois abused children himself, confirmed numerous episodes of violence by Mr. Bourgeois, and questioning the recent allegations of the sexual abuse of Mr. Bourgeois. (Evidentiary Hearing, testimony of Claudia Williams, pp. 53-54, 73-77; testimony of Brenda Goodman, pp. 166-69, 176; GX 202). As to the psychological opinions suggesting that the murder resulted from a build up of pressures on Mr. Bourgeois, and an "explosion of anger" without premeditation, there was evidence in the trial record suggesting premeditation. There was particularly damaging testimony at trial from Mr. Bourgeois's sister, Claudia Williams, in which Mr.

72

Bourgeois directed her, on June 23, 2002 – several days before the murder, to get her black dress out.  (Trial testimony, Day 6, pp. 161-65).  This evidence strongly suggested premeditation, and would serve to temper the value of the "pressure cooker" analysis.

Additionally, to a large degree, the supplemental mitigation evidence would be cumulative to that offered at trial. At trial, Dr. Estrada concluded Mr. Bourgeois had been neglected by his parents, rejected by them, and abused by his mother,  (Penalty Phase, Day 2, pp. 22-24, 44) an illegitimate child, abandoned by father, p. 24, and disciplined harshly as a child. (Penalty Phase, Day 2, p. 48).  The supplemental mitigation reportedly added sexual abuse and increased the level of physical abuse, abandonment and rejection previously known to Dr. Estrada.  (Dr. Estrada's Deposition, p. 21, 26-27).  Dr. Estrada's opinion did not change from the trial to the time of his deposition in 2010. The new material "confirmed some of the suspicions or professional guesses that I had ...." . (Dr. Estrada's Deposition, p. 15, 19, 21). "[W]e are splitting hairs here about narcissistic borderline.  The fact is whatever we call it, my opinion at the time that I testified and is documented and my opinion now, which has been reinforced with the new documentation that I have received, is that Mr. Bourgeois suffered from a condition that under frustration or stress results in

73

USCA5 5573

violence and that this – as a result of this tendency, he became violent continuously through a manner of six weeks against the child that led to her death." (Dr. Estrada's Deposition, p. 69, see also, pp. 37, 39). Essentially, the supplemental mitigation evidence bolstered Dr. Estrada's opinion that he gave at trial. *Cardenas v. Cockrell*, WL 24057305, 16-17 (S.D.Tex.,2003).

Finally, the heinous nature of the crime, overwhelming evidence of aggravating factors, and the incremental nature of the supplemental mitigation evidence makes it doubtful that it would have impacted the sentence of death. *Strickland*, 104 S.Ct. at 2071 (finding no prejudice where state's overwhelming presentation of evidence relating to aggravating factors supporting imposition of death penalty); *Jones v. Johnson*, 171 F.3d 270 (5th Cir.1999) (finding no prejudice where the brutal and lengthy nature of the murder, the defendant's confessions, and the lack of other mitigating evidence required the conclusion that counsel's failure to present the proposed evidence would not have made any difference with respect to the outcome of the sentencing phase), *Sharp v. Johnson*, 107 F.3d 282 (5th Cir.1997) (finding no prejudice where horrendous nature of crime and circumstances would have overwhelmed mitigating evidence identified by defendant). *See Andrews,* 21 F.3d at 624 (concluding that the failure to introduce mitigating evidence, which included

74

USCA5 5574

evidence of mental retardation, did not prejudice defendant because of the cold-blooded nature of the crime); *King v. Puckett,* 1 F.3d 280, 285 (5th Cir.1993) (concluding "that the failure to offer mitigating evidence in the form of King's diminished mental capacity" did not affect "the outcome of his sentencing."); *Glass v. Blackburn,* 791 F.2d 1165, 1170-71 (5th Cir.1986)(finding no prejudice from counsel's failure to introduce mitigating evidence because the murder was calculated and cold-blooded).

## VII.  Conclusion

Petitioner has not established a need to reopen the evidentiary hearing to further consider his jurisdictional issue.  Indeed, the record evidence sufficiently and convincingly establishes that the victim was fatally injured on the Naval Station. Federal jurisdiction exists, and the case was properly tried before this Honorable Court.  Likewise, the Petitioner has failed to establish ineffective assistance in any regard.  Defense counsel performed admirably and within the Constitutionally mandated parameters. While present counsel have demonstrated that they would have likely presented the case in a much different manner than counsel of record at trial, it is clear that the trial defense counsel relied upon the experts they retained and

75

USCA5 5575

presented an adequate mitigation case that remained consistent with Petitioner's claim

of innocence.  Thus, this Court should deny Petitioner's claims in all regards.


Respectfully submitted,

JOSÉ ANGEL MORENO
United States Attorney


TONY R. ROBERTS
Assistant United States Attorney


MARK DOWD
Assistant United States Attorney


ELSA SALINAS
Assistant United States Attorney


    s/ *Patti Hubert Booth*

PATTI HUBERT BOOTH
Assistant United States Attorney
Federal Bar No. 19500
Texas Bar No. 00791593
800 N. Shoreline Blvd., Suite 500
Corpus Christi, TX 78402
PH:  (361) 888-3111
Fax: (361) 888-3200

76

USCA5 5576

CERTIFICATE OF SERVICE

I, Patti Hubert Booth, Assistant United States Attorney, do hereby certify that

a copy of the above Response to Petitioner's Post-Argument Submission was emailed

and placed in the mail on February 18, 2011, via certified mail, return receipt

requested to:

Michael Wisemen

Victor Abreu

James McHugh

Maureen Kearney Rowley

Elizabeth Larin

Federal Community Defender Office

for the Eastern District of Pennsylvania

Capital Habeas Corpus Unit

Suite 545 West – The Curtis Center

Philadelphia, PA 19106

*s/ Patti Hubert Booth*

PATTI  Hubert BOOTH

Assistant United States Attorney

USCA5 5577

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Respondent, | § | |
| | § | |
| vs. | § | CR. No. C-02-216 |
| | § | C.A. No. C-07-223 |
| ALFRED BOURGEOIS, | § | |
| Petitioner. | § | |

ORDER

Petitioner's Motion to Reopen the evidentiary hearing is DENIED.

Petitioner's Motion to Vacate his Conviction and Sentence is also DENIED

with regard to ALL CLAIMS RAISED in his Motion, Petition, Legal

Memorandum, and his presentation of evidence during the hearing and by way of

deposition.

The clerk of this Court shall send a copy of this Order to the parties by any

receipted means.

Signed at Corpus Christi, Texas, this _____ day of _____ 2011.


_____
JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

USCA5 5578

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


UNITED STATES OF AMERICA,          *     CRIMINAL ACTION
                                   *
          PLAINTIFF,               *     CR-C-02-216(1)
                                   *
VS.                                *
                                   *     CORPUS CHRISTI, TEXAS
ALFRED BOURGEOIS,                  *     JANUARY 13, 2011
                                   *     7:55 A.M.
          DEFENDANT.               *
                                   *
* * * * * * * * * * * * * * * * * *


          PARTIAL TRANSCRIPT OF MISCELLANEOUS HEARING
             (PORTIONS NOT PREVIOUSLY TRANSCRIBED)

          BEFORE THE HONORABLE JANIS GRAHAM JACK
                 UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:        MS. PATTI HUBERT BOOTH
                           MS. ELSA SALINAS
                           OFFICE OF THE U.S. ATTORNEY
                           800 NORTH SHORELINE, SUITE 500
                           CORPUS CHRISTI, TEXAS 78401

                           MR. TONY R. ROBERTS
                           MR. MARK MICHAEL DOWD
                           OFFICE OF THE U.S. ATTORNEY
                           P. O. BOX 61129
                           HOUSTON, TEXAS 77208

(APPEARANCES CONTINUED ON PAGE 2)


COURT RECORDER:        MS. VELMA GANO


          PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
            TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
                 MOLLY CARTER, P. O. BOX 270203
            CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

USCA5 5579

APPEARANCES: (CONTINUED)

FOR THE DEFENDANT:        MR. VICTOR JULIO ABREU
                          MR. MICHAEL WISEMAN
                          MS. ELIZABETH A. LARIN
                          OFFICE OF THE FEDERAL PUBLIC DEFENDER
                          601 WALNUT STREET
                          THE CURTIS CENTER, SUITE 545
                          PHILADELPHIA, PENNSYLVANIA 19106

                          MR. JAMES McHUGH
                          FEDERAL COMMUNITY DEFENDER OFFICE
                          FOR THE EASTERN DISTRICT OF
                          PENNSYLVANIA
                          601 WALNUT STREET
                          THE CURTIS CENTER, SUITE 540
                          PHILADELPHIA, PENNSYLVANIA 19106

USCA5 5580

(The proceedings began at 7:55 a.m.)

(Call to Order of the Court.)

THE CLERK:  Court calls Criminal Action C-02-216, United States of America versus Alfred Bourgeois.  May I have appearances, please?

MR. WISEMAN:  Michael Wiseman for Mr. Bourgeois.

MS. LARIN:  Elizabeth Larin for Mr. Bourgeois.

MR. ABREU:  Good morning, Your Honor.  Victor Abreu on behalf of Mr. Bourgeois.

MR. McHUGH:  Good morning, Your Honor.  Jim McHugh on behalf of Mr. Bourgeois.

MS. BOOTH:  Patti Hubert Booth for the United States of America.

MS. SALINAS:  Elsa Salinas on behalf of the United States.

MR. ROBERTS:  Tony Roberts for the United States, Your Honor.

MR. DOWD:  Mark Dowd for the United States, Your Honor.

THE COURT:  I'm glad it's even here, four and four, so -- so is this -- whose witness is this?

MR. McHUGH:  It's mine, Your Honor.

THE COURT:  Mr. Abreu -- I mean, sorry, got it wrong -- Mr. McHugh.

MR. ROBERTS:  Your Honor, I was just wondering, is

USCA5 5581

Mr. Bourgeois on the phone?

THE COURT:  No.  We just said -- Mr. Wiseman gave the authority to go forward without him being on the phone.  I think they don't let him on till 8:00 o'clock.

MR. ROBERTS:  Oh, all right.

THE COURT:  And Ms. Scotch is outside working on that right now.

MR. ROBERTS:  I just wanted to make sure.  Thank you.

THE COURT:  Go ahead.

MR. McHUGH:  Petitioner would call Mr. William May.

THE COURT:  Would you administer the oath, Ms. Gano?

THE CLERK:  Yes, Your Honor.

(Witness sworn.)

THE COURT:  Hold on.  I think Mr. Bourgeois is with us now.  Mr. Bourgeois, are you there?

THE DEFENDANT:  Yes, ma'am.  Good morning.

THE COURT:  Okay.

THE DEFENDANT:  How are you doing?

THE COURT:  Good morning.  Thank you, sir.  You may proceed, sir.

MR. McHUGH:  Thank you, Your Honor.

WILLIAM EDWARD MAY, JR., PETITIONER'S WITNESS NO. 1, SWORN

DIRECT EXAMINATION

BY MR. McHUGH:

Q.   Can you state your name, please, for the record?

USCA5 5582

A.    William Edward May, Jr.

Q.    And Mr. May, I'm drawing your attention back to 2003 and 2004.  How were you employed?

A.    I was an attorney in private practice.

Q.    And what type of law did you practice?

A.    Criminal law.

Q.    And was that, were you 100 percent criminal law?

A.    That's all I did, 100 percent of my time.

Q.    Okay.  And in the course of your employment back in 2003 and 2004, did you come to represent an individual by the name of Adam Longoria?

A.    I did.

Q.    And do you recall the charges that he was facing?

A.    I'm sorry, I couldn't understand you.

Q.    Okay.  Do you recall the charges that he was facing?

A.    Yes.  He had a aggravated robbery charge, which grew out of a bank robbery, and he also had a pending revocation of probation, based on that same offense.

Q.    Okay.  And were these state charges?

A.    Yes.

Q.    Okay.  And were they from Nueces County?

A.    Yes.

Q.    Now, were you familiar with the term, under the Texas Penal Code, of "habitual offender"?

A.    Yes.

USCA5 5583

Q.   Okay.  Can you just describe for us what that means as far as penalties and punishment that a certain Defendant may have if they were considered a habitual offender?

A.   Well, in this case, he had a offense of aggravated robbery, which is a first degree felony.  And a first degree felony that is enhanced with a habitual allegation, as in this case, it raises the minimum punishment from a minimum of five years to a minimum of twenty-five years, making the range of punishment from twenty-five years minimum to a maximum of life imprisonment.

Q.   And when you say "minimum," do you mean a mandatory minimum of 25 years?

A.   Yes.

Q.   Okay.  And in fact, when you entered your appearance and reviewed the file, did you determine whether the State of Texas was considering Mr. Longoria a habitual offender for the bank robbery case?

A.   Yes.

Q.   Now, during your representation --

THE COURT:  Well, had he been indicted as a habitual offender, Mr. May?

THE WITNESS:  I believe he had been.

THE COURT:  Okay.

BY MR. McHUGH:

Q.   And during your representation of Mr. Longoria, did you

USCA5 5584

have occasion to speak with Ms. Patti Booth?

A.    Yes, I did.

Q.    Okay.  What do you recall about that conversation?

A.    The first conversation was when Ms. Booth called me and asked permission to talk to my client, Mr. Longoria, about being a witness in the Bourgeois case.

Q.    Okay.  And was that a telephone conversation?

A.    Yes.

Q.    Okay.  And after this conversation, did you speak with your client, Mr. Longoria?

A.    Yes, sometime later.

Q.    Okay.  And what do you recall about that conversation?

A.    It was a conversation, it was very brief.  It was -- he was calling me on the telephone at the office, and he told me he was going -- he had talked to the --

MR. DOWD:  Judge, I'm going to object.

THE WITNESS:  -- FBI and Patti Booth and that --

THE COURT:  Excuse me.  Just a moment.

THE WITNESS:  -- he was going to be available as a witness --

THE COURT:  There's an objection, Mr. May.  Mr. May, there's an objection.

THE WITNESS:  Excuse me?

THE COURT:  There's an objection.  Just one moment.

MR. DOWD:  Your Honor, I would object.

THE WITNESS:  I'm sorry.

THE COURT:  I think we're on kind of a delay, so I'm sorry to be rude about it, so I have to jump right in. Mr. Dowd?

THE WITNESS:  That's all right.

MR. DOWD:  Your Honor, I would object to any hearsay statements from Mr. Longoria, and I would like to confirm that the privilege, Mr. Longoria has waived his privilege to share this confidential information with, you know, with anybody else.

MR. McHUGH:  If I may respond, Your Honor?

THE COURT:  Yes.

MR. McHUGH:  As to the privilege, we did -- first of all, Mr. Longoria did execute a waiver, which I provided to Mr. May.  Second of all, he actually executed an affidavit in this case, Mr. Longoria, and spoke freely about all his dealings with the Prosecution and Defense, and that was filed with the Court.  So I don't think -- if there was a privilege, it has been waived by Mr. Longoria.  And I provided that to Mr. May.

Also, Your Honor, as to the hearsay, I would cite the Court to Rule 801(d)(1), which is prior statement by a witness. And I suggest to the Court that under that rule this would not be considered hearsay.  Mr. Longoria did testify under oath as the --

USCA5 5586

THE COURT:  Hold on.  Mr. Dowd?

MR. DOWD:  Judge, I would suggest that absent Mr. Longoria's testimony here, he's not a witness in this case.

THE COURT:  He's never been a witness, I don't think.

MR. McHUGH:  Yes, he was, Your Honor, at trial.

THE COURT:  Oh, he was a witness at the, at the trial.

MR. McHUGH:  And that simply is what we're focused on and --

THE COURT:  Okay.  Go ahead.

BY MR. McHUGH:

Q.   Mr. May, you may finish your answer concerning what you recall about your conversation with Mr. Longoria.

A.   As I said, it was fairly brief, and he advised me he was going to be a witness and that he hoped that Ms. Booth would eventually give him some benefit from that.  And I told him that in my experience, that generally you would get some benefit from that, but what it would be, I had no way of knowing and we'd just have to wait and see, since she was not a state court prosecutor.

Q.   So would it be fair to say you advised him to cooperate with Ms. Booth?

A.   He had already made that decision.

Q.   Okay.  And did you agree with that decision in your conversation with him?

USCA5 5587

A.   At that -- I believe he had already talked to them, even before I ever found out about it.  But I did agree that that was a fairly logical thing for him to do under the circumstances.

Q.   Okay.  Now, after the conversation that you had with Mr. Longoria, did you in fact file a continuance of your matter, your state court matter with Mr. Longoria, as a result of his involvement in the federal matter of Mr. Bourgeois?

A.   Yes.

Q.   And why --

A.   I did.

Q.   Why did you do that?

A.   Well, one, I generally don't want to go to trial when a guy has that much evidence against him, and any opportunity to postpone a trial where he would lose and go to prison, I would usually take.  And in this case, since he was going to be testifying in federal court, I thought that was a good reason to postpone the case, so that I could acquire the records from the court reporter after he testifies, in case I had to show that to a Judge, namely the State Court Judge, and demonstrate that he had testified in federal court, and of what value his testimony had been.

Q.   Now, and was the matter in fact continued, the state court matter?

A.   Yes, it was.

USCA5 5588

Q.   Okay.  And was it continued until after Mr. Bourgeois's participation -- I'm sorry -- Mr. Longoria's participation in the Bourgeois matter, his testimony?

A.   Yes, it was.

Q.   Okay.  Now, did in fact Mr. Longoria go to trial on this matter?

A.   Did he go to trial?

Q.   Yes, sir.

A.   No.  I mean, in a sense, I guess.  He had a guilty plea.

Q.   But he -- so he pled guilty.  Is that right?

A.   Yes.

Q.   Okay.  Can you describe for us what took place as you recall on the day of the guilty plea?

A.   When I went into court, I approached the state court prosecutor, James Sales.  I asked him if he had had a chance to talk to Patti Booth about the case.  He said that he had.  I asked him what he was going to recommend.  He told me seven years on each case, concurrent with one another, and that he would be willing to drop it down to five years if Mr. Longoria testified against a different Defendant in a potential state court case.  I can't recall who that target was.  And I conveyed that to Mr. Longoria, and he accepted the offer.

Q.   And did in fact Mr. Longoria then enter his plea in front of Judge Rose Vela?

A.   Yes.

USCA5 5589

Q.   And do you recall, in fact, did the Court go along with this plea negotiation?

A.   Yes.

Q.   Mr. May, after this hearing in front of Judge Vela in state court, were you ever made aware by Ms. Booth that she had written a letter on behalf of your client, Mr. Longoria, to the Texas Board of Pardons and Paroles concerning parole for, in support of parole for Mr. Longoria?

A.   I wasn't in any way involved in that, but you did show me an -- or a statement that concerned that.

Q.   Well, my question was, were you ever made aware by Ms. Booth that she had written a letter on behalf of your client, years later, a couple of years later, after the matter was resolved in front of Judge Vela, concerning his parole from the Texas Department of Corrections?

A.   Yes.  Yes, I was.

Q.   Ms. Booth provided you with a copy of that letter?

A.   No.

Q.   Okay.  So --

THE COURT:  The question was, Mr. May, did Ms. Booth ever tell you this?

THE WITNESS:  Oh, no.  No.  I never talked to Ms. Booth about that.

MR. McHUGH:  No further questions, Your Honor.

THE COURT:  Thank you.

USCA5 5590

MR. DOWD:  May I proceed, Your Honor?

THE COURT:  Please.

CROSS-EXAMINATION

BY MR. DOWD:

Q.   Good morning, Mr. May.

A.   Good morning, Mr. Dowd.

Q.   The state habitual offender charges against Mr. Longoria, is it unusual to, for the state to waive those charges, to drop the habitual offender allegation?

A.   Not unusual at all.

Q.   Okay.  Have you ever -- have you ever pled any of your clients guilty under the habitual offender statute?

A.   Never.

Q.   So you've always been able to get those charges dropped?

A.   That's correct.  It's a really good, you know, threat against a Defendant to get him to enter a plea.  But it seldom ends up with a person getting a life sentence or getting a -- pleading guilty and getting a minimum 25.

Q.   All right.  And when you talked to Mr. Longoria after he had been interacting with the Government, AUSA Patti Booth, he indicated to you that he was hoping for a benefit?  That's what he indicated?

A.   That's correct.

Q.   Okay.  And did he ever indicate to you that -- I mean, at this point, did he indicate to you that he had a quid pro quo

USCA5 5591

with Patti Booth, a firm cooperation agreement?

A.   No, he never did.

THE COURT:  Sorry?

THE WITNESS:  No.

THE COURT:  Well, did you ever have any information from Ms. Booth that she was going to do something for your client?

THE WITNESS:  He never indicated to me that he had any agreement --

THE COURT:  No, Ms. Booth, did she -- did Ms. Booth ever indicate to you that she was going to do anything beneficial for your client in return for his testimony?

THE WITNESS:  No.

THE COURT:  Isn't that about it, Mr. Dowd?

MR. DOWD:  Yes, Your Honor.  Oh, one other thing.

BY MR. DOWD:

Q.   Are you familiar with the antipsychotic medication that Mr. Longoria was on?

A.   No.

Q.   Did you ever find him --

A.   I wasn't aware he was on any until I read some of the affidavits in this case, Mr. Longoria's affidavit in particular.

Q.   All right.  And in your discussions with Mr. Longoria, did you ever find him to be incoherent or, you know, less than

USCA5 5592

cognizant of what was going on or faulty memory, et cetera, et cetera?

A.   He seemed to be perfectly coherent and knew what was going on and didn't have any problems.

Q.   All right.  Thank you, Mr. May.

A.   I was very surprised by the affidavit.

Q.   Thank you, Mr. May.

          MR. DOWD:  Thank you, Your Honor.

          THE COURT:  Thank you.  Anything further?

          MR. McHUGH:  No, Your Honor.

          THE COURT:  Thank you very much, Mr. May.  It was good to see you again, and we'll conclude this.

          THE WITNESS:  Thank you, Your Honor.  I appreciate it.

          THE COURT:  Would you send Ms. Thompson?  Thank you.

          Next witness?

          MR. WISEMAN:  Yes --

          MR. McHUGH:  James Sales, Your Honor.

          THE COURT:  Thanks.

          MR. McHUGH:  He's right outside.

          THE COURT:  Okay.

     JAMES SALES, PETITIONER'S WITNESS NO. 2, SWORN

                    DIRECT EXAMINATION

BY MR. McHUGH:

Q.   Good morning, Mr. Sales.

USCA5 5593

A.    Good morning, sir.

Q.    Can you state your name for the record?

A.    James Sales.

Q.    Mr. Sales, how are you presently employed?

A.    The border prosecutor in the Bee County District Attorney's Office.

Q.    And in 2003 and 2004, how were you employed?

A.    As a gang prosecutor in Nueces County District Attorney's Office.

Q.    And at that time, 2000 --

        THE COURT:  Where are you now, by the way?

        THE WITNESS:  Border prosecutor over in Bee County, under Martha Warner.

        THE COURT:  Thank you.

        THE WITNESS:  Yes, Your Honor.

        THE COURT:  Would you mind leaning into the microphone?  But don't touch it.

        THE WITNESS:  Ah.

        THE COURT:  We have electronic recording, and it really makes this horrible noise in her ear.

        THE WITNESS:  Yes, ma'am.

        THE COURT:  Thank you.

BY MR. McHUGH:

Q.    Mr. Sales, at the time in 2003 and 2004, how long had you been a prosecutor with the Nueces County office or with any

USCA5 5594

office?

A.    Since 1994.

Q.    Okay.  Now, did you receive an e-mail from me or from my office which contained some court files concerning an individual by the name of Adam Longoria?

A.    No.

Q.    Okay.  I have some documents that I'll use to refresh your recollection.

A.    Okay.

Q.    Do you recall back in 2003 prosecuting a man by the name of Adam Longoria for a bank robbery at the Bank of America at 5875 Weber Road in Corpus Christi?

A.    Some details, yes, sir.

Q.    Okay.  And do you recall that Mr. Longoria, at the time of that bank robbery, was also on probation in Nueces County for child endangerment and evading arrest?

A.    I don't recall that.

Q.    Okay.  Now, do you recall if Mr. Longoria, at the time of the bank robbery, when he was charged was a habitual offender?

A.    Without having the records in front of me from seven years ago, I do not recall his criminal history, sir.

Q.    Okay.

        MR. McHUGH:  May I approach, Your Honor?

        THE COURT:  Please.  Well, you can do that right there on the --

USCA5 5595

MR. McHUGH:  Okay.  P-187 is the --

THE COURT:  If you want to square it up, look in your monitor right there.

MR. DOWD:  Your Honor, may I get a copy of those documents?  Those were just in the large packet that was sent to us.

THE COURT:  Do you have copies of those documents?

MR. McHUGH:  I do.

MR. DOWD:  Thank you.

BY MR. McHUGH:

Q.   I'm showing you what's been marked as P-187.  Can you just take a moment to review that, see if that refreshes your recollection concerning Mr. Longoria.

A.   I can see the first enhancement paragraph, but I cannot see the second one.

Q.   Okay.  I'll slide it up.

A.   I can see burglary of a habitation and escape is his two priors.

Q.   Okay.  And I'm going to turn the page of P-187.

A.   Yes, sir, that would make him a habitual felony offender.

Q.   Okay.  And is this in fact the matter that you said you recall the grand jury indicting concerning Mr. Longoria, the May 30th bank robbery?

A.   That would certainly, yes, appear to be the robbery.

Q.   Okay.  Now, if I may, sir, a habitual offender under the

USCA5 5596

Texas Penal Code, what does that mean as far as a Defendant's enhancements at sentencing?

A.    Twenty-five to ninety-nine years or life, $10,000 fine, if the enhancements are found to be true.

Q.    Okay.  And so his -- he would be facing a mandatory minimum of 25 years?

A.    If he was convicted of the underlying offense, yes, sir.

Q.    Okay.  Now, do you recall who Mr. Longoria's attorney was?

A.    No.

Q.    If I suggested to you it was William May, would that ring a bell to you?

A.    It could have been Bill May.

Q.    Okay.  Now, do you recall Mr. May filed a continuance of your trial in your matter for purposes of Mr. Longoria's testimony in a federal matter?

A.    No.

Q.    Okay.

A.    Mr. May was constantly filing continuances in state court. I don't have specific recollection.

Q.    Okay.  Let me show you another document previously marked as P-104.  Can you see that, sir?

A.    It's a little blurry, but I can make it out.

Q.    Okay.  And --

        THE COURT:  Have you got it focused?

        MR. McHUGH:  I guess I shouldn't put it there.

USCA5 5597

THE COURT:  Do y'all not have this stuff in Philadelphia?

MR. McHUGH:  Some courtrooms do.

MR. WISEMAN:  We use stone tools, Your Honor.

MR. McHUGH:  Some courtrooms do.

MR. WISEMAN:  Stone tools.

THE COURT:  I'm so glad to hear it.

MR. WISEMAN:  Could we possibly get that turned on?

THE COURT:  Huh?  Pardon?

MR. WISEMAN:  Could we get that turned on so we can see?

THE COURT:  Well, it hasn't been admitted.

MR. WISEMAN:  Oh, I'm sorry.  Okay.

THE COURT:  That's the secret.

MR. WISEMAN:  That's the secret.

THE COURT:  It just goes from there to there.

MR. McHUGH:  Although, Your Honor, I will say that I talked to Mr. Dowd and he said --

THE COURT:  Well, why don't you offer it?

MR. McHUGH:  -- he had no objection to these --

MR. DOWD:  No objection, Your Honor.

THE COURT:  So what are the numbers?

MR. McHUGH:  The first one was P-187.

THE COURT:  P-187 --

MR. McHUGH:  And this is now 104.

USCA5 5598

THE COURT:  -- P-104 are admitted.  Now they're on.

BY MR. McHUGH:

Q.   So Mr. Sales, can you take a moment to review that and --

THE COURT:  Okay, that's really blurry.  Focus it up, please, sir.

MR. McHUGH:  I'm not sure how to focus it.

THE COURT:  Ms. Scotch, would you show him how to do that?  You -- oddly enough, you push the button that says "focus."

MR. McHUGH:  I never would have thought of that.

(PAUSE.)

BY MR. McHUGH:

Q.   Now, have you been able to review that document, Mr. Sales?

A.   I'm halfway through Paragraph 2.

(PAUSE.)

A.   I am through the word "Counsel."

(PAUSE.)

A.   Yes, sir.

Q.   Okay.  And I'm just going to show you the third page of the document.  Actually it's the second page, Roman Number III, and the Certificate of Service indicates that it was served on you, is that right, on March 23rd?

A.   What that indicates is that it was served on the District Attorney's Office.

USCA5 5599

Q.   Addressed to you?

A.   It's addressed to me.  Undoubtedly it was put in the file.

Q.   Okay.  And is this something in your normal custom and practice that you certainly would have reviewed as you're prosecuting Mr. Longoria?

A.   Probably not.  If Mr. May told me he needed a continuance, I probably would simply have said, "No problem, Bill."

Q.   Okay.  And does it refresh your recollection that Mr. Longoria was in fact involved in the matter of United States versus Alfred Bourgeois?

A.   I was handling four District Courts at the time, prosecuting murders, capital murders, aggravated robberies, drive-by shootings.  I did not pay any attention to -- did not know who Mr. Bourgeois was, did not know what he was accused of, and had other pressing matters, sir.

Q.   But my question was, does this refresh your recollection as to the fact that there was a continuance filed because of Mr. Longoria's involvement in a federal matter?

A.   I'm not trying to be difficult with you, sir.  It would -- if it --

          THE COURT:  It's just a "yes" or a "no."

          THE WITNESS:  No, it does not.

          THE COURT:  Okay.

          MR. McHUGH:  Okay.

          THE COURT:  Moving along.

USCA5 5600

BY MR. McHUGH:

Q.   Yes.  Now, do you recall how this matter was resolved, the matter of the State of Texas versus Adam Longoria?

A.   It would help to see a plea agreement.

Q.   Okay.

A.   No, I do not recall the specific numbers.

Q.   What I was going to suggest is I have the transcript from the plea and revocation hearing that I was going to -- and it's quite brief.

A.   That would help, sir.

        MR. McHUGH:  So this is P-188, Your Honor, and I would offer it.

        MR. DOWD:  No objection, Your Honor.

        THE COURT:  P what?  I'm sorry.

        MR. McHUGH:  P-188, Your Honor.  I'm sorry.

        THE COURT:  P-188 is admitted.

BY MR. McHUGH:

Q.   Do you see that, sir?

A.   Yes, sir.

Q.   Okay.  Does that appear to be a transcript of the State of Texas versus Adam Longoria, dated the 19th of April 2004?

A.   I cannot see the date.

Q.   Oh, I'm sorry.

A.   Yes, sir, it does.

Q.   And in front of Judge Rose Vela?

USCA5 5601

A.    Yes, sir.

Q.    I'm going to turn to Page 3 of that document and have you review that.

A.    I am through Line 20.

Q.    Okay.  So does that refresh your recollection that there was in fact a plea as well as a revocation proceeding at that time?

A.    Yes, sir.

Q.    And revocation proceeding would be a violation of probation.  Is that fair to say?

A.    Yes.

Q.    Okay.  And do you see on Line 9 and 10 that you indicated that you would waive the enhancement paragraphs?

A.    Yes.

Q.    Okay.  I'm going to show you another document, P-189. Take a moment to review that, sir.

      (PAUSE.)

A.    Yes, sir.

Q.    Now, can you describe for the Court, with your years of experience, what in fact that indicates to you?  What is that document?

A.    That would be the, generally the second exhibit we offer into evidence after a plea agreement.  It is a confession and stipulation as to the evidence that we would have presented against Mr. Longoria.  That is what he is judicially confessing

USCA5 5602

to.  We obviously struck through the enhancement paragraph to allow us to reach a plea agreement below the 25-year minimum.

Q.   Now, is that you that would actually strike through that, or would that be -- there's initials there, but I couldn't quite tell whose they were.

A.   Those are my initials, "JS, III."

Q.   Okay.  So would it be fair to say that that's where you struck the enhancement paragraph as far as the stipulation at the sentencing?

A.   Yes, sir.

Q.   Okay.

MR. McHUGH:  Your Honor, I would offer P-189 and the transcript, P-188 at this time.

MR. DOWD:  No objection, Your Honor.

THE COURT:  P what?

MR. McHUGH:  P-188 is the transcript and P-189.

THE COURT:  Both are admitted.  Thank you.  Don't forget to give these to the clerk when you're finished with them.

MR. McHUGH:  I shall.

THE COURT:  Thank you.

BY MR. McHUGH:

Q.   Going to turn back to the transcript, Page (sic) 188.  I just ask you to read Lines 9 through 13, if you can.

A.   Silently or out loud, sir?

USCA5 5603

Q.   No, no, to yourself.  I just have a question about that.

A.   Yes, sir.

Q.   And could you just tell us, from reviewing that, those lines of this, what was the -- what were the charges that Mr. Longoria was on probation for?  Do you see that in Line 11?

A.   Well, evading arrest or detention would be a misdemeanor, unless it was with a vehicle, and endangering a child.

Q.   Okay.  Now I'm going to turn to Page 6 of this document, and it's going to continue on Page 7.  Does this refresh your recollection as to -- if you could start with the indication that the Defendant has entered his plea at the bottom of the page, and then your comments to the Court, your statements to the Court, and then I'm going to flip the page and you can continue reading that.

A.   Yes, sir.

Q.   Okay.  And continuing on to Page 7, top.

     (PAUSE.)

          THE COURT:  Mr. Bourgeois, are you still there?

          THE DEFENDANT:  Yes, ma'am.

          THE COURT:  Okay.  I just want to make -- I'm going to check with you every now and then to make sure you're still on the line.

          THE DEFENDANT:  Yes, ma'am.

BY MR. McHUGH:

Q.   Now, have you had a chance to review that, Mr. Sales?

USCA5 5604

A.   Yes, sir.  I was just getting down to Lines 21, 22 and 23.
Yes, sir.

Q.   I just want to ask you more about the top of the page, as
far as your recommendation to the Court.

A.   Yes, sir.

Q.   Does this refresh your recollection as to what you
recommended to the Court?

A.   Yes, sir.

Q.   And what was that?

A.   Looks like a seven-year prison sentence to run
concurrently, the revocation and the robbery charge.

Q.   Okay.  Now, Mr. Sales, at the time of this revocation and
plea and the litigation of this Longoria matter, were you
familiar with who Ms. Patti Booth was?

A.   Yes.

Q.   Did you know her?

A.   I knew of her.  I knew of her, yes.

Q.   Okay.  Did you speak with her about Mr. Longoria's matter
before he entered his plea -- oh, I'm sorry.  And the date of
this transcript was April 19th of 2004.  Is that right?

A.   Yes, sir.

Q.   At the bottom -- okay.  So my question is, did you speak
with Ms. Patti Booth about this matter before the entry of his
plea on -- Mr. Longoria's plea on April 19th of 2004?

A.   I don't think so.

USCA5 5605

Q.   You say you don't think so.  Is it possible you could have?

A.   I have talked to Ms. Booth off and on over the years.  I do not remember ever specifically talking to her regarding this Defendant, Mr. Longoria.

Q.   So you're not sure if you did or you didn't.

A.   If it is something that I would have done as a plea bargain, that should have been in the plea bargain agreement. I do not have a specific memory of talking with Ms. Booth regarding Mr. Longoria.

Q.   If it was an oral plea agreement, then obviously it would not have been able to appear in the written plea agreement.  Is that fair to say?

A.   Something that important I would have written down, sir.

Q.   Okay.  And did you ever speak with a individual by the name of Megan Beckett, a case agent, an FBI Agent concerning this matter, prior to Mr. Longoria's plea?

A.   I know Agent Beckett.  I do not recall ever talking to Agent Beckett regarding Mr. Longoria.

Q.   Okay.  Do you recall speaking with anybody in any way about the Bourgeois matter before Mr. Longoria entered his plea?

A.   No.

Q.   Did you receive any type of communication, so in other words I've been asking you about speaking with individuals

USCA5 5606

concerning the Bourgeois matter.  Now I'm more specifically asking, did you receive -- or less specifically -- any type of communication from anybody relating to Mr. Longoria and his testimony in the Bourgeois case prior to him entering his plea, Mr. Longoria that is?

A.    Not that I remember, sir.

Q.    Okay.  Now, I wanted you to look at Page 7, and we're -- Page 7 at the bottom.  Do you see that?

A.    Yes, sir.

Q.    And it indicates that if Mr. Longoria -- this is Mr. May speaking in open court -- if Mr. Longoria is a witness in another case, then they would approach the Court to reduce the seven-year sentence to five years.  Is that right?

A.    I cannot see the --

Q.    I'm going to turn the page, but --

A.    All I see is "seven-year sentence."

Q.    Okay.  Right at the top there.

A.    Okay, sir.

Q.    Okay.  Now, does that refresh your recollection as to whether or not Mr. Longoria had been a witness in a case that was the basis of his plea agreement?

A.    I believe at the time that I was involved with the Raza Unida prison gang, that the case in reference was against Gabriel Ramos.  And what ended up happening is Mr. Longoria ended up testifying against me for the Defense, rather than for

USCA5 5607

me.

Q.   I've got to clarify that.  When you're talking about the Gabriel Ramos matter, are you talking about the additional state court matter that would reduce it to five, or are you talking about, would be the first matter that led to the seven-year plea agreement?

A.   It's --

MR. DOWD:  Well, Your Honor, I think the witness has testified there was no first matter that led to the seven-year plea agreement.

MR. McHUGH:  I want to clarify that.  I'm not sure what he's talking about.

BY MR. McHUGH:

Q.   So do you understand our question?

THE COURT:  Why don't you say it again, because I didn't get it.

MR. McHUGH:  Okay.

BY MR. McHUGH:

Q.   You talked about the Gabriel Ramos matter.  Was that the matter that we're talking about as far as Mr. Longoria having further consideration, reducing the seven years to five years?

A.   I believe that that is correct, sir.

Q.   Okay.

A.   And I believe that it's Gabriel Ramos.  There were a bunch of those fellows that we were pursuing at the time.

USCA5 5608

Q.    Okay.  And now refreshing your recollection concerning this plea agreement for the seven years and your recommendation, Mr. Sales indicates -- I'm sorry -- Mr. May indicates, if Mr. Longoria is a witness in another case.  You understand that?  Do you recall whether he was, what the first case was?  When Mr. May's indicating he's a witness in another case, do you recall what the -- or does this refresh your recollection as to what the first case would have been?

A.    If I could have the document --

Q.    I'm sorry.

A.    -- in front of me, that would help.

Q.    And I also would remind you about the continuance that Mr. May filed, which is P-104 concerning the Bourgeois case.

A.    The "another case" is referring to my state case, sir.

Q.    I understand that.  But my question is if you're having another case, does that refresh your recollection of whether there was a first case that Mr. Longoria was a witness in?

A.    In other words --

THE COURT:  I don't know what you're talking about.  Do you know what he's talking about?

THE WITNESS:  I know what he's trying to say, Your Honor, but I disagree --

THE COURT:  Well, why don't you just figure out what the answer is supposed to be and say it.

THE WITNESS:  Yes, Your Honor.  It's another case

USCA5 5609

from the one that was before the Court in the plea.

BY MR. McHUGH:

Q.   Okay.

A.   A case other than the Adam Longoria case, which my interpretation or my remembering is the Gabriel Ramos case.

Q.   Okay.  Now, do you recall, sir, why you dropped the habitual offender 25-year mandatory minimum in this case?

A.   We had a bank robbery with no weapon.  It was a note.  He had a defense of duress, that there was another gang member present that was forcing him to commit the robbery.  He had been stabbed at least 25 to 30 times in his back prior, that seemed to me consistent with a possible duress defense.  I know Mr. May is a very talented attorney, very amicable, could get juries to believe the sob stories, so I thought in the interest of justice, it's better to get something than nothing.  And without a weapon being used, seven years felt like a fair recommendation, as opposed to possibly getting an acquittal.

Q.   So you do remember some significant facts about this case?

A.   I remember Adam Longoria, because of the 25 to 30 stab wounds in the back, yes, sir.

Q.   Okay.  Well, and you just don't remember Adam Longoria. You actually remember various facts about this case.

A.   Yes.

Q.   When was the last time you reviewed the facts of this case?

USCA5 5610

A.    I haven't seen the file in seven years.

Q.    Okay.  Did anybody talk to you about the case recently?

A.    No.

Q.    Did you meet with anybody from the Government concerning your testimony today?

A.    I have --

Q.    Or talk to anybody?

A.    I have talked to them over the phone for probably two to three minutes.

Q.    Okay.  Was that about the facts of the case or just about your appearance?

A.    Just about being here.

Q.    Would you say scheduling issues?

A.    What did I remember.  And I specifically asked for copies of the plea agreement, copies of the transcript to help me refresh my memory prior to testifying.

Q.    And were you provided with any documents?

A.    No, sir, I was not.

Q.    Okay.  Now, so you're saying you thought it was better to get something than nothing.  Well, do you also remember that you had eyewitnesses that identified Mr. Longoria in the bank, victims in the bank?

A.    No, sir.

Q.    Do you also recall that you had a surveillance tape that Mr. Longoria was on while robbing the bank?

USCA5 5611

A.    I would believe that Ms. Bernal on the indictment's probably the bank teller at the time.  So it's reasonable to conclude that she in fact identified him.  But her identification of him would not preclude the duress defense, as she was not in the vehicle and was probably unaware of his gang affiliation or association.

Q.    Were you also aware that the demand note you had processed had a fingerprint from Mr. Longoria, a positive match on his left thumb?

A.    Yes, sir.  I think there was very little doubt that he was the one in the bank and that he had written the note.  That did not preclude the possible duress defense or --

Q.    And would you agree with me that the surveillance tape indicated that he was the only one in the bank as part of this robbery?

A.    I honestly don't remember if there was anyone else.  It seems to me there was someone in the vehicle, but obviously the camera would only reflect who was in the bank.

Q.    Okay.  So if I understand correctly, you had a fingerprint, a surveillance tape.  You had a Mirandized confession from Mr. Longoria, is that right, that he robbed the bank?

A.    I don't remember that.

Q.    Okay.

A.    I'll take you at your word, sir.

USCA5 5612

Q.    And you also had a positive identification from the bank teller, and it's your recollection that you were going to take what you could get?

A.    Yes.

Q.    Because you were concerned about a duress defense.  Is that right?

A.    That is correct, sir.

Q.    And you're aware that Mr. Longoria had just been placed on probation for the car endangerment of the child only a few months before this bank robbery.  Is that right?

A.    No, I don't recall that, sir.

Q.    Okay.

A.    I don't recall when he was placed on probation.

Q.    Now, I'm going to show you what's been marked as Government Exhibit 169.  Take a moment to review that.

        THE COURT:  I'm sorry, is that admitted?

        MS. BOOTH:  That hasn't been admitted.

        MR. DOWD:  Your Honor, if that's not in evidence, I would object to Counsel showing that to the witness.

        MR. McHUGH:  Well, it's --

        THE COURT:  Well, it's not in evidence.  He can show it -- I'm not looking at it.

        MR. DOWD:  Okay.

        THE COURT:  It's off the screen for me.

        MR. DOWD:  Yes, Your Honor.

USCA5 5613

BY MR. McHUGH:

Q.   I'm showing you what's been marked as Government Exhibit 169.  And can you read that, sir?  I'm not sure the focus is working.

THE COURT:  Ms. Scotch, could you figure the focus again?

MR. McHUGH:  I think I've got it now, Your Honor.

THE WITNESS:  It's still a little blurry, sir.

BY MR. McHUGH:

Q.   Does this appear to be a letter written on Department of Justice letterhead from Ms. Booth dated February 9th, 2006, to the Texas Board of Pardons and Paroles?

A.   Yes, sir.

Q.   Okay.  Is it concerning a recommendation for Mr. Longoria for -- in support of his request for parole, in the first paragraph?

A.   Yes, sir.

Q.   Okay.  Now, in this matter, with your many years of experience as a prosecutor, would you expect to be consulted if another prosecutor, whether it be state or federal, was going to write a letter of recommendation for the parole -- for parole for one of the Defendants that you had prosecuted?

A.   No, sir.

Q.   You would not expect to be consulted?

A.   No, sir.  I do not consult the U.S. Attorney's Office when

USCA5 5614

I make recommendations for my state cases.  If I'm not involved in their prosecution, I do not consult them.  I make my own decisions.

Q.   No, I understand that.  But I mean, if you prosecute a Defendant in state court --

A.   Yes, sir.

Q.   -- and an individual, Mr. Longoria, is serving a state sentence, and another prosecutor from another, say from your office or from another county or from the federal government was going to recommend parole in your case, not one of their cases, in your cause, would you expect to be consulted in your years of experience?

A.   My years of experience, sir, the federal government tends to do what they want to do without consulting the state.

Q.   Okay.  So it's your testimony that you would not expect to be consulted by Ms. Booth concerning Mr. Longoria's parole in your matter.

A.   Correct, sir.

Q.   Now, were you aware that Mr. Longoria was released in May of 2010?

A.   I had no idea.

Q.   Were you ever made aware by the Government that he was subsequently arrested for capital murder of a young girl in Kansas?

A.   Lord have mercy.  No, I had no idea.

USCA5 5615

Q.   Okay.  If you were aware of this letter concerning Mr. Longoria, would you have written your own letter opposing it?  And when I say "this letter" I mean P-169.

A.   No.

Q.   And why not, sir?

A.   During that time, I was extremely busy with my own cases. My plate was full, sir.  I did not have extra time to be writing such letters.

Q.   Okay.

        MR. McHUGH:  If I may just have a moment, Your Honor?

        THE COURT:  Yes.

    (PAUSE.)

        MR. McHUGH:  Your Honor, at this point I would move in the exhibits, including -- offer, including Government 169, and I believe my other exhibits have already been admitted.

        THE COURT:  I'm sorry, what other exhibit did you say?

        MR. McHUGH:  I believe the only -- I move in all my exhibits.

        THE COURT:  Okay.

        MR. McHUGH:  I believe the only one that I haven't moved in, though, however, is Government 169.  So I'm asking the Court --

        THE COURT:  Government 169?

        MR. DOWD:  Judge, we would object.  I don't think

USCA5 5616

he's provided any authentication for that.

MR. McHUGH:  Your Honor, this is a letter that was provided to us by the Government.  It's on United States Justice Department -- it's premarked by the Government as an exhibit in this hearing.  It deals specifically with Mr. Longoria, and it's signed by Ms. Patti Booth.  I think this is clearly a document that the Court can take as authentic, or a copy thereof.

THE COURT:  Okay.  Is this the letter to the Board of Paroles?

MR. DOWD:  Yes, Your Honor.

THE COURT:  Okay.  I'll admit that, if you can tie it up to something that happened before his testimony.

MR. McHUGH:  Well, I'm done with my questioning from this --

THE COURT:  Okay.  Thank you.  Oh, sorry. Examination?

MR. DOWD:  No questions, Your Honor.

THE COURT:  Okay.  Did Ms. Booth ever tell you that she had made a deal with Mr. Longoria and she wanted you to give him some reduction?

THE WITNESS:  No, Your Honor.

THE COURT:  You're positive?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Okay.  Thank you.

USCA5 5617

MR. McHUGH:  Your Honor, concerning the letter, I think I can meet the Court's threshold for admission.  The letter --

THE COURT:  You're excused.  Thank you.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  He's excused?

MR. DOWD:  Yes, Your Honor.

THE COURT:  Can we release him from his subpoena to go back to work?  You know where you -- do you have a cell phone?

THE WITNESS:  In my car, Your Honor, yes.

THE COURT:  Would you give Mr. Dowd the cell phone number.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Just in case something comes up and we need to talk to you again.

THE WITNESS:  Yes, Your Honor, I will.

THE COURT:  Thank you, sir.

THE WITNESS:  Good to see you, Your Honor.  Thank you.

THE COURT:  Good to see you.  Are you going to come back to this area, Mr. Sales?

THE WITNESS:  I live in Corpus Christi, Your Honor.

THE COURT:  Well, I meant --

THE WITNESS:  I'm hoping to be invited back to this

USCA5 5618

area.

THE COURT:  That's what I was wondering.  The tides of fortune change, you know.

THE WITNESS:  Yes, they do, Your Honor.

MR. McHUGH:  As to the Court's threshold for admission of this document, the document itself talks about Mr. -- and talked about prior to his testimony in the Bourgeois matter.  The document itself references Mr. Longoria's conduct before, during and after.  So --

THE COURT:  All I'm saying is if you've got some evidence to show that Ms. Booth promised him something before he testified, I'll listen to it, not some post testimony, something that she felt obligated to do, because she's like that.

MR. McHUGH:  Well, what -- and my argument to that is the letter itself states Mr. Longoria testified without any benefit being offered, requested or given.  That's going towards prior to his testimony.

THE COURT:  Okay.

MR. McHUGH:  So as far as the Court's --

THE COURT:  So there was nothing offered to him?

MR. McHUGH:  According to the letter, but I certainly think that there --

THE COURT:  Well, what do you want it to prove, just part of it?  Part of your -- what do you want it to prove?

USCA5 5619

MR. McHUGH:  I think, this letter --

THE COURT:  I'll admit it.  I'm just going to admit it.

MR. DOWD:  Yes, Your Honor.

THE COURT:  It's Exhibit Number what?

MR. McHUGH:  Government 169.

THE COURT:  Are you going to offer it as a Movant's Exhibit?

MR. McHUGH:  Sure.  We'll make it P -- I'm up to --

THE COURT:  Are we doing Ts or Ps?

MR. McHUGH:  P as in Petitioner.

THE COURT:  Okay.  Thank you.  I thought you said T.

MR. McHUGH:  I'm up to 189, so I will also identify it as P-190.

THE COURT:  P-190 is admitted.

MR. McHUGH:  I'm going to hand up the copies of everything I just referenced.

THE COURT:  Thank you very much.

(PAUSE.)

MR. WISEMAN:  Your Honor, I believe that concludes Petitioner's witnesses, and we would rest at this time.

THE COURT:  All right.

MR. DOWD:  Your Honor, my first witness is not here. It's Debbie Hohle.

MS. SALINAS:  I will go get her, Your Honor.

USCA5 5620

MR. DOWD:  Thank you.

THE COURT:  Where's Ms. Booth?

MR. DOWD:  Ms. Booth stepped out.  She's looking for a piece of evidence, Your Honor.

THE COURT:  Floating in the hallway?

MR. DOWD:  Yes, Your Honor.

THE COURT:  Okay.

(PAUSE.)

MR. DOWD:  Stand and be sworn, please.

DEBRA HOHLE, GOVERNMENT'S WITNESS NO. 1, SWORN

DIRECT EXAMINATION

BY MR. DOWD:

Q.   Ms. Hohle, be careful not to touch the microphone.

A.   Yes.

Q.   But lean in toward it so we can hear you.  Would you state your full name, please, and spell your last name?

A.   Debra Hohle, last name is spelled H-O-H-L-E.

Q.   And how are you employed, Ms. Hohle?

A.   I'm an employee at the Corpus Christi Division of the U.S. Attorney's Office.

Q.   Okay.  You're leaning to the -- lean toward the microphone.  There you go.

THE COURT:  If you just put your right arm on that, then you're right there.  Thank you, ma'am.

BY MR. DOWD:

USCA5 5621

Q.   And describe your present duties.

A.   My current title is Administrative Legal Specialist.  I work with trial support and automation, and I do some of the LECC activities.

Q.   Law Enforcement Coordinating Committee activities?

A.   Yes.

Q.   All right.  And how long have you worked for the U.S. Attorney in Corpus Christi?

A.   I began in August of '90 with the U.S. Attorney's Office.

Q.   All right.  And in what capacity did you begin working there?

A.   As a legal assistant.

Q.   All right.  And then at some stage, you were promoted?

A.   Yes.  I became the office manager in approximately '96.

Q.   Okay.  In what capacity did you work for the U.S. Attorney in the year 2003?

A.   I was the office manager.

Q.   All right.  In 2003, were you fully familiar with the practices and procedures of the Criminal Division here in Corpus Christi?

A.   Yes, sir.

Q.   All right.  And did your duties in 2003 include working on the Bourgeois prosecution?

A.   I assisted in the trial prep with indirect and direct methods.

USCA5 5622

Q.   Okay.   Indirect in what way?

A.   In supervising other staff.

Q.   Okay.   And you actually had hands-on involvement yourself?

A.   Yes, sir.

Q.   Okay.   And what role did you play?   Witness preparation?
Document control, what --

A.   As the closer -- as we got closer to trial date, I began
very actively working with witnesses in getting preparation of
the files to be brought over to court.

Q.   Okay.   And in 2003, did the Corpus Christi Criminal
Division have set practices and procedure for providing
discovery material to Defense Counsel?

A.   Yes.

Q.   All right.   And what was that practice or procedure?

A.   At the direction of the AUSA, we would make packages for
defense, and then there was a receipt as we made those packages
for delivery that they would sign off on.

Q.   Okay.   And directing your attention to the prosecution of
Mr. Bourgeois, were those standard practices and procedures
followed in that case as well?

A.   Yes.

Q.   Okay.   There were no special procedures put into place for
Mr. Bourgeois's case?

A.   No.

Q.   In addition to providing discovery under those standard

USCA5 5623

practice and procedures, was discovery provided to Defense Counsel in a more informal way as circumstances dictated?

A.    Yes.

Q.    In what way was that done?

A.    When the Counsel or the AUSAs assigned to the case would have meetings with Defense Counsel or informal, a court hearing, sometimes documents would exchange that wouldn't necessarily be through the receipt format that we would utilize when support staff handed out the discovery.

Q.    Documents would be provided in the courtroom or --

A.    Yes.

Q.    -- in conference room in the U.S. Attorney's Office?

A.    Yes.

Q.    All right.  But as far as the formal discovery procedures, normally the record would be made, notations in the file or some record would be made as far as providing discovery to the defense?

A.    Yes.  Yes.

Q.    And what records would be created?

A.    We would create what we call a discovery receipt in the office, and then it would be signed by whoever received those documents --

Q.    Okay.

A.    -- from the Defense Counsel's office.

Q.    All right.  And there's an issue here in the court

USCA5 5624

regarding a missing document in the FBI lab report, which has been identified as Petitioner's Exhibit 179.  Are you familiar with that document and this issue?

A.    Yes.

Q.    You've been investigating this matter since September?

A.    Yes.

Q.    All right.  And did you look through the U.S. Attorney's Office files, criminal file and discovery file in investigating this matter?

A.    Yes.

Q.    Okay.  Now, these files that you, that you've been referring to and looking through, these are the -- these are our official files that are kept by the U.S. Attorney's Office staff with some intent that they be reliable and reflect what was happening in a case and what was done in a particular case?

A.    Yes.

        MR. ABREU:  Your Honor, I would object to the characterization of the evidence -- of the files.

        MR. DOWD:  I'm just asking her to describe the files she was looking through to investigate this matter, Your Honor.

        THE COURT:  Overruled.  I didn't understand the legal objection, so --

        MR. ABREU:  Well, I think my objection was that he was asking her to draw conclusions about the files and the purpose of how they're kept, Your Honor.

USCA5 5625

THE COURT:  Well, if she's in charge of them, I think she can do that.  Go ahead.

MR. DOWD:  Let me direct your attention --

THE COURT:  Is that what you testified to?

THE WITNESS:  I'm sorry, Your Honor?

THE COURT:  You're charged with keeping the files in order?

THE WITNESS:  Yes, I assist in maintaining the files, yes.

THE COURT:  All right.  Go ahead.

BY MR. DOWD:

Q.   Let me direct your attention to a particular item of discovery in the Bourgeois case, the FBI lab report.  Do you know when the FBI lab report was sent by the FBI to the U.S. Attorney's Office?

A.   I know that we have, with the lab report, there was a packing slip that the date on the packing slip was the 29th of October.  And on that packing slip, it indicates that the FBI sent it via FedEx.  So with that, I cannot articulate the actual day that it entered our office, but since the packing slip's the 29th, and generally FedEx is either, they can do second day, first day, it would have been within the next couple of days of that date.

MR. DOWD:  All right.  Your Honor, may I show something to the witness?

USCA5 5626

THE COURT:  That hasn't been admitted?  Wait.  I'm sorry.

MR. DOWD:  It has not been admitted, Your Honor.

THE COURT:  Okay.

BY MR. DOWD:

Q.  Ms. Hohle, let me show you what's -- oops -- let me show you what's been marked as Government's Exhibit Number 1 in this hearing --

THE COURT:  Now, who's going to take this witness on cross-examination?  If you would like to come up and look at that, if you have not seen the document --

MR. ABREU:  I've seen it, Your Honor, and if it makes it easier, there's no objection to these documents.  I've seen them in advance.  So that might make things easier for --

THE COURT:  What are the numbers?

MR. DOWD:  1, 2 and 3, Your Honor.

THE COURT:  Government's 1, 2 and 3 --

MR. DOWD:  Uh-huh.

THE COURT:  -- are admitted.  Is that right, Mr. Abreu?

MR. ABREU:  Yes, Your Honor.

THE COURT:  No objection to the admission.

BY MR. DOWD:

Q.  And let me just show you so we can identify the document for the Court.  I'm showing you what's been marked as

USCA5 5627

Government's Exhibit Number 1, with a date of October 29th.

A.    Yes.

Q.    On the top left.  Is this the document you're referring to?

A.    Yes, sir.

Q.    All right.  Where was -- where did you locate this document?

A.    That document is, was with what I have file folder marked "original."  It was within that packet.

Q.    All right.  And this reflects that the FBI has prepared this lab report file for shipping to us --

A.    Yes, sir.

Q.    -- on October 29th of '03.  Is that right?

A.    The packing slip was dated the 29th of '03, and the shipping method was FedEx.

Q.    All right.  You estimated it would get to the other attorney's office within a couple of days?

A.    Yes.

Q.    Okay.  Do you know what day of the week October 29th, '03 was?

A.    I looked at a calendar.  It was a Wednesday.

Q.    You looked at a perpetual calendar?

A.    Yes.

Q.    And it was Wednesday?  Okay.

      THE COURT:  What's a perpetual calendar?

USCA5 5628

MR. DOWD:  Goes back to, in perpetuity.

THE COURT:  Okay.

BY MR. DOWD:

Q.   Is that what you did?

A.   Yes.

Q.   Okay.

A.   I actually looked on my cell phone calendar and went all the way back to '03 --

Q.   Okay.

A.   -- to see what day of the week it was.

THE COURT:  You just pulled up a calendar for '03.

THE WITNESS:  Yes, ma'am.

MR. DOWD:  Yeah, I was --

THE COURT:  Okay.

MR. DOWD:  -- trying to add a little, you know --

THE COURT:  I appreciate --

MR. DOWD:  Jazzing it up, you know.

THE COURT:  Thank you.  You don't want to confuse the pitiful Judge, though.

MR. DOWD:  Sorry about that.

BY MR. DOWD:

Q.   And do you know when the FBI --

THE COURT:  Mr. Bourgeois, are you there?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Okay.

USCA5 5629

BY MR. DOWD:

Q.   Do you know when the FBI lab report file was received at the U.S. Attorney's Office?

A.   I can't tell you the actual date it was, entered our office, no.

Q.   Okay.  Now, can you describe to the Court what materials were received, were contained within this FBI lab report file?

A.   Within the file, it had the packing slip documents, there was a correspondence, the first page, which also indicated, and there was a CD with it.

Q.   All right.

A.   And then there was also some original film product with that particular packet.

Q.   All right.  And were you able to copy the CD that came from the FBI?

A.   No.  There was a special proprietary software on that CD, and at the time we did not have the capability and the urgency, that particular CD was given to Defense.

Q.   Okay.  So then -- so the original CD was simply handed over to the Defense?

A.   Yes.

Q.   All right.  Let me --

THE COURT:  That came from the FBI?

THE WITNESS:  Yes, ma'am.

THE COURT:  And did you print out your stuff off,

USCA5 5630

from that CD?

THE WITNESS:  No, we did not, because it had proprietary software, so the disk, when we got it, and we were trying to urgently give it in discovery, we just gave them the disk.

THE COURT:  Well, how did you get your stuff back?

THE WITNESS:  The packet with FBI file had pages plus the disk.  So when we copied, we just gave that one disk, because at the time our system software would not allow us to copy the disk, so we didn't have the capability.

THE COURT:  Okay.

THE WITNESS:  So we gave the paper product and copy, and we just gave them the CD.

THE COURT:  Okay.

BY MR. DOWD:

Q.   Let me show you what's been marked as Government Exhibit Number 2 and ask you if you can identify this.

A.   That is the face sheet of the lab report, as received, which references the CD.

Q.   All right.  This is already admitted.  Does the U.S. Attorney's Office --

THE COURT:  So it's possible that that document was not on the CD but was in the paper copy?

MR. DOWD:  We'll get to that, Judge.

THE COURT:  Okay.

USCA5 5631

BY MR. DOWD:

Q.   And does the U.S. Attorney's Office file suggest how many pages the FBI lab report was?  Not counting the CD, but how many paper, sheets of paper the -- was contained in the FBI lab report?

A.   358 pages.

Q.   Okay.  And this, as you've indicated, it includes not just scientific findings, but some correspondence relating to the sending of the lab report, packing slip?

A.   Correct, the correspondence and the packing -- the packing slip isn't included in the quantity of 358 pages.  The correspondence --

Q.   Oh, the correspondence --

A.   -- and the scientific documents with it.

Q.   Okay.  Now, was the FBI lab report an original itself, or was it simply just a Xerox copy made by the FBI and sent to us?

A.   It did not appear to be original documents.  They appeared to be copies --

Q.   Okay.

A.   -- that were sent to us.

Q.   All right.  Now, in making copies for the Defense, or providing discovery to the Defense, would the Defense simply be given a copy of what we received?

A.   Yes.

Q.   Okay.  And was that done in this case?

USCA5 5632

A.    Yes.

Q.    Were you able to determine who in the U.S. Attorney's Office made a copy of the FBI lab file?

A.    No, I couldn't -- there is no identification of which person made that copy or made the copies.

Q.    And do we know how many copies of the FBI lab report were initially made?

THE COURT:   You mean copies of the paper copy?

MR. DOWD:   Copies of the paper documents.

THE COURT:   Okay.  Thank you.

THE WITNESS:   Being initially made in trial preparation.

BY MR. DOWD:

Q.    Well, no, being initially made at the onset to provide to the Defense.

A.    I would say initially the one copy they were given.

Q.    Okay.

A.    Because of trying to get it to them quickly.

Q.    All right.

THE COURT:   Okay.  Let me say -- let me ask again.

THE WITNESS:   Yes, ma'am.

THE COURT:   You gave them the CD directly from the FBI?

THE WITNESS:   Yes, ma'am.

THE COURT:   And you gave them a paper copy of all the

USCA5 5633

papers?

THE WITNESS:  That the FBI had sent us, yes.

THE COURT:  Okay.

BY MR. DOWD:

Q.    Now, does the U.S. Attorney's Office file reflect how many documents were provided to the U.S. -- to the Defense?

A.    The discovery receipt indicates 358 pages.

Q.    All right.  Let me show you what's been marked as Government's Exhibit Number 3.  Is this the document you're referring to?

A.    Yes.

Q.    All right.  And toward the lower left, it says, "Documents, 358 pages."  That's how you concluded that?

A.    Yes.

Q.    Okay.  So we received 358 pages, and we -- on, in early November '03, and we provided 358 pages to the Defense on November 7th of '03?  Is that correct?

A.    Yes.

Q.    Okay.  And in the U.S. Attorney's -- does the file reflect that this document, P-179, was within the documents received from the FBI as part of this 358 pages?

A.    Yes.

Q.    Okay.  Where was this FBI lab report stored in the U.S. Attorney's Office during the period that it was -- from the period it was received from the FBI in early November to

USCA5 5634

November 7th when it was copied and sent to the Defense team?

A.    There was a designated trial prep room for that case.

Q.    Okay.  How many AUSA's were assigned to the Bourgeois prosecution?

A.    Three.

Q.    And what was the practice of providing copies of investigative material such as the FBI lab report to the AUSAs? Was it -- did everybody get everything?

A.    No.  Every product wasn't copied multiple times for every AUSA.  Sometimes they would want specific copies or we would, depending on what the product was.

Q.    So that was done piecemeal, according to what was requested?

A.    Yes.  As to the AUSA requests, yes.

Q.    Do you know in early 2003 at what stage was the prosecution of Mr. Bourgeois?

A.    I know that there was a status hearing in mid October.

Q.    Which triggered the --

A.    I believe in the status hearing in -- there were discussion of experts and notes and product that needed to be turned over, if I remember, from -- I looked at the docket, and that was my recollection.  I think the 24th, there was a status hearing, I believe.

Q.    Okay.  But there was nothing happening between November 1st and November 7th, as far as --

USCA5 5635

A.    No.  Not in the docket, no.

Q.    Related to this document?

A.    No.

Q.    Okay.  All right.  Now, how many copies of the FBI lab report does the U.S. Attorney have in its office now?

A.    Five.

Q.    Okay.  And are these five copies in the same condition they were in as of September of 2010 at the time of the evidentiary hearing in this case?

A.    Yes.

Q.    Okay.  When this became an issue?

A.    Yes.

Q.    Okay.  Now, do you know which set of the five copies represents the original copy sent to us by the FBI?

A.    The one that I say is the original on it for trial prep, I have a sticker that has the word "original" on it, plus that particular set has the original film that the FBI sent, the actual microfilm of -- I'm not sure what they are, but they have that, so that's why I say that it is, and the packing slip was with that particular grouping.

Q.    And that's why you believe that to be the original set?

A.    Yes.

Q.    And how many pages does that original set contain?

A.    That set's the 358 pages.

Q.    Okay.  And do you think that most reliably represents what

USCA5 5636

was sent by the FBI?

A.   Yes.

Q.   Okay.  Does this set, this original, this set you're calling the original set contain P-179?

A.   Yes.

Q.   Okay.  What other set of our copies are you the most familiar with?

A.   I'm familiar --

Q.   The four other copies?

A.   I'm familiar with all of them.

Q.   Which two did you have the most involvement with?

A.   Which -- the most involvement?

Q.   Yeah.

A.   Well, I prepared files -- when we came to trial, I can tell you that I brought three sets over for trial, and then there --

Q.   Three sets being?

A.   Being what I consider the original, my secondary trial set, and the witness set.

Q.   So you had the original, then you had what would be a copy of the original, and then you had another copy of the original which, which you had for the witness file?

A.   We would put with the witness folders.

Q.   Okay.  And do you know the purpose of the last two copies?

A.   I would -- AUSA working copies, whatever distinction they

USCA5 5637

had in their product, or in that sense, sometimes the attorneys had their own copies.  That would be my assumption of what those were.

Q.    Okay.  And that's why you believe those would be the AUSA working copies?

A.    Yes.

Q.    And of these four copies we have, do you know when and how they were made?

A.    No.

Q.    Okay.  We don't know by whom within the office.  Is that right?

A.    No, I don't.

Q.    And of these four copies of the original, that you have, how many of those four copies contain the P-179 document?

A.    Besides the original, my secondary original and my witness set have the P-179 document.

Q.    Okay.  So the two that you've referred to as the AUSA working copies don't contain the P-179?

A.    No, they don't.

Q.    Okay.  Are any of the five sets exact duplicates of another set?

A.    No.

Q.    Okay.  Are any of them almost exactly, contain the same documents?

A.    There's variances, but they're all off within -- you might

USCA5 5638

go 349 to 360 with documents that have been added or whatever. Like the working files have different documents. But after time, none of them are exactly every page per page the same.

Q.   All right. And the AUSA working copies, do they contain additional pages not contained in the original and the two other reliable sets?

A.   Yes.

Q.   How do you account for this?

A.   As working copies, the extra documents are subpoena copies and things which would have dealt with witnesses, whoever was dealing with that for dates of the courts and their trial subpoenas, and fax cover sheets.

Q.   Are there any documents that were created after November 7th, 2003, that have been placed in any of these copy sets?

A.   One of the documents is a subpoena that has a date of '04. I think it was February '04, but --

Q.   Okay. And this case has progressed through trial, direct appeal, now on 2255 since 2003.

A.   Yes.

Q.   So these files were available for an access, accessible by all the lawyers and the staff members during that period?

A.   Yes.

Q.   Okay. Now, these additional documents you've described and correspondence, subpoenas, et cetera, do you know if any of these additional documents found their way to Mr. Tinker that

USCA5 5639

weren't in the original 358?

A.    Yes.

Q.    Okay.  And how do you know that?

A.    The items received, that we received from the Public Defender's Office included some of those pages in their version of the documents from Mr. Tinker's office.

Q.    So that we got, when we got the 12,000 pages from the Federal Public Defender --

A.    Yes.

Q.    -- and they had received those 12,000 pages from Mr. Tinker --

A.    That's my understanding.

Q.    -- as the documents in the underlying criminal case?

A.    That's my understanding, yes.

Q.    You've identified that there are some additional documents that did, that were supplied to Mr. Tinker that weren't contained in this original 358 pages?

A.    Yes.

Q.    Okay.  And were any of those documents that you're referring to post, dated after November 7, 2003?

A.    I think the one document, the subpoena, the '04 subpoena, I believe, was in that also.

Q.    Okay.  And that related to the FBI lab report materials?

A.    It was to one of the chemists, or one of the lab --

Q.    And that was dated after November 7th, 2003.

USCA5 5640

A.    Yes.

Q.    Yet it was still contained in Mr. Tinker's file.

A.    Yes.

Q.    Okay.  Now, of the 358 pages that were provided to Mr. Tinker on November 7th, 2003, did all 358 of those pages -- I'm referring to our original set -- were all of those included in the 12,000 documents that Mr. Tinker shared with the Public Defender and the Public Defender shared with us?

A.    There are approximately five or six pages different that I don't think -- well, ask me -- I'm not quite sure.

Q.    All right.  Of the 358 pages in our original set --

A.    Uh-huh.

Q.    -- that were provided to Mr. Tinker on November 7, 2003 --

A.    Uh-huh.

Q.    -- did any of those documents, do any of those documents not appear in the 12,000 pages Mr. Tinker shared with the Public Defender and then --

A.    Yes.

Q.    -- we since had access to?

A.    Yes.

Q.    Okay.  And that's the five or six you were describing?

A.    Five or six pages, yes.

Q.    Okay.  So not all the pages that were provided to Mr. Tinker in '03 were turned over to the Public Defender in the 12,000 pages?

USCA5 5641

A.    In what they gave us back, correct.  There's five or six that we would have given that are not in those documents.

Q.    And P-179 is one of those documents?

A.    Yes.

Q.    Okay.  But there's four or five others?

A.    Yes.

Q.    Okay.  Do you know if there's any other discovery materials that were provided to Mr. Tinker that don't appear in those 12,000 pages?

A.    I know a lot of the photos, like the autopsy are something very distinctive that were not in those, that came back to us, in that set of documents.

Q.    Okay.  And then last year you were asked to make a copy of the FBI lab report for the Federal Public Defender in this, in this lawsuit?

A.    Yes.

Q.    Okay.  Do you know which set of copies you used to make copies for them?

A.    It was one of them in the green file jacket, which in hindsight appears to be one of the AUSA working copies.

Q.    Okay.  And that did not contain -- or how did that happen?  What?

A.    Going --

Q.    Describe the circumstances of doing that.

A.    Basically going through the material, as things were

USCA5 5642

identified, I had three stacks of lab report files placed on the table, in the order I took them out of the box.  And as it was said, this is determined, we need to give a copy of that, so scan it.  The one file happened to be the top file, which is just what I picked up, and scanned that particular file.

Q.  Okay.  So that was just an inadvertent --

A.  Just happenstance it was the top file jacket.

Q.  Okay.  And you believed that to be a full copy of the FBI lab report?

A.  Yes.

Q.  Okay.  But as a matter of fact, it did not contain P-179?

A.  No, it did not.

Q.  Okay.  And now we obtained an additional copy of the FBI lab report at the time of the September 2010 evidentiary hearing?

A.  Yes.

Q.  Okay.  And does that latest FBI lab report file, does that exactly match the lab report file that they provided back in 2003?

A.  No.

Q.  What's different?

A.  Within their file, there's also some correspondence and e-mails that would not have been in the file at the time they gave it to us for presentation for discovery, internal e-mails.

Q.  Okay.  So their file was continued to be supplemented --

USCA5 5643

A.    Yes.

Q.    -- as time went on?

A.    It appears so, yes.

          MR. DOWD:  All right.  I believe that's all I have,
Your Honor, if I could just have one moment.

          THE COURT:  Yes, sir.

     (Counsel conferring off the record.)

BY MR. DOWD:

Q.    And just to reiterate, when you made a copy for the Public
Defender, you didn't use the original set; you used one of the
AUSA working copies?

A.    Yes.

          MR. DOWD:  That's all I had, Your Honor.  Pass the
witness.

          THE COURT:  Thank you, sir.  Mr. Abreu?

          MR. DOWD:  Oh, could I have one more question, Your
Honor?

          THE COURT:  Yes, sir.

          MR. DOWD:  I'm sorry.

BY MR. DOWD:

Q.    In evaluating these, in evaluating these files and
determining that there's four, five or six pages in our
original FBI lab report set of copies and don't appear in the
12,000 pages, you worked up some kind of a little chart.  Is
that right?

USCA5 5644

A.    Yeah.   Yes.

Q.    And let me show you what's been marked as Government's

Exhibit Number 4.

      MR. DOWD:   I'm not offering this, Your Honor, but I

just want to see if Ms. Hohle can identify this.

BY MR. DOWD:

Q.    Is this the chart you used to --

A.    Yes.

Q.    -- to determine that what was in the, our original file

did not appear in the 12,000 pages?

A.    Yes.

Q.    Okay.

      MR. ABREU:   By the way, Your Honor, we have no

objection to that document.

      MR. DOWD:   Well, we'd offer it, Judge, Number 4.

      THE COURT:   Government's 4 is admitted.

BY MR. DOWD:

Q.    Let me just, for the record, so that it's clear, which

column -- across the top, it says -- on the far left it says,

"Received Public Defender," and there's a list, a column of

numbers.   What do those numbers relate to?

A.    The 12,000 pages received from the Public Defender's

Office utilizes Bates stamps.   That's their Bates stamp number.

Q     Okay.   And this next column, "Provided Public Defender."

A.    That was my scanned version, and that's my Bates stamp

USCA5 5645

number.

Q.    Okay.  So that was the, from the working copy?

A.    That was the scan, yes.

Q.    Okay.  And then A, you have -- in the next column, you have "A, 366 working."

A.    The A and B are what were in the green file folders that would have been my identification of working copies.

Q.    That you referred to earlier as the AUSA working copies?

A.    Yes, uh-huh.

Q.    And then "Gray Folder -- C, 358, Gray Folder," what is that?

A.    The gray folder is the one that has a Post-it note that I had put on at trial that says "Original," and it's the one that has the original film.

Q.    Okay.

A.    So I, that appears to be the original.

Q.    Okay.  So the C reflects what you've discussed as the original --

A.    Yes.

Q.    -- file.  And then D?

A.    Is the secondary trial copy that we made for trial.

Q.    You described -- and then E?

A.    Is my witness file set.

Q.    Okay.  And where there's letters, for example, going down the C column, there's letters, either Y or N.  What do those

USCA5 5646

refer to?

A.    It's matching the sets of documents that yes, that page was in there or no, it was not in there.

Q.    Okay.  And again, which of these refers to the 12,000 pages?

A.    The very first column.

Q.    The very first column.  Okay.  And so where -- skipping down about one-third of the way, where there appears an N in that first column, and going across to C, there's a Y.  You're trying to say that that document appears in the gray folder with our original copy, but does not appear in the 12,000 pages.  Is that right?

A.    Yes.

Q.    So that's the key to reading this document?

A.    Yes.

        MR. DOWD:  Okay.  That's all I had, Your Honor.  I'll pass the witness.

        THE COURT:  Thank you.

    (Counsel conferring off the record.)

                CROSS-EXAMINATION

BY MR. ABREU:

Q.    Good morning, Ms. Hohle.

A.    Hi.

        MR. ABREU:  Your Honor, may I proceed?

        THE COURT:  Please.

USCA5 5647

MR. ABREU:  Thank you.

BY MR. ABREU:

Q.    Ms. Hohle, so we can agree that P-179 is not a part of the documents that were sent to us in relation to the discovery proceedings here in the 2255?

A.    For the evidentiary hearing, no, sir, they were not -- it was not.

Q.    And we can also agree that P-179 is not part of the 12,000 documents that were exchanged on our part to you?

A.    No, it was not in the 12,000 that you sent to us.

Q.    And we can also agree that P-179 is not, according to your own calculations, in one, two, three of -- two of the working copies, what you call working copies?

A.    Correct.

Q.    And on direct appeal, that there are often or sometimes informal exchanges of materials between the prosecutors and Defense Counsel?

A.    Yes.

Q.    Do you recall that?

A.    Yes.

Q.    Do you have any specific recollection of P-179 being exchanged through any of these informal processes in this case?

A.    That specific page, no.

Q.    Okay.  And you have no documentation about any sort of informal changes, or any formal exchanges of P-179

USCA5 5648

specifically?

A.   I would say yes, I do, when we gave the receipt for the original set, P-179 was in that and it was handed to their office, so I would say yes.

Q.   Okay.  We've talked about that.  But that, that particular exchange does not mention P-179 specifically.

A.   No, because P-179 wasn't an identifiable item at that time --

Q.   Okay.

A.   -- as far as that number, if that's --

Q.   Well, that specific document, it just talks about 358 pages is all.

A.   Yes.

Q.   Okay.  Now, you indicated that when the exchange first took place, the Government kept the paper copy and gave a CD to the Defense.

A.   The --

Q    I --

A    -- original -- okay, originally received from the lab was a CD, correspondence, cover sheet and the pages.  We didn't print pages.  It came in the package.

Q.   I see.

A.   The CD, I personally can't tell you what was on it, other than what was described in the correspondence.  Because of the limitations of our system and being able to download the

USCA5 5649

proprietary software, because of expediency, we just gave them the disk and the pages contained within the packet received from the FBI.

Q.   So both were given to them, the pages and the CD?

A.   Yes.

Q.   And again, you've already stated that you're not aware of whether P-179 was a part of the CD.

A.   I have no -- I could not tell you physically the items on the CD personally.

Q.   Did the Defense have the proprietary software to open the CD?

A.   It was on the disk that they could download it if they chose.

Q.   But you chose not to?

A.   We -- with the limitations of our system and IT capability at that time, no, we didn't -- we did not load it.

Q.   Now, you indicated that the reason you believe P-179 was part of the original 358 pages that were transferred over to trial counsel is because the page numbers match up, 358 pages in your, what you call the original, 358 pages given to trial counsel.

A.   The quantity of pages, yes.

Q.   Okay.  When the copy was made for trial counsel, do you have any written documentation about how many copies had been made prior to that copy being made for trial counsel?

USCA5 5650

A.    I have no documentation, but the copy made for trial counsel would have been made immediately and given at that time.  Because of the proximity, it was given to them on the 7th, the next Friday.  Our AUSAs didn't make, as far as I know, did not make multiple, five, six copies at that time.  At that time we made one to get it to them immediately.

Q.    Okay.  But you don't remember that specifically.  You're saying that's what you believe happened.

A.    In the manner and practice that we would in the date time frames and getting it in, yes.

Q.    Okay.  So it's possible that in fact multiple copies were made, and you just don't recall that.

A.    That's a possibility.

Q.    Okay.  At the time that the copies were provided to trial counsel, the 358 pages, were they Bates stamped?

A.    No.  At that time our system didn't allow, or we didn't utilize that system of documentation as we do now.

Q.    Let me show you what Mr. Dowd and the Government previously marked as Government's Exhibit Number 4 and previously admitted Government's Exhibit Number 4.

A.    Yes.

Q.    That's the chart that you prepared.  Is that correct?

A.    Yes.

Q.    And C, or Column C, 358 Gray Folder, is that the original?

A.    Yes.

USCA5 5651

Q.   Okay.  I'm curious why or how the original does not contain pages that are contained in the remainder of the copies.

A.   Through --

MR. DOWD:  Of which copies, Your Honor?

BY MR. ABREU:

Q.   Well, I'll go down to, a little past halfway down Column C, there's an N listed in one, two, three, four, five, six, seven -- seven different documents that appear not to be in the originals, original one, original two, but do appear to be in the remaining copies, B, A, Public -- Provided Public Defender, and Received Public Defender.

A.   And without having them in front of me, I believe those are the internal correspondence and subpoenas and fax sheets that would not have been in my trial copies that were in some of the working copies.

Q.   Okay.

A.   That's my --

Q.   Okay.  Thank you.  And then regarding, on Page 2, you indicate that there are several duplicates, right?  If I'm looking at 2977, that's a duplicate?

A.   From your -- from your scans, there were a couple of misfeeds that y'all counted as Bates stamps, and a couple of duplicates, which in discovering and counting pages, that's how I identified if you had a page that looked like a duplicate.

USCA5 5652

Q.    Okay.  Now, from the original 358 pages, you have no way of telling us at this point of the ones that were provided to trial counsel at the time whether that particular packet of 358 pages contained duplicates?

A.    I would say because my original, which is the gray, I actually have marked that in that original there's one set that's a duplicate that's the same duplicate within my trial sets.

Q.    But you don't know, and my question is, you provided 358 pages.  You don't know if the original had -- if the second of the copies, of the set you provided to trial counsel also contained duplicate pages that equal the number of 358?

A.    I didn't make the copy myself, so no.

Q.    The working copies are made for the U.S. Attorneys?

A.    Within the attorneys' preference or style, many times copies are made for whatever material they want to work and utilize.

Q.    There were three -- Mr. Dowd, the Government asked about that there were three U.S. Attorneys working on the case at the time?

A.    Yes.

Q.    Were there only two working copies that were produced?

A.    Mr. Roberts was in Houston, so a lot of times the large mass material wasn't necessarily shipped.  If he had working copies there, I have no clue if he did or didn't.  I would not

USCA5 5653

assume necessarily, because he would come down here to work on that product, so that's why I would have two working folders potentially.

Q.    So the two here would have been for Ms. Booth and Ms. Salinas?

A.    Yes.

Q.    Okay.  And P-179 is not in either one of those two?

A.    No.

Q.    Are those the sets that they used to come to court with, the attorneys themselves, the working copies?

A.    I can't say "yes" or "no" to that.  I would not assume so. I would assume that the folders that I prepared for trial, the gray and the secondary original and my witness would have been what was utilized at trial because that's what I had downstairs that I would bring up as they needed it.

MR. ABREU:  May I have a moment, Your Honor?

THE COURT:  Yes, sir.

(PAUSE.)

BY MR. ABREU:

Q.    I just wanted to make sure that this is clear, because apparently it's not, it wasn't.  Of the 358 pages that were sent and copied for trial counsel --

A.    Okay.

Q.    -- you cannot be sure that P-179 was a part of that particular set?

USCA5 5654

A.    If you're asking me what I think, I would say yes, it is.

Q.    I'm not asking you what you think.  I'm asking you, can you tell me that you definitively know that P-179 was part of that particular set?

A.    I didn't make the copy myself, but still I would say yes, it was, because of the packing and the material and what I've got marked as "original" that's contained in there.

Q.    Okay.  And that's just based again on number to number comparison?

A.    Yes.

Q.    Okay.  You indicated that somebody else made the copies?

A.    I don't know what person made them within the office.  The trial -- people assisting the AUSA at that time, I do not know who personally physically made the copies.

Q.    Do you often sometimes make copies yourself of documents?

A.    Yes, I do.

Q.    And you're aware that sometimes misfeeds happen?

A.    Yes, I am.

Q.    Sometimes double pages go through and a single page might not be copied?

A.    Yes, I am.

        MR. ABREU:  May I have just one moment, Your Honor?

        THE COURT:  Yes, sir.

    (Counsel conferring off the record.)

BY MR. ABREU:

USCA5 5655

Q.    I just have one additional question, if I may.  Is it regular practice at the U.S. Attorney's Office to make a comparison after, after copies are provided to trial counsel, to make sure that the same pages were provided from those received in your office?

A.    Is it regular practice?  When I prepare product, I compare as a general rule, what I do -- I now Bates stamp, so therefore that comparison is done automatically because of the new methods.  But at that time we didn't have that structure, so I cannot tell you a count per page per page was done on every copy that was made.

MR. ABREU:  Okay.  That's all I have, Your Honor.

THE COURT:  Thank you.

MR. DOWD:  Nothing further, Your Honor.

THE COURT:  Thank you, ma'am.  You may stand down.

MR. ABREU:  I just want to make sure I get the right documents here.

THE COURT:  Thanks.

(Counsel and clerk conferring off the record.)

THE COURT:  Ms. Booth?

MS. BOOTH:  Yes, Your Honor.

THE COURT:  Just for the record, I know you argued it, but I want to ask you myself, did you -- could you come up to the microphone?

MS. BOOTH:  Yes, Your Honor.

USCA5 5656

THE COURT:  You know the witness, is it Adam Longoria?

MS. BOOTH:  Yes, I do.

THE COURT:  Did you promise him anything or even hint that he might get some benefit for, for his testimony in the Bourgeois trial before or after?

MS. BOOTH:  Never, Your Honor.  He contacted the FBI.  He said that he had information.  As a result of that, I found out that his attorney was Bill May.  I called Bill.  I said, "Mr. May, this guy is calling us from the jail.  Is it okay if we talk to him?"  FBI went and spoke to him.  He never asked for anything.

Now, I will tell you that during the trial, right before we put him on, we were downstairs, and he said something to the effect about "Is this going to help me or anything like that?"  And I said, "Let me tell you something.  If you're going to start talking about that, I'm not going to talk to you.  You came to us.  You told us that you had information, and you know, this is what we're doing.  You know?  I'm not offering you anything.  And I want that clear."

Now, and I -- and that's what I remember.

THE COURT:  Okay.  Anybody want to cross-examine her, now that I've called her up?  You're welcome to do that.

(Counsel conferring off the record.)

MR. McHUGH:  Ms. Booth, was, when Mr. Longoria --

USCA5 5657

THE COURT:  Do you want me to put her under oath?

MR. McHUGH:  Sure, I mean if that's --

THE COURT:  Would you put her under oath, please?
Ms. Scotch, would you administer the oath?

THE CLERK:  Yes, Your Honor.

THE COURT:  Ms. Booth.

MS. BOOTH:  Yes, Your Honor.

(Witness sworn.)

MS. BOOTH:  You want me to sit up here, Judge?

THE COURT:  Go ahead, and then I'm going to ask
you --

MR. WISEMAN:  Ms. Booth, don't touch the microphone.

MS. LARIN:  She doesn't need a microphone.

THE COURT:  She doesn't need a microphone.

MS. BOOTH:  I don't know how to focus the thing, so
don't feel bad, Mr. McHugh.

THE COURT:  Okay.  Ms. Booth, let me just ask you,
now that you're under oath, do you incorporate everything you
just told me as true and correct --

MS. BOOTH:  Yes, Your Honor.

THE COURT:  -- now that you're under oath?

MS. BOOTH:  Yes, Your Honor.

THE COURT:  Okay.  I always kind of like to just jump
to the deal, so --

MR. ROBERTS:  Your Honor, if I may, before we begin,

USCA5 5658

I'm confident the Court is aware that usually when an AUSA is called to the stand, there's regulation, that kind of thing. So I would just ask that the Federal Public Defender be aware that there's --

THE COURT:  I don't know about these regulations, so tell me.  I've never had this happen before, so --

MR. ROBERTS:  Well, there are regulations that are in place that if a Government employee is called to testify and they are going to be asked to speak about things in their official capacity, particularly if they're going to be asked about records, it has to be -- it would actually have to be submitted to Washington, D.C., to get prior approval for them. I'm just asking --

THE COURT:  Okay.

MR. ROBERTS:  -- just for the purposes, particularly --

THE COURT:  Let me just tell you this, that your examination of her will be limited to what I just asked her. Okay?

MR. ROBERTS:  And that's all I was asking, Your Honor.

THE COURT:  Is that all right?

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  Can you do that, sir?

MR. McHUGH:  I will try, Your Honor.

USCA5 5659

THE COURT:  Okay.  Well, do you want to ask her where she lives and what she had for --

MR. McHUGH:  No.

THE COURT:  Okay.

MS. BOOTH:  And Judge, while we're waiting, can I make another little statement?

THE COURT:  Well, go right ahead.

MS. BOOTH:  Well, Your Honor, after this case was over, a few days after the conviction was had, we received a letter, it came --

THE COURT:  Was this after the sentencing or after --

MS. BOOTH:  This was after sentencing.

THE COURT:  Okay.

MS. BOOTH:  After sentencing.  I think it was March the 27th, I'm not real sure.  And I think we finished on March the 24th.  But anyway, it was shortly after this, Mr. Adam Longoria wrote a letter to -- and it went to Megan, and it was addressed to me, too, I believe, to Megan Beckett who was the FBI Agent, and it said something to the effect, "Congratulations."  Then it said, "I know that you have promised me nothing," something to this effect, "but I just had a new baby, or I wanted to see my baby, and I was just wondering if maybe you could like make a call for me."  It was something like that.  And of course, we did nothing.  But we did get that letter from him acknowledging, and I've just sent

USCA5 5660

Ms. Hohle out to get it, acknowledging that he was promised nothing.

Now, subsequent to that, years later, he was not represented by Bill May, he was represented by Chris Gale, and I'm not for sure, but Chris Gale called me on the phone, and Chris said -- this was years later -- and he said, "Hey, Patti, remember Adam Longoria?  I represent him on a civil case."  I think he said that, something like that.  And he said, "Would you mind writing a letter to the Parole Board?"  This was like 2005, 2006, may have been 2007.  I don't know.  But it was years later.

And I said, "Well, I will write what he did.  You know?  I will tell you that I believe that, you know, he called the FBI, he reported that Mr. Bourgeois wanted to kill the Federal Judge, three witnesses."  Plus, what didn't come out is he wanted to kill the Federal Judge, the federal agent, Megan Beckett, and myself.

We had a hearing on that, Judge, if you remember, where a record was made that we didn't really consider that a serious threat, and we were ready to go forward.

But that had been, I believe, the reason that he had come forward is because when you start naming wanting to kill the Feds, everybody over in prison knows that's a pretty serious situation.

So that's why he called the FBI and told them that he

USCA5 5661

wanted to talk to them.  We did not seek him out.  And then we went and talked to him.  Nor did we promise him anything.  I felt like it was his civic duty to do what he was doing.

And we did have two other witnesses that we had cooperation agreements with, which we disclosed, which were Derrick Moore, and I believe Wylie Taylor, and we were offering them time off.  I mean, they were hoping to get 5K departures, and we put that on the record.  If there would have been any deal, we would have put it on the record.

THE COURT:  Now, having said that, do you have questions?

MR. McHUGH:  Yes, I do, Your Honor.

PATTI HUBERT BOOTH, GOVERNMENT'S WITNESS NO. 2, SWORN

CROSS-EXAMINATION

BY MR. McHUGH:

Q.   Good morning, Ms. Booth.

A.   Good morning.

Q.   Ms. Booth, the conversation that you described for Judge Jack with her original questions, was it in the cell room downstairs?

A.   No, it was not.

Q.   Where did it take place?

A.   I think -- I think that it was in grand jury.  And I believe Bill May was there.

Q.   So that was the conversation where you're saying he asked

USCA5 5662

you how this --

A.    It was veiled.  It was veiled.  He didn't -- it was really, it was like a hint.  And that's the only time that even came -- it was kind of like a hint.  It wasn't like --

Q.    Well, what do you recall?

A.    And I can't remember, but that stuck out in my mind, because I immediately went, "Hey, buddy," and I told him, I said, "No, now, if we're going to be talking about that, we're -- that is not part of this."

Q.    And why did you say that?

THE COURT:  And she was --

THE WITNESS:  Because I didn't want any --

THE COURT:  She would probably say that.

THE WITNESS:  I didn't want any question about his motive or my motive for him testifying.

BY MR. McHUGH:

Q.    Okay.  Well, his motive, he asked you or hinted to you that he was looking for some help.  Is that right?

A.    It was a hint.  It was a nuance that I'm smart enough to realize when I'm starting to get nuances.  And that had never come up.  And I had spoken to him numerous -- well, I say numerous, maybe two or three times before, and we had always -- we always start up the thing, "Now you know, why are you coming to do this?"  And, "Well, you know, I have this information." I said, "You know I'm not promising you anything.  I'm not --

USCA5 5663

there is nothing you're going to get out of this deal" --

Q.    Okay.  But he --

A.    -- "but a feeling of self-worth."

Q.    Okay.  But he then did ask you how this would help him.

A.    He didn't -- well, and I'm telling you, I cannot remember the words.  It was a nuance.  It was not a direct, "What are you going to" -- quid pro quo.  It was like a nuance of -- and I got the impression that maybe he was -- that's when I went, "Hey."

Q.    But it was enough for you, as an experienced prosecutor --

A.    Uh-huh.

Q.    -- to get the impression that he was looking for something from you, or he was going to ask you --

A.    He was hinting.

Q.    He was hinting at it?

A.    He was hinting.  And I think that I nipped it in the bud.

Q.    Okay.  And -- so that's right.  It created a response from you to nip it in the bud.  Is that right?

A.    Right.  And --

Q.    Did you --

A.    -- I know now that I didn't know before, in looking at this -- see, I didn't know -- I knew that he had been stabbed for testifying in the prison, that he had witnessed a murder, and that he had been stabbed 27 times, or I thought it was 32 times he had been stabbed.  And so in my mind, I thought well,

USCA5 5664

this would be a good person to put on, because obviously he's testified, he knows what can happen to him. And so, you know, he would be a good witness.

Q.    Okay.  Let me just stop you there.

A.    Okay.

Q.    The stabbed 27 times --

THE COURT:  Good luck.

BY MR. McHUGH:

Q.    The stabbed 27 times, Mr. Sales referred to that this morning.  Is that what you're talking about?

A.    Yes.

Q.    Okay.

A.    Yes.

Q.    Now, that had nothing to do with his bank robbery.  He wasn't stabbed in the course of the bank robbery.  I think that had been previous to the bank robbery.

A.    No, he had witnessed a murder in the prison and testified against a gang.  And that's -- I prosecute all the gang violence stuff now out of the prison, and that was a pretty brave thing for him to do.

Q.    Okay.  But what I just wanted to clarify was, that had nothing to do --

THE COURT:  It's all clarified.

MR. McHUGH:  Okay.  The stabbing that occurred --

THE COURT:  It's all clear.  It's all clear.

USCA5 5665

THE WITNESS:  That is what gave him the creds.  You see, that is why Mr. Bourgeois went to him is because Bourgeois thought he was a big -- they were in this special cell.

THE COURT:  Okay.  Okay.  Enough.

THE WITNESS:  Okay.

MR. McHUGH:  Okay.  Now, Ms. Booth.

THE COURT:  Let's do this real quickly.

BY MR. McHUGH:

Q.   When you got this nuance, this hint, enough that it created that response in you, did you tell Mr. Tinker or Mr. Gilmore about that statement that you had heard from Mr. Longoria?

THE COURT:  Okay.  I know you're doing this for me and for the record, but I don't see any benefit to doing that, that question.  I don't see why she would feel obligated to say that if she didn't promise him anything.

MR. McHUGH:  Well, Your Honor, I think the state of mind of the witness would be certainly fertile ground for Mr. Gilmore, as he's an experienced cross-examiner of these snitches, as he indicated --

THE COURT:  I thought you're saying they're incompetent.

MR. McHUGH:  Mr. -- as to the cross-examination of the snitches --

THE COURT:  Okay.

USCA5 5666

MR. McHUGH:  -- Mr. Gilmore --

THE COURT:  Okay.

MR. McHUGH:  -- testified that he had done this many times --

THE COURT:  Okay.

MR. McHUGH:  -- in his interrogatories.

THE COURT:  Okay.  She didn't tell him.  So go ahead.

THE WITNESS:  No, I didn't.

BY MR. McHUGH:

Q.   Okay.  So you gave him that response, and you didn't tell them.  Now, let's talk about Mr. Sales.  You knew who he was at the time of the --

A.   Uh-huh.

Q.   -- the trial.  Had you met him, face to face?

A.   Yeah, I had seen -- Mr. Sales had been beaten in the courtroom prosecuting gang cases.  Everybody knew who Mr. Sales was.  He's a hero, a legend.

Q.   Okay.  And did you speak to him prior to his, the entry of the guilty plea by Mr. Longoria?

A.   Yeah, I do remember.  And let me tell you, I remember -- I don't know, I think that -- I don't know who called who, but the way it usually works, when a state case -- for me, because I used to be a state prosecutor, and my husband was a state prosecutor at this time.  If I'm going to approach a Defendant as a witness in the state court, what I do is I called Mr. May

USCA5 5667

and asked for permission, because he was the attorney then, and I may have called Jimmy first and said -- to find out who the attorney was, and I'm going to, I'm going to talk to the guy. And I remember saying that I'm going to -- I may use him as a witness, but I don't want anything for it. I don't want anything for him, I don't want anything for it. I mean, I think that I had a two-minute conversation with Jimmy Sales.

Q.   Okay. And did you have a conversation with Mr. Sales after Mr. Longoria testified in the Bourgeois trial?

A.   Okay, I only had one conversation with Jimmy, and I don't remember exactly when it was. I could tell you that.

Q.   So it could have been after.

A.   I don't know. It could have been. But the usual way that I do it is I call him first just out of courtesy, just to say I'm going to be, you know, doing it. But it could have been after. It could have -- you know, I have thought about that conversation, because Jimmy doesn't remember. I mean, obviously he didn't remember talking to me. But I had a short conversation with him sometime, before, after, and during -- because all this happened, you've got to understand, all this happened very quick. He showed up as a witness right before we started. We started voir dire, and we were in the middle of everything. So I don't know exactly when I made a call.

Q.   Okay. Now --

A.   Or he -- see, I don't know if I called him, he called me.

USCA5 5668

I know that I had a short conversation with him.  And as I thought about it, I thought about it for weeks, it may have been after.  It may have been before.  It was a courtesy call.

THE COURT:  It may have been after the trial, it may have been before the trial or during the trial.

THE WITNESS:  I don't --

THE COURT:  But it was one conversation.

THE WITNESS:  One conversation, short.  I don't -- and I --

THE COURT:  I think we've got it.

THE WITNESS:  Yeah.

BY MR. McHUGH:

Q.   And do you recall if -- you're saying that it could have been after the trial.  Would it have been fair to believe that you would have reported to Mr. Sales that in fact his Defendant, the person he's prosecuting, Mr. Longoria, had testified on behalf of Mr. Bourgeois?

A.   If I talked to him afterward, of course I'd say that.

Q.   And in your letter that's been marked as P-190, you said that this was courageous and this was very admirable conduct by Mr. Longoria.  Is that right?

A.   That's -- whatever I said in the letter, I meant.  I didn't lie.

Q.   And it would be fair to think that you would have said the same thing to Mr. Sales if you talked to him after the trial,

USCA5 5669

since you told the Texas Probation and Parole Board, you would have told Mr. Sales the same thing. Is that fair?

A.   Yeah, that's fair. I mean, that's the way I felt about it.

Q.   Okay. And --

A.   But that letter had nothing to do with anything except that Chris Gale called me, asked me -- and I think it was Chris Gale, called me and said, "Would you mind writing a letter for his parole?" And I'll tell you this, he didn't get parole because of my letter, I want you to know that. It didn't help.

Q.   Well, Ms. Booth, at the time of the trial, how long had you been a federal prosecutor, in 2004?

A.   Well, since 1989.

Q.   Okay. So that -- so you were aware at the time of trial that even though a witness -- you've dealt with all types of witnesses, the federal witnesses and the state witnesses in your trials. Is that right?

A.   Yes, sir.

Q.   Okay. And you were aware at the time of trial that even though Mr. Longoria was a state prisoner and you're a federal prosecutor, that you could, down the road, write a letter on his behalf, as you did, to the Texas Board of Pardons and Paroles? Is that fair to say?

THE COURT:  Okay --

THE WITNESS:  That I could write a letter?

**USCA5 5670**

MR. McHUGH:  Yes.

THE COURT:  Okay --

THE WITNESS:  See, the way I --

MR. McHUGH:  For the Defendant.

THE COURT:  Okay, look.  Look, this is the deal.  She didn't -- she says she didn't promise him anything.

MR. McHUGH:  I understand.

THE COURT:  She wrote something later.  Of course you're aware that you can do something down the road, but get to the point of whether or not that would have influenced his testimony.

BY MR. McHUGH:

Q    Okay.  You were aware -- were you aware --

THE COURT:  If he wasn't aware that she was going to do anything for him, how could that influence his testimony?

MR. McHUGH:  Well, if I just may have some leeway, I just want to establish the first point.

THE COURT:  How long are you going to do this?

MR. McHUGH:  Two to three minutes, Your Honor, on this point.  And I assure you --

THE WITNESS:  And what year was it that I wrote that letter in?  Because the trial finished in 2004 --

BY MR. McHUGH:

Q.    And the letter is dated February 9th, 2006.

A.    Okay.  So it was a couple of years later.

USCA5 5671

Q.   Okay.  So what I'm saying is obviously, as the Judge has indicated, at the time of the trial in 2004, you had been a federal prosecutor for a good period of time.  You were aware at that time that you could help a state prisoner by writing a letter to the Texas Board of Pardons and Paroles.  Is that right?

A.   I don't know if it would help them.  In fact, my -- and I want to be quite honest with you, the state -- listening to Jimmy today, it sounded a little bit differently, like he could change a sentence down to five years or something.  When I prosecuted in state court, there were no downward departures.  There were no, there were no 5K or Rule 35 where you could come back later.  I was not aware of that.  The only thing that I, in my mind, thought that I could do was possibly just tell them, you know, so that they would know he --

Q.   And they could take it -- and the reason you'd tell them --

A.   Uh-huh.

Q.   -- was they would take it into consideration at his plea and sentencing, charge bargaining and the sentence.  Is that fair to say?

A.   Um --

Q.   Could.

A.   Well, I knew that, I guess I knew that I could -- now, what was the question again?

USCA5 5672

Q.    Okay.

A.    Because I didn't ask -- the issue here is I never asked for any help for him, nor did I promise him any help.

Q.    I understand.

A.    And that's it.  I know from dealing with confidential informants, I know from dealing with Defendant witnesses that you have to be very clear on the bargaining situation.

Q.    Okay.  But there was no written plea agreement in this case with Mr. Longoria, like there were with the other snitch witnesses.

A.    Well, I don't know.  And it wouldn't make any --

Q.    No, I'm talking about --

A.    It wouldn't make any difference if it was written or not. If I told somebody that I was going to -- and I did, before I came up here, I never had a written plea agreement, nor did I write down 5K departures.  I just told the Defendant I would do it, and I did it.

Q.    Okay.

A.    So written or oral makes no difference to me.

Q.    Well, why in this case would it be different?  Two of the witnesses that were in federal custody, you --

THE COURT:  Okay.  Those were federal Defendants.

MR. McHUGH:  Right.

THE COURT:  This is a state Defendant.  She has no authority over the state Defendants.

USCA5 5673

MR. McHUGH:  But she --

THE COURT:  So that's the big difference.  If you're trying to make a record for me --

MR. McHUGH:  Okay.

THE COURT:  -- you need to get to something that's going to help me.

MR. McHUGH:  Okay.  I just --

THE COURT:  This is not at all helpful.

MR. McHUGH:  I just want to get into the one question about Ms. Booth's --

THE COURT:  Just ask one question then.

BY MR. McHUGH:

Q.   Okay.  Were you aware -- you would agree with me at the time of this trial that you could help Mr. Longoria by advising Mr. Sales -- not promising him you could help him -- by advising Mr. Sales what he had done in your case and prior to his plea and sentencing.

A.   I wasn't going to do it, though.  I mean, I wasn't.  That never, that never entered to my mind.

Q.   I understand that.

THE COURT:  Okay.  Move on.  Move on.

BY MR. McHUGH:

Q.   Okay.  You were also aware --

THE COURT:  Listen to me.

MR. McHUGH:  I'm trying, Your Honor.

USCA5 5674

THE COURT:  Move on.

MR. McHUGH:  I'm trying.

BY MR. McHUGH:

Q.  And you were also aware at the time of this trial, Mr. Bourgeois's trial, that you could also write a letter to the Parole Board.  Is that fair to say?  For a state prisoner?

A.  Oh, yeah, I know I could do that.

Q.  So if at the trial you asked Mr. Longoria, "And you understand that there's no way that I can help you in your state case, no way that I can help you in your state case" --

A.  Did I say it twice, or are you saying it twice?

Q.  I'm saying it twice.

A.  Okay.  Just wanted to know.

Q.  And he answered, "I understand fully," would that be an accurate question, that there's no way that you can help him in the state case?

THE COURT:  Okay, look.  I've got the transcript.  I know that.  I understand your point.  Are you done?

MR. McHUGH:  Let me just --

BY MR. McHUGH:

Q.  Did you consult with Mr. Sales prior to writing the letter to the Parole Board?

A.  Absolutely not.

Q.  Why not, if he's the prosecutor in this case of Mr. Longoria?

USCA5 5675

A.    Absolutely -- because -- I just didn't.  That was something that his defense attorney called me, and I, I felt like I had a, you know, I could do --

Q.    An obligation?

A.    No, not an obligation.

Q.    You felt like you had a what?

A.    I just felt like I could do it, so I did it.  I thought about it, and I said, "Well, you know, he didn't get anything for this, and you know, I'm just going to tell the Parole Board what he did."

Q.    Do you recall your conversation with Mr. May?

A.    Which conversation with Mr. May?

Q.    About this, about Mr. Longoria.  Did you have more than one?

A.    Oh, I don't know.  You know, I may have.  At that time Bill was practicing here.  He was here every day.  I mean, not every day, but he was here a lot.  And we would have had a lot of, a lot of contact.

      But I called him, asked him permission to talk to his client because his client had called FBI.  And I know that I had that conversation with Bill about this case.

Q.    Okay.  And do you recall any additional conversations with Mr. May about this case?

A.    Directly?  No.  No.  I may have talked to him about it.  I can't tell you I didn't, because that was I don't know how many

USCA5 5676

years ago, and we were together all the time.  I mean, he might have been in here on another case at the same time --

THE COURT:  I guess the question is, did you promise Mr. May you'd do anything for Mr. Longoria?

THE WITNESS:  No, absolutely not.

THE COURT:  Move on.

BY MR. McHUGH:

Q.   Did you indicate, not promise --

A.   No.  No.  No.

Q.   Let me ask the question.

A.   Okay.

Q.   Did you indicate in any way to Mr. May that you would report what Mr. Longoria had done to his state court prosecutor?

A.   No.  Bill May pretty much wiped his hands of this.

Q.   What do you mean by that?

A.   Well, Longoria had called us.  I just called Mr. May as a courtesy.  I mean, you know, and I was talking to the witness.  This wasn't part of -- I don't know, I just got the impression Bill May gave us full reign on it because his client had already decided he was going to do it.

Q.   Okay.  But I'm talking after that initial conversation, you said you had all these many conversations in the federal building.

A.   Uh-huh.

USCA5 5677

Q.   Did you ever indicate to Mr. May that if Mr. Longoria cooperated and testified against Mr. Bourgeois, as you wrote in your letter to the Parole Board, that this would be something that you would report to the state prosecutor?

A.   I don't think we ever had that conversation.  He -- you know, no.

Q.   Did you feel you needed to have that conversation with Mr. May?

A.   No, I did not feel like it, because Mr. Longoria was coming in, he approached us.  He was coming in because he had seen something very bad.  And I think he really liked the attention, too, of being -- because Mr. Bourgeois thought he was a hit man.

Q.   Okay.  But you also would agree with me that in your dealings with witnesses that testified, it is very common for the witness to want something in return for their testimony?

A.   Oh, yeah.  Definitely.

Q.   And in fact, it's your testimony that Mr. Longoria did in fact bring that up to you at least one time.  Is that right?

A.   He hinted.  He didn't bring it up directly, but I got, I got just a feeling, and I just nipped it in the bud.  And let me tell you what, Bill May was in that room when we did that conversation.  If it would have been anything, he would have told you.

Q.   Okay.  And Mr. May at the time was a very experienced

USCA5 5678

practitioner.  Is that right?

A.    Uh-huh, yeah.

Q.    Okay.  And he certainly would have known that a prosecutor can report, even though they don't promise, they certainly can, down the road, report what a certain witness did.  It's done all the time.  Isn't that right?

A.    Sure.

Q.    Okay.  And now did you tell Mr. May that you had written a letter to the Parole Board?

A.    No.  Nor did I give a copy.  And that's why you, when Adan Longoria gave you a statement, he said that I didn't write one for him.  And the reason that -- if you look at your -- you presented a letter from, or an affidavit from Longoria saying that I promised to do it and I didn't do it.

Q.    Right.

A.    Okay.  That, I believe, is because Chris Gale called me and asked me if I would do it.  And I told Chris, "You know, I think I will."  But I told Chris at that time that I don't give copies of these letters.  I don't want a Defendant walking around with a letter from Patti Booth, Patti Hubert Booth that says, you know, they did anything.  I simply --

Q.    Why not?

A.    Because if they --

THE COURT:  That's obvious.  Move on.  That's obvious to me.

USCA5 5679

THE WITNESS:  So I sent the letter --

THE COURT:  It should be obvious to you as well.

THE WITNESS:  I sent the letter to the Parole Board.  I did not send a copy to Chris Gale.  I did not give a copy to the Defendant.  Only to the Parole Board.  And then we have a copy.  And that was it.  Chris called me, asked me if I would --

THE COURT:  Okay.  I got it.

THE WITNESS:  Okay.

THE COURT:  What else?

BY MR. McHUGH:

Q.   Why wouldn't you send a copy to his lawyer that had requested it?

THE COURT:  Okay.  Look, move on.

THE WITNESS:  I just --

THE COURT:  We're not going to go into her thought process on this.  Move on.  You're way out of the point.

MR. McHUGH:  If I may just have a moment, Your Honor.

THE COURT:  Please.

(Counsel conferring off the record.)

MR. McHUGH:  That's all I have, Your Honor.

THE COURT:  Thank you.  You can stand down, Ms. Booth.

MR. DOWD:  Your Honor, may I just have one issue with Ms. Booth?

USCA5 5680

THE COURT:  Okay.  Sorry I ever opened this door.

THE WITNESS:  Who gets to cross me, Judge?  Whose witness am I?  Do I have to be crossed by everybody?

THE COURT:  I don't know, but --

(Witness bumps microphone.)

THE COURT:  Oh, my gosh.

THE WITNESS:  I'm sorry, Velma.

THE COURT:  You tried to tell her, Mr. Wiseman.

REDIRECT EXAMINATION

BY MR. DOWD:

Q.    Ms. Booth, let me show you what's been marked as Government's Exhibit Number 5 --

A.    That's it.

Q.    -- and ask if you can identify this.

A.    Yes.  That is the letter, 3-28, yeah, that came right after we finished the trial.  It was a letter from Mr., Mr. Adan Longoria.  And this is the letter, the congratulatory letter that he sent.  And then he said --

Q.    And toward the bottom --

MR. DOWD:  Well, we'd offer Number 5 into evidence, Your Honor, rather than testifying from it.

THE COURT:  Any objection?

MR. McHUGH:  Let me just have a moment, Your Honor.

(PAUSE.)

MR. McHUGH:  No objection, Your Honor.

USCA5 5681

THE COURT:  Government's 5 is admitted.

MR. DOWD:  Thank you, Your Honor.

BY MR. DOWD:

Q.    Toward the bottom of the letter, does Mr. Longoria suggest that, or concede that "You all owe me nothing"?

A.    Right.  He says, "I do understand that you owe me nothing, but it wouldn't" --

THE COURT:  "But."

THE WITNESS:  -- "hurt to ask.  Please take this into consideration on my family's behalf.  Well, I want to thank you for your time on this matter.  Again, thank you."

And I got the letter, and I told Megan that we'd take no action on it.  And we didn't.  That was it.

BY MR. DOWD:

Q.    All right.  And --

A.    But that shows his state of mind four days after the case is over.

Q.    And in relation -- in relation to your letter to the Texas Board of Pardons and Paroles in 2006, when did Chris Gale call and ask for that letter?

A.    That was before I wrote it.

Q.    Well --

A.    I don't --

Q.    Well --

THE COURT:  After the trial, but before you wrote it.

**USCA5 5682**

THE WITNESS:  Right.  Right.  It was after the trial, but before I wrote it.  And it was very close in time.

BY MR. DOWD:

Q.   Close in time to your actually writing the letter?

A.   Right.  Right.

Q.   Okay.  And there was no anticipation of filing that --

A.   No.

Q.   -- letter on his behalf at the time of the Bourgeois trial or your discussions with Mr. Longoria?

A.   No.

THE COURT:  Had you ever done that for a state Defendant?

THE WITNESS:  I've never done that before, Judge.

THE COURT:  Okay.

THE WITNESS:  And in fact, I feel bad because I told Orlando Campos that I would write one for him, and that was on the record, but I didn't write it.

MR. DOWD:  Okay.

THE WITNESS:  I forgot.

MR. DOWD:  That's all I have, Your Honor.

THE COURT:  Anything further?

MR. McHUGH:  Yes.

THE COURT:  I was afraid of that.

THE WITNESS:  I know.

RECROSS-EXAMINATION

USCA5 5683

BY MR. McHUGH:

Q.   So you told Mr. Campos that you would write, what, a letter to the --

A.   I think something, there's something in the record about that -- not a letter, that I would make his cooperation known, and I didn't.

Q.   Known to who?

A.   And I felt bad about that.  I forgot about Orlando.

Q.   Okay.  Now, this letter that --

A.   He was not a squeaky wheel.

Q.   Was Mr. Longoria a squeaky wheel?

A.   Obviously.  You brought -- I mean, here we go.  He's -- he wrote a letter three days after the trial and brought -- and I remembered him again.  This -- go ahead.

Q.   What did you mean by "squeaky wheel"?  Someone who's bothering you, asking you for things?

        THE COURT:  Obviously.  Move on.

BY MR. McHUGH:

Q.   Okay.  This letter --

        THE COURT:  He's still squeaking.

BY MR. McHUGH:

Q.   Government Exhibit 5 --

A.   Uh-huh.

Q.   -- March 28th, 2004, Mr. Longoria's telling you that you didn't promise him anything or "You don't owe me nothing."  Is

USCA5 5684

that right?

A.    Right.

Q.    You would agree with me that that letter was written after you had told him that "No, no, no, no, you can't bring that stuff up."  Is that right?

A.    It was after the trial was over.  The trial was over, I believe, on March the 24th.  So this letter came in four days after the trial was over.

Q.    So after you had read him the riot act, he wrote this letter.  Is that fair to say?

A.    Read him the riot act?  I mean, a week --

Q.    Well, what do you call it, when you had told -- you told him --

A.    I told him, "No, we're not going to talk about -- I mean that's not what we're talking about.  If you want to talk about that, we're out of here."

Q.    Right.  And so he knew when he wrote this letter what you were --

A.    That he wasn't going to get anything.

Q.    Well, he knew that you didn't want to hear that from him. Is that right?

A.    No.  He knew that he had been promised nothing and that we owed him nothing, and that's what he put.

Q.    Okay.  Well --

A.    That was it.  That was the end of it.

USCA5 5685

Q.   All right.  But we would agree that that conversation you had with him was before he put this into writing.  Is that right?

A.   Sure.

Q.   Okay.  By the way --

A.   It was before he testified.

Q.   Who did he write the letter to?  You?  Or did he write it to someone else?

A.   It was, I told you, Megan Beckett, the FBI Agent.  And then in there he talked about Patti and Megan.

Q.   Okay.  But he didn't say that "Patti owes me nothing," did he?

A.   The Government owes him nothing.

Q.   Okay.  That's your interpretation of it.

A.   Yes, sir, that is.

          THE COURT:  Anything else?

          MR. McHUGH:  That's all I had, Your Honor.

          THE COURT:  Thank you.

          MR. DOWD:  Nothing further, Your Honor.

          THE COURT:  You can stand down.

          MR. WISEMAN:  All right, Your Honor.

          THE COURT:  Are we done?

          MR. WISEMAN:  I think except for Dr. Rouse.  I spoke to Mr. Roberts and --

          THE COURT:  Oh.

USCA5 5686

MR. WISEMAN:  Our suggestion, I think jointly, was that we move right into argument until Dr. Rouse is available.

THE COURT:  Well, you don't have a written report and --

MR. WISEMAN:  Oh, well that's another matter, I'm assuming she's testifying, but --

THE COURT:  You didn't get your written report, and I read last night the deposition of Dr. Leestma.

MR. WISEMAN:  Leestma.

THE COURT:  And I also watched the deposition of the second one of Dr. Price, you know, the one that was taken post --

MR. WISEMAN:  Yes.

THE COURT:  -- hearing.  And I, let's see, I watched last night the Alfred Bourgeois Exhibit 41 and 43 and the Manfred Schenk deposition.

MR. WISEMAN:  Yes.  Your Honor, I think, you know, we would, as I've said in my response to the Government's motion, call Dr. Rouse.  We'd like her to testify.  All I was suggesting, even though it was borderline, prefer to have at least something.  All I was going to suggest was that we start the argument on the other issues.

THE COURT:  Sure.

MR. WISEMAN:  And then when Dr. Rouse is available, we can hear from her.

USCA5 5687

THE COURT:  That's fine.

MR. WISEMAN:  Just so the Court knows, at least what our intentions are, unless Your Honor has different questions or concerns, we'd be happy to address them, but we're going to address the first seven claims of the petition.  The others, we think, are legal argument and --

THE COURT:  Would you all like to take a ten-minute break before we begin that?

MR. WISEMAN:  Yeah.  I was just going to give you a preview of what you're going to get.

THE COURT:  Go ahead.  Give me a preview.  Tell me what you're going to tell me, then tell me, then tell me what you said.

MR. WISEMAN:  Okay.

THE COURT:  Right?  Aren't those the rules?

MR. WISEMAN:  Ms. Larin is going to start off discussing the mental retardation claim.

THE COURT:  Okay.

MR. WISEMAN:  I will discuss the ineffective assistance of counsel and penalty phase, as well as the jurisdiction claims to Claim III.  Mr. Abreu is going to do Claim IV, which is the whole sexual assault claim, along with the amendment, P-179 claim.  And then Mr. McHugh is going to discuss claims V, VI and VII, which relate to the bite marks, photo enhancements and the Brady issues that you'll be hearing

USCA5 5688

about this morning.

THE COURT:  Thank you.

MR. WISEMAN:  So ten minutes?

THE COURT:  What do y'all think?  Ten minutes?  Is that enough?  Okay.

MR. ABREU:  I could use it, Your Honor.

THE COURT:  All right.

MR. ABREU:  Thank you, Your Honor.

(Recess from 10:07 a.m. to 10:34 a.m.)

THE COURT:  Go ahead now.  Thank you.

MS. LARIN:  Good morning, Your Honor.  As we have done --

THE COURT:  When I get a call from a senator, I always talk.

MS. LARIN:  That's a good idea.  As we have demonstrated through the hearing, Mr. Bourgeois is a mentally retarded person, and as such is not eligible for the death penalty.  As Your Honor is aware, the definition of mental retardation involves three prongs, significantly subaverage IQ, deficits in adaptive functioning, and onset of these symptoms before the age of 18.  This definition is used by both the DSM and the AIDDD and has been recognized in Atkins and in the courts.

The definition of mental retardation is not a definition of exclusion.  DSM-IV, at Page 47, specifically

USCA5 5689

states, "The diagnostic criteria for mental retardation do not exclude an exclusion criteria -- do not include an exclusion criteria.  Therefore, the diagnosis should be made whenever the diagnostic criteria are met, regardless of and in addition to the presence of another disorder."

This means that as long as Mr. Bourgeois meets this three-pronged test, he is mentally retarded.  Mr. Bourgeois can still have other mental health problems, even many other mental health problems.  The presence or absence --

THE COURT:  Just a moment.  Mr. Bourgeois, are you there?

THE DEFENDANT:  Yes, ma'am, Your Honor.

THE COURT:  Okay.  I just, I'm going to check on you periodically.  Go ahead.  I'm sorry.

THE DEFENDANT:  Yes, ma'am, Your Honor.

THE COURT:  We had a break, and I thought I'd double check.

MR. ROBERTS:  Your Honor, since you took a quick break, this is perfect timing.  We got a note from Dr. Rouse.  Could I update the Court on the status, and then we could --

THE COURT:  Yes.

MR. ROBERTS:  -- tell her when she would be ready?

THE COURT:  Sorry.

MS. LARIN:  That's fine.

MR. ROBERTS:  Sorry.

USCA5 5690

MS. LARIN:  No, you're fine.

MR. ROBERTS:  Dr. Rouse is standing by right now, although she could have a report ready by 2:00 p.m.  I guess she'll explain to us why it's not before now.  And she just asked what time would you like her to be available to testify.

THE COURT:  Mr. Wiseman, this is up to you.  Do you want her testifying without a written report?

MR. WISEMAN:  I think I would rather do that.

THE COURT:  Are you going to call her?

MR. WISEMAN:  I think it's their witness.

MR. ROBERTS:  Yes, Your Honor.  We can call her.

THE COURT:  Okay.

MR. ROBERTS:  And so if you would like -- I didn't understand.  Do you want to wait till 2:00 to get --

MR. WISEMAN:  No, no, I think we should proceed without the report.

THE COURT:  Right now?

MR. WISEMAN:  Well, why don't we let Ms. Larin finish.

THE COURT:  Well, I don't want to interrupt her proceeding.  But on the other hand, I don't want to lose the elusive Rouse.

MS. BOOTH:  Right.

MR. WISEMAN:  All right.  Let's do it now.

MS. LARIN:  I'll do a do-over.

USCA5 5691

THE COURT:  You can do it all over again.

MS. LARIN:  Okay.  Thank you, Your Honor.

THE COURT:  Because you know what, I was searching around while you were talking for my note pad.

MS. LARIN:  Okay.

THE COURT:  So I'll feel better with my note pad in front of me.  Thank you.

MS. LARIN:  Thank you, Your Honor.

THE COURT:  Does she call -- has she called on the meet me line?

MR. ROBERTS:  We can have her call on the meet me line, Your Honor.  We'll -- I sent her that by e-mail.

THE COURT:  Is she there?  All she needs to do is call in.

(Counsel conferring off the record.)

THE COURT:  Ms. Scotch, make sure you've got the right -- Ms. Hohle, call out the number.

MS. HOHLE:  693-6425?

THE COURT:  Yes.  361.

MR. ROBERTS:  Your Honor, in the -- during the deposition, there were some exhibits that were submitted, one of which was the report from Dr. Leestma.  And I know the Court received that, because the defense had -- Mr. Wiseman had filed that.

THE COURT:  Oh, Ms. Scotch, would you get me my

USCA5 5692

notebook on that deposition?  Thanks.

MR. ROBERTS:  And so I'm going to reference that with the report and the transcript of that during Dr. Rouse's testimony.

THE COURT:  Say that again.

MR. ROBERTS:  I'm going to --

THE COURT:  You're going to give her that -- we're going to be using those during Dr. Rouse's testimony?

MR. ROBERTS:  I'm going to reference the transcript --

THE COURT:  Okay.  Then I want to get them right in front of me.

MR. ROBERTS:  -- and the report.  Yes, Your Honor.

THE COURT:  I thought the most significant part for y'all's information, and you can tell me if I'm wrong, or argue differently, was the bottom -- I don't have it in front of me -- but it's the bottom of Page 88 and the top of Page 89.

MR. WISEMAN:  I'm sorry.  I missed the beginning.

THE COURT:  Bottom of Page 88, top of Page 89.

MR. WISEMAN:  Of Dr. --

THE COURT:  Leestma's.  How do you pronounce that?

MR. WISEMAN:  Leestma.

THE COURT:  Leestma, his deposition.

MR. WISEMAN:  And what about the top and the --

THE COURT:  I thought that was the most significant

USCA5 5693

part, bottom of 88, top of 89.  I'm going to have it in front
of me in just a moment.  Yep, that's it.

DR. ROUSE:  Hello?

THE COURT:  Dr. Rouse?

DR. ROUSE:  Yes.  This is Dr. Rouse speaking.

THE COURT:  Oh, good.  Hold on.  We're going to call
you in a moment.

DR. ROUSE:  Okay.  Thank you.

THE COURT:  Mr. Roberts, who wants to -- who's going
to take her?

MR. ROBERTS:  Yes, Your Honor, I'll -- we call,
United States calls Dr. Rouse.

THE COURT:  Would you give her the oath, please,
Ms. Scotch?

THE CLERK:  Yes, Your Honor.

(Excerpt stopping at 10:40:00 a.m.)

(TESTIMONY OF DR. ROUSE PREVIOUSLY TRANSCRIBED.)

(CLOSING ARGUMENTS PREVIOUSLY TRANSCRIBED.)

(Proceedings concluded at 4:16 p.m.)

USCA5 5694

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ Molly Carter                    February 22, 2011
Molly Carter                        Date

USCA5 5695

INDEX

| PETITIONER'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| WILLIAM EDWARD MAY, JR. | 4 | 13 | | |
| JAMES SALES | 15 | | | |

| GOVERNMENT'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DEBRA HOHLE | 43 | 69 | | |
| PATTI HUBERT BOOTH | 78 | 84 | 103 | 105 |

ARGUMENTS ON CLAIM I:
      BY MS. LARIN . . . . . . . . . . . . . . . . . . . . . . 111

| EXHIBITS: | | RECEIVED |
|---|---|---|
| PX-104: | MOTION FOR CONTINUANCE IN LONGORIA CASE . . . | 21 |
| PX-187: | INDICTMENT IN LONGORIA CASE . . . . . . . . . . | 21 |
| PX-188: | TRANSCRIPT OF 4/19/04 PLEA AND REVOCATION HEARING IN LONGORIA CASE . . . . . . . . . . . | 23 |
| PX-189: | CONFESSION & STIPULATION IN LONGORIA CASE . . | 25 |
| PX-190: | LETTER TO BOARD OF PARDONS AND PAROLES . . . . | 42 |
| GX-1: | FBI LAB REPORT FILE SHIPPED 10/29/03 . . . . . . | 49 |
| GX-2: | FACE SHEET OF FBI LAB REPORT . . . . . . . . . . | 49 |
| GX-3: | DISCOVERY RECEIPT . . . . . . . . . . . . . . . | 49 |
| GX-4: | CHART PREPARED BY DEBRA HOHLE . . . . . . . . . | 67 |

USCA5 5696

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

UNITED STATES OF AMERICA

v.                                                    Case No.: 2:02–cr–00216
                                                      Judge Janis Graham Jack

Alfred NMI Bourgeois

      Defendant

## Official Transcript Filed

An official transcript has been filed. It may contain information protected from public disclosure by law. *See* E–Government Act of 2002, Fed. R. Civ. P. 5.2(a) or Fed. R. Crim. P. 49.1(a).

Ninety days after a transcript has been filed, it will be electronically available to the public on PACER. To comply with the rules on privacy, the parties must redact protected information before it is available on PACER.

If redaction is needed, the parties must file a statement listing the items to be redacted, with the transcript's docket number and the item's location by page and line. It must be filed within 21 days of the transcript being filed. A suggested form is at www.txs.uscourts.gov.

Only these portions of data may be visible:

- Last four digits of a social security number or taxpayer identification number;
- Year of a person's birth;
- Initials of a minor's name;
- Last four digits of an account number; and
- City and state of a home address in criminal cases.

Additional redactions require a separate motion and court approval.

A party may view the transcript at the public terminals in the clerk's ofice or buy it through www.txs.uscourts.gov or by calling (361)888–3142 . A party is only responsible for reviewing the:

- Opening and closing statements made for his party;
- Statements by his party;
- Testimony of witnesses called by his party; and
- Other parts ordered by the court.

Redaction is your responsibility. The court, clerk, court reporter, or transcriber will not review this transcript for compliance.

*David J. Bradley*,  Clerk

USCA5 5697

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____
                                          :
UNITED STATES OF AMERICA,                 :        No. Cr-C-02-216
                                          :        No. Cv-07-223
                   Respondent,            :     Honorable Janis Graham Jack,
                                          :              U.S.D.J.
        -against-                         :
                                          :
ALFRED BOURGEOIS,                         :        Electronically Filed
                                          :
                   Petitioner.            :
_____            :

**PETITIONER'S REPLY TO THE**
***GOVERNMENT'S RESPONSE TO PETITIONER'S***
***POST-ARGUMENT SUBMISSION AND***
***OPPOSITION TO MOTION TO REOPEN EVIDENTIARY HEARING[1]***

On February 1, 2011, pursuant to the Court's order, Petitioner filed his *Post-Argument Submission* (document # 649) (hereafter *Post-Argument Submission*, cited as *PAS*).  On that same day he separately filed a *Motion to Reopen Evidentiary Hearing on the Question of this Court's Jurisdiction and Motion for Limited Pre-Hearing Discovery* (document # 648) (hereafter, *Motion*).  After two unopposed motions for extensions of time, on February 18, 2011, the Government filed its *Response to Petitioner's Post-Argument Submission and Opposition to Motion to*

---

[1] All emphasis is supplied unless otherwise noted.  The citations used in the *Post-Argument Submission* are used here.

1

USCA5 5698

*Reopen Evidentiary Hearing* (hereafter, *Response*).  Petitioner files this *Reply*.

**Claim III.   Jurisdiction.**

    **A.    Petitioner's Seven Points.**

In his *Post-Argument Submission*, after reviewing the relevant trial evidence, Petitioner summarized seven gaps in the Government's proof regarding jurisdiction (*PAS*, 18-21).  In a *Response* that is long on rhetoric and surmise, but short on substance, the Government fails to meaningfully respond to Petitioner's seven points.  Petitioner will demonstrate how the Government has either not responded at all to Petitioner's seven points, or else how the response obfuscates rather than clarifies the issues.   The Government's *Response* thus highlights that Petitioner is entitled to relief, or at a minimum, a full and proper hearing on this claim.

The Government's *Response* is rife with generalities and conclusory statements.   Whereas Petitioner provided a detailed, line-by-line, analysis of the evidence, the Government's has failed to engage the actual evidence presented at trial.  <u>See</u> <u>e.g.</u> *Response*, 7 ("The record as a whole establishes that Petitioner murdered his daughter within the special maritime and territorial jurisdiction of the United States" **without discussing the record evidence**); 5-6 (asserting that the jurisdiction question becomes "clear" when Dr. Rouse's opinion is viewed against the "record evidence" **without discussing the record evidence)**; 9 ("the evidence

2

USCA5 5699

demonstrated that the only time Petitioner and his daughter exited the truck after the fatal blows was on the Naval Station" **without identifying the evidence**); 10 ("evidence as a whole firmly established jurisdiction" **without identifying the evidence**).

For the first time in this litigation, the Government also resorts to *ad hominen* attacks on counsel. See e.g. *Response*, 6 (referring to Petitioner's arguments as "not intellectually honest to suggest that certain facts be altered"); 6 (critiquing Petitioner's approach and suggesting that is "essentially how Petitioner approaches every issue raised in his 2255 Motion"); 8 (an aspect of Petitioner's argument "reveals a fundamental flaw in how the Federal Public Defender has approached many issues in this Motion . . . Petitioner's counsel does not account for foundational trial litigation techniques."). While counsel's skins are thick, they point out these attacks because the instant claim requires a searching review of the evidence – generalizations, impugning motives and *ad hominem* attacks do not substitute for such a review. Petitioner would submit that the Government has resorted to this tact because an actual discussion of the evidence would confirm Petitioner's entitlement to relief or a hearing.

**Point 1 (*PAS 19*).** Petitioner has argued that there is no evidence showing that the blows described by AB1994 were struck on the grounds of the Corpus Christi

3

USCA5 5700

Naval Air Station (CCNAS) (*PAS*, 19).  Petitioner challenged the Government to point to evidence to the contrary, id., "It would be incumbent on the Government in its responsive submission to pinpoint precisely how they proved that the family was on the grounds of the CCNAS during the events recounted in AB1994's trial testimony."  The Government did not even attempt to meet this challenge.  Their twelve page response on this issue fails to point to a single piece of trial evidence, or even FBI 302 reports, contradicting Petitioner's point.  With one exception, the Government fails to cite to a single fact from the trial record to refute this Point.[2]

The Government's failure to meet this challenge means only one thing: Petitioner is correct – there was no evidence presented at trial to show that the family was on the CCNAS at the time that the blows described by AB1994 were struck. Thus, taking the Government's proof as true, no rational fact finder could have found the element of jurisdiction.  See Jackson v. Virginia, 443 U.S. 307 (1979).

Instead of citations to evidence, the Government, as noted, resorts to

---

[2]Quite literally, the only trial fact cited by the Government does not address the location of the family when the arguably fatal blows were struck, but rather attempts to show that the blows that were struck were the proximate cause of death. *Response*, 12, citing Tr. 3/4/2004 (AB1994 describing the "real sad face" following infliction of the blows.  This cite has nothing to do with the location of the family when these blows were struck.  To the extent it can be seen as supporting the Government's contention that these blows were the proximate cause of death, they are addressed below in regard to Point 3.

USCA5 5701

generalities, rhetoric and misdirection.  For instance, the Government suggests that counsel "seeks to have this Court view evidence narrowly . . . [and] to reach conclusions that are contrary to the great weight of the evidence." *Response*, 5.  This response does not further the inquiry.  The Government does not recite or even point to **any trial evidence**, much less the "great weight of the evidence."  While accusing Petitioner of urging a "narrow view" of the evidence, at least Petitioner has engaged the actual evidence.  And, in actuality, Petitioner has not suggested that the Court view the evidence narrowly.  To the contrary, in his submission he has reviewed **all of the evidence** presented at trial, and even evidence that was available but not presented, e.g. FBI 302 reports.  The evidence as a whole fails to show that the truck was on the CCNAS at the time of the blows described by AB1994.

In another example of misdirection in lieu of a discussion of the evidence, the Government characterizes Petitioner's argument as being "wholly contrary to the defense theory of the case" and stating "It is not clear whether Petitioner himself would actually agree with counsel's submission considering that Petitioner has always maintained that he did not injure his daughter." *Response*, 6. This assertion intentionally misdirects the Court and squarely ignores the governing law.   This claim is governed by Jackson v. Virginia, 443 U.S. 307 (1979), see *Petitioner's Memorandum in Support of § 2255 Motion* at 27.  Under Jackson, the Court is

5

USCA5 5702

required to view the evidence in a light most favorable to the Government.  Id., at

319.  Thus, any petitioner asserting a Jackson sufficiency claim **must** accept – for

argument's sake – the Government's proof and demonstrate that even taking it as true,

that no "rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt." id.  That is what Petitioner did in his *Post-Argument*

*Submission*.

In a related vein, and in an apparent excuse for failing to meet its burden of

proving the element of jurisdiction, the Government argues that jurisdiction was not

an issue in dispute at trial. *Response*, 10 ("defense counsel at trial did not identify the

jurisdiction as an issue to be challenged at trial").  The Government knows better.

Absent a stipulation from the defense (not present in this case), it must prove every

element of an offense regardless of whether it is "in dispute at trial."  That has been

the law for forty years.  In re Winship, 397 U.S. 358, 364 (1970) ("[W]e explicitly

hold that the Due Process Clause protects the accused against conviction except upon

proof beyond a reasonable doubt of every fact necessary to constitute the crime with

which he is charged.").  And, in any event, the Government acknowledged that it had

the burden to prove this element at trial. Tr. 3/16/04, 10 ("**The last element that we**

**have to prove** is that it happened on a Special Territorial or Maritime Jurisdiction of

the United States and that was because it was on the Navy

6

USCA5 5703

base").[3]

In another effort at misdirection the Government miscasts Petitioner challenge as relating to the credibility of AB1994.  The Government states "While Petitioner does not credit the testimony of Petitioner's then 9-year old daughter, the jury clear found the 9-year old daughter very credible." *Response*, 12.   This is simply inaccurate.  Petitioner assumed all of the testimony was true (*PAS*, 12-14 reviewing the evidence in detail), as he must under Jackson.  He does not challenge her credibility in this claim.  He challenges the Government's failure to prove an element of the offense.  Petitioner certainly does not blame that on AB1994.

**Point 2 (*PAS, 19*).**   Petitioner has also shown that there is **no evidence** establishing that the proximate fatal blows were **not** struck **off of the grounds** of the CCNAS.  Again, the Government does not take on Petitioner's challenge to identify the evidence that blows were not struck off the CCNAS.  In an implicit acknowledgment that AB1994's testimony alone is not sufficient, the Governments cites and relies on Dr. Rouse's recent testimony and her reliance on **multiple witness statements** to demonstrate that the blows were struck on the CCNAS.  *Response* 4, quoting Rouse's hearing testimony, Tr. 1/13/11, 32 ("the description by witness**es**

_____

[3]As pointed out in the *Post-Argument Submission*, this is all that the Government said about jurisdiction in its closing argument.  *PAS*, 6, citing Tr. 3/16/02, 10.

7

USCA5 5704

[plural] of what occurred on the base"). Yet, every witness, with the exception of AB1994, describes events occurring after the infliction of the allegedly fatal blows. In the final analysis, the Government is forced to rely on AB1994, who, as Petitioner has shown, did not testify that the truck was on the CCNAS when the allegedly fatal blows were struck.

**Point 3 (*PAS, 19-20*).**   Petitioner has shown that even assuming AB1994's testimony to be true, there was no evidence presented to show that the blows she described were the proximate cause of death.  The Government relies on AB1994's testimony that the victim had a "sad" face while she was being hit.  *Response*, 12. This fails to make the needed connection.  As Petitioner showed in his *Post-Argument Submission*, there was no evidence presented that the victim went "limp" after the blows or was unconscious.  *PAS*, 12-14.  The fact that a two year had a sad face while being struck is not probative of whether the blows described by AB1994 were fatal – any baby that is struck will have a sad face and such a face hardly means that the blows were fatal.  Indeed, AB1994 used the word "sad" to describe two other events, neither of which had to do with the infliction of fatal blows.  Tr. 3/4-5/04, 41 (describing Robin as "sad" because of fear she would go to jail); at 45 (describing herself as "sad" after her sister was taken to the hospital).

Faced with these realities, and because there is no evidence at all that the child

8

USCA5 5705

"went limp," the Government says, "It is not unreasonable to conclude that the 9-year-old's description of a "real, real sad face" was simply her way of saying "the child went limp." *Response*, 12. This argument strains credulity and speaks for itself. But, the Government says, "clearly, the testimony that described the victim after the 'sad face' established that the victim was limp and clinically decomposed [sic]."[4] This is fantasy. AB1994's testimony – detailed and recited line-by-line in Petitioner's *Post-Argument Submission* (*PAS*, 10-14) – shows nothing of the sort. The witness said nothing more than at some undetermined time after the allegedly fatal blows were struck that "she [the victim] was awake, and then she just, like, fell asleep." There is nothing in this testimony to support a conclusion that the child "clinically decomposed."

**Points 4 & 5 (*PAS*, 20).** Dr. Rouse recently testified that because she could not precisely date when the fatal injuries were inflicted, she relied on the change in the victim's clinical signs and a lack of reported clinical symptoms in the days before her death, to support her belief that the blows were struck on federal land. Counsel indicated in its *Post-Argument Submission* that an exhaustive search of the record fails to reveal any support whatsoever for this alleged change in clinical presentation.

---

[4]Throughout its submission, the Government may have mistakenly used the word "decomposed" when it may have meant to say "deteriorated," "decompensated" or "declined." For sake of clarity, Petitioner will use the Government's word.

9

USCA5 5706

*PAS*, 8-9.

Stripped of the probative value of AB1994's "sad face" testimony, and left with only its far-fetched interpretation that "sad face" really meant "went limp," the Government is left only with Petitioner's testimony that the child was singing her ABCs before she was found unconscious outside of the truck. *Response*, 11-12. Petitioner has already argued the utter absurdity of relying on this one piece of Petitioner's testimony, while considering the remainder of his testimony to be lies. *PAS*, 14-16. However, in view of the Government's dogged reliance on this testimony as the basis for Dr. Rouse's conclusions, she must be confronted on it at a hearing. She would have to demonstrate that she was 1) aware of this alleged fact before trial; 2) that she actually credited it in arriving at her opinion; and 3) it was a significant contributor to her opinion. This is yet another reason to conduct a hearing on this issue and test the Government's reliance on this testimony.

**Point 6 (*PAS, 20*).** Petitioner contends that Dr. Rouse's reliance on the lack of reports from lay people of clinical signs that the victim deteriorated before arriving at the CCNAS is not supported by the record. The Government fails to respond to this point.

**Point 7 (*PAS*, 20-21).** Petitioner argued that the Government could not rely on the fact that Mr. Bourgeois made up the story that the victim fell from the truck.

10

USCA5 5707

It has not relied on this fact in its *Response*.

## B.    The Expert's Opinions.

Dr. Leestma and Dr. Rouse agreed that the fatal injuries cannot be dated by them, or any expert, with any greater precision than one to three days before death.[5]

The experts, however, disagreed on the value of the non-medical evidence, i.e. the accounts of lay witnesses as to the events leading up the victim's death as such relates to whether the injuries were inflicted on the CCNAS. The Government identified this disagreement: "One key distinction between Dr. Leestma and Dr. Rouse's testimony was Dr. Leestma's myopic focus upon the 'medical evidence' to the exclusion of any circumstances reported by witnesses regarding when the victim decomposed." *Response*, 3. However, this disagreement is important only if the witness reports demonstrate that the victim "decomposed" on the grounds of the CCNAS as a result of the blows that were struck on the CCNAS. As Petitioner has shown, however, there was no trial evidence (or FBI 302 reports) showing a decline

---

[5]Significantly, Dr. Rouse also agreed with Dr. Leestma's opinion that the victim had a thrombosis in the sagital sinus. Tr. 1/13/11, 8-9, 10 ("The sagittal sinus, I don't disagree with that at all, that there is a thrombus."). Dr. Rouse also agreed with Dr. Leestma that the thrombosis contributed, at least partially, to death. Id., 37-38. Dr. Rouse also acknowledged that she did not mention the thrombosis in her trial testimony or autopsy report. Id., 38. Had her current opinion regarding the thrombosis been discussed in her autopsy or in her trial testimony, trial counsel would have had yet another reason to vigorously challenge jurisdiction.

11

USCA5 5708

in her condition that occurred while on the base that are based on lay reports.  And, the Government has offered none in response to Petitioner's *Post-Argument Submission*.  Thus, this alleged credibility gap would only be important if the Government cited the evidence relied upon by Dr. Rouse.  Because the Government has not proffered or cited this evidence, there is simply no material dispute between the experts.[6]

---

[6]The Government complains Dr. Leestma went beyond his report during his deposition testimony, and they did not have sufficient time to prepare. *Response*, 3. Petitioner disagrees with this statement as Dr. Leestma did not testify beyond the scope of his report.  In any event, there is much irony to this complaint – at least Dr. Leestma furnished a report.  While Petitioner does not fault Dr. Rouse for not having time to prepare a report, he should not be made to suffer inasmuch as he has been requesting her testimony throughout the conduct of this litigation.  See Transcript of Oral Argument, 4/20/10, 45 (Petitioner: "[we are]  curious that the Government has not got a declaration from Dr. Rouse rebutting our claim"); at 46 (Petitioner: "We are going to present expert testimony, we expect Dr. Rouse will be here."); at 51(Petitioner: "it seems pretty plain to us that at a minimum Dr. Rouse needs to explain why that right-sided subdural hematoma, which she said was the cause of death, didn't, happened on the Naval base."); at 55 (Petitioner: "I want Dr. Rouse here. I want to talk to Dr. Rouse. I want to cross-examine her, as trial counsel should have cross-examined her, about what the cause of death was and when it happened . . .").

The last minute production of Dr. Rouse for telephonic testimony and without provision of a report are further reasons to reopen the hearing, discussed below at Part D.

12

USCA5 5709

### C.     Government's Closing Argument.

Petitioner has pointed out that in its closing argument, the Government failed to even argue or point out evidence that the fatal blows were inflicted on federal land. Instead, the Government spoke to the jury about a "systemic execution" that occurred over a period of time. *PAS*, 5-6.  In response, the Government says that its closing argument is not evidence, and that Petitioner's counsel's position results from a "fundamental flaw in how the Federal Public Defender has approached many issues in this Motion.  While clearly advancing very intellectual and theoretical points . . . Petitioner's counsel does not account for foundational trial litigation techniques." *Response*, 8.  The Government continues, that using such "foundational techniques" it is "common" for lawyers to only focus on contested issues.  Id.

The Government's suggestion that undersigned counsel fail to understand or appreciate "foundational trial technique" is patronizing and more importantly is simply not so.[7]  Petitioner's counsel have not merely advanced "intellectual and theoretical" arguments – they have reviewed the facts and applied the law – that is what lawyers do!  Obviously, what is said in closing argument is not evidence, however, a "prosecutor's closing argument to the jury and post trial representations

---

[7]Three of Petitioner's four attorneys each have extensive trial experience in both state and federal criminal trial courts, in **addition** to their post-conviction capital experience. They fully understand the "foundations" of trial technique.

13

USCA5 5710

to the court are the most accurate assessment of the evidence the government produced at trial," Kamienski v. Hendricks, 332 Fed.Appx. 740, at \*9 (3d Cir. 2009) (granting relief on Jackson claim). Petitioner is confident that if the prosecution could have argued that the evidence demonstrated that the fatal blow was struck on federal land, it would have said so to the jury. It did not argue this point because it knew the evidence did not support it.[8]

---

[8]These problems are reflected in Mr. Robert's handwritten note, referenced in the *Post-Argument Submission* at 7. In response to these notes, the Government attempts to minimize their significance. The Government says that the notes are an accurate statement of the law. *Response*, 9. That is largely true (although the notes do not address the question of proximate cause), however, what the Government fails to mention is the highlighting and capitalization that demonstrates a concern on the Government's part. The Government also ignores that these notes were taken during the preparation of its witness. The fact that counsel generated this note about jurisdiction and then avoided asking the witness about it, is strong proof that the Government knew that jurisdiction was problematic.

Respecting the notes, the Government also says that they are protected by the work-product privilege. Id. However, Mr. Robert's provision of these notes to counsel on April 19, 2010 constituted a waiver of the privilege. Indeed, the reported cases on work-product all address whether a party is entitled to receive discovery **before it has been produced**. Here, the discovery is already in Petitioner's hands and therefore the privilege is waived. Even if the privilege is not waived, the work-product privilege is a qualified privilege. United States v. Nobles, 422 U.S. 225, 239 (1975). It must yield upon a showing of "necessity or justification". 8 C. Wright, A. Miller, & R. Marcus, Federal Practice and Procedure § 2022, p. 324 (2d ed.1994). One can scarcely imagine a more compelling circumstance justifying and necessitating the use of Mr. Robert's notes. To be clear, these notes were taken when he interviewed Dr. Rouse pre-trial and they discussed jurisdiction. Thus viewed, these notes are not protected at all, but constitute disclosable evidence under Brady v. Maryland, 373 U.S. 83 (1963) and its progeny. Had these notes been disclosed to

14

**D.      The Need to Reopen the Hearing and Permit Discovery.**

Petitioner has not had a hearing on this issue.  He was denied a hearing by this Court following the April 20, 2010 argument on the scope of the evidentiary hearing. Instead of a hearing, the Court permitted Petitioner to proffer by declaration any expert evidence in support of this claim.  Tr. 4/20/10, 55.  The Court made clear that any such expert proffer must include a review of the autopsy slides, as well as other trial testimony.  After retaining Dr. Leestma, he conducted his initial review and also indicated his desire to review the autopsy slides.  Petitioner requested them from the Government on June 11, 2010.  It took from then until early January for the Government to locate the slides and for the custodian of the slides to produce them. These events are detailed in a series of motions filed by Petitioner, or jointly.  See *Petitioner's Unopposed Motion for Subpoena Duces Tecum*, filed September 3, 2010 (document # 550); *Petitioner's Unopposed Motion to Continue Time for Taking a Deposition of Dr. Leestma*, filed November 14, 2010 (document # 604); *Petitioner's Unopposed Motion for Subpoena Duces Tecum,* filed December 3, 2010 (document # 617); *Petitioner's Unopposed Motion for Subpoena Duces Tecum*, filed December 8, 2010 (document # 618); and *Joint Motion to Continue Hearing and Argument*,

---

trial counsel, there is a reasonable probability that they too would have challenged jurisdiction.

15

USCA5 5712

filed January 4, 2011 (document #633).

Because of the above-cataloged difficulties, Petitioner was not able to depose Dr. Leestma until January 10, 2011. After his deposition, the Government presented Dr. Rouse via telephone and without provision of a report. Without a report, counsel were not able or prepared to present the witness with photographs or witness statements that may have impacted her reliance on the so-called "clinical picture" of the victim before and after the allegedly fatal blows. This was not a proper or full hearing.

In response to these facts the Government points out that the Court has accommodated Petitioner with regard to **other issues**. *Response*, 2. That is true. The Court granted Petitioner additional hearing time in order to accommodate unavailable witnesses and others who could not be scheduled within the time allotted. Petitioner was and remains appreciative of those accommodations. However, those have nothing to do with Petitioner's legal entitlement to an evidentiary hearing regarding a § 2255 claim.

28 U.S.C. § 2255(b) sets forth the standard governing when a hearing is appropriate and required:

> Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon [and] . . . make findings of fact and conclusions

16

USCA5 5713

of law with respect thereto.

The Court of Appeals for the Fifth Circuit has strictly construed this language, holding that an evidentiary hearing is required "[i]f the district court cannot resolve the allegations without examining evidence beyond the record." United States v. Smith, 915 F.2d 959, 964 (5th Cir. 1990); Byrne v. Butler, 845 F.2d 501, 512 (5th Cir. 1988) ("If the petitioner's allegations cannot be resolved absent an examination of evidence beyond the record, a hearing is required"); Martinez v. Dretke, 111 Fed.Appx. 224, 229 & n.15 (5th Cir. 2004) (applying same standard in section 2254 case).

Given Dr. Rouse's inability during her January, 2011 testimony to identify which witnesses upon which she relied to arrive at her conclusion, a hearing is required on this question. A hearing is also required because of the improper hypothetical question posed by the Government to both Dr. Leestma and Dr. Rouse that the victim went "limp." Petitioner objected to this question because there was no evidence that the victim went limp, and the Government has now acknowledged as much.

A hearing is also required regarding the ineffective assistance of counsel claim related to jurisdiction. Neither Petitioner nor the Government questioned Mr. Gilmore about it because it was not within the scope of the hearing that the Court

17

ordered.  Further, the Government failed to propound interrogatories to Mr. Tinker on this topic, despite its propounding a significant number of others.  In short, trial counsel have not been heard from on this topic.

A hearing is further required because of the following **proffer**.  In a meeting attended by current counsel (Wiseman, Abreu and McHugh) in trial counsel's offices on or about February 1, 2008, current counsel questioned Mr. Tinker and Mr. Gilmore about their failure to challenge jurisdiction.  Mr. Tinker responded that he did not challenge jurisdiction because it was his belief that federal jurisdiction existed if JG-1999 was found unconscious at the Corpus Christi Naval Air Station, regardless of where the fatal injury was inflicted.  At a hearing, Petitioner will question Mr. Gilmore about his recollection of that conversation and will produce contemporaneous notes taken by counsel showing that Mr. Tinker made this statement.

The Government has also failed to respond to Petitioner's request to provide him with an opportunity to inspect the photographs it seized from Petitioner. Petitioner believes that these photos may shed light on the victim's condition in the days leading up to her death and therefore on the question of jurisdiction.  Petitioner is entitled to confront Dr. Rouse with the photos and witness statements to test the reliability of her reliance on the victim's clinical presentation to date the fatal blows.

18

USCA5 5715

**Claim II.    Ineffective Assistance of Counsel for Failing to Present Extant Mitigating Evidence.**

The Government's 65 page submission on this claim contains multiple errors and mistatements of law.  Petitioner replies to the most egregious.

**A.    The Responsibility for Managing the Mitigation Investigation Rests Solely with Counsel.**

Conceding, as it must, that the mitigation investigation fell far short of what the Eighth Amendment requires of capital counsel, the Government seeks to shift responsibility from counsel to the mitigation specialists and Dr. Cunningham.  This effort fails.[9]  The responsibility belongs to counsel alone.

The Government relies, in part, on the AMERICAN BAR ASSOCIATION, GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, FEBRUARY, 2003 (hereafter, ABA Guidelines),[10] to support a number of its positions, including that counsel may rely on their experts and

---

[9]See e.g. *Response*, 42 (noting that the mitigation investigation was "off schedule"), 52 ("the mitigation investigation report didn't get to Dr. Cunningham in a timely manner, not because Trial Counsel failed to send it, but because the mitigation investigators failed to furnish it in a timely manner.  **Again, the shortcoming of the mitigation investigators are not automatically attributable to Trial Counsel**.")

[10]The ABA Guidelines are published at 31 Hofstra Law Review 913 (2003) and are available on line at http://www.americanbar.org/advocacy/other_aba_initiatives/death_penalty_representation/resources.html.

19

USCA5 5716

mitigation specialists and are not responsible for their overall supervision. *Response*, 44 ("Habeas Counsel's theory of ineffectiveness of counsel in this regard depends upon laying 100% of the blame for the problematic mitigation investigation on Trial Counsel, under the theory that Counsel was responsible for supervising the mitigation experts and monitoring their duties.").[11]

There is no doubt that while a lawyer should rely on experts in the area of their expertise, as the ABA Guidelines advise, nothing in them or anywhere else – and certainly nothing cited by the Government – absolves capital counsel from monitoring and supervising the progress of those employed by counsel to conduct the mitigation investigation. See ABA Sponsored, SUPPLEMENTARY GUIDELINES FOR THE MITIGATION FUNCTION OF DEFENSE TEAMS IN DEATH PENALTY CASES, 36 Hofstra Law Review 677 (2008) (hereafter, ABA Mitigation Guidelines).[12] The ABA Mitigation Guidelines require capital counsel to assemble and rely on a host of

---

[11]Again, there is irony in the Government's argument. It seeks to excuse trial counsel's failure to supervise and manage the mitigation case because counsel must rely on their experts. However, when it came time to listen to their experts, counsel either failed entirely to meet with them at all (Dr. Weiner), or only had truncated communications with them (Dr. Cunningham). The same is true for counsel's interactions with Dr. Johnson, related to the DNA claims before the Court. The Government cannot have it both ways.

[12]Available on line at http://www.americanbar.org/advocacy/other_aba_ initiatives /death_penalty_representation/resources.html.

20

experts, however, the duty to supervise, monitor and direct the work of these experts

never shifts from counsel:

> Counsel has a duty to hire, assign or have appointed competent team members; to investigate the background, training and skills of team members to determine that they are competent; **and to supervise and direct the work of all team members**. Counsel must conduct such investigation of the background, training and skills of the team members as will determine that they are competent and must ensure on an ongoing basis that their work is of high professional quality. . . .**All members of the defense team are agents of defense counsel.**

ABA Mitigation Guidelines, Guideline 4.1 B & C, 36 Hofstra Law Review 677, 680

(2008).

In an example of the Government's failure to hold counsel accountable, it

states that trial counsel acted diligently regarding the mitigation investigation.

*Response*, 43.  How can that be when their mitigation specialists did not even visit

Mr. Bourgeois until four months after they were retained?  *Response*, 15.  It was

counsel's job to make sure that these "agents" saw their client.  And, if for whatever

reason, these agents could not do their job, it was up to counsel to secure others.

In another example, the Government asserts that counsel were "saddled" with

Lisa Milstein's unavailability to perform work.  The Government says that her

failures to perform were never "communicated to Trial Counsel." *Response*, 18. This

is extraordinary.  As the weeks turned into months, and the work was not getting

21

USCA5 5718

done, counsel had an obligation to inquire and to insure that it would be done and done well. If some extraordinary reason prevented the work from being completed, counsel were obliged to report that to the Court. Had counsel done so, the motions hearing of December 10, 2003 (referenced at *PAS*, 28-30) may well have ended differently. In fact, when the Court demanded to hear about the delay from the mitigation specialists themselves (where presumably some of Ms. Milstein's problems may have come to light), counsel instead withdrew the motion for a continuance.

The Government seeks to lay blame on Dr. Cunningham for counsel's failures. They say that Dr. Cunningham failed to alert trial counsel to the flaws in the mitigation work until February 7, 2004. *Response*, 18. However, the record shows that Dr. Cunningham did not **receive a single piece of mitigation work** until one week earlier. Tr. 9/21/10, 216 (Dr. Cunningham testifying that he received the first mitigation information from the investigators on January 31, 2004). Dr. Cunningham moved swiftly to alert trial counsel – it was counsel that were not properly performing their roles.

## B.    The Coma.

The Government relies heavily on Mr. Bourgeois' report that he had been in a coma for weeks as a result of a three wheeler accident. *Response*, 15, 16, 20, 33-35,

22

USCA5 5719

50, 51, 54. According to the Government, this false claim was "relied upon" by Dr. Weiner in "making his neurological assessments" *Response*, 16. This is false. Dr. Weiner testified that his neuropsychological testing, showing that Mr. Bourgeois had "mild brain impairment," Tr. 9/20/10, 239, was valid, and the fact that Mr. Bourgeois may have lied about the coma was not relevant to the validity of his results, or his scientific conclusions. Id., 244 ("I would have [told trial counsel] that the actual test results appear to be valid and that there was no evidence of malingering and that the results showed that there was brain damage which was not caused, at the time I didn't know because I thought he had been in a coma, that regardless of what the cause was he has some brain damage.") Dr. Weiner never had the chance to tell this to counsel because counsel never met with him. In a brief phone call – so brief that Dr. Weiner did not bill for it – counsel told him that they were not going to call him at trial because of the coma story. Counsel never asked him about the basis for his conclusions and whether he could offer valid and helpful testimony, notwithstanding the alleged falsehood told by Mr. Bourgeois. Id., 243.[13]

Moreover, Dr. Weiner testified that when he evaluated Mr. Bourgeois (after

---

[13]Counsel's brief phone call with Dr. Weiner stands in bold contrast to the **five hours** that Dr. Price spent with the Government lawyer's outside of court preparing the case (Tr. 9/24/10, 33-34), and the five days he sat with Government counsel during the hearing.

23

USCA5 5720

trial already commenced), he was provided **with no collateral information.** Id., 241 ("I only knew what he [Petitioner] told me").  This means that counsel failed to provide this expert with the hospital records that showed that the coma story was false.  Had Dr. Weiner had these records, he would have been able to question Mr. Bourgeois about the coma, and he would have learned that he was not in a coma.  Id., 210.  Significantly, Dr. Weiner would have also learned from these hospital records that while Mr. Bourgeois did not suffer a coma, he did suffer from a different head injury that could have contributed to his organic brain dysfunction.  Id.

Counsel deficiently failed to provide these records to Dr. Weiner.  Had they done so, the coma story would have been put to rest, and the expert would have seen a different head injury.  See Rompilla v. Beard, 545 U.S. 374 (2005).  In Rompilla counsel failed to review a court file that contained aggravating evidence that the prosecution told them would be used against their client.  They failed to ever look at the file.  Had they done so, they would have not only seen the aggravating evidence, but a wealth of leads to discovering mitigating evidence.  This is analogous to Petitioner's situation.  Trial counsel never provided the medical records to Dr. Weiner.  Had they done so, he would have seen that the coma was not verified, but he would have also learned of a different mitigating fact – the 1993 head injury. Rompilla rejected the argument that the petitioner there could not benefit from the

24

USCA5 5721

unexpected mitigating evidence contained in the unreviewed file:

> The dissent would ignore the opportunity to find this evidence on the ground that its discovery (and the consequent analysis of prejudice) "rests on serendipity," *post,* at 2476.  But once counsel had an obligation to examine the file, counsel had to make reasonable efforts to learn its contents;  and once having done so, they could not reasonably have ignored mitigation evidence or red flags simply because they were unexpected.

Rompilla, 545 U.S. at 391, n. 8.

### C.    Mr. Bourgeois Was Abused.

The Government states:

> During this all-important first formal interview [Bierbaum's], Mr. Bourgeois did not report any child abuse. *Galloway v. Thaler*, 344 Fed.Appx. 64, 68- 69, 2009 WL 2873910, 3 (5th Cir. 2009) (Petitioner failed to disclose sexual abuse to his attorneys despite their efforts to talk with him). **This Court** has consistently refused to hold attorneys responsible for introducing mitigation evidence that their client and other witnesses fail to disclose. *Johnson v. Cockrell*, 306 F.3d 249, 251-53 (5th Cir. 2002), *Soria v. Johnson,* 207 F.3d 232, 250-51 (5th Cir.2000); *West v.Johnson,* 92 F.3d 1385, 1408-09 (5th Cir.1996).

*Response*, 33.[14]  While, like many adult survivors of childhood abuse, Mr. Bourgeois

did not freely discuss this distressing chapter of his life, the abuse itself was no secret.

**Every mental health professional** who has examined Mr. Bourgeois in this litigation

– pre trial and in post-conviction – has concluded that he was abused.  Moreover, the

---

[14]The Government's reference to "This Court" shows that at least this portion of its brief was lifted from a different, Fifth Circuit, appellate brief.

USCA5 5722

memos that were generated by the mitigation specialists demonstrate that there is no question but that Mr. Bourgeois was so abused, and that Mr. Bourgeois did report much of the abuse to the investigators. These reports of abuse are reflected in investigative memos. See Tr. 9/24/10, 12-18 (Wiseman reading memos into record); 53 (Ms. Booth reading others) and 55 (Court admitting memos into evidence, as Exhibit 61-A).

**D.      Counsel Were Not Excused for Failing to Present the Extant Mitigating Evidence Because it Conflicted with the Guilt Phase Defense.**

The Government insists that trial counsel were excused from presenting the extant mitigating evidence that was within their reach, because doing so conflicted with the guilt phase defense that Mr. Bourgeois did not commit the offense. *Response*, 37-40.  In support of this argument, the Government provides a lengthy block quote from the ABA Guidelines. *Response*, 39. What this section of the commentary to the Guidelines says is that counsel should attempt to reconcile the guilt and penalty phase defenses so as to reduce the risk that the defense team will lose credibility with the jury.  So, for instance, the commentary advises presentation of guilt phase defenses that "seek to reduce the client's culpability for the crime . . . rather than to deny involvement altogether." ABA Guidelines, commentary, quoted by Government, *Response*, 39.   The ABA Guidelines go on to tell capital counsel

USCA5 5723

what they must do when circumstances are such that they cannot mesh the guilt phase and penalty phase presentations – that advise is not to throw in the towel and present nothing:

> But whether or not the guilt phase defense will be that the defendant did not commit the crime, counsel must be prepared from the outset to make the transition to the penalty phase.

Id.

The notion that counsel did not present the mitigating evidence because such a presentation would have conflicted with the guilt phase defense, is a red-herring. Not only do the Guidelines say so (see above), trial counsel themselves tried to present and argue some of the types of mitigating evidence that is being put forward by undersigned counsel. They simply did a poor job of it because the actual mitigation investigation had long before run off the rails. See Tr. 9/22/10, 208-210 (Mr. Gilmore acknowledging that he and Mr. Tinker argued abuse even though they claimed to not have wanted to present it because it conflicted with the guilt phase defense of "I didn't do it.").

### E. Only Counsel's Actual Reasons for their Actions are Worthy of Consideration.

The Government continues to insist that this Court may judge counsel to be effective based on their reputation. *Response*, 26. The Government urges the Court

USCA5 5724

to consider counsel's experience and skill.  In a similar vein, the Government offers any number of alleged strategic reasons for counsel's actions or omissions, which are not supported by any statements ever made by counsel.  E.g., *Response*, 40 (suggesting that counsel did not call Dr. Cunningham because his presentation assumed that Petitioner's committed the offense), 56 (suggesting that counsel did not present mitigation through Dr. Cunningham or lay witnesses because they chose to rely on "residual doubt").  However, these positions are contrary to Supreme Court authority and other authority, which say that a prosecutor may not conjure, and courts may not find, strategic reasons for counsel's actions or omissions that counsel have not endorsed.  Wiggins v. Smith, 539 U.S. 510,  526-27 (2003) (unreasonable for court to invoke a "strategy" for counsel that was inconsistent with counsel's actions at trial); Kimmelman v. Morrison, 477 U.S. 365, 386-87 (under Strickland, courts cannot use hindsight to supply a strategy for counsel); Griffin v. Warden, 970 F.2d 1355, 1358 (4th Cir. 1992) ("courts should not conjure up tactical decisions an attorney could have made, but plainly did not" (citing Strickland; Kimmelman)).

WHEREFORE, for all of the above reasons, and based upon the record of these proceedings, Petitioner requests that the Court grant the relief requested in the § 2255 Motion, or alternatively that the Court grant Petitioner the evidentiary hearing and discovery he has moved for.

28

USCA5 5725

Respectfully Submitted,

/s/ Michael Wiseman

Michael Wiseman
Victor Abreu
James McHugh
Elizabeth Larin
Federal Community Defender
Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
Counsel for Petitioner
Alfred Bourgeois

Dated:        February 23, 2011
              Philadelphia, Pennsylvania

### Certificate of Service

I, Michael Wiseman, hereby certify that on this 23rd day of February, 2011 the foregoing has been served upon the following persons by filing the same with the Court's ECF Filing System:

Tony Roberts
Patti Booth
Mark Dowd
Elas Salinas-Patterson

/s/ Michael Wiseman

Michael Wiseman

29

USCA5 5726

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Respondent, | § | |
| | § | |
| vs. | § | CR. No. C-02-216 |
| | § | C.A. No. C-07-223 |
| ALFRED BOURGEOIS, | § | |
| Petitioner. | § | |

GOVERNMENT'S MOTION TO STRIKE PETITIONER'S
REPLY TO THE GOVERNMENT'S RESPONSE TO POST-ARGUMENT
SUBMISSION AND OPPOSITION TO MOTION TO REOPEN EVIDENTIARY
HEARING

TO THE HONORABLE JUDGE OF SAID COURT:

The United States of America, hereinafter "the government," by and through

the United States Attorney for the Southern District of Texas, files this Motion to

Strike Petitioner's Reply to the Government's Response to Petitioner's Post-

Argument Submission and Opposition to Motion to Reopen Evidentiary Hearing.

On February 1, 2011, pursuant to the Court's order, Petitioner filed his *Post*

*Argument Submission* (document #649).  On  February 18,  2011, the government

filed *Government's Response to Petitioner's Post-Argument Submission and*

USCA5 5727

*Opposition to Motion to Reopen Evidentiary Hearing* (document #654). On

February 23, 2011, Petitioner filed *Petitioner's Reply to the Government's*

*Response to Petitioner's Post-Argument Submission and Opposition to Motion to*

*Reopen Evidentiary Hearing* (document #657). There is no provision nor was

there a Court Order from this Honorable Court authorizing Petitioner to file such

a reply. Therefore, the government moves to strike Petitioner's Reply which was

filed on February 23, 2011.

Respectfully submitted,

JOSÉ ANGEL MORENO
United States Attorney

TONY R. ROBERTS
Assistant United States Attorney

MARK DOWD
Assistant United States Attorney

ELSA SALINAS
Assistant United States Attorney

   *s/ Patti Hubert Booth*
PATTI HUBERT BOOTH
Assistant United States Attorney
Federal Bar No. 19500
Texas Bar No. 00791593
800 N. Shoreline Blvd., Suite 500
Corpus Christi, TX 78402
PH: (361) 888-3111
Fax: (361) 888-3200

2

USCA5 5728

## CERTIFICATE OF SERVICE

I, Patti Hubert Booth, Assistant United States Attorney, do hereby certify

that a copy of the above Motion to Strike Petitioner's  Reply  was emailed  to:

Michael Wisemen
Victor Abreu
James McHugh
Maureen Kearney Rowley
Elizabeth Larin
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106

_s/ Patti Hubert Booth_
PATTI  Hubert BOOTH
Assistant United States Attorney

USCA5 5729

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Respondent, | § | |
| | § | |
| vs. | § | CR. No. C-02-216 |
| | § | C.A. No. C-07-223 |
| ALFRED BOURGEOIS, | § | |
| Petitioner. | § | |

ORDER

And now on this _____ of _____, 2011, upon consideration

Government's Motion to Strike Petitioner's Reply to the Government's Response

to Post-Argument Submission and Opposition to Motion to Reopen Evidentiary

Hearing, is hereby Granted.

Petitioner's Reply to Government's Response to Post-Argument Submission

and Opposition to Reopen Evidentiary Hearing, (DE #657) is stricken.

The clerk of this Court shall send a copy of this Order to the parties by any

receipted means.

Signed at Corpus Christi, Texas, this _____ day of _____ 2011.

_____
JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

USCA5 5730

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____
                                                        :
UNITED STATES OF AMERICA,            :        No. Cr-C-02-216
                                                        :        No. Cv-07-223
                        Respondent,              :        Honorable Janis Graham Jack,
                                                        :                 U.S.D.J.
        -against-                                    :
                                                        :
ALFRED BOURGEOIS,                         :        Electronically Filed
                                                        :
                        Petitioner.                 :
_____      :

**PETITIONER'S RESPONSE IN OPPOSITION TO
GOVERNMENT'S MOTION TO STRIKE**

Petitioner, ALFRED BOURGEOIS, through undersigned counsel, hereby

responds to the Government's *Motion to Strike*, and states as follows.

1.    Petitioner filed his *Post-Argument Submission* (document #649) and a

separate *Motion to Reopen Evidentiary Hearing* (document #648).  The Government

filed a consolidated document responding to the *Post-Argument Submission* and

opposing the *Motion to Reopen* (document #654).  Petitioner filed his consolidated

*Reply* (document # 657).  The Government has moved to strike the *Reply* (document

# 658).[1]  Petitioner files this *Response in Opposition* to the Government's Motion.

_____

[1]The Government's pleading was filed on ECF as a "Response," however it
is captioned a *Motion* and it clearly is a motion.  Therefore, ECF may not allow

1

USCA5 5731

2.      The Government argues, without citation to any authority, that there is

no provision or court order permitting the reply.  The Government is incorrect.

3.      As the party with the burden in this litigation, and in particular with

respect to both the *Motion to Reopen* and the *Section 2255 Motion*, Petitioner has a

right to reply.  Dondi Properties Corp. v. Commerce Sav. & Loan Ass'n, 121 F.R.D.

284, 291 (N.D. Tex. 1988) (en banc) ("While our court has decided that the

determination whether to permit a reply is discretionary with each judge, the principle

is well-established that the party with the burden on a particular matter will normally

be permitted to open and close the briefing."); Springs Indus., Inc. v. Am. Motorists

Ins. Co., 137 F.R.D. 238, 239 (N.D. Tex. 1991) ("Following this court's decision in

*Dondi []*, there should be little doubt 'that the party with the burden on a particular

matter will normally be permitted to open and close the briefing.' *Id.* at 291-92 This

principle is sound. In our jurisprudence the party who must persuade the court of the

merits of the relief it seeks is almost always given the final word. 'It should thus be

rare that a party who opposes a motion will object to the movant's filing a reply.'*Id.*

at 291-92"); see also Galderma Laboratories, L.P. v. Actavis Mid Atl. LLC, 2008 WL

3822622 (N.D. Tex. July 23, 2008) ("The purpose of the reply brief is to allow the

---

Petitioner to file this document as a *Response in Opposition* to the *Motion*,  which
would be the proper way to file it.  If he cannot file it as a *Response*, he will chose
the best alternative allowed by ECF.

2

USCA5 5732

movant to rebut the nonmovant's response, thereby persuading the Court that the movant is entitled to the requested relief. Dethrow [v. Park Health Hospital Systems], 204 F.R.D. [102,] 103; Springs Industries, Inc., 137 F.R.D. at 239-40."); Racetrac Petroleum, Inc. v. J.J.'s Fast Stop, Inc., 2003 WL 251318 (N.D. Tex. Feb. 3, 2003) ("The purpose for having a motion, response, and reply is to give the movant the final opportunity to be heard").

4.    While it is understandable that the Government would attempt to silence Petitioner on the issues that are the subject of its *Motion to Strike*, it is not disputable that Petitioner, as the moving party in this capital litigation and with regard to his *Motion to Reopen*, has a right to contest the assertions made in the Government's responsive submissions.    Therefore, his *Reply* is appropriate and ought to be considered by the Court.    The Government's *Motion to Strike* should be denied.

USCA5 5733

Respectfully Submitted,

/s/ Michael Wiseman

Michael Wiseman, Esq.
Chief Capital Habeas Corpus Unit
Capital Habeas Corpus Unit
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19016
215-928-0520
Michael_Wiseman@fd.org

Dated:        March 1, 2011
              Philadelphia, PA

## Certificate of Service

I, Michael Wiseman, hereby certify that on this 1st day of March 2010,
I served the foregoing upon the following persons by filing the same via
ECF:

Tony R. Roberts
Patricia Hubert Booth
Elsa Salinas-Patterson
Mark Dowd

/s/     Michael Wiseman

Michael Wiseman

USCA5 5734

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-CR-216 |
| | § | (C.A. No. C-07-223) |
| ALFRED BOURGEOIS, | § | |

## MEMORANDUM AND ORDER

In 2004, a jury found Alfred Bourgeois guilty of murdering his two-year-old daughter, JG1999. After a separate punishment phase, the same jury decided that he should receive a death sentence. After he unsuccessfully appealed his conviction and sentence to the Court of Appeals for the Fifth Circuit, Bourgeois' appointed counsel filed a lengthy Motion for Relief Pursuant to 28 U.S.C. Section 2255 or in the Alternative Pursuant to 28 U.S.C. § 2241. (DE 396). Bourgeois also filed an extensive memorandum of law supporting his motion. (DE 402). The Court has liberally allowed Bourgeois to develop the factual basis for his post-conviction claims, including through the presentation of testimony and evidence in several hearings. The Government has filed a response arguing that Bourgeois' claims are all procedurally insufficient or substantively without merit. (DE 442).

The Court has fully considered the arguments, evidence, and law supporting Bourgeois' claims. The Court has given ample consideration to the voluminous pleadings filed by the parties. After a full review of the record, and with particular emphasis on this Court's own observations from trial and afterward, the Court finds that Bourgeois has not shown that the Government secured his conviction and sentence in violation of the Constitution or laws of the United States. *See* 28 U.S.C. § 2255.

USCA5 5735

# TABLE OF CONTENTS

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    I.    The Crime . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        A.    Bourgeois Fathers JG1999, Gains Custody, and Begins His Abuse . . . . 10

        B.    JG1999's Last Month . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        C.    The Murder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    II.    Defense Counsel's Pre-Trial Preparation . . . . . . . . . . . . . . . . . . . . . . . . 14

    III.    The Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        A.    Guilt/Innocence Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        B.    Sentencing Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    IV.    Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    V.    Post-Judgment Proceedings and Evidentiary Hearing . . . . . . . . . . . . . . . . 36

PROCEDURAL ADEQUACY OF BOURGEOIS' CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . 40

ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    I.    Bourgeois' Alleged Mental Retardation (claim one) . . . . . . . . . . . . . . . . . 42

        A.    Background of Bourgeois' *Atkins* claim . . . . . . . . . . . . . . . . . . . . 43

        B.    Intellectual Functioning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

            1.    Bourgeois' IQ Scores . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

            2.    Legal Evaluation of Intelligence in *Atkins Cases* . . . . . . . . . . . 52

            3.    Bourgeois' IQ Does Not Persuasively Fall at the Lower End of the

USCA5 5736

Confidence Interval . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

C.    Significant Limitations in Adaptive Skill Areas . . . . . . . . . . . . . . . . . . 65

1.    Assessment by Testing Instruments . . . . . . . . . . . . . . . . . . . . . . . 68

a.    The Woodcock-Johnson . . . . . . . . . . . . . . . . . . . . . . . . . 71

b.    The ABAS-II and the Vineland . . . . . . . . . . . . . . . . . . . 72

2.    Lay Accounts of Bourgeois' Functioning . . . . . . . . . . . . . . . . 77

3.    Bourgeois' Adaptive Abilities . . . . . . . . . . . . . . . . . . . . . . . . . 81

D.    Manifestation of Limitations Before Age 18 . . . . . . . . . . . . . . . . . . 91

E.    Trial Counsel's Failure to Develop Evidence of Mental Retardation . . . 92

F.    Conclusion of Bourgeois' *Atkins* Claim . . . . . . . . . . . . . . . . . . . . 95

II.    Ineffective Assistance of Counsel for Failing to Present Mitigating Evidence (claim

two) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

A.    The *Strickland* Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

B.    Trial Counsel's Investigation and Preparation of Mitigating Evidence . 100

1.    Counsel's Early Efforts to Prepare a Mitigation Defense . . . . . 100

2.    Preparations Before the Guilt/Innocence Phase . . . . . . . . . . . . 105

3.    Trial Counsel Made a Constitutionally Sound Investigation . . . 113

C.    The Unpresented Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

1.    Lay Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

2.    Expert Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

a.    Dr. Cunningham's testimony . . . . . . . . . . . . . . . . . . . 123

b.    Borderline personality disorder . . . . . . . . . . . . . . . . . 129

c.    Neurological impairment . . . . . . . . . . . . . . . . . . . . . 137

3

USCA5 5737

        d.      Premeditation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

    D.    Conclusion of Deficient Performance Analysis  . . . . . . . . . . . . . . . . . 144

    E.    Cumulative Effect of Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . 145

III.    Jurisdiction (claim three) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

    A.    The Autopsy and Trial Testimony . . . . . . . . . . . . . . . . . . . . . . . . 149

    B.    Bourgeois' Post-Judgment Arguments and Post-Conviction Testimony

        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

    C.    Evidence of Recent, Extensive, and Fatal Head Trauma . . . . . . . . . . . 160

IV.    Trial Counsel Provided Ineffective Assistance by Failing to Call an Expert Witness

to Rebut Forensic Evidence Indicting Sexual Assault (claim four) . . . . . . . . . . 165

    A.    The Trial Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

    B.    Dr. Benton's Observation of Sexual Trauma . . . . . . . . . . . . . . . . . . 170

    C.    Forensic Evidence of Semen . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

    D.    Prejudice From Trial Counsel's Defense Against Allegations of Sexual

        Assault . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

V.    Trial Counsel Provided Ineffective Assistance by Not Litigating a *Daubert* Challenge

to Three of the Government's Expert Witnesses (claims five and six) . . . . . . . 182

    A.    Dr. Oliver's Reliance on the Digitally Enhanced Autopsy Photographs (claim

        six) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

    B.    Testimony from Dr. Senn and Dr. Chrz Concerning Bite-Mark Evidence

        (claim five) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

VI.    The Government Violated its Duty under *Brady v. Maryland*, 373 U.S. 83 (1963), by

Failing to Disclose That the Government Promised Inmates Some Benefit for

USCA5 5738

Testifying Against Bourgeois (claim seven) . . . . . . . . . . . . . . . . . . . . . . . . . 194

A.    No Evidence of Concealed Deals with Government Witnesses . . . . . . 196

B.    Materiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

VII.    Trial Counsel Labored under a Conflict of Interest Because of His Representation of
Clients Associated with this Case (claim eight) . . . . . . . . . . . . . . . . . . . . . . . 204

VIII.    The Government Engaged in Misconduct by Making Improper Argumentative
Statements in the Guilt/Innocence and Penalty Phases (claim nine) . . . . . . . . . 207

IX.    Trial Counsel Provided Ineffective by Not Rebutting Evidence of Bourgeois'
Indifferent Demeanor (claim ten) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

X.    A Witness Improperly Relied on Bourgeois' Interactions with Counsel as a Basis to
Formulate an Adverse Opinion about Him (claim eleven) . . . . . . . . . . . . . . . . 217

XI.    Ineffective Assistance of Appellate Counsel (claim twelve) . . . . . . . . . . . . . . 219

XII.    Cumulative Error (claim thirteen) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

XIII.    Lethal Injection (claim fourteen) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223


CERTIFICATE OF APPEALABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224


CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 225

USCA5 5739

## BACKGROUND

Where, as in this case, a jury has found a defendant's crime worthy of the death penalty, federal law guarantees a full and fair inquiry into his conviction and sentence. Bourgeois has raised several claims requiring serious judicial consideration. The events surrounding the murder Bourgeois committed, the pre-trial preparation by his appointed attorneys, and the circumstances of his trial provide an important context to the matters he now brings before the Court. The Court will discuss at length the background for Bourgeois' post-conviction challenge.

In doing so, this Court's role presiding over trial provides a particularly useful vantage point. Cold transcripts often do not convey the nuances and color of the trial itself. Post-conviction proceedings frequently fail to depict the tempestuous trial atmosphere. The printed page dulls the personalities, character, and credibility of the parties and the witnesses. Decisions made in the heat of trial lose some urgency when subjected to harsh light of hindsight. The slow pace and detachment of post-conviction review divorces itself from the stress, fear, and anxiety of trial. For example, passing years have dimmed the powerful effect of some testimony, such as that of Bourgeois' daughter AB1994 as she described the murder. In general, this Court's familiarity with the trial atmosphere, parties, and witnesses provides a colored mosaic that may otherwise be obscured on the black-and-white page.

This is especially the case with respect to the trial attorneys, Douglas Tinker and John Gilmore, whose efforts Bourgeois vigorously attacks at this stage of the case.[1] Lamentably, the record suffers because Mr. Tinker passed away after Bourgeois filed his 2255 motion. With all sensitivity and respect, the Court allowed the parties to glean what information they could from Mr.

---

[1] Except as necessary to identify one of his attorneys, the Court will refer to Bourgeois' lawyers conjunctively as "trial counsel" or "defense counsel."

6

USCA5 5740

Tinker before he succumbed to cancer. With the omission of his testimony, a hole exists in the written record about his efforts to defend Bourgeois.

This Court's experience and observation partially fill in the otherwise empty spaces in the record. For example, this Court's familiarity with Mr. Tinker and Mr. Gilmore as attorneys, both in this case and in others, informs the consideration of Bourgeois' grounds for relief. The legal community highly regards both men as competent and zealous attorneys. Their extensive experience, trial lawyering, and overall sterling character cannot be gainsaid.[2] The Court appointed these attorneys because they were among the best in the legal community. As an example of their character, the Court had to goad Mr. Tinker into filing vouchers for his representation; his concern was for the client, not for a paycheck.

This is not to say that counsel was mistake-free. The Court will not manufacture justifications for mistakes plainly in the record.[3] Nevertheless, this Court's familiarity with defense counsel's efforts reinforces the "strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect." *Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 790 (2011) (quotations omitted). Thus, this Court must "not simply . . . give the attorneys the benefit of the doubt," but also "affirmatively entertain the range of possible reasons

---

[2] As the Court observed at the close of the sentencing hearing: "I don't think . . . your client[] could have had a better . . . advocate or voice in the courtroom . . . throughout what has been a very difficult process." (DE 342 at 102).

[3] Bourgeois' attorneys have argued that Mr. Tinker's absence now leaves them "kind of wrestling with a ghost, in quite a literal sense." (DE 646 at 88). While Mr. Tinker's passing removes the ability to place his strategic decisions on the record, *Strickland* is an objective standard which is also "highly deferential" to counsel's actions. *Premo v. Moore*, ___ U.S. ___, 131 S. Ct. 733, 740 (2011); *Strickland v. Washington*, 466 U.S. 668, 693 (1984); *see also Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 791 (2011) ("*Strickland* . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind").

7

USCA5 5741

. . . counsel may have had for proceeding as they did[.]" *Cullen v. Pinholster*, ___ U.S. ____, ___ S. Ct. ____, 2011 WL 1225705, *16 (2011).

With this understanding, the Court will first provide a general background before addressing Bourgeois' individual grounds for relief.

## I.   The Crime

On June 27, 2002, Bourgeois, a long-haul trucker, arrived to deliver a load on the Naval Air Station Corpus Christi with his wife (Robin), the two daughters they shared (AB1994 and AB2001), and his out-of-wedlock daughter (JG1999).[4] An hour later, Robin frantically begged workers to call an ambulance for two-year-old JG1999 who lay motionless on the ground. Robin said that JG1999 had slipped and fallen from the truck. Concerned bystanders looked on as efforts were made to save the child's life. Alfred Bourgeois, well aware that his daughter lay dying on the pavement, indifferently supervised the unloading of his trailer and arranged for his next load.

Emergency personnel arrived and tried to save the dying little girl. As the ambulance sped away, Bourgeois insistently remained behind to finish unloading his truck in preparation for another run. He casually mentioned that it was a "shame what happened" to the infant. Only with extensive prodding, and the fact that he could not continue making deliveries because his truck had become a crime scene, did Bourgeois follow his daughter to the hospital.

At the hospital, doctors soon saw that the extent of JG1999's injuries far exceeded the explanation given. Finding blood behind her eyes, the doctors ordered an MRI. Medical personnel disbelieved the explanation for her injuries; the extent of her head trauma was much worse than that

---

[4]   This Court's review of the facts comes from the entirety of the trial and post-trial record, with particular emphasis on the highly credible testimony AB1994 and Robin Bourgeois provided at trial.

8

USCA5 5742

which would be expected from a four-to-five-foot fall. Numerous other injuries in various stages of healing also raised suspicions. When doctors informed Bourgeois that they needed to transport JG1999 to another facility and that she may not live much longer, Bourgeois seemed unfazed.

Given the injuries to the infant, Child Protection Services (CPS) began an investigation. Bourgeois told Robin that, if CPS took custody of the other two children, he did not want them to stay with her parents. Bourgeois' preference was unsurprising; he had physically assaulted his mother-in-law not long before. Bourgeois told Robin not to panic and to "stick with the story." Suspicion increased when AB1994 told CPS workers that the falling-out-of-the-truck fiction was "the story my dad said to tell."

As the life ebbed from JG1999's body, Bourgeois returned to the naval base set on continuing his deliveries. After unsuccessfully trying to get back on the road, Federal Bureau of Investigation officers took Bourgeois back to the hospital. Bourgeois told agents the story from which he has not deviated: while driving to the Corpus Christi Naval Exchange, JG1999 sat on his lap and sang her ABC's. When they arrived, he unloaded his trailer until someone informed him that JG1999 had fallen from the truck. He claimed that he rushed to her and began CPR, using a towel to wipe blood from her head or nose. He would not explain the numerous injuries to JG1999 other than to say that he never whipped his children. He seemed singularly unconcerned with JG1999's critical injuries. He said that he "didn't want *it* to suffer" and saw no problem continuing his truck route because "her mother's going to be here in town. I'm coming back."

Robin, however, began to change her story. When doctors seemed incredulous, Robin divulged to FBI agents that Bourgeois had abused JG1999, but kept up the story that she fell from the truck. Only when JG1999 died did Robin admit that Bourgeois had actually killed his daughter. Witness accounts and forensic evidence began to unfold a horrific tale of savage abuse that

9

USCA5 5743

culminated in Bourgeois beating JG1999 to death.

### A.    Bourgeois Fathers JG1999, Gains Custody, and Begins His Abuse

Robin and Bourgeois had a turbulent relationship. Since before their marriage in 1995, Bourgeois beat Robin, threatened to kill her, periodically refused to provide for his family, and repeatedly had extramarital affairs. Robin twice sought restraining orders against her husband. During a separation, Robin also had an affair with a man who owned a limousine service. As part of their reconciliation, Robin and Bourgeois vandalized her paramour's work vehicles. Bourgeois threatened to kill Robin on numerous occasions. Violence, disharmony, and selfishness defined Bourgeois' relationship with his wife.

Bourgeois fathered JG1999 during an extramarital affair he had with Katrina Harrison, a woman he met while on a truck route. In April 2002, the State of Texas initiated paternity proceedings against Bourgeois. In addition to the two daughters he shared with Robin, Bourgeois was already paying child support for two other children. Without telling Robin where he was going, Bourgeois left for Livingston, Texas, to reacquaint himself with Ms. Harrison. They shared a bedroom while he visited his daughter.

When he returned, Bourgeois told Robin about the paternity suit. A confirmatory blood test debunked his claim that he did not know Ms. Harrison. In May 2002, Bourgeois took Robin, his two children, and a niece to a child support hearing in Texas. The Texas court ordered Bourgeois to pay around $160 a month child support. Bourgeois in turn asked for visitation rights. Immediately after the court hearing, Ms. Harrison prepared a suitcase for JG1999, who left with Bourgeois.

Bourgeois then entered into a pattern of conduct aimed at controlling or killing his child. Bourgeois contacted Child Protective Services in Louisiana and falsely claimed that JG1999's mother abused and neglected her. The Louisiana authorities contacted Texas Child Protective

10

USCA5 5744

Services, who found no basis for the claim of neglect. The social worker became concerned that Bourgeois did not want custody, he wanted power over and possession of JG1999. Fearing that JG1999 was in danger, the social worker asked Child Protective Services in Louisiana to monitor Bourgeois' custody of JG1999. No government agency became aware of the vicious abuse JG1999 suffered until she died.

On May 18, 2002, Robin found blood in JG1999's diaper. Dr. Scott Benton, a forensic pediatrician, examined the little girl and found no evidence of abuse. His examination would be a baseline against which to measure Bourgeois' inhumane treatment.

Bourgeois' abuse of JG1999 began soon after they arrived at his home. Robin began noticing bruises, marks, and injuries on the infant. She noticed sores on JG1999's feet which would not heal because Bourgeois kept pressing his thumbs into the wounds. Bourgeois began calling JG1999 names like the "trifling little bitch" and "a mother fucker." When Bourgeois bathed the infant, Robin could hear screaming as he whipped her. A few days after JG1999 came to live at the Bourgeois home, Bourgeois proclaimed that he would teach her to swim. As a video recorder captured his actions, Bourgeois repeatedly tossed her into the air and let her fall into the swimming pool where she sank until Bourgeois pulled her out, coughing and gasping for breath. For approximately 30 minutes, Bourgeois brought the young girl to the brink of drowning until he let her go.

Bourgeois assumed control over potty training JG1999. Bourgeois would strike JG1999 if the two-year-old wet her pants. He began a systematic pattern of beating JG1999, often with electrical cords or other objects. While no conclusive evidence of sexual abuse existed, strange behavior hinted that Bourgeois engaged in sexual activity with his daughters. For example, by this point in their relationship Robin no longer shared a bed with Bourgeois, but each night Bourgeois

11

USCA5 5745

would lock himself in the bedroom with AB1994 and JG1999. JG1999 would spend the night tied to her potty chair under a window.

Bourgeois' brutal abuse of JG1999 intensified. Some nights Robin could hear pounding in the bedroom accompanied by crying. A bloodstain confirmed that one loud thump Robin heard was Bourgeois throwing JG1999 against a wall. Bourgeois' maltreatment of JG1999 stood in stark contrast to that of AB1994 whom he treated "like an angel."

**B.    JG1999's Last Month**

For the last month of the little girl's life, Bourgeois' abuse extended beyond harsh discipline; a particular viciousness attended his continual maltreatment. Bourgeois took his family on the road. The five people – Bourgeois, Robin, their two children AB1994 and AB2001, and JG1999 – traveled across America in the tractor-trailer. JG1999 stayed on her potty chair as they drove. Bourgeois sent postcards to JG1999's mother describing a vacation to amusement parks and full of outdoor activity. In terse phone calls to her mother, Bourgeois instructed the formerly talkative JG1999 to tell her mother that she was all right. The reality, however, was far different from the picture Bourgeois portrayed.

AB1994 saw her father repeatedly bite JG1999 on her hands, feet, and forehead. Once, Bourgeois beat JG1999 with a belt so hard that it broke. JG1999 began to show bruises all over her body. Her hands and feet were swollen and had open sores. He beat her with electrical cords. He once beat her until she lost consciousness. He occasionally taped her mouth shut. He hit her with his shoe. She spent her days and nights on the potty chair. Bourgeois would curse at her. He once locked Robin out of the truck for hours while he remained in the cab alone with the girls. He hit JG1999 in the eyes with all his strength until she had to wear sunglasses to mask the injuries. He once forced JG1999 to drink urine from a bottle he used to relieve himself while driving. He beat

12

USCA5 5746

her with a toy baseball bat until her head swelled "like a football." He told JG1999 that she made him want to kill her. Robin began to notice injuries such as a hole the same size as a cigarette lighter in the infant's foot. He repeatedly held JG1999 under the waves on a trip to the beach. Foreshadowing her murder, Bourgeois once knocked JG1999 unconscious by striking her head against the truck's steering wheel because she referred to herself by her mother's, not his, surname.

As Bourgeois' violence increased, JG1999 became sullen. Bourgeois had broken her once vivacious spirit. It soon became apparent that Bourgeois' abuse would end in the child's death. Bourgeois told Robin he wanted to kill the child. Once he had killed her, he planned on leaving her body in the woods or in a swamp and having Robin report her as kidnaped.

### C.    The Murder

Bourgeois delivered the killing blows on the naval base on June 27, 2002. The day before, the Bourgeois family stopped at their home in Louisiana to collect the mail. Bourgeois received a court order requiring him to pay $519.99 a month in child support for another daughter. After delivering a load to the Ingleside Naval Station, Robin went to sleep. Bourgeois' truck entered the Corpus Christi Naval Air Station at around 10:00 a.m. After asking for directions and having his truck break down, Bourgeois approached the warehouse where he was to make a delivery. Robin was still sleeping in the back. After the truck stopped, JG1999 wiggled on her potty chair and tipped it over. Bourgeois angrily ordered AB1994 to hand him the toddler. Bourgeois pulled down the child's pants and spanked her. He then grabbed her by the shoulders and slammed her head into the window four times. JG1999's face became "real sad." Bourgeois handed the child to AB1994 and he exited the truck.

Robin woke up and saw the child sitting motionless. She touched the infant, but JG1999's arm fell limply. Robin began trying to revive JG1999. Panicking, she honked the truck's horn. She

13

USCA5 5747

confronted Bourgeois when he returned to the truck, asking: "What did you do to her? She's dying." Bourgeois bluntly said he had to finish unloading his truck when Robin begged him to take the child to the emergency room.

Robin began performing CPR, but fluid came out of JG1999's mouth. Robin handed Bourgeois the child and began crying hysterically. She implored: "You're going to have all of us going to jail." Bourgeois then crafted their story: AB1994 forgot to close the cab door as she exited and JG1999 fell as she followed. Bourgeois took JG1999 out of the truck and laid her on the ground. Moments later, Robin exited, saw JG1999 laying on the ground, and began administering CPR again. Paramedics took over the CPR. While Robin was "very upset" and could not "keep her eyes off the baby," Bourgeois was "on the phone most of the time trying to see about getting . . . his next load . . . [to] Kingsville."

As bystanders questioned what happened, Robin said the "little girl fell from the truck." With time, it became apparent that no one believed Bourgeois' story. Robin first told authorities about Bourgeois' cruelty toward the child. Finally, by the morning of the day that JG1999 died, Robin admitted that the story about her falling from the truck was a lie. Bourgeois was arrested.

## II.    Defense Counsel's Pre-Trial Preparation

On July 25, 2002, a grand jury returned a two-count indictment charging Bourgeois with murder under 18 U.S.C. §§ 7 and 1111, and injury to a child under 18 U.S.C. § 13. The Court appointed John Gilmore on October 2, 2002, to represent Bourgeois. Mr. Gilmore had extensive experience handling capital cases. As a prosecutor, he had tried two death penalty cases. As defense counsel, he represented ten or eleven defendants facing a death sentence. He also tried several capital cases in which the prosecution did not seek a death sentence. Outside the death-penalty context, he maintained an active criminal practice, trying an estimated twenty cases each year. In

14

USCA5 5748

2000 and 2008, the local bar named him criminal defense attorney of the year. Mr. Gilmore brought to the defense a background rich in criminal trial experience.

Soon after his appointment, Mr. Gilmore interviewed his client. Mr. Gilmore did not observe any indication of mental illness or mental retardation in Bourgeois' presentation. During their initial conversations, Mr. Gilmore discussed with Bourgeois the possibility of seeking a favorable plea deal with the Government. Bourgeois refused to talk about a plea, making his position clear and unmoveable: he blamed the murder on Robin.[5]

Mr. Gilmore began preparing a defense. Mr. Gilmore requested, and the Court granted, appointment of expert and investigative assistance. (DE 32, 33). Initially, the Court appointed Douglas Tenore as an investigator. Mr. Tenore would assist in the preparations throughout the course of the trial proceedings. As the defense team continued preparing for trial, the Court appointed additional investigative and expert assistance.

On April 9, 2003, a grand jury returned a superceding indictment against Bourgeois listing two counts: unlawful killing with premeditation and malice aforethought under 18 U.S.C. § 7 and 111, and physical assault of a child under 18 U.S.C. § 13 and Texas Penal Code § 22.04(a)(1). At rearraignment, Bourgeois again pleaded not guilty. (DE 44). At this stage of the proceedings, Mr. Douglas Tinker volunteered to help represent Bourgeois. (DE 86).[6] Mr. Tinker brought a wealth

---

[5] In a hearing, Bourgeois expressed his steadfast decision not to plead guilty: "Your Honor, my mind is made up[.] I'm not going to plea. ... My mind was made up when I got arrested that I wasn't going to plea. I don't want to plea. I don't want to talk about a plea." (DE 356 at 16-17). In fact, Bourgeois wrote the Court asking to dismiss his attorneys when they tried to discuss reaching a plea agreement with the Government. (DE 356 at 5-17).

[6] The Court issued a written order appointing Mr. Tinker on July 28, 2003. (DE 83). The Court later amended the appointment of counsel to reflect his work on the case before his official designation as attorney of record. (DE 86).

15

USCA5 5749

of experience to the table. He had represented over a dozen clients facing a death sentence. In 1995, the Criminal Justice Section of the State Bar of Texas named him Outstanding Criminal Defense Lawyer of the Year. He often spoke at conferences for state and national criminal defense attorney organizations. He was well known as a "defense attorney's defense attorney." Importantly, his experience with cases involving genetic material gave him the reputation as an expert in DNA. The Court appointed Mr. Gilmore and Mr. Tinker because the Court's interaction with them showed that they were among the most zealous, competent attorneys in the local bar.

Defense counsel began a double-pronged effort to avert a death sentence even before the Government certified this as a capital case. *See* 18 U.S.C. § 3593(a) (requiring the Government to serve the defendant with notice of its intent to seek a death sentence "a reasonable time before the trial or before acceptance by the court of a plea of guilty").[7] First, defense counsel tried to convince the Government not to seek a death sentence. Mr. Gilmore met with the United States Attorney for the Southern District of Texas and had discussions with members of the Attorney General's Office in Washington, D.C., lobbying against the Government seeking a death sentence.

Second, defense counsel realistically evaluated the case against their client, acknowledging that a jury would likely convict and then have to decide his sentence. Accordingly, the defense began preparations for a capital sentencing hearing even before the Government noticed this as a death-penalty case. Defense counsel requested the appointment of a mitigating investigator and

---

[7]    The attorneys divided the responsibilities for defending Bourgeois. According to Mr. Tinker's recollection: "Mr. Gilmore was responsible for handling all of the government's lay witnesses and law enforcement witnesses. Additionally, he was in charge of coordinating the investigation of the availability of non-expert defense witnesses and presenting their testimony at trial." Mr. Tinker, however, "was in charge of dealing with the government's expert witnesses and obtaining and presenting rebuttal expert testimony." The two attorneys, however, "made the majority of the trial decisions jointly." (PX-82 at 4).

16

received authorization to expend significant funds in preparation for a mitigation case. On June 30, 2003, Mr. Gilmore contacted Dr. Marc Cunningham, a well-known psychologist who has routinely testified in capital trials, to secure his assistance. Dr. Cunningham agreed to participate as an expert witness on mitigation evidence and on violence in prison society. Dr. Cunningham outlined the assignment of responsibilities as he saw them: a mitigation investigator would examine Bourgeois' background and then Dr. Cunningham would "conduct more strategic interviews[.]" Dr. Cunningham informed trial counsel that, "assuming an investigator began aggressively working on a social history," he could be ready for a January trial date. (PX-8).[8]

On July 9, 2003, trial counsel asked Dr. Cunningham if he could recommend a competent investigator for the penalty phase preparation. Dr. Cunningham provided trial counsel a list of experienced mitigation specialists, including Lisa Milstein. After trying to contact others, trial counsel secured the help of Ms. Milstein. She, in turn, solicited help from her associate Gerald Bierbaum, an attorney who now works for the Capital Habeas Unit of the Federal Defender's Office in Las Vegas, Nevada. At Dr. Cunningham's recommendation trial counsel had every reason to trust that they would perform a competent and probing review of Bourgeois' life history.

In a status conference on July 16, 2003, the Government announced that they received authorization to seek a death sentence. (DE 74). The Government outlined the aggravating factors it would rely on as required by 18 U.S.C. § 3593(a). (DE 78, 79).[9] The Court set trial for February

---

[8]    The Court will refer to the exhibits introduced by Bourgeois in the evidentiary hearing held September 20 through 24, 2010, as "PX" and the Government's exhibits as "GX."

[9]    The Government's notice that it would seek a death sentence listed the following factors that the jury would eventually consider in evaluating whether Bourgeois' crime merited a death sentence: (1) the heinous, cruel, or depraved manner in which he committed the offense; (2) the substantial planning and premeditation that went into the crime; (3) the likelihood that Bourgeois

(continued...)

17

USCA5 5751

16, 2004. (DE 76).

On July 25, 2003, Mr. Gilmore sent Dr. Cunningham an email describing their efforts to secure the services of a mitigation expert and informing him that: "The case was reset to February 2004, to allow you to gather information for your evaluation. . . . There is one problem, however. The judge has ordered reciprocal discovery and has set a deadline of mid-December to disclose your information. Please let me know if you can work within these parameters." (PX-8 at 15). The Court, however, later changed the required discovery deadline until the end of jury selection. (DE 185). With several months remaining before the trial date, the defense team consisted of two highly experienced attorneys, an investigator, two mitigation investigators, and an expert witness on mitigation evidence.[10] In addition, Bourgeois himself took an intensely active part in the defense. An expert witness attested that Bourgeois seemed more like a member of the defense team than a defendant. (DE 348 at 286).

Yet defending Bourgeois would be a herculean undertaking for several reasons. The obviously horrendous facts of the case would trouble any juror. Expert and lay witnesses would chronicle at trial the unrelenting abuse that JG1999 suffered at Bourgeois' hands. Bourgeois had wished for the infant's death and made plans for disposing her body. His brutal beatings assured the toddler's eventual demise. He indifferently manipulated others into supporting his transparent attempt to label her death an accident. The crime itself made his conviction a near certainty. The

---

[9]      (...continued)
would commit future acts of violence; (4) the impact of the victim's loss to the family and her personal characteristics as a human being; and (5) the vulnerability of the victim. (DE 78, 79); *see also* 18 U.S.C. § 3592 (outlining the statutorily defined aggravating and mitigating factors).

[10]      In the months before trial, the mitigation investigators interviewed dozens of potential witnesses, some of them several times. The Court also liberally allowed the defense to retain other experts, including a jury selection specialist, a forensic pathologist, and two mental-health experts.

18

jury would not see Bourgeois as a sympathetic defendant.

Also, Bourgeois often provided misinformation to the defense team, making a mitigation defense difficult. Additionally, Bourgeois' violent behavior continued while he was incarcerated as a pre-trial detainee. Bourgeois threatened to have witnesses killed.[11] His threats were not toothless; witnesses, including JG1999's mother, were murdered before trial. (DE 24). Notwithstanding court orders designed to halt all communication (DE 24, 28), Bourgeois continued to imperil the safety of those involved in his trial. His threats to harm and attempted assaults on jailors and United States Marshals assured that custody could not contain his violent behavior. In a case where the punishment phase would examine his ability to comport to the rules and regulations of prison life, Bourgeois hobbled his attorneys' efforts to demonstrate that he could be a model prisoner if the jury spared his life.[12]

---

[11]     Bourgeois also threatened to kill prosecutors, FBI agents, and the trial judge. Even though Bourgeois made the threats at the same time, the Court decided that only those made against witnesses could come before the jury. (DE 387 at 8-10).

[12]     The Court cautioned Bourgeois:

There's some indication that you've intimidated witnesses, attempted to intimidate witnesses, get your brother on them or other family members. It's all going to come out at trial. It's certainly not going to be helpful to you. And you're in a deep enough hole right now without making it any worse.

So you have two of the greatest lawyers I've ever known representing you. You're going to have to put your trust in them. You're going to have to let them do the work that we've got them to do, whether it's mitigation experts or school records or interviews with people. They have really worked hard. And you're putting your whole defense at risk by doing this. I cannot emphasize it strongly enough. Not only are you disobeying this - there's nothing I can do to punish you for the contempt of court that you've done. You're already there. You're already in jail. And that may be why you're continuing to do it because you know that there's very little I can do.

(continued...)

19

USCA5 5753

And critically, Bourgeois' insiste nce that he bore no culpability for JG1999's death compounded the challenges trial counsel faced. The Constitution guaranteed that Bourgeois, if he so chose, could have his day in court. His truculent assertions of innocence in light of overwhelming evidence, however, limited his counsel's strategic choices. Aside from a brief flirtation with pleading guilty immediately before trial to save AB1994 from testifying (PX-8 at 31), Bourgeois eschewed any discussion of a favorable plea. Notwithstanding the highly incriminating evidence against him, Bourgeois took the stand in both phases of trial to blame his wife for JG1999's death. These vocal protestations of innocence posed a dilemma for counsel. Counterpoised between Bourgeois' persistent attempt to deflect responsibility and the character of the evidence against him, his attorneys were sometimes required to present inconsistent information to the jury.

## III.   The Trial

### A.   Guilt/Innocence Phase

The Government called three groups of witnesses in the guilt/innocence phase. First, several individuals put the murder into context. Witnesses described Bourgeois' first delivery on the day of the murder, his entry onto the naval base, the breakdown of his truck before reaching the warehouse, and the events immediately after he killed. The Government called several witnesses who observed Bourgeois' reaction to his daughter's life-threatening injuries, describing him as casual, preoccupied with making his deliveries, and indifferent. An FBI agent summed up Bourgeois' attitude: "He seemed to be more concerned about the delivery of his next load than he

---

[12]   (...continued)
But, what you are doing is putting the sand over your head, as we speak, with every one of these letters.

(DE 351 at 36).

USCA5 5754

was about the welfare of his soon to be deceased daughter[.]" (DE 338 at 102). Other law enforcement witnesses described their interaction afterward with Bourgeois and Robin. They explained how Robin's story broke down as the victim died.

Second, forensic witnesses described the injuries JG1999 sustained at her father's hands, both on the day of the murder and weeks before. Carole McLaughlin, a registered nurse on duty when JG1999 arrived, observed injuries on the infant such as bruising around the eyes, swollen extremities, and hard, calloused hands and feet. Dr. Noorullah Akhtar testified that JG1999 was "virtually dead" when she arrived at the hospital. (DE 344 at 95). He opined that falling from a truck could not cause the extensive blood in and edema of JG1999's brain. Instead, her injuries were equivalent to her falling "four or five stories, head first, on a hard floor." (DE 344 at 93). A CT scan showed "blood in all areas in and around the brain, and the brain is swollen." (DE 344 at 96). The injuries were so severe that JG1999 would not last long. When Dr. Akhtar told Robin that information she cried; Bourgeois "didn't show much expression or grief." (DE 344 at 97). In addition to the blood in her eyes, Dr. Ronald R. Kuffel, Jr., an ophthalmologist, observed several recent head injuries, including a fresh hemorrhage on the right of her head above the hair line.

Dr. Elizabeth A. Rouse performed the autopsy which revealed both the severe head injuries that caused her death and numerous non-lethal wounds all over her body. Of the ten different head injuries, Dr. Rouse identified internal injuries corresponding to the external wounds. Other than the brutal head wounds, Dr. Rouse observed scratch marks near the ears, deep injuries to the hands and feet, looped injuries as if struck with an electrical cord, burns possibly from a cigarette lighter, and deep tissue bruising in nearly every part of her body.

Dr. Scott Anthony Benton, a medical doctor who had examined JG1999 a month before her murder, reviewed the autopsy photographs. He observed a completely different child; none of the

21

USCA5 5755

injuries had been present before. Aside from intense head injuries, he also saw evidence of abuse all over her body. Of particular note, he concluded that there was some evidence of vaginal trauma since his earlier examination. (DE 346 at 45-46). Another witness testified that rectal swabs taken from the victim after her death suggested the presence of semen.

William Russell Oliver, an expert in forensic pathology and forensic imaging, enhanced the autopsy photographs to accentuate the external injuries. He estimated that she had suffered the following external injuries: 25 to 26 whip marks, 78 healed scars, 73 to 105 nonspecific contusions, 8 pattern contusions, 9 to 10 abrasions or excoriations, 7 to 9 healing ulcerations, a possible bite mark, and three lacerations. (DE 345 at 226). Dr. David Senn, a forensic odontologist, could not exclude Bourgeois, Robin, or AB1994 as the probable biter for an injury on JG1999's arm. He could, however, exclude Robin and AB1994 as the possible biters for wounds on her back, leaving Bourgeois as the only possible biter with access to JG1999. Another forensic odontologist, Dr. Bryan Chrz, agreed that Bourgeois was probably the one who bit JG1999 on the back.

The final category of testimony came from the witnesses who observed Bourgeois' unrelenting, escalating, and homicidal abuse, saw the effects of the beatings, or heard his confessions to those acts. Some witnesses described seeing various injuries on JG1999's body, most of which Bourgeois attributed to her natural mother. The Government called three inmates – Darick Moore, Orlando Campos, and Wiley Taylor – who had been housed in county jail facilities with Bourgeois. These men explained that Bourgeois initially claimed that the victim died in an accident, but later, "as he . . . got comfortable, he started like telling [them] really what happened." (DE 344 at 205). Bourgeois said he killed his daughter and was going to make it look like an accident. (DE 344 at 219). Bourgeois admitted that he beat JG1999 with several objects. Bourgeois described his daughter as a "bad child" who "[u]sed to shake her butt all the time[.]" (DE 344 at 205). Also,

22

Bourgeois described "with pride" how he beat his wife. (DE 344 at 219).

Bourgeois' sister Claudia Williams testified that he had made comments foreshadowing the murder. He told Ms. Williams: "You get your black dress out. . . . I'm just going through a lot. I don't know what I'm going to do." (DE 223 at 8). Ms Williams became so concerned that she asked Robin if Bourgeois had any weapons in the truck. (DE 223 at 9).

The most damning testimony of the trial came from those who observed Bourgeois' cruelty firsthand. Robin Bourgeois was asleep when her husband murdered JG1999, but she could still describe his incessant prior abuse and his manufacture of the story afterward. The most chilling testimony came from AB1994 as she described how her father killed her little sister. She credibly, and bravely, chronicled the events leading to the murder and sadly reported on how her father killed JG1999. Nothing weakened her testimony or challenged her version of events.[13]

After the Government rested, the defense moved for an instructed verdict, arguing that insufficient evidence proved Bourgeois' guilt and his premeditation for the murder. The Court denied the motion.

---

[13]     In his Motion to Vacate, Bourgeois brazenly argues that

> [t]rial counsel also failed to present readily available evidence through either crossexamination or through the presentation of live witnesses of the bad character and reputation in the community of Robin and AB-1994 for being truthful and honest. The credibility of these witnesses was critical to the Government's case – simply put, if the jury believed either of these witnesses Petitioner was going to be convicted.

(DE 396 at 61). Bourgeois has not supported his accusations with any evidence calling AB1994's credibility or honesty into question. Any attempt by trial counsel to impugn her credibility would have seriously backfired. This Court vividly remembers AB1994's heart-wrenching account of her father's abuse and murder. Time cannot obscure her forthright testimony and its effect on the jury. The only lies AB1994 told were those she initially conveyed at Bourgeois' direction. The jury accepted her eyewitness testimony of the murder as a valid report of how Bourgeois killed his daughter, and Bourgeois has given the Court no reason to supercede its judgment.

23

USCA5 5757

Notwithstanding the overwhelming evidence against Bourgeois, the trial attorneys followed their client's instructions. The cross-examination of witnesses tried to place reasonable doubt on whether Robin could have been the killer. Bourgeois himself was the only witness called by the defense in the guilt/innocence phase. Bourgeois' testimony stuck to the same story he told investigators: that JG1999 fell from the truck. Notwithstanding the extensive credible testimony about the abuse JG1999 had suffered, Bourgeois testified that he never harmed her, never touched her inappropriately, and never killed her. (DE 338 at 5-6). A blistering cross-examination left Bourgeois looking even worse before the jury. Bourgeois admitted that he had disciplined JG1999 twice by spanking her, but disclaimed any other abuse. As the Government asked about the numerous injuries found on the infant's body, Bourgeois began supplying implausible excuses for each wound. With some injuries, such as the whip marks found on her thighs, Bourgeois denied having any knowledge about them. Instead, he cast blame on Robin Bourgeois. When asked to explain testimony that inculpated him, such as that given by his sister and others, he accused the witnesses of lying. Even with all the testimony showing his detached and indifferent demeanor about the loss of his baby, he unpersuasively claimed: "How can you say I'm not upset. I lost my baby. Yes, I'm upset. . . . I'm highly hurt by this." (DE 338 at 54).

The parties delivered their closing arguments on Tuesday, March 16, 2004. The Government emotionally and forcefully outlined the evidence showing that Bourgeois abused and killed the victim, emphasizing that Bourgeois had planned to kill his daughter beforehand. Both Mr. Tinker and Mr. Gilmore made closing arguments in the guilt/innocence phase. Mr. Tinker begged the jury not to be swayed by emotion and the horrible circumstances of the victim's death, but to look at the facts. Like Bourgeois' own testimony, Mr. Tinker tried to pin the murder on Robin Bourgeois. He hoped that the jury would find that she had a motive to kill the child and had abused the little girl

24

USCA5 5758

herself. He tried to minimize the testimony about Bourgeois' indifferent actions after the murder. In the event that the jury believed Robin and AB1994's account, Mr. Tinker discounted the testimony showing intent and premeditation, making the murder an act of momentary anger.

Mr. Gilmore also briefly argued that the Government had ignored Robin Bourgeois' role in the killing. He characterized Robin Bourgeois as one whose evolving story increasingly blamed Bourgeois as it exculpated herself.

The jury deliberated for less than two hours before finding Bourgeois guilty of both counts in the indictment.

### B.    Sentencing Phase

The defense's focus shifted to securing a life sentence for Bourgeois. Months before trial, the mitigation experts had interviewed many of Bourgeois' friends and family members. Although their reports of each conversation were brief, the investigators gave trial counsel and their expert Dr. Cunningham an outline of Bourgeois' background. As the actual sentencing hearing approached, trial counsel were still deciding precisely which witnesses to call, depending on the case put on by the Government. Before the hearing, defense counsel rented a conference room in a hotel nearby the courthouse. Over the course of a day, the attorneys spoke with approximately 50 individuals, shifting through their testimony to find that which would benefit and not harm Bourgeois. Trial counsel also still had to make difficult decisions about using its expert witnesses, including whether to call Dr. Cunningham to the stand.[14]

The sentencing hearing began on Monday March 22, 2004. The course of the Government's

---

[14]    For instance, on the first day of the sentencing hearing the Court noted that trial counsel did not want the jury instructed before proceeding on specific mitigating factors but "want[ed] to build their case as it goes along." (DE 348 at 7). The defense chose to have the mitigating factors listed in the jury's final charge.

USCA5 5759

case would shape the defense's response. The prosecutor's opening promised to bring forth witnesses who would "testify about Alfred Bourgeois, about the last couple of decades of [his] life, so you know who this Defendant is; other acts of cruelty and violence he has committed, so that you may use those and apply those with what you have already heard." (DE 348 at 24).

As a threshold matter, the jury had to find that Bourgeois intentionally killed the victim. Also, the Government alleged as statutory aggravating factors: that (1) Bourgeois killed in an "especially heinous, cruel, or depraved manner" that involved "torture and serious physical abuse"; (2) he killed after "substantial planning and premeditation"; and (3) JG1999 was "particularly vulnerable due to her youth." Non-statutory aggravating factors included that (1) Bourgeois "is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to the lives and safety of others"[15] and he "caused injury, harm, and loss to the family of JG1999 because of [her] personal characteristics as an individual human being and the impact upon the victim's family." The instructions required the jury to find any of those issues beyond a reasonable doubt.

The defense alleged that it had proven the following mitigating factors by a preponderance of the evidence: (1) Bourgeois had an impaired capacity to understand the wrongfulness of his conduct; (2) he was under "unusual and substantial duress"; (3) he did not have a "significant prior history of other criminal conduct"; (4) he committed the offense under "severe mental or emotional disturbance"; and (5) other relevant information. As non-statutory mitigating factors, the defense hoped the jury would find that (1) Bourgeois had been abused as a child; (2) other persons "who may be culpable in the offense may not be punished"; (3) he was "under stress from family and economic

---

[15]    The Government alleged that Bourgeois had (a) threatened others with violence, (b) demonstrated low rehabilitating potential, and/or demonstrated lack of remorse.

USCA5 5760

factors"; and (4) at the time of the offense he "was driving across the country with three children and

one other adult in the cab of an 18-wheeler truck."

The Government adduced the following information in the punishment phase:

- Bourgeois' mother-in-law Veronica Batiste who described how, while Robin was in the hospital giving birth to AB2001, Bourgeois confronted Mrs. Batiste at her home. When Mrs. Batiste expressed disapproval of how Bourgeois abused Robin, he responded: "I'll beat her if I want. That's my fucking wife." (DE 348 at 35). After a heated, profanity-laden tirade by Bourgeois, she asked him to leave. He punched her in the mouth, grabbed a lamp and struck her with it, and then continued beating her. AB1994 witnessed the whole confrontation. (DE 348 at 35-37). Felony charges from the incident remained pending at the time of trial. (DE 348 at 38). At Bourgeois' wedding he fought with his brother-in-law when he told Bourgeois never to beat Robin. (DE 348 at 42-43). Bourgeois repeatedly hit Robin, including at a neighborhood gas station. (DE 348 at 48).

- A young nephew testified that once while driving Bourgeois got angry, pulled him from the car, and held him by the feet over the side of a high bridge. (DE 348 at 52-53). Bourgeois laughed as the scared child cried. That same day, Bourgeois again held the child by his ankles over a pier at a boat launch. (DE 348 at 53-54). Another time, Bourgeois repeatedly dunked the child who could not swim well under the water, even after he threw up from swallowing so much water. (DE 348 at 56-57). Once, Bourgeois woke the child from his sleep by grabbing his ankles. Bourgeois swung him around until the child's head hit their dog. (DE 348 at 55).

- Bourgeois' first wife, Sheila Bourgeois described how during their four-month marriage Bourgeois argued with her, pushed her, and choked her, even when she was pregnant. When he pushed her over a chair and she "busted up" her nose, she left him. (DE 348 at 61-62).

- Another ex-wife, Cynthia Bourgeois, explained how her young child from another relationship would "shake every time [Bourgeois] would come in her presence." (DE 348 at 70). Once when Bourgeois took the girl away alone she returned with a "big knot" on her head, a swollen forehead, a limp, and a mark like a footprint on her back. (DE 348 at 70-71). The child said that Bourgeois "had pulled her hair out, put her head in the commode." (DE 348 at 74). Cynthia left her husband and never let him see the child again.[16]

---

[16]    Trial counsel's cross-examination showed that she only divorced Bourgeois after she
(continued...)

27

USCA5 5761

- Another wife, Gaynell Belvin James, testified that one time after she divorced Bourgeois she let him take their son for the day. The three-year-old child returned "very shaky, nervous" and "withdrawn" with a bruise on his thigh. (DE 348 at 82). The child was too afraid to go with Bourgeois again for many years. When he was thirteen, Bourgeois took him for what was supposed to be a day. Bourgeois kept him for a month. (DE 348 at 87).

- Another wife, Gaynell Collins Bourgeois, testified that Bourgeois had a bad temper. During their marriage he would push and choke her. (DE 348 at 100). Bourgeois had an affair with Robin and got her pregnant while married to Gaynell. She saw Bourgeois repeatedly hit Robin while she was pregnant. (DE 348 at 102).

- Before trial, Bourgeois told a Deputy United States Marshal, "If I was going to hit somebody, I would hit you." (DE 348 at 108). Later, Bourgeois lunged at the officer during a transfer. (DE 348 at 109).

- Bourgeois' cousin, Isaac Bourgeois, III, got in a scuffle with Bourgeois over insults to his mother. Bourgeois bit his pinky finger to the bone. (DE 348 at 115). The next day Bourgeois and his brother Lloyd confronted Isaac and his mother with pistols and threatened to kill them. They then got in Lloyd's truck, circled around the two, and told them they "could die today." (DE 348 at 116). Bourgeois was convicted of disorderly conduct as a result of the incident. (DE 348 at 118). Isaac's mother, Beatrice Bourgeois, also testified about the event. She explained that, while Lloyd later apologized for the assault, Bourgeois never did. (DE 348 at 124).

- Inmates testified about Bourgeois' incriminating admissions and threats while incarcerated before trial.[17] Bourgeois knew that inmate Adam Longoria was a member of the Texas Syndicate prison gang. When a jailor jokingly told Bourgeois that Longoria was a hit man, Bourgeois communicated that he wanted his cousin Lisa Monroe killed because "he wrote a threatening letter to her, and she turned it in to the Judge." (DE 348 at 155). He said he also wanted his wife and girlfriend "eliminated." (DE 348 at 155-56, 162).

---

[16]    (...continued)
had an affair. (DE 348 at 79). Bourgeois had hired an investigator to follow her and prove she was committing adultery. (DE 348 at 79).

[17]    In a carefully crafted instruction, the Court informed the jury that "the parties have stipulated that as of January 23 of the year 2003, as part of the terms and conditions of Mr. Bourgeois's confinement, he was prohibited from communicating with any other inmate. He could only communicate with his attorneys or guards or the Court." (DE 348 at 144).

28

USCA5 5762

Bourgeois gave Longoria "names, addresses and everything." (DE 348 at 156). He promised that his brother Lloyd would give Longoria "[a] $100,000 18-wheeler, and names of people for drug runs[.]" (DE 348 at 157, 162). Bourgeois confessed that he beat JG1999 "[w]ith a bat, some extension cords." (DE 348 at 166). Bourgeois told inmate Orlando Campos that he "beat[] up his ex-girlfriends"and "was going to kill [Robin] when he got out[.]" (DE 341 at 81). He told Wiley Taylor and Darick Venore Moore that he beat his wives and girlfriends. (DE 341 at 82, 87). He told Taylor he "was trying to have [Robin] killed . . . so that she wouldn't testify against him." (DE 341 at 83). Bourgeois also confessed that he and his brother made most of his money from running drugs and illegal aliens (DE 341 at 83, 87).

- Robin Bourgeois testified that Bourgeois admitted that he did not have a conscience. (DE 248 at 188). Robin read a lengthy letter that Bourgeois had written to her uncle. (DE 348 at 188-211). Bourgeois intended her uncle to tell Robin about the letter's contents. In the letter, Bourgeois repeatedly insulted Robin and accused her of dishonesty. Bourgeois wrote: "in the name of God, Robin['s] days will be short. That niece of yours will have a short life." (DE 348 at 196, 199). Robin understood the letter to be a threat against her. (DE 348 at 211). Bourgeois' letter also alternated between accusing Robin of killing JG1999 and writing that she "fell out of the truck." (DE 348 at 202). He claimed: "All this shit about extension cord beatings, biting this child, brutalizing this child, your niece told those people all this." (DE 348 at 198, 203). Bourgeois discussed extensively his view of the forensic evidence in the case. (DE 348 a 206-08).

- JG1999's grandmother provided sympathetic victim-impact testimony about the toddler's life. (DE 348 at 219-41).

- An FBI agent's testimony further indicated that Bourgeois was a liar and manipulative. (DE 348 at 249-51).

On the first day of the punishment hearing, the Government called Dr. Estrada to testify. As anticipated by the parties' agreement to his appointment as a witness, Dr. Estrada's testimony both hurt and helped Bourgeois' case. Dr. Estrada, a psychiatrist, conducted an evaluation of Bourgeois before trial which included reviewing letters and phone calls Bourgeois made while incarcerated.

Dr. Estrada briefly testified for the Government, primarily identifying aggravating psychological issues from his testing. Dr. Estrada opined that Bourgeois had a "narcissistic

29

personality disorder" which made his "basic motivation in life . . . the aggrandizing of his self-esteem." (DE 348 at 284). He "need[ed] to have this continuous positive feedback for [his] self-esteem[.]" (DE 348 at 284). Bourgeois' narcissism made him "lively, likeable. exciting, interesting, sometimes very persuasive or charismatic," but his self-interest would inevitably "result in friction that may lead to simply break-up of relationships . . . or actual violence." (DE 348 at 285). As a function of his narcissism, Bourgeois' self-reporting to Dr. Estrada exposed that he was a liar.[18]

Dr. Estrada also found that Bourgeois met "a number of specific items that have been found associated with violence" such as "being the subject of rejection, neglect, and abandonment, being the survivor of actual physical or sexual or emotional abuse," all of which can create "a very high predisposition for violence as adults." (DE 348 at 281). Because of that background, Bourgeois had "a much higher tendency toward violence than an ordinary person." (DE 348 at 285). In sum, Dr. Estrada found Bourgeois to be both narcissistic and violent.

The defense began its case for mitigation through the much-longer cross-examination of Dr. Estrada which left the jury with a more sympathetic picture of Bourgeois' life.[19] Dr. Estrada began by putting Bourgeois' early life into context. He was the child from an illegitimate relationship. He did not know his father when young. His mother singled him out for abuse. (DE 341 at 24). Importantly, Dr. Estrada showed how Bourgeois' early life transformed him into a violent adult. Dr. Estrada explained that, when he asked about abusive childhood, Bourgeois was "initially kind of

---

[18]   For instance, while Bourgeois claimed to lose consciousness from a car accident, Dr. Estrada could not corroborate that. (DE 348 at 276). Also, Dr. Estrada could not confirm that Bourgeois was as wealthy as he claimed to be. (DE 348 at 276).

[19]   This tactic allowed trial counsel to argue in closing that Dr. Estrada "is their expert. Dr. Estrada is some who – who they say you as a jury should believe. They wouldn't put him on there if they didn't think that you should be able to rely on what he tells you." (DE 342 at 57).

30

USCA5 5764

vague and a little reluctant." (DE 341 at 22).  Dr. Estrada was not surprised because "individuals who later may be abusive of their own children . . . either gloss over or give excuses to their own parents' neglect or abuse." (DE 341 at 23).  Bourgeois "had suffered neglect and rejection, and there was some physical abuse by his mother." (DE 341 at 23).

Dr. Estrada tied the abuse of JG1999 to Bourgeois' background and the stressors he felt at the time.  Dr. Estrada explained that adults who abuse their children had commonly been abused themselves. (DE 341 at 39).  Bourgeois lived in a "family or subcultural type of environment where a certain measure of violence in family relationships is accepted[.]" (DE 341 at 45).  Because of his own abused childhood and the lack of cultural opprobrium of abuse, "[i]t is not unusual in that culture or context to be physically harsh in the disciplining of children." (DE 341 at 47).  The stress Bourgeois found himself under exacerbated his violent tendencies.  Dr. Estrada explained:

> My opinion was that Mr. Bourgeois at the time was going through a number of stresses.  Number one, he was – discovered that he had had an affair and a child as a result of that affair.  He was very angry about that.  Second, he was under financial stress with debts.  Third, he had a serious marital problem with his wife, they had been arguing about a number of things, and their mutual affairs.  And they were in a confined situation that made any little accident in the toilet the trigger for an explosion of anger that came from a number of different directions, and ended up focus[ed] on the child.

(DE 341 at 41).  Notwithstanding his problems, Dr. Estrada opined that Bourgeois was not a sociopath. (DE 341 at 66).

Dr. Estrada explained that Bourgeois was hard working, had a successful career as a trucker, and had no history of violence outside the family context. (DE 341 at 46).  Because he had "a pattern of abusive relationships again and again and again," Dr. Estrada opined that Bourgeois would continue to be violent "in a family situation." (DE 341 at 50).  Dr. Estrada, however, could not reliably predict whether "the conditions in which he will be in the future are going to be such that

31

USCA5 5765

will allow [violent] behaviors to manifest itself or not." (DE 341 at 50, 51). Dr. Estrada conceded that with "higher . . . supervision available" Bourgeois would have a "lesser degree of all kinds of violent incidents[.]" (DE 341 at 52). Dr. Estrada could not predict how Bourgeois would act in a prison situation, but he anticipated Bourgeois would be in a highly structured environment and, given his age, would adjust better than others may. (DE 341 at 51-52).

The Government's redirect of Dr. Estrada questioned whether Bourgeois had actually suffered abuse as a child. (DE 341 at 54-56). The Government, however, got Dr. Estrada to agree to this summary of his testimony: "he's self-centered, . . . he's angry, and . . . he has a high risk towards violence." (DE 341 at 62).

The record plainly shows that trial counsel struggled with which other witnesses to call. (DE 341 at 5). At the time of trial, the defense had "a whole room full of witnesses[.]" (DE 342 at 91-92). Of those, trial counsel selected three people to testify in the penalty phase, each of whom knew Bourgeois as a child. Bourgeois' sister Michelle Denise Armont, his cousin Carl Kevin Henry,[20] and former neighbor Herman Clayton, Jr., described his impoverished and abused childhood. The witnesses described how Bourgeois "suffered a lot of abuse . . . from his mother." (DE 341 at 113). He received many "whippings." (DE 341 at 125). His mother singled him out for abuse and even "whipped [him] for something someone else did[.]" (DE 341 at 125). His mother would also "chastise" him severely. (DE 341 at 114). The witnesses described some specific incidents displaying his mother's cruelty. She would clean his nose with her long fingernails "and as time go on it developed a real, real bad sore" that "always would be bloody." (DE 341 at 114). His mother would "whip[] him with the extension cord from the fan" (DE 341 at 114). One time she threw the

---

[20]    Bourgeois insisted that trial counsel call Mr. Henry as a witness. The Government impeached Mr. Henry, a former police officer, with his prior convictions for insurance fraud.

32

telephone receiver at him and hit him in the head. (DE 341 at 115). This abuse continued until he reached high-school age. (DE 341 at 115).

During his childhood, Bourgeois went to live with Mary Clayton, an elderly neighbor who everyone called Ms. Mary. (DE 341 at 98). Ms. Mary repeatedly asked Bourgeois' mother to let him come live with her. Conditions improved for him as Ms. Mary "made sure that he had all his basic needs as far as going to school, his clothing, his books, and all his necessities[.]" (DE 341 at 116). Even so, children in the neighborhood teased him, primarily because his father was not around. (DE 341 at 116). His siblings joined in the teasing. When Ms. Mary died, Bourgeois went to live with his sister, Ms. Armont. (DE 341 at 99). He did not move back in with his mother "because there was a conflict that he had with his mother at that time[.]" (DE 341 at 99). Bourgeois had a temper and would "get[] red in the face," but his sister could usually calm him down. (DE 341 at 100). Despite her past abuse, however, Ms. Armont testified that Bourgeois and his mother "resolved the problem [in] the end[.]" (DE 341 at 98).

Bourgeois also addressed the jury himself in the punishment phase. He told jurors:

My sympathy goes out to the soul of JG1999, my baby, her family, relatives and friends, and I'm very sorry for the death of my child. It's a hurting pain and a sorrowful thing that happened. And I feel or believe that I have been wrongfully accused of this crime that I've been convicted for. . . .

So I feel like you all have been misled and I've been wrongfully convicted, and I'm just sorry for the pain and suffering, that I've been wrongfully accused for the death of my baby, and I did not kill my baby.

I just want to close with that I loved JG1999, she's an infant that didn't actually come in this world and I think the real murderer got off with this crime. I just think you all should know that I have been wrongfully convicted. I feel my wife had a lot to do with this and she walked away free, and I just had to say this. If I never get an opportunity to say this to nobody else, my family, Katrina's family, JG1999 came from a lovely family. When I picked her up, when she got in my custody I had no problems with JG1999. She was a lovely kid, very lovely. I realize some of the pictures that you all seen in the swimming pool, I will say I was a little rough like

33

USCA5 5767

that. I'm like that with all my children. And I just feel you all have been wrongfully misled.

I just think I want to close with that, saying that I love my baby, I love her family, I love my family. And I thank each and every one of you for participating, the lawyers for the job they did, and for everybody that communicated. And God bless all of you all.

(DE 342 at 23-24).

Mr. Gilmore's closing argument began with the recognition that defense counsel faced a daunting task: "[I]t's difficult for me to come up here and argue to you about this punishment and what you're going to do [to] him knowing that [Bourgeois] maintains his innocence, and knowing that you don't believe that[.]" (DE 342 at 45). The bulk of his argument, however, assumed that Bourgeois killed JG1999. After discussing the jury's role, Mr. Gilmore discussed mitigating factors in Bourgeois' background. Mr. Gilmore highlighted that "his brothers and sisters made fun of him. And his mother singled him out for abuse." (DE 342 at 47). Mr. Gilmore argued that Bourgeois' abused background was not an excuse, but put context into the crime. The highly stressful environment around Bourgeois – with economic, marital, and other difficulties – compounded lingering problems from his childhood. In the context of the events swirling around Bourgeois, Mr. Gilmore encouraged the jury to find that he "snapped. Intending to discipline her, . . . it got out of hand and it ended up killing her. That's not to excuse his behavior; it's to – in an attempt to try to explain what happened." (DE 342 at 50). Mr. Gilmore urged the jury to find that life imprisonment would be a sufficient, and violence-inhibiting, punishment for Bourgeois.

Mr. Tinker emphasized the severity of a life sentencing, including the high security that would surround Bourgeois. Mr. Tinker also wanted the jury to understand "who is Alfred Bourgeois?" (DE 342 at 58). He discussed how Bourgeois was an "unwanted child in a large family" with a mother who abused him. (DE 342 at 56). He discussed how, notwithstanding his

34

USCA5 5768

turbulent background, Bourgeois finished high school and worked as a trucker. Still, his poor home life – where "he grew up in a society where it was accepted conduct to hit children with items, sticks, switches, electrical cords" – was the "kind of rearing Alfred Bourgeois had and that's why he is what he is today." (DE 342 at 60). His culture allowed that violence as a means of dealing with other stressors, independent of the child's actions. (DE 342 at 61). But even so, Mr. Tinker argued that living his life in "a cage within a cage within a cage" would prevent him from acting violently. (DE 342 at 63). Mr. Tinker then begged the jury not to impose a death sentence. (DE 342 at 66).

The jury instructions required a death sentence if the jury unanimously found that the aggravating factors outweighed the mitigating factors. After five-and-a-half hours deliberation, the jury returned a verdict of death. The jury found that the Government had proven all of the aggravating and non-aggravating mitigating factors. The jury only found that Bourgeois had shown two mitigating factors: six jurors found that he was under stress and all found that he was driving across the country. (DE 299). The Court sentenced Bourgeois to die by lethal injection. (DE 303).

## IV.    Appeal

Mr. Gilmore and Mr. Tinker represented Bourgeois on appeal to the Court of Appeals for the Fifth Circuit. Bourgeois' appeal focused on the constitutionality of the aggravating factors that made his a death-eligible offense. Specifically, Bourgeois raised four claims:

> (1) the government failed to charge any aggravating factors in the indictment, (2) the FDPA statutory-intent factor that renders a defendant with a reckless state of mind eligible for the death penalty violates the Eighth Amendment, (3) the district court erred when it delegated to the Director of the Federal Bureau of Prisons supervision over Bourgeois's execution, and (4) the aggravating factors used in his sentencing were vague and ambiguous.

*United States v. Bourgeois*, 423 F.3d 501, 502 (5th Cir. 2005). In a detailed opinion, the Fifth Circuit found no reversible error. The Fifth Circuit commented that: "This is not a close case.

35

USCA5 5769

Bourgeois fails to prove that there was any error, much less plain error, in any aspect of his trial. Bourgeois's conviction and sentence are, in all respects, AFFIRMED." *Id.* at 512. The United States Supreme Court refused certiorari review. *United States v. Bourgeois*, 547 U.S. 1132 (2005).[21] The instant proceedings followed.

## V.    Post-Judgment Proceedings and Evidentiary Hearing

This Court appointed counsel to represent Bourgeois in this post-judgment action. Bourgeois filed a lengthy Motion for Relief Pursuant to 28 U.S.C. Section 2255 or in the Alternative Pursuant to 28 U.S.C. 2241. (DE 396). Bourgeois also filed a Memorandum of Law in support of his motion. (DE 402). Federal law focuses a 2255 action on whether an inmate's sentence "was imposed in violation of the Constitution or laws of the United States, or that the Court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255. "Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice." *United States v. Vaughn*, 955 F.2d 367, 368 (5th Cir. 1992). Section 2255 actions are not a retrial. *See United States v. Kastenbaum*, 613 F.2d 86, 89 (5th Cir. 1980) ("The guilt or innocence of the defendant is not in issue on a § 2255 proceeding, but rather the validity and the fairness of the proceedings against him."). By this point, the presumption of innocence has run its course and the inmate appears as one lawfully convicted. *See Strickland v. Washington*, 466 U.S. 668, 697 (1984) ("[T]he presumption that a criminal judgment is final is at its strongest in collateral attacks on that judgment."); *United States v. Cervantes*, 132 F.3d 1106, 1109 (5th Cir. 1998) ("Following a

---

[21]    Keith S. Hampton and Adrienne Urrutia represented Bourgeois before the United States Supreme Court.

USCA5 5770

conviction and exhaustion or waiver of the right to direct appeal, we presume a defendant stands

fairly and finally convicted."). A movant bears the ultimate burden of establishing his claims of

error by a preponderance of the evidence. *See Wright v. United States*, 624 F.2d 557, 558 (5th Cir.

1980).

Bourgeois' section 2255 motion raises the following grounds for relief:

1. Bourgeois suffers from mental retardation, making him ineligible for execution under *Atkins v. Virginia*, 536 U.S. 304 (2002), and the Federal Death Penalty Act.

2. Trial counsel provided ineffective assistance at the punishment phase of trial by failing to present available mitigating evidence, including that of his alleged mental retardation.

3. Bourgeois' conviction violates due process because the fatal injury occurred outside the Territorial Jurisdiction of the United States. Trial counsel should have disputed the location of the crime.

4. Trial counsel provided ineffective assistance by failing to present available expert testimony that would have shown that Bourgeois did not sexually assault the victim.

5. Trial counsel provided ineffective assistance by not litigating a *Daubert* challenge to testimony from Dr. Senn and Dr. Chrz concerning bite-mark evidence.

6. Trial counsel provided ineffective assistance by not litigating a *Daubert* challenge to testimony from Dr. Oliver concerning the digitally enhanced autopsy photographs.

7. The Government violated its duty under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose that four inmates were promised some benefit for testifying against Bourgeois.

8. Trial counsel labored under a conflict of interest because of his representation of clients associated with this case.

9. The Government engaged in misconduct by making improper argumentative statements in the guilt/innocence and penalty phases.

10. Trial counsel provided ineffective assistance by not rebutting evidence of

37

USCA5 5771

Bourgeois' indifferent demeanor at trial.

11.    A witness improperly relied on Bourgeois' interactions with counsel as a basis to formulate an adverse opinion about him.

12.    Appellate counsel provided ineffective assistance by failing to advance several claims.

13.    The cumulative effect of the claimed errors results in a constitutional violation.

14.    The method by which the Government would carry out Bourgeois' execution violates the Constitution.

Respondent filed an answer and motion to dismiss arguing that Bourgeois' claims are all either procedurally insufficient or substantively without merit. (DE 442). Afterward, Bourgeois filed a motion asking the Court to hold an evidentiary hearing on his claims. (DE 460). A court should hold an evidentiary hearing and make findings of fact, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." § 2255(b); *see also* Rule 8, RULES GOVERNING SECTION 2255 PROCEEDINGS FOR THE UNITED STATES DISTRICT COURTS (requiring an evidentiary hearing when "warranted"). The Court held oral arguments on April 20, 2010, to designate the issues needing resolution through an evidentiary hearing. (DE 496). In the end, the Court has, to a greater or lesser extent, allowed Bourgeois to present testimony and evidence supporting nearly all his section 2255 claims. This Court has liberally allowed Bourgeois to prepare the factual basis for his post-judgment claims through expert and investigative assistance. The parties have developed a rich factual record through the submission of written interrogatories, declarations, and record documents.

The Court held a week-long evidentiary hearing for the parties to present witnesses.[22]

---

[22]    Bourgeois called the following witnesses in the hearing: Dr. Victoria Swanson, Dr.

(continued...)

38

USCA5 5772

Testimony during that week often extended long after normal court hours. Aside from the witnesses called during that hearing, the Court has heard testimony at different dates and allowed the taking of video depositions of other witnesses.[23] The Court has spent many hours reviewing the testimony of the out-of-court witnesses. The Court has afforded Bourgeois a full and fair opportunity to develop his arguments.

The witnesses and evidence before the Court fall into three groups. First, Bourgeois called witnesses who challenged particular pieces of forensic evidence presented at trial. Specifically relating to claims 3, 4, 5, and 6, witnesses alleged that the Government's case at trial relied on inaccurate evidence about where Bourgeois killed JG1999, whether he sexually assaulted her, and if he was the one who bit her. Second, several witnesses provided testimony relating to claims 1 and 2. This testimony included testimony from trial counsel Mr. Gilmore, one of Bourgeois' trial investigators, and people who knew him while growing up. Importantly, experts provided detailed testimony about Bourgeois' alleged intellectual and psychological deficiencies. Finally, witnesses provided information about Bourgeois' seventh claim that the Government withheld the fact that it

---

[22]      (...continued)
Donald Weiner, Dr. Jethro Toomer, Kathleen Kaib, Claudia Williams, Beverly Frank, Brenda Goodman, Dr. Mark Cunningham, Carl Henry, Donald Reese, Murray Bourgeois, Jon Dailey, George Walker Holden, Jennifer Valdez, Dr. Charles Michael Bowers, John Gilmore, Kerry Brown, Timothy Allen, and Gerald Bierbaum. The Government called Danny Clark, Robert Patterson, William Shotts, Christopher Key, Rhonda Davis, Dr. J. Randall Price, and Dr. Roger Bryan Moore, Jr.

[23]      On September 10, 2010, the parties deposed Dr. Carlos Estrada. On that same date, Dr. Michael M. Gelbort gave live testimony in this Court. Most of the witnesses testified in the evidentiary hearing held from September 20 through September 24, 2010. The parties deposed Dr. William Russell Oliver and Dr. Manfred Schenk on October 28, 2010. The parties also took additional deposition testimony from Dr. Randall Price on November 10, 2010. They also deposed Dr. Jan. E. Leetsma on January 10, 2011. On January 13, 2011, the Court heard testimony from William Edward May, Jr., James Sales, Dr. Elizabeth Aldrich Rouse, Debra Hohle, and Patti Hubert Booth.

USCA5 5773

had made deals with trial witnesses. These three categories of witnesses inferentially provided testimony relating to the remaining claims, such as that the cumulative effect of the alleged errors prejudiced Bourgeois.

The Court will address the relevance, importance, and credibility of each post-conviction witness' testimony in conjunction with the related ground for relief.

## PROCEDURAL ADEQUACY OF BOURGEOIS' CLAIMS

Before turning to the substance of Bourgeois' claims, he must show that he brings them before the Court in a procedurally adequate manner. Respondent argues that Bourgeois has defaulted claims 3, 7-9, 11, 13, and 14 by not raising them on direct appeal. Post-judgment relief exists only for errors that an inmate could not raise on direct appeal. *See Massaro v. United States*, 538 U.S. 500, 504 (2003) (finding that, with the exception of ineffective-assistance-of-counsel claims, "claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice"). Bourgeois could, and should, have raised some issues on direct appeal. For instance, his allegations that the Government did not prove the jurisdictional element of his crime beyond a reasonable doubt (claim three); the Government's closing argument amounted to prosecutorial misconduct (claim nine); and a witness' testimony improperly relied on Bourgeois' trial demeanor to form an opinion (claim eleven), all rest on the trial record. Also, as the Court will discuss later, his fourteenth claim that attacks the Government's method-of-execution is not properly before the Court. The merits of those claims are not fully available for the Court's consideration.

However, the Court also finds that aspects of the challenged claims extend beyond the record as it existed on appeal. For instance, a portion of Bourgeois' third claim imputes ineffective assistance to trial counsel for failing to challenge the Government's proof of jurisdiction. Bourgeois' *Brady* claim (claim seven) and his conflict-of-interest claim (claim eight) both involve factual bases

40

USCA5 5774

not available at the time of appeal. His cumulative-error claim (claim thirteen) asks the Court to take into consideration issues that he properly raised for the first time in his Motion to Vacate. The Court, therefore, finds that a procedural bar only forecloses consideration of Bourgeois' ninth, eleventh, and part of his third claims.

A procedural bar is not insuperable. An inmate may overcome the procedural bar by (1) demonstrating "cause" for not raising the issue on direct appeal and "actual prejudice" resulting from the error or (2) showing that he is "actually innocent" of the crime for which he was convicted. *See United States v. Frady*, 456 U.S. 152, 157 (1982); *United States v. Kallestad*, 236 F.3d 225, 227 (5th Cir. 2000); *United States v. Flores*, 981 F.2d 231, 234-37 (5th Cir. 1993).[24] Bourgeois does not claim to be actually innocent. Instead, Bourgeois argues that he can overcome any procedural bar because appellate counsel's failure to raise the defaulted issues amounts to ineffective assistance. As the Court will discuss at greater length with respect to Bourgeois' related substantive ineffective-assistance-of-appellate-counsel claim (claim twelve), he has not shown that his appellate counsel violated his constitutional rights by omitting any issue on appeal. The Court, therefore, finds that a procedural bar forecloses relief on Bourgeois' ninth, eleventh, and part of his third claim. Given the severity of the sentence Bourgeois faces and the importance of ensuring the fundamental fairness of capital trials, however, the Court will briefly address the merits of the procedurally barred claims in their respective order.

---

[24] Bourgeois also argues that the International Covenant on Civil and Political Rights (ICCPR) trumps the American judicial system's procedural-bar jurisprudence. Bourgeois has not pointed to any authority forgiving procedural deficiencies based on that, or another, international treaty. The Supreme Court has found that other international treaties do not preempt the operation of procedural bars. *See Medellin v. Texas*, 552 U.S. 491, 512 (2008); *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 351 (2006).

41

USCA5 5775

## ANALYSIS

I.      **Bourgeois' Alleged Mental Retardation (claim one)**

Bourgeois alleges that mental retardation precludes his execution under *Atkins v. Virginia*, 536 U.S. 304 (2002). No mental health professional identified Bourgeois as mentally retarded until after he received a death sentence. Up to that point, Bourgeois had lived a life which, in broad outlines, did not manifest gross intellectual deficiencies. Bourgeois graduated from high school at age 18, with the only record of his grades showing B's, C's, and D's. He worked for many years as a long-haul truck driver. He bought a house, purchased cars, and handled his own finances. IQ testing before trial resulted in low scores, but one expert nonetheless described his intelligence in a manner inconsistent with mental retardation. Trial counsel's extensive interaction with Bourgeois did not hint that he was mentally retarded. Bourgeois' trial testimony, long colloquies with the Court, and detailed writings never called into question his intellectual functioning.

Bourgeois now claims that the accomplishments of his life mask an intellect falling within the lowest two percent of the population. According to Bourgeois, his loved ones always considered him to have low intelligence. He owed his academic grades and high school graduation to social promotion, not intellectual competency. Success, such as it came to him, only resulted from significant support and assistance from others. Through his life, Bourgeois purportedly compensated for his low intelligence by subtly eliciting the help. However, no one ever tested Bourgeois for mental retardation until the Government charged him with capital murder. Until after he received a death sentence, Bourgeois allegedly hid his mental deficiencies and gave the appearance of operating with adequate intelligence. This left his current attorneys with the task of trying to prove his mental retardation through retroactive assessment – something the psychological profession did not design its tests to do.

42

USCA5 5776

Bourgeois has amassed lay accounts and expert opinions to support his claim that he falls within the category of offenders the Supreme Court intended to exempt from execution. He also argues that trial counsel provided deficient performance by failing to recognize and develop evidence of his mental retardation. The Government has responded with significant evidence showing that, while Bourgeois' intellectual functioning maybe below normal, he is not mentally retarded. A full review of the evidence and applicable law demonstrates that Bourgeois' *Atkins* claim is without merit.

### A.      Background of Bourgeois' *Atkins* claim

Bourgeois claims both statutory and Constitutional law precludes his execution. In *Atkins*, the Supreme Court found under the Eighth Amendment's "evolving standards of decency" review that "death is not a suitable punishment for a mentally retarded criminal." *Atkins*, 536 U.S. at 321. Even before *Atkins*, however, the Federal Death Penalty Act of 1994 mandated that "[a] sentence of death shall not be carried out upon a person who is mentally retarded." 18 U.S.C.A. § 3596(c).[25] "The only substantive change . . . ushered in by *Atkins* with respect to federal capital defendants, then, is the recognition of a new source of federal law (i.e., constitutional) that bars their execution." *United States v. Webster*, 421 F.3d 308, 311 (5th Cir. 2005).[26]

---

[25]      A dearth of jurisprudence exists with regard to *Atkins* cases under the FDPA. Federal cases do not meaningfully distinguish *Atkins* cases under the FDPA from those originating in state court. The Court, therefore, will look to death penalty cases arising from state jurisdictions, which federal courts evaluate whether a judgment is "contrary to, or involved an unreasonable application of, clearly established Federal law[.]" 28 U.S.C. § 2254(d)(1).

[26]      In the memorandum of law supporting his section 2255 motion, Bourgeois argues that his history of mental problems should prevent his execution. (DE 402 at 15). In other words, Bourgeois asks the Court to extend *Atkins* beyond prohibiting the execution of the mentally retarded to anyone with mental illness. The Fifth Circuit has found that, absent any indication of insanity, the Constitution does not prevent the execution of mentally ill inmates. *See ShisInday v.*
(continued...)

43

USCA5 5777

The *Atkins* Court, however, approached the new constitutional constraint on executions with caution. While acknowledging that prevalent societal norms protected the mentally retarded, the Supreme Court left the contours of that new exemption murky. The *Atkins* Court conceded that "[t]o the extent that there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded." 536 U.S. at 317. Instead of creating a bright-line test to determine intellectual ineligibility for death, the Supreme Court "did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation will be so impaired as to fall within *Atkins*' compass." *Bobby v. Bies*, ___ U.S. ___, 129 S. Ct. 2145, 2150 (2009) (quotation omitted); *see also Moore v. Quarterman*, 454 F.3d 484, 493 (5th Cir. 2006) ("[T]he *Atkins* Court did not adopt a particular criteria for determining whether a defendant is mentally retarded[.]").

Accordingly, a " welter of uncertainty follow[ed] *Atkins*" because "the Supreme Court neither conclusively defined mental retardation nor provided guidance on how its ruling should be applied to prisoners already convicted of capital murder." *Bell v. Cockrell*, 310 F.3d 330, 332 (5th Cir. 2002). Time has produced a patchwork of judicial standards, all informed to a greater or lesser extent by the psychological profession's understanding of mental retardation. This case, like many following in *Atkins*' wake, depends on the interplay between constitutional law and psychological science.

The psychological profession generally agrees as to what standards govern a diagnosis of mental retardation, though the experts in this case have differed drastically in their application of

---

[26]    (...continued)
*Quarterman*, 511 F.3d 514, 521 (5th Cir. 2007). Bourgeois has not alleged that he is incompetent for execution, and nothing in the record at this point suggests a similar mental condition. Bourgeois has not shown that this Court should extend the *Atkins* decision to mentally ill death row inmates.

44

USCA5 5778

those standards. Two sources provide equally valid definitions of mental retardation. The *Atkins* Court relied on the definition provided by the American Association on Mental Retardation ("AAMR"), which is now known as the American Association on Intellectual and Developmental Disabilities ("AAIDD"):

> Mental retardation refers to substantial limitations in present functioning. It is characterized by *significantly subaverage intellectual functioning*, existing concurrently with *related limitations* in two or more of the following applicable *adaptive skill areas*: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests *before age 18*.

*Atkins*, 536 U.S. at 309 n.3 (quoting AMERICAN ASSOCIATION OF MENTAL RETARDATION, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 5 (9th ed. 1992) ("AAMR 9th")) (emphasis added).[27] In addition to the AAMR, the *Atkins* Court also referenced the American

---

[27] The *Atkins* Court relied on the AAMR 9th edition's understanding of mental retardation. In May 2002, the AAMR released a 10th edition that slightly modified its definition: "Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18." AAMR 10TH at 1 (10th Ed. 2002). The AAIDD has recently published an 11th edition of the manual, with the following definition: "Intellectual disability is characterized by significant limitations both in intellectual functioning and adaptive behavior as expressed in conceptual, social, and practical skills. This disability originates before age 18." AAIDD 11th at 1. The definition now includes five "assumptions":

> (1) limitations in present functioning must be considered within the context of community environments typical of the individual's age peers and culture;
>
> (2) valid assessment considers cultural and linguistic diversity as well as differences in communication, sensory, motor, and behavioral factors;
>
> (3) within an individual, limitations often coexist with strengths;
>
> (4) an important purpose of describing limitations is to develop a profile of needed supports; and

(continued...)

45

USCA5 5779

Psychiatric Association's ("APA") definition of mental retardation. *See Atkins*, 536 U.S. at 309 n.3

(quoting DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41 (4th ed. 2000)

("DSM-IV-TR").  The APA definition states

> The essential feature of Mental Retardation is *significantly subaverage general intellectual functioning* (Criterion A) that is accompanied by *significant limitations in adaptive functioning* in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academics, work, leisure, health, and safety (Criterion B). The onset must occur *before age 18 years* (Criterion C).

DSM-IV-TR at 41 (emphasis added).  Together, the APA and the AAIDD standards for mental

retardation thus contain three indispensable criteria for arriving at a diagnosis of mental retardation:

(1) significantly subaverage intellectual functioning; (2) related significant limitations in adaptive

skill areas; and (3) manifestation of those limitations before age 18. *See Clark v. Quarterman*, 457

F.3d 441, 446 (5th Cir. 2006).[28]

---

[27]  (...continued)
(5) with appropriate personalized supports over a sustained period,
the life functioning of the person with intellectual disability generally
will improve.

*Id.*  Dr. Swanson and Dr. Moore relied on the 11th edition.  Dr. Price relied on the DSM-IV definition, but mentioned the AAMR 9th standards.  Dr. Gelbort did not specifically assess for adaptive deficits, but mentioned a standard similar to the 10th or 11th editions. The experts did not describe any meaningful distinction between the various editions as to the substance of what constitutes mental retardation. Dr. Price explained that the 11th edition is "a restatement of the same thing" without "significant differences." (DE 595 at 282).  To date, the Fifth Circuit "has never distinguished between" the various editions of the psychological manual. *Moore v. Quarterman*, 342 F. App'x 65, 72 n.6 (5th Cir. 2009).  The Court will generally refer to the 11th edition when referring to the evidence in this case, but will also occasionally mention the earlier editions under which significant *Atkins* jurisprudence has developed.

[28]  Because the witnesses referred to the AAIDD by both its current and former names, the Court will also do so interchangeably.  The AAIDD currently uses the term "intellectual disability" instead of mental retardation. *See* AAIDD 11th at xvi.  The APA, however, has not yet adopted the term "intellectual disability" and the current diagnostic manual still contains the phrase
(continued...)

46

USCA5 5780

Courts have uniformly accepted this tripartite formulation for deciding whether an inmate qualifies for *Atkins* protection. Yet courts have also struggled to guarantee that convicted capital murderers who claim to be mentally retarded are evaluated in a nonarbitrary manner. An examination for mental retardation, and particularly the adaptive-skills component of that inquiry, involves the subjective evaluation of skills, aptitudes, and life experiences. Transposing the psychological community's understanding of mental retardation unto the legal context amplifies the subjectivity of this analysis.

Here, as in most *Atkins* cases, equally qualified experts have examined Bourgeois and his life and reached drastically different professional opinions about his intellectual functioning. *See Wiley v. Epps*, 625 F.3d 199, 215 (5th Cir. 2010) (noting that most *Atkins* cases involve "essentially a battle of the experts, who gave competing opinions as to [an inmate's] IQ and intellectual functioning"). As will be discussed below, Bourgeois' experts conclude that he is mentally retarded. The law, however, has not completely turned the question of eligibility for execution over to the psychological community. *See Clark*, 457 F.3d at 445 (recognizing that the Supreme Court in *Atkins* did not hold that courts "*must* track the approach of the [AAIDD] or the APA exactly"). The law observes that "[p]sychiatry is not . . . an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior, [and] on cure and treatment[.]" *Ake v. Oklahoma*, 470 U.S. 68, 81 (1985); *see also Jones v. United States*, 463 U.S. 354, 365 (1983) ("The only certain thing that can be said about the present state of knowledge and therapy regarding mental disease is that science has not reached finality of

---

[28]    (...continued)
"mental retardation." To preserve continuity with existing jurisprudence, the Court will use the term "mental retardation" throughout this Memorandum and Order.

47

USCA5 5781

judgment.").[29] The *Atkins* decision did not delegate to psychologists the determination of whether

an inmate should not face execution, but left the contours of the constitutional protection to the

courts. Thus, psychology informs, but does not determinatively decide, whether an inmate is exempt

from execution. *See Hall v. Quarterman*, 534 F.3d 365, 395 (5th Cir. 2008) (observing that federal

courts cannot "commit the ultimate decision of mental retardation to the experts" alone).

With those principles in mind, the Court turns to the expert and lay evidence relating to

mental retardation.[30]

---

[29]    The psychological community's understanding of mental retardation is evolving. The few short years since the *Atkins* decision has seen change in the definition of mental retardation, renovation of the name of the most prominent advocacy organization, and even abandonment of the very term mental retardation. Adoption of the phrase "intellectual disability" is only the most-recent terminology in the psychological community's developing understanding of mental retardation. *See* AAIDD 11th at 7-11 (outlining the various definitions of and terms for mental retardation used by the mental health community in the last century). As the AAIDD observed in the 10th edition of its guidebook:

> The field of mental retardation is currently in a state of flux regarding not just a fuller understanding of the condition of mental retardation, but also the language and process used in naming, defining, and classifying. For example, we are in the midst of discussions about the nature of intelligence; the relationship between intelligence; the implementation of the supports paradigm; the best way to conceptualize disabling conditions; the impact of consumer and reform movements; and the effects of terminology upon individual lives.
>
> This state of flux is both frustrating and challenging. It is frustrating because it prohibits one from relying on past language, definitions, and models of mental retardation that can be a source of stability and permanence to some. However, the state is also challenging, as it provides the opportunity to incorporate the current and evolving understanding of the condition of mental retardation and the factors that influence the lives of people in their societies. Whether perceived from a positivistic or social perspective, the condition of mental retardation is being thought of differently today throughout the world.

AAMR 10th at xii.

[30]    An inmate bears the burden of proof on his *Atkins* claim and must prove the existence
(continued...)

48

USCA5 5782

## B.    Intellectual Functioning

To qualify for a diagnosis of mental retardation, an individual must first show significantly substantial limitations in intellectual functioning. The psychological profession uses a Full-Scale IQ score "of about 70 or below (approximately 2 standard deviations below the mean)." as the key indicator of intellectual ability. *Atkins*, 536 U.S. at 309 n.5. Because IQ tests typically have a standard error of measurement (also called a "confidence interval" or "confidence band"), a base IQ score actually represents a range that could be five points higher or lower. Thus, the psychological profession accepts 75 as a qualifying score for a diagnosis of mental retardation. *See* DSM-IV-TR at 41-42; *Clark*, 457 F.3d at 445. A higher IQ score signifies borderline intellectual functioning, not mental retardation.[31]

---

[30]    (...continued)
of mental retardation. *See Lockett v. Anderson*, 230 F.3d 695, 707 (5th Cir. 2000) (holding that a habeas petitioner generally has "[t]he burden of demonstrating that a constitutional violation occurred"). Yet neither *Atkins* nor the Federal Death Penalty Act clarify what standard governs mental-retardation claims. Circuits have held that the Constitution prohibits the application of a beyond-a-reasonable-doubt standard to *Atkins* claims. *See Hill v. Schofield*, 608 F.3d 1272, 1278-82 (11th Cir. 2010); *Webster*, 421 F.3d at 311. Under 18 U.S.C. § 4241, district courts generally resolve matters regarding mental illness and competency under a preponderance-of-the-evidence standard. Some state courts have adopted a similar standard in adjudicating *Atkins* claims. *See Webster*, 421 F.3d at 312 (reviewing state cases). Others, however, require a defendant to prove mental retardation by clear and convincing evidence. *See State v. Grell*, 135 P.3d 696, 523 (Ariz. 2006). The Fifth Circuit has, in another context, questioned whether "'some heightened standard of proof might apply to sentencing determinations which bear significantly on the severity of sentence.'" *United States v. Greer*, 158 F.3d 228, 240 (5th Cir. 1998) (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 248 (1998)). For instance, a defendant has the burden of proving the affirmative defense of insanity under a clear-and-convincing evidence standard. *See* 18 U.S.C. § 17. While the application of a stringent burden of proof in *Atkins* cases would impose "a significant risk of an erroneous determination," *Cooper v. Oklahoma*, 517 U.S. 348, 363 (1996), this Court need not decide which standard governs Bourgeois' claim. As the Court will discuss at length above, Bourgeois has not shown mental retardation even if he must only meet a preponderance-of-the-evidence standard.

[31]    The APA recognizes four categories of mental retardation: mild, moderate, severe, and profound. *See* DSM IV-TR at 42-44. Individuals with IQ scores between 55 and 70 – around
(continued...)

49

USCA5 5783

1.    *Bourgeois' IQ Scores*

The record contains two IQ scores for Bourgeois, both of which potentially qualify him for a diagnosis of mental retardation. One week before trial, Dr. Donald Weiner, a psychologist, administered the Wechsler Adult Intelligence Scale-Revised ("WAIS-R") test to Bourgeois. Bourgeois obtained a Verbal Score of 76, a Performance Score of 76, and a Full Scale score of 75 on the WAIS-R.[32] The WAIS-R, however, was not the most-current version of the Wechsler. By the time of trial, that test was outdated, the up-to-date testing instrument being the Wechsler Adult Intelligence Scale-III (WAIS-III).[33] Dr. Weiner's purpose in examining Bourgeois, however, was not to diagnose or rule out mental retardation; the defense retained him to identify neurological deficits. (DE 594 at 267). Dr. Weiner chose to administer the outdated test because more research

---

[31]    (...continued)
85% of the mentally retarded population – are classified as mildly mentally retarded if they satisfy the adaptive-functioning and age-at-onset criteria. *See also* AAIDD11th at 32 (observing that between 75% to 89% of the population with mental retardation is mildly mentally retarded). The law has not drawn a distinction between these categories of mental retardation for the purpose of *Atkins* protection.

[32]    Due to a transcription error, Dr. Weiner initially recorded the Full-Scale score as 76. Dr. Weiner explained in the evidentiary hearing:

> [T]his report had to be gotten out very quickly in the context of other things that were scheduled and I don't remember, I might have typed this one myself to get it back in time and if so I just made a typographical error, looking at the results from the test and then transcribing it; and if it was my typist, who is usually very accurate, she then would have gotten this report back to me much more quickly than usual and could have made an error that I just didn't catch.

(DE 594 at 219). At the time of trial, this error made little difference because Dr. Weiner "wasn't asked to do an assessment for mental retardation." (DE 594 at 263).

[33]    Federal courts have recognized the WAIS-III as a "gold standard" testing instrument. *See Thomas v. Quarterman*, 335 F. App'x 386, 391 (5th Cir. 2009). A fourth version of the Wechsler, the WAIS-IV, is the currently updated test. No expert has administered the WAIS-IV to Bourgeois.

USCA5 5784

was available linking WAIS-R scores to neurological deficiencies than was available for the WAIS-III.  (DE 594 at 218, 263, 251).[34]

Dr. Michael Gelbort performed the only psychological testing intended to assess whether Bourgeois has substantial limitations in intellectual functioning.  Bourgeois' current attorneys did not ask Dr. Gelbort to make a final diagnosis of mental retardation, only to evaluate his intellectual capacity. (DE 560 at 78).  In 2007 Dr. Gelbort administered the WAIS-III, with Bourgeois obtaining a Verbal Score of 67, a Performance Score of 78, and a Full Scale Score of 70.  Bourgeois' Full Scale IQ scores facially make a diagnosis of mental retardation possible.

Bourgeois relies on the naked IQ scores to satisfy *Atkins*' first prong.  Bourgeois called Dr. Gelbort in the evidentiary hearing to explain the results of his examination.  Dr. Gelbort testified that:

> Mr. Bourgeois is of limited intellectual ability. He comes out – he tests out pretty much in the borderline to mildly defective range. He shows indication of difficulties, . . . of having frontal lobe impairments, that he did take the tests as requested and put forth good effort.  His learning is problematic, especially when he has to understand conceptually the information being presented to him.  So he can memorize adequately, but he has trouble taking in or encoding and forming new memories and making lasting memories for information that's more conceptual or complex.

---

[34]    On some subtests of the WAIS-R, Bourgeois exhibited "low average abilities," in others, average.  He only exhibited "a significant deficit in assembling an object from its parts." Dr. Weiner also administered the Wide Range Achievement Test, Third Edition ("WRAT-III"). Bourgeois WRAT-III scores showed higher aptitude.  Bourgeois obtained high-school equivalent scores in reading and spelling, but only at the sixth-grade level for arithmetic.  Dr. Weiner opined that Bourgeois "is functioning at the expected level for a high school graduate in reading and spelling.  Arithmetic is an area of weakness for him, but he does not have any specific learning disabilities."  However, in his videotaped examination by Dr. Price, Bourgeois seemed able to do mental mathematical computations adequately. Notwithstanding his low scores on the WAIS-R, Dr. Weiner opined that, while his "overall level of intellectual functioning is in the borderline range," he "shows no indications of having any specific learning disabilities."

51

USCA5 5785

(DE 560 at 29).[35]  Dr. Gelbort's testimony did not address whether Bourgeois' life manifested intellectual deficiencies outside of the testing context.  He explained: "when I'm basing an assessment of their intellect, I'm going to use my intellectual tests" and not factor in information such as whether Bourgeois' interactions with the Court manifest mental retardation.  (DE 560 at 134).

> 2.    *Legal Evaluation of Intelligence in Atkins Cases*

Even though Bourgeois' testing has twice resulted in scores that possibly qualify him for mental retardation, the law has not recognized an IQ score below 75 as automatically meeting the significantly substantial limitations prong.  *Atkins* itself did not establish a cut-off IQ score that exempts inmates from execution.  Much of the case law since *Atkins* has focused on inmates who score in the borderline area around 70.  While the Fifth Circuit has specified that "mental retardation *can be found* in range of 70-75," *Moore v. Quarterman*, 342 F. App'x 65, 68 n.5 (5th Cir. 2009) (emphasis added), all cases in which the Fifth Circuit has found that an inmate warrants *Atkins* relief have involved at least one base score below 70 without adjustment.  *See Thomas v. Quarterman*, 335 F. App'x 386, 388 (5th Cir. 2009) ("[S]ubaverage intellect . . . is typically established . . . a score of 70 or below.").[36]

---

[35]    Dr. Gelbort did not administer any formal instrument to assess whether Bourgeois was malingering.  (DE 560 at 113).  Dr. Gelbort based his opinion that Bourgeois put forth good effort based on "how the data line[d] up," both internally and in comparison to Dr. Weiner's testing, because "there's good consistency across time."  (DE 560 at 31-32, 34).

[36]    The Fifth Circuit has only granted relief on *Atkins* claims in three cases, and each presented at least one score below 70.  *See Wiley v. Epps*, ___ F.3d ___, 2010 WL 4227405, at * 7 (5th Cir. 2010) (noting a childhood score of 68); *Moore v. Quarterman*, 342 F. App'x 65, 68 (5th Cir. 2009) (finding significantly subaverage intellectual functioning with IQ scores ranging from 66 to 76); *Rivera v. Quarterman*, 505 F.3d 349, 361 (5th Cir. 2007) (finding mental retardation with scores as low as 66).  In each of those cases, the AEDPA's deferential standard did not constrain the
(continued...)

52

USCA5 5786

As previously mentioned, psychology does not look at IQ as a fixed point, but as existing along a range. The confidence interval associated with WAIS-R and WAIS-III scores means that a given score may actually represent an IQ five points higher or lower. *See Clark*, 457 F.3d at 444.[37]

---

[36]    (...continued)
federal analysis. Most often, the Fifth Circuit has denied relief when an inmate has IQ scores both under and over 70. *See Hall v. Thaler*, 597 F.3d 746, 746-47 (5th Cir. 2010) (scores ranging from 67 to 84); *Thomas v. Quarterman*, 335 F. App'x 386, 388-89 (5th Cir. 2009) (three IQ tests scoring 67, 75, and 77); *Rosales v. Quarterman*, 291 F. App'x 558, 561 (5th Cir. 2008) (a pre-*Atkins* score of 82 and a post-*Atkins* scores of 61 and 73); *Moore v. Quarterman*, 517 F.3d 781, 784 (5th Cir. 2008) (finding no mental retardation with full-scale IQ scores of 63, 68, 72, 76, and 76); *Morris v. Quarterman*, No. 07-70012 (5th Cir. Apr. 17, 2008) (pre-*Atkins* score of 97 and post-*Atkins* scores of 53 and 64); *Perkins v. Quarterman*, 254 F. App'x 366, 369 (5th Cir. 2007) (scores ranging from 66 to 80); *Taylor v. Quarterman*, 498 F.3d 306, 307-08 (5th Cir. 2007) (pre-*Atkins* score of 75 and post-*Atkins* scores of 65 and 69); *Woods v. Quarterman*, 493 F.3d 580, 585-86 (5th Cir. 2007) (pre-*Atkins* scores of 78 and 80 and post-*Atkins* score of 68); *Clark v. Quarterman*, 457 F.3d 441, 445-46 (5th Cir. 2006) (pre-*Atkins* score of 74 and post-*Atkins* scores of 65 and 68). The Fifth Circuit has also denied relief when an inmate's scores all fall above 70. *See Pierce v. Thaler*, 604 F.3d 197, 214-15 (5th Cir. 2010) (WAIS-III score of 70); *Williams v. Quarterman*, 293 F. App'x 298, 310-11 (5th Cir. 2008) (three different IQ tests scoring a 70 or 71); *Eldridge v. Quarterman*, 325 F. App'x 322, 325 (5th Cir. 2009) (scores ranging from 72 to 112).

[37]    Bourgeois asks the Court to treat his results on the WAIS-R as much lower than the raw full scale score of 75 based on a phenomenon known as the Flynn Effect. "The Flynn Effect . . . posits that, over time, the IQ scores of a population rise without corresponding increases in intelligence and thus the test must be re-normalized over time." *In re Mathis*, 483 F.3d 395, 398 n.1 (5th Cir. 2007). The AAIDD 11th edition advises that "best practices require *recognition* of a potential Flynn Effect when older editions of an intelligence test (with corresponding older norms) are used in the assessment or interpretation of an IQ score." AAIDD 11th, at 37 (emphasis added). All the experts who testified in the evidentiary hearing agreed that the Flynn Effect is a phenomenon that exists in IQ scores throughout society, but they disagreed about whether the general elevation of IQ scores over time requires adjustment of individual test results. For instance, Dr. Swanson testified that the Flynn Effect would place Bourgeois' scores to a "true score . . . somewhere between 68 and 70," (DE 594 at 37), but qualified that the Flynn Effect was "not relevant" in "this particular case because the scores are there . . . they are the scores we are looking for in an *Atkins* case." (DE 594 at 35). Yet she also explained that "[t]here's two large schools of thought on that. The [AAIDD] . . . say[s] you should adjust the individual score. The other camp is you can't take a group statistic study and adjust a single score on that, there's no science for doing this yet." (DE 594 at 36). Dr. Weinsten would have applied the Flynn Effect to his scores. Dr. Weiner explained that, "since that WAIS-R has older normative data[,] . . . his true IQ is probably four or five points lower than that." (DE 594 at 222-23). Nevertheless, Dr. Moore explained that adjusting IQ scores based

(continued...)

53

USCA5 5787

The psychological profession allows any score falling along that range to qualify for a diagnosis of mental retardation. Accordingly, psychologists generally do not question whether an inmate's true IQ falls in the higher or lower end of that range. Indeed, with the main purpose of most IQ testing being to qualify an individual for needed supports or services, the mental health community has little reason to question the results of IQ testing.

Courts, however, endeavor to determine whether a borderline score represents an intelligence capacity above or below the mental-retardation threshold. In the legal context, whether an inmate had significantly subaverage intellectual functioning is a question of fact that the Court decides. *See Clark*, 457 F.3d at 444 (citing *United States v. Webster*, 162 F.3d 308, 351-52 (5th Cir. 1998)). In oral argument, Bourgeois' attorneys conceded that this Court must look at the IQ scores but then reach its own determination of whether he has significantly subaverage intelligence (DE 646 at 79-80). Federal law does not require a court "to find [an inmate] to be mentally retarded merely because the low end of [his] confidence band was below 70, just as it would not be required to find that [he] could be executed on the basis that the high end of this band fell above 70." *Clark*, 457 F.3d at 446. When faced with a borderline IQ score, courts assess whether an inmate's intellectual faculty demonstrates the characteristics of mental retardation, rather than low intelligence. In doing so, the

---

[37]      (...continued)
on the Flynn Effect is "significantly controversial." (DE 599 at 89). In another case, a district court found credible Dr. Moore's testimony that "he had only observed the IQ score adjusted downward for the Flynn effect in evaluations done by the defense in mental retardation hearings." *Sasser v. Hobbs*, ___ F.Supp.2d ___, 2010 WL 4569870, at *13 (W.D. Ark. Nov. 3, 2010). Here, Dr. Swanson conceded that the term "Flynn Effect is primarily used in a courtroom setting," (DE 594 at 156), and the Government argued that it is "[a] litigation tool to try to lower scores and enable people to apply [the *Atkins*] defense to them[.]" (DE 646 at 82). Nevertheless, the Fifth Circuit has not adopted the Flynn Effect "as scientifically valid," *Maldonado*, 625 F.3d at 238 (citing *In re Salazar*, 443 F.3d 430, 433 n. 1 (5th Cir. 2006)). The testimony in this case did not persuasively show a consensus among psychologists that would require the adoption of the Flynn Effect as a legal method to lower an inmate's Full Scale IQ Score.

USCA5 5788

Fifth Circuit has denied relief when the evidence more persuasively suggests that, notwithstanding

borderline IQ scores, an inmate's intelligence is more consistent with the higher end of the

confidence interval. *See Clark*, 457 F.3d at 446.

Here, two factors suggest that Bourgeois' IQ score does not fall in the lower end of the

confidence interval. First, the circumstances do not suggest that Bourgeois' testing resulted in a

valid measure of his intellectual abilities. Second, a full review of Bourgeois' life signals that he has

not suffered the impairment associated with mental retardation and that he functions at the highest

end of the confidence interval, if not even higher. The evidence before the Court shows that it is

much more probable that Bourgeois' true IQ exists above the threshold cutoff for mental retardation.

     3.     *Bourgeois' IQ Does Not Persuasively Fall at the Lower End of the Confidence Interval*

The Government primarily rebutted Dr. Gelbort's testimony through Dr. Price who examined

Bourgeois in 2010.[38] Because he worried that videotaping his administration of psychological testing

---

[38]    In addition to those two witnesses, others briefly testified about Bourgeois' IQ scores. For instance, Dr. Moore primarily testified about Bourgeois' adaptive behaviors, but agreed with Dr. Price that the scores on WAIS subtests were "puzzling" when compared to his life and aptitudes. (DE 599 at 100). Dr. Swanson did not question the results of the IQ testing as a precursor to a diagnosis of mental retardation. Dr. Toomer only affirmed that the IQ scores qualified him for a diagnosis of mental retardation (DE 594 at 324) Dr. Toomer said: "I did not evaluate him specifically with regard to mental retardation, but as part of the evaluative process information presents itself that serves as a basis for the provisional opinion[.]" (DE 594 at 324). Dr. Estrada opined that he would put no credence on the IQ test results, but would base his whole mental-retardation opinion of adaptive deficits. Dr. Swanson found no errors in the administration of the IQ tests. She also observed that the two administering experts "noticed no signs of malingering and they felt he had put forth good effort." (DE 594 at 30). Comparing the subtests between the two IQ test administrations, Dr. Swanson observed that the "scores are fairly consistent across administrations." (DE 594 at 31). Insofar as other experts had observed some strengths in his testing, Dr. Swanson opined that "it's not atypical for a person with mental retardation to have a strength . . . in one area[.]" (DE 594 at 34). Dr. Swanson opined that "Mr. Bourgeois . . . functions with very low cognition, and his cognitive ability is in the mild deficit range for these tests, and so no matter what, no matter if we don't go any further, we are looking at a person who has extremely

(continued...)

USCA5 5789

would compromise its integrity, Dr. Price did not give Bourgeois any normed IQ test but still performed a probing psychological examination. Dr. Price agreed that with Dr. Gelbort on some important issues, such as that Bourgeois' test results placed him in the borderline deficient range for intellectual functioning. (DE at 595 at 238). Also, Dr. Price agreed with Dr. Gelbort that Bourgeois did not malinger during his testing. (DE 595 at 258). Dr. Price, however, did not agree that Bourgeois was eligible for a formal diagnosis of mental retardation. Dr. Price credibly testified that aspects of Bourgeois' testing, such as his ability to concentrate for a length of time, was inconsistent with mental retardation. (DE 595 at 201). Dr. Price found it discrepant "to be able to read and understand and conceptualize some of the things that he was able to talk about[.]" (DE 599 at 50). Importantly, Dr. Price credibly explained that Bourgeois' "cognitive abilities exceed his measured cognitive intelligence." (DE 595 at 215).

Dr. Price did not trust that the IQ testing adequately measured Bourgeois' intelligence. Psychology recognizes that an individual's performance and intentions may influence testing results. Various factors may cause artificially low scores on the WAIS testing instrument. *See Maldonado v. Thaler*, 625 F.3d 229, 238 (5th Cir. 2010) ("[T]he WAIS-III manual instructs that an artificially low score may result from, among other factors, '[c]ultural or linguistic discrepancy from the test standardization table, distractability, anxiety, deafness, poor motivation or inadequate persistence[.]'"). While IQ scores should represent an accurate measure of the inmate's intellectual functioning, the Fifth Circuit has routinely weighed IQ scores against factors such as an inmate's poor performance during testing and whether the scores adequately comport with other information

---

[38]    (...continued)
low cognitive ability. That criteria I think is clearly met." (DE 594 at 39).

56

USCA5 5790

about his intelligence.[39]

Although none of the experts accused Bourgeois of outright malingering on his IQ test, a lack of malingering does not mean that other factors may not have compromised the validity of his test results. Dr. Price credibly provided two reasons to believe that Bourgeois' IQ scores may not reflect his true level of intellectual functioning. As Dr. Price explained, "I would not say that it's malingering. I would say that it's not putting forth full effort and carelessness." (DE 595 at 210); *see also* DE 595 at 225 (explaining that "it's not intentionally trying to get the wrong answer on easy things, it's just not trying" and is "careless, sub optimal effort, not putting forth good effort, with not trying hard").

Bourgeois is apparently an individual who does not perform well on standardized testing instruments. Dr. Price suggested that Bourgeois' idiosyncratic abilities may have caused the testing to underestimate his intellectual level:

---

[39]     Several Fifth Circuit cases have refused to credit IQ scores when the evidence suggested that an inmate had malingered or not put forth his best effort. *See Esparaza v. Thaler*, ___ F. App'x ___, 2010 WL 4559214 at *6 (5th Cir. 2010) (finding "pervasive evidence of poor test taking attitude characterized by low motivation, poor attention and concentration, and low task involvement and persistence."); *Eldridge*, 325 F. App'x at 325 (refusing to honor a score of 72 as a predicate for mental retardation when the expert who administered the test failed to assess for malingering or a lack of effort, to consider possibilities other than mental retardation for the test results, and relied on limited information about the inmate's background); *Williams*, 293 F. App'x at 311 (refusing to credit IQ scores when the record suggested that the inmate had malingered and "the evidence as a whole . . . was inconsistent with a finding of mental retardation."); *Moore*, 517 F.3d at 784 (refusing to find mental retardation after tests showing 63, 68, 72, 72, 76 and 76 because of "other expert indicating that [the inmate]  did not suffer from such functioning and he underperformed on at least some of the tests); *Woods*, 493 F.3d at 586-87 (emphasizing earlier, higher IQ scores when the later scores were less reliable and the inmate has "a motivation to score poorly"); *Clark*, 457 F.3d at 445 (finding that state court's determination was not unreasonable when it refused to credit an IQ score when the inmate "had motivation to lower his scores deliberately"). The Fifth Circuit has also refuse to find adaptive deficits when, notwithstanding an IQ score of 64, the inmate "appeared to be poorly motivated and may have exaggerated his deficits." *Moreno*, 450 F.3d at 164.

57

USCA5 5791

he, like a number of different kinds of people, doesn't test well. I mean he doesn't, it's harder to get him involved in objective testing. It's very easy to get him involved in talking about himself, his life, his situation. It's easy to engage him there. It's even difficult to . . . disengage him from doing that. But objective testing, he kind of shuts down a little bit.

(DE 595 at 202). Bourgeois' inability to test well could be because he "is someone who has been somewhat culturally deprived, didn't profit from education as much as someone else, not experience things that were intellectually academically enriching or didn't profit from those, but the abilities are there and that's inconsistent with mental retardation." (DE 595 at 216). Poor testing taking skills could have caused Bourgeois to underperform on the psychological testing, thus giving an incorrect interpretation of his intellectual ability. *See Esparaza v. Thaler*, ___ F. App'x ___, 2010 WL 4559214 at *6 (5th Cir. 2010) (finding that an inmate's low IQ scores did not amount to subaverage intellectual functioning after testimony that the inmate had "pervasive evidence of poor test taking attitude characterized by low motivation, poor attention and concentration, and low task involvement and persistence.").

In a related vein, some of the experts suggested that Bourgeois may have not put forth his best effort during the examinations. Dr. Price explained that a lack of effort is "a response style that can invalidate the results. It's more difficult to assess. It's less severe. It's present in a lot of cases for a lot of reasons other than the intentional . . . feigning or gross exaggeration of a condition for an external incentive." (DE 595 at 258).[40] This Court's observations match Dr. Price's opinion.

---

[40]    Dr. Price elaborated:

Effort and response style are on a continuum. At one end is full-blown malingering where the person is feigning, completely making something up for an external incentive. At the other end of the continuum is someone that is doing their very best on the test and being as honest as they possibly can be. . . . So everybody falls someplace on that continuum that's being evaluated, the closer you get to the end,

(continued...)

58

USCA5 5792

Even independent of the expert testimony, this Court finds that Bourgeois did not put forth his best effort in the psychological testing. The Court has viewed many hours of video from the examination by Dr. Price and Dr. Moore. Bourgeois answers the questions asked of him, engages in conversation, has logical thoughts, and does not otherwise give any impression of mental retardation. Certain features of Bourgeois' examination suggest he underperformed on the psychological testing. For instance, when the examiner was in the room, Bourgeois answered questions sluggishly. Yet when he was unobserved, Bourgeois moved through the answers quickly. In another example, Bourgeois took an unreasonably long amount of time to compose a paragraph at Dr. Price's request. (PX-159). Dr. Swanson considered the time which he took to write as indication of mental retardation. (DE 594 at 55). Nevertheless, the speed in which he wrote that paragraph contrasts sharply with his voluminous amount of writings each of which, if written at that pace, would have taken days to finish.[41]

---

[40]    (...continued)
whether malingering comes closer to that. Poor effort is someplace in the middle, and so it needs to be considered about the validity of the findings.

(E 595 at 259-60).

[41]    Moreover, Dr. Swanson looked at the "overall grammar and syntax of" the statement and found that "it would be similar to someone who is third grade." (DE 594 at 136). The paragraph read:

> I Alfred Bourgeois strongly believe without a shadow of a doubt that I have been framed and railroaded by Rush of Judgement and have been wrongfully convicted of a crime that was fought by vengeance. I believe this child [JK1999] was not murdered, and without a doubt was not injured in the State of Texas nor on federal land. I believe Robin M. Bourgeois is assaulted my belovth baby long before arriving in Texas or long before on the naval ground. This case is tainted and fabricated.

(PX-159). Dr. Swanson' s testimony in that regard is not credible as the content of the paragraph
(continued...)

59

USCA5 5793

This was possibly not a conscious behavior. Nevertheless, with an awareness that the results of the IQ testing would affect his death eligibility, Bourgeois certainly had reason to put lackluster effort into his testing. The Court finds highly credible Dr. Price's testimony that Bourgeois underperformed on his testing. Bourgeois' performance on the testing instruments does not indicate that his actual IQ score should fall at the lower, rather than higher, end of the confidence interval.

This finding harmonizes with a broader review of how Bourgeois' level of intelligence has manifested itself throughout his life.[42] Even when an inmate scores within the range psychology has set for a diagnosis of mental retardation, the Fifth Circuit has reviewed the whole record to decide if an inmate has exaggerated his deficits or if the circumstances of his life are inconsistent with mental retardation. *See, e.g., Moreno v. Dretke*, 450 F3d 158, 165 (5th Cir. 2006) (finding a post-*Atkins* score of 64 did not meet *Atkins*' first prong). The most perplexing feature of Bourgeois' intellectual testing is that his abilities seem to surpass that anticipated by his IQ score. Dr. Price testified that it was "very unusual" that the results of academic achievement scores administered by Dr. Gelbort, Dr. Weiner, and Dr. Swanson which mostly showed high-school age proficiency were higher than his IQ scores. (DE 595 at 270). Nonetheless, Bourgeois' experts placed his intellectual functioning as equal to that of a child. A disconnect exists between the level at which Bourgeois' experts said he could function and what he could actually do. Reviewing Bourgeois' life, independent of the psychological test results, should manifest a markedly low level of intelligence. Bourgeois' life, however, contradicts such pervasive mental impairment; Bourgeois' behavior and

---

[41]    (...continued)
and complexity of thought transcend what society expects of the average third grader.

[42]    This review does not conflate the *Atkins* prongs, but recognizes that a person whose IQ falls within the lowest two percent of the population should manifest commensurate impairments throughout their life. Intelligence of that low level should be obvious.

60

characteristics are inconsistent with an IQ that would fall below 70. *See Williams v. Quarterman*, 293 F. App'x 298, 309-11 (5th Cir. 2008) (looking at "the evidence as a whole-including [the petitioner's] performance in the classroom and on standardized achievement tests, his writing ability, and the opinions of numerous witnesses who did not believe that [he] was retarded" in deciding that his "IQ scores [were] not an accurate indication of his intellectual functioning").

A persistent feature of the testimony from Bourgeois' experts was a failure to consider fully his alleged intellectual limitations against the whole background of his life. While testimony from various individuals questioned his intellect when younger, those who knew him as an adult did not suspect that he was mentally retarded. Bourgeois graduated from high school,[43] worked for years as an over-land trucker,[44] bought a house, managed his own finances, wrote intricate and detailed letters, communicated without difficulty, participated actively in his own defense, and otherwise carried himself without any sign of intellectual impairment. With respect to his employment and other areas, Bourgeois' experts apparently believed that he only performed his job with a system of supports in place. The testimony before the Court did not support that conclusion. Rather, Dr. Price credibly explained that "it's highly inconsistent for him to have had a job as a cross-country truck driver and performed as he did, just totally inconsistent with mental retardation." (DE 595 at 208).

Courts routinely review an inmate's written correspondence for indicia of mental impairment.

---

[43]    Bourgeois has at times claimed to have gone to college, though the record has never substantiated his claims. Ms. Armont, however, told Dr. Moore that he had attended college classes. (DE 599 at 158-59).

[44]    The AAIDD 11th particularly notes that an employment history is not consistent with mental retardation, but the kind of work Bourgeois did possibly is. "Although it is true that people with [mental retardation] who have higher IQ scores are more likely to be employed than people with lower IQ scores, their employment rate (27.6%) is far below the national average in the general community (75.1%) and more often consists of part-time work in entry-level service jobs, with low wages and minimal benefits." AAIDD 11th at 157.

61

USCA5 5795

*See Maldonado*, 625 F.3d at 243; *Eldridge v. Quarterman*, 325 F. App'x 322, 326 (5th Cir. 2009). The record contains numerous items written by Bourgeois. *See, e.g.*, GX-23 through 27, 32, 33, 176 through 200. Bourgeois' extensive writings, while not polished masterpieces, certainly do not contain indicia of gross mental impairment. Dr. Price credibly described his writings: "[T]hey are very detailed, very, very detailed. Now, his sentence structure, his syntax is not that of an attorney or a person that's been to college, perhaps, but it's certainly, he can communicate when he writes. He can express himself in complete thoughts, and very detailed complete thoughts." (DE 595 at 220). Dr. Moore explained:

> He certainly appears to be able to use written communication effectively. . . . [C]ertainly the vocabulary is good. The ideas are complex. The sentences are often compound. He's able to follow a flow of thought, communicate his ideas effectively. He certainly seems to be a vigilant record keeper, well aware of dates and perhaps locations.

(DE 599 at 139).[45] Bourgeois' writings show an ability to observe the world around him, process relevant information, form strategy, and communicate his thoughts to others. His letters exceed the complexity and sophistication expected of someone operating at a grade-school level. Bourgeois' own writings discount the possibility that he is mentally retarded.

Notably, this Court's interactions with Bourgeois have provided an important point of observation. *See Esparaza*, ___ F. App'x at __, 2010 WL 4559214, at *6 (denying an *Atkins* claim when "[t]hroughout his trial testimony, [Esparza] furnished coherent, even combative testimony fully

---

[45]    A brief sample from correspondence early in this case exemplifies his lack of mental retardation. He instructed trial counsel: "I, Alfred Bourgeois, have every intention of winning my case. I have been falsely arrested, and please take your time and read this letter real well. This will explain how we can win this case in the death of my child, [JG1999]." (DE 598 at 148). In another letter he asked: "Dear Mr. Gilmore, I want a copy of your strategy on my case. I would like to know how you plan to attack my case and what you think the outcome will be. I would appreciate if you could put together a brief memorandum in support of me, Alfred Bourgeois, your Defendant, and position, regarding to my trial." (DE 598 at 151).

USCA5 5796

responsive to both his own trial counsel's and the prosecutor's questions and demonstrated a detailed understanding of the testimony and other evidence introduced during his capital murder trial."). During trial, Bourgeois communicated with the Court on several occasions. The Court viewed his testimony before the jury in both phases of trial. The Court had sufficient interaction with Bourgeois to make a lay assessment of whether he functions at the low level described by his expert witnesses. Bourgeois never gave the Court any impression that he functioned at an intellectual level equal to that of a child. He completely understood the proceedings against him, intelligently assessed the circumstances he faced, actively participated in his defense, formulated strategy, intelligibly communicated his version of events, cogently answered questions put to him, and otherwise appeared to have an adequate level of intelligence. Based on this Court's own observations, the testimony that Bourgeois has significant intellectual limitations is not credible or persuasive.[46]

This does not mean that Bourgeois has high, or even necessarily average, intelligence. True, his intellectual ability was bewildering. He scored low on the testing, but exhibited many obvious intellectual aptitudes. For example, Dr. Estrada's pre-trial report – made without the benefit of any direct examination for mental retardation – commented that Bourgeois was of above-average intelligence. Dr. Price disagreed, opining that Bourgeois' verbal abilities and social skills give off the impression that he is smarter that he is. Bourgeois' ability to appear intelligent likely stems from his narcissism and desire to look good.[47]  But Dr. Swanson's testimony that Bourgeois has

---

[46]  Over the 17 years that the undersigned has presided on the bench, more than 4,750 criminal defendants have come before the Court, almost a ll of whom the undersigned has interviewed for signs of incompetency or other mental impairment. This experiences informs the Court's lay assessment that, until it became expedient to avoid execution, Bourgeois never manifested any indication of mental retardation.

[47]  A constant theme throughout the evidentiary hearing was that, as a narcissist,
(continued...)

63

USCA5 5797

"extremely low cognitive ability" and functions in about the "lowest two percent of the population"

seems ludicrous when looking beyond his IQ scores. (DE 594 at 39). The testimony finding no

disconnect between his test scores and his life lacked credibility. He does not operate as a child.

In the end, "[t]he calculation of a person's IQ score is imprecise at best and may come down

to a matter of the examiner's judgment." *Wiley v. Epps*, 625 F.3d 199, 215 (5th Cir. 2010). The

Court does not invalidate or ignore Bourgeois' IQ test scores, but finds that a fuller view of his

abilities does not correspond to a finding of significant intellectual limitations. This is not a case

where a man's life depends on a few points' difference in test results. As the Court will discuss

below, Bourgeois' functional ability and healthy adaptive skills are inconsistent with mental

retardation. Even assuming that Bourgeois has low intelligence, his ability to function independently

---

[47]    (...continued)
Bourgeois would make himself look better than he was. Dr. Gelbort explained:

> The narcissism oftentimes coupled with what I'm calling low intellect, because that's
> what I believe is here, you get individuals who are trying to cover or mask or hide
> their deficiencies. And one of the ways they do that, especially when you have a
> gregarious narcissistic person who talks a lot, is that they try to steer conversations
> or they tell you what they want to know, or more often than not, they tell you what
> they know about or what they think they know about, rather than just simply
> answering questions.

(DE 560 at 65). Dr. Price, however, credibly described how Bourgeois'

> presentation was not consistent with mental retardation. The most similar thing to
> that that is talked about in the literature often is this idea of the cloaking of
> competence or masking where a person with limited intellectual abilities will say they
> can do things that they can't. His, in my opinion, really exceeded that and had a
> different flavor to it in that it was, I mean he would admit when he couldn't do
> something but he certainly wanted to impress. And his history and the records, I see
> that that's been a style of his, to impress others that he's very successful and has been
> – even though he has been occupationally. It was, it went beyond the cloaking of
> competence.

(DE 595 at 205).

64

USCA5 5798

in society contradict the modifier in *"significantly* subaverage intellectual functioning" as a distinctive feature of mental retardation. The question of whether he has significantly substantial limitations in intellectual functioning is not close. The Court finds that Bourgeois has not met the first prong of the mental-retardation analysis.

## C.    Significant Limitations in Adaptive Skill Areas

While failing to meet one prong of the *Atkins* analysis dooms Bourgeois' claim, in the interest of justice the Court will address the other requirements for a diagnosis of mental retardation. As Dr. Estrada explained, "the IQ . . . [is] like a snapshot of the individual function at one given point in time." (PX-163 at 72). Psychology, thus, relies on "adaptive skill areas" or "adaptive functioning," *Atkins*, 536 U.S. at 318, as an "assessment of the way the person deals with the real issues in their life," (DE PX-163 at 72). The AAIDD defines deficits in adaptive skill areas as "significant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility that are expected for his or her age level and cultural group[.]'" *Maldonado*, 625 F.3d at 241 (quotation omitted). Or, in other words, "how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." DSM-IV-TR at 42 (quoted in *Wiley*, 625 F.3d at 216).

The AAIDD and APA definitions for mental retardation both break the adaptive-limitations inquiry into subcategories of deficiencies. The AAIDD evaluates "significant limitations . . . in adaptive behavior as expressed in conceptual, social, and practical adaptive skills." AAMR 11th at 1.[48]    The APA looks for "significant limitations in at least two of the following skill areas:

---

[48]    The AAIDD 11th gives examples of multidimensional representative skills within
(continued...)

USCA5 5799

communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." DSM-IV-TR at 41. While collapsing the adaptive deficits into distinct subgroups, the APA and AAIDD approaches apparently capture the same range of functional aptitude.

Both Dr. Swanson and Dr. Moore formally measured Bourgeois' adaptive functioning, though other experts touched on the same inquiry informally. Psychologists look to multiple sources for data about an inmate's adaptive abilities. Psychology prefers that "adaptive deficits . . . be 'determined by clinical assessment and, usually, standardized scales[.]'" *Maldonado*, 625 F.3d at 241 (quotation omitted). Other sources of information, such as lay accounts of an individual's aptitude, educational history, and vocational records, also contribute to the adaptive functioning analysis. Both Dr. Swanson and Dr. Moore augmented the results of their psychological testing by interviewing several people who knew Bourgeois.[49] In addition, Dr. Swanson relied on her own "informal functional assessments" of Bourgeois' ability to perform certain tasks. (DE 594 at 23).

Dr. Swanson found that Bourgeois possessed deficits in all three of the AAIDD domains and three of the skill areas (health and safety, functional academics, and social/interpersonal skills) from the DSM-IV-TR. Dr. Swanson concluded that these functional deficits were present in Bourgeois'

---

[48]    (...continued)
the three categories: (1) conceptual skills involve "language; reading and writing; and money, time, and number concepts"; (2) social skills mean "interpersonal skills, social responsibility, self-esteem, gullibility, naivete (i.e., wariness), follows rules/obeys laws, avoid being victimized, and social problem solving"; and (3) practical skills include "activities of daily living (personal care), occupational skills, use of money, safety, health care, travel/transportation, schedules/routines, and use of the telephone." AAIDD 11th at 44.

[49]    Dr. Swanson also interviewed Claudia Williams (maternal sister); Michelle Armont (paternal sister); Murray Bourgeois (maternal cousin); Carl Henry (maternal cousin and former co-worker); Lloyd Ferdinand (maternal brother); Donald Reese (former co-worker); Gwendolyn Thomas Smith (special education teacher); and Fred Thompkins (former co-worker). (PX-33 at 2).

66

youth and persisted into adulthood. She attributed his apparently competent life skills to support from others. Dr. Moore, however, used similar methods and still concluded that Bourgeois did not have deficits in any adaptive skill area.

Before turning to the evidence, the Court notes the difference between the legal and psychological inquiries into possible mental retardation. The mental health community ignores an individual's strengths when looking at adaptive functioning. For instance, Dr. Swanson testified that "in order to diagnose mental retardation you are looking for a collection of deficits in these areas, intellectual or adaptive, but it doesn't mean that someone couldn't have a strength as well." (DE 594 at 17-18). In fact, the 11th edition of the AAIDD manual has expressly adopted as an underlying "assumption" in the definition of mental retardation that "within an individual, limitations often coexist with strengths." AAIDD 11th at 1.[50] The mental health profession looks only at what an individual cannot do, presumably as a function of its role in providing support and services to impaired individuals.

The Fifth Circuit, however, teaches that the *Atkins* inquiry should not be so narrow as to ignore that which an inmate can do, even if the psychological profession approaches the issue differently. *See Williams*, 293 F. App'x at 314; *Clark,* 457 F.3d at 447; *Webster*, 421 F.3d at 313.

---

[50]    Dr. Swanson testified that when a psychologist encounters a strength

in a person that has an accumulation of deficits and you want to know why is the strength there, is the strength there for a specific reason or is it there because people have put supports in place throughout this person's life to make it look like a strength, or is it an area that that person had a unique opportunity as a child.

(DE 594 at 18). Dr. Swanson acknowledged that she looked for strengths in Bourgeois' life, but only did so to see if he has had a unique opportunity to become competent in that area or had supports that would allow him to succeed (DE 594 at 18). Positive abilities did not influence her to weigh the influence of negative ones.

USCA5 5801

The subjective *Atkins* question is not myopic and must take into account the whole of an individual's capabilities. The law makes a holistic view of an individual, recognizing that a few reported problems may not negate an inmate's ability to communicate, to abstract from mistakes, to learn from experience, to engage in logical reasoning, and to have healthy relationships with others. Accordingly, the federal inquiry into adaptive deficits takes on a much different flavor than that done by mental health professionals.

To that end, the federal inquiry probes more deeply the accuracy of the reported deficiencies and aims to put them into context. Thus, for example, a declaration in which someone has cherry-picked a few incidents where an inmate exhibited maladaptive behavior may be sufficient to diagnose mental retardation, but the law will seek to verify the described incidents and to understand if they represent a pervasive disability. The law will compare the deficiencies to positive life skills, presuming that adaptive successes blunt the global effect of reported insufficiencies. This review includes information about an inmate's positive adaptive ability after his eighteenth birthday.

With the holistic nature of the federal review of *Atkins* claims in mind, the Court turns to Bourgeois' arguments that he has deficits in adaptive functioning.

### 1. Assessment by Testing Instruments

The experts in this case used three testing instruments to assess Bourgeois' functional adaptive skills. Dr. Swanson gave Bourgeois the Woodcock-Johnson Test of Cognitive Abilities "which is a battery of academic tests, as well as tests for listening comprehension, oral expression." (DE594 at 23). Also, experts used what Dr. Swanson described as "two gold standards for adaptive assessments": the Vineland Adaptive Behavior Scale, Second Edition ("VABS-II" or "Vineland") and the Adaptive Behavior Assessment System, Second Edition ("ABAS-II"). (DE 594 at 42). These tests decide, through a series of ratings, the extent to which an individual can do certain

USCA5 5802

things. Psychologists can administer these tests to the inmate himself or to a reporting party who has sufficient familiarity with the inmate to assess his abilities. To that end, Dr. Swanson administered the VABS-II and the ABAS-II to one person, Beverly Frank, who knew Bourgeois as a youth.

Dr. Moore had four people who knew Bourgeois as an adult answer questions from the ABAS-II: Michelle Armont (a childhood friend), Rhonda Davis (co-worker), Danny Clark (co-worker); and Nathaniel Banks (childhood friend). Both Dr. Swanson and Dr. Moore asked the reporting individuals to fill out the VABS-II and the ABAS-II which, through a long series of questions, explored Bourgeois' proficiency at certain activities.

Experts in *Atkins* cases measure retrospectively what an inmate could do at a given point in time, often decades before. Here, for example, Dr. Swanson asked reporting individuals to recount what aptitudes Bourgeois had in his young childhood, nearly thirty years earlier. Dr. Swanson and Dr. Moore came to diametrically opposed conclusions about Bourgeois' abilities, confirming that "[t]he assessment of adaptive functioning deficits is no easy task." *Wiley*, 625 F.3d at 217. *Atkins* has made that inquiry a particular challenge for the mental health practitioners. Designers intended that the testing instruments which measure adaptive skills would make a contemporaneous assessment of functioning. By definition, psychology's conceptualization of mental retardation centers on the formative period, which ends for their purposes on an individual's eighteenth birthday. Yet the Constitution prohibits infliction of a death sentence before age 18, *see Roper v. Simmons*, 543 U.S. 551 (2005), ensuring that observations in an *Atkins* case will take place after the developmental period. As Dr. Swanson explained, the *Atkins* inquiry asks the psychological profession to do something its testing instruments were never designed to do: make a retrospective evaluation of an individual's adaptive behavior. (DE 594 at 193).

Caution attends undue reliance on those backward-glancing assessments. The retrospective

69

USCA5 5803

review assumes that those reporting on an inmate's past adaptive abilities can provide competent, honest, and objective observations of his abilities.  Thus, the AAIDD 11th Edition warns to use respondents who are "very familiar with the person and have known him/her for some time and have had the opportunity to observe the person function across community settings and times."  AAIDD 11th at 47.  Care must be taken to extract information from those with sufficient familiarity and understanding to provide reliable data.  The professional organizations recommend "that because the adaptive functioning assessment typically takes the form of interviewing third-parties, the respondent should be someone who is well acquainted with the subject's behavior over an extended period, such as a parent, teacher, or direct-service provider."  *Wiley*, 625 F.3d at 218 (quoting AAMR 10th ed. at 85).  Also, as became a concern in this case, the responder should be one with sufficient age, maturity, and understanding during the time period they observed the inmate to provide a reliable assessment of their behavior.  To that end, the AAIDD 11th instructs "for clinicians to assess the reliability of any respondent providing adaptive behavior information."  AAIDD 11th, at 47.[51]

The process also assumes that time has not dimmed accurate memory.  For instance, the experts administering the standardized assessment tests turned the reporting individual's attention to a specific point in the developmental period, highlighting attendant concerns about memory loss and other factors which degrade the reliability of information.  As Dr. Moore explained, "the struggle with the adaptive functioning measures in an adult is the farther you go back, the less reliable the information is." (DE 599 at 197).  The testing performed by Bourgeois' experts asked people to look back over decades to evaluate what Bourgeois could do at a young age.  Time blurs memories,

---

[51]    Dr. Swanson agreed that the adaptive-deficits tests were normed for retrospective evaluations, their reliability in that capacity is unknown, and thus their results should be interpreted with caution. (DE 594 at 145).

USCA5 5804

relationships may taint perspective, and a lack of contemporaneous accounts degrades reliability. This concern becomes particularly important when, knowing that their information may make a difference between life and death, mental health professionals ask loved ones to look back decades and evaluate an individual's aptitudes.

While psychology has apparently tried to provide its practitioners a means to ascertain intelligence retrospectively, *see* AAIDD 11th at 95-96, mental retardation as understood by *Atkins* complicates the traditional methods of the mental health community. To that end, Dr. Swanson acknowledged that the reliability of using the adaptive-functions measures in a retrospective evaluation was unknown and that caution should attend reviewing the results. (DE 594 at 145).

a.    The Woodcock-Johnson

Dr. Swanson administered the Woodcock-Johnson to assess whether Bourgeois had deficits in the functional academic or conceptual categories. She explained that the "Woodcock-Johnson would meet the gold standard of an academic achievement test. It's actually a battery of many tests assessing many types of adaptive skills and then collapsing them into broad areas." (DE 594 at 44). As a result of his Woodcock-Johnson scores, Dr. Swanson determined that Bourgeois lacked adaptive skills in two subcategories of the AAIDD's conceptual domain. She testified that, in the functional academic category, his scoring showed the intelligence of an elementary school child: "His academic fluency is at the fifth grade level and his actual ability to apply academics actually is at the third grade level, so this is consistent with what you would see with a person who has mild mental retardation." (DE 594 at 58). In oral communication, she opined:

> [I]n that test you give them oral comprehension and other tests that probe for oral language and listening comprehension. On . . . the first two broad cluster scores . . . his scores . . . were at the third grade level and the fourth grade level. Overall that was like at a 9th to 16th percentile, which is consistent, in my opinion, with people having communication deficits which is also under conceptual.

71

USCA5 5805

(DE 594 at 58-59). Because Dr. Swanson explained that individuals with mental retardation may "function overall at about as high as a sixth grade level," (DE 594 at 45), she opined that his lowest scores on the Woodcock-Johnson indicated impairments in the conceptual adaptive domain under the AAIDD and the functional academics area of the APA.

Nevertheless, Dr. Swanson conceded on cross-examination that Bourgeois scored well in several areas of the Woodcock-Johnson. (DE 594 at 143-44). In essence, she focused on his areas of weakness without fully considering his strengths. Dr. Moore described Bourgeois' scores: "By and large, he's functioning in the lower part of the low average range, with a couple of areas that he was significantly below in." (DE 599 at 109). Based on Bourgeois' scores which generally fell outside the impaired range, Dr. Moore disagreed that Bourgeois' Woodcock-Johnson scores indicated global adaptive deficits. He testified that, "in comparison to the general population," Bourgeois was not impaired. (DE 599 at 108-09).

b.    The ABAS-II and the Vineland

Dr. Swanson administered the ABAS-II and the VABS-II to Ms. Frank, asking her to focus on Bourgeois' adaptive abilities when he lived with her grandmother, Ms. Mary, at age seven. Dr. Swanson's testing served as the basis for other experts to find adaptive deficits. Dr. Cunningham, for instance, accepted Dr. Swanson's testing as a valid measure of Bourgeois' abilities. Based on several answers on the ABAS-II and the Vineland, the Court questions whether Ms. Frank could accurately assess Bourgeois' aptitudes. As discussed below, Ms. Frank's answers suggest that Dr. Swanson should have exhibited more care in selecting her only informant.

Dr. Swanson characterized Ms. Frank as a "prime subject to whom to administer the Vineland-II instrument." (GX-175 at 2; DE 459 at 28). Interestingly, Dr. Swanson did not select an informant who lived with Bourgeois or knew him for a long period of time. Ms. Frank is

USCA5 5806

approximately sixteen years older than Bourgeois.[52]  She moved away from the Bend – the

community Bourgeois grew up in – when she was a teenager, but "came in daily to check with her

grandmother.  She sometimes stayed at night with her grandmother." (DE 594 at 68).  Her daily

observation, however, only lasted for several months while she was unemployed. (DE 597 at 94-95).

Dr. Swanson selected as an informant someone who only saw Bourgeois daily for only a brief period

when he was a young child.

Dr. Swanson testified that, in her opinion, Ms. Frank "got to observe her grandmother as she

was working with him, so she had direct knowledge on a daily basis of how he met these different

skills." (DE 594 at 72).  In a supplemental report, Dr. Swanson described Ms. Frank as someone

who was "in a position to observe [Bourgeois] extensively, across multiple settings, over a long

period of time." (PX-33 at 2).[53]  However, Ms Frank's limited contact with Bourgeois during a brief

period of his youth constrained her ability to answer questions reliably.  Dr. Swanson conceded that

the best practice would have been to pick an informant who could assess the inmate nearer his

eighteenth birthday. (DE 594 at 147, 155).  Still, she thought that Ms. Frank could answer her

---

[52]    Dr. Swanson asked Ms. Frank to evaluate Bourgeois for the time period when he was seven years old.  Dr. Swanson erroneously assumed that Ms. Frank was a teenager when she observed Bourgeois, (DE 594 at 72), when she was actually in her early twenties.  Bourgeois was seven years old when he moved in with Ms. Mary, making Ms. Frank about 23 or 24.  She had moved away from the community before Bourgeois was born.  However, she would visit her grandmother "two or three times a week, and sometimes on weekends" but visited her more frequently when she was out of work. (DE 597 at 93, 95).  Ms. Frank had contact with Bourgeois for about two years. (DE 597 at 113).  After that, she only saw him occasionally. (DE 597 at 117).

[53]    Still, Dr. Swanson testified that she "had a lot of concerns on whether Ms. Franks was a good informant or not and how much she would remember[.]" (DE 594 at 73).  Dr. Swanson seemed to base her conclusion that Ms. Franks was a reliable informant on the fact that she answered all the questions on the ABAS-II.  After finding that Ms. Franks could answer all the questions on the ABAS-II, she administered the Vineland. (DE 594 at 73).  The Vineland produced scores in "the mild deficit range[.]" (DE 594 at 75).

USCA5 5807

questions most clearly.  (DE 594 at 147).

Ms. Frank's assessment of Bourgeois' abilities presumed a confidence in her memory that negated the decades since she had observed him.  Ms. Frank answered questions on the testing without making any guesses at how Bourgeois could function.  Dr. Moore found it "surprising . . . that she was able to recall back to that and not guess on anything." (DE 599 at 222).  The conflicting answers she gave suggest that Ms. Frank could not reliably assess Bourgeois' adaptive abilities.  For instance, on the Vineland Ms. Frank reported that Bourgeois could not even hold a fork at age seven, which indicates a degree of impairment far greater than that even suggested by his low IQ scores. In contradiction, on the Vineland Ms. Frank said he could correctly hold a fork.  (DE 594 at 152).[54] She reported on the ABAS II that Bourgeois could not form a sentence using nouns and verbs.  Aside from indicating that she could not properly assess Bourgeois, this answer conflicted with her answer on the Vineland that he could form proper sentences.  (DE 594 at 153-54).  In her evidentiary hearing testimony, Dr. Swanson acknowledged these problematic answers but explained that they would not weigh against using Ms. Frank as an informant.  The best Dr. Swanson could say is that it would be more reliable to have had more than one reporting individual, and preferably someone who knew Bourgeois along a variety of settings closer to age 18.  (DE 594 at 155).

Dr. Moore also administered the ABAS-II, but did so to multiple respondents.  Dr. Moore explicated: "we want to have people who know the individual well and across a variety of settings. Certainly, we want to be aware of whether the person has a vested interest in the outcome. So we want to make sure we get good and objective data. And in a forensic setting, that becomes even more of a challenge." (DE 599 at 104).  His focus, however, was not on Bourgeois' childhood; Dr. Moore

---

[54]    While Dr. Swanson did not rely in the ABAS-II in her report, her evidentiary hearing testimony treated the results from both testing instruments as valid.

74

USCA5 5808

selected respondents who observed Bourgeois both closer to age 18 and when he was older. Dr. Moore explained that he selected informants who had "known Mr. Bourgeois over a fairly extended period – in this case, I was trying to look for, you know, a number of years – and they had been able to spend social time with him, had seen him on a more casual basis[.]" (DE599 at 174). Because Dr. Moore doubted the validity of the results on the ABAS-II from two of the four informants he selected,[55] he only based his assessment on the information provided by Michelle Davis and Nathaniel Banks.

Ms. Davis was a dispatcher at the trucking company where Bourgeois worked for years. She "and her family had known [Bourgeois] for many, many, many years, but also she talked about some of the times that they had talked when her mom brought meals in and things like that." (DE 599 at

---

[55]    Dr. Moore discounted the results he obtained from Ms. Armont. He explained: "In looking at the results of the ABAS that Ms. Armont had completed, there were significant questions about validity of that measure. I had concerns while she was taking it, but in looking at the results, those concerns were certainly verified." (DE 599 at 118). Ms. Armont claimed that Bourgeois was so debilitated that he could not perform functions which the record amply proved that he could do. Dr. Moore suggested that someone had instructed her to answer the questions in a way that would make Bourgeois seem retarded. (DE 599 at 188). Dr. Moore testified: "And Ms. Armont's scores, or the results from the administration to Ms. Armont was significantly below that, significantly different from that. He was in the, basically in the average range, average to slightly above average on the conceptual, social, practical and global for Davis and Clark. He was in the significantly impaired range for Ms. Armont." (DE 599 at 131). Dr. Moore also discounted the scores from Bourgeois' co-worker for fifteen years, Danny Clark. Dr. Moore explained: "Mr. Clark, it became apparent that he had not fully understood the instructions for the ABAS, and thus had completed the form in a manner that invalidated the scores." (DE 599 at 123). Specifically, he made too many guesses about Bourgeois' abilities. (DE 599 at 165). Mr. Clark, however, testified in the evidentiary hearing. From his testimony, he obviously never considered Bourgeois mentally retarded. He described Bourgeois as a competent driver, neat and clean in his appearance, polite, and in other ways much different than the severely impaired individual described by Dr. Swanson. Dr. Moore also attempted to administer the ABAS-II to Claudia Williams, but "she decided not to complete the ABAS because she indicated she didn't want to do anything that could be potentially of harm to her brother." (DE 599 at 119).

75

USCA5 5809

174).  Ms. Davis' answers on the ABAS-II resulted in generally average or above average score.[56]

Ms. Davis testified in the evidentiary hearing.  She was a friendly, credible witness who seemed to have fond remembrances of Bourgeois.  She testified that nothing hinted that he was mentally retarded or even slow.  (DE 595 at 151, 184).

Mr. Banks did not testify in the evidentiary hearing.  Dr. Moore explained that Mr. Banks "was a childhood friend of Mr. Bourgeois and knew him throughout his childhood up to the point that they graduated from – well, knew him throughout his life, but had ongoing contact with him until he was about 18." (DE 599 at 196).[57]  Dr. Moore relied on Mr. Banks because "it seemed clear that they knew each other well, that they had a good friendship, but also that Mr. Banks seemed willing to ask his friend about inconsistencies, and seemed to be really trying to get a bead or understanding about what had happened."  (DE 599 at 216).  Importantly, Dr. Moore asked Mr. Banks to assess Bourgeois age right at about 18.  Mr. Banks' assessment was somewhat lower than the others Dr. Moore used, but that suggested "an upward course of improvement in adaptive functioning."  (DE 599 at 218).  Even so, Mr. Banks only rated Bourgeois below average in two areas, the rest being average or above average.  (DE 599 at 218).[58]

---

[56]  While Ms. Davis made many guesses on the ABAS-II, Dr. Moore opined that it did not invalidate her scoring because "she was certainly a very fastidious, perhaps over-cautious, in endorsing guessed items. But she made seemingly, was vigilant to, if she didn't see it happen, that she checked a guess on there. So there was certainly a lot of guessed responses on there, and she appeared to be, again, taking that, you know, very much tuned into that issue." (DE 599 at 126).

[57]  Mr. Banks testified in the guilt/innocence phase that Bourgeois and his family visited before the murder.  Mr. Banks described JG1999 as sad and bruised.  Bourgeois told him that he natural mother neglected her and her mother's boyfriend abused her.  (DE 344 at 109-111).

[58]  In the evidentiary hearing, Bourgeois objected to any discussion of Nathaniel Banks' ABAS-II responses because the Government did not call him as a witness.  (DE 599 at 120-21).  The Court sustained that objection.  (DE 599 at 121).  Bourgeois, however, later opened the door to

(continued...)

76

USCA5 5810

Dr. Moore's ABAS-II testing generally resulted in scores falling within the average range, with only a few in the below-average category. None of the responses in Dr. Moore's testing suggested significant impairment. In Dr. Moore's opinion, Bourgeois' "adaptive functioning was generally in the skill level expected of the average adult male." (GX-15 at 12). Dr. Moore's testimony, which the Court still must approach with caution because of its retrospective focus, more credibly measured Bourgeois' functioning. As discussed below, the lay testimony that came before the Court amply supported the conclusions from Dr. Moore's testing.

2.    *Lay Accounts of Bourgeois' Functioning*

Standardized testing instruments cannot provide the only data for finding functional adaptive deficits. The AAIDD 11th instructs that "[o]btaining information from multiple respondents and other relevant sources (e.g., school records, employment history, previous evaluations) is essential to providing corroborating information that provides a comprehensive picture of the individual's functioning." AAIDD 11th, at 47.[59] Dr. Swanson provided a supplemental declaration after she interviewed several informants. (PX-33). From those interviews, she painted the picture of Bourgeois as a profoundly impaired individual. She described Bourgeois as a "significantly deficient" person who relied on "family, friends, and co-workers . . . in order to perform daily life activities." (PX-33 at 2). Of those informants, Claudia Williams, Beverly Frank, Brenda Goodman,

---

[58]    (...continued)
consideration of Mr. Banks' responses by asking Dr. Moore about them. (DE 599 ay 198, 215).

[59]    "If adaptive behavior assessment are used and reported in the records reviewed, clinicians should weigh the extent to which (a) multiple informants were used and multiple contexts samples; (b) that limitations in present functioning were considered within the context of community environments typical of the individual's age peers and culture; (c) important social behavioral skills, such as gullibility and naïveté, were assessed; (d) behaviors that are currently viewed as developmentally and socially relevant were included; and (e) adaptive behavior was assessed in reference to typical and actual functioning in the community." AAIDD 11th, at 46.

77

USCA5 5811

Carl Henry, Murray Bourgeois, and Donald Resse testified in the evidentiary hearing. A review of

the evidentiary hearing testimony confirms that Dr. Swanson should have more critically examined

the data upon which she based her conclusions. The testimony from Bourgeois' witnesses was as

follows:

- Bourgeois' sister Claudia Williams could provide broad outlines showing that he had a difficult childhood, but she was not a good historian. To some extent, her confusion was understandable. She was young when she interacted with Bourgeois and was asked to evaluate his aptitude based on her childhood observations.[60] Her testimony showed that she had unreasonable expectations about the tasks Bourgeois should have been able to perform as a child. For example, Ms. Williams expected Bourgeois to clean the bathroom by himself at age four. (DE 597 at 29-30). She described how, when she was about twelve, she would occasionally help him with his Kindergarten homework because he was "very slow." Her assistance, though, consisted of mostly helping him "writing [his] ABC's," a skill that the experts agree he excels at now. (DE 597 at 36-38, 58-59). Unlike some other witnesses, Ms. Williams observed Bourgeois near the end of the developmental period. Bourgeois moved in with Ms. Williams when he was "probably about 18 or 19, something like that." (DE 597 at 39). Dr. Swanson primarily used Ms. Williams' account from that time period to assume that Bourgeois would "rely on [Ms. Williams] for cooking and washing his clothes and things like that." (DE 594 at 91). It was not clear, however, that Bourgeois was incapable of performing those actions; it was clear from her testimony that Ms. Williams was the one in the house that cooked. (DE 597 at 64). She reported that by then Bourgeois dressed himself and had good hygiene. (DE 597 at 40-41). In all, her testimony, while somewhat confused, suggested that any gross impairment in Bourgeois' youth did not extend into his later teenage years.

- Beverly Frank provided detailed testimony about Bourgeois. As previously noted, she observed him as a youth when she, in her twenties, visited her grandmother's house. Ms. Frank explained that he was slow and had problems understanding the games played by the other children. (DE 597 at 98). She identified problems he had at about age seven such as counting

---

[60] The Government's objection to her testimony summarized the inherent problems with relying on her as a reliable witness: "Your Honor, I'm going to object. She's asking for some kind of retroactive interpretation of a 12-year-old, that's how old she would have been . . . How can she make, how can she make that opinion? I mean, it's ludicrous, a 12-year-old, from the eyes of a 12-year-old, and what is she now? At least 39." (DE 597 at 31).

USCA5 5812

change, dressing in mismatched clothing, and properly buttoning a shirt. (DE 597 at 98-99, 109-10). She, however, did not have contact with him as he aged.

- Brenda Goodman, another of Ms. Mary's granddaughters who was 12 years older than Bourgeois, also testified. Ms. Goodman moved away from the Bend around the time of Bourgeois' birth, but would visit regularly. She testified that when young Bourgeois could not put his shoes on the right feet, wear appropriate clothing, button his shirt, or follow directions well. (DE 597 at 138-39). He had problems communicating because he stuttered. (DE 597 at 139). She, however, also testified that Bourgeois would "pitch in" to help with his brother who had cerebral palsy. (DE 597 at 134). Her testimony, nevertheless, did not address Bourgeois' functioning closer to the end of the developmental period.

- Donald Reese, a co-worker from when Bourgeois first began driving, testified about events that led him to question Bourgeois' intelligence. However, he could not provide specific information that conclusively pointed to mental retardation. For example, Dr. Swanson relied on Mr. Reese to assume that Bourgeois only secured his driver's licence by obtaining the exam answers beforehand. Mr. Reese related that many drivers cheated on the examination for their chauffeur's licence, however he had no personal knowledge if Bourgeois cheated. (DE 597 at 391-92). Dr. Swanson relied on Mr. Reese to show Bourgeois' alleged difficulty in operating a truck independently. For example, Mr. Reese said on the first day he and Bourgeois were assigned as team drivers, Bourgeois got in the cab and began pushing buttons randomly until he found one to make the truck go. (DE 597 at 368-69). However, from his testimony it became clear that he did not know if Bourgeois had been trained on that particular truck. Mr. Reese himself did not know what all the buttons did. (DE 597 at 380-83). Mr. Reese described two occasions in which Bourgeois became lost, one of which landed the trailer in a ditch. (DE 597 at 371-75). He also suspected that Bourgeois did not prepare properly for a three-week route (DE 597 at 377-78), but did not specifically testify that he had problems with hygiene. Mr. Reese's testimony added little to the question of whether Bourgeois is mentally retarded.

- Bourgeois' cousin, Carl Henry, testified that he had problems as a child learning new games and riding a bicycle. (DE 597 at 324, 360). After Bourgeois had already been employed at his first job, Mr. Henry played some part in Bourgeois getting a position to drive a "buggy truck" that picked up shopping carts in local neighborhoods. Mr. Henry did not describe any problems Bourgeois had in performing that job. When they moved him up to a delivery truck, but "he had a few problems," so they moved him back to the buggy truck. (DE 597 at 326). With additional training, however, he moved back to the delivery truck. (DE 597 at 327). Mr. Henry, however,

79

USCA5 5813

still had to help Bourgeois fill out forms. (DE 597 at 329). Years later, when Mr. Henry drove with Bourgeois he noticed that he would not use the new communication system in his truck, but would call the dispatcher instead. (DE 597 at 337). He still then had others help with his paperwork. (DE 597 at 338). This testimony, however, conflicted with that from the Government's witnesses who said that Bourgeois could perform all the duties of a truck driver without assistance.

- Murray Bourgeois testified how, when he returned from military service and his cousin was ten, Bourgeois hung around his mechanic's shop but he could not grasp how to work on cars. (DE 597 at 399). He explained that Bourgeois was "slow to catch on. This mechanic thing was like too fast of a pace for him. (DE 597 at 399-400). He testified that Bourgeois had problems when first driving an 18-wheeler and was unsafe. (DE 597 at 400). As an adult, Bourgeois was " slower than most of the guys, you know, catching on to a lot of things." (DE 597 at 401). One time, Bourgeois claimed to be able to ride a three-wheeler ATV, but crashed it. (DE 597 at 402-03). His testimony, however, only showed that Bourgeois "wasn't used to riding it." (DE 597 at 403, 413).

Taken together, the testimony about Bourgeois' childhood and young adulthood suggests that he was slower than other youth, but the reliability of those accounts are impaired somewhat by a failure to have age-appropriate expectations for his behavior. Most of the impairments described consisted of difficulty learning new concepts or activities. For instance, Mr. Henry described how Bourgeois had some difficulty learning to drive some vehicles, but he obviously became proficient with time. Bourgeois succeeded when given more time or training. While Murray Bourgeois still considered him slow, he could obviously learn to operate competently in society. Bourgeois' childhood friends and his relatives testified that he was slow as a youth, but the information was mixed as he got older.

The Government's witnesses described competent adaptive abilities as an adult. The Government called Danny Clark, Robert Patterson, William Shots, Christopher Key, and Rhonda Davis as witnesses to describe Bourgeois' aptitudes as an adult. Each of the Government's witnesses knew Bourgeois in the work context, some of whom had worked for the same trucking company as

80

USCA5 5814

him for many years.  Their descriptions of his work ability ranged from being a competent truck

driver (DE 595 at 7) to an "above-average driver" (DE 595 at 59) to one of the "top two or three

drivers" (DE 595 at 62) to one who customers often complimented and requested (DE 595 at 75-77,

114).  Bourgeois completed entries in his log book satisfactorily (DE 595 at 60, 85) and examined

his load slips for accuracy (DE 595 at 184).  He could figure out how many miles he had traveled

and how many more he could travel in order to comply with regulations.  (DE 595 at 18).  One

witness assured that Bourgeois knew how to work the onboard computer because he was the only

one in the truck at times.  (DE 595 at 100).[61]  He did not just travel dedicated routes but navigated

throughout the nation without apparent difficulty.  (DE 595 at 93-94).[62]  In fact, one witness

described him as an "overachiever."  (DE 595 at 113).  His appearance and grooming were beyond

presentable, but noteworthy.  He had a "very professional appearance."  (DE 595 at 149).  In short,

none of the Government's witnesses suspected that Bourgeois had mental impairments.  The Court

found each of the Government's witnesses to be credible, reliable informants of Bourgeois' abilities

as an adult.

### 3.    Bourgeois' Adaptive Abilities

The evidentiary hearing and record create a complex picture of Bourgeois' life, resulting in

an entangled mosaic of strengths and limitations.  Without question, Bourgeois' life manifested some

level of difficulty at certain points in his life.  This Court's task in reviewing *Atkins* second prong

is to decide whether, on a global level, those problems amount to significant deficits in adaptive

---

[61]    After the murder Bourgeois told FBI agents that "the trucking company could see his location and send him messages via his computer, and he could send messages back to them via computer." (DE 344 at 181).

[62]    Dr. Price's videotaped examination showed that Bourgeois could use a map to navigate.

USCA5 5815

functioning. As previously mentioned, this Court's review differs from that employed by the psychological community. The Court looks at the underlying credibility of the witnesses who reported about Bourgeois' scores on the ABAS and Vineland. Also, the Court compares the alleged deficiencies against his whole life experience.

In some respects, Bourgeois is a subject whose precise faculties are difficult to pin down. Bourgeois' narcissistic tendencies make him exaggerate his abilities and present himself as more capable than he is. He overestimates what he can do and likes to present himself in the best possible manner. Dr. Swanson correctly noted that "he wants to present well, he presents very well." (DE 594 at 101). Bourgeois' narcissism may mask impairments and camouflage poor adaptive skills. At the same time, exaggeration of weaknesses gives a distorted view of his complete capacities.

One persistent problem in this case has been that Dr. Swanson took at face value statements made about Bourgeois' abilities without assessing them for credibility, testing them for validity, or weighing them against things known about his life. As previously noted, some of the witnesses who testified in the evidentiary hearing lacked a reliable ability to remember credibly events that transpired many years before. Also, the inherent desire to save a loved one from a death sentence can alter recollections in his favor. Dr. Swanson's failure to test the validity of the lay interviews highlights the challenge in adjudicating *Atkins*' second prong and makes her conclusion that he had adaptive deficits not credible. Unlike Bourgeois' experts, the Court cannot rely on his scores from his expert's adaptive-limitations testing because the witnesses could not accurately report his abilities.

A fuller examination of Bourgeois' life calls into question the testimony implying that he had severe impairments as a child. The tenuousness of the evidence supporting his claim of having deficient adaptive functioning becomes evident when considering the three areas that Dr. Swanson

82

USCA5 5816

identified as supporting a diagnosis of mental retardation: functional academics; social/interpersonal skills; and health and safety).[63]

*Conceptual Domain - Functional Academics* Dr. Swanson based her opinion of Bourgeois' aptitude in functional academics on his scores on the Woodcock-Johnson and on her lay interviews.[64] The experts debated whether his scores on the Woodcock-Johnson supported a diagnosis of mental retardation. Dr. Moore explained that most of his scores on that test were not low enough to indicate mental retardation.[65] Bourgeois scored low on some areas, but also in the high school range for spelling and reading. The testing provided a mixed picture of Bourgeois' mental abilities, but on the whole, he scored in a range above that signaling significant impairment. His testing on other instruments such as the WRAT-III confirmed that, while his scores in arithmetic dropped to the threshold allowable for mental retardation, the remainder of his scores were in the high school proficiency range.[66] Test scores did not persuasively show that Bourgeois had adaptive deficits.

---

[63] Because her evidentiary hearing testimony mentioned that she found adaptive deficits, but did not extensively discuss which factors supported each category, the Court's discussion also relies on Dr. Swanson's supplemental report.

[64] Dr. Swanson opined that the DSM-IV-TR's functional academic skill area overlaps with the AAIDD's conceptual domain. (PX-33 at 3).

[65] Dr. Moore explained that "a person with mental retardation is significantly impaired. Generally about two standard deviations below the mean. And the standard scores here have a mean of 100 and a standard deviation of 15. So two standard deviations below the mean or significantly impaired would be a score of about 70 or below." (DE 599 at 108). Most of Bourgeois' scores were at 80 or above, though five subparts were at 70 or below (brief math, story recall, applied problems, and story recall delay).

[66] Dr. Weiner and Dr. Gelbort administered the Wide Range Achievement Test-III (WRAT-III). Dr. Gelbort testified that the Woodcock-Johnson "is much more in depth and gets at the same stuff, but with a lot more accuracy and validity [that the WRAT-III], because it's looking at a deeper level." (DE 560 at 43). On both tests, Bourgeois scored at the grade equivalent of high school in reading and spelling, and at the fifth or sixth grade level in arithmetic. Dr. Swanson relied

(continued...)

83

Lay depictions of Bourgeois' schooling should bolster his scoring on objective testing.  As explained in her supplemental report, Dr. Swanson based her finding of functional academics on the following factors:

- individuals said that Bourgeois failed a grade early in school;

- others helped him with his elementary school homework, but he did not seem to understand the concepts;

- in elementary school he received speech therapy;[67]

- he relied on others for help, including in high school he had others do his homework;

- others helped him complete job applications;

- he received written answers to driver's licence examinations beforehand;

- he had difficulty managing and understanding money.

(PX-33 at 3).

The evidentiary hearing testimony, however, failed to verify or support most of those factors. Some testimony suggested that Bourgeois was held back a grade in elementary school.  Even so, the record leaves silent whether this was because of mental retardation, another learning disability, or even absenteeism. The unavailability of educational records hampered a probing look into his school years, but existent material shows that he graduated from high school with adequate grades.  While testimony suggested that he may have been held back from one grade, his unstable home life does not preclude excessive absences, the hampering effects of a deprived home environment, or a general

---

[66]    (...continued)
on the low score in arithmetic to find deficits in functional academics.

[67]    Dr. Swanson never explained how speech therapy necessarily showed mental retardation instead of some other impairment.

USCA5 5818

lack of effort from being the cause for that decision.

The record now before the Court does not suggest that Bourgeois did not earn the admittedly low, but not failing, grades he attained in high school. No one testified that Bourgeois needed assistance with homework in high school. Bourgeois graduated from high school with all passing grades. His school records do not show any accommodation for mental retardation and no one testified that he did not earn the grades he received. Even taking into account the testimony that he had problems learning in the early years, no one testified about his ability to perform in high school, the only period for which records remain.[68]

Also, Dr. Swanson opined that she had received information from Donald Resse, a former coworker, that Bourgeois had received the answers to the driver's licence exam beforehand. (DE 594 at 162). However, Mr. Reese testified that it was common for applicants to have the answers beforehand, but he had no personal knowledge that Bourgeois had received help. (DE 597 at 392). Dr. Swanson assumed that Bourgeois had cheated on his driver's licence exam, but did not explore whether the facts would prove that supposition. Dr. Swanson also assumed that his employer recruited him because he was mentally retarded, though she admitted that she did not have any personal information that it was so. (DE 594 at 95).

In addition, while considering that Bourgeois had problems with money Dr. Swanson did not consider the whole of his financial dealings. Dr. Swanson looked at a limited amount of information

---

[68]    Dr. Swanson apparently selected evidence that supported her conclusion that Bourgeois had mental retardation, but never probed that information for validity or reliability. For instance, she never explored the extent to which Bourgeois needed help in school and how long that need persisted. Claudia Williams testified that Bourgeois had problems doing his homework in elementary school and he "was very slow. You had to constantly show him what to do and how to do it." (DE 597 at 17, 27). But Ms. Williams was confused about when she helped, what she helped with, and how much help he needed. On cross-examination, Ms. Williams testified that Bourgeois received better grades than she did in high school. (DE 597 at 62).

USCA5 5819

suggesting that Bourgeois made poor financial decisions. (DE 594 at 163-64). In her supplemental report, Dr. Swanson listed the information she relied upon to find an inability to manage finances: Bourgeois' brother "provided him a lot of assistance in financial matters. He had signed a lease that had put him in considerable debt on this truck that he had. He had fallen behind on paying on his house. He owed money on credit cards." (DE 594 at 164). But it was evident that Dr. Swanson had not looked at all his financial deals nor factored into her consideration his whole abilities. She saw how he meticulously tracked his financial affairs, as later explained by Dr. Moore. (DE 599 at 133-38). She watched his interview with Dr. Moore in which he elaborated on how he successfully operated in the trucking industry. (DE 594 at 163). She heard how Bourgeois blamed his financial misfortunes on Robin Bourgeois' overspending. (DE 594 at 163, 174). Dr. Swanson, however, only factored into her analysis at information that suggested poor money skills without probing the reliability of the information before her, the etiology of the alleged problems, whether financial difficulties came from mental retardation or other factors, or strong indications that Bourgeois understood how to handle money. Bourgeois was not a financial genius, but the evidence did not persuasively demonstrate that mental retardation was to blame for his money problems. Dr. Price credibly thought that "[l]iving beyond his means and being in financial trouble is more likely related to his personality disorder, especially his impulsivity and sense of entitlement." (GX-1 at 9). Bourgeois' money management showed "a personality disorder trait or . . . a maladaptive personality trait," not mental retardation. (DE 595 at 223).

Dr. Swanson's reliance on Bourgeois' writing ability to show adaptive deficits exemplifies her myopic review. For instance, Dr. Swanson included her observations of how long it took Bourgeois to write a paragraph as an indicator of deficits. (DE 594 at 50-51, 54). She felt that he took an unreasonable amount of time to write, but would not factor the content of his writing into

86

USCA5 5820

her analysis. When the Government challenged her conclusions, Dr. Swanson became defensive and would not accommodate any information that disproved her conclusions. Dr. Swanson admitted that the content of his letters provided "an example that does not support [her] conclusion," but did not revise her conclusion on that basis. In another example, Dr. Swanson assumed that Bourgeois had difficulty understanding and managing money because he made unwise financial deals, (DE 594 at 163), although he assiduously maintained his checking account. Dr. Swanson opined that it "took [Bourgeois] much, much longer than it did the typical person" to learn to drive a truck, but he did learn and apparently did it with adequate proficiency. (DE 594 at 100). Cherry-picking information in isolation limits the data from which an expert draws conclusions, thus guiding the analysis.[69] Choosing narrowly the information that experts will consider leads them toward a conclusion that may not represent the inmate's full abilities.

Dr. Moore, on the other hand, took a full range of behavior into consideration when evaluating informal accounts for adaptive deficits. Dr. Moore criticized picking out individual and isolated problems because "[w]hen we look at adaptive functioning, we're looking at far more broad-based than that." (DE 599 at 206). According to Dr. Moore, Bourgeois' letter writing discounted adaptive deficits. (DE 599 at 13). Factors such as his fastidious record keeping, cogent letter writing, competent spelling, and others signal that insufficient evidence supports a finding of deficits in functional academics. Dr. Swanson lessened her credibility when she only focused on information supporting mental retardation without giving weight to or reconciling factors that disproved her conclusions.

---

[69] In fact, Dr. Swanson later refused to factor Bourgeois' long colloquies with the Court because "you can't use . . . one comment or conversation to infer and make a total global assessment of someone's adaptive abilities." (DE 594 at 179). In fact, she herself based her finding of adaptive deficits on selected, isolated information without considering the whole.

87

USCA5 5821

*Practical Domain - Health and safety* Dr. Swanson based her finding of deficits in the practical domain on Bourgeois' work history. She claimed that he has "profound delays in learning new skills." (PX-33 at 3). According to her, Bourgeois only got his first job because of his mental retardation . She related that he took longer than most to learn how to drive a commercial truck and was "sheltered at one trucking job by a relative who held a supervisory position[.]" (PX-33 at 3). Even later, he had difficulty driving and often got lost, ran over things, and received speeding tickets. He relied on others to navigate the roadways. Through his decades as a truck driver, "he would ask people to join him on his over the road jobs so that they could help him with directions and other tasks." (PX-33 at 4).

The testimony from the evidentiary hearing did not confirm that Bourgeois received his first job because of mental retardation.[70] While possibly showing that it took him longer to learn skills, the abundant evidence before the Court shows that Bourgeois was not only competent in his work skills, but he excelled at his employment.[71] While he initially had problems at his first job, he learned to drive different kinds of trucks and mastered driving tractor-trailers. (DE 597 at 358-59). Dr. Swanson never interviewed any of the witnesses who testified about Bourgeois' successful

---

[70] Dr. Swanson assumed that Ms. Mary got Bourgeois first job. (DE 594 at 93). The testimony was mixed about whether Bourgeois got his first job on his own. Only Ms. Williams, who provided less-than-believable testimony otherwise, said that her husband got him the job. *Compare* DE 597 at 43 *with* DE 597 at 350. Mr. Henry did not testify that retardation played any part in Bourgeois' hiring, his duties, accommodations made for him, or other employment decisions.

[71] Dr. Swanson also mentioned that Bourgeois had problems tying shoes, counting money, and riding a bike. Testimony about Bourgeois' impeccable dress and ability to maintain his own finances when older undercut the testimony about his inability to dress properly or count money when young, even if it may have taken him longer to do so as a youth.

88

USCA5 5822

decades as a truck driver.[72]  Dr. Moore explained that his employment as a truck driver was inconsistent with mental retardation: "This isn't a simple repetitive job that he went to in a factory putting lids on widgets, but a job that had him going out and around the country, living, at least driving independently, picking up loads, taking care of his self-care during that period, interacting with people across a lot of different certainly social styles, as we move across the country." (DE 599 at 133).

Dr. Swanson also found deficits in the APA's related area of health and safety. Dr. Swanson based her finding that he met the health and safety prong on specious evidence. For instance, she found that Bourgeois "had problems keeping himself safe" and mentioned how he "drove himself into a pole, causing himself serious injury." (PX-33 at 4).  While Murray Bourgeois testified that Bourgeois had crashed an ATV, his testimony attributed the accident more to unfamiliarity than mental impairment.  Dr. Swanson also relied on other unsafe practices, speeding tickets, and his getting lost as a support for her conclusion.  She ignored, however, the fact that he drove a tractor-trailer across the country for decades without a major accident.  His work put him on the roadways continually and the testimony did not indicate that he had ever crashed, caused a major accident, or received anything but minor injuries himself from carelessness.  Given his long and successful history as a truck driver, Dr. Swanson's finding of adaptive deficits based on his work history lessens

---

[72]    Testimony from Donald Resse included incidents where Bourgeois was lost or confused while driving, though he complained that since "[t]hat was over 20 years ago" he could not remember some specifics. (DE 597 at 386).  What Dr. Swanson did not figure into her analysis was the decades afterward that Bourgeois apparently worked as a truck driver without significant difficulty.  Even the trial testimony showed Bourgeois maneuvering about the country with an able understanding of direction and an apparent comprehension of how to perform his job effectively.  Bourgeois' many years successfully performing his job duties undercut Mr. Reese's testimony.  Other witnesses described Bourgeois' employment skills in a way that precluded blaming the problems Mr. Reese identified on mental retardation.

89

USCA5 5823

her credibility and implies that she only searched for information that would support her conclusion.

*Social Domain - Social/interpersonal skills* Finally, Dr. Swanson weakly found deficits in Bourgeois' social skills. Dr. Swanson listed Bourgeois talkativeness, which according to her made him "absolutely unable to participate in a two-way conversation" as the primary basis for this diagnosis. (PX-33 at 4; DE 594 at 166-67). Dr. Swanson saw it as a deficit, mainly because he dominated conversations. (PX-33 at 4). Dr. Price saw Bourgeois' loquacious nature, "the gift of gab," as a positive factor. (GX-1 at 8). This Court communicated with Bourgeois many times during the trial. As the record of those colloquies amply shows, Bourgeois may be talkative, but he can engage in the give-and-take of normal conversation without any hint of impairment.[73] This Court's observation of Bourgeois, both in the courtroom and in his video recordings, does not suggest any impairment in the social domain.

In the end, Dr. Swanson failed to make a full review of available evidence relating to Bourgeois' adaptive abilities. To the extent that Bourgeois may have had difficulties when younger, the record does not conclusively link those problems to mental retardation rather than a culturally deprived upbringing, poverty, or abuse. Dr. Swanson did not explore whether or not his childhood problems found their root in substantial mental impairment.

Nothing suggested that deficiencies endured into maturity.[74]  Dr. Moore more credibly

---

[73]    Dr. Swanson also mentioned how Bourgeois' family "tolerated [his] odd manner" and how he had "informal supports to help him initiate and maintain any semblance of relationships." (PX-33 at 4). The record simply did not bear out these extreme statements.

[74]    Of the DSM-IV-TR's three areas, Dr. Swanson only found conclusive evidence of one as Bourgeois aged. She testified that there was "firm evidence of conceptual deficits persisting into adulthood." (DE 594 at 105). While she saw "problems in his practical skill[s]," she explained that they were not "sufficient deficits that would qualify in the area of practical." (DE 594 at 104). She saw "a lot of deficits in the area of social" which merged with his personality disorder, but

(continued...)

90

USCA5 5824

explained: "while his functioning may have been relatively impaired in his early childhood, he appears to have developed greater independence of functioning by the time he finished high school." (GX-15 at 16).[75] Bourgeois operated with remarkable competency in the free world for one with low IQ scores. A broad review of the evidence does not make Bourgeois' claim of adaptive deficits believable.  To the extent that Bourgeois showed problems in his life, such as in functional academics, the evidence does not unquestionably place the blame for those deficiencies on mental retardation, instead of on a failure to exert sufficient effort, possibly in conjunction with additional psychological or behavioral problems. Bourgeois has not made a convincing showing that he suffers from significant adaptive deficits that would serve as a predicate for mental retardation.  The record shows strengths that more than coexist with weaknesses, they call into question the depth and accuracy of reports of those weaknesses. The Court finds that Bourgeois has not shown substantial adaptive deficits by a preponderance of the evidence.

D.    **Manifestation of Limitations Before Age 18**

The evidence before the Court failed to point to any pronounced intellectual impairment before Bourgeois' eighteenth birthday.  Bourgeois has not shown that he is now, was at the time of the crime, or was during the developmental period, mentally retarded.  Some evidence indicated that

---

[74]    (...continued)
seemed more unsure of whether they were significant deficits.  (DE 594 at 104-06).

[75]    Dr. Estrada explained: "I have seen reports from his school indicating very low performance, reports from family members and friends indicating that he was slow to understand things, had difficulty making correct decisions, et cetera, et cetera.  And I have also read reports and information of being able to take care of business and good reports, so I have had a mixed review regarding his cognitive capacities throughout his life." (PX-163 at 32).  Again, the record "gives a mixed picture of good things, bad things" but Bourgeois clearly "had a good adaptive capacity in many areas of functioning." (PX-163 at 37).  Dr. Estrada blamed other psychological issues, like rage episodes, for the problems in Bourgeois' life.

91

USCA5 5825

Bourgeois was a slow learner and took additional time to complete tasks while young. The Court, however, must balance that information against indications that mental retardation did not plague his youth.

As previously discussed, problems with time and perspective plague the most-developed lay testimony about his intellectual functioning as a youth. The evidence may show some problems before Bourgeois eighteenth birthday, but does not convincingly point to a diagnosis of mental retardation before that point in time.[76] The Court finds that Bourgeois has failed to meet all three prongs of the *Atkins* analysis.

**E.      Trial Counsel's Failure to Develop Evidence of Mental Retardation**

In conjunction with his *Atkins* claim, Bourgeois faults defense counsel for not developing evidence of his alleged mental retardation at the time of trial. Evidence of possible mental retardation would play two roles in the sentencing phase. First, mental retardation could preclude a death sentence under the FDPA, 18 U.S.C.A. § 3596(c), and *Atkins*. Second, trial counsel could develop evidence of Bourgeois' possible mental retardation as testimony to mitigate against a

---

[76] Even to the extent that Bourgeois has shown some signs of intellectual disability, his claim to have suffered traumatic brain injury hampers his *Atkins* claim. According to Dr. Moore, the brain injuries Bourgeois' allegedly suffered cloud the question of pre-adult mental retardation:

> But in this particular case there is the contention that there were two significant injuries, two significant head injuries, one of which purportedly led to a behavioral change. And to me, that would create a snag or a difficulty to being able to extrapolate those scores back. We don't know whether those head injuries would have led to a decrease in his IQ functioning. And in fact, if they were significant and led to behavioral change, it's likely that they could have led to a change. So I can't take the scores of the present and simply extrapolate them back and say there's been no change in intellectual functioning.

(DE 599 at 145-46). Bourgeois' medical records, however, did not substantiate his claim to have had head injuries that put him a coma, calling into question the severity of any alleged head trauma.

92

USCA5 5826

sentence of death. While the Court has explicitly found that Bourgeois is not mentally retarded, that ultimate conclusion would not foreclose counsel from presenting the same information to show that Bourgeois has below average or low intelligence.

"Mental retardation as a mitigator and mental retardation under *Atkins* . . . are discrete legal issues." *Bies*, ___ U.S. at ___, 129 S. Ct. at 2153. Even when an inmate has valid IQ scores suggesting low intelligence, an attorney faces difficult questions when deciding whether to present such evidence to the jury because "[b]orderline retardation is not always viewed as a mitigating circumstance." *Riley v. Dretke*, 362 F.3d 302, 307 (5th Cir. 2004). *Atkins* recognized that "reliance on mental retardation as a mitigating factor can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury." 536 U.S. at 321; *see also Penry v. Lynaugh*, 492 U.S. 302, 324 (1989) ("Penry's mental retardation . . . is a two-edged sword: it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future."). The Fifth Circuit has previously found no *Strickland* prejudice in failing to present evidence of low IQ because "'the upper borderline of mild retardation' does not amount to 'any significant organic damage or mental illness.'" *Riley*, 362 F.3d at 307 (quoting *Smith v. Black*, 904 F.2d 950, 977-78 (5th Cir. 1990)).

The Court finds that trial counsel did not violate Bourgeois' constitutional rights by not investigating Bourgeois' mental retardation further. Trial counsel initially withheld any judgment about Bourgeois' level of intelligence until after Dr. Estrada's testing. (DE 388 at 7). However, Mr. Gilmore testified in the hearing that he never thought that Bourgeois was mentally retarded. (DE 598 at 145). Bourgeois was "very active in the defense team." (DE 598 at 145). Bourgeois wrote his attorneys detailed letters giving them precise instructions on the handling of his defense. He even asked his attorneys to provide him a copy of their defense strategy in written form. (DE 598 at 151).

93

USCA5 5827

He informed his attorneys which witnesses he wanted to testify. (DE 598 at 154). Bourgeois gave him no reason to question Dr. Estrada's statement that he had above-average intelligence. (DE 598 at 156). Mr. Tinker explained: "Based on the information we had, from experts and family members, we were unaware that Mr. Bourgeois was mentally retarded, or near retardation level." PX-82 at 9).

Dr. Weiner's testing resulted in an IQ score that on its face fell within the range eligible for a diagnosis of mental retardation. The purpose of Dr. Weiner's testing, however, was to identify neurological deficits. He did not test for mental retardation, and thus did not encourage counsel to investigate that possible defense further. Dr. Weiner explained why he did not investigate Bourgeois' intellectual functioning:

> Well, I really didn't have any way to reliably determine what his actual level of functioning was because he presented himself as someone who had better grades in school than he actually made, who went to college, which to my knowledge he didn't, who didn't tell me about multiple stressful circumstances in his life, the abuse and so on, so it would, in all likelihood, even if I could have administered an adaptive behavior instrument to Mr. Bourgeois, it would have been invalid because he would have probably exaggerated, made himself look like he was more capable of performing out in the world than he actually is.

(DE 594 at 267).[77]

Even though trial counsel did not seek expert assistance in that regard, Mr. Gilmore testified that he was left "just a gut feeling" that he was not mentally retarded. (DE 598 at 214). The evidence adduced after trial has shown that, had trial counsel chosen that defense strategy, the resultant information would not have excluded Bourgeois from execution. As discussed at greater length with respect to Bourgeois' failure-to-present-mitigating-evidence claim, reliance on evidence of a low IQ alone would not have brought about a reasonable probability of a different result. Bourgeois cannot show *Strickland* deficient performance or actual prejudice on trial counsel's failure

---

[77]    Mr. Tinker dealt with Dr. Weiner exclusively. (DE 598 at 215).

94

USCA5 5828

to argue that Bourgeois is mentally retarded.

F.     **Conclusion of Bourgeois' *Atkins* Claim**

This Court has afforded Bourgeois a full and fair opportunity to show whether mental retardation precludes his execution. A holistic review of Bourgeois' life does not manifest the characteristics that *Atkins* identified as making mentally retarded offenders less culpable:

> Because of [mentally retarded offenders'] impairments . . . by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders.

*Atkins*, 536 U.S. at 318 (footnote omitted). Bourgeois' life indicates that he can communicate effectively, learn from experience, and engage in logical thinking.[78] Bourgeois' intellectual and adaptive functioning, while possibly low, does not bear the characteristics that would render his sentence a cruel and unusual punishment. The Court finds that Bourgeois has not shown by a preponderance of the evidence that he is mentally retarded. This Court denies Bourgeois' first ground for relief.

II.    **Ineffective Assistance of Counsel for Failing to Present Mitigating Evidence (claim two)**

Bourgeois' second ground for relief faults trial counsel's preparation and presentation of evidence to mitigate against a punishment of death. The importance of mitigating evidence in a capital case cannot be gainsaid. A capital sentencing jury must have the opportunity to consider "relevant facets of the character and record of the individual offender or the circumstances of the

---

[78]    While some expert witnesses focused on Bourgeois' impaired ability to control impulses, they attributed that deficit to other psychological deficiencies, rather than mental retardation.

95

USCA5 5829

particular offense" including "compassionate or mitigating factors stemming from the diverse frailties of humankind." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976); *see also Abdul-Kabir v. Quarterman*, 550 U.S. 233, 263-64 (2007) ("[B]efore a jury can undertake the grave task of imposing a death sentence, it must be allowed to consider a defendant's moral culpability and decide whether death is an appropriate punishment for that individual in light of his personal history and characteristics and the circumstances of the offense.").

Capital defense attorneys carry a heavy burden in identifying and developing evidence to mitigate against a sentence of death. *See Florida v. Nixon*, 543 U.S. 175, 191 (2004). Nevertheless, "[t]rial counsel's failure to present mitigating evidence during the penalty phase is not per se ineffective assistance" if based on reasoned strategic decision making. *Smith v. Quarterman*, 515 F.3d 392, 405 (5th Cir. 2008); *see also Villegas v. Quarterman*, 274 F. App'x 378, 382 (5th Cir. 2008); *Riley v. Cockrell*, 339 F.3d 308, 316-17 (5th Cir. 2003); *Moore v. Johnson*, 194 F.3d 586, 615 (5th Cir. 1999); *Ransom v. Johnson*, 126 F.3d 716, 723 (5th Cir. 1997). Although the Constitution does not "require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be" or "require defense counsel to present mitigating evidence . . . in every case," *Wiggins*, 539 U.S. at 533-34, "defense counsel has the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances." *Neal v. Puckett*, 286 F.3d 236, 236-37 (5th Cir. 2002) (quoting *Baldwin v. Maggio*, 704 F.2d 1325, 1332 (5th Cir. 1983)) Bourgeois alleges that trial counsel did little to explore his background and gave the jury only a thumbnail sketch of the available evidence.

As previously discussed, Bourgeois' trial attorneys presented the jury with some information about his background. Bourgeois now argues that "the jury in this case was not provided with the true, accurate and available mitigating evidence" about (1) childhood physical abuse; (2) childhood

96

USCA5 5830

sexual abuse; (3) cognitive impairments, including borderline mental retardation and organic brain damage; (4) current mental disorders such as borderline personality disorder; and (5) mental health evidence about how his abusive childhood influenced his adult behavior. (DE 396 at 18-20). Bourgeois claims that trial counsel should have built a sturdier case against a death sentence through both lay witnesses and expert assistance.

The Court has before it an ample view of available evidence and counsel's decision making. Bourgeois supported his Motion to Vacate with declarations from numerous individuals attesting to the difficult circumstances in his childhood. He selected a few of those individuals to testify in the evidentiary hearing. Coupled with that information, mental health experts testified about the lingering psychological effects of his childhood and other mental problems. The Court has provided Bourgeois a full and fair opportunity to present evidence on this claim. The Court will now review the standards governing defense attorneys' representation, pre-trial efforts, selection of lay witnesses, use of expert witnesses, and finally the cumulative effect of their choices.

## A.    The *Strickland* Standard

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). *Strickland* established a familiar two-pronged analysis under which a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's *performance* falls below an objective standard of reasonableness and thereby *prejudices* the defense." *Yarborough v. Gentry*, 540 U.S. 1, 3, (2003) (emphasis added); *see also Wiggins v. Smith*, 539 U.S. 510, 520 (2003). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700.

97

USCA5 5831

To establish deficient performance, an inmate must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct." *Wiggins*, 539 U.S. at 521. Instead, "[t]here are countless ways to provide effective assistance in any given case." *Strickland*, 466 U.S. at 689. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688.[79] In reviewing ineffectiveness claims, "judicial scrutiny of counsel's performance must be highly deferential," *id.* at 689, and courts afford counsel a "strong presumption of competence[.]" *Cullen v. Pinholster*, ___ U.S. ___, ___ S. Ct. ___, 2011 WL 1225705, at *16 (2011); *see also Premo v. Moore*, ___ U.S. ___, 131 S. Ct. 733, 742 (2011) ("[S]ubstantial deference must be accorded to counsel's judgment[.]"); *Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (recognizing the "heavy measure of deference to counsel's judgments"). Even when the record fails

---

[79]    Movant extensively argues that trial counsel's representation fell short of the American Bar Association's *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* ("Guidelines"). Recent Supreme Court precedent has relied on the Guidelines as a useful measure of what activities a reasonable attorney should engage in when representing a capital defendant. *See Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins*, 539 U.S. at 524; *see also Strickland*, 466 U.S. at 688-89 ("Prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable"). Nevertheless,

> [n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. Indeed, the existence of detailed guidelines for representation could distract from the overriding mission of vigorous advocacy of the defendant's cause.

*Strickland*, 466 U.S. at 688-89. The Supreme Court has not held that the guidelines are a checklist to effective representation. Guidelines established by professional organizations do not supplant, but rather inform, *Strickland*'s penetrating performance and prejudice inquiry. *See Wiggins*, 539 U.S. at 521; *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000).

USCA5 5832

to explain all of trial counsel's decision making, as it does in some places here, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Bell v. Cone*, 535 U.S. 685, 698 (2002) (quotation omitted); *see also Gentry*, 540 U.S. at 8 ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect."); *Strickland*, 466 U.S. at 690 (stating that counsel is "strongly presumed" to make decisions in the exercise of professional judgment).[80] In assessing an attorney's performance with respect to a capital sentencing proceeding, courts "look to such factors as what counsel did to prepare for sentencing, what mitigating evidence he had accumulated, what additional 'leads' he had, and what results he might reasonably have expected from these leads." *Neal*, 286 F.3d at 237.

To establish actual prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694; *see also Wiggins*, 539 U.S. at 534. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *See Strickland*, 466 U.S. at 689; *Wiggins*, 539 U.S. at 534. The Court does not consider prejudice in a vacuum. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695.

---

[80]    The Court has before it an incomplete account of the efforts by trial counsel, the investigators, and the expert witnesses to advert a death sentence. Gaps exist in the record, partially owing to Mr. Tinker's passing, partially due to the nature of the information submitted. For instance, Mr. Gilmore's testimony clearly showed that Mr. Tenore played an important part in the defense team and interacted regularly with the mitigation investigators, but his entire role cannot be ascertained from the material. (DE 598 at 192). Some email communications between the defense team members are before the Court, but many are one-sided, without responses, and capture only a portion of an obviously on-going conversation. Nevertheless, the record provides a sufficient basis to decide "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [his client's] background was itself reasonable." *Wiggins*, 539 U.S. at 523.

99

USCA5 5833

A court reviewing for error under *Strickland* recognizes that the years that have passed may distort the landscape as viewed through trial counsel's eyes. *See Harrington v. Richter*, ___ U.S. ___, ___ S. Ct. ___ (2011) ("Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge."); *Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight [and] to reconstruct the circumstances of counsel's challenged conduct[.]"). Thus, an ineffective-assistance claim focuses on "counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct[,]" because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence[.]" *Id.* at 689-90; *see also Richter*, ___ U.S. at ___, 131 S. Ct. at 790 ("After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome.").

**B.     Trial Counsel's Investigation and Preparation of Mitigating Evidence**

Bourgeois claims that trial counsel's investigation was too hasty, too superficial, and too truncated to pass constitutional muster. This Court has already briefly recounted trial counsel's case at the penalty phase. From the transcript alone, it is obvious that this is not a case where defense counsel completely abandoned the heavy duty to investigate and present mitigating evidence. The Court, however, will discuss at length trial counsel's efforts to build an effective punishment defense.

*1.     Counsel's Early Efforts to Prepare a Mitigation Defense*

Early on, Bourgeois established himself as the one who would guide his defense, as evinced by a letter he wrote to trial counsel: "Dear Mr. Gilmore, I want a copy of your strategy on my case.

100

I would like to know how you plan to attack my case and what you think the outcome will be. I would appreciate if you could put together a brief memorandum in support of me, Alfred Bourgeois, your Defendant, and position regarding to my trial." (GX-180). Bourgeois, who was "very active in the defense team," decided that the defense's theory would be that "his wife committed the crime" and never wavered from that defense. (DE 598 at 144-45). Accordingly, trial counsel "built [their] case around" that theory. (DE 598 at 145).

Contemplating that Bourgeois' chosen defensive theory would not be greeted with success, his attorneys began preparing a mitigation case before the Government certified that it would seek a death sentence. The defense first retained the services of Doug Tenore as an investigator. Mr. Gilmore retained Dr. Cunningham who advised him to secure the assistance of a mitigation investigator.[81] At Dr. Cunningham's recommendation, Lisa Milstein and Gerald Bierbaum joined the defense team.

After the Government gave notice that this would be a capital case, the Court set jury selection to begin on February 12, 2004. Trial counsel had seven months to prepare for trial. From the outset, defense counsel pursued both lay witnesses and expert assistance. While the mitigation investigators delayed the beginning of their investigation into lay witnesses, this is certainly not a case where the defense "did not even take the first step of interviewing witnesses or requesting records." *Porter v. McCollum*, ___ U.S. ___, 130 S. Ct. 447, 453 (2009).

The mitigation investigators met with Bourgeois for the first time on October 23, 2003. (PX-

---

[81]   Mr. Gilmore sent Dr. Cunningham an email on July 25, 2003, informing him of his appointment. He described how "[t]he case was reset to February 2004, to allow you to gather information for your evaluation." He told Dr. Cunningham that he had contacted an investigator for "your investigation." The record does not contain any communication from Dr. Cunningham clarifying the relationship he expected between the attorneys, the investigators, and the experts.

101

USCA5 5835

165; DE 351 at 12). Throughout the investigators' interaction with Bourgeois, he was extremely useful but also paradoxically deceptive. Mr. Gilmore explained that Bourgeois "gave [them] names and telephone numbers of everybody that [they] should contact." (DE598 at 146). Testimony from the evidentiary hearing showed that Bourgeois himself communicated with the investigator, Mr. Tenore, about the individuals who could provide information. (DE 598 at 184). Bourgeois, however, also provided misinformation. Bourgeois, for instance, untruthfully told his attorneys that he had been in an accident on a three-wheeled ATV and had been in a coma for two months. He exaggerated the successes in his life. Bourgeois' dishonesty hampered the defense's development of evidence.

In the weeks after the first meeting, the investigators interviewed several individuals.[82] Their efforts, however, were not universally expeditious. On December 1, 2003, Dr. Cunningham's office sent the defense attorneys an email inquiring about the status of the mitigation investigation. Dr. Cunningham's office then informed counsel that they had not yet received any information from the mitigation investigators. Counsel immediately responded and indicated that the mitigation experts had requested more time to prepare, which would require a trial continuance. Counsel asked Dr. Cunningham for clarification on whether the mitigation investigators should feed him information or whether it should go to both of them. The record does not contain a response from Dr. Cunningham. (DE 598 at 193).

At the recommendation of the mitigation investigators, on December 9, 2003, defense counsel filed a motion for a continuance to allow them more time to explore Bourgeois' background.

---

[82] In October 2003, the defense informed the Court that their mitigation investigators had started interviewing witnesses and had been in Corpus Christi the week before. (DE 351 at 17).

102

USCA5 5836

(DE 134).[83] By this point, the mitigation investigators had already interviewed several of Bourgeois'

relatives. (PX-165). Trial counsel informed the Court that the mitigation investigators "cannot

properly complete their investigation of this case until August, 2004." (DE 134). The Court held

a hearing on December 10, 2003. (DE 358). The Court expressed concern that the mitigating

investigators had delayed their efforts to that point. The Court cautioned the defense that a failure

to get the investigation "done in a timely manner" was "very close to bad faith." (DE 358 at 4).[84]

The Court told the defense that the mitigation investigation "had to be finished by trial." (DE 358

at 14).

In the same hearing, the parties discussed the appointment of expert witnesses. The Court

has already appointed experts to explain why Bourgeois killed and whether he premeditated the

murder.[85] The defense wanted to retain Dr. Estrada as a mental-health expert. To trial counsel's

---

[83]     That same day defense counsel filed a motion for a psychological examination
because they observed "highly unusual, often bizarre behavior, listened to abnormal conversations,
and . . . noticed an unnatural writing style[.]" (DE 132 at 1). Around this same time, trial counsel
even requested, and received, funds to employ a jury selection specialist. (DE 129). Also, they had
experts look at the bite-mark and DNA evidence.

[84]     Bourgeois emphasizes the concerns this Court expressed in that hearing as evidence
that trial counsel's mitigation investigation fell below acceptable standards. Bourgeois' motion for
a continuance, however, has to be considered in the context of that time. Trial counsel assured the
Court that the mitigation investigators could complete their investigation in five months before the
February 2004 trial setting. Trial counsel's motion asking for an additional lengthy amount of time
came before the Court at the same time as serious concerns arose about the safety of witnesses.
Bourgeois had, through correspondence, threatened to kill witnesses. At least one had been killed.
The Court told defense counsel: "I have to believe the past representation of [the Government] that
every month delayed puts these witnesses in danger." (DE 358 at 14). This Court had to balance
security concerns against the period needed for an adequate investigation. As the Court informed
trial counsel: "this may be a matter of life and death for many people besides your client." (DE 358
at 101).

[85]     The defense sought the assistance of other experts whose participation in the defense
do not play a major role in the instant proceeding. For instance, trial counsel also secured the help
(continued...)

103

USCA5 5837

"dismay," Dr. Estrada was already retained by the Government. (DE 598 at 156; DE 118; DE 358 at 11). By the time of trial, Mr. Gilmore had worked with Dr. Estrada for a decade and considered him a trusted, candid witness. (DE 595 at 154-57). Trial counsel believed that they could still get the information they needed on cross-examination. While the Government expressed concern that the motion for a mental-health evaluation was only a delay tactic by the defense (DE 132), the parties agreed to have Dr. Estrada examine Bourgeois. (DE 135, 149).

After the December 10th hearing, trial counsel moved to withdraw its request for a continuance. (DE 145). Trial counsel informed the Court that the mitigation investigators had said "they would suspend their work on other investigations and concentrate on completing their investigation on this case." (DE 145 at 1). The mitigation investigators "assured counsel that their work [would] be completed in time for the February trial setting." (DE 145 at 1).

---

[85]    (...continued)

of Dr. Joseph C. Rupp, a forensic pathologist, to testify about whether the forensic evidence suggested that Bourgeois committed a premeditated killing. (DE 350 at 82). The Court would not allow Dr. Rupp to testify in the guilt/innocence phase and questioned its relevance to the punishment proceedings. (DE 350 at 91-92). Trial counsel chose not to call Dr. Rupp as a witness. Trial counsel had retained a jury selection specialist. (DE 129). On October 10, 2003, the Court appointed Dr. George W. Holden to provide psychological explanation for Bourgeois' crime, focusing on "provid[ing] the jury with insight about dynamics of family violence as they related to Mr. Bourgeois' intent and state of mind at the time of the death of his infant daughter." (PX-20 at 1). Trial counsel provided Dr. Holden a "box of material" relating to Bourgeois' background. After reviewing the available material, Dr. Holden provided an explanation for the murder: Bourgeois was upset about the potty training failure, was stressed from living with his family in the truck, and had little attachment to the victim. Dr. Holden suspected that Bourgeois had been abused as a child and thus learned that violence was an appropriate parenting technique. Dr. Holden explained that, "although this is evidently a case of horrible child physical abuse, it appears to be largely understandable and not uncommon – just a more extreme case with a tragic end." (DE 397, Exhibit 9). Dr. Holden filed an addendum letter on February 25, 2004, in which he addressed his opinion as to whether Bourgeois premeditated the killing. (DE 397, Exhibit 10). In a March 1, 2004 hearing, the Court found that Dr. Holden could not provide a physiological justification for the murder in the guilt/innocence phase. (DE 350 at 69).

104

USCA5 5838

## 2.  *Preparations Before the Guilt/Innocence Phase*

As the trial date neared, the defense ramped up efforts to prepare a mitigation defense. The mitigation investigators began interviewing witnesses in earnest, contacting dozens of individuals in the two months left before jury selection began. (PX-165). Mr. Bierbaum "spent a significant amount of time in Louisiana." (DE 342 at 16). Before trial, the mitigation investigators would interview each of Bourgeois' siblings (except the one who suffers from cerebral palsy). The investigators spoke with several members of Ms. Mary's family, long-time friends of Bourgeois, and other family members. Their investigation would inform decisions made by trial counsel and the defense experts.

On January 20, 2004, Dr. Estrada submitted a forensic evaluation finding Bourgeois competent to stand trial and sane at the time of the offense. Importantly, Dr. Estrada found that Bourgeois "appears to have an above average intelligence and memory and an average knowledge commensurate with his level of education and experience." (DE 152 at 6). Dr. Estrada found that he could "remember and describe the details and postulate alternative theories for his defense; none of which involves disturbed mental status." (DE 152 at 7). Also, Dr. Estrada's review of taped telephone conversations with family members showed "no altered mental status at the time, no presence of delusions, and no presence of irrational thinking or irrational behavior or inability to know right and wrong." (DE 152 at 7).[86]

---

[86]     Bourgeois gave Dr. Estrada some untruthful information. He claimed to have attended Louisiana State University for two years and to have worked as a police officer. Importantly, Dr. Estrada reported that "[h]e denies any history of childhood abuse, physical or sexual, neglect or trauma." (DE 152 at 4). Other information, such as his employment history with trucking companies, was correct. Dr. Estrada made observations about Bourgeois' presentation. He found him "alert, attentive, well-oriented to the four spheres . . . . His thought processes show no thought disorder, no delusions, no hallucination, no obsessions, and no compulsions. " (DE 152 at

(continued...)

105

USCA5 5839

On January 21, 2004, Mr. Gilmore told the Court that the defense was "still in the process of investigating mitigating evidence" and was still waiting for a final report from the mitigation investigators. (DE 389 at 8-9). The next few weeks included frequent communication between the mitigation investigators and Dr. Cunningham. On January 30, 2004, mitigation investigators sent Dr. Cunningham and trial counsel "a bunch of material from Bourgeois' case" and expressed a desire to set up a meeting. (PX-60 at 1). Still, the mitigation investigation continued. In a subsequent email, the mitigation investigator advised that there remained "about 10 more probab[l]e witnesses and about 20 more witnesses to contact." (PX-60 at 2). Dr. Cunningham's records also show continual phone calls and correspondence with the defense team throughout February and March. (PX-151).[87] Mr. Bierbaum created a memorandum recording the results of a lengthy interview he and Mr. Tinker conducted with Bourgeois in late January, 2004. The memorandum records significant details about the abuse Bourgeois' mother heaped on him, along with other significant mitigating circumstances. (PX-61).

In early February, trial counsel got authorization for Dr. Cunningham to come to Corpus Christi. Dr. Cunningham interviewed Bourgeois, met with trial counsel, and made his own phone calls to potential witnesses. (PX-151). Dr. Cunningham interviewed Bourgeois for 5½ hours. He also described conducting "extended telephone interviews" with Bourgeois' older siblings.[88] From

---

[86]    (...continued)
6).

[87]    For instance, the defense asked Dr. Cunningham for advice about what questions to ask prospective jurors (PX-60 at 5), promised to send him photographs of Bourgeois and video tapes (PX-60 at 6), and updated him on additional interviews and investigation (PX-60 at 8-12).

[88]    Despite characterizing the interviews as "extended" in 2004, Dr. Cunningham now downplays the information he solicited and blames others for what he later considered to be

(continued...)

106

USCA5 5840

that investigation, Dr. Cunningham became concerned that Bourgeois had a history of rage episodes that could be related to a traumatic brain injury he reportedly suffered. Four days later, Dr. Cunningham advised counsel to have a neurological evaluation performed to provide explanatory and mitigating evidence about Bourgeois' behavior. He also advised counsel to obtain Bourgeois' medical records, which trial counsel had already ordered.[89] Nothing suggests that Dr. Cunningham expressed any contemporaneous concern that insufficient time remained to be ready for trial. (DE 182).

The defense team formed strategy through emails, including correspondence with Dr. Cunningham, on how to deal with trial matters such as Bourgeois' choice to testify. (PX-60 at 16). The defense scheduled another meeting and requested Dr. Cunningham's presence telephonically. (PX-60 at 14). Trial counsel also asked Dr. Cunningham to provide a summary of his findings and opinions regarding possible mitigation evidence. (PX-2, 3). In a short letter Dr. Cunningham listed "a number of adverse developmental factors that singly and collectively increased the likelihood of an adverse and/or criminally violent outcome in adulthood," including: abandonment by his father,

---

[88]      (...continued)
inadequate preparation:

> Given the eleventh-hour realization of this problem, occasioned by defense counsel not providing me with reliable investigation data in a timely manner, and the simultaneous demands of other professional obligations, I did not conduct as many interviews as needed to be accomplished, and the ones that I did conduct were not as comprehensive as I would have preferred. Given more time, and more reliable reports of preliminary interviews, I believe I would have been able to find even more psychologically significant information.

(DE 397, Exhibit 6).

[89]      On January 29, 2004, the defense filed a motion for a subpoena requesting medical records for Bourgeois, his mother, his wife, and his daughters. Trial counsel received Bourgeois' medical records in late February. (PX-81).

107

USCA5 5841

emotional rejection and abuse, physical abuse, the death of his older brother, and rage attacks related

to a head injury. (PX-2). Dr. Cunningham also pointed to "pro-social patterns and positive

relationship patterns" including a good work history, that he "[w]as an involved father who provided

economic support as well relationship [*sic*] to his children," and "[d]isplayed an ongoing interest

in and was a constructive influence on his nieces and nephews."[90] Dr. Cunningham also gave trial

counsel a separate letter describing his opinion of whether Bourgeois would be a risk of committing

violent acts while incarcerated. (PX-3). Dr. Cunningham's report seemed detached from Bourgeois'

record of misconduct after his arrest.[91]   Additionally, Dr. Cunningham compared Bourgeois to

studies of life-sentenced capital inmates. He observed that most life-sentenced capital inmates had

a 20-30% risk exists for acts of assaultive violence and an 8-10% chance of "a more chronic violence

problem" in prison. Dr. Cunningham thought that Bourgeois' incarceration history would reduce

---

[90]    Dr. Cunningham's conclusions seem detached from the facts of this case considering
that the Government would argue that Bourgeois reluctance to support more children played into his
murder.   Also, the Government would use Bourgeois' abusive treatment of a nephew as an
aggravating factor.

[91]    By this point, Bourgeois had threatened to kill several individuals before trial, had
been prohibited from communicating with anyone other than his attorneys but still smuggled out
letters nonetheless, had threatened to assault jailors, and lunged at a Federal Marshal. Bourgeois'
threats and violence required him to be isolated from all other inmates. Dr. Cunningham told trial
counsel that "it is my understanding that Mr. Bourgeois has not engaged in any assaults on inmates
or staff and further that he has received few if any disciplinary write-ups." Dr. Cunningham
recognized that Bourgeois had made threats of inflicting some violence from prison, but stated that
"the credibility of these reports has not been determined." Dr. Cunningham disregarded Bourgeois'
ability to order any violence from prison because, in his opinion, he lacked sufficient financial
resources or ties to organized criminal groups to carry them out. He also expressed confidence that,
"should the Department of Justice conclude that there is good cause to fear Mr. Bourgeois' violent
reach, special conditions of confinement can be brought to bear that would restrict and monitor his
communications," without recognizing that Bourgeois had already bypassed similar conditions
before trial.   Dr. Cunningham cannot blame trial counsel or mitigation experts for his
misunderstanding about the heightened security due to Bourgeois' threats and violence. He had
already interviewed Bourgeois in jail, witnessed his level of security, and, with his professed
expertise in incarceration, should have recognized the exceptional efforts made to isolate Bourgeois.

USCA5 5842

his own risk to around one or two percent. Dr. Cunningham emphasized that Bourgeois age, work history, and "continuing relationships with family members" would further reduce his likelihood of violence.

Jury selection began on February 19, 2004. Trial counsel continued preparing expert testimony for trial. At Dr. Cunningham's recommendation, trial counsel explored whether neurological issues contributed to Bourgeois' crime. (PX-1). Trial counsel had received court funds to employ a neurologist to perform an EEG and other studies to investigate Bourgeois' rage episodes. (DE 182). The results of the EEG did not reveal any abnormalities. On February 28, 2004, Dr. Donald Weiner performed a neuropsychological evaluation of Bourgeois that found him in the "impaired range, although some tests were only slightly impaired."[92] His performance on other parts of the test suggested results consistent with individuals who "have a tendency to exhibit inappropriate behavior under stress circumstances, without always being aware of the inappropriateness of their actions."

Jury selection ended on February 25, 2004. The guilt/innocence phase began on March 1, 2004. As the punishment phase approached, trial counsel began to choose which mitigating

---

[92] Bourgeois told Dr. Weiner that he had been in a three-wheeler accident in 1984 which resulted in "his being in a coma for 1-2 months." Bourgeois' performance on neurological testing suggested "mild overall cerebral damage, with moderate cerebral damage in the posterior portion of the cerebral cortex . . . likely die to the injuries sustained in the three-wheeler accident[.]" Dr. Weiner administered for tests: the Wechsler Adult Intelligence Scale-Revised ("WAIS-R"); the Wide Range Achievement Test-Third Edition ("WRAT-III"); the Halstead-Reitan Neurological Test Battery for Adults, and the Test of Memory Malingering. Dr. Weiner found no evidence of malingering and believed that his test results were "a valid indication of his current level of neuropsychological functioning." (DE 391, Exhibit 16). As previously mentioned, Bourgeois relies on Dr. Weiner's testing to support his *Atkins* claim. Dr. Cunningham's billing records show that he reviewed Dr. Weiner's neurological report on March 4, 2004. (PX-151 at 3; DE. 597 at 248). It is telling, given his knowledge of Dr. Weiner's results, his expertise, and his own personal interaction with Bourgeois, that Dr. Cunningham never recommended that the defense pursue mental retardation as a mitigation defense.

USCA5 5843

witnesses would testify. The investigators and attorneys had contacted "over 50 people" to discuss mitigating evidence. (DE 598 at 184).[93] The mitigation investigators had provided trial counsel detailed summaries of their interviews with possible witnesses and with Bourgeois himself. (PX-61 at 24-39). The record plainly shows that the mitigation investigators had already pursued various avenues of investigation and interviewed many family members. After Bourgeois' conviction, trial counsel informed the Court that they were meeting with witnesses and would let the Court know who they planned to call. (DE 347 at 99).

Despite the defense efforts, not everyone was willing to testify on Bourgeois' behalf. Bourgeois family did not all look favorably on the prospect of testifying. His ex-wives and others still feared him. Others felt constrained in talking about his childhood because they did not want to disparage his still-living mother. Mr. Tinker explained: "My recollection is that information was gathered that might have helped our case, but that other information gathered would have a negative impact on our case. I don't recall the specifically [sic] what the information was, but I recall family members being split on the issue." (PX-82 at 9).

Prior to the punishment phase, trial counsel met with a large group of family members – possibly as many as fifty – and interviewed them personally. Mr. Gilmore explained in the evidentiary hearing:

| The Government: | And let me ask you, on some of the people that Mr. Bourgeois told you to go to and speak to, did you – was what they were saying not good for your defense? |
|---|---|
| Mr. Gilmore: | We brought down – I think we spoke with over 50, at least through the investigators, spoke with over 50 people. |

---

[93] One time line records interviews by the mitigation team with nearly 40 individuals, and some were interviewed multiple times. (PX-165). At trial, Mr. Tenore testified in a hearing that they had contacted "probably over 50" potential witnesses. (DE 342 at 15).

110

USCA5 5844

| | |
|---|---|
| The Government: | And let me ask you, during the trial, did you rent a room, a little conference room over in the hotel that's next to here? |
| Mr. Gilmore: | We got a small conference room and then a bigger room. We had all the witnesses in the big room, and then we'd take them individually into the conference room and talk to them individually. |
| The Government: | And how many witnesses do you think were there when you did that? |
| Mr. Gilmore: | I don't remember. It was a lot. It took most of the day talking to them. |
| The Government: | Okay. And after you went through this group of witnesses, is that when you decided, after talking, decide which ones to call? |
| Mr. Gilmore: | We make a decision, you know, how they're going to present in court and whether or not they have relevant evidence, whether or not they've got too much baggage in terms of prior convictions, things like that. |

(DE 598 at 184-85). Trial counsel sorted through those and chose to call only ones whose testimony would help more than it hurt.

But trial counsel did not make those decisions unilaterally. Mr. Gilmore testified that the trial attorneys "always discussed the witnesses with Mr. Bourgeois." (DE 598 at 154). For instance, Bourgeois insisted that his defense call his cousin as a witness, even though he had prior convictions. (DE 598 at 185).

With that background, the defense decided to present its mitigating case through the cross-examination of one expert witness and the somewhat-brief testimony of three lay witnesses. Because Dr. Cunningham's proposed testimony "did not fit with [the chosen] defense," (DE 598 at 182), they decided not to have him testify. To recount the punishment-phase defense briefly, cross-examination of Dr. Estrada established that Bourgeois "had suffered neglect and rejection, and there was some

111

USCA5 5845

physical abuse by his mother." (DE 341 at 23). In fact, his mother singled him out for abuse. (DE 341 at 24). That abusive background contributed to Bourgeois' own abuse of children. (DE 341 at 47). Also, violence in Bourgeois' past caused him to be violent when under stress. Specifically, heavy stress around the time of the murder caused Bourgeois to explode in anger at JG1999. (DE 341 at 41). Three lay witnesses, Bourgeois' sister Michelle Denise Armont, his cousin Carl Kevin Henry, and former neighbor Herman Clayton, Jr., described his impoverished and abused childhood. The witnesses explained that Bourgeois "suffered a lot of abuse" and received many "whippings" from his mother including with "the extension cord from the fan." (DE 341 at 113-14, 125). For instance, witnesses described how his mother cruelly cleaned his nose with her long fingernails "and as time go on it developed a real, real bad sore" that "always would be bloody." (DE 341 at 114). Neighborhood children, and even his own siblings, teased him, primarily because his father was not around. (DE 341 at 116). Bourgeois developed problems with anger and would "get[] red in the face," but his sister could usually calm him down. (DE 341 at 100).

Trial counsel's closing argument discussed mitigating factors in Bourgeois' background. Trial counsel highlighted abuse from his mother and teasing from his siblings.[94] Trial counsel

---

[94]    Trial counsel stated:

The things that we have shown you about Alfred Bourgeois, knowing that you feel that he's guilty of this crime, are that Alfred is a 38-year-old man who was born in Louisiana, the product of a relationship, his mother and father weren't married. He has 22 siblings. His brothers and sisters that he lived with made fun of him because he never saw his father. His father had a one-night stand with his mother and then left and didn't support him until sometime when he was in high school, when he made contact with him. And his brothers and sisters made fun of him. And his mother singled him out for abuse. So much so that he went to live with Miss Mary, the elderly lady, to get away from his mother. And despite the fact that the Government may have you say he would – may want you to believe that he was doing that for his own convenience, he sacrificed to go and live with Miss Mary to

(continued...)

112

USCA5 5846

claimed that, with the lingering effects of childhood and stress swirling about him, Bourgeois just

"snapped" and "it got out of hand and it ended up killing her. That's not to excuse his behavior; it's

to – in an attempt to try to explain what happened." (DE 342 at 50).

> 3.      *Trial Counsel Made a Constitutionally Sound Investigation*

With that background in mind, the Court finds that counsel made a probing effort to

investigate mitigating evidence. While the defense team delayed part of their investigation

somewhat, the Court is more concerned with the results than the timing of their efforts. Bourgeois

draws the Court's attention to *Williams v. Taylor*, 529 U.S. 362 (2000), for the proposition that "[t]he

Supreme Court has held that when counsel leave themselves such a truncated period of time to

prepare a complex mitigation investigation, they perform deficiently." (DE 649 at 30). The

Supreme Court, however, has never set a minimum length of time necessary for an adequate

mitigation investigation. In fact, recent Supreme Court cases focus on whether the scope of the

investigation was broad enough and the inquiry deep enough, not whether the attorneys met some

pre-appointed time line.

Of particular importance, the Supreme Court has found no error where trial counsel began

preparing much earlier than the "week before the trial" as in *Williams*. In *Bobby v. Van Hook*, 130

S. Ct. 13, 18 (2009), the Supreme Court found it "simply incorrect" to refer to a mitigation

investigation started much later than the one in the instant case as "last minute." The defense in *Van*

---

[94]     (...continued)
take care of her. And he stayed with her until her death. And then after that, he did
not want to go back home. You heard Michelle Armont testify that he didn't want
to go back, that he didn't want to go back because of the way that his mother treated
him.

(DE 342 at 47).

USCA5 5847

*Hook* contacted their lay witnesses early and often. They were in touch with their expert witnesses more than a month before trial, and they met with the other for two hours a week before verdict. The *Van Hook* defense tried to enlist a mitigation specialist five weeks before trial. The Supreme Court found that this mitigation investigation did not amount to deficient performance. *See Van Hook*, ___ U.S. at ___, 130 S. Ct. at 18. The defense team in this case began its probing investigation even earlier than the attorneys in *Van Hook*.

The time line Bourgeois submitted into evidence amply shows that the investigators began interviewing witnesses months ahead of trial. (PX-165). They turned over information to the defense team and to Dr. Cunningham with increased regularity as the trial neared, but certainly well before the beginning of the guilt/innocence phase. The defense sought the assistance of several expert witnesses whose efforts informed their decision making. While some decisions were made as the penalty phase drew nearer, the evidence before the Court shows that the defense team amassed much of the evidence well before trial. With the possible exception of Dr. Weiner's evaluation that the Court will discuss below, Bourgeois simply fails to prove the trial counsel's investigation was not done quickly enough. With that in mind, the Court turns to Bourgeois' allegation that trial counsel failed to adduce sufficient evidence from lay and expert witnesses.

## C.    The Unpresented Evidence

Bourgeois faults counsel for not presenting (1) additional information about childhood physical and sexual abuse; (2) testimony that he suffers from borderline personality disorder; (3) evidence that he suffers from brain damage; and (4) evidence that he did not premeditate the killing. In reviewing those allegations, the Court keeps in mind that each category of evidence Bourgeois faults trial counsel for not adducing carries sharp aggravating factors with its mitigating thrust. Such evidence functions as a "two-edged sword." *Penry v. Lynaugh*, 492 U.S. 302, 324 (1989); *see also*

114

*Vasquez v. Thaler*, 389 F. App'x 419, 429 (5th Cir. 2010) ("The Supreme Court has held that evidence of mental impairment can be both mitigating and aggravating[.]"). On one hand "it might well have helped the jury understand [the defendant], and his horrendous acts," but on the other "might not have made [him] any more likable to the jury[.]" *Sears v. Upton*, ___ U.S. ___, 130 S. Ct. 3259, 3264 (2010). Worse, the "double-edged" nature of the evidence may have militated in favor of finding that Bourgeois was a future danger to society. *Cantu v. Thaler*, ___ F.3d ___, 2011 WL 222986 at *5 (5th Cir. 2011); *Woods v. Thaler*, ___ F.3d ___, 2010 WL 4272751 at *12-13 (5th Cir. Oct. 25, 2010); *Vasquez v. Thaler*, 389 F. App'x 419, 429 (5th Cir. 2010); *Martinez v. Quarterman*, 481 F.3d 249, 254 (5th Cir. 2007); *Bryan v. Gibson*, 276 F.3d 1163, 1178 (10th Cir. 2001); *Motley v. Collins*, 18 F.3d 1223, 1228 (5th Cir. 1994). Trial counsel's decisions must be weighed with the recognition that the evidence Bourgeois faults them for not adducing was not exclusively mitigating. Courts defer to counsel's strategic decisions, and especially so when the withholding of beneficial information staves off the disclosure of harmful information.

### 1.    *Lay Witnesses*

Bourgeois has provided declarations from many individuals to support his claim that counsel did not give the jury a full view of his background. The defense team spoke with many of those individuals. Many of those who were not interviewed were distant relations or friends.[95] For instance, Bourgeois' section 2255 motion relies on affidavits from three second cousins, the friend

---

[95]    The trial team apparently never contacted: his sister-in-law Anita Ferdinand; his second cousin Murray Bourgeois; his maternal uncle Wilmer Bourgeois; a former girlfriend's friend Lawanda Cook; Ms. Mary's granddaughter Beverly Frank (though the investigators spoke with her father); his second cousin Allen Henry; his second cousin Jersey Henry; his second cousin Yvonne Robinson Joseph; his sister-in-law Jevona Jeanette Rixner; a former neighbor Louis Russell, Jr.; and a former girlfriend Ivy Thomas. While their statements say that the defense never contacted them, the Government had subpoenaed his cousin Isaac Bourgeois III and his sister-in-law Anita Ferdinand to testify at trial.

USCA5 5849

of a former girlfriend, and a neighbor from decades past. Also, the trial team never spoke with two

of Ms. Mary's granddaughters, though the records from the mitigating investigators show they spoke

with other members of the Clayton family.

The Court placed no limitation on Bourgeois' ability to call witnesses in the evidentiary

hearing to testify about the failure-to-present-mitigating-evidence claim.[96] Bourgeois chose only to

present testimony from Claudia Williams, Beverly Frank, Brenda Goodman, Carl Henry, Donald

Reese, Murray Bourgeois, and Kerry Brown. Most of those witnesses were not unfamiliar to the trial

team. The mitigating experts repeatedly interviewed Claudia Williams. Dr. Cunningham himself

interviewed her more than once. She and Carl Henry testified at trial. Dr. Cunningham, and possibly

other members of the defense team, interviewed both Carl Henry and Kerry Brown. While trial

counsel and the mitigation investigators did not include the granddaughters of Ms. Mary (Beverly

Frank and Brenda Goodman) in their investigation, they interviewed other members of Ms. Mary's

family.

Bourgeois primarily relies on the witnesses' testimony to show an abused childhood, sexual

abuse, and low intelligence. The evidentiary hearing testimony about his abused childhood followed

familiar territory, but also introduced some new information. Ms. Williams provided compelling

broad outlines that Bourgeois had a difficult childhood, one without nurturing or love on the part of

---

[96]     In a court date before the evidentiary hearing, counsel for Bourgeois informed the Court that the defense would limit the number of lay witnesses it would call: "We have proffered 23 declarations. I don't think we have to call 23. Perhaps we can pick our best ten and proffer the remaining 13. And we will try to cover different areas so the Court's not seeing the same thing." (Transcript of hearing held on April 20, 2010, DE 496 at 39). The Court provided Bourgeois a full and fair opportunity to substantiate his claim that trial counsel should have called additional witnesses in the penalty phase of trial. (DE 576 at 55-61). Bourgeois has not given the Court any indication that the declarants he did not call as witnesses would have provided some critical, but missing, piece of information. The Court assumes that their testimony would have followed similar themes as the live testimony Bourgeois presented.

USCA5 5850

his mother. She remembered severe whippings that left Bourgeois bloody. She explained that her mother beat Bourgeois "constantly." (DE 597 at 14). She also recounted one time that her mother cut off the tip of Bourgeois' finger with a meat cleaver because he would not eat his mother's cooking. (DE597 at 14). She explained: "My mother did Alfred some wrong things, bad things." (DE 597 at 14). Ms. Mary's granddaughter, Beverly Frank, provided credible testimony insofar as she had insight to Bourgeois' home life. She explained why Ms. Mary took Bourgeois in: "she brought Alfred in more or less because Alfred was really mistreated by his mom. We saw a lot of abuse. And my grandmother just took him under her wing to stay with her." (DE 597 at 97). Another of Ms. Mary's granddaughters, Brenda Goodman, described Bourgeois' mother as "overwhelmed, frustrated all time" and neglectful because of her alcohol abuse. (DE 597 at 132-33).

Bourgeois' cousin Carl Henry provided some context for Bourgeois' mothers abuse: "his mother had a resentment from him, due to his father and her [had] a relationship that was a one-night relationship, and it didn't work out." (DE 597 at 322). Without providing specifics, he testified that he had observed abuse. (DE 597 at 322-23). Bourgeois' cousin Murray Bourgeois explained that he "got mistreated, treated different more than the rest of his sisters and brothers." (DE 597 at 396). He was "abused more than the rest" and would "from time to time . . . have red whelps on him." (DE 597 at 397).

These witnesses' testimony, however, came with caveats. For example, Ms. Williams was confused, easily led by attorneys' questioning, and not a good historian. On cross-examination she admitted that she had talked to the mitigation investigators several times before trial, but had never conveyed the story about Bourgeois' mother cutting off the tip of his finger or that she whipped him with an electrical cord until he bled. (DE 597 at 51). She explained: "the reason why I didn't say, because it was sad. I was ashamed of my mother." (DE 597 at 51). She said that, because her

117

mother was still alive during the time of trial, family members did not want to talk about the way she treated Bourgeois. (DE 597 at 52). The witnesses had not only seen Bourgeois being abused, but had seen him abuse others. Ms. Williams explained that she knew that Bourgeois himself beat his other wives and children. (DE 597 at 54). She told FBI agents before trial that she was sure Bourgeois was capable of killing Robin and that "Alfred knew the difference between right and wrong, and he made the choice to kill JG1999." (DE 597 at 54-55).

With regard to his abused childhood, this is not a case where the defense attorneys "failed to pursue known leads" or "ignored . . . useful information[.] *Skinner v. Quarterman*, 576 F.3d 214, 220 (5th Cir. 2009). The trial investigators made a wide-ranging investigation that uncovered information about Bourgeois' abusive childhood.[97] Each of the four witnesses that trial counsel called in the punishment phase described his abused childhood. Even so, Bourgeois claimed not to have been abused and his family was hesitant to discuss the abuse until his mother died. While mostly ambiguously discussing "whippings," (DE 341 at 135), witnesses still specifically mentioned: (1) that Bourgeois received more abuse than others; (2) this abuse included being "whipped . . . with an extension cord"; (3) his mother routinely picked at his nose with her long fingernails; and (4) the abuse was continual. Trial counsel presented the same type of evidence relating to child abuse that Bourgeois has adduced in these proceedings.[98]

---

[97] Bourgeois now complains that the Government at trial disputed the accuracy of the accounts that Bourgeois' mother abused him, hoping that additional witnesses would have shored up the jury's confidence in that mitigation theory. The Government questioned the reliability of the testimony concerning abuse because Bourgeois himself lied to Dr. Estrada about his homelife (DE 342 at 59) Dr. Estrada concluded that he had lied about his childhood (DE 341 at 17, 22-23).

[98] In many respects, Bourgeois' abuse of JG1999 mirrors that which he claimed to have experienced. Of his children. Bourgeois singled out JG1999, his "outside child" for abuse. Like his mother, he beat her with extension cords, continually picked at open wounds, and otherwise
(continued...)

118

The Fifth Circuit has refused to find *Strickland* error when trial counsel presented similar mitigating evidence, even if only in outline form, at trial. *See Coble v. Quarterman*, 496 F.3d 430, 437 (5th Cir. 2007); *Rodriguez v. Quarterman*, 204 F. App'x 489, 501 (5th Cir. 2006); *Alexander v. Quarterman*, 198 F. App'x 354, 359-60 (5th Cir. 2006); *Parr v. Quarterman*, 472 F.3d 245, 257-58 (5th Cir. 2006). This Court "must be particularly wary of 'arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing.'" *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000) (quoting *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999)). Here, the defense presented evidence of the same nature as that has developed after trial. To whatever extent the trial testimony lacked the depth exhibited by Bourgeois' post-trial evidence, the breadth of testimony about his abused child hood is nearly identical. The trial evidence largely followed the same themes and allowed for the jury to arrive at the same conclusions as they would if they had before them the entirety of the mitigating evidence developed after trial. With regard to the evidence of Bourgeois' abused childhood, "[i]t must be conceded that the jury was presented a clear, if not fully portrayed, picture of [Bourgeois'] life." *Neal*, 286 F.3d at 243. "[T]hough perhaps not as effectively as it might have been, the jury did hear [the child-abuse] evidence." *Parr*, 472 F.3d at 258.[99]

---

[98]    (...continued)
maltreated her. Bourgeois excluded JG1999 from family activities. Bourgeois' childhood abuse came full circle, but manifested itself in cruelty and savagery that culminated in murder. Dr. Estrada's testimony sufficiently blamed Bourgeois' violence as an adult on his childhood abuse. Further discussion would only have emphasized that Bourgeois was like his mother, only much worse.

[99]    Moreover, Bourgeois was forty years old at the time of trial. The jury may have come to the conclusion that as Bourgeois "aged and became more chronologically removed from his
(continued...)

119

USCA5 5853

Low intelligence and sexual abuse were the main areas in which the evidentiary hearing testimony exceeded the outlines counsel drew at trial. The most troubling allegation Bourgeois makes is that trial counsel failed to investigate whether he was sexually abused by two men, one a son of Ms. Mary and the other the church choirmaster. Testimony from the evidentiary hearing could not credibly validate those allegations. Murray Bourgeois, Ms. Williams, and Mr. Henry had never heard that Bourgeois had been sexually assaulted. (DE 597 at 57, 74-76, 357-68, 414). Mr. Henry expressed skepticism that it happened as Bourgeois now alleges. (DE 597 at 357-58). Only Ms. Goodman could provide any testimony about Bourgeois' claiming to have been sexually abused. She explained: "[M]y uncle raped Alfred. Now, I don't know at what age that happened, but when we discovered my uncle had AIDS, and Alfred told me this when he was older, that Uncle Jake had raped him." (DE 597 at 142). Even then, her testimony is somewhat suspect because it was based solely on what Bourgeois told her; no other witness could corroborate that he had been sexually assaulted. In fact, witnesses expressed surprise and disbelief that Bourgeois had experienced sexual abuse, particularly at the hand of the church choirmaster.

Even Ms. Goodman was hesitant to divulge that information until late in the legal process. Although Bourgeois' post-conviction investigators asked Ms. Goodman questions about abuse in Bourgeois' background, she did not report it in her initial statement and had only mentioned it recently. (DE 597 at 167). Her reluctance to tell others about what she described as a "dark thing" that she "couldn't tell [her] family" gives no confidence that she would have relayed the information to counsel. (DE 597 at 143). The Fifth Circuit refused to hold "attorneys responsible for introducing

---

[99]    (...continued)
difficult childhood and traumatic experiences . . . his troubled background would exercise a lesser degree of influence over his actions, thereby rendering him less of a future danger." *Coble v. Quarterman*, 496 F.3d 430, 447 (5th Cir. 2007).

120

USCA5 5854

mitigation evidence that their client and other witnesses fail to disclose." *Johnson v. Cockrell*, 306

F.3d 249, 252-53 (5th Cir. 2002). Bourgeois has not shown that trial counsel erred in not presenting

evidence of sexual abuse.

Bourgeois has extensively relied on lay testimony to bolster his claims of mental retardation.

Independent of the psychological testimony, the witnesses uniformly expressed that, at least as a

child, Bourgeois was slow.[100] Their testimony, however, varied in the extent to which that impacted

Bourgeois' life. Some witnesses described how, at least at a young age, Bourgeois had problems

with activities such as cooking. Some testimony showed that Bourgeois had complained about being

asked to perform "girl's work" such as washing clothes and making food. Other witnesses, however,

described such activities as part of his daily routine at Ms. Mary's house.[101] Nevertheless, the Court

is not convinced that a reasonable attorney would encourage the jury to choose a life sentence based

on Bourgeois' intellectual limitations. The jury would have heard his cogent, descriptive testimony

that lacked any sign of mental impairment. The jury would have viewed his interaction with counsel

and his ability to follow the course of the legal proceedings. The jury would have known that

---

[100] In addition to the information about Bourgeois' intellectual abilities as a child, witnesses talked about his adulthood. Donald Reese, a former co-worker, described problems Bourgeois experienced when they worked as team drivers. Bourgeois had problems with some of the equipment, got lost when driving, only brought a small amount of clothing with him on long trips, and was uncomfortably talkative. Kerry Brown, an attorney Bourgeois previously had retained for legal matters, provided testimony relating to his mental impairments. Mr. Brown described Bourgeois as controlling, continually in debt, a bad money manager, "dealing with a lot of issues" involving his family and business, and under stress. (DE 598 at 237-47). Cross-examination of Mr. Brown would have revealed that Bourgeois "was jealous, overbearing, owed everybody child support, beat up his mother-in-law, and then . . . destroyed property[.]" (DE 598 at 249). Mr. Brown's testimony, particularly that revealing that Bourgeois "beat the hell out of his mother-in-law," would not have helped the defense. (DE 598 at 248).

[101] The witnesses did not agree on whether Ms. Mary rescued Bourgeois from an abusive atmosphere or whether his mother sent him to serve as a care giver to the elderly, physically impaired woman.

USCA5 5855

Bourgeois successfully worked for years as a truck driver. The Government would assuredly subject any witness attesting to his low intelligence to the same cross-examination from the evidentiary hearing. The Court finds that a reasonable attorney could weigh the probable benefit against the possible loss of credibility and decide not to focus the defense on Bourgeois' low intelligence.

The Court has reviewed the whole of the unpresented mitigation evidence and concludes that trial counsel did not provide ineffective assistance in the investigation, preparation, or presentation of lay testimony in the punishment phase. The Court, therefore turns to Bourgeois' claim that trial counsel should have amplified the case relating to his mental health.

> ### 2.    Expert Testimony

Bourgeois claims that trial counsel should not have relied only on the cross-examination of Dr. Estrada, but should have called additional expert witnesses in the punishment phase. Bourgeois hopes that expert testimony would have discussed: (1) the effects of his abused childhood on his mental state (as explained by Dr. Cunningham); (2) his borderline personality disorder; (3) how neurological impairment affected his ability to control his impulses and make decisions; and (4) Dr. Holden's conclusion that he did not premeditate the crime. In those post-judgment proceedings, Bourgeois has called seven expert witnesses – Drs. Gelbort, Estrada, Swanson, Weiner, Toomer, Cunningham, and Holden – who testified to a greater or lesser extent about each of those theories. The witnesses described Bourgeois as a man with overlapping and interlacing mental illnesses that made him prone to excessively violent reactions when under stress. The Court will describe their testimony as it relates to each theory he faults trial counsel for not presenting.

As an initial matter, however, the Court notes that "[c]ounsel's decision not to hire experts falls within the realm of trial strategy." *Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993); *see also Colburn v. Cockrell*, 37 F. App'x 90 (5th Cir. 2002) ("The hiring of expert witnesses and the

122

USCA5 5856

presentation of their testimony is a matter of trial strategy."). To reiterate, trial counsel secured the assistance of mental health experts before the punishment phase. Trial counsel sought Dr. Holden's assistance to determine if Bourgeois had committed a premeditated filicide. Trial counsel sought testing for competency by Dr. Estrada and later relied on his cross-examination to place mental-health information before the jury. Dr. Cunningham synthesized the mitigating evidence and provided guidance about mental health issues. At Dr. Cunningham's direction, trial counsel had Dr. Weiner perform neurological testing. No doubt exists that trial counsel was amply aware of the results of their testing. The record contains numerous on-the-record discussions about whether trial counsel would use their proposed testimony. Trial counsel decided only to rely on Dr. Estrada. The Court will review whether that decision met constitutional standards.

> a.    Dr. Cunningham's testimony

Bourgeois claims that trial counsel should have put a psychological varnish on the evidence about his abused childhood, showing that it had a "'profound impact' on [his] behavior." (DE 402 at 37). Trial counsel sought Dr. Cunningham's assistance early in the case for that purpose. While Bourgeois claims that trial counsel was unfamiliar with Dr. Cunningham's conclusions, the record shows otherwise. As previously discussed, trial counsel had sufficient communication with Dr. Cunningham as the trial approached. Trial counsel reviewed Dr. Cunningham's report, spoke with him on the telephone, met with him for several hours, and sat by him at the counsel table during trial. Trial counsel even edited the PowerPoint slides that Dr. Cunningham had prepared to excise any reference to Dr. Weiner's testing.[102] This Court's interaction with the trial attorneys and the plain

---

[102]    At some point before trial, Dr. Cunningham prepared a PowerPoint presentation and gave trial counsel a binder with the proposed slides. He provided for two presentations: a mitigating presentation and one showing Bourgeois' future threat. Dr. Cunningham would have testified that
(continued...)

123

USCA5 5857

evidence in the record gives no reason to slight counsel's familiarity with Dr. Cunningham's proposed testimony.

While Bourgeois complains vigorously that trial counsel failed to get information to Dr. Cunningham about childhood abuse in an expeditious manner, the record does not show any similar concern from Dr. Cunningham as the trial approached. The investigators turned over to Dr. Cunningham the results of their investigation well before the guilt/innocence phase started. Other than an email sent by an employee months before trial, the record contains no contemporaneous complaint from Dr. Cunningham about the timing or completeness of that information. Dr. Cunningham interviewed potential witnesses himself. The record does not contain any indication that Dr. Cunningham's own interviews unveiled a wealth of evidence that still laid uncovered. Trial counsel relied on Dr. Cunningham and he did not signal to them that the mitigation investigation was substandard before trial.

---

[102]    (...continued)
various "damaging factors" – an overwhelmed family system, abandonment by his father, "childhood problems putting on the brakes," emotional rejection and abuse, physical abuse, and neuropsychological problems – served as a pressure cooker that exploded when set afire by Robin's infidelity, martial problems, and financial concerns. In his second presentation, Dr. Cunningham would have provided general information about behavior in secure environments, including the Bureau of Prisons, and specific items that would make Bourgeois less likely to be a threat in prison: his age, his "behavior in pre-trial custody," his continuing relationship and contact with family, and stable history in the community. Bourgeois attached a copy of some of the PowerPoint slides to his 2255 motion. (DE 397, Exhibits 5 and 6). Before the sentencing hearing began, the Court talked with Dr. Cunningham about how to best place his intended PowerPoint presentation on the record. (DE 348 at 2-4). After addressing the manner in which to preserve Dr. Cunningham's presentation, the discussion turned to the substance of his testimony. The Government wished to exclude any part of Dr. Cunningham's testimony that discussed the Bureau of Prison's policy and practices, and the related speculation about how offenders in general behave in prison, and focus instead on Bourgeois' own propensity toward violence. (DE 348 at 4-6). The Court refused to limit the scope of Dr. Cunningham's testimony, but allowed the Government to call its own witness to rebut Dr. Cunningham's testimony. (DE 348 at 5-6). The Government announced that it intended to rely on its own expert from the Bureau of Prisons, John Shaw, if the defense called Dr. Cunningham. (DE 348 at 5; 341 at 78).

124

USCA5 5858

In the end, trial counsel said that he decided not to call Dr. Cunningham because his theory

of the case conflicted with Bourgeois' chosen defense.[103]    Trial counsel discussed his abused

childhood and history as a sympathetic, not explanatory or as a justifying factor.  (DE 598 at 210-

11).[104]    Importantly, Bourgeois agreed with that decision.  As Mr. Gilmore explained in the

---

[103]    Trial counsel also knew that calling Dr. Cunningham would bring along "so many hazards."  (DE 347 at 106).  The Government informed the Court that, if Dr. Cunningham testified about Bourgeois' future danger, the door would be open to harmful evidence that did not come before the jury.  (DE 347 at 106).  This information possibly included additional information that Bourgeois claimed to have committed another killing, had told people he wanted to kill Robin, had sexually assaulted AB1994, and was cruel to animals.  (DE 347 at 82, 88, 92-94, 105-06).  Other aspects of his testimony would offend jurors.  In one portion of his proposed testimony, he would have told jurors to excuse Bourgeois' repeated fierceness against women because domestic violence is a common, and in his view, apparently accepted feature in society.  Jurors may be expected to react with revulsion to that information.  This is not an isolated example.  At its core Dr. Cunningham's testimony was detached from the extensive testimony that the jury had already seen about the person Bourgeois was.  To the extent that Dr. Cunningham's testimony would deal with Bourgeois' threat of violence when incarcerated, rather than his "pressure cooker" theory, trial counsel adduced the same information through Dr. Estrada.  Mr. Gilmore testified: "we elicited that testimony from  Dr. Estrada, and I thought Dr. Estrada was effective for us."  (DE 598 at 209).  Dr. Estrada opined that Bourgeois would only be violent "in a family situation."  (DE 341 at 50).  Dr. Estrada testified that with "higher . . . supervision available" Bourgeois would have a "lesser degree of all kinds of violent incidents[.]"  (DE 341 at 52).  While probably not as extensively as anticipated by Dr. Cunningham, trial counsel adduced expert testimony to show that Bourgeois would not be violent when in "a cage within a cage within a cage."  (DE 342 at 63).

[104]    Mr. Gilmore's closing argument, for example, differentiated between abuse as sympathy and as an excuse:

> Now, these things are offered to you not as an excuse for committing this crime, but to try to help you understand his mindset, and trying to help you understand where he comes from. *This is – it's not an excuse for him, if you believe he committed this crime, for him doing it.  It's something to show you that he's a human being.*  We're all human beings.  And we're – we're all capable of doing bad things in the right circumstances, or the wrong circumstances as it may be.  At the time that this incident occurred, these factors came into play along with his current situation; the current situation being that he was having economic problems, he and his wife were having problems, they'd had problems since – since she had the affair.  And I realize he had affairs, too.  But this was what was going on in his mind, the fact that his wife had an affair.

(continued...)

125

USCA5 5859

evidentiary hearing:

| The Government: | Okay. And when you showed [a notebook containing a copy of the material in Dr. Cunningham's proposed PowerPoint] to Mr. Bourgeois, did he have any reflection on it? Did he make a statement as to this presentation? |
|---|---|
| Mr. Gilmore: | Well, his position all along was that he did not commit the crime. And so specifically what did he say? I just remember we told him that we didn't think we were going to call Dr. Cunningham, and he did not oppose that. And we told him why, because his theory of the mitigation part of the case didn't jive with our theory of defense. |
| The Government: | Did he make some kind of statement to the effect that, "This means that Dr. Cunningham's saying I'm guilty" |
| Mr. Gilmore: | It's something to that effect. I can't remember exactly what was said. But I, you know, explained to him that that's what those arrows meant that he had all the pressure on him, and that's why he exploded and did this. |
| The Government: | And after you explained that to him, did he want to present Dr. Cunningham? |
| Mr. Gilmore: | He agreed with our assessment. |

(DE 596 at 183).

In the evidentiary hearing, Mr. Gilmore further elaborated on other reasons why they decided not to call Dr. Cunningham as a witness: "We weren't impressed with Dr. Cunningham. We didn't particularly think he was going to impress the jury, and we did not like his presentation." (DE 598 at 211). From this Court's own observations, Dr. Cunningham would not have been a good witness for the defense. When trial counsel told Dr. Cunningham they weren't going to use him, he was

---

[104]    (...continued)
(DE 342 at 48) (emphasis added). Trial counsel also explained during Dr. Estrada's cross-examination that he was "not asking these questions to help excuse what Mr. Bourgeois did, but to explain it." (DE 341 at 23-24).

126

USCA5 5860

"very angry." Mr. Gilmore explained: "If you tell a professional witness that you're not going to use them, you know, he should be professional about it, and he wasn't." (DE 598 at 186). Mr. Gilmore's recollection comports with this Court's own observations. In the evidentiary hearing, Dr. Cunningham's demeanor, even though his speech was generally of a level pitch, was consistently argumentative and condescending in tone and facial expression. Dr. Cunningham openly showed scorn, both in his physical manifestation and his substantive testimony, for the defense's case at trial. He did not appear as an impartial scientific expert, but as someone seeking to advance an agenda.[105]

Dr. Cunningham's testimony came off as distant from the facts of the case before the jury. For example, Dr. Cunningham vigorously asserted that his academic research proved that Bourgeois was not a violent risk while kept in a highly structured environment. The jury, however, would compare that opinion with Bourgeois' actual behavior before trial. While in custody in the state jail facility, he ordered hits on witnesses. His threats were not toothless; witnesses were murdered before trial. Even when security isolated Bourgeois, he continued to sneak out communications, threaten security personnel, and even tried to attack a United States Marshal.[106] Dr. Cunningham's testimony would seem hollow – and even unbelievable – given Bourgeois' vicious nature. His claim that Bourgeois would not be violent could offend the jury and lessen trial counsel's credibility with the finder of fact.

His evidentiary hearing testimony was removed from the reality of the defense's efforts

---

[105]    Testimony from a hearing at the time of trial showed that counsel was not only familiar with Dr. Cunningham's presentation, but had tried to excise any reference to Dr. Weiner's findings without sacrificing any important part of it. (DE 347 at 19).

[106]    Bourgeois' brother, Lloyd Ferdinand, made threats against witnesses and intimidated those who would testify against Bourgeois. When Bourgeois tried to hire Longoria to eliminate witnesses, Mr. Ferdinand was the one who would have paid him. (DE 347 at 52-54).

127

USCA5 5861

before trial. He bore an arrogant demeanor as he broadly faulted defense efforts and lauded his own. He criticized the mitigating investigators for not feeding him enough information, but the record does not show that he responded when counsel asked him whether he or the investigators should provide him with information. He complained about the cursory nature of the information, but never said whether he actually communicated that concern to trial counsel or the investigators. The Court appointed him as an expert eight months before trial, but his records show that he did little, if anything, until the last few weeks before trial. He himself interviewed witnesses, some of whom testified in the evidentiary hearing, and himself could have secured the information he claims went undiscovered. Even then, his presentation consisted of information he had apparently prepared in the numerous cases in which he had previously testified.

Dr. Cunningham's testimony showed that both the mitigation experts and trial attorneys gave him information and were familiar with the basic issues of the case. The Court has viewed not only Dr. Cunningham's testimony in the detached context of the federal evidentiary hearing, but can also plug that testimony into the trial context that it observed. The Court's observation of the trial landscape and the jurors' reaction to evidence provides a vantage point to consider the effect any proposed testimony would have. The jury already had before it evidence that Bourgeois' mother had abused him, and trial counsel concluded that Dr. Cunningham's proposed testimony was not convergent with or helpful to their chosen defense. A reasonable and zealous trial attorney could find that Dr. Cunningham was not a witness whose testimony, both in content and tone, would benefit the defense.[107]

---

[107] Once supported by an adequate investigation, "counsel's selection of a strategy is unchallengeable[.]" *Bower v. Quarterman*, 497 F.3d 459, 467 (5th Cir. 2007); *see also Strickland*, 466 U.S. at 690. "A conscious and informed decision on trial tactics and strategy cannot be the basis
(continued...)

128

USCA5 5862

b.     Borderline personality disorder

Testimony from the evidentiary hearing showed that Bourgeois had some sort of mental disorder, though the testimony varied somewhat as to its etiology, effect, and treatability.  Drs. Estrada, Gelbort, Swanson, Toomer, Price, and Moore all examined Bourgeois and agreed that he suffered from borderline personality disorder.  Bourgeois claims that trial counsel should have put that information before the jury.

Each expert provided different insight to the nature and effect of borderline personality disorder.  Dr. Estrada provided the fullest view into how that disorder effected Bourgeois.  Dr. Estrada did not diagnosis Bourgeois with a borderline personality disorder when he initially examined Bourgeois before trial.  Dr. Estrada testified in the evidentiary hearing that he had suspected that Bourgeois had a personality defect, but that additional information about his background confirmed it.[108]  Dr. Estrada defined the psychological condition:

---

[107]     (...continued)
for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002). "*Strickland* requires. . . [courts to] defer to counsel's decision . . . not to present a certain line of mitigating evidence when that decision is both fully informed and strategic, in the sense that it is expected, on the basis of sound legal reasoning, to yield some benefit or avoid some harm to the defense." *Moore*, 194 F.3d at 615; *see also St. Aubin v. Quarterman*, 470 F.3d 1096, 1102 (5th Cir. 2006); *Riley v. Dretke*, 362 F.3d 302, 306 (5th Cir. 2004).

[108]     Dr. Estrada explained in his deposition:

In this case, I had only suspicions at the time, but then with all the information I have reviewed since, it has become clear that my suspicion regarding this person's background is correct and my suspicions regarding his personality organization were correct; and these are the two elements that, in my opinion, resulted in this terrible behavior.  Regarding the background, the documentation that I reviewed now is clearly indicating that he suffered not only from rejection and abandonment and physical abuse by his natural mother, but in addition, he suffered from sexual abuse and exploitation by the people that he trusted; and finally, he suffered for many years

(continued...)

USCA5 5863

> Borderline personality disorder is characterized by a chronic habitual and automatic pattern of relationships that is characterized by extremes of love and hate triggered by satisfaction. The person becomes idealized, if is fulfilling the individual needs, to extreme devaluation and rage if the person is frustrating. As a result of this basic problem, the individual has extremely unstable relationships, often leading to breaking up the relationship if the pattern is strong enough to leave or having the battered wife syndrome and family violence syndrome when the wife is – or the spouse is weak and cannot separate, resulting in having episodes of honeymoon, followed by episodes of hate and violence.
>
> . . . [T]he person suffering from a borderline personality due to this instability of his attitudes about the people they are involved with, [is] extremely vulnerable to stress. And during episodes of stress, they are involved in impulsive behavior, behavior with very poor judgment, bordering in psychotic, irrational behavior. That's why the name borderline. It's a border between the psychosis and the neurosis come from and is often associated with drug and alcohol abuse.

(PX-163 at 28). Dr. Estrada noted two sources of the disorder: a genetic one and a childhood plagued by "rejection, neglect and abandonment[.]" (PX-163 at 25).

> Dr. Estrada connected the disorder to Bourgeois' abuse of JG1999:
>
> This is a pattern in which he reacts to frustration in this rage without any concern for consequences; and in my opinion, this is very poor judgment.
>
> Then he's calmed down the following day, and he's able to navigate through the highways in the country without losing track like nothing has happened. This is, in my opinion, very poor judgment and a characteristic of borderline under stress. You do crazy things. You do terribly violent things, and they act the next day like so what, that was yesterday.

(PX-163 at 36). This rage would "impact his executive" function and inhibit his "[j]udgment, planning, decision making, control of impulses, control of affects, managing cause and

_____

[108]    (...continued)
of teasing, humiliation and discrimination because of his mixed race and his limitations in intellect and physical conditioning. These, in my opinion, resulted in developing a narcistic and borderline personality disorder. The narcistic personality disorder is what is most obvious when one meets this man.

(PX-163 at 22).

USCA5 5864

consequences[.]" (PX-163 at 36). Thus, Bourgeois did not intentionally kill the child but succumbed to the stressors about him. (PX-163 at 39).[109]

Testimony from the other experts, both for Bourgeois and for the Government, also probed his borderline personality disorder, although not as deeply as Dr. Estrada did. Dr. Toomer testified that the borderline disorder "affects all aspects of an individual's functioning" including "instability that manifests itself across a variety of activities, interpersonal relationships, personal identity, mood and emotionality as well as self-image." (DE 594 at 297). Dr. Price agreed that Bourgeois had a "personality disorder that's longstanding and pervasive" and that such mental disorders are "oftentimes associated to childhood abuse." (DE 595 at 204, 232). Dr. Moore confirmed that people with borderline personality disorder most often act out at those with whom they have a close relationship. (DE 599 at 160). None of the experts questioned the diagnosis of borderline personality disorder. All agreed that the disorder caused Bourgeois to be emotionally unstable,

---

[109]    In Dr. Estrada's words:

> And my opinion, in summary, is this man under the serious stress that he was facing, finances, marital problems and being dumped with a new child that he didn't expect and fatherhood, care and financial obligations, under this stress, he reacted in a typical borderline fashion caused by his background of trauma, neglect and rejection by losing control of his anger and torturing, tormenting and abusing this child intermittently throughout six weeks with periods in which he was actually caring and nice to the child in typical borderline fashion that ultimately the abuse caused this child's death.
>
> It is my opinion, therefore, that this is not the act of a premeditation, an act where he was looking for some gain, getting rid of the child, getting rid of the wife or blaming the wife or the child. There would be better ways.

(PX-163 at 39). To some extent, this disorder mirrors Dr. Cunningham's "pressure cooker" demonstrative and would present similar concerns for the defense.

131

USCA5 5865

impulsive, and to have difficulties in his interpersonal relationships.[110]

Because Bourgeois relies on Dr. Estrada, the expert trial counsel relied on to place Bourgeois' mental state before the jury, the Court must address two questions. First, did trial counsel supply Dr. Estrada with sufficient information to allow him to come to a diagnosis of borderline personality disorder? Second, even with that diagnosis, would a reasonable attorney put that information before a jury? *See Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 789 (2011) (finding no error when counsel failed to uncover evidence because it would "be reasonable to conclude that a competent attorney might elect not to use it"); *Neal*, 239 F.3d at 687 ("We must determine whether there is a gap between what counsel actually did and what a reasonable attorney would have done under the circumstances."). The Court finds that neither of the answers to those two questions supports a finding of *Strickland* deficient performance.

Dr. Estrada had significant information, apparently given by both parties, before he examined Bourgeois. He interviewed Bourgeois himself. Dr. Estrada sat in the courtroom and heard the entirety of the punishment-phase evidence. He had enough information to diagnose Bourgeois with the closely related disorder of narcissism. Yet he did not diagnose Bourgeois with borderline personality disorder. Instead, he concluded that narcissism explained much of Bourgeois' behavior.

After Bourgeois' conviction and sentence, and considering new information, Dr. Estrada reached this new psychological conclusion. Possibly because of Bourgeois' tangled mental-health issues, it would be a "difficult assessment" to diagnose him with borderline personality disorder. (DE 594 at 111). That, however, does not mean Dr. Estrada could not have done so with the

---

[110]    Dr. Cunningham's testimony, however, did not discuss borderline personality disorder but referred to a "history of rage attacks that had been occurring since his childhood or adolescence, with marked changes in his consciousness and demeanor, and with memory deficits that occurred afterwards for the events during that rage." (DE 597 at 234).

132

USCA5 5866

information before him at trial. Admitting that he has "more information now," Dr. Estrada conceded in his deposition that it is "possible" that he had sufficient information at the time of trial to arrive at a diagnosis of borderline personality disorder. (PX-163 at 60). At the time of trial Dr. Estrada already knew that Bourgeois had suffered neglect, rejection, and physical abuse at the hands of his mother. (PX-163 at 60, 62-63). He admitted that many of the same factors that underscored the diagnosis of narcissism he arrived at before trial contributed to his diagnosis of borderline personality disorder. (PX-163 at 61). Dr. Estrada attributed his new diagnosis to "thinking more about it and reviewing the pattern of relations, particularly the relations to women, and a social border interview of all of his wives, then it became more clear that that was a pattern of borderline personality." (PX-163 at 60).

Bourgeois has not convincingly shown that Dr. Estrada did not have the tools necessary to reach a borderline-personality-disorder diagnosis before trial. Dr. Estrada had interviewed Bourgeois and was aware of his violence toward his wives. (DE 341 at 45). The Government's case at the punishment phase emphasized a life-long unrelenting pattern of aggression. Dr. Estrada sat throughout the punishment phase of trial and listened as Bourgeois' ex-wives explained their turbulent and violent marriage to him. The instability of Bourgeois' relationships was fully before Dr. Estrada, as it was before the jury. He testified that he saw "a pattern of abusive relationships again and again and again." (DE 341 at 50). Still, he conceded that the "key features of his violent actions . . . haven't changed from the information [he] . . . received since the trial has been over." (PX-163 at 52).[111]

---

[111]    Dr. Estrada remembered:

discussions with both the government and the defense regarding Mr. Bourgeois'
(continued...)

133

USCA5 5867

Once given sufficient information, trial counsel has a right to rely on the conclusions of the experts he retains. No constitutional right exists to the effective assistance of expert witnesses. After placing the building blocks for the diagnosis before the expert witnesses, trial counsel complied with their duty to investigate possible mental illness. Trial counsel cannot be held accountable for relying on his experts after providing them sufficient evidence. *See Bell v. Thompson*, 545 U.S. 794, 810 (2005) (endorsing state court finding that because "two experts did not detect brain damage, counsel cannot be faulted for discarding a strategy that could not be supported by a medical opinion"). Trial counsel relied, as Bourgeois does now, on Dr. Estrada to identify salient mental health concerns. Bourgeois has not shown that trial counsel was to blame because mental-health experts did not diagnose him with borderline personality disorder earlier.

Even so, to succeed on this claim Bourgeois must show that a reasonable attorney would have presented evidence of that psychological disorder. While admittedly a more difficult question, the Court finds that a zealous attorney could weigh the value of the borderline-personality-disorder

---

[111]    (...continued)
background and information gathered from wives and other people who knew him and that I have given my opinion to both about the – the – the impact of the background of child abuse and rejections and neglect, the pattern of violence with multiple wives and intimate relationships, and the fact that this made him a potentially dangerous person, because the basic fault, so to speak, was not treated or fixed, and – but I also remember that I was not able or allowed to elaborate in how the background is affecting the current situation.

(PX--163 at 70). Bourgeois argues that Dr. Estrada was told not to base his opinion on Dr. Cunningham or Dr. Weiner's reports. (PX-163 at 70). Dr. Estrada, in fact, used the background information from Dr. Cunningham while testifying. (DE 341 at 25). The Court limited the ability to refer to Dr. Weiner's report, but did not prevent him from relying on the information from Dr. Cunignham that did not directly implicate that derived from Dr. Weiner. (DE 341 at 33). Dr. Cunningham's report, however, did not address the problems Bourgeois had with his wives any more specifically than the trial testimony did. It is telling that Dr. Cunningham's report did not mention the possibility of a borderline personality disorder, while Bourgeois now finds the condition to be abundantly obvious.

134

USCA5 5868

diagnosis against possible harm, and stay his hand. Bourgeois has not sufficiently recognized the aggravating edge of that evidence, the Government's use of similar evidence against him at trial, and the absence of any testimony about rehabilitation.

In many ways, Dr. Estrada's deposition testimony differed little from that adduced at trial by both parties, but particularly by the Government as an aggravating circumstance.[112] The Government had elicited testimony from Dr. Estrada that Bourgeois had engaged in "repetitive acts of violence" and was a "rageaholic or impulsive in [his] decisions." (DE 348 at 283). Even if the defense placed the mitigating influence of that diagnosis before the jury, cross-examination would go like it did in the hearing and even at trial. The Government would surely ask: "[E]very time someone's abused as a child, do the – do they act out and abuse children later in life?" (DE 341 at 57). The Government would ask, as it did Dr. Price, why this disorder was "directed at certain things[.]" (DE 595 at 231). The Government would be able to adduce rebuttal evidence similar to Dr. Price's testimony that the commission of the murder more as a function of "antisocial psychopathic traits and features." (DE 595 at 231).[113] The jury would respond to the information much in the same way

---

[112]   The experts stated that a narcissistic personality disorder can be found in the same category of disorders as borderline. The Government adduced the evidence that he had a narcisstic personality disorder. (DE 348 at 284). The two disorders are apparently not entirely dissimilar. Dr. Swanson vacillated between I "put[ting] him personality disorder NOS, some put him narcissistic and some people put him borderline. I tend to probably want to go more borderline, but all those are in the same cluster of personality disorders that they have and there is definitely mood problems there[.]" (DE 594 at 103). Dr. Price also described the two disorders similarly. At trial, Dr. Estrada described the narcissism in a way similar to his description of borderline personality disorder. He described such people as being "lively, likeable, exiciting, interesting, sometimes very persuasive or charismatic" at the start of a relationship bit with time "their personal problems are inevitable and result in friction that may lead to simple break of relationships . . . or actual violence." (DE 348 at 285-86).

[113]   Even Bourgeois' expert Dr. Gelbort had not decided whether he was a sociopath, but "would absolutely agree that many of the behaviors [he had] seen described can be caused by

(continued...)

135

as Dr. Gelbort: "I don't want them for my neighbor." (DE 560 at 75).

One problem trial counsel would face in presenting the evidence of Bourgeois' various mental disorders is that the testimony did not show any hope of diminishing or susceptibility to treatment. Dr. Estrada testified that, while the borderline personality disorder would explain what Bourgeois did, it would not make him less violent in the future. (PX-163 at 67). No evidence suggested that psychologists could control Bourgeois' mental issues or cause them to go into remission. The same evidence that would explain Bourgeois violence toward his child would predict violence toward others. One circuit has noted that sentencers "may not be impressed with the idea that to know the cause of viciousness is to excuse it; they may conclude instead that when violent behavior appears to be outside the defendant's power of control, capital punishment is appropriate to incapacitate." *Foster*, 223 F.3d at 637. Without some indication that treatment or confinement would control the effects of his mental illness, the jury would be left to assume that Bourgeois' violent acts would persist immutably.

As the Fifth Circuit has explained, a juror could "have seen the evidence as only aggravating, because [the defendant's] borderline personality disorder and the difficulty of treating it increase the likelihood that [he] will act out violently again." *Nelson v. Quarterman*, 472 F.3d 287, 307-08 (5th Cir. 2006); *see also Cantu v. Thaler*, ___ F.3d ___, 2011 WL 222986 at *5 (5th Cir. 2011) (finding no error when the defense chose not to have neuropsychological testing because "[t]he potentially detrimental results of such an examination could have strengthened the State's position that [the defendant] was a sociopath and thus a future danger, thereby warranting the death penalty."). Without additional evidence, the jury may think that successful treatment of his mental illness would

---

[113]    (...continued)
sociopathic etiology." (DE 560 at 73).

USCA5 5870

be unlikely.[114] The thrust of the evidence that would dull the Government's case would also sharpen the chance for a death sentence. The proposed evidence "would still acknowledge that [Bourgeois] has the same dangerous disposition; [his experts] now simply opine[] that [they] can explain why." (DE 443 at 119).

Bourgeois' new evidence of mental illness would blame the killing on an apparently intractable mental condition. A reasonable attorney may have viewed the whole of the evidence and face a difficult choice, but could rationally decide not to present evidence of borderline personality disorder.

c.    Neurological impairment

As previously discussed, at Dr. Cunningham's suggestion trial counsel retained Dr. Weiner to perform a neuropsychological examination based on head injuries Bourgeois claimed to have received as a child. Dr. Weiner administered the WRAT-III, the Halstead-Reitan Neuropsyhological Test Battery for Adults, and the Test of Memory malingering. Dr. Weiner concluded that Bourgeois' results on some categories of the Halstead-Reitan indicated brain damage. Dr. Weiner's report noted "overall mild impairment with moderate cerebral damage in the posterior portion of the cerebral cortex. In all likelihood, this damage is due to the injuries Mr. Bourgeois sustained in a three-wheeler accident that took place in 1984, resulting in a coma lasting 1-2 months." (DE 397, Exhibit 16).

Trial counsel seriously considered calling Dr. Weiner as a punishment-phase witness. After the guilt/innocence phase, the defense turned his report over to the Government. In a March 17,

---

[114]    The evidence before the Court in this case differs from one in which the parties presented evidence that "although borderline personality disorder is treatable, success is by no means certain and is expressly conditioned on intensive therapy" but "successful treatment is often the exception rather than the rule." *Nelson v. Quarterman*, 472 F.3d 287, 308-09 (5th Cir. 2006).

137

USCA5 5871

2004, hearing Government stated that Dr. Estrada had reviewed the material and had found serious flaws in his methodology. The Government told the Court that they were bringing in their own neuropsychologist to test Bourgeois. (DE 340 at 25-27). Trial counsel objected to any additional testing. (DE 340 at 27). According to the Government, Dr. Weiner had brain scans done that came back negative for impairment. (DE 340 at 27). The Court ordered a hearing on Dr. Weiner's proposed testimony to find out what testing he performed. (DE 340 at 36, 47-48).

In a hearing on March 19, 2004, the defense informed the Court that had decided not to call Dr. Weiner as a witness. (DE 347 at 14). Trial counsel informed the Court that "Dr. Estrada disagreed with some of Dr. Weiner's findings." (DE 347 at 18). The trial court told the defense that, if they were not going to call Dr. Weiner as a witness, they could not rely on the results from his testing. (DE 347 at 16). Accordingly, Dr. Cunningham and Dr. Estrada could not use Dr. Weiner's report during his potential testimony. (DE 347 at 16-19).

Bourgeois claims that trial counsel's choice not to call Dr. Weiner as a witness violated his constitutional rights. Bourgeois supports this claim with a new report and testimony from Dr. Weiner. Dr. Weiner explained that "as [he] understood the situation, the lawyers were concerned that [his] conclusions were not reliable because they were not sure that Mr. Bourgeois accurately reported the head injury referenced on page three of [his] report." (DE 397, Exhibit 16 at 2). He opined, however, that his "test results and conclusions are valid regardless of how the damage was caused, and regardless of what Mr. Bourgeois told [him] about the damage." (DE 397, Exhibit 16 at 2).

Bourgeois also presented testimony in the evidentiary hearing regarding the results of Dr. Weiner's testing. Dr. Weiner affirmed the validity of his testing and explained that the brain dysfunction would impair Bourgeois' cognition so that "he may at times perceive things in a

138

USCA5 5872

distorted way and act in an inappropriate manner." (DE 594 at 240). The brain impairment would influence his emotions, impulse control, and ability to make judgments. (DE 594 at 240). Dr. Gelbort testified that his testing agreed with Dr. Weiner, though he may have localized the injury in another part of the brain. In addition, Dr. Gelbort did not see the source of the impairment as influential as its effect.

Against that background, trial counsel obviously made a strategic decision not to rely on Dr. Weiner's testing. Mr. Tinker explained in his answers to interrogatories: "I do recall having a neurological exam done, because there was a claim that Mr. Bourgeois had been in a car accident and had been in a coma. I do not recall the exam resulting in any information that would have been helpful at trial. Further, the government informed us that they had evidence that Mr. Bourgeois was never in a coma and that he only sustained broken bones in the accident." (Mr. Tinker Interrogatories at 9). A strategic decision by trial counsel is "virtually unchallengeable." *Strickland*, 466 U.S. at 690. Evidence since trial confirms that trial counsel made a reasonable decision. *See Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect.").

As an initial matter, Dr. Weiner premised his conclusion on Bourgeois' claim that he suffered a coma from a three-wheeler accident. The record plainly shows that Bourgeois lied; he had no coma, no serious head injury, and no neurological impairment from that injury. While Bourgeois now points to other potential episodes that may have resulted in brain trauma, the fact is that Dr. Weiner's testimony would have allowed the Government to label him a manipulator and a liar. With Bourgeois' chosen defense to blame the killing on Robin, and his decision to take the stand, trial

139

counsel would have incentive to shore up his credibility.[115]  Trial counsel's decision not to call Dr.

Weiner on that basis alone is a reasonable one, meant to avoid more harm to the defense.

Additional factors developed in the evidentiary hearing confirm the wisdom of trial counsel's

decision.  Bourgeois has repeatedly criticized Dr. Weiner for using an outdated IQ test.  Dr. Price

testified that he also used outdated methodology.  Dr. Price testified that Dr. Weiner's attempt to

"localize" the injury in Bourgeois' brain was an out-of-date approach, now jettisoned by current

psychological thinking.  (DE 595 at 218).  More importantly, Dr. Price credibly testified that Dr.

Weiner relied on the raw scores from the Halstead-Reitan rather than applying norms – called the

Heaton norms – which research confirms as valid.  The Heaton norms adjust the raw Halstead-Reitan

scores for demographic factors, including race.[116]  Neither Dr. Gelbort nor Dr. Weiner applied norms

---

[115]    Dr. Price's testimony suggested that Dr. Weiner should have used greater care in relying on Bourgeois' self-reported coma.  He testified:

> In a forensic evaluation you already go into this as the evaluator with a certain amount of skepticism and with an eye to evaluate the response style of anybody you talk to to evaluate how much weight you give to evidence, and when you find that some of the information that you have been provided by someone isn't accurate, then it would lead us to be even more critical or skeptical of other information.  And it could be a sign that they are trying to present in a way as being more impaired than they actually are, or, in your hypothetical, creating a situation that would likely be interpreted as a traumatic event.

(DE 595 at 198).

[116]    Dr. Price explained:

> Well, using the norms most similar to the person, including race, that – what the literature describes race as an adjustment as a proxy for other factors in the person's life, cultural enrichment, educational opportunities, quality of education and a socioeconomic status. It stands as a proxy for that. And to avoid over identifying or – you would get a greater degree of impairment comparing someone to Caucasians as you would to comparing them to African Americans.

(continued...)

140

USCA5 5874

to their raw scores. (DE 621, Exhibit 1 at 32). When applying the norms for the general population, Bourgeois has mild mental impairment. However, Bourgeois, though of a mixed-racial background, was "raised in an African American family, in an African American community." (DE 621, Exhibit 1 at 35). Applying the Heaton norms for African-Americans to Weiner's testing places Bourgeois outside of the impaired range. (DE 621, Exhibit 1 at 18, 22).

While Bourgeois elicited testimony from Dr. Price that "some controversy" exists in psychology over the use of the Heaton norms, he did not show that their application was not good, or even necessary, psychological practice. (DE 621, Exhibit 1 at 17). With the scores from the Heaton norms finding no impairment, Dr. Price attributed the defects that Dr. Weiner described to a personality disorder, not a brain injury. (DE 595 at 223). Application of the Heaton norms would also "not be consistent with somebody that's mentally retarded." (DE 621, Exhibit 1 at 41-42).

In the end, counsel must approach the decision whether to present evidence of brain damage with careful deliberation. Evidence of mental and neurological conditions is double-edged: while it can create jury sympathy, it can equally bolster the Government's claims of future dangerousness by showing poor ability to control impulses and learn from past mistakes. The Fifth Circuit defers to counsel's strategic decision not to present such double-edged mitigation evidence. With the surety that presenting Dr. Weiner's testimony would reveal Bourgeois' manipulation, the credible testimony that he had applied the wrong norms, and the marginal benefit to the defense, trial counsel's decision not to adduce evidence of neurological impairment is not *Strickland* deficient performance.

---

[116]    (...continued)
(DE 621, Exhibit 1 at 16).

USCA5 5875

d.    Premeditation

Finally, Bourgeois claims that trial counsel should have called Dr. Holden in the punishment phase to testify that he did not premeditate his crime. The defense elicited Dr. Holden's help well before trial. After receiving a box of material from the defense, Dr. Holden provided a report that he later supplemented after receiving additional information. Dr. Holden opined that Bourgeois did not commit an intentional or premeditated "filicide": "[i]t is highly unlikely that Mr. Bourgeois had decided to (or thought about) killing [the victim]. Instead, what probably happened was that in a fit of rage over the spilled potty, he lost control of himself and in the course of administering physical discipline fatally injured [her]."

Trial counsel initially wanted to call Dr. Holden as a guilt/innocence phase witness. Dr. Holden wanted to testify that Bourgeois did not intend to murder JG1999, but that "this death resulted in a continuation of harsh punishment." (DE 350 at 37). Dr. Holden would have testified that "Bourgeois had never formed a close bonding, attachment, love relationship with the child. . . . So, he was stressed financially, emotionally with the child, fatigued, and then when the child spilled the potty, my interpretation is that he totally lost it and [be]came very punitive trying to teach her never to do that again." (DE 350 at 19-20). Dr. Holden conceded that he based his whole opinion about intent on the theory that Bourgeois was the murderer. (DE 350 at 17). Although the defense had supplied Dr. Holden with a "box of information" with "more than 100 pages" including the results of DNA analysis, CPS records, and the autopsy(DE 350 at 55-57), Dr. Holden seemed unaware of many facts surrounding the killing. After a more complete discussion of the evidence, Dr. Holden weakened his opinion on Bourgeois' guilt. In the end, he weakly stated "it's possible that it was not premeditated." (DE 350 at 65).

It was obvious that Dr. Holden's testimony would not benefit the defense in the

142

USCA5 5876

guilt/innocence phase. (DE 350 at 21). Dr. Holden himself agreed that he would not be much help to the jury on the question of guilt. (DE 350 at 54). The Court held that Rule 704(b) prevented Dr. Holden's testimony in the guilt/innocence phase. (DE 350 at 64, 69). The defense, though, indicated that "intend[ed] to make another offer [at] the punishment phase to have him testify." (DE 350 at 70). Trial counsel ultimately chose not to call Dr. Holden in the punishment phase.

The record does not contain a clear statement of why counsel chose not to call Dr. Holden as a witness. As the questioning before the guilt/innocence phase revealed, Dr. Holden would have premised his testimony on Bourgeois' having committed the murder – a theory incompatible with that chosen by the defense. Dr. Holden's testimony would have conflicted with Bourgeois' own statements before the jury in the punishment phase.

Bourgeois secured a new declaration from Dr. Holden in these proceedings. Unlike his earlier testimony, he now has backed away somewhat from his earlier focus on whether the crime was premeditated. Now, with new information, his focus would be on the "family violence . . . that sadly repeats itself through generations," which when combined with "numerous psychological factors that impaired Mr. Bourgeois' ability to control his actions," would have explained the murder as the act of "an abuse-survivor, experiencing high stress, with low functioning, and with consequent impairments in impulse control." (PX-20 at 7).

At any rate, this Court's observation in the two times he has appeared before the Court was that a reasonable attorney would not have called him. His testimony came off as academic, speculative, and untethered to the facts of the crime. After seeing how his opinions fared when subjected to scrutiny, a reasonable and competent attorney might not have chosen for him to testify. In fact, the Government seemed eager to put his testimony before the jury knowing how it would benefit them. (DE 350 at 21). The Court's observations assure that trial counsel did not render

143

deficient performance in not calling Dr. Holden as a punishment phase witness.

## D.      Conclusion of Deficient Performance Analysis

This case differs fundamentally from those in which the Supreme Court has found deficient performance.[117] "This is not a case in which the defendants attorneys failed to act while potentially powerful mitigating evidence stared them in the face, or would have been apparent from documents any reasonable attorney would have obtained[.]" *Van Hook*, ___ U.S. ___, 130 S. Ct. 13, 19 (2009) (citing *Rompilla*, 545 U.S. at 389-93 and *Wiggins*, 539 U.S., at 525). Trial counsel zealously gathered the tools necessary to make a probing investigation into a mitigation defense. Trial counsel used those tools to craft a defense which would remain true to Bourgeois' wishes but still advocate for a sentence less than death. In doing do, trial counsel amassed information not fundamentally different, for the most part, from that Bourgeois relies upon in this proceeding. In reviewing the accumulated defensive material, the Government's case, the credibility of witnesses, the jury's composition, and Bourgeois' wishes, trial counsel made hard choices. *See Richter*, ___ U.S. at ___, ___ S. Ct. at ___ ("There are, however, countless ways to provide effective assistance in any given

---

[117]      *See Sears v. Upton*, ___ U.S. ___, 130 S. Ct. 3259, 3264 (2010) (trial counsel essential failed to conduct any mitigation investigation and none of the evidence relied upon was known to trial counsel); *Porter v. McCollum*, ___ U.S. ___, 130 S. Ct. 447, 453 (2009) (with a month to prepare before sentencing the attorney "had only one short meeting with [the defendant] regarding the penalty phase. He did not obtain any of [his] school, medical, or military service records or interview any members of [his] family."); *Rompilla v. Beard*, 545 U.S. 374, 389 (2005) (finding deficient performance when defense lawyers failed to "to look at a file he kn[ew] the prosecution w[ould] cull for aggravating evidence . . when the file [was] sitting in the trial courthouse, open for the asking"); *Wiggins v. Smith*, 539 U.S. 510, 516-19 (2003) (trial counsel wholly failed to prepare a social history and ignored serious issues that required further investigation); *Williams v. Taylor*, 529 U.S. 362, 395 (2000) ("[T]rial counsel did not begin to prepare for [the punishment] phase of the proceeding until a week before the trial[,] . . . failed to conduct an investigation that would have uncovered extensive records graphically describing [the defendant's] nightmarish childhood, . . .introduce available evidence that [he] was 'borderline mentally retarded' and otherwise ignored readily available evidence).

144

case. Even the best criminal defense attorneys would not defend a particular client in the same way."). This Court will defer to those decisions.

That is not to say that trial counsel did not make mistakes. No trial is perfect. *See United States v. Hasting*, 461 U.S. 499, 508 (1983) (noting that "there can be no such thing as an error-free, perfect trial"). But the Supreme Court recently emphasized that "the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Van Hook*, ___ U.S. at ___, 130 S. Ct. at 17 (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 479 (2000)); *see also Gentry*, 540 U.S. at 8 ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."). Hindsight and second-guessing may possibly suggest different courses of action, but with eyes focused on how trial counsel viewed the landscape before them, this Court finds that trial counsel engaged in reasonable decision making bolstered by a reasonable investigation. The Court finds that Bourgeois has failed to show deficient performance under *Strickland*.

### E.    Cumulative Effect of Prejudice

Even if Bourgeois could show that trial counsel's performance fell below constitutional expectations, he would still have to show actual prejudice. The Court will consider the entirety of Bourgeois' unpresented evidence conjointly. The Fifth Circuit "ha[s] construed [Supreme Court precedent] to require that an evaluation of *Strickland* prejudice include consideration of both the quantity and quality of the additional mitigating evidence." *Hood v. Dretke*, 93 F. App'x 665, 669 (5th Cir. 2004); *see also Strickland*, 466 U.S. at 695 ("[T]he question is whether there is a reasonable probability that, absent the errors, the sentencer – including an appellate court, to the extent it independently reweighs the evidence – would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."). Particularly, "*Williams*, *Wiggins*, and *Rompilla*

145

looked at the quality of the mitigation case put forward by trial counsel as compared to what the petition suggested should have been presented." *Alexander v. Quarterman*, 198 F. App'x 354, 361 (5th Cir. 2006).

In addition, the prejudice inquiry looks at all available evidence, not just that favoring the defense. *Strickland*, 466 U.S. at 695 ("In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."). In assessing the relative weight of the new mitigating evidence, a reviewing court compares and contrasts the new evidence with that from the trial. *See Wong v. Belmontes*, ___ U.S. ____, 130 S. Ct. 383, 390 (2009) ("[T]he reviewing court must consider all the evidence-the good and the bad-when evaluating prejudice."). The Fifth Circuit has indicated that a court looks to see if the petitioner's new evidence will "lessen the impact of the other evidence against him[,]" *Conner v. Quarterman*, 477 F.3d 287, 294 (5th Cir. 2007), because "overwhelming aggravating factors" can outweigh unpresented mitigating evidence. *Sonnier v. Quarterman*, 476 F.3d 349, 360 (5th Cir. 2007). For instance, the "horrific facts of the crime," *Martinez*, 481 F.3d at 259, the "brutal and senseless nature of the crime," *Smith*, 471 F.3d at 576, or the "cruel manner in which he killed," *Miniel v. Quarterman*, 339 F.3d 331, 347 (5th Cir. 2003), may weigh heavily against a finding of *Strickland* prejudice. *See also Strickland*, 466 U.S. at 700; *Knight v. Quarterman*, 186 F. App'x 518, 535 (5th Cir. 2006); *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002); *Andrews v. Collins*, 21 F.3d 612, 624 n.23 (5th Cir. 1994); *Russell v. Lynaugh*, 892 F.2d 1205, 1213 (5th Cir. 1989). Additionally, if the "evidence of . . . future dangerousness was overwhelming . . . it is virtually impossible to establish prejudice." *Ladd*, 311 F.3d at 360 (citing *Strickland*, 466 U.S. at 698).

Finally, federal courts consider whether or not the new evidence is double-edged or introduces new aggravating circumstances into the calculus of sentencing. A court must consider

146

USCA5 5880

whether the material upon which a petition bases his *Strickland* claim contains unhelpful information. *See Burger v. Kemp*, 483 U.S. 776, 793-95 (1987); *Strickland*, 466 U.S. at 700. The Fifth Circuit has refused to find prejudice if the unpresented evidence "also contained evidence that, if disclosed, would have been detrimental to [the defense] case." *Ransom v. Johnson*, 126 F.3d 716, 724 (5th Cir. 1997); *see also Dowthitt v. Johnson*, 230 F.3d 733, 745 (5th Cir. 2000); *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999); *Cockrum v. Johnson*, 119 F.3d 297, 304 (5th Cir. 1997); *West v. Johnson*, 92 F.3d 1385, 1410 (5th Cir. 1996), *Woods v. Johnson*, 75 F.3d 1017, 1035 (5th Cir. 1996); *Callins v. Collins*, 998 F.2d 269, 278 (5th Cir. 1993).

The facts of this case are atrocious. Bourgeois committed a horrible murder. This Court need not to recount again the evidence showing the torture, neglect, and abuse that he inflicted on his helpless victim. He was indifferent to JG1999's injuries, unremitting in his beatings, uncaring about her death, and unremorseful at trial. He bit her, beat her with various objects, and probably sexually assaulted her. The Government presented significant evidence that the rage he reserved for his young daughter resulted from financial concerns, not psychological conditions.

The episode that resulted in JG1999's death was not an isolated incident. Bourgeois had been violent in the past and continued his violence while in custody. He had been cruel to children before, beat his wives, assaulted his mother-in-law, threatened jail guards, and tried to assault a United States Marshal. He threatened that his daughter's death would not be the only one. In fact, he threatened to kill witnesses. The jury saw Bourgeois as a violent man.

Trial counsel adduced some of the evidence upon which Bourgeois now relies. The jury knew that his mother neglected and abandoned him. Psychological testimony from Dr. Estrada put some of the blame on mental health issues. While Bourgeois has now presented more nuanced and detailed defensive theories, the jury would not respond more favorably than to those trial counsel

147

fashioned to conform to Bourgeois' chosen defense. Given the whole of the evidence, the Court finds no reasonable probability of a different result. The Court denies Bourgeois' *Strickland* claim.

### III.    Jurisdiction (claim three)

Bourgeois claims that he did not kill JG1999 on federal property. Under 18 U.S.C. § 1111(b), "*[w]ithin the special maritime and territorial jurisdiction of the United States*, [w]hoever is guilty of murder in the first degree shall be punished by death or by imprisonment for life[.]" (emphasis added). "[C]rimes committed within the confines of federal military reservations [fall] within the special territorial jurisdiction of the United States." *United States v. Bell*, 993 F.2d 427, 429 (5th Cir. 1993).[118] The Corpus Christi Naval Air Station is within the United States territorial jurisdiction. According to Bourgeois, the Government did not meet its burden of showing, beyond a reasonable doubt, that JG1999 died from injuries inflicted on federal property.

Federal law decides jurisdiction by the place of the fatal injury, not death. *See* 18 U.S.C. § 3236 ("[T]he offense shall be deemed to have been committed at the place where the injury was inflicted, or the poison administered or other means employed which caused the death, without regard to the place where the death occurs."). Jurisdiction in this case came from Bourgeois beating his daughter's head against the truck window on the naval base. Bourgeois' jurisdictional argument presupposes that earlier injuries, unrelated to the vicious beating, caused the victim's death. In other words, the prior injuries he administered in another jurisdiction killed the toddler, not the beating on federal property. Bourgeois faults trial counsel for not basing the trial defense around a

---

[118]    Congress has defined this jurisdiction as including "[a]ny lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building." 18 U.S.C. § 7.

148

USCA5 5882

jurisdictional challenge. He also asks the Court to reopen the evidentiary hearing to allow more testimony on this matter.

### A.    The Autopsy and Trial Testimony

Dr. Elizabeth Rouse performed the autopsy and noted numerous external scars and wounds on JG1999's head in various stages of healing. The extent and severity of the numerous injuries Bourgeois inflicted over time created a complexly tangled patchwork of bruises, scars, wounds, lacerations, and other injuries. The overlapping and all-encompassing nature of the victim's external injuries chronicled weeks of abuse by her father.

The autopsy and Dr. Rouse's subsequent trial testimony provided important information about the victim's external and internal head injuries. Dr. Rouse discussed the "severe head injuries, what I call a closed head injury," including "the injuries that actually resulted in her death. And . . . there's a number of different components of those head injuries[.]" (DE 345 at 121). Dr. Rouse described layers of injuries, from the skin, to the undersurface of the scalp, to the brain itself. For example, Dr. Rouse described a "recent bruise" on tissue that "indicate[d] that at that spot on her head, there was an impact. . . . right at the hair line on the right forehead and a "fairly complex bruise . . . that would indicate actually multiple impacts at that site." (DE 345 at 126-27). She observed a "multitude of smaller [bruises] . . . across the back of her scalp, across the back of her head . . . where something either hit her head, or her head hit something." (DE 345 at 129-30). Dr. Rouse identified a total of 10 bruises on the undersurface of the scalp. (DE 345 at 123).[119] She also described a subgaleal hemorrhage that "indicates an impact to the head, the actual point on the head

---

[119]    JG1999 also had "impact bruises on the front of her scalp, on the right, and then all across the back. . . . Both sides in the back. . . . [A] fairly large one behind the right ear." (DE 345 at 144).

USCA5 5883

where force was transmitted." (DE 345 at 146). She explained: "all appear what we would call recent injuries. . . . within the past few days[.]" (DE 345 at 130-31, 146).

Bourgeois correctly observes that these wounds alone are not evidence of a recent life-threatening injury. Dr. Rouse explained that the bruises "did not result in the death. But what they indicate is the mechanism of what ultimately caused the injury to her head. *What she actually died from is the forces that were transmitted on the brain.* That's what resulted in her death." (DE 345 at 131) (emphasis added). The scalp wounds "are just markers for where those impacts occurred, where that force was transmitted to the brain." (DE 345 at 132). The most important part of the autopsy was its description of what that force did to JG1999's brain.

As part of the autopsy procedure, Dr. Rouse sent slides of JG1999's brain away for microscopic examination. The autopsy report incorporates a conclusion prepared by Dr. Kathlenne S. Kagan-Hallet, an associate professor of pathology with the University of Texas Health Science Center at San Antonio. In a report dated September 17, 2002, Dr. Kagan-Hallet noted that the autopsy revealed "subgaleal bruising and subdural hematoma, as well as pattern injuries to the skin."[120] In the portion of her report entitled "microscopic findings and comments," Dr. Kagan-Hallet noted older injuries and some "in a stage of early organization." In the section designated "neuropathologic diagnosis," she noted a "history of head trauma," and described "{Right} subdural hematoma, mostly recent, minimal organization (approximately 10 days' duration)" She also noted "Cerebral white matter. Organized contusion infarcts (7+ days' duration), myelin tearing and axonal bodies." (DE 397, Attachment 50).

---

[120] The autopsy report notes "two discrete areas of recent subgaleal hemorrhage in the right frontal scalp" and "[a]cross the occipital scalp . . . a total of eight discrete areas of recent subgaleal hemorrhage." She also observed a "semisolid subdural hematoma . . . over the right occipital region" and a "patchy subarachnoid hemorrhage over the brain."

USCA5 5884

Dr. Rouse's trial testimony provided the most important insight into Dr. Kagan-Hallet's observations. In discussing the intercranial findings, Dr. Rouse described several indicators that the victim had experienced significant trauma: (1) a subdural hematoma ("where blood has leaked, and that indicates where tremendous forces have been applied to the brain, resulting in her death"); (2) a subarachnoid hemorrhage ("which is blood over the actual surface of the brain"); (3) swelling of the brain; (4) "feuxsaxonal" injury ("injury to the actual nerves and cells of the brain. . . the injury to the brain itself"); and (5) fresh hemorrhaging in the victim's retina ("[w]hen there are injuries to the brain, those forces are often commonly transmitted also to the eyes, and you'll also get hemorrhage. The blood doesn't leak from around the brain to the eyes."). (DE 345 at 132, 134, 138, 139). All those factors indicated significant blows to the head that transmitted force to the brain itself. (DE 345) ("[T]o get a hemorrhage within the brain, it certainly indicates significant impact to the head.").

Despite this recent bruising on the underside of her scalp, Dr. Rouse did not discuss the age of the intercranial features, particularly the subdural hematoma. She did, however, give her opinion as to the cause of death. She testified that "the feuxsaxonal (phonetic) injury, injury to the brain itself. *And that's what actually resulted in her death.* The scalp hemorrhages are just markers for where those impacts occurred, where that force was transmitted to her brain." (DE 345 at 132) (emphasis added). Dr. Rouse elaborated:

> The actual cause of death – we can go through my, basically the summary is my autopsy findings. The cause of death is what we call *a closed head injury, an impact to the head resulting in a devastating brain injury, which we could see looking at the brain, by the bruising of the scalp , the bleeding over the brain, both under the dura and over the lining of the brain, and then also microscopically, when we looked at the actual brain tissue, we could see injury throughout the brain.* I actually sent those sections to a neuropathologist to confirm that there was extensive injury in the brain which would have resulted in her death. *She has the hemorrhage along the optic nerves, as well as the hemorrhage on the back of the retina on both eyes, which*

151

USCA5 5885

*again that's very protected.*  You do not see that type of retinal hemorrhage in accidental trauma, specifically not in any sort of trivial accident.  Certainly, you could get it with something of the magnitude such as a car accident.  That type of injury is required to get retinal hemorrhage.

(DE 345 at 170) (emphasis added).  Acknowledging that the medical evidence did not allow Dr. Rouse to establish precisely when and where JG1999 died, the Government asked her if the fatal injuries were consistent with the AB1994's version of the events.  (DE 345 at 171).  Dr. Rouse testified that the beating which AB1994 witnessed "could certainly explain the injuries that were seen on the child."  (DE 345 at 171).

## B.    Bourgeois' Post-Judgment Arguments and Post-Conviction Testimony

Bourgeois' claim that he did not kill JG1999 on federal property turns on Dr. Kagan-Hallet's observations from the autopsy report.  In his Motion to Vacate, Bourgeois based his jurisdictional argument on the subdural hematoma of "approximately 10 days' duration[.]"  Treating the subdural hematoma as an indication of when JG1999 received the fatal blows, Bourgeois argued that he could not have inflicted the killing injury on federal property.  As support, Bourgeois first secured an affidavit from Dr. Werner Spitz, a forensic pathologist.  Dr. Spitz opined that the fatal injuries were a week or more old:

> The neuropathology report by Dr. Kathleen Kagan-Hallet indicates mild to moderate cerebral edema with hemorrhagic necrosis of cerebellar tonsillar tips, subdural hematoma of approximately 10 days duration and organized contusion infarcts of 7+ days duration as well as, myellin tearing and axonal bodies.  The scalp bruises are relatively small and do not conform with one or more falls or forceful impacts.  *I disagree with the witness testimony (AB1994) whereby the child's head was struck multiple times on the interior of the vehicle.*  I am also surprised to see what appear to be fresh bruises of 1 or 2 days in the scalp, while the subdural bleed and contusion infarcs in the white matter show evidence or organization compatible with a week or longer.  The findings place in question causation of the injuries and their timing.  The scalp injuries in and of themselves would not have been life threatening and there is no question as to the life threatening nature of the cerebral injuries.

(DE 397, Declaration of Werner Spitz, MD dated May 10, 2007, Attachment 53) (emphasis

152

USCA5 5886

added).[121] Relying on Dr. Spitz's assumption that trial testimony claimed that the oldest part of the subdural hematoma represented the killing injury, Bourgeois claims that the federal government never properly had jurisdiction to try him for capital murder.

From the outset, Dr. Spitz's affidavits lacks credibility because he dismisses AB1994's testimony without having viewed her in court. His willingness to dispute a well-settled factual account calls his conclusions into question. The Court observed AB1994's trial testimony. AB1994 was a highly credible witness who convincingly described, to the best of her ability and beyond expectations for her young age, what her father did to her little sister. Dr. Spitz's disregard for her testimony, as well as the other evidence showing an obvious serious injury on federal property, makes his declaration not credible.

When this Court allowed limited factual development of this claim, Bourgeois wisely did not secure any additional testimony from Dr. Spitz. Instead, Bourgeois obtained two reports from Dr. Jan E. Leestma, a consultant in forensic neuropathology. Dr. Leestma examined the evidence, including the autopsy photographs and conceded that "[i]t seems inescapable that this child had been physically assaulted over a considerable period of time before death." (DE 641, Exhibit 2). He did not, however, give a definite answer to the "critical question . . . of when the fatal head injuries to the child were caused." Acknowledging that "she had sustained a number of head impacts allegedly due to having been beaten over a period of time," Dr. Leestma's report did not list a cause of death.

---

[121]   The courts in this circuit that have considered Dr. Spitz's testimony have found him not useful or credible. For instance, one court in the Western District of Texas labeled his methodology "simplistic and preposterous[.]" *Bittner v. General Motors Corp.*, 2005 WL 5977561, at *1 (W.D. Tex. 2005). In another case, Dr. Spitz formed conclusions based on "*no evidence.*" *Galvan v. City of San Antonio*, 2008 WL 5352945, at *6 (W.D. Tex. 2008) (emphasis in original); *see also Hill v. Carroll County, Miss.*, 2008 WL 2066526, at *5 (N.D. Miss. 2008) (noting that Dr. Spitz relied on a conclusion that was "wholly speculative").

153

USCA5 5887

He suggested that some of the brain injuries – specifically "a coagulopathy which appears to have included sagittal sinus thrombosis and possibly cortical venous infarctions" – may have "resulted in the child's death at any time with or without any new episode of trauma." (DE 641, Exhibit 2). He refused, however, to look at anything other than the medical evidence in ascertaining a cause of death. Where Dr. Spitz had criticized AB1994's testimony, Dr. Leetsma ignored her account and any other evidence that would put JG1999's injuries into context.[122]

The parties deposed Dr. Leetsma on January 10, 2011. (DE 641). In response, the Government called Dr. Rouse as a witness and the parties questioned her by telephone in a hearing on January 13, 2011. The resultant evidentiary record provides a highly technical view of the overlapping and interwoven injuries Bourgeois inflicted on his daughter. While disagreeing on many points, the experts found some areas of consensus. Both Dr. Leetsma and Dr. Rouse found serious brain damage in the victim. Both experts observed both recent ("acute") and older ("chronic") brain injury.[123] They both opined that the injuries were complex and hard to separate, age, and gauge. Dr.

---

[122]    In the end, he explained:

> Much of the pathology in this child is not acute. The scalp injuries are of variable ages in which the hemorrhages show aging of red cells cellular repair and inflammatory reactions and healing-scarring. The brain lesions range from possibly few days in age to days to weeks old. The child may have had coagulopathy which appears to have included sagittal sinus thrombosis and possibly cortical venous infarctions. These processes could have resulted in the child's death at any time with or without any new episode of trauma.

(DE 641, Exhibit 2). Admitting that the "child's condition deteriorated after the reported incident in the father's truck," Dr. Leestma opined that "there is very little information derived from the autopsy that can accurately pin point what physical injury resulted from this alleged incident or that it directly caused the child's death." (DE 641, Exhibit 2).

[123]    Dr. Rouse testified: "[C]learly the multitude of injuries makes this a complex picture. We can categorize the injuries into, you know, ones that appear to be six weeks old, you know, five,

(continued...)

154

USCA5 5888

Rouse explained that "you have a complex constellation of things going on in response to that injury." (DE 646 at 7). Dr. Leetsma agreed that the mixture of acute and chronic injuries made this a difficult case. (DE 641 at 88-89).

Without question, both experts could place injuries into two time periods – those more than a week old and those less than three days. The victim died around 24 hours after the ambulance took her from the naval base. Neither doctor could medically pinpoint the exact time of the newest injuries, though both agreed they occurred within three days of death. Dr. Leetsma explained:

> I don't know anyone who has a magical formula to break down into smaller increments this two- to three-day acute injury scenario. Red blood cells just don't change over that period of time. It's at the three-day mark and beyond that they begin to undergo some changes. The inflammatory reactions that can occur with an impact to the scalp, or any other place, are so variable between individuals that I know of no reliable reproducible scale that someone can use. That means they may have opinions on this matter, but I don't know of any reliable method that can sharpen our razor, so to speak, or turn up the power of the microscope to answer these kinds of question.

(DE 641 at 94-95). Dr. Rouse agreed:

> [S]he has many injuries of many, many ages, on different parts of her body. Unfortunately, we cannot, with medical certainty, get down very close on the aging of any of the injuries. We can, however, put them in categories of things that are more chronic, they're healing. The body is clearly healing in response to this injury. And some of those are where there's scarring. You know, that clearly takes weeks for a scar to develop. Other things show more along the time frame of about a week. And when I say, "a week," seven days, ten days. I can't differentiate between those two. But you know, clearly a few days have passed from the time of injury. And then she also has injuries that appear to have been in the last day or two. And you know, one to three days. I don't think you can distinguish between one day and two days, particularly when her last day was very altered.

(DE646 at 17).

---

[123]    (...continued)
six weeks old, to some that are, like I said, a week old, some that are days old. You know, days, weeks or months. We can't pinpoint exactly any injury, as far as pinpoint down to the day, this occurred on this date." (DE 646 at 22).

155

USCA5 5889

In another example of agreement, both experts thought that the subdural hematoma was not a major cause of the victim's death. Dr. Leetsma observed

> two components to the subdural hematoma. The chronic component . . . aged and dated ten days to two weeks before this incident. The fresh blood or more recent blood cannot be accurately aged and dated within about three days, two days from the time of death. So it is possible that some blood that is in this compound subdural hematoma came during the time period you just discussed, but there is absolutely no way I can tell you if that happened.

(DE 641 at 48). "The estimate of the age of the healing of the subdural hematoma, or the reaction that we're talking about, on the order of ten days to two weeks." (DE 641 at 35). Dr. Leetsma opined that, while still a factor, the subdural hematoma was "a rather minor component because of the relatively small volume estimated of that subdural hematoma." (DE 641 at 25). Dr. Rouse agreed that the subdural hematoma, "'space-wise' . . . was not a large collection of blood. But there are other injuries to the brain that are all causing, that are – there are other markers of injury to the brain." (DE 646 at 7). In those other injuries was where the experts differed. Some of the matters on which the experts disagreed include:

- Dr. Leetsma considered venous thrombosis ("clotting of cerebral veins . . . and the superior sagittal sinus") to have caused the most significant precursor to the intercranial swelling that he thought caused her death. (DE 641 at 26). The clotting of the venous channel under the skull "led to infarctions in the brain and cerebral edema and bleeding." (DE 641 at 26-27). However, he could only date "some aspects" of the venous thrombus. (DE 641 at 32). He thought that the clot "ha[d] been there for some days . . .[T]he recent red blood cells could be anywhere two to three days from the time of death. The blood clot itself is probably more than that, several days. And that's about as good as we can do with that particular component." (DE 641 at 32-33). The thrombosis occurred before "the collapse and decompensation of this child that was discovered at the naval base and leading to the hospitalization and then ultimately the child's death 24 hours or so later. The thrombosis antedates that whole business, that whole process by several days most likely." (DE 641 at 50). Dr. Rouse, on the other hand, explained: "As you go to the thrombus, that appears I think all within a few days. . . . One to three days." (DE 646 at 18). She also testified that the thrombosis was "all a constellation of injury that is acutely going on two to three days, on top of

156

USCA5 5890

previous injury a week prior." (DE 646 at 20). In short, she testified: "I don't think the thrombus alone is a significant injury to the brain. I think it's in response to the other injuries to the brain." (DE 646 at 10).

- Dr. Leestma did not believe that the recent portion of the subdural hematoma was consistent with injuries sustained on the naval base. (DE 641 at 48). Dr. Rouse, however, "would argue that the acute [component] does not conflict with occurring 24 hours prior to her death." (DE 646 at 27).

- The experts also disagreed about the source of the retinal bleeding observed when JG1999 arrived at the hospital. Dr. Leetsma explained that the retinal bleeding was "a consequence of the increased intercranial pressure this child had." (DE 641 at 45). Dr. Rouse, however, thought that "a tremendous transmission of forces" had caused the retinal hemorrhage. (DE 646 at 14).[124]

- Dr. Rouse noted that Dr. Leetsma omitted any reference to intercranial evidence of trauma. He did not "mention[] the tearing of the myelin and the axonal body. That's sheering of the fibers in the brain. These are all traumatic." (DE 646 at 11). Dr. Rouse explained that "[t]he actual neurons and tissue of the brain itself was damaged" and credibly testified "we see microscopically different manifestations, but it's all due to trauma. Trauma explains all of the findings." (DE 646 at 7, 12).

- Dr. Rouse testified "You cannot ignore the scalp hemorrhage, which are impact sites on the head, meaning her head hit – either something hit her head or her head hit something." (DE 646 at 40).[125] Dr. Leetsma, however, would "argue about does that really represent an impact site" and stated that "it's difficult to tell when those [impacts] occurred or how they occurred." (DE 641 at 43).

---

[124]    Dr. Leetsma opined that

First of all, physical forces generally do not and cannot cause the kind of retinal bleeding we see here. They can certainly lead to it if you have a car crash and a giant subdural or tremendous cerebral edema, that's going to produce intercranial pressure which can produce the retinal hemorrhages. But directly as a result of physical forces, that would not be acceptable or is not scientifically proven.

(DE 641 at 46-47).

[125]    Dr. Rouse testified: "The scalp injuries, the bruising, which as we call it subgaleal hemorrhage, that means bruising of the scalp – and contusion is the same as a bruise – those are recent. And I would say within days. There's fresh blood in those bruises of the scalp. And they indicate an impact site." (DE 646 at 18).

157

USCA5 5891

- In the end, Dr. Leetsma found one cause of death: "increased intercranial pressure which had its consequences causing her to remain comatose, nonresponsive, nonbreathing, and ultimately destroyed the circulation of the brain[.]" (DE 641 at 24). Dr. Rouse clarified that the "intercranial pressure" was "one of the physiologic responses that led to her death" but "a complex constellation of things" such as trauma, swelling, the thrombus, and the subdural hematoma contributed to her death. (DE 646 at 8).[126] If the swelling had been occurring before the incident on the naval base, "[y]ou would have expected a different scenario, where she would have had more symptoms leading up to the death, nausea, vomiting, being somnolent, sleepy, head – you know, older people describe headaches, that she would have been irritable. There would have been signs, as she was incurring increasing intercranial pressure . . . rather than a very abrupt change." (DE 646 at 40).

Most importantly, the experts disagreed about the manner in which an expert must consider the bare medical findings in light of other evidence. Both experts saw evidence of recent injury. Both experts opined that the most recent of JG1999's injuries occurred within a three-day window.[127] Both also agreed that they could not with any degree of precision place a date and hour on the most recent injuries. However, the most substantive disagreement between the experts was how to factor additional information into their conclusions.

The Government criticizes this claim because Bourgeois "seeks to have this Court view evidence narrowly based upon a defense expert's opinion but without reference or reliance upon other contextual evidence." (DE 654 at 5). Dr. Leetsma turned a blind eye to anything other than the autopsy findings. Dr. Leetsma would not take into account any testimony about the circumstances

---

[126]    Dr. Rouse described the difference between Dr. Kagan-Hallet's description of the edema as "mild to moderate" and the CAT scan as "severe" to be "broad terms" in which there is "a subjective assessment of a finding" and "overlap." (DE 646 at 46). "And I would attribute differences to a neuropathologist and a radiologist are looking at different, using different terminology, using different references." (DE 646 at 46).

[127]    Dr. Rouse testified that dating the injuries did not take into consideration the time after JG1999 died, "[b]ecause the physiology stopped at the time of death." (DE 646 at 28).

USCA5 5892

of JG1999's death, such as AB1994's testimony. Accordingly, he could not say whether the victim

died from the injuries on the naval base.[128]

Unlike Dr. Leetsma, Dr. Rouse testified that professionals use the circumstances surrounding

the death to inform their findings: "We use the physical findings in conjunction with the

investigative information. . . . Pull the two together, view each in light of the other." (DE 646 at

43). Dr. Rouse testified that a forensic examiner looks at

> all the investigative information. Some we discount, some does not fit, some fits. I
> mean, but we consider all the information that's available. . . . And we would, we
> certainly look at the medical evidence, but that is always looked at in conjunction
> with clinical evidence, with eyewitness statements, with medical records, physicians'
> previous examinations. We would pull that all together to come to our conclusion.

(DE 646 at 26). Dr. Rouse credibly explained that

> certainly the circumstances help place how significant the injury is in resulting in the
> death. For example, this child has evidence of brain injury that is a week old. By all

---

[128]    He explained:

> First of all, the aging and dating of the acute component of the subdural we have
> imprecision there, we can't do any better than a couple of days. Meaning if -- I
> couldn't tell you whether a red blood cell in that clot came five minutes before the
> heart stopped in this child or two days before. I can't. I can't do it. So that limits
> that.
>
> We have other processes that are involved in this child. The older component of the
> subdural. The cerebral thrombosis clearly predates the arrival of this child at the
> naval base. The bruising on the scalp and so forth and so on, of which there are a
> number of them, all of those have both acute and chronic components and the issue
> is the same. I can't tell you if bleeding that is there of an acute nature or recent nature
> precisely when it occurred or how it occurred.

(DE 641 at 51). Even to the limited extent he considered the circumstances leading up to JG1999's
death, Dr. Leetsma did not have a full understanding of the facts. For instance, he stated that"[t]he
child apparently at some point was reported to have drunk her own urine because she was hungry
or thirsty." (DE 641 at 79-80). He used that to infer that "this child had been ill in some fashion
prior to this incident." (DE 641 at 79-80). Dr. Leedemsa had a misconstrued understanding of the
incident in which the victim drank, and was forced to drink, her father's urine.

159

USCA5 5893

accounts, she was functioning neurologically fairly normally during that week. She was conscious, talking, walking. She has evidence microscopically of recent injury, days. At a point on the 27th, clinically her neurologic status changed abruptly. She lost consciousness, was no longer walking, talking. That fits very well microscopically with the acute injuries. The timing fits well.

(DE 646 at 22).

In this case, Dr. Rouse's testimony indicated that a medical expert cannot ignore the significant amount of recent trauma that would place the killing injury just before JG1999 arrived at the hospital. In essence, Dr. Rouse looked at the information like a jury would have to plugging scientific observations into eyewitness accounts.

## C.    Evidence of Recent, Extensive, and Fatal Head Trauma

Given the pervasive and prolonged abuse JG1999 suffered at Bourgeois' hands, the existence of different-aged brain injuries is not surprising. Unquestionably, Bourgeois' whipping, hitting, and beating the victim over time – including his barbarous assaults with a plastic baseball bat – inflicted head injuries. In his Motion to Vacate and related briefing, Bourgeois treated the subdural hematoma and related injuries' age as the only indicator of when JG1999 received the fatal injury. This is a myopic view of the trial testimony and autopsy findings. Trial testimony did not refer to the subdural hematoma as the only, or even a major, cause of death. Rather, trial testimony was consistent with the evidentiary hearing explanation that a complex serious of injuries caused JG1999''s death. In sum, she died from trauma to the brain.

The Court does not find Dr. Leetsma's testimony persuasive insofar as he contends that intercranial pressure from earlier wounds caused the victim's death. Regardless of the mention of a ten-day-old hematoma, Dr. Rouse's trial testimony convincingly described how recent injuries killed JG1999. Nothing in the record suggests any major neurological side effects before her arrival

160

USCA5 5894

on federal property.[129]

Trial testimony helped place the killing injury on the naval base. Bourgeois asserts: "There was no evidence offered through [AB1994] or any other witness to demonstrate that the fatal blows were inflicted on the grounds of the [Naval] Air Station." (DE 402 at 28). Bourgeois seriously downplays how AB1994's testimony as it fits into the context of other trial testimony. True, she chronicled a weeks-long pattern of abuse toward JB1999 that fashioned the complex constellation of wounds observed by forensic experts. She saw her father spank, hit, bite, whip, and beat the young child. AB1994 recalled more than one head injury her father caused. He told AB1994 that he wanted to kill the child, and certainly acted like he wanted to kill her. Fresh blood was present in the bruises on JG1999's head which corresponded to the internal injuries that caused her death.

But most importantly, AB1994 saw the murder on federal property. Bourgeois takes advantage of AB1994's testimony told through her childhood view to argue that no time line would place his violent act on federal property. He fails to recognize how, even if her trial testimony drifted from event to event without always following chronology, it harmonizes with the accounts of others who saw Bourgeois on federal property. After entering the naval base, two individuals saw

---

[129]    Dr. Rouse emphasized the lack of any report showing impaired functioning before Bourgeois slammed his daughter's head into the truck window. Dr. Rouse credibly explained

> If she died from an injury that the insult that occurred a week prior, again, yes, at some point you would go from conscious to unconscious. But you would anticipate days of symptoms prior, lethargy, not eating, vomiting for several days' duration, you know, that you would anticipate a constellation of symptoms. Typically also it would be, the loss of consciousness would be closer to the insult, not a week later. Typically it may be a day or two, but you would expect it to occur more recently and with symptoms in the intervening period.

(DE 646 at 45).

161

USCA5 5895

Bourgeois before he arrived at the loading dock. Hal Resides, the Occupational Safety and Health Manager for Corpus Naval Air Station, saw Bourgeois' waving for him to stop just after 10:00 a.m. on July 27, 2002. Bourgeois leaned out of the driver's side window and asked for directions to the warehouse. After he turned the engine off so they could talk, Mr. Resides saw a young girl looking out the window. (DE 355 at 113-116).[130] Mr. Resides' description of his encounter with Bourgeois suggested that JG1999 had not yet suffered a life-threatening injury.

By 10:25 a.m. Bourgeois had notified his dispatch that he was on the naval base, but his truck would not start. (DE 337 at 283). Carl Mead Arnoux, an employee at the naval base, saw Bourgeois' truck in front of the compound with the hood up. (DE 355 at 132). He helped Bourgeois jump start his vehicle.[131] These witnesses observed no sign of emergency while Bourgeois was on federal property – Bourgeois was "very kind" and not "frustrated" or "upset." (DE 335 at 143-44). The testimony from Mr. Resides and Mr. Armoux suggest that there was no concern about JG1999's welfare before Bourgeois brought her on federal land.

At approximately 11:00 a.m., Bourgeois pulled the tractor-trailer parallel to the loading dock at the Navy Exchange warehouse. (DE 335 at 147). AB1994 then described how her father stopped, told her not to get out, and then went to ask for directions. (DE 241 at 36). AB1994 described JG1999 as active and wiggling around when they arrived to unload the truck. (DE 245 at 36-37). When the truck started to back up, JG1999 tipped the potty. (DE 241 at 36).

After she spilled the potty, Bourgeois ordered AB1994 to hand him the infant. Bourgeois

---

[130]    While Bourgeois asked for directions and shut off his vehicle, he did not describe either of them leaving their vehicles.

[131]    AB1994 remembered that her father's truck would not start, but she did not remember helping him start it as he and Mr. Arnoux jumpstarted it. (DE 241 at 36).

162

took off JG1999's pants and spanked her. AB1994 then described the murder:

> AB1994:    He took her by the shoulders, and he started hitting her head on the window.
>
>                   . . .
>
> Ms. Booth:   And could you see her face, AB1994?
>
> AB1994:    Yes.
>
> Ms. Booth:   What was her face doing?
>
> AB1994:    Like making a real, real sad face.
>
> Ms. Booth:   Okay. And when she was making this real sad face, did you tell him, "Stop, Daddy, stop"?
>
> AB1994:    No.

(DE 245 at 39). Bourgeois hit her head against the window four times, put JG1999's clothes back on, and told AB1994 "to catch her and put her right next to [her] seat." (DE 245 at 39). AB1994 "was awake, and then she just, like, fell asleep." (DE 245 at 40).[132] Bourgeois then concocted his story and played it out to the hilt.

Dr. Rouse's testimony harmonized with other testimony from other medical experts who examined JG1999 before she died. When she arrived at the hospital she bore signs of recent trauma.[133] Dr. Rouse credibly explicated: "She had a multitude of injuries, the relative role of which

---

[132]    Bourgeois tries to create inconsistency between AB1994's account and the other trial testimony. AB1994's recollection harmonizes in many respects, other than the murder itself, with what Bourgeois said happened before he dashed the victim's head into the window. (DE 344 at 187). Also, her testimony does not hint that the killing blows happened somewhere other than the naval base they had entered an hour before. Bourgeois' and AB1994's actions in the hour leading up to the murder, as described by those who came into contact with them, do not even suggest the urgency that they showed once it became clear that JG1999 was dying. No basis exists to raise reasonable doubt about the location of the killing.

[133]    For instance, Dr. Noorullah Akhtar, the pediatric intensive care physician that first evaluated and treated JG1999, realized when she was first brought to the hospital that the recent head

(continued...)

163

USCA5 5897

I don't think you can dissect out. But clearly that last injury pushed it till the brain could no longer compensate and resulted in her death." (DE 646 at 39). Abundant and conclusive evidence showed trauma both consistent with AB1994's testimony and amply sufficient to cause JG1999's death.

Most importantly, Bourgeois' own words place the killing injury on federal property. He described how, when he arrived on the naval base and his truck broke down "JG1999 came into the front of the truck with him. While he could not start his truck, Bourgeois described interacting with JG1999: "At that time we were playing. Me, her – at this time I was broken down. Me, her, AB 1994, we were singing ABC's." (DE 338 at 50). After a man helped jumpstart his truck, JG1999 went into the sleeper area of the truck. (DE 338 at 51). When they arrived to unload the truck, JG1999 was "sitting on a potty in the sleeper and getting her hair combed." (DE 338 at 49, 52). Bourgeois made similar statements to FBI Agents soon after the incident. (DE 344; 46 R. 185-186). His own words do not show any hint of critical injury before they stopped to unload at the naval exchange.

Dr. Spitz and Dr. Leetsma's opinions, far removed from trial proceedings and testimony, do not credibly challenge the location of the murder. The Court finds that Bourgeois has not adduced

---

133    (...continued)
injuries included extensive blood in the brain and edema of the brain. Ms. Carol McLaughlin, a registered nurse with expertise in child abuse, was on duty when JG1999 arrived and observed several pattern injuries on the child. Dr. Ronald R. Kuffel, Jr., a board certified ophthalmologist. who Dr. Akhtar requested examine JG1999 because she had so much blood in her eyes, observed "multiple hemorrhages . . . all over the back of the eye." (DE 345 at 87). He testified that trauma to the head could cause such injuries. (DE 345 at 89). He explained that he had previously observed mild hemorrages which "go away within days to a week or so" but JG1999's were "quite extensive" and "not mild at all." (DE 345 at 91). He described how he observed "massive subinterlimiting hemorrhages, a very extensive amount of blood throughout both eyes." (DE 345 at 91). He described that type of hemorrhage as "usually associated with life-threatening injuries." (DE 345 at 91). He credibly testified that the injury was consistent with AB1994's description of Bourgeois beating his young daughter's head against the window of his truck. (DE 345 at 91).

164

credible evidence to challenge the jurisdictional element of his crime. Bourgeois does not show that trial counsel could have initiated a valid jurisdictional defense. Trial counsel was aware before trial that the forensic evidence could be interpreted in such a manner that "it could have occurred more than two days before." (DE 350 at 80). Had trial counsel tried to argue insufficiency of the evidence showing jurisdiction, he might have lessened his credibility with jurors. The Court denies this claim and will not allow additional factual development on the issue.

## IV. Trial Counsel Provided Ineffective Assistance by Failing to Call an Expert Witness to Rebut Forensic Evidence Indicting Sexual Assault (claim four)

Bourgeois claims that trial counsel provided ineffective assistance in defending against the accusation that he sexually assaulted JG1999. The possibility that Bourgeois sexually assaulted his daughter was an inflammatory, but not essential, part of the Government's case. The evidence about possible sexual assault came from two sources: (1) the examination of autopsy photographs by an expert in the sexual abuse of children and (2) testing done on rectal swabs taken during the autopsy. Bourgeois claims that trial counsel should have sought expert assistance to rebut both types of evidence.

### A. The Trial Evidence

During the autopsy, Dr. Rouse administered a sexual assault examination on the victim. She took swabs from JG1999's mouth, vagina, and anus. Dr. Rouse made slides from those swabs and turned them over to the FBI for testing. (DE 345 at 172, 176-77). Dr. Rouse however, did not observe any external trauma to JG1999's genital area. In fact, the autopsy report stated: "The external genitalia are those of a normal female child, and there is no evidence of any trauma to the labia or introitus. The hymen is present and appears atraumatic. The back is straight and the anus is unremarkable and atraumatic." (DE 397, Exhibit 52, Autopsy Report of Dr. Elizabeth Rouse, PA,

165

USCA5 5899

p. 3). Nevertheless, the Government used the autopsy photographs and the results from testing the swabs to argue that Bourgeois sexually assaulted his daughter.

The Government's opening argument promised to show that "there was seminal fluid in the rectum of that baby." (DE 335 at 42). Testimony about Bourgeois' sexual assault on his young daughter began after AB1994 testified on the fourth day of trial. Previously, the parties had carefully avoided asking about any sexual abuse Bourgeois inflicted on his daughters. The forensic evidence allowed the Government to prove that the murder was only the culminating event in a barrage of abuse that also contained a sexual component.

The Government first called Dr. Scott Anthony Benton, the Medical Director of the Children-at-Risk Evaluation Center and a Clinical Associate Professor with Louisiana State University and Tulane Schools of Medicine. Dr. Benton testified that he examined JG1999 on May 21, 2002, after Child Protective Services in Louisiana had received a complaint that JG1999 had vaginal bleeding. (DE 346 at 23-24). At that point, Bourgeois only had possession of the child for a few days. (DE 346 at 28). In his head-to-toe examination of her, Dr. Benton did not observe signs of abuse. Specifically, he found nothing in the vaginal or rectal area that would indicate bleeding or sexual trauma. (DE 346 at 31-32).[134]

Dr. Benton, however, found a much different picture when he reviewed the autopsy photographs. At trial, Dr. Benton briefly contrasted the appearance of the victim's genital area in his initial examination with what he saw later:

> [T]he autopsy photograph is specific that it is blood outside of a vessel. Okay? And the reason I can say that is because all of the other parts of her vagina are white. When you drain blood from a mucus membrane, it turns white. But that area doesn't.

---

[134]    He noticed inflamation around her urethra, but did not see any evidence of trauma. (DE 346 at 45).

166

USCA5 5900

It stays – it's a black red. And that tells me that that's blood outside of a blood vessel. So . . . this could have been trauma[.] . . . This one is blood outside and most likely is trauma[.]

(DE 346 at 46). The bulk of Benton's testimony about sexual assault did not focus on external observations, but on the possibility that the FBI had detected semen in her rectum.

Dr. Benton did not perform any testing on substances taken from JG1999's corpse. However, the Government laid a foundation for later testimony by asking Dr. Benton about how forensic testing can indicate sexual abuse. Dr. Benton testified that three tests could confirm the presence of semen: (1) a test for acid phospatase, which is a substance predominantly produced in the male prostrate and deposited in ejaculation or pre-ejaculation; (2) testing for the presence of the prostatic specific antigen, also known called by the terms "P30" or "PSA"; and (3) the "more confirmatory" observation of sperm cells. (DE 346 at 22-23). The Government asked what it would mean if testing found indications of semen, but no sperm could be observed. (DE 346 at 49). Dr. Benton explained that sexual abuse may still have occurred under some circumstances, such as if the man has had a vasectomy,[135] if he only deposits only pre-ejaculate fluid, or he has been ill. (DE 346 at 50-52). Finally, the Government asked Dr. Benton specifically about what substances contain the PSA protein, thus allowing for a positive result on the P30 test. Dr. Benton testified that the P30 could only be found in secretions from the prostate and in breast milk. (DE 346 at 53).

Cross-examination did not challenge Dr. Benton's observation of possible vaginal trauma. Instead, trial counsel focused on the reliability of P30 testing. Dr. Benton explained that, although "very low levels of false positives" are associated with the P30 test, "there is no such thing as 100

---

[135]    Before trial, trial counsel told the Court that Dr. Johnson "asked [him], as a matter of fact, . . . .whether or not [their] client had a vasectomy, and [they] discovered he has not." (DE 388 at 33).

167

USCA5 5901

percent accuracy." (DE 346 at 55). He testified there are "multiple ways to test for the P30, just to confirm that it really is there." (DE 346 at 55). He conceded, however, that the P30 test still had a chance of being erroneous. (DE 346 at 55).

The Government next called Caroline Zervos, a forensic serology examiner with the DNA Analysis Unit for the FBI laboratory in Quantico, Virginia. Ms. Zervos testified about the Government's testing of postmortem swabs, labeled Q5 through Q7, taken from JG1999's rectum. Ms. Zervos described how the forensic laboratory generally uses two tests, the presumptive acid phospatase and the confirmatory PSA, to determine the presence of semen. (DE 346 at 63-64). Here, the laboratory only performed a confirmatory P30 test in order to avoid a false positive. (DE 346 at 87). The test was positive for samples Q5 and Q7. (DE 346 at 85). Throughout Ms. Zervos' testimony, she equated a positive score on the P30 testings with a positive finding of semen.

Cross-examination probed whether anything other than prostate proteins could result in a positive P30 test. Ms. Zervos testified that low levels of P30 could be in 'peripheral male blood, as well as male urine" but at "very low concentrations." (DE 346 at 104). She did not believe that the protein could be found in female fluids. (DE 346 at 105-06). Also, she did not know if anything could be injected that would have the same reaction. (DE 346 at 106). In a discussion with the Court, Mr. Tinker expressed that he "got more than he wanted" from Ms. Zervos because she "didn't know whether things in food might cause" a false positive. (DE 346 at 107).

Anthony Onorato, a forensic DNA examiner with the FBI, testified that the only DNA present on the rectal swabs, Q5-Q7, came from JG-1999. (DE 346 at 118). He explained, however, that it was not uncommon to have a sample where semen, but not male DNA, is detected. (DE 346 at 127-28). On cross-examination, Mr. Onorato testified that the only place outside of male semen where the P30 protein can be found is the blood of a male with prostate cancer. (DE 346 at 128-29).

168

USCA5 5902

Also, Mr. Tinker emphasized that the FBI testing was negative for sperm and for male DNA. (DE 346 at 130).

> During guilt/innocence closing, the Government argued:
>
> The DNA, our DNA, expert testified that the swabs that were taken from JG-1999's little bottom had semen on them. There was semen in that baby's bottom. But the swabs were taken at the autopsy and the autopsy was done on June 29th. The baby was thrown on the side of the truck on June 27th and died on the 28th, two days. Dr. Benton testified, the DNA specialist testified that the sperm is very delicate, that it degrades quickly. But when you get a confirmatory test for semen, you've got semen. It's an ejaculate from a man, not from a woman, from a man from sexual arousal. And that's what we know.
>
> The other thing that Dr. Benton told us, as many of the other physicians, is that there can be things happen and not show. You know, I thought it was real interesting yesterday when Mr. Bourgeois was testifying because I said, what was that around her eyes? I said, wt [sic] that Vaseline? No, we don't have Vaseline in the truck.
>
> What is so bad about having Vaseline? I thought that was interesting. It's a lubricant. Why would you have to deny that?

(DE 339 at 20).

The defense's closing argument responded by pointing out weaknesses in the evidence of sexual assault: "They say sexually abused. And they don't talk about the fact that they found no evidence of trauma to the rectum or the genitalia when they examined this child at the hospital." (DE 339 at 24). In addition to calling the post-mortem observations into question, trial counsel pointed out forensic weaknesses in the Government's testing. Trial counsel asserted that the testing should have "no reliability as far your decision making in this case" since the Government's case rested on "nothing but insinuations since that test for the semen, the advanced test, I don't know what it's call[ed], was negative. There's no evidence of semen, I suggest to you, being found on this child." (DE 339 at 41-42).

The Government did not adduce any additional evidence of sexual assault in the punishment

USCA5 5903

phase. In the punishment closing arguments, the Government chronicled the extensive physical injuries Bourgeois inflicted on the victim. Pages and pages of transcript recount his unrelenting torture. In that closing, the Government twice briefly mentioned that Bourgeois' semen had been found in the victim. First, when discussing how Bourgeois had laughed in videotapes while subjecting children to abuse and traumatic episodes, Ms. Booth asked: "Was he laughing when he beat JG-1999 to death? Was he laughing when he bit her, or he burns her, or *he put his filthy semen in her little body*?" (DE 342 at 70) (emphasis added). Second, the Government argued that Bourgeois had not shown remorse:

> Let's talk about lack of remorse. The Defendant spoke to you. Was there remorse in his voice? Did he ever admit to you that he lost it and accidentally killed the baby, and that it was his background that did it to him? No, he didn't. Not ever. He murdered this baby. His signature with his teeth marks *and his semen is all in that baby*.

(DE 342 at 75-76) (emphasis added).

Bourgeois argues that trial counsel should have presented expert testimony to undercut Dr. Benton's observation of sexual abuse and to blunt the forensic evidence. The Court observes, however, that to succeed on this claim Bourgeois must prove both that the Dr. Benton was incorrect in his physical observations and that the positive P30 did not necessarily equate to a positive result for semen. Absent evidence that would likely eviscerate the effect of either prong, the other would give the jury a sufficient basis to find that Bourgeois sexually assaulted his daughter.

### B.    Dr. Benton's Observation of Sexual Trauma

Bourgeois argues that Dr. Benton had no reliable basis for his testimony about sexual trauma. Bourgeois premises his argument on (1) Dr. Rouse's autopsy report that did not find evidence of sexual trauma and (2) an affidavit from Dr. Spitz in which he criticizes Dr. Benton's testimony. Dr. Spitz has opined that:

170

USCA5 5904

> As a forensic pathologist, being aware of the type of exposure of the body available to a pathologist performing an autopsy and directly viewing the body, I take exception with Dr. Benton's observations and consider them questionable. Dr. Rouse was in a much better position to determine if a bruise was present. She examined the entire area, described it, and determined it was normal.

(DE 397, Exhibit 53, Declaration of Werner U. Spitz, M.D., PA document at ¶ 15). [136] Bourgeois faults trial counsel for not questioning Dr. Rouse about her autopsy findings or otherwise verifying that JG1999 did not suffer sexual abuse.

Bourgeois did not call any witness in the evidentiary hearing to criticize Dr. Benton's observations. Bourgeois did not question Dr. Rouse during her post-conviction testimony about her sexual-assault examination. Bourgeois relies entirely on Dr. Spitz affidavit that does not necessarily eviscerate Dr. Benton's interpretation of the evidence, it only opines that the person performing the autopsy would be in a "better position to determine if a bruise was present."

Bourgeois has not presented any evidence showing that Dr. Rouse's initial observation of no trauma was more valid than Dr. Benton's trial testimony. In particular, he has not shown that Dr. Benton's specialized knowledge about childhood sexual abuse and prior treatment of JG1999 did not provide sufficient support for his expert opinion. Unlike Dr. Rouse, Dr. Benton could comment on the condition of JG1999's genital area over time; he could compare her autopsy photographs with those taken a month before her death. Bourgeois' ineffective-assistance claim relies on the unproven speculation that Dr. Rouse would not defer to Dr. Benton's observations. Bourgeois has not shown that trial counsel should have relied on an expert witness such as Dr. Spitz, who can only say that it is better to defer to the autopsy doctor's observations. At best, Bourgeois has shown that experts can disagree on how to interpret the evidence collected during the autopsy.

---

[136]    From the onset, Dr. Spitz's testimony on this issue is suspect. As previously noted, Dr. Spitz is not a credible expert.

171

USCA5 5905

Even without calling additional witnesses, trial counsel exploited weaknesses in the evidence of sexual trauma. For example, during the cross-examination of Carol Ann McLaughlin, the registered nurse who examined JG1999 the day after her death, trial counsel stressed that she saw no evidence of sexual trauma to her genitalia. (DE 595 at 65). Trial counsel also brought out that Ms. McLaughlin observed no trauma in her pelvic examination. (DE 595 at 69-70). During closing arguments, the first thing Mr. Tinker stressed was that "they found no evidence of trauma to the rectum or genitalia when they examined this child at the hospital." (DE 339 at 24). On post-conviction review, Bourgeois has not adduced any evidence or testimony that would put a stronger case against the evidence of sexual trauma than the essence of that brought out by trial counsel. Bourgeois has not shown that trial counsel performed deficiently in addressing Dr. Benton's testimony.

## C.    Forensic Evidence of Semen

Before trial, Bourgeois' attorneys sought expert help in performing their own testing on the rectal swabs. The Court appointed Dr. Elizabeth Johnson as a DNA expert pursuant to trial counsel's *ex parte* request well before trial. (DE 122; DE 351 at 18-19). Trial counsel had confidence in Dr. Johnson's abilities after seeing her presentations at a seminar. Trial counsel communicated with her repeatedly. (DE 388 at 14, 33, 35). Dr. Johnson identified sufficient biological material for further serological and DNA testing. Trial counsel made sure that the Government sent the remaining samples to Dr. Johnson in January 2004. (DE 388 at 32-34).[137] To

---

[137]    Bourgeois has raised a related *Brady* claim which asserts that the Government did not turn over a report relating to its testing. (DE 614). Specifically, Bourgeois notes the existence of a document now labeled PX-179 entitled "P30 Test Results"that "indicates that on the three swabs, Q5-Q7, that were subjected to p30 testing by the FBI, the results were 'very weak, very weak and weak,' respectively." (DE 611 at 6). The basis for this *Brady* claim is that this report, while

(continued...)

USCA5 5906

that point, Dr. Johnson had been "good about talking to [the defense] about issues." (DE388 at 35).

Dr. Johnson first ordered an acid phosphatase test, which detects an enzyme present in several body fluids, but in a particularly high concentration in seminal fluid, that came back negative. (DE 575 at 7-8). Next, she ordered her own P30 test which came back as a "weak positive." (DE 575 at 18).[138] The negative results from her microscopic sperm search, which was even more sensitive than that done by the FBI, made her question the accuracy of the P30 results. In light of the absence of sperm cells, Dr. Johnson interpreted the weak positive P30 test as a "false positive" that could be "due to bacterial proteins found in the rectal swab. If there was actually sperm on the swab, they should be observed." (DE 575 at 23). To that end, she formed the following opinion:

---

[137]    (...continued)
contained in additional collections of trial material, was not in the documents trial counsel submitted to Bourgeois' current attorneys. According to Bourgeois, PX-179 was also not in the material trial counsel turned over to Dr. Johnson and trial counsel apparently did not rely on that information in cross-examination. Bourgeois asserts that his attorneys only became aware of PX-179 during the evidentiary hearing. A *Brady* claim requires the defendant to show that (1) the Government intentionally or inadvertently suppressed (2) material favorable to the defense which (3) was materially prejudicial. *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Brady v. Maryland*, 373 U.S. 83, 89 (1963). Bourgeois has not shown by a preponderance of the evidence that the Government, whether intentionally or by accident, withheld PX-179. The Government called a witness to explain how in late 2003, the Goverment received 358 pages of material from the FBI lab, including PX-179, and then soon thereafter sent the defense 358 pages of material. (DE 655 at 54-57). Also, the records trial counsel turned over to Bourgeois' current attorneys did not contain other documents the Government disclosed before trial. (DE 655 at 63-64). While PX-179 was not found in trial counsel's files, the preponderance of the evidence certainly indicates that the Government fulfilled its *Brady* obligation. At any rate, as the Court will discuss with respect to his *Strickland* claim, a notation of weak results on the P30 test does not indicate an absence of seminal fluid, but triggers a confirmatory search for sperm. The "weak" or "very weak' results from PX-179 signal a small amount, not an absence, of seminal fluid. At any rate, Dr. Johnson's own testing, fully available to the defense, came to the same conclusion.

[138]    Dr. Johnson explained that "P30 is a protein that is found in abundance in human seminal fluid, and it is found in lesser concentrations in some other fluids. . . . Amniotic fluid has been reported, breast milk, urine from men, some serum from men, and some female serum, and some female urine." (DE 575 at 13).

USCA5 5907

"Taking all of the test results, some of which were negative, negative for sperm, negative for acid phosphatase, negative for DNA, even on the Y chromosome testing, that it was not reasonable to conclude that there was semen present on the swabs." (DE 575 at 19).

By the time Dr. Johnson finished her testing, trial loomed near. Trial counsel faced an oncoming deadline for the disclosure of all expert reports. As the parties were tardy in disclosure, on February 25, 2004, the Court ordered that all experts whose reports were not produced within two days would be excluded from testifying. (DE 196). Trial counsel stepped up efforts to secure a report from Dr. Johnson.[139]

On March 1, 2004 – immediately before the guilt/innocence phase – Dr. Johnson provided trial counsel with a two-page summary of her proposed the testimony. In a handwritten report that she obviously prepared hastily,[140] Dr. Johnson summarized the results of her testing. She reported that her AP test and microscopic sperm search came out negative, but her P30 test yielded a weak positive. Dr. Johnson did not see the weak positive, however, as dispositive particularly because her microscopic search showed no sperm. She told counsel that the P30 result could be a false positive due to bacterial from the rectal swab or from other substances where prostatic specific antigen (PSA) has been detected, such as amniotic fluid, breast milk, saliva, female urine and female serum.

Trial counsel did not call Dr. Johnson as a witness. In his post-conviction answer to interrogatories, Mr. Tinker explained:

---

[139]   She later testified that she did not previously known that there was any urgency to the preparation of her report. (DE 575 at 27).

[140]   Dr. Johnson explained in the evidentiary hearing that she provided him "a handwritten document, because I was in Colorado on another case and didn't have my file, and he kind of caught me off guard needing something. So I put together a handwritten document for him, to assist him in cross-examination." (DE 575 at 21).

174

USCA5 5908

I had met Dr. Johnson at a seminar and was very impressed with her presentation. I spoke with her afterward about helping us with Mr. Bourgeois' case. I had a great deal of problems getting her to return my phone calls. I learned, during my dealings with her that she did not have her own lab. She did not do the testing I requested in a timely fashion and, therefore, we did not utilize her services.

(PX-82 at 14).

In his Motion to Vacate, Bourgeois faults counsel for not calling an expert such as Dr. Johnson to challenge the forensic evidence of sexual assault. Bourgeois' attack to trial counsel's efforts emphasizes three themes: (1) the P30 result was only a "weak positive," which he argues raises the accompanying possibility that it was a "false positive"; (2) substances other than semen could have provided the P30 antigen that gave the weak positive result; and (3) no observation of sperm cells confirmed the presence of semen. Bourgeois' challenge, however, cannot stand independent of what his attorneys did at trial. In fact, Respondent persuasively argues that, although trial counsel did not call Dr. Johnson as a witness, the flow of his questioning suggests that he used her report to prepare for cross-examination.

Trial counsel did not leave forensic testimony about sexual assault unrebutted. For instance, trial counsel's cross-examination of Dr. Benton centered on whether the P30 test was susceptible to false-positive results. (DE 346 at 53-55). Trial counsel asked both Ms. Zervos and Mr. Onorato whether substances other than semen could give a positive result on the P30 test. (DE 346 at 102-06, 128-29). Trial counsel even elicited from Ms. Zervos that she did not know if digested food could contain the P30 antigen – a factor which Dr. Johnson's testimony would have refuted. (DE 346 at 106). Trial counsel's questioning and argument also highlighted that the Government's experts observed no sperm cells. (DE 346 at 130). In fact, trial counsel's questioning showed that the absence of sperm made the Government experts recommend DNA testing. (DE 346 at 130).

Without calling an expert witness, trial counsel's cross-examination touched on the issues

175

USCA5 5909

raised in Bourgeois' Motion to Vacate. "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Richter*, ___ U.S. at ___, 131 S. Ct. at 791. "In many instances cross-examination will be sufficient to expose defects in an expert's presentation." *Id.* (noting also that "[w]hen defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict"). If based on an adequate investigation and understanding of the issues, an attorney's decision to attack the Government's expert witnesses on cross-examination rather than calling additional experts can be reasonable performance. *See Bower v. Quarterman*, 497 F.3d 459, 467 (5th Cir. 2007). Trial counsel's questioning manifested a familiarity with the issues presented in Dr. Johnson's report and, in fact, introduced doubts that could not have been raised by expert testimony, such as that digested food could contribute to the positive P30 results.

Validating trial counsel's cross-examination through expert testimony certainly could have provided some benefit to the defense. Bourgeois has made much of Dr. Johnson's opinion that the P30 testing resulted in a "weak positive," hoping that it would discount the possibility of sexual assault. In the hearing, Dr. Johnson's explanation of her testing tracked the pre-trial report she gave counsel, but she explicitly drew a distinction between her test results and that from the FBI testing on the P30 assay: they reported a "positive" and she reported a "weak positive" because the test line on the P30 test card "was barely visible . . . It's actually very difficult to see on a photograph even." (DE 575 at 72).[141] Bourgeois particularly hopes that her qualification of the P30 results as a "weak

---

[141]    Dr. Johnson explained that in 2004 she tested rectal swabs for the presence of seminal fluid and spermatozoa. (DE 575 at 6). The swabs were tested using the acid phospatase test, which came up negative. (DE 575 at 6, 8). A microscopic search for spermatozoa was negative. (DE 575 (continued...)

176

USCA5 5910

positive" would have undermined the certainty of the Government testing about semen. The value in Dr. Johnson's testimony, therefore, would have been in showing that the evidence should have compelled the Government to perform the more-confirmatory sperm search.

Dr. Johnson's testing, however, did not completely discount the possibility that Bourgeois sexually assaulted his daughter. On cross-examination, Dr. Johnson admitted that a finding of "weak positive" indicated that the test had only detected a lesser amount of PSA, not that it did not find any semen. (DE 575 at 74-75, 87-88). She elaborated: "the test is designed to detect p30. But whether or not – you can make some double-checks and checks and balances based on the intensity of the color reaction, which gives you an idea of concentration or the amount of material you're dealing with." (DE 575 at 87). In other words, a weak positive indicates the amount, not the presence of, PSA. Testimony in the evidentiary from Jerrilyn Conway, an FBI forensic examiner, confirmed that "[t]he weak positive result means that there is a limited amount of PSA present, which means that there is a limited amount of semen present." (DE 576 at 13).

In that regard, Dr. Johnson's proposed trial testimony would only have reconfirmed that a substance with PSA was contained in the victim's rectum. Dr. Johnson's testimony would most benefit the defense if she could identify a substance high enough in PSA content to react with the P30 test. The testimony at trial and on post-conviction review was not completely in agreement about what materials contain PSA. Ms. Zervos did not know if substances from female could

---

[141]    (...continued)
at 9-10). She also performed a P30 test. She explained that the P30 protein had been found in "[a]mniotic fluid . . . , breast milk, urine from men, some serum from men, and some female serum, and some female urine." (DE 575 at 13). She did not know if studies identifying the P30 protein had included two-and-a-half year old children. (DE 575 at 17, 100, 105). She explained that: "Taking all of the test results, some of which were negative, negative for sperm, negative for acid phosphatase, negative for DNA, even on the Y chromosome testing, that it was not reasonable to conclude that there was semen present on the swabs." (DE 575 at 19).

177

contain PSA/P30. The trial testimony allowed for it to exist in females from lactation. The post-conviction record shows that the P30 antigen exists in different substances produced by both males and females. Dr. Johnson explained that it had been found in "[a]mniotic fluid . . ., breast milk, urine from men, some serum from men, and some female serum, and some female urine. (DE 575 at 13). Because the blood on JG1999's underwear tested negative for PSA/P30, and Dr. Johnson agreed that her blood could not have been the source of the substance in her rectum (DE 575 at 106-08), the substance was likely foreign to the victim's body. Not even Bourgeois' other expert, Charles Alan Keel, however, could conclusively identify a substance naturally occurring in a two-year-old infant that would contain the P30 protein. (DE 575 at 13).[142]

Problematically for Bourgeois, Dr. Johnson did not discuss the level at which PSA occurs in substances other than semen. Ms. Conway, however, explained that the P30 test was designed not to react to substances with a lower concentration of PSA than semen. (DE 576 at 10, 20-21). According to Ms. Conway, research had shown that substances such as female urine or female serum, both of which Dr. Johnson identified as a source of PSA, would not trigger a positive reaction on the P30 test. (DE 576 at 20-21). Studies have shown that PSA levels in pre-pubescent girls were not high enough to account for a "false positive." (DE 576 at 26). The only substance containing PSA at a level near that which could trigger a positive reaction was breast milk. (DE 576 at 22). Especially where the circumstances of this case do not present a circumstance where breast milk would be present in JG1999's rectum, Ms. Conway credibly explained that "if the PSA test was

---

[142]     Mr. Keel did not know if a toddler can produce the P30 antigen. (DE 575 at 129). He also opined that "there's really no such thing . . . as a false positive. . . . It's whether or not the result is coming from P30 or not." (DE 575 at 130). Mr. Keel viewed the P30 test as "a screening tool, in the same way that we use acid phosphatase . . . it's only a presumptive test." (DE 575 at 135).

178

positive, they can be assured that that came from semen." (DE 576 at 20). With that understanding, Dr. Johnson's post-conviction testimony still allows for the P30 reaction coming from a substance external to the victim, which still carries with it the possibility of sexual assault.[143]

Taken in the context of the trial and post-conviction record, the testimony from Dr. Johnson and Mr. Keel does not show that trial counsel provided ineffective deficient in relying on cross-examination to poke holes in the Government's forensic evidence. Here, the forensic evidence of sexual assault was not of the strongest sort, but was not inconsequential either. Given the complex scientific issues at play, and the fact that his experts could question but not conclusively eliminate the possibility of sexual assault, Bourgeois has not shown that using experts to highlight that information would have swayed the jury. In particular, the Court's observation of Mr. Keel and Dr. Johnson showed that they would not be persuasive witnesses before the jury. They identified the same errors in the testing that trial counsel had, yet bogged down their testimony with fine distinctions which did not completely discount the possibility of sexual assault. A reasonable trial attorney could certainly be concerned that a prolonged attack without a clear-cut resolution could make a minor, but highly inflammatory, issue a much more prominent feature in the jury's

---

[143]    Bourgeois hopes that Dr. Johnson's testimony would have discounted Dr. Benton's testimony treating sperm as easily degradable. Dr. Johnson criticized Dr. Benton's testimony that the sperm could have degraded over time as "totally erroneous" because "[s]perm are very durable. They can be found in decomposing bodies 30 days after" death. (DE 575 at 15, 101-02).Dr. Johnson explained that, according to their own guidelines, the FBI testing should not have allowed a conformation of sexual assault because FBI protocol only allowed identification of sperm when it was "intact, with a tail attached[.]" (DE 575 at 103). Additional experts in the hearing bolstered Dr. Johnson's testimony. Charles Alan Keel, a forensic scientist with Forensic Science Associates who "specialize[s] in the identification and genetic characterization of human body" testified that "there's no proof of semen being detected . . .in the evidence that was presented at trial." (DE 575 at 123, 127). His testimony, in essence, was that a positive P30 could not reliably predict the presence of seminal fluid without the presence of sperm. Ms. Conway, however, disagreed and stated that sperm cells will break down quickly, likely only susceptible to identification for a day. (DE 576 at 25). She expected, though, the sperm cells to survive as long as the PSA would. (DE 576 at 47).

179

USCA5 5913

deliberation.

For the reasons outlined above, Bourgeois has not shown that trial counsel provided ineffective assistance by not calling expert witnesses such as Dr. Johnson or Mr. Keel at trial.

**D.      Prejudice From Trial Counsel's Defense Against Allegations of Sexual Assault**

To succeed, Bourgeois must also show a reasonable probability of a different result had trial counsel vigorously attacked the evidence of sexual assault. In doing so, Bourgeois would both have to (1) discount the presence of semen through a false positive on the two rectal swabs and (2) conclusively show through Dr. Johnson's testimony that Dr. Benton incorrectly identified vaginal trauma.[144]  Even if he could rebut that evidence, testimony hinted that Bourgeois committed improprieties on his daughters when he spent nights locked in a bedroom alone with them. The testimony of bruising and semen only confirmed that Bourgeois sexually assaulted JG1999.

To some extent, an aggressive challenge to the sexual-assault evidence could have opened the door to additional prejudicial information. Trial counsel had acted to prevent the Government from adducing "[a]ny evidence that the defendant may have or did sexually abuse his daughter, [AB1994]." (DE 160 at 3).  The Court refused to allow the Government to adduce evidence in its case-in-chief that witnesses "saw [him] french kiss AB1994," have her sit on his lap inappropriately, and treat her like a mature adult.  (DE 347 at 92, 94-95).  In fact, the Court commented without rejoinder from trial counsel that "everybody in the room knows what was going on with Mr. Bourgeois and AB1994."  (DE 347 at 94).  An additional and aggressive challenge to the allegation that he sexually assaulted JG1999 may have allowed the Government to discuss what he had done

---

[144]      Because *Brady*'s materiality standard is "identical to" the standard for prejudice under *Strickland, Johnson v. Scott*, 68 F.3d 106, 109-10 (5th Cir. 1995), the discussion that follows above also shows why Bourgeois cannot succeed on his related claim that the Government withheld information about its DNA testing.

180

USCA5 5914

to his other daughter.

Regardless, the evidence of sexual abuse was an inflammatory, but not decisive, factor in both phases of trial. Without much question, Bourgeois' sexual abuse of his daughter did not substantially impact the factors the jury had to consider reaching a verdict as to his guilt. Bourgeois expresses the most concern about the Government's reliance on sexual assault at the punishment phase. The Court's review of the trial and the evidentiary hearing testimony indicates that he has not shown a reasonable probability of a different result had trial counsel's efforts disputed the sexual-assault evidence.

As discussed above, the post-conviction evidence questioned, but did not completely eliminate, the possibility that Bourgeois sexually assaulted his daughter. Even so, that evidence was not a pronounced feature of the trial. Even if trial counsel had conclusively rebutted the testimony from both Dr. Benton and from the other forensic experts, the jury still had already heard vivid testimony about how Bourgeois viciously abused his daughter in numerous other ways. While the evidence of sexual abuse made Bourgeois seem more selfish, uncaring, and inhuman, the jury still had before it a graphic understanding of the unrelenting abuse he heaped upon the young child. The Government's brief mention of sexual assault in the punishment phase closing argument was only another reminder that JG1999 bore the signs of her father's abuse throughout the rest of her body. While certainly similar information could unduly inflame a jury in other circumstances, Bourgeois' abusive and violent tendencies prevent any reasonable likelihood that jurors would have reacted differently in the punishment-phase had they not known that Bourgeois had raped his daughter.

In sum, Bourgeois has not shown that, had trial counsel challenged the evidence of sexual abuse in the manner he proposed, there would have been a reasonable probability of a different result. The Court will deny Bourgeois' ineffective-assistance claim based on those allegations.

181

USCA5 5915

**V.**     **Trial Counsel Provided Ineffective Assistance by Not Litigating a *Daubert* Challenge to Three of the Government's Expert Witnesses (claims five and six)**

As discussed at length above, the autopsy revealed that JG1999's body bore numerous and varied wounds suggesting a long, tormented series of physical assaults. The Government sought expert assistance to describe those injuries to the jury. Those expert witnesses used the autopsy photographs to chronicle the dozens of bruises, lacerations, and other wounds throughout the young victim's body. For example, forensic odontologists Dr. Senn and Dr. Chrz's testimony linked Bourgeois to bite marks on JG1999's arm and lower back. As a demonstrative device, expert witnesses relied on digitally enhancements made to the autopsy photographs by Dr. Oliver.

Bourgeois faults trial counsel for not challenging the scientific and technical reliability of (1) Dr. Oliver's use of digitally enhanced autopsy photographs (claim five) and (2) Dr. Senn and Dr. Chrz's opinion about bite mark evidence (claim six). Bourgeois asserts that, had counsel asked the Court to subject the experts' opinions to the rigors of *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), their testimony would not have come before the jury. The Court finds that Bourgeois has not met his burden under *Strickland* with regard to these claims.

**A.**     **Dr. Oliver's Reliance on the Digitally Enhanced Autopsy Photographs (claim six)**

The Government sought the assistance of Dr. William Oliver to ascertain the extent of external injuries on the victim. Dr. Oliver, a medical doctor board certified in anatomical, clinical, and forensic pathology who also possesses a master's degree in computer science, received copies of the autopsy photographs which had been taken with a 35mm camera. Dr. Oliver digitally enhanced the autopsy photographs using a method called Contrast-Limited Adaptive Histogram Equalization ("CLAHE") which redistributed colors to accentuate certain features. For his trial testimony, Dr. Oliver created a PowerPoint presentation with three representations of many autopsy

182

USCA5 5916

photographs: the original, a digital enhancement of the original image, and the enhanced photograph with markings indicating the external injuries. Other experts relied on Dr. Oliver's enhancements.

During a pre-trial hearing trial counsel raised concerns about the use of the enhanced images, but did not lodge a *Daubert* challenge. (DE 350 at 103; DE 345 at 14). Mr. Tinker informed the Court that his particular concern was that the photographs were more prejudicial than probative, not that Dr. Oliver's testimony lacked reliability. (DE 345 at 30). The Court told the parties that it would like to hear about Dr. Oliver's methodology before his enhanced photographs came before the jury. (DE 350 at 103-04).

Before Dr. Rouse began her testimony in the guilt/innocence phase that would use the enhanced photographs, the Court again said it wanted to hear about "whatever [Dr. Oliver's] expertise is on this enhanced picture taking." (DE 346 at 174). Dr. Oliver testified outside of the jury's presence about the enhancement of the photographs. (DE 345 at 7-9). As Dr. Oliver began discussing the digital enhancements, the Court asked if his imaging technique had been peer reviewed, which he said it had. (DE 345 at 14). Dr. Oliver outlined the process he used to accentuate the external injuries. He explained that his method of image processing changed the relative value or prominence of features already visible in the image. (DE 345 at 17). Mr. Tinker asked if "this is something that you do, or are there other people in the country that do this kind of thing?" (DE 595 at 29). Dr. Oliver described a "long history of all this" and referred to "contrast enhancement in the 1960s for bite mark analysis. So the general practice of doing image processing to evaluate imagery is actually fairly old." (DE 595 at 29). The specific technique he used "has been in use since the mid 1980s." (DE 595 at 30).

Nevertheless, Dr. Oliver stressed that his forensic conclusions came from the original photographs, not the enhancements. He stated that his "conclusions are based on going back to the

183

USCA5 5917

original image" and that the CLAHE technique only served to "make features in an image more obvious." (DE 345 at 13). When he later testified before the jury, he reiterated that "you don't want to draw conclusions from" the enhanced images but you must "go back to the previous image." (DE 345 at 26). The trial court allowed the admission of the enhancements "as an aid to the jury." (DE 345 at 30). Other witnesses, most notably Dr. Senn and Dr. Chrz, used Dr. Oliver's enhanced images to accentuate the injuries they identified. Only the unenhanced autopsy photographs went with the jury into deliberations. (DE 345 at 33).

Bourgeois claims that Dr. Oliver's method of enhancing the autopsy photographs is not reliable or scientifically endorsed. The Federal Rules of Evidence and the Supreme Court's *Daubert* jurisprudence govern the admission of expert testimony. Both essentially require that expert testimony be reliable and relevant. Bourgeois' attack on Dr. Oliver's testimony does not allege that all digital enhancement of photographic evidence violates scientific principles. Instead, Bourgeois claims that the specific CLAHE technique Dr. Oliver utilized has not been peer reviewed, distorts the original image, and otherwise insert a degree of unreliability into the expert's analysis. Bourgeois also contends that trial counsel should have sought expert assistance to dispute the Government's reliance on the enhanced images. To that end, Bourgeois has adduced significant technical evidence criticizing Dr. Oliver's methodology.

However, this Court's analysis cannot stray far from *Strickland*'s inquiry into what trial counsel should have done and how it would have made a difference at trial. The ultimate inquiry is not an expert's strict compliance with scientific principles or paradigms, but *Strickland* performance and prejudice.[145] With that in mind, the Court only needs to summarize the highly

---

[145]   In his answers to the interrogatories, Mr. Tinker stated: "I reviewed the government's
(continued...)

184

detailed evidence in order to conclude that Bourgeois has not met *Strickland*'s deficient performance or actual prejudice prong on these claims.

Bourgeois primarily relies on three sources to challenge Dr. Oliver's CLAHE technique. First, Bourgeois put forward C. Michael Bowers, a forensic odontologist and dentist, as an expert in photo imaging and enhancement. Dr. Bowers prepared a report that coupled his review of the CLAHE method with his own examination of the *Daubert* analysis. In the hearing, however, Dr. Bowers revealed that his expertise with digital enhancement came from "weekend courses in [his] town . . . put on by . . . the junior college." (DE 598 at 40). His scientific works on the subject consisted of a book he self-published. Dr. Bowers is not expert in image enhancement.[146] As the Court will discuss with respect to his testimony about the bite mark evidence, Dr. Bowers was also not a credible witness.

Second, in the hearing Bourgeois called United States Army Colonel J. Curtis Dailey, DDS, who the Government had initially consulted as a witness in this case, to testify about the use of the enhancements for identifying bite marks. Dr. Dailey opined that he had never seen Dr. Oliver's CLAHE procedure used before. (DE 597 at 425). Dr. Dailey, however, is not an expert in digital enhancement. As the Court will discuss at greater length below, Dr. Dailey's self-interest clouds his credibility in this case.

Finally, in a report bearing the names of Michael Cherry and Manfred Schenk, Bourgeois also

---

[145]    (...continued)
evidence and reports; and personally met and interviewed the government's experts. I believe I had an expert review the evidence, but at this time, I do not recall who that person was."

[146]    To the extent that he testified from his use of digital enhancements, he explained "Digital enhancement standards at this point are actually quite lax, even with the study working groups that they've established." (DE 598 at 81).

185

USCA5 5919

included a report from CherryBiometrics criticizing Dr. Oliver's enhancement of the photographs.

The report states that Dr. Oliver's use of CLAHE

> disort[ed] almost everything in the newly created image. There is no way to know whether his enhancements distorted the areas he claims he improved. Therefore his enhanced images cannot be used as a fair and accurate building block to analyze bite marks or 'injuries' that were not visibly present in the original autopsy photographs.

The report noted problems with Dr. Oliver's approach, including that he used a substandard scan of the original photograph, changed the image into inaccurate shapes and colors, lost information in the file structure of the images, and further distorted the images when converting them into a PowerPoint program. (DE 397, Exhibit 43 at 3). Bourgeois also presented testimony from Manfred Schenk, one of the co-authors of the report from Cherry Biometrics through a videotaped deposition. The Government objected to his qualification as an expert in digital imaging. (DE 609, Deposition of Manfred Schenk, at 18). Mr. Schenk complained that a loss of detail and accuracy could accompany Dr. Oliver's techniques.

As a counterbalance to Bourgeois' evidence, the parties also deposed Dr. Oliver, who defended his technique and explained his demonstrative use of the photographs.

The Court's summary only captures the briefest outline of the sizeable evidence Bourgeois has amassed to denigrate Dr. Oliver's enhancement technique. The wide-ranging development of this claim, however, threatens to side-rail the focus from what happened at trial. The knowledge that Dr. Oliver's digital enhancement technique somewhat distorts the resultant image is not new. At trial, Dr. Oliver explained how his process left "artifacts" or otherwise compromised portions of the image in order to enhance others. (DE 345 at 203). Alterations in the enhanced images were apparent to the Court and the jury through Dr. Oliver's three-part presentation in which the jury saw the original image, the enhancement, and the enhancement with the injuries marked. Even without

186

the layers of expert testimony from post-conviction review, Dr. Oliver has never denied that his

CLAHE method alters the original image.

The question is how the enhancements affected the data upon which Dr. Oliver based his

expert opinion, that is, the identification of the injuries Bourgeois inflicted. Dr. Oliver's use of the

images has caused the parties to see the nature of his testimony differently. The Government

considers the heart of Dr. Oliver's opinion to rest on his observations and conclusions drawn from

the original photographs, with the digital enhancements serving as a demonstrative aid whose

formation does not fall under *Daubert*'s strictures. Bourgeois instead views the enhancements as

the foundational basis for Dr. Oliver's expert opinion, subjecting their creation to the rigors of

*Daubert*.

It is obvious from the trial transcript and post-conviction hearing record that Dr. Oliver's trial

opinions rested on observations he made from the original autopsy photographs. At trial, Dr. Oliver

emphatically told the jury that if

> you notice a feature in one of these images, go back and look at the original. If you
> don't see it in the original image, it doesn't matter who says it's there, if I say it's
> there or anybody else says it['s] there. If you don't see it in the original image, don't
> believe them. It's that simple. This isn't rocket science.

(DE 345 at 204). In his deposition Dr. Oliver reiterated that he only counted injuries observable on

the original autopsy photographs. (DE 609 at 31). Simply, the original photographs, not the

challenged enhancements, formed the basis for his expert assessment. As Bourgeois has not

seriously challenged Dr. Oliver's expertise to identify external injuries from autopsy photographs,

he has not raised any concern that would have prevented Dr. Oliver from testifying.

Moreover, Dr. Oliver's digital enhancements were not the genesis for the claim that

Bourgeois physically assaulted JG1999. The enhanced digital images were not by far the only

187

USCA5 5921

evidence that Bourgeois tormented his young daughter with extensive abuse. Dr. Oliver's testimony only served to reconfirm observations made by medical personnel when JG1999 arrived at the hospital. Ms. McLaughlin, the registered nurse who could not perform a typical head-to-toe examination because of her serious condition, observed numerous pattern injuries and bruising throughout JG1999's body. The original autopsy photographs themselves undeniably confirmed the graphic testimony recounting Bourgeois' abuse. Dr. Rouse's autopsy report included a section listing "injuries indicative of chronic abuse" with included a litany of severe trauma throughout the victim's body. In addition, Dr. Rouse observed deep tissue bruising when she cut into JG1999's body. Dr. Benton described the numerous wounds he observed in the unaltered autopsy photographs. An FBI agent describing visiting JG1999 in the hospital and observe bruising, whip marks, burn marks, and other extreme injuries. (DE344 at 176). Importantly, AB1994 provided a detailed account of Bourgeois' savage abuse that meshed seamlessly with the injuries highlighted in the digital enhancements. Removing the digital enhancements from the evidentiary equation would not have measurably changed the case before the jury.

Bourgeois' highly technical challenge to Dr. Oliver's digital enhancement obfuscates the sources, nature, and pervasiveness of the evidence showing that Bourgeois viciously abused his daughter. Given the fact that Dr. Oliver based his conclusions on the original autopsy photographs and in light of the mountain of additional evidence showing harsh physical abuse, Bourgeois has not shown *Strickland* deficient performance or prejudice respect to counsel's failure to raise a *Daubert* challenge to Dr. Oliver's digital enhancements. Any alleged error by trial counsel by not litigating a *Daubert* challenge did not call into question the fundamental fairness of either phase of trial.

188

USCA5 5922

**B.      Testimony from Dr. Senn and Dr. Chrz Concerning Bite-Mark Evidence (claim five)**

Bourgeois claims that trial counsel should have raised a *Daubert* challenge to the two experts – Dr. Senn and Dr. Chrz – who linked Bourgeois to bite marks found on JG1999's right arm and on her back just above the waist. As discussed below, strong evidence showed that Bourgeois was the one who bit his young daughter. Bourgeois has not presented any credible evidence that would undercut the trial testimony.

Dr. Rouse had testified that she observed multiple bite marks on the victim. (DE 345 at 156). In particular, Dr. Rouse described two "arched contusions, contusions that are, you know, this type of shape, that have discrete areas that are consistent with a bite mark . . . on the right forearm, and then one on her left flank . . . [j]ust kind of the side between her belly and her back, lower." (DE 345 at 174). Dr. Rouse testified that she took pictures of the bite marks. (DE 345 at 175-76).

Before trial, the Government had sought the assistance of United States Army Colonel J. Curtis Dailey, a consultant for the Armed Forced Institute of Pathology, to analyze the bite-mark evidence, but did not call him as a witness. Using only a portion of the available photographic evidence, Dr. Dailey compared dental casts taken from Bourgeois, Robin and AB1994 to the bite marks. Dr. Dailey could not "rule in, or rule out" Bourgeois, Robin, AB1994 "as the possible biter."[147] (DE 397, Exhibit 45). Dr. Dailey did not testify at trial. He did, however, try to bill the

---

[147]      Dr. Dailey explained that he could not include or exclude any of the three because the bite marks had diffuse presentation in the photographs, the bite marks were in distorted positions, the ruler in the photographs was in a different spatial plane than the marks, and the three individuals' dentition had similar metric and spatial pattern relationships. (PX-140 at 1). Bourgeois provided an affidavit from Dr. Dailey with his section 2255 motion. Dr. Dailey stated that, when he told the Government the results of his analysis, Assistant United States Attorney Booth was "irate" and told him that Bourgeois "was a really bad man." When he told her that information was irrelevant to his analysis, "she then told [him] that if [he] could not help her she would go out and find an expert who

(continued...)

189

USCA5 5923

Government for his work on this case. He also apparently tried to secure an appointment as an expert witness once his commission ended.

The Government sought the opinion of additional forensic odontologists, Dr. Senn and Dr. Chrz. Dr. Senn's role was twofold: (1) determine whether the injuries were indeed bite marks and, if so, (2) determine which of the individuals with access to JG1999 he could exclude as a possible biter. (DE 345 at 254-56). Dr. Senn testified that the injuries on her arm and back were consistent with bite marks. (DE 345 a 250, 252). Comparing models taken from the three potential biters, Dr. Senn could not exclude or include any of them from biting JG1999 on the arm. (DE 345 at 274). He could, however, exclude Robin and AB1994 from biting her on the back. (DE 345 at 279).

The American Board of Forensic Odontology Guidelines for Bite Mark Analysis require a second opinion. (DE 345 at 283-84; DE 388 at 28). Dr. Senn sent the photographs and dental models to Dr. Chrz, who is also a dentist and an expert in forensic odontology. Dr. Chrz conducted a similar bite mark analysis but utilized a technique called grey scale shading that allowed identification with greater detail. (DE 345 at 297-312). Dr. Chrz also identified the injury on JG1999's arm as a probable bite mark and excluded Robin and AB1994 as the one who left the bite on JG1999's back. (DE 345 at 311). Because this was a "closed situation" where only the three people in the truck could have bitten JG1999, Dr. Chrz explained that only left Bourgeois "as a suspect capable of causing the pattern injury that is seen on her back." (DE 345 at 311).

Well before trial counsel Mr. Tinker met with Dr. Senn and questioned him about his findings. (DE 388 at 28). Mr. Tinker was not unfamiliar with forensic odontology. During a hearing Ms. Booth told the Court that Mr. Tinker's pre-trial questioning of Dr. Senn was "brilliant"

---

[147]    (...continued)
could help her." (DE 397, Exhibit 45; DE 597 at 426-27).

190

USCA5 5924

and that he had been "the very first Prosecutor in the State of Texas to get a conviction with bite mark evidence[.]" (DE 388 at 36). Trial counsel considered whether to challenge Dr. Senn's and the other experts' qualifications through *Daubert*, but informed the Court that they had instead chosen to just attack the substance of their opinions. (DE 388 at 38-42). Trial counsel filed a motion in limine asking that Dr. Senn only be allowed to testify "to a medical certainty," not that they "might be or could be or probably are teeth marks." (DE 160 at 3).

Bourgeois launches two attacks on the bite-mark evidence. First, Bourgeois claims trial counsel should have objected to Dr. Senn and Dr. Chrz's testimony because the science of forensic odontology is not sufficiently reliable under *Daubert*. Second, assuming that a court can consider bite-mark evidence, Bourgeois asserts that the science would not have pointed to him as the one who bit the infant girl. The Court will only discuss Bourgeois' claim briefly because, in the context of the testimony he adduced in the hearing and the trial record, he has not made a colorable showing of possible merit.

Bourgeois supported his Motion to Vacate with a report in which Dr. Bowers assumed expertise in digital imagery, made legal conclusions about *Daubert*'s application, and denigrated the relevance of his profession in court. He wrote:

> [B]oth experts otherwise adhere to the general rules and methods of their forensic board, the ABFO. The acceptability of methods does not impact, however, on analytical judgment and interpretation of the evidence. In my opinion, the limits of the bitemark evidence in <u>Bourgeois</u> have been ignored by both of my colleagues. The methods they used are inappropriate and not relevant to the injuries on the child's body.

(DE 397, Exhibit 52 at 3). Dr. Bowers was not a credible witness. Aside from his claim to be an expert in an area for which he had no expertise, he also assumed too much when he presumed as a forensic odontologist that he could inform the Court whether the Government's testimony should

191

USCA5 5925

have been excluded under *Daubert*. His decision to educate the Court on legal conclusions reflects his testimony in the evidentiary hearing. His testimony was condescending and argumentative. His testimony was slippery; he evaded giving answers that would not benefit Bourgeois.[148] Most troubling, the essence of Dr. Bowers' testimony was that forensic odontology's only role in criminal cases was to identify something as a bite mark, without attempting to identify who may have or may not have been the biter. (DE 598 at 109). On cross-examination, Dr. Bowers admitted that he did not know of any other forensic odontologist in the nation who was testifying in court that bite mark evidence is not reliable. (DE 598 at 85-86). To his knowledge, bite mark evidence has never been excluded in a case. (DE 598 at 86).[149] Dr. Bowers' testimony – both in general and relating to the specific factors a competent odontologist would consider in this case – was not credible or even useful to the Court. His testimony would not have resulted in the exclusion of Dr. Senn or Dr. Chrz under *Daubert*.

Bourgeois has not raised a credible attack on Dr. Senn or Dr. Chrz's conclusions. Aside from Dr. Bowers, Bourgeois relies on Dr. Dailey's testimony not to exclude Robin or AB1994 as possible biters. From the trial record and the evidentiary hearing, it was apparent that Dr. Dailey had not

---

[148]    For instance, Dr. Bowers agreed that bite mark evidence is generally reliable for the purposes of excluding individuals as the biter, (DE 598 at 87), but refused to do so in this case. He carefully selected problems Dr. Senn had noted with forensic odontology without giving voice to guiding themes such as: "Bite mark analysis is too important and valuable to the investigation and adjudication of certain crimes to be discounted or overlooked" and "The use of bite mark analysis to exclude suspects is powerful and important." (DE 598 at 94-95). Aside from his conclusion about the evidence in this case, cross-examination showed that Dr. Bowers' testimony in another case shifted after one party agreed to pay him. (DE 598 at 109-13). In that case, Dr. Bowers apparently initially refused to exclude as a biter a man who had no teeth. (DE 598 at 110). He admitted that he gave "incorrect" testimony under oath in that case. (DE 598 at 112-13).

[149]    At the same time he criticized the foundational aspects of Dr. Senn's testimony, Dr. Bowers asserted that he had no reason to question Dr. Senn's integrity and his reasons for coming to his conclusions in this case. (DE 598 at 118).

192

USCA5 5926

considered the whole of the evidence in this case. He based his conclusions on a limited amount of information. Worse, his request for reimbursement for his services while a government employee taints his testimony with self-interest. Even in his live testimony, Dr. Oliver did not appear credible. Neither of Bourgeois' post-conviction witnesses would have been persuasive in any way to the jury.

Even if trial counsel should have made the challenge to the bite-mark evidence that Bourgeois proposes, he has not shown a reasonable probability of a different result. Again, prolonged discussion of highly technical scientific factors cannot brush aside the heart-wrenching testimony the jury heard. Bourgeois brashly, and incorrectly, argues that "[t]he bite marks found on the victim cannot be traced to [him] with certainty any greater than guess work." (DE 459 at 2). AB1994's trial testimony is conspicuously absent from Bourgeois' discussion of prejudice on these claims. AB1994 provided vivid testimony showing that Bourgeois often bit JG1999.

AB1994 described how she saw her father bite JG1999's feet "[m]any times" until she would cry. (DE 245 at 14). Bourgeois never bit any of his other daughters, but he bit JG1999's hands until they got "ugly." (DE 245 at 15). AB1994 recalled that her father even bit JG1999 on the head: "He just opened his mouth wide, and he just started biting her right there." (DE 245 at 23). AB1994 testified that JG1999 wore socks "[b]ecause she was bitten all up, and her feet looked bad." (DE 346 at 3). She elaborated:

| The Government: | Okay. Did you ever see your dad hit her while she was sitting on the potty? Or do you remember? |
| AB1994: | I don't remember. |
| The Government: | Okay. Did you ever see her bleeding after your dad hit her? |
| AB1994: | When he bit her. |
| The Government: | Okay. And when he bit her, what do you mean? Where did he bite her? |

USCA5 5927

| AB1994: | Right on the forehead. |
| The Government: | How about her hands? Did you see her bleed when he bit her on the hands? |
| AB1994: | A little. |
| The Government: | How about her feet? Did you see her bleed when he bit her on the feet? |
| AB1994: | Yes. |

(DE 346 at 5). Even if trial counsel could have prevented Drs. Senn and Chrz from testifying, AB1994 had already provided emotionally wrenching testimony that Bourgeois repeatedly bit JG1999's feet and hands making her cry out in pain. The fact that AB1994 did not mention that Bourgeois bit JG1999 on the arm and back would aid the defense little in light of the unimpeached testimony of his ruthless biting elsewhere on the infant. The Court finds that Bourgeois has wholly failed to prove deficient performance or prejudice with respect to this claim.

## VI. The Government Violated its Duty under *Brady v. Maryland*, 373 U.S. 83 (1963), by Failing to Disclose That the Government Promised Inmates Some Benefit for Testifying Against Bourgeois (claim seven)

Bourgeois' seventh claim alleges that the Government breeched its duty under *Brady v. Maryland*, 373 U.S. 83 (1963), to provide exculpatory evidence to the defense. "[T]he special role played by the American prosecutor in the search for truth in criminal trials" encourages the full disclosure to the defense of all exculpatory or impeachment evidence. *Strickler v. Greene*, 527 U.S. 263, 281 (1999). "Courts, litigants, and juries properly anticipate that 'obligations [to refrain from improper methods to secure a conviction] . . . plainly rest[ing] upon the prosecuting attorney, will be faithfully observed.'" *Banks v. Dretke*, 540 U.S. 668, 697 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). Bourgeois asserts that the Government breeched its duty to reveal deals it

194

USCA5 5928

allegedly made with inmate witnesses.

The Government relied on inmates to relate incriminating statements Bourgeois made while incarcerated before trial. In his Motion to Vacate, Bourgeois argued that the Government secured the testimony of four inmates – Adam Longoria, Orlando Campos, Wiley Taylor, and Darick Moore[150] – by making them promises that they did not divulge to the defense. At the time of trial, Longoria faced state drug charges and Campos was serving a 12-year state sentence. Taylor and Moore had not yet been sentenced on federal drug charges.[151] The inmates' collective testimony showed that Bourgeois said he killed his daughter and was going to make it look like an accident, admitted to beating his wife and the victim, had alleged drug trafficking connections, and had ordered hits from prison. The Government verified Bourgeois' ordering of hits from his prison cell through notes he passed to Longoria. (DE 348 at 159).

The parties questioned each of the inmates about what benefit they expected to receive for their assistance. Longoria and Campos testified that the Federal Government could not help with their state court cases. (DE 344 at 216; DE 348 at 167, 184-86). Longoria, in fact, explicitly stated that he did not expect the United States Government to "come in and testify on [his] behalf that [he] cooperated[.]" (DE 348 at 186). Campos agreed that the Government "told [him] clearly" that they "can't reduce [his] time," but he still "hop[ed] that [the Government] will relay to authorities that [he] came in and testified in a murder case[.]" (DE 344 at 216, 223-26). Moore and Taylor

---

[150]    The pleadings, transcripts, and record provide various spellings for Moore's first name.

[151]    At the time of trial, Moore had pleaded guilty to a federal charge of possessing with intent to distribute cocaine base but he had not yet been sentenced. (DE 344 at 200). Taylor had pleaded guilty to a charge of conspiracy with intent to distribute more than 50 grams of methamphetamine, but had not yet been sentenced. (DE 344 at 228)

USCA5 5929

explained that they hoped the Government would ask for a downward departure of their sentences because they cooperated against Bourgeois. (DE344 at 202-03, 209, 231). Bourgeois now argues that he can prove that the Government promised to help each of the men in exchange for their testimony.

Three essential elements compose a valid *Brady* claim: "'The evidence must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *Banks*, 540 U.S. at 691 (quoting *Strickler*, 527 U.S. at 281-282). Here, Bourgeois claims that the alleged Government deals would have impeached the inmates' testimony. Without question, impeachment evidence "falls within the *Brady* rule[.]" *United States v. Bagley*, 473 U.S. 667, 676 (1985); *see also Giglio v. United States*, 405 U.S. 150, 155 (1972) ("[E]vidence of any understanding or agreement as to a future prosecution would be relevant to [a witness'] credibility and the jury [is] entitled to know of it.").[152]

### A.    No Evidence of Concealed Deals with Government Witnesses

Bourgeois did not call any of the inmates in the federal evidentiary hearing.[153] Without direct

---

[152]    For the first time in his Memorandum of Law in Support of Motion for Relief Pursuant to 28 U.S.C. Section 2255, Bourgeois argues that the Government's failure to disclose deals with its witnesses violated its affirmative burden to correct testimony which it knows to be false under *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972). The Supreme Court has not yet decided whether a *Brady* claim is distinct from a false-evidence claim. *See Banks v. Dretke*, 540 U.S. 668, 690 n.11 (2004). Courts generally assume that a *Napue/Giglio* claim has three components: "(1) the testimony in question was actually false; (2) the testimony was material; and (3) the prosecution had knowledge that the testimony was false." *United States v. Webster*, 392 F.3d 787, 801 (5th Cir. 2004). For the same reasons discussed above, Bourgeois has not shown that the witnesses gave false testimony or that their testimony was constitutionally material.

[153]    Bourgeois, knowing that he was in custody in Kansas, sought a subpoena for Longoria
(continued...)

196

testimony from the inmates, Bourgeois' *Brady* claim rests on an uncertain foundation. Bourgeois largely supports his *Brady* claim on hearsay statements from others and inferences. "[S]peculation about the suppression of exculpatory evidence is an insufficient basis to support a *Brady* claim." *Medellin v. Dretke*, 371 F.3d 270, 281 (5th Cir. 2004); *see also Wood v. Bartholomew*, 516 U.S. 1, 6 (1995) (denying a *Brady* claim based on "mere speculation"); *Hughes v. Johnson*, 191 F.3d 607, 630 (5th Cir. 1999) ("[S]peculation does not support a *Brady* claim.").

Bourgeois did not adduce any evidence in the hearings suggesting that the Government concealed any agreement with Moore, Taylor, and Campos. The evidence does not hint that the Government made undisclosed deals with those inmates. Bourgeois claims that the two federal inmates – Taylor and Moore – more than hoped for a downward departure; the Government had promised to ask for a reduced sentence. Bourgeois has apparently abandoned his allegations regarding Taylor.[154] Bourgeois did not call Moore in the evidentiary hearing, but rests on a declaration in which Moore claimed that: "[Ms. Booth] told me if I testified against Bourgeois she would contact my prosecutor, Lance Duke, and make sure that my sentence was reduced." (DE 402, Affidavit/Declaration of Darrick Moore dated September 18, 2007, Exhibit 67). The facts reveal that

---

[153]    (...continued)

to appear. Bourgeois did not request that the Court issue a writ requiring the officials in Kansas to release Longoria to federal custody for his testimony. (DE 598 at 23, 30-33). The United States Marshals tried to serve subpoenas on Campos and Moore, but Bourgeois had not provided them with an accurate address. (DE 598 at 77). Bourgeois forfeited his opportunity to have those individuals testify.

[154]    In his Motion to Vacate, Bourgeois claimed that the Government entered into an undisclosed deal with Wiley Taylor. (DE 396 at 107-09). His Memorandum of Law in Support of his Motion for Relief does not mention Taylor. Bourgeois has not adduced any evidence showing that the Government engaged in a deal with Taylor. Bourgeois seems to have abandoned his claim with respect to Taylor.

197

USCA5 5931

he received a lighter sentence partially because of his assistance in this and another case.[155]  Yet Bourgeois has not shown that a plea agreement or other formal understanding existed between Moore and the Government.  The defense and the jury knew that Moore expected to receive something for his testimony.  Bourgeois has not shown that the Government substantially withheld any additional promise that induced his testimony.

With respect to Campos who was serving a 12-year sentence for a drug charge in state court, Bourgeois claims that either Ms. Booth or an FBI agent promised Campos they would help him get a reduced sentence if he testified.  According to Bourgeois, Campos was paroled after only serving three years of that sentence.  Yet he has not provided a declaration, affidavit, or other competent statement from Campos detailing any promise from the Government that resulted in his testimony or his early release from State custody.[156]  Bourgeois instead relies on an affidavit from an investigator who purports to relate what Campos told her.  (DE 397, Declaration of Kathleen Kaib dated May 14, 2007, Attachment 30).  Bourgeois has not shown how her hearsay account could be admissible.  He has not otherwise verified what the investigator alleges Campos said.  Bourgeois bases his claim relating to Moore entirely on speculation.

---

[155]    Moore was sentenced on April 25, 2004.  Assistant United States Attorney Lance Duke recommended that Moore receive 75 months where the original guidelines range was 151 to 188 months because of Bourgeois' assistance in this and another case.  Also, the Government noted that Moore had experienced "a great deal of coercion and harassment by his fellow inmates for testifying on behalf of the Government." (*United States v. Moore*, C-03-CR-75 [S.D. Tex.], DE 41 at 6).  Recognizing Moore's assistance in the instant case, this Court sentenced Moore to 65 months. AUSA Duke later filed a Motion to Reduce Sentence Pursuant to Rule 35(b) based on Moore's substantial assistance in another case.

[156]    Ms. Booth did, however, communicate to Campos that: "The best thing I could do for you would be to tell the authorities that you cooperated here." (DE 646 at 198).  Nevertheless, at trial she thought that nothing could be done to reduce Campos' sentence. (DE 340 at 56-57).  In the end, she assured: "I promised him nothing." (DE 340 at 57).

198

Bourgeois has provided the most evidentiary support for his claims relating to Longoria. Longoria has provided a declaration in which he claims that AUSA Patti Booth said "she could not provide me anything now but after I testified she would be happy to help me in the future with my case or parole." Longoria claims that the state prosecutor in his case, James Sales, and his trial attorney, William May, each knew about the deal he made with the Government. Bourgeois claims that a letter Ms. Booth later wrote to the Texas Board of Pardons and Paroles confirms that she entered into a deal with him.

Bourgeois, however, has not verified Longoria's story. Bourgeois subpoenaed Longoria as a witness in the evidentiary hearing. Longoria did not appear, which is unsurprising as he currently faces state capital murder charges in Kansas. Bourgeois called other witnesses in an attempt to confirm Longoria's story, but their testimony did not show that the Government concealed a deal with him. For example, Bourgeois called Longoria's former girlfriend as a witness to provide hearsay recitations about what he allegedly said contemporaneous with trial.[157] She testified that Longoria told her several times that "he was planning on trying to make a deal [with prosecutors] so he can get out early to be with [her] and [their] baby." (DE 598 at 26-27). However, she had no personal knowledge if Longoria actually made a deal. She did not have any direct knowledge about any agreement; she only knew what Longoria told her. (DE 598 at 28). Her recitation of hearsay statements carries little weight, especially after she testified that Longoria was a liar. (DE 598 at 28, 30). She did not know if Longoria was being truthful when he claimed that he was going to cut a deal with prosecutors. (DE 598 at 30).

---

[157]    Bourgeois also wanted another inmate to provide hearsay testimony about what he heard Moore say. (DE 598 at 255-56). The Court disallowed the presentation of hearsay testimony.

199

USCA5 5933

Longoria's former attorney Mr. May appeared in the evidentiary hearing by video.[158]  Mr. May's testimony credibly established that the Government never promised to do anything on Longoria's behalf. (DE 655 at 14).  Mr. James Sales, the prosecutor who handled Longoria's state case, testified that he did not remember having any communication with the Government prior to Longoria's sentencing. (DE 655 at 29).  He explained that the State's plea agreement with Longoria had nothing to do with Bourgeois' case. (DE 655 at 32).  Ms. Booth never told Mr. Sales that she made a deal with Longoria. (DE 655 at 39).

Importantly, Ms. Booth explained on the record that she did not offer Longoria any benefit for his testimony. (DE 655 at 79).  At one point before his testimony Longoria hinted that he wanted help with his state case, but Ms. Booth clearly told him that she would promise him nothing. (DE 655 at 85-86, 100).  She did not tell Mr. May that she would do anything to help his client. (DE 655 at 99).  Years later, another attorney requested that she write a letter on Longoria's behalf to the

---

[158]    Mr. May testified that AUSA Booth contacted him and asked for permission to speak with Longoria. (DE 655 at 7).  Longoria told Mr. May that he was "going to be a witness and that he hoped that Ms. Booth would eventually give him some benefit from that." Mr. May responded that, in his experience, "generally you would get some benefit from that, but what it would be, I had no way of knowing and we'd just have to wait and see, since she was not a state court prosecutor." (DE 655 at 9).  Mr. May then filed a continuance in Longoria's criminal case, hoping that, with all of the evidence against Longoria, holding off trial until after the Bourgeois trial would allow him to seek some benefit from the state court. (DE 655 at 10).  Mr. May explained what then happened:

> When I went into court, I approached the state court prosecutor, James Sales. I asked him if he had had a chance to talk to Patti Booth about the case. He said that he had. I asked him what he was going to recommend. He told me seven years on each case, concurrent with one another, and that he would be willing to drop it down to five years if Mr. Longoria testified against a different Defendant in a potential state court case. I can't recall who that target was. And I conveyed that to Mr. Longoria, and he accepted the offer.

(DE 655 at 11).  On cross-examination Mr. May explained that Longoria only hoped to receive some benefit; the Government had not promised a quid pro quo deal. (DE 655 at 13-14).

200

USCA5 5934

Parole Board, which she did. (DE 655 at 83). She had never promised to do that and her actions after trial did not retrospectively trigger *Brady*.

In all, Bourgeois has not brought forth any credible evidence that would show that the Government promised to help Longoria in return for his testimony. Mr. May, Mr. Sales, and Ms. Booth's testimony credibly proved that the Government did not make a deal with Longoria. There is absolutely no factual basis for the *Brady* claim based on the four inmates' testimony.

**B.    Materiality**

Notwithstanding Bourgeois' failure to meet the first two prongs of the *Brady* analysis, the Court likewise finds that he has not shown that any alleged suppression of information was material. The *Brady* materiality standard requires a defendant to show a "reasonable probability of a different result." *Kyles*, 514 U.S. at 434; *see also Bagley*, 473 U.S. at 682 ("The evidence is material only of there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different."). A court must ask whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).[159] The Court considers all alleged *Brady* violations collectively. *See id.* at 421-22; *United States v. Hughes*, 230 F.3d 815, 819 (5th Cir. 2000).

"[M]ateriality is a fact-intensive examination done on a careful, case-by-case basis." *Banks v. Thaler*, 583 F.3d 295, 322 (5th Cir. 2009). In the guilt/innocence phase, the Government called the inmates to provide testimony on main two points: (1) Bourgeois had caused his daughter's death

---

[159]    This standard corresponds to *Strickland*'s requirement that "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694.

USCA5 5935

and (2) he told Robin Bourgeois to lie about the source of the toddler's injuries.[160]  The inmate witnesses were far from the centerpiece of the Government's case. *See United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004) ("The materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state."). Other testimony strongly confirmed that Bourgeois, despite his attempts to pin the murder on Robin, killed JG1999. In addition to forensic evidence and circumstantial factors substantiating the case against Bourgeois, AB1994 convincingly told the jury that her father beat JG1999 against the truck window. Both Robin Bourgeois and AB1994 testified persuasively that Bourgeois had ordered them to fabricate an explanation for the toddler's death. The additional evidence more that corroborated the inmates' testimony, it eclipsed their brief statements and provided a strong independent basis for Bourgeois' conviction. Bourgeois has not shown that the alleged *Brady* errors were material to his conviction.

In addition to emphasizing guilt/innocence testimony about Bourgeois' callous boasting about the murder, *see Cone v. Bell*, ___ U.S. ___, 129 S. Ct. 1769, 1784 (2009) ("Evidence that is material to guilt will often be material for sentencing purposes as well[.]"), the Government called the inmates in the penalty phase to emphasize Bourgeois' lawlessness and propensity toward violence. Some of the other testimony in the penalty phase covered the same ground as that provided by the inmates. For instance, the inmates' testimony established that Bourgeois had physically

---

[160]    Moore explained that, while Bourgeois initially claimed that JG1999's death was an accident, he later claimed that she was a "bad child" who would shake her butt all the time." (DE 344 at 205-06). Bourgeois told Moore he whipped JG1999 with an extension cord and otherwise abused her. (DE 344 at 206). Bourgeois told Taylor that he killed the victim, Robin did not keep to their agreed-upon story, and he previously beat his wife. (DE 344 at 230). He called JG1999 "that fucking baby." (DE 344 at 231). Campos testified that, after telling one story, Bourgeois said that he "hit his little girl and that him and his wife . . . had a plan to go by and make it look like she had fell out of his 18-wheeler." (DE 344 at 219). Campos also testified that Bourgeois admitted to beating his wife. (DE 344 at 220).

202

USCA5 5936

abused his wife. Other witnesses, including Bourgeois' former wives, more vividly and dramatically expounded on Bourgeois' habitual violence against women. Robin's own mother provided detailed testimony about how Bourgeois abused her daughter. Also, other witnesses, including Robin, confirmed that he had issued violent threats from his prison cell. Also, Bourgeois' calloused statements about his young victim only echoed the indifferent attitude he repeatedly showed to her passing. The inmates' testimony largely repeated themes more vividly developed elsewhere in the Government's case. The inmates' testimony only showed that Bourgeois made efforts to actualize the threats he had already made. "[W]hen the undisclosed evidence is merely cumulative of other evidence [in the record], no *Brady* violation occurs." *Spence v. Johnson*, 80 F.3d 989, 995 (5th Cir. 1996).

To the extent that the inmates' testimony provided the only information about some issues, Bourgeois has not shown that any alleged *Brady* error impinged on the fairness of his trial. For instance, no other witnesses testified that Bourgeois had drug connections. In the entire context of the penalty phase, however, Bourgeois' drug running was only one piece of a detailed picture of his criminality. The jury had to consider more relevant acts of violence, such as his repeated and heartless aggression toward women and children. In the entire context of the highly incriminating case for a death sentence, the inmates' testimony only played a minor theme.

Even then, the inmates did not come before the jury unblemished. Trial counsel's opening argument accused the inmates of "look[ing] around [to] find somebody else to serve their time." (DE 216 at 5). Trial counsel extensively questioned each inmate about their lengthy criminal records. (DE 344 at 209-10, 232-33, 271-72; DE 348 at 167-68, 177-79). Trial counsel probed the inmates' incentive to testify for the Government. (DE 344 at 235). Trial counsel's closing argument hammered that the inmates were men who had committed crimes, were not trustworthy, and "were

203

paid or hoped to be paid" for their testimony. (DE 339 at 30-31). Trial counsel argued that they "are liars" who, when arrested, "try to find "someone else to serve their time." (DE 339 at 30). Whatever impeachment may have resulted from confirming the alleged deals only would have added one more layer of concern to what trial counsel already put before the jury.

Given the whole evidentiary landscape against Bourgeois, the corroborating evidence that verified the inmates' testimony, and the minor effect of the evidence unique to their testimony, the Court find that Bourgeois has not shown that, "had the evidence [of an alleged deal] been disclosed to the defense, the result of the proceedings would have been different." *Bagley*, 473 U.S. at 682. The Court will deny Bourgeois' *Brady* claim.

## VII.    Trial Counsel Labored under a Conflict of Interest Because of His Representation of Clients Associated with this Case (claim eight)

Apart from his other arguments about trial counsel's representation, Bourgeois also claims that conflicting interests prejudiced his attorneys' ability to defend him zealously. This is not a case where trial counsel actively represented multiple defendants with competing interests. Nor did trial counsel's current or former clients testify against Bourgeois. Instead, Bourgeois' conflict-of-interest claim arises out of three circumstances involving his attorney, Mr. Gilmore:

- Mr. Gilmore had previously represented Ross Griffin in a federal criminal action. Bourgeois alleges that Griffin acted as a jailhouse informant for the Government. Bourgeois states that Griffin "had been offered favorable treatment to cooperate against [him]." (DE 396 at 110). Griffin never testified against Bourgeois.

- Mr. Gilmore had called Adam Longoria as a witness in the trial of another criminal defendant.[161]

---

[161]    In that case, Longoria apparently related conversations he heard while residing on the same cell block as Bourgeois, though Bourgeois does not allege that the testimony in that case concerned him directly. Mr. Gilmore's cross-examination of Longoria in this case discussed how

(continued...)

204

USCA5 5938

- Mr. Gilmore had represented Roel Contreras who was a co-defendant of Orlando Campos. Campos initially testified against Contreras in exchange for a reduced sentence, but at some point tried to disavow his prior testimony against Mr. Gilmore's client.

Bourgeois summarily asserts that these three circumstances created a conflict of interest that fenced in trial counsel's efforts to defend him.

With its guarantee of effective legal representation, the Constitution promises a criminal defendant conflict-free counsel. "A conflict will exist only 'when defense counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client.'" *United States v. Garcia-Jasso*, 472 F.3d 239, 243 (5th Cir. 2006) (quoting *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000)); *see also United States v. Culverhouse*, 507 F.3d 888, 893 (5th Cir. 2007) (stating that an actual conflict exists "when the attorney knows that his clients' interests diverge and must then choose between the interests of multiple clients, or be compelled to compromise his duty of loyalty"). To succeed on a conflict-of-interest claim, however, an inmate must show more than a "mere possibility of a conflict of interest." *See Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980). The Supreme Court has explained that "'an actual conflict of interest' mean[s] precisely a conflict that affected counsel's performance – as opposed to a mere theoretical division of loyalties." *Mickens v. Taylor*, 535 U.S. 162, 164 (2002). Accordingly, "[t]o establish a Sixth Amendment violation on the basis of a conflict of interest the defendant must demonstrate: (1) that his counsel acted under the influence of an actual conflict; and (2) that the conflict adversely affected his performance at trial." *Culverhouse*, 507 F.3d at 892; *see also Cuyler*, 446 U.S. at 348-50.

---

[161]    (...continued)
he had called him as a witness in the earlier case. (DE 348 at 179-80).

205

Bourgeois has not shown "more than a speculative or potential conflict." *Culverhouse*, 507 F.3d at 892. Mr. Gilmore's relationship with criminal defendants tenuously connected to this case did not conflict with his advocacy for Bourgeois. Bourgeois, in fact, exaggerates and misrepresents the nexus between the three circumstances listed above and his own case. For example, Bourgeois alleges that "[p]rior to and during [his] trial, Mr. Gilmore represented . . . Ross Griffin . . .[who] was under indictment in the United States District Court for the Southern District of Texas for the distribution and sale of marijuana." (DE 396 at 110). Griffin was actually sentenced on June 17, 2003, before the Government even designated this a capital case. (*United States v. Griffin*, 2:02-CR-309-2 (S.D. Tex.)). Griffin did not appeal and it appears that Mr. Gilmore's representation of Griffin ended when judgment issued. Bourgeois also labels Griffin a "government witness" against him. (DE 402 at 107).[162] The Government never called Griffin as a witness in the case. In fact, Bourgeois has not shown that the Government made any attempt to act on the information Griffin provided, particularly because Griffin's account was inconsistent with known evidence. Moreover, Bourgeois has never substantiated his claim that Griffin, after he had already been sentenced for his crime, "had been offered favorable treatment to cooperate against [Bourgeois]." (DE 402 at 107). Nothing suggests that Griffin's action in making statements to a government agent after sentencing divided Mr. Gilmore's loyalties.

In the two other circumstances, Bourgeois likewise summarily speculates that the entangled web of information given by snitches in the Nueces County jail hindered Mr. Gilmore's ability to

---

[162]    An FBI agent did not interview Griffin until June 30, 2003. (DE 396, Exhibit 60). Bourgeois emphasizes that "Griffin was housed with [Bourgeois] in the Nueces County Jail along with Mr. Adam Longoria and Mr. Darrick Moore," both of whom testified against Bourgeois at trial. (DE 396 at 110). The record Bourgeois relies upon, however, does not arise out of conversations in the county jail facility, but in a federal court holding cell during earlier hearings.

USCA5 5940

cross-examine witnesses in his case. Bourgeois, however, does not show that anything limited Mr. Gilmore's ability to probe the truth. Speculation about tenuous relationships between criminal cases does not equate to an actual conflict of interest.

Bourgeois has simply failed to show that an actual conflict impaired Mr. Gilmore's ability to advocate ardently on his behalf. The Court denies Bourgeois' speculative claim that Mr. Gilmore operated under a conflict of interest.

**VIII.  The Government Engaged in Misconduct by Making Improper Argumentative Statements in the Guilt/Innocence and Penalty Phases (claim nine)**

Given the horrific facts of this case and the emotionally charged trial atmosphere, both parties' closing arguments passionately championed their cause. The Government's attorneys in particular used strong language and forceful argument. Bourgeois claims that the Government crossed the line into constitutionally prohibited misconduct with certain comments made during the closing arguments in both phases of trial. Bourgeois complains that the Government improperly (a) disparaged Bourgeois and his attorneys; (b) appealed to the jury's civic responsibility and to religious sentiments; (c) knowingly made false arguments; (d) interjected personal information; and (d) diluted the jury's consideration of mitigating evidence. The Court finds that the Government's statements did not amount to prosecutorial misconduct.

In its zealous advocacy, the Government may strike hard, but not foul, blows. *See Berger v. United States*, 295 U.S. 78, 88 (1935). A criminal conviction "is not to be lightly overturned on the basis of a prosecutor's comments standing alone," *United States v. Bernard*, 299 F.3d 467, 488 (5th Cir. 2002), which require relief only "in only the most egregious cases." *Ortega v. McCotter*, 808 F.2d 406, 408 (5th Cir. 1987). A two-step process governs claims of prosecutorial misconduct. "First, we . . . initially decide whether or not the prosecutor made an improper remark." *United*

207

USCA5 5941

*States v. Gallardo-Trapero,* 185 F.3d 307, 320 (5th Cir. 1999). Second, "[i]f an improper remark was made, we must then evaluate whether the remark affected the substantial rights of the defendant." *Id.* "The determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict.'" *Bernard,* 299 F.3d at 488 (quoting *United States v. Iredia,* 866 F.2d 114, 117 (5th Cir. 1989)) Under that framework, the Court will evaluate Bourgeois' prosecutorial-misconduct claim.

With respect to each prosecutorial statement, the Government correctly responds that "[m]ost of the comments were nothing more than a fair comment upon the evidence" and some "were analogies that are commonly permissible during argument" while other "challenges are flatly incorrect." (DE 443 at 96). With a firm recollection of the atmosphere in the closing arguments, and having reviewed the record with respect to each allegation, the Court finds no merit to Bourgeois' prosecutorial-misconduct claim. In each instance, the Government's statements were strong, but not constitutionally improper.

For instance, Bourgeois asserts that the Government urged the jury to base its decision on religion. "Courts universally condemn" injecting religion into legal proceedings. *Hicks v. Collins,* 384 F.3d 204, 223 (6th Cir. 2004). However, the context of the questioning shows that the Government did not tell the jury to jettison legal standards or to let religion guide their deliberations. The Government twice mentioned that "pride comes before the fall," (DE 339 at 11, 46), a phrase which has a biblical origin but has also entered the common parlance.[163] The Government did so

---

[163] Bourgeois also objects to when the Government stated: "He called it 'it'. The kid that died. The fucking kid and those words are *sacrilegious when you speak about this lamb* because he didn't see it as human." (DE 339 at 17) (emphasis added). Bourgeois does not identify what Biblical passage the Government invoked by using the words "sacrilegious" or "lamb." While perhaps harkening to religious imagery, that statement does not directly refer to commonly known

(continued...)

208

rhetorically, not as an encouragement to convict him based on religious views. *See United States v. Bailey*, 123 F.3d 1381, 1401-02 (11th Cir. 1997) (finding no error when "[t]he prosecutor did not suggest that [the defendant] should be adjudicated under Biblical law, and he did not ask the jury to decide the case on a religious or emotional basis."). Bourgeois has not pointed to any case expunging similar comments from the courtroom setting.[164]

The phrase in which Bourgeois alleges that the Government told the jury it had a civic duty to convict him merely commented on its own duty to investigate and prosecute criminal acts:

> The Defendant never dreamed in his arrogance that the CPS would care about that baby, that FBI would be called, that FBI would care about that baby, that the United States would care about that baby because he saw it as thing for his pleasure. Shocked that he couldn't drive away. Shocked that he couldn't have his truck back and leave. The arrogance of his cruelty. *The arrogance to think that the United States would not care about one of its citizens even if it was a little citizen.* The arrogance of his cruelty.

(DE 339 at 17-18). This statement did not encourage the jury to protect society by convicting him; it inferred that Bourgeois did not think that the Government would act to prosecute. The Government did not ask the jury to apply extra-judicial standards in considering the evidence.

Bourgeois invited some of the challenged prosecutorial comments. For example, he says that the Government interjected personal information into the penalty-phase closing by conveying that

---

[163]    (...continued) elements of religious belief, much less encourage the jury to let religious persuasion influence its decision.

[164]    Even in cases where the Government has made the extremely troubling argument that a jury should return a sentence of death because the Bible required it, courts have found no error when the comments are isolated and the facts of the crime egregious. *See Middlebrooks v. Bell*, 619 F.3d 526, 543 (6th Cir. 2010); *Coe v. Bell*, 161 F.3d 320, 351 (6th Cir. 1998); *but see Romine v. Head*, 253 F.3d 1349, 1370-71 (11th Cir. 2001) (finding error under the circumstances of that case)

209

USCA5 5943

it was difficult to try this capital case.[165]  The Government, however, only responded to the final portion of Mr. Tinker's argument where he stated that "it's easy for Ms. Booth to say let's kill him, because she is not the one that does it." (DE 342 at 64).  Ms. Booth, who argued next, responded that seeking a death sentence was the most difficult thing she had done.  (DE 324 at 66-67).  A prosecutor may validly respond to the defense argument without committing misconduct. *See United States v. Mendoza*, 522 F.3d 482, 492 (5th Cir. 2008) (holding that a reviewing court does "not view the prosecutor's remarks in isolation but consider the effect of those remarks in the context of the entire trial."); *United States v. Saenz*, 747 F.2d 930, 939 (5th Cir. 1984) ("Allegedly improper prosecutorial comments must be considered in context when determining their propriety.").

Other challenged statements were permissible summaries of the evidence.  For example, Bourgeois alleges that the Government falsely argued that Orlando Campos testified "not because he hoped to get lesser time but because he had a child, a six year old, and he believed that this man

---

[165]    Bourgeois refers to the following colloquy in the penalty phase:

| | |
|---|---|
| Ms. Booth: | Now, Mr. Tinker told you this was going to be very easy for me to ask for someone's death. And he's very wrong. I've raised five children, I've buried family – |
| Mr. Tinker: | She's outside the record here, your Honor, and I just – |
| Ms. Booth: | Judge I'm responding to – he opened the door. |
| Mr. Tinker: | About how many kids she's got doesn't have anything to do with the trial in this case. |
| The Court: | Go ahead, Ms. Booth |
| Ms. Booth: | My baby brother is in Iraq serving his country. Things are hard, and this is the hardest thing that I have ever done in my life. |

(DE 324 at 66-67).

210

should be held accountable." (DE 339 at 58). Bourgeois complains that this was a false statement because "Orlando Campos more than 'hoped' he would be getting a sentence reduction for his cooperation with the Government, he knew he would be getting a deal." (DE 402 at 129). The Court has already found that Campos did not have a deal with the Government. The Government's statement accurately comports with the evidence: the federal government had no power to change Campos' state-court sentence and the prosecutor's comments accurately recalled Campos' testimony about why he testified.

In another instance, Bourgeois complains that the Government claimed that, by securing Dr. Senn's assistance after Dr. Dailey could not help them, they were not "expert shopping." (DE 339 at 19-20).[166] Bourgeois seems to believe that Dr. Dailey "was unable to provide them with favorable bite mark evidence," meaning that the Government shopped for experts until they found one who would testify in their favor. (DE 402 at 116). In reality, Dr. Dailey "could not rule in or out any of the three individuals as the possible biter." (DE 387, Attachment 45). Bourgeois has not shown that the Government "expert shopped" by seeking out someone who could answer the question asked of them, and thus the closing argument was not "false argument." In addition, as discussed above,

---

[166]    During the guilt/innocence phase closing, the prosecutor stated:

> Now the defense told you in their opening, first of all, that there was going to be testimony that a child could have made those marks. You didn't hear that. The only child whose bite was analyzed was excluded. He told you that there was forum shopping by the United States on our experts and what did you hear? We sent our teeth to Dr. Senn. Dr. Senn made his analysis and sent it for a second opinion. In serious and solemn matters of our health, like to get surgery or to do some kind of other procedure on us, many times we'll get a second opinion. Is that expert shopping or is that just making sure?

3/16/04 at 19-20. Bourgeois argues that "the Government had engaged in forum shopping for favorable bite mark evidence" by first consulting with United States Army Colonel J. Curtis Dailey, M.D. Dr. Dailey could not conclusively identify Borugeois as the biter.

211

forensic odontology requires a second opinion in similar cases. (DE 339 at 43).

Bourgeois also argues that the Government told the jury to abandon its duty to consider his

mitigating evidence. In closing, the prosecutor stated:

> The mitigation that the Defense wants you to look at and decide that that overpowers
> the aggravating factors that he's alleged to, and they are that he was under substantial
> duress, that he was – that he was driving in an 18-wheeler with three children, that
> he had family and economic pressures. You know and I thought, "Oh, well, that's
> just life, that's not mitigation."

(DE 342 at 74). Bourgeois argues that "[w]hile the jury in this case was certainly free to decide that

the mitigation proffered on behalf of Mr. Bourgeois did not outweigh the aggravating circumstances,

the prosecutor's argument that Mr. Bourgeois' evidence 'was not mitigation,' improperly prevented

the jury from considering the mitigating evidence." (DE 402 at 121). Nevertheless, if the jury

instructions properly outline the use of mitigating evidence, the Government can freely comment on

the weight the jury should accord it. *See Bland v. Sirmons*, 459 F.3d 999, 1026 (10th Cir. 2006).

The Government did not tell the jury to ignore mitigating evidence, they only disputed the weight

of that evidence.

Bourgeois also complains that the Government called him names. In the guilt/innocence

phase argument, the Government stated that its bite-mark experts "did the best they could to

determine – to exclude, their goal was to see who they could exclude. And they excluded Robin. But

who did they not exclude? They didn't exclude *this man, that thing that's sitting right there*. (DE

339 at 48-49) (emphasis added). The Government contends that was a reasonable response to

Bourgeois' own use of "dehumanizing terms" for the victim. (DE 443 at 97). "The use of colorful

pejoratives is not improper." *United States v. Fields*, 483 F.3d 313, 360 (5th Cir. 2007) (quoting

*United States v. Shoff*, 151 F.3d 889, 893 (8th Cir. 1998)); *see also United States v. Malatesta*, 583

F.2d 748, 759 (5th Cir. 1978) ("Unflattering characterizations of a defendant do not require a new

212

trial when such descriptions are supported by the evidence."). As with the rest of the challenged comments, the Government's reference to Bourgeois as a "thing" was isolated and not a pervasive feature of the trial. The Court has reviewed all of the comments Bourgeois challenges in the context of the whole trial and finds no prosecutorial misconduct.

Even assuming, *arguendo*, the Government's comments were improper, Bourgeois fails to show the requisite prejudice.[167] As an initial matter, the Court instructed the jury that the parties' arguments were not evidence. (DE 339 at 61); *see United States v. Pittman*, 401 F. App'x 895, 900 (5th Cir. 2010) (finding that a similar instruction "[a]meliorat[ed] the government's [allegedly] improper argument and cross-examination and their resultant prejudice"); *United States v. Tomblin*, 46 F.3d 1369, 1390 (5th Cir. 1995) (presuming a similar instruction sufficient "unless there is an overwhelming probability that the jury will be unable to follow the instruction and there is a strong probability that the effect [of the prosecutorial misconduct] is devastating."). Had this been a close case, perhaps the jury instruction itself may not have been enough to dispel the taint of the alleged prosecutorial misconduct. However, the evidence of Bourgeois' guilt was overwhelming and the case for a death sentence especially strong. The allegedly prejudicial comments were not the centerpieces of the Government's argument, but isolated rhetorical flourishes and intermittent

---

[167]    The prejudice step "sets a high bar . . . The determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict." *United States v. Fields*, 483 F.3d 313, 358 (5th Cir. 2007); *see also Lowenberg*, 853 F.2d at 301 ("The ultimate question before us, however, is not the impropriety of the prosecutor's remarks but whether these remarks were so inflammatory that they entitle the defendant to a new trial."). Courts reviewing the prejudice from the prosecution's unfair arguments focus on three factors: (1) the magnitude of the prejudicial effect of the prosecutor's remarks; (2) the efficacy of any cautionary instruction by the judge; and (3) the strength of the evidence supporting the conviction. *See United States v. McCann*, 613 F.3f 486, 496 (5th Cir. 2010); *United States v. Gallardo-Trapero*, 185 F.3d 307, 321 (5th Cir. 1999); *United States v. Diaz-Carreon*, 915 F.2d 951, 956 (5th Cir. 1990); *United States v. Lowenberg*, 853 F.2d 295, 302 (5th Cir. 1988).

213

themes. Where, as here, "numerous witnesses, pieces of evidence, and issues [are] placed before the jury," it is highly unlikely that "the prosecutor's statements overshadowed what had come before and unduly prejudiced the [defendant's] case. *See Gallardo-Trapero*, 185 F.3d at 320-21. The overwhelming evidence against Bourgeois and the detailed jury instructions prove that the comments did not prejudice Bourgeois. The allegedly improper comments were not of a sufficient magnitude to cast serious doubt on the jury's verdict. The Court denies Bourgeois' claims of prosecutorial misconduct.

## IX.   Trial Counsel Provided Ineffective by Not Rebutting Evidence of Bourgeois' Indifferent Demeanor (claim ten)

The Government portrayed Bourgeois as a heartless man who, while his infant daughter lay dying, only worried about his own interests. Multiple government witnesses related their surprise at Bourgeois' lack of emotion and inaction. Indifference marked what little attention Bourgeois paid to his dying daughter. One witness summed up the testimony about Bourgeois' demeanor as "just kind of heartless." (DE 335 at 289). Bourgeois faults his trial attorneys for not calling expert witnesses to explain that mental illness caused his apathy.

Testimony from the evidentiary hearing only inferentially addressed this claim. As previously discussed, experts have diagnosed Bourgeois with various interlocking psychological conditions. Bourgeois argues that his demeanor on the day he killed his daughter was not one of a deeply flawed character, but a deeply disturbed man. Bourgeois claims that his alleged mental retardation – or at least his impaired intelligence – inhibited his ability to process new information, making him unable to understand fully the events he caused. Overlapping mental conditions, such as borderline personality disorder, "which can cause individuals to dissociate, or separate themselves both emotionally and mentally, in times of stress" allegedly caused him to "'spac[e] out'" while his

214

USCA5 5948

daughter was dying. (DE 402 at 127). Bourgeois claims that trial counsel should have presented the

mental-health evidence in the guilt innocence phase to "humanize him in the eyes of the jury."

(DE402 at 127). He also claims that the information in the penalty phase would have mitigated

against a death sentence.

With regard to the guilt/innocence phase, Bourgeois does not claim that his attorneys should

have presented an insanity, diminished capacity, or other defense by which his mental state would

exculpate him. Instead, Bourgeois hopes that a psychologist could have "humanized" him so that

the jury would not see him as a calloused killer.[168] The proposed testimony was not relevant.[169]

Bourgeois' theory addresses his apathetic attitude after the killing, but mental disorders do not

explain his intent as he killed. As trial counsel recognized in the closing argument, the jury "had to

decide one of three things. One, is it murder with malice and premeditation. Is it murder with

malice not premeditated. Is it not murder at all." (DE 339 at 25). The lay depictions of the

circumstances surrounding the crime were unquestionably properly before the jury; Bourgeois' still-

---

[168]    In recognizing that "there are countless ways to provide effective assistance in any given case," the Supreme Court recently cited with approval a case stating that "[t]he current infatuation with 'humanizing' the defendant as the be-all and end-all of mitigation disregards the possibility that this may be the wrong tactic in some cases because experienced lawyers conclude that the jury simply won't buy it." *Cullen v. Pinholster*, ___ S. Ct. ___, 2011 WL 1225705, at *17 (2011) (citing *Pinholster v. Ayers*, 590 F.3d 651, 692 (9th Cir. 2009) (Kozinski, C.J., dissenting)).

[169]    The federal rules do not commonly permit Bourgeois' proposed guilt/innocence defense. Under Federal Rule of Evidence 704(b),

> No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

FED. R. EVID. 704(b).

USCA5 5949

unproven explanation for his demeanor would not have been.

With respect to the punishment phase, Dr. Estrada examined Bourgeois but apparently did not come to the conclusion that mental illness made him grossly indifferent. Nevertheless, trial counsel elicited from Dr. Estrada that his disinterested demeanor toward his daughter's dying was common to those who, because they had been abused, became abusers themselves. (DE 341 at 36-38). Trial counsel secured expert assistance before trial and used Bourgeois indifference to benefit the defense, though for a different way than he proposes now. *See Strickland*, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case.").

A reasonable attorney would not necessarily put forth mental illness as an excuse for Bourgeois' indifferent attitude. As previously noted, Bourgeois' claim of mental retardation is not strong and is inconsistent with a holistic view of his life. Placing evidence that mental disorders blunted Bourgeois' response after the killing would not seriously persuade the jury's consideration of his intent during the killing or his reaction to the murder.[170] The jury would have to place the mental-health evidence into the broader context of Bourgeois' relationship with his daughter. Bourgeois heartlessly mistreated her, callously cursed her, viciously abused her, and vocally wished her dead. Psychological testimony about his indifferent demeanor as she died did not explain his inhumane treatment of her over time. Emphasizing this aspect of Bourgeois' personality also would only have reinforced the Government's emphasis on his "decrease in the capacity for empathy or decrease in the regard for others" as a feature of his future danger to society. (DE 348 at 283). The Court finds that the proposed mental-health testimony does not show deficient performance by trial counsel or create a reasonable probability of a different result.

---

[170] The evidence as it was allowed trial counsel to argue that Bourgeois' actions did not show callous disregard, but a desire hurry on to the hospital. (DE 339 at 28)

216

USCA5 5950

**X.    A Witness Improperly Relied on Bourgeois' Interactions with Counsel as a Basis to Formulate an Adverse Opinion about Him (claim eleven)**

Bourgeois argues that the Government's questioning of Dr. Estrada violated his constitutional rights. Dr. Estrada's direct testimony revealed that Bourgeois would be a future societal danger, manipulated others, and was narcissistic. Dr. Estrada based his opinion, in part, on his in-trial observations of Bourgeois, particularly those relating to his interaction with counsel:

> I would say that in my opinion, Mr. Bourgeois' attitude throughout these proceedings has been one of a member of the defense team, and rather than the Defendant or the father of the victim. He has been very attentive, has made profuse notes and has been able to discuss and provide assistance to his defense team as needed.
>
> In addition, he also, to me, portrayed the impression of feeling often disgusted with the presentation and answers of the witnesses and having a sense that whatever the witnesses may be saying was not going to shake him or affect him. And I think that these two characteristics that I mention are very consistent with a diagnosis of a narcissistic personality disorder.

(DE 348 at 286). Bourgeois claims that the Government used his constitutional rights against him through this statement. In essence, he argues that "[t]he Government's reliance on a mental health opinion that was based upon Petitioner's participation as 'part of the defense team' violated Petitioner's right to participate in his trial and to assist counsel. In effect, Petitioner was penalized by invoking and exercising these fundamental rights." (DE 396 at 129).

Bourgeois does not point to any case law limiting an expert witness' in-court observations only to issues unrelated to the exercise of constitutional rights. Instead, Bourgeois draws comparison to Supreme Court authority preventing the Government from commenting on a defendant's post-arrest silence. *See Doyle v. Ohio*, 426 U.S. 610 (1976); *Griffin v. California*, 380 U.S. 609, 614 (1965). However, Bourgeois' argument is similar to one rejected by the Supreme Court in *Portunondo v. Agard*, 529 U.S. 61 (2000). In *Agard*, the prosecutor's closing argument mentioned that, because he was the last witness called by the defense, the defendant had the benefit of listening

217

USCA5 5951

to all prior accounts before testifying. Drawing a comparison to *Doyle* and *Griffin*, the *Agard* defendant argued that the prosecutor's comments stifled his right to be present at trial, confront witnesses, and testify. The Supreme Court refused to extend *Doyle* and *Griffin* because a jury making observations about the courtroom events "*is* natural and irresistible" and "what the jury is perfectly entitled to do." *Agard*, 529 U.S. at 67-68. Also, the Supreme Court said that commenting on a defendant's credibility and other related issues fundamentally differs from commenting on his guilt. *See id.* at 69.

Here, the Government did not mention Bourgeois' failure to testify, nor could Dr. Estrada's testimony reasonably be construed to encroach on his right to silence. Dr. Estrada's testimony did not directly address Bourgeois' right to appear at trial or right to consult with his attorneys. The challenged comments related to Bourgeois' demeanor and actions before the jury. Courts have held that prosecutorial discussion of a defendant's trial demeanor does not violate his constitutional rights. *See Bates v. Lee*, 308 F.3d 411, 421 (4th Cir. 2002) ("[P]rosecutorial comments about the lack of remorse demonstrated by a defendant's demeanor during trial do not violate a defendant's Fifth Amendment right not to testify."); *Hall v. Wainwright*, 733 F.2d 766, 773 (11th Cir. 1984) (holding that the jury would not interpret a comment simply related to a defendant's demeanor during the trial as a comment on the defendant's failure to testify); *Cunningham v. Perini*, 655 F.2d 98, 100 (6th Cir. 1981) (holding that comments related to the defendant's demeanor in court did not run afoul of the Fifth Amendment). Bourgeois has not shown that the Constitution prevents witnesses for the Government from testifying about matters that inferentially touch upon a defendant's constitutional rights. *See Bates,*, 308 F.3d at 422 (finding no error in the prosecutor comments on the defendant's demeanor at trial); *Williams v. Chrans*, 945 F.2d 926, 953-54 (7th Cir. 1991) (finding that comments related to lack of remorse did not violate *Griffin* because jury could

218

USCA5 5952

consider remorse in light of defendant's demeanor and testimony);

Even when the Government improperly discusses a defendant's valid exercise of constitutional rights, a reviewing court must still decide if, beyond a reasonable doubt, the jury would have found against the defendant absent the prosecutor's improper statements. *See United States v. Martinez-Larraga*, 517 F.3d 258, 269 (5th Cir. 2008) (citing the harmless doubt standard from *Brecht v. Abrahamson*, 507 U.S. 619 (1993)). Dr. Estrada's remarks focused on his opinion that Bourgeois had a narcissistic personality. Before commenting on his trial observation, Dr. Estrada made that same diagnosis based on "all the information that [he] ha[d]," without mentioning anything that would implicate Bourgeois' constitutional rights. (DE 348 at 285). Dr. Estrada's testimony along this vein was brief and was not a decisive issue throughout the remainder of the sentencing proceedings. Even if the Government's witness improperly commented on the exercise of Bourgeois' constitutional rights, any error was harmless. This is particularly the case because the Court and the jury could make the same lay assessment of Bourgeois' courtroom behavior. In fact, the jury was in the best position to view and assess how Bourgeois interacted with his attorneys. For those reasons, the Court will deny this claim.

## XI.    Ineffective Assistance of Appellate Counsel (claim twelve)

Mr. Gilmore and Mr. Tinker represented Bourgeois on appeal. They raised four issues on appeal that required a probing review by the Court of Appeals for the Fifth Circuit. Bourgeois' criticism of their representation extends to their appellate efforts. In three tersely briefed claims, Bourgeois argues that appellate counsel should have argued that:

- the Court improperly admitted into evidence inflammatory and prejudicial photographs of the victim.

- Dr. Estrada's testimony comparing his background to others sentence to death violated his Eighth Amendment rights, and trial counsel should have lodged

219

USCA5 5953

an objection on that basis.

- "failing to raise all of the record-based claims discussed herein, which were not properly raised or objected to at trial." (DE 396 at 127).

"[I]neffective assistance of appellate counsel claims are governed by the test set forth in *Strickland*[.]" *Amador v. Quarterman*, 458 F.3d 397, 410 (5th Cir. 2006). An inmate challenging his appellate counsel's selection of claims must show both deficient performance and that "the outcome of the appeal would have been different." *Id.*; *Pitts v. Anderson*, 122 F.3d 275, 279 (5th Cir. 1997); *Sharp v. Johnson*, 107 F.3d 282, 286 n. 9 (5th Cir. 1997). The Court finds that Bourgeois has not met *Strickland*'s demanding burden with respect to his ineffective-assistance-of-appellate-counsel claims.

Appellate counsel did not provide constitutionally deficit representation by not advancing a challenge to the admission of photographic evidence at trial. The Government carefully selected only photographs that were necessary for the trial testimony. Trial counsel reviewed the autopsy photographs and then strongly and repeatedly challenged their prejudicial nature. (DE 350 at 102; DE 345 at 1-8, 92-111). The Court carefully considered trial counsel's objections, studied the relative importance of each photograph, and weighed the impact it could have on the jury. The Court admitted into evidence only those photographs that would not be unduly prejudicial. With that background, the Court finds that a reasonable appellate attorney would not raise a claim based on the autopsy photographs and that the outcome of the appeal could not have been different had appellate counsel done so. *See Ries v. Quarterman*, 522 F.3d 517, 531–32 (5th Cir. 2008) ("Counsel need not raise every nonfrivolous ground of appeal, but should instead present solid, meritorious arguments based on directly controlling precedent.").

Similarly, appellate counsel would not be ineffective for not challenging Dr. Estrada's

220

USCA5 5954

testimony. During the Government's direct questioning of Dr. Estrada, it tried to extract information about how common it was for death row inmates to have been abused:

| | |
|---|---|
| The Government: | Do you know much about the background of people that have actually murdered somebody and been given the death penalty? Do you know much about any of that? |
| Dr. Estrada: | Unfortunately I have been involved in a number of those cases. |
| The Government: | And there are – are there people that have been abused as children that were ultimately sentenced to death because of their actions? |
| Dr. Estrada: | Not the majority. |
| The Government: | Okay. But some have been? |
| Dr. Estrada: | Yes. |

(DE 341 at 57). After Dr. Estrada's testimony, trial counsel objected that he had violated Bourgeois' right to individualized sentencing. (DE 341 at 74-78). Bourgeois now claims that appellate counsel should have argued that Dr. Estrada's testimony denied him sentencing as a "uniquely individual human being," because it compared him to others. *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976).[171]

Appellate counsel did not provide ineffective representation by not raising Bourgeois' variant on a *Woodson* claim. Bourgeois has not cited any case where the Supreme Court has reversed a death sentence because a witness discussed the outcome of mitigating circumstances in other cases. Nevertheless, Dr. Estrada's isolated comment by no means played a major part in the jury's consideration of mitigating evidence. To the extent that it had any effect, the testimony helped

---

[171]    In *Woodson*, the Court struck down a statute that mandated an automatic death sentence for those convicted of first-degree murder because the statute failed to require a consideration of the defendant's character, record, or circumstances of his crime.

USCA5 5955

Bourgeois more than it harmed him. The jury heard that childhood abuse could be a sufficient basis to impose a life sentence. Dr. Estrada's comment likely helped the defense because he told the jury that the "majority" of those who had been abused as children did not receive a death sentence. (DE 341 at 58).[172] That information would only help the jury facing a mountain of reasons to sentence Bourgeois to death. Bourgeois has not shown that appellate counsel violated his constitutional rights by not advancing a *Woodson* claim.

Insofar as Bourgeois raises a generalized complaint that appellate counsel should have raised each record-based claim that he advances in his Motion to Vacate, the Court has already extensively discussed each and finds them without merit. As the Court has found no error or prejudice flowing from the underlying claims, Bourgeois cannot meet the *Strickland* standard. *See Mayabb v. Johnson*, 168 F.3d 863, 869 (5th Cir. 1999) (applying *Strickland* to an ineffective assistance of appellate counsel claim and noting that "[w]hen we do not find prejudice from the trial error, by extension, we cannot find prejudice from an appellate error predicated on the same issue").

In the end, an appellate attorney cannot be faulted for not raising meritless claims. *See United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument thus cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue."); *Williams v. Collins*, 16 F.3d 626, 634 (5th Cir. 1994). "Failure to raise meritless objections is not ineffective lawyering; it is the very opposite." *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994); *see also Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998) ("[F]ailure to make a frivolous

---

[172]   Interesting, Dr. Estrada's testimony bears strong similarities to Dr. Cunningham's comparison of Bourgeois's future risk for violence to that of other offenders. Bourgeois faults trial counsel for not calling Dr. Cunningham to compare him to other inmates.

222

USCA5 5956

objection does not cause counsel's performance to fall below an objective level of reasonableness . . . ."). The Court denies Bourgeois' ineffective-assistance-of-appellate-counsel claim.

## XII.    Cumulative Error (claim thirteen)

Bourgeois claims that, even if each claim raised by his Motion to Vacate alone does not require relief, accumulating the effect of them all does. He argues: "Each of the above-described claims of constitutional error stand on their own and independently require relief. However, should this Court find error, but believe that individually they do not merit relief, the Court should consider the cumulative impact of the constitutional violations." (DE 396 at 134). This Court sat at trial, has held numerous hearings, and has considered voluminous evidence. With complete surety, the Court concludes that Bourgeois received all the Constitution affords him, and then some. Whether taken singly or as a whole, the issues Bourgeois raises in his 2255 motion do not show a flawed trial laden with unfairness. *See Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996) ("Meritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised."); *Mullen v. Blackburn*, 808 F.2d 1143, 1147 (5th Cir. 1987) ("Twenty times zero equals zero."). Bourgeois was lawfully convicted and sentenced to death. The Court finds no merit to his cumulative-error claim.

## XIII.    Lethal Injection (claim fourteen)

As his final claim, Bourgeois argues that the United States of America employs an unconstitutional method of execution. Bourgeois summarily argues that "unnecessary pain and suffering in violation of the Eighth Amendment" will result when the Government carries out his death sentence because of "the combination of drugs to be used, the protocol governing the execution, the use of untrained non-medical and unqualified personnel and the physical space in which the execution would be carried out." (DE 396 at 128). Nevertheless, Bourgeois provides two

223

USCA5 5957

reasons that make the instant action an improper vehicle to address his claims. First, because Bourgeois' execution "is far from imminent, the question is not yet ripe." (DE 396 at 128). Second, "a challenge to lethal injection is properly brought in a separate civil rights action under 42 U.S.C. § 1983." (DE 396 at 128). Nevertheless, Bourgeois states that he "will be happy to litigate this Eighth Amendment challenge in whatever forum is deemed appropriate." (DE 396 at 128). In addition to those two reasons for dismissing Bourgeois' lethal-injection challenge, the Government observes that the Supreme Court in *Baze v. Rees*, 553 U.S. 35 (2008), recently upheld the constitutionality of a State's execution protocol which is similar to that used by the federal government.[173]

Both parties agree that this issue is not now properly before the Court. A motion pursuant to § 2255, by its own terms, challenges the constitutionality of a movant's conviction and sentence of death, not the means of carrying out that sentence. The Court will dismiss this premature and noncognizable claim.

## CERTIFICATE OF APPEALABILITY

The AEDPA bars appellate review of a 2255 motion unless a district or circuit court certifies specific issues for appeal. *See* 28 U.S.C. § 2253(c); FED.R.APP.P. Rule 22(b). Bourgeois has not sought a Certificate of Appealability ("COA"), though this Court can consider the issue *sua sponte*. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). The Court must address whether the circumstances justify an appeal before issuing a final judgment. *See* Rule 11, RULES GOVERNING SECTION 2255 CASES IN THE UNITED STATES DISTRICT COURTS.

A COA may issue when an inmate "has made a substantial showing of the denial of a

---

[173]    18 U.S.C. § 3596(a) provides that federal death sentences shall be implemented "in the manner prescribed by the law of the State in which the sentence is imposed."

224

USCA5 5958

constitutional right." 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Settled precedent forecloses relief on Bourgeois' claims. Under the appropriate standard, Bourgeois has not shown that this Court should authorize any issue for appellate review. This Court will not certify any issue for consideration by the Fifth Circuit.

## CONCLUSION

The Court has fully considered the pleadings, the record, and the applicable law. Bourgeois has raised many issues requiring serious judicial consideration. The Court commends Bourgeois' current attorneys for their tireless efforts to defend him. They have zealously probed the legal and factual background of this case looking for issues meriting judicial review. In their briefing and argument, they have proven themselves competent and fervid defenders of their client's rights. Nonetheless, this Court finds no error invalidating Bourgeois' capital conviction or death sentence. As Bourgeois has failed to show that his sentence was imposed in violation of the Constitution or laws of the United States, was in excess of the maximum authorized by law, or is otherwise subject to collateral attack; his claims do not merit section 2255 relief.

Accordingly, the Court **DENIES** Bourgeois Motion to Vacate, **DENIES WITHOUT PREJUDICE** any outstanding motions, and **DISMISSES** this case. The Court will not certify any issue for consideration by the appellate court.

**SIGNED** and **ENTERED** on this 19th day of _MAY_, 2011.

_Janis Graham Jack_
Janis Graham Jack
United States District Judge

225

USCA5 5959

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-216 |
| | § | (C.A. No. C-07-223) |
| | § | |
| ALFRED NMI BOURGEOIS | § | |

## FINAL JUDGMENT

In accordance with the Court's Memorandum and Order, the Court hereby enters

Final Judgment dismissing the motion of Alfred Bourgeois to vacate, set aside or correct

sentence under 28 U.S.C. § 2255 or in the alternative pursuant to 28 U.S.C. § 2241. The Court

will not certify any issue for consideration by the appellate court.

SIGNED and ORDERED this 19th day of May, 2011.

_____
Janis Graham Jack
United States District Judge

1 / 1

USCA5 5960

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Respondent-Plaintiff | § | |
| | § | CR C-02-216 |
| vs. | § | CV C-07-223 |
| | § | |
| ALFRED BOURGEOIS, | § | |
| Petitioner-Defendant | § | |

### GOVERNMENT'S  MOTION TO CORRECT THE COURT'S MEMORANDUM AND ORDER OF MAY 19, 2011[1]

I.

On May 19, 2011, the court filed its Memorandum and Order ruling on Mr. Bourgeois's Motion filed pursuant to 28 U.S.C. § 2255.  On page 193 of the Order, in the context of discussing Dr. Dailey's involvement in the case, the court made a seemingly disjointed reference to Dr. Oliver not being credible.  Considering the court found Dr. Oliver's testimony creditable in the immediately previous section of the Order (pp. 182-88), it appears to the government  the court mistakenly substituted Dr. Oliver's name on page 193, for that of Dr. Dailey.  The government believes the court intended to find that Dr. Dailey did not appear credible on page 193. Essentially a scrivener's error, the government moves the court pursuant to R.Civ.P.

---

[1]  Criminal docket entry 660.

USCA5 5961

60 (a) to correct the Order to reflect the court's true intended findings.  As an appeal

of this Order has not yet been filed, the court is empowered to rule on this Motion

without the involvement of the 5th Circuit.  Accordingly, if the court agrees the

government is correct in its above observations, the government moves the court to

correct the subject Order to reflect the court true intended findings, to substitute Dr.

Dailey's name for Dr. Oliver's name on line three of page 193 of the Order.

II.

For these reasons, the United States respectfully requests the court to correct

the Order by substituting Dr. Dailey's name for Dr. Oliver's name on line three of

page 193 of the Order.

Respectfully submitted,

JOSE ANGEL MORENO
United States Attorney

s/ Patti Hubert Booth
PATTI  HUBERT BOOTH
Assistant United States Attorney
Federal I.D. No. 19500
State Bar I.D. No. 02650500
800 N. Shoreline Blvd., Suite 500
Corpus Christi, Texas 78401
(361) 888-3111

USCA5 5962

**CERTIFICATE OF CONSULTATION**

I, Patti Hubert Booth, Assistant United States Attorney, certify that on May 26, 2011, I consulted with Mr. Michael Wiseman, Counsel for Mr. Bourgeois, regarding the instant Motion, who advised he and his team will take no position on this request.

s/ Patti Hubert Booth
PATTI HUBERT BOOTH
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I, Patti Hubert Booth, Assistant United States Attorney, certify that a copy of this motion for correction of the Order will be served upon Counsel of Record by electronic notice upon filing this Motion electronically with the court.

s/ Patti Hubert Booth
PATTI HUBERT BOOTH
Assistant United States Attorney

-3-

USCA5 5963

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Respondent-Plaintiff | § | |
| | § | CR C-02-216 |
| vs. | § | CV C-07-223 |
| | § | |
| ALFRED BOURGEOIS, | § | |
| Petitioner-Defendant | § | |

ORDER  GRANTING MOTION TO CORRECT ORDER

Upon consideration of the Government's motion to correct the Order of

May 19, 2011 (R. 660), the Court finds the Motion should be and is GRANTED.


_____        _____
Date                              UNITED STATES DISTRICT JUDGE

USCA5 5964

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-216 |
| | § | |
| ALFRED NMI BOURGEOIS | § | |

## ORDER

On May 19, 2011, the Court denied Bourgeois' motion pursuant to 28 U.S.C. § 2255.

(DE 660).  The Government has filed a motion to correct because on page 193 of the

Memorandum and Order, the Court inadvertently referred to Dr. Oliver instead of Dr. Dailey.

(DE 662).  The Court obviously intended the sentence to read "Even in his live testimony, Dr.

Dailey did not appear credible."  The Court's reference to Dr. Oliver is a reference to Dr. Dailey.

The Court, therefore, **GRANTS** the Government's motion.

SIGNED and ORDERED this 26th day of May, 2011.

_____
Janis Graham Jack
United States District Judge

1 / 1

USCA5 5965

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____

|                                    |   |                               |
|------------------------------------|---|-------------------------------|
| UNITED STATES OF AMERICA,          | : | No. Cr-C-02-216               |
|                                    | : | No. Cv-07-223                 |
| Respondent,                        | : | Honorable Janis Graham Jack,  |
|                                    | : | U.S.D.J.                      |
| -against-                          | : |                               |
|                                    | : |                               |
| ALFRED BOURGEOIS,                  | : | Electronically Filed          |
|                                    | : |                               |
| Petitioner.                        | : |                               |

_____ :

**PETITIONER'S UNOPPOSED MOTION PURSUANT TO
FED.R.CIV.P. 58(D) FOR ENTRY OF JUDGMENT**

Petitioner, Alfred Bourgeois, through counsel moves for entry of judgment, and

in support states the following.

1.  On May 19, 2011 this Court issued a *Memorandum and Order* disposing

of Petitioner's § 2255 Motion.  The Court's judgment was entered on this Court's

criminal docket (02-cr-216) (document #661),  but not on the civil docket.

2.  A section 2255 motion is a civil proceeding.  Accordingly, the Clerk of

this Court assigned a civil docket number when Petitioner filed his § 2255 Motion on

May 14, 2007.  See  Bourgeois v. United States, 07-cv-223.

3.  Because Petitioner's ability to pursue post-judgment remedies, e.g. filing

1

USCA5 5966

a notice of appeal, requires entry of judgment in the civil docket, Petitioner makes

this request pursuant to Fed.R.Civ.P. 58(d) that this Court enter its judgment in the

civil docket.

4.      The Government has indicated to counsel that it does not oppose this

request.

Respectfully Submitted,

/s/ Michael Wiseman

Michael Wiseman, Esq.
Chief Capital Habeas Corpus Unit
Capital Habeas Corpus Unit
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19016
215-928-0520
Michael_Wiseman@fd.org

Dated:        June 1, 2011
              Philadelphia, PA

### Certificate of Service

I, Michael Wiseman, hereby certify that on this first day of June, 2011I served the foregoing on counsel for the Government through this Court's ECF filing system.

/s/ Michael Wiseman

_____
Michael Wiseman

2

USCA5 5967

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____
                                        :
UNITED STATES OF AMERICA,               :        No. Cr-C-02-216
                                        :        No. Cv-07-223
                Respondent,             :    Honorable Janis Graham Jack,
                                        :            U.S.D.J.
        -against-                       :
                                        :
ALFRED BOURGEOIS,                       :
                                        :
                Petitioner.             :
_____        :

**ORDER**

And Now, this ___ day of June 1, 2011 upon consideration of *Petitioner's Unopposed Motion Pursuant to Fed.R.Civ.P. 58(d) for Entry of Judgment*, it is ORDERED:

The motion is granted.  The Clerk of Court is directed to enter this Court's May 19, 2011 judgment (document #661) on the civil docket in Bourgeois v. United States, C-07-223.


                                        _____
                                        Janis Graham Jack, USDJ


USCA5 5968

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____

|                                  |   |                             |
|----------------------------------|---|-----------------------------|
| UNITED STATES OF AMERICA,        | : | No. Cr-C-02-216             |
|                                  | : | No. Cv-07-223               |
| Respondent,                      | : | Honorable Janis Graham Jack,|
|                                  | : | U.S.D.J.                    |
| -against-                        | : |                             |
|                                  | : |                             |
| ALFRED BOURGEOIS,                | : |                             |
|                                  | : |                             |
| Petitioner.                      | : |                             |

_____ :

**PETITIONER'S MOTION PURSUANT TO F.R.CIV.P. 59(E)
TO ALTER OR AMEND JUDGMENT**

Petitioner, Alfred Bourgeois, through undersigned counsel, moves pursuant to

F.R.Civ.P. 59 (e), to alter or amend the judgment.  In support he states the following.[1]

**INTRODUCTION**

On May 19, 2011 the Court entered judgment against Petitioner with respect

to his Motion pursuant to 28 U.S.C. § 2255 (document # 661).

Petitioner moves for relief from the judgment because of serious, substantial

---

[1]Transcripts of prior proceedings are cited as "Tr." followed by the date of the proceeding and a page number.  The Court's *Memorandum and Opinion* (document # 660) is referred to as *Opinion* is cited as *Op.*, followed by a page cite to the Westlaw version, 2011 WL 1930684 (S.D. Texas. May 19, 2011).  All other citations are either self explanatory or are explained.  All emphasis is added unless otherwise indicated.

1

USCA5 5969

and troubling errors of law and fact in the Court's *Opinion*.

During oral argument on Petitioner's § 2255 Motion, the Court acknowledged

its difficult challenge to "step-back" from the disturbing nature of this case:

Counsel:    And the other set of cases I provided Your Honor is that
            you can't, you can't substitute your judgment about what
            you would have done –

Court:      I agree with you 100 percent. And you know, this, it's very
            difficult to be in –

Counsel:    Sure.

Court:      – this kind of a position and having watched the trial. So
            last night several times when I was watching some of these
            videos that were very disturbing, I kept saying, I kept
            thinking, "Remove, step back and remove yourself." ...
            Because . . . It's a different process. That's all.

            *                    *                    *

Court:      But I need to go back over each of the things, each of the
            testimonies and determine whether, whether I feel that it
            was good or bad, whether they should have at least been
            explored in front of the jury. And I don't have any problem
            doing that. . . .And that's, to me, what my charge is. . . .I
            just hope I can do it right.

Tr., 1/13/11, 93-94.

Regrettably, and for the reasons that follow, this Court failed to step-back from

the case. This is evidenced by a plethora of instances where the Court engaged in a

subjective analysis of the evidence presented at the evidentiary hearing and compared

2

USCA5 5970

it to its subjective analysis of the trial evidence, such analysis being based on **the Court's subjective views**.[2]  This not only shows a failure to conduct a fair and detached review of the post-conviction evidence, i.e., an objective analysis of the evidence, it violates clear and controlling law respecting a post-conviction court's duty in assessing evidence.[3]

_____

[2]The Court's Opinion is laced with such subjective and improper analysis of the evidence – for example:  *Op.*, 60: "**From this Court's own observations**, Dr. Cunningham would not have been a good witness for the defense."; *Op.,* 61: "The **Court's observation** of the trial landscape and the jurors' reaction to evidence provides a vantage point to consider the effect any proposed testimony would have"; *Op.*, 64: "The jury would respond to the information in much the same way as Dr. Gelbort . . ." *Op.*, 68: "At any rate, **this Court's observation** in the two times he has appeared before the Court was that a reasonable attorney would not have called him. **His testimony came off as** academic, speculative, and untethered to the facts of the crime. ... The Court's observations assure that trial counsel did not render deficient performance in not calling Dr. Holden as a punishment phase witness."; *Op.,* 79: "Had trial counsel tried to argue insufficiency of the evidence showing jurisdiction, he might have lessened his credibility with jurors."; *Op.,* 87: "In particular, the Court's observation of Mr. Keel and Dr. Johnson showed that they would not be persuasive witnesses before the jury. They identified the same errors in the testing that the trial counsel had, yet bogged down their testimony with fine distinctions which did not completely discount the possibility of sexual assault."

[3]Petitioner's claims all sound in ineffective assistance of counsel.  Strickland v. Washington, 466 U.S. 668 (1984) and its progeny eschew subjective findings by the post-conviction court.  See Hill v. Lockhart, 474 U.S. 52, 60 (1985) (Strickland analysis "should be made objectively, without regard for the 'idiosyncracies of the particular decisionmaker'" (quoting Strickland, 466 U.S. at 695).  In Strickland itself, the post-conviction judge found no prejudice based upon his own opinion of what the evidence showed, and the Supreme Court held that his opinion was "irrelevant to the prejudice inquiry."  Id., 466 U.S. at 700.  The question is not what this Court thought of the post-conviction evidence or of a comparison of this evidence with the trial

3

USCA5 5971

Against this backdrop of inappropriate subjective analyses permeating the

Court's resolution of this matter, Petitioner seeks relief because of additional legal

and factual errors made with respect to the following claims for relief:

Claim II.[4]    Counsel were Ineffective For Failing to Investigate
and Present Mitigating Evidence in the Penalty
Phase of Trial;

Claim III.    The Court did not Have Jurisdiction over Petitioner
and Counsel Ineffectively Failed to Challenge the
Lack of Jurisdiction;

Claim IV.    Counsel Ineffectively Failed to Challenge Evidence
of Sexual Assault; and

Claims V    Counsel Ineffectively Failed to Challenge the Use of
& VI.    Digitally Enhanced Photos.

In the event that the Court does not alter the judgment to award relief on the

four above-enumerated claims for relief, Petitioner alternatively requests that the

Court alter the judgment to permit a Certificate of Appealabilty (COA) as to each

claim, pursuant to 28 U.S.C. § 2253(c).  In the last section addressing Petitioner's

entitlement to a COA, he will explain how the Court misapprehended the law relevant

---

presentations (or non-presentations of evidence).  Instead, the question is an objective
one – did counsel perform deficiently and if so, is there a reasonable probability of
a different outcome.

[4]Petitioner identifies the Claims using the same numbering as used in the §
2255 Motion.

USCA5 5972

to COA.

## STANDARD GOVERNING RULE 59(E)

Rule 59(e) "was adopted to make clear that the district court possesses the power to rectify its own mistakes in the period immediately following the entry of judgment. White v. New Hampshire Dep't of Employment Sec., 455 U.S. 445, 450 (1982) (internal quotation marks omitted). Rule 59(e) "is properly invoked to correct manifest errors of law or fact." In re Transtexas Gas Corp., 303 F.3d 571, 581 (5th Cir. 2002). A district court has broad discretion to grant a motion to alter or amend judgment. Lavespere v. Niagra Mach. & Tool Works, 910 F.2d 167, 174 (5th Cir. 1990) (overruled on other grounds). Moreover, Rule 59(e) does not set forth any particular grounds for relief. Id. Rather, Rule 59(e) relief is appropriately considered after weighing relevant circumstances on a case-by-case basis. Id.

Petitioner submits that with respect to each of the claims discussed herein, the Court has committed either factual or legal errors that should result in the amendment of the judgment.

5

USCA5 5973

CLAIM II.  INEFFECTIVE ASSISTANCE AT PENALTY PHASE.

There is little to any dispute that Alfred Bourgeois was a traumatically physically and sexually abused child;[5] that he has borderline level of intelligence, i.e., borderline mental retardation[6]; organic brain damage,[7] and suffers from a host of resultant psychological impairments,[8] including Borderline Personality Disorder,[9] post-traumatic stress disorder and a paranoid-delusional process. Although **virtually none of this evidence was presented to the sentencing jury** – the only aspects of

_____

[5]The Government's experts agreed that Petitioner was terribly abused and that this abuse had an impact on his emotional development and mental illness.  For instance, Dr. Price testified that much of Mr. Bourgeois' instability is traceable to his lifetime of abuse, deprivations, neglect and parental abandonment. Tr. 9/23/10, 232, 239.

[6]See Tr. 9/23/10, 239-40 (Dr. Price agreeing that Bourgeois is in the borderline level of intellectual functioning).

[7]See Tr. 11/10/10, 26 (deposition of Dr. Price: "I would agree that these scores [Dr. Weiner's] on the tests that were administered using the overall Heaton norms would be consistent with impairment in those areas that are sensitive to brain dysfunction."). Thus, the Court erred when it wrote that Dr. Price did not agree that Mr. Bourgeois was intellectually impaired.  *Op.*, 66.

[8]See e.g. *Op*. 46, n. 78 ("While some expert witnesses focused on Bourgeois' impaired ability to control impulses, they attributed that deficit to other psychological deficiencies, rather than mental retardation.")

[9]Again, the Government's experts do not dispute this diagnosis.  See Tr. 9/23/10, 232 (Dr. Price agreeing with Petitioner's experts that Bourgeois' Borderline Personality Disorder exists and derives from his abusive childhood); Tr. 9/24/10, 155-56 (Dr. Moore agreeing that Petitioner has a Borderline Personality Disorder and that it "drives" his conduct).

USCA5 5974

this litany of mitigating factors that the jury heard was Dr. Estrada's "assumption" that Mr. Bourgeois was abused as a child – the Court has fashioned a narrative excusing counsel's abject failure to conduct a constitutionally adequate mitigation investigation or to present this overwhelming mitigating case for life.  To excuse these failures, the Court has ignored evidence that did not fit within the narrative and drew unwarranted and repeated inferences against Petitioner's case at virtually every juncture.  Whereas the Court ascribed shrewd strategic calls made by counsel, a full review of the facts relevant to this claim shows, not shrewd decision making, but a dysfunctional defense effort.

At the core of the Court's findings about counsel's ostensible tactics, is the question of the timing of the mitigation investigation.  The Court found that counsel made a "probing effort to investigate mitigating evidence." *Op.,* 54.  The Court stated that "While the defense team **delayed part of their investigation somewhat**, the Court is more concerned with the results than the timing of their efforts."  The Court also notes that Williams v. Taylor, 529 U.S. 362 (2000) – while finding counsel who commenced an investigation on the eve of trial were constitutionally inadequate – did not set "pre-appointed" time lines for when a mitigation investigation should commence. *Op.*, 54. That is true, but only as far as it goes.  As the full narrative of the mitigation investigation shows, and as AMERICAN BAR ASSOCIATION GUIDELINES

7

USCA5 5975

FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, February 2003, 31 Hofstra L.Review 913 (2003) (hereafter, ABA Guidelines) counsels, a constitutionally adequate mitigation case cannot be put together on the eve of trial.[10]  Yet, what this Court concludes was a "partial delay of the mitigation investigation" was in reality an abject failure to conduct a proper and timely investigation, with resulting prejudicial results.  And while the Court understandably is more concerned with the "results," the Court failed to appreciate that the timing has an effect on the results, as shown below.

A prime example of the last minute nature of the investigation relates to trial counsel's testimony that counsel interviewed "as many as fifty" potential mitigation witnesses "prior to the punishment phase." These so-called interviews occurred when the witnesses were in Corpus Christi for the penalty phase and took place in a hotel conference room.  While it may have been "prior" to the start of the penalty phase, the interviews occurred on the Sunday before the Monday, March 22, 2004 start of

---

[10]See ABA Guidelines at 967-68 ("recent studies indicate that several **thousand** hours are typically required to provide appropriate representation"); at 1002 (team defense approach allows attorneys to delegate "**time consuming** tasks to skilled assistants"); at 1022 ("penalty phase preparation **requires extensive and generally unparalleled investigation**"); at 1022 ("**The mitigation investigation should begin as quickly as possible**, because it may affect the investigation of the first defenses. . . , decisions about the need for expert evaluations . . ."); at 1025 ("corroborating information from multiple sources – **a time consuming task** – is important . . .").

8

USCA5 5976

the penalty phase proceedings. If counsel's testimony is taken as true, the defense team individually interviewed fifty (50) witnesses over the course of a day. Although there was no precise testimony about how long the day was, if one assumes a 10 hour day (or 600 minutes), this would average to about 12 minutes per interview – hardly the constitutional talisman for mitigation investigation.

Yet, this Court also found that some of the mitigation witnesses were reluctant to discuss abuse visited upon Petitioner by his mother, while his mother was still living. *Op., 56.* Obviously, that reluctance would not be overcome by sporadic interviews with a mitigation specialist, culminating in a 12 minute session with counsel on the eve of the penalty phase.[11]

So, timing is important – not because of artificial deadlines – but because of the labor intensive and time consuming nature of this endeavor. With this in mind, Petitioner reviews the actual and full facts related to the failure to conduct a timely and therefore proper mitigation investigation. Petitioner also discussed the negative

---

[11]Petitioner's Exhibit 165 shows that Claudia Williams, whom the Court offered as an example of a witness who was reluctant to discuss her mother's brutality while she was still alive (but see Tr. 9/24/10, 16 (Ms. Williams acknowledging her mother's abuse of Petitioner)), was interviewed by Ms. Milstein on November 25, 2003, by telephone by Mr. Bierbaum on February 25, 2004 and by Mr. Bierbaum again on March 2, 2004. Given what trial counsel had learned about Mr. Bourgeois' abuse (see e.g. Tr. 9/24/10, 13-18 (trial investigative memos showing that they had uncovered significant abuse)), they were obliged to spend additional time with the witnesses to overcome any reluctance to discuss Mr. Bourgeois' mother's cruelty.

9

USCA5 5977

impact of counsel's delay.

This Court found that counsel made early efforts to construct a mitigation case, even before the Government provided notice that this would be a capital case. *Op.*, 49. They contacted Dr. Cunningham in June, 2003. The Court appointed Dr. Cunningham on or about July 25, 2003 with the trial scheduled for February, 2004, and with a discovery deadline of December, 2003. See email from Mr. Gilmore to Dr. Cunningham, July 25, 2003. The Court correctly notes that Dr. Cunningham's office contacted trial counsel by email on December 1, 2003 to advise them that he had yet to receive any information from the mitigation investigators. *Op.*, 50.

**Fact:**[12]     From the time of Dr. Cunningham's appointment to the case on July 25, 2003 through December 1, 2003 – a period of just over four months – Dr. Cunningham was provided with no information about Mr. Bourgeois from the mitigation specialists. Thus, while the Court notes that counsel had seven months in which to conduct the investigation, over half of it was squandered with virtually no mitigation-related activity being conducted.

This period of squandered time was also reflected in Dr. Cunningham's invoice, which showed that he billed for no activity between July, 2003 and January 22, 2004. Tr. 9/21/10, 208.

The Court also neglected to note counsel's belief that they would be obtaining a continuance of the trial from February, 2004 as reflected in Mr. Gilmore December 1, 2004 email response to Dr. Cunningham. Tr.

---

[12]In this section, Petitioner's uses the designation of "Fact" as a shorthand for facts that were overlooked and apparently ignored by the Court in the timing narrative, which of course provides grounds for reconsideration of the Judgment.

USCA5 5978

9/21/10, 213.

The Court found that the mitigation investigators met with Mr. Bourgeois on October 23, 2003. *Op.*, 49.

**Fact:** Counsel allowed almost three of the seven pre-trial months to elapse without **insisting** that their specialists meet their client.

The Court states: "In the weeks after the first meeting, the investigators interviewed several individuals." *Op.*, 50.

**Fact:** In reality on January 30, 2004 Dr. Cunningham finally received his first mitigation interview summaries. Judging from the fact that he billed for 80 minutes to review and analyze them, he believed that he would have received between three and twelve such summaries. Tr. 9/21/10, 217-18. Thus, with trial now less than three weeks away, Dr. Cunningham was finally given some materials that he had been requesting for months.

The Court noted that Dr. Cunningham provided a summary of his opinions to trial counsel who provided them to the Government. *Op.*, 52.[13]

**Fact:** The summary was presented on February 25, 2004 (<u>see</u> Petitioner's Exhibit 2), **after voir dire commenced** and just one business day before the start of testimony at the guilt phase and well after the initial discovery cutoff of December, 2003 (<u>see</u>, email from Gilmore to Cunningham, July 25, 2003, Petitioner's Exhibit 8).

The Court states: "The guilt/innocence phase began on March 1, 2004. As the

---

[13]The Court notes that Dr. Cunningham provided two letters summarizing his views, one related to mitigation and the other to future dangerousness. While the Court critiqued his vews on future dangerousness, *Op.* 107-08 & n. 91, Petitioner has never contended that counsel were ineffective for not utilizing Dr. Cunningham with respect to the question of future dangerousness.

11

USCA5 5979

punishment phase approached, trial counsel began to choose which mitigating witnesses would testify."

**Fact:**     The Court's belief that this was an orderly and deliberate review of what mitigating evidence to investigate and present is belied by, among other things, the testimony of Dr. Cunningham and Gerald Bierbaum. See Tr. 9/21/10, 218 (Dr. Cunningham testifying that from January 30, 2004 to the commencement of trial was inadequate to construct a proper mitigation case, "not even a close call."); id., at 222 ("the state of the investigation was abysmal. The summaries I was provided were in most instances superficial and incomplete."; Tr. 9/22/10, 262 (Bierbaum testifying that he did not receive requested mitigation records "until late in the guilt phase"); id., at 262-63 (Bierbaum saw a psychological evaluation on Mr. Bourgeois for the first time "on counsel table" during the penalty phase); id., at 265-67 (Bierbaum explaining the flaws in Lisa Milstein's initial memos and his finding out that she was undergoing personal issues, including "neurological problems" which impacted her work); id., at 271 (Bierbaum: "I recall being informed that the case was going to go to trial in late February or early March and being really concerned that the work hadn't been done").

Of particular note, as of January 30, 2003, Dr. Cunningham had never evaluated Mr. Bourgeois, because best practices require obtaining background information about the defendant **before** commencing such an evaluation, and of course he had only obtained the first of such information on January 30. Tr. 9/21/10, 217.

The Court also did not mention that Dr. Cunningham noted that the summaries he received on January 30, 2003 contained errors, which meant that he could not rely on them. Tr. 9/21/10, 223, 224 ("I was already concerned about the inadequacy of detail . . . in these interviews. Now there are also fundamental errors of fact, so that . . . my confidence that I could independently rely on these was significantly reduced. Both because of that inadequacy of depth, as well as fundamental errors, I realized that I was going to have to interview individuals and primarily rely on my own findings, that I couldn't rely on the history they had

12

USCA5 5980

provided."); see also Tr. 9/22/10, 265-67 (Bierbaum testifying that the memos produced by Ms. Milstein were not up to her usual standard).

The Court stated that Mr. Gilmore never received an answer to his question to Dr. Cunningham in which Gilmore asked whether the mitigation information should go to him directly or to the lawyers. *Op*., 50.

**Fact:**        Mr. Gilmore testified correctly that the responsibility for managing the case and insuring that materials were obtained and provided to the proper people at the correct time remained with him and Mr. Tinker. Tr. 9/22/10, 223[14]

With regard to the December 2003 motion to continue, the Court observed, "Trial counsel informed the Court that the mitigation investigators 'cannot properly complete their investigation of this case until August, 2004.' . . . The Court expressed concern that the mitigating investigators had delayed their efforts to that point. The Court cautioned the defense that a failure to get the investigation 'done in a timely

---

[14]See also ABA Sponsored, SUPPLEMENTARY GUIDELINES FOR THE MITIGATION FUNCTION OF DEFENSE TEAMS IN DEATH PENALTY CASES, 36 Hofstra Law Review 677, 680 (2008):

> Counsel have a duty to hire, assign or have appointed competent team members; to investigate the background, training and skills of team members to determine that they are competent; **and to supervise and direct the work of all team members**. Counsel must conduct such investigation of the background, training and skills of the team members as will determine that they are competent and must ensure on an ongoing basis that their work is of high professional quality. . . .**All members of the defense team are agents of defense counsel.**

13

USCA5 5981

manner' was 'very close to bad faith.'" *Op.*, 50.

**Fact:**     Dr. Cunningham testified that his assistant spoke with Mr. Tinker on November 17, 2003 and was told that the "attorneys are aware of the previous time line and **are working with the judge to get a continuance."** Based on that phone call, Dr. Cunningham believed that a continuance was "likely." Tr. 9/21/10, 208-09. At the time of that phone call, in fact the "investigators" had interviewed only **one** person. See Petitioner's Exhibit 165.

And, as noted above, counsel conducted their mass interview of potential mitigation witnesses for the first and only time on the eve of the penalty phase and for, what was likely, at most, an average of 12 minutes.

This fuller narrative shows a very different picture from that which the Court set forth in its *Opinion*. It is against this backdrop of last minute, rushed and incomplete investigation, that this Court next found a variety of alleged tactical and strategic reasons for counsel's penalty phase presentation. Again, the full facts and relevant law, tell a very different story.

**Dr. Cunningham.** The Court explained that trial counsel chose not to call Dr. Cunningham as a witness at the penalty hearing because his mitigation theory "conflicted with Bourgeois' chosen defense. Trial counsel discussed [Bourgeois'] abused childhood **as sympathetic, not explanatory or as a justifying factor**. *Op.*,

14

USCA5 5982

60.[15]   The Court cites a portion of counsel's closing to the jury to support this

distinction between "sympathy" and "explanatory," but this distinction makes no

sense in the context of counsel's overall penalty phase theory as reflected in their

_____

[15]As explained, this distinction is not supported by the record.  In any event, counsel have an obligation not just to garner sympathy, but to provide "reasons," if they are available, to demonstrate why the jury should vote for life as a "reflection of a reasoned moral responses," as the Supreme Court has stated:

> Underlying Lockett [v. Ohio, 438 U.S. 586 (1978)] and Eddings [v. Oklahoma, 455 U.S. 104 (1982)] is the principle that punishment should be directly related to the **personal culpability** of the criminal defendant. If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, **evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems**, may be less culpable than defendants who have no such excuse. . .   Thus, the sentence imposed at the penalty stage should reflect a reasoned moral response to the **defendant's background, character, and crime.**

Penry v. Lynaugh, 492 U.S. 302, 319 (1989) (internal quotation marks and citations omitted).  And, as the Fifth Circuit has emphasized, this duty is even more important when the facts of the offense, as the Court has found here, are "atrocious," *Op.*, 70. See Walbey v. Quarterman, 2009 WL 113778, *8, 309 Fed.Appx. 795 (5th Cir. Jan. 19, 2009) ("Texas's next argument – that Walbey suffered no prejudice because the brutality of his crime eclipses any mitigating evidence – is a non-starter. ... **To permit a jury to impose the death sentence solely because the facts are heinous and egregious would be to return to the days of inflicting capital punishment based on emotion and revenge** .... Almost without exception, the cases we see in which conviction of a capital crime has produced a death sentence arise from extremely **egregious, heinous, and shocking facts**. But, if that were all that is required to offset prejudicial legal error and convert it to harmless error, habeas relief ... would virtually never be available, so testing for it would amount to a hollow judicial act.")

15

USCA5 5983

closing argument.

Clearly counsel was seeking to **explain** Petitioner's conduct based on the stressors he was facing in combination with his life history. While some of this mitigation had a sympathetic quality to it, counsel was presenting it as an explanation. The Court's finding to the contrary is unsupported by the record.

Counsel began their closing by reciting some of Petitioner's life history, including his child hood abuse. Tr. 3/24/03, 47 ("his mother singled him out for abuse"). Immediately after reviewing these details about his background, including his abuse, counsel told the jury "these things are offered to you not as an excuse for committing this crime, but to try to help you understand his **mindset. . . we're all capable of doing bad things in the right circumstances**." Id., 48. Obviously counsel was using portions of Petitioner's background, that could garner sympathy, to explain Petitioner's "mindset."[16] The erroneous distinction between seeking

---

[16]In this context, counsel's statement that these factors are not an "excuse" for his having committed the offense is a reference to a legal excuse, i.e. a defense to the crime. See e.g. McKoy v. North Carolina, 494 U.S. 433, 441 (1990) ("in Eddings [v. Oklahoma, 455 U.S. 104 (1982)], the sentencing court had ruled that it was precluded [] from considering evidence of the defendant's troubled childhood and emotional disturbance. The State Court of Criminal Appeals affirmed, holding that such evidence was irrelevant to mitigation because it **did not support a legal excuse from criminal liability**. This Court reversed on the ground that such evidence was undoubtedly relevant to mitigation **even if it did not excuse** the defendant's conduct.")

16

USCA5 5984

sympathy and explaining the conduct is repeated throughout the summation of both lawyers.  See also id., 48 ("at the time that this incident occurred, **these factors** came into play along with his **current situation** (counsel having just told the jury that the "current situation included the long truck ride, the potty spilling, his wife's infidelity and his financial difficulties); id., at 50 ("**these factors** all came together and Mr. Bourgeois snapped"); id., 50 ("if you believed he did it, it was not a premeditated act"); at 49 ("Something happened in [sic] that trip.  if you believe that he did it this, something happened during that trip that brought all these factors together and caused him to snap.").

The Court's conclusion that the abuse was offered only to garner sympathy and not to explain, viz, mitigate the offense, is simply not supported by counsel's theory as articulated in the closing.  Counsel was arguing that there was an explanation for why Mr. Bourgeois snapped – counsel had the correct theory, they simply had no evidence (aside from Dr. Estrada's set of assumptions) upon which to support the theory.

Similarly, counsel squarely offered Dr. Estrada's assumptions as a basis to mitigate the offense, and not simply to garner sympathy.  Mr. Tinker explained the importance of Dr. Estrada's testimony: "And Dr. Estrada concluded from what happened [with respect to the offense] that Alfred Bourgeois was abused as a child."

17

USCA5 5985

Tr. 3/24/04, 58.  This is a direct link between Mr. Bourgeois assumed childhood abuse and the reasons that he "snapped."  Similarly, Mr. Tinker told the jury that Mr. Bourgeois "grew up in an environment in which whipping apparently is accepted for the men. They could – if they thought their wives or girlfriends got out of hand, they'd hit them.  I'm not telling you that because I think it's good, I'm not telling you that because – because I think its proper; I'm telling you that because that's the kind of rearing Alfred Bourgeois had and that's why he is what he is today."  Id., 59-60.[17]

The Court's conclusion that counsel did not offer abuse evidence because it conflicted with the defense is also belied by Mr. Gilmore's *Response Affidavit* (Petitioner's Exhibit 83).  In it, he explained his view of Dr. Cunningham's theory,

---

[17]In another example of this Court's incomplete treatment of these issues, it faulted Dr. Cunningham's proposed testimony that said essentially the same thing that Mr. Tinker told to the jury.  This Court said:

> Other aspects of his [Cunningham's] testimony would offend jurors.  In one portion of his proposed testimony, he would have told jurors to excuse Bourgeois' repeated fierceness against women because domestic violence is a common, and in his view, apparently accepted feature of society.  Jurors may be expected to react with revulsion to that information.

*Op.*, 60, n. 103.  It is incumbent upon this Court, if it does not grant the requested relief to explain – if it can – this discrepant treatment of the very same concepts, one expressed by attorney Tinker, and the other by Dr. Cunningham.  More to the point, the Court would need to explain why counsel chose not to put Dr. Cunningham on the witness stand to provide the very same theory that counsel argued.

18

USCA5 5986

which sounds very much like the theory the defense presented, *sans* any evidence:

> I believe an accurate summary of Dr. Cunningham's proposed testimony to be that Mr. Bourgeois had numerous factors influence him at the time of the killing, which explained and somewhat mitigated his actions. Among these factors, were his upbringing as a child; his mental problems; his economic situation and the instability of his marriage, caused by the discovery that he had a child out of wedlock, which was order to pay support for; taking the family on the cross-country trip, forcing them to spend long periods of time in a confined space. All of these issues supposedly came to boil, causing Mr. Bourgeois to commit the murder.

Pet. Ex. 83, page 3. Reading this, one would imagine that counsel would have been eager to use Dr. Cunningham, or to present the components of his theory, e.g. the abuse evidence and notion that Mr. Bourgeois exploded (to use Dr. Cunningham's pressure cooker analogy). Indeed, Dr. Cunningham's pressure cooker sounds very much like Mr. Gilmore's repeated references to Mr. Bourgeois having "snapped."

Mr. Gilmore, however, explained why they decided not to use Dr. Cunningham:

> The problem, in [sic] our perspective, was that Mr. Bourgeois denied that he had committed the crime and throughout the trial, including his allocution to the jury [sic]. Dr. Cunningham's explanation conflicted with Mr. Bourgeois' defense.

Id. This explanation, adopted by the Court simply rings hollow when one examines Mr. Tinker and Mr. Gilmore's closing arguments. They offered childhood abuse as part of an explanation for Mr. Bourgeois' conduct – plain and simple. This Court's

19

USCA5 5987

findings to the contrary are not supported by the record.[18]

**Brain Damage.** The Court stated: "counsel must approach the decision whether to present evidence of brain damage with careful deliberation." *Op.*, 141. This is true, which is why counsel performed abysmally in their dealings with Dr. Weiner.

Dr. Weiner testified that after he submitted his report, there was no further contact with counsel reflected in his billing and he recalled none, with the exception of a brief phone call. Tr. 9/20/11, 242-43. Dr. Weiner recalled that the only contact between he and counsel was the phone call – likely from Mr. Tinker – that was of less than five minutes in duration. During this call, there was no discussion of his report or of his findings or conclusions. His invoice for services reflected no contact with counsel subsequent to the generation of his report. Id., 243. Instead of a discussion about his report, the phone call with counsel "was more of a statement . . . that because Mr. Bourgeois had given me incorrect, inaccurate and not factual information about the coma, they felt that my report would not be useful and weren't going to use

---

[18]This Court noted: "once supported by an adequate investigation, counsel's selection of a strategy is unchallengeable." (citing cases, internal quotation marks omitted). *Op.*, 61, n. 107. That is absolutely true. However, the question raised by Mr. Gilmore *Response Affidavit* and evidentiary hearing testimony, and comparing it to what actually occurred at trial, is whether he is being accurate in his recollection of what his alleged strategy actually was. Petitioner submits that he was not.

20

USCA5 5988

it in any way." Id., 244, 242.  Counsel never asked Dr. Weiner about whether Mr. Bourgeois' comments about having been in a coma had an impact on his testing or on his opinions.  Id.  Had counsel asked, Dr. Weiner:

> would have said that the actual test results appear to be valid and there was no evidence of malingering and that the results showed that there was brain damage . . . that regardless of the cause was he has some brain damage.

Tr. 9/20/11, 244.

And, because counsel never consulted with Dr. Weiner about any aspect of his evaluation, they were not in any position to consider the various points that the Court says should have gone into their alleged strategic calculus not to use this evidence:

> Evidence of mental and neurological conditions is double-edged: while it can create jury sympathy, it can equally bolster the Government's claim of future dangerousness by showing poor ability to control impulses and learn from past mistakes.  The Fifth Circuit defers to counsel's strategic decision not to present such double-edged mitigation evidence.  With the surety of presenting Dr. Weiner's testimony would reveal Bourgeois' **manipulation**, the credible testimony that he applied the **wrong norms**, and the **marginal benefit** to the defense,[19] trial counsel's decision not to adduce evidence of neurological impairment

---

[19]Evidence of brain damage is not "marginal."  Sears v. Upton, 130 S.Ct. 3259 (2010) (discussing significant mitigating value of organic brain damage); Porter v. McCollum, 130 S.Ct. 447, 451 (2009) ("Porter presented an expert in neuropsychology [] who had examined Porter and administered a number of psychological assessments [and] concluded that Porter suffered from brain damage that could manifest in impulsive, violent behavior."); Rompilla v. Beard, 545 U.S. 374 (2005) (Rompilla "suffers from organic brain damage, an extreme mental disturbance significantly impairing several of his cognitive functions.").

21

USCA5 5989

is not Strickland deficient performance.

*Op.*, 67.   Aside from the facts that counsel never learned about how the "manipulation" effected the testing, or what norms were used, or the extent and impact of Dr. Weiner's findings on Mr. Bourgeois behavior, there is much wrong with this Court's statement that requires reconsideration of this Court's judgment. Since counsel never consulted with Dr. Weiner, they were never in a position to learn anything about his conclusions.   And, as Strickland teaches:

> In rejecting Strickland's claim, we defined the deference owed such strategic judgments in terms of the adequacy of the investigations supporting those judgments: "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable;  and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances . . .'

Wiggins v. Smith, 539 U.S.510, 522 (2003), quoting, Strickland, 466 U.S. at 690.

Here, counsel could not possibly have a reasonable tactic for not meeting with an expert hired at court expense to review their findings and to make a "fully informed and strategic" decision about whether to use him.  United States v. Jones, 287 F.3d 235, 331 (5th Cir. 2002), cited by the Court at *Op.*, 61, n. 107.  Therefore counsel could not have made a reasonable judgment not to meet with this expert and

22

USCA5 5990

learn of his results.

There is also a timing component to counsel's ineffective failure to present Dr. Weiner's findings. Counsel failed to present Dr. Weiner with the medical records that they belatedly obtained in late February, 2004 (after the commencement of trial).[20] Tr. 9/20/10, 207. These records (Petitioner's Exhibit 81) showed that although Mr. Bourgeois was not in a coma from the three-wheeler accident, that he did suffer other head injuries, documented in the records, which could have caused the type of brain damage identified in Dr. Weiner's testing. Tr. 9/20/10, 246. And, if Dr. Weiner had adequate time to conduct a full evaluation, he would have also been able to present to counsel a "psychological explanation" for what this Court has concluded was a "manipulation" regarding the coma.[21]

---

[20]See *Op.*, 51, n.89 (counsel filed for subpoena for the medical records on January 29, 2004 and received the records in late February, 2004). Notably, Mr. Bierbaum advised counsel to obtain these records as early as November 11, 2003. Tr. 9/22/10, 225-26 – evidence of further wasted time by a dysfunctional defense team.

[21]The Court says that Mr. Bourgeois was "extremely useful but also paradoxically deceptive" in his dealings with counsel. Op., 102. However, there are psychological explanations for why a person with Mr. Bourgeois' constellation of mental health deficits are not "good historians." While deceit is certainly one possible explanation for the assertion about being in a coma, and other perceived lies that the Court may believe were told by Petitioner, brain damaged, personality disordered, traumatized and psychologically impaired people, often do not relate the truth on account of their condition. See e.g. Tr. 9/10/10, 57 (Dr. Gelbort explaining how a subject's impairments can shade their view of what is true, and their ability to relate accurate information).

23

USCA5 5991

As noted, there is a timing aspect to counsel's failure to properly utilize Dr. Weiner. Dr. Weiner testified that he was asked to conduct the evaluation with a "tight time line" and because his schedule was booked, he performed it on a weekend, which is contrary to his practice. Under the circumstances, he said it "was a rush job." The evaluation was done on Saturday March 1, after trial had commenced. Tr. 9/20/10, 204-06.

Thus, counsel waited until after the start of trial to have a neuropsychological evaluation done. They failed to provide their expert with any documents about their client, including medical records demonstrating a head injury. They then failed to consult with their expert to learn about his results, to ask pertinent questions, or to make a truly informed decision about whether to call him as a witness.

**Dr. Estrada.** The Court spends much time explaining that Dr. Estrada's post-conviction opinion was not really any different than what was presented at trial. *Op.*, 61-65. In the end, the Court concludes that Dr. Estrada had the "tools" at trial to reach the same conclusions that he did in his post-conviction testimony. Thus, the Court discredited Dr. Estrada's testimony that he stood by his § 2255 declaration when he said: "I do not believe that the jury in this case was provided with an accurate and complete picture of Mr. Bourgeois' mental health profile." Tr. 9/10/10, 18.

24

USCA5 5992

That would be an odd result, inasmuch as both sides agreed that Dr. Estrada was a pre-eminent expert; both sides agreed to have him evaluation Mr. Bourgeois for competency; he became a Court expert in this case on that question and Mr. Gilmore sung his praises in his testimony, Tr. 9/22/10, 154 (Mr. Gilmore testifying that Dr. Estrada is the only expert he uses in his practice, because he "trusts" him; he is "not a prostitute" but will "tell you the truth"). The more reasonable conclusion for the Court to have drawn is that based on all of the information presented to him in post-conviction, **including the fact that Mr. Bourgeois was badly abused as a child – a fact that he was not privy to at trial** – that Mr. Bourgeois had a Borderline Personality Disorder, which combined with his other deficits mitigated the offense.

**Remaining Points.** There are several other areas in which the Court made serious errors of law and fact.

**Dual Edged Sword.** The Court variously excuses counsel's failure to investigate or present mitigating evidence because some of the evidence had an aggravating, as well as a mitigating quality. While such a dual edged sword analysis is proper for determining prejudice from counsel's **informed** decision not to present mitigating evidence, such a dual edged sword analysis has no place in deciding deficient performance **when counsel has not done the investigation**. See discussion of Strickland deficient performance, immediately above. Thus, when the Court

25

USCA5 5993

repeatedly says that "no reasonable attorney" would want to put on evidence of

Borderline Personality Disorder, organic brain dysfunction or low intelligence

because of its potentially aggravating quality, such analysis is a non-starter if the

lawyer never investigated the area in question.[22]  Here, having never consulted with

Dr. Weiner, counsel effectively did not "investigate" the results of his testing and

therefore any decision was not informed.

Moreover, when it comes to low intelligence and intellectual impairments, the

Supreme Court has often cited these factors as mitigating.  See Smith v. Texas, 543

U.S. 37, 44 (2004) ("There is no question that a jury might well have considered

petitioner's IQ scores [of 78]. . . as a reason to impose a sentence more lenient than

death."); Williams v. Taylor, 529 U.S. 362, 398 (2000) (same).

Finally, the Court's determination that Strickland error cannot be found

because counsel presented **some** mitigating evidence at trial is also contrary to clear

Supreme Court authority.  Specifically, the Court's holding that because broad

contours of Mr. Bourgeois' childhood abuse were presented to the jury, and that the

post conviction testimony differs in these areas in depth, but not breadth, see *Op.,*

119, requires reconsideration.

---

[22]See *Op.*, 58 (no reasonable attorney would put on evidence of Bourgeois'
intellectual limitations); at 62 (same for Borderline Personality Disorder);

USCA5 5994

In Williams v. Taylor, 529 U.S. 362, 398 (2000), the Court held that counsel's deficient investigation prejudiced Williams because the "graphic description of Williams childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded' might well have influenced the jury's appraisal of his moral culpability."

In Wiggins v. Smith, 539 U.S. 510, 535 (2003), Wiggins' history of abuse, neglect and abandonment, as well as his "diminished mental capacities," was "powerful" evidence of the sort "relevant to assessing a defendant's moral culpability." The Court found that had the jury heard the "nature and the extent," *id* at 535, of the abuse suffered by Wiggins and had the jury been able to put the details of Wiggins' "excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." *Id.* at 537.

In Porter v. McCullum, 130 S. Ct. 447, 449 (2009) (per curium), the Court concluded that counsel's failure to investigate and present mitigating evidence that "described his abusive childhood, his heroic military service and the trauma he suffered because of it, his long-term substance abuse, and his impaired mental health and mental capacity" was prejudicial. The evidence the Court found persuasive included lengthy descriptions of his "horrible family life" and detailed testimony

27

USCA5 5995

regarding Porter's military service in the Korean War, including discussion of particular battles in which Porter was engaged. Porter's jury, however, did not hear this detailed and descriptive testimony. This Court therefore concluded that jurors "heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability." Id., at 454.

Trial counsel presented a small fraction of Petitioner's life story and omitted any compelling or descriptive details. Counsel failed to convey the nature and extent of the trauma, neglect and privation Petitioner suffered and they failed to present any testimony regarding Petitioner's significant mental impairments, including borderline intellectual functioning and brain damage. The Court's conclusion that counsel was not ineffective because, although the testimony was lacking in detail, the jury heard that Mr. Bourgeois was abused as a child, stands in direct conflict with the relevant decisions of the United States Supreme Court.

Moreover, as a factual matter, post conviction counsel presented testimony on several additional areas of mitigation in addition to childhood abuse, including: childhood sexual abuse, neglect, and abandonment, low intelligence, brain damage, and a debilitating personality disorder, that were never presented to the jury. As described above, the Court erroneously dismissed this aspect of Petitioner's claim by stating that reasonable counsel might not have chosen to present this evidence. The

28

USCA5 5996

Court's invocation of a strategic reason where none existed violates precedent. The Court is not at liberty to create strategic reasons, the Court must only consider counsel's stated reasons. See Wiggins, 539 U.S. at 526-27 ("[T]he 'strategic decision' the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing."); Kimmelman v. Morrison, 477 U.S. 365, 386-87 (1986) (under Strickland, courts cannot use hindsight to supply a strategy for counsel).

**CLAIM III.  JURISDICTION.**

Because the Court has also made significant errors of law and fact with respect to the question of jurisdiction, Petitioner also seeks reconsideration of the denial of relief.

**A.      The Court's Conclusion about Jurisdiction Disregards the Actual Cause of the Victim's Death.**

The Court has found that the fatal blows were delivered on the naval base. This conclusion ignores the scientific data first reported by the Government's neuropathologist that showed that the actual cause of death was brain injuries sustained 7– 10 days prior to the victim's death.

**1.      The expert testimony at trial misled the jury regarding the timing of the fatal injuries.**

USCA5 5997

Dr. Rouse testified at trial regarding the cause of death. According to Dr. Rouse, the victim had multiple "recent" bruises on her scalp. Tr. 3/8/04, 131. However, according to Dr. Rouse's testimony, the cause of death was "bleeding and hemorrhage within her brain, what's called a subdural hematoma." Tr. 3/8/04, 132; *Op.*, 72.

The Court recognizes that Dr. Rouse "did not discuss the age of the intercranial features, particularly the subdural hematoma." *Op.*, 72. What the Court fails to note is the fact that Dr. Rouse's trial testimony misled the court and the jury about the timing of the fatal injuries. Her testimony attributes the fatal hemorrhage within the victim's brain to the "recent" bruises seen on the scalp. She states: "These bruises did not result in the death. But what they indicate is the mechanism of what ultimately caused the injury in her head. What she actually died from is the forces that were transmitted on the brain. That's what resulted in her death. But these are markers for how that force, how those injuries occurred." Tr. 3/8/04, 131-132; *Op.*, 72.

This testimony directly contradicts the neurophathologist's report, ordered by Dr. Rouse, showing that the fatal brain injuries were at least 7– 10 old. In her trial testimony, Dr. Rouse explained that she sent the slides of brain tissue to the neuropathologist to "confirm that there was extensive injury in the brain which would

30

USCA5 5998

have resulted in her death." Tr. 3/8/04, 170.  However, Dr. Rouse misleadingly failed to explain that the neuropathologist concluded that the fatal brain injury was incurred 7– 10 days prior to death.  Scientific evidence available at trial proves that the recent bruising could not be the "markers" of what caused of the fatal injury.  The timing of these two injuries, the bruises and the intercranial injury, do not coincide.

Dr. Rouse continued in her deception when she testified that AB1994's testimony about a beating she witnessed shortly before her sister went to the hospital could "explain the injuries that were seen on the child." Tr. 3/8/04, 171; *Op.*, 73.  In fact, the description of a beating close to the time of death could only be consistent with the recent bruises found on the child, and could not describe the forces that led to the actual cause of death – the pre-existing subdural hematoma and intercranial injury.

Dr. Rouse misled the jury when she failed to acknowledge that the fatal brain injuries she discussed were actually 7 – 10 days old.  Although Dr. Rouse testified that she had requested that a neuropathologist examine the brain tissue slides to "confirm that there was extensive injury in the brain which would have resulted in her death," Tr. 3/8/04, 170, Dr. Rouse did not testify in detail about the results of the

31

USCA5 5999

neuropathologist's examination, and the Government failed to ask her about them.[23]

The neurophathological findings alone give rise to reasonable doubt that the fatal

blows were inflicted on the navy base.

> **2.     The Court's reliance on AB 1994's testimony to establish the timing of the fatal blows is not supported by the evidence**.

AB1994 testified at trial that her father hit his daughter's head against the

window of the cab of the truck.  However, her testimony quite literally does not state

the these blows were inflicted on the base.  See Tr. 3/4-5/04, 39-40 (testimony of

AB1994).  More importantly, even if the blows she witnessed were inflicted on the

base, they could not have been the cause of the fatal subdural hematoma.  This, of

course, is because the fatal injuries, as revealed on the autopsy brain slides and

reported in the neuropathological report, were inflicted at least a week prior to

Petitioner's entry onto the naval base.

The Court discounts the Petitioner's expert opinions because they do not rely

on AB1994's testimony regarding Petitioner's actions on the day she collapsed.[24]

---

[23] It is notable that Dr. Rouse herself has never examined the brain slides herself, but relied on specialist to do so.

[24]There is irony to the Court's view that Dr. Leetsma was not worthy of belief because he did not consider the lay testimony in his opinion.  Yet, when Petitioner attempted to secure discovery of the photos seized from Petitioner (see Petitioner's *Motion for Discovery* (document # 648), which could shed light on whether the

USCA5 6000

However, the experts did not rely on AB1994's testimony because her testimony is not relevant to the fatal injuries and it is vague in the extreme. The brain slides examined by the Government's expert Dr. Kagan-Hallet pre-trial, and then again by Petitioner's expert pursuant to this Court's discovery order, reveal that the fatal blows pre-dated Petitioner's entry on the base. The question of whether or not the experts relied on or reviewed AB1994's testimony regarding her father's actions on the day they were on the base is therefore not dispositive or even relevant. The Court's discounting of the expert opinions because they are purely a review of the scientific data rather than the trial testimony is unreasonable. The scientific evidence that was not utilized by trial counsel is the pertinent piece of evidence regarding this claim. As will be discussed below, the Court's unreasonable discrediting of expert opinions is especially unreasonable in this case, where an evidentiary hearing was not granted. Further hearing would allow Petitioner the opportunity to present more evidence about the "context" of the fatal injuries.

### 3. Trial counsel were ineffective for failing to challenge jurisdiction.

Counsel failed to use the neuropathologist report to challenge the jurisdictional element of the crime. The findings in this report explain that the fatal injuries pre-

---

victim was showing signs of decompensation prior to entering federal lands, the Court denied that *Motion. Op.*, 111 (denying outstanding motions).

33

existed Petitioner's entry on the base. This report would have challenged Dr. Rouse's unsupported implication that the blows AB1994 witnessed were the fatal blows, and that they occurred on federal land. The report was available and counsel had no reason for failing to either call Dr. Kagan-Hallet or another neuropathologist to testify, or to use the report to cross examine Dr. Rouse regarding the timing of the fatal brain injury. Alternatively, counsel could have raised this issue in a pre-trial motion or in a motion for acquittal after the Government had presented its case in chief. Counsel failed to even question Dr. Rouse about the cause of death or the time of the fatal injury.

The Court's conclusion that counsel might have chosen not to present this evidence because it might have lessened their credibility in the eyes of the jury, *Op.,* 79, is flawed. First, the Court has not provided Petitioner with the opportunity to present testimony about trial counsel's strategy, if any, about this claim, because the Court did not permit a hearing on it. Second, the Court's reasoning goes against basic rules of legal advocacy: in any case, but especially in a capital murder case, reasonable counsel would hold the Government to its burden of proof beyond a reasonable doubt regarding every element of the crime. Petitioner is aware of no precedent stating that counsel should not hold the prosecution to its burden of proof on every element of the offense.

34

Counsel's deficient performance prejudiced Petitioner. Counsel's failure to challenge jurisdiction undermined the adversarial process; the Government should have been held to its standard of proof to this basic element of the crime. If Dr. Kagan Hallet's findings had been introduced at trial, it is more than likely that the jury would not have determined that the fatal blows were inflicted on the navy base.

**B.      The Court Erred When it Denied Petitioner a Hearing and Complete Discovery on this Claim.**

The Court denied an evidentiary hearing on this claim, but allowed limited discovery and subsequent supplementation of Petitioner's claim via deposition. The Court required that Petitioner's expert evaluate the autopsy slides reviewed pre-trial by Dr. Kagan-Hallet (now deceased) that form the basis of her opinion that the fatal brain injuries were 7– 10 days old. Tr. 4/20/10, 61-62. Petitioner retained Dr. Leetsma, a neuropathologist, to review the slides, which were belatedly provided by the Government, and write a report. Dr. Leetsma was eventually deposed, belatedly, then, the Government was granted permission to "rebut" Dr. Leetsma's deposition. The Government was able to present this rebuttal even though their expert, Dr. Rouse, never completed a report, the Government said was forthcoming, regarding her rebuttal testimony.

In the end, as the Court notes, Petitioner was only allowed "limited factual

35

USCA5 6003

development of this claim." *Op.*, 74. This limitation violates the 28 U.S.C. § 2255, which governs here, and is unreasonable. Under Section 2255 (b), "Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall ... grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." The Fifth Circuit has held that where the allegations in the Section 2255 motion are not negated by the record, the district court must hold an evidentiary hearing. United States v. Briggs, 939 F.2d 222, 228 (5th Cir. 1991) (evidentiary hearing required when evidence that existed at the time of trial that, if true, might support the petitioner's constitutional claim). Indeed, Petitioner's allegations are supported by the evidence of the Government's own neuropathological findings, the facts of which are misrepresented by Dr. Rouse's testimony at trial. A full evidentiary hearing and discovery (such as that which was denied by the Court) was warranted. This Court should amend its judgment to afford Petitioner the hearing to which he was entitled.

The Court notes that the Government's own expert failed to testify conclusively regarding the timing of the fatal injuries at the trial. *Op.*, 73. Instead, as discussed above, the expert misled the jury by making an unfounded connection between the "recent" bruises and the subdural hematoma that she knew predated Petitioner's entry on the naval base. The Government's expert still has not definitively dated the fatal

36

USCA5 6004

injury.   On rebuttal, Dr. Rouse vaguely testified that death was caused by "trauma, swelling, the thrombus,[25] and the subdural hemotoma." Tr. 1/27/11, 8; *Op.*, 76.  This testimony remains vague as far as timing the fatal injury and, in addition, does not comport with her trial testimony.

Further, the expert testimony leaves open questions regarding the timing of the fatal injuries that can only be answered through further testimony.  For example, in her testimony rebutting Dr. Leetsma, Dr. Rouse testified that she did not believe the victim had a pre-existing brain injury because she did not exhibit "signs [that ] she was incurring increasing intercranial pressure." Tr. 1/13/11, 60; *Op.*, 76.  Putting aside the fact that this testimony is not credible because the neuropathological findings prove that the victim had already suffered a brain injury prior to her entry on the naval base, the testimony calls for further evidence.  Dr. Leetsma also commented that more information regarding the child's clinical state leading up to her death would help confirm more exactly the timing of the fatal injuries.  See Tr. 1/10/11, 30-31.  If granted a hearing, Petitioner would present witnesses to describe the victim's symptoms of brain injury prior to her entry on the base.  At a minimum, they would produce the results of the discovery, including photos showing the victim's condition

---

[25]Notably, Dr. Rouse had never mentioned a thrombus prior to its identification by Dr. Leestma,

USCA5 6005

in the days leading up to her death.

In the end, then, this Court still has not discerned the timing of the fatal injuries. No Government expert has testified with specificity about the timing question. Instead, the Government's expert misled the court and the jury at trial by stating that the recent bruises caused what is revealed in a pre-trial report to be an older injury. Dr. Rouse has not completely corrected that testimony and instead continues to vaguely skirt around the question of timing. In other words, the Government still has not met its burden of proof beyond a reasonable doubt regarding jurisdiction. A conviction based on faulty testimony about an element of the crime violates Due Process. In re Winship 397 U.S. 358, 364 (1970) ("Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.")

The Court's conclusion that trial counsel might have made a strategic decision to not question the Government's expert about the timing of the fatal blows and/or to not present the testimony of Dr. Kagan Hallet or another neuropathologist to challenge jurisdiction is yet another example of the Court ascribing trial strategy where none existed, and is especially inappropriate where no hearing has been granted to elicit evidence about counsel's strategy. In this case, because no hearing was granted, Petitioner has not been given the opportunity to question trial counsel

38

USCA5 6006

about their awareness of the jurisdiction question or any strategic reason for their failure to challenge jurisdiction.[26] Imputing a strategic reason to counsel's failure, while denying Petitioner the opportunity to offer evidence on the issue, violates Section 2255's requirement that a hearing be granted. Further hearing would prove that counsel's failure to use readily available evidence from the Government's own scientist to credibly challenge a basic element of the Government's case was ineffective under Strickland.

### CLAIM IV.  COUNSEL INEFFECTIVELY FAILED TO CHALLENGE EVIDENCE OF SEXUAL ASSAULT.

As the Court's *Opinion* acknowledges, in his "challenge" to the alleged sexual assault and semen evidence, counsel:

- did not, on cross-examination, challenge Dr. Benton's alleged observations of vaginal trauma in the autopsy photos;

- did not, elicit from Dr. Rouse, who performed the autopsy and took the photos relied on by Benton, that she found no evidence of vaginal or anal trauma;

---

[26]Mr. Tinker told undersigned counsel that he never challenged jurisdiction because of a misunderstanding regarding federal law regarding jurisdiction. He told counsel that he never raised the claim because he thought that federal jurisdiction was founded if the victim died on federal lands. Petitioner has proffered this fact to the Court and counsel have offered their contemporaneous notes of this conversation. See *Petitioner's Reply to the Government's Response to Petitioner's Post-Argument Submission and Opposition to Motion to Reopen Evidentiary Hearing* (document # 657) at 18.

39

USCA5 6007

- did <u>not</u> present any expert to rebut the alleged vaginal trauma observed by Dr. Benton;

- did <u>not</u> present any expert testimony to rebut Dr. Benton's testimony that p30 is <u>only</u> found in semen and breast milk;

- did <u>not</u> present any expert testimony to rebut the testimony of FBI serologist Caroline Zervos that p30 is <u>only</u> found in peripheral male blood and male urine;

- did <u>not</u> present any expert testimony to rebut the testimony of FBI forensic DNA examiner Anthony Onorato that the <u>only</u> place, outside of male semen that P30 could be found, is in the blood of males with prostate cancer;

- did <u>not</u> question either FBI expert about FBI protocol which <u>required</u> the observation of sperm (<u>none were observed in this case</u>) to confirm the presence of semen when a p30 test is, <u>as it was in this case</u>, "weak" to "very weak" positive;[27]

- did <u>not</u> present any expert testimony to rebut the allegation that a positive P30 test, <u>alone</u>, was definitive for the presence of semen.

Nevertheless, the Court credits counsel for sufficiently challenging the alleged

sexual assault evidence and in particular, the semen evidence.  <u>See</u> <u>e.g.</u> *Op.*,81 (On

cross-examination of Dr. Benton, "counsel focused on the reliability of p30 testing");

<u>id.</u> ("Cross-examination [of FBI agent Zervos] probed whether anything other than

---

[27]Although the Court denied Petitioner's claim that the Government suppressed evidence that the FBI's testing for p30 revealed a "weak" to "very weak" positive results, the Court did find that the FBI's testing, as well as the defense expert's testing, resulted in weak to very weak positives. *Op.*, 84 n. 137.

40

USCA5 6008

prostate proteins could result in a positive p30 test"); id. at 82 ("On cross-examination [of FBI agent Onorato] ... Mr. Tinker emphasized that the FBI testing was negative for sperm and for male DNA"); id. (the defense's closing argued that there was "no evidence of trauma to the rectum or genitalia when they examined the child at the hospital," and "no evidence of semen ... being found on this child").

Notably, however, the Court's *Opinion* omits the relevant transcript pages showing that the Court sustained the Government's objection and rebuked counsel for arguing that there is "no evidence of semen" because counsel **failed to present evidence that there was no semen.**

Indeed, the un-cited transcript lines and pages immediately following those cited by the Court reveal that counsel's attempt to argue "no evidence of semen" prompted the following exchange:

Ms. Booth:        Your Honor, I have to object. That is a mischaracterization of the evidence.

Court:        **That is sustained**.

Mr. Tinker:        The test that the witness ask for, and maybe I don't understand it, was negative and that's the testimony before you folks.

Ms. Booth:        I have to object, your Honor.

Mr. Tinker [sic]:    Let me see counsel at side bar.

41

USCA5 6009

(Begin bench conference at 9:40 a.m.)

Court:  **The test was positive for semen.** They sent it off for an extra DNA test. That came back no DNA from your client. Don't refer again, there was –

It is not the same thing. **There is (inaudible), no evidence of any kind that there was no seminal fluid in the anus of that child. it was –**

**That is what the expert testified to, there was seminal fluid found in her anus. What they couldn't identify because it was degraded, was the DNA. There was no question of the expert testified. They don't have to believe it but there's no question that the expert testified that there was seminal fluid** –

Mr. Tinker:  I didn't do that on purpose – we got over here and I said, I object. And you said, why do you –

Court:  What you objected to was the guy coming in and saying, well, they to again to get another DNA expert to try to (inaudible), not to identify the DNA. It was too degraded.

Mr. Tinker:  You said, why do you object that it was negative and so I said, okay, it was negative. But I didn't know (inaudible). Well anyway, I'm just saying –

Court:  (Inaudible) that there was DNA that came back no – they couldn't find DNA. They could only find JG-1999's DNA.

Mr. Tinker:  But I didn't do that on purpose, Judge.

Court:  But you've said it several times (inaudible) that there was another test they could have done to

42

USCA5 6010

> identify the seminal fluid. . . Don't put emphasis on it because they don't have to believe what the experts say.

Tr 3/16/04, 43-45. Thus, the record actually reflects that although, by focusing on the rectal semen and p30 evidence on cross-examination of the Government's witnesses, counsel recognized the significance and highly prejudicial nature of that evidence, counsel's attempt to challenge the semen evidence was not only unsuccessful, **but not even allowed**, because counsel presented **no** evidence in support of his challenge.

Nevertheless, the Court concluded that Petitioner cannot succeed on his claim that trial counsel should have presented expert testimony to undercut the evidence of sexual abuse, because trial counsel would have to "eviscerate the effect" of both Dr. Benton's conclusion upon review of the autopsy photos, and the positive P30 test results. *Op.*, 82. "Absent evidence that would likely eviscerate the effect of either prong, the other would give the jury a sufficient basis to find that Bourgeois sexually assaulted his daughter." Id.

The Court's reasoning is flawed in two ways. First, as will be described below, counsel has presented evidence that shows trial counsel was ineffective for failing to use readily available evidence to undermine **both** Dr. Benton's testimony and the impact and significance of the p30 test results.

Second, the Court mis-stated the standard by which ineffectiveness claims must

43

USCA5 6011

be evaluated.  The Court's language essentially imposed a new and higher bar to proving prejudice in ineffectiveness claims.  The statement that counsel would have had to "eviscerate" the evidence presented by Government witnesses in order to succeed on a <u>Strickland</u> claim is directly contradicted by clearly established federal law.  Far from having to show that counsel could have "eviscerated" the Government's evidence, Petitioner need only show that, absent trial counsel's ineffectiveness, there is a "a reasonably probability that... the result of the proceeding would have been different." <u>Strickland</u> at 694; <u>Williams</u> at 405-406 ("requirement that the prisoner establish by a preponderance of the evidence that the result of his criminal proceeding would have been different... would be "diametrically different," "opposite in character or nature," and "mutually opposed" to our clearly established precedent because we held in <u>Strickland</u> that the prisoner need only demonstrate a "reasonable probability that ... the result of the proceeding would have been different.").

**Dr. Benton's Testimony**.  In defense of trial counsel's failure to rebut Dr. Benton, the Court asserts that Petitioner failed to present post-conviction evidence challenging Dr. Benton's observations of alleged sexual abuse.  *Op*., 83 ("Bourgeois did not call any witness in the evidentiary hearing to criticize Dr. Benton's observations); <u>id.</u> ("Bourgeois has not presented any evidence showing that Dr.

44

USCA5 6012

Rouse's initial observation of no trauma was more valid than Dr. Benton's trial testimony... he has not shown that Dr. Benton's specialized knowledge about childhood abuse and prior treatment of JG-1999 did not provide sufficient support for his expert opinion"); id., at 84 ("On post-conviction review, Bourgeois has not adduced any evidence or testimony that would put a stronger case against the evidence of sexual trauma than the essence of that brought out by trial counsel. Bourgeois has not shown that trial counsel performed deficiently in addressing Dr. Benton's testimony").  The Court is wrong.

Indeed, unlike trial counsel, Petitioner has presented much more than an "essence" of evidence.  Petitioner has presented significant scientific evidence, all of which was available to trial counsel, that would have completely undermined Dr. Benton's testimony.

As the Court noted, Dr. Rouse specifically found that "[t]he external genitalia are those of a normal female child, **and there is no evidence of any trauma to the labia or introitus**.  **The Hymen is present and appears atraumatic.  The back is straight and the anus is unremarkable and atraumatic.**"  Although Dr. Rouse's finding would have directly rebutted Dr. Benton's alleged observations, counsel, inexplicably, neglected to elicit this information from Dr. Rouse on cross-examination.  Had counsel elicited this information from Dr. Rouse, he could have

45

USCA5 6013

argued to the jury that her live, contemporaneous observations, as the person **who actually performed the autopsy and took the autopsy photos** Dr. Benton relied on to make his observations, are more accurate and credible than Dr. Benton's.

Contrary to the Court's *Opinion*, Petitioner need not have presented Dr. Rouse's testimony at the post-conviction hearing to establish that this evidence was available to trial counsel and that Dr. Rouse, had she been questioned at trial, would have testified consistent with her own autopsy report. Indeed, if she had not, Dr. Rouse, who the Government so heavily relied on, and continues to rely on, to establish cause of death; age, timing, extent, nature and location of injuries; intent; and the alleged "barrage of abuse," *Op.*, 80, would have been impeached and her credibility undermined. Thus, even though she was not likely to deviate from her report at trial, if she had, counsel would have been in a win-win situation – If she adopted her report, counsel could have argued that her observations trump Dr. Benton's, and if she denied her report, counsel could have argued that she, a key Government witness, was not credible. Accordingly, counsel could have had no tactical or strategic basis for failing to elicit the extremely helpful findings of no observable sexual trauma from Dr. Rouse's autopsy report to rebut Dr. Benton.

Moreover, at the post-conviction hearing, Petitioner also presented the Driscoll Children's Hospital, Sexual Abuse Nurse Examiner's (SANE) reports, which also

46

USCA5 6014

indicate that there was no evidence of sexual abuse. See P-152 at 4 ("Vulva Labia Majora – No trauma notes, Vulva Labia Minora – No trauma noted, Hymen – No trauma noted ... Perineum – No trauma noted, Anus – No sphincter tone, No trauma noted); id. at 9 ("The hospital's SANE department was consulted as well. The patient had a sexual abuse examination that was normal and showed no evidence of any sexual abuse").[28] Although, as the Court noted, *Op.,* 84, counsel questioned SANE nurse McLaughlin about her findings of no abuse, had counsel also elicited Dr. Rouse's findings, he could have argued that two experts, a forensic pathologist and a SANE nurse specifically trained to look for evidence of sexual abuse, who unlike Dr. Benton, actually examined JG-1999 at the time of death, both determined that there was no evidence of sexual trauma. This too would have undermined Dr. Benton's testimony. However, because counsel failed to elicit Dr. Rouse's specific findings, as a specialist in identifying and determining the pathology of injuries, that there was no evidence of sexual assault at the autopsy, the jury was left lacking significant evidence that would have severely undermined Dr. Benton's testimony.

Dr. Benton's "specialized knowledge" about sexual abuse in living children did not make him an expert in post-mortem identification of sexual trauma to the vagina

---

[28] Defense counsel failed to offer the Sexual Abuse Examiner's Report, indicating no evidence of sexual trauma, into evidence.

47

USCA5 6015

or anus – particularly from photographs. That was however, forensic pathologist Dr. Rouse's area of expertise, and she conducted the autopsy and made first hand observations of no trauma to the vagina or anus of JG-1999. Thus, contrary to the Court's *Opinion*, Petitioner has established that Dr. Rouse's observations of no trauma, in conjunction with the SANE nurse's observations, are more valid than Dr. Benton's and has shown that Dr. Benton's area of expertise did not provide sufficient basis to discount Dr. Rouse's autopsy findings. See *Op.,* 83 ("Bourgeois has not presented any evidence showing that Dr. Rouse's initial observation of no trauma was more valid than Dr. Benton's trial testimony... he has not shown that Dr. Benton's specialized knowledge about childhood abuse and prior treatment of JG-1999 did not provide sufficient support for his expert opinion").

The Court's *Opinion* also noted that the "bulk of Benton's testimony about sexual assault did not focus on external observations, but on the possibility that the FBI had detected semen in her rectum." *Op.*, 81. Specifically, Dr. Benton testified about the possibility of finding semen in a sample without sperm. He explained the physiological reasons why some men produce semen without sperm. Tr. 3/5/04, 50-51. He also testified that the components of semen are much more stable than sperm; that sperm die relatively quickly, making them harder to find. Id., at 51. His testimony also erroneously stated that p30 can only be found in the human male

48

prostate  and in the lactating breast of women.  Id.,at 53; *Op.*, 81.

However, while asserting that Petitioner relied solely on the supposedly

discredited opinion of Dr. Spitz,[29] and presented no post-conviction evidence to rebut

Dr. Benton, the Court ignores Petitioner's post-conviction evidence from experts, Dr.

Elizabeth Johnson and Charles Alan Keel, directly rebutting Dr. Benton's testimony

regarding the alleged semen.[30]  This expert testimony would have directly rebutted

_____

[29]Dr. Spitz did not testify at Petitioner's § 2255 hearing, nor was his affidavit proffered in support of this claim at the hearing.

[30]In a footnote, the Court took note of both Dr. Johnson's and Mr. Keel's testimony, disputing Dr. Benton's contention that sperm is easily degradable. Op., 87 n.143.  However, the Court – without explanation – credited Ms. Conway's testimony, and concluded that Dr. Johnson and Mr. Keel merely "bogged down their testimony with fine distinctions which did not completely discount the possibility of sexual assault." Id. at 87.  There is no explanation for the Court's dismissal of Dr. Johnson's and Mr. Keel's expert opinions relating to the survivability of sperm and given the frequent exonerations on the basis of DNA testing of decades old  sperm, it is Ms. Conway's testimony which should be questioned.  *See, e.g.*, the case of Thomas McGowan, released in 2008 after DNA testing of sperm collected 23 years earlier "showed that the sperm cells collected from the victim's body during her hospital examination could not have come from" him, *Know the Cases: Thomas McGowan*, *The Innocence Project*, http://www.innocenceproject.org/Content/Thomas_McGowan.php (last visited Jun. 16, 2011); Curtis McCarty, exonerated in 2007 after DNA testing "on sperm recovered from the victim's body" 20 years earlier "showed that the sperm did not match McCarty," *Know the Cases: Curtis McCarty*, **The Innocence Project**, Curtis_McCarty.php (last visited Jun. 16, 2011); Charles Chatman, released in 2008 after DNA testing of sperm collected 26 years earlier excluded him as a match, *Know the Cases: Charles Chatman*, *The Innocence Project*, /Content/Curtis_McCarty.php (last visited Jun. 16, 2011); Larry Peterson, exonerated in 2006 after DNA testing of sperm collected 18 years earlier showed that "Peterson

USCA5 6017

Dr. Benton's testimony about the degradation of semen and sperm.

In response to questioning regarding the persistence, survivability, and detectability of sperm, Dr. Johnson testified as follows:

Q:          Okay.  And are there – let me just follow up on the Judge's question.  Are there circumstances where in fact sperm and/or male DNA are located years after an offense – or years after it's been discovered, let me ask that.

A:          Yes, decades.  Sperm are incredibly tough and durable.

Q:          What do you mean by that?

A:          They are so durable they have an extra reinforcing protein that is so hard to break open that we have to add an extra chemical to the test reaction in the laboratory to break them open.

---

was excluded as a contributor of any and all of the biological evidence," *Know the Cases: Larry Peterson*, **The Innocence Project** http://www.innocenceproject.org /Content/Larry_Peterson.php (last visited Jun. 16, 2011); Leo Waters, exonerated in 2003 after testing on sperm collected 22 years earlier showed that he "was excluded as a potential contributor of the spermatozoa," *Know the Cases: Leo Waters,* **The Innocence Project**,  Content/Leo_Waters.php (last visited Jun. 16, 2011)**;** Robert Miller, exonerated in 1998 after DNA testing on sperm collected 10 years earlier excluded him "as [a] possible contributor of the genetic material,"*Know the Cases: Robert Miller*, **The Innocence Project**,  **Content/Robert_Miller.php (last visited Jun. 16, 2011); Calvin Willis, released in 2003 after DNA testing on sperm collected 17 years earlier showed that Willis "was excluded form being a contributor to any of the samples,"**Know the Cases: Calvin Willis, **The Innocence Project**, http://www.innocenceproject.org /Content/Calvin_Willis.php (last visited Jun. 16, 2011); Rickie Johnson, released in 2008 after "mini-STR DNA testing was performed on the sperm from the perpetrator of the crime," collected 25 years earlier, and "the results proved that Johnson could not have been the attacker," *Know the Cases: Rickie Johnson*, The Innocence Project, http://www.innocenceproject. org/Content/Rickie_Johnson.php (last visited Jun. 16, 2011).

50

USCA5 6018

Court:        And so someone testified at trial that sperm would have suffered degradation over that time period

Witness:      I think that was Dr. Benton's testimony.

Court:        Yes.

Witness:      That was totally erroneous.

Court:        Okay.

Witness:      Sperm are very durable.  They can be found in decomposing bodies 30 days after, you know –

Court:        Well, I read about how they, you know, the Innocence Project and what have you, and they come up with the old DNA from – but I guess I assume that that was stored like in a rape kit that was done pretty quickly or –

Witness:      there is evidence being analyzed in cold cases that are decades old.  And again, decomposing bodies that have been burned, sperm have been detected in the vaginal canals of these bodies.

Court:        Okay.  So days isn't old?

Witness:      Weeks, months –

Court:        Okay.

Witness:      – years.

Q:     [A]nd I was going to ask you about Dr. Benton's testimony specifically.  Was his testimony regarding the persistence of sperm accurate, in your estimation?

A:     No, it was not.

Q:     The survivability of sperm?

51

USCA5 6019

A:    No, it was not.

Tr. 9/22/10, 14-16.    Subsequently, during questioning regarding Dr. Benton's

testimony about substances where p30 has been detected, Dr. Johnson testified as

follows:

Q:    Let me read you this portion of Mr., of Dr. Benton's testimony.  "And more specific, a confirmatory test is called Prostate Specific Antigen, also known as a p30 assay.  And this is confirmatory test for the presence of semen, because it doesn't exist anywhere else in bodily fluids, including animal bodily products, except in male prostate and with one exception, human breast milk."  Do you recall that testimony?

A:    Yes, I do now.

Q:    Okay.  Was Mr. (sic) Benton's testimony complete regarding where p30 has been located?

A:    It was not.

Q:    And had you been called as a witness in 2004, would you have been able to testify regarding the accuracy of that testimony?

A:    Yes, I would have.

Tr. 9/22/10, 32-33.

Petitioner also presented evidence from Forensic Scientist, Examiner and

Criminalist Charles Alan Keel to rebut Dr. Benton's testimony.[31]    Regarding Dr

---

[31]The parties agreed to expedite the proceedings by admitting Mr. Keel's report, subject to cross-examination, as the substantive evidence he would provide at the post-conviction hearing.  Tr. 9/22/10, 126.

52

USCA5 6020

Benton's trial testimony, Mr. Keel specifically stated:

> Contrary to the testimony of Dr. Benton, semen is the suspension of sperm cells in seminal fluid, not merely a product of the prostate gland without sperm. Neither is the fluid portion of semen merely a product of the prostate gland, but a complex mixture of fluids from the seminal vesicles, the prostate gland, thebulbourethral glands, and other minor glands (urethral and preputial). Neither does the prostate contribute the majority of the liquid of seminal fluid. The seminal vesicles contribute 65-70%, the prostate 25-30%, and the other contributions are 2-5%. Of the prostate gland's contribution, only about 1% is protein including acid phosphatase and p30/ PSA. Semen is produced in a cascade reaction at orgasm. The vas deferens contract forcing sperm, which have been stored in the epididymis, up to the ampullae (top end) of the vas deferens.The sperm then pass through ducts into the urethra where they are mixed with the fluids from the seminal vesicles, the prostate, and bulbourethral glands forming semen which is then ejaculated. [See Boron, et al, 2005; *Medical Physiology:* Elsevier / Saunders]

> Also contrary to the testimony of Dr. Benton, "pre-ejaculate" fluid is the product of the bulbourethral glands, not the prostate gland, and it typically comprises less than 1% of semen. As the product of the bulbouretheral glands and not the prostate, it is likely that this fluid does not contain any more p30/ PSA than might be detected in the peripheral blood of a male. The claim by Dr. Benton that one might be detecting only "pre-ejaculate" or bulbourethreal fluid as semen, collected from an environment such as the rectum, is patently absurd to a knowledgeable scientist. But this claim went totally unchallenged, thereby misleading the jury. While there is a "cleansing" of the urethra and some potential lubrication for the foreskin/ glans penis by this bulbourethral gland product, this "pre-ejaculate" fluid's primary function is to increase the mobility of sperm in the vagina and cervical mucus.

> Dr. Benton described other possible ways in which semen might be void of semen: vasectomy, temporary pathology or illness, or multiple ejaculation. Clearly, vasectomy is not in play here, as Bourgeois had an infant child even younger than Gunter and there is no indication of this

53

USCA5 6021

surgery after the conception of this child. Also, since Bourgeois had at least three known children, and was apparently healthy at the time of this incident, there is no reason to believe he might be azoospermic or even oligospermic as the result of temporary illness. How often Bourgeois might have ejaculated resulting in a reduced sperm count prior to the alleged sodomy is not known, but the entire family of five had been on the road together in the cab of the tractor-trailer for the last 22 days of Gunter's life. Given that about 2,000 sperm mature every second in normal spermiogenesis, and that the volume of semen is reduced proportionately to the number of sperm per unit volume, Benton's claim of the detection of normal semen void of sperm by chance is also patently absurd.

9/24/07 Forensic Science Associates Report at 19-20

\*                                      \*                                      \*

The absence of sperm from a suspected semen source, who by default had to be Alfred Bourgeois, who by all evidence was a normal semen producer, together with the absence of any male DNA from the suspected semen on the Gunter rectal swabs in separate DNA analyses by the FBI and Orchid Cellmark, should have given any scientist pause in offering this questionable semen finding to a jury. However, this finding was even further perverted before the jury by Dr. Benton's "confusion" of the concept of sperm persistence with viability, a concept in which any physician in his position should be well versed.

The Persistence of Semen: Seminal Fluid versus Sperm

Dr. Benton testified that sperm degrade much more quickly than the fluid component of semen, especially in the rectal environment. This is diametrically untrue. As testified to by Benton, it is true that sperm will lose their motility and cease to respire as living cells within hours of ejaculation. They also easily "loose their little tails". But contrary to Benton's testimony, the persistence, as opposed to viability, of sperm cells is dramatically longer than that of the soluble constituents of semen, including acid phosphatase and p30. The soluble components of semen are subject to the same diluting forces and environmental

54

USCA5 6022

conditions as are sperm wherever the semen is deposited. In a dry, cool environment semen (both the fluid and cellular components) will persist for decades, if not longer. In a moist environment, however, sperm cells will persist much longer than the fluid component of semen. This is because sperm cells are equipped with a specialized cell membrane that makes them much more highly resistant to degradation and assimilation by normal metabolic mechanisms than are free dissolved proteins like acid phosphatase and p30 and even epithelial and white blood cells. As described previously, we exploit the hardiness of the sperm cell membrane and its resistance to degradation. We digest away non-sperm cells and soluble protein with an exogenous proteinase in order to then isolate the sperm from those soluble proteins and non-sperm cells. Further, because they are particulate, we can concentrate them into a small volume via centrifugation, thereby dramatically increasing the opportunity to recover and observe them. We can enhance that observational capacity by staining the cell debris with different stains that not only distinguish sperm from non-sperm cells, but also distinguish the unique morphological characteristics of the sperm cell. Because of this, Dr. Benton's claims that the detection of normal semen in the absence of sperm by mechanisms other than aspermia is most sensitive and uncommon, and that one might be able to detect seminal fluid in one area that is void of sperm because of chance, are ludicrous to any knowledgeable forensic scientist.

The ability to recover semen, and hence, sperm, from body orifices depends on several factors, but mostly on the passage of ante-mortem time and the physical activity of the "victim". Semen will be rapidly cleared from living body orifices by gravity drainage, natural dilution and metabolic mechanisms, and environmental conditions. But semen, and particularly sperm, deposited in a body orifice at about the time of death will persist even beyond initial decomposition stages. Sperm numbers sufficient for robust DNA analysis are recovered from buried bodies and bloated bodies that have washed up on shore. Semen associated with a body in a cold or winter environment will persist even longer. Thus, completely contrary to Dr. Benton's testimony, it is unexpected to detect semen in the absence of sperm. One should be able to concentrate, isolate, stain, and identify sperm from semen dilutions

55

USCA5 6023

that are beyond the detectable limits of the soluble protein components; therefore, it is axiomatic that whenever the soluble components of semen are detectable, sperm should be easily detected. While it is possible to have sperm whose DNA is degraded beyond detection limits, the sperm cells themselves will maintain their integrity and be readily identifiable.[32]  Assays such as acid phosphatase and p30, which are convenient and relatively specific, are used to focus an investigation for semen. But one should never rely upon any single result except the observation of sperm as an unequivocal identification of semen. If semen was truly detected in this case by P5A assay, sperm should have been observed and a typable quantity of sperm DNA should have been recovered from it.

Id. at 25-27.  On cross examination, Mr. Keel also testified that Dr. Benton provided "either false or completely ignorant" testimony.  Tr. 9/22/10, 136.  See also id. at 149 (rebutting Dr. Benton's definition of "semen"); id. at 150 ("Dr. Benton simply said that semen is the product of the prostate gland.  And that's nowhere near the truth"); id. at 155 ("the suggestion [from Benton] that you might be detecting only pre-ejaculate fluid in the environment from the rectum is just patently absurd"); id. at 156 ("Dr. Benton is suggesting that something that comprises less than 1 percent of the total volume of semen is what was actually – might have been picked up on the rectal swab, and that's what the p30 result came from.  And that's ridiculous.  That's like taking a drink of coffee and not getting any caffeine").

---

[32]For example, microscopic slide smears with semen that have been treated with caustic dyes during staining and/or excess heat during fixing will reveal normal sperm cells but the sperm DNA may be degraded.

56

USCA5 6024

Dr. Johnson's and Mr. Keel's testimony was not the only evidence Petitioner

presented at the § 2255 hearing in rebuttal of Dr. Benton's trial testimony. Indeed,

as the Government's own expert Jerrilyn Conway conceded:

Q:    Did you review the testimony of Dr. Scott Benton in this case?

A:    I did.

Q:    I refer Counsel to the transcript from the same day , March 5th of '04, at Page
      22, regarding this paragraph noting right here in the middle that start, "And a
      more specific." "And more specific, a confirmatory test is called Prostate
      Specific Antigen, also known as a p30 assay. And this is confirmatory test for
      the presence of semen, because it doesn't exist anywhere else in bodily fluids,
      including animal bodily products, except in male prostate and with one
      exception, human breast milk." Did you read that testimony?

A:    I did.

Q:    You would agree that that is also incorrect?

A:    It is.

Tr. 9/24/10, 45. Thus, just as Petitioner presented evidence to rebut Dr. Benton's

observations from autopsy photos of alleged sexual trauma, Petitioner also presented

evidence to rebut Dr. Benton's testimony about the confirmation of semen and p30.

Indeed, in light of all the evidence Petitioner did present from Dr. Rouse's autopsy

report, Dr. Elizabeth Johnson, Alan Keel, and even Government expert FBI Agent

Conway, the Court's finding that Petitioner relied solely on Dr. Spitz and presented

no evidence to rebut Dr. Benton is plainly wrong. On the contrary, Petitioner

USCA5 6025

presented overwhelming evidence in rebuttal of Dr. Benton's testimony about the prevalence of prostate specific antigen in humans, as well as the specificity and limitations of the P30 test.   All of which was available to trial counsel.  Petitioner's post-conviction evidence stands in stark contrast to the evidence presented at trial in rebuttal of Dr. Benton's testimony – eight questions, within two transcript pages of testimony from Nurse McGlaughlin.

Although Petitioner has completely undermined Dr. Benton's testimony, Petitioner need only establish evidence that counsel could have presented to undermine Benton and create reasonable doubt regarding Petitioner's guilt.  If trial counsel had effectively presented Dr. Rouse's findings and if he had presented the testimony of qualified experts to discuss the limitations of PSA testing, the jury would have rejected the Government's claim that Petitioner sexually assaulted his daughter.  Without this highly inflammatory finding, there is a reasonable likelihood that the outcome of this case, either at the guilt or penalty phase would have been different.

**Forensic evidence of semen**.  As the Court noted, the Government presented testimony at trial from Dr. Benton, FBI forensic serology examiner, Caroline Zervos, and FBI forensic DNA examiner Anthony Onorato, alleging that the presence p30 in swabs from JG-1999's rectum, <u>alone</u>, confirmed the presence of semen.  Op. at 81-82.

58

USCA5 6026

In support of that proposition, at Petitioner's § 2255 hearing, the Government presented the testimony of forensic examiner Jerrilyn Conway. <u>See</u> Tr. 9/24/10. Petitioner addressed Dr. Benton's inaccurate and incomplete testimony about p30 above, and will now address the Government's remaining evidence and witnesses.

At trial, in an attempt to show that the positive p30 could have resulted from something other than semen, on cross-examination, counsel inquired of Caroline Zervos and Anthony Onorato whether p30 had been detected in substances other than semen. *Op.,* 81-82. Ms. Zervos testified that p30 could only be found in peripheral male blood and male urine and Mr. Onorato testified that the only place, outside of male semen that p30 could be found, was in the blood of males with prostate cancer. <u>Id.</u>. Both denied p30 could be found in any female fluids. <u>Id.</u> On cross-examination, trial counsel also elicited from agent Zervos that she "didn't know whether things in food might cause" a false positive p30 test, *Op.,* 81, and from agent Onorato, that FBI testing for sperm and male DNA was negative. <u>Id.</u> at 82.

On the basis of this cross-examination of Government witnesses, the Court concluded that counsel's performance was not deficient for failing to present rebuttal expert testimony because, "[w]ithout calling an expert witness, trial counsel's cross-examination touched on the issues raised in Bourgeois Motion to Vacate." *Op.*, 86. Again, the Court is wrong.

USCA5 6027

Clearly, counsel's cross-examination of Zervos and Onorato was intended to elicit evidence of other substances where p30 may be detected, including female fluids, and that the sperm and DNA tests were negative, in order to allow him to argue that the positive p30 was the result of something other than semen and that the negative sperm and DNA result confirmed the absence of semen.   In fact, as stated above, counsel attempted to argue that there was "no evidence of semen." *Op.,* 82. However, also as stated this Court <u>sustained</u> the Government's objection and <u>precluded</u> counsel's argument that there was "no semen" because counsel failed to present <u>any</u> evidence that there was no semen. <u>See</u> Tr. 3/16/04, 43-45.        I    n contrast, in post-conviction, Petitioner presented significant scientific evidence to support his assertion that there was "no semen" – all of which, was available to trial counsel.  Dr. Elizabeth Johnson testified that had she been called as a witness in Petitioner's 2004 trial, she would have testified consistent with her March 1, 2004 report to Mr. Tinker that:

- unlike the FBI, she conducted and acid phosphatase test for semen and a microscopic sperm search, and both were negative;

- p30 has been detected in substances other that semen and female fluids in particular, including female urine and female serum;

- because p30 has been detected and is not only produced in the male prostate, the term prostate specific antigen for p30 is a misnomer;

USCA5 6028

- if the FBI's positive p30 test were the result of semen, as many as 500 sperm would be observable, and none were observed here; and,

- the p30 test she conducted resulted in a "weak positive," which could be caused by rectal bacteria and not semen.

Tr. 9/22/10, 22-26. Additionally, Dr. Johnson testified that despite the p30 result "taking all of the test results, some of which were negative, negative for sperm, negative for acid phosphatase, negative for DNA, even on Y chromosome testing, that is was not reasonable to conclude that there was semen present on the swabs." Id. at 19; 120-21. Although counsel knew the evidence Dr. Johnson could provide at trial, and attempted to establish these same points on cross-examination, he failed to do so and thus, none of this evidence was presented to the jury.

Similarly, post-conviction evidence from Alan Keel established that in his opinion, "there is no proof of semen being detected [ ] in the evidence that was presented at trial," Tr. 9/22/10, 127; you can't rule out that P30 may be present in a toddler as a function of their own biology because "every cell in every person's body possesses two copies of the gene that produces p30," id. at 129; p30 assay may react to a protein which is not p30, id. at 129-30; sperm cells die but persist, id. at 132; if the positive p30 was caused from semen, sperm should have been detected, id. at 133; the fact that there was no semen in JG-1999's underpants is another "red flag"

61

USCA5 6029

against a conclusion that semen was present, id. at 167; that "there's no semen on these swabs," id at 169. See also 9/24/07 Report of Forensic Science Associates. Again, none of this evidence was presented by trial counsel.[33]

While acknowledging that "expert testimony certainly could have provided some benefit to the defense, Op. at 86, the Court nevertheless discounts the value of Dr. Johnson's testimony.  According to the Court, "the value of Dr. Johnson's testimony [regarding the "weak positive" p30 test result she obtained] would have been in showing that the evidence should have compelled the Government to perform the more-confirmatory sperm search." Additionally, the Court found that because Dr. Johnson also obtained a positive p30 test result, albeit a 'weak positive", "Dr. Johnson's testimony [ ] did not completely discount the possibility that Bourgeois sexually assaulted his daughter." Id.

On the other hand, the Court credited the Government's post-conviction expert, Jerrilyn Conway's testimony that "a week positive result means there is limited PSA present, which means there is a limited amount of semen present," id.,

And, that "if the PSA test was positive, they can be assured that that came from

---

[33]The evidence counsel could have presented stands in stark contrast to the evidence counsel did elicit at trial. See e.g. Op., 81 ("Mr. Tinker expressed that he 'got more than he wanted' from Ms. Zervos because she 'didn't know whether things in food might cause' a false positive"). Notably, no expert has ever opined as much.

USCA5 6030

semen." Id. at 87.[34]  The Court's acceptance of Ms. Conway's testimony over Dr. Johnson's is misplaced for several important reasons.

First, the **primary** value of Dr. Johnson's testimony is not related to what additional testing it would have prompted the Government to undertake.  *Op.,* 86. The value in Dr. Johnson's proposed testimony is derived from the fact that Dr. Johnson conducted additional testing (acid phosphatase and microscopic sperm search), all of which was negative, and that in conjunction with the FBI's negative results on the smear slide sperm search, autosomal DNA and the incredible sensitive Y chromosomal DNA search, she would have testified that there was an insufficient basis to conclude that the "weak positive" p30 test result was the result of semen – thus, there was no semen.  Tr. 9/22/10, 120-21. See also Tr. 9/22/10, (Mr. Keel) ("there is no proof of semen being detected [ ] in the evidence that was presented at trial"). Thus, contrary to the Court's opinion, *Op.,* 86, had counsel presented Dr. Johnson, he could have argued that she completely discounted the possibility that JG-1999 was sexually assaulted because Dr. Johnson had established that there was no scientific basis to assert that semen had been found and thus, in combination with the

---

[34]The Court inexplicably found the defense experts too technical, which could turn off jurors.  *Op.*, 87, but did not make the same finding for the Government's equally technical witnesses, i.e., Zervos, Onorato, Conway.  Any fair reading of Petitioner's experts shows that they were no more "technical" than the Government's.

USCA5 6031

conclusions in Dr. Rouse's autopsy report and the SANE nurse examination reports,

there was no scientific basis to conclude that any sexual assault had taken place.  As

previously stated, trial counsel attempted to make this argument but was precluded

by the Court because he presented no evidence to support the foundation of such an

argument  – that there was no semen.  See Tr. 3/16/04, 43-45.

Second, the significance of the more confirmatory sperm search the FBI would

be compelled to undertake with a "weak positive" p30 test result should not be so

readily discounted.  Op. at 86.  Although, at trial, the Government's evidence only

alleged that their p30 testing was positive, in actuality, the testing results on the three

rectal swabs (Q5-Q7) was "very weak, very weak and weak," respectively.  See P-

179; Tr. 9/24/10, 67-68.  These results are extremely important.

Indeed, in addition to supporting the credibility and validity of Dr. Johnson's

testing, who also achieved a "weak positive," FBI Procedures for the Serological

Identification of Biological Substances on Evidentiary Materials (2002), Chapter 11

states:

> Attempts to identify human semen in some categories of evidence **MUST** be approached through the identification of spermatozoa rather than by the detection of human specific proteins, such as p30.  These categories would include ... stain extracts that possess **borderline levels of p30**.

See P-180.  Thus, because the Government's actual p30 test results as set forth in P-

USCA5 6032

179 reveals "borderline levels of p30," (weak to very weak), the FBI was <u>required</u> to confirm the presence of any alleged semen through the identification of spermatozoa – not solely a p30 test.  Notably, <u>no</u> sperm were ever detected in this case.  Indeed, the smear slide which was inspected by the FBI was <u>NEGATIVE</u> for the presence of any spermatozoa.   The microscopic sperm searches conducted <u>on all three swabs</u> by Dr. Elizabeth Johnson and Technical Associates were also <u>NEGATIVE</u> for the presence of spermatozoa.  <u>See</u> Tr. 9/22/10 (testimony of Dr. Elizabeth Johnson).

Based on the actual "very weak" to "weak" results it is the credibility and reliability the Government's witnesses, not Dr. Johnson, that should be questioned. Indeed, the FBI's very own protocols contradict the Government's experts allegations that "a week positive result means there is limited PSA present, which means there is a limited amount of semen present," <u>id.</u>, and, that "if the PSA test was positive, they can be assured that that came from semen." <u>id.</u> at 87.  In other words, if a weak positive p30 test always confirms the presence of semen, why does the FBI protocol mandate the observation of sperm to confirm semen? The answer, as Dr. Johnson and Mr. Keel stated, is that a "weak positive" does <u>not</u> confirm the presence of semen.

Had counsel presented an expert witnesses, provided them with P-179 and the

65

USCA5 6033

FBI manuals available at the time of trial,[35] He could have argued that contrary to the trial testimony from Caroline Zervos, Anthony Onorato and Dr. Benton, based on their own protocols, the FBI, like the defense expert, could <u>not</u> conclude that semen was present on the basis of a "weak" to "very weak," "borderline" p30 test result. Moreover, counsel could have argued that because in this case, as his expert had testified, all sperm searches and additional testing, including acid phosphatase, autosomal DNA and Y chromosome DNA were negative, there was insufficient basis to conclude that semen was present. In other words, counsel could have argued, as he attempted but this Court precluded, that there was no semen detected on the JG-1999 rectal swabs. The Court's opinion does not discuss the "value" of this potential evidence and these arguments and they cannot be discounted.

The Court also finds it "problematic" that unlike the Government's expert, Ms.

---

[35]This Court has already ruled that the Government did not fail to disclose P-179 to the defense at the time of trial. *Op.*, 84, n. 137. Thus, P-179 was available to trial counsel. Similarly, the 2002 FBI manual in effect at the time of trial was provided to post-conviction counsel by the Government upon request and would have presumably have been provided to trial counsel, <u>had he asked</u>. Even without an expert, it is inconceivable that counsel, in possession of P-179 and its "weak" to "very weak" p30 results, would not have used it to challenge the Government's semen contention. Indeed, counsel could simply have argued that the jury should not accept "weak and "very weak" results as the equivalent of a "positive" result. At a minimum, he could have cross-examined Ms. Zervos and Mr. Onorato with P-179 and argued that their failure to reveal the actual results as "weak" and "very weak" diminished their credibility. Counsel failing in these regards support Petitioner's claim of deficient performance.

USCA5 6034

Conway, Dr. Johnson did not, allegedly, discuss the levels at which PSA occurs in

substances other than semen. Op. at 87.  Here, again, the Court ignores the actual

record.  As Dr. Johnson testified:

Q:    Let me refer you now to Page 3.[36]  Can you tell us what that is?

A:    Yes.  This is a page from a publication, and it lists a table with various
      substances, including semen, but other substances in which PSA has
      been found, and their concentrations.

Q:    Okay.  And those are some of the same fluids that we've discussed
      already.  Correct?

A:    Yes, it is.

Q:    And I'm looking at some of those concentrations, and I'm curious about
      whether the concentrations listed there are sufficient to react and cause
      a positive p30 test on a card, on a test card.

A:    Well, the limited detection of the ABA card –

Q:    Yes.

A:    – is 4 nanograms per mil –

Q:    Okay.

A:    – and 2 nanograms per mil for the Seratec card.  So some of them are.
      I mean, some of them are greatly – breast milk, greater than 101 case.
      Some of them are not meeting that limited detection, but some are.

Q:    Okay, And let me ask you – well, let me read you something from the

_____

[36] Page 3 refers to the third page of the report Dr. Johnson provided to trial
counsel.

67

USCA5 6035

results and discussions and ask you if you agree or disagree with that particular statement. It says, "It is now quite clear that the term Prostate Specific Antigen is a misnomer. Although present in greater amounts in seminal deposits, its presence has been detected in a variety of other body fluids." Do you agree with that?

A:    Yes.

Q:    Okay. You've told us that already. Down, down to the bottom. "Of particular concern to this analyst is the detection of PSA in female urine and female serum. The finding of urine on a pair of underwear from a rape survivor would not be uncommon. In addition, if trauma is present, or the survivor is menstruating, blood may be present on the vaginal swabs or on the stains in the underwear. When an extract is prepared from the strains on the underwear and PSA is detected, how sure can the analyst be that the result is from semen? In other words, what is the likelihood that the strain is from female urine or serum?" Do you agree or disagree with that statement?

A:    I agree that there is cause for concern and to consider these factors.

Q:    Okay. And had you been called at trail in 2004, would you have testified consistent with the information that's contained on Page 3 of this document that you sent to Mr. Tinker?

A:    Yes

Tr. 9/22/10, 25-26; See also Tr. 9/22/10, 118-20.

Thus, the Court appears to have accepted Ms. Conway's testimony without consideration of the evidence that Dr. Johnson provided which directly refutes Ms. Conway.

The Court has blindly accepted the Government's witness without

68

USCA5 6036

acknowledgment that significant portions of the scientific community, including other

law enforcement agencies, <u>disagree</u> with Ms. Conway and the FBI on whether the p30

assay can react with substances other than semen and whether a positive p30 test,

alone, can confirm the presence of semen.  <u>Id.</u>; <u>see</u> <u>also</u> Texas Department of Public

Safety, DNA-04-09, p.1 ("P30 Identification ... p30 is considered to be a

**presumptive** test for semen.  The presence of p30 indicates, **but does not confirm**

the presence of semen.   Semen can **only** be confirmed by the presence of

spermatozoa");[37] California Department of Justice Bureau of Forensic Services,

Biology Technical Procedures, p. 51 ("Section 4 – Semen ... for p30 immunassay

cards, a positive result **alone** (without sperm or AP results) will allow you to make

the statement of 'p30 detected.'  **However, your report should include a statement**

**that explains that the other body fluids may react with these test cards**.  The

immunoassay cards **are very sensitive** and can detect p30 at very low levels that may

---

[37]Texas DPS policy conforms with the evidentiary hearing testimony of Alan Keel who stated that a p30 test can be used in conjunction with other evidence to indicated the presence of semen but the <u>only stand alone</u> confirmatory test for semen was the identification of spermatozoa.  <u>See</u> <u>e.g.</u> P-88, 2007 Report of Forensic Science Associates, 20 (" And since sperm are only found in semen, the observation of sperm is proof of the presence of semen.  In the criminal justice context, the observation of sperm is the only definitive proof of the presence of semen from a forensic specimen").  In this case, <u>all</u> searches for the presence of spermatozoa were <u>negative</u>.

69

USCA5 6037

be present in body fluids **other than seminal fluid**”), attached;[38] 2005 Seratec Card

Protocol, p.3 (“**inconclusive**: Due to the increase in sensitivity using Seratec seminal

fluid (PSA) test, **the analyst is advised to have a second positive test result before**

**confirming seminal fluid is present** in a stain extract (e.g. positive AP test,

spermatozoa observed in the pellet, or male profile present in the sperm DNA

fraction).  If the only positive test result obtained from the stain extract is the Seratec

PSA card, the conclusion for this situation would be ‘seminal fluid **could not be**

**confirmed**.’”).[39]

Indeed, even the FBI own protocol manual in effect at the time of Petitioner’s

trial conflicts with Ms. Conway’s testimony.  See P-180, FBI Procedures for the

Serological Identification of Biological Substances on Evidentiary Materials (2002),

11(“Attempts to identify human semen in some categories of evidence **MUST** be

---

[38]Likewise, in this case, the acid phophatase (AP) test and the sperm searches were negative.  Thus, unlike the FBI, the California protocols do not permit the confirmation of semen with a positive p30 test alone and certainly not with “very weak, very weak, weak” results.

[39]The Seratec Card test is now used by the FBI to test for p30 and was substituted for the ABA card after accuracy problems were detected with the ABA card – the card used in this case.  Tr. 9/24/10, 76-78.  Thus, even the protocols by the manufacturer of the presumably more accurate Seratec test card now used by the FBI, cautions that a positive test card alone, does not confirm the presence of semen.  The other tests that Seratec advises a forensic analyst should consider in conjunction with their test card (AP test, identifiable sperm or male DNA), were ALL NEGATIVE in Mr. Bourgeois case.

USCA5 6038

approached through the identification of spermatozoa rather than by the detection of

human specific proteins, such as p30.  These categories would include ... stain

extracts that possess **borderline levels of p30**").[40]

Moreover, although the Court cites counsel's cross-examination of Ms. Zervos

and Mr. Onorato, regarding substances where p30 has been detected, what the Court's

opinion notably failed to acknowledge was that both Agents Zervos' and Onorato's

testimony on this point was demonstrably <u>wrong</u>, and counsel could have proven it.

Contrary to Ms. Zervos' and Mr. Onorato's trial testimony, p30 had not only

been detected in semen, peripheral male blood, male urine, and the blood of males

with prostate cancer.   As Dr. Johnson testified:

Q:    Is [Ms. Zervos' testimony regarding where p30 may be located accurate? Or complete? Let me ask you that.

A:    It's not complete.

Q:    Okay.  Because you've already testified that it could be found in these [ ] other substances.

A:    Yes.

Q:    Had you been called as a witness at the time of trial, would you have been able to address Ms. Zervos' testimony that p30 is only found in male peripheral blood and semen?

---

[40]Thus, the FBI's very own protocols require the identification of sperm to confirm the presence of semen when, <u>as in this case</u>, you have borderline levels of p30.  The two separate sperm searches conducted in the case were negative.

71

USCA5 6039

A:    Yes, I would have.

Q:    Did you also review the testimony of Mr. Onorato?

A:    I did.

***

Q:    Was Mr. Onorato's testimony about where p30 might be located complete?

A:    It was not.

Q:    Had you been called as a witness in 2004, would you have been able to address Mr. Onorato's testimony regarding where p30 could be located?

A:    Yes, I would.

Tr. 9/22/10, 29-32.

Indeed, as the Government's own expert, Jerrilyn Conway, conceded during Petitioner's § 2255 hearing, at the time of Petitioner's trial in 2004, studies had been published identifying the presence of P30, albeit at lower levels, in other fluids, including female fluids. Tr. 9/24/10, 39-45. As Agent Conway also conceded, contrary to the testimony of Agents Zervos and Onorato, p30 has been detected in male urine, female urine, female serum, amniotic fluid, breast milk, the serum of boys, and the serum of girls. Id. at 39-40. Thus, Agent Zervos and Onorato's testimony was incorrect and incomplete. Id. at 40 (testimony of Agent Conway) ("Q: Did you read in Ms. Zervos' testimony where she testified that PSA or p30 has not been detected in any female fluids ... That would be incorrect? A: It is, yes"); id. at

72

USCA5 6040

42 (regarding testimony of Onorato) ("Q: That's not a complete listing of all the fluids where p30 has been found either.  Is that correct? A: It's not no").

Contrary to the Court's opinion, because counsel did <u>not</u> elicit what he intended from Ms. Zervos and Mr. Onorato about substances, other than semen which contain p30, counsel's reliance on cross-examination was insufficient and the decision <u>not</u> to call an expert was <u>not</u> reasonable.  <u>See</u> Op. at 81 ("In a discussion with the Court, Mr. Tinker expressed that he 'got more than he wanted' from Ms. Zervos..."); <u>id.</u> at 86 ("Without calling an expert witness, trial counsel's cross-examination touched on the issues raised in Bourgeois' Motion to Vacate); id. (...an attorney's decision to attack the Government's expert witness on cross-examination rather than calling additional experts can be reasonable performance").[41]

The Court's reliance on trial counsel's elicitation of DNA results from Mr. Onorato in support of counsel's performance is also misplaced.  Op. at 82. ("Also,

---

[41]Moreover, contrary to the Court's opinion, trial counsel's use of Dr. Johnson's report during cross-examination of Government witnesses actually supports's Petitioner's claim of deficient performance.  Indeed, counsel's "use" of Johnson's report shows that counsel considered the information she provided him in her report, which she could have provided at trial, valuable to the defense. Thus, because his cross-examination of Government witnesses failed to elicit the helpful information contained in her report, Dr. Johnson should have been presented at trial. <u>See</u> *Op.*, 85 ("respondents persuasively argues that, although trial counsel did not call Dr. Johnson as a witness, the flow of his questioning suggests that he used her report to prepare for cross-examination").

73

USCA5 6041

Mr. Tinker emphasized that the FBI testing was negative for sperm and for male

DNA"). The record actually reflect that trial counsel <u>objected</u> when the Government

sought to elicit testimony from Mr. Onorato that additional, more sensitive Y

chromosomal DNA testing had been performed by Orchid Cellmark on behalf of the

Government and that those result were <u>negative</u> for male DNA.[42] Tr. 3/5/04, 132-34.

Indeed, after the Court rightfully asked counsel, "[d]on't you want that evidence.

What harm could it be for your client?" Mr. Tinker responded, "I didn't think about

that." <u>Id.</u> at 133. Clearly, counsel had either never seen the Orchid Cellmark results,

even though they were provided in pre-trial discovery, or had failed to understand

their beneficial significance. In either scenario, counsel's objection to the Y

chromosome DNA results highlights his poor performance – the jury learned that Y

chromosome DNA testing was negative <u>in spite of</u>, not because of counsel's cross-

examination or performance.[43]

**Counsel's "strategy."** The Court's opinion also makes references to counsel's

strategy regarding the failure to present expert testimony to rebut the allegations of

---

[42]At the time of trial, Orchid Cellmark had the capability to perform the more sensitive Y chromosome DNA testing which the FBI lab could not perform.

[43]This too contradicts the Courts finding that counsel did not need to present expert testimony because his "questioning manifested a familiarity with the issues presented in Dr. Johnson's report..." *Op.*, 86.

USCA5 6042

sexual assault and semen. However, the Court's *post hoc* creation of strategic basis for counsel's inaction does not comport with counsel's actual, stated basis for failing to present expert testimony.  In his interrogatories propounded by the Government, Mr. Tinker stated that he did not "utilize [Dr. Johnson's] services" because he had trouble "getting her to return phone calls," "she did not have her own lab," and she "did not do the testing I requestedin a timely fashion."  P-Ex82, 14.

However, just as the record does not support the Court's stated strategy for Mr. Tinker's failure to call Dr. Johnson or any expert at trial, Mr. Tinker's reasoning is also not supported by the record.  Although Dr. Johnson's report was submitted to counsel after the Court imposed deadline for disclosing expert reports, this fact only highlights counsel's deficient performance.  Indeed, it was counsel's responsibility to insure that all expert reports were submitted in a timely manner and Dr. Johnson was not the only expert for which counsel neglected to obtain a timely report.  See Tr. 2/25/04, 135-48 (discussing counsel's failure to secure and disclose expert reports from Dr. Rupp, Dr. Holder and Dr. Weiner); see also *Government's **Third** Motion for Reciprocal Discovery, 2/17/04* (requesting expert summaries from Dr. Joseph Rupp, Dr. Elizabeth Johnson, Dr. George Holden, Dr. Daniel W. Davis, Dr. Linda Norton, and Dr. Donald Weiner) (emphasis added).  Moreover, any allegation that Dr. Johnson is at fault for the late disclosure because she was uncommunicative with

USCA5 6043

counsel is belied by the record. On January 16, 2004, just a month and half before she submitted her report to counsel, Mr. Tinker expressly told the Court that Dr. Johnson has been prompt in her work and good at communicating with counsel. Tr. 1/16/04, 34-35 ("As soon as she gets it and has an opportunity to test it, and I think she'll be prompt. She's been good about talking to me about issues").

Moreover, as Dr. Johnson testified, Mr. Tinker never made her aware of the Court imposed deadline for expert reports and if he had, she would have complied with any court imposed deadline. Tr. 9/22/10, 27. See also P-168 (12/31/03 fax from Dr. Johnson to Mr. Tinker indicating she tried unsuccessfully to reach Mr. Tinker after completing her review of Mr. Bourgeois' case); Tr. 9/22/10, 19-20 (same); see also Tr. 924/10, GX-206 (Technical Associates report faxed from Dr. Johnson to Mr. Tinker on 2/26/04, before Court's 3/1/04 deadline for the production of expert reports).

Finally, as has already been discussed at the hearing, the fact that Dr. Johnson did not "have her own lab" should not have been preclusive. The Government's experts also do not complete their own testing, but only analyze the results. This separation between technician and analyst is typical of laboratories in most fields of forensic science.

**Prejudice**. The Court begins its denial of relief by stating that "[t]he

76

USCA5 6044

possibility that Bourgeois sexually assaulted his daughter was an inflammatory, but

not essential, part of the Government's case." Op at 80.  The Court erred.  On the

contrary, evidence that Mr. Bourgeois allegedly sexually assaulted and anally raped

his two year old daughter was not merely inflammatory, it was <u>highly</u> inflammatory

and <u>extremely</u> prejudicial.  The Government's trial theory alleged that JG-1999 was

killed as part of a systematic pattern of "abuse" and "torture."  Indeed, in an apparent

contradiction, just two paragraphs after stating the evidence was not essential, the

Court acknowledged that "[t]he forensic evidence allowed the Government to prove

that the murder was only the culminating event in a barrage of abuse that also

contained a sexual component." <u>Id.</u> Of this alleged "barrage of abuse," it is difficult

to conceive of evidence more inflammatory and prejudicial than the alleged sexual

assault and anal rape of a two year old girl by her own father – "inflammatory" is, to

say the least, an understatement.

Moreover, a finding of sexual assault by the jury all but insured that counsel's

chosen defense, that Robin Bourgeois was the actual perpetrator of the abuse on JG-

1999,[44] failed.  The alleged vaginal trauma and presence of semen – which, among

_____

[44]<u>See</u> <u>e.g.</u> Tr. 3/16/04, 34 (defense closing argument) ("I think you have the
right to wonder whether Robin Bourgeois committed these acts against this child");
<u>id.</u> at 35 ("I just want to make it clear.  Mr. Tinker and my position is that Alfred
Bourgeois did not kill this child"); <u>id.</u> at 38 ("And she – by the way, in the first – the
first – the CPS interview, [AB-1994] said that her mother [Robin] came up with the

77

USCA5 6045

those with access to the child – could only have been perpetrated by Petitioner, completely undermined Mr. Bourgeois' defense. Thus, contrary to the Court's finding, the evidence of sexual assault was highly inflammatory and essential to the conviction and sentence of death secured by the Government.

For this reason, counsel had an obligation to investigate, develop and present evidence to rebut the alleged sexual assault. In this regard, counsel failed to live up to their obligation.

Nevertheless, the District Court concludes that Petitioner was not prejudiced by counsel's ineffectiveness. The District Court's prejudice analysis warrants reconsideration. On its face, it is clear that reasonable jurists could differ regarding the prejudice caused by counsel's ineffectiveness in this arena. The Court states "the evidence of sexual abuse was an inflammatory, but not decisive, factor in both phases of trial. *Without much question*, Bourgeois' sexual abuse of his daughter did not substantially impact the factors the jury had to consider reaching a verdict as to his guilt ... The Court's review of the trial and the evidentiary hearing testimony indicates that he has not shown a reasonable probability of a different result had trial counsel's efforts disputed the sexual-assault evidence." Op. At 88.

---

idea of lets put the baby down and say she fell out of the truck"); id. at 40 ("Robin Bourgeois is the one who has, as Mr. Tinker told you, the motive. The motive for killing this baby").

USCA5 6046

Additionally, the Court applies the wrong test in considering prejudice. The Court notes that "the post-conviction evidence questioned, but did not completely eliminate, the possibility that Bourgeois sexually assaulted his daughter." Id. Once again, the Court is holding Petitioner to the wrong standard. Petitioner on post conviction must show a reasonable likelihood of a different result. In this case, Petitioner must show that, had counsel performed effectively, the jury may have rejected the evidence of sexual assault, which would have changed the result of either the guilt or penalty phase of trial.

The Court concedes that "certainly similar information could unduly inflame a jury in other circumstances." Id. However, the Court believes that "Bourgeois' abusive and violent tendencies prevent any reasonable likelihood that jurors would have reacted differently in the punishment-phase had they not known that Bourgeois had raped his daughter." Id. Here, the Court is replacing her own subjective views on the subject into the prejudice determination, something strictly prohibited by Strickland. 466 U.S. at 695 "assessment of prejudice ... should not depend on the idiosyncracies of the particular decisionmaker." See Claim II, supra.

In addition, the Court's no-prejudice in the penalty phase determination fails to assess the totality of the mitigation evidence presented both at trial and in the post conviction proceedings. The question of prejudice must be viewed cumulatively,

79

USCA5 6047

meaning that this Court must consider the post-conviction evidence presented to support a case for mitigation when considering the impact of Petitioner's claim of ineffectiveness for failure to rebut evidence of sexual assault. Williams, 529 U.S. at 397 ("prejudice determination was unreasonable insofar as it failed to evaluate the totality of the available mitigation evidence.")

Certainly, as this Court recognizes, Petitioner has presented ample evidence to raise a doubt about the presence of sexual assault in this case. It is hard to believe that the specter of the sexual assault of a two year old did not have a significant impact on the jury's determination at both the guilt and penalty phases of trial. The Court's denial of this claim and denial of COA on this claim warrants reconsideration. Reasonable jurists could disagree regarding the prejudice to Petitioner due to counsel's ineffective handling of the evidence of sexual assault at trial.

**CLAIMS V & VI.**   **DIGITALLY ENHANCED PHOTOGRAPHS.**

The Court concluded that Petitioner has not met his burden to prove that counsel were ineffective under Strickland for failing to prevent the use of digitally altered autopsy photographs. *Op.*, 90. The Government inappropriately relied on the digitally altered and enhanced photographs that were modified by its expert, Dr.

USCA5 6048

Oliver.  These photographs were used throughout the course of Dr. Oliver's, Dr. Senn's, and Dr. Chrz's testimony.  The Court concluded at the time of trial that Dr. Oliver's enhancements were meant as a "demonstrative aid" and an "aid to the jury." *Op.*, 92.  However, the Court was unaware at the time that both sets of Dr. Oliver's photographs were digitally altered, not just the ones that were labeled "enhanced." Trial counsel failed to investigate the unreliable methods used by Dr. Oliver in both digitalizing and enhancing the autopsy photographs.  Counsel further failed to lodge a <u>Daubert</u> objection to the use of unreliable, enhanced images throughout the trial. No reliable science exists to ensure the reliability or accuracy of these enhanced and altered photographs.  Their prejudicial weight cannot be overstated.

### A.    Facts

Dr. Oliver testified at trial as a forensic pathologist.  His testimony specifically focused on the pattern evidence of abuse found on the victim's body.  In preparation for his testimony, Dr. Oliver prepared a PowerPoint presentation of the autopsy photographs.  To aid the jury, Dr. Oliver presented three photographs for each single autopsy photograph he relied upon.  Tr. 3/8/04, 9.  All three photographs were digitized.  The first was labeled the "original" un-enhanced image.  He also showed the jury two other enhanced images with varied levels of alterations. <u>Id</u>.  In presenting this evidence, Dr. Oliver actually states that the "original" images were "digitized at

81

600 DPI on a. . . scanner, and then, of course downsized to fit onto the PowerPoint." Tr. 3/8/04, 19.  Trial counsel did not probe further into Dr. Oliver's use of the digitized "originals" as a basis for his report.

Consequently, these digitized scans were inappropriately misrepresented to the jury as "originals" through PowerPoint, not as digitally altered photographs. Tr. 10/28/10, 92.  At deposition, Dr. Oliver conceded: (1) that there was loss of detail in scanning the digital images; (2) that the digitized images were presented as "originals" to the jury even though they had been altered by the scanning process; (3) that conversion of the images for PowerPoint presented a degree of unreliability before the jury; (4) that PowerPoint is not a "good program" to display the measurement of injuries; and (5) that he relied on digitalization compression technology despite its degree of inaccuracy. Tr. 10/28/10,  96.

Nor did counsel challenge the methodology Dr. Oliver used in "enhancing" the photographs.  Dr. Oliver conceded that there's no method available by which to measure the reliability of the altered or enhanced photographs. Id., at 24.  Further, he conceded that his most basic methods, the use of JPEG to digitize photographs, does not comport with the FBI's minimum guidelines for the use of film technology in evidence. Id., at 74-77.  Instead, he used the "de facto" standard for film technology in pathology, which is the use of JPEG.  Id., at 77-78.  All of these

82

USCA5 6050

statements render Dr. Oliver's methods unreliable, and do not comport with Daubert.

The impact of these altered photos, both the "originals" and the "enhanced" versions, cannot be overstated. For instance, Dr. Chrz reached is conclusions based on images he received from Dr. Senn, who in turn received images from Dr. Oliver, who relied on Dr. Rouse's autopsy photos. Tr. 3/4/08, 317. Significantly, Dr. Senn and Dr. Chrz both relied on Dr. Oliver's digital distortions and accordingly, their conclusions should not have been admissible.

Despite the multiple layers of unreliable evidence used by Government experts, trial counsel failed to investigate the experts' methodology. Although counsel voir dired Dr. Oliver, he failed to probe the underlying reliability of the "original" photographs nor explore the reliability of the "enhanced" images.

### B.    Deficient Performance.

The Federal Rules of Evidence and Daubert v. Merrell Dow Pharmaceutical, Inc., 509 U.S. 579 (1993), govern the admissibility of expert testimony. In prior submissions, Petitioner has alleged that the fairness of his trial was fundamentally undermined by his counsel's failure to lodge a Daubert challenge to preclude the Government's use of unreliable and enhanced damaging photographs at trial. At bottom, the Court's view that counsel could not have succeeded in preventing the presentation of these harmful images and testimony through a Daubert motion, is

83

USCA5 6051

erroneous.

Counsel's failure to challenge the enhanced photographs under Daubert was deficient. Dr. Oliver's methodology in enhancing the photographs clearly did not meet the standards for scientific evidence set forth under Daubert. Daubert directs that an expert must show that his methods are reliable. To test reliability, a court must look at factors like rates of error, technical standards, test-ability, and peer-review. Id. Dr. Oliver's methods have not been tested, have not been examined for rates of error, do not meet comparable standards in other areas of forensic science, and have not been peer reviewed.

The Court erroneously dismissed Petitioner's arguments as simply a "highly technical challenge" to the reliability of Dr. Oliver's conclusions. *Op.*, 93. The Court further erred in finding that Dr. Oliver did not rely on altered photographs in coming to his conclusions. Id. This, now, has been proven to be untrue. The Court also fails to acknowledge that two other experts, Dr. Senn and Dr. Chrz likewise relied on Dr. Oliver's altered photos.

The Court also fails to acknowledge that Petitioner's complaint was not only that the experts used unreliable methodology in coming to their conclusions (because the photographs they relied on had been altered in an unscientific manner), but also that the experts used unreliable methodology in presenting their evidence to the jury.

84

USCA5 6052

Petitioner contends that <u>Daubert</u> could have been used to preclude both 1) the experts' conclusions based on unreliable evidence and 2) the experts' testimony that presented unreliable and misleading photographs to the jury. Counsel should have made a <u>Daubert</u> objection on both fronts.

The Court's endorsement of the Government's attempts to limit the harm of the unreliable evidence at trial by calling it a demonstrative aid not only is erroneous, since the unreliable photographs did inform the experts' opinions, but is unavailing. <u>Daubert</u> is not limited to evidence that formed the basis of expert opinions. It applies to any evidence used by the scientists at trial, as well.

## C.    Prejudice.

The Court has reasoned that "any alleged error by trial counsel by not litigating a Daubert challenge did not call into question the fundamental fairness of either phase of trial." *Op.*, 93. Petitioner respectfully disagrees for the following reasons.

The Court's prejudice analysis is flawed because a court must consider the totality of evidentiary errors presented to the judge or jury. <u>Strickland</u>, 466 U.S. at 695-96. Further, the <u>Strickland</u> also explained that while some errors are insignificant, others may "alter[] the entire evidentiary picture." This Court has stated that, "removing the digital enhancements from the evidentiary equation would not have measurably changed the case before the jury." *Op.*, 93. However, <u>Strickland</u>

85

USCA5 6053

adheres to "an objective standard of reasonableness," in determining deficient performance and prejudice. Wiggins v. Smith, 539 U.S. 510, 521 (2003). The focus of the inquiry to be addressed should be whether the evidentiary picture was altered. That is not even a close call. The Court's admission of such damaging evidence undoubtedly distorted the jury's understanding of the extent of the injuries.

The Court concluded that Petitioner was not prejudiced because the photographs labeled "enhanced" were not provided to the jury during their deliberations. *Op.*, 90. However, this ignores the impact the photos had on the jury throughout the trial. The jury was never informed that one set, labeled "originals," had been altered. The jury was, disastrously, directed by Dr. Oliver to rely on these photographs as originals, a label we now know was false.

Further, the Court's conclusion that Petitioner was not harmed by the use of the set of photographs labeled "enhanced" as "demonstrative aids" is also erroneous. To whatever extent the images were used as a "demonstrative aid," the value of such egregiously unreliable images were minimal compared to their prejudicial effect to jurors. The Court inappropriately de-emphasized the highly inflammatory nature of the altered photographs shown to jurors. To the extent that the "enhanced" photographs were not used as a basis on which experts formed an opinion, their probative value is even further diminished in comparison to their prejudicial impact.

86

USCA5 6054

Additionally, the <u>Daubert</u> inquiry is not foreclosed simply because the set of photos labeled "enhanced" were not the basis of the Dr. Oliver's conclusions. <u>Daubert</u> 509 U.S. at 584. Instead, the reviewing court should go further into the <u>Daubert</u> inquiry as to the scientific validity and evidentiary reliability of Dr. Oliver's digital enhancement process since the presentation was displayed to jurors, causing prejudice. <u>Id.</u> at 590.

Because the digitized enhancements were so drastically altered, the images became egregiously unreliable evidence to present before a jury, even as an demonstrative aid. The unreliable enhanced photographs caused prejudice to the petitioner because they inflamed the jury against him. As such, trial counsel was deficient for not raising a Daubert challenge to prevent such prejudicial evidence.

For these multiple reason, trial counsel was deficient for failing to raise a clearly meritorious Daubert challenge to the use of enhanced and altered photographs at the trial. Petitioner should be granted relief under the claims discussed above.

### RECONSIDERATION OF THE DENIAL OF A CERTIFICATE OF APPEALABILITY

At the conclusion of its 225 page slip *Opinion* the Court states that Petitioner has "raised many issues requiring serious judicial consideration." This Court has provided such consideration, albeit, committing the multiple above-described errors, and counsel appreciate that consideration. However, the denial of a Certificate of

USCA5 6055

Appealability (COA) under these circumstances simply violates the governing law. When a petitioner raises "many issues requiring serious judicial consideration" that requires such detailed and indepth analysis, it is difficult to fathom that he has also not met the criteria for obtaining a COA on at least one or more of those issues.

The Court has cited <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000) and the statute, 28 U.S.C. § 2253, for the proposition that Petitioner may only obtain a COA if he "has made a substantial showing of the denial of a constitutional right." *Op.*, 111.   However, that is only part of the standard, and in invoking only that portion, the Court has overlooked the various Petitioner-friendly aspects of the law governing COA.   Petitioner herein reviews that law and shows why he is entitled to further review.[45]

---

[45]28 U.S.C §2253 states, in relevant part:

(a)    In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –

(B)    the final order in a proceeding under § 2255.

(c)(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of

88

USCA5 6056

Under the "substantial showing of the denial of a constitutional right" standard of 28 U.S.C. §2253(c)(2), a petitioner need only "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983) (internal citations and quotation marks omitted).

The Barefoot standard was reaffirmed in Slack v. McDaniel, 529 U.S. 473, 484 (2000) and in Miller-El v. Cockrell, 537 U.S. 322 (2003). Miller-El, reaffirmed that a COA should be allowed when the Petitioner's case is "debatable," or the issues could be "resolved in a different manner," or when the case "deserve[s] encouragement to proceed further." See id. at 336.

Petitioner submits that the issues described herein are certainly debatable – the Court could not and did not summarily dismiss them (with the partial exception of the jurisdiction claim for which Petitioner was not provided a full hearing). The Court heard days of testimony, and wrote two hundred and twenty five pages to address them. Certainly, in those pages, this Court took on the "debate." Moreover, while this

---

the constitutional right.

(c)(3) The certificate of appealability under the paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

89

USCA5 6057

Court has yet to be convinced of the merits of any of Petitioner's claims, given this Court's treatment of the issues, it cannot say that "jurists of reason" could not resolve them differently.

And, in that regard, Miller-El is significant.  It states that "a COA does not require a showing that the appeal will succeed.":

> The holding in Slack would mean very little if appellate review were denied because the prisoner **did not convince a judge**, or, for that matter, three judges, that he or she would prevail.  It is consistent with § 2253 that a COA will issue in some instances where there is no certainty of ultimate relief.  After all, when a COA is sought, the whole premise is that the prisoner has already failed in that endeavor.
>
> * * *
>
> **We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus**.  **Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail.**

Miller-El, at 336-38 (internal quotation marks and citations omitted).

In capital cases, "the nature of the penalty is also a proper consideration in determining whether to issue a certificate of appealability."  Barefoot, 463 U.S. at 893.  Because this case involves the death penalty, "any doubts as to whether a certificate of appealability should issue must be resolved in [Mr. Bourgeois'] favor."  Moreno v. Dretke, 450 F.3d 158, 163 (5th Cir. 2006); Morris v. Dretke, 379 F.3d 199,

90

USCA5 6058

204 (5th Cir. 2004), citing <u>Hernandez v. Johnson</u>, 213 F.3d 243, 248 (5th Cir. 2000).

This Court's extensive *Opinion* highlights the fact that Petitioner has raised non-frivolous, substantial claims and arguments as to which Petitioner should be permitted a COA. Indeed, sprinkled through the *Opinion* are suggestions that Petitioner's claims are not frivolous, but are debatable. <u>See</u> <u>e.g.</u>, *Op.*, 86 (with respect to DNA claim: "Validating trial counsel's cross-examination through expert testimony certainly could have provided some benefit to the defense"); <u>id.</u>, ("expert testimony certainly could have provided some benefit to the defense"); <u>id.</u>, at 87 (with respect to DNA claim: "here the forensic evidence of sexual assault was not of the strongest sort").

In <u>Jeffries v. Barksdale</u>, 453 U.S. 914, 916 (1981) (J. Rehnquist dissenting) former Chief Justice Rehnquist noted the legislative history of § 2253 – which as <u>Slack</u> indicates remains materially unchanged except for the change of name from the former Certificate of Probable Cause to appeal. He wrote: "The legislative history of 28 U.S.C. § 2253 and its predecessors demonstrates the clear congressional purpose to impose the certificate-of-probable-cause requirement as a means of terminating **frivolous appeals** in certain habeas corpus cases." Petitioner has not presented frivolous issues, as evidenced by this Court's treatment of them, and its extensive opinion about them. Nor would his appeal of them be frivolous. This Court cannot

USCA5 6059

and should not rule that each of the four claims discussed herein are "frivolous" – the record demonstrates otherwise.

**REQUEST FOR RELIEF**

Petitioner respectfully requests that the Court:

1.      Order the Government to Respond to this Motion;

2.      Permit Petitioner to file a Reply Memorandum;

3.      Entertain oral argument on this Motion;

4.      Alter or Amend its Judgment to award relief to Petitioner by vacating his convictions or sentences on each of the above described grounds, individually or collectively; or,

5.      Should the Court not grant Petitioner relief from his convictions and sentence, then Petitioner requests that the Court award a COA as to each of the four claims described herein, or as to any of them individually.

92

USCA5 6060

Respectfully Submitted

/s/ Michael Wiseman

Michael Wiseman
Victor Abreu
Elizabeth Larin
James J. McHugh, Jr.
Assistant Federal Defenders
Capital Habeas Corpus Unit
Federal Community Defender
Eastern District of Pennsylvania
Suite 545 – West, The Curtis Center
Philadelphia, PA 19106
215-928-0520

Counsel for Petitioner,
Alfred Bourgeois

Dated:        June 16, 2011

## Certificate of Service

I, Michael Wiseman, hereby certify that on this 16th day of June, 2011 I served the foregoing on the following by filing the same with the Court's ECF filing system and by email:

Tony Roberts, Esq.
Patti Booth, Esq.
Mark Dowd, Esq.
Elsa Salinas-Patterson, Esq.

/s/ Michael Wiseman

Michael Wiseman

93

USCA5 6061

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-216 |
| | § | (C.A. No. C-07-223) |
| ALFRED NMI BOURGEOIS | § | |

**ORDER**

On May 19, 2011, the Court entered a comprehensive Memorandum and Order denying Bourgeois' motion pursuant to 28 U.S.C. § 2255.  (DE 660).  Bourgeois has now filed a Motion Pursuant to F.R.Civ.P. 59(e) to Alter or Amend Judgement.  (DE 665).  "'Motions for a new trial or to alter or amend a judgment must clearly establish either a manifest error of law or fact or must present newly discovered evidence.  These motions cannot be used to raise arguments which could, and should, have been made before the judgment issued.  Moreover, they cannot be used to argue a case under a new legal theory.'"  *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990) (quoting *Federal Deposit Ins. Corp. v. Meyer*, 781 F.2d 1260, 1268 (7th Cir. 1986)).  The Court has reviewed Bourgeois' post-judgment pleading and the record and, for all the reasons stated in the Memorandum and Order, **DENIES** his Rule 59(e) motion.

SIGNED and ORDERED this 17th day of June, 2011.

_____
Janis Graham Jack
Senior United States District Judge

1 / 1

USCA5 6062

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____
                                              :
UNITED STATES OF AMERICA,       :         No. Cr-C-02-216
                                              :         No. Cv-07-223
            Respondent/Appellee,  :
                                              :         Honorable Janis Graham Jack,
            -against-                        :         U.S.D.J.
                                              :
ALFRED BOURGEOIS,               :
                                              :
            Petitioner/Appellant.  :
_____  :

**NOTICE OF APPEAL**

**PLEASE TAKE NOTICE**, that Petitioner/Appellant, through undersigned

counsel, hereby appeals to the United States Court of Appeals for the Fifth Circuit

from the district court's May 19, 2011 *Memorandum and Order* (docket # 660) and

entry of *Final Judgment* against Petitioner (docket # 661), denying and dismissing

*Petitioner's Motion for Relief Pursuant to 28 U.S.C. Section 2255 or in the*

*Alternative Pursuant to 28 U.S.C. 2241* (docket # 396); and from the district court's

June 17, 2011 order (docket # 666) denying Petitioner's *Motion to Alter or Amend the*

*Judgment Pursuant to F.R.Civ.P. 59(e)* (docket # 665), and from each and every

subsidiary adverse ruling and finding forming the bases for said orders.

1

USCA5 6063

Respectfully Submitted,

/s/ Michael Wiseman

Michael Wiseman
Victor J. Abreu
Assistant Federal Defenders[1]
Federal Community Defender
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
Michael_Wiseman@fd.org
Victor_Abreu@fd.org

Dated:        August 15, 2011

## CERTIFICATE OF SERVICE

I, Michael Wiseman, hereby certifies that on this 15th day of August, 2011 he served the foregoing upon the following individuals by filing the same with this Court's ECF filing system:

Tony Roberts, Esq.
Patti Hubert Booth, Esq.
Elsa Salinas-Patterson, Esq.
Mark Dowd, Esq.
Assistant United States Attorneys
Counsel for the Respondent/Appellee

/s/ Michael Wiseman

Michael Wiseman

---

[1]Counsel were appointed by the district court on October 16, 2006 (docket number 380), and lead-counsel Wiseman was admitted *pro hac vice* (docket number 382) on October 24, 2006.

2

USCA5 6064

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

UNITED STATES OF AMERICA      §

§

v.      §    CASE NUMBER:  2:02CR216

§    District Judge:  JANIS GRAHAM JACK

§    Court Reporter(s):  ERO

ALFRED BOURGEOIS      §

**NOTICE OF THE FILING OF AN APPEAL**

In connection with this appeal, instrument # 667, filed by ALFRED BOURGEOIS, a copy of the notice of appeal, the order being appealed and the docket sheet are attached.

In regard to this appeal:

- This defendant is represented by either a CJA attorney or the Federal Public Defender.

- DKT-13 transcript ordering instructions are attached.

- The Clerk of Court will submit to the Fifth Circuit Court of Appeals a Certificate of Non-Compliance if the appellant fails to return the transcript order form.

David Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | CASE NUMBER:  2:02CR216 |
| v. | § | District Judge:  JANIS GRAHAM JACK |
| | § | Court Reporter(s):  ERO |
| | § | |
| ALFRED BOURGEOIS | § | |

**TRANSCRIPT ORDER INSTRUCTIONS TO APPELLANT**

Pursuant to FRAP 10(a)(1), a transcript order form must be filed within 14 days of the filing of the notice of appeal.

Please review the instructions on the attached DKT 13 Transcript Order Form.  Prepare a separate DKT 13 for each reporter from whom transcripts are ordered.  All transcripts from tape recorded proceedings may be ordered on one form.  Specify exact dates of proceedings to be transcribed on the appropriate reporter or tape order.

If transcript is unnecessary or already on file in the Clerk's office, prepare a DKT 13 and mark the appropriate box to indicate this information.

The appellant must contact the court reporter within 14 days of the filing of the notice of appeal to arrange for the preparation of transcripts.

Court Reporting Services
P.O. Box 61010
Houston, TX  77208

Electronic Court Reporting 713-250-5404
Court Reporters 713-250-5499

US District Court
600 E Harrison Street
Brownsville, TX 78520-7114
956-548-2500

US District Court
1300 Victoria Street, Suite 1131
Laredo, TX 78040
956-790-1733

US District Court
1133 North Shoreline Blvd, Room 208
Corpus Christi, TX 78401
361-888-3142

US District Court
1701 W. Business Hwy 83, Suite 1011
McAllen, TX 78501
956-618-8065

US District Court
PO Box 2300
Galveston, TX 77553
409-766-3530

US District Court
PO Box 1638
Victoria, TX 78476
361-788-5000

**USCA5 6066**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____
:
UNITED STATES OF AMERICA,         :         No. Cr-C-02-216
                                   :         No. Cv-07-223
            Respondent/Appellee,   :
                                   :         Honorable Janis Graham Jack,
            -against-              :              U.S.D.J.
                                   :
ALFRED BOURGEOIS,                  :
                                   :
            Petitioner/Appellant.  :
_____  :

**NOTICE OF APPEAL**

**PLEASE TAKE NOTICE**, that Petitioner/Appellant, through undersigned

counsel, hereby appeals to the United States Court of Appeals for the Fifth Circuit

from the district court's May 19, 2011 *Memorandum and Order* (docket # 660) and

entry of *Final Judgment* against Petitioner (docket # 661), denying and dismissing

*Petitioner's Motion for Relief Pursuant to 28 U.S.C. Section 2255 or in the*

*Alternative Pursuant to 28 U.S.C. 2241* (docket # 396); and from the district court's

June 17, 2011 order (docket # 666) denying Petitioner's *Motion to Alter or Amend the*

*Judgment Pursuant to F.R.Civ.P. 59(e)* (docket # 665), and from each and every

subsidiary adverse ruling and finding forming the bases for said orders.

1

USCA5 6067

Respectfully Submitted,

/s/ Michael Wiseman

Michael Wiseman
Victor J. Abreu
Assistant Federal Defenders[1]
Federal Community Defender
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
Michael_Wiseman@fd.org
Victor_Abreu@fd.org

Dated:        August 15, 2011

## CERTIFICATE OF SERVICE

I, Michael Wiseman, hereby certifies that on this 15th day of August, 2011 he served the foregoing upon the following individuals by filing the same with this Court's ECF filing system:

Tony Roberts, Esq.
Patti Hubert Booth, Esq.
Elsa Salinas-Patterson, Esq.
Mark Dowd, Esq.
Assistant United States Attorneys
Counsel for the Respondent/Appellee

/s/ Michael Wiseman

Michael Wiseman

---

[1]Counsel were appointed by the district court on October 16, 2006 (docket number 380), and lead-counsel Wiseman was admitted *pro hac vice* (docket number 382) on October 24, 2006.

2

USCA5 6068

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA      §

§

VS.      §    CRIMINAL ACTION NO. C-02-216

§       (C.A. No. C-07-223)

ALFRED NMI BOURGEOIS      §

## FINAL JUDGMENT

In accordance with the Court's Memorandum and Order, the Court hereby enters

Final Judgment dismissing the motion of Alfred Bourgeois to vacate, set aside or correct

sentence under 28 U.S.C. § 2255 or in the alternative pursuant to 28 U.S.C. § 2241. The Court

will not certify any issue for consideration by the appellate court.

SIGNED and ORDERED this 19th day of May, 2011.

_____
Janis Graham Jack
United States District Judge

1 / 1

USCA5 6069

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-216 |
| | § | (C.A. No. C-07-223) |
| ALFRED NMI BOURGEOIS | § | |

**ORDER**

On May 19, 2011, the Court entered a comprehensive Memorandum and Order denying Bourgeois' motion pursuant to 28 U.S.C. § 2255. (DE 660). Bourgeois has now filed a Motion Pursuant to F.R.Civ.P. 59(e) to Alter or Amend Judgement. (DE 665). "'Motions for a new trial or to alter or amend a judgment must clearly establish either a manifest error of law or fact or must present newly discovered evidence. These motions cannot be used to raise arguments which could, and should, have been made before the judgment issued. Moreover, they cannot be used to argue a case under a new legal theory.'" *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990) (quoting *Federal Deposit Ins. Corp. v. Meyer*, 781 F.2d 1260, 1268 (7th Cir. 1986)). The Court has reviewed Bourgeois' post-judgment pleading and the record and, for all the reasons stated in the Memorandum and Order, **DENIES** his Rule 59(e) motion.

SIGNED and ORDERED this 17th day of June, 2011.

_____
Janis Graham Jack
Senior United States District Judge

1 / 1

USCA5 6070

APPEAL, CLOSED

# U.S. District Court
# SOUTHERN DISTRICT OF TEXAS (Corpus Christi)
# CRIMINAL DOCKET FOR CASE #: 2:02-cr-00216-1
# Internal Use Only

Case title: USA v. Bourgeois                    Date Filed: 07/25/2002
Magistrate judge case number: 2:02-mj-00264     Date Terminated: 03/24/2004

Assigned to: Judge Janis Graham Jack

Appeals court case numbers: 04-40410,
KendraBledsoe, VelmaGano(103pgs),
VelmaGano(115pgs), VelmaGano
(118pgs), VelmaGano(121pgs),
VelmaGano(122pgs), VelmaGano
(137pgs), VelmaGano(139pgs),
VelmaGano(149pgs), VelmaGano
(15pgs), VelmaGano(167pgs),
VelmaGano(178pgs), VelmaGano
(255pgs), VelmaGano(273pgs),
VelmaGano(294pgs), VelmaGano
(297pgs), VelmaGano(303pgs),
VelmaGano(342pgs), VelmaGano
(350pgs), VelmaGano(360pgs),
VelmaGano(367pgs), VelmaGano
(46pgs), VelmaGano(69pgs),
VelmaGano(7pgs), VelmaGano(84pgs),
VelmaGano(8pgs), VelmaGano(92pgs),
VelmaGano(9pgs)

### Defendant (1)

**Alfred NMI Bourgeois**                 represented by   **Adrienne Urrutia Wisenberg**
*TERMINATED: 03/24/2004*                                  Barnes & Thornburg LLP
                                                          1717 Pennsylvania Ave
                                                          Ste 500
                                                          Washington, DC 20006
                                                          202-371-6377
                                                          Email: awisenberg@btlaw.com
                                                          *TERMINATED: 07/03/2006*
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Designation: CJA Appointment*

                                                          **Joel Douglas Tinker**
                                                          Attorney at Law
                                                          P O Box 276

Corpus Christi, TX 78403
361-882-4378
Fax: 361-882-3635
Email: douglastinker@hotmail.com
*TERMINATED: 03/24/2004*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**John S Gilmore , Jr**
Attorney at Law
622 S Tancahua
Corpus Christi, TX 78401
361-882-4378
Fax: 361-882-3635
Email: gilmorelaw@msn.com
*TERMINATED: 03/24/2004*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Jose I Gonzalez-Falla**
Office of Federal Public Defender
606 N Carancahua
Ste 401
Corpus Christi, TX 78476-0401
361-888-3532
Fax: 361-888-3534
Email: Jose_Gonzalez-Falla@FD.org
*TERMINATED: 10/02/2002*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

**Keith Hampton**
Attorney at Law
1103 Nueces
Austin, TX 78701
512-476-8484
*TERMINATED: 10/16/2006*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Michael Clark Gross**
Attorney at Law
106 S St Mary's Street
Ste 260
San Antonio, TX 78205

**USCA5 6072**

210-354-1919
Fax: 210-354-1920
Email: lawofcmg@flash.net
*TERMINATED: 10/16/2006*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Michael Wiseman**
Office of the Federal Public Defender
601 Walnut Street
The Curtis Center, Suite 545
Philadelphia, PA 19106
215-928-0520
Fax: 215-928-0826
Email: Michael_Wiseman@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

**Victor Julio Abreu**
Federal Community Defender
Capital Habeas Corpus Unit
601 Walnut Street
Ste 545 West
Philadelphia, PA 19106
215-928-0520
Fax: 215-928-0826
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

**Pending Counts**                                    **Disposition**

Did knowingly and willfully and with
malice aforethought kill J.G. while
within the Special Maritime and
Territorial Jurisdiction of the United
States: 18 USC 7 and 1111. Date of
Offense: June 27, 2002. PENALTY:
Any term of imprisonment up to life, a
fine of up to $250,000, not more than 5
years SRT, and a $100 special
assessment.
(1)

Did knowingly and willfully and with
malice aforethought, kill J.G. while
within the Special Maritime and

**USCA5 6073**

| | |
|---|---|
| Territorial Jurisdiction of the United States- 18 USC 7 and 1111. Date of Offense: 6/27/02. PENALTY: By Death or imprisonment of life, a fine of up to $250,000, not more than 5 years SRT, and a $100 special assessment. (1s) | |
| Did knowingly and intentionally and with premeditation and malice aforethought, kill a girl child, J.G., through physical assault while within the Special Maritime and Territorial Jurisdiction of the United States; 18 USC 7 and 1111 and 18 USC 3591(a)(2)(A)(B)(C) and (D); and 18 USC 3592(c)(6)(9) and (11). Date of Offense: 6/27/02. PENALTY: Sentence of death. (1ss) | Sentence of Death. |
| Did knowingly and intentionally physically assault and cause serious bodily injury to J.G., a minor child, while on land acquired for use by the United States of America; Texas Penal Code 22.04. Date of Offense: June 27, 2002. PENALTY: Imprisonment for five to ninety-nine years, a fine of up to $10,000, not more than 5 years SRT and a $100 special assessment. (2) | |
| Did knowingly and intentionally physically assault and cause serious bodily injury to J.G., a minor child, while on land acquired for use by the United States of America- Texas Penal Code 22.04. Date of Offense: 6/27/02. PENALTY: Imprisonment for five to niney-nine years, a fine of up to $10,000, not more than 5 years SRT, and a $100 special assessment. (2s) | |

### Highest Offense Level (Opening)

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

USCA5 6074

## Highest Offense Level (Terminated)

None

| Complaints | Disposition |
| --- | --- |
| None | |

## Interested Party

**Tim Allen**

## Plaintiff

**USA**                                                    represented by    **Financial Litigation**
U S Attorney's Office
Southern District of Texas
P O Box 61129
Houston, TX 77208
713-567-9000
Fax: 713-718-3391 fax
Email: flu.usatxs-@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**US Marshal - CC**
1133 North Shoreline, Room 109
Corpus Christi, TX 78401
361-888-3154
Fax: 361-888-3174
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**US Pretrial Svcs-CC**
1133 N Shoreline Blvd
Rm 114
Corpus Christi, TX 78401
361-888-3411
Fax: 361-888-3419 fax
Email:
txsptdb_corduty@txspt.uscourts.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**US Probation - CC**

**USCA5 6075**

1133 North Shoreline Blvd, Room 124
Corpus Christi, TX 78401
361-888-3518 fax
Fax: 361-888-3518 fax
Email:
TXSPdb_CorDuty@txsp.uscourts.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Elsa Salinas**
Office of the U S Attorney
800 N Shoreline Blvd
Ste 500
Corpus Christi, TX 78401
361-888-3111
Fax: 361-888-3200
Email: elsa.salinas@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James L Turner**
US Attorneys Office
919 Milam
Suite 1500
Houston, TX 77002
713-567-9361
Fax: 713-718-3302
Email: jim.turner@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Patricia Hubert Booth**
United States Attorneys Office
800 N Shoreline
Ste 500
Corpus Christi, TX 78401
361-888-3111
Fax: 361-888-3200
Email: Patti.Booth@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paula C Offenhauser**
US Attorneys Office
PO Box 61129
Houston, TX 77208-1129
713-567-9364
Fax: 713-718-3302

**USCA5 6076**

Email: paula.offenhauser@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tony R Roberts**
Office of the US Attorney
PO Box 61129
Houston, TX 77208
713-567-9810
Email: tony.roberts@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark Michael Dowd**
Office of the US Attorney
P. O. BOX 61129
Houston, TX 77208
713-567-9368
Fax: 713-718-3302
Email: mark.dowd@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/28/2002 | | ARREST of Alfred NMI Bourgeois [ 2:02-m -264 ] (kbledsoe) (Entered: 07/01/2002) |
| 06/28/2002 | | COMPLAINT as to Alfred NMI Bourgeois , filed. [ 2:02-m -264 ] (kbledsoe) (Entered: 07/01/2002) |
| 06/28/2002 | | Initial appearance as to Alfred NMI Bourgeois held before Magistrate Judge Jane Cooper-Hill ;Preliminary Examination set for 2:00 7/2/02 ;Detention Hearing set for 2:00 7/2/02 Ct Reporter: Linda R. Smith digital 3:11:18-3:21:14 App: Mark Patterson, Patti Hubert Booth f/govt; Dft appeared without counsel; Dft requests appointed counsel (approved JC-H); Order appointing FPD; Govt motion for detention without bond; (Defendant informed of rights.); Dft remanded. , filed. [ 2:02-m -264 ] (kbledsoe) (Entered: 07/01/2002) |
| 06/28/2002 | | CJA 23 FINANCIAL AFFIDAVIT by Alfred NMI Bourgeois , filed. (approved JC-H) [ 2:02-m -264 ] (kbledsoe) (Entered: 07/01/2002) |
| 06/28/2002 | | ORDER Appointing Federal Public Defender for Alfred NMI Bourgeois . Attorney Jose I Gonzalez-Falla added. ( Appointed by Magistrate Judge Jane Cooper-Hill ), entered. [ 2:02-m -264 ] (kbledsoe) (Entered: 07/01/2002) |
| 06/28/2002 | | ORDER OF TEMPORARY DETENTION AND HEARING as to Alfred NMI Bourgeois Detention Hearing set for 2:00 7/2/02 ( Signed by Magistrate Judge Jane Cooper-Hill ), entered. [ 2:02-m -264 ] (kbledsoe) (Entered: 07/01/2002) |

USCA5 6077

| | | |
|---|---|---|
| 07/02/2002 | | Detention hearing as to Alfred NMI Bourgeois held before Magistrate Judge Jane Cooper-Hill Ct Reporter: Linda Smith digital 2:21:42-3:39:21 App: Patti Hubert Booth f/govt; Jose Gonzalez-Falla f/dft; Govt wit #1. Govt rests. Dft rests. Court heard arguments. Court grants Govt motion for detention. Court to enter Order of Detention. Dft remanded. , filed. [ 2:02-m -264 ] (kbledsoe) (Entered: 07/03/2002) |
| 07/02/2002 | | Preliminary Examination as to Alfred NMI Bourgeois held before Magistrate Judge Jane Cooper-Hill Ct Reporter: Linda Smith digital 2:21:42-3:39:21 App: Patti Hubert Booth f/govt; Jose Gonzalez-Falla f/dft; Dft appeared with counsel; Court finds probable cause. Dft remanded. , filed. [ 2:02-m -264 ] (kbledsoe) (Entered: 07/03/2002) |
| 07/02/2002 | | ORDER OF DETENTION PENDING TRIAL as to Alfred NMI Bourgeois ( Signed by Magistrate Judge Jane Cooper-Hill ), entered. [ 2:02-m -264 ] (kbledsoe) (Entered: 07/11/2002) |
| 07/22/2002 | | MOTION by Alfred NMI Bourgeois for protective order , filed. [ 2:02-m -264 ] (kbledsoe) (Entered: 07/24/2002) |
| 07/23/2002 | | ORDER granting [0-1] motion for protective order as to Alfred NMI Bourgeois (1) ( Signed by Magistrate Judge Jane Cooper-Hill ), entered. Parties ntfd. [ 2:02-m -264 ] (kbledsoe) (Entered: 07/24/2002) |
| 07/25/2002 | 1 | INDICTMENT as to Alfred NMI Bourgeois (1) count(s) 1, 2 ,filed. (kbledsoe) (Entered: 07/25/2002) |
| 07/26/2002 | 2 | MOTION by Alfred NMI Bourgeois to continue arraignment , filed. (kbledsoe) (Entered: 07/26/2002) |
| 07/26/2002 | 3 | NOTICE of Setting : set Arraignment for 2:00 7/29/02 for Alfred NMI Bourgeois before Magistrate Judge Jane Cooper-Hill , filed. Parties ntfd. (lsmith) (Entered: 07/29/2002) |
| 07/29/2002 | 4 | NOTICE of Setting : reset Arraignment for 2:00 8/5/02 for Alfred NMI Bourgeois before Magistrate Judge Jane Cooper-Hill , filed. Parties ntfd. (lsmith) (Entered: 07/29/2002) |
| 07/31/2002 | 5 | ORDER granting [2-1] motion to continue arraignment as to Alfred NMI Bourgeois (1) ( Signed by Magistrate Judge Jane Cooper-Hill ), entered. Parties ntfd. (kbledsoe) (Entered: 08/01/2002) |
| 08/01/2002 | 6 | Excludable Delay Worksheet XG start 7/26/02 as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 08/01/2002) |
| 08/05/2002 | 7 | Arraignment held before Magistrate Judge Jane Cooper-Hill Ct Reporter: Linda Smith digital 2:08:09-2:14:54 App: Jon Muschenheim f/govt; Jose Gonzalez-Falla f/dft; Alfred NMI Bourgeois (1) count(s) 1, 2 , filed., Plea of Not Guilty: count(s) 1, 2 Dft appeared with counsel. Dft waived the reading of the Indictment. Dft remanded. (kbledsoe) (Entered: 08/06/2002) |
| 08/05/2002 | 8 | SCHEDULING ORDER setting Pretrial Conference for 8:30 9/30/02 |

| | | |
|---|---|---|
| | | for Alfred NMI Bourgeois ; Jury Trial for 8:00 10/2/02 ; Jury Selection for 8:00 10/2/02 ; Plea Agreement Due 9/30/02 before Judge Janis Graham Jack ( Signed by Magistrate Judge Jane Cooper-Hill ), entered. Parties ntfd. (kbledsoe) (Entered: 08/06/2002) |
| 08/20/2002 | 9 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Preliminary Examination and Detention Hearing for dates of July 2, 2002 before Judge Jane Cooper-Hill , filed. ( Court Rptr: Linda Smith) (kbledsoe) (Entered: 08/20/2002) |
| 09/05/2002 | 10 | MOTION by Alfred NMI Bourgeois exparte , and SEALED , filed. (kbledsoe) (Entered: 09/06/2002) |
| 09/13/2002 | 11 | SEALED ORDER as to Alfred NMI Bourgeois granting [10-1] motion exparte , granting [10-2] motion SEALED ( Signed by Magistrate Judge B. J. Ellington ), entered. Parties ntfd. (kbledsoe) (Entered: 09/13/2002) |
| 09/16/2002 | 12 | MOTION by Alfred NMI Bourgeois exparte , and SEALED , filed. (kbledsoe) (Entered: 09/17/2002) |
| 09/18/2002 | 13 | ORDER granting [12-1] motion exparte as to Alfred NMI Bourgeois (1), granting [12-2] motion SEALED ( Signed by Magistrate Judge Jane Cooper-Hill ), entered. Parties ntfd. (kbledsoe) (Entered: 09/18/2002) |
| 09/26/2002 | 14 | MOTION to quash subpoena as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 09/26/2002) |
| 09/26/2002 | 15 | JOINT MOTION by Alfred NMI Bourgeois, and USA to continue final pretrial conference and trial , filed. (kbledsoe) (Entered: 09/26/2002) |
| 09/27/2002 | 16 | ORDER striking [14-1] motion to quash subpoena as to Alfred NMI Bourgeois (1) ( Signed by Magistrate Judge Jane Cooper-Hill ), entered. Parties ntfd. (kbledsoe) (Entered: 09/27/2002) |
| 09/27/2002 | 17 | MOTION by Alfred NMI Bourgeois exparte , and to seal , filed. (kbledsoe) (Entered: 09/27/2002) |
| 09/30/2002 | 18 | MOTION by Alfred NMI Bourgeois exparte , and to seal , filed. (kbledsoe) (Entered: 10/01/2002) |
| 09/30/2002 | 19 | Pre-trial conference as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:39-8:45 App: Patti Booth f/govt; Jose Gonzalez-Falla f/dft. Dft appeared with counsel. Parties are not ready for trial. Joint mtn for continuance. Court grnats mtn for continuance until Friday March 14, 2003 8:00 am. FPTC at 3/13/02 8:30 am. Dft mtn exparte under seal discussed. Mtn to withdraw by Jose Gonzalez-Falla filed. Court will appoint atty in a few days. , filed. (kbledsoe) Modified on 06/23/2003 (Entered: 10/01/2002) |
| 09/30/2002 | 20 | ORDER granting [17-1] motion exparte as to Alfred NMI Bourgeois |

| | | |
|---|---|---|
| | | (1), granting [17-2] motion to seal ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 10/01/2002) |
| 10/02/2002 | 21 | ORDER granting [15-1] joint motion to continue final pretrial conference and trial as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 10/04/2002) |
| 10/02/2002 | 22 | SEALED ORDER as to Alfred NMI Bourgeois granting [18-1] motion exparte , granting [18-2] motion to seal ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 10/07/2002) |
| 12/18/2002 | 23 | NOTICE of Setting : set hearing on Deft's letter for 8:00 12/20/02 for Alfred NMI Bourgeois before Judge Janis Graham Jack , filed. Parties ntfd. (kbledsoe) (Entered: 12/18/2002) |
| 12/20/2002 | 24 | Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:26-8:41 App: Patti Booth f/govt; John Gilmore f/dft. Dft says he is satisfied with Mr. Gilmore, who remains as atty. Court advises atty is to meet with client here. USM advised they need a day in advance to have dft here. Court inquires about DNA testing. AUSA Booth requests they need more time due to the length of time DNA test results take. AUSA Booth announces to the Court that one of the witnesses in this case was murdered last night and has received information as to the dft threatening other witnesses. Court limits dfts ability to communicate with others; dft must do so through his atty. Status conference is set for 2/12/03 1:00 pm. Court adjourned. (kbledsoe) (Entered: 12/20/2002) |
| 12/20/2002 | 25 | Excludable Delay Worksheet XT start 9/30/02 as to Alfred NMI Bourgeois , filed. (ysanchez) Modified on 06/23/2003 (Entered: 06/23/2003) |
| 01/08/2003 | 26 | MOTION by USA as to Alfred NMI Bourgeois for clarification of court order and request for hearing , filed. (lrivera) (Entered: 01/09/2003) |
| 01/08/2003 | 27 | Motion clarifying Court's Order Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano Tape Number: Digital: 3:41-4:05 App: Patti Booth f/govt; John Gilmore f/deft. Case called. Mr. Bourgeois and Honorable Judge Janis Graham Jack by telephone conference. Ms. Booth advises Court about the reason for the emergency motion. Mr. Gilmore informs he received letters (3) during his visit to Mr. Bourgeois on January 2, 2003. He was informed by USM office to pick up letters. Court inquires about leters being appropriate enough to be sent. Mr. Gilmore explains one letter to Atty in Louisiana is not appropriate. Patti Booth informs there are two additional letters on hold by USM unopened. The intercepted letters were sent to FBI by their recipients. Playback of oral order on Dec 20, 2002. Court informs the intention of order was not to put Mr. |

USCA5 6080

| | | |
|---|---|---|
| | | Gilmore in position of screening letters. All communication, both by mail or telephone has to be made through Mr. Gilmore. Court instructs Ms. Booth to provide unopened letters to Mr. Gilmoe. Court will enter order clafifying original oral order. Order will be signed by fax but will be considered as original. Ms. Booth explains charge in superseding indictment could be as to subsequent crimes. Court inquires to Mr. Bourgeois about hearing the proceedings clearly, he replied affirmative. No further matters on either side. Court adjourns. (lrivera) (Entered: 01/09/2003) |
| 01/08/2003 | 28 | ORDER CLARIFYING PRIOR ORDER ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (lrivera) (Entered: 01/09/2003) |
| 02/06/2003 | 29 | Docket Entry as to Alfred NMI Bourgeois , filed. Spoke to Patti Booth today and explained that the scheduled status conference in the above stated matter has been moved up from 1:00 pm on 2/12/03 to 12:30 same day. Spoke to John Gilmore's office today, stated to Tina, Mr. Gilmore's secretary of said change. In addition, I told them both that a written notice would follow by fax with mentioned setting. (kbledsoe) (Entered: 02/07/2003) |
| 02/06/2003 | 30 | NOTICE of Setting : reset status conference for 12:30 2/12/03 for Alfred NMI Bourgeois before Judge Janis Graham Jack , filed. Parties ntfd. (kbledsoe) (Entered: 02/07/2003) |
| 02/12/2003 | 31 | Status Conference Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Lori Cayce digital 12:53-1:01 App: Patti Booth f/govt; John Gilmore f/dft. Case called; appearance of counsel. Mr. Gilmore requests funds for Dr. White's review. Court instructs Mr. Gilmore to do request in writing. Court advises attorney and dft of previous order on contacting anyone. Mr. Gilmore request continuance until the end of March. Court sets FPTC 3/20/03 8:30 am; Jury Selection & Trial 3/21/03 8:00 am. Court inquires as to the child in courtroom. Ms. Patti Booth states she came to see courtroom. Court excuses attorneys. Court adjourns. (kbledsoe) (Entered: 02/13/2003) |
| 02/19/2003 | 32 | MOTION by Alfred NMI Bourgeois for Government funds for an Expert Witness, Pathology Field, and for Investigator , filed. (kbledsoe) (Entered: 02/19/2003) |
| 02/19/2003 | 32 | MEMORANDUM by Alfred NMI Bourgeois to [32-1] motion for Government funds for an Expert Witness, Pathology Field, and for Investigator , filed. (kbledsoe) (Entered: 02/19/2003) |
| 02/23/2003 | 33 | ORDER granting [32-1] motion for Government funds for an Expert Witness, Pathology Field, and for Investigator as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 02/24/2003) |
| 03/07/2003 | 34 | AGREED MOTION by Alfred NMI Bourgeois for continuance , filed. (kbledsoe) (Entered: 03/07/2003) |
| 03/11/2003 | 35 | ORDER granting [34-1] motion for continuance as to Alfred NMI |

| | | |
|---|---|---|
| | | Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 03/11/2003) |
| 03/19/2003 | 36 | Excludable Delay Worksheet XT start 3/11/03 as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 03/19/2003) |
| 03/20/2003 | 37 | Pre-trial conference as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:27-9:23 App: Patti Booth f/govt; John Gilmore f/dft. Mr. Gilmore states all issues worked out and requests funds for investigator. Ms. Booth has given exhibits to Mr. Gilmore. Ms. Booth to provide the court with a charge agreed to by both parties as to count 2 injury to a child. Ms. Booth states many exhibits will be graphic. Ms. Booth will make animation exhibit available to Mr. Gilmore. Court adjourns. , filed. (kbledsoe) (Entered: 03/20/2003) |
| 03/26/2003 | 38 | APPLICATION by USA as to Alfred NMI Bourgeois for writ of habeas corpus ad testificandum , filed. (kbledsoe) (Entered: 03/26/2003) |
| 03/26/2003 | 39 | WRIT of Habeas Corpus ad Testificandum issued for Orlando Campos on 4/14/03 in case as to Alfred NMI Bourgeois . (kbledsoe) Modified on 03/27/2003 (Entered: 03/27/2003) |
| 04/04/2003 | 40 | UNOPPOSED MOTION by Alfred NMI Bourgeois for continuance , filed. (kbledsoe) Modified on 04/07/2003 (Entered: 04/04/2003) |
| 04/08/2003 | 41 | Motion for Continuance Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 1:19-1:25 App: Patti Booth f/govt; John Gilmore f/dft. Case called; appearance of counsel. Mr. Gilmore is abandoning mtn for continuance. Attys to work on stipulation of evidence. Trial set 4/14/03. Court adjourns. (kbledsoe) (Entered: 04/09/2003) |
| 04/08/2003 | 42 | MOTION by USA as to Alfred NMI Bourgeois for Reciprocal Discovery , filed. (kbledsoe) (Entered: 04/09/2003) |
| 04/09/2003 | 43 | SUPERSEDING INDICTMENT as to Alfred NMI Bourgeois (1) count(s) 1s, 2s , filed. (kbledsoe) (Entered: 04/09/2003) |
| 04/10/2003 | 44 | Arraignment held before Magistrate Judge Jane Cooper-Hill Ct Reporter: Linda Smith digital 10:57:59-11:01:36 App: Patti Hubert Booth f/govt; John Gilmore f/dft. Alfred NMI Bourgeois (1) count(s) 1s, 2s , filed., Plea of Not Guilty: count(s) 1s, 2s Dft appeared with counsel. Dft advised his true name. Dft waived the reading of the Indictment. Pretrial Order dates to be determined by District Court at status conference to be held instanter. Dft remanded. (kbledsoe) (Entered: 04/11/2003) |
| 04/10/2003 | 45 | Status conference as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 11:06-11:18 App: Patti Booth f/govt; John Gilmore f/dft. Dft has been re-indicted. Both counsel do not waive 30 days for trial. Case is set for FPTC 5/8/03 |

**USCA5 6082**

| | | | |
|---|---|---|---|
| | | | 8:30 a.m. and Jury Selection with Trial to follow 5/20/03 8:00 a.m. Motion deadline is 5/5/03. Court adjourns. , filed. (kbledsoe) (Entered: 04/11/2003) |
| 04/10/2003 | 46 | | SCHEDULING ORDER setting Pretrial Conference for 8:30 5/8/03 for Alfred NMI Bourgeois ; Jury Trial for 8:00 5/20/03 ; Jury Selection for 8:00 5/20/03 ; Plea Agreement Due 5/20/03 before Judge Janis Graham Jack ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 04/11/2003) |
| 04/25/2003 | 49 | | CJA 21 (SEALED), filed. (per Case Manager Sylvia Syler on 6/11/03). (kbledsoe) Modified on 06/11/2003 (Entered: 05/02/2003) |
| 04/30/2003 | 47 | | MOTION by Alfred NMI Bourgeois to continue jury selection/jury trial , filed. (shytnen) (Entered: 04/30/2003) |
| 05/01/2003 | 48 | | NOTICE of Setting : set Motions hearing for 1:30 5/6/03 for Alfred NMI Bourgeois before Judge Janis Graham Jack , filed. Parties ntfd. (kbledsoe) (Entered: 05/02/2003) |
| 05/01/2003 | 58 | | ORDER granting [47-1] motion to continue jury selection/jury trial as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 05/07/2003) |
| 05/05/2003 | 50 | | MOTION by Alfred NMI Bourgeois for Rule 16 discovery , and Request for Disclosure of Under Brady/Agurs/Giglio and Jencks Act , filed. (kbledsoe) (Entered: 05/05/2003) |
| 05/05/2003 | 51 | | MOTION by Alfred NMI Bourgeois to determine admissibility of defendant's statements , filed. (kbledsoe) (Entered: 05/05/2003) |
| 05/05/2003 | 52 | | BRADY MOTION by Alfred NMI Bourgeois for discovery of all favorable evidence , filed. (kbledsoe) (Entered: 05/05/2003) |
| 05/05/2003 | 53 | | MOTION by Alfred NMI Bourgeois for jury questionnaire and memorandum of authorities in support thereof , filed. (kbledsoe) (Entered: 05/05/2003) |
| 05/05/2003 | 54 | | MOTION by Alfred NMI Bourgeois to compel Government to specify evidence to be used at trial , filed. (kbledsoe) (Entered: 05/05/2003) |
| 05/05/2003 | 55 | | MEMORANDUM OF POINTS AND AUTHORITIES by Alfred NMI Bourgeois in support of [50-2] motion to compel Disclosure of exculpatory evidence , filed. (kbledsoe) (Entered: 05/05/2003) |
| 05/05/2003 | 56 | | MOTION by Alfred NMI Bourgeois for Government funds for Expert Witness , filed. (SEALED by Court's instructions) (kbledsoe) Modified on 02/29/2004 (Entered: 05/05/2003) |
| 05/06/2003 | 57 | | ORDER granting [50-1] motion for Rule 16 discovery as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 05/06/2003) |
| 05/06/2003 | 59 | | Status Conference to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 1:26-2:20 App: Patti |

| | | |
|---|---|---|
| | | Booth f/govt; John Gilmore, Douglas Tinker f/dft. Case called; appearance of counsel. Ms. Booth states she has given open file and exhibit list. Ms. Booth states she has a proposed witness list. Discussion of psychologist. Ms. Booth will advise the court 5/25/03 regarding death penalty. Discussion of jury selection in July and September. Court sets jury selection if case is non-death penalty on 7/2/03 8:00 a.m. and if case proceeds as death penalty the case will be set 9/15/03 8:00 a.m. Court advises Mr. Booth she is the attorney in charge in this case. Court sets deadline for disclosures on 6/18/03 and if case proceeds as death penalty the deadline is 8/4/03. Discussion of jury questionaire. Court advises attys they can agree on a questionaire. Court sets status conference for 6/19/03 9:00 a.m. Court grants motion for favorable discovery. Court to hear issue of jury questionaire and motion of admissibility of dft's statement's on 6/19/03 9:00 a.m. Court adjourns. (kbledsoe) (Entered: 05/07/2003) |
| 05/06/2003 | 60 | ORDER ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 05/07/2003) |
| 06/10/2003 | 61 | MOTION by USA as to Alfred NMI Bourgeois SEALED , filed. (kbledsoe) (Entered: 06/10/2003) |
| 06/13/2003 | 62 | SEALED ORDER as to Alfred NMI Bourgeois granting [61-1] motion SEALED ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 06/16/2003) |
| 06/18/2003 | 63 | RESET NOTICE of Setting : reset status conference for 2:30 6/26/03 for Alfred NMI Bourgeois before Judge Janis Jack , filed. Parties ntfd. (kbledsoe) (Entered: 06/19/2003) |
| 06/19/2003 | 64 | SEALED CJA 21 (Signed by Judge Janis Graham Jack ) , entered. (kbledsoe) (Entered: 06/19/2003) |
| 06/23/2003 | 65 | Excludable Delay Worksheet XT start 2/12/03 as to Alfred NMI Bourgeois , filed. (ysanchez) (Entered: 06/23/2003) |
| 06/23/2003 | 66 | Excludable Delay Worksheet XE start 4/8/03 as to Alfred NMI Bourgeois , filed. (ysanchez) (Entered: 06/23/2003) |
| 06/23/2003 | 67 | Excludable Delay Worksheet XT start 4/14/03 as to Alfred NMI Bourgeois , filed. (ysanchez) (Entered: 06/23/2003) |
| 06/23/2003 | 68 | Excludable Delay Worksheet XT start 5/6/03 as to Alfred NMI Bourgeois , filed. (ysanchez) (Entered: 06/23/2003) |
| 06/26/2003 | 69 | Status Conference as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Lisa Hardwick digital 2;28-2:57 App: Patti Hubert Booth, Elsa Salinas-Patterson f/govt; John Gilmore f/dft. Case called; appearance of counsel. Discussion on status of death penalty question. Mtn for reciprocal discovery by Govt, no objection by dft. Court grants motion. Discussion on number of jurors to be brought in. Mr. Gilmore requests keeping the September date of trial whether death penalty or not. Court sets motions hearing for 8:00 a.m. |

**USCA5 6084**

| | | 7/16/03. Court adjourned. (kbledsoe) (Entered: 06/30/2003) |
|---|---|---|
| 06/26/2003 | 70 | NOTICE of Setting : reset motions hearing/status conference for 8:00 7/16/03 for Alfred NMI Bourgeois before Judge Janis Jack , filed. Parties ntfd. (kbledsoe) (Entered: 06/30/2003) |
| 06/30/2003 | 71 | SEALED ORDER as to Alfred NMI Bourgeois granting [56-1] motion as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 07/02/2003) |
| 07/07/2003 | 72 | SEALED CJA 21 as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. (kbledsoe) (Entered: 07/08/2003) |
| 07/11/2003 | 73 | MOTION by Alfred NMI Bourgeois for continuance , filed. (kbledsoe) (Entered: 07/11/2003) |
| 07/16/2003 | 74 | Motions/Status Conference Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 1:55-3:43/4:07-4:49 App: Patti Booth, Elsa Salinas-Patterson, Tony Roberts f/govt; Douglas Tinker, John Gilmore f/dft. Case called; appearances of counsel. The Court distributes notebooks to the attys of record. Ms. Booth announced that the govt will seek the death penalty. The AUSA will file notice ot the court. The Court officially appoints Mr. Tinker as co-counsel to Mr. Gilmore. Discussion of FBI report from AUSA. AUSA offers GX#1. No objections by Mr. Tinker. Exhibit #1 admitted. Discussion of jury and trial issues. Court discusses sequestering the jury. Mr. Tinker request that Mr. Bourgeois be isolated in Nueces County Jail. The Court schedules the following dates. Court adjourned. (kbledsoe) (Entered: 07/21/2003) |
| 07/16/2003 | 75 | Exhibit list by USA as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 07/21/2003) |
| 07/16/2003 | 84 | CJA 30 Appointment and Authority to Pay Court appointed Counsel (Douglas Tinker) , filed. (kbledsoe) (Entered: 08/05/2003) |
| 07/18/2003 | 76 | SCHEDULING ORDER setting Jury Trial for 8:00 2/16/04 for Alfred NMI Bourgeois ; before Judge Janis Graham Jack ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 07/21/2003) |
| 07/21/2003 | 77 | CJA 20 as to Alfred NMI Bourgeois : Appointment of Attorney Douglas Tinker ( Appointed by Judge Janis Graham Jack ) , entered. (kbledsoe) (Entered: 07/21/2003) |
| 07/22/2003 | 78 | SECOND SUPERSEDING INDICTMENT as to Alfred NMI Bourgeois (1) count(s) 1ss , filed. (kbledsoe) Modified on 08/13/2003 (Entered: 07/24/2003) |
| 07/23/2003 | 79 | NOTICE of Intent to seek the Death Penalty by USA as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 07/24/2003) |
| 07/23/2003 | 80 | NOTICE of Setting : Arraignment for 11:00 7/25/03 for Alfred NMI Bourgeois before Magistrate Judge Jane Cooper-Hill , filed. Parties |

| | | |
|---|---|---|
| | | ntfd. (kbledsoe) (Entered: 07/24/2003) |
| 07/25/2003 | 81 | Arraignment held before Magistrate Judge Jane Cooper-Hill Ct Reporter: Kendra Bledsoe digital 11:03:37-11:07:05 App: Patti Hubert Booth f/govt; John Gilmore f/dft. Alfred NMI Bourgeois (1) count(s) 1ss , filed., Plea of Not Guilty: , count(s) 1ss Deft and Deft Atty John Gilmore both have copies of the 2nd Superseding Indictment and the Notice of Intent to Seek the Death Penalty. Deft waived the reading of the Indictment. The existing Scheduling Order entered by District Judge Janis Graham Jack will stand with no objections by any party. Dft remanded. (kbledsoe) (Entered: 07/25/2003) |
| 07/25/2003 | 82 | Excludable Delay Worksheet XT start 7/16/03 as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 07/25/2003) |
| 07/28/2003 | 83 | ORDER appointing co-counsel to represent Defendant Alfred Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 07/29/2003) |
| 07/30/2003 | 85 | CJA 30 Appointment and Authority to pay Court Appointed Counsel (John Gilmore) , filed. (kbledsoe) (Entered: 08/05/2003) |
| 08/04/2003 | 86 | AMENDED ORDER APPOINTING CO-COUNSEL to represent Defendant Afred Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 08/05/2003) |
| 08/05/2003 | 87 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Initial Appearance dates of June 28, 2002 before Judge Jane Cooper-Hill , filed. ( Court Rptr: Linda Smith) (kbledsoe) (Entered: 08/08/2003) |
| 08/05/2003 | 88 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Arraignment for dates of April 10, 2003 before Judge Jane Cooper-Hill , filed. ( Court Rptr: Kendra Bledsoe) (kbledsoe) (Entered: 08/08/2003) |
| 08/05/2003 | 89 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Arraignment Hearing for dates of August 5, 2002 before Judge Jane Cooper-Hill , filed. ( Court Rptr: Linda Smith) (kbledsoe) (Entered: 08/08/2003) |
| 08/11/2003 | 90 | NOTICE of Setting : set status conference for 8:00 10/24/03 for Alfred NMI Bourgeois before Judge Janis Graham Jack , filed. Parties ntfd. (kbledsoe) (Entered: 08/11/2003) |
| 08/12/2003 | 91 | MOTION by Alfred NMI Bourgeois EXPARTE , and SEALED , filed. (kbledsoe) (Entered: 08/12/2003) |
| 08/12/2003 | 92 | MOTION by Alfred NMI Bourgeois Re: Teeth Impression , filed. (kbledsoe) (Entered: 08/12/2003) |
| 08/13/2003 | 93 | NOTICE of Setting : Motion hearing set for 2:00 8/14/03 as to: Alfred Bourgeois, re: (91-1) before Judge Janis Graham Jack , filed. Parties ntfd. (shytnen) (Entered: 08/13/2003) |
| | | |

USCA5 6086

| 08/14/2003 | 94 | SEALED ORDER as to Alfred NMI Bourgeois granting [91-1] motion EXPARTE as to Alfred NMI Bourgeois (1), granting [91-2] motion SEALED as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (shytnen) (Entered: 08/14/2003) |
|---|---|---|
| 08/14/2003 | 95 | SEALED minute sheet as to Alfred NMI Bourgeois , filed. (shytnen) (Entered: 08/15/2003) |
| 08/14/2003 | 96 | SEALED EXHIBIT LIST as to Alfred NMI Bourgeois , filed. (shytnen) Modified on 02/29/2004 (Entered: 08/15/2003) |
| 08/14/2003 | 97 | Motion Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano Digital 3:25-3:48 App: Patti Booth & Elsa Salinas Patterson f/govt; Doug Tinker f/deft. Telephone conference on Motion Hearing. - (DE #92 ) Case called. Appearances made. Discussion regarding extra set of teeth impressions. There are 2 sets of teeth. Ms. Booth states the second set is not as reliable as the 2nd set. Ms. Booth states that there is only one real set. Ms. Booth believes that the molds are destroyed in the making of the sets. Court suggests that Mr. Tinker can send expert to the teeth for inspection. Court states that Mr Tinker can take the deposition of the expert. The Court will authorize this expense. The expert that is being used is Dr. David Senn, he lives in Durango Co. The other Doctor is Dr. Oliver who had enhanced photographs. Ms. Booth is to provide the names, addresses, and phone numbers of the forensic odentologists. Hearing for tomorrow is canceled. Parties excused. Court adjourned. (shytnen) (Entered: 08/15/2003) |
| 08/14/2003 | 98 | ORDER granting [92-1] motion Re: Teeth Impression as to Alfred NMI Bourgeois (1) Teeth impressions taken from deft, his wife and daughter be made available to deft's experts for examination, however the impressions are to remain in the possession of the United States at all times. United States to supply deft with copies of any and all photographs of any skin impressions made during the investigation of the bite marks in this case. United States to supply deft with copies of the field notes, work sheets or any other item or report made by any expert who has viewed the teeth impressions or attempted to identify the person who made the bite impressions on the deceased. United States to provide deft with phone numbers and addresses of the two forensic odontologiest who have examined the teeth impressions. ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (shytnen) (Entered: 08/15/2003) |
| 08/15/2003 | 99 | ORDER vacating [94-1] sealed order ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (shytnen) (Entered: 08/15/2003) |
| 08/22/2003 | 100 | SEALED DOCUMENT as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 08/26/2003) |
| 08/28/2003 | 101 | CJA 31 as to Alfred NMI Bourgeois : Request for Authorization and Voucher Expert and other Services (Death Penalty Proceedings) |

USCA5 6087

| | | |
|---|---|---|
| | | (Issued to Attorney John Gilmore) , entered. (kbledsoe) (Entered: 08/29/2003) |
| 08/29/2003 | 102 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Hearing for dates of January 8, 2003 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (pgs 1-17) (kbledsoe) Modified on 09/02/2003 (Entered: 09/02/2003) |
| 08/29/2003 | 103 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Motion Hearing/Letter Hearing for dates of December 20, 2002 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (pgs 1-12) (kbledsoe) Modified on 09/02/2003 (Entered: 09/02/2003) |
| 08/29/2003 | 104 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Motion Hearing/Continuance Hearing for dates of April 8, 2003 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (pgs 1-5) (kbledsoe) Modified on 06/23/2004 (Entered: 09/02/2003) |
| 08/29/2003 | 105 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Criminal Docket Hearing for dates of September 30, 2002 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (pgs 1-6) (kbledsoe) (Entered: 09/02/2003) |
| 08/29/2003 | 106 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Final Pretrial Conference Hearing for dates of March 20, 2003 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (pgs 1-39) (kbledsoe) (Entered: 09/02/2003) |
| 09/02/2003 | 107 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Status Conference Hearing for dates of February 12, 2003 before Judge Janis Graham Jack , filed. ( Court Rptr: Lori Cayce) (1-8) (kbledsoe) (Entered: 09/04/2003) |
| 09/02/2003 | 108 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Status Hearing Hearing for dates of April 10, 2003 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (1-9) (kbledsoe) (Entered: 09/04/2003) |
| 09/02/2003 | 109 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Status Hearing Hearing for dates of May 6, 2003 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (1-41) (kbledsoe) (Entered: 09/04/2003) |
| 09/02/2003 | 110 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Status Conference Hearing for dates of June 26, 2003 before Judge Janis Graham Jack , filed. ( Court Rptr: Lisa Hardwick) (1-25) (kbledsoe) (Entered: 09/04/2003) |
| 09/02/2003 | 111 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Motions/Status Conference Hearing for dates of July 16, 2003 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (1-108) (kbledsoe) (Entered: 09/04/2003) |
| 09/26/2003 | 112 | MOTION by Alfred NMI Bourgeois EX PARTE , filed. (kbledsoe) |

USCA5 6088

| | | Modified on 09/29/2003 (Entered: 09/26/2003) |
|---|---|---|
| 09/28/2003 | 113 | ORDER granting [112-1] motion EX PARTE as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 09/29/2003) |
| 10/08/2003 | 114 | MOTION by Alfred NMI Bourgeois EXPARTE , and TO SEAL , filed. (2/25/04-pursuant to DE #194, motion is hereby unsealed). (kbledsoe) Modified on 02/29/2004 (Entered: 10/08/2003) |
| 10/08/2003 | 115 | MOTION by Alfred NMI Bourgeois EXPARTE , and TO SEAL , filed. (2/25/04-pursuant to DE#194, motion is hereby unsealed). (kbledsoe) Modified on 02/29/2004 (Entered: 10/08/2003) |
| 10/08/2003 | 116 | MOTION by Alfred NMI Bourgeois EXPARTE , and TO SEAL , filed. (2/25/04-pursuant to DE #194, motion is hereby unsealed). (kbledsoe) Modified on 02/29/2004 (Entered: 10/08/2003) |
| 10/14/2003 | 117 | NOTICE of Setting : Motion hearing, set for 10:00 10/20/03 as to: Alfred Bourgeois, re: (116-1), (116-2), (115-1), (115-2), (114-1), (114-2) before Judge Janis Graham Jack , filed. Parties ntfd. (kbledsoe) (Entered: 10/16/2003) |
| 10/15/2003 | 118 | DESIGNATION OF GOVERNMENT'S EXPERT WITNESSES by USA as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 10/16/2003) |
| 10/20/2003 | 119 | SEALED Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Lori Cayce Digital: 10:07-10:23. (lrivera) (Entered: 10/21/2003) |
| 10/20/2003 | 121 | SEALED ORDER as to Alfred NMI Bourgeois granting [115-1] motion EXPARTE as to Alfred NMI Bourgeois (1), granting [115-2] motion TO SEAL as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (lrivera) (Entered: 10/21/2003) |
| 10/20/2003 | 122 | SEALED ORDER as to Alfred NMI Bourgeois granting [116-1] motion EXPARTE as to Alfred NMI Bourgeois (1), granting [116-2] motion TO SEAL as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (lrivera) (Entered: 10/21/2003) |
| 10/21/2003 | 120 | SEALED ORDER as to Alfred NMI Bourgeois granting [114-1] motion EXPARTE as to Alfred NMI Bourgeois (1), granting [114-2] motion TO SEAL as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (lrivera) (Entered: 10/21/2003) |
| 10/21/2003 | 123 | SEALED EXPARTE ORDER ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (lrivera) Modified on 10/21/2003 (Entered: 10/21/2003) |
| 10/23/2003 | 124 | MEMORANDUM Regarding Sequestration of the Jury by USA as to |

USCA5 6089

| | | |
|---|---|---|
| | | Alfred NMI Bourgeois to , filed. (kbledsoe) (Entered: 10/23/2003) |
| 10/24/2003 | 125 | ORDER ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 10/24/2003) |
| 10/24/2003 | 126 | ORDER OF CONFINEMENT ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 10/24/2003) |
| 10/24/2003 | 127 | Status Conference Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:54-9:56 Appearances: Patti Booth, Elsa Salinas-Patterson, Tony Roberts f/govt; Doug Tinker f/dft. Case called. Appearances made. Court states that Government filed a motion to oppose the sequestration of the jury. Court states that the Court won't do it. Ms. Booth states that she is more concerned with witness tampering instead of jury tampering. Mr. Tinker discusses expert witnesses and notes. Ms. Booth states that she will provide experts notes to Mr. Tinker. Court instructs Mr. Tinker to have his experts maintain all notes, records and log notes. Ms. Booth states that the teeth molds have not been made available to the Defendant. Court states that the molds are to be made available to the Defendant. Ms. Booth states that she has an initial report from Dr. Senn indicates that he can exclude Robin and Alfredesha as the biter but cannot exclude Mr. Bourgeois as the biter. Mr. Tinker is requesting the reports and worksheets from experts. Court orders Ms. Booth to provide information by noon next Friday. Mr. Tinker is asking if any of the witnesses had had a polygraph test administered. Mr. Tinker is asking for the questions that was asked of Robin Bourgeois. Mr. Tinker would like permission to speak with polygrapher. Court Orders Ms. Booth to think about giving the name of the polygraph administrator to Mr. Tinker. Court believes that there may be different ways for a polygraph to be administered and read, and the Court wants expert testimony that all polygraphs look a like and are administered the same. Court instructs Ms. Booth to give the questions and answers of polygraph. Court orders for the questions and answers be given to Mr. Tinker by noon, next Friday. Mr. Tinker states that it will take 6 months to complete report the mitigation experts investigation. Discussion regarding expert disclosure. Court states that the experts must be ready for trial. Mr. Tinker states that the DNA and teeth experts still are unable to go to work. Discussion regarding DNA. Ms. Booth states that the teeth are at UTSA. Court asks about anonymity of the jurors. Ms. Booth states that the AUSA is going to ask for anonymity of the jurors. Mr. Tinker is asking about not even knowing the jurors names. Mr. Tinker objects. Mr. Tinker wants to know the names ofthe jurors. Court needs to hear on the record the reason why to empanel an anonymous jury . Ms. Booth states that she has not disclosed to the Defense the names of the witnesses. Ms. Booth states that the witnesses are afraid and asks for anonymity be put off as long as possible. Mr. Tinker is asking who the witnesses are afraid of. Ms. Booth states that Mr. Bourgeois claims to have family members that are going to take care of witnesses. Ms. Booth states that there are several inmates that witness. And that Mr. |

USCA5 6090

| | | |
|---|---|---|
| | | Bourgeois went into detail about torturing a witness. Also, he has said this to several people. Ms. Booth has spoken to family members. Court asked if a witness had been murdered. Ms. Booth states that the mother of the baby that was murdered, Katrina Harrison, was murdered. After an interview, Katrina was murdered. The man that murdered her was immediately incarcerated and then he killed himself. Ms. Booth states that Mr. Bourgeois claims to be a member of a prison gang. Mr. Tinker states that he has no evidence. AUSA has no evidence. Ms. Booth states that Mr. Bourgeois has been writing letters. Ms. Booth states that there are telephone calls from the jail, but she does not know the date of the phone calls. Discussion regarding letters. Mr. Bourgeois is inciting family against Robin. AUSA states that there was a burglary of the home while Robin was here. AUSA offers exhibits 1 and 2. For the purpose of these proceedings, Mr. Tinker has no objections. Court admits exhibit 1 and 2 are admitted for the purposes of this hearing. The letters refer to Lloyd. AUSA states that Lloyd is his brother. Discussion regarding writing materials. AUSA states that he is probably getting trustees to get things in and out of jail. Court states that the letters are trying to tell what people are to say. Mr. Bourgeois states that he will not write anymore letters. Mr. Bourgeois states that he has not made phone calls. Ms. Booth states that he has called to Uncle of his wife, Ms. King, and Lloyd. Ms. Booth states that she is going to pick up paperwork regarding phone calls. Court Orders Mr. Bourgeois can only call his attorney. Court has instructed defendant to not call or write anyone other than his attorneys. Court admonished Mr. Bourgeois in regards to his writing. Mr. Tinker states that Ms. Booth has provided the name and phone number of the polygraph operator. Ms. Booth will provide the questions and answers. Court reviews scheduling order. Court does not have a problem with providing names and addresses to the attorneys. Court believes that Mr. Bourgeois should have pen and paper to write things to his lawyers and mitigating experts. Court asks if Mr. Bourgeois is in solitary confinement. Court states that Mr. Bourgeois will have no free time except for 1 hour a day, which is supervised, and he will not have any contact with other inmates. Ms. Reddell will provide copy of the order to the jail. Ms. Booth states that there is blood that can be tested out of the truck. Court adjourned. Parties excused. (kbledsoe) (Entered: 10/29/2003) |
| 10/24/2003 | 128 | Exhibit list by USA as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 10/29/2003) |
| 12/04/2003 | 129 | MOTION by Alfred NMI Bourgeois for Government Funds for Expert Witnesses with Memo of Law , filed. (kbledsoe) (Entered: 12/05/2003) |
| 12/05/2003 | 130 | MOTION by Alfred NMI Bourgeois for Psychiatric Exam , filed. (shytnen) (Entered: 12/08/2003) |
| 12/08/2003 | 131 | RESPONSE by USA as to Alfred NMI Bourgeois in opposition to [129-1] motion for Government Funds for Expert Witnesses , filed. |

USCA5 6091

| | | |
|---|---|---|
| | | (shytnen) (Entered: 12/08/2003) |
| 12/09/2003 | 132 | RESPONSE by USA as to Alfred NMI Bourgeois to [130-1] motion for Psychiatric Exam , filed. (kbledsoe) (Entered: 12/09/2003) |
| 12/09/2003 | 133 | NOTICE of Setting : Motion hearing, set for 10:00 12/10/03 as to: Alfred Bourgeois, re: (130-1), (129-1) before Judge Janis Graham Jack , filed. Parties ntfd. (kbledsoe) (Entered: 12/09/2003) |
| 12/09/2003 | 134 | MOTION by Alfred NMI Bourgeois for continuance , filed. (kbledsoe) (Entered: 12/09/2003) |
| 12/10/2003 | 135 | Motions Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 10:08-11:04 Appearances: Patti Booth/Elsa Salinas-Patterson/Tony Roberts f/govt; Doug Tinker/John Gilmore f/dft. Case called. Appearances made. Discussion regarding competency issues. AUSA has no objections as long as the trial is not delayed. Discussion regarding investigators. Parties agree using Dr. Estrada. Court instructs parties to submit an agreed order this afternoon. AUSA states that Dr. Estrada is a possible witness. Court will not deprive AUSA of their witness. Court denies Defendants motion for continuance. Discussion regarding statements made by Defendant. Discussion regarding witness statements. Court states that AUSA can show witness statements with redacted names. Defense is requesting mental health documentation on the child. AUSA states that there is a psychological report on the child. AUSA will submit the report to the Court under seal. Court orders that the witness statements are to be made available this afternoon; the documents are to be redacted so the persons and/or any indicia of identification cannot be determined. Discussion of defendants motion for expert witness in jury. Mr. Tinker states that he intends to file a motion to quash the jury list from which the jury panel will be chosen because the jurors are selected from the voter registration and does not include driver's license. Court states that the Southern District of Texas jury plan has been held as constitutional. Defense requests a copy of the jury plan and a list of names in the jury wheel. Court provides a copy of the jury plan. Court will allow a demographics expert as long as Defense will have a report within 30 days. Court states that the Court will not grant a continuance in this case and any experts that are appointed must be ready by trial date. Mr. Tinker also requests a jury selection expert. Discussion regarding a jury selection expert. AUSA opposes jury selection expert. Court is asking for the amount expert will charge. Court states that no one but attorneys will have access of the jury list. Court is requesting an estimate on experts fees for jury selection. AUSA suggests that an expert may be needed for jury selection, as well. Discussion regarding jury wheel - demographics, driver's license - statistics. Court states that the parties are to submit an agreed order on psychiatrist. If the parties cannot agree on a psychiatrist then the Court will appoint BOP psychiatrist for the AUSA and a psychiatrist of Defense's choice. Defense is to notify case manager to verify that they have reviewed witness |

| | | |
|---|---|---|
| | | statements. Discussion regarding representation of the child. AUSA states that Pam Garcia was appointed to represent the child in state proceedings. Parties excused. Court adjourned. (kbledsoe) (Entered: 12/11/2003) |
| 12/10/2003 | 136 | SEALED Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack digital 2:49-3:43 (kbledsoe) (Entered: 12/11/2003) |
| 12/10/2003 | 137 | SEALED Exhibit list by Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 12/11/2003) |
| 12/10/2003 | 138 | SEALED Exhibit list by USA as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 12/11/2003) |
| 12/10/2003 | | ORAL ORDER as to Alfred NMI Bourgeois denying [134-1] motion for continuance ( Entered by Judge Janis Graham Jack ) (kbledsoe) (Entered: 12/11/2003) |
| 12/12/2003 | 139 | MOTION and RESPONSE by Alfred NMI Bourgeois Concerning Law and Capital Questions in Proposed Juror Questionaire and Issues regarding Disqualification of Jurors for Cause , filed. (kbledsoe) (Entered: 12/12/2003) |
| 12/12/2003 | 140 | MOTION AND MEMORANDUM OF LAW by USA as to Alfred NMI Bourgeois regarding Capital Questions in Proposed Juror Questionaire and Issues regarding Disqualification of Jurors "For Cause" , filed. (kbledsoe) (Entered: 12/15/2003) |
| 12/14/2003 | 141 | ORDER granting [130-1] motion for Psychiatric Exam as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 12/15/2003) |
| 12/15/2003 | 142 | NOTICE of Setting : set status conference for 1:30 12/16/03 for Alfred NMI Bourgeois before Judge Janis Graham Jack , filed. Parties ntfd. (kbledsoe) (Entered: 12/15/2003) |
| 12/15/2003 | 143 | MOTION by Alfred NMI Bourgeois SEALED , filed. (kbledsoe) (Entered: 12/15/2003) |
| 12/16/2003 | 144 | SEALED OPPOSITION by USA as to Alfred NMI Bourgeois to [143-1] motion SEALED , filed. (kbledsoe) (Entered: 12/16/2003) |
| 12/16/2003 | 145 | MOTION by Alfred NMI Bourgeois to withdraw Motion for Continuance , filed. (kbledsoe) (Entered: 12/18/2003) |
| 12/16/2003 | 146 | SEALED Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack digital 1:26-3:07 (kbledsoe) (Entered: 12/18/2003) |
| 12/16/2003 | 147 | Exhibit list by USA as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 12/18/2003) |
| 12/16/2003 | 148 | ORDER ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 12/18/2003) |
| 12/19/2003 | 149 | AGREED ORDER COMMITTING DEFENDANT FOR |

| | | |
|---|---|---|
| | | EXAMINATION TO DETERMINE MENTAL COMPETENCY ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 12/19/2003) |
| 12/22/2003 | 150 | MOTION by USA as to Alfred NMI Bourgeois for leave to file Late Motion and Ask Permission to Notice the Court of an Additional Expert Witness , filed. (kbledsoe) (Entered: 12/23/2003) |
| 01/10/2004 | 151 | NOTICE of Setting : Motion hearing set for 2:00 1/16/04 as to: Alfred Bourgeois, re: (150-1) before Judge Janis Graham Jack , filed. Parties ntfd. (kbledsoe) (Entered: 01/12/2004) |
| 01/16/2004 | 153 | Status Conference Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano Digital: 1:58-3:14 Appearances: Patty Booth, Tony Roberts, and Elsa Salinas-Patterson f/govt; Doug Tinker and John Gilmore f/deft. Discussion regarding corrections to the jury instructions. Discussion regarding experts. DNA expert. Court approves Defendant's expert for jury selection at $50 per hour. Discussion regarding Daubert motions. Defense does not intend to file any daubert motions. Defense is proved list of persons with relevant knowledge to the Court by February 2, 2004. Parties agree to stipulate that Defedant is over 18 years of age. Court grants motion for leave to designate an expert witness. Expert testimony motions are to be filed by Friday, January 23, 2004. Discussion regarding jury panel on February 9th. Court sets scheduling conference on Thursday, January 29, 2004 at 1:30 pm. (amireles) (Entered: 01/21/2004) |
| 01/16/2004 | 154 | ORDER Set status conference for 1:30 1/29/04 for Alfred NMI Bourgeois before Judge Janis Graham Jack ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (amireles) (Entered: 01/21/2004) |
| 01/16/2004 | 155 | ORDER granting [150-1] motion for leave to file Late Motion and Ask Permission to Notice the Court of an Additional Expert Witness as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (amireles) (Entered: 01/21/2004) |
| 01/16/2004 | 156 | REQUEST by USA as to Alfred NMI Bourgeois for corrections/deletions/additions to court's proposed trial and sentencing instructions and voir dire (tabs a through g) , filed. (amireles) (Entered: 01/21/2004) |
| 01/20/2004 | 152 | Forensic Psychiatric Report (SEALED) as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 01/20/2004) |
| 01/21/2004 | 157 | ORDER ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. Copy of order mailed to Gerald Bierbaum by regular and certified mail. (kbledsoe) (Entered: 01/23/2004) |
| 01/21/2004 | 158 | ORDER ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 01/23/2004) |
| 01/21/2004 | 159 | Status Conference Hearing as to Alfred NMI Bourgeois held before |

USCA5 6094

| | | | |
|---|---|---|---|
| | | | Judge Janis Graham Jack Ct Reporter: Velma Gano digital 2:57-3:18/3:47-3:59 Appearances: Booth, Tony Roberts, Elsa Salinas-Patterson f/govt; Doug Tinker, John Gilmore f/dft. Case called. Appearances made. Discussion regarding Dr. Estrada's report. Discussion regarding witnesses names. Court instructs Defense to reveal the names of both the witnesses and their attorneys to Defense. Court orders for deadline for reciprocal discovery on guilt and innocense phase is due on Friday, January 30, 2004. Discussion regarding report from Dr. Estrada. Discussion regarding statements made by mitigating investigator, Gerald Bierbaum. Court instructs defense to have Mr. Bierbaum appear in court via telephone. Discussion regarding exchange of sentencing witnesses. Discussion regarding to redacting Dr. Estrada's report. Gov't is to provide the redacted report to the Court. Recess. Resume. Court recalls case. Investigator Gerald Bierbaum appears by phone. Mr. Bierbaum sworn. Discussion regarding statements made by investigator Bierbaum. Court orders Mr. Bierbaum not to tell anyone that he is court appointed to investigate this case. Mr. Bierbaum will not invoke the name of the Court. Mr. Bierbaum states that his address is 1744 Norfolk, Houston , Texas 77098; phone 713 572-2333. Court admonishes Mr. Bierbaum. Court provides copy of Dr. Estrada's report to Defense. Dft remanded. (kbledsoe) (Entered: 01/24/2004) |
| 01/26/2004 | 160 | | MOTION by Alfred NMI Bourgeois in limine , filed. (kbledsoe) (Entered: 01/27/2004) |
| 01/29/2004 | 161 | | MOTION by Alfred NMI Bourgeois for subpoena(s) under Rule 17 (b) , filed. (kbledsoe) (Entered: 01/29/2004) |
| 01/29/2004 | | | Per Deanne with John Gilmore's office, DE #161 does not need to be sealed. (kbledsoe) (Entered: 01/29/2004) |
| 01/29/2004 | 162 | | AGREED MOTION by USA as to Alfred NMI Bourgeois SEALED , filed. (kbledsoe) (Entered: 01/29/2004) |
| 01/29/2004 | 163 | | ORDER granting [161-1] motion for subpoena(s) under Rule 17(b) as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 01/29/2004) |
| 01/29/2004 | 164 | | SEALED ORDER as to Alfred NMI Bourgeois granting [162-1] motion SEALED ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) Modified on 03/12/2004 (Entered: 01/29/2004) |
| 02/03/2004 | 165 | | ORDER ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 02/03/2004) |
| 02/04/2004 | 166 | | SEALED DOCUMENT as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 02/04/2004) |
| 02/04/2004 | 167 | | COMMENTS ON JURY QUESTIONAIRE by USA as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 02/04/2004) |
| | | | |

**USCA5 6095**

| 02/04/2004 | 168 | MOTION AND RESPONSE by USA as to Alfred NMI Bourgeois SEALED , filed. (kbledsoe) (Entered: 02/04/2004) |
|---|---|---|
| 02/05/2004 | 169 | MOTION by Alfred NMI Bourgeois for Travel Authorization , filed. (kbledsoe) (Entered: 02/05/2004) |
| 02/05/2004 | 170 | ORDER ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 02/06/2004) |
| 02/05/2004 | 171 | APPLICATION by USA for Writ of Habeas Corpus ad Testificandum as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 02/06/2004) |
| 02/09/2004 | 172 | MOTION by Alfred NMI Bourgeois for Travel Authorization , filed. (kbledsoe) (Entered: 02/09/2004) |
| 02/09/2004 | 173 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 02/09/2004) |
| 02/09/2004 | 174 | WRIT of Habeas Corpus ad Testificandum issued for Adam Longoria on 2/16/04 in case as to Alfred NMI Bourgeois . (kbledsoe) Modified on 02/09/2004 (Entered: 02/09/2004) |
| 02/09/2004 | 175 | Jury Qualification as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 7:59-8:39/ 8:59-10:28/10:36-10:46/11:22-11:25/11:30-11:32/ 1:41-2:58/3:41-4:10/4:33-4:37/4:38-4:44 Appearances: Patti Booth/Tony Roberts/Elsa Salinas-Patterson f/govt; Doug Tinker/John Gilmore f/dft. Case called. Appearances made. Discussion regarding jury qualification. Discussion regarding challenges for cause and peremptory challenges. If both sides strike, the Court will consider that a joint strike and will not count against the peremptory challenges. Court conducts Jury Qualification. Discussion regarding jurors that were excused. Jurors instructed to complete questionnaire. Recess. Discussion regarding notes from prospective jurors. Resume. Court begins afternoon Qualification. Discussion regarding jurors that were excused. Jurors instructed to complete questionnaire. Parties excused. Court Adjourned. (kbledsoe) (Entered: 02/13/2004) |
| 02/09/2004 | 184 | ORDER ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 02/17/2004) |
| 02/10/2004 | 176 | Instanter Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 11:43-11:46 Appearances: Patti Booth/Tony Roberts/Elsa Salinas-Patterson f/govt; Doug Tinker/John Gilmore f/dft. Case called. Appearances made. Discussion regarding responses in questionnaire no. 43. Court collects all copies of questionnaire no. 43. Parties excused. Court adjourned. (kbledsoe) (Entered: 02/13/2004) |
| 02/10/2004 | 177 | Jury Qualification as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 1:45-1:48 Appearances: Patti Booth/Tony Roberts/Elsa Salinas-Patterson f/govt; |

**USCA5 6096**

| | | Doug Tinker/John Gilmore f/dft. Court explains to counsel that the jury was released. Court will reset jury service. Parties excused. Court adjourned. (kbledsoe) (Entered: 02/13/2004) |
|---|---|---|
| 02/11/2004 | 178 | Docket Entry as to Alfred NMI Bourgeois , filed. (kbledsoe) Modified on 02/13/2004 (Entered: 02/12/2004) |
| 02/12/2004 | 179 | MOTION by Alfred NMI Bourgeois for subpoena(s) under Rule 17 (b) , filed. (kbledsoe) Modified on 02/13/2004 (Entered: 02/13/2004) |
| 02/12/2004 | 180 | ORDER granting [176-1] motion for subpoena(s) under Rule 17(b) as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) Modified on 02/13/2004 (Entered: 02/13/2004) |
| 02/12/2004 | 181 | CORRECTIONS TO TAB G-JURY INSTRUCTIONS by USA as to Alfred NMI Bourgeois , filed. (kbledsoe) Modified on 02/13/2004 (Entered: 02/13/2004) |
| 02/13/2004 | 182 | EX PARTE ORDER ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (3/1/04-Refer to DE#185) (kbledsoe) Modified on 03/01/2004 (Entered: 02/13/2004) |
| 02/13/2004 | 183 | EXPARTE ORDER ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (3/1/04-Refer to De#185) (kbledsoe) Modified on 03/01/2004 (Entered: 02/13/2004) |
| 02/16/2004 | 185 | Status Conference Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:25-9:15/9:35-10:42/ Appearances: Patty Booth/Tony Roberts/Elsa Salinas-Patterson f/govt; Doug Tinker/John Gilmore f/dft. Case called. Appearances made. Discussion regarding Defendants Motion in Limine. Court in Limines testimony in the guilt and innocence phase except the allege confession to the inmate. Court will grant in Limine on everything else and will consider the testimony out of the presence of the jury. Discussion regarding experts testifying. Court instructs parties to provide summaries on anticipated expert testimony. Discussion regarding EEG. Court provides a copy of the report from Dr Cunningham that was filed with the Defense's exparte order. Defense had agreed to not seal exparte orders. Court instructs Defense to obtain a complete report from Dr. Cunningham. Court reviews expert testimony rules under 702, 703, and 705 - regarding summary, basis and reason of opinions. Court sets deadline for summaries to be exchanged no later than the time the final juror is selected. Discussion regarding belt on Defendant. Recess. Resume. Qualification of jury. Discussion regarding jurors excuses. Jurors instructed to complete questionnaire. Recess. Resume. Court instructs parties to submit agreed strikes on first 75 jurors. Discussion regarding questions that the prospective jurors may have. Court reviews excused jurors. Parties excused. Court Adjourned. (kbledsoe) (Entered: 02/18/2004) |
| 02/16/2004 | 186 | SECOND MOTION by USA as to Alfred NMI Bourgeois for Reciprocal Discovery , filed. (kbledsoe) (Entered: 02/18/2004) |

USCA5 6097

| | | |
|---|---|---|
| 02/17/2004 | 187 | THIRD MOTION by USA as to Alfred NMI Bourgeois for Reciprocal Discovery , filed. (kbledsoe) (Entered: 02/18/2004) |
| 02/19/2004 | 188 | Status Conference & Jury Selection-Day 1 as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:11-9:32/11:13-12:47/1:07-4:06 Appearances: Patty Booth/Tony Roberts/Elsa Salinas-Patterson f/govt; Doug Tinker/John Gilmore f/dft. Case called. Appearances made. Discussion regarding general voir dire. Discussion having Dr. Winer conducting exam on Defendant. Discussion regarding medical situation on Defendant. Court states that the juror information forms will be available at the podium during individual voir dire. Court reads into the record numbers of jurors that were excused from the afternoon because of their names being called out in the atrium. Court excuses juror 203. Jury Selection continued. Jurors in. Jurors present are the following: 1, 3, 6, 7, 8, 9, 10, 11, 12, 13, 14, 16, 21, 27, 28, 30, 33, 34, 37, 44. Jurors sworn. Small group voir dire. Individual voir dire. Recess. Resume. Continue individual voir dire. Juror no. 7 is selected. Recess. Resume. Continue individual voir dire. Juror 11 and 21 are selected. Recess. Resume. Continue individual voir dire. Parties excused. Court adjourned. (kbledsoe) Modified on 02/24/2004 (Entered: 02/22/2004) |
| 02/19/2004 | 189 | JOINT MOTION by USA and Alfred NMI Bourgeois regarding Agreed Strikes for Cause , filed. (kbledsoe) (Entered: 02/22/2004) |
| 02/19/2004 | | Voir dire begun as to Alfred NMI Bourgeois (1) count(s) 1ss , filed. (kbledsoe) (Entered: 02/24/2004) |
| 02/20/2004 | 190 | Status Conference & Jury Selection-Day 2 as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:25-10:14/10:31-12:12/1:14-3:03 Appearances: Patty Booth/Tony Roberts/Elsa Salinas-Patterson f/govt; Doug Tinker/John Gilmore f/dft. Case called. Appearances made. Court grants strike for cause on juror no. 44. Discussion regarding challenges for cause. Jury selection continued. Jurors in. Jurors present are the following: 20, 23, 29, 36, 38, 40, 41, 42, 46, 47, 49, 50, 51, 54, 56, 57, 58, 64, 65, 66, 69, 70, 72, 74, 76, 77, 79, 80, 81. Jurors sworn. Court conducts small group voir dire. Jurors excused. Court conducts individual voir dire. Recess. Resume. Juror nos. 40, 57, and 64 are selected. Recess. Resume individual voir dire. Juror no. 76 selected. Discussion regarding child protective services records. Court states that the from CPS are to be submitted to the Court for in-camera inspection. Discussion regarding making witness statements available to the Defense. Parties excused. Court adjourned. (kbledsoe) Modified on 02/24/2004 (Entered: 02/22/2004) |
| 02/22/2004 | 191 | ORDER granting [189-1] joint motion regarding Agreed Strikes for Cause as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 02/24/2004) |
| 02/23/2004 | 192 | Jury selection-Day 3 as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:22-10:19/10:44- |

|  |  |  |
|---|---|---|
|  |  | 12:10/1:32-3:24/3:41-5:23 Appearances: Patty Booth/Tony Roberts/Elsa Salinas Patterson f/govt; Doug Tinker/John Gilmore f/dft. Case recalled. Court explains that the CPS records have been released to the Court. CPS workers, Chuck Thompson and Tabitha Palmroy, sworn. Court questions CPS workers as to the true and correct copy of the documents. CPS workers excused. Jury in. Jurors present for voir dire are the following: 17, 22, 32, 59, 71, 82, 83, 87, 89, 92, 93, 95, 96, 99, 100, 101, 102, 103, 105, 106,107,109,110,111, 112, 113, 115, 118, 120, 121, 123, 124, 126, 129, and 130. Jurors sworn. Court conducts small group voir dire. Jurors excused. Court conducts individual voir dire. Recess. Resume. Parties agree to select 4 alternates. Juror 96 is selected. Recess. Resume. Juror no. 105, 115 and 124 selected. Dft remanded. Parties excused. Court adjourned. (kbledsoe) (Entered: 02/24/2004) |
| 02/23/2004 | 195 | EX PARTE SEALED DOCUMENTS (5 volumes) as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 02/27/2004) |
| 02/24/2004 | 193 | Jury selection-Day 4 as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:24-10:27/10:43-12:18/1:36-3:05/3:35-5:16 Appearances: Patty Booth / Tony Roberts / Elsa Salinas Patterson f/govt; Doug Tinker / John Gilmore f/dft. Case recalled. Council present. Court announces that parties are allowed 5 strikes each for alternate jurors. Jury selection continued. Prospective jurors in. Jurors present are the following: 94, 98, 14, 125, 131, 132, 133, 134, 136, 137, 139, 140, 142, 143, 145, 146, 147, 148, 149, 150, 152, 153, 154, 155, 157, 158, 159, 160, 161, 162, 163, 166, 169, 171, 175. Jurors sworn. Juror no 133 selected. Recess. Resume. Juror voir dire continued. Parties excused. Court adjourned. (kbledsoe) (Entered: 02/25/2004) |
| 02/25/2004 | 194 | ORDER granting [187-1] motion for Reciprocal Discovery as to Alfred NMI Bourgeois (1) set status conference for 10:00 1/27/04 before Judge Janis Graham Jack ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 02/25/2004) |
| 02/25/2004 | 196 | Jury selection-Day 4 as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:24-8:25/8:49-10:27/11:00-12:15 Appearances: Patty Booth/Tony Roberts/Elsa Salinas-Patterson f/govt; Doug Tinker/John Gilmore f/dft. Case re-called. Council present. Discussion regarding the alternate jurors. Jury selection continued. Prospective jurors in. Jurors present are the following: 156, 177, 179, 181, 182, 184, 185, 187, 188, 192, 193, 195, 196, 200, 202, 213, 215, 216, 218, 219, 221, 222, 224, 225, 228, 233, 234, 235, 239, 241, 246. Jurors sworn. Juror nos 156, 188, 192 are selected as alternates. Discussion regarding jury charge. Discussion regarding reports from experts. Court sets deadline for Friday, at 10:00 am for reports from experts. Dr. Winers report due Wednesday at noon. Court asks parties if there is any reason why this jury cannot be seated. No objections by either sides. Court allows opening arguments 30 minutes for each side. Discussion regarding reports, CV, and |

USCA5 6099

| | | publications of experts. Court sets Daubert hearing on Friday, February 27, 2004, at 10:00 am. Parties excused. Court adjourned. Dft remanded. (kbledsoe) (Entered: 02/29/2004) |
|---|---|---|
| 02/25/2004 | 197 | SEALED Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack digital 8:25-8:49 (kbledsoe) (Entered: 02/29/2004) |
| 02/25/2004 | 198 | Court's Exhibit (SEALED) as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 02/29/2004) |
| 02/26/2004 | 199 | APPLICATION by USA for Writ of Habeas Corpus ad testificandum in case as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 02/29/2004) |
| 02/27/2004 | 200 | WRIT of Habeas Corpus ad Testificandum issued for Travis Bowser on 3/1/04 in case as to Alfred NMI Bourgeois . (kbledsoe) (Entered: 02/29/2004) |
| 02/27/2004 | 201 | MEMORANDUM OF LAW by USA as to Alfred NMI Bourgeois in Opposition to Introduction of Expert Evidence on Premeditation , filed. (kbledsoe) (Entered: 02/29/2004) |
| 03/01/2004 | 202 | MOTION by USA as to Alfred NMI Bourgeois in limine regarding reference to punishment while questioning witnesses and regarding the health of witness Karen Jackson , filed. (kbledsoe) (Entered: 03/07/2004) |
| 03/01/2004 | 203 | Daubert and Exhibits Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano 8:22-10:13/11:42-11:54/1:16-1:27/2:42-3:02 Appearances: Patty Booth/Tony Roberts/Elsa Salinas-Patterson f/govt; Doug Tinker/John Gilmore f/dft. Case called. Appearances made. Court requests from Defense case law on premeditation. Court states that experts cannot testify on premeditation. Mr. Tinker offers exhibits 1 and 2. Court admits exhibits 1 and 2. Defense calls George W. Holden. Witness sworn. Direct. Cross. Re-direct. Mr. Tinker and Ms. Booth agreed that they have reviewed the CPS records that were filed under seal. Re-cross. Discussion regarding rule 704b. Expert cannot testify as to premeditation. Witness excused. Defense calls Dr. Joseph Rupp. Sworn. Direct. Court sustains daubert challenge. Cross. Witness excused. Discussion regarding Govts motion in Limine. Deft does not oppose the motion in Limine. Court grants govt's motion in Limine. Court advises that Mr. Bourgeois can add another attorney at anytime. Recess Resume. Government offers the following exhibits. 1, 2, 3, 4, 5, 6-30, 31, 32, 60, 67, 68-78, 79-90, 91-102, 103-112, 113-121, 122-136, 137 -145, 225-302, 304, 310-313, 315-318, 319-326, 342, 350-356, 357. Court admits govt exhibits 1, 2, 3, 4, 5, 6-30, 31, 32, 60, 67, 68-78, 79-90, 91-102, 103-112, 113-121, 122-136, 137-145, 225-302, 304, 310-313, 315-318, 319-326, 342, 350-356, 357. Parties are to give exhibits to clerk. Recess. Resume. Govt offers 327, 328. Exhibits 327, 328 admitted. Govt offers 334, 343, 344, 345, 346, 347, 348, 349. Court admits 334, 343, 344, 345, 346, 347, 348, 349. Discussion |

USCA5 6100

| | | |
|---|---|---|
| | | regarding CPS records. Court allows both parties to review CPS reports regarding Robin Bourgeois. Discussion regarding TRO's filed by wife. Court will in Limine TRO's until items become relevant. Recess. Resume. Discussion regarding letters from Robin. Discussion regarding with opening statements. Court states that each side is allowed 30 minutes for opening arguments with a 2 minute warning. Discussion regarding 302's on witnesses. Discussion regarding jury charge. Court will resume at 8:00 am tomorrow. Parties excused. Court adjourned. Dft remanded. (kbledsoe) (Entered: 03/07/2004) |
| 03/01/2004 | 204 | Exhibit list by Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 03/07/2004) |
| 03/01/2004 | 205 | Exhibit list by USA as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 03/07/2004) |
| 03/01/2004 | 206 | Jury list as to Alfred NMI Bourgeois , filed. 12 jurors and 4 alternates selected. (kbledsoe) (Entered: 03/07/2004) |
| 03/01/2004 | 207 | ORDER granting [202-1] motion in limine as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 03/07/2004) |
| 03/02/2004 | 208 | Witness list by USA as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 03/07/2004) |
| 03/02/2004 | 209 | Jury trial-Day 1 as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:02-8:09/8:18-10:21/10:38-12:15/1:12-3:23/3:50-5:51 Appearances: Patty Booth/Tony Roberts/Elsa Salinas-Patterson f/govt; Doug Tinker/John Gilmore f/dft., filed. Case re-called. Counsel present. Discussion regarding exhibits. Discussion regarding substituting pictures for the tangible evidence at the end of the trial. Jury in. Jury sworn. Opening statements. Govt calls witness #1 Karen Ann Jackson. Sworn. Direct. Cross. Redirect. Excused. Govt calls witness #2 - Gladysbell Barreto. Sworn. Direct. Cross. Re-direct. Excused. Jury out. Recess. Resume. Jury in. Govt calls witness #3 - Beth Lewis. Direct. Cross. Excused. Govt calls witness # 4 - Nena Mennor. Sworn. Direct. Cross. Govt calls witness #5 - Hal Frederick Resides. Sworn. Direct. Govt offers no. 358. No objections. Govt exhibit no. 358 admitted. Cross. Govt calls witness #6 - Carl Mead Arnoux. Sworn. Direct. Govt offers no. 359. No objections. Govt exhibit no. 359 admitted. Cross. Re-direct. Re-cross. Excused. Govt calls witness #7. - Karen Krueger. Sworn. Direct. Jury out. Recess. Resume. Jury in. Witness #7-recalled. Cross. Re-direct. Re-cross. Govt calls witness #8- Joni Dee Parker. Sworn. Direct. Cross. Excused. Govt calls witness #9- Timothy Darr. Sworn. Direct. Cross. Re-direct. Excused. Govt calls witness #10 - John Burgess. Sworn. Direct. Cross. Re-direct. Re-cross. Excused. Govt calls witness #11 - David Paoletti. Sworn. Direct. Cross. Re-direct. Excused. Jury out. Recess. Resume. Jury in. Govt calls witness #12 - Michael Brozgal. Sworn. Direct. Cross. Re-direct. Excused. Govt calls witness #13 - Michael Boyd. Sworn. Direct. Cross. Excused. Govt |

| | | calls witness #14 - William Smith. Sworn. Direct. Cross. Excused. Govt calls witness #15 - Craig Rudolf. Sworn. Direct. Cross. Excused. Govt calls witness #16 - Robin Bourgeois. Sworn. Direct. Jury out. Court advises witness #16 - Robin Bourgeois, right to an counsel. Ms. Bourgeois states that she does not request an attorney. Recess. Parties excused. Court adjourned. Dft remanded. (kbledsoe) (Entered: 03/07/2004) |
|---|---|---|
| 03/03/2004 | 210 | Jury trial-Day 2 as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:15-10:26/10:47-11:46/12:52-1:16/1:44-3:45/4:14-5:23 Appearances: Patty Booth/Tony Roberts/Elsa Salinas-Patterson f/govt; Doug Tinker/John Gilmore f/dft. , filed. (Terminated motions - ) Case re-called. Counsel present. Discussion regarding testimony of Robin Bourgeois. Witness Robin Bourgois takes stand. Court advises Ms. Bourgeois of her right to an attorney. Ms. Bourgeios waives her right to remain silent and waives right to attorney. Court has Atty, Hector Del Toro, on standby for witness Robin Bourgeois. Govt offers exhibit no 361. No objections. Govt exhibit no. 361 admitted. Jury in. Testimony of govt witness #16 - Robin Bourgeois continues. Govt offers exhibit no. 314. No objections. Govt exhibit no. 314 admitted. Jury out. Court excuses Atty Hector Del Toro. Recess. Resume. Govt offers exhibits no. 308, 309. No objections. Exhibits no. 308, 309 are admitted. Govt offers exhibits no. 305, 306, 307. No objections. Exhibits no. 305, 306, 307 are admitted. Govt offers exhibit no. 303. No objection. Govt exhibit 303 is admitted. Jury in. Direct Testimony continues on Robin Bourgeois. Jury out. Recess. Resume. Discussion regarding exhibits. Govt offers exhibits 360, 330, 333. No objections. Govt exhibits 360, 330, 333 admitted. Govt offers 332, 362, 363. No objections. Govt exhibts 332, 362, 363 admitted. Govt offers 364, 365, 366, 367. No objections. Govt exhibits 364, 365, 366, 367 are admitted. Jury in. Govt offers exhibits 329, 330, 332. No objections. Govt exhibits 329, 330 332 admitted. Defense moves for a mistrial. Court denies motion. Defts offer exhibits 1-5. No objections. Defts exhibits 1-5 are admitted. Direct continues on Robin Bourgeois. Deft withdraws exhibit no. 1. No objection. Defts exhibit no.1 withdrawn. Parties excused. Court adjourned. Dft remanded. (kbledsoe) (Entered: 03/07/2004) |
| 03/03/2004 | 211 | Exhibit list by Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 03/07/2004) |
| 03/04/2004 | 212 | MEMORANDUM OF LAW by USA as to Alfred NMI Bourgeois regarding alleged Prejudicial Testimony about a polygraph test and Response to Defendant's Motion for Mistrial , filed. (kbledsoe) (Entered: 03/07/2004) |
| 03/04/2004 | 213 | Jury trial-Day 3 as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:19-8:22/8:30-10:35/11:00-11:55/1:06-3:14/3:41-5:38 Appearances: Patty Booth/Tony Roberts/Elsa Salinas-Patterson f/govt; Doug Tinker/John |

**USCA5 6102**

| | | |
|---|---|---|
| | | Gilmore f/dft., filed. (Terminated motions - ) Case called. Counsel present. Defense re-offers defendants exhibit no. 1. No objections. Court admits Defts exhibit no. 1. Witness #16 - Robin Bourgeois retakes stand. Cross. Re-direct. Re-cross. Jury out. Recess. Resume. Discussion regarding testimony of Robin Bourgeois. Excused. Govt calls witness #17 - Joe Merced Suarez. Sworn. Direct. Cross. Excused. Jury out. Recess. Resume. Jury in. Govt calls witness #18 Adolfo Yzaguirre . Sworn. Direct. Cross. Re-direct. Excused. Govt calls witness #19 - Julie Ann Bissell. Sworn. Direct. Cross. Re-direct. Govt calls witness #20 - Amy Ford. Direct. Govt offers exhibit 369. No objections. Govt exhibit 369 is admitted. Govt offers exhibits 370 and 371. No objections. Govt exhibits 370 and 371 are admitted. Govt offers exhibit 372. No objections. Govt exhibit 372 is admitted. Cross. Defense offers exhibits 6-31. No objections. Defts Exhibits 6-31 are admitted. Re-direct. Deft offer exhibit no. 32. No objections. Deft exhibit no. 32 admitted. Re-cross. Excused. Govt calls witness #21 - Anthony Dumas. Sworn. Direct. Govt offers exhibits 373. No objections. Exhibit 373 admitted. Cross. Re-direct. Excused. Jury out. Jury in. Govt calls witness #22 - Andrew Udinsky. Sworn. Direct. Re-direct. Cross. Excused. Govt calls witness #23 - Robert Patterson. Sworn. Direct. Cross. Re-direct. Excused. Govt calls witness #24 - AB-1994. Sworn. Direct. Jury out. Parties excused. Court adjourned. Dft remanded. (kbledsoe) (Entered: 03/07/2004) |
| 03/05/2004 | 214 | Jury trial-Day 4 as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:32-8:32/8:37-10:29/10:45-12:54 Appearances: Patty Booth/Tony Roberts/Elsa Salinas-Patterson f/govt; Doug Tinker/John Gilmore f/dft., filed. (Terminated motions - ) Case continued. All counsel present. Direct testimony continues on AB-1994. Cross. Re-direct. Govt calls witness #25 - Dr. Scott Benton. Sworn. Direct. Govt offers exhibits 375 and 376. No objections. Exhibits 375 and 376 are admitted. Cross. Excused. Govt calls witness #26 - Caroline Zervos. Sworn. Direct. Jury out. Discussion regarding chain of custody of evidence. Jury in. Direct continues on witness #26. Cross. Govt calls witness #27 - Tony Onorato. Sworn. Direct. Cross. Re-direct. Re-cross. Excused. Govt calls witness #28 - Audrell Leonard. Sworn. Direct. Cross. Re-direct. Re-cross. Re-direct. Excused. Govt calls witness #29 Stacy Williams. Sworn. Direct. Cross. Govt calls witness #30 - Jason Dumas. Sworn. Direct. Excused. Jury instructed to report at 8:30 am on Monday morning. Jury out. Parties excused. Court adjourned. Dft remanded. (kbledsoe) (Entered: 03/07/2004) |
| 03/05/2004 | 215 | ORDER ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 03/07/2004) |
| 03/05/2004 | 216 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Defendant's Opening Statement for dates of 3/2/04 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (1-7) (kbledsoe) (Entered: 03/07/2004) |
| | | |

USCA5 6103

| 03/08/2004 | 217 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Questioning of Juror No. 14 for dates of 2/19/04 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (kbledsoe) (Entered: 03/09/2004) |
|---|---|---|
| 03/08/2004 | | Text not available. (Entered: 03/11/2004) |
| 03/08/2004 | | Text not available. (Entered: 03/11/2004) |
| 03/08/2004 | 218 | Jury trial-Day 5 as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:07-9:16/9:26-10:35/10:51-12:18/1:17-3:11/3:28-4:48/ 5:00-5:45 Appearances: Patty Booth/Tony Roberts/Elsa Salinas-Patterson f/govt; Doug Tinker/John Gilmore f/dft. , filed. (Terminated motions -, ) Case continued. Counsel present. Discussion regarding exhibits. Govt calls Dr. William Oliver. Sworn. Direct. Govt calls Carol McLaughlin. Sworn. Direct. Cross. Re-direct. Excused. Govt calls Dr. Ronald Richard Kuffel, Jr. Sworn. Direct. Govt offers exhibit 378. No objections. Court admits Govts exhibit no. 378. Witness Excused. Discussion regarding testimony of Dr. Elizabeth Rouse. Jury out. Govt calls Dr. Elizabeth Rouse. Sworn. Direct. Cross. Govt offers exhibits 148, 149, 35, 49, 46, 40, 53, 42, 43, 33, 52, 38, 51, 63, 61, 62, 58, 57, 55, 56, 59,41. Defense objects on the basis of the inflammatory nature of the photos. Court admits Govt exhibits 148, 149, 35, 49, 46, 40, 53, 42, 43, 33, 52, 38, 51, 63, 61, 62, 58, 57, 55, 56, 59, 41. Govt offers exhibits 150-224. Defense objects on the basis of the inflammatory nature of the photos. Court admits Govt exhibits 150-224. Jury in. Direct continues. Cross. Excused. Jury out. Recess. Resume. Jury in. Govt calls Dr. William Oliver. Sworn. Direct. Cross. Re-direct. Excused. Govt offers exhibits no. 379, 380, and 381. No objections. Court admits govts exhibits 379, 380, 381. Govt calls Dr. David Senn. Sworn. Direct. Cross. Re-direct. Re-cross. Govt calls Dr. Brian Chrz. Sworn. Direct. Jury out. Recess. Resume. Jury in. Direct continues. Jury out. Discussion regarding next witness Sheretta Collins. Court sustains objections. Parties excused. Court adjourned. (kbledsoe) (Entered: 03/11/2004) |
| 03/09/2004 | 219 | Jury trial-Day 6 as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:16-8:26/8:33-10:04/ Appearances: Patty Booth/Tony Roberts/Elsa Salinas-Patterson f/govt; Doug Tinker/John Gilmore f/dft. , filed. (Terminated motions -, [186-1] motion for Reciprocal Discovery (1), motion for Travel Authorization (1), [168-1] motion SEALED , [160-1] motion in limine , [156-1] motion for corrections/deletions/ additions to court's proposed trial and sentencing instructions and voir dire (tabs a through g) , [143-1] motion SEALED , [139-1] motion Concerning Law and Capital Questions in Proposed Juror Questionaire and Issues regarding Disqualification of Jurors for Cause , [140-1] motion regarding Capital Questions in Proposed Juror Questionaire and Issues regarding Disqualification of Jurors "For Cause" , [129-1] motion for Government Funds for Expert Witnesses , [73-1] motion for |

| | | |
|---|---|---|
| | | continuance , [54-1] motion to compel Government to specify evidence to be used at trial , [53-1] motion for jury questionnaire , [51-1] motion to determine admissibility of defendant's statements , [50-2] motion Request for Disclosure of Under Brady/Agurs/Giglio and Jencks Act , [42-1] motion for Reciprocal Discovery, ). Case continued. All counsel present. Discussion regarding potential witnesses. Witness Bryan Chrz re-takes stand. Jury in. Cross. Re-direct. Re-cross. Re-redirect. Excused. Jury out. Govt calls Dr. Noorullah Akhtar. Sworn. Direct. Cross. Excused. Govt calls Nathaniel Banks. Sworn. Direct. Govt offers exhibit 384. No objections. Govts exhibit 384 is admitted. Cross. Govt calls Dana Banks. Sworn. Direct. Excused. Jury out. Recess. Resume. Discussion regarding testimony of witnesses. Govt calls Shereta Collins. Sworn. Direct. Excused. Govt calls Claudia Williams. Sworn. Direct. Excused. Govt calls Mike Harris. Sworn. Direct. Excused. Jury out. Jury in. Govt calls Darrick Bernard Moore. Sworn. Direct. Cross. Re-direct. Excused. Govt calls Orlando Campos. Sworn. Direct. Cross. Re-direct. Excused. Jury out. Recess. Resume. Jury in. Govt calls Wiley Taylor. Sworn. Direct. Cross. Re-direct. Excused. Govt calls Megan Beckett. Sworn. Direct. Cross. Excused. Defense moves for instructed verdict insufficient in finding of guilt in particular first degree murder and premeditation. Court finds that there is evidence to support the finding of premeditation. Court denies motion. Parties excused. (kbledsoe) (Entered: 03/11/2004) |
| 03/09/2004 | 220 | ORDER Allowing Travel Expense ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 03/11/2004) |
| 03/10/2004 | 221 | MOTION by Alfred NMI Bourgeois for subpoena(s) under Rule 17(b) , filed. (kbledsoe) (Entered: 03/11/2004) |
| 03/11/2004 | 222 | ORDER granting [221-1] motion for subpoena(s) under Rule 17(b) as to Alfred NMI Bourgeois (1) ( Signed by Magistrate Judge B. J. Ellington ), entered. Parties ntfd. (kbledsoe) (Entered: 03/11/2004) |
| 03/11/2004 | 223 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Testimony of Claudia Williams for dates of 3/9/04 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (1-14) (kbledsoe) (Entered: 03/12/2004) |
| 03/11/2004 | 224 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Testimony of Dr. Elizabeth Rouse for dates of 3/8/04 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (1-68) (kbledsoe) (Entered: 03/12/2004) |
| 03/12/2004 | 225 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Magistrate Judge B. J. Ellington ), entered. Parties ntfd. (kbledsoe) (Entered: 03/12/2004) |
| 03/12/2004 | 226 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Magistrate Judge B. J. Ellington ), entered. Parties ntfd. (kbledsoe) (Entered: 03/12/2004) |

USCA5 6105

| | | |
|---|---|---|
| 03/12/2004 | 227 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Magistrate Judge B. J. Ellington ), entered. Parties ntfd. (kbledsoe) (Entered: 03/12/2004) |
| 03/12/2004 | 228 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Magistrate Judge B. J. Ellington ), entered. Parties ntfd. (kbledsoe) (Entered: 03/12/2004) |
| 03/12/2004 | 229 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Magistrate Judge B. J. Ellington ), entered. Parties ntfd. (kbledsoe) (Entered: 03/12/2004) |
| 03/12/2004 | 230 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Magistrate Judge B. J. Ellington ), entered. Parties ntfd. (kbledsoe) (Entered: 03/12/2004) |
| 03/12/2004 | 231 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Magistrate Judge B. J. Ellington ), entered. Parties ntfd. (kbledsoe) (Entered: 03/12/2004) |
| 03/12/2004 | 232 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Magistrate Judge B. J. Ellington ), entered. Parties ntfd. (kbledsoe) (Entered: 03/12/2004) |
| 03/12/2004 | 233 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Magistrate Judge B. J. Ellington ), entered. Parties ntfd. (kbledsoe) (Entered: 03/12/2004) |
| 03/12/2004 | 234 | SEALED DOCUMENT as to Alfred NMI Bourgeois , filed. Copies provided to counsel. (kbledsoe) Modified on 03/12/2004 (Entered: 03/12/2004) |
| 03/12/2004 | 235 | MOTION by Alfred NMI Bourgeois for subpoena(s) under Rule 17 (b) , filed. (kbledsoe) (Entered: 03/12/2004) |
| 03/12/2004 | 236 | MOTION by Alfred NMI Bourgeois for subpoena(s) under Rule 17 (b) , filed. (kbledsoe) (Entered: 03/12/2004) |
| 03/12/2004 | 237 | ORDER granting [236-1] motion for subpoena(s) under Rule 17(b) as to Alfred NMI Bourgeois (1) ( Signed by Magistrate Judge Jane Cooper-Hill ), entered. Parties ntfd. (kbledsoe) (Entered: 03/12/2004) |
| 03/12/2004 | 238 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Magistrate Judge Jane Cooper-Hill ), entered. Parties ntfd. (kbledsoe) (Entered: 03/12/2004) |
| 03/12/2004 | 239 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Magistrate Judge Jane Cooper-Hill ), entered. Parties ntfd. (kbledsoe) (Entered: 03/12/2004) |
| 03/15/2004 | 240 | MOTION by Alfred NMI Bourgeois for subpoena(s) under Rule 17 (b) , filed. (lrivera) (Entered: 03/15/2004) |
| 03/15/2004 | 241 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Jury Trial Day 2 Hearing for dates of March 3, 2004 before Judge Janis Graham |

**USCA5 6106**

| | | |
|---|---|---|
| | | Jack , filed. ( Court Rptr: Velma Gano) (lrivera) (Entered: 03/15/2004) |
| 03/15/2004 | 242 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Jury Trial Day 3 Hearing for dates of March 4, 2004 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (lrivera) (Entered: 03/15/2004) |
| 03/15/2004 | 243 | ORDER granting [240-1] motion for subpoena(s) under Rule 17(b) as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (lrivera) (Entered: 03/15/2004) |
| 03/15/2004 | 244 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Testimony of Robin Bourgeois Hearing for dates of March 2-3, 2004 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (lrivera) (Entered: 03/15/2004) |
| 03/15/2004 | 245 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Transcript of Testimony of AB1994 Hearing for dates of March 4-5, 2004 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (lrivera) (Entered: 03/15/2004) |
| 03/15/2004 | 246 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 03/16/2004) |
| 03/15/2004 | 247 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 03/16/2004) |
| 03/15/2004 | 248 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 03/16/2004) |
| 03/15/2004 | 249 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 03/16/2004) |
| 03/15/2004 | 250 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 03/16/2004) |
| 03/15/2004 | 251 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 03/16/2004) |
| 03/15/2004 | 252 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 03/16/2004) |
| 03/15/2004 | 253 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) Modified on 03/17/2004 (Entered: 03/16/2004) |
| 03/15/2004 | 254 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) |

USCA5 6107

| | | (Entered: 03/16/2004) |
|---|---|---|
| 03/15/2004 | 255 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 03/16/2004) |
| 03/15/2004 | 256 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 03/16/2004) |
| 03/15/2004 | 257 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 03/16/2004) |
| 03/15/2004 | 258 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 03/16/2004) |
| 03/15/2004 | 259 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 03/16/2004) |
| 03/15/2004 | 260 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 03/16/2004) |
| 03/15/2004 | 261 | Jury trial-Day 7 as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:34-9:47/10:17-10:41/1:11-2:03/2:20-2:25 Appearances: Patty Booth / Tony Roberts / Elsa Salinas Patterson f/govt; Doug Tinker / John Gilmore f/dft. , filed. (Terminated motions -, ). Case continued. Counsel present. Discussion regarding testimony of Alfred Bourgeois. Jury in. Defense calls Alfred Bourgeois. Sworn. Direct. Cross. Jury out. Defense moves for a mistrial. Objection to video tape. Court denies motion for mistrial. Jury in. Cross continues. Witness stands down. Defense rests. Jury out. Recess. Resume. Discussion regarding evidence. Govt re-calls Megan Beckett. Direct. Excused. Govt calls Cort Scharn. Sworn. Direct. Excused. Govt closes. Defense closes. Jury instructed to return at 8:30a.m. tomorrow. Discussion regarding alternate jurors. Discussion regarding jury charge. Mr. Tinker moves for an instructed verdict or moves for an acquittal. Court denies motion. Recess. Resume. Court provides copy of charge to parties. No objections to charge or verdict form. Discussion regarding closing arguments and time warnings. Parties excused. Court adjourned. (kbledsoe) (Entered: 03/17/2004) |
| 03/16/2004 | 262 | Jury trial-Day 8 as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gnao digital 8:25-10:30/10:42-10:49/12:18-12:37 Appearances: Patty Booth / Tony Roberts / Elsa Salinas Patterson f/govt; Doug Tinker / John Gilmore f/dft. , filed. (Terminated motions - ). Case continued. All counsel present. No objections to charge and jury form. Discussion regarding alternate jurors. Jury in. Closing arguments. Court charges jury. Alternate jurors |

USCA5 6108

|  |  | are excused to a separate jury room. Jurors deliberate. Recess. Jury note no.1 "We have reached a unanimous verdict." Resume. Jury in. Jurors polled. Defendant is found guilty on Count One of the Indictment. Court instructs the jury to return at 8:30 am Thursday. Jurors excused. Alternate jurors advised to return at 8:30 on Thursday. Alternate jurors excused. Discussion regarding Defense witnesses to be present on Friday. Discussion regarding evidence. Juror note no. 2 regarding jurors trip. Court responds to jury note. Discussion regarding preliminary charge. Court sets hearing for March 16, 2004 at 3:00 pm. Parties excused. Court adjourned. (kbledsoe) (Entered: 03/17/2004) |
| 03/16/2004 | 263 | Court's Instructions to the Jury as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 03/17/2004) |
| 03/16/2004 | 264 | JURY VERDICT as to Alfred NMI Bourgeois Guilty: Alfred NMI Bourgeois (1) count(s) 1ss , filed. (kbledsoe) (Entered: 03/17/2004) |
| 03/16/2004 | 265 | Jury note #1 filed as to Alfred NMI Bourgeois (kbledsoe) (Entered: 03/17/2004) |
| 03/16/2004 | 266 | Jury note #2 filed as to Alfred NMI Bourgeois (kbledsoe) (Entered: 03/17/2004) |
| 03/16/2004 | 267 | ORDER to provide meal for jurors ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 03/17/2004) |
| 03/16/2004 | 268 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Jury Trial-Day 7 (partial transcript of proceeding- testimony of Alfred Bourgeois) for dates of 3/15/04 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (79 pgs.) (kbledsoe) (Entered: 03/17/2004) |
| 03/16/2004 | 269 | MOTION by Alfred NMI Bourgeois for subpoena(s) under Rule 17 (b) , filed. (kbledsoe) (Entered: 03/17/2004) |
| 03/16/2004 | 270 | ORDER granting [269-1] motion for subpoena(s) under Rule 17(b) as to Alfred NMI Bourgeois (1) ( Signed by Magistrate Judge Jane Cooper-Hill ), entered. Parties ntfd. (kbledsoe) (Entered: 03/17/2004) |
| 03/16/2004 | 271 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Magistrate Judge Jane Cooper-Hill ), entered. Parties ntfd. (kbledsoe) (Entered: 03/17/2004) |
| 03/16/2004 | 272 | MOTION by Alfred NMI Bourgeois for Travel Authorization , filed. (kbledsoe) (Entered: 03/17/2004) |
| 03/17/2004 | 273 | PETITION by USA for Writ of Habeas Corpus ad testificandum in case as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 03/17/2004) |
| 03/17/2004 | 274 | WRIT of Habeas Corpus ad Testificandum issued for Celso Ramos, Jr. on 3/17/04 in case as to Alfred NMI Bourgeois . (kbledsoe) (Entered: 03/17/2004) |

| 03/17/2004 | 275 | AMENDED PETITION by USA for Writ of Habeas Corpus ad testificandum in case as to Alfred NMI Bourgeois , filed. (kbledsoe) Modified on 03/17/2004 (Entered: 03/17/2004) |
|---|---|---|
| 03/17/2004 | 276 | MOTION by Alfred NMI Bourgeois for subpoena(s) under Rule 17(b) , filed. (kbledsoe) (Entered: 03/17/2004) |
| 03/17/2004 | 277 | WRIT of Habeas Corpus ad Testificandum issued for Celso Ramos, Jr. on 3/18/04 in case as to Alfred NMI Bourgeois . (kbledsoe) (Entered: 03/17/2004) |
| 03/17/2004 | 278 | ORDER granting [276-1] motion for subpoena(s) under Rule 17(b) as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 03/17/2004) |
| 03/17/2004 | 279 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 03/18/2004) |
| 03/17/2004 | 283 | Status Conference Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 3:44-5:05 Appearances: Patty Booth / Tony Roberts / Elsa Salinas Patterson f/govt; Doug Tinker/John Gilmore f/dft. Case continued. All counsel present. Discussion regarding instructions to jury and verdict form regarding sentencing phase. Discussion regarding type of evidence that will be presented. Discussion regarding reports from experts. Discussion regarding Dr. Cunningham. Court is asking for documents, raw data and standardized testing that was used for conclusions from Dr. Winer. Govt is requesting a neuro-psychological exam of Deft. Defense objects to more testing of Deft. Further, Defense requests that if tests are ordered, then, Defense objects going forward with case until the results of the tests are known. Govt requests a delay of the sentencing phase. No objections by Defense. Discussion regarding schedule of the sentencing phase. Discussion regarding reports of experts. Discussion regarding a pre-sentence investigation report to be used in rebuttal. Discussion regarding telephone calls. Court instructs clerk to have jurors to report on Monday, March 22, 2004 at 8:30 am. Court sets hearing at 9:00 am on Friday, March 19, 2004, regarding reliability and admissibility of testimony. Court instructs parties to go through documents one more time. Court sets hearing regarding Dr. Winer and the testing. Court sets hearing on Thursday, March 18, 2004, at 2:00 pm unless the govt informs the court that the hearing is not needed. Court provides video tape to the parties. Parties excused. Court adjourned. (kbledsoe) (Entered: 03/21/2004) |
| 03/17/2004 | 284 | ORDER appointing standby counsel for witness (Atty Hector Del Toro for witness Robin Bourgeois) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 03/21/2004) |
| 03/17/2004 | 286 | SEALED DOCUMENT as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 03/24/2004) |
| 03/18/2004 | 280 | MOTION by Alfred NMI Bourgeois for subpoena(s) under Rule 17 |

USCA5 6110

| | | | |
|---|---|---|---|
| | | | (b) , filed. (kbledsoe) (Entered: 03/18/2004) |
| 03/18/2004 | | 281 | ORDER granting [280-1] motion for subpoena(s) under Rule 17(b) as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 03/18/2004) |
| 03/19/2004 | | 282 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 03/19/2004) |
| 03/19/2004 | | 285 | MEMORANDUM by USA as to Alfred NMI Bourgeois in opposition to Expert Testimony regarding Violence Risk Assessment , filed. (kbledsoe) (Entered: 03/21/2004) |
| 03/19/2004 | | 287 | Status conference as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 9:00-10:25/11:03- Appearances: Patty Booth / Tony Roberts / Elsa Salinas Patterson f/govt; Doug Tinker / John Gilmore f/dft. Case called. Appearances made. Discussion regarding instructions to the jurors. Court requests the catch-all mitigating documents. Discussion regarding testimony of inmates. Discussion regarding letters written by Deft. Govt calls Cynthia Bourgeois. Sworn. Direct. Cross. Witness stands down. Defense objects to the statements as the incident was remote and hearsay. Court tests reliability. Court overrules objection. Govt calls Adam Longoria. Sworn. Direct. Cross. Recess. Resume. Discussion regarding 16 yr old boy. Defense objects to remoteness. Court overrules objection. Discussion regarding Veronica Batiste. No objection. Discussion regarding Gaynell James. Defense objects to remoteness and not relevant. Court states that she can testify. Court overrules objection. Discussion regarding Sheila Bourgeois, Gaynell James. Court will allow witnesses to testify. Discussion regarding Gerilyn Dumas. Defense objection as to not relevant to jury in this proceeding. Court will need to test reliability of witness. Discussion regarding Deputy Marshal Alfredo Lujan and Agend Rob Andrews. Court will allow to testify. Deft's cousin is allowed to testify. Discussion regarding letter to Anthony Dumas. Court will allow Robin Bourgeois after Longoria testifies. Discussion regarding video tape. Court states that the tape is admissible where Deft is at beach with children. Recess. Resume. Parties agree that 10 minutes would be enough time for opening statements. Discussion regarding offering exhibits for sentencing phase. Parties excused. Court adjourned. Dft remanded. , filed. (kbledsoe) (Entered: 03/24/2004) |
| 03/22/2004 | | 288 | Sentencing Phase-Day 1 Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:30-10:29/10:46-11:46/12:50-3:36 Appearances: Patty Booth / Tony Roberts / Elsa Salinas Patterson f/govt; Doug Tinker / John Gilmore f/dft. Case continued. All counsel present. Discussion regarding testimony of Dr. Cunningham. Jury in. Govt offers all evidence and testimony offered in the guilt and innocense phase of the trial. Court instructs jury regarding sentencing phase. Opening statements by Govt. Govt calls witness no. 1 - Veronica Batiste. Sworn. Direct. Govt |

| | | |
|---|---|---|
| | | offers exhibit no. 390. No. objections. Govt exhibit no 390 is admitted. Govt offers exhibit no. 387,388,389, 391. No. objections. Govt exhibit no 387, 388, 389, 391 are admitted. Cross. Re-direct. Excused. Govt calls witness no. 2 - Anthony Woods Batiste. Sworn. Direct. Cross. Excused. Govt calls witness no. 3 - Sheila Bourgeois. Sworn. Direct. Cross. Re-direct. Excused. Govt calls witness no. 4 - Cynthia Bourgeois. Sworn. Direct. Cross Govt calls witness no. 5 - Gaynell James. Sworn. Direct. Jury out. Discussion regarding testimony. Recess. Resume. Jury in. Govt calls witness no. 6 - Gaynell Collins Bourgeois. Sworn. Direct. Cross. Re-direct. Re-cross. Excused. Govt calls witness no. 7 - Deputy Marshal Alfredo Lujan. Sworn. Direct. Cross. Govt calls witness no. 8 - Isaac Bourgeois, III. Sworn. Direct. Redirect. Excused. Govt calls witness no. 9 -Beatrice Bourgeois. Sworn. Direct. Cross. Govt calls witness no. 10 - Special Agent Rob Andrews. Sworn. Direct. Excused. Jury out. Discussion regarding stipulation. Recess. Resume. Discussion regarding exhibits. Jury in. Govt calls witness no. 11 - Adam Longoria. Sworn. Direct. Cross. Re-direct. Govt offers exhibits 413 and 414. No objections. Govts exhibits 413 and 414 are admitted. Govt offers exhibits 412 a, b, c, and d. No objections. Govts exhibits 412 a, b, c, and d are admitted. Jury out. Recess. Resume. Jury in. Testimony continues Cross. Redirect. Excused. Govt calls witness no. 12 - Robin Bourgeois. Sworn. Direct. Govt offers exhibit 392. No objections. Govts exhibit no. 392 admitted. Cross. Redirect. Excused. Govt calls witness no. 13 - Carolyn Ann Jackson. Sworn. Direct. Govt offers exhibits 393 and 394. Defense objects - prejudice of content. Court admits exhibits 393 and 394. Govt offers exhibits 395-411. Defense objects to exhibits 403, 409-411. Court admits exhibits 395-411. Jury out. Recess. Resume. Jury in. Witness Carolyn Jackson, excused. Govt calls witness no. 14 - Megan Beckett. Sworn. Direct. Govt calls witness no. 15 - Dr. Carlos Estrada. Sworn. Direct. Jury out. Recess. Parties excused. Court adjourned. Dft remanded. (kbledsoe) (Entered: 03/24/2004) |
| 03/22/2004 | 289 | Witness list by USA as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 03/24/2004) |
| 03/23/2004 | 290 | Sentencing Phase-Day 2 Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:19-9:01/9:09-10:09/10:46-11:14/12:18-12:22/ 4:24-4:48 Appearances: Patty Booth / Tony Roberts / Elsa Salinas Patterson f/govt; Doug Tinker/John Gilmore f/dft. Case called. Appearances made. Govt witness no. 15 - Dr. Carlos Estrada takes the stand. Cross continues on Dr. Estrada. Jury out. Discussion regarding testimony. Recess. Resume. Jury in. Cross continues on Dr. Estrada. Re-direct. Discussion regarding. Recess. Resume. Mr. Tinker objects to the comparing people. Mr. Tinker moves for a mis-trial. Court carries the motion. Jury in. Govt calls witness no. 16 - Orlando Campos. Sworn. Direct. Excused. Govt calls witness no. 17 - Wiley Taylor. Sworn. Direct. Cross. Re-direct. Govt calls witness no. 18 - Darrick Moore. Sworn. Direct. Excused. Govt rests. Jury out. Recess. Resume. Jury in. |

| | | |
|---|---|---|
| | | Defense calls witness no. 1- Michelle Armant. Sworn. Direct. Cross. Excused. Defense calls witness no. 2 - Carl Henry. Sworn. Direct. Cross. Excused. Defense calls witness no. 3 - Rev. Herman Clayton. Sworn. Direct. Cross. Defense rests. Govt closes. Defense closes. Jury out. Recess. Resume. Discussion regarding charge. Discussion regarding motion for mistrial. Court re-plays testimony of Dr Estrada. Court denies motion for mistrial without prejudice. No objections to the charge. Parties excused. Court adjourned. Dft remanded. (kbledsoe) (Entered: 03/24/2004) |
| 03/23/2004 | 291 | SEALED DOCUMENT as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 03/24/2004) |
| 03/23/2004 | 292 | ORDER ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 03/24/2004) |
| 03/24/2004 | 293 | ORDER to provide meal for jurors ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 03/24/2004) |
| 03/24/2004 | 294 | Court's Instructions to the Jury-Sentencing Hearing as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 03/24/2004) |
| 03/24/2004 | 295 | Jury note #1 filed as to Alfred NMI Bourgeois (kbledsoe) (Entered: 03/24/2004) |
| 03/24/2004 | 296 | RESPONSE to Juror Note #1 in the Sentencing Matter as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 03/24/2004) |
| 03/24/2004 | 297 | Jury note #2 filed as to Alfred NMI Bourgeois (kbledsoe) (Entered: 03/24/2004) |
| 03/24/2004 | 298 | Jury note #3 filed as to Alfred NMI Bourgeois (kbledsoe) (Entered: 03/24/2004) |
| 03/24/2004 | 299 | SPECIAL FINDINGS FORM as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 03/24/2004) |
| 03/24/2004 | 300 | JUDGMENT as to , Alfred NMI Bourgeois (1) count(s) 1ss ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 03/24/2004) |
| 03/24/2004 | 301 | Sentencing Phase-Day 3 held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:20-10:58/11:07-11:07/ 1:25-1:28/1:35-1:38/1:40-1:41/1:55-1:56/3:40-3:40/4:19-4:28 Appearances: Patty Booth/Tony Robert/Elsa Salinas-Patterson f/govt; Doug Tinker/John Gilmore f/dft. Alfred NMI Bourgeois (1) 1ss. Case continued. All counsel present. Court advises that Deft has the right to speak. Court states that Deft can speak before arguments begin. Jury in. Deft makes a statement to the jury. Closing arguments. Court charges jury. Court releases alternates to alternate jury room. Jury out. Clerk and counsel confirm that all exhibits are present. Court instructs clerk to take exhibits to the jury room. Resume. Jury note no. 1. Court responds to question no. 1. Recess. Resume. Jury note no. 2. Court responds to question no. 2. Recess. Resume. Jury note no.3. Jury in. |

|  |  | Court asks that foreman return the special findings form for publication. Court reads special findings form. Jurors recommend by unanimous vote that Deft be sentenced to death. Jurors polled. Jurors released. Court imposes sentence. Parties excused. Court adjourned. Dft remanded. (kbledsoe) Modified on 03/26/2004 (Entered: 03/25/2004) |
|---|---|---|
| 03/25/2004 | 302 | Sentencing Phase-Day 4 Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 9:06-9:12 Appearances: Tony Roberts f/govt; John Gilmore f/dft. Case called. Appearances made. Court vacates judgment signed on March 24, 2004. Deft advised of appeal rights. Court advises that the court will enter a new judgment. Court advises defendant that if a notice of appeal is filed, then court will appoint Mr. Gilmore and Mr. Tinker to represent the Deft. Parties excused. Court adjourned. Dft remanded. (kbledsoe) Modified on 03/26/2004 (Entered: 03/25/2004) |
| 03/25/2004 | 303 | JUDGMENT as to Alfred NMI Bourgeois (1) count(s) 1ss ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 03/25/2004) |
| 03/29/2004 | 304 | NOTICE OF APPEAL of Judgment by Alfred NMI Bourgeois (1) count(s) 1ss , filed. (kbledsoe) (Entered: 03/30/2004) |
| 03/30/2004 |  | Notice of appeal and Copy of docket for Alfred NMI Bourgeois transmitted to USCA: [304-1] appeal . Parties ntfd. (kbledsoe) (Entered: 03/30/2004) |
| 03/30/2004 |  | Transcript forms mailed to John Gilmore. (kbledsoe) (Entered: 03/30/2004) |
| 04/08/2004 | 305 | WRIT of Habeas Corpus ad Testificandum executed for Adam Longoria in case as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 04/13/2004) |
| 04/08/2004 | 306 | WRIT of Habeas Corpus ad Testificandum executed for Celso Ramos, Jr. in case as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 04/13/2004) |
| 04/08/2004 | 307 | WRIT of Habeas Corpus ad Testificandum executed for Celso Ramos, Jr. in case as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 04/13/2004) |
| 04/26/2004 | 308 | Transcript requested in appeal as to Alfred NMI Bourgeois [304-1] appeal , filed. (kbledsoe) (Entered: 05/12/2004) |
| 05/05/2004 | 309 | Amended Transcript requested in appeal as to Alfred NMI Bourgeois [304-1] appeal , filed. (kbledsoe) Modified on 05/12/2004 (Entered: 05/12/2004) |
| 05/05/2004 | 310 | Amended Transcript requested in appeal as to Alfred NMI Bourgeois [304-1] appeal , filed. (kbledsoe) Modified on 05/12/2004 (Entered: 05/12/2004) |
|  |  |  |

USCA5 6114

| 05/05/2004 | 311 | Amended Transcript requested in appeal as to Alfred NMI Bourgeois [304-1] appeal , filed. (kbledsoe) Modified on 05/12/2004 (Entered: 05/12/2004) |
| 05/05/2004 | 312 | Amended Transcript requested in appeal as to Alfred NMI Bourgeois [304-1] appeal , filed. (kbledsoe) (Entered: 05/12/2004) |
| 05/05/2004 | 313 | Amended Transcript requested in appeal as to Alfred NMI Bourgeois [304-1] appeal , filed. (kbledsoe) (Entered: 05/12/2004) |
| 05/05/2004 | 314 | Amended Transcript requested in appeal as to Alfred NMI Bourgeois [304-1] appeal , filed. (kbledsoe) (Entered: 05/12/2004) |
| 05/05/2004 | 315 | Amended Transcript requested in appeal as to Alfred NMI Bourgeois [304-1] appeal , filed. (kbledsoe) (Entered: 05/12/2004) |
| 05/05/2004 | 316 | Amended Transcript requested in appeal as to Alfred NMI Bourgeois [304-1] appeal , filed. (kbledsoe) (Entered: 05/12/2004) |
| 05/10/2004 | 317 | Amended Transcript requested in appeal as to Alfred NMI Bourgeois [304-1] appeal , filed. (kbledsoe) (Entered: 05/12/2004) |
| 05/10/2004 | 318 | Amended Transcript requested in appeal as to Alfred NMI Bourgeois [304-1] appeal , filed. (kbledsoe) (Entered: 05/12/2004) |
| 05/10/2004 | 319 | MOTION by Alfred NMI Bourgeois to unseal (Motions hearing 8/14/03) , filed. (kbledsoe) (Entered: 05/12/2004) |
| 05/10/2004 | 320 | MOTION by Alfred NMI Bourgeois to unseal (Motions hearing 12/10/03) , filed. (kbledsoe) (Entered: 05/12/2004) |
| 05/10/2004 | 321 | MOTION by Alfred NMI Bourgeois to unseal (Jury Qualification(s) 2/9/04), filed. (kbledsoe) (Entered: 05/12/2004) |
| 05/10/2004 | 322 | MOTION by Alfred NMI Bourgeois to unseal (Jury Qualification(s) 2/10/04) , filed. (kbledsoe) (Entered: 05/12/2004) |
| 05/10/2004 | 323 | MOTION by Alfred NMI Bourgeois to unseal (Jury Selection Day 3 on 2/23/04), filed. (kbledsoe) (Entered: 05/12/2004) |
| 05/10/2004 | 324 | MOTION by Alfred NMI Bourgeois to unseal (Jury Selection Day 4 on 2/24/04) , filed. (kbledsoe) (Entered: 05/12/2004) |
| 05/10/2004 | 325 | MOTION by Alfred NMI Bourgeois to unseal (Jury Selection Day 5 on 2/25/04), filed. (kbledsoe) (Entered: 05/12/2004) |
| 05/14/2004 | 334 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Arraignment Hearing for dates of 7/25/03 before Judge Jane Cooper-Hill , filed. Ct Reporter: Kendra Bledsoe (6 pgs) (kbledsoe) Modified on 05/20/2004 (Entered: 05/20/2004) |
| 05/14/2004 | 333 | Transcript requested in appeal as to Alfred NMI Bourgeois [304-1] appeal , filed. (kbledsoe) (Entered: 05/20/2004) |
| 05/16/2004 | 326 | ORDER granting [319-1] motion to unseal as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties |

| | | |
|---|---|---|
| | | ntfd. (kbledsoe) (Entered: 05/19/2004) |
| 05/16/2004 | 327 | ORDER granting [320-1] motion to unseal as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 05/19/2004) |
| 05/16/2004 | 328 | ORDER granting [321-1] motion to unseal as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 05/19/2004) |
| 05/16/2004 | 329 | ORDER granting [322-1] motion to unseal as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 05/19/2004) |
| 05/16/2004 | 330 | ORDER granting [323-1] motion to unseal as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 05/19/2004) |
| 05/16/2004 | 331 | ORDER granting [324-1] motion to unseal as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 05/19/2004) |
| 05/16/2004 | 332 | ORDER granting [325-1] motion to unseal as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 05/19/2004) |
| 06/04/2004 | 334 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Selection Hearing for dates of 2/19/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (255 pgs) (kbledsoe) (Entered: 06/07/2004) |
| 06/04/2004 | 335 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Trial-Day 1 Hearing for dates of 3/2/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (367 pgs) (kbledsoe) (Entered: 06/07/2004) |
| 06/07/2004 | 339 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Trial-Day 8 Hearing for dates of 3/16/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (92 pgs) (kbledsoe) (Entered: 06/09/2004) |
| 06/07/2004 | 340 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Hearing Hearing for dates of 3/17/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (69 pgs) (kbledsoe) (Entered: 06/09/2004) |
| 06/07/2004 | 341 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Sentencing-Day 2 Hearing for dates of 3/23/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (137 pgs) (kbledsoe) (Entered: 06/09/2004) |
| 06/07/2004 | 342 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Sentencing Hearing-Day 3 Hearing for dates of 3/24/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (121 pgs) |

USCA5 6116

| | | |
|---|---|---|
| | | (kbledsoe) (Entered: 06/09/2004) |
| 06/07/2004 | 343 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Continuation of Sentencing Hearing-Day 4 for dates of 3/25/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (8 pgs) (kbledsoe) (Entered: 06/09/2004) |
| 06/08/2004 | 336 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Trial-Day 2 Hearing for dates of 3/3/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (115 pgs) (kbledsoe) (Entered: 06/09/2004) |
| 06/08/2004 | 337 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Trial-Day 3 Hearing for dates of 3/4/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (303 pgs) (kbledsoe) (Entered: 06/09/2004) |
| 06/08/2004 | 338 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Trial-Day 7 Hearing for dates of 3/15/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (122 pgs) (kbledsoe) (Entered: 06/09/2004) |
| 06/10/2004 | 344 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Trial-Day 6 Hearing for dates of 3/9/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (297 pgs) (kbledsoe) (Entered: 06/14/2004) |
| 06/10/2004 | 345 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Trial-Day 5 Hearing for dates of 3/8/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (360 pgs) (kbledsoe) (Entered: 06/14/2004) |
| 06/10/2004 | 346 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Trial-Day 4 Hearing for dates of 3/5/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (178 pgs) (kbledsoe) (Entered: 06/14/2004) |
| 06/10/2004 | 347 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Hearing for dates of 3/19/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (122 pgs) (kbledsoe) (Entered: 06/14/2004) |
| 06/10/2004 | 348 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Sentencing Hearing-Day 1 for dates of 3/22/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (294 pgs) (kbledsoe) (Entered: 06/14/2004) |
| 06/14/2004 | 349 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Selection for dates of 2/20/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (273 pgs) (kbledsoe) (Entered: 06/15/2004) |
| 06/14/2004 | 350 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Pretrial Conference & Daubert Hearing for dates of 3/1/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (139 pgs) (kbledsoe) (Entered: 06/16/2004) |

**USCA5 6117**

| | | |
|---|---|---|
| 06/14/2004 | 351 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Status Conference Hearing for dates of 10/24/03 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (46 pgs) (kbledsoe) (Entered: 06/16/2004) |
| 06/14/2004 | 352 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Qualification Hearing for dates of 2/10/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (7 pgs) (kbledsoe) (Entered: 06/16/2004) |
| 06/14/2004 | 353 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Qualification Hearing for dates of 2/16/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (118 pgs) (kbledsoe) (Entered: 06/16/2004) |
| 06/21/2004 | 354 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Selection for dates of 2/23/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (350 pgs) (kbledsoe) (Entered: 06/22/2004) |
| 06/21/2004 | 355 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Selection for dates of 2/24/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (342 pgs) (kbledsoe) (Entered: 06/22/2004) |
| 06/21/2004 | 356 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Selection for dates of 2/25/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (149 pgs) (kbledsoe) (Entered: 06/22/2004) |
| 06/21/2004 | 357 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Motion Hearing/Ex-Parte for dates of 8/14/03 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (15 pgs) (kbledsoe) (Entered: 06/23/2004) |
| 06/21/2004 | 358 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Motions Hearing for dates of 12/10/03 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (103 pgs) (kbledsoe) (Entered: 06/23/2004) |
| 06/21/2004 | 359 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Qualification-Held in the Courtroom for dates of 2/9/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (84 pgs) (kbledsoe) (Entered: 06/23/2004) |
| 06/21/2004 | 360 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Qualification-Held in Jury Assembly Room for dates of 2/9/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (167 pgs) (kbledsoe) (Entered: 06/23/2004) |
| 06/21/2004 | 361 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Hearing for dates of 2/10/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (9 pgs) (kbledsoe) (Entered: 06/23/2004) |
| 06/22/2004 | 362 | MOTION by Alfred NMI Bourgeois to vacate Order , filed. (kbledsoe) (Entered: 06/23/2004) |
| | | |

**USCA5 6118**

| | | |
|---|---|---|
| 06/23/2004 | | Copy of DE #362 provided to AUSA, John Gilmore and US Marshal. (kbledsoe) (Entered: 06/23/2004) |
| 07/01/2004 | 363 | Docket Entry as to Alfred NMI Bourgeois , filed. The following original exhibits have been substituted with digital photographs: 1-15, 60, 291-296, 298-299, 312-324, 326-328, 342, 355, 357, 393-408, 410-411. Exhibit nos. 297 and 300 are substituted with original photos. Agreed to by: Elsa Salinas-Patterson and John Gilmore. (kbledsoe) (Entered: 07/02/2004) |
| 07/02/2004 | | Certified and transmitted record on appeal consisting of 5 volumes of the record, 52 volumes of transcripts, 74 sealed envelopes, 1 box of trial exhibits (Government & Deft), and 8 envelopes of exhibits to U.S. Court of Appeals as to Alfred NMI Bourgeois : [304-1] appeal . Circuit No. 04-40410. Parties ntfd. (kbledsoe) (Entered: 07/02/2004) |
| 07/02/2004 | | Certified and transmitted supplemental record on appeal consisting of 1 volume of the record (containing DE #363) to U.S. Court of Appeals as to Alfred NMI Bourgeois : [304-1] appeal . Circuit No. 04-40410. Parties ntfd. (kbledsoe) (Entered: 07/02/2004) |
| 07/07/2004 | 364 | RECEIPT for Withdrawal of Exhibits for USA as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 07/08/2004) |
| 07/12/2004 | 365 | Letter MOTION by Alfred NMI Bourgeois for new trial , filed. (kbledsoe) (Entered: 07/13/2004) |
| 07/23/2004 | | Certified and transmitted supplemental record on appeal consisting of 1 volume of the record (containing DE #364 & DE #365) to U.S. Court of Appeals as to Alfred NMI Bourgeois : [304-1] appeal . Circuit No. 04-40410. Parties ntfd. (kbledsoe) (Entered: 07/23/2004) |
| 08/06/2004 | 366 | Letter MOTION by Alfred NMI Bourgeois for new trial , filed. (kbledsoe) (Entered: 08/10/2004) |
| 09/01/2004 | | Certified and transmitted supplemental record on appeal consisting of 1 volume of the record (DE #366) to U.S. Court of Appeals as to Alfred NMI Bourgeois : [304-1] appeal . Circuit No. 04-40410. Parties ntfd. (kbledsoe) Modified on 09/01/2004 (Entered: 09/01/2004) |
| 09/13/2004 | | Fifth Court of Appeals LETTER of acknowledgement of supplemental record consisting of de# 366 - 1 volume as to Alfred NMI Bourgeois ( USCA No: 04-40410) ,filed.(amireles, ) (Entered: 09/20/2004) |
| 04/06/2005 | 367 | Writ of Habeas Corpus ad Testificandum Returned Executed in case as to Alfred NMI Bourgeois, filed. (kbledsoe, ) (Entered: 04/08/2005) |
| 04/06/2005 | 368 | Writ of Habeas Corpus ad Testificandum Returned Executed for Orlando Campos on 3/3/05. in case as to Alfred NMI Bourgeois, filed. (lsmith, ) (Entered: 04/11/2005) |
| 10/03/2005 | 369 | MOTION to Withdraw as Attorney for Handling a Writ of Certiorari to Supreme Court & a Sec. 2255 Motion in Trial Court, by John Gilmore, for Alfred NMI Bourgeois, filed. (glerma, ) Additional |

| | | attachment(s) added on 10/4/2005 (glerma, ). (Entered: 10/04/2005) |
|---|---|---|
| 10/05/2005 | 370 | JUDGMENT of USCA Fifth Circuit (certified copy) 8/25/05; Issued as Mandate 9/29/05; Affirming the judgment of the district court as to Alfred NMI Bourgeois as to 304 Notice of Appeal - Judgment and Sentence Alfred NMI Bourgeois (1) Count 1ss USCA No. 04-40410. ,filed.(srussell, ) (Entered: 10/05/2005) |
| 10/13/2005 | 371 | AMENDED MOTION FOR LEAVE to Withdraw as Counsel by Alfred NMI Bourgeois, filed. (Attachments: # 1 Proposed Order) (srussell, ) (Entered: 10/14/2005) |
| 10/17/2005 | | Attorney update in case as to Alfred NMI Bourgeois. Attorney Keith Hampton for Alfred NMI Bourgeois, Adrienne Urrutia for Alfred NMI Bourgeois added. (amireles, ) (Entered: 10/18/2005) |
| 10/18/2005 | 372 | ORDER granting 369 Motion to Withdraw as Attorney. as to Alfred NMI Bourgeois (1)Alfred NMI Bourgeois (1); granting 371 Motion to Withdraw as attorney and Order appointing Keith S. Hampton and Adrienne Urrutia. as to Alfred NMI Bourgeois (1)Alfred NMI Bourgeois (1). (Signed by Judge Janis Graham Jack.) Parties notified. (amireles, ) (Entered: 10/18/2005) |
| 02/03/2006 | 373 | Appeal Record Returned from the USCA Fifth Circuit as to Alfred NMI Bourgeois re 304 Notice of Appeal - Judgment and Sentence consisting of 56 volumes-51 transcripts (vol #23 missing), 5 volumes of record, 2 boxes of exhibits (returned to exhibit room),, file reassembled and forwarded to fileroom, sealed pleadings forwarded to vault, (USCA No:04-40410) ,filed.(amireles, ) (Entered: 02/07/2006) |
| 05/22/2006 | 374 | WRIT OF CERTIORARI Issued by US Supreme Court as to Alfred NMI Bourgeois re 304 Notice of Appeal - Judgment and Sentence,filed. Petition for a writ of certiorari is denied.(glerma, ) (Entered: 05/25/2006) |
| 06/14/2006 | 375 | EXPARTE MOTION To Substitute by Alfred NMI Bourgeois, filed. (glerma, ) (Entered: 06/14/2006) |
| 06/15/2006 | 376 | ORDER striking 375 Exparte Motion as to Alfred NMI Bourgeois (1). (Signed by Judge Janis Graham Jack.) Parties notified.(kwallace, ) (Entered: 06/16/2006) |
| 06/16/2006 | 377 | Appeal Record Returned from the USCA Fifth Circuit as to Alfred NMI Bourgeois re 304 Notice of Appeal - Judgment and Sentence consisting of 1 transcript (vlm 23 - dkt #358), file reassembled and forwarded to fileroom, sealed pleadings forwarded to vault, (USCA No:04-40410), filed.(kwallace, ) (Entered: 06/16/2006) |
| 07/01/2006 | 383 | CJA 20 as to Alfred NMI Bourgeois: Appointment of Attorney Michael Clark Gross for defendant, ( Signed by Judge Janis Graham Jack ). Parties notified. (lrivera, ) (Entered: 01/10/2007) |
| 07/03/2006 | 378 | SEALED ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ). Parties notified. (amireles, ) (Entered: |

| | | |
|---|---|---|
| | | 07/07/2006) |
| 07/03/2006 | | Attorney update in case as to Alfred NMI Bourgeois. Attorney Michael Clark Gross for Alfred NMI Bourgeois added. Attorney Adrienne Urrutia Wisenberg terminated. (amireles, ) (Entered: 07/07/2006) |
| 09/25/2006 | 379 | SEALED MOTION by Alfred NMI Bourgeois, filed. (amireles, ) (Entered: 09/25/2006) |
| 10/16/2006 | 380 | ORDER granting 379 Sealed Motion as to Alfred NMI Bourgeois (1). (Signed by Judge Janis Graham Jack.) Parties notified.(kwallace, ) (Entered: 10/17/2006) |
| 10/16/2006 | | Attorney update in case as to Alfred NMI Bourgeois. Attorney Victor Julio Abreu for Alfred NMI Bourgeois, Michael Wiseman for Alfred NMI Bourgeois added. Attorney Michael Clark Gross and Keith Hampton terminated. (kwallace, ) (Entered: 10/17/2006) |
| 10/16/2006 | | Minute Entry for proceedings held before Judge Janis Graham Jack :Telephone Conference as to Alfred NMI Bourgeois held on 10/16/2006. Discussion regarding Exparte Motion. Appearances:Michael Gross, Keith Hampton, Victor Julio Abreu, Michael Wiseman.(Digital # 9:13-9:24)(ERO:l cayce) , filed. (sscotch, ) (Entered: 10/17/2006) |
| 10/19/2006 | 381 | MOTION and Order for Michael Wiseman to Appear Pro Hac Vice by Alfred NMI Bourgeois, filed. Clerk notes: Document appears to be redacted due to grey shading in document, not redacted by clerk. (amireles, ) (Entered: 10/19/2006) |
| 10/19/2006 | 382 | MOTION AND ORDER for Admission Pro Hac Vice for Michael Wisemand to proceed as counsel as to Alfred NMI Bourgeois.( Signed by Judge Janis Graham Jack ). Parties notified. (kwallace, ) (Entered: 10/26/2006) |
| 01/10/2007 | | Attorney Gross called and requested a CJA form, he was appointed 7/3/06 and never received a form, as to Alfred NMI Bourgeois:, filed. (lrivera, ) (Entered: 01/10/2007) |
| 02/13/2007 | 384 | MOTION to Unseal Transcripts by Alfred NMI Bourgeois, filed. (Attachments: # 1 proposed order)(lrivera, ) (Entered: 02/13/2007) |
| 02/14/2007 | 385 | ORDER granting 384 Motion Unseal Transcripts as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified. (lrivera, ) (Entered: 02/14/2007) |
| 03/28/2007 | 386 | TRANSCRIPT as to Alfred NMI Bourgeois re: Ex Parte Motion Hearing held on 10/20/03 before Judge Janis Graham Jack. Court Reporter: V. Gano. Transcript is available for viewing in the office of the clerk, filed. (kwallace, ) (Clerk instruced by V. Gano that this transcript is not to be sealed) (Entered: 03/29/2007) |
| 03/28/2007 | 387 | TRANSCRIPT as to Alfred NMI Bourgeois re: Status Conference |

USCA5 6121

| | | |
|---|---|---|
| | | held on 12/16/03 before Judge Janis Graham Jack. Court Reporter: V. Gano. Transcript is available for viewing in the office of the clerk, filed. (Attachments: # 1 Conclusion of Transcript) (kwallace, ) (Entered: 03/29/2007) |
| 03/28/2007 | 388 | TRANSCRIPT as to Alfred NMI Bourgeois re: Status Conference held on 01/16/04 before Judge Janis Graham Jack. Court Reporter: V. Gano. Transcript is available for viewing in the office of the clerk, filed. (Attachments: # 1 Conclusion of Transcript) (kwallace, ) (Entered: 03/29/2007) |
| 03/28/2007 | 389 | TRANSCRIPT as to Alfred NMI Bourgeois re: Status Conference held on 01/21/04 before Judge Janis Graham Jack. Court Reporter: V. Gano. Transcript is available for viewing in the office of the clerk, filed. (kwallace, ) (Entered: 03/29/2007) |
| 04/04/2007 | 390 | MOTION Completion of Record *Petitioner's Motion To Complete Record and Consolidated Brief in Support* by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 04/04/2007) |
| 04/05/2007 | 391 | MOTION to Unseal Document *Motion to Unseal and Inspect Records* by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 04/05/2007) |
| 04/06/2007 | 392 | ORDER re: 391 Motion to Unseal Document as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified. (dperez, ) (Entered: 04/06/2007) |
| 04/09/2007 | 393 | Unopposed MOTION to Produce United States Marshall Service Records *and Proposed Order* by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 04/09/2007) |
| 04/09/2007 | | Minute Entry for proceedings held before Judge Janis Graham Jack : Telephone Conference as to Alfred NMI Bourgeois held on 4/9/2007 regardind Motion to Complete Record and Consolidate Breif in Support (DE 390). Appearances: Patricia Hubert Booth, Michael Wiseman.(Digital # 8:35-8:45)(ERO:v gano), filed.(sscotch, ) (Entered: 04/09/2007) |
| 04/20/2007 | 394 | ORDER granting 393 Motion to Produce United States Marshal Service Records as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(amireles, ) (Entered: 04/20/2007) |
| 04/20/2007 | 395 | Receipt from USM re: DE 394 as to Alfred NMI Bourgeois, filed. (amireles, ) Additional attachment(s) added on 2/14/2008 (amireles, ). (Entered: 04/23/2007) |
| 05/09/2007 | | Minute Entry for proceedings held before Judge Janis Graham Jack : Telephone Conference as to Alfred NMI Bourgeois held on 5/9/2007. Discussion regarding USM records. Appearances: Victor Julio Abreu, Patricia Hubert Booth.(Digital # 1:24-1:31)(ERO:v gano), filed. (sscotch, ) (Entered: 05/09/2007) |
| 05/14/2007 | 396 | MOTION to Vacate under 28 U.S.C. 2255 by Alfred NMI Bourgeois, |

**USCA5 6122**

| | | filed. (Wiseman, Michael) (Entered: 05/14/2007) |
|---|---|---|
| 05/14/2007 | | Civil Case number assigned C-07-223 as to Alfred NMI Bourgeois: re 5/14/07 2255 Motion, filed. (amireles, ) (Entered: 05/17/2007) |
| 05/15/2007 | 397 | NOTICE *Petitioner's Notice of Filing of Appendix in Support of Section 2255 Motion* of Notice of Filing Appendix in Support of Section 2255 Motion by Alfred NMI Bourgeois, filed. (Attachments: # 1 Appendix Volume I# 2 Appendix Volume II# 3 Appendix Volume III)(Wiseman, Michael) (Entered: 05/15/2007) |
| 06/04/2007 | 398 | MOTION to File Memorandum In Support of Motion by Alfred Bourgeois, filed. (mserpa, ) Initially filed & docketed in 2:07cv223. Motion re-docketed in CR case by deputy clerk. (Entered: 07/20/2007) |
| 07/19/2007 | 399 | ORDER granting 398 Motion for leave to file a memorandum of law in support of 2255 motion as to Alfred NMI Bourgeois (1). Petitioner may file a memorandum of law in support of 2255 motion on or before September 28, 2007. Respondent shall answer the motion on or before January 28, 2008. Petitioner may reply to the government's response on or before March 28, 2008.(Signed by Judge Janis Graham Jack.) Parties notified.(mserpa, ) (Entered: 07/20/2007) |
| 07/19/2007 | | Set/Reset Deadlines as to Alfred NMI Bourgeois: Alfred Bourgeois Responses (re: memorandum in support of 2255 motion) due by 9/28/2007. Response to Motion due by 1/28/2008, Reply to Response to Motion due by 3/28/2008. (mserpa, ) (Entered: 07/20/2007) |
| 09/28/2007 | 400 | MOTION for Extension of Time to File *Petitioner's Motion for One Business Day Extension of Time to File Memo of Law* Memorandum of Law by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 09/28/2007) |
| 09/28/2007 | 401 | ORDER granting 400 Motion for Extension of Time to File to file Memorandum in Support of Section 2255 Motion as to Alfred NMI Bourgeois (1). Petitioner is granted an extension to Friday, Oct. 5, 2007, to file his Memorandum of Law in Support of his Section 2255 Motion.(Signed by Judge Janis Graham Jack.) Parties notified. (mserpa, ) (Entered: 09/28/2007) |
| 10/05/2007 | 402 | TRIAL BRIEF as to Alfred NMI Bourgeois, filed. (Attachments: # 1 Appendix Petitioner's Supplemental Appendix in Support of 2255 Motion)(Wiseman, Michael) (Entered: 10/05/2007) |
| 01/15/2008 | 403 | Unopposed MOTION for Extension of Time to File Response/Reply as to 399 Order on Motion for Miscellaneous Relief, by USA as to Alfred NMI Bourgeois, filed. (Attachments: # 1)(Roberts, Tony) (Entered: 01/15/2008) |
| 01/15/2008 | 404 | ORDER granting 403 Unopposed MOTION for Extension of Time to File Response/Reply as to 399 Order on Motion for Miscellaneous Relief, as to Alfred NMI Bourgeois. The United States is ORDERED to file an Answer by 4/28/2008. Petitioner may reply to Govt's |

| | | |
|---|---|---|
| | | Response by 07/30/08. ( Signed by Judge Janis Graham Jack ) Parties notified. (kwallace, ) (Entered: 01/16/2008) |
| 01/16/2008 | 405 | Document(s) Sent by certified mail to Michael Wiseman; Tracking Number 7003 3110 0002 0869 5940 re: 404 Order,, Set Deadlines,, Set Deadlines/Hearings,, filed. (kwallace, ) (Entered: 01/16/2008) |
| 01/16/2008 | 406 | Document(s) Sent by certified mail to Victor Julio Abreu; Tracking Number 7003 3110 0002 0869 5957 re: 404 Order,, Set Deadlines,, Set Deadlines/Hearings,, filed. (kwallace, ) (Entered: 01/16/2008) |
| 01/16/2008 | 407 | Document(s) Sent by certified mail to James L Turner; Tracking Number 7003 3110 0002 0869 5964 re: 404 Order,, Set Deadlines,, Set Deadlines/Hearings,, filed. (kwallace, ) (Entered: 01/16/2008) |
| 01/16/2008 | 408 | Document(s) Sent by certified mail to Tony Roberts; Tracking Number 7003 3110 0002 0869 5988 re: 404 Order,, Set Deadlines,, Set Deadlines/Hearings,, filed. (amireles, ) (Entered: 01/16/2008) |
| 01/22/2008 | 409 | Certified Mail Receipt Returned regarding Order (de# 404) as to Alfred NMI Bourgeois, executed on 1/18/08, filed. (vrios, ) (Entered: 01/25/2008) |
| 01/22/2008 | 410 | Certified Mail Receipt Returned from AUSA regarding Order (de# 404) as to Alfred NMI Bourgeois, executed on 1/17/08, filed. (vrios, ) (Entered: 01/25/2008) |
| 01/22/2008 | 411 | Certified Mail Receipt Returned from James L. Turner regarding Order (de# 404) as to Alfred NMI Bourgeois, executed on 1/17/08, filed. (vrios, ) (Entered: 01/25/2008) |
| 01/28/2008 | 412 | Certified Mail Receipt Returned as to Alfred NMI Bourgeois, executed on 1/23/08 re: 405 Document(s) Sent to Michael Wiseman RE: DE #404, filed. (srussell, ) (Entered: 01/30/2008) |
| 02/05/2008 | 413 | MOTION Amendment of Court's Order Regarding Communications *Petitioner's Unopposed Motion to Amend Court's Order Limiting Mr. Bourgeois' Communications* by Alfred NMI Bourgeois, filed. (Attachments: # 1 Exhibit Prior Court Ordres Regarding Communications)(Wiseman, Michael) (Entered: 02/05/2008) |
| 02/06/2008 | 414 | ORDER granting in part 413 MOTION Amendment of Court's Order Regarding Communications *Petitioner's Unopposed Motion to Amend Court's Order Limiting Mr. Bourgeois' Communications* as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ) Parties notified. (amireles, ) (Entered: 02/06/2008) |
| 02/06/2008 | | Set/Reset Deadlines as to Alfred NMI Bourgeois: Alfred NMI Bourgeois Response to Motion due by 3/6/2008 (amireles, ) (Entered: 02/06/2008) |
| 02/19/2008 | 415 | Second MOTION for Extension of Time to File Response/Reply as to 404 Order,, Set Deadlines,, Set Deadlines/Hearings, 399 Order on Motion for Miscellaneous Relief, by USA as to Alfred NMI |

|  |  | Bourgeois, filed. (Attachments: # 1)(Roberts, Tony) (Entered: 02/19/2008) |
|---|---|---|
| 02/19/2008 | 416 | ORDER as to Alfred NMI Bourgeois granting 415 Second MOTION for Extension of Time to File Response/Reply as to 404 Order,, Set Deadlines,, Set Deadlines/Hearings, 399 Order on Motion for Miscellaneous Relief, Answer due by 7/21/2008 Alfred NMI Bourgeois Replies due by 10/20/2008....( Signed by Judge Janis Graham Jack ) Parties notified. (lcayce, ) (Entered: 02/19/2008) |
| 02/22/2008 | 417 | Document(s) Sent by certified mail to Michael Wiseman; Tracking Number 7003 3110 0002 0872 8327 re: 416 Order,, filed. (lcayce, ) (Entered: 02/22/2008) |
| 02/22/2008 | 418 | Document(s) Sent by certified mail to Tony Roberts; Tracking Number 7003 3110 0002 0872 8358 re: 416 Order,, filed. (lcayce, ) (Entered: 02/22/2008) |
| 02/22/2008 | 419 | Document(s) Sent by certified mail to James L Turner; Tracking Number 7003 3110 0002 0872 8341 re: 416 Order,, filed. (lcayce, ) (Entered: 02/22/2008) |
| 02/22/2008 | 420 | Document(s) Sent by certified mail to Victor Julio Abreu; Tracking Number 7003 3110 0002 0872 8334 re: 416 Order,, filed. (lcayce, ) (Entered: 02/22/2008) |
| 02/28/2008 | 421 | Certified Mail Receipt Returned as to AUSA James L. Turner RE: DE #416 Order granting Second Motion for Extention of Time as to Alfred NMI Bourgeois, executed on 2/26/08, filed. (srussell, ) (Entered: 02/28/2008) |
| 02/28/2008 | 422 | Certified Mail Receipt Returned from Michael Wiseman regarding document # 416 ) as to Alfred NMI Bourgeois, executed on 2/25/08, filed. (gchavez, ) (Entered: 02/28/2008) |
| 02/28/2008 | 423 | Certified Mail Receipt Returned as to AUSA Tony Roberts RE: DE #416 Order granting Second Motion for Extention of Time as to Alfred NMI Bourgeois, executed on 2/26/08, filed. (srussell, ) (Entered: 02/28/2008) |
| 03/04/2008 | 424 | Certified Mail Receipt Returned as to Alfred NMI Bourgeois re: 420 Document(s) Sent, filed. (vrios, ) (Entered: 03/04/2008) |
| 03/06/2008 | 425 | RESPONSE by USA as to Alfred NMI Bourgeois re 414 Order, *Regarding Defendant's Motion to Amend Order Limiting Correspondence*, filed. (Attachments: # 1 # 2)(Booth, Patricia) (Entered: 03/06/2008) |
| 03/17/2008 | 426 | NOTICE OF SETTING as to Alfred NMI Bourgeois..... Telephone Conference set for 3/19/2008 at 01:10 PM before Judge Janis Graham Jack, filed. (sscotch, ) (Entered: 03/17/2008) |
| 03/19/2008 |  | Minute Entry for proceedings held before Judge Janis Graham Jack : Telephone Conference as to Alfred NMI Bourgeois held on 3/19/2008. |

USCA5 6125

| | | |
|---|---|---|
| | | Discussion regarding 413 MOTION Amendment of Court's Order Regarding Communications Petitioner's Unopposed Motion to Amend Court's Order Limiting Mr. Bourgeois' Communications. Appearances: Victor Julio Abreu, Patricia Hubert Booth, Tony R Roberts, Michael Wiseman.(Digital # 1:14-1:35)(ERO:v gano), filed. (sscotch, ) (Entered: 03/21/2008) |
| 06/25/2008 | 427 | MOTION to Unseal Document *Forensic Psychiatric Evaluation* by USA as to Alfred NMI Bourgeois, filed. (Attachments: # 1 Proposed Order)(Patterson, Elsa) (Entered: 06/25/2008) |
| 06/26/2008 | 428 | ORDER granting Government's 427 Motion to Unseal Document as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(kwallace, ) (Entered: 06/26/2008) |
| 07/11/2008 | 429 | Third MOTION for Extension of Time to File Response/Reply as to 416 Order, 399 Order on Motion for Miscellaneous Relief, by USA as to Alfred NMI Bourgeois, filed. (Attachments: # 1 Proposed Order) (Roberts, Tony) (Entered: 07/11/2008) |
| 07/11/2008 | 430 | ORDER granting 429 Motion for Extension of Time to File Response/Reply as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(amireles, ) (Entered: 07/11/2008) |
| 07/11/2008 | | Document(s) Sent by certified mail to Victor Abreau; Tracking Number 7003 3110 0002 0872 9652 re: 430 Order on Motion for Extension of Time to File Response/Reply, filed. (amireles, ) (Entered: 07/11/2008) |
| 07/11/2008 | | Document(s) Sent by certified mail to Michael Wiseman; Tracking Number 7003 3110 0002 0872 9669 re: 430 Order on Motion for Extension of Time to File Response/Reply, filed. (amireles, ) (Entered: 07/11/2008) |
| 07/11/2008 | | Document(s) Sent by certified mail to James L. Turner; Tracking Number 7003 3110 0002 0872 9683 re: 430 Order on Motion for Extension of Time to File Response/Reply, filed. (amireles, ) (Entered: 07/11/2008) |
| 07/11/2008 | | Document(s) Sent by certified mail to Tony R. Roberts; Tracking Number 7003 3110 0002 0872 9676 re: 430 Order on Motion for Extension of Time to File Response/Reply, filed. (amireles, ) (Entered: 07/11/2008) |
| 07/11/2008 | | Set/Reset Deadlines/Hearings as to Alfred NMI Bourgeois: Answer due by 9/19/2008 Alfred NMI Bourgeois Responses due by 12/19/2008 (amireles, ) (Entered: 07/11/2008) |
| 07/18/2008 | 431 | Certified Mail Receipt Returned RE: DE #430 Order as to Alfred NMI Bourgeois, Received by AUSA James L Turner, executed on 7/16/08, filed. (srussell, ) (Entered: 07/18/2008) |
| 07/18/2008 | 432 | Certified Mail Receipt Returned RE: DE #430 as to Alfred NMI Bourgeois, Received by AUSA Tony R Roberts, executed on 7/16/08, |

USCA5 6126

| | | filed. (srussell, ) (Entered: 07/18/2008) |
|---|---|---|
| 07/21/2008 | 433 | Certified Mail Receipt Returned as to Alfred Bourgeois, executed on 7/18/08 re: Document(s) Sent, filed. (mserpa, ) (Entered: 07/21/2008) |
| 07/21/2008 | 434 | Certified Mail Receipt Returned as to Alfred NMI Bourgeois, executed on 7/21/08. 430 Addressed to Victor Julio Abreu, filed. (lsmith, ) (Entered: 07/22/2008) |
| 07/31/2008 | 435 | Opposed MOTION to Compel *Trial Defense Counsel to file responsive affidavits* by USA as to Alfred NMI Bourgeois, filed. (Attachments: # 1 Appendix Petitioner's Letter to Trial Defense Counsel, # 2 Proposed Order)(Roberts, Tony) (Entered: 07/31/2008) |
| 08/08/2008 | 436 | MOTION for Extension of Time to File Response/Reply *to Government's Motion Seeking Order for Affidavit from Defense Counsel* by Alfred NMI Bourgeois, filed. (Attachments: # 1 Proposed Order)(Wiseman, Michael) (Entered: 08/08/2008) |
| 08/13/2008 | 437 | RESPONSE in Opposition by Alfred NMI Bourgeois re 435 Opposed MOTION to Compel *Trial Defense Counsel to file responsive affidavits*, filed.(Wiseman, Michael) (Entered: 08/13/2008) |
| 08/28/2008 | | Minute Entry for proceedings held before Judge Janis Graham Jack: Telephone Conference as to Alfred NMI Bourgeois held on 8/28/2008 regarding affidavits and interrogatories. Appearances:John Gilmore, James McHue, Patricia Hubert Booth, Elsa Salinas Patterson, Tony R Roberts, Michael Wiseman.(Digital # 8:29-8:46)(ERO:l cayce), filed. (sscotch, ) (Entered: 08/28/2008) |
| 08/28/2008 | 438 | ORDER granting 435 Motion Seeking Order for Affidavit from Defense Counsel to Enable Respondent to Adequately Respond to Petitioner's Secton 2255 Motion as to Alfred NMI Bourgeois (1). Court ORDERS Mr. Tinker and Mr. Gilmore to respond to the allegations of ineffective assistance to the best of their ability. Mr. Gilmore will prepare an affidavit on or before Sept. 12, 2008. United States will prepare the first set of questions for Mr. Tinker by Sept. 5, 2008. Mr. Tinker's responses to the questions will be filed with the Court. Mr. Gilmore will file written notice with the Court if Mr. Tinker cannot complete his answers by Sept. 22, 2008. Bourgeois will submit any further questions for Mr. Tinker within ten days after the initial responses are filed with the Court. (Signed by Judge Janis Graham Jack.) Parties notified.(mserpa, ) (Entered: 08/28/2008) |
| 08/28/2008 | | Set/Reset Deadlines in case as to Alfred NMI Bourgeois 396 MOTION to Vacate under 28 U.S.C. 2255. Responses due by 10/15/2008 (mserpa, ) (Entered: 08/28/2008) |
| 09/19/2008 | 439 | Sealed Event, filed. (Entered: 09/19/2008) |
| 09/22/2008 | 440 | Sealed Event, filed. (Entered: 09/22/2008) |
| 10/02/2008 | | Clerk provides copies to de #'s 439 and 440 to Michael Wiseman, Victor Abreu, Patti Hubert Booth, Elsa Salinas-Patterson, Tony |

**USCA5 6127**

| | | |
|---|---|---|
| | | Roberts, and James Turner as to Alfred NMI Bourgeois, filed. (sscotch, ) (Entered: 10/02/2008) |
| 10/14/2008 | 441 | NOTICE *of Service of Interrogatories Directed to Douglas Tinker, Esq.* by Alfred NMI Bourgeois re 438 Order on Motion to Compel,,,, filed.(Wiseman, Michael) (Entered: 10/14/2008) |
| 10/15/2008 | 442 | Sealed Event, filed. (With attachments) (Entered: 10/15/2008) |
| 10/15/2008 | 443 | Sealed Event, filed. (With attachments) (Entered: 10/15/2008) |
| 10/29/2008 | 444 | NOTICE OF SETTING as to Alfred NMI Bourgeois. Telephone Conference set for 10/30/2008 at 09:00 AM before Judge Janis Graham Jack, filed. (sscotch, ) (Entered: 10/29/2008) |
| 10/30/2008 | | Minute Entry for proceedings held before Judge Janis Graham Jack: Telephone Conference as to Alfred NMI Bourgeois held on 10/30/2008. Appearances: Patricia Hubert Booth, Elsa Salinas Patterson, Tony R Roberts, Michael Wiseman.(Digital # 9:00-9:14) (ERO:v gano), filed.(sscotch, ) (Entered: 10/30/2008) |
| 12/17/2008 | 445 | AO 435 TRANSCRIPT ORDER FORM This is to order a transcript of Telephone Conferences on 3/19/2008; 8/28/2008; and 10/30/2008 before Judge Janis Graham Jack Court Reporter/Transcriber: Velma Gano, filed. (lsmith, ) (Entered: 12/22/2008) |
| 01/06/2009 | 446 | Unopposed MOTION for Extension of Time to File Response/Reply *Brief in Support of Section 2255 Motion* by Alfred NMI Bourgeois, filed. (Attachments: # 1 Proposed Order)(Wiseman, Michael) (Entered: 01/06/2009) |
| 01/12/2009 | 447 | ORDER granting 446 Motion for Extension of Time to File Response/Reply as to Alfred NMI Bourgeois (1). Petitioner shall file his Reply Brief in Support of his Section 2255 Motion on or before April 15, 2009.(Signed by Judge Janis Graham Jack.) Parties notified. (mserpa, ) (Entered: 01/12/2009) |
| 01/16/2009 | 452 | Sealed Event, filed. (Entered: 03/27/2009) |
| 01/16/2009 | 453 | Sealed Event - This document replaces DE 452 (incomplete image)., filed. (Entered: 03/27/2009) |
| 01/20/2009 | 448 | TRANSCRIPT as to Alfred NMI Bourgeois re: Telephone Conference held on 03/19/08 before Judge Janis Graham Jack. Court Reporter/Transcriber Molly Carter. Release of Transcript Restriction set for 4/20/2009., filed. (mocarter, ) (Entered: 01/20/2009) |
| 01/20/2009 | 449 | TRANSCRIPT as to Alfred NMI Bourgeois re: Telephone Conference held on 08/28/08 before Judge Janis Graham Jack. Court Reporter/Transcriber Molly Carter. Release of Transcript Restriction set for 4/20/2009., filed. (mocarter, ) (Entered: 01/20/2009) |
| 01/20/2009 | 450 | TRANSCRIPT as to Alfred NMI Bourgeois re: Telephone Conference held on 10/30/08 before Judge Janis Graham Jack. Court |

USCA5 6128

| | | Reporter/Transcriber Molly Carter. Release of Transcript Restriction set for 4/20/2009., filed. (mocarter, ) (Entered: 01/20/2009) |
|---|---|---|
| 01/20/2009 | 451 | Notice of Filing of Official Transcript as to 450 Transcript, 448 Transcript, 449 Transcript. Party notified, filed. (vgano, ) (Entered: 01/20/2009) |
| 04/08/2009 | 454 | Unopposed MOTION for Extension of Time to File Response/Reply *Brief in Support of Section 2255 Motion* by Alfred NMI Bourgeois, filed. (Attachments: # 1 Proposed Order)(Wiseman, Michael) (Entered: 04/08/2009) |
| 04/08/2009 | 455 | ORDER granting 454 Motion for Extension of Time to File Response/Reply as to Alfred NMI Bourgeois (1). Bourgeois shall file his reply brief on or before June 15, 2009. (Signed by Judge Janis Graham Jack.) Parties notified.(dperez, ) (Entered: 04/08/2009) |
| 04/08/2009 | | Set/Reset Deadlines as to Alfred NMI Bourgeois: Reply Brief due by 6/15/2009 (dperez, ) (Entered: 04/08/2009) |
| 04/09/2009 | 456 | Sealed Event, filed. (Entered: 04/09/2009) |
| 06/12/2009 | 457 | MOTION for Extension of Time to File Reply Brief by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 06/12/2009) |
| 06/12/2009 | 458 | ORDER granting 457 Motion for Extension of Time to File Reply Brief in Support of Section 2255 Motion as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(dperez, ) (Entered: 06/12/2009) |
| 06/12/2009 | | Set/Reset Deadlines as to Alfred NMI Bourgeois: Reply Brief due by 6/26/2009 (dperez, ) (Entered: 06/12/2009) |
| 06/26/2009 | 459 | REPLY TO RESPONSE to Motion by Alfred NMI Bourgeois re 396 MOTION to Vacate under 28 U.S.C. 2255, filed. (Attachments: # 1 Appendix Second Supplemental Appendix, pages 1-50, # 2 Appendix Second Supplemental Appendix, pages 51-100, # 3 Appendix Second Supplemental Appendix, pages 101-150, # 4 Appendix Second Supplemental Appendix, pages 151-200, # 5 Appendix Second Supplemental Appendix, pages 201-250, # 6 Appendix Second Supplemental Appendix, pages 251-end)(Wiseman, Michael) (Entered: 06/26/2009) |
| 07/01/2009 | 460 | MOTION for Hearing *Petitioner's Motion for an Evidentiary Hearing and Discovery*, MOTION for Discovery by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 07/01/2009) |
| 07/02/2009 | 461 | PROPOSED ORDER re: 460 MOTION for Hearing *Petitioner's Motion for an Evidentiary Hearing and Discovery* MOTION for Discovery as to Alfred NMI Bourgeois, filed.(Wiseman, Michael) (Entered: 07/02/2009) |
| 08/12/2009 | 462 | ORDER for Govt to respond to Deft. motion as to Alfred NMI Bourgeois Responses due by 9/11/2009.(Signed by Judge Janis |

| | | |
|---|---|---|
| | | Graham Jack) Parties notified. (lsmith, ) (Entered: 08/12/2009) |
| 08/28/2009 | 463 | MOTION for Discovery by USA as to Alfred NMI Bourgeois, filed. (Attachments: # 1 Proposed Order)(Patterson, Elsa) (Entered: 08/28/2009) |
| 09/04/2009 | 464 | RESPONSE in Opposition by Alfred NMI Bourgeois re 463 MOTION for Discovery *Petitioner's Answer in Partial Opposition to Government's Motion for Discovery*, filed.(Wiseman, Michael) (Entered: 09/04/2009) |
| 09/08/2009 | 465 | NOTICE OF SETTING as to Alfred NMI Bourgeois. Telephone Conference set for 9/9/2009 at 10:15 PM before Judge Janis Graham Jack, filed. (sscotch, ) (Entered: 09/08/2009) |
| 09/09/2009 | 466 | ORDER as to Alfred NMI Bourgeois. At the conference, the Court ordered that within sixty days Bourgeois will submit to the Government any documents that are relevant and which they can agree to turn over without compromising Bourgeois' attorney/client privilege. Bourgeois will submit the remainder of the records to the Court under seal for in camera inspection. Court recommends that Bourgeois Bates stamp the sealed material.(Signed by Judge Janis Graham Jack) Parties notified. (mserpa, ) (Entered: 09/09/2009) |
| 09/09/2009 | | Minute Entry for proceedings held before Judge Janis Graham Jack: Telephone Conference as to Alfred NMI Bourgeois held on 9/9/2009 Appearances:John Gilmore. Patricia Hubert Booth, Elsa Salinas Patterson, Tony R Roberts, Michael Wiseman.(Digital # 10:26-10:36)(ERO:v gano), filed.(sscotch, ) (Entered: 09/12/2009) |
| 09/21/2009 | 467 | AO 435 TRANSCRIPT ORDER FORM by Kathrin Hennig. This is to order a transcript of Telephone Conference held on September 9, 2009 before Judge Janis Graham Jack (original). Court Reporter/Transcriber: Transcriber, filed. (grogan, ) (Entered: 09/22/2009) |
| 10/12/2009 | 468 | TRANSCRIPT as to Alfred NMI Bourgeois re: Telephone Conference held on 09/09/09 before Judge Janis Graham Jack. Court Reporter/Transcriber Molly Carter. Release of Transcript Restriction set for 1/11/2010., filed. (mocarter) (Entered: 10/12/2009) |
| 10/13/2009 | 469 | Notice of Filing of Official Transcript as to 468 Transcript. Party notified, filed. (vgano, ) (Entered: 10/13/2009) |
| 11/09/2009 | 470 | NOTICE *Petitioner's* of Notice of Compliance with Discovery Request by Alfred NMI Bourgeois, filed.(Wiseman, Michael) (Entered: 11/09/2009) |
| 11/09/2009 | 471 | Sealed Event, filed. (With attachments) (Entered: 11/09/2009) |
| 11/24/2009 | | Minute Entry for proceedings held before Judge Janis Graham Jack: MINUTE ENTRY re: EXPARTE HEARING as to Alfred NMI Bourgeois held on 11/24/2009 Appearances: M Wiseman(Digital # 5:08-5:24)(ERO:v gano), filed.(sscotch, ) (Entered: 12/14/2009) |

USCA5 6130

| 12/09/2009 | 472 | MOTION for Inspection of Outgoing Mail by Defendant In Camera by USA as to Alfred NMI Bourgeois, filed. (Attachments: # 1 Proposed Order)(Booth, Patricia) (Entered: 12/09/2009) |
|---|---|---|
| 12/10/2009 | 473 | RESPONSE to Motion by Alfred NMI Bourgeois re 472 MOTION for Inspection of Outgoing Mail by Defendant In Camera, filed. (Wiseman, Michael) (Entered: 12/10/2009) |
| 12/11/2009 | 474 | NOTICE OF SETTING as to Alfred NMI Bourgeois. Telephone Conference set for 12/14/2009 at 01:15 PM before Judge Janis Graham Jack, filed. (lsmith, ) (Entered: 12/11/2009) |
| 12/14/2009 | 475 | NOTICE OF SETTING as to Alfred NMI Bourgeois. Telephone Conference set for 12/14/2009 at 01:15 PM before Judge Janis Graham Jack, filed. (sscotch, ) (Entered: 12/14/2009) |
| 12/14/2009 | | Minute Entry for proceedings held before Judge Janis Graham Jack: MOTION HEARING - TELEPHONE CONFERENCE as to Alfred NMI Bourgeois held on 12/14/2009 re: 472 MOTION for Inspection of Outgoing Mail by Defendant In Camera. Appearances: Patricia Hubert Booth, Tony R Roberts, Elsa Salinas Patterson, Michael Wiseman.(Digital # 1:16-1:38)(ERO:v gano), filed.(sscotch, ) (Entered: 12/14/2009) |
| 12/15/2009 | 476 | ORDER RE: 472 Government's Motion for In Camera Inspection of Outgoing Mail by Defendant to an Individual Other Than His Attorney of Record as to Alfred NMI Bourgeois. Government is Ordered to file a status update in this case within 30 days which outlines which issues need to be set for a hearing.(Signed by Judge Janis Graham Jack) Parties notified. (srussell, ) (Entered: 12/15/2009) |
| 12/16/2009 | 477 | Sealed Event, filed. (With attachments) (Entered: 12/16/2009) |
| 12/17/2009 | 478 | Sealed Event, filed. (With attachments) (Entered: 12/17/2009) |
| 12/21/2009 | 479 | ORDER denying 463 Motion for Discovery as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified. (srussell, ) (Entered: 12/21/2009) |
| 12/24/2009 | 480 | RESPONSE to Motion by USA as to Alfred NMI Bourgeois re 460 MOTION for Hearing *Petitioner's Motion for an Evidentiary Hearing and Discovery* MOTION for Discovery *regarding Evidentiary Hearing and Discovery issues*, filed. (Attachments: # 1 Proposed Order)(Roberts, Tony) (Entered: 12/24/2009) |
| 01/08/2010 | 481 | MOTION for Extension of Time to File Response/Reply as to 480 Response to Motion, by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 01/08/2010) |
| 01/11/2010 | 482 | ORDER as to Alfred NMI Bourgeois Granting 481 MOTION for Extension of Time to File Response/Reply as to 480 Response to Motion, ( Replies due by 1/11/2010).(Signed by Judge Janis Graham Jack) Parties notified. (srussell, ) (Entered: 01/11/2010) |

| 01/11/2010 | 483 | REPLY TO RESPONSE to Motion by Alfred NMI Bourgeois re 460 MOTION for Hearing *Petitioner's Motion for an Evidentiary Hearing and Discovery* MOTION for Discovery, filed.(Wiseman, Michael) (Entered: 01/11/2010) |
| 03/08/2010 | 484 | Unopposed MOTION to Compel by USA as to Alfred NMI Bourgeois, filed. (Attachments: # 1 Proposed Order)(Dowd, Mark) (Entered: 03/08/2010) |
| 03/08/2010 | 485 | Corrected MOTION to Compel by USA as to Alfred NMI Bourgeois, filed. (Attachments: # 1 Proposed Order)(Dowd, Mark) (Entered: 03/08/2010) |
| 03/18/2010 |  | Minute Entry for proceedings held before Judge Janis Graham Jack: Telephone Conference as to Alfred NMI Bourgeois held on 3/18/2010. Appearances: Patricia Hubert Booth, Tony R Roberts, Elsa Salinas, Michael Wiseman.(Digital # 4:31-4:50)(ERO:v gano) Deft remanded to custody, filed.(sscotch, ) (Entered: 03/19/2010) |
| 03/19/2010 | 486 | SCHEDULING ORDER as to Alfred NMI Bourgeois Oral argument to discuss issues that will be developed in an evidentiary hearing set for 4/20/2010 at 01:30 PM before Judge Janis Graham Jack;Evidentiary Hearing set for 9/20/2010 at 08:30 AM before Judge Janis Graham Jack. (Signed by Judge Janis Graham Jack) Parties notified. (srussell, ) (Entered: 03/19/2010) |
| 03/19/2010 | 487 | ORDER granting 485 Motion to Compel as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(lrivera, ) (Entered: 03/19/2010) |
| 04/19/2010 | 488 | NOTICE of Supplemental Authority by Alfred NMI Bourgeois, filed. (Attachments: # 1 Exhibit US v Johnson, # 2 Exhibit US v Sinisterra) (Wiseman, Michael) (Entered: 04/19/2010) |
| 04/20/2010 |  | Minute Entry for proceedings held before Judge Janis Graham Jack: HEARING re: 2255 issues as to Alfred NMI Bourgeois held on 4/20/2010. Govt offers exhibit no. 1. ADMITTED. Appearances: Patricia Hubert Booth, Mark Michael Dowd, Tony R Roberts, Elsa Salinas, Michael Wiseman, Victor Julio Abreu.(Digital # 1:26-2:51) (ERO:v gano), filed.(sscotch, ) (Entered: 04/25/2010) |
| 04/20/2010 | 491 | EXHIBIT LIST by USA as to Alfred NMI Bourgeois, filed. (Attachments: # 1 REDACTED - Report)(sscotch, ) (Additional attachment(s) added on 4/27/2010: # 2 UNREDACTED - Report) (sscotch, ). (Entered: 04/27/2010) |
| 04/21/2010 | 489 | ORDER as to Alfred NMI Bourgeois. Govt to submit notes taken by Elsa Salinas Patterson and Patricia Hubert Booth, Govt to submit draft protective order and Attorney's for Bourgeois to turn over to the Govt psychological data underlying mental retardation testing due by 4/27/2010.(Signed by Judge Janis Graham Jack) Parties notified. (srussell, ) (Entered: 04/21/2010) |
|  |  |  |

| | | |
|---|---|---|
| 04/26/2010 | 490 | AO 435 TRANSCRIPT ORDER FORM by K. Hennig. This is to order a transcript of Oral Argument held on 4/20/10 before Judge Janis Graham Jack Court Reporter/Transcriber: Garcia Services, filed. (mserpa, ) (Entered: 04/27/2010) |
| 04/27/2010 | 492 | Agreed MOTION for Protective Order by USA as to Alfred NMI Bourgeois, filed. (Attachments: # 1 Proposed Order)(Dowd, Mark) (Entered: 04/27/2010) |
| 04/27/2010 | 493 | Sealed Event, filed. (With attachments) (Entered: 04/27/2010) |
| 04/27/2010 | 494 | Sealed Event, filed. (With attachments) (Entered: 04/27/2010) |
| 04/27/2010 | 495 | PROTECTIVE ORDER as to Alfred NMI Bourgeois.(Signed by Judge Janis Graham Jack) Parties notified. (srussell, ) (Entered: 04/28/2010) |
| 05/04/2010 | 496 | TRANSCRIPT as to Alfred NMI Bourgeois re: Hearing held on 4/20/10 before Judge Janis Graham Jack.Court Reporter/Transcriber Garcia Services. Release of Transcript Restriction set for 8/2/2010., filed. (judgarcia, ) (Entered: 05/04/2010) |
| 05/05/2010 | 497 | Notice of Filing of Official Transcript as to 496 Transcript. Party notified, filed. (dterrell, ) (Entered: 05/05/2010) |
| 05/06/2010 | | Minute Entry for proceedings held before Judge Janis Graham Jack: Telephone Conference as to Alfred NMI Bourgeois held on 5/6/2010 regarding videotaping examination and discussion regarding Final Hearing Order. Appearances: Patricia Hubert Booth, Tony R Roberts, Elsa Salinas, Michael Wiseman.(Digital # 1:09-1:36)(ERO:v gano) Deft remanded to custody, filed.(sscotch, ) (Entered: 05/06/2010) |
| 05/06/2010 | 498 | ORDER Re: Telephone Conference orders as to Alfred NMI Bourgeois.(Signed by Judge Janis Graham Jack) Parties notified. (srussell, ) (Entered: 05/07/2010) |
| 05/10/2010 | 499 | AO 435 TRANSCRIPT ORDER FORM by Kathrin Hennig. This is to order a transcript of Phone Conference held on 5/6/10 before Judge Janis Graham Jack, filed. (mserpa, ) (Entered: 05/11/2010) |
| 05/25/2010 | 500 | TRANSCRIPT as to Alfred NMI Bourgeois re: Telephone Conference held on 05/06/10 before Judge Janis Graham Jack.Court Reporter/Transcriber Molly Carter. Release of Transcript Restriction set for 8/23/2010., filed. (mocarter) (Entered: 05/25/2010) |
| 05/25/2010 | 501 | MOTION for Reconsideration re 498 Order by USA as to Alfred NMI Bourgeois, filed. (Attachments: # 1 Proposed Order)(Booth, Patricia) (Entered: 05/25/2010) |
| 05/26/2010 | 502 | Notice of Filing of Official Transcript as to 500 Transcript. Party notified, filed. (vrios, ) (Entered: 05/26/2010) |
| 05/29/2010 | 503 | RESPONSE to Motion by Alfred NMI Bourgeois re 501 MOTION for Reconsideration re 498 Order *Petitioner's Response in Opposition to* |

Case 2:19-cv-00392-JMS-DLP    Document 10-3    Filed 10/18/19    Page 1965 of 2006
PageID #: 8027

| | | |
|---|---|---|
| | | *Government's Motion to Reconsider*, filed. (Attachments: # 1 Exhibit Price Report, Excerpt, USA v Fields, # 2 Exhibit Transcript Excerpt, USA v Hammer, # 3 Exhibit Government's Motion, USA v Nelson, # 4 Exhibit Opinion, Excerpt, Commonwealth v DeJesus, # 5 Exhibit Complaint, Texas v Denkowski, # 6 Exhibit Marberry Letter, 5-07-2010, # 7 Exhibit Order, Trentadue v FBI)(Wiseman, Michael) (Entered: 05/29/2010) |
| 06/07/2010 | | Minute Entry for proceedings held before Judge Janis Graham Jack: Telephone Conference as to Alfred NMI Bourgeois held on 6/7/2010. Discussion regarding 501 Motion for Reconsideration and 503 Response. Telephone Conference set for 6/9/2010 at 12:00 PM (Central Time) before Judge Janis Graham Jack. Appearances: Tony R Roberts, Elsa Salinas, Michael Wiseman.(Digital # 2:57-3:25)(ERO:v gano), filed.(sscotch, ) (Entered: 06/08/2010) |
| 06/09/2010 | 504 | ORDER denying 501 Motion for Reconsideration as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified. (mserpa, ) (Entered: 06/09/2010) |
| 06/09/2010 | | Minute Entry for proceedings held before Judge Janis Graham Jack: MOTION HEARING regarding 501 Motion to Reconsider as to Alfred NMI Bourgeois held on 6/9/2010. Govt witnesses: Hector Joyner, Roger B Moore, Jr., Ph.D., J Randall Price, Ph.D. Appearances: Patricia Hubert Booth, Mark Michael Dowd, Tony R Roberts, Michael Wiseman.(Digital # 2:05-1:10)(ERO:v gano, d perez), filed.(sscotch, ) (Entered: 06/13/2010) |
| 06/09/2010 | | **Terminate Deadlines and Hearings as to Alfred NMI Bourgeois: (sscotch, ) (Entered: 06/20/2010) |
| 06/13/2010 | 505 | NOTICE OF SETTING as to Alfred NMI Bourgeois. Evidentiary Hearing set for 9/10/2010 at 09:00 AM before Judge Janis Graham Jack, filed. (sscotch, ) (Entered: 06/13/2010) |
| 06/14/2010 | 506 | NOTICE of Psychological Testing by USA as to Alfred NMI Bourgeois re 498 Order, filed.(Dowd, Mark) (Entered: 06/14/2010) |
| 06/17/2010 | 507 | AO 435 TRANSCRIPT ORDER FORM by Kathrin Hennig. This is to order a transcript of Telephone Conference held on 06/07/10 before Judge Janis Graham Jack, filed. (lcayce, ) (Entered: 06/18/2010) |
| 06/17/2010 | 508 | AO 435 TRANSCRIPT ORDER FORM by Kathrin Hennig. This is to order a transcript of Telephone Conference held on 06/09/10 before Judge Janis Graham Jack, filed. (lcayce, ) (Entered: 06/18/2010) |
| 06/29/2010 | 509 | TRANSCRIPT as to Alfred NMI Bourgeois re: Telephone Conference held on 6/7/10 before Judge Janis Graham Jack.Court Reporter/Transcriber Garcia Services. Release of Transcript Restriction set for 9/27/2010., filed. (judgarcia, ) (Entered: 06/29/2010) |
| 06/29/2010 | 510 | TRANSCRIPT as to Alfred NMI Bourgeois re: Telephone Conference |

USCA5 6134

| | | |
|---|---|---|
| | | held on 6/9/10 before Judge Janis Graham Jack.Court Reporter/Transcriber Grcia Services. Release of Transcript Restriction set for 9/27?2010., filed. (judgarcia, ) (Entered: 06/29/2010) |
| 06/30/2010 | 511 | Notice of Filing of Official Transcript as to 510 Transcript, 509 Transcript. Party notified, filed. (dterrell, ) (Entered: 06/30/2010) |
| 07/02/2010 | | Writ of Habeas Corpus ad Testificandum Issued as to Alfred Bourgeois for September 20, 2010 at 8:30 a.m. in case as to Alfred NMI Bourgeois ( Signed by Judge Judge Janis Graham Jack), filed. (lsmith, ) (Entered: 07/02/2010) |
| 07/02/2010 | | ***Set/Reset Hearings as to Alfred NMI Bourgeois: Evidentiary Hearing set for 9/20/2010 at 08:30 AM before Judge Janis Graham Jack (lsmith, ) (Entered: 07/02/2010) |
| 08/06/2010 | 512 | Agreed MOTION for Protective Order by USA as to Alfred NMI Bourgeois, filed. (Attachments: # 1 Proposed Order)(Dowd, Mark) (Entered: 08/06/2010) |
| 08/06/2010 | 513 | Agreed MOTION for Protective Order by USA as to Alfred NMI Bourgeois, filed. (Attachments: # 1 Proposed Order)(Dowd, Mark) (Entered: 08/06/2010) |
| 08/06/2010 | 514 | ORDER granting 513 Motion for Protective Order as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified. (mserpa, ) (Entered: 08/06/2010) |
| 08/16/2010 | 515 | MOTION For Additional Court Days to Present Case by Alfred NMI Bourgeois, filed. (Attachments: # 1 Exhibit Exhibit A -- Witness List, # 2 Exhibit Exhibit B -- Index to Hearing Exhibits)(Wiseman, Michael) (Entered: 08/16/2010) |
| 08/18/2010 | 516 | ORDER denying 515 Motion for Additional Court Dates to Present His Evidence as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(bcortez, ) (Entered: 08/18/2010) |
| 08/24/2010 | 517 | Unopposed MOTION to Withdraw Document *Trial Exhibits* by USA as to Alfred NMI Bourgeois, filed. (Attachments: # 1 Proposed Order) (Dowd, Mark) (Entered: 08/24/2010) |
| 08/25/2010 | 518 | ORDER granting 517 Motion to Withdraw Document as to Alfred NMI Bourgeois (1). The Government will provide copies of the exhibits to counsel for Bourgeois. The Court ORDERS the Government to return the original trial exhibits to the Court after they are copied.(Signed by Judge Janis Graham Jack.) Parties notified. (bcortez, ) (Entered: 08/25/2010) |
| 08/25/2010 | 520 | RECEIPT FOR WITHDRAWAL OF EXHIBITS by Alfred NMI Bourgeois, filed. (bcortez, ) (Entered: 08/26/2010) |
| 08/26/2010 | 519 | MOTION Phone Conference *to Address Witness Unavailability* by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 08/26/2010) |
| | | |

**USCA5 6135**

| | | |
|---|---|---|
| 08/27/2010 | | ***Set/Reset Hearings as to Alfred NMI Bourgeois: Evidentiary Hearing set for 9/10/2010 at 09:00 AM before Judge Janis Graham Jack (sscotch, ) (Entered: 08/27/2010) |
| 08/27/2010 | 522 | Receipt for Exhibits as to Alfred NMI Bourgeois, filed.(bcortez, ) (Entered: 08/31/2010) |
| 08/30/2010 | | Minute Entry for proceedings held before Judge Janis Graham Jack: MOTION HEARING held on 8/30/2010 re: 519 Motion Phone Conference to Address Witness Unavailability as to Alfred NMI Bourgeois. Appearances: Patricia Hubert Booth, Mark Michael Dowd, Tony R Roberts, Elsa Salinas, Michael Wiseman.(Digital # 5:09-5:13) (ERO:v gano), filed.(sscotch, ) (Entered: 09/02/2010) |
| 08/31/2010 | 521 | ORDER granting 519 Motion Phone Conference to Address Witness Unavailability as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(amireles, ) (Entered: 08/31/2010) |
| 09/02/2010 | 523 | Sealed Event, filed. (With attachments) (Entered: 09/02/2010) |
| 09/02/2010 | 524 | Sealed Event, filed. (With attachments) (Entered: 09/02/2010) |
| 09/02/2010 | 525 | Sealed Event, filed. (With attachments) (Entered: 09/02/2010) |
| 09/02/2010 | 526 | Sealed Event, filed. (With attachments) (Entered: 09/02/2010) |
| 09/02/2010 | 527 | Sealed Event, filed. (With attachments) (Entered: 09/02/2010) |
| 09/02/2010 | 528 | Sealed Event, filed. (With attachments) (Entered: 09/02/2010) |
| 09/02/2010 | 529 | Sealed Event, filed. (With attachments) (Entered: 09/02/2010) |
| 09/02/2010 | 530 | Sealed Event, filed. (With attachments) (Entered: 09/02/2010) |
| 09/02/2010 | 531 | Sealed Event, filed. (With attachments) (Entered: 09/02/2010) |
| 09/02/2010 | 532 | Sealed Event, filed. (With attachments) (Entered: 09/02/2010) |
| 09/02/2010 | 533 | Sealed Event, filed. (With attachments) (Entered: 09/02/2010) |
| 09/02/2010 | 534 | Sealed Event, filed. (With attachments) (Entered: 09/02/2010) |
| 09/03/2010 | 535 | Sealed Order, filed. (Entered: 09/03/2010) |
| 09/03/2010 | 536 | NOTICE of Notice of Deposition by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 09/03/2010) |
| 09/03/2010 | 537 | Sealed Order, filed. (Entered: 09/03/2010) |
| 09/03/2010 | 538 | Sealed Order, filed. (Entered: 09/03/2010) |
| 09/03/2010 | 539 | Sealed Order, filed. (Entered: 09/03/2010) |
| 09/03/2010 | 540 | Sealed Order, filed. (Entered: 09/03/2010) |
| 09/03/2010 | 541 | Sealed Order, filed. (Entered: 09/03/2010) |
| 09/03/2010 | 542 | Sealed Order, filed. (Entered: 09/03/2010) |

| | | |
|---|---|---|
| 09/03/2010 | 543 | Sealed Order, filed. (Entered: 09/03/2010) |
| 09/03/2010 | 544 | Sealed Order, filed. (Entered: 09/03/2010) |
| 09/03/2010 | 545 | Sealed Order, filed. (Entered: 09/03/2010) |
| 09/03/2010 | 546 | Sealed Order, filed. (Entered: 09/03/2010) |
| 09/03/2010 | 547 | Sealed Order, filed. (Entered: 09/03/2010) |
| 09/03/2010 | 548 | Sealed Event, filed. (With attachments) (Entered: 09/03/2010) |
| 09/03/2010 | 549 | Sealed Event, filed. (With attachments) (Entered: 09/03/2010) |
| 09/03/2010 | 552 | Sealed Event, filed. (Entered: 09/07/2010) |
| 09/03/2010 | 553 | Sealed Event, filed. (Entered: 09/07/2010) |
| 09/07/2010 | 550 | Sealed Event, filed. (With attachments) (Entered: 09/07/2010) |
| 09/07/2010 | 551 | NOTICE *Corrected Notice* of Deposition by Alfred NMI Bourgeois re 536 Notice (Other), filed.(Wiseman, Michael) (Entered: 09/07/2010) |
| 09/07/2010 | 554 | NOTICE OF ATTORNEY APPEARANCE Michael Wiseman appearing for AFPD as to Alfred NMI Bourgeois, filed.(Wiseman, Michael) (Entered: 09/07/2010) |
| 09/09/2010 | 555 | NOTICE OF RESETTING as to Alfred NMI Bourgeois. Evidentiary Hearing set for 9/10/2010 at 03:30 PM before Judge Janis Graham Jack, filed. (sscotch, ) (Entered: 09/09/2010) |
| 09/10/2010 | 556 | Corrected MOTION to Correct 550 Sealed Event filed by Alfred NMI Bourgeois by Alfred NMI Bourgeois, filed. (Attachments: # 1 Proposed Order, # 2 Subpoena)(Wiseman, Michael) (Entered: 09/10/2010) |
| 09/10/2010 | 557 | ORDER FOR ISSUANCE OF SUBPOENA DUCES TECUM IN ADVANCE OF HEARING as to Alfred NMI Bourgeois.(Signed by Judge Janis Graham Jack) Parties notified. (amireles, ) (Additional attachment(s) added on 9/13/2010: # 1 MAIN DOCUMENT) (amireles, ). (Entered: 09/13/2010) |
| 09/10/2010 | | Minute Entry for proceedings held before Judge Janis Graham Jack: EVIDENTIARY HEARING as to Alfred NMI Bourgeois held on 9/10/2010. Witness: Michael Gelbort.,Ph. d. Defense exhibits: 15,16,17,31,86,132 - Admitted. Govt exhibits: 4-13,19-22 - Admitted. Appearances: Patricia Hubert Booth, Mark Michael Dowd, Tony R Roberts, Elsa Salinas, Michael Wiseman, Elizabeth Larin.(Digital # 2:49-4:44/4:52-6:27)(ERO:v gano), filed.(sscotch, ) (Entered: 09/19/2010) |
| 09/14/2010 | 558 | AO 435 TRANSCRIPT ORDER FORM by Elsa Salinas, AUSA. This is to order a transcript of Evidentiary Hearing held on 9/10/10 before Judge Janis Graham Jack, filed. (mserpa, ) (Entered: 09/14/2010) |
| 09/15/2010 | 559 | Writ of Habeas Corpus ad Testificandum Issued as to Timothy Lynn |

**USCA5 6137**

| | | |
|---|---|---|
| | | Allen for 9/20/10 at 8:30 a.m. in case as to Alfred NMI Bourgeois ( Signed by Judge Judge Janis Graham Jack), filed. (vrios, ) (Entered: 09/16/2010) |
| 09/15/2010 | | ***Set/Reset Hearings as to Alfred NMI Bourgeois: Hearing set for 9/20/2010 at 08:30 AM before Judge Janis Graham Jack (vrios, ) (Entered: 09/16/2010) |
| 09/16/2010 | 560 | TRANSCRIPT as to Alfred NMI Bourgeois re: Evidentiary Hearing held on 09/10/10 before Judge Janis Graham Jack. Court Reporter/Transcriber Molly Carter. Release of Transcript Restriction set for 12/15/2010., filed. (mocarter) (Entered: 09/16/2010) |
| 09/17/2010 | 561 | Notice of Filing of Official Transcript as to 560 Transcript. Party notified, filed. (dterrell, ) (Entered: 09/17/2010) |
| 09/20/2010 | | Minute Entry for proceedings held before Judge Janis Graham Jack: EVIDENTIARY HEARING as to Alfred NMI Bourgeois held on 9/20/2010. Witnesses: Victoria Swanson, Donald Weiner, Jethro Toomer, Kathleen Kaib. defts exhibits 36, 33, 136, 155, 159, 160, 161, 34, 35, 154, 156, 29a, 29, 28, 24, 163, 164 - ADMITTED. Govt - 175, 201. - ADMITTED. Govt substitutes exhibits 4 and 5 which were admitted on 9/10/10 - (DVDs did not work). Appearances:Michael Wiseman, Victor Julio Abreu,Elizabeth Larin, James McHugh. Patricia Hubert Booth, Mark Michael Dowd, Tony R Roberts, Elsa Salinas, (Digital # 8:23-10:40/ 10:58-12:21/1:06-3:11/3:24 -6:11) (ERO:v gano) Deft remanded to custody, filed.(sscotch, ) (Entered: 10/05/2010) |
| 09/21/2010 | 562 | MOTION Additional Court Time *Renewed Motion for Additional Court Time to Present Evidence* by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 09/21/2010) |
| 09/21/2010 | | Minute Entry for proceedings held before Judge Janis Graham Jack: EVIDENTIARY HEARING as to Alfred NMI Bourgeois held on 9/21/2010. Witnesses: Claudia Williams, Beverly Frank, Brenda Goodman, Mark Cunningham, Carl Henry, Donald Reese, Murray Bourgeois, Jon Curtis Dailey. Deft Exhibits 1, 2, 4, 5, 7, 8, 9, 10, 56, 60, 72, 130, 144, 151, 165, 166, 167, 98, 139, 140 - ADMITTED. Govt Exhibits 202, 71, 72, 172, 173, 174 - ADMITTED. Appearances:Michael Wiseman, Victor Julio Abreu, Elizabeth Larin, James McHugh. Patricia Hubert Booth, Mark Michael Dowd, Tony R Roberts, Elsa Salinas, (Digital # 8:00-10:11/10:25-12:02/1:02-2:54/3:11-6:38)(ERO:v gano) Deft remanded to custody, filed. (sscotch, ) (Entered: 10/05/2010) |
| 09/22/2010 | 563 | NOTICE *Petitioner's Objection to Court's Comment Regarding the Demeanor of Mark Cunningham, Ph.D.* of Petitioner's Objection by Alfred NMI Bourgeois, filed.(Wiseman, Michael) (Entered: 09/22/2010) |
| 09/22/2010 | | Minute Entry for proceedings held before Judge Janis Graham Jack: EVIDENTIARY HEARING as to Alfred NMI Bourgeois held on |

USCA5 6138

| | | |
|---|---|---|
| | | 9/22/2010. Witnesses: Elizabeth Johnson, George Holden, Jennifer Valdez, Michael Bowers, John Gilmore, Kerry Brown, Tim Allen, Gerald Bierbaum, Alan Keel. Court appoints Fred Jimenez to represent Tim Allen (witness). Deft Exhibits 93, 168 91, 92, 21, 18a, 18, 19, 20, 96, 116, 82, 83, 81, 90, 157, 158, 3, 88 - ADMITTED. Govt Exhibits 204, 172a, 178-200, 73, 176, 177 - ADMITTED. Appearances:Michael Wiseman, Victor Julio Abreu, Elizabeth Larin, James McHugh. Patricia Hubert Booth, Mark Michael Dowd, Tony R Roberts, Elsa Salinas. (Digital # 9:25-12:09/1:13-4:48/5:05-7:14/7:18-8:34)(ERO:v gano) Deft remanded to custody, filed.(sscotch, ) Modified on 10/5/2010 (sscotch, ). (Entered: 10/05/2010) |
| 09/23/2010 | 568 | MOTION to Strike *For Violation of Fed.R.Civ.P. 26* by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 09/23/2010) |
| 09/23/2010 | 569 | Subpoena Returned Executed on 9/14/10 as to Alfred NMI Bourgeois, filed. (bcortez, ) (Additional attachment(s) added on 9/24/2010: # 1 Unredacted Subpoena) (bcortez, ). (Entered: 09/24/2010) |
| 09/23/2010 | | Minute Entry for proceedings held before Judge Janis Graham Jack: EVIDENTIARY HEARING as to Alfred NMI Bourgeois held on 9/23/2010. Witnesses: Danny Clark, Robert Patterson, William Shotts, Christopher Key, Rhonda Davis, Randall Price. Deft Exhibits 171,141,152,178(sealed) - ADMITTED. Govt Exhibits 1,2,3,14,23-26 - ADMITTED. Appearances:Michael Wiseman, Victor Julio Abreu, Elizabeth Larin, James McHugh. Patricia Hubert Booth, Mark Michael Dowd, Tony R Roberts, Elsa Salinas.(Digital # 8:53-9:52/11:23-12:30/1:14-2:59/3:27-6:04)(ERO:v gano) Deft remanded to custody, filed.(sscotch, ) (Entered: 10/05/2010) |
| 09/24/2010 | | Minute Entry for proceedings held before Judge Janis Graham Jack: EVIDENTIARY HEARING as to Alfred NMI Bourgeois held on 9/24/2010. Witnesses: Randall Price, Jerrilyn Conway, Roger Moore. Deft Exhibits 58, 61a, 179, 177 - ADMITTED. Govt Exhibits 63-65, 205, 206, 27-41, 43, 15-18, 208 - ADMITTED. Appearances:Michael Wiseman, Victor Julio Abreu, Elizabeth Larin, James McHugh. Patricia Hubert Booth, Mark Michael Dowd, Tony R Roberts, Elsa Salinas.(Digital # 8:26-10:48/11:18-12:21/1:35-4:42/5:41-6:22)(ERO:v gano) Deft remanded to custody, filed.(sscotch, ) (Entered: 10/05/2010) |
| 09/24/2010 | 573 | EXHIBIT LIST by Alfred NMI Bourgeois, filed. (sscotch, ) (Entered: 10/06/2010) |
| 09/24/2010 | 574 | EXHIBIT LIST by USA as to Alfred NMI Bourgeois, filed. (sscotch, ) (Entered: 10/06/2010) |
| 10/04/2010 | 570 | AO 435 TRANSCRIPT ORDER FORM by Kathrid Hennig. This is to order a transcript of Evidentiary Hearing held on 9/20/10-9/24/10 before Judge Janis Graham Jack (Original). Court Reporter/Transcriber: V. Gano, filed. (bcortez, ) (Entered: 10/05/2010) |
| 10/05/2010 | 571 | AO 435 TRANSCRIPT ORDER FORM by Kathryn Hennig. This is |

USCA5 6139

|  |  |  |
|---|---|---|
|  |  | to order a transcript of Testimony of Keel, Johnson, Conway held on 9/22/10 and 9/24/10 before Judge Janis Graham Jack Court Reporter/Transcriber: Molly Carter, filed. (lcayce, ) (Entered: 10/06/2010) |
| 10/05/2010 | 572 | CJA 20 for Fred Jimenez to represent Tim Allen in case as to Alfred NMI Bourgeois.(Signed by Judge Janis Graham Jack) Parties notified. (lsmith, ) (Entered: 10/06/2010) |
| 10/12/2010 | 575 | TRANSCRIPT as to Alfred NMI Bourgeois re: Partial Transcript of Evidentiary Hearing - Day 3 (Testimony of Elizabeth Ann Johnson and Charles Alan Keel) held on 09/22/10 before Judge Janis Graham Jack. Court Reporter/Transcriber Molly Carter. Release of Transcript Restriction set for 1/10/2011., filed. (mocarter) (Entered: 10/12/2010) |
| 10/12/2010 | 576 | TRANSCRIPT as to Alfred NMI Bourgeois re: Partial Transcript of Evidentiary Hearing - Day 5 (Testimony of Jerrilyn Conway) held on 09/24/10 before Judge Janis Graham Jack. Court Reporter/Transcriber Molly Carter. Release of Transcript Restriction set for 1/10/2011., filed. (mocarter) (Entered: 10/12/2010) |
| 10/12/2010 | 578 | AO 435 TRANSCRIPT ORDER FORM by K. Hennig. This is to order a transcript of Evidentiary Hearing held on 9/20/10 - 9/26/10 (except for Keel, Johnson & Conway testimonies) before Judge Janis Graham Jack, filed. (mserpa, ) (Entered: 10/13/2010) |
| 10/13/2010 | 577 | Notice of Filing of Official Transcript as to 575 Transcript, 576 Transcript,. Party notified, filed. (vrios, ) (Entered: 10/13/2010) |
| 10/21/2010 | 579 | MOTION Petitioner's Opposed Motion to Take Brief Deposition of Dr. Michael Gelbort *and Certificate of Service* by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 10/21/2010) |
| 10/25/2010 | 580 | NOTICE of Deposition by Alfred NMI Bourgeois, filed.(Wiseman, Michael) (Entered: 10/25/2010) |
| 10/25/2010 | 581 | NOTICE of Deposition by Alfred NMI Bourgeois, filed.(Wiseman, Michael) (Entered: 10/25/2010) |
| 10/26/2010 | 582 | ORDER denying 579 Motion to Take Brief Deposition of Dr. Michael Gelbort as to Alfred Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(mserpa, ) (Entered: 10/26/2010) |
| 10/26/2010 | 583 | Agreed MOTION To Withdraw Trial Exhibits To Copy for Use in Depositions by USA as to Alfred NMI Bourgeois, filed. (Attachments: # 1 Proposed Order)(Booth, Patricia) (Entered: 10/26/2010) |
| 10/26/2010 | 584 | ORDER granting 583 Motion release certain trial exhibits temporarily to the Govt. as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.)(Order referred to case manager) Parties notified. (lsmith, ) (Entered: 10/27/2010) |
| 10/27/2010 | 585 | RECEIPT FOR WITHDRAWAL OF EXHIBITS by Alfred NMI Bourgeois, filed. (Signed by AUSA Patti Hubert Booth and Case Mgr. |

| | | |
|---|---|---|
| | | Sondra Scotch)(lsmith, ) (Entered: 10/27/2010) |
| 10/27/2010 | 586 | MOTION (Second) To Withdraw Trial Exhibits to Copy for Deposition by USA as to Alfred NMI Bourgeois, filed. (Attachments: # 1 Proposed Order)(Salinas, Elsa) (Entered: 10/27/2010) |
| 10/27/2010 | 587 | Certificate of Conference by USA as to Alfred NMI Bourgeois *(Amended) RE: Document #586*, filed. (Salinas, Elsa) (Entered: 10/27/2010) |
| 10/27/2010 | 588 | MOTION (Amended) Second Motion To Withdraw Trial Exhibits by USA as to Alfred NMI Bourgeois, filed. (Attachments: # 1 Proposed Order)(Salinas, Elsa) (Entered: 10/27/2010) |
| 10/27/2010 | 589 | ORDER granting 588 Motion to withdrawn govt exhibits 35, 125-149, 375, 376, 388 and 391 as to Alfred NMI Bourgeois (1). Exhibits are to be returned.(Signed by Judge Janis Graham Jack.) Parties notified. (lsmith, ) (Entered: 10/28/2010) |
| 10/27/2010 | 590 | RECEIPT FOR THE RETURN OF EXHIBITS by USA as to Alfred NMI Bourgeois, filed. (lsmith, ) (Entered: 10/28/2010) |
| 10/28/2010 | 591 | RECEIPT FOR WITHDRAWAL OF EXHIBITS (35, 125-145, 146, 147-148, 149, 375-376, 388, 391) by USA as to Alfred NMI Bourgeois, filed. (lsmith, ) (Entered: 10/28/2010) |
| 10/28/2010 | 592 | RECEIPT FOR RETURN OF EXHIBITS by USA as to Alfred NMI Bourgeois, filed. (bcortez, ) (Entered: 10/28/2010) |
| 11/02/2010 | 593 | NOTICE of Deposition by Alfred NMI Bourgeois, filed.(Wiseman, Michael) (Entered: 11/02/2010) |
| 11/05/2010 | 594 | TRANSCRIPT as to Alfred NMI Bourgeois re: Evidentiary Hearing - Day 1 held on 9/20/10 before Judge Janis Graham Jack.Court Reporter/Transcriber Garcia Services. Release of Transcript Restriction set for 2/3/2011., filed. (judgarcia, ) (Entered: 11/05/2010) |
| 11/05/2010 | 595 | TRANSCRIPT as to Alfred NMI Bourgeois re: Evidentiary Hearing - Day 4 held on 9/23/10 before Judge Janis Graham Jack.Court Reporter/Transcriber Garcia Services. Release of Transcript Restriction set for 2/3/2011., filed. (judgarcia, ) (Entered: 11/05/2010) |
| 11/05/2010 | 596 | Notice of Filing of Official Transcript as to 594 Transcript, 595 Transcript. Party notified, filed. (vgano, ) (Entered: 11/05/2010) |
| 11/05/2010 | 597 | TRANSCRIPT as to Alfred NMI Bourgeois re: Evidentiary Hearing - Day 2 held on 09/21/10 before Judge Janis Graham Jack.Court Reporter/Transcriber Molly Carter. Release of Transcript Restriction set for 2/3/2011., filed. (mocarter) (Entered: 11/05/2010) |
| 11/05/2010 | 598 | TRANSCRIPT as to Alfred NMI Bourgeois re: Evidentiary Hearing - Day 3 held on 09/22/10 before Judge Janis Graham Jack. Court Reporter/Transcriber Molly Carter. Release of Transcript Restriction set for 2/3/2011., filed. (mocarter) (Entered: 11/05/2010) |

USCA5 6141

| 11/05/2010 | 599 | TRANSCRIPT as to Alfred NMI Bourgeois re: Evidentiary Hearing - Day 5 held on 09/24/10 before Judge Janis Graham Jack. Court Reporter/Transcriber Molly Carter. Release of Transcript Restriction set for 2/3/2011., filed. (mocarter) (Entered: 11/05/2010) |
|---|---|---|
| 11/05/2010 | 600 | Notice of Filing of Official Transcript as to 598 Transcript, 599 Transcript, 597 Transcript. Party notified, filed. (vgano, ) (Entered: 11/05/2010) |
| 11/15/2010 | 601 | DISCOVERY NOTICE by Alfred NMI Bourgeois *Notice of Discovery Compliance*, filed. (Wiseman, Michael) (Entered: 11/15/2010) |
| 11/15/2010 | 602 | MOTION Motion to Take Deposition *of Bill May and Adam Longoria* by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 11/15/2010) |
| 11/15/2010 | 603 | Unopposed MOTION For Admission of Hearing Exhibit P-180 by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 11/15/2010) |
| 11/15/2010 | 604 | Unopposed MOTION to Continue Time for Taking a Deposition *of Dr. Leestma* by Alfred NMI Bourgeois, filed. (Attachments: # 1 Exhibit Note Taken By AUSA Roberts)(Wiseman, Michael) (Entered: 11/15/2010) |
| 11/15/2010 | 605 | MOTION to Amend by Alfred NMI Bourgeois, filed. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit D)(Wiseman, Michael) (Entered: 11/15/2010) |
| 11/15/2010 | 606 | NOTICE of Filing of Exhibit C to Motion to Amend by Alfred NMI Bourgeois re 605 MOTION to Amend, filed.(Wiseman, Michael) (Entered: 11/15/2010) |
| 11/15/2010 | 607 | NOTICE of Filing of Exhibit C, Part 2, to Motion to Amend by Alfred NMI Bourgeois re 606 Notice (Other), filed.(Wiseman, Michael) (Entered: 11/15/2010) |
| 11/15/2010 | 608 | LETTER MOTION New Counsel by Alfred NMI Bourgeois, filed. (lsmith, ) (Entered: 11/16/2010) |
| 11/17/2010 | 609 | NOTICE of Filing of Trial Depositions by Alfred NMI Bourgeois, filed. (Attachments: # 1 Exhibit Oliver Deposition, # 2 Exhibit Schenk Deposition)(Wiseman, Michael) (Entered: 11/17/2010) |
| 11/17/2010 | 610 | ORDER granting 603 Motion as to Alfred Bourgeois (1); striking 605 Motion to Amend as to Alfred Bourgeois; striking 606 ; and striking 607 . The Government will respond to motion 602 within ten (10) days from the entry of this Order. Court ORDERS Bourgeois to refile 605 606 and 607 as one pleading. The Government will file a response to that pleading within ten (10) days of its filing. (Signed by Judge Janis Graham Jack.) Parties notified.(mserpa, ) (Entered: 11/17/2010) |
| 11/18/2010 | 611 | MOTION to Amend *and Supplement Claim IV* by Alfred NMI |

| | | |
|---|---|---|
| | | Bourgeois, filed. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit)(Wiseman, Michael) (Entered: 11/18/2010) |
| 11/29/2010 | 612 | RESPONSE to Motion by USA as to Alfred NMI Bourgeois re 604 Unopposed MOTION to Continue Time for Taking a Deposition *of Dr. Leestma*, 602 MOTION Motion to Take Deposition *of Bill May and Adam Longoria*, filed. (Attachments: # 1 Proposed Order) (Roberts, Tony) (Entered: 11/29/2010) |
| 11/29/2010 | 613 | RESPONSE to Motion by USA as to Alfred NMI Bourgeois re 611 MOTION to Amend *and Supplement Claim IV*, filed. (Attachments: # 1 Proposed Order, # 2 Affidavit)(Dowd, Mark) (Entered: 11/29/2010) |
| 12/02/2010 | 614 | ORDER denying 602 Motion to Take Deposition as to Adam Longoria as to Alfred NMI Bourgeois (1); granting in part 604 Motion to Continue Time for Taking a Deposition of Dr. Leestma as to Alfred NMI Bourgeois (1)( Hearing for Oral Arguments set for 1/13/2011 at 08:00 AM before Judge Janis Graham Jack); denying as moot 608 LETTER MOTION for New Counsel as to Alfred NMI Bourgeois (1); granting 611 Motion to Amend as to Alfred NMI Bourgeois (1). (Signed by Judge Janis Graham Jack.) Parties notified.(amireles, ) (Entered: 12/02/2010) |
| 12/02/2010 | | Set/Reset Deadlines as to Alfred NMI Bourgeois: Advisory due by 12/3/2010 noon. (amireles, ) (Entered: 12/02/2010) |
| 12/02/2010 | 615 | AO 435 TRANSCRIPT ORDER FORM by Aaron Butler. This is to order a transcript of Telephone Conference held on December 1, 2010 before Judge Janis Graham Jack (original). Court Reporter/Transcriber: Typist, filed. (grogan, ) (Entered: 12/02/2010) |
| 12/02/2010 | 616 | NOTICE of Status and Location of Brain Slides by USA as to Alfred NMI Bourgeois re Set/Reset Deadlines, filed.(Roberts, Tony) (Entered: 12/02/2010) |
| 12/03/2010 | 617 | MOTION for Subpoenas at Govt Expense *Petitioners Unopposed Motion for Issuance of Subpoena Duces Tecum in Advance of Hearing* by Alfred NMI Bourgeois, filed. (Attachments: # 1 Proposed Order) (Wiseman, Michael) (Entered: 12/03/2010) |
| 12/06/2010 | | Minute Entry for proceedings held before Judge Janis Graham Jack: Telephone Conference as to Alfred NMI Bourgeois held on 12/6/2010 regarding 616 Status and location of slides. Appearances: Patricia Hubert Booth, Tony R Roberts, Elsa Salinas, Victor Julio Abreu. (Digital # 8:54-9:01)(ERO:v gano), filed.(sscotch, ) (Entered: 12/06/2010) |
| 12/08/2010 | 618 | Unopposed MOTION for Subpoenas at Govt Expense *Regarding Brain Slides* by Alfred NMI Bourgeois, filed. (Attachments: # 1 Proposed Order)(Wiseman, Michael) (Entered: 12/08/2010) |
| 12/09/2010 | 619 | NOTICE of Filing of Video Depositions by Alfred NMI Bourgeois, filed.(Wiseman, Michael) (Entered: 12/09/2010) |
| | | |

**USCA5 6143**

| | | |
|---|---|---|
| 12/09/2010 | 620 | ORDER granting 618 Motion for Subpoenas as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified. (amireles, ) (Entered: 12/09/2010) |
| 12/09/2010 | 621 | NOTICE of Filing of Deposition by Alfred NMI Bourgeois, filed. (Attachments: # 1 Exhibit)(Wiseman, Michael) (Entered: 12/09/2010) |
| 12/09/2010 | 622 | *USM-285 for Kristine McAshan* as to Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 12/09/2010) |
| 12/09/2010 | 623 | *USM-285 for Dr. Jennifer Rulon* as to Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 12/09/2010) |
| 12/20/2010 | 624 | STATUS REPORT *Petitioner's Status Report on Production and Delivery of Autopsy Slides to Dr. Jan Leestma* by Alfred NMI Bourgeois, filed.(Wiseman, Michael) (Entered: 12/20/2010) |
| 12/20/2010 | 625 | MOTION Motion for Issuance and Service of Witness Subpoena by Alfred NMI Bourgeois, filed. (Attachments: # 1 Proposed Order, # 2 USM 285, # 3 Subpoena)(Wiseman, Michael) (Entered: 12/20/2010) |
| 12/20/2010 | 626 | MOTION Motion for Issuance and Service of Witness Subpoena by Alfred NMI Bourgeois, filed. (Attachments: # 1 Proposed Order, # 2 USM 285, # 3 Subpoena)(Wiseman, Michael) (Entered: 12/20/2010) |
| 12/21/2010 | 627 | ORDER granting 625 Motion Issuance and Service of Witness Subpoena as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(amireles, ) (Entered: 12/21/2010) |
| 12/21/2010 | 628 | ORDER granting 626 Motion Issuance and Service of Witness Subpoena as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(amireles, ) (Entered: 12/21/2010) |
| 12/28/2010 | 629 | MOTION Motion for Issuance and Service of Witness Subpoena by Alfred NMI Bourgeois, filed. (Attachments: # 1 Proposed Order, # 2 USM-285, # 3 Subpoena)(Wiseman, Michael) (Entered: 12/28/2010) |
| 12/28/2010 | 630 | ORDER granting 629 Motion for Issuance and Service of Witness Subpoena as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(amireles, ) (Entered: 12/28/2010) |
| 12/29/2010 | 631 | TRANSCRIPT as to Alfred NMI Bourgeois re: Telephone Conference held on 12/01/10 before Judge Janis Graham Jack.Court Reporter/Transcriber Molly Carter. Release of Transcript Restriction set for 3/29/2011., filed. (mocarter) (Entered: 12/29/2010) |
| 12/30/2010 | 632 | Notice of Filing of Official Transcript as to 631 Transcript. Party notified, filed. (vgano, ) (Entered: 12/30/2010) |
| 01/04/2011 | 633 | Joint MOTION to Continue Hearing and Argument by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 01/04/2011) |
| 01/04/2011 | 634 | PROPOSED ORDER re: 633 Joint MOTION to Continue Hearing and Argument as to Alfred NMI Bourgeois, filed.(Wiseman, Michael) (Entered: 01/04/2011) |

USCA5 6144

| 01/06/2011 | 635 | NOTICE OF SETTING as to Alfred NMI Bourgeois - regarding 633 Joint MOTION to Continue Hearing and Argument. Motion Hearing set for 1/7/2011 at 09:30 AM before Judge Janis Graham Jack, filed. (sscotch, ) (Entered: 01/06/2011) |
| 01/07/2011 | 636 | NOTICE of Notice of Deposition of Jan Leestma, MD by Alfred NMI Bourgeois, filed.(Wiseman, Michael) (Entered: 01/07/2011) |
| 01/07/2011 | 637 | ORDER denying 633 Motion to Continue as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(mserpa, ) (Entered: 01/07/2011) |
| 01/07/2011 | | Minute Entry for proceedings held before Judge Janis Graham Jack: MOTION HEARING as to Alfred NMI Bourgeois held on 1/7/2011 regarding 633 Motion for Continuance. Appearances:Elizabeth Larin, Patricia Hubert Booth, Mark Michael Dowd, Tony R Roberts, Elsa Salinas, Michael Wiseman, Victor Julio Abreu.(Digital # 9:22-9:26) (ERO:v gano), filed.(sscotch, ) (Entered: 01/10/2011) |
| 01/07/2011 | | Minute Entry for proceedings held before Judge Janis Graham Jack: Telephone Conference as to Alfred NMI Bourgeois held on 1/7/2011 regarding deposition of expert witness. Appearances: Patricia Hubert Booth, Mark Michael Dowd, Tony R Roberts, Elsa Salinas, Michael Wiseman, Victor Julio Abreu.(Digital # 3:11-3:16)(ERO:v gano), filed.(sscotch, ) (Entered: 01/10/2011) |
| 01/11/2011 | 638 | MOTION To Allow Dr. Rouse to Testify on January 13, 2011 by USA as to Alfred NMI Bourgeois, filed. (Attachments: # 1 Proposed Order)(Booth, Patricia) (Entered: 01/11/2011) |
| 01/11/2011 | 639 | RESPONSE in Opposition by Alfred NMI Bourgeois re 638 MOTION To Allow Dr. Rouse to Testify on January 13, 2011 *Response in Partial Opposition to the Testimony of Dr. Rouse*, filed. (Wiseman, Michael) (Entered: 01/11/2011) |
| 01/11/2011 | 640 | ORDER granting 638 Motion To Allow Dr. Rouse to Testify on January 13, 2011 as to Alfred NMI Bourgeois (1). (Signed by Judge Janis Graham Jack.) Parties notified.(amireles, ) (Entered: 01/12/2011) |
| 01/12/2011 | | Minute Entry for proceedings held before Judge Janis Graham Jack: Telephone Conference as to Alfred NMI Bourgeois regarding expert reports held on 1/12/2011. Appearances:Elizabeth Larin, Mark Michael Dowd, Tony R Roberts, Michael Wiseman, Victor Abreu. (Digital # 11:20-1142)(ERO:v gano), filed.(sscotch, ) (Entered: 01/12/2011) |
| 01/12/2011 | 641 | NOTICE of Notice of Filing Deposition of Jan Leestma, M.D. by Alfred NMI Bourgeois, filed. (Attachments: # 1 Transcript, # 2 Exhibit Exhibit 1, # 3 Exhibit Exhibit 2, # 4 Exhibit Exhibit 2a, # 5 Exhibit Exhibit 3, # 6 Exhibit Exhibit 4, # 7 Exhibit Exhibit 5, # 8 Exhibit Exhibit 6)(Wiseman, Michael) (Entered: 01/12/2011) |
| 01/12/2011 | 642 | NOTICE of Notice of Filing of Points and Authorities by Alfred NMI |

USCA5 6145

| | | |
|---|---|---|
| | | Bourgeois, filed.(Wiseman, Michael) (Entered: 01/12/2011) |
| 01/13/2011 | | Minute Entry for proceedings held before Judge Janis Graham Jack: EVIDENTIARY HEARING as to Alfred NMI Bourgeois held on 1/13/2011. Witnesses: William May, James Sales, Debra Hohle, Patti Booth, Dr. Elizabeth Rouse. Govt exhibits 1-5 Admitted. Defense exhibts P104, P187-P190 - Admitted. Appearances:Elizabeth Larin, Jame McHugh, Michael Wiseman, Victor Julio Abreu, Patricia Hubert Booth, Mark Michael Dowd, Tony R Roberts, Elsa Salinas.(Digital # 7:55-10:07/10:27-11:55/12:51-4:16)(ERO:v gano), filed.(sscotch, ) (Entered: 01/17/2011) |
| 01/13/2011 | 643 | EXHIBIT LIST by USA as to Alfred NMI Bourgeois, filed. (sscotch, ) (Entered: 01/17/2011) |
| 01/13/2011 | 644 | EXHIBIT LIST by Alfred NMI Bourgeois, filed. (sscotch, ) (Entered: 01/17/2011) |
| 01/13/2011 | | **Terminate Misc Hearing as to Alfred NMI Bourgeois: - (sscotch, ) (Entered: 01/20/2011) |
| 01/19/2011 | 645 | AO 435 TRANSCRIPT ORDER FORM by Kathrin Hennig. This is to order a transcript of Hearing/Argument held on 1/13/11 before Judge Janis Graham Jack (copy). Court Reporter/Transcriber: Molly Carter, filed. (vrios, ) (Entered: 01/20/2011) |
| 01/27/2011 | 646 | TRANSCRIPT as to Alfred NMI Bourgeois re: Partial Transcript of Miscellaneous Hearing (Testimony of Dr. Rouse and Arguments) held on 01/13/11 before Judge Janis Graham Jack. Court Reporter/Transcriber Molly Carter. Release of Transcript Restriction set for 4/27/2011., filed. (mocarter) (Entered: 01/27/2011) |
| 01/28/2011 | 647 | Notice of Filing of Official Transcript as to 646 Transcript,. Party notified, filed. (vgano, ) (Entered: 01/28/2011) |
| 02/01/2011 | 648 | MOTION Reopen Hearing *Petitioner's Motion to Reopen Hearing with Respect to Court's Lack of Jurisdiction* by Alfred NMI Bourgeois, filed. (Attachments: # 1 Proposed Order)(Wiseman, Michael) (Entered: 02/01/2011) |
| 02/01/2011 | 649 | TRIAL BRIEF by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 02/01/2011) |
| 02/04/2011 | 650 | Unopposed MOTION for Extension of Time to File Response/Reply as to 649 Trial Brief by USA as to Alfred NMI Bourgeois, filed. (Attachments: # 1 Proposed Order)(Dowd, Mark) (Entered: 02/04/2011) |
| 02/07/2011 | 651 | ORDER GRANTING EXTENSION OF TIME as to Alfred NMI Bourgeois granting 650 Unopposed MOTION for Extension of Time to File Response/Reply as to 649 Trial Brief ( Responses due by 2/16/2011).(Signed by Judge Janis Graham Jack) Parties notified. (lsmith, ) (Entered: 02/07/2011) |
| | | |

**USCA5 6146**

| 02/15/2011 | 652 | Unopposed MOTION for Extension of Time to File Response/Reply as to 649 Trial Brief by USA as to Alfred NMI Bourgeois, filed. (Attachments: # 1 Proposed Order)(Dowd, Mark) (Entered: 02/15/2011) |
| --- | --- | --- |
| 02/15/2011 | 653 | ORDER granting 652 Motion for Extension of Time to File Response/Reply as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(lsmith, ) (Entered: 02/15/2011) |
| 02/15/2011 | | Set/Reset Deadlines as to Alfred NMI Bourgeois: Responses due by 2/18/2011 (lsmith, ) (Entered: 02/15/2011) |
| 02/18/2011 | 654 | RESPONSE by USA as to Alfred NMI Bourgeois re 649 Trial Brief, filed. (Attachments: # 1 Proposed Order)(Booth, Patricia) (Entered: 02/18/2011) |
| 02/22/2011 | 655 | TRANSCRIPT as to Alfred NMI Bourgeois re: Partial Transcript of Miscellaneous Hearing (Portions not Previously Transcribed) held on 01/13/11 before Judge Janis Graham Jack.Court Reporter/Transcriber Molly Carter. Release of Transcript Restriction set for 5/23/2011., filed. (mocarter) (Entered: 02/22/2011) |
| 02/23/2011 | 656 | Notice of Filing of Official Transcript as to 655 Transcript,. Party notified, filed. (dterrell, ) (Entered: 02/23/2011) |
| 02/23/2011 | 657 | REPLY TO RESPONSE to Motion by Alfred NMI Bourgeois re 648 MOTION Reopen Hearing *Petitioner's Motion to Reopen Hearing with Respect to Court's Lack of Jurisdiction Reply to Government's Response to Petitioner's Post-Argument Submission and Opposition to Motion to Reopen Evidentiary Hearing*, filed.(Wiseman, Michael) (Entered: 02/23/2011) |
| 02/28/2011 | 658 | RESPONSE by USA as to Alfred NMI Bourgeois re 657 Reply to Response,, filed. (Attachments: # 1 Proposed Order)(Booth, Patricia) (Entered: 02/28/2011) |
| 03/01/2011 | 659 | RESPONSE to Motion by Alfred NMI Bourgeois re 648 MOTION Reopen Hearing *Petitioner's Motion to Reopen Hearing with Respect to Court's Lack of Jurisdiction Response in Opposition to Government's Motion to Strike Reply*, filed.(Wiseman, Michael) (Entered: 03/01/2011) |
| 05/19/2011 | 660 | ORDER DENYING 396 MOTION to Vacate under 28 U.S.C. 2255 as to Alfred NMI Bourgeois (1); denying without prejudice 362 Motion to Vacate; denying without prejudice 365 Motion for New Trial as to Alfred NMI Bourgeois (1); denying without prejudice 366 Motion for New Trial as to Alfred NMI Bourgeois (1); denying without prejudice 648 Motion as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) (Attachments: # 1 Continuation pgs 41-80, # 2 Continuation pgs 81-120, # 3 Continuation pgs 121-160, # 4 Continuation pgs 161-200, # 5 Continuation pgs 201-225) Parties notified.(sscotch, ) (Entered: 05/19/2011) |

| 05/19/2011 | 661 | FINAL JUDGMENT as to Alfred NMI Bourgeois.(Signed by Judge Janis Graham Jack) Parties notified. (sscotch, ) (Entered: 05/19/2011) |
|---|---|---|
| 05/26/2011 | 662 | MOTION to Correct *The Court's Memorandum* by USA as to Alfred NMI Bourgeois, filed. (Attachments: # 1 Proposed Order)(Booth, Patricia) (Entered: 05/26/2011) |
| 05/26/2011 | 663 | ORDER granting 662 Motion to Correct as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(mserpa, ) (Entered: 05/26/2011) |
| 06/01/2011 | 664 | Agreed MOTION Entry of Judgment by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 06/01/2011) |
| 06/16/2011 | 665 | MOTION to Alter Judgment *Petitioner's Motion Pursuant to F.R.Civ.P. 59e to Alter or Amend Judgment* by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 06/16/2011) |
| 06/17/2011 | 666 | ORDER denying 665 Motion to Alter Judgment as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified. (mserpa, ) (Entered: 06/17/2011) |
| 08/15/2011 | 667 | NOTICE OF APPEAL to US Court of Appeals for the Fifth Circuit by Alfred NMI Bourgeois,filed.(Wiseman, Michael) (Entered: 08/15/2011) |

**USCA5 6148**

READ INSTRUCTIONS ON BACK OF LAST PAGE BEFORE COMPLETING
TRANSCRIPT ORDER

| District Court | District Court Docket Number |
|---|---|
| Southern District of Texas (Corpus Christi) | 2:02-cr-00216 |

Short Case Title __USA v. Bourgeois_____    Court Reporter __Velma Gano_____

Date Notice of Appeal Filed by Clerk of District Court __08/15/2011__    Court of Appeals # __04-40410__
_(If Available)_

**PART I.** _(To be completed by party ordering transcript. Do not complete this form unless financial arrangements have been made.)_
A. Complete one of the following:

☐ No hearings
☐ Transcript is unnecessary for appeal purposes
☐ Transcript is already on file in Clerk's office
☒ This is to order a transcript of the following proceedings: _(check appropriate box)_

United States Court
Southern District of Texas
FILED

SEP 06 2011

David J. Bradley, Clerk of Court

Voir dire ☐; Opening statement of plaintiff ☐ defendant ☐;
Closing argument of plaintiff ☐ defendant ☐; Opinion of court ☐;
Jury instructions ☐; Sentencing ☐; Bail hearing ☐; 2255 Proceeding ☒

| HEARING DATE(S) | PROCEEDING | JUDGE/MAGISTRATE |
|---|---|---|
| 03/19/2008 - Telephone Conference  ALREADY FILED | 2255 | Judge Janis Graham Jack |
| 10/30/2008 - Telephone Conference  ALREADY FILED | " | " |
| 09/09/2009 - Telephone Conference  ALREADY FILED | " | " |
| (See Attached Sheet) | | |

**FAILURE TO SPECIFY IN ADEQUATE DETAIL THOSE PROCEEDINGS TO BE TRANSCRIBED,
OR FAILURE TO MAKE PROMPT SATISFACTORY FINANCIAL ARRANGEMENTS FOR TRANSCRIPT,
ARE GROUNDS FOR DISMISSAL OF THE APPEAL.**

B. This is to certify that satisfactory financial arrangements have been completed with the court reporter for payment of the cost of the transcript. The method of payment will be:

☐ Private funds;  ☐ Criminal Justice Act Funds _(Attach copy of
CJA Form 24 to court reporter's copy)_;  ☒ Other IFP Funds;
☐ Advance Payment waived by reporter;  ☐ U.S. Government Funds;

☐ Other _____

Signature _____    Date Transcript Ordered __08/__ 2011__

Print Name __Victor Abreu, Esquire_____    Counsel for __Alfred Bourgeois__

Address __601 Walnut St., Suite 345W, Phila, PA  19106__    Telephone __215-928-0520__

**ALLOWANCE BY THE COURT FOR LEAVE TO PROCEED IN FORMA PAUPERIS IN A CIVIL APPEAL
DOES NOT ENTITLE THE LITIGANT TO HAVE TRANSCRIPT AT GOVERNMENT EXPENSE.**

---

**PART II.**    COURT REPORTER ACKNOWLEDGEMENT _(To be completed by the Court Reporter and forwarded to the
Court of Appeals within 7 days after receipt. Read instructions on reverse side of copy 4 before completing)._

| Date transcript order received | If arrangements are not yet made, date contact made with ordering party re: financial arrangements | Estimated completion date * | Estimated number of pages |
|---|---|---|---|
| | | | |

☐ Satisfactory Arrangements for payment were made on _____
☐ Arrangements for payment have not been made. Reason: ☐ Deposit not received  ☐ Unable to
contact ordering party  ☐ Other _(Specify)_ _____

_____    _____    _____
Date    Signature of Court Reporter    Telephone

Address of Court Reporter: _____
* Do not include an estimated completion date unless satisfactory financial arrangements have been made or waived.

---

**PART III.**    NOTIFICATION THAT TRANSCRIPT HAS BEEN FILED IN THE DISTRICT COURT _(To be completed by court
reporter on date of filing transcript in District Court and notification must be forwarded to Court of Appeals on the
same date)._

This is to certify that the transcript has been completed and filed with the District Court today.

_____ Actual Number of Pages    _____ Actual Number of Volumes

_____    _____
Date    Signature of Court Reporter

DKT-13 (5/96)

Copy 6 - Appellant's Copy to be sent to the District Court upon completion of Part I

USCA5 6149

TRANSCRIPT ORDER                    (Continued)
for USA v.  Bourgeois                08/29/2011

| HEARING DATES | PROCEEDING | JUDGE/MAGISTRATE |
|---|---|---|
| 11/24/2009 - Ex Parte Hearing (Audio) | 2255 | Judge Janis Graham Jack |
| 12/14/2009 - Telephone Conference (Audio) | 2255 | " |
| 04/20/2010 - Hearing | (Already filed) | " |
| 05/06/2010 - Telephone Conference | (Already filed) | " |
| 06/07/2010 - Telephone Conference | (Already filed) | " |
| 06/09/2010 - Motion Hearing | (Already filed) | " |
| 09/10/2010 - Evidentiary Hearing | (Already filed) | " |
| 09/20 to 09/24/2010 - Evidentiary Hearing | (Already filed) | " |
| 12/01/2010 - Telephone Conference | (Already filed) | " |
| 12/06/2010 - Telephone Conference | 2255 | " |
| 01/13/2011 - Evidentiary Hearing/Argument | (Already filed) | " |
| 08/28/2008 - Telephone Conference | (Already filed) | " |

USCA5 6150

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


UNITED STATES OF AMERICA,        *    CRIMINAL ACTION
                                 *
        PLAINTIFF,               *    CR-C-02-216(1)
                                 *
VS.                              *
                                 *    CORPUS CHRISTI, TEXAS
ALFRED BOURGEOIS,                *    DECEMBER 14, 2009
                                 *    1:15 P.M.
        DEFENDANT.               *
                                 *
* * * * * * * * * * * * * * * * *

TRANSCRIPT OF TELEPHONE CONFERENCE

BEFORE THE HONORABLE JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:          MS. PATTI HUBERT BOOTH
                             MS. ELSA SALINAS
                             OFFICE OF THE U.S. ATTORNEY
                             800 NORTH SHORELINE, SUITE 500
                             CORPUS CHRISTI, TEXAS 78401

                             MR. TONY R. ROBERTS
                             OFFICE OF THE U.S. ATTORNEY
                             P. O. BOX 61129
                             HOUSTON, TEXAS 77208


            (APPEARANCES CONTINUED ON PAGE 2)


COURT RECORDER:              MS. VELMA GANO


        PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
          TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
                MOLLY CARTER, P. O. BOX 270203
           CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

USCA5 6151

APPEARANCES:   (CONTINUED)

FOR THE DEFENDANT:          MR. MICHAEL WISEMAN
                           OFFICE OF THE FEDERAL PUBLIC DEFENDER
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 545
                           PHILADELPHIA, PENNSYLVANIA 19106

USCA5 6152

3

(The proceedings began at 1:15 p.m.)

(Call to Order of the Court.)

THE CLERK:  Court calls Criminal Action C-02-216, United States of America versus Alfred Bourgeois.  May I have appearances, please?

MR. ROBERTS:  Tony Roberts for the United States.

THE COURT:  Could you speak up, Mr. Roberts?

MR. ROBERTS:  Yes, Your Honor.  Tony Roberts for the United States.

THE COURT:  Thank you.

MS. SALINAS:  Elsa Salinas for the United States.

MS. BOOTH:  Patti Booth for the United States.

MR. WISEMAN:  Michael Wiseman for Mr. Bourgeois.

THE COURT:  Okay.  As you know, the Government wants me to inspect Mr. Bourgeois's outgoing mail that's going to a lawyer in Mississippi.

Mr. Roberts, Ms. Booth, Ms. Salinas, have you contacted that lawyer now that you know what it's for?

MS. BOOTH:  No, I did not.  I did verify that it is a lawyer.  I did not make any contact.  I understand that Mr. Bourgeois is representing himself.

THE COURT:  Right.  So that's not anything privileged when it gets to her.

MS. BOOTH:  So I'm worried about -- I understand it's a very big package that he's prepared, and our whole concern

USCA5 6153

was that threats or attempts to contact or intimidation, all of those things can, to the untrained eye --

THE COURT:  Well, I'm concerned about it for this.  I think you need to contact the lawyer, because if I recall, that was the lady who was an object of possible murder for hire.  Do you remember that?

MS. BOOTH:  Oh.

MS. SALINAS:  Oh, my gosh.

THE COURT:  And I'm very much worried that her address is in those documents some place.

MR. WISEMAN:  I'm sorry, Your Honor, this is Michael Wiseman.  Is the Court saying that the lawyer was the object of murder for hire?

THE COURT:  No, the wife.

MR. WISEMAN:  Oh, the wife.  Okay, okay, yeah.

THE COURT:  And I'm worried, you know, now he's at least got a state.  You know, if we're to accept those threats as, give some credibility to those past threats, I'm real -- I'm more concerned about that than what's in the box.

MS. BOOTH:  Okay.

THE COURT:  And I don't see any reason, Ms. Booth, why you can't subpoena those documents once they land on a lawyer's desk.

MS. BOOTH:  Yes, ma'am.

THE COURT:  Ms. Salinas and Mr. Roberts?

MS. SALINAS:  Yes, Your Honor.

THE COURT:  Mr. Wiseman, what is -- I don't mean to tell people how to try their case, but I am, I do have a legitimate concern about the lady.

MR. WISEMAN:  No, I understand, Your Honor.  Yeah, I, you know --

THE COURT:  She was going in the Witness Protection Program, I think.

MS. BOOTH:  Uh-huh.

MR. WISEMAN:  Robin Bourgeois.

MS. BOOTH:  Right.

MR. WISEMAN:  Right.  My understanding, Your Honor, is that she filed a divorce proceeding against Alfred Bourgeois --

THE COURT:  Yeah, but you usually -- you usually put your address in there.  Even so, if it was in the State of Mississippi, all those things are going to be public record.

MR. WISEMAN:  Right.  But we -- I'm just trying to think back now.  He forwarded those papers to us when they first came in to him, expecting that we would represent him. I, of course, had to explain to him that I am not a, nor anyone in my office is in Mississippi.

THE COURT:  Yeah, I can't find this, Mr. Wiseman, but I remember he communicated with me from Terre Haute, saying he wanted me to appoint him a lawyer to get a divorce from her.

USCA5 6155

MR. WISEMAN:  I see.

THE COURT:  I don't know what happened to that correspondence.

MR. WISEMAN:  I don't know --

THE COURT:  My administrative assistant is still looking for it.  I sent it back to him and said, you know, "I don't appoint lawyers for that purpose."  But I'm trying to find the letter so that everybody can have it, the one that he originally sent to me.  And of course, I don't know what's in that packet, Ms. Booth, but I --

MS. BOOTH:  Yes.

THE COURT:  -- and Mr. Roberts and Ms. Salinas, but I would assume that those documents might aid you in his now expression of mental retardation.

MS. BOOTH:  Yes, ma'am.

THE COURT:  And I'm most concerned actually that you contact the lawyer in Mississippi and see exactly if there's any way he could determine, from the pleadings she sent to him, where this woman and her child live.

And I realize, until the response was filed, you all didn't know whether this was his lawyer or her lawyer.

MS. BOOTH:  Right.

THE COURT:  And as long as it's her lawyer, it puts a whole different cast on what you have available to you.

MS. BOOTH:  I didn't -- our concern was we didn't do

USCA5 6156

anything improper.  We just wanted to alert the Court and have the Court --

THE COURT:  Well, if you, if you -- this is my -- if you want somebody to look through those, I think you ought to be looking through them, and you ought to get them from the lawyer in Mississippi.

MS. BOOTH:  Yes, ma'am.

THE COURT:  If you have to ask her, you know, pay her to Xerox them or whatever you need to do, and also to see how safe that lady is --

MS. BOOTH:  Yes, ma'am.

THE COURT:  -- and her child, who both testified, as you know, against Mr. Bourgeois.  And his hope, of course, is to have a retrial.  Right, Mr. Wiseman?

MR. WISEMAN:  Well, sure.  Sure.  That's his hope.

THE COURT:  So I guess nobody thought about that, so I call that to your attention.

Now, if you can't get those documents that way, I will entertain, I'll just deny this without prejudice at the moment and see if you can get those documents another way for other reasons.

MS. BOOTH:  Yes, Your Honor.

THE COURT:  And if you can't, I'll look into this again.  I actually thought about one of you all contacting the Mississippi lawyer and putting her on the phone, on this phone

USCA5 6157

conference.

MS. BOOTH:  Hmm.

THE COURT:  So you've looked through these documents, Mr. Wiseman?

MR. WISEMAN:  I'm sorry, Your Honor?

THE COURT:  You've looked through these documents?

MR. WISEMAN:  No.  I have no idea what's in them.

THE COURT:  Oh, okay.

MR. WISEMAN:  Mr. Abreu spoke to Counselor English from Terra Haute and told, was told what is represented in our response, that there does not appear to be contraband, and they do appear to be related to the divorce proceeding.

THE COURT:  Well, I don't have a clue what it is, and none of us do actually.

MR. WISEMAN:  Yeah.  I guess logistically, I'm not sure -- because if the prison's holding on to the documents, the Mississippi lawyer doesn't have them right now, so maybe the appropriate thing to do would be to have the prison allow them to be sent, and take it from there.

THE COURT:  Well, I want to hear from Ms., I want Ms. Booth to give us a written update, or Mr. Roberts, or whoever is lead -- I thought Ms. Booth was lead counsel before, Ms. Salinas.

MS. SALINAS:  Yes, Your Honor.

THE COURT:  Just file a notice with the Court whether

or not these are going to be, documents are going to be available to you from this lawyer in Mississippi or not.  If not, well, I'm not going to let them be mailed without further review, I think.  I may ask Mr. Wiseman to review them, as an officer of the Court, and report back.

MR. WISEMAN:  I would very much like to review them.

THE COURT:  The issue is twofold:  One, it may have something to do with competency -- it's threefold -- two, there may be some contraband combination.  I think that probably that the U.S. Attorney thought that this was his lawyer.  And in the past, he has sent contraband letters, already posted, to his lawyers for, to be forwarded.  And third is the safety of this woman and her daughter.  And so I need assurances on all three of those levels before the documents are sent on to the Mississippi lawyer.

MR. WISEMAN:  Well, Your Honor, if I could suggest if the Court wants to direct the counselor at Terra Haute to simply make a copy of the package, send one copy to the Government, one copy to me, we could all look through them and --

THE COURT:  Well, that's fine.  I thought you didn't want anybody to look at them.

MR. WISEMAN:  Well, I can't stop the Government from subpoenaing them, once they --

THE COURT:  Well, if you want to make a copy, that's

USCA5 6159

fine with me, too.  I guess somebody would have to pay the
Bureau of Prisons to do that.  Right?

MS. BOOTH:  Well, Your Honor, if they could, if
there's possibly a way that they could send the package to the
U.S. Attorney's Office, we would make two packages, and then
send them on to the, with -- and then alert the Court as to
what, if it would be -- we'll ask the Court if we might send
them on to the attorney.

THE COURT:  Either way.  It can go directly to
Mr. Wiseman, and he can make copies, or directly to you, and
you can make copies, which I'm going to leave this up to
Mr. Wiseman as to what his preference is.

MR. WISEMAN:  I'll contact Mr. English and represent
that the Court would like them to send the documents to me.
I'll immediately copy them, send them to the Government, and
you know, we'll take it from there, if they're --

THE COURT:  And then would you wait, please, before
forwarding on to the Mississippi lawyer?  Somebody needs to
contact --

MR. WISEMAN:  I'll wait for direction.

THE COURT:  -- the Mississippi lawyer, though, so he
doesn't get a default, you know what I mean?

MS. BOOTH:  I will call Angela Sampson.  That's the
attorney.

THE COURT:  And tell her what the entire issue is.

**USCA5 6160**

And I want you, Ms. Booth, to get from her whatever documents she's filed on behalf of Ms. Bourgeois.

MS. BOOTH:  Uh-huh.

THE COURT:  Because I'm concerned it's going to have an address.

MS. BOOTH:  An address.

THE COURT:  It may be, it may be bad enough that he's got a state, if, if his allegations, the allegations are to be believed.  And I have no choice but to give them credence at this time for her protection.

MS. BOOTH:  Well, I'm also concerned, Your Honor, that these documents, if he is representing himself pro se, could definitively answer the question of mental retardation or not.

THE COURT:  Well, I think I've already made that point.

MS. BOOTH:  So these would be the ultimate answer and extremely important evidence for the Government.

THE COURT:  Mr. Wiseman?

MR. WISEMAN:  I don't dispute that they may have probative value.  I -- having read stacks and stacks of Mr. Bourgeois's writings, I would disagree that they would be the definitive answer.  But we'll leave that for another date.

THE COURT:  Well, I've read quite a bit of his -- I know that he has had correspondence with me.

USCA5 6161

MR. WISEMAN:  Yeah.

THE COURT:  And I do think that that type of thing is evidence as to competence.

MR. WISEMAN:  Yeah.  I don't dispute it has some probative value.  I just don't know that it --

THE COURT:  And I, and this is the way I want to do this, Mr. Wiseman.  I hesitate to put you in a position also of doing something that's against your client's interest.  So I'm going to ask you to go through these documents, copy everything, send it to the U.S. Attorney.  If you think that there's something that would compromise your client's interests, we're going to have to talk about it.

MR. WISEMAN:  Okay.  I --

THE COURT:  Because it's not -- if he was sending it to some stranger in Mississippi, it doesn't have any attorney-client privilege or any whatever, but I guess there's a self-incrimination issue that he's already waived by posting it.  What do you think?

MR. WISEMAN:  Your Honor, I --

MS. BOOTH:  That would be my --

MR. WISEMAN:  I guess the bottom line is by, right, by sending it to a third party, I don't know that he has any privilege as to those particular documents.  But rather than discussing it in a vacuum, why don't we see what they are.  And if --

USCA5 6162

THE COURT:  All right.  Well then we'll talk -- we'll just save that for another day.  I don't want to over analyze, but I am --

MR. WISEMAN:  Yeah.

THE COURT:  -- concerned about, about that issue as well.

MR. WISEMAN:  Yeah, I appreciate the Court's pointing that out.  All right.  So I will tell Mr. English, Counselor English to forward the documents to me, with the Court's direction.  And as soon as I get them, I will have them copied and sent on.

THE COURT:  And I have your representation that you'll copy everything?

MR. WISEMAN:  Oh, absolutely, Your Honor.

THE COURT:  All right.  Anything further?  Does that satisfy you, Government?

MS. BOOTH:  And I will contact Ms. Sampson to find out what the status of that lawsuit --

THE COURT:  Well, get a copy of that petition from her, please.

MS. BOOTH:  Yes, Your Honor.

THE COURT:  Anything else?

MR. ROBERTS:  Your Honor, I just -- Tony Roberts for the United States -- I was just wondering if there was any update on the discovery that we had asked about before.  And I

USCA5 6163

understand that Mr. Wiseman had sent it, but I had not seen anything arrive yet.  So I was just curious if there was an update on that.

MR. WISEMAN:  You haven't gotten the documents?

MR. ROBERTS:  No, I have not.

THE COURT:  Well, where are they?  I thought that was a couple of months ago.

MR. WISEMAN:  Yeah, I mean, we overnight mailed them.

MS. BOOTH:  Are we talking about the boxes?

MR. WISEMAN:  Yes, the boxes.

MS. BOOTH:  Oh, yeah, the boxes are here.

MR. WISEMAN:  Yeah.  Are you talking about the in-camera documents, Mr. Roberts?

MR. ROBERTS:  Yes.  I was talking about those as well.

MR. WISEMAN:  Right.  I owe the Court an additional submission on that, which I hope to make by Thursday.

THE COURT:  Mr. Wiseman, can you and I have an ex parte discussion about this also?

MR. WISEMAN:  Sure, absolutely.

THE COURT:  I've got a courtroom full of people right now.

MR. WISEMAN:  Yeah, yeah.  Your Honor, what I was going to suggest is if it would be convenient, I could have that additional submission to you on Thursday, and then perhaps

USCA5 6164

there may or may not be a need for an additional discussion.

THE COURT:  All right.  That will be fine then. Perhaps we can schedule another conversation in the future. You know I record all these ex parte conversations, so they're in the record.

MR. WISEMAN:  Yes, of course.

THE COURT:  Let me ask you then, are you all ready to set a hearing, an evidentiary hearing?

MR. WISEMAN:  Yes, we -- Plaintiffs certainly are. Petitioner certainly is.  We would need to have, you know, for logistical reasons, a bit of time, but --

THE COURT:  Yeah, I promised the Marshals at least a two-month heads up on this.

MR. WISEMAN:  Yeah.

THE COURT:  Because he'll have to be housed again in the federal courthouse.  Can you all give me some indication of how long -- I can give you a date now.  I was thinking April.

MR. WISEMAN:  April?  Um --

THE COURT:  Is that too far away?

MR. WISEMAN:  No, no, no.  I'm just thinking, I have quite a few moving parts here that I need to get in place, and I was not prepared to, today, to talk about specific dates.  I think, if I could suggest that determining the scope of the hearing might make picking a date a little easier, just because we'll know how many days we're going to need and which

USCA5 6165

witnesses we'll need, I think maybe -- well, my suggestion, Your Honor, as long as we're talking --

THE COURT:  Well, the whole issue really is whether or not his attorneys were -- failed in their obligation to him to give him a proper defense.

MR. WISEMAN:  That's one way of putting it, but then there's multiple components to that claim of ineffective --

THE COURT:  I thought they all, don't they all -- oh, okay.  I see what you mean.

MR. WISEMAN:  If --

THE COURT:  I had forgotten about the bite mark thing.

MR. WISEMAN:  My hope would be to have an actual argument on our, the scope of the hearing, where we could go claim by claim and articulate our respective positions as to why we're entitled to a hearing.  And then at the end of that, the Court could say, "Okay, hearing is granted on these claims, not granted on other claims," and then would be in a position to actually pick a date for the hearing.  So I think we could schedule that argument for soon.

THE COURT:  Do y'all want to do that in person?

MR. WISEMAN:  I would prefer to do that in person, yes.

THE COURT:  I would think so.

MR. WISEMAN:  Yeah.

USCA5 6166

THE COURT:  Besides, I haven't met you.

MR. WISEMAN:  That's right.  That's another reason, right.

THE COURT:  Why don't we do that then.  Why don't we set aside a morning in April to do that.

MR. WISEMAN:  That sounds fine.

THE COURT:  Am I going to be expecting some further briefing on these issues?  I thought I remembered everything except for the bite marks having to do with refusing to put on evidence or not putting on evidence as to his mental ability, whether it's competence or retardation or that sort of thing, some kind of mitigating evidence.

MR. WISEMAN:  Well, there's mitigating evidence. There's also the question about the time of death, whether it was on federal property or not.  So there are, again, I'm not prepared to go through it all, but there are a number of issues that we think are hearing-worthy.

I was just wondering, I can't recall, did the Government ever respond to our discovery motion?  I think they were waiting for our discovery to get to them, and so I think that's still outstanding, a response to our motion for a hearing and discovery.  But other than that, I think the case will be ready for an argument on the scope of the hearing.

MR. ROBERTS:  That's correct, Your Honor.  We had, we were prepared to submit a response to their discovery and their

USCA5 6167

request for a hearing, and then we had, you instructed us to wait until such time as they turned over (inaudible) to us so that we could address the retardation claims.

So we have not actually filed the response to their discovery request.  We're kind of waiting on this, the remaining discovery and the writings of Alfred Bourgeois in response to this.  And there are a couple of issues that we could, that could turn on whether or not, what type of experts we might, each side might need.  So an argument sounds like a good idea, that we could address Brady issues, some other issues that the Court might decide to resolve on the record instead of needing witnesses.

THE COURT:  All right.  Well, maybe you all could, in preparation for that, just give me a brief status report about what, from the Government anyway, what evidence, what issues you think could be resolved on the record, as it stands, and which you believe need further development with a record, with a hearing.

MR. ROBERTS:  Okay, Your Honor.  Do you want that right now?

THE COURT:  How about a month?

MR. ROBERTS:  Okay.  I can certainly file something within a month that articulates that and --

THE COURT:  What do you think, Mr. Wiseman?

MR. WISEMAN:  Sure.  I mean, we've already moved for

a hearing and --

THE COURT:  Well, I'm going to give you a hearing, I just don't know how much of a hearing.  I anticipate, I guess, the hearing would be on mental health issues only.

MR. WISEMAN:  Right.  I guess what I'm thinking is that we've articulated our view as to what we should get a hearing on.  They need to respond to that.  So rather than a status, perhaps we can have their response.  And then we'll know what's in controversy and we could address that at the hearing --

THE COURT:  Okay, that would be fine.

MR. WISEMAN:  -- at argument.

THE COURT:  And I just, if I put the burden on the Government to at least give me a status update as to what they think should, what they agree should have a hearing and what they disagree, then you could respond to that.

MR. WISEMAN:  Okay.  I guess I would just like an opportunity to reply to whatever they have to say about what's --

THE COURT:  Of course.

MR. WISEMAN:  -- entitled to a hearing.

THE COURT:  I was just trying to figure out what they, what they would concede needs a hearing.

MR. WISEMAN:  Okay.  Well, that's --

MR. ROBERTS:  Your Honor, I can tell you on the

USCA5 6169

record right now -- Tony Roberts for the United States -- I can tell you on the record right now that our -- we believe that you could actually resolve all of the issues on the matters that have been submitted, after --

THE COURT:  You know, and you may very well be right, but I'm not going to do that.

MR. ROBERTS:  I understand, Your Honor.

THE COURT:  Sorry.

MR. ROBERTS:  I anticipated that.  But that's going to be part of our submission.

THE COURT:  And I appreciate that.  But I can tell you that it just seems to be only fair that they be allowed to develop a record in this area.

MR. ROBERTS:  And actually, I actually agree with that, Your Honor.  I think my initial submission was that in all likelihood, there probably, it probably is the fairest approach of due process to have the hearing on the, particularly on the mental health aspect, since it wasn't --

THE COURT:  And whether or not there was retardation issues, those kind of things.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  And you know, Mr. Wiseman, what I was concerned about on the mental retardation issues?

MR. WISEMAN:  Yes, Your Honor.

THE COURT:  I don't know, I want to give you a

USCA5 6170

heads-up about what I was thinking, because I have actually granted a writ of habeas corpus from a state capital inmate on that, on the issue of mental retardation.

MR. WISEMAN:  Uh-huh.

THE COURT:  And I looked at the, at that time, and I'm sure you know very well better than I do the standards laid out by -- and they're supposed to be state by state, but this is not going to be state by state -- but what constitutes mental retardation, when the tests have to be given, and it has to be established before a certain very young age, like 10, something like that.

MR. WISEMAN:  I believe it's 18.

THE COURT:  Pardon?

MR. WISEMAN:  By the age of 18.

THE COURT:  Okay.  But I don't know if you have any of those records.  I haven't seen them.

MR. WISEMAN:  Oh, the records -- believe we have proof that we can offer --

THE COURT:  Pardon?

MR. WISEMAN:  -- through the records.

THE COURT:  Pardon?

MR. WISEMAN:  I mean, go to a school district that maintains records certainly for that long, if they had them at all, but --

THE COURT:  You don't -- I'm sorry, so you have no

USCA5 6171

records?

MR. WISEMAN:  We have no school records that we've --

THE COURT:  Okay.  And the reason I asked that, it just puts you, a very, I think, a difficult burden on you to do that, when he's tested at this age after a capital murder conviction.  And that's what I understood you had.

MR. WISEMAN:  Yeah.  Your Honor, this is a very complicated set of issues to address.  And I just, I'm fearful that we're addressing --

THE COURT:  Well, that's why I wanted you to be able to develop it in person.

MR. WISEMAN:  Yeah, exactly.

THE COURT:  But I wanted to tell you my concerns in that area, which I'm sure you share.

MR. WISEMAN:  Yeah.  No, I -- we have some obstacles, but we also think we can overcome them.

THE COURT:  Anything else?

MR. WISEMAN:  I guess I'm not sure where we stand.  We're going to wait for the Government's status slash response in about a month?

MR. ROBERTS:  Well, were you still going to submit -- you were going to submit something this Thursday, you said, with regard to the in camera documents.  Are you still going to --

MR. WISEMAN:  Yeah.  That's going to be a sealed

USCA5 6172

submission regarding those documents.

MR. ROBERTS:  And that was, if I understood right, that was so that Judge Jack could review those documents and determine if any of those should be turned over to the United States.

MR. WISEMAN:  Exactly.  There's 22 pages, I believe, in controversy.

MR. ROBERTS:  So if those documents were then turned over to the United States, they would then become part of our reply.

MR. WISEMAN:  Exactly.

MR. ROBERTS:  And so I can prepare a response leaving --

THE COURT:  Mr. Wiseman, I'm having a hard time with that.  Maybe we can have another ex parte conversation after you file your documents.

MR. WISEMAN:  Sure.  Okay.

THE COURT:  Anything else?

MR. WISEMAN:  Nothing from me, Your Honor, Michael Wiseman.

MR. ROBERTS:  Nothing from the United States, Your Honor.

THE COURT:  All right.  So where we are is waiting for the Government to file a response, which they need your discovery for, Mr. Wiseman, which they've had almost all of it

USCA5 6173

24

but 22 pages for a couple of months now, I think.  And you can always file a supplemental response if I let you have these other 22 pages, Mr. Roberts.

But, and then you all in a month, the U.S. Attorney is, you're going to file sort of a status update to tell me what items you think can without a doubt be resolved without further development on the, as to a hearing, and which items you think you would concede anyway that might be appropriate for a hearing.

MR. ROBERTS:  Okay.

THE COURT:  And then you'll respond a couple of weeks later, Mr. Wiseman?

MR. WISEMAN:  Yes, that sounds fine.

THE COURT:  And then I'll give you a date in the future -- I'm not going to do it now, but maybe we'll get together by phone another time to set up sort of an oral arguments kind of a thing is what you anticipate?

MR. WISEMAN:  That sounds great.

THE COURT:  And then what issues remain, if any, will be set for a hearing.  Is that okay?

MR. WISEMAN:  Yes, that sounds great.  Thank you.

THE COURT:  All right.  Thank you all very much. You're excused.

MR. ROBERTS:  Your Honor, can I clarify one matter?

THE COURT:  Wait, wait, wait.  Yes.

USCA5 6174

MR. ROBERTS:  Just, I just want to make sure, are you expecting two responses from the United States, one with regard to their motion, and then another status update?

THE COURT:  Yes, sir.  Mr. Wiseman, are you still there?

MR. WISEMAN:  Yes, I am.

THE COURT:  Okay.  Yes, sir.

MR. ROBERTS:  All right, Your Honor.  We'll get that response submitted as soon as possible.

THE COURT:  Thank you very much.

MR. ROBERTS:  Thank you.

MR. WISEMAN:  Thank you.

THE COURT:  Bye.

(Proceedings concluded at 1:40 p.m.)

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ Molly Carter                    September 26, 2011
Molly Carter                        Date

USCA5 6175