## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

|  |  |  |
|---|---|---|
| ALFRED BOURGEOIS, | : | CIVIL ACTION |
|  | : | (Capital Habeas Corpus) |
| Petitioner, | : |  |
|  | : | Case No. 2:19–cv–00392–JMS–DLP |
| V. | : |  |
|  | : | **CAPITAL CASE** |
| SUPERINTENDENT, USP-Terre Haute, | : | **EXECUTION SCHEDULED FOR** |
| UNITED STATES OF AMERICA, | : | **JANUARY 13, 2020** |
|  | : |  |
| Respondents. | : |  |
|  | : |  |

---

## REPLY IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS AND MOTION FOR STAY OF EXECUTION

---

Victor J. Abreu
Katherine Thompson
Peter Williams
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West—The Curtis Center
Philadelphia, PA 19106
215-928-0520
Victor_Abreu@fd.org
Katherine_Thompson@fd.org
Pete_Williams@fd.org

Counsel for Petitioner

Dated: November 15, 2019

**PRELIMINARY STATEMENT**

Petitioner Alfred Bourgeois shall be referred to as Petitioner or Mr. Bourgeois. Respondents shall be referred to as the Government. Mr. Bourgeois's August 15, 2019, Petition for Writ of Habeas Corpus Pursuant ("Petition") shall be cited as "Pet." followed by the relevant page or paragraph number(s). The Government's October 15, 2019, Response shall be cited as "GR" followed by the relevant page number(s).

With this Reply Brief, Petitioner is filing a supplement to Appendix A, which was filed with the Petition on August 15, 2019. The supplemental appendix is entitled "Appendix A, Vol. II," and the page numbers continue sequentially from the last page of the initial volume. Cites to both volumes of Appendix A shall be referred to by the initial "A" and relevant page number. Relevant transcripts from Petitioner's § 2255 level proceedings are provided in Appendix B, filed with the Petition, and cites to pages from the transcript shall be referred to as "Tr.," followed by the relevant date and page number.

All other citations are either self-explanatory or will be explained.

All emphasis in this Petition is supplied unless otherwise indicated.

i

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. i

TABLE OF CONTENTS........................................................................................................... ii

INTRODUCTION ..................................................................................................................... 1

I.  MR. BOURGEOIS IS ENTITLED TO REVIEW UNDER 28 U.S.C. § 2241
    BECAUSE HE SATISFIES THE 28 U.S.C. § 2255(E) SAVINGS CLAUSE ................. 5

    A.  Section 2255 Is "Inadequate or Ineffective" to Test Mr. Bourgeois's
        Claim of Categorical Ineligibility for Execution. ................................................... 6

        1.  Mr. Bourgeois's claim need not fit within the facts of *Davenport* or
            *Webster* to be cognizable under § 2241. ........................................................ 7

        2.  Mr. Bourgeois may proceed under § 2241 because he presents a
            structural error with § 2255............................................................................ 9

    B.  Mr. Bourgeois Has Never Received Judicial Review of His *Atkins*
        Claim Under Constitutionally-Mandated Diagnostic Standards........................... 11

        1.  The § 2255 District Court's opinion cannot be considered a "reliable
            judicial determination" of Mr. Bourgeois's claim in the wake
            of *Moore-I*................................................................................................... 12

        2.  Mr. Bourgeois's current *Atkins* claim relies on the application of the
            medical community's diagnostic standards, which was not available
            to him at the time of his initial § 2255 proceedings...................................... 27

    C.  Mr. Bourgeois's Petition Is Neither an Abuse of the Writ Nor Barred
        by *Teague*.......................................................................................................... 36

        1.  Mr. Bourgeois's petition is not an abuse of the writ..................................... 36

        2.  *Teague* is not relevant to either of Mr. Bourgeois's jurisdictional
            arguments.................................................................................................... 37

        3.  *Teague* cannot preclude review of Mr. Bourgeois's claim that he is
            categorically ineligible for execution under the Constitution........................ 41

II.    THE GOVERNMENT HAS NOT CHALLENGED THAT MR. BOURGEOIS MAY PROCEED UNDER § 2241 BECAUSE HE CHALLENGES THE EXECUTION, AS WELL AS THE IMPOSITION, OF HIS SENTENCE. .................... 42

III.    MR. BOURGEOIS IS ENTITLED TO A STAY OF EXECUTION. .............................. 43

REQUEST FOR ORAL ARGUMENT ........................................................................................ 45

**INTRODUCTION**

In his Petition, Mr. Bourgeois establishes that he is intellectually disabled ("ID") under the medical community's diagnostic standards and thus his execution is barred by *Atkins v. Virginia*, 536 U.S. 304 (2002), and its progeny. Mr. Bourgeois also establishes that he is entitled to review of his *Atkins* claim under these standards prior to his scheduled execution on January 13, 2020, as the plain language of the Federal Death Penalty Act ("FDPA") and numerous Supreme Court decisions categorically ban *the carrying out of an execution* on an intellectually disabled person. The Government does not dispute that an ID person is entitled to prove he is categorically ineligible for death at the time of his execution. It only challenges Mr. Bourgeois's ability to bring his *Atkins* claim under 28 U.S.C. § 2241, relying on various unconvincing arguments.

First, the Government contends that § 2241 is not available to Mr. Bourgeois because the facts underlying his jurisdictional claim do not precisely align with the facts presented in either *In re Davenport*, 147 F.3d 605 (7th Cir. 1998), or *Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015). Yet the Seventh Circuit has never held, or even suggested, that these two cases represent the only circumstances under which the 28 U.S.C. § 2255(e) Savings Clause is available; a petitioner need only show that § 2255 is "inadequate or ineffective" to challenge his conviction or sentence. And, just as the *Davenport* court found § 2255 to be inadequate where it denies the defendant the ability to challenge his imprisonment for a "nonexistent offense," *Davenport*, 147 F.3d at 611, and the *Webster* court found § 2255 to be inadequate as it prevented Mr. Webster from challenging his constitutionally prohibited sentence, § 2255 is inadequate here:

- *Atkins* was unavailable to Mr. Bourgeois at the time of his initial § 2255 proceedings because then-binding Fifth Circuit jurisprudence rejected the medical community's approach to ID in favor of a "legal" approach that employed the same unscientific standards and practices invalidated in *Moore v. Texas*, 137 S. Ct. 1039 (2017) ("*Moore–I*").

- Indeed, unlike the *Atkins* claim at issue in this Court's recent § 2241 decision in *Fulks v. Krueger*, there is *no doubt* that the district court that reviewed Mr. Bourgeois's initial *Atkins* claim ("District Court" or "§ 2255 Court") did so using "factors that the Supreme Court subsequently deemed inappropriate in *Moore*."[1]

- Mr. Bourgeois has established that, when his *Atkins* claim is analyzed under the medical community's diagnostic standards as now required by *Moore–I*, he is indisputably ID. *See* Pet. § III.

- Nevertheless, Mr. Bourgeois is now precluded from bringing a second § 2255 motion to obtain review of his sentence under constitutionally-mandated standards due to the procedural language of AEDPA's strict relitigation bar.

Accordingly, Mr. Bourgeois has established that he is intellectually disabled and constitutionally exempt from execution, but without an avenue under § 2255 to vindicate his claim for relief. Just as it did in *Webster*, this constitutes a structural defect that allows him to pass through the Savings Clause.

The Government attempts to distinguish *Webster*, in part, by stating that unlike Mr. Bourgeois who previously raised an *Atkins* claim, Mr. Webster could not have raised his *Atkins* claim in his initial § 2255. In fact, however, Mr. Webster not only raised an *Atkins* claim in his initial § 2255 proceedings, he, like Mr. Bourgeois, also unsuccessfully sought authorization to re-raise that claim in a successor petition. And—just as it does here—the Government argued in *Webster* that the petitioner's prior *Atkins* litigation precluded him from proceeding under § 2241. The Seventh Circuit rejected that argument, allowing Mr. Webster to use § 2241 to bring—and ultimately prevail on—his successive *Atkins* claim. The Government also attempts to distinguish

---

[1] No. 2:15–cv–33–JRS–MJD, 2019 WL 4600210, *16 n.9 (S.D. Ind. Sept. 20, 2019). In *Fulks*, the petitioner sought to bring an *Atkins* claim for the first time under § 2241, explaining that his claim was not viable under the legal and diagnostic regime in effect at the time of his initial § 2255 motion. Yet the Court found this premise to be too speculative, as it "would require the Court to assess the evidence supporting Mr. Fulks' *Atkins* claim, *then speculate how another federal court would have treated that evidence.*" *Id.* at *16. Here, the Court need not engage in any such speculation:  it was not until *Moore–I* invalidated the Fifth Circuit's unscientific approach to ID that *Atkins* became available to Mr. Bourgeois.

*Webster* on the ground that it involved newly discovered evidence. But, as nothing in *Webster* limits § 2241 relief to *Atkins* claims that are procedurally and factually identical to Mr. Webster's, the Government's distinction is meaningless. In *Webster*, the Seventh Circuit rejected the proposition that the language of § 2255(h)(1) could render an *Atkins* claim "beyond the scope of the savings clause" and "create the possibility of an unconstitutional punishment." *Webster*, 784 F.3d at 1139. The same reasoning applies here, as the procedural barrier created by the § 2255(h) relitigation bar is all that prevents Mr. Bourgeois from challenging the constitutionality of his upcoming execution under clinical diagnostic standards. As the *Webster* court explained, Mr. Webster could proceed under § 2241 because the wording of § 2255(h) foreclosed his ability to challenge "a particular sentence [that] was *constitutionally forbidden*." *Id.* at 1138. Mr. Bourgeois should be allowed to do the same.

The Government also argues that Mr. Bourgeois is precluded from proceeding under § 2241 because he purportedly received a reliable judicial determination when he litigated his *Atkins* claim in his initial § 2255 proceedings. The success of this argument depends on the Government establishing—as it attempts to do in Section B of the Response—that the § 2255 District Court's adjudication of Mr. Bourgeois's claim is consistent with *Moore–I*'s requirement that *Atkins* be assessed according to diagnostic standards. But again, applying then-binding Fifth Circuit jurisprudence, the District Court repeatedly and expressly eschewed the medical standards for ID in favor of an unscientific "legal" approach when it reviewed Mr. Bourgeois's *Atkins* claim. The Government's attempts to argue otherwise are unconvincing.

In light of the difficulty of showing that the District Court complied with diagnostic standards, the Government also challenges Mr. Bourgeois's right to rely on *Moore–I* and *Moore*

3

*v. Texas*, 139 S. Ct. 666 (2019) ("*Moore–II*"), and the diagnostic standards they require, in his

§ 2241 petition. But, contrary to the Government's arguments:

- Mr. Bourgeois cannot be barred from obtaining judicial review of his *Atkins* claim under medical standards, as the execution of an ID person is constitutionally prohibited, meaning that procedural barriers to relief that would normally be permissible are themselves constitutionally invalid;

- Mr. Bourgeois could not have relied on the principles enunciated in *Moore–I* and *Moore–II* in his first § 2255 motion because, prior to *Moore–I* holding that courts are *required* to apply current medical standards in the evaluation of *Atkins* claims, Mr. Bourgeois had no authority to challenge settled Fifth Circuit that supported the use of non-scientific factors in the disposition of an such claims;

- Mr. Bourgeois can rely on constitutional cases in support of his § 2241 petition, as he need only show § 2255 is inadequate or ineffective; and

- Allowing Mr. Bourgeois to rely on new diagnostic standards would not forever forestall a final decision in this case, or open the floodgates to endless *Atkins* litigation from other capital petitioners. Mr. Bourgeois is perhaps the only § 2255 litigant who raised a timely and meritorious *Atkins* claim, but was denied relief on the basis of circuit jurisprudence subsequently invalidated by *Moore–I*. This is not a claim like the one presented in *Fulks*, in which the petitioner conceded that he would not have been ID under diagnostic standards in effect at the time of his § 2255 proceedings. Here, Mr. Bourgeois has established that, if his claim is assessed under the medical community's diagnostic standards—as of 2011 or as of today—he is undeniably ID. This is a rare case indeed.

