# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## NOTICE OF ISSUANCE OF MANDATE

December 1, 2020

To:

Roger A. G. Sharpe
UNITED STATES DISTRICT COURT
Southern District of Indiana
104 U.S. Courthouse
Terre Haute , IN 47807

| No. 20-1891 | ALFRED BOURGEOIS,<br> Petitioner - Appellee<br><br>v.<br><br>T. J. WATSON, Warden, and UNITED STATES OF AMERICA,<br>Respondents - Appellants |
| --- | --- |

| **Originating Case Information:** |
| --- |
| District Court No: 2:19-cv-00392-JMS-DLP<br>Southern District of Indiana, Terre Haute Division<br>District Judge Jane Magnus-Stinson |

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A
certified copy of the opinion/order of the court and judgment, if any, and any direction as to
costs shall constitute the mandate.

RECORD ON APPEAL STATUS:          No record to be returned

**NOTE TO COUNSEL:**

If any physical and large documentary exhibits have been filed in the above-entitled cause, they are to be withdrawn ten (10) days from the date of this notice. Exhibits not withdrawn during this period will be disposed of.

Please acknowledge receipt of these documents on the enclosed copy of this notice.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Received above mandate and record, if any, from the Clerk, U.S. Court of Appeals for the Seventh Circuit.

**Date:**                                    **Received by:**

_____12/1/2020_____          _____
                                     Deputy Clerk, U.S. District Court

form name: **c7_Mandate**(form ID: **135**)

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

CERTIFIED COPY
A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

**FINAL JUDGMENT**

October 6, 2020

Before:         MICHAEL S. KANNE, Circuit Judge
                DAVID F. HAMILTON, Circuit Judge
                AMY J. ST. EVE, Circuit Judge

| | |
|---|---|
| No. 20-1891 | ALFRED BOURGEOIS,<br> Petitioner - Appellee<br><br>v.<br><br>T. J. WATSON, Warden, and UNITED STATES OF AMERICA,<br>Respondents - Appellants |
| **Originating Case Information:** | |
| District Court No: 2:19-cv-00392-JMS-DLP<br>Southern District of Indiana, Terre Haute Division<br>District Judge Jane Magnus-Stinson | |

The judgment of the District Court is **REVERSED**, with costs, and this case is **REMANDED** with instructions for the district court to deny Bourgeois's motion for a stay of execution and dismiss Bourgeois's § 2241 petition. The above is in accordance with the decision of this court entered on this date.

form name: **c7_FinalJudgment**(form ID: **132**)

In the

# United States Court of Appeals

## For the Seventh Circuit



CERTIFIED COPY
A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

———————————

No. 20-1891

ALFRED BOURGEOIS,

*Petitioner-Appellee,*

*v.*

T.J. WATSON, Warden, and UNITED STATES OF AMERICA,

*Respondents-Appellants.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Terre Haute Division.
No. 2:19-cv-00392-JMS-DLP — **Jane Magnus-Stinson**, *Chief Judge.*

———————————

ARGUED SEPTEMBER 9, 2020 — DECIDED OCTOBER 6, 2020

———————————

Before KANNE, HAMILTON, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Alfred Bourgeois, a federal prisoner, was sentenced to death after he brutally abused and murdered his two-year-old daughter. Bourgeois now collaterally attacks his death sentence on the ground that he is intellectually disabled. Both the Federal Death Penalty Act (FDPA), 18 U.S.C. § 3596(c), and the Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304 (2002), forbid the execution of intellectually disabled offenders. But that is not the end of the matter.

Bourgeois does not seek relief under 28 U.S.C. § 2255—the main statute authorizing postconviction relief for federal prisoners. Indeed, Bourgeois already has fully litigated an intellectual-disability claim under § 2255. Instead, Bourgeois brings a habeas corpus petition under 28 U.S.C. § 2241. To invoke that statute, however, Bourgeois must show that his case fits within a narrow exception known as the "savings clause." *See* 28 U.S.C. § 2255(e).

In the district court, Bourgeois accompanied his § 2241 petition with a motion to stay his execution—which the district court granted. In doing so, the court found that the government had waived its argument that Bourgeois could not channel his FDPA claim through the savings clause. We reverse that determination and further find that Bourgeois does not meet the stringent requirements for savings-clause eligibility. As a result, his § 2241 petition is procedurally barred. We vacate the stay with instructions for the district court to dismiss the petition.

## I. Background

### A. Factual Background

We review the underlying facts only briefly, to provide context for the procedural issues that govern this appeal. Bourgeois's daughter, "JG," was born in October 1999. For the first two and a half years of her life, JG lived with her mother and grandmother in Texas. In April 2002, JG's mother petitioned a local court for a paternity test. The test determined that Bourgeois was JG's father. JG's mother then petitioned the court for child support from Bourgeois.

At the time, Bourgeois was a truck driver living in Louisiana with his wife, Robin, and their two children. In May 2002,

No. 20-1891                                                        3

Bourgeois came to Texas for JG's child support hearing. At the hearing, the court granted JG's mother's request for child support from Bourgeois. The court also granted Bourgeois's request for visitation rights with JG for the next seven weeks. Bourgeois took custody of JG after the hearing.

For the next month—the last of JG's life—Bourgeois tortured and abused JG. He punched her in the face hard enough to give her black eyes. He whipped her with an electrical cord and beat her with a belt. He struck her on the head with a plastic baseball bat so many times that her head swelled in size. He threw her against walls. He burned the bottom of her foot with a cigarette lighter and prevented anyone from treating her injuries. He also emotionally abused JG. Bourgeois, for example, "taught" JG how to swim by repeatedly tossing her into a swimming pool, letting her sink, and then pulling her out as she choked and gasped for air. Even JG's potty training became a source of torment for her. Bourgeois made JG spend her days sitting on her "training potty." When Bourgeois brought his family (including JG) along on his trucking routes, Bourgeois forced JG to sleep on her training potty. Bourgeois punished JG's "accidents" with beatings. Remarkably, there was more abuse—including evidence of sexual abuse—but that is enough to lay the groundwork for the events that followed.

In late June 2002, Bourgeois drove his family in his truck to Corpus Christi Naval Air Station, where Bourgeois was delivering a shipment. JG, as usual, was sitting on her training potty. When Bourgeois backed up his truck, JG wiggled and tipped over her potty chair. Enraged, Bourgeois started yelling at JG and spanking her. He then grabbed her by the shoulders and slammed the back of her head into the truck's front

windows and dashboard four times. Robin woke up soon af-
ter the attack and noticed that JG was limp and motionless.
After trying unsuccessfully to revive JG through CPR, Robin
told Bourgeois that JG needed emergency medical attention.
Bourgeois replied that he would take her to the emergency
room when he was done unloading the truck. He added that
they should say JG had slipped and fallen out of the truck.
Insistent that JG needed medical attention, Robin handed her
to Bourgeois. Bourgeois took JG outside and put her on the
ground. When Robin found her there, she again tried CPR
while a passerby called 911. At that point, Bourgeois came
running from behind the truck to ask what had happened.