Nor is the Government able to persuasively argue that Mr. Bourgeois's Petition is an abuse of the writ or that it is barred by *Teague v. Lane*, 489 U.S. 288 (1989), as nothing in the jurisprudence relied upon by the Government actually supports either of these claims. Mr. Bourgeois's Petition is not an abuse of the writ because it relies on a change in the law that occurred after his initial § 2255 proceedings. And *Teague* is irrelevant to each of Mr. Bourgeois's two bases for § 2241 jurisdiction. In any event, regardless of the jurisdictional basis for Mr. Bourgeois's Petition, *Teague* is a judge-made, prudential doctrine that was announced well before the decision in *Atkins* and as such it cannot be applied to bar review of his claim that he is categorically exempt from execution.

Finally, the Government completely fails to challenge Mr. Bourgeois's claim that he is entitled to § 2241 review because he challenges the execution of his sentence, as well as its imposition. In addition to the prohibition on the carrying out of an execution of the intellectually disabled set forth by *Atkins* and its progeny, Mr. Bourgeois was sentenced under the FDPA, which expressly mandates that a "sentence of death shall not be *carried out* upon a person who *is* mentally retarded." 28 U.S.C. § 3596(c). This language calls for an inquiry necessarily governed by the present, including the prisoner's present-day functioning as measured by present-day diagnostic standards, rather than standards applicable at the time the sentence was imposed. And, as the Seventh Circuit has recognized, § 2241 confers habeas jurisdiction where a federal prisoner is challenging not the validity but the execution of his sentence.

Hence, whether because he satisfies the § 2255(e) Savings Clause, or because he is challenging the execution of his sentence, Mr. Bourgeois is entitled to litigate the merits of his *Atkins* claim and establish that he is intellectually disabled and cannot constitutionally be executed on January 13, 2020.

## I. MR. BOURGEOIS IS ENTITLED TO REVIEW UNDER 28 U.S.C. § 2241 BECAUSE HE SATISFIES THE 28 U.S.C. § 2255(E) SAVINGS CLAUSE.

The Government acknowledges that a federal prisoner is entitled to § 2241 review under the Savings Clause when the remedy under § 2255 is "inadequate or ineffective to test the legality of his" sentence. GR at 41 (citing § 2255(e)). Yet the Government contends that Mr. Bourgeois is precluded from proceeding under § 2241 because: (i) his claim does not precisely fit within the facts of prior cases in which the Seventh Circuit has found the savings clause applicable; and (ii) he "fully adjudicated" the same *Atkins* claim he now presents and received a "reliable judicial determination" of that claim in his initial § 2255 proceedings. *See* GR at 5–8. The Government errs on both counts.

5

### A. Section 2255 Is "Inadequate or Ineffective" to Test Mr. Bourgeois's Claim of Categorical Ineligibility for Execution.

As set forth in his Petition, Mr. Bourgeois's initial § 2255 *Atkins* claim was denied in 2011 under an approach to *Atkins* found to be unconstitutional in *Moore–I*.  Following the *Moore–I* decision, Mr. Bourgeois sought authorization from the Fifth Circuit to file a second petition under § 2255(h)(2). *See* Pet. ¶¶ 9–11. The circuit panel did not deny that Mr. Bourgeois qualifies as ID under the diagnostic standards required under *Moore–I*. Nor did it dispute that *Atkins* could be "newly available" to a petitioner who had been unable to successfully raise an ID claim earlier due to Fifth Circuit jurisprudence that has since been overruled. To the contrary, the Fifth Circuit subsequently reaffirmed that "it is correct to equate legal availability" under § 2255(h)(2) with changes in the standards by which an *Atkins* claim is assessed. *In re Johnson*, No. 19–20552, 19–70013, 2019 WL 3814384, at *5–6 (5th Cir. Aug. 14, 2019). Nevertheless, the panel denied Mr. Bourgeois's application on the ground that he was procedurally barred from re-litigating his *Atkins* claim under 28 U.S.C. § 2244(b)(1). *In re Bourgeois*, 902 F.3d 446 (5th Cir. 2018).[2] Mr. Bourgeois then filed his § 2241 Petition with this Court, arguing that the Fifth Circuit's interpretation of § 2255(h)[3] precludes review of his death sentence under current constitutional standards, despite that same opportunity having been given to other, *less diligent* prisoners, and despite the categorical bar against executing an intellectually disabled person.

---

[2] 28 U.S.C. § 2244(b)(1) provides: "A claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed."

[3] Section 2255(h) states that "[a] second or successive motion must be certified as provided in section 2244." As explained in the Petition, Mr. Bourgeois argued in his application that the § 2244(b)(1) re-litigation bar is expressly limited to petitions brought by state prisoners under § 2254, but the Fifth Circuit rejected this argument. *See* Pet. ¶ 10.

### 1. Mr. Bourgeois's claim need not fit within the facts of *Davenport* or *Webster* to be cognizable under § 2241.

The Government recognizes that the Seventh Circuit has found § 2241 review appropriate in a number of different settings. *See* GR 51–56. Nevertheless, the Government argues that Mr. Bourgeois's *Atkins* claim is barred because it "does not fall within either of the narrow paths for § 2241 relief set forth by the Seventh Circuit in *Davenport* and *Webster*." GR at 6. But as this Court recently acknowledged, "[t]he Seventh Circuit has never held that the Savings Clause is only met in the specific circumstances in which it has so found." *Fulks*, 2019 WL 4600210, at *14. To the contrary, *Webster* made clear that the only requirement for establishing § 2241 jurisdiction through the savings clause is that there be "some kind of structural problem with section 2255." *Webster*, 784 F.3d at 1136.

Notably, the Government defeats its own "*Davenport*-or-*Webster*" argument in acknowledging that § 2241 was available to the petitioner in *Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001), a case that involves no factual overlap with either *Davenport* or *Webster*. In *Garza*, the petitioner sought to raise a claim under § 2241 based on the ruling of an international treaty body issued after his § 2255 proceedings concluded. In analyzing the jurisdictional issue, the *Garza* court recognized generally that there are "circumstances" in which "the operation of the successive petition rules absolutely prevent[] the petitioner from ever having an opportunity to raise a challenge to the legality of his sentence." *Id.* at 922. One such circumstance was *Davenport*, which involved a retroactive change in statutory law, and another was Mr. Garza's case. *Id.*; *see also Webster*, 784 F.3d at 1137 (describing *Garza* as "*one illustration* of a situation in which petitioner was entitled under the savings clause to use section 2241 to attack a sentence"); *Poe v. Lariva*, 834 F.3d 770, 772 (7th Cir. 2016) (referring to a new retroactive

7

statutory rule as just "*[o]ne circumstance* under which this court has permitted resort to § 2241").

Citing *Fulks*, the Government attempts to distinguish Mr. Bourgeois's § 2241 *Atkins* claim from *Garza*, stressing that it was "literally impossible" for Mr. Garza to have raised his claim earlier as the factual predicate did not yet exist. GR at 54 (citing *Fulks*, 2019 WL 4600210, at *4). But *Fulks* is distinguishable. There, the petitioner sought to bring an *Atkins* claim for the first time under § 2241, explaining that his claim was not viable under the legal and diagnostic regime in effect at the time of his initial § 2255 motion. Yet the Court found this premise to be too speculative, as it "would require the Court to assess the evidence supporting Mr. Fulks' *Atkins* claim, *then speculate how another federal court would have treated that evidence*." *Id.* at *16. The Court went on to stress that "this speculative analysis would not be required had Mr. Fulks raised an *Atkins* claim in his § 2255 when he had the opportunity to do so," in which case the Court "would not have to speculate how another court would have treated a wide-range of evidence regarding Mr. Fulks' alleged intellectual disability." *Id.* at *16, n.9. Here, by contrast, the District Court that denied Mr. Bourgeois's prior *Atkins* claim did so under Fifth Circuit precedent that made it "literally impossible" for his claim to succeed.  It was not until *Moore–I* invalidated that jurisprudence that Mr. Bourgeois could raise his current claim.

In short, in *Davenport*, *Webster*, and *Garza*, the Seventh Circuit allowed claims to proceed under § 2241 because the petitioner identified a structural problem that rendered § 2255 "inadequate or ineffective" to test the petitioner's claim. In none of these cases did the petitioner present the same factual scenario as any other case in which the court found jurisdiction under § 2241. Here, Mr. Bourgeois has established that developments occurring after his trial and § 2255 proceedings show that he is categorically ineligible for execution. Yet because § 2255(h)

8

does not account for claims of categorical ineligibility from execution, "as a structural matter," Mr. Fulks's challenge to his sentence "cannot be entertained by use of the 2255 motion." *Webster*, 784 F.3d at 1139. Just as in Mr. Webster's case, "[t]o hold otherwise would lead . . . to the intolerable result of condoning an execution that violates the Eighth Amendment." *Id.*

### 2. Mr. Bourgeois may proceed under § 2241 because he presents a structural error with § 2255.

The Government also argues that § 2255 is not inadequate or ineffective "simply because Bourgeois may be barred from filing a second § 2255 motion." GR at 49–50. Yet Mr. Bourgeois's claim is not premised on the mere fact that his successor application was denied. Rather, just like the petitioner in *Webster*, Mr. Bourgeois argues that § 2255, as interpreted by the Fifth Circuit, is inadequate or ineffective because a "glitch" in the wording of § 2255(h) precludes him from challenging the fundamental legality of his death sentence. *See Webster v. Lockett*, Case 2:12–cv–00086–JPH–MJD, ECF Doc. 1 at 30 (filed Apr. 6, 2012).

The Government attempts to distinguish *Webster*, in part, by stating that Mr. Webster "could not have used" *Atkins* in his first § 2255. GR at 55. In fact, Mr. Webster not only raised an *Atkins* claim in his initial § 2255 proceedings, he also unsuccessfully sought authorization to re-raise that claim in a successor petition. And—just as it does here—the Government argued in *Webster* that the petitioner's prior *Atkins* litigation precluded him from proceeding under § 2241. *See Webster v. Lockett*, Case 2:12–cv–00086–JPH–MJD, ECF Doc. 17 at 12 (filed Aug. 7, 2012) ("The remedy provided in section 2241 does not become available to Webster simply because he cannot meet the requirements for filing a successive section 2255 motion."). Of course, the

9

Seventh Circuit rejected that argument, allowing Mr. Webster to use § 2241 to bring—and ultimately prevail on[4]—his successive *Atkins* claim. *See Webster*, 784 F.3d at 1138–39.

The Government also attempts to distinguish *Webster* on the ground that it involved newly discovered evidence. *See* GR at 31–32. But again, nothing in *Webster* limits § 2241 relief to *Atkins* claims that are procedurally identical to Mr. Webster's, i.e., those that involve new facts that the claimant could not have reasonably discovered earlier. As with the previous § 2241 cases on which *Webster* relied, *Webster* itself is "best underst[ood] . . . as [an] appropriate application[] of the law to the facts before the court." 784 F.3d at 1137.