JG died in the hospital the next day. As planned, Bour-
geois and Robin told authorities that JG had fallen out of the
truck. Their story quickly unraveled when the autopsy report
came back. The medical examiner described the autopsy as
one of the most involved of her career, due to the sheer num-
ber and extent of JG's injuries. There were bruises, human bite
marks, scratch marks, loop marks (consistent with an electri-
cal cord), and a circular hole on the bottom of one of JG's feet.
The examiner also found deep tissue bruising all over JG's
body. Based on these extensive injuries, the examiner con-
cluded that JG was a chronically abused or battered child. The
ultimate cause of death, in her determination, was an impact
to the head resulting in a devastating brain injury. The loca-
tion of the brain injury was consistent with Bourgeois holding
JG by the shoulders and slamming her head against the win-
dows and dashboard of the truck cab. Robin and one of Bour-
geois's other daughters later told authorities the truth about
JG's death and the consistent abuse she suffered.

No. 20-1891                                                    5

## B. Procedural Background

Bourgeois was charged with murder on federal property, in violation of 18 U.S.C. §§ 7 and 1111. After a two-week trial in the Southern District of Texas, the jury found Bourgeois guilty and unanimously recommended a sentence of death, which the court imposed.

Bourgeois directly appealed to the Fifth Circuit. He challenged the government's use of aggravating factors at sentencing, the constitutionality of the FDPA, and the district court's delegation of supervision over his execution to the Director of the Bureau of Prisons. The Fifth Circuit affirmed, commenting "[t]his is not a close case." *United States v. Bourgeois*, 423 F.3d 501, 512 (5th Cir. 2005). The Supreme Court denied certiorari. *Bourgeois v. United States*, 547 U.S. 1132 (2006).

Bourgeois then filed a motion for postconviction relief under 28 U.S.C. § 2255. The motion came before the same judge who oversaw Bourgeois's trial. Bourgeois raised fourteen grounds for relief, only one of which concerns us here: Bourgeois argued that he was intellectually disabled[1] and thus ineligible for the death penalty under the FPDA and the Supreme Court's constitutional decision in *Atkins*. The district court held a week-long evidentiary hearing that often extended beyond normal work hours. The court heard testimony from expert and lay witnesses who testified about Bourgeois's intellectual and psychological abilities.

---

[1] Following the Supreme Court's practice, we use the term "intellectual disability" instead of "mental retardation," even though earlier cases, including *Atkins*, used the latter term. *Hall v. Florida*, 572 U.S. 701, 704 (2014).

The court denied Bourgeois's § 2255 motion in a thorough 225-page opinion that devoted 53 pages to analyzing Bourgeois's intellectual-disability claim. *United States v. Bourgeois*, No. C.A. C–07–223, 2011 WL 1930684 (S.D. Tex. May 19, 2011). The court began by noting that Bourgeois had not received a diagnosis of intellectual disability until after the court had sentenced him to death. *Id.* at *22. "Up to that point, Bourgeois had lived a life which, in broad outlines, did not manifest gross intellectual deficiencies." *Id.* The court then analyzed Bourgeois's intellectual-disability claim using the "uniformly accepted … tripartite formulation for deciding whether an inmate qualifies for *Atkins* protection." *Id.* at *24. The "three indispensable criteria" were: "(1) significantly subaverage intellectual functioning; (2) related significant limitations in adaptive skill areas; and (3) manifestation of those limitations before age 18." *Id.* Following *Atkins*'s guidance, the court drew this three-part test from the 11th edition of the American Association on Intellectual and Developmental Disabilities's (AAIDD's) manual entitled Intellectual Disability: Definition, Classification, and Systems of Supports (AAIDD-11), and the 4th edition of the American Psychiatric Association's (APA's) Diagnostic and Statistical Manual of Mental Disorders (DSM-4). *Id.* at *23–24 & n.27.

On the first prong (significantly subaverage intellectual functioning), Bourgeois had tested within the range for intellectual disability in IQ tests following his death sentence, but the court found that his test scores did not accurately measure his intellectual abilities. *Id.* at *25–31. Instead, based on "highly credible" testimony from the government's expert and the court's independent review of Bourgeois's psychological evaluations, the court determined that Bourgeois had not put forth his best efforts in testing. *Id.* at *27–29. In addition,

"a fuller view" of Bourgeois's life did "not correspond to a finding of significant intellectual limitations." *Id.* at *31. The court stressed that Bourgeois had "graduated from high school, worked for years as an over-land trucker, bought a house, managed his own finances, wrote intricate and detailed letters, communicated without difficulty, participated actively in his own defense, and otherwise carried himself without any sign of intellectual impairment." *Id.* at *29 (footnotes omitted). The court credited the government's expert's testimony that Bourgeois's competence as a truck driver was "totally inconsistent with mental retardation." *Id.*

On the second prong (significant limitations in adaptive skill areas), the court began by distinguishing between the "psychological" and "legal"  approaches to adaptive functioning: whereas the "psychological" approach considered only "deficits," the law "compare[d] the deficiencies to positive life skills, presuming that adaptive successes blunt the global effect of reported insufficiencies." *Id.* at *32–33. With that in mind, the court turned to the evidence. The parties had presented conflicting expert and lay testimony about Bourgeois's adaptive abilities. The experts had reached "diametrically opposed conclusions about Bourgeois' abilities." *Id.* at *33. The lay testimony also pointed in different directions. For example, people who knew Bourgeois as a youth testified that he had difficulty learning new activities and grasping new concepts. *Id.* at *37–39. Bourgeois's trucking colleagues, on the other hand, testified that he was an above-average truck driver who ably discharged the various duties of the job. *Id.* at *39. One even described him as an "overachiever." *Id.* In the end, the court found that "[a] broad review of the evidence does not make Bourgeois' claim of adaptive deficits believable." *Id.* at *44. Although Bourgeois "may have had difficulties

when younger," the record did "not conclusively link those
problems to mental retardation rather than a culturally de-
prived upbringing, poverty, or abuse." *Id.* And "[n]othing
suggested that deficiencies endured into maturity." *Id.* To the
contrary, "Bourgeois operated with remarkable competency
in the free world for one with low IQ scores." *Id.*

The court's conclusion on the third prong (manifestation
of intellectual limitations before 18) followed directly from its
conclusions on the first two prongs: "The evidence before the
Court failed to point to any pronounced intellectual impair-
ment before Bourgeois' eighteenth birthday. Bourgeois
has not shown that he is now, was at the time of the crime, or was
during the developmental period, mentally retarded." *Id.* Be-
cause Bourgeois "failed to meet all three prongs of the *Atkins*
analysis," his intellectual-disability claim failed. *Id.* After re-
jecting Bourgeois's remaining claims, the court denied his
§ 2255 motion and denied a certificate of appealability. *Id.* at
*111. Turning to the Fifth Circuit, Bourgeois requested a cer-
tificate of appealability to appeal some aspects of the district
court's ruling, but he did not challenge the denial of his intel-
lectual-disability claim. *See United States v. Bourgeois*, 537 F.
App'x 604 (5th Cir. 2013) (per curiam) (denying Bourgeois's
request for a certificate of appealability).