Looking to the reasoning (as opposed to the facts) behind *Webster*, the Government's distinction between Mr. Webster's case and that presented by Mr. Bourgeois is meaningless. In *Webster*, the petitioner filed a § 2241 petition raising an *Atkins* claim based on newly discovered evidence establishing his intellectual disability. He argued that § 2255 was ineffective to prove he was categorically ineligible for execution because the language of § 2255(h)(2) limits successors based on new evidence to those establishing innocence of *the offense*. The Seventh Circuit agreed, explaining there is a "lacuna in the statute" for the "narrow set of cases" involving claims of categorical ineligibility for execution. *Webster*, 784 F.3d at 1138. The *Webster* court went on to reject the proposition that the procedural language of § 2255 could render an *Atkins* claim "beyond the scope of the savings clause" and "create the possibility of an unconstitutional punishment." *Id.* at 1139.

The same reasoning applies here. The relitigation bar in § 2244(b)(1) was enacted as part of AEDPA, i.e., before any categorical exclusion against execution of the intellectually disabled existed. Thus, Congress could not have contemplated the situation in which Mr. Bourgeois now

---

[4] *See Webster*, 2019 WL 2514833, at *1 (granting relief on remand).

finds himself: categorically exempt from a death sentence, but without recourse under § 2255 to prevent his unconstitutional execution. The particular provision of AEDPA that placed him in this position is irrelevant. As the *Webster* court explained, Mr. Webster could proceed under § 2241 because the wording of § 2255(h) foreclosed his ability to challenge "a particular sentence [that] was *constitutionally forbidden*." *Id.* at 1138. Mr. Bourgeois should be allowed to do the same.

### B.    Mr. Bourgeois Has Never Received Judicial Review of His *Atkins* Claim Under Constitutionally-Mandated Diagnostic Standards.

In addition to challenging that Mr. Bourgeois has established a structural defect with § 2255 within the meaning of prior Seventh Circuit jurisprudence, the Government argues that Petitioner is unable to make use of the Savings Clause because "he fully adjudicated" his *Atkins* claim in first § 2255 proceeding. GR at 5. But as explained in Mr. Bourgeois's Petition and below, his claim is that he is intellectually disabled under the medical community's diagnostic standards, which then-binding Fifth Circuit jurisprudence precluded the District Court from considering at the time of its 2011 decision denying *Atkins* relief.

The Government tries to argue otherwise, even claiming that the court "prescien[tly]" applied diagnostic criteria that were not published until two years *after* the court penned its decision. *See* GR at 79 (referring to the standards set forth in the DSM–5).[5] It is absurd to state

---

[5] As explained in the Petition, the American Association on Intellectual and Developmental Disabilities ("AAIDD") and the American Psychiatric Association ("APA") are the leading diagnostic authorities in the field of intellectual disability. *See* Pet. ¶ 5; *see also Moore–I*, 137 S. Ct. at 1053 (citing the current manuals from the APA and the AAIDD as offering the best available description of how mental disorders are expressed and can be recognized by trained clinicians."). The AAIDD published the most recent edition of its manual entitled *Intellectual Disability: Definition, Classification, and Systems of Supports Definition Manual*, in 2010 ("AAIDD–10"). The AAIDD is also publisher of the *User's Guide: Intellectual Disability, Definition, Classification, and Systems of Supports*, the most recent edition of which was issued in 2012; and *The Death Penalty and Intellectual Disability*, issued in 2015. The most

that the District Court followed diagnostic criteria that did not exist at the time of Mr.

Bourgeois's § 2255 proceedings. But the court did not even apply the diagnostic standards that

were current as of 2011; to the contrary, it deliberately rejected them. Hence, the review that Mr.

Bourgeois now seeks in this Court is not simply an attempt to relitigate or appeal the § 2255

Court's denial of relief. It is a request to receive review of his *Atkins* claim—for the first time—

under the medical community's standards for diagnosing ID, as required by Supreme Court

jurisprudence, before he is unconstitutionally executed on January 13, 2020.

### 1. The § 2255 District Court's opinion cannot be considered a "reliable judicial determination" of Mr. Bourgeois's claim in the wake of *Moore–I*.

According to the Government, Mr. Bourgeois's *Atkins* claim "began . . . in the Southern

District of Texas and ends there," GR at 2, as the § 2255 Court has already reliably adjudicated

the claim. The success of this argument depends on the Government establishing—as it attempts

to do in Section B of the Response—that the § 2255 Court's adjudication of Mr. Bourgeois's

claim is consistent with *Moore–I*'s requirement that *Atkins* be assessed according to diagnostic

standards. But, unlike in *Fulks*, there is *no doubt* in this case that the § 2255 Court "applied

factors that the Supreme Court subsequently deemed inappropriate in *Moore*." *Fulks*, 2019 WL

4600210, *16 n.9. Indeed, the District Court repeatedly and expressly eschewed the medical

standards for ID in favor of a "legal" approach grounded in erroneous stereotypes of the

intellectually disabled. The Government's attempts to establish otherwise are unconvincing.

First, the Government contends that the District Court complied with the principles

announced in *Moore–I*, and even complied with diagnostic standards that had not yet been

published, simply because the court recognized that ID is assessed under three prongs (i.e.,

---

recent edition of the APA's guidelines is found in the Diagnostic and Statistical Manual of Mental Disorders—5th Edition ("DSM–5").

subaverage intellectual functioning, adaptive deficits, and onset before age eighteen). *See, e.g.*, GR at 79–80 ("Conforming with the Supreme Court's later decisions in *Hall* [*v. Florida*, 572 U.S. 701 (2014)] and *Moore*, the district court consulted, relied on, and adhered to the AAIDD and APA's clinical definition of intellectual disability/mental retardation contained in AAIDD– 11 (2010) and DSM–IV–TR (2000)[6] in making its *Atkins* determination."); *id.* at 79 ("Whether through prescience or thorough research of substantive *Atkins* and/or *Atkins*-related procedural issues developing in federal and state courts at that time, the district court analyzed intellectual disability under *Atkins* according to the APA's definition of intellectual functioning deficits in the DSM–5."). But *Moore–I* and *Moore–II*, make clear that applying the clinical definition of intellectual disability is much more than simply reaching opinions on the three prongs of the diagnosis. Indeed, for both rounds of review in Bobby Moore's case, the CCA made findings on all three prongs of ID.  However, because the CCA assessed those three prongs with reference to standards that violated the "medical community's diagnostic framework," the Supreme Court held that Texas's approach to the *Atkins* analysis "creat[ed] an unacceptable risk that persons with intellectual disability will be executed." *Moore–I*, 137 S. Ct. at 1048, 1053. The same is true here.

Second, the Government denies that the District Court "disregard[ed] Bourgeois' Full Scale IQ test scores, rel[ied] on various unscientific stereotypes, or rel[ied] on its own 'armchair assessment'" in assessing whether Petitioner satisfies prong one. GR at 83. Unfortunately for the Government, the plain language of the District Court's opinion repeatedly and unambiguously proves otherwise, as summarized in the following chart:

---

[6] The DSM–IV–TR is the fourth edition of the APA's Diagnostic and Statistical Manual, published in 2000, and was the current version of the DSM at the time of Mr. Bourgeois's § 2255 proceedings.

| Government Response | District Court Opinion |
|---|---|
| The court did not "disregard Bourgeois' Full Scale IQ test scores." | "The psychological profession allows any score falling along that range [of 70–75] to qualify for a diagnosis of mental retardation. . . . Courts, however, endeavor to determine whether a borderline score represents an intelligence capacity above or below the mental-retardation threshold. In the legal context, whether an inmate had significantly subaverage intellectual functioning is a question of fact that the Court decides." *See, e.g.*, *Bourgeois*, 2011 WL 1930684, at *26.<br><br>"[A]ll cases in which the Fifth Circuit has found that an inmate warrants *Atkins* relief have involved at least one base score below 70 without adjustment." *Id.* |
| The court did not "rely on various unscientific stereotypes." | "Bourgeois' behavior and characteristics are inconsistent with an IQ that would fall below 70" because, inter alia:<br><br>&bull; he "lived a life which, in broad outlines, did not manifest gross intellectual deficiencies," *id.* at *22;<br><br>&bull; he "worked for many years as a long haul truck driver . . . bought a house, purchased cars, and handled his own finances," *id.* at *29; and<br><br>&bull; "otherwise carried himself without any sign of intellectual impairment," *id.* |
| The court did not "rely on its own 'armchair assessment.'" | "Notably, this Court's interactions with Bourgeois have provided an important point of observation. During trial, Bourgeois communicated with the Court on several occasions. The Court viewed his testimony before the jury in both phases of trial. The Court had sufficient interaction with Bourgeois to make a lay assessment of whether he functions at the low level described by his expert witnesses." *Id.* at *30.<br><br>"Based on this Court's own observations, the testimony that Bourgeois has significant intellectual limitations is not credible or persuasive." *Id.*<br><br>"The Court has viewed many hours of video from the examination by Dr. Price and Dr. Moore. Bourgeois answers the questions asked of him, engages in conversation, has logical thoughts, and does not otherwise give any impression of mental retardation." *Id.* at *28. |

The Government attempts to explain away the plain language quoted above by casting the District Court's prong-one conclusion as merely the product of its crediting the Government's experts (Drs. Price and Moore) over those presented by petitioner (Drs. Gelbort, Weiner, and Swanson). *See, e.g.*, GR at 83 (court did not rely on stereotypes, but rather "credited Dr. Price and Dr. Moore's assessment of Bourgeois'[s] intellectual functions based on IQ scores evaluated in conjunction with considerations listed in the DSM–5"); GR at 91 (court "critically analyzed the diametrically opposed conclusions by the medical experts, assessed the credibility and accuracy of their assessments and reports based on the evidence, and examined the veracity of the evidence underlying their professional judgment").

This argument ignores that the District Court relied on its own lay assessment of Mr. Bourgeois's functioning. *See supra.* Yet even assuming the Court's conclusions were presented only as credibility determinations, *Moore–II* makes clear that a court cannot circumvent the application of medical criteria by couching its decision in terms of "credibility." *See Moore–II*, 139 S. Ct. at 670 (recognizing that CCA purported to abandon *Briseño* factors and base its post-*Moore–I* denial of relief on finding that the state's expert was more credible, but finding the CCA nevertheless repeated same practices invalidated in *Moore–I*). That is precisely what the District Court did here, as each of the credibility determinations cited by the Government is either founded on a misrepresentation of the record and/or itself involves a violation of diagnostic criteria.

For instance, as already discussed in Mr. Bourgeois's Petition, the court supported its decision to ignore Petitioner's presumptively-qualifying IQ scores based, in part, on Dr. Price's contra-diagnostic testimony concerning Mr. Bourgeois's lack of education and his "cultural deprivation." *See, e.g.*, Pet. ¶ 133 (explaining that, per *Moore–I* and diagnostic guidelines, Mr.

15

Bourgeois's limited education and lack of stimulation are factors that make intellectual disability more, not less, likely). Additionally, as the Government highlights, the District Court cites to Dr. Price's testimony that "it was 'very unusual' that the results of Bourgeois's academic achievement scores . . . showed high-school age proficiency higher than his IQ scores." GR at 83–84 (citing *Bourgeois* at * 29). In fact, twelve of Mr. Bourgeois's thirteen scores on the Woodcock–Johnson III ("WJ–III") were in the impaired range.[7] As set forth in the Petition:

> Petitioner's individual achievement test scores on the WJ–III include: story recall at a kindergarten level; applied problem solving at a second grade level; oral comprehension and passage comprehension at a third grade level; writing samples and understanding directions at a fourth grade level; calculation, reading fluency, and writing fluency at a fifth grade level; and math fluency at a sixth grade level. *See* A0240. The only tests on which he scored above a sixth grade level—letter-word identification (eighth grade) and spelling (thirteenth grade)—are tests that implicate mere rote learning, as opposed to any problem solving, analysis, or higher-level thinking.