About four years later, Bourgeois sought leave from the
Fifth Circuit to file a successive § 2255 motion. *See* 28 U.S.C.
§ 2255(h). In his new motion, Bourgeois again raised an intel-
lectual-disability claim. Bourgeois said he deserved a second
chance to present his claim because the Supreme Court's de-
cision in *Moore v. Texas*, 137 S. Ct. 1039 (2017) (*Moore I*) had
breathed new life into his claim. The Fifth Circuit held that
Bourgeois's successive motion was barred by "§ 2244(b)(1)'s

strict relitigation bar," which applied to federal prisoners through 28 U.S.C. § 2255(h). *In re Bourgeois*, 902 F.3d 446, 447 (5th Cir. 2018).

This brings us to Bourgeois's present petition. Bourgeois currently resides at the federal penitentiary in Terre Haute, Indiana. In August 2019, a month after he received an execution date,[2] Bourgeois filed a habeas corpus petition under 28 U.S.C. § 2241 in the Southern District of Indiana. He also moved to stay his execution. Once again, Bourgeois argued that he was intellectually disabled, and that his death sentence ran afoul of *Atkins* and the FDPA. Relying in part on the FDPA's ban on executing a person who "is" (present tense) intellectually disabled, 18 U.S.C. § 3596(c), he argued that *Atkins* and the FDPA forbid both the "imposition" and the "execution" of his death sentence.

Procedurally, Bourgeois tried to channel his petition through § 2255(e)'s "savings clause,"[3] which permits a federal

---

[2] In July 2019, the government set Bourgeois's execution for January 13, 2020. The execution did not go forward because, on November 20, 2019, the district judge presiding over execution-protocol litigation brought by Bourgeois and others in the District of Columbia preliminarily enjoined the government from carrying out the executions. *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-145 (TSC), 2019 WL 6691814 (D.D.C. Nov. 20, 2019). On April 2, 2020, the D.C. Circuit vacated that preliminary injunction. *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106 (D.C. Cir. 2020). The Supreme Court denied certiorari. *Bourgeois v. Barr*, No. 19-1348, 2020 WL 3492763 (U.S. June 29, 2020). The lower court's stay in the case now before us remains in effect, and Bourgeois has not received a new execution date.

[3] We have alternated between referring to § 2255(e) as the "safety valve" and the "savings clause." *Compare Purkey v. United States*, 964 F.3d 603, 611 (7th Cir. 2020) ("safety valve"), *with Lee v. Watson*, 964 F.3d 663,

prisoner who has already moved for relief under § 2255 to file a habeas corpus petition under § 2241 if § 2255 was "inadequate or ineffective to test the legality of his detention." 28 U.S.C. § 2255(e). Bourgeois argued that his § 2255 motion was "inadequate or ineffective to test the legality" of his death sentence because the judge in the Southern District of Texas who denied his motion relied on diagnostic standards that the Supreme Court later rejected in *Moore I* and its follow-on decision in *Moore v. Texas*, 139 S. Ct. 666 (2019) (*Moore II*).

The district judge ordered the government to respond to Bourgeois's petition. In its lengthy response, the government argued that Bourgeois had fully litigated his intellectual-disability claim in the Southern District of Texas, and that the Supreme Court's continued development of the law in *Moore I* and *Moore II* did not justify savings-clause relief. In any event, the government argued, the Southern District of Texas's analysis was consistent with *Moore I* and *Moore II*. Throughout its brief, the government referred to Bourgeois's intellectual-disability claim as his "*Atkins* claim." It did not mention Bourgeois's FDPA claim in its analysis. In his reply, Bourgeois argued that the government "completely fail[ed] to challenge [his] claim that he is entitled to § 2241 review because he challenges the execution of his sentence, as well as its imposition."

The district court granted Bourgeois's motion for a stay. *Bourgeois v. Warden*, No. 2:19-cv-00392-JMS-DLP, 2020 WL 1154575, at *1 (S.D. Ind. Mar. 10, 2020). Without addressing his *Atkins* claim, the court found that Bourgeois was likely to succeed on his FDPA claim. *Id.* Before reaching the merits, the

_____

666 (7th Cir. 2020) ("savings clause"). We use the term "savings clause" in this opinion.

court found that the government had waived any argument that Bourgeois's FDPA claim could not proceed under § 2241 by not separately addressing his FDPA claim in its briefing. *Id.* at *3. The court faulted the government for "fail[ing] to even mention" the FDPA claim, "let alone explain why it cannot be brought in a § 2241." *Id.* That failure was "inexplicable and inexcusable." *Id.* The court stressed that Bourgeois's reply had "highlighted [the government's] failure to address the FDPA claim," yet the government had "failed to seek leave to file a surreply addressing that claim." *Id.* That, in turn, led the court to infer that the government's "failure to address the claim was more intentional than inadvertent," thus establishing waiver (and not merely forfeiture). *Id.* Turning to the merits of Bourgeois's FDPA claim, the court found that he had made a strong showing of intellectual disability. *Id.* at *4–5. The court granted Bourgeois's motion and stayed his execution. *Id.* at *6.

After the court entered the stay, the government sought leave to file a surreply. The government emphasized that Bourgeois himself had referred to his *Atkins* and FDPA claims collectively as his "*Atkins* claim" throughout his petition. Because Bourgeois had relied on the same arguments for both claims—which are governed by identical standards—the government had similarly not "parse[d] out" a separate FDPA claim in its response to the petition. The court denied the government's motion, finding that Bourgeois had, in fact, presented separate statutory and constitutional claims. The court reiterated that Bourgeois's reply brief had flagged the government's failure to address his FDPA claim, yet the government had not sought leave to file a surreply until after the court ruled. The government now appeals the district court's stay order.

## II. Discussion

We review the district court's decision to enter a stay for abuse of discretion. *Venckiene v. United States*, 929 F.3d 843, 853 (7th Cir. 2019). We review the underlying factual findings for clear error and legal conclusions de novo. *Id.*; *Mays v. Dart*, --- F.3d ----, No. 20-1792, 2020 WL 5361651, at *5 (7th Cir. Sept. 8, 2020). "[A] factual or legal error may alone be sufficient to establish that the court abused its discretion in making its final determination." *Mays*, 2020 WL 5361651, at *5 (alteration in original) (quoting *Lawson Prod., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1437 (7th Cir. 1986)).

The four stay factors are: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009). Stay applicants "must satisfy all of the requirements for a stay, including a showing of a significant possibility of success on the merits." *Hill v. McDonough*, 547 U.S. 573, 584 (2006).