*See* Pet. ¶ 50. Hence, the only "high school range" score Mr. Bourgeois received was for spelling. Although Dr. Moore testified otherwise, he was discussing the "scaled score" column of the test results, rather than the "age and grade equivalent" column, despite acknowledging that the then-current version of the DSM described the level of functional academics achievable by a person with ID in terms of grade level, not standard score. Tr. 9/24/10 at 180–85; *see also* DSM–IV–TR at 43 ("[B]y their late teens," individuals with mild intellectual disability could "acquire academic skills up to approximately the sixth-grade level.").[8] And even looking to the "scaled

---

[7] Both the Government and defense experts agreed that the WJ–III was the most comprehensive of the achievement tests administered. *See* Tr. 9/23/10 at 265 (Price); Tr. 9/10/10 (p.m.) at 46–47 (Gelbort); Tr. 9/20/10 at 44 (Swanson).

[8] As discussed in the Petition, the DSM–5 does away with any specific grade cut-off, describing the level of functioning necessary for significant impairments in the conceptual domain as follows: "For school-age children and adults, there are difficulties in learning academic skills involving reading, writing, arithmetic, time, or money, with support needed in one or more areas to meet age-related expectations. In adults, abstract thinking, executive

16

score" column, Dr. Moore conceded on cross that Mr. Bourgeois had five scores that are "two standards deviations below the mean," including broad Math, Brief Math, Story Recall, Applied Problems, and Story Recall Delay—all of which implicate higher-level thinking as opposed to rote memorization. *Id.* at 181–82. Under diagnostic standards—then and now—this constituted evidence of impairment and was consistent with ID. Accordingly, the District Court had no basis for crediting Dr. Price's testimony that Mr. Bourgeois's IQ scores were inconsistent with his achievement testing.

More generally, the Government claims that the District Court "credited Dr. Price's and Dr. Moore's judgment" of Mr. Bourgeois's intellectual functioning "based on the evidence viewed in proper context." GR at 84. However, the Government immediately goes on to cite many of the erroneous stereotypes that these experts used to support their opinions, including Mr. Bourgeois's ability to "read and understand and conceptualize *some* of the things that he was able to talk about," that he "express[ed] himself in complete thoughts," "often" wrote "compound sentences," "communicated his ideas effectively," and worked as a truck driver. GR at 84–85. None of these "skills" is inconsistent with a diagnosis of ID, and all reflect the types of erroneous stereotypes of ID condemned in *Moore–I* and diagnostic guidelines. *See* Pet. ¶¶ 41, 129–31.[9]

---

function . . ., and short-term memory, as well as functional use of academic skills (e.g., reading, money management) are impaired." A0076 (DSM–5 at 34).

[9] That the Government quotes these purported "strengths" in its briefing to support the argument that the District Court applied clinical standards demonstrates a profound lack of understanding on the part of the Government regarding the diagnostic criteria and the Court's holdings in *Moore–I* and *Moore–II*. The same is true regarding the Government's favorable citation to Dr. Price's opinion that Mr. Bourgeois's low IQ scores could be explained by his limited education and "cultural deprivation." GR at 83.

By contrast, Mr. Bourgeois's prong-one experts, Drs. Wiener and Gelbort, supported their conclusions as to the validity of Petitioner's IQ scores, in part, with reference to the consistency between the full-scale scores he received on each test, as well as the consistency in the overall pattern of correct and incorrect answers on each test. *See, e.g.*, Tr. 9/10/10 at 32 (Dr. Gelbort explaining it would be very difficult for an individual to "feign bad" in the same way on two tests administered three years apart); Tr. 9/20/10 at 223–25, 229 (Dr. Weiner testifying similarly); *see also Webster v. Lockett*, No. 2:12–v–86–WTL–MJD, 2019 WL 2514833, *7 (S.D. Ind. June 18, 2019) (citing, in support of finding petitioner's IQ tests scores valid, expert testimony that "it would be 'extremely difficult' to consistently fake IQ scores" across multiple tests). And, contrary to the District Court's assertion that Dr. Gelbort relied on the "naked IQ scores" for his opinion of Mr. Bourgeois's functioning, *Bourgeois*, 2011 WL 1930684, at *25, Dr. Gelbort in fact testified that he also considered the neuropsychological and achievement testing administered to Mr. Bourgeois, as well as historical records and the manner in which he presented in his evaluations by Dr. Gelbort and Government experts, *see* Tr. 9/10/10 at 26, 28–30, 38–39. The court's only reason for discrediting Dr. Gelbort's testimony rests on a mischaracterization of the record and a disregard of diagnostic standards. *See Bourgeois*, at *26 (misrepresenting Dr. Gelbort's testimony as to whether he was willing to consider Mr. Bourgeois's "courtroom behavior" in his assessment and ignoring that diagnostic standards preclude reliance on verbal behavior and prison functioning in the diagnosis of ID).

In light of the foregoing, there is no support for the Government's claim that the § 2255 Court's prong-one determination is based on a proper credibility finding that is consistent with diagnostic standards.

18

Third, even given the District Court's express rejection of diagnostic standards and extensive reliance on non-clinical factors in the evaluation of prong one, the Government ultimately claims that the court "did precisely the two things that *Hall* and *Moore* direct" a court to do in assessing intellectual functioning:

> [The Court] afforded Bourgeois the opportunity to present his evidence and argument on *Atkins*' three-part criterion without limitation. And, after finding that Bourgeois' IQ test score fell within a presumptive range accepted by the medical community as a qualifying score for a diagnosis of mental retardation (but that a fuller view of his abilities does not correspond to a finding of significant intellectual limitations), the court continued its inquiry into *Atkins*' adaptive deficits criteria.

GR at 87–88.

Yet *Moore–I* does not merely require the presentation of evidence and argument on "*Atkins*' three-part criterion without limitation." Rather, *Moore–I* "made clear . . . that courts should not disregard the medical community's current standards in favor of applying a judicially-created standard." GR at 77. And, with respect to prong-one specifically, *Moore–I* rejected the argument that a court could "properly consider[] factors unique" to the petitioner in order to disregard "the lower end of the standard-error range" for his IQ scores, *Moore–I*, 137 S. Ct. at 1049, which is precisely what the District Court did in Mr. Bourgeois's case. Rather, *Moore–I* held that "the presence of other sources of imprecision in administering the test to a particular individual, cannot *narrow* the test-specific standard-error range." *Id.* (internal citations omitted) (emphasis in original).

Furthermore, *Moore–I* held that, where a petitioner's IQ score falls within the presumptive range for ID, the court cannot "end the intellectual-disability inquiry" based on that score, but instead that the reviewing court was required to find prong one to be established and move on to prong two. *Moore–I*, 137 S. Ct. at 1050; *see also id.* at 1049 ("Because the lower end of Moore's score range falls at or below 70, the CCA had to move on to consider Moore's

19

adaptive functioning."). Like the CCA in *Moore*, the District Court here expressly found that Mr. Bourgeois had failed to meet prong one, and it also held that *this finding alone* "*doom[ed]*" his *Atkins* claim. *Bourgeois*, 2011 WL 1930684, at *31. This violated *Moore–I*[10] and diagnostic standards, which *require* that courts find prong one satisfied and proceed to prong two "where an individual's IQ score, adjusted for the test's standard error, falls within the clinically established range for intellectual-functioning deficits." *Moore–I*, 137 S. Ct. at 1049–50. The mere fact that the court conducted a prong-two assessment "in the interests of justice," *Bourgeois*, 2011 WL 1930684, at *31, does not render the court's approach compliant with *Moore–I*.

Fourth, the Government denies that the District Court relied on the "judicially-created *Briseño* factors that formed the basis of the error explored in *Moore I* and *Moore II*" or "any facsimile of the *Briseño*-test applied by the CCA in *Moore*." GR at 88 (referring to the standards first set forth in *Ex parte Briseño*, 135 S.W.3d 1 (Tex. Crim. App. 2004), *abrogated by Moore–I*, 137 S. Ct. 1039). The Government's position is contradicted by the fact that many of the examples of behavior the District Court found inconsistent with a diagnosis of ID directly implicate at least one of the invalidated *Briseño* factors. *See* Pet. ¶ 142. It is also contradicted by the District Court's conclusions that Mr. Bourgeois "never gave the Court any impression that he functioned at an intellectual level *equal to that of a child*," and that ID-range functioning "*should be obvious*." *Id.* at *31, n.42. Such comments demonstrate a view of intellectually disabled persons directly on par with the view that led to creation of the *Briseño* factors in the first place. As explained in the Petition, the CCA in *Briseño* explicitly stated that its goal was to "define that level and degree of mental retardation at which a consensus of Texas citizens would agree that a

---

[10] The *Moore–II* Court did not address prong one, as the CCA focused only on prong two in re-evaluating Mr. Moore's claim on remand following *Moore–I*. *See Moore–II*, 139 S. Ct. at 670.

person should be exempted from the death penalty," *Briseño*, 13 S.W.3d at 6, and pointed to the fictional character "Lennie" from John Steinbeck's *Of Mice and Men* as someone who "might" be considered by Texans to be entitled to *Atkins* relief. *Id.* The CCA then went on to invent the *Briseño* factors as a way for courts to determine if a particular defendant's functioning was sufficiently close to that of Lennie, in which case the defendant would be entitled to *Atkins* relief.

Here, the mere fact that the District Court did not directly cite to the now-overruled *Briseño* decision does not mean that its adaptive-behavior assessment was any less rooted in the "lay stereotypes of the intellectually disabled" that caused the Supreme Court to reverse the CCA's decisions in *Moore–I* and *Moore–II*. *Moore–I*, 137 S. Ct. at 1052.[11] Indeed, in *Moore–II*, the Supreme Court found that the CCA had continued to effectively employ certain *Briseño* factors, despite expressly claiming that it had abandoned reliance on them when assessing Mr. Moore's *Atkins* claim on remand. *See Moore–II*, 139 S. Ct. at 670–72.

Fifth, the Government denies "Bourgeois' global claim that the district court counteracted his adaptive deficits by overemphasizing adaptive strengths and unscientific stereotypes of intellectually disabled individuals." GR at 89. It supports this position, in part, by noting that the court "referred" to the fact that "the AAIDD–2010 adopts an underlying 'assumption' in the definition of mental retardation that 'within an individual, limitations often coexist with strengths." GR at 90 (citing *Bourgeois* at *32). Incredibly, however, the Government fails to mention that the court *immediately thereafter* stated:

> The Fifth Circuit, however, teaches that the *Atkins* inquiry should not be so narrow as to ignore that which an inmate can do, even if the psychological profession approaches the issue differently. . . . The law makes a holistic view of an individual, recognizing that a few reported problems may not negate an inmate's ability to

---

[11] As explained in the Petition, the District Court did cite to numerous Fifth Circuit decisions denying habeas relief to Texas prisoners whose *Atkins* claims had been rejected in state court, including those denied relief under the *Briseño* factors. Pet. ¶¶ 126–27.

communicate, to abstract from mistakes, to learn from experience, to engage in logical reasoning, and to have healthy relationships with others. Accordingly, *the federal inquiry into adaptive deficits takes on a much different flavor than that done by mental health professionals*.

*Bourgeois*, 2011 WL 1930684, at *32; *see also id.* at *33 ("The law will compare the

deficiencies to positive life skills, presuming that adaptive successes blunt the global effect of

reported insufficiencies.").