The district court found that Bourgeois had met all four stay factors, but we only reach the first one: likelihood of success on the merits. The district court's determination that Bourgeois was likely to succeed on the merits of his FDPA claim rested on a preliminary finding that the government had waived any argument that Bourgeois's FDPA claim was not cognizable under § 2255(e)'s savings clause. That is where we part ways with the district court. We find that the government did not waive, or even forfeit, this argument. And even if it had forfeited the argument, we would excuse that

forfeiture on these facts. We proceed to consider whether Bourgeois's *Atkins* and FDPA claims are cognizable under the savings clause. They are not. With no procedural home for his claims, Bourgeois's likelihood of success on the merits is non-existent. Thus, we vacate the stay.

## A. Waiver and Forfeiture[4]

We recently discussed the distinction between waiver and forfeiture in civil cases in *Henry v. Hulett*, 969 F.3d 769 (7th Cir. 2020) (en banc). We observed that, "[w]hereas waiver is the 'intentional relinquishment or abandonment of a known right,' forfeiture is the mere failure to raise a timely argument, due to either inadvertence, neglect, or oversight." *Id.* at 786 (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). "In the criminal context," we noted, "the distinction between waiver and forfeiture is critical: while waiver precludes review, forfeiture permits a court to correct an error under a plain error standard." *Id.* In the civil context, we had been less clear about the role of plain error review. *Id.* We took the occasion to "clarify that 'our ability to review for plain error in civil cases is severely constricted,' as 'a civil litigant should be bound by his counsel's actions.'" *Id.* (quoting *SEC v. Yang*, 795 F.3d 674, 679 (7th Cir. 2015)). "Plain error review is available in civil cases only in the rare situation where a party can demonstrate that: '(1) exceptional circumstances exist; (2)

---

[4] The government has not asked us to reconsider our conclusion that § 2255(e) is non-jurisdictional. *Harris v. Warden*, 425 F.3d 386, 388 (7th Cir. 2005); *Prevatte v. Merlak*, 865 F.3d 894, 901 (7th Cir. 2017). Thus, we will address the question of waiver. *See Moore v. Olson*, 368 F.3d 757, 759 (7th Cir. 2004) ("Defects in subject-matter jurisdiction … may not be waived or forfeited.").

14                                         No. 20-1891

substantial rights are affected; and (3) a miscarriage of justice
will occur if plain error review is not applied.'" *Id.* (quoting
*Thorncreek Apartments III, LLC v. Mick*, 886 F.3d 626, 636 (7th
Cir. 2018)). "The determination of what circumstances fit
these criteria is solely within our discretion." *Id.* These stand-
ards govern here because, although habeas proceedings arise
from criminal cases, they are civil in nature.

We start with waiver. After reviewing the record below,
we find that there was no basis to conclude that the govern-
ment had waived its argument that Bourgeois's FDPA claim
could not pass through the savings clause. To begin, Bour-
geois himself did not clearly parse out separate *Atkins* and
FDPA claims. Rather, he presented one intellectual-disability
claim arising under two sources of law that—as both parties
agree—provide substantively identical protection and are
governed by the same standard. *See Webster v. Daniels*, 784
F.3d 1123, 1139 n.6 (7th Cir. 2015) (en banc) (*Webster I*) (noting
that *Atkins* and the FDPA may provide different procedural
pathways to relief); *id.* at 1150 (Easterbrook, J., dissenting)
("*Atkins* and *Hall* do not alter the [FDPA's] substantive stand-
ard."). Bourgeois's first argument heading was: "Mr. Bour-
geois Is Intellectually Disabled and Is Ineligible for the Death
Penalty Under the Federal Death Penalty Act and *Atkins v. Vir-
ginia* and Its Progeny." Bourgeois did not include separate
sub-headings or arguments for his *Atkins* and FDPA claims.
Instead, he made one set of arguments for both claims, and
accompanied the arguments with citations to both *Atkins* and
the FDPA. At times, Bourgeois even referred to both claims
collectively as his "*Atkins* claim." Given that Bourgeois him-
self did not treat his *Atkins* and FDPA claims as distinct, we
do not believe that the government intentionally chose to dis-
aggregate the claims and respond to only one of them.

No. 20-1891                                                    15

Nor are we aware of any conceivable strategic reason why the government would intentionally respond to Bourgeois's *Atkins* claim while forgoing its right to challenge his FDPA claim. Why respond to the *Atkins* claim at all, if Bourgeois could still proceed with his substantively identical FDPA claim? Neither Bourgeois nor the court below answer this question. In these circumstances, we do not consider the government's failure to respond to be "a deliberate decision not to present a ground for relief that might be available in the law." *United States v. Cook*, 406 F.3d 485, 487 (7th Cir. 2005).

The sole reason that the court below gave for its finding of intentional waiver was the government's failure to seek leave to file a surreply after Bourgeois's reply brief "highlighted [the government's] failure to address the FDPA claim." 2020 WL 1154575, at *3. We respectfully disagree with that reading of Bourgeois's reply brief. On pages 42–43 of his 45-page reply brief (the portion cited by the district court), Bourgeois argued that the government "completely fails to challenge Mr. Bourgeois's claim that he is also entitled to review under § 2241 because his challenge goes not only to the imposition of his sentence, but also to the *execution* thereof." He went on to argue (as he did in his opening petition) that both *Atkins* and the FDPA forbid the execution of a person who is presently intellectually disabled. True, he relied on the FDPA's statutory language to make that argument. But nowhere did he say that the government failed to respond to—let alone waived its response to—the cognizability of his FDPA claim. The government's failure to seek leave to file a surreply to respond to this argument does not support a finding of waiver.

That is especially true because "surreply briefs are rare and discouraged in most districts." *Ennin v. CNH Indus. Am.,*

*LLC*, 878 F.3d 590, 595 (7th Cir. 2017). Indeed, while the Southern District of Indiana's local rules allow a party opposing summary judgment to file a surreply as a matter of right in certain limited circumstances, they are otherwise silent on surreplies. S.D. Ind. L.R. 56–1(d). We have previously held that, when local rules do not permit filing a surreply as of right, a party does not waive an argument for purposes of appeal by failing to seek leave from the district court to raise the argument in a surreply. *Hardrick v. City of Bolingbrook*, 522 F.3d 758, 763 n.1 (7th Cir. 2008); *Ennin*, 878 F.3d at 596. Otherwise, "arguments before the district court would proceed ad infinitum making litigation unruly and cumbersome." *Hardrick*, 522 F.3d at 763 n.1. For similar reasons, we will not infer waiver here from the government's failure to seek leave to file a surreply—with no authorization from the local rules—to respond to an argument that Bourgeois never distinctly presented. The district court's factual determination that the government intentionally waived its argument was clearly erroneous and amounts to an abuse of discretion. *See Mays*, 2020 WL 5361651, at \*5.

We turn next to forfeiture. On appeal, the government insists that its failure to respond to Bourgeois's FDPA claim was, at most, forfeiture. Although the district court did not address forfeiture, its finding of intentional waiver was incompatible with forfeiture. After reviewing the issue for ourselves, we are convinced that the government's failure to respond separately to Bourgeois's FDPA claim—which was governed by the same standard as his *Atkins* claim—did not result in forfeiture. Forfeiture results from "inadvertence, neglect, or oversight." *Henry*, 969 F.3d at 786. We do not believe that the government's silence on Bourgeois's FDPA claim was "oversight" when Bourgeois himself, through his

undifferentiated presentation of the claims, was just as much to blame for that silence.