Undeterred by the court's plain language, the Government also contends that, in practice,

"[t]he court did not find that Bourgeois['s] perceived adaptive strengths counteracted the

evidence of his adaptive deficits." GR at 91. Once again, the Government ignores the District

Court's own words:

> The evidentiary hearing and record create a complex picture of Bourgeois' life, resulting in an entangled mosaic of strengths and limitations. . . . This Court's task in reviewing *Atkins*['s] second prong is to decide whether, on a global level, those problems amount to significant deficits in adaptive functioning. As previously mentioned, *this Court's review differs from that employed by the psychological community. The Court . . . compares the alleged deficiencies against his whole life experienc*e. . . .
>
> Bourgeois has not made a convincing showing that he suffers from significant adaptive deficits that would serve as a predicate for mental retardation. *The record shows strengths that more than coexist with weaknesses, they call into question the depth and accuracy of reports of those weaknesses*. The Court finds that Bourgeois has not shown substantial adaptive deficits by a preponderance of the evidence.

*Bourgeois*, 2011 WL 1930684, at *40, 44.

As it does in defense of the court's prong-one analysis, the Government attempts to

reframe the court's findings as the product of a credibility determination among competing

experts. Again, this ignores that the District Court expressly relied on its own lay assessment of

Mr. Bourgeois's functioning. *See, e.g.*, *Bourgeois*, 2011 WL 1930684, at *43 ("This Court's

observation of Bourgeois, both in the courtroom and in his video recordings, does not suggest

22

any impairment in the social domain."); *id.* at n.42 (Bourgeois "never gave the Court any impression that he functioned at an intellectual level equal to that of a child.").

And again, the Government ignores that the District Court's credibility determinations are unsupported by the diagnostic criteria. For instance, the Government first cites to the court's finding that Dr. Swanson failed to "make a full review of available evidence relating to Bourgeois's adaptive abilities." GR at 91. However, as discussed in the Petition, the court discounted Dr. Swanson's conclusion precisely because, unlike Dr. Moore, Dr. Swanson complied with diagnostic criteria. *See* Pet. ¶ 139. For instance, the court criticized Dr. Swanson for focusing on adaptive deficits rather than adaptive strengths, despite the court having acknowledged the medical community does the same. *See id.* Additionally, the court criticized Dr. Swanson for "refus[ing] to factor Bourgeois' long colloquies with the Court" into its assessment, even though Dr. Swanson explained that the AAIDD–2010 precludes reliance on "verbal behavior to infer level of adaptive behavior or about having ID." *Bourgeois*, at *42 n.69; Tr. 9/20/10 at 174. More generally, the court complained that a "persistent feature of the testimony from Bourgeois' experts"—including Dr. Swanson—"was a failure to consider fully his alleged intellectual limitations against the whole background of his life." *Bourgeois*, at *29. The court based this conclusion on the fact that "testimony from various individuals questioned his intellect when younger, [but] those who knew him as an adult did not suspect that he was mentally retarded." *Id.* However, *Moore–I* expressly struck down the *Briseño* factor that instructed courts to consider whether the person's "family, friends, teachers, [and] employers" thought he was ID. *Moore–I*, 137 S. Ct. at 1051 (citing *Briseño*, 135 S.W.3d at 8); *see also id.* ("[T]he medical profession has endeavored to counter lay stereotypes of the intellectually disabled.").

23

The Government also cites to the District Court's decision to credit the scores obtained by Dr. Moore's administration of the ABAS to "multiple respondents"—Mr. Bourgeois's sister, Michelle Armont; co-workers Danny Clark and Rhonda Davis; and friend Nathaniel Banks—over the scores obtained by Dr. Swanson's administration of the Vineland and ABAS to Beverly Frank. GR at 91–92.

The Government's reliance on the ABAS scores argument also runs contrary to diagnostic standards. As noted in the Petition, even under ideal circumstances, formal adaptive behavior testing is far less reliable that IQ, achievement, or neuropsychological testing. For this reason, formal tests of adaptive behavior such as the ABAS are not meant to be the sole basis for an adaptive behavior assessment, but one piece of data alongside collateral reports from witness, record review, and more reliable neuropsychological and achievement testing. *See* Pet. at ¶¶ 77–81 (citing the AAIDD–10 and DSM–5).

In this case, the circumstances are not ideal. All formal adaptive behavior tests are designed for the contemporaneous assessment of the individual in question—meaning the report is asked about the individual's functioning right now. In an *Atkins* case, by necessity, all formal adaptive behavior instruments must be administered retrospectively—meaning the reporter is asked about the individual's functioning in the past. This departure from the test protocol undermines the reliability of the results. *See* Pet. ¶ 77. Experts for both parties, as well as the District Court, acknowledged the shortcomings with the formal adaptive behavior testing in this case. *Id.*; *Bourgeois*, 2011 WL 1930684, at *33. The Government's attempt to rely on this testing now runs contrary to the diagnostic standards and the testing protocol upon which the tests were based.

24

However, even assuming, *arguendo*, that the tests were appropriately relied on by the Government, these test results *supported* a finding of intellectual disability as the only one of Dr. Moore's respondents who produced valid results returned scores in the intellectually disabled range. The ABAS–II consists of a series of questions regarding the functioning of the individual being assessed. The respondents (including the respondents used by Dr. Moore), are required to answer each one of these questions, even if they are guessing and do not know what the answer to that question is. If a respondent provides more than three guess in any one of the ten skill areas addressed by the ABAS–II, then the validity of that respondent's answers are in question and the administrator is instructed to interview the respondent as to the reason for the guesses and consider if the respondent has sufficient knowledge for the administration of the ABAS–II to proceed or the test administration should be abandoned. Harrison, P. L. & Oakland, T., *Manual: Adaptive Behavior Assessment System–2d Ed.*, The Psychological Corporation (2003) at 23.

Here, where more than three guesses in one skill area would have been cause for concern, Mr. Clark, Ms. Davis, and Mr. Banks exceeded the three-guess threshold in eight of ten areas (Clark and Davis) or seven of ten areas (Banks). Moreover, Dr. Moore failed to perform the required follow-up interviews on the reason for the large number of guesses on any of these respondents. In the end, the two respondents who were able to validly assess Mr. Bourgeois's adaptive behavior under diagnostic standards—Ms. Armont and Ms. Frank—each placed him in the impaired range for all three domains of functioning and the composite score.[12] And Dr. Swanson's explanation that she did not administer additional formal testing because she was

---

[12] Ms. Armont's scores were as follows: General Adaptive Composite: 61, Conceptual: 55, Social: 60, Practical: 70. Ms. Frank's scores on the Vineland were General Adaptive Composite: 66; Communication (Conceptual): 69; Socialization (Social): 66; Daily Living Skills (Practical): 66.

unable to find another reporter with enough knowledge of Mr. Bourgeois's life to merit such testing, aside from Ms. Armont (who had already been given testing by Dr. Moore), is supported by Dr. Moore's results. *See* Tr. 9/20/10 at 154–56. Hence, the District Court's decision to credit Dr. Moore's testing and disregard that conducted by Dr. Swanson violated diagnostic standards and was merely another manifestation of its unscientific approach to ID.

It is also worth noting that the ABAS's ten skill areas correspond to the ten areas that the DSM–IV–TR used to measure adaptive functioning[13] and under that definition, Mr. Bourgeois need only have demonstrated deficits in *two* of the ten areas to satisfy prong two. *See* DSM–IV–TR at 41. Thus, even if the testing results of Mr. Clark, Ms. Davis, and Mr. Banks were treated as valid, the fact that they were unable to knowledgeably assess Mr. Bourgeois's functioning in the majority of skill areas makes those test results *irrelevant* to a clinical diagnosis of ID.

Finally, the Government contends that the District Court's prong-two analysis was a product not only of its crediting Dr. Moore over Dr. Swanson, but also of the court "reasonably assess[ing] and weight[ing] the reliability of competing lay testimony." GR at 92. However, because all of the Government's lay witnesses were colleagues of Mr. Bourgeois who knew him only in a work setting,[14] and because Mr. Bourgeois need have only established adaptive deficits

---

[13] As the District Court explained, at the time of Mr. Bourgeois's § 2255 proceedings, the AAIDD and APA used different "subcategories of deficiencies" under prong two, but the two approaches "capture the same range of functional aptitude." *Bourgeois*, 2011 WL 1930684, at *31.

[14] As noted above, because Mr. Bourgeois was only required to establish deficits in two of the DSM–IV–TR's ten skill areas, or one of the AAIDD's three types of adaptive behavior (conceptual, social, or practical), the fact that the Government's lay witnesses knew him only in a work setting severely limited the relevance of their testimony. These witnesses' testimony was also limited by the fact that none knew Mr. Bourgeois during the developmental period, particularly given that all of the experts agreed Mr. Bourgeois had become skilled at masking his deficits by the time he reached adulthood. *See* Pet. § III.C.3.d.

26

in one of the three AAIDD domains or two of the APA's ten skill areas, even if the District Court had fully credited the testimony of each of the Government's lay witnesses, Mr. Bourgeois would still meet the definition of intellectual disability.

### 2. Mr. Bourgeois's current *Atkins* claim relies on the application of the medical community's diagnostic standards, which was not available to him at the time of his initial § 2255 proceedings.

Given the impossibility of demonstrating that the § 2255 District Court's decision complies with *Moore–I* and *Moore–II*, the Government alternatively argues that Mr. Bourgeois's Petition should be rejected because it is simply an improper attempt to relitigate or appeal the § 2255 Court's 2011 denial of relief. *See, e.g.*, GR at 72 ("[T]hough Bourgeois seeks to characterize his *Atkins* claim as new (or at least revised), in reality he seeks to relitigate his same 2011 *Atkins* claim in this § 2241 habeas petition."); *id.* ("[T]he Southern District of Texas judge's legal and factual *Atkins* determinations are not unreasonable merely because the Supreme Court, a circuit court, or this Court 'would have reached a different conclusion in the first instance.'"). But Mr. Bourgeois does not dispute that the District Court's legal analysis was compelled by Fifth Circuit precedent valid at the time of its decision. Indeed, that is precisely the reason that Mr. Bourgeois did not seek a Certificate of Appealability on his *Atkins* claim. *See* Pet. ¶¶ 125–26 (describing Fifth Circuit's pre-*Moore–I* jurisprudence); *see also Cathey v. Davis (In re Cathey)*, 857 F.3d 221, 231 (5th Cir. 2017) (recognizing that Fifth Circuit jurisprudence at the time of petitioner's initial habeas made an *Atkins* claim "unviable"). Rather, Mr. Bourgeois argues that he is constitutionally entitled to review of his *Atkins* claim under *Moore–I*, and that his claim relies on the application of standards not available under Fifth Circuit jurisprudence binding at the time of his § 2255 proceedings. And the Government's arguments against application of these current standards are unpersuasive.

27

a. **Mr. Bourgeois is entitled to *Atkins* review under diagnostic and legal standards constitutionally-mandated at the time of his execution.**

The Government's argument that Mr. Bourgeois has received his one and only shot at *Atkins* relief ignores that Supreme Court jurisprudence dating back to *Atkins* prohibits the *execution* of the intellectually disabled. In *Atkins*, the Court concluded that "[capital] punishment is excessive and that the Constitution 'places a substantive restriction on the State's power *to take the life*' of a mentally retarded offender." *Atkins*, 536 U.S. at 320 (quoting *Ford v. Wainwright*, 477 U.S. 399, 405 (1986), which likewise categorically prohibits the *execution* of a particular class of capital prisoners); *id.* at 321 ("We are not persuaded that the *execution of mentally retarded* criminals will measurably advance the deterrent or the retributive purpose of the death penalty.").