In the end, though, our conclusion on forfeiture does not make a difference because, even if the government had forfeited the issue, we would forgive it on these unique facts. As we have said, we have discretion to forgive a party's forfeiture in exceptional circumstances. *Id.* These circumstances include when a forfeited ground is "founded on concerns broader than those of the parties." *United States v. Ford*, 683 F.3d 761, 768 (7th Cir. 2012) (quoting *Wood v. Milyard*, 566 U.S. 463, 471 (2012)). In *Ford*, for instance, we forgave the government's failure to argue harmless error because reversing on a harmless error would harm not just the forfeiting party, but also "innocent third parties, in particular other users of the court system, whose access to that system is impaired by additional litigation." *Id.* at 769. Although *Ford* was a criminal case, we relied there on two Supreme Court decisions that arose in the civil habeas context. The first was *Granberry v. Greer*, 481 U.S. 129 (1987), which held that a federal appellate court has discretion in "exceptional cases" to consider a state's forfeited exhaustion argument because of the significant comity and federalism interests implicated by the exhaustion requirement. *Id.* at 134. The second was *Wood*, 566 U.S. 463, which held that federal appellate courts have discretion to consider forfeited statute-of-limitations defenses, given "the institutional interests served by AEDPA's statute of limitations," such as conserving judicial resources and protecting the accuracy and finality of state-court judgments. *Id.* at 472–73.

Similar considerations would compel us to look past any government forfeiture in this case. We have already explained why the government's failure to separately address

Bourgeois's FDPA claim was excusable as a practical matter. But there are also broader interests at stake. As we recently observed in *Purkey v. United States*, 964 F.3d 603 (7th Cir. 2020), "[f]inality" is a "central goal[] of the judicial system." *Id.* at 606. The importance of finality is especially pronounced where, as here, postconviction proceedings have tied up a criminal conviction for more than a dozen years. Beyond finality, there is judicial efficiency. "The idea of an entitlement to *one* untainted opportunity to make one's case is deeply embedded in our law." *Id.* The savings clause embodies that principle by generally prohibiting repeat claims in federal postconviction proceedings. *See id.*; *see also United States v. Giovannetti*, 928 F.2d 225, 226 (7th Cir. 1991) (per curiam) (observing that courts may excuse forfeiture "for the sake of protecting third-party interests including such systemic interests as the avoidance of unnecessary court delay"). Taken together, these significant interests convince us that, even if the government had forfeited its FDPA argument, that forfeiture would not prevent us from considering the savings-clause issue.

## B. Cognizability Under the Savings Clause

That brings us to the main issue in this case: whether Bourgeois's case "fits within the narrow confines of the safety valve." *Purkey*, 964 F.3d at 611. Given its finding on waiver, the district court did not address this question. For that reason, Bourgeois, anticipating a loss on the waiver issue, asks us to remand the issue so that the district court can consider it in the first instance. That is indeed the normal course. *Amcast Indus. Corp. v. Detrex Corp.*, 2 F.3d 746, 749 (7th Cir. 1993). But that is not the best course here. We are dealing with a pure issue of law that both sides have fully briefed. Remanding it to the district court would likely result in a second appeal on

No. 20-1891                                                    19

the issue, and we would be right back where we started.
"[T]he district judge's view, while it would no doubt be inter-
esting, could have no effect on our review, which is plenary
on matters of law." *Id.* at 750. Given this posture, the extensive
briefing on the issue, and the long pendency of this case, re-
solving the issue now is the better use of judicial resources.

### 1. Savings Clause and § 2241

Section 2255 permits a prisoner serving a federal sentence
to "move the court which imposed the sentence to vacate, set
aside or correct the sentence." 28 U.S.C. § 2255(a). "In the
great majority of cases," § 2255 is the "exclusive postconvic-
tion remedy for a federal prisoner." *Purkey*, 964 F.3d at 611.
Section 2255 has a strict one-year statute of limitations. 28
U.S.C. § 2255(f). In addition, the statute ordinarily limits pris-
oners to just one shot at relief. As we recognized in *Purkey*,
though, there are two exceptions to that rule. *Id.* First,
§ 2255(h) authorizes a federal court of appeals to certify a
"second or successive motion" if it contains "newly discov-
ered evidence" proving innocence, or if it identifies "a new
rule of constitutional law, made retroactive to cases on collat-
eral review by the Supreme Court." 28 U.S.C. § 2255(h). Bour-
geois pursued that option to no avail in the Fifth Circuit. *In re
Bourgeois*, 902 F.3d at 447. The second exception is § 2255(e),
better known as "the savings clause." That subsection pro-
vides that a habeas corpus petition "shall not be entertained"
if the petitioner "has failed to apply for relief, by motion, to
the court which sentenced him, or that such court has denied
him relief, *unless it also appears that the remedy by motion is in-
adequate or ineffective to test the legality of his detention*." 28
U.S.C. § 2255(e) (emphasis added). A prisoner who qualifies
for this "narrow pathway" to relief may file a petition under

28 U.S.C. § 2241, the general habeas corpus statute. *Purkey*, 964 F.3d at 611.

We recently examined the scope of the savings clause in two cases that weigh heavily on Bourgeois's appeal. The first is *Purkey*, which we have already referenced. In that case, Wesley Purkey filed a § 2241 petition claiming ineffective assistance of counsel. *Id.* at 615. Purkey had previously raised a claim of ineffective assistance of counsel in his § 2255 motion, but in his § 2241 petition he identified three new grounds of ineffective assistance. *Id.* He blamed his failure to raise those grounds earlier on the ineffectiveness of his § 2255 counsel. *Id.* Invoking the savings clause, Purkey argued "that section 2255 is structurally inadequate to test the legality of a conviction and sentence any time a defendant receives ineffective assistance of counsel in his one permitted motion." *Id.* at 614.

We rejected that broad argument and explained that "the words 'inadequate or ineffective,' taken in context, must mean something more than unsuccessful." *Id.* at 615. Instead, "there must be a compelling showing that, as a practical matter, it would be impossible to use section 2255 to cure a fundamental problem. It is not enough that proper use of the statute results in denial of relief." *Id.*

We found that Purkey was missing that "something more." *Id.* at 615–17. We did not deny that Purkey had raised a significant question as to the effectiveness of his trial counsel. *Id.* at 615. "But that [was] not the proper question before us." *Id.* It was, instead, "whether, having raised in his section 2255 motion 17 specific ways in which his trial counsel were ineffective, Purkey is now entitled to add additional allegations … through section 2241." *Id.* He was not. We stressed that, "[a]t the time Purkey filed his motion under section 2255,

nothing formally prevented him from raising each of the three errors he now seeks to raise in his petition under 2241." *Id.* Even if Purkey's counsel were not up to par, we were "left with the fundamental problem" that "the mechanisms of section 2255 gave him an opportunity to complain about ineffective assistance of trial counsel, and he took advantage of that opportunity. There was nothing structurally inadequate or ineffective about section 2255 as a vehicle to make those arguments." *Id.* at 616–17.