In the years that followed, the Supreme Court repeatedly confirmed that *Atkins* prohibited the *execution* of the intellectually disabled, not just the imposition of the death sentence on intellectually disabled defendants. In 2005, when announcing a categorical ban on the execution of individuals who committed crimes as juveniles, the Supreme Court noted that *Atkins* bars "the *execution* of a mentally retarded person." *Roper v. Simmons*, 542 U.S. 551, 559 (2005). In 2014, the Supreme Court rejected practices relating to the interpretation of intelligence testing in *Atkins* proceedings that violated diagnostic standards because those invalid practices would create in an "unacceptable risk that persons with intellectual disability will be *executed*." *Hall*, 572 U.S. at 704 (emphasis added). In 2015, *Brumfield v. Cain*, 135 S. Ct. 2269 (2015), again confirmed that "[i]n [*Atkins*], this Court recognized that the *execution* of the intellectually disabled contravenes the Eighth Amendment's prohibition on cruel and unusual punishment" and that the "Eighth Amendment places a *substantive restriction* on the State's power to *take the life* of a mentally retarded offender." *Id.* at 2273–74 (emphasis added, internal citations and quotations omitted).

28

Finally, in 2017, *Moore–I* rejected invalid diagnostic practices, again because the use of such practices "creat[ed] and unacceptable risk that persons with intellectual disability will be executed." *Moore–I*, 137 S. Ct. at 1044 (quoting *Hall*, *supra*) (emphasis added).

The Government's argument also violates the right, created by *Moore–I*, to receive an *Atkins* adjudication under *current* diagnostic standards. As discussed in the Petition, *Moore–I* overturned the Texas CCA's outdated approach to ID, holding that courts must apply the "medical community's current standards" in making an *Atkins* determination. *Moore–I*, 137 S. Ct. at 1053. Citing manuals from the APA and AAIDD, *Moore–I* held that "[r]eflecting improved understanding over time, . . . current manuals offer the best available description of how mental disorders are expressed and can be recognized by trained clinicians." *Id.* (internal quotations omitted). In accordance with this holding, *Moore–I* did not assess the CCA's post-conviction assessment of Mr. Moore's intellectual functioning based on the clinical definitions that were in place at the time of trial, but the diagnostic authorities that were present at the time *Moore–I* was litigated. *Id.* at 1050–53.[15]

That Supreme Court jurisprudence categorically bars the *execution* of the intellectually disabled, as opposed to simply the *imposition* of a death sentence on someone who is ID, is significant. Procedural barriers that would normally be permissible become constitutionally invalid if they permit an unconstitutional *execution* to occur. The Seventh Circuit described this dynamic in *Webster v. Daniels*:

> In Webster's case, the problem is that the Supreme Court has now established that the Constitution itself forbids the execution of certain people: those who satisfy the criteria for intellectual disability that the Court has established, and those who were

_____

[15] As discussed below, this Court likewise applied current diagnostic standards—as opposed to the standards applicable at the time of trial or § 2255 proceedings—in reviewing Bruce Webster's *Atkins* claim under § 2241. *See Webster*, 2019 WL 2514833, at *3 (citing *Moore–I*, 137 S. Ct. at 1045); *see also infra* § I.B.2.a.

29

below the age of 18 when they committed the crime.[] In virtually all other situations, Congress has almost unlimited discretion to select the penalty, or the range of penalties, that go along with a particular crime. If Congress selects 20 years, but because of some error that went undetected through direct appeals and an initial motion under section 2255 the defendant receives 25 years, there is no doubt a problem, but it is likely not one of constitutional dimension. Congress could have chosen 25 years to begin with, and the defendant would have had nothing to complain about.

784 F.3d 1123, 1139 (7th Cir. 2015).

The Seventh Circuit went on to describe the "'Kafkaesque' nature of a procedural rule that, if construed to be beyond the scope of the savings clause, would (or could) lead to an unconstitutional punishment." *Id.* at 1139. It accordingly recognized that, where (as here) a "structural problem" with § 2255 prevents a petitioner from establishing that he is categorically exempt from execution, the petitioner may bring a § 2241 petition. *Id.* "To hold otherwise," the Seventh Circuit explained, "would lead in some cases . . . to the intolerable result of condoning an execution that violates the Eighth Amendment." *Id.*; *see also id.* (noting that "a core purpose of habeas corpus is to prevent a custodian from inflicting an unconstitutional sentence").

      **b.** ***Moore–I*** **and** ***Moore–II*** **changed the legal landscape governing** ***Atkins*** **litigation in the Fifth Circuit, thereby making** ***Atkins*** **newly available to him.**

The Government also insists that Mr. Bourgeois could have relied on the principles enunciated in *Moore–I* and *Moore–II*, "in his first § 2255 motion," which was filed in 2007. GR at 63; *see also* GR at 75 ("[N]either *Hall* nor *Moore* can be understood to yield a result so novel that Bourgeois could not have advanced his legal theories earlier on appeal from the district court's denial of his *Atkins* claim."). But the Government defeats its own argument in its attempt to defend the § 2255 Court's contra-diagnostic analysis of Mr. Bourgeois claim in 2011. Specifically, in Section B of its Response, the Government repeatedly points out that the *Atkins* decision did not prescribe any particular approach to the assessment of ID. *See, e.g.*, GR at 77–

30

78 ("[T]he [District Court] properly concluded . . . that *Atkins* 'did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation will be so impaired as to fall within the *Atkin*s compass.'"); *id.* at 78 ("The district court correctly held that *Atkins* did not delegate to the psychologists the determination of whether an inmate was categorically exempt from execution, but left 'the contours of the constitutional protection to the courts.'"). As the Government concedes, *Atkins* did not mandate the application of diagnostic standards in the assessment of ID. That is precisely why the Government is *incorrect* when it argues that § 2241 is unavailable to Mr. Bourgeois because he could have appealed the District Court's "factual and legal determinations as an unreasonable application of *Atkins*." GR at 75. Prior to *Moore–I*, which *mandates* application of medical standards in the evaluation of *Atkins* claims, Mr. Bourgeois has no authority to challenge settled Fifth Circuit that supported the use of non-scientific factors in the disposition of an *Atkins* claim.

At the very least, there is no question that prior to *Moore–I*, the Fifth Circuit[16] applied the same contra-diagnostic standards that the CCA had applied in the case of Bobby Moore. *See* Pet. § IV.A.2. Indeed, when this Court reviewed Bruce Webster's § 2241 *Atkins* claim on remand in 2019, it applied the principles enunciated in *Moore–I* and reached starkly different conclusions than those reached by the Northern District Court of Texas and Fifth Circuit in Mr. Webster's § 2255 proceedings. *See Webster*, 2019 WL 2514833. For instance, in *Webster*, the § 2255 court supported its conclusion that Mr. Webster did not satisfy prong two by citing to testimony of his purported adaptive strengths and relying largely on erroneous stereotypes of ID. *See Webster v.*

---

[16] As explained in the Petition, § 2241 is available to petitioners if circuit precedent would have required the district court and appellate panel to erroneously reject petitioner's claim at the time of his § 2255 motion. *See* Pet. § IV.A.2 (citing *In re Davenport*, 147 F.3d 605, 611 (7th Cir. 1998)).

*United States*, 4:00–CV–1646, 2003 WL 23109787, at \*14 (N.D. Tex. Sept. 30, 2003), *aff'd* 392 F.3d 787 (5th Cir. 2004). By contrast, as required by *Moore–I*, this Court focused on adaptive deficits and gave no weight to evidence of purported strengths that are entirely consistent with a diagnosis of ID:

> The Government has pointed to evidence that Webster does exhibit areas of strength, including, but not limited to, his *musical ability, excellent hygiene, ability to drive, achievement test scores, and ability to engage in conversation*. . . . However, in accordance with guidance from the medical community and as instructed by the Supreme Court, the Court has focused its adaptive-functioning inquiry on adaptive deficits.

*Webster*, 2019 WL 2514833, at \*10; *see also* Pet. § IV.A.2 (describing that the Government presented similar evidence of purported strengths in Mr. Bourgeois's case, which the District Court improperly found defeated his ID claim). The § 2255 court in *Webster* had also relied on testimony of petitioner's adaptive functioning from prison guards and Government experts who had evaluated Mr. Webster while incarcerated. *See Webster*, 2003 WL 23109787, at \*13–14. This Court, however, gave "little weight" to evidence of Mr. Webster's adaptive functioning in prison, citing *Moore–I* for the proposition that "[c]linicians . . . caution against reliance on adaptive strengths developed in a controlled setting, as a prison surely is." *Id.* (citing *Moore–I*, 137 S. Ct. at 1050) (internal quotation marks omitted).

Mr. Webster also presented newly discovered evidence in support of his § 2241 *Atkins* claim. But, according to the Government, "much of what he produce[d] [was] cumulative to evidence produced at trial," and in any event, the "newly available evidence ha[d] insufficient gravitas to raise doubt about earlier fact-finding." *See Webster v. Lockett*, Case 2:12–cv–00086–JPH–MJD, ECF Doc. 17 at 11, 14 (filed Aug. 7, 2012). Hence, the application of diagnostic criteria as newly required by *Moore–I*, rather than the unscientific standards applied under pre-*Moore–I* Fifth Circuit jurisprudence, had a significant impact on Mr. Webster's ultimate success

in this Court. The results will be the same in Petitioner's case if he is permitted to proceed under § 2241.

Lastly, while the Government cites to *Shoop v. Hill*, 139 S. Ct. 504, 508 (2019), to support its claim that Mr. Bourgeois could have relied on *Moore–I* and *Moore–II* in 2011, *see* GR at 62, *Shoop* actually *defeats* the Government's argument. There, the Sixth Circuit had cited *Moore–I* in granting habeas relief to a petitioner under 28 U.S.C. § 2254 on the grounds that the state court's pre–*Moore–I* denial of *Atkins* relief unreasonably "overemphasized Hill's adaptive strengths" and "relied too heavily" on prison functioning. *Shoop*, 139 S. Ct. at 506. The Supreme Court reversed, explaining:

> Although the Court of Appeals asserted that the holding in *Moore* was "merely an application of what was clearly established by *Atkins*," the court did not explain how the rule it applied can be teased out of the *Atkins* Court's brief comments about the meaning of what it termed "mental retardation." While *Atkins* noted that standard definitions of mental retardation included as a necessary element "significant limitations in adaptive skills . . . that became manifest before age 18," *Atkins* did not definitively resolve how that element was to be evaluated but instead left its application in the first instance to the States.

*Id.* at 508 (internal citations omitted). In other words, the *Shoop* Court *rejected* the proposition advanced by the Government here, which is that *Moore–I* added nothing novel to *Atkins*. And in any event, *Shoop* was limited to the narrow question of whether *Moore–I* constitutes clearly established federal law for purposes of a § 2254(d) analysis, and does not address the issue of whether the petitioner may be constitutionally executed, which is the only issue relevant here.

### c. Constitutional cases involving a categorical ban against execution may provide the basis for § 2241 jurisdiction.

Next, the Government contends that Mr. Bourgeois cannot rely on *Moore–I* and *Moore–II* as bases for § 2241 jurisdiction because they are "constitutional cases," as opposed to changes in statutory law. *See* GR at 60 ("Constitutional claims, unlike statutory claims, do not reveal 'some kind of structural problem with § 2255' that forecloses a single round of judicial review.")