Our second recent decision on the savings clause is *Lee v. Watson*, 964 F.3d 663 (7th Cir. 2020). Like Purkey, Daniel Lewis Lee relied on the savings clause to raise a claim of ineffective assistance of counsel that his § 2255 counsel had missed. *Id.* at 667. Applying *Purkey*, we rejected that use of the savings clause. *Id.* We reiterated *Purkey*'s "unambiguous[]" holding that "a § 2241 petition may not proceed under the Savings Clause absent 'a compelling showing' that it was 'impossible' to use § 2255 to cure the defect identified in the § 2241 petition." *Id.* at 666 (quoting *Purkey*, 964 F.3d at 615). Because Lee's case was "indistinguishable from *Purkey*," the savings clause did not apply. *Id.* at 667.

### 2. The Law Governing Intellectual-Disability Claims

With *Purkey* and *Lee* in mind, we turn to Bourgeois's pitch for savings-clause relief. At a basic level, Bourgeois says his intellectual-disability claim qualifies for savings-clause relief because no court has ever reviewed that claim in accordance with clinical diagnostic standards. He acknowledges that he raised an intellectual-disability claim in his § 2255 motion, but he faults the judge in the Southern District of Texas who rejected that claim for applying "non-clinical, unscientific standards" that the Supreme Court later rejected in *Moore I*

and *Moore II*. To better make sense of Bourgeois's argument, we briefly review the underlying legal framework.

The FDPA, which Congress passed in 1994, provides: "A sentence of death shall not be carried out upon a person who is mentally retarded." 18 U.S.C. § 3596(c). As we have said, the parties agree that the FDPA provides the same substantive protection as *Atkins* and its progeny. Because Bourgeois's claims are substantively identical, we refer to them collectively as his "intellectual-disability claim." Our analysis applies equally to both claims.

In *Atkins*, the Supreme Court held that the Eighth Amendment's ban on cruel and unusual punishments forbids the execution of intellectually disabled offenders. 536 U.S. at 321. Importantly, the Supreme Court signaled that the law relies on "clinical" definitions of intellectual disability. *Id.* at 318. The Supreme Court referenced two "similar" definitions of intellectual disability (both of which we have already mentioned). First, it cited an earlier version of AAIDD-11. *Id.* at 308 n.3. Second, it cited DSM-4. *Id.* It summarized both definitions as "requir[ing] not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." *Id.* at 318.

Twelve years later, in *Hall v. Florida*, 572 U.S. 701 (2014), the Supreme Court reiterated that courts "are informed by the work of medical experts in determining intellectual disability." *Id.* at 710. The Court cited both *Atkins* and the newly available fifth edition of the APA's Diagnostic and Statistical Manual of Mental Disorders (DSM-5) for its slightly refined definition of intellectual disability: "[T]he medical community defines intellectual disability according to three criteria:

significantly subaverage intellectual functioning, deficits in adaptive functioning (the inability to learn basic skills and adjust behavior to changing circumstances), and onset of these deficits during the developmental period." *Id.* The Court held that Florida's strict requirement of an IQ score of 70 or less for a finding of intellectual disability was incompatible with that definition. *Id.* at 723.

A few years later, in *Moore I*, the Supreme Court considered whether Texas was adhering to the medical community's definition of intellectual disability. The Texas Court of Criminal Appeals (CCA) had reversed a lower court for applying the medical community's current definition of intellectual disability instead of the intellectual-disability factors that the CCA had adopted in a previous case (the "*Briseno* factors"). 137 S. Ct. at 1044. The Supreme Court vacated the CCA's decision, finding that the *Briseno* factors were "untied to any acknowledged source" and "[n]ot aligned with the medical community's information." *Id.* The Court highlighted a few specific ways in which the CCA had departed from the required framework. First, the CCA's conclusion that Moore's IQ score of 74 meant that he was not intellectually disabled was "irreconcilable with *Hall*." *Id.* at 1049. Second, "[i]n concluding that Moore did not suffer significant adaptive deficits, the CCA overemphasized Moore's perceived adaptive strengths." *Id.* at 1050. Citing DSM-5 and AAIDD-11, the Court stressed that "the medical community focuses the adaptive-functioning inquiry on adaptive *deficits*." *Id.* Third, the CCA had sought to blame Moore's adaptive deficits on other factors, such as his traumatic childhood experiences and personality disorder, when neither of those factors was inconsistent with a finding that Moore was also suffering from an intellectual disability. *Id.* at 1051. Indeed, Moore's traumatic

childhood experiences were a risk factor for intellectual disability. *Id.* In short, by relying on "the wholly nonclinical *Briseno* factors, the CCA failed adequately to inform itself of the 'medical community's diagnostic framework.'" *Id.* at 1053 (quoting *Hall*, 572 U.S. at 721).

The case came back to the Supreme Court in *Moore II*. On remand following *Moore I*, the CCA had revisited, and again rejected, Moore's claim of intellectual disability. In a per curiam opinion, the Supreme Court reversed the CCA's decision on remand, finding that the CCA, while purporting to apply the latest medical diagnostic standards, had, "with small variations," simply "repeat[ed] the analysis we previously found wanting." 139 S. Ct. at 670. After reviewing the trial record on its own, the Court concluded that Moore was intellectually disabled. *Id.* at 672.

### 3. Bourgeois's Eligibility for Savings-Clause Relief

With that context, we consider whether Bourgeois is correct that *Moore I* and *Moore II* somehow qualify him for the "narrow pathway" of review under the savings clause. *Purkey*, 964 F.3d at 611. According to Bourgeois, the judge that denied his § 2255 motion made essentially the same errors that the CCA made in *Moore I* and *Moore II*. Bourgeois says the § 2255 court relied on "then-binding Fifth Circuit precedent" to "reject[] diagnostic standards in evaluating Bourgeois's § 2255 claim." On the intellectual-functioning prong, Bourgeois faults the court for not finding that his IQ scores (70 and 75) automatically established significantly subaverage intellectual functioning. Instead, he says the court relied on "unscientific, erroneous stereotypes" to conclude that his IQ score did not accurately represent his level of intellectual functioning. On the adaptive-deficits prong, Bourgeois criticizes the

court for dismissing the "psychological" approach to adaptive functioning in favor of a "legal" approach that weighed adaptive deficits against adaptive strengths. He contends that, like the CCA in *Moore I*, the § 2255 court erroneously relied on unscientific stereotypes to evaluate his intellectual disability and improperly blamed his adaptive deficits on certain "dysfunctional" aspects of his background.