33

(quoting *Fulks*, 2019 WL 4600210, at \*10). In support of this position, the Government argues that if a petitioner could rely on a new, non-retroactive constitutional case to establish § 2241 jurisprudence, Bruce Webster would have simply relied on the Supreme Court's decision in *Hall v. Florida*, as opposed to newly discovered evidence. GR at 60 n.12. But the *Hall* decision relates specifically to the prong-one component of an ID analysis, whereas Mr. Webster's initial § 2255 *Atkins* claim was denied on the basis of prong two. *See Webster*, 784 F.3d at 1132 (noting that in Mr. Webster's initial § 2255 proceedings, the Fifth Circuit "was willing to accept that Webster had a low I.Q.," but "found that the government's evidence of his adaptive functioning had effectively countered those numbers"); *id.* at 1143 (noting that, contrary to the situation in *Hall*, the main area of dispute between the parties was primarily adaptive functioning, and describing Mr. Webster's case as "*the reverse* of the of the one the Supreme Court discussed in *Hall*"). Thus, *Hall* played no role in *Webster* not because it is a "constitutional case," but because *Hall* was of no use to Mr. Webster. Meanwhile, *Webster did* involve a constitutional case to the extent that, like Mr. Bourgeois, the Mr. Webster sought to relitigate a previously-unavailable claim under *Atkins* and its progeny.

The Government also cites to *Poe*, 834 F.3d at 772, in support of its claim that a constitutional case cannot be used to satisfy the Savings Clause. *See* GR at 60. But the *Poe* holding is based on the fact that petitioner could have brought his § 2241 claim under § 2255 but for his own failure to comply with the statute of limitations. Thus, as in other Seventh Circuit cases, *see* Pet. ¶¶ 104–09 & *supra* § I.A, the *Poe* court did not base its jurisdictional ruling on any particular characterization of the petitioner's argument; it merely considered whether the petitioner was able to establish that, *as a structural matter*, he was precluded from bringing his § 2241 claim under § 2255. *Poe*, 834 F.3d at 774 (distinguishing Mr. Poe's case from that of Mr.

34

Webster on the ground that Poe "was unable to bring his *Richardson* claim because *he* filed the wrong petition under § 2241 and his subsequent petition under § 2255 was untimely") (emphasis in original). Here, Mr. Bourgeois raises a claim of categorical exemption from execution that, like Mr. Webster's and in contrast to Mr. Poe's, could not have been successfully raised in § 2255 proceedings and could not be raised in a successor § 2255 motion.

> **d.  The application of current diagnostic standards will not "forever forestall[] a final decision" in Mr. Bourgeois's case.**

Next, the Government argues that Mr. Bourgeois should not be allowed to rely on new diagnostic standards as a basis for § 2241 jurisdiction because doing so "would permit him to 'refile his claims with each revision of the medical standards governing the diagnosis of intellectual disability' forever forestalling a final decision in this case." GR at 66 (citing *Fulks*, 2011 WL 1930684, at *14). But Mr. Bourgeois does not ask for § 2241 review based solely on his status as an intellectually disabled person. He bases his request for review on the fact that he is perhaps the only § 2255 litigant who raised a timely and meritorious *Atkins* claim, but was denied relief on the basis of circuit jurisprudence subsequently invalidated by *Moore–I*.

Notably, the Government also raised the specter of unending litigation in opposing this Court's jurisdiction under § 2241 in the *Webster* case:

> Webster has had the opportunity for one round of effective collateral review. If he is correct that he must be permitted a second chance to prove his mental retardation because of "new evidence," then will he be permitted a third or fourth chance if he produces still more evidence. For example, if Webster takes another IQ test or has another expert evaluate his adaptive skills, what prevents him from claiming that he must be allowed to proceed under section 2241 once again because he has "new evidence"?

Doc. 17 at 10. The Seventh Circuit rejected this argument based on a finding that Mr. Webster's case presented unique circumstances in that the new evidence existed at the time of trial, could not have been discovered by diligent trial counsel, and bore "directly on the constitutionality of

35

the death sentence." *Webster*, 784 F.3d at 1140 (noting that it "will be a rare case" that meets these requirements, "but not impossible").

Mr. Bourgeois also presents a "rare case." This is not a claim like the one presented in *Fulks*, in which the petitioner conceded that he would not have been ID under diagnostic standards in effect at the time of his § 2255 proceedings. *Fulks*, 2019 WL 4600210, at *11. Here, Mr. Bourgeois has established that, if his claim is assessed under the medical community's diagnostic standards—as of 2011 or as of today—he is undeniably ID. Yet the framework of § 2255 has no mechanism under which he can vindicate his claim.

### C.    Mr. Bourgeois's Petition Is Neither an Abuse of the Writ Nor Barred by *Teague*.

Lastly, the Government argues that Mr. Bourgeois's Petition is an abuse of the writ and premised on a theory at odds with *Teague v. Lane*, 489 U.S. 288 (1989). GR at 66–71. This argument suffers from several flaws.

#### 1.    Mr. Bourgeois's petition is not an abuse of the writ.

First, the Government cites to *Roundtree v. Krueger*, 910 F.3d 312 (7th Cir. 2018), to argue that Mr. Bourgeois's petition constitutes an abuse of the writ. Yet *Roundtree* provides no support for the Government's position. There, the petitioner successfully filed a second § 2255 motion in the Eighth Circuit based on a new retroactive rule of law, but was denied relief because his claim was procedurally defaulted. *Id.* at 312–13. Mr. Roundtree then raised the same claim in the Seventh Circuit under § 2241. After observing that § 2255 is "inadequate or ineffective" when it cannot be used to address novel legal developments, the Seventh Circuit dismissed the petition because Mr. Roundtree relied on no such new law. Rather, he was attempting to relitigate the exact same claim that was resolved in his § 2255 proceedings. *See id.* at 313 (finding nothing in Seventh Circuit jurisprudence that "permits relitigation under § 2241

36

of a contention that was actually resolved in a proceeding under § 2255, *unless the law changed after the initial collateral review*"). *Id.* at 313. In short, Mr. Roundtree's § 2241 petition was dismissed because he did not "contend that the law has changed in the slightest after the Eighth Circuit rejected his contentions," and his "problem [lay] not in § 2255 but in his own failure to object at trial." *Id.* at 313–14.

By contrast, Mr. Bourgeois's claim very clearly relies on changes in the law that postdate his initial collateral review; he cites to *Moore–I* and *Moore–II* throughout his Petition to establish that *Atkins* was not available to him until the Supreme Court invalidated the Fifth Circuit jurisprudence applicable at the time of his initial § 2255 proceedings. And, unlike Mr. Roundtree, Mr. Bourgeois is not precluded from obtaining successive § 2255 relief based on a procedural default, but rather because he was *too diligent* in bringing an *Atkins* claim at a time when Fifth Circuit jurisprudence made that claim unviable. *See* Pet. ¶ 10.

### 2. *Teague* is not relevant to either of Mr. Bourgeois's jurisdictional arguments.

Next, the Government argues that "*Teague* bars Bourgeois' reliance on *Moore* to revitalize his *Atkins* claim," as "*Moore* did not announce a new rule that could apply retroactively under *Teague*." GR at 68. As an initial matter, the Government cites to nothing to support the notion that *Teague* applies to claims brought under § 2241. *See* GR at 68 (citing *Horn v. Banks*, 536 U.S. 266 (2002), which holds federal courts must conduct *Teague* review in § 2254 cases if the state so requests, and *Van Daalwyk v. United States*, 21 F.3d 179, 180 (7th Cir. 1994), which holds that *Teague* is applicable to collateral challenges to federal convictions under § 2255).

In any event, Mr. Bourgeois has never argued that *Moore–I* is a new retroactive rule; he did not raise that argument in his petition for authorization to file a second § 2255 motion in the

37

Fifth Circuit, and he does not raise it now. Rather, his argument is that *Moore–I* made *Atkins*—

which is indisputably retroactive—newly available to him by invalidating the Fifth Circuit

precedent that had precluded him from successfully raising an *Atkins* claim in his initial § 2255

proceedings. *See* Pet. ¶ 10. The Fifth Circuit has permitted other, less diligent petitioners to raise

untimely *Atkins* claims in successive petitions based on nearly identical theories, but Mr.

Bourgeois was denied the same opportunity under § 2255 for procedural reasons. *See id.* (citing

*In re Cathey*, 857 F.3d at 231–32 and *In re Johnson*, 2019 WL 3814384, at \*5–6). Mr. Bourgeois

then filed his § 2241 Petition with this Court, arguing that he is intellectually disabled and

constitutionally exempt from execution, but without an avenue under § 2255 to vindicate his

claim for relief.

In *Cathey*, the Fifth Circuit rejected an argument similar to the one the Government

makes here, although the issue there was not *Teague*, but whether petitioner could bring a

successor *Atkins* claim under § 2244(b)(2)(A).[17] Mr. Cathey relied on a change in the Fifth

Circuit's approach to the intellectual-functioning prong of ID, announced in *In re Salazar*, 443

F.3d 430 (5th Cir. 2006), to argue that *Atkins* was "newly available" to him within the meaning

of AEDPA. The state opposed this theory on the ground that circuit law did "not represent a new

rule of constitutional law recognized by the Supreme Court" that would allow Mr. Cathey to

escape the bar on successive petitions. The Fifth Circuit disagreed, explaining that Mr. Cathey

was not arguing that *Salazar* was "a new rule of constitutional law for § 2244(b)(2) purposes,"

but rather was using the new law "to support his contention" that any *Atkins* claim filed in his

initial habeas petition would have been "unviable." *In re Cathey*, 857 F.3d at 231.

---

[17] 28 U.S.C. § 2244(b)(2)(A) allows state prisoners to bring a successive § 2254 petition where the "claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable."

The same is true here: Mr. Bourgeois relies on *Moore–I*, which overruled the "legal" approach to ID employed by the Fifth Circuit at the time of his initial § 2255 proceedings, to support his contention that *Atkins* was previously unavailable to him.[18] Thus, Mr. Bourgeois is entitled to review of his newly-viable *Atkins* claim, and he has established that he is unable to obtain this review under § 2255 due to a structural problem with the statute, allowing him to pass through the Savings Clause and proceed under § 2241. *Teague* is irrelevant to this argument.

Nor does *Teague* bar Mr. Bourgeois from relying on *Moore–I* and *Moore–II* to establish that, under the medical community's diagnostic standards, he is intellectually disabled and categorically exempt from execution. Indeed, after determining that § 2241 jurisdiction was appropriate, the Seventh Circuit in *Webster* expressly directed this Court to consider Mr. Webster's claim on remand "under *Atkins* and *Hall*," even though *Hall* has not been declared retroactive by the Supreme Court. *Webster*, 784 F.3d at 1146. Furthermore, when this Court analyzed Mr. Webster's claim in 2019, it did so under the standards articulated in *Moore–I*, without any discussion of retroactivity or *Teague*. *See Webster*, 2019 WL 2514833, *3–11.[19] Similarly, once the Fifth Circuit had ruled that *Atkins* was "newly available" to the petitioner in

---

[18] In *Cathey*, the state also challenged the notion that *Atkins* was "unavailable" to Mr. Cathey in 2004 just because his claim would have been meritless under then-binding Fifth Circuit jurisprudence. The Fifth Circuit again disagreed, explaining that the "argument assumes the conclusion: that claims are 'available' despite being meritless." *In re Cathey*, 857 F.3d at 231; *see also id.* ("[T]he State's contention that a claim's legal availability 'does not depend on its prior success in lower courts' is not sound in the context of this particular *Atkins* claim.").

[19] Notably, the Government also applied *Moore–I* in the Proposed Findings of Fact and Conclusions of Law it submitted to this Court on remand in *Webster*, also without any discussion of retroactivity or *Teague*. *See Webster*, Case 2:12–cv–00086, ECF Doc. 195 (filed May 24, 2019).