Initially, we note our disagreement with Bourgeois's contention that the Texas district court "eschewed medical standards" in denying his § 2255 motion. After a week-long hearing, the court thoroughly analyzed Bourgeois's § 2255 motion in a 225-page written order that dedicated more than 50 pages to analyzing his intellectual-disability claim alone. *Bourgeois*, 2011 WL 1930684. Far from rejecting medical standards, as the CCA had done in *Moore I*, the district court identified, and applied, the most recent medical guidance on intellectual disabilities. *Id.* at \*23–24. The district court's references to its "legal" approach to adaptive functioning do not convince us that its treatment of adaptive functioning was inconsistent with *Moore I* because the court found Bourgeois's alleged adaptive deficiencies to be slight and uncorroborated, without regard to his adaptive strengths. *See, e.g., id.* at \*41 (finding that "[t]he evidentiary hearing testimony … failed to verify or support most of" of the academic deficiencies that Bourgeois's expert relied on); *id.* at \*44 (concluding, after reviewing all the evidence presented on Bourgeois's adaptive deficits, merely that Bourgeois "may have had difficulties when younger").

Contrary to what Bourgeois suggests, moreover, the court did not view adaptive impairments as a zero-sum game, attributable to either one cause (e.g., childhood abuse) or another (e.g., intellectual disability), but not both. Rather, the

court found that the record did not "conclusively link" Bourgeois's childhood problems "to mental retardation rather than a culturally deprived upbringing, poverty, or abuse." *Id.* In other words, there was a lack of evidence about what caused Bourgeois's alleged impairments. Unlike the CCA in the *Moore* cases, the § 2255 court did not view Bourgeois's other childhood problems as evidence that he was not intellectually disabled. Lastly, nowhere in *Moore I* or *Moore II* did the Supreme Court say that a court must accept an IQ score at face value, especially when a psychological expert credibly testifies that the subject did not put forth his best effort on the test. For these reasons, we are not convinced that the district court's analysis ran afoul of clinical diagnostic standards.

In the end, though, it is not for us to decide whether the § 2255 court got it right or wrong. That point seems lost on Bourgeois, who goes on at length about why, in his view, the § 2255 court was wrong. "[T]hat is not the proper question before us." *Purkey*, 964 F.3d at 615. The savings clause is not simply another avenue for appeal. Indeed, Bourgeois had the chance to appeal the court's denial of his intellectual-disability claim, yet he chose not to do so. At this stage of the proceedings, our only role is to determine whether there was something "structurally inadequate or ineffective about section 2255 as a vehicle" for Bourgeois. *Id.* at 616–17. There plainly was not.

*Atkins* was the watershed case on intellectual disability. Before *Atkins*, the Supreme Court had not decided whether the Constitution prevents the execution of intellectually disabled offenders. *Atkins* held that it does, and further signaled that the law borrows its definition of intellectual disability from the medical community. 536 U.S. at 308 n.3, 318. The

No. 20-1891                                                27

Supreme Court carried forward that core insight from *Atkins* in *Hall*, *Moore I*, and *Moore II*, and further elaborated on the measurements of intellectual function and the evaluation of adaptive deficits.  The importance of applying medical standards, however, has been evident since *Atkins* and was evident to the § 2255 court in this case.

Critically, *Atkins* was on the books when Bourgeois filed his § 2255 motion in 2007. Bourgeois says he never had the chance to litigate his intellectual-disability claim under clinical diagnostic standards. But that is precisely what Bourgeois did in his § 2255 motion. The § 2255 court set forth, and applied, the same three-part test for intellectual disability that now prevails. *Bourgeois*, 2011 WL 1930684, at *23–24; *see Webster v. Watson*, --- F.3d ----, No. 19-2683, 2020 WL 5638691, at *9 (7th Cir. Sept. 22, 2020) (*Webster II*) (relying on the same three-part test). It drew that test from *Atkins*, DSM-4, and AAIDD-11. *Bourgeois*, 2011 WL 1930684, at *23–24; *see Webster II*, 2020 WL 5638691, at *14 (relying on DSM-5 and AAIDD-11). True, some aspects of the court's analysis would have looked different if the Supreme Court had decided *Moore I* by then. But the savings clause does not apply every time the Supreme Court clarifies the law that governed a prisoner's § 2255 motion, or, where intellectual disability is at issue, every time the medical community updates its diagnostic standards. Were that the case, we would truly be facing "a never-ending series of reviews and re-reviews." *Purkey*, 964 F.3d at 615.

As in *Purkey*, "nothing formally prevented [Bourgeois] from raising each of the … errors he now seeks to raise in his petition under 2241." *Id.* Indeed, Bourgeois's § 2255 motion *did* raise the errors that he now seeks to correct. Bourgeois makes that point inadvertently when criticizing the § 2255

court's analysis. He argues that the court's "refusal to follow diagnostic criteria" led it to credit the government's expert, who weighed adaptive deficiencies against adaptive strengths, over his own expert, who, "consistent with diagnostic criteria … explained that the[] strengths did not offset Bourgeois's deficits in any given area." Far from being "impossible" to rely on the substantive teachings of *Moore I* and *Moore II*, Bourgeois hired an expert to testify to precisely what the Supreme Court eventually clarified in *Moore I* and *Moore II*—namely, that the adaptive functions inquiry focuses on adaptive deficits. Bourgeois suggests that binding Fifth Circuit precedent prevented the court from properly analyzing his adaptive deficits. But even if that were true, it does not demonstrate that it was "impossible" for Bourgeois, armed with *Atkins* and the latest clinical diagnostic standards, to demonstrate that he was intellectually disabled. "[T]he words 'inadequate or ineffective,' taken in context, must mean something more than unsuccessful." *Purkey*, 964 F.3d at 615.

Bourgeois's problems do not stop there. We have held that the savings clause affords relief in limited circumstances to federal prisoners who rely on retroactive statutory-interpretation cases that postdate their § 2255 motions. *See, e.g., In re Davenport*, 147 F.3d 605, 611 (7th Cir. 1998). As we observed in *Purkey*, "[s]tatutory problems are simply not covered in section 2255." 964 F.3d at 615. But *Moore I* and *Moore II* are constitutional cases, not statutory interpretation cases. That is why Bourgeois relied on *Moore I* when he sought permission from the Fifth Circuit to file a successive § 2255 motion. *See* 28 U.S.C. § 2255(h). The Fifth Circuit denied his request. *In re Bourgeois*, 902 F.3d at 447. Bourgeois now comes to us with essentially the same argument, asking us in effect to overrule the Fifth Circuit. This time, Bourgeois does not even attempt

to argue that *Moore I* and *Moore II* are retroactive. We will not authorize that end-run around § 2255(h).

Bourgeois has two unpersuasive rejoinders. First, Bourgeois says it does not matter whether *Moore I* and *Moore II* are retroactive because the FDPA applies current definitions of intellectual disability. According to Bourgeois, the FPDA's ban on executing a person who "is" intellectually disabled, 18 U.S.C. § 3596(c), proscribes executing anyone who is presently intellectually disabled, as determined by current legal and diagnostic standards—including those reflected in *Moore I* and *Moore II*. This is part of Bourgeois's larger argument that *Atkins* and the FDPA forbid both the "imposition" and the "execution" of death sentences on the intellectually disabled.