*Cathey*, it conducted a prima facie merits determination of Mr. Cathey's *Atkins* claim under the standards of *Hall* and *Moore*. *In re Cathey*, 857 F.3d at 236–40.

*Teague* is also irrelevant to Mr. Bourgeois's alternative basis for § 2241 jurisdiction, which is that he is entitled to review under § 2241, as opposed to § 2255, because his challenge goes not only to the imposition of his sentence,[20] but also to the *execution* thereof. *See* Pet. ¶¶ 155–59. The Seventh Circuit has repeatedly held § 2241 is the appropriate vehicle for such claims. *See id.* (citing *Kramer v. Olson*, 347 F.3d 214, 217 (7th Cir. 2003), and *Valona v. United States*, 138 F.3d 693, 694 (7th Cir. 1998)).

The *Teague* doctrine was animated by "interests of comity and finality." *Teague*, 489 U.S. at 308. As the Supreme Court explained in announcing the rule:

> In many ways the application of new rules to cases on collateral review may be more intrusive than the enjoining of criminal prosecutions, for it continually forces the States to marshal resources in order to keep in prison defendants whose trials and appeals conformed to then-existing constitutional standards. Furthermore, as we recognized in *Engle v. Isaac*, "[s]tate courts are understandably frustrated when they faithfully apply existing constitutional law only to have a federal court discover, during a [habeas] proceeding, new constitutional commands."

*Id.* at 310 (internal citations omitted). Neither of these concerns is implicated by Mr. Bourgeois's claim that he may challenge the *execution* of his sentence under § 2241, which is an argument that rests on constitutional and federal statutory law prohibiting the Government from carrying out an execution on an individual who is intellectually disabled at the time of that execution. *See infra* § II. Indeed, this jurisdictional basis could be sustained under the FDPA alone, as it

---

[20] In its Response, the Government misleadingly states that "Bourgeois does not claim that his sentence violated *Atkins* at the time it was imposed," citing to the portion of Mr. Bourgeois's Petition setting for his alternative basis for jurisdiction. *See* GR at 66 (citing Petition, p. 72 ¶156). In fact, as made clear in the Petition, Mr. Bourgeois challenges *both* the imposition *and* the execution of his death sentence.

40

precludes the "carrying out" of an execution against a person who "is" ID, and the *Teague* rule

applies to new rules of constitutional law only. *See* 18 U.S.C. § 3596(c); *see also infra* § II.

### 3. *Teague* cannot preclude review of Mr. Bourgeois's claim that he is categorically ineligible for execution under the Constitution.

Regardless of the jurisdictional basis for Mr. Bourgeois's Petition, *Teague* cannot be

applied here. *Teague* is a judge-made, prudential doctrine that was announced well before the

decision in *Atkins*. *See Danforth v. Minnesota*, 552 U.S. 264, 278 (2008) (stating that "*Teague* is

plainly grounded" in the authority of federal courts "to adjust the scope of the writ in accordance

with equitable and prudential considerations"). And "the problem is that the Supreme Court has

now established that the Constitution itself forbids the execution of certain people," including

"those who satisfy the criteria for intellectual disability." *Webster,* 784 F.3d at 1139.

As described above, *see supra* § I.B.2.a, the *Webster* court determined that, although

Congress has virtually unlimited discretion to set sentences for federal crimes and therefore can

statutorily preclude collateral challenges to those sentences, this is not the case where the

sentence is constitutionally prohibited. *Id.* at 1139 (stressing that "a core purpose of habeas

corpus is to prevent a custodian from inflicting an unconstitutional sentence"). While *Teague* is a

judge-made rule as opposed to a statutory one, the result is the same: applying *Teague* to

foreclose Mr. Bourgeois's claim of categorical ineligibility from execution would result in the

same "Kafkaesque" scenario as allowing the procedural language of § 2255(h) to foreclose Mr.

Webster's claim. Thus, just as the Seventh Circuit rejected the Government's argument in

*Webster* that the wording of § 2255(h) could render an *Atkins* claim "beyond the scope of the

savings clause" and "create the possibility of an unconstitutional punishment," *id.*, this Court

should reject the argument that *Teague* could do the same. *Cf. Hall*, (striking down Florida

statute imposing strict IQ cut-off because the rule "create[d] an unacceptable risk that persons

41

with intellectual disability will be executed, and thus [was] unconstitutional"); *Moore–I*, 137 S. Ct. at 1044 (rejecting invalid diagnostic practices because the use of such practices "creat[ed] and unacceptable risk that persons with intellectual disability will be executed").

## II.    THE GOVERNMENT HAS NOT CHALLENGED THAT MR. BOURGEOIS MAY PROCEED UNDER § 2241 BECAUSE HE CHALLENGES THE EXECUTION, AS WELL AS THE IMPOSITION, OF HIS SENTENCE.

Despite submitting a lengthy Response opposing Mr. Bourgeois's Petition, the Government completely fails to challenge Mr. Bourgeois's claim that he is also entitled to review under § 2241 because his challenge goes not only to the imposition of his sentence, but also to the *execution* thereof. *See* Pet. ¶¶ 155–59.

As stated above, the plain language of the FDPA and of numerous Supreme Court decisions dating back to *Atkins* categorically bans *the carrying out of an execution* on an intellectually disabled person. *See* Pet. ¶¶ 156–57; *see also* 18 U.S.C. § 3596(c) ("A sentence of death *shall not be carried out* upon a person who *is* mentally retarded."); *supra* § I.B.2.b (summarizing Supreme Court jurisprudence). What is more, Congress forbids not only the *execution* of the intellectually disabled, but, more precisely, the imposition of that penalty against any person who "is" of that category. 18 U.S.C. § 3596(c). Petitioner's claim is that he "is" intellectually disabled and therefore ineligible for execution at this time, and therefore, that the legal measure of his disability under the Eighth Amendment must be the measure that applies today, which rests on the clinical standards of specialists in the field rather than the lay standards of judges, jurors, or even a prisoner's co-workers or jailers. *See Moore–I,* 137 S. Ct. at 1053.

The Government not only admits, but insists, that *Moore–I* has not been declared retroactive by the Supreme Court, and that Petitioner cannot seek relief in the form of a successive petition under 28 U.S.C. § 2255. *See* GR at 6–7, 61–63. But that is the point: Petitioner brings a compelling claim that he "is" intellectually disabled and that the Constitution

42

and the laws of the United States forbid his execution. This is necessarily a challenge to the *execution* of his death sentence rather than its *imposition*. *Compare* 18 U.S.C. § 3596(c) ("A sentence of death *shall not be carried out. . . .*"), *with* 28 U.S.C. § 2255(a) ("A prisoner . . . claiming the right to be released upon the ground that the sentence *was imposed* in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.").

Finally, as discussed above, *Atkins* categorically prohibits the *execution* of the intellectually disabled, and this holding has been repeatedly reaffirmed by the Supreme Court. *See supra* § I.B.2. Construing any *Atkins* challenge as a challenge to the *imposition* of the petitioner's death sentence would necessarily exclude challenges from petitioners like Mr. Bourgeois who were determined not to be ID under the legal standards prevailing at the time of § 2255 proceedings, but are ID under current standards. And this would create the precise situation that both the Supreme Court and the Seventh Circuit have sought to avoid: an unacceptable risk that an intellectually disabled person will be executed. *See Moore–I*, 137 S. Ct. at 1043; *Hall*, 572 U.S. at 704; *Webster*, 784 F.3d at 1139.

## III. MR. BOURGEOIS IS ENTITLED TO A STAY OF EXECUTION.

Petitioner's request for a stay is simple: the Court should delay Mr. Bourgeois's imminent execution to allow for full and fair review of his *Atkins* claim under constitutionally-mandated diagnostic standards. In his Motion for Stay of Execution, Petitioner established that he meets each of the factors governing such requests: (i) a significant possibility of success on the merits; (ii) irreparable harm will result in the absence of the stay; (iii) the balance of harms is

43

in favor of the moving party; and (iv) the public interest supports a stay. The Government's Response in no way diminishes these arguments.

First, the Government repeats the same unconvincing allegations discussed above, namely that Mr. Bourgeois cannot proceed under § 2241 because he "does not meet the tests under either *Davenport* or *Webster*;" that Mr. Bourgeois already received a reliable judicial determination on his *Atkins* claim in his initial § 2255 proceedings; and that in any event he is not entitled to review of his claim under the medical community's diagnostic standards because *Moore–I* and *Moore–II* are not retroactively applicable. GR at 93–95. For all of the reasons discussed in the Petition and this Reply, these arguments do not weigh against Mr. Bourgeois's right to review under § 2241 or his likelihood of success on the merits of his *Atkins* claim.

The Government also asserts that it "has a strong interest in enforcing Bourgeois' death sentence," but as the Supreme Court has recognized, "[n]o legitimate penological purpose is served by executing a person with intellectual disability." *Hall*, 134 S. Ct. at 1992.

Finally, the Government incorrectly asserts that "Mr. Bourgeois does not claim that his sentence violated *Atkins* at the time the jury unanimously imposed it,"[21] and that "he does not fall within a class of persons the Eighth Amendment categorically exempts from execution." GR at 95. In fact, Mr. Bourgeois's claim is that he is now and has at all times been ID under the medical community's diagnostic standards. He has never been given the opportunity to establish the merits of that claim under the appropriate scientific standards, and is entitled to a stay of his execution so that he may do so now.

---

[21] As explained above, the Government misleadingly bases this argument on Mr. Bourgeois's claim that he is entitled to review under § 2241 based on the execution, *as well as the imposition*, of his death sentence. *See supra* n.20.

## REQUEST FOR ORAL ARGUMENT

Counsel for Mr. Bourgeois respectfully requests the opportunity to argue the pending petition for writ of habeas corpus and motion for stay of execution, in light of the factual and legal complexity surrounding the issues involved in this death penalty proceeding, and in particular, the questions concerning the Court's jurisdiction and authority to resolve the merits of Petitioner's claim and to stay, and ultimately prohibit, an execution that would violate the Eighth Amendment as well as Congress's directive that "a sentence of death shall not be carried out upon a person who is mentally retarded." 18 U.S.C. § 3596(c).

## CONCLUSION

For the reasons above and in his Petition, Mr. Bourgeois requests that the Court provide the following relief:

A) That an evidentiary hearing be conducted on the merits of Petitioner's claims, any procedural issues, and all disputed issues of fact;

B) That leave to amend this Petition be granted, if necessary, after further fact development through investigation and an evidentiary hearing;

D) That Petitioner be allowed a reasonable time to file a memorandum of law in support of this Petition following any further fact development or following the denial of fact development; that the Government be allowed a reasonable time to respond; and that Petitioner be allowed a reasonable time to reply;

E) That oral argument be held on the pending petition for writ of habeas corpus and motion for stay of execution; and

F) That habeas relief from Petitioner's sentence of death be granted.

Respectfully submitted,


/s/ Peter Williams
Peter Williams
Victor J. Abreu
Katherine Thompson
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West—The Curtis Center
Philadelphia, PA 19106
215–928–0520
Victor_Abreu@fd.org
Katherine_Thompson@fd.org
Pete_Williams@fd.org


Counsel for Petitioner


Dated: November 15, 2019

46

## CERTIFICATE OF SERVICE

I, Peter Williams, hereby certify that on this 15th day of November, 2019, a copy of the

forgoing was served via ECF filing on the following people:

Paula C. Offenhauser
Special Assistant United States Attorney
1000 Louisiana, Suite 2300
Houston, Texas 77002

Brian Reitz
Assistant United States Attorney
Office of the United States Attorney
Southern District of Indiana
10 West Market St., Suite 2100
Indianapolis, Indiana 46204-3048

/s/ Peter Williams
Peter Williams