Bourgeois makes much of the FDPA's use of the word "is." But what other word would Congress have chosen? Intellectual disability is a permanent condition that must manifest before the age of 18. *Atkins*, 536 U.S. at 318. It would be senseless to proscribe the execution of someone who merely "was" intellectually disabled when they were sentenced, or who "will be" intellectually disabled when their sentence is carried out. Bourgeois seems to confuse intellectual disability with the temporary condition of incompetency, which may come and go. *See Ford v. Wainwright*, 477 U.S. 399 (1986); *see also Williams v. Kelley*, 858 F.3d 464, 472 (8th Cir. 2017) (per curiam); *Busby v. Davis*, 925 F.3d 699, 713 (5th Cir. 2019). For these reasons, we find no support for Bourgeois's argument in the word "is." And with no textual (or other) support, we are unwilling to accept Bourgeois's sweeping argument that a fresh intellectual-disability claim arises every time the medical community updates its literature.

Next, Bourgeois contends that his case fits within the parameters of the three main cases where we have found the savings clause applicable: *Davenport*, 147 F.3d 605; *Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001); and *Webster I*, 784 F.3d 1123. To the contrary, *Davenport*, *Garza*, and *Webster I* merely illustrate the "something more" that Bourgeois is missing. *Purkey*, 964 F.3d at 615. In *Davenport*, the successful petitioner (Nichols) had a new, retroactive Supreme Court statutory decision holding that the conduct for which he was imprisoned was not a crime. 147 F.3d at 611. Garza had a previously unobtainable decision from an international tribunal finding that his death sentence violated international human rights norms. 253 F.3d at 923. And Webster had clear and convincing new evidence showing that he was intellectually disabled and thus ineligible for the death penalty. 784 F.3d at 1140–44.

We recently reviewed Webster's new evidence again in *Webster II*, 2020 WL 5638691, which further illustrates the type of unusual circumstances that warrant savings-clause relief. On remand following our decision in *Webster I*, the district court held a lengthy evidentiary hearing on Webster's intellectual-disability claim. From the evidence presented at the hearing, the district court determined that Webster's new evidence of intellectual disability, which predated his capital trial, had been unavailable to Webster at trial despite his counsel's diligent efforts to obtain it at the time. *Id.* at *8. The new evidence was far from cumulative, moreover, because it showed for the first time that Webster had been diagnosed as intellectually disabled *before* he committed the crimes for which he had been sentenced to death, "at a time when Webster had no incentive to malinger." *Id.* at *15. That was critical because the government's theory at trial was that Webster's low IQ scores were the product of malingering. *Id.* at *3. After

reviewing the new evidence and other evidence presented at the hearing, the district court found that Webster was intellectually disabled. *Id.* at \*9–12. We upheld the district court's factual findings on appeal because they contained no clear error. *Id.* at \*12–17. Unlike Webster, Bourgeois has no newly discovered evidence. Instead, he had a full and fair opportunity to litigate his intellectual-disability claim before the district court that decided his § 2255 motion.

To be sure, *Davenport*, *Garza*, and the *Webster* cases do not "create rigid categories delineating when the safety valve is available." *Purkey*, 964 F.3d at 614. But they illustrate the limited kinds of structural defects that justify savings-clause relief. Of the three cases, *Davenport* may best illustrate what Bourgeois is lacking. Nichols, the successful petitioner in *Davenport*, had a retroactive, statutory decision that completely undermined the legal basis for his conviction. Bourgeois's only claim, by contrast, is that the law governing his intellectual-disability claim continued to develop after he lost on that claim in his § 2255 motion. That is not enough. A federal prisoner is entitled to one "reasonable opportunity to obtain … judicial correction of a fundamental defect in his conviction or sentence." *Davenport*, 147 F.3d at 611. Bourgeois had that opportunity. That being so, Bourgeois is not eligible for savings-clause relief on either his *Atkins* claim or his FDPA claim.

### III. Conclusion

The question in this appeal is not whether Alfred Bourgeois is intellectually disabled. It is, instead, whether he was able to litigate his intellectual-disability claim in his § 2255 motion. He was, and he did. The savings clause is a narrow route to relief that exists only to prevent fundamental errors that § 2255 could not have corrected. It does not invite federal

prisoners to relitigate their claims every time the Supreme Court refines the relevant legal standard.

Accordingly, we REVERSE the district court's determination that Bourgeois is likely to succeed on the merits and REMAND with instructions for the district court to deny Bourgeois's motion for a stay of execution and dismiss Bourgeois's § 2241 petition.

One final matter: At oral argument, the government requested that we issue our mandate immediately. We decline that request. Instead, we exercise our authority to expedite the issuance of the mandate and adjust the rehearing deadlines. Fed. R. App. P. 35(c), 40(a), 41(b); *see, e.g., Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*, 134 F.3d 821, 829 (7th Cir. 1998). The mandate shall issue seven days after the date this opinion is issued. A petition for panel or en banc rehearing must be filed within seven days after the issuance of this opinion. A petition for rehearing shall stay issuance of the mandate until disposition of the petition. If the petition is denied, the mandate shall issue immediately upon denial.

In the

# United States Court of Appeals

## For the Seventh Circuit



CERTIFIED COPY
A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

―――――――――――

No. 20-1891

ALFRED BOURGEOIS,

*Petitioner-Appellee,*

*v.*

T.J. WATSON, Warden, and UNITED STATES OF AMERICA,

*Respondents-Appellants.*

―――――――――――

Appeal from the United States District Court for the
Southern District of Indiana, Terre Haute Division.
No. 2:19-cv-00392-JMS-DLP — **Jane Magnus-Stinson**, *Chief Judge.*

―――――――――――

On Petition for Rehearing and Rehearing En Banc

―――――――――――

December 1, 2020

―――――――――――

Before SYKES, *Chief Judge,* EASTERBROOK, KANNE, ROVNER,
WOOD, HAMILTON, BRENNAN, SCUDDER and ST. EVE, *Circuit
Judges.*

PER CURIAM. On consideration of petitioner-appellee's pe-
tition for panel rehearing or rehearing en banc, filed on

2                                                    No. 20-1891

October 13, 2020, the judges on the original panel have voted
to deny rehearing. A judge in regular active service requested
a vote on the petition for rehearing en banc. A majority of
judges in regular active service voted to deny the petition for
rehearing en banc.

Circuit Judge Wood dissents from the denial of rehearing
en banc, on the ground that in her view the petitioner is enti-
tled to a hearing on his claim that his execution will violate
the Federal Death Penalty Act, 18 U.S.C. § 3596(c), with whom
Circuit Judge Rovner joins.

Accordingly, the petition for panel rehearing or rehearing
en banc filed by petitioner-appellee is **DENIED**. Pursuant to
the panel's October 6, 2020 opinion, the mandate shall now
issue immediately.